UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011 JMA-AYS
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                       Plaintiffs,          **NOTICE OF**
                                         **MOTION**

- against -

                                            **Justice: Honorable**
VILLAGE OF BABYLON; and, RALPH          **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,          **(Shields, Anne Y., M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY          **Submitted:**
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                       Defendants.
-------------------------------------------------------------------X

## NOTICE OF MOTION

PLEASE TAKE NOTICE that upon the annexed brief, dated the 25th day of June 2021, and upon all papers filed herein, a motion will be made by the Defendants to this Court, the Honorable Joan M. Azrack presiding at the courthouse located at 100 Federal Plaza, Central Islip, New York 11722-4448 for 1) pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment dismissing the Amended Complaint; 2) pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment and/or pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for lack of service of process and failure to state a cause of action dismissing the Complaint filed under Docket No. 2:21-cv-00014 and consolidated under this docket, and dismissing the consolidated amended complaint and 3) alternatively compelling plaintiff John

Lepper to attend an additional 50-h hearing, compelling plaintiffs to attend an additional deposition and compelling discovery responses to demands to be prepared by defendants in the amended consolidated complaint and for such other and further relief as this Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that answering papers, if any, must be served within the time limits specified in the court ordered briefing schedule as entered by the Court on May 18, 2021.

Dated: June 25, 2021
        Mineola, New York

                                    Yours, etc.

                                    KELLY, RODE & KELLY, LLP
                                    Attorneys for Defendants
                                    330 Old Country Road
                                    Mineola, New York 11501
                                    (516) 739-0400

                    By:             Eric P. Tosca
                                    _____
                                    Eric P. Tosca (EPT1489)
                                    Associate Attorney

To:     LAW OFFICES OF CORY H. MORRIS
        Attorneys for Plaintiffs
        135 Pinelawn Road, Suite 250s
        Melville, New York 11747
        (631) 450-2515

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually     Docket No.: 2:18-cv-07011 JFB-GRB
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                 Plaintiffs,                  **AFFIRMATION IN**
                                                   **SUPPORT**

    - against -
                                                   **Justice: Honorable**
                                                   **Joan M. Azrack (U.S.D.J.)**
VILLAGE OF BABYLON; and,                      **(Shields Anne Y., M.J.)**
KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY          **Submitted:**
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                 Defendants.
------------------------------------------------------------------X

         Eric P. Tosca, an attorney admitted to practice before this Court, and the Courts of

the State of New York, hereby affirm and declare under penalty of perjury as follows:

         1.      I am an attorney duly admitted to practice law in the State of New York and the

United States District Court for the Eastern District of New York.

         2.      I am an associate in the firm of Kelly, Rode & Kelly, LLP, attorneys for the

defendants in this action.

         3.      I submit this affirmation in support of the defendants' motion for summary

judgment and motion to dismiss for the reasons set forth in the accompanying memorandum of

law and adopt the arguments in the memorandum of law as set forth fully herein. While any

motion to dismiss the complaint under Docket Number 21-cv-00014 was stayed by the order of this Honorable Court dated

4.      We submit that this Honorable Court should grant the motion to dismiss the complaint, including dismissal of each and every cause of action and request for relief set forth in the plaintiffs' complaint, jointly and severally.

5.      In support of the motion to dismiss the complaint, your affirmant refers to the following exhibits:

Exhibit A-Plaintiffs' Original Complaint;

Exhibit B-Plaintiff's Amended Complaint;

Exhibit C-Amended Answer of Defendants to Amended Complaint;

Exhibit D-Plaintiffs' Answer to Counterclaims.

Exhibit E-Complaint originally filed under Docket Number 2:21-cv-00014

Exhibit F-Answer to Complaint filed under Docket Number 2:21-cv-00014

Exhibit G-Amended Consolidated Complaint

Exhibit H-Answer to Amended Consolidated Complaint

Exhibit I-Pertinent Portions of Transcript of John Lepper

Exhibit J-Pertinent Portions of Transcript of Gerard Glass

Exhibit K-Pertinent Portions of Transcript of Stephen Fellman.

Exhibit L- Transcript of Ralph Scordino

Exhibit M-First Notice of Claim

Exhibit N-Second Notice of Claim

Exhibit O-Transcript of John Lepper's 50-h Hearing

Exhibit P-Pertinent Portions of Transcript of Deborah Longo.

Exhibit Q-Affidavit of Stephen Fellman

Exhibit R-Affirmation of Gerard Glass

Exhibit S-Affidavit of Suzanne Schettino

Exhibit T-Affidavit of Kevin Muldowney

Exhibit U-Affidavit of Deborah Longo

Exhibit V-Affidavit of Anthony Davida

Exhibit W-Attested Report of Joseph Danatzko, P.E.

Exhibit X-Zoning Board decision Baldauf family application for variance

Exhibit Y-letters from Linda Scordino's attorney regarding death certificate,

    Facebook posting by John Lepper offering deposition transcripts

Exhibit Z-affidavit of Mayor Mary Adams

Exhibit AA-affidavit of Robyn Silvestri

Exhibit AB-affidavit of Jean Marie Parker

Exhibit AC-affidavit of Jennifer Lister

6. Defendants submit that the plaintiffs' pleadings set forth no viable or plausible cause of action against the Defendants. The complaint/amended complaint fails to state a cause of action to sustain any civil rights claims, injunctive relief, state tort law claims or a declaration concerning the constitutionality of the ordinance which plaintiff John Lepper was found guilty of violating in state village court. For the same reasons, the complaint filed under Docket Number 2:21-cv-00014 and the amended consolidated complaint. As to the these newly filed complaints, there are additional reasons to dismiss them or the newly asserted causes of action. Plaintiff has not served the original complaint under Docket No. 2:21-cv-00014 in accordance with proper service of process under the Federal Rules and new causes of action are alleged that are time

barred. Furthermore, as to the state-based claims, plaintiff willfully deprived the defendants with a 50-h hearing.

7.      As fully set forth in our memorandum of law, the plaintiffs failed to state a cause of action in the original complaint and in the amended consolidated complaint. There is no basis to the plaintiffs' federal claims and no basis to the plaintiffs' state-based claims. Plaintiff John Lepper has sued independently in the new complaint. The complaint under docket 2:21-cv-00014 assert similar claims of civil rights violations drawn from the original amended complaint. However, Noelle Lepper and John Lepper and Noelle Lepper on behalf of their children have opted out of the that litigation, evincing an intent of Noelle Lepper and John Lepper and Noelle Lepper on behalf of their children to relinquish their claims. Aside from our arguments concerning their not have standing to sue in the first place, we submit that the claims by Noelle Lepper and the Lepper children should be deemed withdrawn.

8.      Standing to sue or not, the claims are without basis in failing to plead a factual basis warranting dismissal of the claims on a motion to dismiss or warranting dismissal on summary judgment after a review of the record.

9.      Plaintiffs' claims and tactics in litigating this case have been malicious against civil servants who have nothing more than enforce a code provision designed to protect the public and enforce a quality of life for which Plaintiffs concede was the very reason they moved to the Village of Babylon. (See Exhibit N, pages of Transcript of Noelle Lepper)

10.      Demonstrated in Exhibit   is the kind of litigation practice, in which Plaintiffs have engaged. The entire transcript of the late Mayor Scordino is attached. Questions were asked that turned out to be wholly irrelevant and immaterial. Ms. Scordino's health and the names of Ralph Scordino family members were raised for no reason. Insinuation of marital infidelity and

corruption was made without foundation and without demonstrating any relationship to the claims in this case.   There were no more than a handful of questions that were material to the claims in this case. The same may be said of Stephen Fellman's deposition.  Questions were raised about his family members, even as far removed as Mr. Fellman's stepmother.

11.   The litigation strategy pursued by plaintiffs only underscores the lack of substantive merit to the plaintiffs' claims.

12.   Specifically with reference to the complaint filed under Docket No. 2:21-cv-00014, there are new causes of action challenging the retention of Gerard Glass and claims of malicious prosecution based on dismissal of tickets issued to John Lepper based on technical procedural grounds. However, the dismissal of the tickets on procedural grounds does not provide a basis for any additional claims. The plaintiff also cites to subsequent permits issued for playhouse structures to other persons in the village to support the claims for unequal treatment.

13.   Firstly, subsequent permits cannot be a basis for claims that accrued over two years before the permits were issued.  Mr. Lepper is required to show that there is a basis for unequal treatment when he was denied a permit.  The only structure that could conceivably come close is the application of Baldauf, which was denied because the elevated tree structure was too closed to the property line after a request for a variance was made to the Village.  The Baldaufs were compelled to move their intended structure to another part of their property if they wished to proceed, which they did.  That being the only factual basis to the claims renders any claim of unequal treatment void.

14.   Secondly, the claims are otherwise repetitious and should be dismissed because of the prior action pending.  Nonetheless, the omission of Ms. Lepper and the children from the new complaint demonstrate an intent to abandon their claims.

15.     Thirdly, the new complaint suffers a jurisdictional defect. It was not served properly and as such the both the complaint under Docket No. 2:21-cv-00014 and the amended consolidated complaint must be dismissed. Lack of service was raised in our answers to both. Mr. Lepper served the complaint on a person employed by the Village and again separately on Gerard Glass at Mr. Glass' office. No other service was made, and no affidavit of service has been filed. Service by Mr. Lepper is improper since he is a party to the case. Service specifically on the Village must be served on the Village Clerk, which was not done. At the time service was made, Deborah Longo, Anthony Davida and Kevin Muldowney were no longer employed by the Village.

16.     Addressing the merits of the new complaint, we submit that John Lepper lacks standing to bring the claim. He has not demonstrated that he was still a taxpayer in the Village and brings the challenge to Mr. Glass' employment alone in any event. Moreover, Mr. Glass is an attorney. The challenge to his engagement breaches the right of the Village to choose an attorney of its own choosing. Plaintiff has no standing to challenge the contracts that the Village makes. While we submit that there is no substantive merit to Mr. Lepper's claims, if he personally sustained damages, that could be redressed by a request for monetary relief.

17.     We respectfully refer to the arguments in the attached memorandum of law addressing the legal merits to our defense to the multifaceted claims of the plaintiffs.

18.     Joseph Danatzko, P.E., attested to his findings in his report of the inspection of July 31, 2020. The findings explain multiple problems with the safety of the tree house in violation of building standards and in violation state mandated safety code provisions. The claims of the plaintiffs are rendered moot by these findings. The tree house could never be issued a permit or a certificate of occupancy even if a variance could be secured regarding the proximity of the tree house to the street. Even if all contentions of the plaintiffs as asserted were credited, the tree house

could never receive approval since the tree house is structurally unsafe.

19.     The amended consolidated complaint alleges that the defendants engaged in a conspiracy to report John Lepper to the fire department and to report Mr. Lepper to the police department. A report to the fire department because Mr. Lepper wore his uniform in public is not unlawful and not actionable. Plaintiff has no basis for an unlawful arrest. There is no allegation that any action was taken by the police department against Mr. Lepper. Nonetheless, the proof demonstrates that none of the defendants were involved in either a report to the police or the fire department. There is no evidence to support plaintiff's claims.

20.     The defendants request attorney's fees and litigation fees from the plaintiff who asserts baseless claims against the Village. The conduct of the lawsuit as demonstrated by questions posed in the depositions were designed to harass and embarrass the defendants in this matter. A host of immaterial questions were posed particularly in the deposition that infringed into the witnesses' personal lives. A video was taken of each deposition by plaintiff's counsel. To make matters worse, Mr. Lepper offered copies of the depositions to anyone who wanted a copy on social media. The purpose of asking these questions was clearly designed to publicly reveal personal information asked at the depositions. We submit that sanctions should be imposed on the plaintiffs and their counsel and that attorneys' fees should be recoverable by the defendants in defending the claims pursuant to Section 54(d)(2) of the Federal Rules of Civil Procedure.

21.     While we urge that the plaintiffs' complaints and amended complaints should be dismissed. In the event that this Honorable Court sustains any cause of action, the stay on discovery concerning damages should be lifted and Defendants should be permitted to question the plaintiff concerning the alleged damages form the allegations in the amended consolidated complaint. We are entitled to a deposition of John Lepper to ascertain his knowledge of allegations

cited in the complaint, his knowledge of reports made to the police department and the fire department, the amount of attorneys' fees he has been billed or paid, the terms of his attorneys' fees arrangement, his knowledge of Gerard Glass' representation of the Village, the reasons that he is the sole plaintiff in his 2021 summons and complaint, whether Noelle Lepper has relinquished her claims in the original complaint and his knowledge of other structures claimed in his amended consolidated complaint. We respectfully submit that Defendants should be granted leave to serve interrogatory and document demands in reference to the allegations in the allegations in the complaint filed in 2021.

**WHEREFORE,** it is respectfully submitted that the motion 1) pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment dismissing the Amended Complaint; 2) pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment and/or pursuant to Rule Rule 12(c) of the Federal Rules of Civil Procedure for lack of service of process and failure to state a cause of action dismissing the Complaint filed under Docket No. 2:21-cv-00014 and consolidated under this docket, and dismissing the consolidated amended complaint; 3) an order compelling plaintiffs to pay attorneys' fees expended in the defense of the actions brought against the Defendants; and 3) alternatively compelling plaintiff John Lepper to attend an additional 50-h hearing, compelling plaintiffs to attend an additional deposition and compelling discovery responses to demands to be prepared by defendants in the amended consolidated complaint be granted, and for such other and further relief as this Court may deem just and proper be granted in its entirety, together with such other and further relief as to this Court may deem just and proper.

Dated: Mineola, New York
     June 25, 2021

                                                Eric P. Tosca

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

Docket No.: 2:18-cv-07011 JFB-GRB

Plaintiffs,

**RULE 56.1 STATEMENT**

- against -

VILLAGE OF BABYLON; and, RALPH
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

**Justice: Honorable
Joan M. Azrack, U.S.D.J.
(Shields Anne Y., M.J.)**

**Submitted:**

Defendants.

------------------------------------------------------------------X

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DEFENDANTS VILLAGE OF BABYLON, KEVIN MULDOWNEY, s/h/a KEVIN

MULDOWNEY, Village Trustee, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA,

s/h/i/a TONY DAVIDA, Village Trustee, MARY ADAMS, Mayor, s/h/a MARY ADAMS,

Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE

SCHETTINO, s/h/a SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS,

ESQ. s/h/a GERARD GLASS, ESQ., Village of Babylon Attorney; DEBORAH LONGO, s/h/a

DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official

capacity, file this Statement of Undisputed Material Facts In Support of Defendants' Motion for Summary Judgment pursuant to Rule 56.1 of the Local Rules for the United States District Court for the Eastern District of New York.

## UNDISPUTED MATERIAL FACTS

1.      John Lepper and Noelle Lepper own and owned for all times mentioned in their first Amended Complaint the house and property located at 59 Cockenoe Road in the Incorporated Village of Babylon in the County of Suffolk, State of New York. (Exhibit B, Exhibit I)

2.      John Lepper and Noelle Lepper have two minor children who have resided for all times mentioned in the Amended Complaint at 59 Cockenoe Avenue in in the Incorporated Village of Babylon in the County of Suffolk, State of New York. (Exhibit I, pp. 1-10).

3.      The property at 59 Cockenoe Avenue fronts two public streets, Cockenoe Avenue on one side and Wampum Road on the other. (Exhibit Q affidavit of Stephen Fellman and Exhibit W, affidavit of Joseph Danatzko).

4.      John Lepper commenced construction of a wooden structure in a tree (for all times hereinafter mentioned as "the treehouse") on the property of 59 Cockenoe Road in or before May 2018.

5.      Before starting the construction of the treehouse, John Lepper did not make an application for a permit. (Exhibit I, Exhibit Q affidavit of Stephen Fellman).

6.      For all times mentioned in the Amended Complaint Stephen Fellman was and is the Village Inspection for the Incorporated Village of Babylon. (Exhibit Q, affidavit of Stephen Fellman)

7.      Stephen Fellman was informed by Anthony Davida that there was a structure being built in a tree at 59 Cockenoe Avenue in the Village of Babylon. In his capacity of Village Building

Inspector, Stephen Fellman transmitted a letter in May 2018 advising John Lepper may require a permit for a wooden structure in the tree that did not have walls or a roof.  (Exhibit Q, affidavit of Stephen Fellman, Exhibit V, affidavit of Anthony Davida).

8.    John Lepper continued construction of the treehouse after the letter requesting that he talk to Stephen Fellman in May 2018 (Exhibit Q, affidavit of Stephen Fellman).

9.    During construction of the treehouse, John Lepper went to Village Hall to obtain a permit for the treehouse on May 21, 2018 (Exhibit I, Exhibit I, Exhibit Q, affidavit of Stephen Fellman).

10.    The permit application filed by John Lepper did not contain signed and sealed plans by a licensed professional engineer or architect.  (Exhibit Q, affidavit of Stephen Fellman).

11.    All or part of the treehouse is situated less than ten feet from property line on the Wampum side of the property at 59 Cockenoe Avenue in the Incorporated Village of Babylon. (Exhibit Q, affidavit of Stephen Fellman, Exhibit W, affidavit with report of Joseph Danatzko with photographs).

12.    Specifically, the tree house is located 13 feet, 1 inch from the interior edge of the curb along Wampum Road and 4 feet, 6 inches from wood fencing adjacent to Wampum Road, and the centerline of the subject tree was located approximately 9 feet, 10-1/2 inches east and 25 feet north of the single familiar residence on the property.  (Exhibit W, affidavit with report of Joseph Danatzko).

13.    The treehouse was constructed from old timber from a boathouse owned by the Lepper family that had been destroyed in Superstorm Sandy (Exhibit W, affidavit with report of Joseph Danatzko, Exhibit I, 58-62)

14.    Except that Mr. Lepper claims that the trees were healthy when they were pruned,

no inspection was done on the tree to determine the stability of the tree to support the tree house. (Exhibit I, pp. 58-62).

15.     Mr. Lepper built the tree house and was not familiar with the Village zoning or building codes at the time he constructed the tree house. He also had no experience building a tree house with the exception of building a tree house when he was a boy. (Exhibit I, pp. 24-25, 58-60, 283-293).

16.     The tree was constructed of wood that is not pressure treated wood. (Exhibit W, affidavit with report of Joseph Danatzko).

17.     The lot area of the platform base of the tree house measures 111.7 square feet. (Exhibit W, affidavit with report of Joseph Danatzko).

18.     The platform base of the tree house is 8 feet, 8 13/16 inches above grade level. (Exhibit W, affidavit with report of Joseph Danatzko).

19.     There is electrical wiring to the tree house which is used in part to provide electricity to an outdoor light on the exterior of the tree house.   There was no electrical underwriter's certificate for any electrical components in or on the tree house.   (Exhibit W, affidavit with report of Joseph Danatzko).

20.     The only means of ingress and egress from the tree house is to go through a window, which Mr. Lepper employs the use of a free-standing ladder. (Exhibit I, pp. 90-93; Exhibit W, affidavit with report of Joseph Danatzko).

21.     On July 31, licensed professional engineer Joseph Danatzko inspected the tree house and found conditions in violation of building codes.   He opined that there were unsafe conditions in the tree house.   (Exhibit W, affidavit with report of Joseph Danatzko).

22.     Tickets were issued by the Village of Babylon to John Lepper in connection with

his construction of the treehouse.  (Exhibit R, affirmation of Gerard Glass).

    23.    John Lepper was told that he would need to obtain a variance for the treehouse and signed and sealed plans were required.  (Exhibit Q, affidavit of Stephen Fellman).

    24.    John Lepper claims that Justice Court Judge Rafter directed John Lepper to stop work on the treehouse and unplug the light to the tree house on September 4, 2018.  (Exhibit A, amended complaint, para. 66).

    25.    Though he lacked a permit and was told he needed a permit to construct the tree house, John Lepper continued construction on the treehouse.  (Exhibit Q, affidavit of Stephen Fellman).

    26.    No tickets were issued to Noelle Lepper or the Lepper children.  (Exhibit R, affirmation of Gerard Glass).

    27.    John Lepper did not apply for a variance with the Zoning Board of Appeals of the Village of Babylon.   (Exhibit R, affirmation of Gerard Glass, Exhibit Q, affidavit of Stephen Fellman).

    28.    John Lepper did not seek any remedy before the Zoning Board of Appeals of the Village of Babylon contesting that a permit was not issued for his treehouse. (Exhibit R, affirmation of Gerard Glass).

    29.    Section 365-26 of the Code of the Incorporated Village of Babylon states:

> **A.**  No building shall hereafter be erected and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall contain all information necessary to enable him to determine whether the proposed building addition or structural alterations or change of use to an existing

building comply with the provisions of this chapter and Chapter 171, Flood Damage Prevention, where applicable.

[Amended 10-24-2006 by L.L. No. 8-2006; 7-14-2015 by L.L. No. 5-2015]

**B.** No permit shall be required for a storage shed located on the same plot as a one- or two-family dwelling, provided that only one storage shed shall be located on such plot and that such storage shed shall be securely anchored to the ground, shall comply with the structural provisions of the New York State Uniform Fire Prevention and Building Code and shall comply with all other Village laws, rules and regulations. Any storage shed which, in the opinion of the Building Inspector, has become dangerous, unsound, unsafe or hazardous as a result of fire, neglect, disrepair, structural failure, collapse, vandalism or any other means shall be declared a public nuisance. Any such shed declared to be a public nuisance shall be removed in accordance with the Building Inspector's specifications.

**C.** Decks/patios; outdoor playgrounds and gyms.

[Added 9-9-1986 by L.L. No. 4-1986; amended 1-11-1994 by L.L. No. 1-1994]

> **(1)** As used in this subsection, the following terms shall have the meanings indicated:

> **DECK/PATIO**

> A single- or multi-level open flat or roof-enclosed structure composed of wood, metal, masonry or similar material.

> **(2)** Decks and patios over 18 inches in height shall conform to minimum setback requirements of the main structure. A building permit shall be required for a deck/patio which is 18 inches or more above the adjacent grade level.

> **(3)** A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet.

(Exhibit W, attested report of Joseph Danatzko)

30. The Plaintiffs did not serve their notice of claim upon the Village of Babylon thirty days or more before filing the summons and complaint in this action, Docket Number 2:18-cv-07011. (Exhibit A, summons and complaint; Exhibit M, first notice of claim).

31.     Plaintiffs did not attend a 50-h hearing pursuant to New York's General Municipal Law before filing the summons and complaint in this action, Docket Number 2:18-cv-07011. (Exhibit A, Exhibit B).

32.     The late Ralph Scordino was Mayor of the Village of Babylon served as mayor from 2020 until his death on October 29, 2020. (Exhibit L, pp. 165-172).

33.     Robyn Silvestre served as Village Trustee from July 28, 2018 and still serves as Village Trustee. (Exhibit AA, affidavit of Robyn Silvestre).

34.     Mary Adams served as Village Trustee from June 15, 2016 until she was inaugurated to the office of Mayor of the Village of Babylon on October 30, 2020.  (Exhibit Z, affidavit of Mary Adams).

35.     Kevin Muldowney served as Village Trustee and Deputy Mayor for all times alleged in the complaint until September 1, 2020 (Exhibit T, affidavit of Kevin Muldowney).

36.     Anthony Davida served as Village Trustee from 2002 until December 31, 2020. (Exhibit V, affidavit of Anthony Davida).

37.     Stephen Fellman has been employed by the Village of Babylon as Building Inspector since 1991. (Exhibit Q, affidavit of Stephen Fellman).

38.     Gerard Glass served as Village Attorney from 2018 until April 5, 2021.  (Exhibit R, affirmation of Gerard Glass).

39.     Deborah Longo had been employed by the Village of Babylon from 2008 until August 1, 2020.  (Exhibit U, affidavit of Deborah Longo).

40.     Suzanne Schettino had been employed by the Village of Babylon from 1997 until April 29, 2021.  (Exhibit S, affidavit of Suzanne Schettino).

41.     While constructing the tree house, John Lepper was aware that no permit was

issued and he continued to build the tree house expecting that a stop work order would be issued because no permit was issued. He understood that the "acceptance" of the permit application by Deborah Longo was not an approval of the permit application, but rather it would be taken for review. (Exhibit I pp. 270-271, 303, Exhibit U, affidavit of Deborah Longo)

42.     John Lepper claimed that he defended his case in the Justice Court asserting that the building code did not apply to him because the structure was under 90 square feet. (Exhibit A, plaintiffs' amended complaint, para. 71).

43.     In a video recorded interview on November 2018 with *Newsday*, John Lepper told the reporter that he and his family used the tree house as a chapel, named the GFY Chapel, the Good For You Chapel. He considered the issue one of religious freedom. (Exhibit I, pp. 160-178).

44.     John Lepper reportedly made the statement to *Newsday* to protect his rights and he had no attorney at the time he made the statement. (Exhibit I, pg. 174).

45.     John Lepper never had personal discussion about the issues of the treehouse with Mayor Ralph Scordino. (Exhibit I, pp. 307-313).

46.     Before Mr. Lepper was told he needed a permit for the treehouse, another family seeking to build a structure in a tree was told that a permit was needed (Exhibit Q, affidavit of Stephen Fellman).

47.     The owners of the Baldauf tree house were not granted a permit and were required to apply to the Zoning Board of Appeals and were required to submit signed sealed plans and a survey by a licensed surveyor in order to apply for a variance with the Zoning Board of Appeals. Their application for a variance for the tree house in violation of the setback requirements was denied. (Exhibit X, Exhibit Q, affidavit of Stephen Fellman).

48.     Stephen Fellman had issued permits to the Leppers for work performed on the

Lepper home before the tree house was built. (Exhibit Q, affidavit of Stephen Fellman).

49.     Stephen Fellman's purpose for contacting John Lepper regarding the subject tree house was to enforce the Code of the Village of Babylon.  (Exhibit Q, affidavit of Stephen Fellman).

50.     John Lepper was never told by any of the originally named defendants that they objected to his making complaints about any drugs problems in the Village of Babylon. (Exhibit I, p. 361).

51.     John Lepper handed a copy of the summons and complaint under Docket Number 21-cv-00014 to someone other than the Village Clerk at Village Hall.  John Lepper handed a copy of the summons and complaint under Docket Number 21-cv-00014 to someone in Gerard Glass' office and not to Gerard Glass.  No other summons and complaint under Docket Number 21-cv-00014 was served by John Lepper or on his behalf.  (Exhibit R, affirmation of Gerard Glass).

52.     John Lepper offered on social media to provide copies of video depositions of the defendants that were taken in the instant action. (Exhibit Y)

Dated: June 25, 2021
       Mineola, New York

                                        Yours, etc.

                                        KELLY, RODE & KELLY, LLP
                                        Attorneys for Defendants
                                        330 Old Country Road
                                        Mineola, New York 11501
                                        (516) 739-0400

                         By:            Eric P. Tosca

                                        Eric P. Tosca (EPT1489)
                                        Associate Attorney

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK   )
                       ) ss.:
COUNTY OF NASSAU   )

JENNIFER LOMONACO, being duly sworn, deposes and says:

I am not a party to this action, am over 18 years of age and reside at Mineola, New York.

On the 25th day of June 2021, I served, a true and correct copy of the within Memorandum of Law in Support and Motion for Summary Judgment, Dismissal, Compel Discovery, Table of Contents, Table of Authorities and Notice of Motion and all exhibits and attorney affirmation by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed each of the following persons at the last known addresses set forth each name:

LAW OFFICES OF CORY H. MORRIS
Attorneys for Plaintiffs
135 Pinelawn Road, Suite 250s
Melville, New York 11747
(631) 450-2515

JENNIFER LOMONACO

Sworn to before me this
25th day of June 2021

Notary Public



PAUL M. BARTKOWSKI
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in Suffolk County
01BA6395333
MY COMMISSION EXPIRES

# EXHIBIT "A"

ORIGINAL

Index № _____   **FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

# United States District Court

DEC 1 0 2018   ★

## Eastern District of New York

LONG ISLAND OFFICE

CV18 7011

JOHN LEPPER AND NOELLE LEPPER, individually and as
parents and natural guardians of their infant children,
B.J.L. and B.I.,

*Plaintiffs*

Plaintiffs Demand
a Jury Trial

*–against–*

VILLAGE OF BABYLON;
RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA,
Village Trustee, MARY ADAMS, Village Trustee;

BIANCO, J.

STEPHEN FELLMAN, Village of Babylon Building Inspector
SUZANNE SCHETTINO, Department of Public Works; GERARD
GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon, AND

BROWN, M. J.

JOHN AND JANE DOE (municipal agents, employees,
consultants and/or independent contractors) ##1–10 who might
be further identified in further prosecution of this claim,

*Defendants*

# VERIFIED COMPLAINT

### CORY H. MORRIS
LAW OFFICES OF CORY H. MORRIS
*Attorney for Plaintiffs*
VICTOR JOHN YANNACONE, JR., *of counsel*

1

## PRELIMINARY STATEMENT

1. This is a civil action seeking monetary relief, a declaratory judgment, compensatory and punitive damages, disbursements, costs and fees for violations of the Plaintiffs' rights, abuse of process, negligent and/or intentional infliction of emotional distress, and negligence, brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, the First, Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution and New York State Law.

2. Specifically, the Plaintiffs, John Lepper, Noelle Lepper, individually and as the parents and guardians of their infant son, B.J.L., and daughter, B.L., collectively referred to herein as the "Lepper family," allege that the Defendants, jointly and severally, individually and collectively, negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive them of their Constitutional rights, pursuant to the above-mentioned statutes and causes of action by committing acts under color of law and depriving the Plaintiff of rights secured by the Constitution and laws of the State of New York.

3. Defendant Village of Babylon was negligent in training, hiring and supervising its Building Inspector, Defendant Stephen Fellman ("Fellman").

4. Defendant Village of Babylon was deliberately indifferent to the need to train its Building Inspectors (inclusive of Fellman) to issue legal process in a fair manner and not for the purpose of, among other things, silencing or retaliating against dissent(ers) or those who critiqued the Village of Bablyon.

5. Accordingly, Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution, and for conspiring to condone and encourage such civil rights violations and for conspiring to violate Plaintiffs' Civil Rights.

6. As a result of the Defendants' actions (or lack thereof), Plaintiffs emotional scarring and suffering, and incurred significant cost and expenses due to the Defendants' actions, including but not limited to: substantial legal fees, loss of good name and standing in the community, emotional distress and other cost/expenses.

2

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

8. This Court is requested to exercise supplemental jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. §1367.

9. Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the events and violations herein alleged occurred was in Suffolk County, New York.

10. A Notice of Claim was filed on December 7, 2018 and Plaintiffs intend on amending this Complaint to comply with the timeliness requirements of the New York General Municipal Law § 50.

## ADMINISTRATIVE PROCEEDINGS AND TIMELINESS

11. This action has been commenced within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986.

## PARTIES

12. Plaintiff, JOHN LEPPER is a citizen of the United States, a United States Marine veteran and resides at 59 Cockenoe Avenue, in the Incorporated Village of Babylon, Suffolk County, New York.

13. Plaintiff, NOELLE LEPPER is a citizen of the United States, a United States Marine veteran and resides at 59 Cockenoe Avenue, in the Incorporated Village of Babylon, Suffolk County, New York.

14. John Lepper and Noelle Lepper his wife are the lawful owners of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in

Block F as shown on Map of Sampwam Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York (hereinafter referred to as the "Subject Property").

15. Infant B.J.L. is a six-year-old minor and the natural child born of the union of John Lepper and Noelle Lepper.

16. Infant B.L. is a five-year-old minor and the natural child born of the union of John Lepper and Noelle Lepper.

17. At all times relevant in this Complaint, and upon information and belief, DEFENDANT VILLAGE OF BABYLON, is a recipient of federal funding (whether directly or through the Town of Babylon) and was a recipient of federal funding at the time of the events complained of herein.

18. Defendant Village of Babylon is an incorporated Village located within the Town of Babylon in Suffolk County, New York.

19. Defendant Village of Babylon is governed by an elected Mayor and four elected Trustees, collectively the Babylon Village Board.

20. According to information posed on the Village of Babylon website at http://www.villageofbabylonny.gov/ Defendant Ralph Scordino, is the duly elected Mayor, Defendant Kevin Muldowney, is the Deputy Mayor, and Defendants  Robyn Silvestri, Tony Davida, and Mary Adams, are Village Trustees.

21. In the absence of Internet available information, upon information and belief, Defendant STEPHEN FELLMAN ("Fellman") is the Village of Babylon Building Inspector.

22. In the absence of Internet available information, upon information and belief, Defendant SUZANNE SCHETTINO, directs the Department of Public Works.

23. Upon information and belief, Defendant GERARD GLASS, Esq. ("Glass") is the Village of Babylon Attorney.

24. In the absence of Internet available information, upon information and belief, Defendant DEBORAH LONGO, is involved in administration of the Village of Babylon Planning Board.

4

25. JOHN AND JANE DOE (municipal agents, employees, consultants and/or independent contractors) ##1–10 who might be further identified in further prosecution of this claim.

26. All of the individual named Defendants are being sued in both their individual and official capacities.

27. Defendants Ralph Scordino, Kevin Muldowney, Robyn Silvestri, Tony Davida, Stephen Fellman, Deborah Longo, Suzanne Schettino, Gerald Glass and Mary Adams, are collectively referred to herein as "Defendants."

## THE FACTS

28. In April, 2018, Plaintiff, JOHN LEPPER, found a syringe, a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard when he was playing with his children. He informed his neighbors immediately and was outspoken in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

29. Defendants, and all of them, knew and came to learn either by direct knowledge, electronic mail correspondence or through various paper correspondence of John Lepper as a Village of Babylon resident who was outspoken regarding the crime occurring on his property and the greater problem concerning the use of illicit drugs, namely heroin, in the Village of Babylon.

30. On or about May 3, 2018, after conferring with Plaintiff NOELLE LEPPER, Plaintiff John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of Babylon.

31. The following Lepper family neighbors can see the treehouse from their property: Joe and Joanne Mineo and their sons M.M. and N.M.; Pay and Keirsten Murphy and their daughter G.; Kevin and Lyndsey and their children A. and S.; Joe and Katelyn and their two pre-school-age children, [redacted] all of whom live on

5

Cockonoe Ave; and Mike And Josephine Domingo and their three college-age daughters who live on Wampum Road.

32. By letter dated May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that "It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit."

33. Upon information and belief, a single neighbor of John and Noelle Lepper made a complaint(s) to the Defendant Mayor Ralph Scordino who, again, disseminated this information regarding John Lepper to Defendants collectively.

34. Village of Babylon Code Section 365–26, section A, states: "No building shall hereafter be erected and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall contain all information necessary to enable him to determine whether the proposed building addition or structural alterations or change of use to an existing building comply with the provisions of this chapter and Chapter 171, Flood Damage Prevention, where applicable."

35. Village of Babylon Code Section 365-26, section C, subsection (3) states "A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet."

36. In response to the May 10, 2018 letter from Defendant Fellman, Plaintiffs stopped work on the treehouse for their children.

37. On or about May 21st, 2018, Plaintiff John Lepper visited the Building Department office of Defendant Village of Babylon; completed a building permit application and submitted a front

6

elevation / framing drawing with a copy of a recent survey of the Lepper Family Home.

38. The unidentified Building Department employee, "Jane Doe", to whom Plaintiff John Lepper submitted the application commented that she usually did not receive such a detailed drawing from homeowners to which Mr. Lepper explained that he had gone to Island Drafting and Technical Institution in Amityville.

39. While at the Village of Babylon Building Department on or about May 21, 2018, Plaintiff John Lepper spoke with another employee of Defendant Village of Babylon, Holly Zappala, and told her that a used hypodermic needle was found on his property, and other used hypodermic needles were being found in the area and that he had concerns for the well-being of his family.

40. Ms. Zappala told Plaintiff John Lepper that Defendant Village of Babylon was aware of drug-related crimes and the presence of hypodermic instruments prior to April, 2018 and that she and the Village of Babylon administration may be aware of criminal activity occurring on the subject premises and toward the Lepper Family.

41. This knowledge was evidenced by the relocation of a school-bus stop located within walking proximity of the Lepper Family residence to a distance away from a home that is known by the Defendants to be involved with illegal drug use/drug abuse and/or drug sale.

42. Upon information and belief, the Village of Babylon, Defendants collectively, did conspire to silence John Lepper by taking the building permit application without any intention of reviewing or approving such application and later issuing criminal legal process against John Lepper at a later date.

43. Defendants knew of John Lepper's intention to utilize this child's play set/gym, something he constructed in a tree, to address the public concern, protect his children and exercise his first amendment and liberty interests in directing the upbringing of his youth free from the scourge of dangerous hypodermic needles.

44. Plaintiff John Lepper, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of heroin in his community, spoke to and informed everyone present in the Village of Babylon building department on May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018 to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon.

45. Defendants, and all of them, knew of Plaintiff John Lepper's concerns and knew that he was complying with a legal process to which Defendants would never review and later use against Plaintiff John Lepper in a criminal proceeding.

46. On June 15, 2018, Plaintiff John Lepper called the Village of Babylon Building Department to check on the status of his application and was told by an unidentified employee, Jane Doe, that no determination had been made as to whether Mr. Lepper's treehouse was in violation of the town code.

47. Plaintiff John Lepper immediately ceased construction and assembly of the partially fabricated treehouse as soon as he had been ordered to do so by Building Inspector Fellman.

48. Determined to either delay construction of an innocuous and code-compliant treehouse solely for the benefit of minor children, or harass and intimidate the Lepper family by destroying their infant son's eagerly anticipated birthday present, the Defendants, jointly and severally, individually and collectively, refused to issue the appropriate building permit or withdraw the "stop work" order.

49. Within hours of his son's birthday, Plaintiffs John and Noelle Lepper decided to complete the treehouse and raise their children in the manner and safe-guard them from what he had already advised the Defendants was the scourge of drug abuse and the criminal activity known to be occurring in his neighborhood and already visited upon his property.

8

50. On July 19, 2018, Plaintiffs, received by certified mail three putative accusatory instruments that stated Mr. Lepper was in violation of Village of Babylon Code § 365–26 for construction of a treehouse without a permit.

51. Although sent in July, 2018, the Village of Babylon accusatory instruments bore May, 2018 dates.

52. Such certified mailing evidences not only the conspiracy between the above state actors, it evidences the abuse of process that would later be approved, in whole, by the Village of Justice Court as prosecuted by Defendant Gerald Glass.

53. In response, on July 19, 2018, Plaintiff John Lepper immediately visited the Village of Babylon Building Department to inquire about the three summons he had received.

54. Plaintiff John Lepper was told that he needed to make an appointment with Building Inspector Fellman and a meeting was scheduled for July 24, 2018.

55. Plaintiff John Lepper met with Defendant Building Inspector Fellman on July 24, 2018 and inquired as to the nature of the accusatory instruments after receiving no notice of action on his application or any notice that he was in violation of the Code for providing a treehouse for his children.

56. As Plaintiff John Lepper asked Defendant Building Inspector Fellman about each essentially identical citation which merely concluded that a "treehouse" violated Village of Babylon Code § 365–26 Defendant Building Inspector Fellman stated that Mr. Lepper owed $250 for the first accusatory instrument, $500 for the second accusatory instrument and $1,000 for the third accusatory instrument.

57. Plaintiff John Lepper protested to Defendant Building Inspector Fellman that not only were such fines unwarranted and excessive but that no prior notice of any violation had been provided to the Lepper family.

9

58. Building Inspector Fellman told Mr. Lepper to resolve the matter in Court on August 14, 2018.

59. Defendant Building Inspector Fellman knew and operated with the approval of Defendant Ralph Scordino.

60. Upon information and belief, Defendant Fellman and Defendant Ralph Scordino conspired with the Defendants, and all of them, to be implicit in the use of fines to silence Village of Babylon citizens who were critical of Defendants, critical of the handling of crime within the Village of Babylon and addressing (or failing to address) the criminal activity reported on Plaintiff John and Noelle Lepper's property.

61. Building Inspector Fellman knew and had reason to know that Defendants, collectively, were able to utilize the Village of Bablyon Code to raise revenue from its citizens by demanding money in lieu of Court Action.

62. Upon information and belief, Ralph Scordino did act and conspire with a private citizen who requested such fines to issue for the sole purpose of removal of the Lepper Family Treehouse prior to a review of the building permit or even the Village of Babylon town code.

63. Building Inspector Fellman and the Village of Babylon engaged in requesting and obtaining monies in response to the issuance of Village of Babylon violations.

64. Village of Babylon engaged in a pattern and practice of issuing Village of Babylon Code violations against persons to obtain monies knowing that the Village of Babylon Code criminalized either innocuous, ambiguous or innocent conduct.

65. Upon information and belief, Defendant Village of Babylon is more concerned with punishing taxpaying residents and extorting unconscionable fines from them for questionable violations of obscure and arcane, vague and ambiguous ordinances extracting fines out of law abiding resident property owners than providing

municipal services such a promptly processing an application for a building permit.

66. Defendant Ralph Scordino knew and had reason to know that Village of Babylon employees conducted themselves in a manner to extract fine money under the threat of legal process and arrest, from alleged building violations to smoking at the Village of Babylon train station.

67. Defendant Ralph Scordino knew and had reason to know that Defendants, all of them, conducted themselves in a manner to extract fine money under the threat of legal process and arrest, from alleged building violations to smoking at the Village of Babylon train station.

68. Among the parents and children who visited the Treehouse prior to August 14 hearing were: Joe and Joanne Mineo and their sons, M.M. age 14 and N.M. age 16; , Pat and Kirsten Murphy and their daughter G.M., age 7; Terri McSweeney and Cindy McSweeney with E.M., age 7 and P.M., age 5; Steve Kazda and Amanda Kazda and their sons, J.K., age 6 and J.K. age 4; Mike Columbia and Christina Columbia and their daughters, C.C., age 6 and C.C., age 4; Mike Pagamo and Doreen Pagamo and M.P., age 8 and M.P., age 6; Charlie Lepper and Deena Lepper and their children, J.L., age 14; J.L., age 10, and C.L., age 8; George, age 93, a WWII veteran and Barbara

## THE VILLAGE OF BABYLON TRIAL

69. Plaintiff John Lepper who is a New York City firefighter sought an adjournment of the hearing from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illnesses from service at the 9/11 scene. Village Judge John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, arriving in Court at precisely 1400 hours still in his Class A uniform.

11

70. Village Judge John T. Rafter and Defendant Gerard Glass, the Babylon Village attorney acting as the prosecutor both knew that Mr. Lepper was unrepresented by counsel, and that he was facing fines which might amount to $1,750 together with court costs and the possibility of continued and continuing prosecution, yet at no time did Village Judge Rafter or Village Attorney Glass ever warn the Defendant or advise him not only of his right to counsel, but because of the questionable nature of the charges and the circumstances of the prosecution the real need to consult an attorney before proceeding any further in his own defense.

71. Upon information and belief, the wife of Village Judge John T. Rafter works with the complainant who instigated the prosecution of the Lepper Family for erecting a treehouse for their children and the children of the neighborhood.

72. Upon information and belief, the complainant who instigated the prosecution against the Lepper Family did influence Defendants for the purpose of silencing John Lepper.

73. Upon information and belief, Defendants, all of them, utilized the complainant to, among other things, extract monies from John Lepper, to watch him pain and endeavor to build such play set/gym for his children without acknowledging his permit application only to threaten to issue John Lepper daily fines for the same.

74. On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per Section 116 Unsafe Structures of the International Building Code the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

75. There is no evidence that the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code.

76. Defendant Village Attorney Glass requested an adjournment of the hearing scheduled for September 4, 2018 and Village Judge Rafter adjourned the case to September 18, 2018.

12

77. On September 18, 2018, Village Judge Rafter learned that the office of Defendant Village of Babylon Mayor had received a complaint regarding John Lepper.

78. Village Judge Rafter never informed Mr. Lepper, who was appearing pro se without benefit of counsel, of his rights to receive information about the complaint and the complainant; his right to challenge the accusatory instruments that merely stated "Tree House" and were unsigned as legally insufficient.

79. Nevertheless, Village Judge Rafter did inquire of Mr. Lepper, *pro se*, about his efforts at complying with the Village of Babylon Code § 365–26 and the permit application which Mr. Lepper voluntarily filed.

80. Mr. Lepper informed Village Judge Rafter that his building permit application was accepted by the employees of the Village of Babylon Building Department.

81. The following interaction took place between Mr. Lepper and Village Judge Rafter during the purported trial against Mr. Lepper (hereinafter referred to as "Village of Babylon Court Proceeding"):

"JUDGE RAFTER: Okay . Did you have an understanding of what the purpose of the permit is?

MR. LEPPER: Yes sir .

JUDGE RAFTER: What was your understanding of what the purpose of the permit was?

MR. LEPPER: A construction permit was required for a structure being put up according to building code 365-26 it's not required for under 90 square feet. And I explained that to Mr. Fellman .

JUDGE RAFTER: I will interpret the code, sir .

MR. LEPPER: Okay .

JUDGE RAFTER: Neither you nor Mr. Fellman will interpret the code."

13

82. Already, Village Judge Rafter was imputing fault on the pro se Defendant, John Lepper who had attempted to comply with what was a patently vague and ambiguous ordinance.

83. In the Village of Babylon Court Proceeding, the following question and answer ensued:

   "JUDGE RAFTER: Did you have an understanding of that before you undertook the construction?
   MR . LEPPER: Not exactly, sir. Because I did not think that a permit was required for what I was putting up."

84. Village Judge Rafter continued to make the case for the prosecutor, Defendant Village Attorney Glass, who at no time objected to the line of inquiry of the accused, Mr. Lepper.

85. In the Village of Babylon Court Proceeding, the following question and answer ensued:

   "JUDGE RAFTER: Did you contact the building department before you began construction or even contemplated construction of a tree house?
   MR. LEPPER: Yes. On the 19th when I submitted the application. Prior to the platform no , sir. I did not think a permit was required for a tree house. I was not sure."

86. Rather than credit the sworn testimony of John Lepper. A *pro se* Defendant, and presumed innocent until proven guilty beyond reasonable doubt, Village Judge Rafter continued to push the burden onto Mr. Lepper who provided sworn evidence that he submitted a permit application prior to construction and prior to the issuance of any accusatory instrument by Village of Babylon.

87. In the Village of Babylon Court Proceeding, the following question and answer ensued:

   "JUDGER RAFTER: What is the basis of your objection?
   MR . LEPPER: That was submitted on May 19th after I received the letter from Mr. Fellman regarding construction of the tree

14

> house without a permit. That was accepted by the office
> upstairs on May 19th and it was complete.

> JUDGE RAFTER : You note there is no date on this. Do you have
> any proof as to when it was received?

> MR . LEPPER : I was given a copy of the drawing I made and the
> survey that it was received ."

88. Determined to convict the *pro se* Defendant John Lepper, Village
Judge Rafter interrupts Defendant Village Attorney Glass when
questioning Defendant Building Inspector Fellman during the trial
about Mr. Lepper's contention that the Lepper Family Treehouse
did not require a permit.

89. In the Village of Babylon Court Proceeding, the following question
and answer ensued:

> "MR. GLASS: Mr. Fellman, it's your contention that under the
> Babylon Village code 365-26 there was no building permit for
> this structure -- this tree house, correct?

> MR, FELLMAN: Correct.

> MR. GLASS: Is there any provision of the Babylon Village code that
> would exempt one in the Village of Babylon from having to
> obtain a building permit based up on the facts you have testified
> to?

> JUDGE RAFTER: Mr. Glass , I think that calls for a conclusion of
> law. So I am not going to permit him to answer that.

> MR. GLASS: Okay. I have nothing further .

> JUDGE RAFTER: You can ask in his opinion as a violation of the
> code and then set forth the facts upon which he bases his
> opinion. And then I would make the ultimate determination.

> MR . GLASS: Judge, perhaps this should be the question then. Is
> there any provision of the code that exempts tree houses from
> obtaining a building permit?

> MR . FELLMAN: No .

> MR. GLASS: Okay. I have nothing further judge."

15

90. Most telling is the testimony from Defendant Building Inspector Fellman that "we can issue violations every 24 hours."

91. Defendants threat in open court would allow the Defendants to accrue such fines that would become a lien on John and Noelle Lepper's property should they not pay such fine.

92. Defendants, all of them, worked together to create such an ambiguous condition that must result in either the removal of the Lepper Family Treehouse or the removal of the Plaintiffs, completely, due to excessive daily fines for literally the presence of the Lepper Family Treehouse.

93. Defendants, collectively and independently, did act in such a matter to silence Mr. Lepper's complaints about the used hypodermic needles on his property and the concern for safety within the Village of Babylon.

94. Defendants, collectively and independently, knew and had reason to know that, although novel, Mr. Lepper created this treehouse in response to a health hazard and continued crime on and around his property.

95. Defendants worked together, by issuing legal process, refusing a permit and omitting their true intentions by mail correspondence, to create a condition that would harm not only Mr. Lepper by issuing of such summons, but harm his ability to raise his children in a manner he saw fit and in a manner free from the illegal drug use occurring on and around his property.

96. Defendants worked together to deny free use of Mr. Lepper's property by utilization of an overbroad statute and ignoring the expansive subsection that would allow the construction of the Lepper Family Treehouse.

Case 2:18-cv-07011-JMA-AYS   Document 127   Filed 07/26/21   Page 38 of 1193 PageID #: 4096

## THE VERDICT AND THE AFTERMATH

97. Village Judge Rafter convicted John Lepper by Order dated October 17, 2018 yet, as was stated on the record on November 20, 2018, did not recuse himself or allow further inquiry into his wife's relationship with the complainant who, upon information and belief, submitted a complaint against the Lepper Family Treehouse.

98. In his decision Village Judge Rafter stated that the "testimony of Stephan Fellman...established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office that a treehouse was being constructed," yet no such complaint was ever shown to Mr. Lepper although he requested a copy on several occasions, nor was it produced during the trial.

99. On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a pro se defendant in a quasi-criminal proceeding, Mr. Lepper was found in violation of Section 365–26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

100. The Order by Village Judge Rafter finding John. Lepper in violation of Section 365–26 of the Village of Babylon Code required Village Judge Rafter to use a definition of building from a dictionary since it was not defined in the Village of Babylon Code: "The Merriam-Webster Dictionary defines a building as follows; A structure that is designed or intended for support, enclosure, shelter or protection of persons, animals or property having a permanent roof that is support by columns or walls."

101. Without referring to the remaining provisions of the Village of Babylon Code governing children's play gyms and the expansive use of "any combination," Judge Rafter states "The Court hereby specifically finds that the treehouse in question constituted a "building" within the meaning of the subject Code section."

Case 2:18-cv-07011-JFB-GRB  Document 1  Filed 12/10/18  Page 18 of 47 PageID #: 18

17

102. In that same October 17, 2018 Order finding Mr. Lepper in violation of Section 365–26 of the Village of Babylon Code Village Judge Rafter states, "it is noted that the Notice of Violation is not signed by any representative of the Village of Babylon."

103. On October 17, 2018, after the Order of Village Judge Rafter was delivered by code enforcement, John Lepper went to Village Court to inquire about an appeal.

104. The next day, October 18, 2018, Babylon Village Attorney Gerard Glass sent a letter to the Lepper Family, stating, in toto, that "As you know this office is counsel to the Village of Babylon. The Court has rendered its decision. Please let me know your intentions. Thank you for your attention and courtesies herein."

105. The day after Attorney Glass sent his letter, and two days after the Order was issued, Building Inspector Fellman stated in a letter that, "On October 17, 2018 Village Justice John Rafter found you guilty of each offense listed on various summonses you received regarding the construction of a treehouse within your front yard setback. I, as Building Inspector, am ordering the continuation of the stop work order barring any further construction or occupancy of the tree house."

106. Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

107. Rather than allow the Lepper family sufficient time to appeal or seek counsel to elapse, the Defendants, jointly and severally, individually and collectively, did work together to injure the Plaintiff Lepper family; silence the Lepper family from speaking out about community problems, and did engage in an abuse of legal process to have Mr. Lepper remove the Lepper Family Treehouse.

108. Defendant Building Inspector Fellman did issue multiple additional accusatory instruments concerning the Lepper Family Treehouse on October 31, 2018.

18

109. On November 5, 2018, John Lepper paid the fines imposed on him by Village Judge Rafter in his October 17th Order.

110. On November 20, 2018, through counsel, Mr. Lepper asked the Court to enjoin the daily issuance of fines so that Mr. Lepper may resolve the new set of accusatory instruments against him on the merits but the Hon. John T. Rafter refused to do so.

111. On November 20, 2018, Defendant Glass argued and The Village of Babylon Justice Court agreed that the Court will not enjoin further fines.

112. After allowing your affiant to file an omnibus motion to dismiss the criminal charges against Mr. Lepper, Village Judge Rafter refused any application to enjoin the Village of Babylon, the Defendants, from issuing daily fines against Mr. Lepper.

113. On November 20, 2018, Village Judge Rafter stated that "I have no intention of enjoining anyone, so that application is denied."

114. On November 21, 2018, John Lepper tried to obtain copies of exhibits that were missing from the trial on September 18, 2018. After waiting two hours he was denied copies.

115. The Village of Babylon Clerk stated to Mr. John Lepper that he could not obtain Court records.

116. After waiting for two hours, on November 21, 2018, the Village of Babylon Court Clerk stated to Mr. John Lepper that she had to "check" with Defendant Gerald Glass to see if she could release such Court records to John Lepper.

117. On November 27th 3:15pm, Mr. John Lepper filed a Motion to dismiss all accusatory instruments against him with letter from Attorney Cory Morris requesting copies of Village of Babylon Court exhibits from his previous conviction.

118. Only after legal instruction and a demand from an attorney was John Lepper able to obtain Court records for which he was legally entitled.

119. November 27th, 2018, John Lepper attended the Village of Babylon Board of Trustees meeting with Joe Mineo and Nick Montalto.

19

120. John Lepper did not speak out at the Village of Babylon Board of Trustees meeting because of the continued accusatory instruments, threat the treehouse would be removed and the threat of daily accruing fines for simply creating the Lepper Family Treehouse.

121. John Lepper, threatened with the prospect of daily fines, felt silenced, humiliated and unable to exercise his first amendment rights.

122. As a citizen and taxpayer of the Village of Babylon, Defendants silenced John Lepper by the issuance of such legal process and the continued threat of legal process against John Lepper.

## ACTIONS OF DEFENDANTS COMPLAINED OF BY PLAINTIFFS

123. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper in retaliation for his speaking out about matters of public concern in and around the Village of Babylon.

124. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper to further the wishes of Defendants, collectively, for political purposes and in derogation of the constitutional rights of the Lepper Family.

125. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to Mr. Lepper carrying criminal sanctions to the Lepper Family without allowing Mr. Lepper the opportunity to comply with or otherwise challenge the actions of the Village of Babylon,

126. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to obtain monies and property for which Defendants were not entitled.

127. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions were unjustified and without probable cause or even arguable probable cause.

128. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions would cause harm to and inflict distress upon the Plaintiffs.

129. The Defendants, jointly and severally, individually and collectively, and the inability to obtain a fair trial continue to oppress the Lepper family and cast a cloud of criminality over their persons, home, and family.

130. Among the examples of the organized oppression of the Lepper family by the Defendants, jointly and severally, individually and collectively, has been the wrongful delay and outright refusal to provide Mr. Lepper with the exhibits from his trial before Village Judge Rafter.

## EQUITY

131. Defendant Village of Babylon through the threats of Building Inspector Fellman continues to insist that the Lepper family tear down and completely remove their children's treehouse under threat of daily fines of up to $1,000 each day.

132. The Lepper Family is in imminent danger of serious, permanent, and irreparable economic damage.

133. The Lepper family parents continue to live in fear that they will suffer serious economic punishment for a reasonable use of their own private property and their temerity in exercising their First Amendment rights by speaking out against the unconscionable actions of the Defendants in depriving the Lepper family of their liberty interest in raising their children as they see necessary which included trying to protect their infant children from exposure to hypodermic needles on the ground by building them a safe harbor in the air; and then retaliating against the Lepper family for speaking out.

134. The Lepper family The Lepper family Plaintiffs have no adequate remedy at law.

135. Upon information and belief, the Defendant Village of Babylon has not established any association between Village of Babylon Code Section 365–26 and the public health, safety and welfare of the residents of the Village of Babylon.

136.  That there is no substantial credible evidence that the Lepper Family Treehouse represents a threat, much less a danger, to the health, safety, and welfare of the residents of the Village of Babylon.

137. Staying enforcement of the ordinance pending the resolution of this action and a declaration of the constitutionality and enforceability of Village of Babylon Code Section 365–26 will not cause any harm and/or damage to the residents of the Incorporated Village of Babylon.

138. The Lepper Family has made no other request for injunctive relief.

## PLAINTIFFS SEEK TO DECLARE VILLAGE OF BABYLON CODE § 325–26 UNCONSTITUTIONAL

139. Mr. Lepper seeks to enjoin the enforcement of the Defendant VILLAGE OF BABYLON Code as unconstitutional.

140. The elected officials, particularly the Village Judge, and all the employees, agents of, and consultants to the Incorporated Village of Babylon have a clear and unequivocal duty to all the resident property owners of the Village to assure them peaceful and quiet enjoyment of their homes and property according to the ancient and long standing maxim of at the heart of common law equity jurisprudence, *sic utere tuo ut alienum non laedas*, enjoining everyone to use their own property in such a way as not to injure that of another.

141. Defendant Village of Babylon seeks to limit the use of the Subject Premises.

22   .

142. Defendant Village of Babylon claims it has a right to restrict the erection of structures on private property that are less than 90 square feet.

143. Village of Babylon Code §326–26 can only be enforceable if it is a proper exercise of the police powers of the State by the Village of Babylon.

144. Village of Babylon Code §326–26 should be considered a zoning regulation by Defendants Village of Babylon.

145. To impose fines and even imprisonment for erecting a "building... on any lot, plot or premises" in the Village of Babylon "until a permit authorizing the same shall have been issued by the Building Inspector" (Village of Babylon Code §326–26.) without defining "building" and the phrase, "lot, plot or premises" creates a vague, ambiguous, and essentially meaningless ordinance.

146. Each of the accusatory instruments lodged against Defendant Lepper is based on the claim that erecting a treehouse of less than 90 square feet without a building permit or variance from the Zoning Board of Appeals is a violation of the Village of Babylon Code.

## DEFENDANTS USE OF LEGAL PROCESS, FINES AND PROSECUTION IS DESIGNED TO SILENCE MR. LEPPER AND VIOLATES MR. LEPPER'S FIRST AMENDMENT'S RIGHTS

147. Defendants have constrained the ability of the Lepper family to create a treehouse for his infant children shortly after he spoke out against the criminal activity occurring within Village of Babylon.

148. Defendants knew and had reason to know that the Lepper family parents intended on building a treehouse to remove their children from and allow their children to play without the danger of contact with hypodermic needles on the ground which had been discarded from the street and public walkways onto the Lepper property.

149. Defendants knew and had reason to know that John Lepper spoke publicly and spoke out against the hypodermic needles found on

his property, crime in his community and the safety and wellbeing of his children.

150. In response to his identifying the problem of the hypodermic needles and their indication of a community drug problem and bringing the issues before the administration of the Village of Babylon, Defendants, individually and collectively, did conspire and act to deprive Mr. Lepper of his rights under the First, Fourth, Fifth, and Fourteen Amendment by ordering immediate and total removal of the treehouse he built for his children under the threat of continuing Draconian confiscatory fines and penalties.

151. Defendants, individually and collectively, did act to deprive Mr. Lepper of his rights under the First, Fourth, Fifth, and Fourteen Amendment while knowing and having reason to know that Mr. Lepper fully complied with the permit process of the Village of Babylon Code, and by obfuscating an already arcane and obscure administrative process cause injury to the Lepper family.

152. Rather than remedy the problem of drug abuse in the community or address the concerns Mr. Lepper expressed about the dangers of the discarded hypodermic needles which could have been addressed by Village of Babylon Code Enforcement, Defendants accepted the building permit which Mr. Lepper filed and the fee which he tendered without any intention of processing the application or even acknowledging its existence in their later prosecution in the Babylon Village Court.

153. Upon information and belief, Defendants did conspire and plan to issue accusatory instruments to Mr. Lepper with the ultimate goal of obtaining money, removing all remnants of a then unfinished treehouse, and punishing the Lepper family for exercising their constitutional rights.

154. On May 10, 2018, Defendants acknowledged that the treehouse did not violate any provision of the Village of Babylon Code by accepting the building permit application and fee.

24

155. Defendants concede that notice of all three violations which were each dated in May, 2018, were actually sent to Mr. Lepper in July, 2018.

156. Defendants delayed processing the Lepper family building permit for their children's treehouse and by failing to acknowledge and/or act upon the application, created a situation where fines would accrue against the Lepper family for lack of a permit and cause the Lepper family serious, permanent, and irreparable economic damage.

157. Defendants caused quasi criminal process to issue legal process against the Lepper family to silence the Plaintiff John Leffer and violate the civil and constitutional rights of the Lepper family.

158. Upon information and belief, the complainant at issue and the Village of Babylon Mayor did act and conspire with the Defendants to silence the Plaintiff Lepper family and remove their children's playhouse.

## VILLAGE OF BABYLON CODE § 325–26 FORECLOSES AGE-APPROPRIATE PRIVATE RIGHTS OF ASSEMBLY AND ASSOCIATION ON ARBITRARY GROUNDS AND ARE THEREFORE TECHNICALLY CAPRICIOUS AS WELL AND CERTAINLY UNDERINCLUSIVE.

159. Plaintiffs have constitutionally protected liberty interests in their property.

160. Plaintiff John Lepper and Plaintiff Noelle Lepper  have the right to establish a home and bring up children.

161. Plaintiff Noelle Lepper and Plaintiff John Lepper have the right to direct the upbringing and education of their infant children.

162. Plaintiff John Lepper and Plaintiff Noelle Lepper have the right and duty to nurture their children and direct their children's destiny.

Case 2:18-cv-07011-JMA-AYS Document 127 Filed 07/26/21 Page 47 of 1193 PageID #: 4105

163. Insofar as their children are concerned, Plaintiff John Lepper and Plaintiff Noelle Lepper have the right coupled with the high duty, to prepare their children for additional obligations.

164. A special respect for individual liberty in the home has long been part of our culture and our law.

165. That Defendants issued legal process to silence the Plaintiffs and to remove the Lepper Family Treehouse without reason to believe that the children's treehouse would have a negative impact on the public health and safety of the residents of the Village of Babylon and thereby violated the constitutional rights and liberty interests of the Plaintiffs without due process of law.

166. Defendants took action within the span of forty-eight hours to find Mr. Lepper guilty of a crime and then threaten daily fines if the treehouse was not removed, however, they still have not acted upon the permit application filed by the Lepper family.

167. The conviction of an unrepresented pro se John Lepper and the unjustified fines imposed by Village Judge Rafter were an unconstitutional attempt to silence Plaintiff John Lepper and intimidate him from speaking out against government ineptitude, the scourge of drugs, and his intention to do something about it on his own property.

168. Defendants actions in the prosecution of the Lepper family violated their civil and constitutional rights of the Plaintiff Lepper family, their liberty rights, and their rights to due process, enjoyment of property, freedom of assembly, and the ability to associate with one another on their property without the fear of government intrusion or reprisal.

169. Defendants violated the civil and constitutional rights of the Plaintiff Lepper family by the unsupported citation of the Lepper Family Treehouse as an unsafe structure in violation of the International Building Code without the basis therefore.

170. Defendant Building Inspector Fellman never presented any substantial credible evidence identifying the nature and manner he claimed the treehouse was an unsafe treehouse.

## DEFENDANTS ENGAGE IN A PATTERN AND PRACTICE OF VIOLATING THE RIGHTS OF PERSONS WITHIN THE VILLAGE OF BABYLON

171. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees in issuing summons and observing the First Amendment rights of persons within the Village of Babylon.

172. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees that engaged in a pattern and practice of issuing legal process for the sole purpose of generating revenue.

173. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees who issued process without a legal basis therefore.

174. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees who did not consult the Village of Babylon code prior to issuing summons.

175. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees who directed legal process, investigation and inquiry into those who spoke out against the Village of Babylon or exercise political speech.

176. Mr. Lepper voiced concern over crime and used hypodermic needles on his property to Defendants, collectively and, at times, individually.

27

177. Mr. Lepper made his intentions to remedy what he saw as a pressing health and moral concern on his property known to all of the Defendants.

178. Defendants, collectively, did act to injure Mr. Lepper by the illegal use of legal process, summons and notices stating that "Treehouse" was illegal.

179. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees as to whether a "Treehouse" was an illegal use of one's property.

180. Defendants, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control Village of Babylon employees in the other section of Village of Babylon code that allows any combination of child play set and separates the definition of building from that code.

181. Defendants, jointly and severally, individually and collectively, knew and had reason to know that Mr. Lepper exercised his right to dissent on political issues within the Village of Babylon.

182. Defendants, jointly and severally, individually and collectively, knew and had reason to know that the violations visited upon Mr. Lepper were without legal basis yet allowed such violations to be issued and prosecuted.

183. Defendants, jointly and severally, individually and collectively, utilized that legal process against Mr. Lepper for the purpose of creating a situation where Mr. Lepper was forced to remove the Lepper Family Treehouse, destroying a child's birthday present and play set, or accrue daily fines.

184. Defendants, jointly and severally, individually and collectively, knew and had reason to know that the ambiguity in the Village of Babylon code and their refusal to respond to Mr. Lepper's legal inquiries would result in such a situation that could result in the leverage of daily fines.

28

185. Upon information and belief, within a year's time, such daily fines could exceed the property value of Plaintiffs' home.

186. Defendants exercised such process and utilized such process in a pattern and practice to the detriment of persons who speak out against the Village of Babylon.

187. Defendants inhibited a pattern and practice, a deliberate indifference to such practice and/or a custom, policy, trade or usage of issuing legal process to obtain such monies to which Defendants are not entitled and to silence speech, conduct and other innocuous behaviors within the Village of Babylon.

188. Here Defendants, jointly and severally, came together to harm Mr. Lepper.

189. Defendants conducted themselves in creating affirmative acts and failing to act to intervene in the violation of Mr. Lepper's constitutional rights.

190. Further, Defendants actions were calculated to harm the beneficiaries of Mr. Lepper's labor, his children, in the use of the Lepper Family Treehouse.

191. Defendants, collectively, operated to deny Mr. Lepper a fair opportunity to be heard or obtain an understanding of what was or what would not subject him to daily fines.

192. Defendants, jointly and severally, individually and collectively, acted and failed to act in accepting Mr. Lepper's building permit application and issuing vague and ambiguous letters that would later serve as the notice for legal violations to which Defendants issued to punish Mr. John Lepper.

193. Accordingly, Plaintiffs were damaged by Defendants, jointly and severally, individually and collectively, in their failure to adequately and properly train, supervise, manage, and control Village of Babylon employees from violating the constitutional rights guaranteed to persons within the Village of Babylon in its issuance of legal process, threats of criminal action, excessive and inappropriate fines and conspiring to harm such persons.

# PLAINTIFF JOHN LEPPER'S RIGHTS ARE BEING VIOLATED BY THE THREAT AND ISSUANCE OF CONTINUED FINES

194. Village of Babylon Code Section 365–26 is criminal in nature.

195. The fines associated with Village of Babylon Code Section 365–26 are punitive, doubling and tripling and culminating in the demand for the removal of property without due process.

196. Such fines and threat of daily fine not only suppresses political speech but it is excessive under the 8th Amendment of the United States Constitution.

197. The actions of Defendants in enforcing Village of Babylon Code Section 365–26 against the Lepper family and threatening to continue enforcement with successive process and escalating fines and penalties for the very same conduct violate the Constitutional Rights of the Lepper family by subjecting them to repeated double jeopardy.

198. Mr. Lepper raised this issue before the Honorable John T. Rafter who ignored the issues, then convicted Mr. Lepper, an unrepresented, pro se defendant without any substantial credible evidence of guilt.

199. Honorable John T. Rafter not only stated that such daily fines were part of the Village of Babylon code but that the Village of Babylon Court would not enjoin anyone from issuing fines.

200. Accordingly, Mr. Lepper is without a remedy and seeks the jurisdiction of this Honorable Court to remedy such civil rights actions.

201. The accrual of multiple accusatory instruments, existing unfounded convictions of three violations and pending prosecution of further accusatory instruments establishes the imminent danger of serious, permanent, and irreparable economic damage and the likelihood that such danger will be continued based upon the sworn testimony of Defendant Building Inspector Fellman,

Plaintiff John Lepper and the Lepper family has been placed in jeopardy, repeatedly, for the same alleged criminal offense.

## PROSECUTION OF THE LEPPER FAMILY BY THE DEFENDANTS IS AN UNCONSTITUTIONAL TAKING OF THEIR PROPERTY

202. Village of Babylon Code Section 365–26 is unconstitutional:

203. Village of Babylon Code Section 365–26 as enforced by the Defendants against the Plaintiff Lepper family is unconstitutionally vague, overbroad, and violates the civil and constitutional rights of the Lepper family guaranteed to them under the First, Fourth, Fifth, and Fourteen Amendment of the Constitution.

204. Village of Babylon Code Section 365–26 fails to give Plaintiff John Lepper fair notice that building a treehouse of less than 90 square feet is forbidden by the Code.

205. Village of Babylon Code Section 365-26 does not provide guidance to ordinary homeowners as to whether building a treehouse for their infant children might be construed as a violation subjecting them to criminal prosecution.

206. Village of Babylon Code Section 365–26 encourages arbitrary and erratic arrests and convictions.

207. The accusatory instruments charging Plaintiff John Lepper with violating Village of Babylon Code Section 365-26 for building a treehouse for his infant children upon the malice and/or animosity of a neighbor.

208. Village of Babylon Code Section 365–26 fails to meet the fundamental principle of statutory construction for laws with criminal penalties, minimal guidelines to govern law enforcement.

209. As evidenced by the Kafkaesque prosecution and continued litigation over a treehouse for the infant Lepper children on their own property, Village of Babylon Code Section 365-26 allows law enforcement and local government to pursue their personal

animosity in violation of the civil and constitutional rights of the Plaintiffs.

210. Defendants actions, inactions and continued use of process against Mr. Lepper constitutes an unlawful taking under the United States Constitution.

211. Defendants threats to remove property under the threat of fine and legal process constitutes an abuse of process and violates Mr. and Mrs. Lepper's right to substantive and procedural due process.

212. Village of Babylon Code Section 365-26 has been utilized to obtain monies from Mr. Lepper under threat of continuing fines, liens on the Lepper family home, and/or jailing.

## PRAYER FOR RELIEF

213. **Wherefore** Plaintiffs demand judgment demand judgment against the Defendants, jointly and severally, individually and collectively,

214. **DECLARING**, Village of Babylon Code Section 365-26 unconstitutionally infirm.

215. **DIRECTING** and imposing a mandate upon the Defendant Village of Babylon requiring said Defendant to correct all past violations of federal and state law;

216. **RESTRAINING** Defendants, jointly and severally, individually and collectively, from continuing to violate federal and state laws;

217. **PROVIDING** such other and further equitable relief as may be appropriate under the circumstances;

218. **APPOINTING** an independent monitor and/or receiver to supervise and monitor the efforts of Defendant Village of Babylon to remedy past injustices against and persons subject to illegal uses of process, threats of daily fines, threats of criminal conviction and civil rights violations due to the exercise of their first amendment rights.

219. **AWARDING** just compensation to the Plaintiffs as appropriate general and compensatory damages in an amount to be determined at trial;

32

220. **AWARDING** appropriate punitive damages sufficient to Defendants and other Village of Babylon employees for acting in retaliation to the dissent of local citizens and for their efforts in harming Mr. Lepper and his children by destroying one of the last vestiges of Americana and the limiting Plaintiffs' ability to raise their children in a manner they see fit;

221. **AWARDING,** pursuant to 42 U.S.C. § 1988, fair and reasonable attorneys fees together with the costs and disbursements and reimbursement of all the expenses incurred by the Plaintiffs and their attorneys in the prosecution of this action of this action;

222. All together with such other and further relief as to this Court shall seem just and proper under the circumstances.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

33

DATED AT   Dix Hills, New York
           December 6, 2018

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiffs*
33 Walt Whitman Rd, *suite* 310
Dix Hills, New York 11746
Phone:  (631) 450–2515
FAX:  (631) 223–7377
Email:  Cory.H.Morris@protonmail.com

VICTOR JOHN YANNACONE, JR., (VY6405)
*of counsel*
Phone:  (631) 475–0231
Email  barrister@yannalaw.com

To:  GERARD GLASS, Esq.
     *Babylon Village Attorney*
     *On behalf of the Village of Babylon*
     153 West Main Street
     Babylon, New York 11702

## INDEPENDENT VERIFICATION

State of New York
County of Suffolk  } ss:

   Noelle Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the Plaintiffs filing this Verified Complaint and accompanying Order to Show Cause in the United States District Court, Eastern District of New York; that I have read the foregoing Verified Complaint and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of
perjury on December 6, 2018

NOELLE LEPPER

Sworn before me on the
6ᵗʰ of December, 2018

NOTARY PUBLIC

LINDA T. THYDEN
Notary Public, State of New York
No. 4947530
Qualified in Nassau County
Commission Expires February 27, 20__

## INDEPENDENT VERIFICATION

State of New York  
County of Suffolk $\Big\}$ ss:

    John Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the Plaintiffs filing this Verified Complaint and accompanying Order to Show Cause in the United States District Court, Eastern District of New York; that I have read the foregoing Verified Complaint and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of  
perjury on December 6, 2018

_____  
JOHN LEPPER

Sworn before me on the  
6ᵗʰ of December, 2018

NOTARY PUBLIC

LINDA T. THYDEN  
Notary Public, State of New York  
No. 4947550  
Qualified in Nassau County  
Commission Expires February 27, 20 19

## AFFIDAVIT OF JOHN LEPPER

State of New York

County of Suffolk $\}$ *ss:*

JOHN LEPPER, being duly sworn, deposes and says:

1.  Together with my wife Noelle Lepper I am the lawful owner of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in Block F as shown on Map of Sampwam Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York.

2.  I am writing this affidavit with the intent to try and explain why we decided to build our treehouse and what we were trying to accomplish by having it.

3.  My wife and I  decided that we were going to start our family in 2012. So we started looking for a home that would be suit our needs. We were moving from Amityville and always thought that Babylon was a perfect fit, beautiful friendly beach community with a lot to offer.

4.  In May 2012 we closed on what we thought was the perfect house that we would eventually make our home. It was a beautiful two and a half story colonial built in 1924 or at least that's what I thought. My wife didn't have the same vision.

5.  The house was beautiful but it was tired; meaning that it would need to be fully restored. So we reached out to an architect that we knew, gave him a few ideas of what we were looking for, and a month or so later we had our final drawings and filed for our construction permit.

6.  We had to get a variance for the project because of an extension and wrap around porch. On July 7,2012 my wife and I were

2

blessed with our first child Bayden James Lepper. It was a great start to a new chapter of our lives.

7. Unfortunately October 29,2012 when hurricane Sandy came through our area we like so many others in our area along the shore suffered a devastating loss. We were fully involved in the renovation of our new home at the time which was uninhabitable and the house we were renting was just washed out by hurricane Sandy.

8. We had almost four feet of water through the first floor of our house. So my wife and I took our four month old son and we moved into a hotel for the next six months.

9. A major setback but my wife and I were still looking forward and trying to stay optimistic still feeling so blessed from the birth of our son Bayden and the new home that we were building for our family. A lot of additional stress and financial hardship but we made it through putting it all behind moving into our new home in April 2013.

10. It's definitely taken a toll on us and as much as we don't like to talk about it I still feel that we haven't fully recovered from our losses yet. Probably because we were blessed again on October 27, 2013 with our daughter Brianna.

11. Now being somewhat settled in our new home I feel that I'm finally getting a chance to truly embrace being a father and it is by far the most rewarding thing that I have ever done. It has made me a better person and I was already pretty awesome. I feel that being a father truly made me a selfless person and there is nothing that I enjoy more than giving and spending ever minute that I have available with my family.

12. I think for myself and probably most parents when you bring someone into this world who didn't ask to be here who relies 100% on you for protection, guidance and unconditional love at the very least you can give that to them!

13. My most important goal in life since having my children is to hopefully live up to their expectations.

14. In May of 2016 our daughter Brianna was diagnosed with Gaushers Disease, a rare lysosomal blood disorder. The months leading up to Brianna's diagnosis were emotionally exhausting on

Case 2:18-cv-07011-JMA-AYS   Document 127   Filed 07/26/21   Page 60 of 1193 PageID #: 4118

3

my wife and I. If you want to know what dying feels like it's when one of your kids is sick and you no one has an answer for what's wrong and all of the symptoms are pointing toward cancer. Thankfully that wasn't our diagnosis, Gaushers Disease type 1 was ours.

15. Brianna will live a pretty normal life and when I say pretty normal there are a lot of things now and in the future that we need to watch out for. My wife and I were bringing Brianna to Cohen's Children's Hospital weekly for the first year for her infusions.

16. After the first year we able to have a nurse come to our house and do the infusions at home which was good but emotionally draining for our four year old daughter.

17. Our daughter liked the nurses at Cohen's better. Thankfully my wife Noelle is a registered nurse and was able to be trained to do Brianna's infusions herself which is great but now it takes an emotional toll on Noelle. It's not easy to be a mother to the person you're supposed to be protecting but still have to be the one inflicting pain on a weekly basis for a two and a half hour infusion. That's more than enough for any family to have to endure.

18. Which brings me to the reasons for writing this letter. In April of 2018 While playing with my kids in the yard I saw what looked like a needle next to my fence. I went to get a closer look and to my surprise it was a needle in plain sight in a spot where my kids could have picked it up. I couldn't believe what I had just found in my bushes I took it in the house to show my wife and we notified a few of the neighbors of what we had just found. One of our neighbors told us that they had found the same thing by their house.

19. Being a member of the FDNY I'm well aware of the opioid epidemic but was still surprised and a little taken back to find something like that in our neighborhood. We choose this area to raise our family hoping to never see anything like this.

20. Anyway it happened. We found what we found and we moved forward with our eyes open a little wider. I spoke to my wife and told her that I would like to build the kids a treehouse and would like to try and have it done for Bayden's seventh birthday I had

4

vacation coming up and we just had our 150 year-old boathouse taken down in Amityville at the house that we previously rented from my mother so we were going to use the old heavy timbers and some of the old siding from it.

21. I started the project May 3rd 2018 and on May 10th we received a letter from the village of Babylon building inspector Mr. Steve Fellman stating that the structure that we were building might require a permit.

22. I stopped work on the treehouse and on May 21st I went to the village building department and filled out the building permit application and submitted a front elevation / framing drawing with a copy of a recent survey from our renovation of our home in 2012.

23. The woman that accepted it in the building department actually commented on the drawing that I submitted she said that she usually didn't receive such a detailed drawing from homeowners I explained to her that I had gone to Island Drafting and Technical Institution in Amityville where the building inspector Mr. Fellmen has his architectural firm.

24. I had also explained why we had decided to build our treehouse to Holly Zappala one of the other women working in the building department office and a neighbor of ours and I told her what we had found in our bushes. She told me that she was aware of a few other incidents that had happened in the past and that she might have an idea of who might have left that needle in our bushes.

25. I had let everyone in the building department know that it was my intention to build the treehouse for our sons birthday on July 7th.

26. Somewhere around June 15th I called the building department to check the status of our application and was told that no determination had been made yet and I reminded whoever I spoke with that we were trying to build the treehouse for our sons birthday on July 7th.

27. Not hearing anything from the building department on June 30th I had already built the walls of the treehouse in our garage and erected the walls to show our son what daddy was doing in the garage for the past few days and to show him what we were trying to accomplish for his birthday.

5

28. The week of July 4th I expected to either receive a stop work order or our building permit. Not receiving either one I figured I would continue to work on the treehouse for our son until someone called or we received a stop work order or were issued our permit.

29. We never heard anything from the village until July 19th when my wife received a certified envelope with three violations in it the Violation said that we were in violation of Babylon Village Bldg Code 365–26 construction of a treehouse without a permit.

30. On July 19th I brought the envelope down to the building department to inquire about the violations and was told that I needed to make an appointment with Mr. Fellman the building inspector and he would explain what the violations were for.

31. The woman scheduled our meeting for July 24th at 3pm and when I meet Mr. Fellman on July 24 and asked what the violations were for as I pulled each on out of the envelope he was very curt as he started rattling off dollar amounts that I owed he said the first  one was $250, the second one was $500 & the last one was a thousand.

32. My response to him was how could you expect anyone to pay for three violations for three separate day that all came in the same envelope.

33. Not allowing me any time to respond to the first violation. Never even receiving a Stop Work Order, Permit Application Denial letter or a Notice of Violation. So that pretty much how that meeting went and Mr. Fellman told me that he would see me in court on August 14.

34. I felt this was in retaliation for my views and opinions voiced publicly to the Village of Babylon concerning the crime that occurred on and around my property and concerning the greater issue of heroin use and crime in the Village of Babylon.

35. I left the building department with a copy of Babylon Village bldg. code 365-26 C. Decks/Patios; outdoor playgrounds and gyms. (3) A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet.

6

36. The treehouse we constructed for Bayden is under the 90 square feet and does not require a permit. I felt pretty confident that this would be resolved on August 14th.

37. I also contacted an attorney who is a friend of the family to consult with him on the matter and also to ask him if he wouldn't mind requesting an adjournment to the later 7pm session on August 14 or possibly a later date as I had a plaque dedication for a friend and colleagues from the fire department who had died one year prior due to 9/11 related injuries.

38. That request was denied immediately! When I showed up to court on August 14th for court I had to leave my friends plaque dedication an hour after it started in Manhattan to make it on time to my 2pm court hearing. I made it at exactly 2pm still in my class A fire department uniform.

39. I was never informed of my rights as a pro se defendant and had no idea that I could be subject to such fines against my property that may result in the taking of my property.

40. At no time did I intend to break the law nor did I break the law.

41. I complied with the Village of Babylon code as it was written in constructing a tree house for the safety of my children and in response to the crime occurring on and around my property to which Defendants refused to address.

42. I feel that I was the subject of retaliation and am now the subject of a criminal prosecution for building a treehouse for my children.

43. The Village of Babylon, through its various employees and agents, have threatened to issue daily fines if I do not take the tree house down.

44. I never received a response to my permit application from the Village of Babylon.

45. It seems clear that the Village of Babylon, Defendants herein, have no intention of allowing me or my children to have a treehouse at our home.

46. The Village of Babylon, through the Defendants named herein and the Honorable John T. Rafter, have allowed and intend to allow daily fines to issue for building a play set/gym in the form of a treehouse for my children.

7

The above is a true and accurate statement sworn to me under the penalties of perjury.

JOHN LEPPER

Sworn to before me on
December __6__ 2018

Notary Public

LINDA T. THYDEN
Notary Public, State of New York
No. 4947550
Qualified in Nassau County
Commission Expires February 27, 20 _19_

Submitted by

CORY H. MORRIS (CM 5225)
*Attorney for the Plaintiffs*

email Cory.H.Morris@protonmail.com

To : GERARD GLASS, ESQ., *Village Attorney*
Village of Babylon
153 West Main Street
Babylon, NY 11702
email gg@glasslaw.com

## AFFIDAVIT OF NOELLE LEPPER

State of New York
County of Suffolk  } *ss*:

NOELLE LEPPER, being duly sworn, deposes and says:

1. I am the wife of John Lepper and together with my husband I am the lawful owner of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in Block F as shown on Map of Sampwam Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York.

2. John and I lived in Amityville for 8 years together. When we decided to start a family we knew Babylon was our first choice to buy a home and start a family. We believed Babylon village had everything a growing family wants a quiet safe community with great neighbors, excellent schools and amazing variety of restaurants and stores.

3. John and I wanted to be close to the village so we found a home for sale in the "indian section" on Cockonoe Ave. I was not happy with the home it was a 1920's colonial that needed a complete renovation. John told me he could turn this house into a home and to trust his "vision". I was skeptical, but knew he was an Amazing Contractor and Architect. John completed the renovation in April 2013 and made the house into a beautiful home for our family.

4. Cockonoe Ave and our surrounding streets are filled with hard working families who just like us are trying to raise their families with values like kindness, respect, and love. We have been blessed with two children Bayden who turned 6 in July and

2

Brianna who turned 5 in October. We live on a street with many young kids.

5.  Our bus stop is in front of our house and we have 14 kids at our stop ages kindergarten to sixth grade.

6.  In April of this year John was in the backyard with the kids playing on the hammock. John was pushing them and the kids were laughing and singing songs with each other. John suddenly got distracted, something caught his eye, it was a hyperdermic needle on the ground next to our fence post. It was in reach and aim of Bayden and Brianna. When John showed me what he found I immediately felt nauseous to my stomach. We notified our surrounding neighbors what we found and much to our surprise our neighbor Pat and Keirsten Murphy fond a needle on their property as well.

7.  We were horrified angry and most of all scared! How could we protect our kids if our own backyards aren't safe? It was then that John approached me with the idea ... He wanted to build Bayden a treehouse for his 6th Birthday. I knew John would build a safe and fun place for our kids to make amazing memories together. Growing up with a treehouse is every child's dream. It is a place where children can use their imagination to create endless adventures.

8.  In May of 2018, John started building the platform for the treehouse. As Bayden and Brianna watched Daddy building the platform they immediately wanted to know what Daddy was doing? When he told them he was building a treehouse for them and he would have it ready for Baydens BD they were the happiest kids on the planet. They started telling everyone they knew and even people they didn't. Bayden would tell strangers he saw in the grocery store, "My daddy is building me a treehouse!" Their response was you're the luckiest boy in the world.

9.  Soon all of the kids on the street found out and would come down to watch John build. Bayden and Brianna talked about the treehouse all day long. They were in school still and at the bus stop the parents told John my kid is so excited for the tree house to be built. That is all they talk about.

10.  Bayden and Brianna talked about what games they would play in the treehouse they had it all planned: they were going to bring

3

their favorite board games Candy land and Chuks and Ladders, and Bayden was bringing his Po Kemon, Star Wars and Batman toys and Brianna was bringing her Barbies, Shopkins, and Her favorite hello Kitty house to play.

11. They asked me to buy them water guns so they could spray Daddy when he was mowing the lawn. One day when John was working on the treehouse. I took the kids to Phelps Lane Park where they have a pirates playground. When we left, I heard them talking in the back seat, Bayden told Brianna, "When Daddy finishes our treehouse we could play pirates in the treehouse!" Brianna's response was "Yeah it will be so much fun!" Yes it was all they talked about!

12. After the platform was done and John put the walls up Bayden and Brianna started getting more excited. They talked about how Bayden's Birthday party would be "The Best Party Ever!" Bay told John and I. Bayden said, "I can't wait to have all my friends come over and play in our treehouse, this will be the best day of my life!"

13. I have come to learn that because of my husband's building of the treehouse and his outspoken view regarding the heroin use in the Village of Babylon, he has suffered criminal accusations.

14. I have come to learn that the Village of Babylon intends on issuing daily fines if my husband does not remove the treehouse from the property.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

4

The above is a true and accurate statement sworn to me under the penalties of perjury.

NOELLE LEPPER

Sworn to before me on
December __6__ 2018

Notary Public

LINDA T. THYDEN
Notary Public, State of New York
No. 4947550
Qualified in Nassau County
Commission Expires February 27, 20 __1 9__

Submitted by

_____
CORY H. MORRIS (CM 5225)
*Attorney for the Plaintiffs*

email Cory.H.Morris@protonmail.com

To :  GERARD GLASS, ESQ., *Village Attorney*
      Village of Babylon
      153 West Main Street
      Babylon, NY 11702
      email gg@glasslaw.com

Case 2:18-cv-07011-JFB-GRB   Document 1-1   Filed 12/10/18   Page 1 of ~~1~~ PageID #: 18

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 10 2018 ★

LONG ISLAND OFFICE

JS 44 (Rev. 01/29/2018)                **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
John Lepper, Joelle Lepper individually and as parents and natural custodians of infant Children BJ1 and BJ

DEFENDANTS Village of ... Ralph Scordino, Kevin Muldoveney, Robyn Silvestri, Tony Davola, Mary Adeuce, Stephen Fellner, Sirene Scottino,

**(b)** County of Residence of First Listed Plaintiff   Suffolk NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Gerard Glass, Deborah

IN U.S. PLAINTIFF CASES ONLY)   Longo - Jane
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF   John + Jane
THE TRACT OF LAND INVOLVED.    Doe #1-10

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Cory H. Morris P.C., 35 West Whitmanred
Suite 310, Dix Hills NY 11746, 631-450-2515

Attorneys *(If Known)*
Suffolk, County   Gerard Glass, ESG.

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

CV18   7011

BIANCO, J.
BROWN, M.J.

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability | | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☒ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | **IMMIGRATION** | |
| | | ☐ 555 Prison Condition | ☐ 462 Naturalization Application | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | |

**V. ORIGIN** *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* 42 USC 1983, 1985 and 1986 - 1st Am, 4th Am, 5th Am, and 8th Am to U.S. Const.
Brief description of cause:   Issuing of excessive and unreasonable fines, 1st Am Violations, etc.

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $   CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   December 10, 2018   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**
RECEIPT # 26702   AMOUNT $400.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

**Case is Eligible for Arbitration** [ ]

I, _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

[X] monetary damages sought are in excess of $150,000, exclusive of interest and costs,

the complaint seeks injunctive relief,

the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County?     [ ] Yes     [X] No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?     [ ] Yes     [ ] No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?     [X] Yes     [ ] No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:

If your answer to question 2 (b) is "No", does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?     [ ] Yes     [ ] No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

[X] Yes          [ ] No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

[ ] Yes   (If yes, please explain   [X] No

I certify the accuracy of all information provided above.

Signature: _____

Last Modified: 11/27/2017

# EXHIBIT "B"

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Eastern District of New York

ECEIVED

DEC 21 2018

VILLAGE CLERK'S OFFICE

JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I.

*Plaintiff(s)*

v.

VILLAGE OF BABYLON; and, RALPH SCORDINO,
Mayor, KEVIN MULDOWNEY, Deputy Mayor,
ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village Tru

*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.   2:18-cv-07011 JFB-GRB

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee,
MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building
Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS,
Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of
Babylon, each individually and in their official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants, 153 West Main Street, Babylon, NY 11702

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:      CORY H. MORRIS (CM 5225)
                                 33 Walt Whitman Rd, suite 310
                                 Dix Hills, New York 11746
                                 Phone: (631) 450-2515

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.



DOUGLAS C. PALMER
*CLERK OF COURT*

Date:  **12/18/2018**

*s/ Jean Bollbach*

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.  2:18–cv–07011 JFB-GRB

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

2:18–cv–07011 JFB-GRB

# United States District Court

## Eastern District of New York

JOHN LEPPER AND NOELLE LEPPER, individually and as parents and natural guardians of their infant children, B.J.L. and B.I.,

*Plaintiffs*

–against–

VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants,

*Defendants*

## AMENDED VERIFIED COMPLAINT

### CORY H. MORRIS
LAW OFFICES OF CORY H. MORRIS
*Attorney for Plaintiffs*
VICTOR JOHN YANNACONE, JR., *of counsel*

i

# TABLE OF CONTENTS

Plaintiffs demand a trial by Jury ..................................................................1

Preliminary Statement .................................................................................1

Introduction ...................................................................................................1

I.   Jurisdiction and Venue ..........................................................................2

II.  Administrative proceedings and timeliness .........................................2

III. Parties.....................................................................................................3

IV.  The Facts ................................................................................................5

V.   Actions of Defendants complained of by Plaintiffs............................24

VI.  The basis for equitable relief...............................................................25

VII.    First cause of action for injunctive relief.......................................26

VIII.   Defendants use of legal process, fines and prosecution is
        designed to silence Mr. Lepper and violates the First Amendment
        rights of the Lepper family ..............................................................27

IX.  Village of Babylon Code § 325–26 forecloses age-appropriate
     private rights of assembly and association on arbitrary grounds
     and are therefore technically capricious as well and certainly
     underinclusive. .....................................................................................30

X.   Plaintiffs' rights are being violated by the threat of continued fines........31

XI.  Prosecution of the Lepper family by the Defendants for alleged
     violations of Village of Babylon Code Section 365–26 is an
     unconstitutional taking of their property .............................................32

XII.    Plaintiffs seek a judgment declaring that they are entitled to
        trial by jury on charges of violating Village of Babylon Code
        Section 365–26 ...................................................................................33

XIII.   Eighth Amendment and excessive fines ...........................................34

XIV.   42 U.S.C. §1983: "Monell" claim ......................................................36

XV.  State Law Claims...................................................................................37

ii

XVI.   Negligence .................................................................................38

XVII.   Abuse of process ......................................................................38

XVIII.   Negligent and/or intentional infliction of emotional distress ..........39

XIX.   Defamation ...............................................................................40

XX. Prima facie tort ..........................................................................40

XXI.   Injuries and Damages ...............................................................40

Prayer for relief ................................................................................41

Parents' Verifications ........................................................................43

1

## PLAINTIFFS DEMAND A TRIAL BY JURY

### PRELIMINARY STATEMENT

This is a civil action seeking a declaratory judgment and equitable relief against, and compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from, the Defendants for violating Plaintiffs' civil, constitutional, and human rights, under the Fourth, Fifth and Fourteenth Amendment to the United States Constitution and New York State Law; and to recover compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants for their negligence, abuse of process, negligent and/or intentional infliction of emotional distress, and prima facie tort.

### INTRODUCTION

1. Plaintiffs, John Lepper and Noelle Lepper, individually and as the parents and guardians of their infant son, B.J.L., and daughter, B.L., collectively referred to herein as the "Lepper family," allege that Defendants, jointly and severally, individually and collectively, intentionally, knowingly, wantonly, negligently, and/or recklessly, sought to and did wrongfully deprive the Lepper family of their civil, constitutional, and human rights by committing acts under color of law which depriving the Lepper family of their civil, constitutional, and human rights.

2. Plaintiffs, John Lepper and Noelle Lepper, individually and as the parents and guardians of their infant son, B.J.L., and daughter, B.L., collectively referred to herein as the "Lepper family," allege that Defendant Village of Babylon was negligent in training, hiring and supervising its Building Inspector, Defendant Stephen Fellman and was deliberately indifferent to the need to train its Building Inspectors.

3. Plaintiffs, John Lepper and Noelle Lepper, individually and as the parents and guardians of their infant son, B.J.L., and

2

daughter, B.L., collectively referred to herein as the "Lepper family," allege that Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution, and for conspiring to condone and encourage such civil rights violations and for conspiring to violate Plaintiffs' Civil Rights.

## I.     JURISDICTION AND VENUE

4.  The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

5.  This honorable Court is requested to exercise supplemental jurisdiction with respect to Plaintiffs' State Law claims pursuant to 28 U.S.C. §1367.

6.  This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, and 42 U.S.C. § 2000d.

7.  This action is also brought pursuant to the Declaratory Judgment Act, under 28 U.S.C. §§ 2201–2202, to address the specific and anticipated harm Plaintiffs and all other similarly situated residents within the Village of Babylon face.

8.  Declaratory relief is necessary whether or not Defendant Village of Babylon discontinues prosecution so long as the threat of prosecution for violation of Village of Babylon Code Section 365–26 continues to exist.

9.  Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the events and violations herein alleged occurred was in Suffolk County, New York.

## II.     ADMINISTRATIVE PROCEEDINGS AND TIMELINESS

10. This action has been commenced within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 42 U.S.C. § 1986.

3

11. There are no effective New York state or federal administrative remedies available to the Lepper family.

12. Plaintiffs have exhausted any potentially effective administrative remedies.

13. On or about December 7, 2018, Plaintiffs filed a Notice of Claim against the Village of Babylon.

14. Plaintiffs avail themselves of the General Municipal Law Section 50-H for the purpose of an examination.

### III.  PARTIES

15. Plaintiff, JOHN LEPPER is a citizen of the United States, an honorably discharged United States Marine presently employed as a member of the Fire Department of the City of New York and resides at 59 Cockenoe Avenue, in the Incorporated Village of Babylon, Suffolk County, New York.

16. Plaintiff, NOELLE LEPPER is a citizen of the United States, and resides at 59 Cockenoe Avenue, in the Incorporated Village of Babylon, Suffolk County, New York.

17. John Lepper and Noelle Lepper his wife are the lawful owners of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in Block F as shown on Map of Sampwam Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York (hereinafter referred to as the "Subject Property").

18. Infant B.J.L. is a six-year-old minor born of the union of John Lepper and Noelle Lepper.

4

19. Infant B.L. is a five-year-old minor born of the union of John Lepper and Noelle Lepper.

20. Collectively, John Lepper and Noelle Lepper his wife, Infant B.L. and Infant B.J.L. are referred to herein as "Plaintiff" or "Plaintiffs."

21. At all times relevant in this Complaint, and upon information and belief, DEFENDANT VILLAGE OF BABYLON is a recipient of federal funds and was a recipient of federal funding at the time of the events complained of herein.

22. Defendant Village of Babylon is an incorporated Village located within the Town of Babylon in Suffolk County, New York.

23. Defendant Village of Babylon is governed by an elected Mayor and four elected Trustees, collectively the Babylon Village Board.

24. According to information posted on the Village of Babylon website at http://www.villageofbabylonny.gov/ Defendant Ralph Scordino, is the Mayor, Defendant Kevin Muldowney, is the Deputy Mayor, and Defendants Robyn Silvestri, Tony Davida, and Mary Adams, are Village Trustees.

25. Defendant Village of Babylon, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee, Mary Adams, Village Trustee; collectively the Babylon Village Board, STEPHEN FELLMAN, Defendant SUZANNE SCHETTINO, Defendant GERARD GLASS, Esq. and Defendant DEBORAH LONGO are referred to collectively as "Defendants" or "Defendant."

26. Upon information and belief, Defendant Stephen FELLMAN is the Village of Babylon Building Inspector; Defendant SUZANNE SCHETTINO, directs the Department of Public Works; Defendant GERARD GLASS, Esq. is the Village of Babylon Attorney; and Defendant DEBORAH LONGO, is

5

involved in administration of the Village of Babylon Planning Board.

27. All of the individual named Defendants are being sued in both their individual and official capacities.

### IV.    THE FACTS

28. In April 2018, when he was playing with his children, Plaintiff, John Lepper, found a syringe, a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard. He informed his neighbors immediately and was outspoken in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

29. The following is a true and accurate aerial view of the Lepper property and its surrounding neighborhood identifying the location where the hypodermic needle was found.

6



7

30. On or about May 3, 2018, after conferring with Plaintiff Noelle Lepper, Plaintiff John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from potential contact with the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of. Babylon.

31. The following Lepper family neighbors can see the treehouse from their property: Joe and Joanne Mineo and their sons M.M. and N.M.; Pay and Keirsten Murphy and their daughter G.; Kevin and Lyndsey Cunningham and their children A. and S.; Joe and Katelyn and their two pre-school-age children all of whom live on Cockonoe Ave; and Mike And Josephine Domingo and their three college-age daughters, Anna, Giovanna and Lucia who live on Wampum Road, Village of Babylon, Suffolk County New York.

32. By letter dated May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that "It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit."

33. Village of Babylon Code Section 365–26, section A, states: "No building shall hereafter be erected and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall contain all information necessary to enable him to determine whether the proposed building addition or structural alterations or change of use to an existing building

8

comply with the provisions of this chapter and Chapter 171, Flood Damage Prevention, where applicable."

34. Village of Babylon Code Section 365-26, section C, subsection (3) states "A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet."

35. In response to the May 10, 2018 letter from Defendant Fellman, Plaintiffs stopped work on the treehouse for their children.

36. Upon information and belief, Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee are jointly and severally, individually and collectively, responsible for allowing such notice to be sent to Plaintiffs.

37. According to statements made by Defendant Gerald Glass in open Court on December 10, 2018, Defendant elected officials Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee, Mary Adams, Village Trustee, sought to enjoin Plaintiffs use of their property in exchange for monies to which Defendants, jointly and severally, individually and collectively, by and on behalf of the Village of Babylon sought to take from the Plaintiffs as homeowners by improper attempts to enforce Village of Babylon Code Section 365–26.

38. On or about May 21st, 2018, Plaintiff John Lepper visited the Building Department office of Defendant Village of Babylon; completed a building permit application and submitted a front elevation/framing drawing with a copy of a recent survey of the Lepper Family Homestead.

39. The following is a true and correct copy of the survey of the Lepper property indicating the location of the children's treehouse.



9

1-STORY FRAME GARAGE
FRAME GARAGE
CONCRETE DRIVEWAY
WAMPUM ROAD
COCKENOE AVENUE
OWNERS:
JOHN LEPPER & NOELLE LEPPER
FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK
FRANKLIN FIRST FINANCIAL
SAMPAWAM PARK-ANNEX
SUFFOLK COUNTY, NEW YORK
SCALE: 1"=20'
DATE: MARCH 16, 2012
LISA McQUILKIN
LAND SURVEYING
274 EAST MAIN STREET
EAST ISLIP, N.Y. 11730
ELEVATIONS ASSUMED DATUM
STATE OF NEW YORK
69 COCKENOE AVENUE, BABYLON

40. Upon information and belief, Defendants jointly and severally, individually and collectively, failed to act upon or even acknowledge Plaintiffs' efforts to comply with the Village of Babylon Code.

41. Defendants, jointly and severally, individually and collectively, knew and/or had reason to know that the Plaintiff Lepper parents sought to use their real-property in a manner that would contribute to and benefit the education and personal growth of their infant children.

42. Defendants, jointly and severally, individually and collectively, never intended to act upon Plaintiffs' building permit application.

43. The unidentified Building Department employee, "Jane Doe", to whom Plaintiff John Lepper submitted the application commented that she usually did not receive such a detailed drawing from homeowners.

44. On or about May 21, 2018, while at the Village of Babylon Building Department office, John Lepper spoke with another employee of Defendant Village of Babylon, Holly Zappala, and told her that he had found a used hypodermic needle on his property, and other used hypodermic needles were being found in the immediate neighborhood of his property and that he had concerns for the well-being of his family.

45. Ms. Zappala told Plaintiff John Lepper that Defendant Village of Babylon was aware of drug-related crimes and the presence of hypodermic instruments prior to April 2018 and that she and the Village of Babylon administration may be aware of criminal activity occurring on the subject premises and toward the Lepper Family.

46. Plaintiff John Lepper, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of drugs in his community, spoke to and informed everyone present in the building department on

11

May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018 to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon.

47. Defendants, jointly and severally, individually and collectively, apparently intended to take advantage of the voluntary, but not legally required, application filed by John Lepper for a permit to construct a tree house for his children as a vehicle to charge Plaintiffs with violations of Village of Babylon Code Section 365–26 and collect fines from Plaintiffs by simply refusing to consider and act upon the application by Plaintiff, John Lepper.

48. On June 15, 2018, Plaintiff John Lepper called the Village of Babylon Building Department to check on the status of his application and was told by an unidentified employee, Jane Doe, that no determination had been made. At this point no one representing the Village of Babylon had mentioned anything about constructing the proposed treehouse being a violation of Village of Babylon Code Section 365–26.

49. Plaintiff John Lepper immediately ceased construction and assembly of the partially fabricated treehouse as soon as he was ordered to do so by Building Inspector Fellman.

50. Determined to either delay construction of an innocuous and code-compliant treehouse solely for the benefit of minor children, or harass and intimidate the Lepper family by destroying their infant son's eagerly anticipated birthday present, the Defendants, jointly and severally, individually and collectively, refused to issue the appropriate building permit.

51. Therefore, within hours of their son's birthday, Plaintiffs John and Noelle Lepper completed the treehouse to safe-guard their children from what Defendants, jointly and severally,

12

individually and collectively, knew or should have known was the scourge of drug abuse and the criminal activity known to be occurring in the Lepper neighborhood and already visited upon the Lepper property.

52. On July 19, 2018, Plaintiffs, received by certified mail three accusatory instruments dated July 11th,12th & 13th each of which stated Mr. Lepper was in violation of Village of Babylon Code § 365–26 for construction of a treehouse without a permit.

53. In response, on July 19, 2018, Plaintiff John Lepper immediately visited the Village of Babylon Building Department to inquire about the three summons he had received. He was told that he needed to make an appointment with Building Inspector Fellman and a meeting was scheduled for July 24, 2018.

54. Plaintiff John Lepper met with Defendant Building Inspector Fellman on July 24, 2018 and asked Defendant Building Inspector Fellman about each essentially identical citation which merely concluded that a "treehouse" violated Village of Babylon Code § 365–26. In response, Defendant Building Inspector Fellman stated that Mr. Lepper owed $250 for the first accusatory instrument, $500 for the second accusatory instrument and $1,000 for the third accusatory instrument.

55. Defendants, jointly and severally, individually and collectively, engaged in this course of conduct to raise revenue and receive monies to which Defendant Village of Babylon would not otherwise be entitled.

56. Plaintiff John Lepper protested to Defendant Building Inspector Fellman that not only were such fines unwarranted and excessive but that no prior notice of any violation had been provided to the Lepper family. In response, Defendant Building Inspector Fellman told Mr. Lepper to resolve the matter in Court on August 14, 2018.

57. Upon information and belief, Defendant Village of Babylon is more concerned with punishing taxpaying residents and extorting unconscionable fines from them for questionable violations of obscure and arcane, vague and ambiguous ordinances extracting fees and fines out of law abiding resident property owners, than providing municipal services such as promptly processing an application for a building permit.

58. Among the parents and children who visited the Treehouse prior to August 14 hearing were: Joe and Joanne Mineo and their sons, M.M. age 14 and N.M. age 16;, Pat and Kirsten Murphy and their daughter G.M., age 7; Terri McSweeney and Cindy McSweeney with E.M., age 7 and P.M., age 5; Steve Kazda and Amanda Kazda and their sons, J.K., age 6 and J.K. age 4; Mike Columbia and Christina Columbia and their daughters, C.C., age 6 and C.C., age 4; Mike Pagamo and Doreen Pagamo and M.P., age 8 and M.P., age 6; Charlie Lepper and Deena Lepper and their children, J.L., age 14; J.L., age 10, and C.L., age 8; George Samuel Kravis age 93, a WWII veteran and Barbra Kravis who is over 65 years of age who lived on the block for over sixty years.

59. Plaintiff John Lepper who is a New York City firefighter sought an adjournment of the hearing from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illnesses from service at the 9/11 scene. Village Judge John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, arriving in Court at precisely 1400 hours still in his Class A uniform.

60. Village Judge John T. Rafter and Defendant Gerard Glass, the Babylon Village attorney acting as the prosecutor both knew that Mr. Lepper was unrepresented by counsel, and that he was facing fines which might amount to $1,750 together with

14

court costs and the possibility of continued and continuing prosecution, yet at no time did Village Judge Rafter or Village Attorney Glass ever warn the Defendant or advise him not only of his right to counsel, but because of the questionable nature of the charges and the circumstances of the prosecution the real need to consult an attorney before proceeding any further in his own defense.

61. Upon information and belief, the wife of Village Judge John T. Rafter works with the unidentified and unnamed complainant who instigated the prosecution of the Lepper Family for erecting a treehouse for their children and the children of the neighborhood.

62. Upon information and belief, Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee conveyed to Village Justice John Rafter and other employees of Defendant Village of Babylon such as Building Inspector Fellman their desire to collect money from fines following convictions of Village of Babylon residents who had the temerity to challenge the unsupported judgment of Defendant Building Inspector Fellman that a violation of Village of Babylon Code Section 365–26 existed.

63. On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per Section 116 Unsafe Structures of the International Building Code the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

64. There is no evidence that the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code.

65. No substantial credible evidence has ever been presented showing that the Lepper family treehouse is in any way

15

unsafe for its intended use by the Lepper children and other children.

66. Defendant Village Attorney Glass requested an adjournment of the hearing scheduled for September 4, 2018 and Village Judge Rafter issued a verbal "stop work" order and asked us to unplug the light. Then he adjourned the case to September 18, 2018.

67. Upon information and belief, on September 18, 2018, Village Judge Rafter learned that the office of Defendant Village of Babylon Mayor had received a complaint regarding John Lepper.

68. Village Judge Rafter never informed Mr. Lepper, who was appearing pro se without benefit of counsel, of his rights to receive information about the complaint and the complainant and his right to challenge the accusatory instruments that merely stated, "Tree House" and were unsigned as legally insufficient.

69. Nevertheless, Village Judge Rafter did inquire of Mr. Lepper, pro se, about his efforts at complying with the Village of Babylon Code § 365-26 and the permit application which Mr. Lepper voluntarily filed.

70. Mr. Lepper informed Village Judge Rafter that his building permit application was accepted by the employees of the Village of Babylon Building Department.

71. The following interaction took place between Mr. Lepper and Village Judge Rafter:

JUDGE RAFTER: Okay. Did you have an understanding of what the purpose of the permit is?
MR. LEPPER: Yes sir.
JUDGE RAFTER: What was your understanding of what the purpose of the permit was?
MR. LEPPER: A construction permit was required for a structure being put up according to building code 365-26 it's not

16

required for under 90 square feet. And I explained that to Mr.
Fellman.
JUDGE RAFTER: I will interpret the code, sir.
MR. LEPPER: Okay.
JUDGE RAFTER: Neither you nor Mr. Fellman will interpret the
code.

Trial transcript September 18, 2018, 10:3–23.

72. Already, Village Judge Rafter was imputing fault on the pro se
Defendant, John Lepper who had attempted to comply with
what was a patently vague and ambiguous ordinance:
JUDGE RAFTER: Did you have an understanding of that before you
undertook the construction?
MR. LEPPER: Not exactly, sir. Because I did not think that a
permit was required for what I was putting up.

Trial transcript September 18, 2018, 11:12–19.

Village Judge Rafter continued to make the case for the prosecutor,
Defendant Village Attorney Glass, who at no time objected to the
line of inquiry of the accused, Mr. Lepper:

JUDGE RAFTER: Did you contact the building department before
you began construction or even contemplated construction of
a tree house?
MR. LEPPER: Yes. On the 19th when I submitted the application.
Prior to the platform no, sir. I did not think a permit was
required for a tree house. I was not sure.

Trial transcript September 18, 2018, 12:2–14.

73. Rather than credit the sworn testimony of John Lepper. A pro
se Defendant, and presumed innocent until proven guilty
beyond reasonable doubt, Village Judge Rafter continued to
push the burden onto Mr. Lepper who provided sworn
evidence that he submitted a permit application prior to
construction and prior to the issuance of any accusatory
instrument by Village of Babylon:

17

JUDGER RAFTER: What is the basis of your [Mr. Lepper's] objection?

MR. LEPPER: That was submitted on May 19th after I received the letter from Mr. Fellman regarding construction of the tree house without a permit. That was accepted by the office upstairs on May 19th and it was complete.

JUDGE RAFTER : You note there is no date on this. Do you have any proof as to when it was received?

MR. LEPPER : I was given a copy of the drawing I made and the survey that it was received.

Trial transcript September 18, 2018, 35:7–23.

74. Determined to convict the pro se Defendant John Lepper, Village Judge Rafter interrupts Defendant Village Attorney Glass when questioning Defendant Building Inspector Fellman during the trial about Mr. Lepper's contention that the Lepper Family Treehouse did not require a permit:

MR. GLASS: Mr. Fellman, it's your contention that under the Babylon Village code 365-26 there was no building permit for this structure -- this tree house, correct?

MR, FELLMAN: Correct.

MR. GLASS: Is there any provision of the Babylon Village code that would exempt one in the Village of Babylon from having to obtain a building permit based up on the facts you have testified to?

JUDGE RAFTER: Mr. Glass, I think that calls for a conclusion of law. So I am not going to permit him to answer that.

MR. GLASS: Okay. I have nothing further.

JUDGE RAFTER: You can ask in his opinion as a violation of the code and then set forth the facts upon which he bases his opinion. And then I would make the ultimate determination.

MR. GLASS: Judge, perhaps this should be the question then. Is there any provision of the code that exempts tree houses from obtaining a building permit?

MR. FELLMAN: No.

MR. GLASS: Okay. I have nothing further judge.

Trial transcript September 18, 2018, 39:11–25, 40:2–22.

18

75. Most telling is the testimony from Defendant Building Inspector Fellman that "we can issue violations every 24 hours."

Trial transcript September 18, 2018, 45:11–12.

76. Village Judge Rafter convicted John Lepper by Order dated October 17, 2018 yet, as was stated on the record on November 20, 2018, did not recuse himself or allow further inquiry into his wife's relationship with the complainant who, upon information and belief, submitted a complaint against the Lepper Family Treehouse.

77. In his decision Village Judge Rafter stated that the "testimony of Stephan Fellman...established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office that a treehouse was being constructed," yet no such complaint was ever shown to Mr. Lepper although he requested a copy on several occasions, nor was it produced during the trial.

78. On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a pro se defendant in a quasi-criminal proceeding, Mr. Lepper was found in violation of Section 365–26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

79. The Order by Village Judge Rafter finding John Lepper in violation of Section 365–26 of the Village of Babylon Code required Village Judge Rafter to use a definition of building from a dictionary since it was not defined in the Village of Babylon Code: "The Merriam-Webster Dictionary defines a building as follows; A structure that is designed or intended for support, enclosure, shelter or protection of persons,

animals or property having a permanent roof that is support by columns or walls."

Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 1.

80. Without referring to the remaining provisions of the Village of Babylon Code governing children's play gyms and the expansive use of "any combination," Judge Rafter states "The Court hereby specifically finds that the treehouse in question constituted a "building" within the meaning of the subject Code section."

Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 3.

81. In that same October 17, 2018 Order finding Mr. Lepper in violation of Section 365–26 of the Village of Babylon Code, Village Judge Rafter states, "it is noted that the Notice of Violation is not signed by any representative of the Village of Babylon."

Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.

82. In that same October 17, 2018 Order finding Mr. Lepper in violation of Section 365–26 of the Village of Babylon Code Village Judge Rafter states, "it is noted that the Notice of Violation is not signed by any representative of the Village of Babylon."

Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.

83. In his October 17, 2018 Order finding Mr. Lepper in violation of Section 365–26 of the Village of Babylon Code Village Judge Rafter finds that "Defendant [Mr. Lepper] did apply for a permit" (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.) but then states without any reference to the record, "but his application was deemed incomplete as it did not contain a drawing from a licensed

20

architect or engineer." (Decision and Order of Village Justice
John Rafter dated October 17, 2018, p. 2.)

84. There is no evidence that the Lepper family was ever informed
by any representative of the Village of Babylon that such a
"drawing" was required for a children's tree house of less than
90 square feet floor area.

85. If, in fact, the Village of Babylon Code Section 365–26 does
require such an expensive document to obtain a permit for a
children's tree house of less than 90 square feet of floor area it
essentially prevents a homeowner from the legal and proper
use of their real property and is on its face a violation of
Plaintiffs' civil, constitutional and human rights associated
with title to real property and the quiet enjoyment of that
property as a family.

86. On October 17, 2018, after the Order of Village Judge Rafter
was delivered by code enforcement, John Lepper went to
Village Court to inquire about appeal.

87. The next day, October 18, 2018, Babylon Village Attorney
Gerard Glass sent a letter to the Lepper Family, stating, in
toto, that "As you know this office is counsel to the Village of
Babylon. The Court has rendered its decision. Please let me
know your intentions. Thank you for your attention and
courtesies herein."

88. The day after Attorney Glass sent his letter, and two days
after the Order was issued, Building Inspector Fellman stated
in a letter that, "On October 17, 2018 Village Justice John
Rafter found you guilty of each offense listed on various
summonses you received regarding the construction of a
treehouse within your front yard setback. I, as Building
Inspector, am ordering the continuation of the stop work order
barring any further construction or occupancy of the tree
house."

89. Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

90. Rather than allow the Lepper family sufficient time to appeal or seek counsel to elapse, the Defendants, jointly and severally, individually and collectively, did work together to injure the Plaintiff Lepper family; silence the Lepper family from speaking out about community problems, and did engage in an abuse of legal process to have Mr. Lepper remove the Lepper Family Treehouse.

91. Defendant Building Inspector Fellman did issue multiple additional accusatory instruments concerning the Lepper Family Treehouse to the Leper family on Halloween, October 31, 2018.

92. On November 5, 2018, John Lepper paid the fines imposed on him by Village Judge Rafter in his October 17, 2018 Order.

93. On November 13, 2018, Building Inspector Fellman the day of a hearing scheduled for trial on accusatory instruments previously issued by Building Inspector Fellman, Building Inspector Fellman created and filed a document designated "Accusatory Instrument/Information for State and Village Ordinances" asserting John Lepper "did wrongfully and unlawfully commit the offense of Section 365–26 Construction without a Permit," followed by a recital of "§365–26 Permit Required; Materials to be submitted."

94. Nowhere in that putative Accusatory Instrument/Information and the ordinance quoted therein is there any mention of drawing by an "architect or engineer."

95. In that putative Accusatory Instrument/Information, Building Inspector Fellman alleges that he "did observe the defendant [John Lepper] erected a treehouse without a building permit. Further after a stop work order was issued on 10/19/18

22

barring any further construction or occupancy of the treehouse the defendant added lights."

96. On November 13, 2018, Village Justice John Rafter conducted a hearing on the accusatory instrument issued on October 20, 2018.

97. November 16, 2018, Plaintiff John Lepper filed Notice of Appeal from the Order of Village Justice John Rafter dated October 17, 2018.

98. Plaintiff John Lepper filed a FOIL request and a litigation hold notice and to this date the Defendants have not responded or complied.

99. On November 20, 2018. Village Justice John Rafter conducted a hearing on the October 20, 2018 and October 31, 2018 accusatory instruments.

100. On November 20, 2018, through counsel, Mr. Lepper asked the Court to enjoin the daily issuance of fines so that Mr. Lepper may resolve the new set of accusatory instruments against him on the merits but Village Justice John Rafter refused to do so.

101. On November 21, 2018, John Lepper tried to obtain copies of exhibits that were missing from the trial on September 18, 2018. After waiting two hours he was denied copies.

102. November 27, 2018, at approximately 1515 hours Plaintiff John Lepper filed a Motion to dismiss the outstanding accusatory instruments together with a letter from Attorney Morris requesting copies of the exhibits from the trial on September 18, 2018.

103. On December 10, 2018, Plaintiffs filed their Verified Complaint accompanied by an Order to Show Cause and the matter was scheduled to be heard before Hon. Joseph F. Bianco.

23

104. Defendant Gerald Glass, Esq. did state in open Court on
December 10, 2018 that the Village of Babylon utilized daily
fines against purported Village of Babylon Code violators to
obtain compliance.

105. Defendant Gerald Glass, Esq. did represent in open Court on
December 10, 2018 that the Village of Babylon intends on
requiring building permits for any treehouse structure in the
Village of Babylon.

106. Defendant Gerald Glass, Esq. did state in open Court on
December 10, 2018 that the Village of Babylon sought to
enjoin the use of a light that illuminated Plaintiffs American
Flag and the adjoining street where illegal drug activity had
taken place.



107. Defendant Gerald Glass, speaking on behalf of all Defendants,
did wish to enjoin Plaintiff from efforts at ameliorating the
drug use that occurred on and around his property by
illuminating the street.

108. Defendant Gerald Glass, on December 10, 2018 before this
Honorable Court, did provide several admissions as to the true

24

intentions of Defendants, jointly and severally, individually and collectively, to punish Plaintiffs for every day that the Lepper Family Treehouse existed.

109. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was monitoring Plaintiffs' property.

110. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was conducting surveillance of Plaintiffs' property and the family activities thereon.

111. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon took issue with a temporary electric extension cord to a tree on Plaintiffs'' private property.

## V.  ACTIONS OF DEFENDANTS COMPLAINED OF BY PLAINTIFFS

112. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper in retaliation for his speaking out about matters of public concern in and around the Village of Babylon.

113. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper to further the wishes of some unidentified complainant and in derogation of the constitutional rights of the Lepper Family.

114. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to Mr. Lepper carrying criminal sanctions to the Lepper Family without allowing Mr. Lepper the opportunity to comply with or otherwise challenge the actions of the Village of Babylon,

115. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to obtain monies and property for which Defendants were not entitled.

116. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions were unjustified and without probable cause or even arguable probable cause.

117. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions would cause harm to and inflict distress upon the Plaintiffs.

118. The Defendants, jointly and severally, individually and collectively, and the inability to obtain a fair trial continue to oppress the Lepper family and cast a cloud of criminality over their persons, home, and family.

119. Among the examples of the organized oppression of the Lepper family by the Defendants, jointly and severally, individually and collectively, has been the wrongful delay and outright refusal to provide Mr. Lepper with the exhibits from his trial before Village Judge Rafter.

## VI.   THE BASIS FOR EQUITABLE RELIEF

120. Defendant Village of Babylon through the threats of Building Inspector Fellman continues to insist that the Lepper family tear down and completely remove their children's treehouse under threat of daily fines of up to $1,000 each day.

121. The Lepper family is in imminent danger of serious, permanent, and irreparable economic damage.

122. The Lepper family parents continue to live in fear that they will suffer serious economic punishment for a reasonable use of their own private property and their temerity in exercising their First Amendment rights by speaking out against the unconscionable actions of the Defendants in depriving the

Lepper family of their liberty interest in raising their children as they see necessary which included trying to protect their infant children from exposure to hypodermic needles on the ground by building them a safe harbor in the air; and then retaliating against the Lepper family for speaking out.

123. The Lepper family Plaintiffs have no adequate remedy at law.

124. Defendant Village of Babylon has not established any association between Village of Babylon Code Section 365–26 and the public health, safety and welfare of the residents of the Village of Babylon.

125. That there is no substantial credible evidence that the Lepper family children's treehouse represents a threat, much less a danger, to the health, safety, and welfare of the residents of the Village of Babylon.

126. Staying enforcement of the ordinance pending the resolution of this action and a declaration of the constitutionality and enforceability of Village of Babylon Code Section 365–26 will not cause any harm and/or damage to the residents of the Incorporated Village of Babylon.

127. Mr. Lepper and the Lepper family have made no other request for injunctive relief.

### VII.   FIRST CAUSE OF ACTION FOR INJUNCTIVE RELIEF

128. Mr. Lepper seeks to enjoin the enforcement of Village of Babylon Code Section 365–26 as unconstitutional.

129. The elected officials, particularly the Village Judge, and all the employees, agents of, and consultants to the Incorporated Village of Babylon have a clear and unequivocal duty to all the resident property owners of the Village to assure them peaceful and quiet enjoyment of their homes and property according to the ancient and long standing maxim of at the heart of common law equity jurisprudence, *sic utere tuo ut*

27

*alienum non laedas,* enjoining everyone to use their own property in such a way as not to injure that of another.

130. Defendant Village of Babylon seeks to limit the use of the Subject Premises.

131. Defendant Village of Babylon claims it has a right to restrict the erection of structures on private property that are less than 90 square feet.

132. Village of Babylon Code §326–26 can only be enforceable if it is a proper exercise of the police powers of the State by the Village of Babylon.

133. Village of Babylon Code §326–26 should be considered a zoning regulation by Defendants Village of Babylon.

134. To impose fines and even imprisonment for erecting a "building... on any lot, plot or premises" in the Village of Babylon "until a permit authorizing the same shall have been issued by the Building Inspector" (Village of Babylon Code §326–26.) without defining "building" and the phrase, "lot, plot or premises" creates a vague, ambiguous, and essentially meaningless ordinance.

135. Each of the accusatory instruments lodged against Defendant Lepper is based on the claim that erecting a treehouse of less than 90 square feet without a building permit or variance from the Zoning Board of Appeals is a violation of the Village of Babylon Code.

    VIII.   **DEFENDANTS USE OF LEGAL PROCESS, FINES AND PROSECUTION IS DESIGNED TO SILENCE MR. LEPPER AND VIOLATES THE FIRST AMENDMENT RIGHTS OF THE LEPPER FAMILY**

136. Defendants have constrained the ability of the Lepper family to create a treehouse for his infant children shortly after he spoke out against the criminal activity occurring within Village of Babylon.

28

137. Defendants knew and had reason to know that the Lepper
family parents intended on building a treehouse to remove
their children from and allow their children to play without
the danger of contact with hypodermic needles on the ground
which had been discarded from the street and public
walkways onto the Lepper property.

138. Defendants knew and had reason to know that John Lepper
spoke publicly and spoke out against the hypodermic needles
found on his property, crime in his community and the safety
and wellbeing of his children.

139. In response to his identifying the problem of the hypodermic
needles and their indication of a community drug problem and
bringing the issues before the administration of the Village of
Babylon, Defendants, individually and collectively, did
conspire and act to deprive Mr. Lepper of his rights under the
First, Fourth, Fifth, and Fourteen Amendment by ordering
immediate and total removal of the treehouse he built for his
children under the threat of continuing Draconian confiscatory
fines and penalties.

140. Defendants, individually and collectively, did act to deprive
Mr. Lepper of his rights under the First, Fourth, Fifth, and
Fourteen Amendment while knowing and having reason to
know that Mr. Lepper fully complied with the permit process
of the Village of Babylon Code, and by obfuscating an already
arcane and obscure administrative process cause injury to the
Lepper family.

141. Rather than remedy the problem of drug abuse in the
community or address the concerns Mr. Lepper expressed
about the dangers of the discarded hypodermic needles which
could have been addressed by Village of Babylon Code
Enforcement, Defendants accepted the building permit which
Mr. Lepper filed and the fee which he tendered without any
intention of processing the application or even acknowledging

29

its existence in their later prosecution in the Babylon Village Court.

142. Upon information and belief, Defendants at the behest of an unnamed and unidentified complainant did conspire and plan to issue accusatory instruments to Mr. Lepper with the ultimate goal of obtaining money, removing all remnants of a then unfinished treehouse, and punishing the Lepper family for exercising their constitutional rights.

143. On May 10, 2018, Defendants acknowledged that the treehouse did not violate any provision of the Village of Babylon Code by accepting the building permit application and fee.

144. Defendants concede that notice of all three violations which were each dated in May, 2018, were actually sent to Mr. Lepper in July, 2018.

145. Defendants delayed processing the Lepper family building permit for their children's treehouse and by failing to acknowledge and/or act upon the application, created a situation where fines would accrue against the Lepper family for lack of a permit and cause the Lepper family serious, permanent, and irreparable economic damage.

146. Defendants caused quasi criminal process to issue legal process against the Lepper family to silence the Plaintiff John Lepper and violate the civil and constitutional rights of the Lepper family.

147. Upon information and belief, Defendants John and/or Jane Doe did act and conspire with the Defendants, jointly and severally, individually and collectively, to silence the Plaintiff Lepper family and remove their children's playhouse.

30

IX.   **VILLAGE OF BABYLON CODE § 325–26 FORECLOSES AGE-APPROPRIATE PRIVATE RIGHTS OF ASSEMBLY AND ASSOCIATION ON ARBITRARY GROUNDS AND ARE THEREFORE TECHNICALLY CAPRICIOUS AS WELL AND CERTAINLY UNDERINCLUSIVE.**

148. Plaintiffs have constitutionally protected liberty interests in their property.

149. Plaintiff John Lepper and Plaintiff Noelle Lepper have the right to establish a home and bring up children.

150. Plaintiff Noelle Lepper and Plaintiff John Lepper have the right to direct the upbringing and education of their infant children.

151. Plaintiff John Lepper and Plaintiff Noelle Lepper have the right and duty to nurture their children and direct their children's destiny.

152. Insofar as their children are concerned, Plaintiff John Lepper and Plaintiff Noelle Lepper have the right coupled with the high duty, to prepare their children for additional obligations.

153. A special respect for individual liberty in the home has long been part of our culture and our law.

154. That Defendants issued legal process to silence the Plaintiffs and to remove the Lepper Family Treehouse without probable cause that the children's treehouse would have a negative impact on the public health and safety of the residents of the Village of Babylon and thereby violated the constitutional rights and liberty interests of the Plaintiffs without due process of law.

155. Defendants took action within the span of forty-eight hours to find Mr. Lepper guilty of a crime and then threaten daily fines if the treehouse was not removed, however, they still have not acted upon the permit application filed by the Lepper family.

31

156. The conviction of an unrepresented pro se John Lepper and the unjustified fines imposed by Village Judge Rafter were an unconstitutional attempt to silence Plaintiff John Lepper and intimidate him from speaking out against government ineptitude, the scourge of drugs, and his intention to do something about it on his own property.

157. Defendants actions in the prosecution of the Lepper family violated their civil and constitutional rights of the Plaintiff Lepper family, their liberty rights, and their rights to due process, enjoyment of property, freedom of assembly, and the ability to associate with one another on their property without the fear of government intrusion or reprisal.

158. Defendants violated the civil and constitutional rights of the Plaintiff Lepper family by the unsupported citation of the Lepper Family Treehouse as an unsafe structure in violation of the International Building Code without the basis therefore.

159. Building Inspector Fellman never presented any substantial credible evidence identifying the nature and manner he claimed the treehouse was an unsafe treehouse.

X.     **PLAINTIFFS' RIGHTS ARE BEING VIOLATED BY THE THREAT OF CONTINUED FINES**

160. Village of Babylon Code Section 365–26 is criminal in nature.

161. The fines associated with Village of Babylon Code Section 365–26 are punitive, doubling and tripling and culminating in the demand for the removal of property without due process.

162. The actions of Defendants in enforcing Village of Babylon Code Section 365–26 against the Lepper family and threatening to continue enforcement with successive process and escalating fines and penalties for the very same conduct violate the Constitutional Rights of the Lepper family by subjecting them to repeated double jeopardy.

32

163. Mr. Lepper raised this issue before the Honorable John T. Rafter who ignored the issues, then convicted Mr. Lepper, an unrepresented, pro se defendant without any substantial credible evidence of guilt.

164. The accrual of multiple accusatory instruments, existing unfounded convictions of three violations and pending prosecution of further accusatory instruments establishes the imminent danger of serious, permanent, and irreparable economic damage and the likelihood that such danger will be continued based upon the sworn testimony of Defendant Building Inspector Fellman, Plaintiff John Lepper and the Lepper family has been placed in jeopardy, repeatedly, for the same alleged criminal offense.

### XI.    PROSECUTION OF THE LEPPER FAMILY BY THE DEFENDANTS FOR ALLEGED VIOLATIONS OF VILLAGE OF BABYLON CODE SECTION 365–26 IS AN UNCONSTITUTIONAL TAKING OF THEIR PROPERTY

165. Village of Babylon Code Section 365–26 is unconstitutional:

166. Village of Babylon Code Section 365–26 as enforced by the Defendants against the Plaintiff Lepper family is unconstitutionally vague, overbroad, and violates the civil and constitutional rights of the Lepper family guaranteed to them under the First, Fourth, Fifth, and Fourteen Amendment of the Constitution.

167. Village of Babylon Code Section 365–26 fails to give Plaintiff John Lepper fair notice that building a treehouse of less than 90 square feet is forbidden by the Code.

168. Village of Babylon Code Section 365-26 does not provide guidance to ordinary homeowners as to whether building a treehouse for their infant children might be construed as a violation subjecting them to criminal prosecution.

33

169. Village of Babylon Code Section 365–26 encourages arbitrary and erratic arrests and convictions.

170. The accusatory instruments charging Plaintiff John Lepper with violating Village of Babylon Code Section 365-26 for building a treehouse for his infant children upon the malice and/or animosity of a neighbor.

171. Village of Babylon Code Section 365–26 fails to meet the fundamental principle of statutory construction for laws with criminal penalties, minimal guidelines to govern law enforcement.

172. As evidenced by the Kafkaesque prosecution and continued litigation over a treehouse for the infant Lepper children on their own property, Village of Babylon Code Section 365-26 allows law enforcement and local government to pursue their personal animosity in violation of the civil and constitutional rights of the Plaintiffs.

173. Village of Babylon Code Section 365-26 has been utilized to obtain monies from Mr. Lepper under threat of continuing fines, liens on the Lepper family home, and/or jailing.

XII. **PLAINTIFFS SEEK A JUDGMENT DECLARING THAT THEY ARE ENTITLED TO TRIAL BY JURY ON CHARGES OF VIOLATING VILLAGE OF BABYLON CODE SECTION 365–26**

174. Village of Babylon Code Section 365-26 is one that carries more than simple fines.

175. Because of the criminal nature of Village of Babylon Code Section 365-26, Plaintiffs aver that they are entitled to a trial right.

176. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, intend on utilizing daily fines to enforce Village of Babylon Code Section 365-26.

34

177. Upon information and belief, Village of Babylon Code Section 365-26 can result in fines amounting to thousand(s) of dollars a day.

178. Defendants, and specifically as stated in open Court by Gerald Glass, Esq., can utilize New York Supreme Court actions to enforce Village of Babylon Code Section 365-26 by entering the property.

179. Defendants, and specifically Defendant Stephen Fellman on October 19, 2018, threatened removal of property from Plaintiffs under threat of daily fines.

180. Such action is beyond a petty offense as contemplated by the Constitution of the United States.

181. Such action is beyond a petty offense as contemplated by the New York State Penal Law

182. Under the New York State Constitution and the rights asserted thereunder, the Plaintiffs assert that a Jury Trial attach to prosecutions of Village of Babylon Code Section 365-26.

183. Under the Federal Constitution and the amendments thereto, Plaintiffs assert that a Jury Trial attach to prosecutions of Village of Babylon Code Section 365-26.

### XIII.   EIGHTH AMENDMENT AND EXCESSIVE FINES

184. Because of the criminal nature of Village of Babylon Code Section 365-26, Plaintiffs can suffer fines up to one-thousand dollars for the misuse of personal property.

185. The Eighth Amendment of the United States Constitution protects against unreasonable and excessive fines.

186. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, intend on utilizing daily fines to enforce Village of Babylon Code Section 365-26.

35

187. Upon information and belief, Village of Babylon Code Section 365-26 can result in fines amounting to thousand(s) of dollars a day.

188. Plaintiffs would have committed no further action but rather Plaintiffs inaction would allow such daily fines to accrue.

189. Defendants, all of them, know and have reason to know that such daily fines are excessive and extortionate in nature.

190. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, discussed utilizing daily fines as part of their package of tools to enforce Village of Babylon Code Section 365-26.

191. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, opined that the existence of the Lepper Family Treehouse was deserving of daily fines by Defendants utilizing Village of Babylon Code Section 365-26.

192. Plaintiffs need take no further action for Defendants to issue additional fines.

193. Plaintiffs need take no further action for Defendants to issue daily fines.

194. According to Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, Defendants could simply observe and fine Plaintiff everyday he sought to defend himself in court.

195. According to Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, Defendants could simply observe and fine Plaintiff everyday he sought to obtain a building permit from Defendants, the Village of Babylon.

196. Defendants, collectively, through their attorney and agent as Village Attorney, Gerard Glass did state in open Court on December 10, 2018 that the Village of Babylon did use

36

exorbitant fines to obtain property, or revenue or coerce action to which Defendants are not otherwise entitled.

197. Accordingly, Plaintiffs are damaged and seek enjoinment of the enforcement of Village of Babylon Code Section 365-26.

### XIV.   42 U.S.C. §1983: "MONELL" CLAIM

198. Defendant elected officials, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control their employees, particularly Building Inspector Fellman in the administration of the Village of Babylon Code Section 365–26 the Lepper family has suffered injury and damage.

199. Defendant elected officials, jointly and severally, individually and collectively, were responsible for the administration and operation of the Village of Babylon.

200. Defendant elected officials, jointly and severally, individually and collectively, were responsible for policy and decision making in the Village of Babylon.

201. Defendant elected officials, jointly and severally, individually and collectively, actively established or permitted to exist a Village wide policy of denial of due process and equal protection in the administration and enforcement of the Village of Babylon Code, in this specific case Section 365–26.

202. Defendants, jointly and severally, individually and collectively, subjected Plaintiffs, the Lepper family, to selective enforcement of Village of Babylon Code Section 365–26 and disparate treatment from that afforded similarly situated property owners.

203. Defendant elected officials, jointly and severally, individually and collectively, failed to remediate the actions taken against the Lepper family for erecting their children's treehouse and continue to harass, threaten, and attempt to coerce the Lepper family into removing their children's treehouse.

37

204. Defendant elected officials, jointly and severally, individually and collectively, have continued to subject the Lepper family to continued prosecution for alleged violations of Village of Babylon Code Section 365–26 as part of a cover up for the unjustified and improper earlier prosecution and conviction of Plaintiff John Lepper for violating Village of Babylon Code Section 365–26 by erecting a treehouse of less than 90 square feet "lot area" for his infant children.

205. Defendant elected officials, jointly and severally, individually and collectively, knew, or should have known, that there was no system or procedure in place for reporting, investigating, or remediating incidents involving harassment of Village residents by means of the Village of Babylon Code other than this litigation.

206. Defendant elected officials, jointly and severally, individually and collectively, maintained a deliberate indifference to the human, civil, and constitutional rights of the Plaintiff Lepper family.

### XV. STATE LAW CLAIMS

207. Defendants, jointly and severally, individually and collectively, had a duty not to subject Plaintiff John Lepper and the Lepper family to constitutional violations, summary punishment, improper and inappropriate charges of Babylon Village Code violations malicious prosecution, abuse of process, false and improper investigation.

208. Defendants, jointly and severally, individually and collectively, through their conduct, acts, and omissions acted outrageously and beyond the bounds of decency in (a) attempting to coerce Plaintiffs into removing a lawful children's treehouse from their property by threatening ongoing and continued legal proceedings with the potential for confiscatory fines and imprisonment; (b) filing unjustified and unsupportable criminal charges against and imposing

38

summary punishment and excessive fines upon Plaintiffs for allegedly violating an unconstitutional ordinance, Village of Babylon Code Section 365–26; (c) concealing and attempting to cover up the wrongs done to Plaintiffs; and defaming, slandering and failing to redress the grievances done to the Plaintiffs.

209. Defendants, jointly and severally, individually and collectively, violated the Plaintiff's rights secured under the United States Constitution and the New York State Constitution.

### XVI.   NEGLIGENCE

210. Defendants, jointly and severally, individually and collectively, had a duty to act reasonably and responsibly and not to act in a manner that would cause injury and/or harm or the threat of harm to the Plaintiff Lepper family.

211. Defendant Village of Babylon was negligent, careless, and reckless in the treatment of Plaintiffs by failing to train, supervise, discipline and investigate its employees involved in the instant matter.

212. Defendant Village of Babylon knew or should have known of its employees' propensities for the conduct which caused substantial and severe injury to the Plaintiffs.

213. Defendants acted negligently in violating the civil, Constitutional, and human rights of the Plaintiffs.

### XVII.   ABUSE OF PROCESS

214. Defendant Village of Babylon employed regularly issued legal process to compel Plaintiffs to remove their children's treehouse.

215. Defendants, jointly and severally, individually and collectively, intended to intent to do harm and cause damage to the Lepper family without excuse of justification.

39

216. Defendants, jointly and severally, individually and collectively, in order to obtain a collateral objective that is outside the legitimate ends of the process did cause a series of unfounded accusatory instruments to be issued against Plaintiff John Lepper.

### XVIII. NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

217. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiffs causing them to suffer pain, shame, humiliation and anguish.

218. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiffs occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to Plaintiffs.

219. Defendants did fail to investigate improper use of criminal process but, rather, Defendants began to conspire and cover up such actions by prosecuting criminal charges and threatening Plaintiffs with unjust and excessive fines and threatened loss of their property.

220. The Defendants knew or had reason to know that Plaintiffs were guilty of no wrongdoing.

221. Defendants, jointly and severally, individually and collectively, acted with knowledge and reason to know that their conduct would cause severe and extreme emotional and physical harm to Plaintiffs.

222. As a result, Plaintiffs suffered great pain, emotional degradation, loss of employment, shame, humiliation and anguish, causing them great distress and emotional agony.

40

### XIX. DEFAMATION

223. The Plaintiff Lepper family is being harassed by the Village of Babylon and the individual defendants, to the extent that the Lepper family use of their property is being monitored and the curtilage of their property invaded without due process on what appears to be a daily basis for the purpose of attempting to fabricate charges of Babylon Village Code violations for further prosecution.

224. Whereas, as a result of said defamation, Plaintiffs continue to suffer from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and severe/extreme emotional distress.

### XX. PRIMA FACIE TORT

225. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiffs causing them to suffer pain, shame, humiliation and anguish.

226. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiffs occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to Plaintiffs.

### XXI. INJURIES AND DAMAGES

227. As a direct and proximate result of the wrongful actions and inappropriate lack of action by the Defendants, jointly and severally, individually and collectively, Plaintiffs, particularly the infant Plaintiffs, have suffered injury and damages, emotional and psychological harm, including loss of educational opportunities, emotional injury, distress and pain, and incurred significant cost and expenses, including but not limited to legal fees, loss of good name and standing in the

41

community, public stigma, personal humiliation, social degradation, and other cost and expenses.

#### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek an order of this honorable Court:

DECLARING Village of Babylon Code Section 365–26 unconstitutional and unenforceable as violating the rights of the Plaintiffs under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

PROHIBITING the Village of Babylon from issuing further accusatory instruments against Plaintiffs charging violations of Village of Babylon Code Section 365–26 for the existence of the Lepper family treehouse.

MANDATING the right to trial by jury for any alleged violations of Village of Babylon Code Section 365–26.

VACATING AND DISMISSING any convictions of Plaintiff John Lepper for violating Village of Babylon Code Section 365–26.

DIRECTING restitution of any fines already paid by or on behalf of the Lepper family for convictions of violating Village of Babylon Code Section 365–26 for erecting their children's treehouse.

AWARDING Plaintiffs compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants.

All together with such other and further relief as to this Court shall deem just and proper.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

42

DATED AT   Dix Hills, New York
December 16, 2018

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiffs*
33 Walt Whitman Rd, *suite* 310
Dix Hills, New York 11746
Phone:  (631) 450–2515
FAX:  (631) 223–7377
Email:  Cory.H.Morris@protonmail.com

VICTOR JOHN YANNACONE, JR., (VY6405)
*of counsel*
Phone:  (631) 475–0231
Email  barrister@yannalaw.com

To:   GERARD GLASS, Esq.
*Babylon Village Attorney*
72 East Main Street Suite 3
Babylon, New York 11702

## INDEPENDENT VERIFICATION

State of New York  } ss:
County of Suffolk  }

   John Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the Plaintiffs filing this Amended Verified Complaint and accompanying documents; that I have read the foregoing Amended Verified Complaint and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of
perjury on December 16 2018

                                       JOHN LEPPER

Sworn before me on the
16th of December, 2018

NOTARY PUBLIC

JENNIFER LYNN RUTZLER
Notary Public - State of New York
NO. 01RU6238749
Qualified in Suffolk County
My Commission Expires Apr 11, 2019

## INDEPENDENT VERIFICATION

State of New York
County of Suffolk } ss:

Noelle Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the Plaintiffs filing this Amended Verified Complaint and accompanying documents; that I have read the foregoing Amended Verified Complaint and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of
perjury on December 16, 2018

Noelle Lepper

NOELLE LEPPER

Sworn before me on the
16th of December, 2018

NOTARY PUBLIC

JENNIFER LYNN BUTZLER
Notary Public - State of New York
NO. 01KU6238748
Qualified in Suffolk County
My Commission Expires April 11, 2019

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually      Index No.: 2:18-cv-07011 JFB-GRB
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                Plaintiffs,          **JURY TRIAL DEMANDED**

     -against-

VILLAGE OF BABYLON; and, RALPH
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                Defendants.
-------------------------------------------------------------X

### DEFENDANTS' AMENDED ANSWER AND COUNTERCLAIM
### TO PLAINTIFFS' AMENDED VERIFIED COMPLAINT

         Defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN

MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village

Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village

of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, each

individually and in their official capacity, hereby answer the Amended Verified Complaint of the

plaintiffs, JOHN LEPPER and NOELLE LEPPER, individually, and as parents and natural guardians

of their infant children, B.J.L. and B.I., filed in the above-captioned matter on December 17, 2018,

and assert affirmative defenses and counterclaims as follows:

## ANSWERING EACH AND EVERY CAUSE
## OF ACTION OF THE COMPLAINT

**FIRST:**          Denies allegations contained in paragraphs numbered "1," "2," "3," "4," "5," "6," "7," "8," "9," "10," "11," "12," "13," "14," "28," "29," "36," "37," "40," "41," "42," "43," "44," "45," "46," "47," "50," "51," "55," "57," "61," "62," "64," "65," "73," "74," "78," "84," "85," "89," "90," "107," "108," "109," "110," "112," "113," "114," "115," "116," "117," "118," "119," "120," "121," "122," "123," "124," "125," "126," "128," "130," "132," "134," "135," "136," "137," "138," "139," "140," "141," "142," "143," "144," "145," "146," "147," "154," "155," "156," "157," "158," "159," "161," "162," "163," "164," "165," "166," "167," "168," "169," "170," "171," "172," "173," "175," "176," "179," "180," "181," "182," "183," "185," "186," "189," "190," "196," "197," "198," "201," "202," "203," "204," "205," "206," "208," "209," "211," "212," "213," "215," "216," "217," "218," "219," "220," "221," "222," "223," "224," "225," "226" and "227" of the Amended Verified Complaint.

**SECOND:**          Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered "15", "16", "17", "18", "19", "20," "21," "24," "25," "26," "27," "30," "31," "32," "35," "38," "39," "48," "49," "52," "53," "54," "56," "58," "59," "60," "63," "66," "67," "69," "70," "71," "72," "75," "76," "77," "79," "80," "81," "82," "83," "86," "87," "88," "91," "92," "93," "94," "95," "96," "97," "98," "99," "100," "101," "102," "103," "104," "105," "106," "111," "127," "177," "178," "184" and "191" of the Amended Verified Complaint.

**THIRD:**          Denies allegations contained in paragraphs numbered "23," "33," "129," "133," "149," "150," "151," "152," "153," "160" and "174" of the Amended Verified

Complaint and refers all questions of law to the Court.

FOURTH:             Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered "34," "148," "187," "188," "192," "193," "194," "195," "199" and "200" of the Amended Verified Complaint and refers all questions of law to the Court.

FIFTH:             Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph numbered "68" of the Amended Verified Complaint and refers all questions of law to the Court, and denies that any accusatory instruments were defective.

SIXTH:             Denies allegations contained in paragraphs numbered "207" and "210" of the Amended Verified Complaint and refers all questions of law regarding legal duty to the Court.

SEVENTH:             Denies allegation contained in paragraph numbered "214" of the Amended Verified Complaint as vague.

### DEMAND FOR JURY TRIAL

EIGHTH:             Defendants demand a trial by jury for the non-equitable relief.

### FOR A FIRST, SEPARATE AND COMPLETE DEFENSE THE DEFENDANTS RESPECTFULLY SHOW THIS COURT, UPON INFORMATION AND BELIEF:

NINTH:             That any injuries or damages sustained by the plaintiffs were occasioned through the negligence and culpable conduct on the part of the plaintiffs.

### FOR A SECOND, SEPARATE AND COMPLETE DEFENSE THE DEFENDANTS RESPECTFULLY SHOW THIS COURT, UPON INFORMATION AND BELIEF:

TENTH:             That this Court lacks jurisdiction over the person or property of the answering defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN

MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, in that the service of process was not made in accordance with the provisions of the law.

FOR A THIRD, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

ELEVENTH: That the party making claim lacks capacity to bring the action. Claims brought by and on behalf of the infant plaintiffs by John Lepper and Noelle Lepper are not properly made since the infants were not part of any transaction concerning the disposition of the permit or of the application to build the tree house and they have no standing to bring a claim where there were not part of any transaction with the defendants. Alternatively, John Lepper and Noelle Lepper are not proper parties to assert claim on behalf of the infants since there are counter-claims against them related to the alleged harm to the infants.

FOR A FOURTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWELFTH: There is another action pending between the same parties for the same cause of action. There is a pending claim before the Justice Court in the Village of Babylon related to the pending fines wherein the plaintiffs have the same challenges to the fines and the ordinance the plaintiffs violated. Therefore, the Amended Verified Complaint should be dismissed.

FOR A FIFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

THIRTEENTH:        That the plaintiffs' Amended Verified Complaint fails to state

sufficient facts to constitute a cause of action against these defendants.

FOR A SIXTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

FOURTEENTH:        That this Court lacks jurisdiction over the subject matter of this action

inasmuch as there is no diversity of citizenship between the litigants as required by FRCP.  There

is no basis to the federal claims.  The state claims asserted by the plaintiffs herein lack the requisite

diversity of citizenship or damages to remain in federal court independently.

FOR A SEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

FIFTEENTH:        That all or part of the action is barred by the Doctrine of Collateral

Estoppel or Res Judicata.  The issue of the constitutionally of the ordinance challenged by the

plaintiff herein was raised in proceeding in the Babylon Village Court.  A determination by that court

which is a court of competent jurisdiction found that the ordinance was constitutional and the

plaintiff John Lepper was held liable for the charges against him in building the claimed tree house

without filing a proper application for a permit and in violation with the zoning ordinances

challenged by the plaintiff in their complaint.

FOR AN EIGHTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SIXTEENTH:        The lawsuit brought by the plaintiffs is entirely without merit and is

frivolous, subject to sanctions.

FOR A NINTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SEVENTEENTH:    That the party making claims failed to mitigate damages. Plaintiffs

failed to build the tree house properly to comply with the zoning code of the Village of Babylon and

failed to obtain a permit through the Building Department of the Village of Babylon. All claimed

damages could have been avoided by plaintiffs by adhering to state and local building codes.

FOR A TENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

EIGHTEENTH:    The plaintiffs' claims for punitive damages are barred.

FOR AN ELEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

NINETEENTH:    The defendants are protected under a governmental immunity from

claims of negligence. The defendants acted appropriately in carrying out village law and any claims

of negligence against them are protected under immunity as allowed by law.

FOR A TWELFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTIETH:    These claims are not ripe for determination before the Federal Court.

FOR A THIRTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FIRST:    The claims are barred by failure to serve a timely Notice of Claim

pursuant to Sections 50-e and 50-i of the General Municipal Law. The plaintiffs failed to allow any

time before filing the complaint to afford the Village of Babylon the opportunity to take a hearing

pursuant to 50-h of the General Municipal Law.

FOR A FOURTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-SECOND: The claims are barred by the failure of plaintiffs to attend a hearing

pursuant to Section 50-h of the General Municipal Law. No time was allowed before the complaint

was filed for a 50-h hearing to take place. The plaintiffs failed to allow any time before filing the

complaint to afford the Village of Babylon the opportunity to take a hearing pursuant to 50-h of the

General Municipal Law.

FOR A FIFTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-THIRD: Plaintiffs failed to exhaust their administrative remedies and have not

completed the application for a permit and have not filed before the Zoning Board of Appeals. The

plaintiffs did not complete the permit application. The plaintiffs failed to file proper plans and survey. The

plaintiffs did not avail themselves to the administrative process through the Zoning Board of Appeals to

address any claimed challenges to issues concerning the permit.

AS AND FOR A COUNTERCLAIM AGAINST JOHN LEPPER
AND NOELLE LEPPER, THE DEFENDANTS VILLAGE OF
BABYLON; AND, RALPH SCORDINO, MAYOR, KEVIN
MULDOWNEY, DEPUTY MAYOR, ROBYN SILVESTRI,
VILLAGE TRUSTEE, TONY DAVIDA, VILLAGE TRUSTEE,
MARY ADAMS, VILLAGE TRUSTEE; STEPHEN FELLMAN,
VILLAGE OF BABYLON BUILDING INSPECTOR; SUZANNE
SCHETTINO, DEPARTMENT OF PUBLIC WORKS; GERARD
GLASS, ESQ., VILLAGE OF BABYLON ATTORNEY; AND
DEBORAH LONGO, PLANNING BOARD, VILLAGE OF
BABYLON, EACH INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITY, HEREBY ALLEGE:

TWENTY-FOURTH: That if the plaintiffs B.J.L. and B.I. were caused to sustain

damages at the time and place set forth in the plaintiff's Amended Verified Complaint through any

culpable conduct and/or negligence other than plaintiffs' own, and if said damages arose in whole or in part from the negligence of and/or culpable conduct of the defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and if any judgment is recovered herein by the plaintiffs B.J.L. and B.I. against the answering defendants, they will be damaged thereby and the answering defendants will be entitled to proportionate contribution and/or indemnity on the basis of the responsibility of the plaintiffs above named.

TWENTY-FIFTH:    That if the plaintiffs B.J.L. and B.I. were caused to sustain damages at the time and place set forth in the plaintiff's Amended Verified Complaint through any culpable conduct and/or negligence other than plaintiffs' own, and if said damages arose in whole or in part from the negligence of and/or culpable conduct of the defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and if any judgment is recovered herein by the plaintiffs B.J.L. and B.I. against the answering defendants, the damages were caused by the failure of John Lepper and Noelle Lepper to build a safe tree house compliant with the building code of the Village of Babylon; to build a tree house that conforms to the set back

requirements from the front of the property as set by the building code; in failing to exhaust the remedies in the administrative process by filing a proper application for permit, proper plans and survey, and in failing to file an appeal to the Board of Zoning Appeals; in failing to show that the tree house is a safe structure with proper means of ingress and egress; without admitting to the allegations in the complaint, in building a tree house for children to use in an area that the plaintiffs claim is unsafe as set forth in their complaint and in making representations for the use of a tree house that fails to comply with local and state law and without obtaining a permit for the subject building.

WHEREFORE, the answering defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, demand judgment dismissing the Amended Verified Complaint herein as to the answering defendants with costs, and further demand that the ultimate rights of the answering defendants and the plaintiffs as between themselves be determined in this action, and that the answering defendants have judgment over and against the plaintiffs for all or a part of any verdict or judgment which may be obtained herein by the

plaintiffs against the answering defendants, together with costs and disbursements of this action.

Dated:     Mineola, New York
         March 6, 2019

                               Respectfully submitted,

                               KELLY, RODE & KELLY, LLP

BY:        Eric P. Tosca

                               ERIC P. TOSCA
                               Attorneys for Defendants
                               330 Old Country Road - Suite 305
                               Mineola, New York 11501
                               (516) 739-0400
                               Our File No.: PDG/EPT 148530-752

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       33 Walt Whitman Road - Suite 310
       Dix Hills, New York 11746
       (631) 450-2515

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2019, I served a true copy of the foregoing Defendants' Amended Answer and Counterclaim to Plaintiffs' Amended Verified Complaint by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

To:     LAW OFFICES OF CORY H. MORRIS
        Attorneys for Plaintiffs
        33 Walt Whitman Road
        Suite 310
        Dix Hills, New York 11746
        (631) 450-2515

ERIC P. TOSCA
E-Mail: eptosca@krklaw.com

EXHIBIT "D"

2:18–cv–07011 JFB-GRB

# United States District Court

## Eastern District of New York

JOHN LEPPER AND NOELLE LEPPER, individually and as parents and natural guardians of their infant children, B.J.L. and B.I.,

*Plaintiffs*

–against–

VILLAGE OF BABYLON;
RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney: DEBORAH LONGO, Planning Board, Village of Babylon,

*Defendants*

# ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM

CORY H. MORRIS
LAW OFFICES OF CORY H. MORRIS
*Attorney for Plaintiffs*
VICTOR JOHN YANNACONE, JR., *of counsel*

1

# ANSWER TO DEFENDANTS' COUNTERCLAIM

Plaintiffs JOHN LEPPER and NOELLE LEPPER, individually, and as parents and natural guardians of their infant children, B.J.L. and B.I., by Cory H. Morris, Principal Attorney in The Law Offices of Cory H. Morris, attorney of record for said Plaintiffs submits the following as and for an answer to Defendants counterclaim designated paragraph "Twenty-fourth" and of Defendants Answer and Counterclaim filed March 6, 2019 which states,

"TWENTY-FOURTH: That if the plaintiffs B.J.L. and B.I. were caused to sustain damages at the time and place set forth in the plaintiff s Amended Verified Complaint through any culpable conduct and/or negligence other than plaintiffs' own, and if said damages arose in whole or in part from the negligence of and/or culpable conduct of the defendants, Village of Babylon; and, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee, Mary Adams, Village Trustee; Stephen Fellman, Village of Babylon Building Inspector; Suzanne Schettino, Department of Public Works; Gerard Glass, Esq., Village of Babylon Attorney; and Deborah Longo, Planning Board, Village of Babylon, each individually and in their official capacity, and if any judgment is recovered herein by the plaintiffs B.J.L. and B.I. against the answering defendants ,they will be damaged thereby and the answering defendants will be entitled to proportionate contribution and/ or indemnity on the basis of the responsibility of the plaintiffs above named."

2

Further, Plaintiffs JOHN LEPPER and NOELLE LEPPER, individually, and as parents and natural guardians of their infant children, B.J.L. and B.I., by Cory H. Morris, Principal Attorney in The Law Offices of Cory H. Morris, attorney of record for said Plaintiffs submits the following as and for an answer to Defendants counterclaim designated paragraph "Twenty-fifth" of Defendants Answer and Counterclaim filed March 6, 2019 which states,

TWENTY-FIFTH: That if the plaintiffs B.J.L. and B.I. were caused to sustain damages at the time and place set forth in the plaintiffs Amended Verified Complaint through any culpable conduct and/or negligence other than plaintiffs' own, and if said damages arose in whole or in part from the negligence of and/or culpable conduct of the defendants, VILLAGE OF BABYLON; and. RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor. ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village ofBabylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon. each individually and in their official capacity. and if any judgment is recovered herein by the plaintiffs B.J.L. and B.l. against the answering defendants, the damages were caused by the failure of John Lepper and Noelle Lepper to build a safe tree house compliant with the building code of the Village of Babylon; to build a tree house that conforms to the set back requirements from the front of the property as set by the building code; in failing to exhaust the remedies in the administrative process by filing a proper application for permit, proper plans and survey, and in failing to file an appeal to the Board of Zoning Appeals; in failing to show that the tree house is a safe structure with proper means of ingress and egress; without admitting to the allegations in the complaint, in building a tree house for children to use in an area that the plaintiffs claim is unsafe as set forth in their complaint and in making representations for the use of a tree house that fails to comply with local and state law and without obtaining a permit for the subject building.

3

1. Plaintiffs deny each and every allegation of said paragraph Twenty-fourth and Twenty-Fifth of Defendants' Answer and Counterclaim, except to admit that said Defendants "each individually and in their official capacity," "will be damaged" "if any judgment is recovered herein by the plaintiffs B.J.L. and B.I. against the answering defendants."

### AS AND FOR AN AFFIRMATIVE DEFENSE TO DEFENDANTS' COUNTERCLAIM

2. Plaintiffs state that any liability and damages for which Defendants may be liable to the Plaintiffs is not subject to contribution or indemnification from the Plaintiffs.

3. Plaintiffs have not breached any duty which Defendants have identified which might establish they are joint tortfeasors with the Defendants or any one of them.

4. Plaintiffs have not contributed to their own injuries in any way by breaching any established duty.

5. Defendants have presented no evidence that they might be entitled to apportionment of fault.

6. Defendants have presented no evidence to indicate they might be entitled to contribution from the Plaintiffs pursuant to New York CPLR § 1401.

7. Plaintiffs have committed no wrongdoing which can establish liability for common law indemnification.

8. There is no basis for contractual indemnification of the Defendants by the Plaintiffs.

WHEREFORE Plaintiffs seek judgment DISMISSING Defendants' counterclaim all together with such other and further relief as shall be just and proper under the circumstances.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

4

DATED AT   Dix Hills, New York

March 26, 2019

_____

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiffs*
Office & P.O. Address
33 Walt Whitman Rd, *suite* 310
Dix Hills, New York 11746
Phone: (631) 450–2515
FAX: (631) 223–7377
Email: Cory.H.Morris@protonmail.com
VICTOR JOHN YANNACONE, JR., (VY6405) *of counsel*
Phone: (631) 475–0231
Email: barrister@yannalaw.com

To:      ERIC P. TOSCA, ESQ.
         *Attorney for Defendants*
         Kelly Rode & Kelly, Esqs.
         330 Old Country Road
         Mineola, NY 11580
         Phone: 516-739-0400
         Fax: 516-739-0434
         Email: eptosca@krklaw.com

# EXHIBIT "E"

Case 2:21-cv-00014-BMC   Document 2   Filed 01/04/21   Page 1 of 3 PageID #: 70

AO 440 (Rev. 06/12) Summons in a Civil Action

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

# UNITED STATES DISTRICT COURT★

JAN 04 2021 ★

for the

Eastern District of New York

LONG ISLAND OFFICE

JOHN LEPPER

)
)
)
)
)

*Plaintiff(s)*

v.

VILLAGE OF BABYLON; RALPH SCORDINO,
KEVIN MULDOWNEY, ROBYN SILVESTRI, TONY
DAVIDA, MARY ADAMS, STEPHEN FELLMAN,
SUZANNE SCHETTINO, GERARD GLASS, et al

*Defendant(s)*

)
)
)
)
)
)
)

# CV-21 0014

Civil Action No.

**COGAN, J**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* VILLAGE OF BABYLON; Village of Babylon Mayor, Estate of RALPH SCORDINO, KEVIN MULDOWNEY, Dep. Mayor, ROBYN SILVESTRI, Trustee, TONY DAVIDA, Trustee, MARY ADAMS, Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants, 153 West Main Street, Babylon, NY 11702

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   CORY H. MORRIS (CM 5225)
135 Pinelawn Road, Suite 250s
Melville NY 11747

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date:   JAN - 4 2021

*Signature of Clerk or Deputy Clerk*

RECEIVED
JAN 4 2021
VILLAGE CLERK'S OFFICE

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Summons-Addendum

## ADDENDUM

VILLAGE OF BABYLON; Village of Babylon Mayor, Estate of RALPH SCORDINO, KEVIN MULDOWNEY, Dep. Mayor, ROBYN SILVESTRI, Trustee, TONY DAVIDA, Trustee, MARY ADAMS, Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants,

153 West Main Street, Babylon, NY 11702

Case 2:21-cv-00014-BMC Document 1 Filed 01/04/21 Page 1 of 67 PageID #: 1

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

2:20-cv-

★ JAN 04 2021 ★

LONG ISLAND OFFICE

# United States District Court

## Eastern District of New York

CV-21 0014

JOHN LEPPER,

*Plaintiffs*

—against—

COGAN, J

VILLAGE OF BABYLON;
THE ESTATE OF RALPH SCORDINO, Former Village of Babylon
Mayor, Village of Babylon Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village Trustee;
STEPHEN FELLMAN, Village of Babylon Building Inspector;
SUZANNE SCHETTINO, Department of Public Works; GERARD
GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon,

*Defendants*

# VERIFIED COMPLAINT

☐ ORIGINAL

LAW OFFICES OF CORY H. MORRIS
*Attorney for Plaintiffs*
VICTOR JOHN YANNACONE, JR., *of counsel*

## TABLE OF CONTENTS

Plaintiff demands a trial by Jury..................................................1

Preliminary Statement ...............................................................1

Introduction ...............................................................................1

Jurisdiction and Venue ..............................................................3

Administrative Proceedings and Timeliness .............................3

Parties.......................................................................................4

The Facts ..................................................................................6

    The Children's Treehouse ....................................................6

    John Lepper's Application.....................................................9

    Other structures in the Village of Babylon .........................13

    The prosecution of John Lepper .........................................18

    Village Justice Court prosecution I .....................................20

    The Village Court proceedings II .........................................22

    The Order of Village Justice Rafter .....................................26

    Post-trial actions against John Lepper.................................29

    The second wave of prosecutions against John Lepper...................30

    Commencement of the first action .......................................32

    Plaintiff's appeal to the Appellate Term...............................34

General Complaints by the Plaintiff.........................................36

The basis for equitable relief....................................................37

Defendants use legal process, fines and prosecution to silence John Lepper and violate his First Amendment rights ..........................38

Village of Babylon code § 365–26 forecloses age-appropriate private rights of assembly and association on arbitrary grounds and are

therefore technically capricious as well and certainly underinclusive. .................................................................................. 41

Plaintiff John Lepper's rights are being violated by the threat of continued fines .......................................................................... 43

Prosecution of John Lepper by the defendants is an unconstitutional taking of his property..................................................................... 45

The excessive fines threated by the Village of Babylon violate the Eighth Amendment........................................................................ 46

Plaintiff's "Monell" claim; 42 U.S.C. §1983 ............................................. 48

Plaintiff seeks injunctive relief.............................................................. 50

State Law Claims .................................................................................. 51

Malicious prosecution............................................................................ 52

Extra-Judicial actions against John Lepper............................................. 53

The role of the Village Attorney............................................................. 55

Abuse of Process .................................................................................. 57

Negligence ........................................................................................... 57

Negligent and/or Intentional Infliction of Emotional Distress .............. 58

Defamation ........................................................................................... 59

Prima Facie Tort .................................................................................. 59

Injuries and Damages ........................................................................... 60

Prayer for Relief................................................................................... 60

Verification ........................................................................................... 63

ii

PLAINTIFF DEMANDS A TRIAL BY JURY

## PRELIMINARY STATEMENT

This is a civil action seeking a declaratory judgment, injunctive relief and equitable relief against, and compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from, the Defendants for violating Plaintiff's civil, constitutional, and human rights, under the Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution and New York State Law; and to recover compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants for their negligence, abuse of process, negligent and/or intentional infliction of emotional distress, and prima facie tort.

## INTRODUCTION

1. Plaintiff, John Lepper, alleges that Defendants, jointly and severally, individually and collectively, intentionally, knowingly, wantonly, negligently, and/or recklessly, sought to and did wrongfully deprive him of his civil, constitutional, and human rights by committing acts under color of law to deprive him of his civil, constitutional, and human rights.

2. Plaintiff, John Lepper, alleges that Defendant Village of Babylon was negligent in training, hiring and supervising its Village of Babylon Attorney, Defendant Gerard Glass, and was deliberately indifferent to the actions of Gerard Glass who, among other things, sought to profit off of the malicious prosecution of Plaintiff in derogation of prosecutorial canons.

1

3. Plaintiff, John Lepper alleges that Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution, retaliation and for conspiring to condone and encourage such civil rights violations together with conspiring to and violating Plaintiff's Civil Rights.

4. Defendant Village of Babylon conspired in prosecuting Plaintiff, an innocent taxpayer, in the hiring and supervising its employees, inclusive of Defendant Gerard Glass, who profited enormously from the same prosecution and being sued as a Defendant under Docket No. 18-cv-7011.

5. Defendants, individually and collectively, knew and had reason to know that the seizure, false prosecution, threats against Plaintiff, tickets over "treehouse without a permit" and retaliation against Plaintiff, discussed further herein, would cause damages and were intended to silence the Plaintiff at enormous costs to the Village of Babylon taxpayer.

6. Accordingly, Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution, and for conspiring to condone and encourage such civil rights violations and for conspiring to violate Plaintiff's Civil Rights.

7. As a result of the Defendants' actions (or lack thereof), Plaintiff John Lepper suffered emotional scarring and suffering, and incurred significant cost and expenses due to the Defendants' actions, including but not limited to: substantial legal fees, loss of good name and standing in the community, emotional distress and other cost/expenses.

## JURISDICTION AND VENUE

8.  The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

9.  This Honorable Court is requested to exercise supplemental jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. §1367.

10. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986.

11. This action is also brought pursuant to the Declaratory Judgment Act, under 28 U.S.C. §§ 2201–2202, to address the specific and anticipated harm Plaintiffs and all other similarly situated residents within the Village of Babylon.

12. Declaratory relief is necessary whether or not Defendant Village of Babylon discontinues open prosecution against John Lepper so long as the threat of prosecution for violation of Village of Babylon Code Section 365–26 continues to exist.

13. Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the events and violations herein alleged occurred was in Suffolk County, New York.

## ADMINISTRATIVE PROCEEDINGS AND TIMELINESS

14. This action has been commenced within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 42 U.S.C. § 1986.

15. There are no effective New York state or federal administrative remedies available to the John Lepper.

16. Plaintiff has exhausted any potentially effective administrative remedies.

17. On or about March 10, 2020 Plaintiff John Lepper filed a Second Notice of Claim against the Village of Babylon.

18. Plaintiff John Lepper availed himself of the General Municipal Law Section 50-H for the purpose of an examination.

19. Defendants refused to adjust the claim and more than ninety (90) days have passed.

## PARTIES

20. Plaintiff, JOHN LEPPER is a citizen of the United States, an Honorably discharged United States Marine presently employed as a member of the Fire Department of the City of New York and is a resident of the Incorporated Village of Babylon, Suffolk County, New York.

21. John Lepper is a lawful owner of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in Block F as shown on Map of Sampwam

4

Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York (hereinafter referred to as the "Subject Property").

22. Infant B.J.L. is a six-year-old minor and the natural child born of the union of John Lepper and Noelle Lepper.

23. Infant B.L. is a five-year-old minor and the natural child born of the union of John Lepper and Noelle Lepper.

24. At all times relevant in this Complaint, and upon information and belief, Defendant Village of Babylon , is a recipient of federal funding and was a recipient of federal funding at the time of the events complained of herein.

25. Defendant Village of Babylon is an incorporated Village located within the Town of Babylon in Suffolk County, New York.

26. Defendant Village of Babylon is governed by an elected Mayor and four elected Trustees, collectively the Babylon Village Board.

27. According to information posed on the Village of Babylon website at http://www.villageofbabylonny.gov/ Defendant Ralph Scordino, was the duly elected Mayor and has died before the date of this complaint and Defendant Mary Adams is now the Mayor, Defendant Kevin Muldowney, is the Deputy Mayor, and Defendant Robyn Silvestri, Defendant Tony Davida, Dominic Bencivenga and Anthony Cardali were/are Village of Babylon Trustees.

5

28. Upon information and belief, Defendant Stephen Fellman is the Village of Babylon Building Inspector; Defendant Suzanne Schettino, directs the Department of Public Works; Defendant Gerard Glass, Esq. is the Village of Babylon Attorney; and Defendant Deborah Longo, is involved in administration of the Village of Babylon Planning Board.

29. All of the individual named Defendants are being sued in both their individual and official capacities.

## THE FACTS

30. This is the second lawsuit filed by John Lepper against these actors, the first seeking injunctive relief related to the pending destruction and forcible removal of the treehouse discussed herein and filed under Docket Number 18-cv-7011:

31. In April, 2018, Plaintiff, JOHN LEPPER, found a syringe and a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard when he was playing with his children. He informed his neighbors immediately and was outspoken in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

## THE CHILDREN'S TREEHOUSE

32. The following is a true and accurate aerial view of the Lepper property and its surrounding neighborhood identifying the location where the hypodermic needle was found.



33. On or about May 3, 2018, Plaintiff John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of Babylon.

34. The following Lepper family neighbors can see the treehouse from their property: Joe and Joanne Mineo and their sons M.M. and N.M.; Pay and Keirsten Murphy and their daughter G.; Kevin and Lyndsey and their children A. and S.; Joe and Katelyn and their two pre-school-age children, all of whom live on Cockonoe Ave; and Mike And Josephine Domingo and their three college-age daughters who live on Wampum Rd.

35. By letter dated May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that "It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit."

36. Village of Babylon Code § 365–26, § A, states: "No building shall hereafter be erected and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall

8

contain all information necessary to enable him to determine whether the proposed building addition or structural alterations or change of use to an existing building comply with the provisions of this chapter and Chapter 171, Flood Damage Prevention, where applicable."

37. Village of Babylon Code § 365–26 C(3) states "A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet."

38. In response to the May 10, 2018 letter from Defendant Fellman, Plaintiffs stopped work on the treehouse for their children.

39. Upon information and belief, Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee were jointly and severally, individually and collectively, responsible for allowing such notice to be sent to Plaintiff.

40. Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee were jointly and severally, individually and collectively, responsible for the continuing violations, retaliation, and constitutional violations against Plaintiff.

## JOHN LEPPER'S APPLICATION

41. On or about May 21st, 2018, Plaintiff John Lepper visited the Building Department office of Defendant Village of Babylon;

9

completed a building permit application and submitted a
front elevation / framing drawing with a copy of a recent
survey of the Lepper Family Home, a copy of which is
annexed hereto and made a part of this complaint designated
Exhibit 1.

42. An unidentified Building Department employee, "Jane Doe",
to whom Plaintiff John Lepper submitted the application
commented that she usually did not receive such a detailed
drawing from homeowners.

43. While at the Village of Babylon Building Department on or
about May 21, 2018, Plaintiff John Lepper spoke with another
employee of Defendant Village of Babylon, Holly Zappala, and
told her that a used hypodermic needle was found on his
property, and other used hypodermic needles were being
found in the area and that he had concerns for the well-being
of his family.

44. On or about May 21, 2018, while at the Village of Babylon
Building Department office, John Lepper spoke with another
employee of Defendant Village of Babylon, Holly Zappala, and
told her that he had found a used hypodermic needle on his
property, and other used hypodermic needles were being
found in the immediate neighborhood of his property and that
he had concerns for the well-being of his family.

45. Ms. Zappala told Plaintiff John Lepper that Defendant
Village of Babylon was aware of drug-related crimes and the
presence of hypodermic instruments prior to April, 2018 and
that she and the Village of Babylon administration may be

10

aware of criminal activity occurring on the subject premises and toward the Lepper Family.

46. Plaintiff John Lepper, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of heroin in his community, spoke to and informed everyone present in the building department on May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018 to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon.

47. The following is a true and correct copy of the survey of the Lepper property indicating the location of the children's treehouse:

(The Rest of this Page Intentionally Left Blank)

11

01/23/2013 08:38 FAX 002

**OWNERS:**

JOHN LEPPER & NOELLE LEPPER
FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK
FRANKLIN FIRST FINANCIAL

SURVEY OF LOTS 18B & 18C,
IN BLOCK F, AS SHOWN ON MAP OF
**SAMPAWAM PARK-ANNEX**
FILED: OCTOBER 31, 1921 – MAP No: 768
IN THE INCORPORATED VILLAGE OF BABYLON,
TOWN OF BABYLON,
SUFFOLK COUNTY, NEW YORK
SCTM: 0102-004.00-01.00-100.000

SCALE: 1"=20'
DRAWN BY: R.K.H.
FILE No.: Q088-12
DATE: MARCH 16, 2012

AREA: 7,576.00 Sq.Ft.
0.1739 ACRES
ELEVATIONS ASSUMED DATUM

STATE OF NEW YORK — ELIZABETH G. McQUILKIN — LICENSED LAND SURVEYOR

**LISA McQUILKIN**
LAND SURVEYING
374 EAST MAIN STREET
EAST ISLIP, N.Y. 11730
TEL: 631-277-3606
FAX: 631-277-3906

69 COCKENOE AVENUE, BABYLON

48. Upon information and belief, Defendants jointly and severally, individually and collectively, failed to act upon or even acknowledge Plaintiffs' efforts to comply with the Village of Babylon Code.

## OTHER STRUCTURES IN THE VILLAGE OF BABYLON

49. For example, Defendants actually responded to others similarly situated who attempted to comply with the code, such as the application of 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York:

VILLAGE OF BABYLON
133 West Main Street
Babylon, New York 11702
(631) 669-1300
BUILDING DEPARTMENT
BUILDING PERMIT FORM

Application is hereby made to Code Enforcement Official (Building Inspector) of the Village of Babylon, NY, for the approval of plans and specifications to build or install as herein described. The applicant agrees to comply with all the provisions of the code of the Village of Babylon and/or any other applicable Federal, State and Local codes.

NOTE: Survey or site plans must accompany permit application. (For commercial or industrial applications, consult the Village of Babylon Planning Board.

FOR OFFICE USE ONLY:
102– 6 – 1 – 12 Flood Zone
Section Block Lot
Estimated Value of Construction $ Fee
Permit Number:
Current Zoning A-9 Approved By: Date Checked:
Permit Application Denied Why?
Is this permit a result of a Zoning Board of Appeals approval? ☐ Yes ☐ No
If yes, what conditions, if any, were set:
Board of Appeals Case #:
Pre-site inspection made by: Date:
Approved for Issuance of Permit: Date: 6/26/20
Issued by: Date: Checked by:
Certificate of Occupancy #:

Permit(s) requested (check one or more below)
Numbers refer to questions on right that must be answered.

Building Permit
☐ Commercial ☐ Industrial ☐ Residential
☐ Main Building ☐ Addition 1–8
☐ Accessory Building ☐ Alteration 1–8
☐ Interior Alteration ☐ Addition 1–8
☐ Two-Family Special Permit 1–3, 7, 8
☐ Change of Use or Occupancy 1–3, 8
☐ Fire Damage Repair 1–3, 8
☐ Fireplace 6, 7
☐ Board of Appeals 1–3, 7, 8
☐ Swim/Pool ☐ In-Ground ☐ Above
4 foot safety fence required 1–8
☐ Demolition (Valid only 6 mos.) 1–3, 7, 8
☐ Underground Tank Installation
(plus plumbing permit) 1–3, 6, 8
☒ Other - Explain 1–8

RECEIVED JUN 25 2020 THE VILLAGE OF BABYLON BUILDING DEPARTMENT

Answer, in black ink, questions numbered next to type of PERMIT(S) REQUESTED.
1. PRESENT USE of property Single Family Home
2. PROPOSED USE Addition of a playground/swing set
3. DESCRIPTION OF PROPOSED WORK Add addition to current [illegible] foot playground
4. FLOOR AREA to be constructed or altered: [illegible] Total Square Feet
5. SIZE of property (186) x (134) = 24,695 sq. ft. or 0.57 Acres
6. HEIGHT of building from average grade to highest point 12 Feet
7. PROPERTY LOCATION 99 Park Ave. Babylon, NY 11702
☐ N ☒ S ☐ E ☐ W Side of Park Avenue St. Rd. Ave. Feet
8. ORIGINAL CERTIFICATE OF OCCUPANCY #
Certified as:

APPROVED

50.   Upon information and belief, persons like Thomas C. Bruckner, submitted handwritten drawings such as the following that were acted upon while Plaintiff's were not:



51.   Defendants, jointly and severally, individually and collectively, knew and/or had reason to know that the Plaintiff sought to use their real-property in a manner that would contribute to and benefit the education and personal growth of their infant children.

52.   Defendants, jointly and severally, individually and collectively, never intended to act upon Plaintiff's building permit application.

14

53. Defendants, jointly and severally, individually and collectively, apparently intended to take advantage of the voluntary, but not legally required, application filed by John Lepper for a permit to construct a tree house for his children as a vehicle to charge Plaintiffs with violations of Village of Babylon Code Section 365–26 and collect fines from John Lepper by simply refusing to consider and act upon the application by Plaintiff, John Lepper.

54. On June 15, 2018, Plaintiff John Lepper called the Village of Babylon Building Department to check on the status of his application and was told by an unidentified employee, Jane Doe, that no determination had been made as to whether Mr. Lepper's treehouse was in violation of the town code.

55. Plaintiff John Lepper immediately ceased construction and assembly of the partially fabricated treehouse as soon as he had been ordered to do so by Building Inspector Fellman.

56. Determined to either delay construction of an innocuous and code-compliant treehouse solely for the benefit of minor children, or harass and intimidate the Lepper family by destroying their infant son's eagerly anticipated birthday present, the Defendants, jointly and severally, individually and collectively, refused to issue the appropriate building permit or withdraw the "stop work" order.

57. Within hours of his son's birthday, Plaintiffs John decided to complete the treehouse and raise his children in the manner and safe-guard them from what he had already advised the Defendants was the scourge of drug abuse and the criminal

15

activity known to be occurring in his neighborhood and already visited upon his property.

58. Mr. Lepper's neighbor had a similar structure in the air, abutting the property line, and Village of Babylon officials know about the same structure yet chose to prosecute John Lepper not his neighbor or others.

59. In 18-cv-7011, John Lepper presented photographic evidence to the Defendants and this Honorable Court that a number of treehouses and similar structures existed throughout the Incorporated Village of Babylon but not subject to the onerous requirements imposed upon John Lepper. 

60. Other treehouse/unpermitted structures may by placed close to the water and perhaps may incur maritime violations should the Defendants peer deep enough into this intellectual abscess that  continues to persist with respect to the Lepper Family Treehouse and, specifically, John Lepper.

16

61.  The following is a true and accurate photograph of a similar such structure existing within the Village of Babylon, County of Suffolk, State of New York: 

62.  While these treehouse type structures, mostly utilized by children as part of Americana—that pursuit of happiness for which the United States of America professed belongs to all— come in all shapes and sizes and nearly all of them do not have building permits: 

63.  The following is a true and accurate photograph of a another such structure existing within the Village of Babylon, County of Suffolk, State of New York that does not seem to be a treehouse but most certainly abuts the property line and appears to have a finished roof and siding, yet has not been subject to the onerous requirements, prosecutions, fines or

17

threats imposed upon John Lepper and his family, as considered in Docket No: 18-cv-7011:

## THE PROSECUTION OF JOHN LEPPER

64. On July 19, 2018, John Lepper received by certified mail three accusatory instruments dated July 11th, 12th & 13th each of which stated John Lepper was in violation of Village of Babylon Code § 365–26 for construction of a treehouse without a permit.

65. In response, on July 19, 2018, Plaintiff John Lepper immediately visited the Village of Babylon Building Department to inquire about the three summons he had received. He was told that he needed to make an appointment with Building Inspector Fellman and a meeting was scheduled for July 24, 2018.

66. Plaintiff John Lepper met with Defendant Building Inspector Fellman on July 24, 2018 and asked Defendant Building Inspector Fellman about each essentially identical citation which merely concluded that a "treehouse" violated Village of Babylon Code § 365–26. In response, Defendant Building Inspector Fellman stated that Mr. Lepper owed $250 for the first accusatory instrument, $500 for the second accusatory instrument and $1,000 for the third accusatory instrument.

67. Plaintiff John Lepper met with Defendant Building Inspector Fellman on July 24, 2018 and asked Defendant Building Inspector Fellman about each essentially identical citation which merely concluded that a "treehouse" violated Village of

18

Babylon Code § 365–26. At that time, Mr. Lepper had not received any notice of action on his application or any notice that he was in violation of the Code for providing a treehouse for his children.

68. In response, Defendant Building Inspector Fellman stated that Mr. Lepper owed $250 for the first accusatory instrument, $500 for the second accusatory instrument and $1,000 for the third accusatory instrument.

69. Plaintiff John Lepper protested to Defendant Building Inspector Fellman that not only were such fines unwarranted and excessive but that no prior notice of any violation had been provided to the Lepper family.

70. Building Inspector Fellman told Mr. Lepper to resolve the matter in Court on August 14, 2018.

71. Upon information and belief, Defendant Village of Babylon is more concerned with punishing taxpaying residents and extorting unconscionable fines from them for questionable violations of obscure and arcane, vague and ambiguous ordinances extracting fines out of law abiding resident property owners than providing municipal services such a promptly processing an application for a building permit.

72. Among the parents and children who visited the Treehouse prior to August 14 hearing were: Joe and Joanne Mineo and their sons, M.M. age 14 and N.M. age 16; , Pat and Kirsten Murphy and their daughter G.M., age 7; Terri McSweeney and Cindy McSweeney with E.M., age 7 and P.M., age 5; Steve Kazda and Amanda Kazda and their sons, J.K., age 6

19

and J.K. age 4; Mike Columbia and Christina Columbia and their daughters, C.C., age 6 and C.C., age 4; Mike Pagamo and Doreen Pagamo and M.P., age 8 and M.P., age 6; Charlie Lepper and Deena Lepper and their children, J.L., age 14; J.L., age 10, and C.L., age 8; a 93 year old WWII veteran, and Barbra who is over 65 years of age.

## VILLAGE JUSTICE COURT PROSECUTION I

73. Plaintiff John Lepper who is a New York City firefighter sought a continuance of the hearing scheduled for August 14, 2018 from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illnesses from service at the 9/11 scene. Village Judge John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, arriving in Court at precisely 1400 hours still in his Class A uniform.

74. Village Judge John T. Rafter and Defendant Gerard Glass, the Babylon Village attorney acting as the prosecutor both knew that Mr. Lepper was unrepresented by counsel, and that he was facing fines which might amount to $1,750 together with court costs and the possibility of continued and continuing prosecution, yet at no time did Village Judge Rafter or Village Attorney Glass ever warn the Defendant or advise him not only of his right to counsel, but because of the questionable nature of the charges and the circumstances of the prosecution the real need to consult an attorney before proceeding any further in his own defense.

20

75. Upon information and belief, the wife of Village Judge John T. Rafter works with the complainant who instigated the prosecution of the Lepper Family for erecting a treehouse for their children and the children of the neighborhood.

76. Upon information and belief, Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee conveyed to Village Justice John Rafter and other employees of Defendant Village of Babylon such as Building Inspector Fellman their desire to collect money from fines following convictions of Village of Babylon residents who had the temerity to challenge the judgment of Defendant Building Inspector Fellman that a violation of Village of Babylon Code Section 365–26 existed.

77. Defendants, jointly and severally, individually and collectively, engaged in this course of conduct to raise revenue and receive monies to which Defendant Village of Babylon would not otherwise be entitled.

78. On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per § 116 Unsafe Structures of the International Building Code the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

79. There is no substantial credible evidence that the Village of Babylon ever adopted the International Building Code nor incorporated its § 116 as part of the Village of Babylon Code.

21

80. In contrast to an John Lepper's certification of an engineer, to date, no substantial credible evidence has ever been presented showing that the Lepper family treehouse is in any way unsafe for its intended use, an arboreal playhouse, by the Lepper children and other children.

## THE VILLAGE COURT PROCEEDINGS II

81. Defendant Village Attorney Glass requested an adjournment of the hearing scheduled for September 4, 2018 and Village Judge Rafter issued a verbal "stop work" order and asked Mr. Leper "to unplug the light." Then he adjourned the case to September 18, 2018.

82. Upon information and belief, on September 18, 2018, Village Judge Rafter learned that the office of Defendant Village of Babylon Mayor had received a complaint regarding John Lepper.

83. Upon information and belief, the late Defendant Mayor Ralph Scordino played golf with Village Judge John T. Rafter and discussed matters pending in the Village Court, including the prosecution of John Lepper.

84. Village Judge Rafter never informed Mr. Lepper, who was appearing pro se without benefit of counsel, of his rights to receive information about the complaint and the complainant; his right to challenge the accusatory instruments that merely stated, "Tree House" and were unsigned as legally insufficient.

22

85.  Nevertheless, Village Judge Rafter did inquire of Mr. Lepper, pro se, about his efforts at complying with the Village of Babylon Code § 365–26 and the permit application which Mr. Lepper voluntarily filed.

86.  Mr. Lepper informed Village Judge Rafter that his building permit application had been accepted by the employees of the Village of Babylon Building Department.

87.  The following interaction took place between Mr. Lepper and Village Judge:

    JUDGE RAFTER: Okay . Did you have an understanding of what the purpose of the permit is?

    MR. LEPPER: Yes sir .

    JUDGE RAFTER: What was your understanding of what the purpose of the permit was?

    MR. LEPPER: A construction permit was required for a structure being put up according to building code 365–26 it's not required for under 90 square feet. And I explained that to Mr. Fellman .

    JUDGE RAFTER: I will interpret the code, sir .

    MR. LEPPER: Okay .

    JUDGE RAFTER: Neither you nor Mr. Fellman will interpret the code. (Trial transcript of September 18, 2018, 10:3–23:)

88.  Already, Village Judge Rafter was imputing fault on the pro se Defendant, John Lepper who had attempted to comply with what was a patently vague and ambiguous ordinance:

    JUDGE RAFTER: Did you have an understanding of that before you undertook the construction?

23

MR . LEPPER: Not exactly, sir. Because I did not think that a permit was required for what I was putting up. (Trial transcript September 18, 2018, 11:12–19.)

89.   Village Judge Rafter continued to make the case for the prosecutor, Defendant Village Attorney Glass, who at no time objected to the line of inquiry of the accused, Mr. Lepper:

JUDGE RAFTER: Did you contact the building department before you began construction or even contemplated construction of a tree house?

MR. LEPPER: Yes. On the 19th when I submitted the application. Prior to the platform no , sir. I did not think a permit was required for a tree house. I was not sure. (Trial transcript September 18, 2018, 12:2–14)

90.   Rather than credit the sworn testimony of John Lepper. A pro se Defendant, and presumed innocent until proven guilty beyond reasonable doubt, Village Judge Rafter continued to push the burden onto Mr. Lepper who provided sworn evidence that he submitted a permit application prior to construction and prior to the issuance of any accusatory instrument by Village of Babylon:

JUDGER RAFTER: What is the basis of your objection?

MR . LEPPER: That was submitted on May 19th after I received the letter from Mr. Fellman regarding construction of the tree house without a permit. That was accepted by the office upstairs on May 19th and it was complete.

JUDGE RAFTER : You note there is no date on this. Do you have any proof as to when it was received?

24

MR . LEPPER : I was given a copy of the drawing I made and the survey that it was received. (Trial transcript September 18, 2018, 35:7–23)

91.    Determined to convict the pro se Defendant John Lepper, Village Judge Rafter interrupts Defendant Village Attorney Glass when questioning Defendant Building Inspector Fellman during the trial about Mr. Lepper's contention that the Lepper Family Treehouse did not require a permit:

MR. GLASS: Mr. Fellman, it's your contention that under the Babylon Village code 365–26 there was no building permit for this structure -- this tree house, correct?

MR, FELLMAN: Correct.

MR. GLASS: Is there any provision of the Babylon Village code that would exempt one in the Village of Babylon from having to obtain a building permit based up on the facts you have testified to?

JUDGE RAFTER: Mr. Glass , I think that calls for a conclusion of law. So I am not going to permit him to answer that.

MR. GLASS: Okay. I have nothing further .

JUDGE RAFTER: You can ask in his opinion as a violation of the code and then set forth the facts upon which he bases his opinion. And then I would make the ultimate determination.

MR . GLASS: Judge, perhaps this should be the question then. Is there any provision of the code that exempts tree houses from obtaining a building permit?

MR . FELLMAN: No .

MR. GLASS: Okay. I have nothing further judge. (Trial transcript September 18, 2018, 39:11–25, 40:2–22)

25

92. Most telling is the testimony from Defendant Building Inspector Fellman that "we can issue violations every 24 hours." (Trial transcript September 18, 2018, 45:11–12)

93. Village Judge Rafter convicted John Lepper by Order dated October 17, 2018 yet, as was stated on the record on November 20, 2018, did not recuse himself or allow further inquiry into his wife's relationship with the complainant who, upon information and belief, submitted a complaint against the Lepper Family Treehouse.

94. In his decision, Village Judge Rafter stated that the "testimony of Stephan Fellman...established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office that a treehouse was being constructed," yet no such complaint was ever shown to Mr. Lepper although he requested a copy on several occasions, nor was it produced during the trial.

95. To date no such complaint has been produced albeit it is known and John Lepper has reason to know that it is the product of the conspiracy between and among the Defendants.

## THE ORDER OF VILLAGE JUSTICE RAFTER

96. On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a pro se defendant in a quasi-criminal proceeding, Mr. Lepper was found in violation of § 365-26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any

26

citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

97. The Order by Village Judge Rafter finding John. Lepper in violation of § 365–26 of the Village of Babylon Code required Village Judge Rafter to use a definition of "building" from a dictionary since it was not defined in the Village of Babylon Code: "The Merriam-Webster Dictionary defines a building as follows; A structure that is designed or intended for support, enclosure, shelter or protection of persons, animals or property having a permanent roof that is support by columns or walls." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 1)

98. Without referring to the remaining provisions of the Village of Babylon Code governing children's play gyms and the expansive use of "any combination," Judge Rafter states "The Court hereby specifically finds that the treehouse in question constituted a "building" within the meaning of the subject Code section." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 3)

99. In that same October 17, 2018 Order finding Mr. Lepper in violation of § 365–26 of the Village of Babylon Code Village Judge Rafter states, "it is noted that the Notice of Violation is not signed by any representative of the Village of Babylon." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2)

27

100. In his October 17, 2018 Order finding Mr. Lepper in violation of § 365–26 of the Village of Babylon Code Village Judge Rafter finds that "Defendant [Mr. Lepper] did apply for a permit" (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.) but then states without any reference to the record, "but his application was deemed incomplete as it did not contain a drawing from a licensed architect or engineer." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.)

101. The Village of Babylon never required "a drawing from a licensed architect or engineer" from any other "elevated playhouse" or treehouse that now exists in the Village.

102. There is no evidence that the Lepper family was ever informed by any representative of the Village of Babylon that such a "drawing" was required for a children's tree house of less than 90 square feet floor area.

103. If, in fact, the Village of Babylon Code Section 365–26 does require such an expensive document to obtain a permit for a children's tree house of less than 90 square feet of floor area it essentially prevents a homeowner from the legal and proper use of their real property and is on its face a violation of Plaintiffs' civil, constitutional and human rights associated with title to real property and the quiet enjoyment of that property as a family.

104. Indeed, as per the application of Thomas C. Bruckner concerning 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York, this requirement was pretextual.

28

### POST-TRIAL ACTIONS AGAINST JOHN LEPPER

105. On October 17, 2018, after the Order of Village Judge Rafter was delivered by code enforcement, John Lepper went to Village Court to inquire about appeal.

106. The next day, October 18, 2018, Babylon Village Attorney Gerard Glass sent a letter to the Lepper Family, stating, in toto, that "As you know this office is counsel to the Village of Babylon. The Court has rendered its decision. Please let me know your intentions. Thank you for your attention and courtesies herein."

107. The day after Attorney Glass sent his letter, and two days after the Order was issued, Building Inspector Fellman stated in a letter that, "On October 17, 2018 Village Justice John Rafter found you guilty of each offense listed on various summonses you received regarding the construction of a treehouse within your front yard setback. I, as Building Inspector, am ordering the continuation of the stop work order barring any further construction or occupancy of the tree house."

108. Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

109. The threat of accruing daily fines, issued by Defendant Fellman and repeated in open court by Defendant Gerard Glass, persist to this very day.

29

### THE SECOND WAVE OF PROSECUTIONS AGAINST JOHN LEPPER

110. Rather than allow the Lepper family sufficient time to appeal or seek counsel to elapse, the Defendants, jointly and severally, individually and collectively, did work together to injure the Plaintiff Lepper family; silence the Lepper family from speaking out about community problems, and did engage in an abuse of legal process to have Mr. Lepper remove the Lepper Family Treehouse.

111. Defendant Building Inspector Fellman did issue multiple additional accusatory instruments concerning the Lepper Family Treehouse on October 31, 2018.

112. On November 5, 2018, John Lepper paid the fines imposed on him by Village Judge Rafter in his October 17th Order.

113. On November 13, 2018, the day of a hearing scheduled for trial on accusatory instruments previously issued by Building Inspector Fellman, Building Inspector Fellman created and filed a document designated "Accusatory Instrument/Information for State and Village Ordinances" asserting John Lepper "did wrongfully and unlawfully commit the offense of Section 365–26 Construction without a Permit," followed by a recital of "§365–26 Permit Required; Materials to be submitted."

114. Nowhere in that putative Accusatory Instrument/Information and the ordinance quoted therein is there any mention of the need for any drawing by an "architect or engineer."

115. Nowhere in the application of Thomas C. Bruckner 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York is such a requirement nor is there a requirement on any of the treehouses/boathouses/playhouses which have been allowed to exist in the Village of Babylon without permits.

116. In that putative Accusatory Instrument/Information, Building Inspector Fellman alleges that he "did observe the defendant [John Lepper] erected a treehouse without a building permit. Further after a stop work order was issued on 10/19/18 barring any further construction or occupancy of the treehouse the defendant added lights."

117. On November 13, 2018, Village Justice John Rafter conducted a hearing on the accusatory instrument issued on October 20, 2018.

118. November 16, 2018, Plaintiff John Lepper filed a Notice of Appeal, a FOIL request, and a Litigation Hold Notice.

119. On November 20, 2018, a hearing was held before Village Justice Rafter concerning an alleged October 20th Violation and two additional from Halloween.

120. On November 20, 2018, through counsel, Mr. Lepper asked the Court to enjoin the daily issuance of fines so that Mr. Lepper may resolve the new set of accusatory instruments against him on the merits but the Hon. John T. Rafter refused to do so.

31

121. On November 21, 2018, John Lepper tried to obtain copies of exhibits that were missing from the trial on September 18, 2018. After waiting two hours he was denied copies.

122. On November 27, 2018, at approximately 1515 hours Plaintiff John Lepper filed a Motion to dismiss the outstanding accusatory instruments together with a letter from Attorney Morris requesting copies of the exhibits from the trial on September 18, 2018.

123. On November 27, 2018, at 8pm Mt. Lepper attended a Babylon Village Board of Trustees meeting with Joe Mineo and Nick Montalto.

### COMMENCEMENT OF THE FIRST ACTION

124. On December 10, 2018, Plaintiff filed a Verified Complaint accompanied by an Order to Show Cause and the matter was heard before Hon. Joseph F. Bianco.

125. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon utilized daily fines against purported Village of Babylon Code violators to obtain compliance.

126. Defendant Gerald Glass, Esq. did represent in open Court on December 10, 2018 that the Village of Babylon intends to require building permits for any treehouse structure in the Village of Babylon.

127. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon took issue with

32

a temporary electric extension cord to a tree on Plaintiffs' private property and sought to enjoin the use of a light that illuminated Plaintiffs American Flag and the adjoining street where illegal drug activity had taken place.



128. According to statements made by Defendant Gerald Glass in open Court on December 10, 2018, the attempts of Defendant elected officials Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee, Mary Adams, Village Trustee, to enforce Village of Babylon Code Section 865-26 was a thinly disguised effort to extort money from the Plaintiff.

129. Defendant Gerald Glass, speaking on behalf of all Defendants, did wish to enjoin Plaintiff from efforts at

ameliorating the drug use that occurred on and around his property by illuminating the street.

130. Defendant Gerald Glass, on December 10, 2018 before this Honorable Court, did provide several admissions as to the true intentions of Defendants, jointly and severally, individually and collectively, to punish Plaintiffs for every day that the Lepper Family Treehouse existed.

131. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was monitoring Plaintiffs' property.

132. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was conducting surveillance of Plaintiffs' property and the family activities thereon.

133. Defendant Gerard Glass, Esq. did proceed to profit as being sued as a named Defendant along with the Village of Babylon as further discussed below.

## PLAINTIFF'S APPEAL TO THE APPELLATE TERM

134. John Lepper did appeal the convictions of the lower court.

135. *People* v *Lepper (John)* 2019 NY Slip Op 52117(U) was decided on December 19, 2019 by the Appellate Term, Second Department (hereinafter "Appellate Term Decision") which held that "The accusatory instruments...fail to allege facts of an evidentiary nature establishing the nature of the work that defendant performed on the tree house, namely, that

34

defendant had erected the tree house, structurally altered it or changed the use thereof...[and]... Therefore, the accusatory instruments fail to allege every element of the offense." *Id.*

136. According to a *Newsday* Article, Keldy Ortiz, *Homeowner who built treehouse serves claim against Village of Babylon,* Newsday (April 30, 2020), https://nwsdy.li/3oO9VZu, Defendant Gerard Glass "said the December decision[, Appellate Term Decision], was based on a technicality."

137. Defendant Gerard Glass stated to *Newsday*, "Babylon Village attorney Gerard Glass says the decision is no surprise because village officials knew there was an issue in the way the summons was written, and they could not correct it after the fact." See Deborah S. Morris, "Permit not needed for Babylon treehouse, court rules," *Newsday* (January 2, 2020), https://nwsdy.li/3oOa9zO.

138. Defendant Gerard Glass admits that Defendants knew of this issue yet proceeded, not only in the prosecution but in demanding daily fines and removal/alteration of the Lepper treehouse.

139. Defendants further retaliated against John Lepper as discussed below, harming his person, reputation and job.

140. Referring to the Appellate Term decision, Defendant Gerard Glass is quoted as stating that "This has no impact on the case whatsoever," Glass said. "This has nothing to do with the substantive issues of the cause of why he didn't get a building permit." *Id.*

35

## GENERAL COMPLAINTS BY THE PLAINTIFF

141. As evidenced by, among other things, the significant number of unpermitted structures in the nature of treehouses, boathouses, play houses within the Village of Babylon, Code, Defendants lacked probable cause for actively prosecuting John Lepper.

142. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper in retaliation for his speaking out about matters of public concern in and around the Village of Babylon.

143. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper to further the wishes of some unidentified complainant and in derogation of the constitutional rights of the Lepper Family.

144. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to Mr. Lepper carrying criminal sanctions without allowing Mr. Lepper the opportunity to comply with or otherwise challenge the actions of the Village of Babylon.

145. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to obtain monies and property for which Defendants were not entitled.

36

146. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions were unjustified and without probable cause.

147. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions would cause harm to and inflict distress upon the Plaintiff.

148. The Defendants, jointly and severally, individually and collectively, and the inability to obtain a fair trial continue to oppress the Lepper family and cast a cloud of criminality over their persons, home, and family.

149. Among the examples of the organized oppression of the Lepper family by the Defendants, jointly and severally, individually and collectively, has been the wrongful delay and outright refusal to provide Mr. Lepper with the exhibits from his trial before Village Judge Rafter.

### THE BASIS FOR EQUITABLE RELIEF

150. Defendant Village of Babylon through the threats of Building Inspector Fellman continues to insist that the Lepper family tear down and completely remove their children's treehouse under threat of daily fines of up to $1,000 each day.

151. John Lepper is in imminent danger of serious, permanent, and irreparable economic damage.

152. The Lepper family continues to live in fear that they will suffer serious economic punishment for a reasonable use of their own private property and their temerity in exercising their First Amendment rights by speaking out against the

37

unconscionable actions of the Defendants in depriving the Lepper family of their liberty interest in raising their children as they see necessary which included trying to protect their infant children from exposure to hypodermic needles on the ground by building them a safe harbor in the air; and then retaliating against the Lepper family for speaking out.

153. John Lepper has no adequate remedy at law.

154. Defendant Village of Babylon has not established any association between Village of Babylon Code § 365–26 and the public health, safety and welfare of the residents of the Village of Babylon.

155. There is no substantial credible evidence that the Lepper family children's treehouse represents a threat, much less a danger, to the health, safety, and welfare of the residents of the Village of Babylon.

156. Staying enforcement of the ordinance, specifically the daily fines, pending the resolution of this action and a declaration of the constitutionality and enforceability of Village of Babylon Code § 365–26 will not cause any harm and/or damage to the residents of the Village of Babylon.

### DEFENDANTS USE LEGAL PROCESS, FINES AND PROSECUTION TO SILENCE JOHN LEPPER AND VIOLATE HIS FIRST AMENDMENT RIGHTS

157. Defendants have constrained the ability of John Lepper to create a treehouse/playhouse/elevated playhouse for his infant children shortly after he spoke out against the criminal activity occurring within Village of Babylon.

38

158. Defendants have retaliated against John Leper for exercising his rights under the First Amendment.

159. Attorney Eric Tosca, representing the same Defendants in Lepper v. Village of Babylon, 18-cv-7011 tried to make an emergency application to enjoin the press from attending and John Lepper from contacting the press when it had its purported inspection of the Subject Premises.

160. Defendants knew and had reason to know that John Lepper intended on building a treehouse to remove his children from and allow their children to play without the danger of contact with hypodermic needles on the ground which had been discarded from the street and public walkways onto the Lepper property.

161. Defendants knew and had reason to know that John Lepper spoke publicly and spoke out against the hypodermic needles found on his property, crime in his community and the safety and wellbeing of his children.

162. In response to his identifying the problem of the hypodermic needles and their indication of a community drug problem and bringing the issues before the administration of the Village of Babylon, Defendants, individually and collectively, did conspire and act to deprive Mr. Lepper of his rights under the First, Fourth, Fifth, and Fourteen Amendment by ordering immediate and total removal of the treehouse he built for his children under the threat of continuing Draconian confiscatory fines and penalties.

39

163. Defendants, individually and collectively, did act to deprive Mr. Lepper of his rights under the First, Fourth, Fifth, Eighth, and Fourteen Amendment while knowing and having reason to know that Mr. Lepper fully complied with the permit process of the Village of Babylon Code, and by obfuscating an already arcane and obscure administrative process cause injury to the Lepper family.

164. Rather than remedy the problem of drug abuse in the community or address the concerns Mr. Lepper expressed about the dangers of the discarded hypodermic needles which could have been addressed by, among others, the Village of Babylon Code Enforcement, Defendants accepted the building permit which Mr. Lepper filed and the fee which he tendered without any intention of processing the application or even acknowledging its existence in their later prosecution of John Lepper in the Babylon Village Court.

165. Upon information and belief, Defendants at the behest of an unnamed and unidentified complainant did conspire and plan to issue accusatory instruments to Mr. Lepper with the ultimate goal of obtaining money, removing all remnants of a then unfinished treehouse, and punishing the Lepper family for exercising their constitutional rights.

166. On May 10, 2018, Defendants acknowledged that the treehouse did not violate any provision of the Village of Babylon Code by accepting the building permit application and required fee.

40

167. Defendants concede that notice of all three violations which were each dated in May, 2018, were actually sent to Mr. Lepper in July, 2018.

168. Defendants delayed processing the Lepper family building permit for their children's treehouse and by failing to acknowledge and/or act upon the application, created a situation where fines would accrue against the Lepper family for lack of a permit and cause the Lepper family serious, permanent, and irreparable economic damage.

169. Defendants caused quasi criminal process to issue legal process against the Lepper family to silence the Plaintiff John Lepper and violate the civil and constitutional rights of the Lepper family.

### VILLAGE OF BABYLON CODE § 365–26 FORECLOSES AGE-APPROPRIATE PRIVATE RIGHTS OF ASSEMBLY AND ASSOCIATION ON ARBITRARY GROUNDS AND ARE THEREFORE TECHNICALLY CAPRICIOUS AS WELL AND CERTAINLY UNDERINCLUSIVE.

170. Plaintiff John Lepper has a constitutionally protected liberty interest in his property.

171. Plaintiff John Lepper has the right to establish a home and bring up children.

172. Plaintiff John Lepper has the right to direct the upbringing and education of his infant children.

41

173. Plaintiff John Lepper has the right and duty to nurture his children and maintain the physical homestead environment in which they will grow and mature.

174. A special respect for individual liberty in the home has long been part of our culture and our law.

175. That Defendants issued legal process to silence the Plaintiffs and to remove the Lepper Family Treehouse without probable cause that the children's treehouse would have a negative impact on the public health and safety of the residents of the Village of Babylon and thereby violated the constitutional rights and liberty interests of the Plaintiff without due process of law.

176. Defendants took action within the span of forty-eight hours to find Mr. John Lepper guilty of a crime and then threaten daily fines if the treehouse was not removed, however, they still have not acted upon the permit application filed by the Lepper family.

177. The conviction of an unrepresented pro se John Lepper and the unjustified fines imposed by Village Judge Rafter were an unconstitutional attempt to silence Plaintiff John Lepper and intimidate him from speaking out against government ineptitude, the scourge of drugs, and his intention to do something about it on his own property.

178. Defendants actions in the prosecution of John Lepper violated his civil and constitutional rights of the Plaintiff Lepper family, their liberty rights, and their rights to due process, enjoyment of property, freedom of assembly, and the ability to

42

associate with one another on their property without the fear of government intrusion or reprisal.

179. Defendants violated the civil and constitutional rights of the Plaintiff Lepper family by the unsupported citation of the Lepper Family Treehouse as an unsafe structure in violation of the International Building Code without any legal, much less, equitable basis therefore.

180. Building Inspector Fellman never presented any substantial credible evidence identifying the nature and manner he claimed the treehouse was an unsafe treehouse and claimed, in sworn testimony, that the treehouse was safe.

### PLAINTIFF JOHN LEPPER'S RIGHTS ARE BEING VIOLATED BY THE THREAT OF CONTINUED FINES

181. Village of Babylon Code § 365–26 is criminal in nature.

182. The fines associated with Village of Babylon Code § 365–26 are punitive, doubling and tripling and culminating in the demand for the removal of property without due process.

183. The actions of Defendants in enforcing Village of Babylon Code § 365–26 against the Lepper family and threatening to continue enforcement with successive process and escalating fines and penalties for the very same conduct violate the Constitutional Rights of the Lepper family by subjecting them to repeated double jeopardy.

184. John Lepper raised this issue before the Honorable John T. Rafter who ignored the issues, then convicted Mr. Lepper, an

43

unrepresented, pro se defendant without any substantial credible evidence of guilt.

185. The accrual of multiple accusatory instruments, existing unfounded convictions of three violations and pending prosecution of further accusatory instruments establishes the imminent danger of serious, permanent, and irreparable economic damage and the likelihood that such danger will be continued based upon the sworn testimony of Defendant Building Inspector Fellman, Plaintiff John Lepper and the Lepper family has been placed in jeopardy, repeatedly, for the same alleged criminal offense.

186. Defendants, jointly and severally, individually and collectively, had a duty not to subject Plaintiff John Lepper and the Lepper family to constitutional violations, summary punishment, improper and inappropriate charges of Babylon Village Code violations, malicious prosecution, abuse of process, false and improper investigation.

187. Defendants, jointly and severally, individually and collectively, through their conduct, acts, and omissions acted outrageously and beyond the bounds of decency in attempting to coerce Plaintiff into removing a lawful children's treehouse from their property by threatening ongoing and continued legal proceedings with the potential for confiscatory fines and imprisonment and filing unjustified and unsupportable criminal charges against and imposing summary punishment and excessive fines upon Plaintiff for allegedly violating an unconstitutional ordinance, Village of Babylon Code §365–26;

44

together with concealing and attempting to cover up the wrongs done to Plaintiffs; and defaming, slandering and failing to redress the grievances done to the Plaintiff.

188. Defendants, jointly and severally, individually and collectively, violated the Plaintiff's rights secured under the United States Constitution and the New York State Constitution.

### PROSECUTION OF JOHN LEPPER BY THE DEFENDANTS IS AN UNCONSTITUTIONAL TAKING OF HIS PROPERTY

189. Village of Babylon Code § 365–26 is unconstitutional:

190. Village of Babylon Code § 365–26 as enforced by the Defendants against the Plaintiff Lepper family is unconstitutionally vague, overbroad, and violates the civil and constitutional rights of the Lepper family guaranteed to them under the First, Fourth, Fifth, Eighth and Fourteen Amendment of the Constitution.

191. Village of Babylon Code § 365–26 fails to give Plaintiff John Lepper fair notice that building a treehouse of less than 90 square feet is forbidden by the Code.

192. Village of Babylon Code § 365–26 does not provide guidance to ordinary homeowners as to whether building a treehouse for their infant children might be construed as a violation subjecting them to criminal prosecution.

193. Village of Babylon Code § 365–26 encourages arbitrary and erratic arrests and convictions.

194. The accusatory instruments charging Plaintiff John Lepper with violating Village of Babylon Code § 365–26 for building a treehouse for his infant children upon the malice and/or animosity of a neighbor.

195. Village of Babylon Code § 365–26 fails to meet the fundamental principle of statutory construction for laws with criminal penalties, minimal guidelines to govern law enforcement.

196. As evidenced by the Kafkaesque prosecution and continued litigation over a treehouse for the infant Lepper children on their own property, Village of Babylon Code § 365–26 allows law enforcement and local government to pursue their personal animosity in violation of the civil and constitutional rights of the Plaintiff.

197. Village of Babylon Code § 365–26 has been utilized to obtain monies from Mr. Lepper under threat of continuing fines, liens on the Lepper family home, and/or incarceration.

### THE EXCESSIVE FINES THREATED BY THE VILLAGE OF BABYLON VIOLATE THE EIGHTH AMENDMENT

198. Because of the criminal nature of Village of Babylon Code Section 365–26, Plaintiff John Lepper can suffer fines up to one-thousand dollars per day during the existence of his children's treehouse.

199. The Eighth Amendment of the United States Constitution protects against unreasonable and excessive fines.

46

200. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, intend on utilizing daily fines to enforce Village of Babylon Code § 365–26.

201. Village of Babylon Code § 365–26 can result in fines amounting to thousand(s) of dollars even though no further action was taken by the Plaintiff thereby establishing that the fines are associated with the mere existence of the children's treehouse, not its use.

202. Defendants, jointly and severally, individually and collectively, know and have reason to know that such daily fines are excessive and extortionate in nature.

203. Defendants, as stated in open Court by Gerald Glass, Esq. on December 10, 2018, discussed utilizing daily fines as part of their package of tools to enforce Village of Babylon Code § 365–26.

204. Defendants as stated in open Court by Gerald Glass, Esq. on December 10, 2018, opined that the existence of the Lepper Family Treehouse was deserving of daily fines by Defendants utilizing Village of Babylon Code § 365–26.

205. Plaintiff needs to take no further action for Defendants to issue additional fines.

206. Plaintiff needs to take no further action for Defendants to issue daily fines.

207. According to Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018,

47

Defendants could simply observe and fine Plaintiff everyday he sought to defend himself in court.

208. Defendants, collectively through their attorney and agent as Village Attorney, Gerard Glass did state in open Court on December 10, 2018 that the Village of Babylon did use exorbitant fines to obtain property, or revenue or coerce action to which Defendants are not otherwise entitled.

209. Accordingly, Plaintiffs are damaged and seek enjoinment of the enforcement of Village of Babylon Code Section 365–26.

### PLAINTIFF'S "MONELL" CLAIM; 42 U.S.C. §1983

210. Defendant elected officials, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control their employees, particularly Building Inspector Fellman, and the Defendant Village of Babylon prosecutor, Gerard Glass, in the administration of the Village of Babylon Code Section 365–26 for which John Lepper has suffered injury and damage.

211. Defendant elected officials, jointly and severally, individually and collectively, were responsible for the administration and operation of the Village of Babylon.

212. Defendant elected officials, jointly and severally, individually and collectively, were responsible for policy and decision making in the Village of Babylon.

213. Defendant elected officials, jointly and severally, individually and collectively, actively established or permitted to exist a Village wide policy of denial of due process and equal

48

protection in the administration and enforcement of the Village of Babylon Code, in this specific case Section 365–26.

214. Defendants, jointly and severally, individually and collectively, subjected Plaintiff, John Lepper, to selective enforcement of Village of Babylon Code Section 365–26 and disparate treatment from that afforded similarly situated property owners.

215. Defendant elected officials, jointly and severally, individually and collectively, failed to remediate the actions taken against the Lepper family for erecting their children's treehouse and continue to harass, threaten, and attempt to coerce the Lepper family into removing their children's treehouse.

216. Defendant elected officials, jointly and severally, individually and collectively, failed to remediate the actions taken against John Lepper for speaking out against criminal activity, against the retaliation experienced, exercising his right to dissent, appeal from the court, seek redress in a court of law and being politically active within the Village of Babylon.

217. Defendant elected officials, jointly and severally, individually and collectively, have continued to subject John Lepper to continued prosecution for alleged violations of Village of Babylon Code Section 365–26 as part of a cover up for the unjustified and improper earlier prosecution and conviction of Plaintiff John Lepper for violating Village of Babylon Code Section 365–26 by erecting a treehouse of less than 90 square feet "lot area" for his infant children.

49

218. Defendant elected officials, jointly and severally, individually and collectively, knew, or should have known, that there was no system or procedure in place for reporting, investigating, or remediating incidents involving constitutional violations and harassment of Village of Babylon residents by means of the Village of Babylon Code other than this litigation.

219. Defendant elected officials, jointly and severally, individually and collectively, maintained a deliberate indifference to the human, civil, and constitutional rights of the John Lepper.

### PLAINTIFF SEEKS INJUNCTIVE RELIEF

220. Mr. Lepper seeks to enjoin the daily fines, threatened removal of property and continued enforcement of Village of Babylon Code § 365–26 as against him as unconstitutional.

221. The elected officials, particularly the Village Judge, and all the employees, agents of, and consultants to the Incorporated Village of Babylon have a clear and unequivocal duty to all the resident property owners of the Village to assure them peaceful and quiet enjoyment of their homes and property according to the ancient and long standing maxim of at the heart of common law equity jurisprudence, *sic utere tuo ut alienum non laedas*, enjoining everyone to use their own property in such a way as not to injure that of another.

222. Defendant Village of Babylon seeks to limit the use of the Plaintiff's real property while it imposes no restriction on others property within the Village of Babylon and, *inter alia*, accept hand-written drawings from other residents.

50

223. Defendant Village of Babylon claims it has a right to restrict the erection of structures on private property that are less than 90 square feet.

224. Village of Babylon Code §326–26 can only be enforceable if it is a proper exercise of the police powers of the State by the Village of Babylon.

225. Village of Babylon Code §326–26 should be considered a zoning regulation by Defendants Village of Babylon.

226. To impose fines and even imprisonment for erecting a "building... on any lot, plot or premises" in the Village of Babylon "until a permit authorizing the same shall have been issued by the Building Inspector" (Village of Babylon Code §326–26.) without defining "building" and the phrase, "lot, plot or premises" creates a vague, ambiguous, and essentially meaningless ordinance.

227. Each of the accusatory instruments lodged against Defendant Lepper is based on the claim that erecting a treehouse of less than 90 square feet without a building permit or variance from the Zoning Board of Appeals is a violation of the Village of Babylon Code.

## STATE LAW CLAIMS

228. Defendants, jointly and severally, individually and collectively, had a duty not to subject Plaintiff John Lepper and the Lepper family to constitutional violations, summary punishment, improper and inappropriate charges of Babylon

51

Village Code violations malicious prosecution, abuse of process, false and improper investigation.

229. Defendants, jointly and severally, individually and collectively, through their conduct, acts, and omissions acted outrageously and beyond the bounds of decency in (a) attempting to coerce Plaintiffs into removing a lawful children's treehouse from their property by threatening ongoing and continued legal proceedings with the potential for confiscatory fines and imprisonment; (b) filing unjustified and unsupportable criminal charges against and imposing summary punishment and excessive fines upon Plaintiffs for allegedly violating an unconstitutional ordinance, Village of Babylon Code Section 365–26; (c) concealing and attempting to cover up the wrongs done to Plaintiffs; and defaming, slandering and failing to redress the grievances done to the Plaintiff.

230. Defendants, jointly and severally, individually and collectively, violated the Plaintiff's rights secured under the United States Constitution and the New York State Constitution.

## MALICIOUS PROSECUTION

231. The actions of the Defendants, jointly and severally, individually and collectively, in prosecuting John Lepper for building an elevated playhouse for his children are a perversion of proper legal procedures in violation of his

52

personal liberty and privacy interests under the Fourth Amendment.

232. Defendants actions, as discussed above, were undertaken to punish John Lepper for exercising his first amendment rights.

233. Defendants, collectively, did act to punish John Lepper, defame John Lepper, harass and intimidate John Lepper by legal process, threat of arrest, defamation and prosecution.

234. Defendants, collectively, did encourage Defendant Gerard Glass to incur large legal fees, in excess of $50,000 USD, to prosecute John Lepper and defend the constitutional violations against John Lepper to which Defendant Gerard Glass, an attorney, did oblige.

235. The actions of the Defendants, jointly and severally, individually and collectively, in prosecuting John Lepper for building an elevated playhouse for his children were initiated or continued against him, with malice and without probable cause, and were terminated in his favor by the Appellate Term of the Supreme Court.

## EXTRA-JUDICIAL ACTIONS AGAINST JOHN LEPPER

236. Defendants, individually and collectively, did contact the Suffolk County Police Department and make false allegations seeking to have John Lepper falsely arrested.

237. Defendant the late mayor Ralph Sciordino did contact the Suffolk County Police Department that visited with John Lepper and did inform John Lepper that he was the subject of a criminal complaint by, among others, Mayor Scordino.

238. In April 2019, upon information and belief, Defendants conspired to send a letter to Commissioner Nigro of the FDNY further efforts to slander, defame and harm John Lepper, who is a New York City firefighter, by complaining to the FDNY that firefighter Lepper broke FDNY rules by wearing his Class-A uniform in a courtroom to gain special favoritism from the Babylon Village Justice Court and further that he committed a criminal act against the late Mayor Ralph Sciordino.

239. As a result of the conspiracy perpetrated by and contributed to by the Defendants, jointly and severally, individually and collectively, John Lepper was forced to obtain representation from Eric Bischoff and defense by TJ McManus, Esq. of Sullivan Block and McGarry.

240. At the time the Defendants, jointly and severally, individually and collectively, conspired to facilitate the complaint to the FDNY they knew that John Lepper had sought a continuance of the hearing scheduled for August 14, 2018 from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illnesses from service at the 9/11 scene.

241. At the instance of Village Prosecutor Gerard Glass, Village Justice John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, in order to arrive in Court at precisely 1400 hours, but still in his Class A uniform.

242. On February 4th 2020, Detective Brian Greenze and another Suffolk County detective from Suffolk County Police Headquarters in Yaphank arrived at the home of John Lepper's mother asking to speak to him.

243. Det. Green told John Lepper that Village of Babylon Mayor Ralph Scordino and Town of Babylon Councilman Terry McSweeney had complained that they "felt threatened" by John Lepper and that he was "following" them.

244. Defendants, individually and collectively, did make these false accusations to injure John Lepper, subject John Lepper to seizure and/or arrest and attempted to have the Suffolk County Police Department prosecute John Lepper.

245. Defendants actions were the actual and proximate cause of harm, embarrassment, accruing legal fees and other damages.

## THE ROLE OF THE VILLAGE ATTORNEY

246. In response to a *Newsday* Article stating that taxpayers are "paying more than $50,000 in legal costs associated with a backyard treehouse they didn't help construct and can't enjoy for themselves." Keldy Ortiz, "Dispute over little backyard treehouse costs Babylon Village residents big bucks," *Newsday* (September 27, 2020), https://nwsdy.li/31KnoQ0, Defendant Gerard "Glass defended the cost — $54,749 — to help the village tackle the lawsuits Lepper has filed." *Id.*

247. According to *Newsday*, Village of Babylon Records show the following monies were paid to Gerard Glass relating to a

child's treehouse: Dec. 1 to Dec. 31, 2018: $7,450; Jan. 9 to June 27, 2019: $21,324; June 28 to Sept. 30, 2019: $9,425; Oct. 1 to Jan. 10, 2020: $10,050.

248.  Actual malice by the Defendants against Plaintiff John Lepper is evidenced by paying Village Attorney Gerard Glass well over $50,000.00 USD, in addition to the $75,000.00 USD he makes as a part-time prosecutor for the Village of Babylon.

249.  The American Bar Association recommends that "Prosecutors whose professional obligations are devoted full-time and exclusively to the prosecution function are preferable to part-time prosecutors who have other potentially conflicting professional responsibilities." American Bar Association, *Criminal Justice Standards for the Prosecution Function*, Fourth Edition (2017), Rule 3-2.1(a)(iii); *available at* https://bit.ly/3oJPCwB.

250.  Indeed, "The prosecutor should not permit the prosecutor's professional judgment or obligations to be affected by the prosecutor's personal, political, financial, professional, business, property, or other interests or relationships. A prosecutor should not allow interests in personal advancement or aggrandizement to affect judgments regarding what is in the best interests of justice in any case." *Id.* at Rule 3-1.7(f)

251.  Gerard Glass utilized his part-time position to prosecute a child's treehouse with instruments he later admitted were legally insufficient.

55

252. Gerard Glass profited at the costs of taxpayers "For 72 hours and 25 minutes between Jan. 9, 2018, and June 27, 2019, the village received a bill from Glass of $21,725. During that time, the village received bills for various instances related to the cases with Lepper, including phone calls with village officials, a *Newsday* reporter and attending a deposition of Lepper, according to invoices." Keldy Ortiz, "Dispute over little backyard treehouse costs Babylon Village residents big bucks," *Newsday* (September 27, 2020), https://nwsdy.li/3IKnoQ0.

## ABUSE OF PROCESS

253. Defendant Village of Babylon employed regularly issued legal process to compel Plaintiff to remove a children's treehouse.

254. Defendants, jointly and severally, individually and collectively, intended to intent to do harm and cause damage to the Lepper family without excuse of justification.

255. Defendants, jointly and severally, individually and collectively, in order to obtain a collateral objective that is outside the legitimate ends of the process did cause a series of unfounded accusatory instruments to be issued against Plaintiff John Lepper.

## NEGLIGENCE

256. Defendants, jointly and severally, individually and collectively, had a duty to act reasonably and responsibly and not to act in a manner that would cause injury and/or harm or the threat of harm to the Plaintiff Lepper family.

57

257. Defendant Village of Babylon was negligent, careless, and reckless in the treatment of Plaintiffs by failing to train, supervise, discipline and investigate its employees involved in the instant matter.

258. Defendant Village of Babylon knew or should have known of its employees' propensities for the conduct which caused substantial and severe injury to the Plaintiff.

259. Defendants acted negligently in violating the civil, Constitutional, and human rights of the Plaintiff.

### NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

260. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiffs causing them to suffer pain, shame, humiliation and anguish.

261. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiffs occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to Plaintiff.

262. Defendants did fail to investigate improper use of criminal process but, rather, Defendants began to conspire and cover up such actions by prosecuting criminal charges and threatening Plaintiff with unjust and excessive fines and threatened loss of their property.

58

263. The Defendants knew or had reason to know that Plaintiff John Lepper were guilty of no wrongdoing.

264. Defendants, jointly and severally, individually and collectively, acted with knowledge and reason to know that their conduct would cause severe and extreme emotional and physical harm to Plaintiff.

## DEFAMATION

265. The Plaintiff John Lepper family is being harassed by the Village of Babylon and the individual defendants, to the extent that the Lepper family use of their property is being monitored and the curtilage of their property invaded without due process on what appears to be a daily basis for the purpose of attempting to fabricate charges of Babylon Village Code violations for further prosecution.

266. Whereas, as a result of said defamation, Plaintiff John Lepper continue to suffer from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and severe/extreme emotional distress.

## PRIMA FACIE TORT

267. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiff causing him to suffer pain, shame, humiliation and anguish.

268. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiff occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to Plaintiffs.

## INJURIES AND DAMAGES

269. As a direct and proximate result of the wrongful actions and inappropriate lack of action by the Defendants, jointly and severally, individually and collectively, Plaintiff John Lepper has suffered injury and damages, emotional and psychological harm, emotional injury, distress and pain, and incurred significant cost and expenses, including but not limited to legal fees, loss of good name and standing in the community, public stigma, personal humiliation, social degradation, and other cost and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment of this Honorable Court:

DECLARING that Defendants jointly and severally, individually and collectively, maliciously prosecuted Plaintiff John Lepper for allegedly violating Village of Babylon Code § 365–26.

DECLARING that the prosecution of John Lepper for allegedly violating Village of Babylon Code § 365–26 was malicious

DECLARING that the prosecution of John Lepper for violating Village of Babylon Code Section 365–26 as detailed above was malicious and a prosecution for which the Defendant Village of Babylon Prosecutor maintained a financial interest for pursing;

60

DECLARING that multiple fines, duplicative and daily fines, sought to be imposed under Village of Babylon Code § 365–26 as unconstitutional and violate the Plaintiff's rights under the Fourteenth, Fifth and Eighth Amendments to the United States and New York State Constitutions;

DECLARING that multiple fines, duplicative and daily fines, sought to be imposed under Village of Babylon Code § 365–26 unconstitutional and unenforceable as unconstitutionally excessive;

PROHIBITING the Village of Babylon from issuing further accusatory instruments against Plaintiff charging violations of Village of Babylon Code § 365–26 for the existence of the Lepper family treehouse;

PROHIBITING the Village of Babylon from issuing accusatory instruments against other treehouses or children's play structures less than 90 square feet in floor area located within the Village of Babylon;

APPOINTING a federal monitor to observe, monitor, retrain and direct the Defendants to refrain from violation of civil rights and first amendment violations;

DIRECTING restitution to the Plaintiff and all the other residents of the Incorporated Village of Babylon of all the monies expended by or on behalf of the Village in prosecuting the Plaintiff for allegedly violating Village of Babylon Code § 365–26 by erecting a treehouse to be used as a playhouse for his infant children;

AWARDING Plaintiff compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants.

All together with such other and further relief as to this Court shall deem just and proper.

61

Respectfully submitted,

DATED AT   Melville, New York
December 21, 2020

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiff*
135 Pinelawn Road, Suite 250s
Melville NY 11747
Phone:  (631) 450–2515
FAX :  (631) 223–7377
Email :  Cory.H.Morris@protonmail.com

VICTOR JOHN YANNACONE, JR., (VY6405)
*of counsel*
Phone:  (631) 475–0231
Email  barrister@yannalaw.com

To:   ERIC TOSCA, Esq.
KELLY RODE AND KELLY
*Attorneys for the Defendants*
330 Old Country Road
Mineola, NY 11580

GERARD GLASS, Esq.
*Babylon Village Attorney*
153 West Main Street
Babylon, New York 11702

62

To: ERIC TOSCA, Esq.
KELLY RODE AND KELLY
*Attorneys for the Defendants*
330 Old Country Road
Mineola, NY 11580

GERARD GLASS, Esq.
*Babylon Village Attorney*
153 West Main Street
Babylon, New York 11702

i

## VERIFICATION

State of New York } ss:

County of Suffolk

JOHN LEPPER being duly sworn, deposes and says that he is the Plaintiff in the within action and the father and natural guardian of the infant Plaintiffs and that he has read the foregoing complaint and that the allegations of fact contained therein are true except as to those portions therein stated to be alleged upon information and belief, and as to those allegations he believes them to be true.

JOHN LEPPER

Sworn on this 31 th
day of December 2020

Joan D. Reardon 12/31/2020

JOAN D. REARDON
NOTARY PUBLIC, State of New York
No. 01RE6329703
Qualified in Suffolk County
Commission Expires August 31, 20 23

# EXHIBIT "F"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER,                                                    Index No. 2:18-cv-07011 JMA-AYS

                      Plaintiff,                        Previously filed under
                                     Index No. 2:21-cv-00014
      -against-

                                  **JURY TRIAL DEMANDED**

VILLAGE OF BABYLON; THE ESTATE OF RALPH
SCORDINO, Former Village of Babylon Mayor, Village
of Babylon Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village
Trustee; STEPHEN FELLMAN, Village of Babylon
Building Inspector; SUZANNE SCHETTINO,
Department of Public Works; GERARD GLASS, Esq.,
Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon,

                  Defendants.
-------------------------------------------------------------------X

### DEFENDANTS' ANSWER
### TO PLAINTIFF'S VERIFIED COMPLAINT

        Defendants, VILLAGE OF BABYLON; KEVIN MULDOWNEY, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA, MARY ADAMS, Mayor of the Village of

Babylon; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE

SCHETTINO; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO,

hereby answer the Verified Complaint of the plaintiff, JOHN LEPPER, filed in the above-

captioned matter on December 21, 2020, and assert affirmative defenses as follows:

## ANSWERING EACH AND EVERY CAUSE
## OF ACTION OF THE COMPLAINT

**FIRST:**             Denies allegations contained in paragraphs numbered "1," "2," "3," "4," "5," "6," "7," "8," "9," "10," "11," "12," "13," "14," "15," "16," "17," "18," "19," "21," "24," "27," "29," "30," "31," "32," "38," "39," "40," "42," "43," "44," "45," "46," "47," "48," "49," "51," "52," "53," "54," "55," "56," "57," "58," "59," "60," "61," "62," "63," "66," "67," "68," "69," "71," "73," "74," "75," "76," "77," "79," "80," "83," "84," "86," "88," "89," "90," "91," "93," "94," "95," "96," "97," "99," "101," "102," "103," "104," "109," "110," "111," "112," "113," "114," "115," "125," "126," "128," "129," "130," "131," "132," "133," "136," "137," "138," "139," "140," "141," "142," "143," "144," "145," "146," "147," "148," "149," "150," "151," "152," "153," "154," "155," "156," "157," "158," "159," "160," "161," "162," "163," "164," "165," "166," "167," "168," "169," "175," "176," "177," "178," "179," "180," "182," "183," "184," "185," "186," "187," "188," "189," "190," "191," "192," "193," "194," "195," "196," "197," "199," "200," "201," "202," "203," "204," "207," "208," "209," "210," "213," "214," "215," "216," "217," "218," "219," "220," "222," "226," "227," "228," "229," "230," "231," "232," "233," "234," "235," "236," "237," "238," "239," "240," "241," "244," "245," "248," "251," "252," "253," "254," "255," "256," "257," "258," "259," "260," "261," "262," "263," "264," "265," "266," "267," "268" and "269" of the Verified Complaint.

**SECOND:**             Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered "20," "22," "23," "33," "34," "64," "65," "72," "78," "82," "85," "87," "98," "105," "106," "107," "117," "118," "120," "121," "122," "123," "134," "242," "243" and "247" of the Verified Complaint.

THIRD:            Denies allegations contained in paragraphs numbered "26," "28," "37," "100," "135," "170," "181," "198," "211," "212," "223," "224," "225" and "249" of the Verified Complaint and refers all questions of law to the Court.

FOURTH:          Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered "36," "119," "171," "172" and "173" of the Verified Complaint and refers all questions of law to the Court.

FIFTH:            Denies allegations contained in paragraph numbered "41" of the Verified Complaint and no Exhibit 1 is attached.

SIXTH:            Denies allegations contained in paragraphs numbered "50," "174," "205," "206" and "221" of the Verified Complaint as the allegations are too vague to constitute a fair statement to respond to.

SEVENTH:      Denies allegations contained in paragraphs numbered "70," "81," "92," "108," "127" and "246" of the Verified Complaint as the alleged statements are without context to form a fair statement to respond to.

EIGHTH:         Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph numbered "116" of the Verified Complaint as the alleged statements are without context to form a fair statement to respond to.

NINTH:           Denies allegations contained in paragraph numbered "250" of the Verified Complaint as the alleged statement is without context to form a fair statement to respond to, and refers all questions of law to the Court.

## DEMAND FOR JURY TRIAL

TENTH:            Defendants demand a trial by jury for the non-equitable relief.

FOR A FIRST, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

ELEVENTH:      That any injuries or damages sustained by the plaintiff was

occasioned through the negligence and culpable conduct on the part of the plaintiff.

FOR A SECOND, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWELFTH:      That this Court lacks jurisdiction over the person or property of the

named defendants either individually or collectively, VILLAGE OF BABYLON; THE ESTATE

OF RALPH SCORDINO, KEVIN MULDOWNEY, ROBYN SILVESTRI, TONY DAVIDA,

MARY ADAMS, STEPHEN FELLMAN, SUZANNE SCHETTINO, GERARD GLASS, Esq.,

and DEBORAH LONGO, in that no proper service of process under Federal law or State law was

made on the defendants.

FOR A THIRD, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

THIRTEENTH:      That the party making claim lacks capacity to bring the action.

Plaintiff has no standing to sue for alleged *Monell* claims.  The plaintiff has no standing to interfere

with the election of any of the parties to hire counsel and has no standing to set aside or disrupt

contractual undertakings by any of the defendants.

FOR A FOURTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

FOURTEENTH:      There is another action pending between the same parties for the

same causes of action arising from the same facts and circumstances. Therefore, the Verified

Complaint should be dismissed.

FOR A FIFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

FIFTEENTH:       That the plaintiff's Verified Complaint fails to state sufficient facts

to constitute a cause of action against these defendants.

FOR A SIXTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SIXTEENTH:       That this Court lacks jurisdiction over the subject matter of this

action inasmuch as there is no diversity of citizenship between the litigants as required by FRCP.

FOR A SEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SEVENTEENTH:       That all or part of the action is barred by the Doctrine of Collateral

Estoppel or *Res Judicata*.

FOR AN EIGHTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

EIGHTEENTH:       The lawsuit brought by the plaintiff is entirely without merit and is

frivolous, subject to sanctions.

FOR A NINTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

NINETEENTH:       That the party making claims failed to mitigate damages.

FOR A TENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTIETH:       The plaintiff's claims for punitive damages are barred and are devoid

of merit.

FOR AN ELEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FIRST:    The defendants, particularly the individually named defendants, are

protected under a governmental immunity from claims of negligence or any other claims made by

the plaintiff in this action.  Each and every defendant is immune inasmuch as they carried out a

duty in their role as public servants barring the claims made herein.

FOR A TWELFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-SECOND: These claims are not ripe for determination before the Federal

Court.

FOR A THIRTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-THIRD:    The claims, especially the alleged pendant state-based claims are

barred by failure to serve a timely Notice of Claim pursuant to Sections 50-e and 50-i of the

General Municipal Law putting the defendants on fair notice of the claims for which recovery by

the plaintiff is sought.

FOR A FOURTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FOURTH:  The claims are barred by the failure of plaintiff to attend a hearing

pursuant to Section 50-h of the General Municipal Law.  The plaintiff's conduct in depriving the

defendants of a 50-h hearing was sanctionable.

FOR A FIFTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FIFTH:     Plaintiff failed to exhaust his administrative remedies and has not

completed the application for a permit and have not filed before the Zoning Board of Appeals.

FOR A SIXTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-SIXTH:     That this action was not commenced within the applicable time

limits, therefore, the Statute of Limitations constitutes a complete defense to the plaintiff's action.

FOR A SEVENTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-SEVENTH:  Allegations of any comments made in court are improper to allege

as a basis to a lawsuit.

FOR AN EIGHTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-EIGHTH:     "THE ESTATE OF RALPH SCORDINO" is not an entity subject
to being sued.

FOR AN NINETEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-EIGHTH: The capacities of the defendants are misnamed in the lawsuit.

FOR A TWENTIETH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-NINTH:     That any statements made by the defendants were substantively
truthful,

or opinion, and constitute a complete defense to plaintiff's claims.

WHEREFORE, the answering defendants, VILLAGE OF BABYLON, KEVIN

MULDOWNEY, TONY DAVIDA, MARY ADAMS, STEPHEN FELLMAN, SUZANNE

SCHETTINO, GERARD GLASS, Esq. and DEBORAH LONGO demand judgment against the plaintiff dismissing the Verified Complaint herein, together with costs and disbursements of this action.

Dated:      Mineola, New York
              January 25, 2021

Respectfully submitted,

KELLY, RODE & KELLY, LLP

BY: _*Eric P. Tosca*_

ERIC P. TOSCA
Attorneys for Defendants
330 Old Country Road - Suite 305
Mineola, New York 11501
(516) 739-0400
Our File No.: PDG/EPT 148530-752

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       135 Pinelawn Road - Suite 250s
       Melville, New York 11747
       (631) 450-2515

CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, I served a true copy of the foregoing Defendants' Answer to Plaintiff's Verified Complaint by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       135 Pinelawn Road - Suite 250s
       Melville, New York 11747
       (631) 450-2515

                                          *Eric P. Tosca*

                                          ERIC P. TOSCA
                                          E-Mail: eptosca@krklaw.com

## ATTORNEY VERIFICATION

ERIC P. TOSCA, an attorney duly licensed to practice law before the courts of the State of New York and of the United States District Court, Eastern District, hereby affirms the truth of the following under the penalties of perjury:

I am a duly admitted and practicing Attorney-at-Law; that I am one of the attorneys for the defendants VILLAGE OF BABYLON; KEVIN MULDOWNEY, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, MARY ADAMS, Mayor of the Village of Babylon; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO herein, and that I have read the foregoing ANSWER and know the contents thereof and that the same is true to my own knowledge, except as to those statements therein alleged to be upon information and belief and as to those statements, I believe it to be true.

The source of my knowledge is the contents of a file maintained in my office, which contains various reports of investigations, statements, interviews, copies of official documents, etc.

The reason this verification is not made by the defendants, is due to the fact that said defendants do not reside in the same county wherein I maintain my professional office; to wit: County of NASSAU.

Dated:      Mineola, New York
            January 25, 2021

                                    *Eric P. Tosca*
                                    ERIC P. TOSCA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOHN LEPPER,                                            Index No. 2:18-cv-07011 JMA-AYS

                Plaintiff,                       Previously filed under
                                                       Index No. 2:21-cv-00014

                                                       **NOTICE FOR DISCOVERY
                                                       PURSUANT TO RULE 33
        -against-                             OF FEDERAL RULES OF
                                                       CIVIL PROCEDURE**

VILLAGE OF BABYLON; THE ESTATE OF RALPH
SCORDINO, Former Village of Babylon Mayor, Village
of Babylon Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village
Trustee; STEPHEN FELLMAN, Village of Babylon
Building Inspector; SUZANNE SCHETTINO,
Department of Public Works; GERARD GLASS, Esq.,
Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon,

                Defendants.
-------------------------------------------------------------------X

**C O U N S E L O R S :**

      **PLEASE TAKE NOTICE,** that pursuant to Rule 33 of Federal Rules of Civil Procedure,

you are required to serve upon the undersigned the following information within the time limits

set forth in the Federal Rules of Civil Procedure.

      1.     The name, home address, and professional or office address of each person you

intend to call as an expert witness at trial specifically including but not limited to any medical,

economic, engineering, accident reconstruction design or other expert from whom you intend to

elicit opinion testimony on any issue relating to liability or damages in the above captioned matter.

      2.     For each expert you intend to call at trial separately state the following in reasonable

detail:

(a)    The subject matter on which such expert is to testify.

(b)    The qualifications of such expert as will be offered at trial.

(c)    The substance of the facts upon which such expert will rely.

(d)    The substance of the opinion to which such expert will testify.

(e)    A summary of the grounds for such expert's opinion.

3.    If no experts will be called by you at trial, affirmatively so state.

**PLEASE TAKE FURTHER NOTICE,** that this demand is a continuing demand requiring disclosures of any demanded information obtained by you which would be required to be disclosed by you up to and including the time of trial immediately upon your obtaining or developing such information.

**PLEASE TAKE FURTHER NOTICE,** that the demanding party will seek preclusion or other appropriate relief at the time of trial with respect to the testimony of any expert concerning whom there has not been full reasonable disclosure pursuant to this demand.

Dated:    Mineola, New York
          January 25, 2021

                                        Respectfully submitted,

                                        KELLY, RODE & KELLY, LLP

                              BY:    *Eric P. Tosca*

                                        ERIC P. TOSCA
                                        Attorneys for Defendants
                                        330 Old Country Road - Suite 305
                                        Mineola, New York 11501
                                        (516) 739-0400
                                        Our File No.:  PDG/EPT 148530-752

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       135 Pinelawn Road - Suite 250s
       Melville, New York 11747
       (631) 450-2515

CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, I served a true copy of the foregoing Notice for Discovery Pursuant to Rule 33 of Federal Rules of Civil Procedure by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:   LAW OFFICES OF CORY H. MORRIS
      Attorneys for Plaintiffs
      135 Pinelawn Road - Suite 250s
      Melville, New York 11747
      (631) 450-2515

*Eric P. Tosca*

ERIC P. TOSCA
E-Mail: eptosca@krklaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER,

                        Plaintiff,

              -against-

VILLAGE OF BABYLON; THE ESTATE OF RALPH
SCORDINO, Former Village of Babylon Mayor, Village
of Babylon Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village
Trustee; STEPHEN FELLMAN, Village of Babylon
Building Inspector; SUZANNE SCHETTINO,
Department of Public Works; GERARD GLASS, Esq.,
Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon,

                       Defendants.
-------------------------------------------------------------------X

Index No. 2:18-cv-07011 JMA-AYS

Previously filed under
Index No. 2:21-cv-00014

**NOTICE FOR DISCOVERY
AND INSPECTION**

**C O U N S E L O R S :**

      **PLEASE TAKE NOTICE,** that pursuant to Rule 33 of Federal Rules of Civil Procedure,

you are required to serve upon the undersigned within twenty (20) days of the date hereof, the

following documents and information, except any demands that are subject to a stay and that shall

be provided at such time the stay is lifted:

      1.     The name and address of any eyewitness to the occurrence which gives rise to this

lawsuit known to the plaintiff or the plaintiff's representatives or known to any other party or

party's representative making claim against this defendant, including but not limited to the identity

of any alleged informant to the fire department as alleged in the complaint.

      2.     The names and addresses of any notice witnesses or persons with knowledge of the

existence of any condition or state of facts which gives rise to this lawsuit known to the plaintiff

or the plaintiff's representatives or known to any other party or party's representative making claim against this defendant.

3.      Full and complete copies of any and all statements made by the defendant, the defendant's agents or employees which are in the possession of the plaintiff or the plaintiff's representatives, or in the possession of any other party or party's representative making claims against this defendant, whether recorded, printed, typewritten or otherwise preserved, whether signed or unsigned.

4.      Duly authorized hospital, office, physician, or other medical record release authorizations to obtain the complete hospital, office, or other record of every hospital, physician, nurse, or other medically oriented personnel or facility who have rendered treatment to the plaintiff for any injuries alleged to have been sustained as a result of the occurrence which gives rise to this lawsuit.

5.      Duly authorized hospital, office, physician, or other medical record release authorizations to obtain the complete hospital, office, or other record of every hospital, physician, nurse, or other medically oriented personnel or facility who have rendered any treatment, care or performed any examinations upon the plaintiff for a period of five (5) years prior to the institution of this lawsuit.

6.      True and complete copies of any and all accident reports prepared by or on behalf of the plaintiff or the plaintiff's representatives, or from information obtained from the plaintiff or the plaintiff's representatives, made in the regular course of business.

7.      True and complete copies of any photographs in the possession of the plaintiff or the plaintiff's representatives of any instrumentality, or condition alleged to have been involved in

the occurrence which gives rise to this lawsuit, whether said instrumentality, condition automobile is under the possession and control of the plaintiff, this defendant, or any other person or entity.

8.    True and accurate copies of all documents concerning the alleged disciplinary action taken by the fire department in plaintiff's possession and the identity of any informants.

9.    True and accurate copies of all legal bills and related expenses claimed by the plaintiff for all claims alleged in the complaint.

10.    Copies of all drawings, invoices, manuals, blueprints and other documents reflecting the design, plan and construction of the treehouse identified in the complaint and tree house accessories, including electrical equipment and wiring.

11.    Copies of all applications for permits and underwriting certificates related to design and construction of the tree house identified in the complaint and the tree house accessories, including electrical equipment and wiring.

12.    Copies of all contracts, proposals and invoices to or from any contractors or vendors related to the construction and design of the tree house identified in the complaint and the tree house accessories, including electrical equipment and wiring.

Where appropriate, true and complete copies of all the above requested documents will be given compliance.

**PLEASE TAKE FURTHER NOTICE,** that this demand is a continuing demand and the demanding party will object at time of trial to the introduction of any testimony or evidence which flows from the existence of such documents or information which have not been produced.

**PLEASE TAKE FURTHER NOTICE,** that unless this demand is timely and fully complied with, an appropriate application will be made seeking relief.

**PLEASE TAKE FURTHER NOTICE,** that any expense involved in duplicating the materials called for in this demand will be promptly reimbursed to the answering party upon representation of a proper bill.

Dated:        Mineola, New York
              January 25, 2021

                              Respectfully submitted,

                              KELLY, RODE & KELLY, LLP

              BY:      *Eric P. Tosca*
                              ERIC P. TOSCA
                              Attorneys for Defendants
                              330 Old Country Road - Suite 305
                              Mineola, New York 11501
                              (516) 739-0400
                              Our File No.:  PDG/EPT 148530-752

TO:     LAW OFFICES OF CORY H. MORRIS
        Attorneys for Plaintiffs
        135 Pinelawn Road - Suite 250s
        Melville, New York 11747
        (631) 450-2515

CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, I served a true copy of the foregoing Notice for Discovery and Inspection by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:   LAW OFFICES OF CORY H. MORRIS
      Attorneys for Plaintiffs
      135 Pinelawn Road - Suite 250s
      Melville, New York 11747
      (631) 450-2515

        *Eric P. Tosca*
      ERIC P. TOSCA
      E-Mail: eptosca@krklaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOHN LEPPER,

                Plaintiff,

        -against-

VILLAGE OF BABYLON; THE ESTATE OF RALPH
SCORDINO, Former Village of Babylon Mayor, Village
of Babylon Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village
Trustee; STEPHEN FELLMAN, Village of Babylon
Building Inspector; SUZANNE SCHETTINO,
Department of Public Works; GERARD GLASS, Esq.,
Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon,

                Defendants.
-------------------------------------------------------------------X

Index No. 2:18-cv-07011 JMA-AYS

Previously filed under
Index No. 2:21-cv-00014

**DEMAND FOR**
**COLLATERAL SOURCES**

**C O U N S E L O R S :**

      **PLEASE TAKE NOTICE,** that you are hereby required to furnish to the undersigned

within (30) days thereof pursuant to Rule 33 of Federal Rules of Civil Procedure all documents,

bills, invoices, receipts or cancelled checks concerning indemnification, payment and/or

reimbursements, in whole or in part, which plaintiff has received from collateral sources including

- but not limited to - insurance, social security, workmen's compensation or employee benefit

programs for the cost of medical care, custodial care, rehabilitation services, loss of earnings and

other economic loss which the plaintiff will claim as special damages in this action.

      **PLEASE TAKE FURTHER NOTICE,** that failure to comply the above mentioned

request will render the plaintiff subject to available provisions provided under the Federal Rules

of Civil Procedure and that this demand is to be considered a continuing demand.

Dated:    Mineola, New York
            January 25, 2021

                                     Respectfully submitted,

                                     KELLY, RODE & KELLY, LLP

BY:       *Eric P. Tosca*

                                     ERIC P. TOSCA
                                     Attorneys for Defendants
                                     330 Old Country Road - Suite 305
                                     Mineola, New York 11501
                                     (516) 739-0400
                                     Our File No.:  PDG/EPT 148530-752

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       135 Pinelawn Road - Suite 250s
       Melville, New York 11747
       (631) 450-2515

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, I served a true copy of the foregoing Demand for Collateral Sources by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:    LAW OFFICES OF CORY H. MORRIS
       Attorneys for Plaintiffs
       135 Pinelawn Road - Suite 250s
       Melville, New York 11747
       (631) 450-2515

*Eric P. Tosca*

ERIC P. TOSCA
E-Mail: eptosca@krklaw.com

EXHIBIT "G"

**2:20–cv–07011-JMA-AYS | 2:21-cv-00014-JMA-AYS**

# United States District Court

## Eastern District of New York

**JOHN LEPPER** and **NOELLE LEPPER**, individually and as parents and natural guardians of their infant children, **B.J.L.** and **B.I.**; and

**JOHN LEPPER,** individually and, as a resident taxpayer of the Incorporated Village of Babylon, on behalf of all those other resident taxpayers of the Incorporated Village of Babylon so unfortunate as to be similarly afflicted and suffering economic damage as a result of the expenditure of Village funds for the inappropriate and improper defense of individual village officials engaged in the persecution of John Lepper for providing a treehouse in which his infant children might play,

*Plaintiffs*

–*against*–

**VILLAGE OF BABYLON;**
**THE ESTATE OF RALPH SCORDINO**, former Mayor, Village of Babylon, by its Legal Representative John and/or Jane Doe; **MARY ADAMS**, former Village Trustee and now Mayor; **KEVIN MULDOWNEY**, Deputy Mayor, **ROBYN SILVESTRI**, Village Trustee, **TONY DAVIDA**, Village Trustee, **STEPHEN FELLMAN**, Village of Babylon Building Inspector; **SUZANNE SCHETTINO**, Department of Public Works; **GERARD GLASS**, Esq., Village of Babylon Attorney; **DEBORAH LONGO**, Planning Board, Village of Babylon,

*Defendants*

## AMENDED CONSOLIDATED VERIFIED COMPLAINT

LAW OFFICES OF CORY H. MORRIS
*Attorney for Plaintiffs*
VICTOR JOHN YANNACONE, JR., *of counsel*

# TABLE OF CONTENTS

AMENDED CONSOLIDATED VERIFIED COMPLAINT .........................................3

PLAINTIFFS DEMAND A TRIAL BY JURY ........................................................3

PRELIMINARY STATEMENT............................................................................3

INTRODUCTION..............................................................................................3

JURISDICTION AND VENUE ...........................................................................5

ADMINISTRATIVE PROCEEDINGS AND TIMELINESS ......................................6

PARTIES .......................................................................................................6

THE FACTS....................................................................................................9

    THE CHILDREN'S TREEHOUSE ...............................................................9

    JOHN LEPPER'S APPLICATION..............................................................12

    OTHER STRUCTURES IN THE VILLAGE OF BABYLON ..............................15

    THE PROSECUTION OF JOHN LEPPER ...................................................20

    VILLAGE JUSTICE COURT PROSECUTION I.............................................22

    THE VILLAGE COURT PROCEEDINGS II..................................................23

    THE ORDER OF VILLAGE JUSTICE RAFTER ...........................................27

    POST-TRIAL ACTIONS AGAINST JOHN LEPPER .......................................30

    THE SECOND WAVE OF PROSECUTIONS AGAINST JOHN LEPPER.............31

    COMMENCEMENT OF THE FIRST ACTION ...............................................33

    PLAINTIFF'S APPEAL TO THE APPELLATE TERM ....................................35

GENERAL COMPLAINTS BY THE PLAINTIFF.................................................36

THE BASIS FOR EQUITABLE RELIEF.............................................................38

DEFENDANTS FAIL TO ESTABLISH ANY CONSTITUTIONAL BASIS FOR EXERCISE
    OF THE "POLICE POWER" ....................................................................38

DEFENDANTS USE LEGAL PROCESS, FINES AND PROSECUTION TO SILENCE JOHN LEPPER AND VIOLATE HIS FIRST AMENDMENT RIGHTS ............. 39

VILLAGE OF BABYLON CODE § 365–26 FORECLOSES AGE-APPROPRIATE PRIVATE RIGHTS OF ASSEMBLY AND ASSOCIATION ON ARBITRARY GROUNDS AND ARE THEREFORE TECHNICALLY CAPRICIOUS AS WELL AND CERTAINLY UNDERINCLUSIVE. ................................................... 41

PLAINTIFF JOHN LEPPER'S RIGHTS ARE BEING VIOLATED BY THE THREAT OF CONTINUED FINES ............................................................................. 43

PROSECUTION OF JOHN LEPPER BY THE DEFENDANTS IS AN UNCONSTITUTIONAL TAKING OF HIS PROPERTY .................................. 45

THE EXCESSIVE FINES THREATED BY THE VILLAGE OF BABYLON VIOLATE THE EIGHTH AMENDMENT ....................................................................... 46

PLAINTIFF'S "MONELL" CLAIM; 42 U.S.C. §1983 ...................................... 47

PLAINTIFF SEEKS INJUNCTIVE RELIEF ........................................................ 50

FEDERAL & PENDENT STATE LAW CLAIMS ............................................... 51

MALICIOUS PROSECUTION ........................................................................ 52

EXTRA-JUDICIAL ACTIONS AGAINST JOHN LEPPER .................................... 53

THE ROLE OF THE VILLAGE ATTORNEY ..................................................... 54

ABUSE OF PROCESS ................................................................................. 56

NEGLIGENCE ............................................................................................ 56

NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .. 57

DEFAMATION ........................................................................................... 58

PRIMA FACIE TORT ................................................................................... 58

INJURIES AND DAMAGES ........................................................................... 58

PRAYER FOR RELIEF ................................................................................. 59

VERIFICATION .......................................................................................... 62

## AMENDED CONSOLIDATED VERIFIED COMPLAINT

Plaintiff John Lepper files this amended consolidated verified complaint by his attorneys, the Law Office of Cory H. Morris, pursuant to the direction of United States District Judge Joan M. Azrack entered on January 14, 2021.

### PLAINTIFFS DEMAND A TRIAL BY JURY

### PRELIMINARY STATEMENT

This is a civil action seeking a declaratory judgment, and equitable relief, together with compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants for violating Plaintiff's civil, constitutional, and human rights, under the Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution and New York State Law; and for their negligence, abuse of process, negligent and/or intentional infliction of emotional distress, and prima facie tort resulting in injury and damage to the Plaintiff, together with judgment on behalf of himself and all those other resident taxpayers of the Incorporated Village of Babylon so unfortunate as to be similarly afflicted and suffering economic damage as a result of the expenditure of Village funds for the inappropriate and improper defense of individual village officials engaged in the persecution of John Lepper for providing a treehouse in which his infant children might play .

### INTRODUCTION

1.  Plaintiff, John Lepper, alleges that Defendants, jointly and severally, individually and collectively, intentionally, knowingly, wantonly, negligently, and/or recklessly, sought to

3

and did wrongfully deprive him of his civil, constitutional, and human rights by committing acts under color of law to deprive him of his civil, constitutional, and human rights.

2.  Plaintiff, John Lepper, alleges that Defendant Village of Babylon was negligent in training, hiring and supervising its Village of Babylon Attorney, Defendant Gerard Glass, and was deliberately indifferent to the actions of Gerard Glass who, among other things, sought to profit off of the malicious prosecution of Plaintiff in derogation of prosecutorial ethics.

3.  Plaintiff, John Lepper alleges that Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution.

4.  Defendant Village of Babylon conspired in prosecuting Plaintiff, an innocent taxpayer, in the hiring and supervising its employees, inclusive of Defendant Gerard Glass, who profited enormously from the same prosecution and being sued as a Defendant under Docket No. 18-cv-7011.

5.  Defendants, individually and collectively, knew and had reason to know that the seizure, false prosecution, threats against Plaintiff, accusatory instruments charging "treehouse without a permit" and retaliation against Plaintiff, would cause damages and were intended to silence the Plaintiff at enormous costs to the Village of Babylon taxpayer.

6.  Accordingly, Defendant Village of Babylon is liable to the Plaintiff for abuse of process, malicious prosecution, retaliation and for conspiring to condone and encourage such civil rights violations together with conspiring to and violating Plaintiff's Civil Rights.

4

7. As a result of the Defendants' actions or lack thereof, Plaintiff John Lepper suffered emotional scarring and suffering, and incurred significant cost and expenses due to the Defendants' actions, including but not limited to substantial legal fees, loss of good name and standing in the community, emotional distress and other cost/expenses.

## JURISDICTION AND VENUE

8. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

9. This Honorable Court is requested to exercise supplemental jurisdiction with respect to Plaintiffs' State Law claims pursuant to 28 U.S.C. §1367.

10. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986.

11. This action is also brought pursuant to the Declaratory Judgment Act, under 28 U.S.C. §§ 2201–2202, to address the specific and anticipated harm Plaintiffs and all other similarly situated residents within the Village of Babylon.

12. Declaratory relief is necessary whether or not Defendant Village of Babylon discontinues prosecution against John Lepper so long as the threat of prosecution for violation of Village of Babylon Code Section 365–26 continues to exist.

13. Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the events and violations herein alleged occurred was in Suffolk County, New York.

5

## ADMINISTRATIVE PROCEEDINGS AND TIMELINESS

14. This action has been commenced within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 42 U.S.C. § 1986.

15. There are no effective New York state or federal administrative remedies available to the John Lepper.

16. Plaintiff has exhausted any potentially effective administrative remedies.

17. On or about December 7, 2018, Plaintiffs filed a Notice of Claim against the Village of Babylon.

18. Thereafter Plaintiffs were available for the purpose of an examination under the provisions of General Municipal Law § 50-h, however, Defendants chose not to conduct such examination.

19. On January 9, 2019, Defendants stipulated to waive the affirmative defense(s) of jurisdiction and service of process.

20. On or about March 10, 2020 Plaintiff John Lepper filed a Second Notice of Claim against the Village of Babylon.

21. Plaintiff John Lepper has been examined under the provisions of General Municipal Law § 50-h.

22. Defendants refused to adjust the claim and more than ninety (90) days have passed.

## PARTIES

23. Plaintiff, JOHN LEPPER is a citizen of the United States, an honorably discharged United States Marine presently employed as a member of the Fire Department of the City of

6

New York and resides at 59 Cockenoe Avenue, in the Incorporated Village of Babylon, Suffolk County, New York.

24. John Lepper is a lawful owner together with Noelle Lepper, his wife, of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00. The property appears in its present configuration as Lots 19B & 19C in Block F as shown on Map of Sampwam Park–Annex filed on October 31, 1921 as Map No: 758 in the Incorporated Village of Babylon, Town of Babylon, Suffolk County, New York (hereinafter referred to as the "Subject Property").

25. As a resident taxpayer of the Incorporated Village of Babylon, Plaintiff John Lepper is a suitable and proper representative Plaintiff with sufficient knowledge of the facts and circumstances surrounding the subject matter of this litigation to act as a Representative Plaintiff for the purpose of preventing waste of Village funds and recovery of funds already improperly expended by the Incorporated Village of Babylon.

26. Infant B.J.L. is a minor and the natural child born of the union of John Lepper and Noelle Lepper.

27. Infant B.L. is a minor and the natural child born of the union of John Lepper and Noelle Lepper.

28. At all times relevant in this Complaint, and upon information and belief, Defendant Village of Babylon, is a recipient of

7

federal funding and was a recipient of federal funding at the time of the events complained of herein.

29.   Defendant Village of Babylon is an incorporated Village located within the Town of Babylon in Suffolk County, New York.

30.   Defendant Village of Babylon is governed by an elected Mayor and four elected Trustees, collectively the Babylon Village Board.

31.   According to information posted on the Village of Babylon website at http://www.villageofbabylonny.gov/ Defendant Ralph Scordino, who was the duly elected Mayor has died before the date of this complaint and Defendant Mary Adams is now the Mayor, Defendant Kevin Muldowney, is the Deputy Mayor, and Defendants Robyn Silvestri, Tony Davida, Dominic Bencivenga and Anthony Cardali were and/or are Village of Babylon Trustees.

32.   Upon information and belief, Ralph Scordino died on or about October 29, 2020, however, Defendants, individually, collectively, or by counsel have not yet filed a copy of his death certificate with this Court in this action.

33.   Upon information and belief, no Legal Representative (or next of kin) has been served or appointed to represent the Estate of the late Ralph Scordino. See D.E. 90.

34.   Upon information and belief, Defendant Stephen Fellman is the Village of Babylon Building Inspector; Defendant Suzanne Schettino, directs the Department of Public Works; Defendant Gerard Glass, Esq. is the Village of Babylon Attorney; and Defendant Deborah Longo, is involved in administration of the Village of Babylon Planning Board.

35. All of the individual named Defendants are being sued in both their individual and official capacities.

## THE FACTS

36. This is the second lawsuit filed by John Lepper against these actors, the first seeking injunctive relief related to the pending destruction and forcible removal of the treehouse discussed herein and filed as D.E. 8, on December 17, 2018 under Docket Number 18-cv-7011:

37. In April, 2018, Plaintiff, John Lepper, found a syringe and a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard when he was playing with his children. He informed his neighbors immediately and was outspoken in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

## THE CHILDREN'S TREEHOUSE

38. The following is a true and accurate aerial view of the Lepper property and its surrounding neighborhood identifying the location where the hypodermic needle was found.

9



39.  On or about May 3, 2018, Plaintiff John Lepper began to
     utilize timbers from an old boat house that was destroyed in
     Superstorm Sandy to create a treehouse to insulate his
     children from the hypodermic needles he found in and around
     his property at 59 Cockenoe Avenue within the Village of
     Babylon.

40.  The following Lepper family neighbors can see the treehouse
     from their property: Joe and Joanne Mineo and their sons
     M.M. and N.M.; Pay and Keirsten Murphy and their daughter
     G.; Kevin and Lyndsey and their children A. and S.; Joe and
     Katelyn and their two pre-school-age children, all of whom
     live on Cockenoe Ave; and Mike And Josephine Domingo and
     their three college-age daughters who live on Wampum Rd.

10

41.  By letter dated May 10, 2018, Village of Babylon Building
     Inspector Stephen Fellman informed Mr. Lepper that "It has
     come to my attention that you are building a structure, in the
     rear/front yard of the above referenced premises, that may
     require a building permit."

42.  Village of Babylon Code § 365–26, § A, states: "No building
     shall hereafter be erected and no existing building shall be
     structurally altered or added to on any lot, plot or premises
     and no excavation or work of any nature shall commence in
     connection therewith, nor shall any use of an existing
     building be changed until a permit authorizing the same shall
     have been issued by the Building Inspector. The Building
     Inspector shall require that the application for a permit and
     the accompanying plot plan, plans and specifications shall
     contain all information necessary to enable him to determine
     whether the proposed building addition or structural
     alterations or change of use to an existing building comply
     with the provisions of this chapter and Chapter 171, Flood
     Damage Prevention, where applicable."

43.  Village of Babylon Code § 365–26 C(3) states "A building
     permit shall be required when an outdoor playground or gym
     (or any combination) exceeds a lot area of 90 square feet."

44.  In response to the May 10, 2018 letter from Defendant
     Fellman, Plaintiffs stopped work on the treehouse for their
     children.

45.  Upon information and belief, Defendant elected officials,
     Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor,
     Robyn Silvestri, Village Trustee, Tony Davida, Village
     Trustee and Mary Adams, Village Trustee were jointly and

severally, individually and collectively, responsible for allowing such notice to be sent to Plaintiffs.

46. Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee and Mary Adams, Village Trustee jointly and severally, individually and collectively, were responsible for the continuing violations of the civil and Constitutional rights of and retaliation Plaintiff for attempting to assert those rights.

## JOHN LEPPER'S APPLICATION

47. On or about May 21st, 2018, Plaintiff John Lepper visited the Building Department office of Defendant Village of Babylon; completed a building permit application and submitted a front elevation / framing drawing with a copy of a recent survey of the Lepper Family Home, a copy of which is annexed hereto and made a part of this complaint designated Exhibit 1 (D.E. 26, Exhibit 4).

48. An unidentified Building Department employee, "Jane Doe", to whom Plaintiff John Lepper submitted the application commented that she usually did not receive such a detailed drawing from homeowners.

49. While at the Village of Babylon Building Department on or about May 21, 2018, Plaintiff John Lepper spoke with another employee of Defendant Village of Babylon, Holly Zappala, and told her that a used hypodermic needle was found on his property, and other used hypodermic needles were being found in the area and that he had concerns for the well-being of his family.

50. On or about May 21, 2018, while at the Village of Babylon Building Department office, John Lepper spoke with another

employee of Defendant Village of Babylon, Holly Zappala, and told her that he had found a used hypodermic needle on his property, and other used hypodermic needles were being found in the immediate neighborhood of his property and that he had concerns for the well-being of his family.

51. Ms. Zappala told Plaintiff John Lepper that Defendant Village of Babylon was aware of drug-related crimes and the presence of hypodermic instruments prior to April, 2018 and that she and the Village of Babylon administration may be aware of criminal activity occurring on the subject premises and toward the Lepper Family.

52. Plaintiff John Lepper, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of heroin in his community, spoke to and informed everyone present in the Village of Babylon building department on May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018 to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon.

53. The following is a true and correct copy of the survey of the Lepper property indicating the location of the children's treehouse:

THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY BLANK.

13

01/23/2013 08:38 FAX                                                              ☏002



14

54. Upon information and belief, Defendants jointly and severally, individually and collectively, failed to act upon or even acknowledge Plaintiffs' efforts to comply with the Village of Babylon Code.

## OTHER STRUCTURES IN THE VILLAGE OF BABYLON

55. For example, Defendants actually responded to others similarly situated who attempted to comply with the code, such as the application of 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York:

VILLAGE OF BABYLON
153 West Main Street
Babylon, New York 11702
(631) 669-1300
BUILDING DEPARTMENT
BUILDING PERMIT FORM

Application is hereby made to Code Enforcement Official (Building Inspector) of the Village of Babylon, NY, for the approval of plans and specifications to build or install as herein described. The applicant agrees to comply with all the provisions of the code of the Village of Babylon and/or any other applicable Federal, State and Local codes.

NOTE: Survey or site plans must accompany permit application. (For commercial or industrial applications, consult the Village of Babylon Planning Board.

FOR OFFICE USE ONLY:
102– 6 – 1 – 12 Flood Zone
Section Block Lot
Estimated Value of Construction $ Fee:
Permit Number:
Current Zoning A-9 Approved By: Date Checked:
Permit Application Denied Why?
Is this permit a result of a Zoning Board of Appeals approval? ☐ Yes ☐ No
If yes, what conditions, if any, were set:
Board of Appeals Case #:
Pre-site inspection made by: Date:
Approval for Issuance of Permit: Date: 6/26/20
Issued by: Date: Checked by:
Certificate of Occupancy #

Permit(s) requested (check one or more below) Numbers refer to questions on right that must be answered.
Building Permit
☐ Commercial ☐ Industrial ☐ Residential
☐ Main Building ☐ Addition 1–8
☐ Accessory Building ☐ Addition 1–8
☐ Interior Alteration ☐ Addition 1–8
☐ Two-Family Special Permit 1–3, 7, 8
☐ Change of Use or Occupancy 1–3, 8
☐ Fire Damage Repair 1–4, 8
☐ Fireplace 3, 7
☐ Board of Appeals 1–3, 7, 8
☐ Swim/Pool ☐ In-Ground ☐ Above
4 foot safety fence required 1–8
☐ Demolition (Valid only 6 mos.) 1–3, 7, 8
☐ Underground Tank Installation (plus plumbing permit) 1–3, 6, 8
☒ Other - Explain 1–8

RECEIVED JUN 25 2020 INC. VILLAGE OF BABYLON BUILDING DEPARTMENT

Answer, in black ink, questions numbered next to type of PERMIT(S) REQUESTED.
1. PRESENT USE of property Single Family Home
2. PROPOSED USE Addition of a playground/swing set
3. DESCRIPTION OF PROPOSED WORK Add addition to current 8 ft playground
4. FLOOR AREA to be constructed or altered: 36 + new 86.5 = 131.5 Total Square Feet
5. SIZE of property (180) × (131.5) = 24,645 sq. ft. or 0.57 Acres
6. HEIGHT of building from average grade to highest point 12 Feet
7. PROPERTY LOCATION 99 Park Ave Babylon NY 11702
☐ N ☒ S ☐ E ☐ W Side of Park Avenue Rd. Ave. Feet
8. ORIGINAL CERTIFICATE OF OCCUPANCY #
Certified as:

APPROVED

56. Upon information and belief, persons like Thomas C. Bruckner, submitted handwritten drawings such as the following that were acted upon while Plaintiff's were not:



57.  Defendants, jointly and severally, individually and
collectively, knew and/or had reason to know that the Plaintiff
Lepper parents sought to use their real-property in a manner
that would contribute to and benefit the education and
personal growth of their infant children.

58.  Defendants, jointly and severally, individually and
collectively, never intended to act upon Plaintiffs' building
permit application.

59.  Defendants, jointly and severally, individually and
collectively, apparently intended to take advantage of the
voluntary, but not legally required, application filed by John
Lepper for a permit to construct a tree house for his children
as a vehicle to charge Plaintiffs with violations of Village of
Babylon Code Section 365–26 and collect fines from Plaintiffs

16

by simply refusing to consider and act upon the application by Plaintiff, John Lepper.

60.  On June 15, 2018, Plaintiff John Lepper called the Village of Babylon Building Department to check on the status of his application and was told by an unidentified employee, Jane Doe, that no determination had been made as to whether Mr. Lepper's treehouse was in violation of the town code.

61.  Plaintiff John Lepper immediately ceased construction and assembly of the partially fabricated treehouse as soon as he had been ordered to do so by Building Inspector Fellman.

62.  Determined to either delay construction of an innocuous and code-compliant treehouse solely for the benefit of minor children, or harass and intimidate the Lepper family by destroying their infant son's eagerly anticipated birthday present, the Defendants, jointly and severally, individually and collectively, refused to issue the appropriate building permit or withdraw the "stop work" order.

63.  Within hours of his son's birthday, Plaintiffs John decided to complete the treehouse and raise his children in the manner and safe-guard them from what he had already advised the Defendants was the scourge of drug abuse and the criminal activity known to be occurring in his neighborhood and already visited upon his property.

64.  Mr. Lepper's neighbor had a similar structure in the air, abutting the property line, and Village of Babylon officials know about the same structure yet chose to prosecute John Lepper not his neighbor or others.

17

65. In 18-cv-7011, John Lepper presented photographic evidence to the Defendants and this Honorable Court that a number of treehouses and similar structures existed throughout the Incorporated Village of Babylon but not subject to the onerous requirements imposed upon John Lepper.

66. Other treehouse/unpermitted structures may by placed close to the water and perhaps may incur maritime violations should the Defendants peer deep enough into this intellectual abscess that continues to persist with respect to the Lepper family treehouse and, specifically, John Lepper.

67. The following is a true and accurate photograph of a similar such structure existing within the Village of Babylon, County of Suffolk, State of New York:

68. While these treehouse type structures, mostly utilized by children as part of Americana—that pursuit of happiness for which the United States of America professed



belongs to all— come in all shapes and sizes and nearly all of them do not have building permits:

69. The following is a true and accurate photograph of a another such structure existing within the Village of Babylon, County of Suffolk, State of New York that does not seem to be a treehouse but most certainly abuts the property line and appears to have a finished roof and siding, yet has not been subject to the onerous requirements, prosecutions, fines or threats imposed upon John Lepper and his family, as considered in Docket No: 18-cv-7011:



70. More recently, on or about June 19, 2020, one Richard J.J. Sullivan, Jr. filed an application with the Building Department of the Village of Babylon a copy of which was produced by the Defendants only after Plaintiff filed a demand under the New York State Freedom of Information Law (FOIL). A copy of that Building Permit Application is attached hereto and made a part hereof as the fourth page of Exhibit 2, the FOIL production with respect to 250 Fire Island Avenue. See D.E. 103.

71. A copy of photographs of the Sullivan treehouse produced by the Defendants in response to Plaintiff's FOIL demand is attached hereto and made a part hereof as the sixth through ninth pages of Exhibit 2.

19

Case 2:18-cv-07011-JMA-AYS   Document 127   Filed 07/26/21   Page 252 of 1193 PageID #:
4310
Case 2:21-cv-00014-JMA-AYS   Document 12   Filed 03/04/21   Page 21 of 63 PageID #: 218

72.   On or about July 2, 2020, Defendant Stephen R. Fellman
      issued Certificate of Occupancy No. 20–00106 to "Maintain
      Play Structure" at 250 Fire Island Avenue.  See *Id.*

## THE PROSECUTION OF JOHN LEPPER

73.   On July 19, 2018, John Lepper received by certified mail
      three accusatory instruments dated July 11th,12th & 13th
      each of which stated John Lepper was in violation of Village
      of Babylon Code § 365–26 for construction of a treehouse
      without a permit.

74.   In response, on July 19, 2018, Plaintiff John Lepper
      immediately visited the Village of Babylon Building
      Department to inquire about the three summons he had
      received. He was told that he needed to make an appointment
      with Building Inspector Fellman and a meeting was
      scheduled for July 24, 2018.

75.   Plaintiff John Lepper met with Defendant Building Inspector
      Fellman on July 24, 2018 and asked Defendant Building
      Inspector Fellman about each essentially identical citation
      which merely concluded that a "treehouse" violated Village of
      Babylon Code § 365–26. In response, Defendant Building
      Inspector Fellman stated that Mr. Lepper owed $250 for the
      first accusatory instrument, $500 for the second accusatory
      instrument and $1,000 for the third accusatory instrument.

76.   Plaintiff John Lepper met with Defendant Building Inspector
      Fellman on July 24, 2018 and asked Defendant Building
      Inspector Fellman about each essentially identical citation
      which merely concluded that a "treehouse" violated Village of
      Babylon Code § 365–26. At that time, Mr. Lepper had not
      received any notice of action on his application or any notice

20

that he was in violation of the Code for providing a treehouse for his children.

77.  In response, Defendant Building Inspector Fellman stated that Mr. Lepper owed $250 for the first accusatory instrument, $500 for the second accusatory instrument and $1,000 for the third accusatory instrument.

78.  Plaintiff John Lepper protested to Defendant Building Inspector Fellman that not only were such fines unwarranted and excessive but that no prior notice of any violation had been provided to the Lepper family.

79.  Building Inspector Fellman told Mr. Lepper to resolve the matter in Court on August 14, 2018.

80.  Upon information and belief, Defendant Village of Babylon is more concerned with punishing taxpaying residents and extorting unconscionable fines from them for questionable violations of obscure and arcane, vague and ambiguous ordinances extracting fines out of law abiding resident property owners than providing municipal services such a promptly processing an application for a building permit.

81.  Among the parents and children who visited the Treehouse prior to August 14 hearing were: Joe and Joanne Mineo and their sons, M.M. age 14 and N.M. age 16; , Pat and Kirsten Murphy and their daughter G.M., age 7; Terri McSweeney and Cindy McSweeney with E.M., age 7 and P.M., age 5; Steve Kazda and Amanda Kazda and their sons, J.K., age 6 and J.K. age 4; Mike Columbia and Christina Columbia and their daughters, C.C., age 6 and C.C., age 4; Mike Pagamo and Doreen Pagamo and M.P., age 8 and M.P., age 6; Charlie Lepper and Deena Lepper and their children, J.L., age 14;

21

J.L., age 10, and C.L., age 8; a 93 year old WWII veteran, and Barbra who is over 65 years of age.

## VILLAGE JUSTICE COURT PROSECUTION I

82. Plaintiff John Lepper who is a New York City firefighter sought a continuance of the hearing scheduled for August 14, 2018 from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illnesses from service at the 9/11 scene. Village Judge John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, arriving in Court at precisely 1400 hours still in his Class A uniform.

83. Village Judge John T. Rafter and Defendant Gerard Glass, the Babylon Village attorney acting as the prosecutor both knew that Mr. Lepper was unrepresented by counsel, and that he was facing fines which might amount to $1,750 together with court costs and the possibility of continued and continuing prosecution, yet at no time did Village Judge Rafter or Village Attorney Glass ever warn the Defendant or advise him not only of his right to counsel, but because of the questionable nature of the charges and the circumstances of the prosecution the real need to consult an attorney before proceeding any further in his own defense.

84. Upon information and belief, the wife of Village Judge John T. Rafter works with the complainant who instigated the prosecution of the Lepper Family for erecting a treehouse for their children and the children of the neighborhood.

85. Upon information and belief, Defendant elected officials, Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village

22

Trustee and Mary Adams, Village Trustee conveyed to Village Justice John Rafter and other employees of Defendant Village of Babylon such as Building Inspector Fellman their desire to collect money from fines following convictions of Village of Babylon residents who had the temerity to challenge the unsupported judgment of Defendant Building Inspector Fellman that a violation of Village of Babylon Code Section 365–26 existed.

86.  Defendants, jointly and severally, individually and collectively, engaged in this course of conduct to raise revenue and receive monies to which Defendant Village of Babylon would not otherwise be entitled.

87.  On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per § 116 Unsafe Structures of the International Building Code the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

88.  There is no substantial credible evidence that the Village of Babylon ever adopted the International Building Code nor incorporated its § 116 as part of the Village of Babylon Code.

89.  No substantial credible evidence has ever been presented showing that the Lepper family treehouse is in any way unsafe for its intended use, an arboreal playhouse, by the Lepper children and other children.

## THE VILLAGE COURT PROCEEDINGS II

90.  Defendant Village Attorney Glass requested an adjournment of the hearing scheduled for September 4, 2018 and Village Judge Rafter issued a verbal "stop work" order and asked Mr.

23

Leper "to unplug the light." Then he adjourned the case to September 18, 2018.

91. Upon information and belief, on September 18, 2018, Village Judge Rafter learned that the office of Defendant Village of Babylon Mayor had received a complaint regarding John Lepper.

92. Upon information and belief, the late Defendant Mayor Ralph Scordino played golf with Village Judge John T. Rafter and discussed matters pending in the Village Court, including the prosecution of John Lepper.

93. Village Judge Rafter never informed Mr. Lepper, who was appearing pro se without benefit of counsel, of his rights to receive information about the complaint and the complainant; his right to challenge the accusatory instruments that merely stated, "Tree House" and were unsigned as legally insufficient.

94. Nevertheless, Village Judge Rafter did inquire of Mr. Lepper, pro se, about his efforts at complying with the Village of Babylon Code § 365–26 and the permit application which Mr. Lepper voluntarily filed.

95. Mr. Lepper informed Village Judge Rafter that his building permit application had been accepted by the employees of the Village of Babylon Building Department.

96. The following interaction took place between Mr. Lepper and Village Judge:

JUDGE RAFTER: Okay . Did you have an understanding of what the purpose of the permit is?

MR. LEPPER: Yes sir .

24

JUDGE RAFTER: What was your understanding of what the purpose of the permit was?

MR. LEPPER: A construction permit was required for a structure being put up according to building code 365–26 it's not required for under 90 square feet. And I explained that to Mr. Fellman .

JUDGE RAFTER: I will interpret the code, sir .

MR. LEPPER: Okay .

JUDGE RAFTER: Neither you nor Mr. Fellman will interpret the code. (Trial transcript of September 18, 2018, 10:3–23:)

97. Already, Village Judge Rafter was imputing fault on the pro se Defendant, John Lepper who had attempted to comply with what was a patently vague and ambiguous ordinance:

JUDGE RAFTER: Did you have an understanding of that before you undertook the construction?

MR . LEPPER: Not exactly, sir. Because I did not think that a permit was required for what I was putting up. (Trial transcript September 18, 2018, 11:12–19.)

98. Village Judge Rafter continued to make the case for the prosecutor, Defendant Village Attorney Glass, who at no time objected to the line of inquiry of the accused, Mr. Lepper:

JUDGE RAFTER: Did you contact the building department before you began construction or even contemplated construction of a tree house?

MR. LEPPER: Yes. On the 19th when I submitted the application. Prior to the platform no , sir. I did not think a permit was required for a tree house. I was not sure. (Trial transcript September 18, 2018, 12:2–14)

99. Rather than credit the sworn testimony of John Lepper. A pro se Defendant, and presumed innocent until proven guilty beyond reasonable doubt, Village Judge Rafter continued to push the burden onto Mr. Lepper who provided sworn

25

evidence that he submitted a permit application prior to construction and prior to the issuance of any accusatory instrument by Village of Babylon:

JUDGER RAFTER: What is the basis of your objection?

MR . LEPPER: That was submitted on May 19th after I received the letter from Mr. Fellman regarding construction of the tree house without a permit. That was accepted by the office upstairs on May 19th and it was complete.

JUDGE RAFTER : You note there is no date on this. Do you have any proof as to when it was received?

MR . LEPPER : I was given a copy of the drawing I made and the survey that it was received. (Trial transcript September 18, 2018, 35:7–23)

100. Determined to convict the pro se Defendant John Lepper, Village Judge Rafter interrupts Defendant Village Attorney Glass when questioning Defendant Building Inspector Fellman during the trial about Mr. Lepper's contention that the Lepper Family Treehouse did not require a permit:

MR. GLASS: Mr. Fellman, it's your contention that under the Babylon Village code 365–26 there was no building permit for this structure -- this tree house, correct?

MR, FELLMAN: Correct.

MR. GLASS: Is there any provision of the Babylon Village code that would exempt one in the Village of Babylon from having to obtain a building permit based up on the facts you have testified to?

JUDGE RAFTER: Mr. Glass , I think that calls for a conclusion of law. So I am not going to permit him to answer that.

MR. GLASS: Okay. I have nothing further .

JUDGE RAFTER: You can ask in his opinion as a violation of the code and then set forth the facts upon which he bases his opinion. And then I would make the ultimate determination.

MR . GLASS: Judge, perhaps this should be the question then. Is there any provision of the code that exempts tree houses from obtaining a building permit?

MR . FELLMAN: No .

MR. GLASS: Okay. I have nothing further judge. (Trial transcript September 18, 2018, 39:11–25, 40:2–22)

101. Most telling is the testimony from Defendant Building Inspector Fellman that "we can issue violations every 24 hours." (Trial transcript September 18, 2018, 45:11–12)

102. Village Judge Rafter convicted John Lepper by Order dated October 17, 2018 yet, as was stated on the record on November 20, 2018, did not recuse himself or allow further inquiry into his wife's relationship with the complainant who, upon information and belief, submitted a complaint against the Lepper Family Treehouse.

103. In his decision, Village Judge Rafter stated that the "testimony of Stephan Fellman...established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office that a treehouse was being constructed," yet no such complaint was ever shown to Mr. Lepper although he requested a copy on several occasions, nor was it produced during the trial.

104. To date no such complaint has been produced albeit it is known and John Lepper has reason to know that it is the product of the conspiracy between and among the Defendants.

## THE ORDER OF VILLAGE JUSTICE RAFTER

105. On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a pro se defendant in a quasi-criminal proceeding,

Mr. Lepper was found in violation of § 365–26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

106. The Order by Village Judge Rafter finding John. Lepper in violation of § 365–26 of the Village of Babylon Code required Village Judge Rafter to use a definition of "building" from a dictionary since it was not defined in the Village of Babylon Code: "The Merriam-Webster Dictionary defines a building as follows; A structure that is designed or intended for support, enclosure, shelter or protection of persons, animals or property having a permanent roof that is support by columns or walls." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 1)

107. Without referring to the remaining provisions of the Village of Babylon Code governing children's play gyms and the expansive use of "any combination," Judge Rafter states "The Court hereby specifically finds that the treehouse in question constituted a "building" within the meaning of the subject Code section." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 3)

108. In that same October 17, 2018 Order finding Mr. Lepper in violation of § 365–26 of the Village of Babylon Code Village Judge Rafter states, "it is noted that the Notice of Violation is not signed by any representative of the Village of Babylon." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2)

28

109. In his October 17, 2018 Order finding Mr. Lepper in violation of § 365–26 of the Village of Babylon Code Village Judge Rafter finds that "Defendant [Mr. Lepper] did apply for a permit" (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.) but then states without any reference to the record, "but his application was deemed incomplete as it did not contain a drawing from a licensed architect or engineer." (Decision and Order of Village Justice John Rafter dated October 17, 2018, p. 2.)

110. The Village of Babylon never required "a drawing from a licensed architect or engineer" from any other "elevated playhouse" or treehouse that now exists in the Village.

111. There is no evidence that the Lepper family was ever informed by any representative of the Village of Babylon that such a "drawing" was required for a children's tree house of less than 90 square feet floor area.

112. If, in fact, the Village of Babylon Code Section 365–26 does require such an expensive document to obtain a permit for a children's tree house of less than 90 square feet of floor area it essentially prevents a homeowner from the legal and proper use of their real property and is on its face a violation of Plaintiffs' civil, constitutional and human rights associated with title to real property and the quiet enjoyment of that property as a family.

113. Indeed, as per the application of Thomas C. Bruckner concerning 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York, and the application of Richard J.J. Sullivan, Jr. concerning 250 Fire Island Avenue, this requirement was pretextual.

29

## POST-TRIAL ACTIONS AGAINST JOHN LEPPER

114. On October 17, 2018, after the Order of Village Judge Rafter was delivered by code enforcement, John Lepper went to Village Court to inquire about appeal.

115. The next day, October 18, 2018, Babylon Village Attorney Gerard Glass sent a letter to the Lepper Family, stating, in toto, that "As you know this office is counsel to the Village of Babylon. The Court has rendered its decision. Please let me know your intentions. Thank you for your attention and courtesies herein."

116. The day after Attorney Glass sent his letter, and two days after the Order was issued, Building Inspector Fellman stated in a letter that, "On October 17, 2018 Village Justice John Rafter found you guilty of each offense listed on various summonses you received regarding the construction of a treehouse within your front yard setback. I, as Building Inspector, am ordering the continuation of the stop work order barring any further construction or occupancy of the tree house."

117. Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

118. The threat of accruing daily fines, issued by Defendant Fellman and repeated in open court by Defendant Gerard Glass, persists to this very day.

## THE SECOND WAVE OF PROSECUTIONS AGAINST JOHN LEPPER

119. Rather than allow the Lepper family sufficient time to appeal or seek counsel to elapse, the Defendants, jointly and severally, individually and collectively, did work together to injure the Plaintiff Lepper family; silence the Lepper family from speaking out about community problems, and did engage in an abuse of legal process to have Mr. Lepper remove the Lepper Family Treehouse.

120. Defendant Building Inspector Fellman did issue multiple additional accusatory instruments concerning the Lepper Family Treehouse on October 31, 2018.

121. On November 5, 2018, John Lepper paid the fines imposed on him by Village Judge Rafter in his October 17th Order.

122. On November 13, 2018, the day of a hearing scheduled for trial on accusatory instruments previously issued by Building Inspector Fellman, Building Inspector Fellman created and filed a document designated "Accusatory Instrument/Information for State and Village Ordinances" asserting John Lepper "did wrongfully and unlawfully commit the offense of Section 365–26 Construction without a Permit," followed by a recital of "§365–26 Permit Required; Materials to be submitted."

123. Nowhere in that putative Accusatory Instrument/Information and the ordinance quoted therein is there any mention of the need for any drawing by an "architect or engineer."

124. Nowhere in the application of Thomas C. Bruckner 99 Park Avenue, Village of Babylon, County of Suffolk, State of New York is such a requirement nor is there a requirement on any

of the treehouses/boathouses which have been allowed to exist in the Village of Babylon without permits.

125. In that putative Accusatory Instrument/Information, Building Inspector Fellman alleges that he "did observe the defendant [John Lepper] erected a treehouse without a building permit. Further after a stop work order was issued on 10/19/18 barring any further construction or occupancy of the treehouse the defendant added lights."

126. On November 13, 2018, Village Justice John Rafter conducted a hearing on the accusatory instrument issued on October 20, 2018.

127. November 16, 2018, Plaintiff John Lepper filed a Notice of Appeal, a FOIL request, and a Litigation Hold Notice.

128. On November 20, 2018, a hearing was held before Village Justice Rafter concerning an alleged October 20th Violation and two additional from Halloween.

129. On November 20, 2018, through counsel, Mr. Lepper asked the Court to enjoin the daily issuance of fines so that Mr. Lepper may resolve the new set of accusatory instruments against him on the merits but the Hon. John T. Rafter refused to do so.

130. On November 21, 2018, John Lepper tried to obtain copies of exhibits that were missing from the trial on September 18, 2018. After waiting two hours he was denied copies.

131. On November 27, 2018, at approximately 1515 hours Plaintiff John Lepper filed a Motion to dismiss the outstanding accusatory instruments together with a letter from Attorney Morris requesting copies of the exhibits from the trial on September 18, 2018.

32

132. On November 27, 2018, at 8pm Mt. Lepper attended a Babylon Village Board of Trustees meeting with Joe Mineo and Nick Montalto.

### COMMENCEMENT OF THE FIRST ACTION

133. On December 10, 2018, Plaintiff filed a Verified Complaint accompanied by an Order to Show Cause and the matter was heard before Hon. Joseph F. Bianco.

134. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon utilized daily fines against purported Village of Babylon Code violators to obtain compliance.

135. Defendant Gerald Glass, Esq. did represent in open Court on December 10, 2018 that the Village of Babylon intends to require building permits for any treehouse structure in the Village of Babylon.

136. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon took issue with a temporary electric extension cord to a tree on Plaintiffs" private property and sought to enjoin the use of a light that illuminated Plaintiffs American Flag and the adjoining street where illegal drug activity had taken place.

33



137. According to statements made by Defendant Gerald Glass in open Court on December 10, 2018, the attempts of Defendant elected officials Ralph Scordino, Mayor, Kevin Muldowney, Deputy Mayor, Robyn Silvestri, Village Trustee, Tony Davida, Village Trustee, Mary Adams, Village Trustee, to enforce Village of Babylon Code Section 365–26 was a thinly disguised effort to extort money from the Plaintiff.

138. Defendant Gerald Glass, speaking on behalf of all Defendants, did wish to enjoin Plaintiff from efforts at ameliorating the drug use that occurred on and around his property by illuminating the street.

139. Defendant Gerald Glass, on December 10, 2018 before this Honorable Court, did provide several admissions as to the true intentions of Defendants, jointly and severally, individually and collectively, to punish Plaintiffs for every day that the Lepper Family Treehouse existed.

34

140. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was monitoring Plaintiffs' property.

141. Defendant Gerald Glass, Esq. did state in open Court on December 10, 2018 that the Village of Babylon was conducting surveillance of Plaintiffs' property and the family activities thereon.

142. Defendant Gerard Glass, Esq. did proceed to profit as being sued as a named Defendant along with the Village of Babylon as further discussed below.

## PLAINTIFF'S APPEAL TO THE APPELLATE TERM

143. John Lepper did appeal the convictions of the lower court.

144. *People* v *Lepper (John)* 2019 NY Slip Op 52117(U) was decided on December 19, 2019 by the Appellate Term, Second Department (hereinafter "Appellate Term Decision") which held that "The accusatory instruments…fail to allege facts of an evidentiary nature establishing the nature of the work that defendant performed on the tree house, namely, that defendant had erected the tree house, structurally altered it or changed the use thereof…[and]… Therefore, the accusatory instruments fail to allege every element of the offense." *Id.*

145. According to a *Newsday* Article, Keldy Ortiz, *Homeowner who built treehouse serves claim against Village of Babylon,* Newsday (April 30, 2020), https://nwsdy.li/3oO9VZu, Defendant Gerard Glass "said the December decision[, Appellate Term Decision], was based on a technicality."

146. Defendant Gerard Glass stated to *Newsday*, "Babylon Village attorney Gerard Glass says the decision is no surprise

because village officials knew there was an issue in the way the summons was written, and they could not correct it after the fact." See Deborah S. Morris, "Permit not needed for Babylon treehouse, court rules," *Newsday* (January 2, 2020), https://nwsdy.li/3oOa9zO.

147. Defendant Gerard Glass admits that Defendants knew of this issue yet proceeded, not only in the prosecution but in demanding daily fines and removal/alteration of the Lepper treehouse.

148. Referring to the Appellate Term decision, Defendant Gerard Glass is quoted as stating that "This has no impact on the case whatsoever," Glass said. "This has nothing to do with the substantive issues of the cause of why he didn't get a building permit." *Newsday* (January 2, 2020), https://nwsdy.li/3oOa9zO.

## GENERAL COMPLAINTS BY THE PLAINTIFF

149. As evidenced by, among other things, the significant number of unpermitted structures in the nature of treehouses, boathouses, and play houses within the Village of Babylon, Defendants lacked probable cause for actively prosecuting John Lepper.

150. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper in retaliation for his speaking out about matters of public concern in and around the Village of Babylon.

151. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments against Mr. Lepper to

further the wishes of some unidentified complainant and in derogation of the constitutional rights of the John Lepper and his family.

152. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to Mr. Lepper carrying criminal sanctions without allowing Mr. Lepper the opportunity to comply with or otherwise challenge the actions of the Village of Babylon.

153. Defendants, jointly and severally, individually and collectively, through Defendant Building Inspector Fellman, did issue accusatory instruments to obtain monies and property to which Defendants were not entitled.

154. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions were unjustified and without probable cause.

155. Defendants, jointly and severally, individually and collectively, knew and had reason to know that their actions would cause harm to and inflict distress upon the Plaintiff.

156. The Defendants, jointly and severally, individually and collectively, continue to oppress the Lepper family and cast a cloud of criminality over their persons, home, and family.

157. Among the examples of the organized oppression of the Lepper family by the Defendants, jointly and severally, individually and collectively, has been the wrongful delay and outright refusal to provide Mr. Lepper with the exhibits from his trial before Village Judge Rafter along with evidence requested, required to be produced or requested under the Freedom of Information Law.

## THE BASIS FOR EQUITABLE RELIEF

158. Defendant Village of Babylon through the threats of Building Inspector Fellman continues to insist that the Lepper family tear down and completely remove their children's treehouse under threat of daily fines of up to $1,000 each day.

159. As a result of such demands and threats, the Lepper family is in imminent danger of serious, permanent, and irreparable economic damage.

160. The Lepper family continues to live in fear that they will suffer serious economic punishment for a reasonable use of their own private property and their temerity in exercising their First Amendment rights by speaking out against the unconscionable actions of the Defendants in depriving the Lepper family of their liberty interest in raising their children as they see necessary which included trying to protect their infant children from exposure to hypodermic needles on the ground by building them a safe harbor in the air; and then retaliating against the Lepper family for speaking out.

161. John Lepper and his family has no adequate remedy at law.

## DEFENDANTS FAIL TO ESTABLISH ANY CONSTITUTIONAL BASIS FOR EXERCISE OF THE "POLICE POWER"

162. Defendant Village of Babylon has not established any association between Village of Babylon Code § 365–26 and the public health, safety and welfare of the residents of the Village of Babylon.

163. There is no substantial credible evidence that the Lepper family children's treehouse represents a threat, much less a

danger, to the health, safety, and welfare of the residents of the Village of Babylon.

164. Staying enforcement of the ordinance pending the resolution of this action and a declaration of the constitutionality and enforceability of Village of Babylon Code § 365–26 will not cause any harm and/or damage to the residents of the Incorporated Village of Babylon.

## DEFENDANTS USE LEGAL PROCESS, FINES AND PROSECUTION TO SILENCE JOHN LEPPER AND VIOLATE HIS FIRST AMENDMENT RIGHTS

165. Defendants have constrained the ability of John Lepper to create a treehouse for his infant children shortly after he spoke out against the criminal activity occurring within Village of Babylon.

166. Defendants have retaliated against John Leper for exercising his rights under the First Amendment.

167. Attorney Eric Tosca, representing the same Defendants in Lepper v. Village of Babylon, 18-cv-7011 tried to make an emergency application to enjoin the press from attending and John Lepper from contacting the press when it had its purported inspection of the subject premises.

168. Defendants knew and had reason to know that John Lepper intended to build a treehouse to remove their children from, and allow their children to play without, the danger of contact with hypodermic needles on the ground which had been discarded from the street and public walkways onto the Lepper property.

169. Defendants knew and had reason to know that John Lepper spoke publicly against the hypodermic needles found on his

property, crime in his community and the safety and well-being of his children.

170. In response to his identifying the problem of the hypodermic needles and their indication of a community drug problem and bringing the issues before the administration of the Village of Babylon, Defendants, individually and collectively, did conspire and act to deprive Mr. Lepper of his rights under the First, Fourth, Fifth, Eighth and Fourteen Amendment by ordering immediate and total removal of the treehouse he built for his children under the threat of continuing confiscatory fines and penalties.

171. Defendants, individually and collectively, did act to deprive John Lepper of his rights under the First, Fourth, Fifth, Eighth and Fourteen Amendments to the United States Constitution while knowing and having reason to know that Mr. Lepper fully complied with the permit process of the Village of Babylon Code, and by obfuscating an already arcane and obscure administrative process in order to cause injury to John Lepper and his family.

172. Rather than remedy the problem of drug abuse in the community or address the concerns Plaintiff John Lepper expressed about the dangers of the discarded hypodermic needles which could have been addressed by Village of Babylon Code Enforcement, Defendants accepted the building permit which Mr. Lepper filed and the fee which he tendered without any intention of processing the application or even acknowledging its existence in their later prosecution in the Babylon Village Court.

173. Upon information and belief, Defendants at the behest of an unnamed and unidentified complainant did conspire and plan

40

to issue accusatory instruments to Mr. Lepper with the ultimate goal of obtaining money, removing all remnants of a then unfinished treehouse, and punishing the Lepper family for exercising their constitutional rights.

174. On May 10, 2018, Defendants acknowledged that the treehouse did not violate any provision of the Village of Babylon Code by accepting the building permit application and required fee.

175. Defendants concede that notice of all three violations which were each dated in May, 2018, were actually sent to Mr. Lepper in July, 2018.

176. Defendants delayed processing the Lepper building permit for his children's treehouse and by failing to acknowledge and/or act upon the application, created a situation where fines would accrue against John Lepper for lack of a permit and cause Plaintiff John Lepper serious, permanent, and irreparable economic damage.

177. Defendants caused quasi criminal process to issue against the Lepper family to silence the Plaintiff John Lepper and violate his civil and constitutional rights.

**VILLAGE OF BABYLON CODE § 365–26 FORECLOSES AGE-APPROPRIATE PRIVATE RIGHTS OF ASSEMBLY AND ASSOCIATION ON ARBITRARY GROUNDS AND ARE THEREFORE TECHNICALLY CAPRICIOUS AS WELL AND CERTAINLY UNDERINCLUSIVE.**

178. Plaintiff John Lepper has a constitutionally protected liberty interest in his property.

179. Plaintiff John Lepper has the right to establish a home and bring up children.

41

180. Plaintiff John Lepper has the right to direct the upbringing and education of his infant children.

181. Plaintiff John Lepper has the right to speak to the news/press without retaliation or fear of retaliation by the Defendants.

182. Plaintiff John Lepper has the right and duty to nurture his children and maintain the physical homestead environment in which they will grow and mature.

183. A special respect for individual liberty in the home has long been part of our culture and our law.

184. Defendants issued legal process to silence the Plaintiffs and to remove the Lepper Family Treehouse without probable cause and a proper finding that the children's treehouse would represent a danger to the public health and safety of the residents of the Village of Babylon and thereby violated the constitutional rights, due process and liberty interests of Plaintiff John Lepper without due process of law.

185. Defendants took action within the span of forty-eight hours to find Mr. Lepper guilty of a crime and then threaten daily fines if the treehouse was not removed, however, they still have not acted upon the permit application filed by John Lepper over two years ago.

186. The conviction of an unrepresented *pro se* Defendant, John Lepper, in the Babylon Village Justice Court and the unjustified fines imposed by Village Judge Rafter were an unconstitutional attempt to silence Plaintiff John Lepper and intimidate him from speaking out against government ineptitude, the scourge of drugs, and his intention to do something about it on his own property.

42

187. Defendants actions in the prosecution of Plaintiff John Lepper violated his civil and constitutional, his liberty rights, and his rights to due process, enjoyment of property, freedom of assembly, and the ability to associate with others on his property without the fear of government intrusion or reprisal.

188. Defendants violated the civil and constitutional rights of Plaintiff John Lepper by the unsupported citation of the Lepper Family Treehouse as an unsafe structure in violation of the International Building Code without any legal, much less equitable, basis therefore.

189. Building Inspector Fellman never presented any substantial credible evidence identifying the nature and manner he claimed the treehouse was an unsafe treehouse.

### PLAINTIFF JOHN LEPPER'S RIGHTS ARE BEING VIOLATED BY THE THREAT OF CONTINUED FINES

190. Village of Babylon Code § 365–26 is criminal in nature.

191. The fines associated with Village of Babylon Code § 365–26 are punitive, doubling and tripling and culminating in the demand for the removal of private property without due process.

192. The actions of Defendants in enforcing Village of Babylon Code § 365–26 against Plaintiff John Lepper and threatening to continue enforcement with successive process and escalating fines and penalties for the very same conduct violate the Constitutional Rights of the Lepper family by subjecting them to repeated double jeopardy.

193. John Lepper raised this issue before the Honorable John T. Rafter who ignored the issues, then convicted Mr. Lepper, an

43

unrepresented, *pro se* defendant without any substantial credible evidence of guilt or legally sufficient instrument.

194. The accrual of multiple accusatory instruments, existing unfounded convictions of three violations and pending prosecution of further accusatory instruments establishes the imminent danger of serious, permanent, and irreparable economic damage and the likelihood that such danger will be continued according to the sworn testimony of Defendant Building Inspector Fellman. As a result, Plaintiff John Lepper has been placed in jeopardy repeatedly for the same alleged criminal offense.

195. Defendants, jointly and severally, individually and collectively, had a duty not to subject Plaintiff John Lepper to constitutional violations, summary punishment, improper and inappropriate charges of Babylon Village Code violations, malicious prosecution, abuse of process, false and improper investigation.

196. Defendants, jointly and severally, individually and collectively, through their conduct, acts, and omissions acted outrageously and beyond the bounds of decency in attempting to coerce Plaintiff into removing a lawful children's treehouse from their property by threatening ongoing and continued legal proceedings with the potential for confiscatory fines and imprisonment and filing unjustified and unsupportable criminal charges against and imposing summary punishment and excessive fines upon Plaintiff for allegedly violating an unconstitutional ordinance, Village of Babylon Code §365–26; together with concealing and attempting to cover up the wrongs done to Plaintiff; and defaming, slandering and failing to redress the grievances done to the Plaintiff.

44

197. Defendants, jointly and severally, individually and collectively, violated the Plaintiff's rights secured under the United States Constitution and the New York State Constitution.

### PROSECUTION OF JOHN LEPPER BY THE DEFENDANTS IS AN UNCONSTITUTIONAL TAKING OF HIS PROPERTY

198. Village of Babylon Code § 365–26 is unconstitutional:

199. Village of Babylon Code § 365–26 as enforced by the Defendants against the Plaintiff John Lepper is unconstitutionally vague, overbroad, and violates the civil and constitutional rights of John Lepper guaranteed under the First, Fourth, Fifth, and Fourteenth Amendment of the Constitution.

200. Village of Babylon Code § 365–26 fails to give Plaintiff John Lepper fair notice that building a treehouse of less than 90 square feet is forbidden by the Code.

201. Village of Babylon Code § 365–26 does not provide guidance to ordinary homeowners as to whether building a treehouse for their infant children might be construed as a violation subjecting them to criminal prosecution.

202. Village of Babylon Code § 365–26 encourages arbitrary and erratic arrests and convictions.

203. The accusatory instruments charging Plaintiff John Lepper with violating Village of Babylon Code § 365–26 for building a treehouse for his infant children were based upon the malice and/or animosity of a neighbor.

45

204. Village of Babylon Code § 365–26 fails to meet the fundamental principle of statutory construction for laws with criminal penalties by failing to set forth minimal guidelines to guide and govern law enforcement.

205. As evidenced by the Kafkaesque prosecution and continued litigation over a treehouse for the infant Lepper children on their own property, Village of Babylon Code § 365–26 allows law enforcement and local government to pursue their personal animosity in violation of the civil and constitutional rights of the Plaintiff.

206. Village of Babylon Code § 365–26 has been utilized to obtain monies from Mr. Lepper under threat of continuing fines, liens on the Lepper family home, and/or incarceration.

### THE EXCESSIVE FINES THREATED BY THE VILLAGE OF BABYLON VIOLATE THE EIGHTH AMENDMENT

207. Because of the criminal nature of Village of Babylon Code Section 365–26, Plaintiff John Lepper can suffer fines up to one-thousand dollars per day during the existence of his children's treehouse.

208. The Eighth Amendment of the United States Constitution protects against unreasonable and excessive fines.

209. Defendants, and specifically as stated in open Court by Gerald Glass, Esq. on December 10, 2018, intend on utilizing daily fines to enforce Village of Babylon Code § 365–26.

210. Village of Babylon Code § 365–26 can result in fines amounting to thousand(s) of dollars even though no further action was taken by the Plaintiff thereby establishing that the fines are associated with the mere existence of the children's treehouse, not its use.

211. Defendants, jointly and severally, individually and collectively, know and have reason to know that such daily fines are excessive and extortionate in nature.

212. Defendants, as stated in open Court by Defendant Gerald Glass, Esq. as Village Attorney on December 10, 2018, discussed utilizing daily fines as part of their "package of tools" to enforce Village of Babylon Code § 365–26.

213. Defendants as stated in open Court by Defendant Gerald Glass, Esq. as Village Attorney on December 10, 2018, opined that the existence of the Lepper Family Treehouse was deserving of daily fines by Defendants utilizing Village of Babylon Code § 365–26.

214. Plaintiff needs to take no further action for Defendants to issue additional daily fines.

215. According to Defendants, and specifically as stated in open Court by Defendant Gerald Glass, Esq. as Village Attorney on December 10, 2018, Defendants could simply observe and fine Plaintiff everyday he sought to defend himself in court.

216. Defendants, collectively through their attorney and agent Defendant Gerard Glass as Village Attorney, did admit in open Court on December 10, 2018 that the Village of Babylon did use exorbitant fines to obtain property, or revenue or coerce action to which Defendants are not otherwise entitled.

217. Accordingly, Plaintiffs are damaged and seek enjoinment of the enforcement of Village of Babylon Code Section 365–26.

## PLAINTIFF'S "MONELL" CLAIM; 42 U.S.C. §1983

218. Plaintiff John Lepper as a resident taxpayer of the Incorporated Village of Babylon has standing individually

and, as a resident taxpayer of the Incorporated Village of Babylon, on behalf of all those other resident taxpayers of the Incorporated Village of Babylon so unfortunate as to be similarly afflicted and suffering economic damage as a result of the expenditure of Village funds for the inappropriate and improper defense of individual village officials engaged in the persecution of John Lepper for providing a treehouse in which his infant children might play.

219. Defendant elected officials, jointly and severally, individually and collectively, failed to adequately and properly train, supervise, manage, and control their employees, particularly Building Inspector Fellman, and the Defendant Village of Babylon prosecutor, Gerard Glass, in the administration of the Village of Babylon Code Section 365–26 as a result of which John Lepper has suffered injury and damage.

220. Defendant elected officials, jointly and severally, individually and collectively, were responsible for the administration and operation of the Village of Babylon.

221. Defendant elected officials, jointly and severally, individually and collectively, were responsible for policy and decision making in the Village of Babylon.

222. Defendant elected officials, jointly and severally, individually and collectively, actively established or permitted to exist a Village wide policy of denial of due process and equal protection in the administration and enforcement of the Village of Babylon Code, in this specific case Section 365–26.

223. Defendants, jointly and severally, individually and collectively, subjected Plaintiff John Lepper to selective enforcement of Village of Babylon Code Section 365–26 and

48

disparate treatment from that afforded similarly situated property owners.

224. Defendant elected officials, jointly and severally, individually and collectively, failed to remediate the actions taken against the John Lepper for erecting treehouse as an arboreal playhouse for his infant children and continues to harass, threaten, and attempt to coerce John Lepper into removing their children's treehouse.

225. Defendant elected officials, jointly and severally, individually and collectively, failed to remediate the actions taken against John Lepper for speaking out against criminal activity, exercising his right to dissent, appeal from the court, seek redress in a court of law and being politically active within the Village of Babylon.

226. Defendant elected officials, jointly and severally, individually and collectively, have continued to subject John Lepper to continued prosecution for alleged violations of Village of Babylon Code Section 365–26 as part of a cover up for the unjustified and improper earlier prosecution and conviction of Plaintiff John Lepper for violating Village of Babylon Code Section 365–26 by erecting a treehouse of less than 90 square feet "lot area" for his infant children.

227. Defendant elected officials, jointly and severally, individually and collectively, knew, or should have known, that there was no system or procedure in place for reporting, investigating, or remediating incidents involving harassment of Village residents by means of the Village of Babylon Code other than this litigation.

228. Defendant elected officials, jointly and severally, individually and collectively, maintained a deliberate indifference to the

human, civil, and constitutional rights of Plaintiff John Lepper.

## PLAINTIFF SEEKS INJUNCTIVE RELIEF

229. Plaintiff John Lepper seeks to enjoin the daily fines and continued enforcement of Village of Babylon Code § 365–26 as against him as unconstitutional.

230. The elected officials, particularly the Village Judge, and all the employees, agents of, and consultants to the Incorporated Village of Babylon have a clear and unequivocal duty to all the resident property owners of the Village to assure them peaceful and quiet enjoyment of their homes and property according to the ancient and long standing maxim of at the heart of common law equity jurisprudence, *sic utere tuo ut alienum non laedas*, enjoining everyone to use their own property in such a way as not to injure that of another.

231. Defendant Village of Babylon seeks to limit the use of the Plaintiff's real property while it imposes no similar restriction on other property within the Village of Babylon.

232. Village of Babylon Code §326–26 can only be enforceable if it is a proper exercise of the police powers of the State by the Village of Babylon.

233. Village of Babylon Code §326–26 should be considered a zoning regulation.

234. To impose fines and even imprisonment for erecting a "building... on any lot, plot or premises" in the Village of Babylon "until a permit authorizing the same shall have been issued by the Building Inspector" (Village of Babylon Code §326–26.) without defining "building" and the phrase, "lot,

50

plot or premises" creates a vague, ambiguous, and essentially meaningless ordinance.

235. Each of the accusatory instruments lodged against Defendant Lepper is based on the claim that erecting a treehouse of less than 90 square feet without a building permit or variance from the Zoning Board of Appeals is a violation of the Village of Babylon Code Section 365–26.

## FEDERAL & PENDENT STATE LAW CLAIMS

236. Defendants, jointly and severally, individually and collectively, had a duty not to subject Plaintiff John Lepper to constitutional violations, summary punishment, improper and inappropriate charges of Babylon Village Code violations malicious prosecution, abuse of process, false and improper investigation.

237. Defendants, jointly and severally, individually and collectively, through their conduct, acts, and omissions acted outrageously and beyond the bounds of decency in (a) attempting to coerce Plaintiffs into removing a lawful children's treehouse from their property by threatening ongoing and continued legal proceedings with the potential for confiscatory fines and imprisonment; (b) filing unjustified and unsupportable criminal charges against and imposing summary punishment and excessive fines upon Plaintiffs for allegedly violating an unconstitutional ordinance, Village of Babylon Code Section 365–26; and (c) concealing and attempting to cover up the wrongs done to Plaintiffs; and defaming, slandering and failing to redress the grievances done to the Plaintiff.

238. Defendants, jointly and severally, individually and collectively, violated the Plaintiff's rights secured under the

51

United States Constitution and the New York State Constitution.

### MALICIOUS PROSECUTION
(New York and Federal Law)

239. The actions of the Defendants, jointly and severally, individually and collectively, in prosecuting John Lepper for building an elevated playhouse for his children are a perversion of proper legal procedures in violation of his personal liberty and privacy interests under the Fourth Amendment.

240. Defendants actions, as discussed above, were undertaken to punish John Lepper for speaking out against IV drug use in the Village of Babylon near his home.

241. Defendants, collectively, did act to punish John Lepper, defame John Lepper, harass and intimidate and seize John Lepper by legal process, threat of arrest and prosecution.

242. Defendants, collectively, did pay large and inappropriate fees to Defendant Gerard Glass as Village Attorney/Prosecutor to prosecute John Lepper and defend the violations of the civil and Constitutional rights of Plaintiff by the Incorporated Village of Babylon.

243. Decedent Mayor Ralph Scordino did ask the Suffolk County Police Department to arrest John Lepper without probable cause, causing the seizure of John Lepper, discussed below.

244. The actions of the Defendants, jointly and severally, individually and collectively, in prosecuting John Lepper for building an elevated playhouse for his children were initiated or continued against him, with malice and without probable cause.

## Extra-Judicial Actions Against John Lepper

245. Defendants, individually and collectively, did contact the Suffolk County Police Department and make false allegations seeking to have John Lepper falsely arrested and prosecuted.

246. The late mayor, Defendant Ralph Scordino, in conspiracy with others, did contact the Suffolk County Police Department to make a criminal complaint against John Lepper.

247. On February 4th 2020, Detective Brian Greenze and another Suffolk County detective from Suffolk County Police Headquarters in Yaphank arrived at the home of John Lepper's mother asking to speak to him.

248. Det. Green told John Lepper that Village of Babylon Mayor Ralph Scardino and Town of Babylon Councilman Terry McSweeney had complained that they "felt threatened" by John Lepper and that he was "following" them.

249. Defendants, individually and collectively, did make these false accusations to injure John Lepper, subject John Lepper to seizure and/or arrest and attempted to have the Suffolk County Police Department prosecute John Lepper.

250. In April 2019, Defendants conspired to send a letter to Commissioner Nigro of the FDNY further efforts to slander, defame and harm John Lepper, who is a New York City firefighter, by complaining to the FDNY that firefighter Lepper broke FDNY rules by wearing his Class-A uniform in a courtroom to gain special favoritism from the Babylon Village Justice Court and further that he committed a criminal act against the late Mayor Ralph Sciordino.

251. As a result of the conspiracy (42 U.S.C. §§ 1983, 1985 and 1986) perpetrated by and contributed to by the Defendants, jointly and severally, individually and collectively, John Lepper was forced to obtain representation from Eric Bischoff and defense by TJ McManus, Esq. of Sullivan, Block, and McGarry.

252. At the time the Defendants, jointly and severally, individually and collectively, conspired to facilitate the complaint to the FDNY they knew that John Lepper had sought a continuance of the hearing scheduled for August 14, 2018 from the afternoon session of the Court to the evening session in order for him to attend a memorial service for a brother firefighter who had died of illness from service at the 9/11 scene.

253. At the instance of Village Prosecutor Gerard Glass, Village Justice John T. Rafter denied the request and Firefighter Lepper was forced to leave the Memorial service before it was completed, in order to arrive in Court at precisely 1400 hours, but still in his Class A uniform.

254. Defendants actions were the actual and proximate cause of harm, embarrassment, accruing legal fees and other damages.

### THE ROLE OF THE VILLAGE ATTORNEY

255. In response to a *Newsday* Article stating that taxpayers are "paying more than $50,000 in legal costs associated with a backyard treehouse they didn't help construct and can't enjoy for themselves." Keldy Ortiz, "Dispute over little backyard treehouse costs Babylon Village residents big bucks," *Newsday* (September 27, 2020), https://nwsdy.li/3lKnoQ0, Defendant Gerard "Glass defended the cost — $54,749 — to help the village tackle the lawsuits Lepper has filed."

256. According to *Newsday*, Village of Babylon Records show the following monies were paid to Gerard Glass relating to a child's treehouse: Dec. 1 to Dec. 31, 2018: $7,450; Jan. 9 to June 27, 2019: $21,824; June 28 to Sept. 30, 2019: $9,425; Oct. 1 to Jan. 16, 2020: $16,050.

257. Actual malice by the Defendants against Plaintiff John Lepper is evidenced by paying Village Attorney Gerard Glass well over $50,000.00 USD, in addition to the $75,000.00 USD he makes as a part-time prosecutor for the Village of Babylon.

258. The American Bar Association recommends that "Prosecutors whose professional obligations are devoted full-time and exclusively to the prosecution function are preferable to part-time prosecutors who have other potentially conflicting professional responsibilities." American Bar Association, *Criminal Justice Standards for the Prosecution Function,* Fourth Edition (2017), Rule 3-2.1(a)(iii); *available at* https://bit.ly/3oJPCwb.

259. Indeed, "The prosecutor should not permit the prosecutor's professional judgment or obligations to be affected by the prosecutor's personal, political, financial, professional, business, property, or other interests or relationships. A prosecutor should not allow interests in personal advancement or aggrandizement to affect judgments regarding what is in the best interests of justice in any case." https://bit.ly/3oJPCwb at Rule 3-1.7(f)

260. Defendant Gerard Glass, Esq., as Village Attorney/Prosecutor utilized his part-time position to prosecute a child's treehouse with instruments he later admitted were legally insufficient.

261. Gerard Glass profited at the costs of taxpayers "For 72 hours and 25 minutes between Jan. 9, 2019, and June 27, 2019, the

village received a bill from Glass of $21,725. During that time, the village received bills for various instances related to the cases with Lepper, including phone calls with village officials, a *Newsday* reporter and attending a deposition of Lepper, according to invoices." Keldy Ortiz, "Dispute over little backyard treehouse costs Babylon Village residents big bucks," *Newsday* (September 27, 2020), https://nwsdy.li/3lKnoQ0.

## ABUSE OF PROCESS
### (New York and Federal Law)

262. Defendant Village of Babylon employed regularly issued legal process to compel Plaintiff to remove a children's treehouse.

263. As discussed more fully above, Defendants, jointly and severally, individually and collectively, in order to obtain a collateral objective that is outside the legitimate ends of the process did cause a series of unfounded accusatory instruments to be issued against Plaintiff John Lepper.

264. Defendants, jointly and severally, individually and collectively, intended to do harm and cause damage to Plaintiff John Lepper and his family without justification.

## NEGLIGENCE

265. Defendants, jointly and severally, individually and collectively, had a duty to act reasonably and responsibly and not to act in a manner that would cause injury and/or harm or the threat of harm to the Plaintiff Lepper family.

266. Defendant Village of Babylon was negligent, careless, and reckless in the treatment of Plaintiffs by failing to train, supervise, discipline and investigate its employees involved in the instant matter.

56

267. Defendant Village of Babylon knew or should have known of its employees' propensities for the conduct which caused substantial and severe injury to the Plaintiff.

268. Defendants acted negligently in violating the civil, Constitutional, and human rights of the Plaintiff.

## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

269. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiff causing him to suffer pain, shame, humiliation and anguish.

270. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiffs occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to Plaintiff.

271. Defendants did fail to investigate improper use of criminal process but, rather, Defendants began to conspire and cover up such actions by prosecuting criminal charges and threatening Plaintiff with unjust and excessive fines and threatened loss of their property.

272. The Defendants knew or had reason to know that Plaintiff John Lepper was guilty of no wrongdoing.

273. Defendants, jointly and severally, individually and collectively, acted with knowledge and reason to know that their conduct would cause severe and extreme emotional and physical harm to Plaintiff.

57

## DEFAMATION

274. Plaintiff John Lepper is being harassed by the Village of Babylon and the individual defendants, to the extent that the Lepper family use of their property is being monitored and the curtilage of their property invaded without due process on what appears to be a daily basis for the purpose of attempting to fabricate charges of Babylon Village Code violations for further prosecution.

275. Defendants, individually, collectively, jointly and severally falsely accused John Lepper of breaking the law(s).

276. As a result of said defamation, Plaintiff John Lepper continue to suffer from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and severe/extreme emotional distress.

## PRIMA FACIE TORT

277. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in violating the civil rights and liberty interests of the Plaintiff John Lepper causing him to suffer pain, shame, humiliation and anguish.

278. The reprehensible, extreme and outrageous conduct of the Defendants, jointly and severally, individually and collectively, against Plaintiff occurred with intent and full knowledge that their conduct would cause severe and extreme emotional and psychological harm to the Plaintiff.

## INJURIES AND DAMAGES

279. As a direct and proximate result of the wrongful actions and inappropriate lack of action by the Defendants, jointly and severally, individually and collectively, Plaintiff John Lepper

58

has suffered injury and damages, emotional and psychological harm, emotional injury, distress and pain, and incurred significant cost and expenses, including but not limited to legal fees, loss of good name and standing in the community, public stigma, personal humiliation, social degradation, and other costs and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Lepper seeks judgment of this honorable Court:

DECLARING that Defendants jointly and severally, individually and collectively, maliciously prosecuted Plaintiff John Lepper for allegedly violating Village of Babylon Code § 365–26.

DECLARING that the prosecution of John Lepper for allegedly violating Village of Babylon Code § 365–26 was malicious

DECLARING that the prosecution of John Lepper for violating Village of Babylon Code Section 365–26 as detailed above was malicious and a prosecution for which the Defendant Village of Babylon Prosecutor maintained a financial interest for pursing;

DECLARING that multiple fines, duplicative and daily fines, sought to be imposed under Village of Babylon Code § 365–26 as unconstitutional and violate the Plaintiff's rights under the Fourteenth and Eighth Amendments to the United States Constitution;

DECLARING that multiple fines, duplicative and daily fines, sought to be imposed under Village of Babylon Code § 365–26 unconstitutional and unenforceable as unconstitutionally excessive;

DECLARING that Plaintiff John Lepper is a proper representative of the resident taxpayers of the Incorporated Village of Babylon for the purposes of this action.

DECLARING that the expenditure of Village funds to defend the late Mayor, the village trustees, and other village officials in this action is an improper and unlawful expenditure of Village funds.

PROHIBITING the Village of Babylon from issuing further accusatory instruments against Plaintiff charging violations of Village of Babylon Code § 365–26 for the existence of the Lepper family treehouse;

PROHIBITING the Village of Babylon from issuing accusatory instruments against other treehouses or children's play structures less than 90 square feet in floor area located within the Village of Babylon;

PROHIBITING Defendant Incorporated Village of Babylon from paying any further monies from Village funds for the payment of legal fees any attorney engaged in the personal defense of any of the individual named Defendants in this action;

APPOINTING a federal monitor to observe, monitor, and retrain the Defendants in order to assure that jointly and severally, individually and collectively, said Defendants refrain from violating the civil and Constitutional rights of the Plaintiff and all the other residents of the Incorporated Village of Babylon;

DIRECTING Defendant Incorporated Village of Babylon to immediately seek reimbursement of any and all monies paid from Village funds to any attorney for representing any of the individual named Defendants in this litigation acting as a private individual or exercising the powers of elected office;

DIRECTING restitution to the Plaintiff and all the other residents of the Incorporated Village of Babylon of all the monies expended by or on behalf of the Village in prosecuting the Plaintiff for allegedly violating Village of Babylon Code § 365–26 by erecting a treehouse to be used as a playhouse for his infant children;

AWARDING Plaintiff compensatory, general, and punitive damages, costs, disbursements, and attorneys' fees from the Defendants.

All together with such other and further relief as to this Court shall deem just and proper.

DATED AT   Melville, New York
           March 4, 2021

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiff*
135 Pinelawn Road, Suite 250s
Melville NY 11747
Phone:  (631) 450–2515
FAX :  (631) 223–7377
Email :  Cory.H.Morris@protonmail.com

VICTOR JOHN YANNACONE, JR., (VY6405)
*of counsel*
Phone:  (631) 475–0231
Email  barrister@yannalaw.com

To:   ERIC TOSCA, Esq.
      KELLY RODE AND KELLY
      *Attorneys for the Defendants*
      330 Old Country Road
      Mineola, NY 11580

      GERARD GLASS, Esq.
      *Babylon Village Attorney*
      153 West Main Street
      Babylon, New York 11702

## VERIFICATION

State of New York
County of Suffolk  } ss:

CORY H. MORRIS duly affirming as an attorney admitted to practice in the State of New York, deposes and says that he is the attorney for the Plaintiffs in the within action and that he has read the foregoing amended complaint and that the allegations of fact contained therein are true except as to those portions therein stated to be alleged upon information and belief, and as to those allegations he believes them to be true all based upon statements of the Plaintiffs and materials in his file.

CORY H. MORRIS

Affirmed on this fourth
day of March 2021

62

EXHIBIT "H"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I., and

JOHN LEPPER, individually and, as a resident
taxpayer of the Incorporated Village of Babylon, on
behalf of all those other resident taxpayers of the
Incorporated Village of Babylon so unfortunate as to
be similarly afflicted and suffering economic damage
as a result of the expenditure of Village funds for the
inappropriate and improper defense of individual
village officials engaged in the persecution of John
Lepper for providing a treehouse in which his infant
children might play,

       Plaintiffs,

  -against-

VILLAGE OF BABYLON;
THE ESTATE OF RALPH SCORDINO, former Mayor,
Village of Babylon, by its Legal Representative John
and/or Jane Doe; MARY ADAMS, former Village
Trustee and now Mayor; KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village Trustee,
TONY DAVIDA, Village Trustee, STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works; GERARD
GLASS, Esq., Village of Babylon Attorney; DEBORAH
LONGO, Planning Board, Village of Babylon,

       Defendants.
-------------------------------------------------------------------X

Index No. 2:20-cv-07011 JMA-AYS

Previously filed under
Index No. 2:18-cv-07011 and
2:21-cv-00014

**JURY TRIAL DEMANDED**

### DEFENDANTS' ANSWER TO
### PLAINTIFFS AMENDED CONSOLIDATED VERIFIED COMPLAINT

Defendants, VILLAGE OF BABYLON; MARY ADAMS, former Village Trustee and

now Mayor; KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee,

TONY DAVIDA, Village Trustee, STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, hereby answer the Amended Consolidated Verified Complaint of the plaintiffs, JOHN LEPPER and NOELLE LEPPER, individually and as parents and natural guardians of their infant children, B.J.L. and B.I., and JOHN LEPPER, individually and, as a resident taxpayer of the Incorporated Village of Babylon, on behalf of all those other resident taxpayers of the Incorporated Village of Babylon so unfortunate as to be similarly afflicted and suffering economic damage as a result of the expenditure of Village funds for the inappropriate and improper defense of individual village officials engaged in the persecution of John Lepper for providing a treehouse in which his infant children might play, filed in the above-captioned matter on March 4, 2021, and assert affirmative defenses as follows:

<div align="center">ANSWERING EACH AND EVERY CAUSE<br>OF ACTION OF THE COMPLAINT</div>

<u>FIRST:</u>                  Denies allegations contained in paragraphs numbered "1," "2," "3," "4," "5," "6," "7," "8," "9," "10," "11," "12," "13," "14," "15," "16," "17," "18,""19," "20," "21," "22," "24," "25,""28,""31,""35," "36," "37," "38," "44,""45," "46,""47," "48," "49," "50," "51," "52," "53," "54," "55," "57," "58," "59,""60," "61," "62," "63," "64," "65," "66," "67," "68," "69," "70," "71,""72," "75,""76,""77," "78," "79," "80,""82," "83," "84," "85," "86," "88," "89," "92," "93," "95,""97," "98," "99," "100," "102," "103," "104," "105," "106," "107," "108," "110," "111," "112," "113," "118," "119," "120," "121," "122," "123," "124," "125," "134," "135," "137," "138," "139," "140," "141," "142," "145," "146," "147," "148," "149," "150," "151," "152," "153," "154," "155," "156," "157," "158," "159," "160," "161," "162," "163,"

"164," "165," "166," "167," "168," "169," "170," "171," "172," "173," "174," "175," "176," "177," "184," "185," "186," "187," "188," "189," "191," "192," "193," "194," "195," "196," "197," "198," "199," "200," "201," "202," "203," "204," "205," "206," "208," "209," "210,""211," "212," "213," "215," "216," "217," "218," "219," "222," "223," "224," "225," "226," "227," "228," "229," "231," "234,""235," "236," "237," "238," "239," "240," "241," "242," "243," "244," "245," "246," "249," "250," "251," "252," "253," "254," "257," "260," "261," "262," "263," "264," "265," "266," "267," "268," "269," "270," "271," "272," "273," "274," "275," "276," "277," "278" and "279" of the Amended Consolidated Verified Complaint.

SECOND:          Denies each and every allegation in the form alleged contained in paragraphs numbered "32" of the Amended Consolidated Verified Complaint.

THIRD:          Denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered "23,"  "26," "27," "33,"  "39," "40," "73," "74," "81," "87," "91," "94," "96," "114," "115," "116," "126," "127," "129," "130," "131," "132," "143," "247" and "248" of the Amended Consolidated Verified Complaint.

FOURTH:          Denies each and every allegation in the form alleged contained in paragraphs numbered "30," "34," "42,"  "43," "56," "90," "101," "109," "117," "128," "136," "144," "178," "179," "180," "181," "182," "183," "190," "207," "214," "220," "221," "230," "232," "233," "255," "256," "258," "259,"  of the Amended Consolidated Verified Complaint and refers all questions of law to the Court and all questions of fact to the trier of fact.

## DEMAND FOR JURY TRIAL

FIFTH:          Defendants demand a trial by jury for the non-equitable relief.

FOR A FIRST, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SIXTH:                 That any injuries or damages sustained by the plaintiff was

occasioned through the negligence and culpable conduct on the part of the plaintiff.

FOR A SECOND, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SEVENTH:              That this Court lacks jurisdiction over the person or property of the

named defendants either individually or collectively, VILLAGE OF BABYLON; THE ESTATE

OF RALPH SCORDINO, former Mayor, Village of Babylon, by its Legal Representative John

and/or Jane Doe; MARY ADAMS, former Village Trustee and now Mayor; KEVIN

MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE

SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon

Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, in that no proper service

of process under federal law or state law was made on the defendants.

FOR A THIRD, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

EIGHTH:              That the party making claim lacks capacity to bring the action.  Plaintiff has

no standing to sue for alleged *Monell* claims.  The plaintiff has no standing to interfere with the

election of any of the parties to hire counsel and has no standing to set aside or disrupt contractual

undertakings by any of the defendants.

FOR A FOURTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

NINTH:          There is another action pending between the same parties for the same

causes of action arising from the same facts and circumstances. Therefore, the Amended

Consolidated Verified Complaint should be dismissed.

FOR A FIFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TENTH:          That the plaintiff's Amended Consolidated Verified Complaint fails

to state sufficient facts to constitute a cause of action against these defendants.

FOR A SIXTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

ELEVENTH:          That this court lacks jurisdiction over the subject matter of this

action inasmuch as there is no diversity of citizenship between the litigants as required by FRCP.

FOR A SEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWELFTH:          That all or part of the action is barred by the doctrine of Collateral

Estoppel or *Res Judicata*.

FOR AN EIGHTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
<u>UPON INFORMATION AND BELIEF:</u>

<u>THIRTEENTH:</u>      The lawsuit brought by the plaintiffs is entirely without merit and is

frivolous, subject to sanctions.

FOR A NINTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
<u>UPON INFORMATION AND BELIEF:</u>

<u>FOURTEENTH:</u>      That the parties making claims failed to mitigate damages.

FOR A TENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
<u>UPON INFORMATION AND BELIEF:</u>

<u>FIFTEENTH:</u>      The plaintiffs' claims for punitive damages are barred and are

devoid of merit.

FOR AN ELEVENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
<u>UPON INFORMATION AND BELIEF:</u>

<u>SIXTEENTH:</u>      The defendants, particularly the individually named defendants, are

protected under a governmental immunity from claims of negligence or any other claims made by

the plaintiff in this action.   Each and every defendant is immune inasmuch as they carried out a

duty in their role as public servants barring the claims made herein.

FOR A TWELFTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

SEVENTEENTH:         These claims are not ripe for determination before the Federal

Court.

FOR A THIRTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

EIGHTEENTH:         The claims, especially the alleged pendant state-based claims are

barred by failure to serve a timely Notice of Claim pursuant to Sections 50-e and 50-i of the

General Municipal Law putting the defendants on fair notice of the claims for which recovery by

the plaintiffs is sought.

FOR A FOURTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

NINETEENTH:         The claims are barred by the failure of plaintiffs to attend a hearing

pursuant to Section 50-h of the General Municipal Law.   The plaintiff's conduct in depriving the

defendants of a 50-h hearing was sanctionable.

FOR A FIFTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTIETH:         Plaintiffs failed to exhaust their administrative remedies and have

not completed the application for a permit and have not filed before the Zoning Board of Appeals.

FOR A SIXTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FIRST:     That this action was not commenced within the applicable time

limits, therefore, the Statute of Limitations constitutes a complete defense to the plaintiffs' action.

FOR A SEVENTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-SECOND:   Allegations of any comments made in court are improper to allege

as a basis to a lawsuit.

FOR AN EIGHTEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-THIRD:    "THE ESTATE OF RALPH SCORDINO" is not an entity subject

to being sued.

FOR AN NINETEENTH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FOURTH: The capacities of the defendants are misnamed in the lawsuit.

FOR A TWENTIETH, SEPARATE AND COMPLETE DEFENSE
THE DEFENDANTS RESPECTFULLY SHOW THIS COURT,
UPON INFORMATION AND BELIEF:

TWENTY-FIFTH:    That any statements made by the defendants were substantively

truthful, or opinion, and constitute a complete defense to plaintiff's claims.

>AS AND FOR A COUNTERCLAIM AGAINST JOHN LEPPER
>AND NOELLE LEPPER, THE DEFENDANTS VILLAGE OF
>BABYLON; THE ESTATE OF RALPH SCORDINO, FORMER
>MAYOR, VILLAGE OF BABYLON, BY ITS LEGAL
>REPRESENTATIVE JOHN AND/OR JANE DOE; MARY
>ADAMS, FORMER VILLAGE TRUSTEE AND NOW MAYOR;
>KEVIN    MULDOWNEY,    DEPUTY    MAYOR,    ROBYN
>SILVESTRI, VILLAGE TRUSTEE, TONY DAVIDA, VILLAGE
>TRUSTEE, STEPHEN FELLMAN, VILLAGE OF BABYLON
>BUILDING    INSPECTOR;    SUZANNE    SCHETTINO,
>DEPARTMENT OF PUBLIC WORKS; GERARD GLASS, ESQ.,
>VILLAGE OF BABYLON ATTORNEY; AND DEBORAH
>LONGO, PLANNING BOARD, VILLAGE OF BABYLON,,
>EACH   INDIVIDUALLY   AND   IN   THEIR   OFFICIAL
>CAPACITY, HEREBY ALLEGE:

TWENTY-SIXTH:    That if the plaintiffs B.J.L. and B.I. were caused to sustain damages

at the time and place set forth in the plaintiff's Amended Consolidated Verified Complaint through

any culpable conduct and/or negligence other than plaintiffs' own, and if said damages arose in

whole or in part from the negligence of and/or culpable conduct of the defendants, VILLAGE OF

BABYLON; THE ESTATE OF RALPH SCORDINO, former Mayor, Village of Babylon, by its

Legal Representative John and/or Jane Doe; MARY ADAMS, former Village Trustee and now

Mayor; KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY

DAVIDA, Village Trustee, STEPHEN FELLMAN, Village of Babylon Building Inspector;

SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon,, each

individually and in their official capacity, and if any judgment is recovered herein by the plaintiffs

B.J.L. and B.I. against the answering defendants, they will be damaged thereby and the answering defendants will be entitled to proportionate contribution and/or indemnity on the basis of the responsibility of the plaintiffs above named.

WHEREFORE, the answering defendants, VILLAGE OF BABYLON; THE ESTATE OF RALPH SCORDINO, former Mayor, Village of Babylon, by its Legal Representative John and/or Jane Doe; MARY ADAMS, former Village Trustee and now Mayor; KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon,, each individually and in their official capacity, demand judgment dismissing the Amended Verified Complaint herein as to the answering defendants with costs, and further demand that the ultimate rights of the answering defendants and the plaintiffs as between themselves be determined in this action, and that the answering defendants have judgment over and against the plaintiffs for all or a part of any verdict or judgment which may be obtained herein by the plaintiffs against the answering defendants, together with costs and disbursements of this action.

Dated: Mineola, New York
       May 26, 2021

Respectfully submitted,

KELLY, RODE & KELLY, LLP

BY:     *Laurence G. McDonnell*
        Laurence G. McDonnell
        Attorneys for Defendants
        330 Old Country Road - Suite 305
        Mineola, New York 11501

(516) 739-0400
Our File No.:  PDG/EPT 148530-752

TO:    LAW OFFICES OF CORY H. MORRIS
          Attorneys for Plaintiffs
          135 Pinelawn Road, Suite 250s
          Melville, New York 11747
          (631) 450-2515
          Cory.H.Morris@protonmail.com

          VICTOR JOHN YANNACONE, JR.
          Of Counsel
          (631) 475-0231
          barrister@yannalaw.com

## ATTORNEY VERIFICATION

Laurence G. McDonnell, an attorney duly licensed to practice law before the courts of the State of New York and of the United States District Court, Eastern District, hereby affirms the truth of the following under the penalties of perjury:

I am a duly admitted and practicing Attorney-at-Law; that I am one of the attorneys for the defendants VILLAGE OF BABYLON; MARY ADAMS, former Village Trustee and now Mayor; KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; and DEBORAH LONGO, Planning Board, Village of Babylon, herein, and that I have read the foregoing ANSWER and know the contents thereof and that the same is true to my own knowledge, except as to those statements therein alleged to be upon information and belief and as to those statements, I believe it to be true.

The source of my knowledge is the contents of a file maintained in my office, which contains various reports of investigations, statements, interviews, copies of official documents, etc.

The reason this verification is not made by the defendants, is due to the fact that said defendants do not reside in the same county wherein I maintain my professional office; to wit: County of NASSAU.

Dated: Mineola, New York
May 26, 2021

*Laurence G. McDonnell*

Laurence G. McDonnell

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2021, I served a true copy of the foregoing Defendants' Answer to Plaintiffs' Amended Consolidated Verified Complaint by mailing same in a sealed envelope, by first class mail with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:    LAW OFFICES OF CORY H. MORRIS
        Attorneys for Plaintiffs
        135 Pinelawn Road, Suite 250s
        Melville, New York 11747
        (631) 450-2515
        Cory.H.Morris@protonmail.com

        VICTOR JOHN YANNACONE, JR.
        Of Counsel
        (631) 475-0231
        barrister@yannalaw.com

*Laurence G. McDonnell*

Laurence G. McDonnell
E-Mail: lgmcdonnell@krklaw.com

# EXHIBIT "I"

ORIGINAL

PDG lEPT/CMG 148530·752

RECEIVED

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK          JUL - 2 2019
3  ----------------------------------------X
   JOHN LEPPER and NOELLE LEPPER, individually   KELLY & KELLY, LLP
4  and as parents and natural guardians of
   their infant children, B.J.L. and B.I.,
5
6                                  PLAINTIFFS,
7            -against-            Index No.
                                 2:18-cv-07011
8                                JFB-GRB
9  VILLAGE OF BABYLON; and, RALPH SCORDINO,
   Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN
10 SILVESTRI, Village Trustee, TONY DAVIDA,
   Village Trustee, MARY ADAMS, Village
11 Trustee; STEPHEN FELLMAN, Village of
   Babylon Building Inspector; SUZANNE
12 SCHETTINO, Department of Public Works;
   GERARD GLASS, Esq., Village of Babylon
13 Attorney; DEBORAH LONGO, Planning Board,
   Village of Babylon, each individually and
14 in their official capacity, and John and/or
   Jane Doe, unnamed, unidentified
15 complainants,
16                                  DEFENDANTS.
   ----------------------------------------X
17
18              DATE:  June 27, 2019
19              TIME:  11:41 A.M.
20
21
22       (DEPOSITION OF JOHN LEPPER.)
23
24
25

2

1
2               DATE:   June 27, 2019
3               TIME:   11:41 A.M.
4
5               DEPOSITION of the Plaintiff,
6    JOHN LEPPER, taken by the Defendants,
7    pursuant to an Order, held at the offices
8    of Diamond Reporting, Inc., 150 Broadhollow
9    Road, Melville, New York 11747, before
10   Martha Trikas, a Notary Public of the State
11   of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2    A P P E A R A N C E S:

3

4    LAW OFFICE OF CORY H. MORRIS
        Attorney for the Plaintiffs
5      JOHN LEPPER and NOELLE LEPPER
        33 Walt Whitman Road, Suite 310
6      Dix Hills, New York 11746
        BY:   CORY H. MORRIS, ESQ.
7

8

9    KELLY, RODE & KELLY
        Attorneys for the Defendants
10     VILLAGE OF BABYLON; and, RALPH SCORDINO,
        Mayor, KEVIN MULDOWNEY, Deputy Mayor,
11     ROBYN SILVESTRI, Village Trustee, TONY
        DAVIDA, Village Trustee, MARY ADAMS,
12     Village Trustee; STEPHEN FELLMAN, Village
        Of Babylon Building Inspector; SUZANNE
13     SCHETTINO, Department of Public Works;
        GERARD GLASS, Esq., Village of Babylon
14     Attorney; DEBORAH LONGO, Planning Board,
        Village of Babylon, each individually and
15     In their official capacity, and John
        And/or Jane Doe
16     330 Old Country Road
        Mineola, New York 11501
17     BY:   ERIC P. TOSCA, ESQ.
        File #:   PDG/EPT 148530-752
18     Claim #:   1812820618

19

20

21
      ALSO PRESENT:
22
         GERARD GLASS
23

24             *          *          *

25

4

1
2     F E D E R A L   S T I P U L A T I O N S
3
4
5      IT IS HEREBY STIPULATED AND AGREED by and
6     between the counsel for the respective
7     parties herein that the sealing, filing and
8     certification of the within deposition be
9     waived; that the original of the deposition
10     may be signed and sworn to by the witness
11     before anyone authorized to administer an
12     oath, with the same effect as if signed
13     before a Judge of the Court; that an
14     unsigned copy of the deposition may be used
15     with the same force and effect as if signed
16     by the witness, 30 days after service of
17     the original & 1 copy of same upon counsel
18     for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21     all objections except as to form, are
22     reserved to the time of trial.
23
24              *      *      *      *
25

5

1               J. LEPPER

2   J O H N   L E P P E R, called as a witness,

3   having been first duly sworn by a Notary

4   Public of the State of New York, was

5   examined and testified as follows:

6   EXAMINATION BY

7   MR. TOSCA:

8        Q.    Please state your name for the

9   record.

10       A.    John Lepper.

11       Q.    What is your address?

12       A.    59 Cockenoe Avenue, Babylon,

13   New York 11702.

14            MR. TOSCA:  Please mark this

15            (handing).

16            (Whereupon, the aforementioned

17            photos were marked as Defendants'

18            Exhibits A - J for identification as

19            of this date by the Reporter.)

20            MR. MORRIS:  Before we begin,

21            I'd like to indicate for the record

22            that this witness is exercising his

23            right under the federal rules to

24            receive, review and correct a copy of

25            the transcript.  It could be sent to

```
 1                    J. LEPPER
 2        my office.
 3             Also, before I guess the end of
 4        the deposition, we're just going to
 5        ask to confirm that the July 5th
 6        depositions.  And I'm also going to
 7        ask you for a page extension if
 8        you'll agree.
 9             MR. TOSCA:  I don't understand
10        what you mean by page extensions.
11             MR. MORRIS:  In terms of our
12        memorandum of law and cross motion.
13             MR. TOSCA:  Okay.
14             This is not something that I
15        want in the deposition transcript
16        record.
17             If you want to talk about that
18        independently, Mr. Morris, I will but
19        not here.
20             MR. MORRIS:  Absolutely.
21             MR. TOSCA:  As far as the
22        depositions also, as we had
23        discussed, we will commence with the
24        depositions of the defendants once
25        the plaintiffs have completed.
```

1           J. LEPPER

2               So assuming that we're done

3       with both plaintiffs by July 5th,

4       we'll be ready July 5th.

5               I think we've discussed this

6       already.

7               MR. MORRIS:  Okay.

8               To the extent that you're

9       conditioning the production the

10      production of defendants on

11      plaintiffs, we're going to object.

12              And if we need to, we have the

13      opportunity.  We should do it now

14      probably before July 5th because

15      that's the day after Independence

16      Day.

17              MR. TOSCA:  To talk to the

18      magistrate.

19              MR. MORRIS:  Yes, to talk to

20      the magistrate.

21              MR. TOSCA:  Okay.

22              MR. MORRIS:  But please begin.

23      Q.      All right.

24              Are you ready?

25      A.      Yes.

8

```
 1                    J. LEPPER
 2        Q.    Good morning, Mr. Lepper.  My
 3   name is Eric Tosca.  I represent the
 4   defendants in this matter.
 5              I'm going to ask you some
 6   questions regarding your claims.  And if
 7   you don't hear any of the questions I ask
 8   of you, I'm going to ask you to let me know
 9   because I'll repeat them for you.
10              Okay?
11        A.    Sure.
12        Q.    If you don't understand any of
13   the questions I ask of you, please let me
14   know that as well and I will rephrase them
15   so, hopefully, you do understand them.
16              Okay?
17        A.    Sure.
18        Q.    In addition, I'm going to ask
19   that all responses that you give on the
20   record be verbal because the reporter is
21   not able to take a nod of the head, you
22   know, show the dimensions with your hands
23   or something else.
24        A.    I understand.
25        Q.    Okay.
```

```
 1                    J. LEPPER
 2              Mr. Lepper, what is your date
 3    of birth?
 4         A.      ████████████ 1973.
 5         Q.    And your social security
 6    number?
 7              MR. MORRIS:  I'm going to ask
 8         that this be redacted.  Only the last
 9         five digits, only the birth year be
10         put on the record, please.
11         A.      ████.
12         Q.    You have to give me the whole
13    thing.
14         A.      ████44553.
15         Q.    And what is your marital
16    status?
17         A.    Married.
18         Q.    And your wife's name?
19         A.    Noelle, N-O-E-L-L-E.
20         Q.    And her last name is Lepper?
21         A.    Yes, sir.
22         Q.    What was her maiden name?
23         A.    Desantis, D-E-S-A-N-T-I-S.
24         Q.    What's your date of marriage?
25         A.    Date of marriage was 8/22/03.
```

10

```
 1                    J. LEPPER
 2        Q.    '03?
 3        A.    Yes, sir.
 4        Q.    Do you have any children?
 5        A.    I'm sorry.
 6              '08. '08.
 7              MR. TOSCA:  Off the record.
 8              (Whereupon, an off-the-record
 9         discussion was held.)
10        Q.    And do you have any children?
11        A.    Yes, sir.
12        Q.    How many children do you have,
13     sir?
14        A.    Two.
15        Q.    What are their names?
16        A.    B.L. is my son.  Six years old.
17        Q.    What is his date of birth?
18        A.    ████████  2012.
19              And B.L.
20        Q.    And what is her date of birth?
21        A.    ███████████  2013.
22              MR. MORRIS:  So please note for
23         the record I ask that you redact and
24         only leave the birth year of those
25         two children, please.
```

```
 1                   J. LEPPER
 2    permits.
 3          Q.    In your name?
 4          A.    Yes.
 5          Q.    Did you do any filings --
 6          A.    No.
 7                MR. MORRIS:  Objection.
 8          Q.    -- where you personally went
 9    down to the building department?
10                MR. MORRIS:  Objection.
11                You can answer.
12          A.    No.
13          Q.    Were you familiar with the
14    building codes at that time?
15                MR. MORRIS:  Objection.
16                You can answer.
17          A.    No, I wasn't.
18          Q.    And at any time during the
19    construction, did you look up any building
20    codes?
21                MR. MORRIS:  Objection.
22                You can answer.
23          A.    No.
24                I never needed to.
25          Q.    Did you receive any violations
```

25

```
 1                    J. LEPPER
 2      for any of the construction that was
 3      performed at that time?
 4           A.    No, I did not.
 5           Q.    At the completion of the
 6      renovations, did you receive any
 7      certificates for completion of the --
 8           A.    Yes, I did.
 9           Q.    -- work?
10                 What certificates did you
11      receive?
12           A.    A certificate of occupancy.
13           Q.    For what?
14           A.    Excuse me?
15           Q.    For what?
16           A.    Certificate of occupancy for
17      the completion of the construction, closing
18      out the permit.
19           Q.    Well, were there any additions
20      you had put on the home?
21                 MR. MORRIS:  Objection.
22                 You can answer.
23           A.    Yes.
24           Q.    Were all those additions
25      attached to that house?
```

41

```
 1                    J. LEPPER
 2         A.    The light fixture was installed
 3    -- I don't know.
 4               Prior to September 4th.
 5         Q.    September 4th of 2018?
 6         A.    Correct.
 7         Q.    Does the treehouse have any
 8    other lighting?
 9         A.    No.
10         Q.    I'm going to show you what has
11    been marked as Exhibit C and ask you to
12    identify what's depicted in that photograph
13    (handing).
14         A.    (Complying.)
15               What you see there is a piece
16    of greenfield.
17         Q.    Well, first off:  Is this the
18    bottom of the treehouse?
19         A.    Yes.
20         Q.    Is that the platform to the
21    treehouse?
22               MR. MORRIS:  Objection.
23               You can answer.
24         A.    Yes.
25         Q.    And it's surrounding or it's
```

42

```
 1                    J. LEPPER
 2   around a tree, is that correct, tree trunk?
 3        A.    That's correct.
 4        Q.    Now, you said something was a
 5   greenfield.
 6              Could you tell me what it is
 7   that you're referring to as the greenfield.
 8        A.    What you pointed out in the
 9   picture is the greenfield (indicating).
10        Q.    In other words, I guess it's a
11   metal housing for wire?
12        A.    Correct.
13        Q.    And who installed that metal
14   housing?
15              MR. MORRIS:  Objection.
16              You can answer.
17        A.    I did.
18        Q.    What's inside the metal
19   housing?
20        A.    An SJ code which is an
21   extension code.
22        Q.    You have the light fixture.
23              Does that have a wire with a
24   plug to it?
25              MR. MORRIS:  Objection.
```

43

1                    J. LEPPER

2              You can answer.

3      A.    No.

4      Q.    Does it have any kind of cord

5  to it?

6              MR. MORRIS:  Objection.

7              You can answer.

8      A.    It has the SJ code which you

9  see in the picture.

10     Q.    Did you attach the SJ cord to

11  the fixture?

12     A.    Yes, I did.

13     Q.    And how did you do that?

14              Physically, what did you do to

15  attach it?

16     A.    I connected the positive wire

17  to the positive wire and the negative wire

18  to the negative wire to the box.

19     Q.    I'm sorry.

20              Say that again.

21              You attached the positive wire

22  to the positive wire and the negative wire

23  to the negative wire and --

24              MR. MORRIS:  Objection.

25     A.    -- the ground.

44

```
 1                    J. LEPPER
 2        Q.    The ground to?
 3        A.    The box.
 4        Q.    Okay.
 5              When you say you attached
 6    wires, was that to the fixture itself?
 7        A.    Yes.
 8        Q.    And the SJ cord runs how long?
 9        A.    I don't know.
10        Q.    So is the SJ cord long enough
11    without the use of any other extension
12    cords to reach the outlet on the house?
13        A.    Yes.
14        Q.    The outlet we're talking about
15    is attached to the house?
16        A.    Correct.
17        Q.    Where in the house; the back,
18    the side, inside, somewhere else?
19        A.    It's on the side.
20        Q.    On the side of the house.
21              On the side where Wampum is?
22        A.    Yes.
23        Q.    Do you know who installed that
24    outlet?
25              MR. MORRIS:  Objection.
```

45

```
 1                    J. LEPPER
 2              You can answer.
 3         A.   Yes.
 4              Netron Electric.
 5              MR. MORRIS:  Do you know how to
 6         spell that?
 7              THE WITNESS:  N-E-T-R-O-N.
 8         Q.   Did you consult with any
 9    electrician for wiring the fixture?
10              MR. MORRIS:  Objection.
11              You can answer.
12         A.   Yes.
13         Q.   Who did you consult with?
14         A.   My brother.
15         Q.   Is he an electrician?
16         A.   Yes, he is.
17         Q.   And what is his name?
18         A.   Charlie Lepper.
19         Q.   Did your brother help you with
20    the fixture or did you do it by yourself?
21              I mean was he there physically
22    when you did it?
23              MR. MORRIS:  Objection.
24              You can answer.
25         A.   I did by myself.
```

46

```
 1                    J. LEPPER
 2         Q.   And he told you how to do the
 3    wiring?
 4         A.   I worked for an electrical
 5    contractor.
 6         Q.   You said you had a brother.
 7    You consulted with him.
 8              Did he tell you how to do the
 9    wiring?
10              MR. MORRIS:  Objection.
11              You can answer.
12         A.   No, I didn't.  I didn't need
13    him to.
14         Q.   Did he tell you what type of
15    wiring to get?
16              MR. MORRIS:  Objection.
17              You can answer.
18         A.   I asked him if what I bought
19    was okay.
20         Q.   Where did you purchase the SJ
21    cord?
22         A.   I'm not sure.
23         Q.   The greenfield, where did you
24    purchase that?
25         A.   I'm not sure.
```

Case 2:18-cv-07011-JMA-AYS Document 127 Filed 07/26/21 Page 328 of 1193 PageID #: 4386

1               J. LEPPER

2               I think I had it in the garage.

3        Q.     Have you ever wired fixtures

4    before this time?

5               MR. MORRIS:  Objection.

6               You can answer.

7        A.     Yes, I have.

8        Q.     About how many fixtures have

9    you wired?

10       A.     I can't answer that.

11              A lot.

12       Q.     Okay.

13              Now, the greenfield that we're

14   talking about, do you know what the purpose

15   of that is?

16              MR. MORRIS:  Objection.

17              You can answer.

18       A.     Yes, I do.

19       Q.     What is the purpose?

20       A.     It's an armor shielding to

21   protect it from being tampered with.

22       Q.     To protect the wire from being

23   tampered with you mean?

24       A.     I put it on there to protect my

25   children or anybody from touching the wire.

49

1                    J. LEPPER

2      it's directly buried into the ground so it

3      can't be tampered with in the ground.

4           Q.    How far underground did you

5      bury it?

6           A.    I'm not sure.

7           Q.    Did you seek to get any permits

8      before doing the electrical work?

9                 MR. MORRIS:  Objection.

10                You can answer.

11          A.    No, I didn't.

12          Q.    Do you know if any permits are

13     required for something like that?

14                MR. MORRIS:  Objection.

15                You can answer.

16          A.    No, I don't.

17          Q.    Did you inquire?

18          A.    No, I didn't.

19          Q.    So the greenfield though, does

20     that go all the way under the ground up

21     until the outlet?

22          A.    That's correct.

23          Q.    And then does it come outside

24     up through the ground?

25          A.    Yes, it does.

```
 1                    J. LEPPER
 2        Q.    So it's the rearmost tree of
 3   the property?
 4              MR. MORRIS:  Objection.
 5              You can answer.
 6        A.    Yes.
 7        Q.    Who decided which tree to put
 8   this treehouse on?
 9        A.    My wife.
10              We both discussed it briefly, I
11   guess.
12        Q.    And what made you determine to
13   put it on that tree?
14              MR. MORRIS:  Objection.
15              You can answer.
16        A.    That was the tree that was
17   closest -- it was the tree closest to what
18   was their play area in the backyard.
19        Q.    The tree that you attached it
20   to before you put the treehouse on there,
21   did you do any inspection of that tree to
22   make sure that it wasn't dying or that it
23   wasn't weak or something else?
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
 1                    J. LEPPER
 2        A.    The trees were -- when we were
 3   doing the renovation on the property and
 4   the one tree was removed.  The rest of the
 5   trees were pruned and maintained.
 6              And at that time, all the trees
 7   were very healthy.
 8        Q.    Who told you this?
 9        A.    I think -- whoever removed the
10   tree.
11        Q.    Do you know the company that
12   did that?
13        A.    No.
14        Q.    Do you have any records of the
15   company that removed the tree?
16              MR. MORRIS:  Objection.
17              You can answer.
18        A.    I don't believe so.
19        Q.    Did you mention to him that you
20   intended to put a treehouse on one of the
21   trees?
22              MR. MORRIS:  Objection.
23              You can answer.
24        A.    No.
25              At that time, we had no
```

```
 1                    J. LEPPER
 2    intention to put a treehouse in the tree.
 3        Q.   The material for the treehouse,
 4    is that all wood?
 5        A.   Yes.
 6        Q.   Where did you get the wood to
 7    make the treehouse?
 8        A.   Some of the wood -- most of the
 9    heavy timber and the siding was reclaimed
10    from a boathouse that we -- a property we
11    owned in Amityville was damaged during
12    Sandy.  And the boathouse had to be demoed,
13    demolished.  And that's most of the
14    material from that.
15        Q.   Before constructing this
16    treehouse, did you ever build any other
17    treehouses?
18        A.   Only for myself when I was a
19    kid.
20        Q.   Other than that?
21        A.   No.
22        Q.   By the way, do you belong to
23    any organizations regarding treehouses?
24        A.   No.
25        Q.   The wood that you said you had
```

```
 1                    J. LEPPER
 2   used was from a boathouse in Amityville.
 3              Was that property you owned
 4   with your wife?
 5              MR. MORRIS:  Objection.
 6              You can answer.
 7      A.    No.
 8              My parents owned that property.
 9      Q.    When you say the wood was
10   reclaimed, what does that mean?
11      A.    After the boathouse was
12   demolished, I asked the contractor to save
13   me certain timbers so that I can use it.
14      Q.    When you asked the contractor
15   to do that, was it your intention to use
16   the wood for a treehouse at that time?
17              MR. MORRIS:  Objection.
18              You can answer.
19      A.    I'm not sure.
20      Q.    You said the boathouse was
21   demolished.
22              Did this happen during a storm?
23      A.    No.
24      Q.    How did it become demolished?
25      A.    It had to be removed in order
```

```
 1                    J. LEPPER
 2    to install new bulkhead.
 3         Q.    And when was --
 4         A.    It was damaged during the
 5    storm.
 6         Q.    It was what?
 7         A.    It was damaged during the
 8    storm.
 9         Q.    The boathouse or the bulkhead
10    or both?
11         A.    Both.
12         Q.    You're talking about during the
13    storm.
14               You're talking about Hurricane
15    Sandy?
16         A.    Correct.
17         Q.    When was it that you were given
18    the wood from the boathouse?
19         A.    I don't recall.
20         Q.    Do you remember approximately
21    how long before you actually started
22    construction of the treehouse that you were
23    given this wood?
24               MR. MORRIS:  Objection.
25               You can answer.
```

86

1                    J. LEPPER

2        A.    Screwdrivers.

3        Q.    Did you use any scaffolding to

4   build the treehouse?

5              MR. MORRIS:  Objection.

6              You can answer.

7        A.    No.

8              I just used ladders.

9        Q.    You said somebody helped you or

10  some people helped you hand you things; is

11  that right?

12             MR. MORRIS:  Objection.

13        Objection.

14        A.    Yes.

15             A few people might have handed

16  me some material.

17       Q.    Did anybody do any physical

18  work on the structure itself where they

19  would attach things, put anything up?

20             MR. MORRIS:  Objection.

21             You can answer.

22       A.    No.

23       Q.    Is the treehouse completed at

24  this point?

25       A.    No.

87

```
 1                    J. LEPPER
 2         Q.    Was there anything additional
 3    you wanted to do to the treehouse?
 4         A.    Finish?
 5         Q.    Yes.
 6         A.    Finish.
 7         Q.    What do you have to do to
 8    finish the treehouse?
 9         A.    Um, I have to finish putting
10    the roof on, shutters, secure the windows
11    to make it safe for the kids to play up
12    there and install the hatch in the floor so
13    that the kids can actually access it.
14         Q.    You mentioned shutters.
15               Where were the shutters going?
16         A.    There's supposed to be shutters
17    on each of the windows.
18         Q.    How many windows are there by
19    the way?
20         A.    Three.
21               No.  Five.
22               I'm sorry.
23         Q.    Five?
24         A.    Uh-hum.
25         Q.    Is there any skylight on the
```

88

```
 1                    J. LEPPER
 2    roof of the treehouse?
 3         A.    No.
 4         Q.    You said secure the windows.
 5               What do you mean by secure the
 6    windows?
 7               How would you do that?
 8         A.    I was going to put -- there's
 9    going to be shutters -- there's going to be
10    a plantation shutter up on the dog house
11    for ventilation, wood shutters on lower
12    windows with half inch pipe going across.
13    Probably two on each window for the kids so
14    they can be secure, can't fall out and keep
15    safe.
16               That's all.
17         Q.    And the hatch you were talking
18    about, that's on the floor?
19         A.    Yes.
20         Q.    Is that the entryway to the
21    treehouse?
22               MR. MORRIS:  Objection.
23               You can answer.
24         A.    It will be.  It doesn't exist
25    right now.  There is no hatch.
```

```
 1                J. LEPPER
 2      Q.    How do you get into the
 3   treehouse now, if you can at all?
 4            MR. MORRIS:  Objection.
 5            You can answer.
 6      A.    Only through ladder.
 7      Q.    Through ladder?
 8      A.    Ladder and a window.
 9      Q.    I'm not sure how the hatch
10   gives you access.
11            How would the hatch give you
12   access to the treehouse other than using a
13   ladder?
14      A.    There is a ladder up the tree
15   (indicating).
16      Q.    Okay.
17      A.    You know, it would be ladder on
18   the tree.  There's already wood that's
19   attached to the tree that the kids could
20   climb up, open the hatch and they would
21   just access the hatch through the floor.
22      Q.    So the hatch actually is
23   something that once they climb the ladder,
24   go through the opening of the floor, they
25   would close the hatch so that the opening
```

90

```
 1                    J. LEPPER
 2    would be closed; am I correct?
 3                MR. MORRIS:  Objection.
 4                You can answer.
 5        A.    Correct.
 6        Q.    So when you say gain access,
 7    right now you got access to the treehouse,
 8    right?
 9                It's just that there is no
10    hatch there; am I correct?
11                MR. MORRIS:  Objection.
12                You can answer.
13                (At this time Mr. Glass exited
14         the room.)
15        A.    No.
16                There is only access with the
17    ladder going through the window.
18        Q.    There is only access --
19        A.    There's only access if you put
20    up ladder and climb through the window.
21        Q.    Well, you said there is a
22    ladder on the tree.
23                Is that what you're talking
24    about?
25                MR. MORRIS:  Objection.
```

91

1                    J. LEPPER

2            You can answer.

3        A.    There's, you know, there's

4    pieces of wood, reclaimed 2 by 4 wood that

5    goes up the tree to where the hatch would

6    be but it does not exist right now.

7        Q.    When you go up those steps --

8        A.    Uh-hum.

9        Q.    -- is there an opening that you

10   can go through at this point?

11       A.    No.

12       Q.    So the entire floor is --

13       A.    Sealed.

14       Q.    -- sealed?

15            Closed, right?

16       A.    Yes.

17       Q.    So right now if you want to get

18   into the treehouse, you have to actually

19   climb the ladder and then go through the

20   window?

21            MR. MORRIS:  Objection.

22       Q.    Is that what you have to do?

23       A.    Yes.

24       Q.    Otherwise, you have no access

25   to the treehouse.

1           J. LEPPER

2      A.   Yes.

3      Q.   Was there any ladder that's

4  specifically designed for the treehouse or

5  you're just using an extension ladder?

6           MR. MORRIS:  Objection.

7           You can answer.

8      A.   As far as the work was?

9      Q.   No.

10           I guess it's a bad question.

11  Let me rephrase the question.

12           Did you build a ladder

13  specifically to get through the window of

14  the treehouse?

15      A.   No.

16      Q.   What type of ladder are you

17  talking about that you would use in order

18  to get access through the window of the

19  treehouse?

20      A.   A fiberglass 12-foot A-frame

21  ladder.

22      Q.   And do you have a fiberglass

23  A-frame ladder?

24      A.   Yes.

25           But like I said, that's just

141

1              J. LEPPER

2       Q.    Up until today.

3       A.    Yes.  Yes.

4       Q.    When was the last time that

5    there were any other children other than

6    your own children who went up to the

7    treehouse?

8       A.    Well, I recently got a new

9    neighbor and they have gone up to see the

10   treehouse.  So I let them see the treehouse

11   from the ladder.

12      Q.    Where is this neighbor?

13      A.    Their address?

14      Q.    Yes.

15      A.    Directly next door on the --

16   west side of -- west side of my house.

17      Q.    Are you talking about on

18   Cockenoe or Wampum?

19      A.    On Cockenoe.

20      Q.    So they're directly next door?

21      A.    Yes.

22      Q.    Do you know their names?

23      A.    The children?

24      Q.    No.

25            The parents.

142

```
1                    J. LEPPER
2        A.    Yes.
3        Q.    What are their names?
4        A.    ████████████    (phonetic).
5        Q.    Sounds familiar.
6              MR. GLASS:  It is familiar.
7              Can I speak to you.  I'll tell
8        you right now.
9              (Whereupon, an off-the-record
10       discussion was held.)
11       Q.    Do you know if Mr.     is the
12                              ?
13             MR. MORRIS:  Let the record
14       reflect that I think your client just
15       whispered that in your ear.
16       Q.    I'm sorry?
17       A.    Yes.
18       Q.    Do you know when they moved in?
19       A.    Exactly?
20       Q.    Yes.
21       A.    A couple of weeks -- I'm not
22  really sure.  A week ago, a couple of weeks
23  ago?
24       Q.    Do you know how many children
25  they have?
```

143

1                    J. LEPPER

2        A.    Three.

3        Q.    And you let the children up

4    into the treehouse?

5              MR. MORRIS:  Objection.

6              You can answer objection.

7        A.    No.

8              I let them see the treehouse.

9    I told them they were not allowed to be in

10   the treehouse so I let them look from the

11   ladder.

12       Q.    The question previously was:

13   Have any other children been up in the

14   treehouse?

15       A.    Till now?

16       Q.    Yes.

17       A.    Yes.

18       Q.    Okay.

19             So the question was:  When was

20   the last time any children other than your

21   own were up in the treehouse?

22       A.    I don't know.  I don't know.

23       Q.    Okay.

24             Did you show the children the

25   treehouse?

144

```
 1                    J. LEPPER
 2              MR. MORRIS:  Objection.
 3        Q.    Mr. and Mrs.        children.
 4        A.    Yes.
 5        Q.    Okay.
 6              Did you put a ladder up for
 7    them to climb up to the treehouse?
 8        A.    I did.
 9        Q.    Did they go inside the
10    treehouse?
11        A.    They observed it from the
12    ladder and I did let them walk in there
13    real quick and then they came back out.
14        Q.    How did they get in?
15        A.    The ladder.
16        Q.    All right.
17              But how did they get physically
18    into the treehouse?
19              Did they climb the ladder?
20        A.    From the ladder they climbed
21    through the window.
22        Q.    And did your children use it at
23    that time?
24        A.    My daughter came up with me.
25              Yes.
```

145

```
 1                    J. LEPPER
 2               MR. MORRIS:  Hold it right
 3          there.
 4               Let's take a brief break.
 5               (Whereupon, a short recess was
 6          taken.)
 7          Q.   How many     children went up
 8     into the treehouse?
 9          A.   All of them.
10          Q.   Three?
11          A.   Three.
12          Q.   And how long were they in the
13     treehouse for?
14          A.   Less on that five minutes.
15               They just wanted to see it.
16          Q.   Was Mr. and Mrs.     there?
17          A.   Mrs.     was there.
18          Q.   Was Mr.     there?
19          A.   No.
20          Q.   Was Mrs. Lepper there?
21          A.   No.
22          Q.   You said a couple of weeks ago.
23               But do you know the date?
24          A.   No.
25          Q.   Before that time, when was the
```

146

1                    J. LEPPER

2    last time any children but your own were in

3    the treehouse?

4         A.    Nobody's been in there.

5         Q.    When was the last time that

6    your children went into the treehouse?

7         A.    I don't know.

8         Q.    Was it more than a month ago?

9              MR. MORRIS:  Objection.

10             You can answer.

11        A.    I just told you that my

12   daughter went up the ladder the same time

13   that the other kids wanted to see it

14   because the other kids were there and they

15   were just checking it out.  And she went up

16   also.

17        Q.    Before your daughter and the

18        children had gone up to the

19   treehouse --

20             THE WITNESS:  What are you

21        looking at?

22        Q.    -- did your children go up to

23   the treehouse within the month before?

24        A.    Within the month before this

25   happened?

1                    J. LEPPER

2      Q.    Yes.

3      A.    I don't recall.

4            I don't believe so.

5            MR. MORRIS:  Counsel, you have

6      the defendant.  He's absolutely

7      entitled to be here.  He's sort of

8      staring directly at the client.

9            MR. GLASS:  I'm staring at

10     whoever is speaking.

11           MR. MORRIS:  It seems like

12     judging from the body language here

13     between both parties and the court

14     reporter is now laughing, it may be

15     best --

16           MR. GLASS:  So is one of the

17     defendants.

18           MR. MORRIS:  It may be best if

19     maybe they sit back.

20           MR. GLASS:  I'm happy to do

21     that.

22           MR. TOSCA:  He's allowed to

23     look.

24           MR. MORRIS:  Absolutely.

25     Absolutely.

148

```
 1                  J. LEPPER
 2           I'm not saying that.
 3           MR. GLASS:  Off the record.
 4           I'm looking at whoever is
 5      speaking.
 6           MR. MORRIS:  I'm looking at a
 7      computer screen.
 8           Just again, the proximity is
 9      getting closer.  And it seems that
10      body language --
11           MR. GLASS:  I'll sit back if
12      that's helpful.
13           MR. MORRIS:  Please.
14           MR. TOSCA:  Just for the
15      record, your client was also staring
16      at my client while I was speaking to
17      him.
18           THE WITNESS:  Can we move on?
19      Q.   Can we go back?
20           So have you been up in the
21      treehouse, inside the treehouse in the past
22      two months?
23      A.   I just told you I was up there
24      the other day.
25      Q.   Before that.
```

149

```
 1                    J. LEPPER
 2       A.    I don't know.  I don't recall.
 3       Q.    How about after that?
 4       A.    After what?
 5       Q.    After the      children went up
 6   to the treehouse.
 7       A.    I don't recall now.
 8       Q.    Had you told Mr.      that you
 9   had agreed to a Court Order to stay away
10   from the treehouse and not to use it?
11             MR. MORRIS:  Objection.
12             You can answer.
13       A.    No.
14       Q.    Have you done anymore
15   renovation or building or changes to the
16   treehouse in the past two months?
17       A.    No.
18             MR. MORRIS:  Objection.
19             You can answer.
20       Q.    Is there a name to this
21   treehouse?
22       A.    What do you mean; name?
23       Q.    Did you ever call it something?
24   Did you ever name it?
25             Some people name boats.
```

283

```
 1                        J. LEPPER
 2    permit application.
 3         Q.    Okay.
 4                Did anybody tell you that it
 5    was issued?
 6         A.    No determination had been made.
 7         Q.    And you continued to build the
 8    treehouse anyway.
 9         A.    No.
10         Q.    Did you do something before you
11    started to build the treehouse again?
12         A.    Um, I believe I waited and
13    called one more time.  I waited and might
14    have called one more time until the week
15    before my son's birthday like I said on the
16    record earlier.  I believe it was June 30th
17    that I just erected the walls.
18         Q.    And by that time, you had not
19    gotten a permit yet, correct?
20         A.    No.
21         Q.    That's not correct?
22         A.    No, I didn't get a permit.
23                I didn't get anything.
24         Q.    And you went ahead and built it
25    anyway.
```

284

```
 1                    J. LEPPER
 2        A.    Um, I erected the walls to let
 3   my son know on his birthday so that my son
 4   could see on his birthday what dad was
 5   doing in the garage so he knew what our
 6   intentions was on his birthday.
 7        Q.    And at some point, you put a
 8   roof on also.
 9              MR. MORRIS:  Objection.
10              You can answer.
11        A.    No.
12        Q.    You never put a roof on the
13   treehouse?
14        A.    Yes, we did.
15        Q.    Okay.
16              And when you put the roof on,
17   you knew that you didn't have a permit.
18              Am I correct?
19              MR. MORRIS:  Objection.
20              You can answer.
21        A.    After my meeting with Mr.
22   Fellman when he neglected his job to
23   explain to me what Building Code 365 was,
24   so I had left the building that day.  And I
25   went downstairs to get a copy of the
```

```
 1                    J. LEPPER
 2    Building Code 365-26.
 3         Q.   Do you have access to the
 4    Internet?
 5              Do you use a computer?
 6         A.   I do.
 7         Q.   Did you go on the Babylon
 8    Village website?
 9              MR. MORRIS:  Objection.
10              At what time?
11              MR. TOSCA:  Let's see.
12         Q.   Before you went down to look at
13    the code, did you go on the Internet to
14    review the Babylon Village code?
15         A.   No.
16         Q.   Did somebody give you the
17    code --
18              MR. MORRIS:  Objection.
19              You can answer.
20         Q.   -- at the building department.
21         A.   Not until after I received the
22    three violations.
23         Q.   And how many pages did they
24    give you of the code?
25         A.   They didn't give me anything.
```

286

```
 1                    J. LEPPER
 2            I had to copy, photocopy I
 3    guess the book.  There were copies of the
 4    book of Building Code 36526.
 5         Q.    Did you copy the entire book or
 6    did you just take the pile of pages?
 7         A.    The entire code.
 8         Q.    The entire code.
 9               How many pages is that?
10         A.    I don't know.
11         Q.    Did you know that you could
12    have gone on Internet and just accessed it
13    on the Internet?
14         A.    Yes, I know that.
15               I didn't know that at the time.
16    I went to speak to Mr. Fellman in person to
17    get an explanation of what building code
18    36526 was, of what I was being violated
19    for.
20         Q.    You said that outside of
21    discussing the permit and asking him what
22    the code provision was and what it meant
23    and you said he didn't tell or you or he
24    didn't explain it to you, did you speak
25    about anything else at that time?
```

287

```
 1                    J. LEPPER
 2              MR. MORRIS:  Objection to
 3         everything except for did you speak
 4         to anything else at that time.
 5    A.    Did we speak?
 6              Yes.
 7              We spoke about everything we
 8    just spoke about.  We spoke about the
 9    violations and the code, that we
10    complained.
11              And I don't know what else.
12    Q.    Well, you mentioned something
13    about a hypodermic needle previously and I
14    want to know:  Did you speak to him about
15    the hypodermic needle during that
16    conversation?
17              MR. MORRIS:  Objection.
18              Asked and answered.
19    A.    Yes, it did come up in the
20    conversation.
21    Q.    At what point in the
22    conversation did it come up?
23    A.    I'm not sure.
24              It was in the conversation.
25    Probably towards -- maybe towards the end.
```

```
 1                      J. LEPPER
 2              I don't know.
 3      Q.     Okay.
 4              Who brought up the hypodermic
 5    needle?
 6              What raised the issue first?
 7      A.     Obviously, I did because he
 8    didn't know about it.
 9      Q.     Okay.
10              What did you tell him?
11              MR. MORRIS:  Objection.
12              You can answer.
13      A.     I told him what we had found in
14    the bushes while we were playing with our
15    kids.
16      Q.     I'm sorry.
17              I didn't hear you, actually.
18              Did you say just now I told him
19    why we put the treehouse up?
20              MR. MORRIS:  Could we get a
21          read back, please.
22              (Whereupon, the referred to
23          answer was read back by the
24          Reporter.)
25      Q.     Did you tell him why you put
```

```
 1                    J. LEPPER
 2    the treehouse up?
 3              MR. MORRIS:  Note my objection.
 4              You can answer.
 5         A.    I told him why we decided we
 6    were going to put the treehouse up and what
 7    we had found in our bushes.
 8         Q.    Okay.
 9              What was the connection between
10    the two?
11         A.    The connection between the two
12    is I found a hypodermic needle in my bushes
13    within arm's reach of my children.  And I
14    put a lock on my gate in a place where I
15    thought I would never have to put a lock on
16    my gate and decided at some point that we
17    were going to put a treehouse so we could
18    keep our kids safe in our backyard and away
19    from what we were finding in the street or
20    the bushes or wherever else.
21         Q.    Was the purpose for your
22    putting up the treehouse related to the
23    hypodermic needle you found in the bushes?
24              MR. MORRIS:  Objection.
25              You can answer.
```

290

```
 1                    J. LEPPER
 2      A.      What's the purpose of putting?
 3              Repeat that.
 4              MR. TOSCA:  Sure.
 5              Could you repeat it.
 6              (Whereupon, the referred to
 7        question was read back by the
 8        Reporter.)
 9              MR. MORRIS:  Note my objection.
10              You can answer.
11      A.      That was -- it firmed it up.
12   Like I said, I don't know if we discussed
13   it prior to ever, you know, putting up a
14   treehouse.
15              But finding that needle
16   definitely was the reason why we said
17   that's what we were going to do.  That's
18   what we were going to do with the wood that
19   we reclaimed from the boathouse.  That was
20   the most.
21      Q.      How would the treehouse resolve
22   any issues regarding a hypodermic needle
23   that you found?
24              How is that related at all?
25      A.      How is it related at all?
```

```
 1                    J. LEPPER
 2        Q.    Yes.
 3        A.    Well, keeping my kids safe in
 4   my backyard where I could actually
 5   supervise them and watch them in my
 6   backyard.
 7        Q.    Right.
 8              And how is the treehouse going
 9   to protect them from hypodermic needles?
10        A.    Probably spend less time on the
11   street where these needles seem to be
12   frequently found.  Cause I don't think
13   they're going to be found in my backyard,
14   although we did find one next to my fence.
15        Q.    You found the hypodermic
16   needles on the property.
17              Am I correct?
18        A.    Yes.
19        Q.    And the area where you found
20   the hypodermic needle is adjacent to the
21   walkway, the side public walkway?
22        A.    No, there is no side public
23   walkway.
24              I found it next to the fence.
25        Q.    Okay.
```

292

1              J. LEPPER

2              When you say there is no side

3    public walkway, is there an area of the

4    ground that people walk on on Wampum

5    alongside your home?

6              MR. MORRIS:  Objection.

7              You can answer.

8         A.   There's grass, if that's what

9    you're referring to.

10        Q.   Yes.

11             People walk on there, right?

12        A.   No.

13             MR. MORRIS:  Objection.

14        Q.   You never saw anybody walk

15   there?

16        A.   I see the dogs walk on there

17   but they typically walk in the street.

18        Q.   The people walk in the street.

19        A.   Yes.

20        Q.   So the hypodermic needle though

21   you found was on your side of the property;

22   is that correct?

23        A.   It was on my side of the

24   property?

25        Q.   Yes.

```
 1                      J. LEPPER
 2         A.    It was on the other side of the
 3    fence, you know, next to the fence post, on
 4    the street side of the fence post.  It's,
 5    like, a chicken wire fence.
 6         Q.    Now I understand.
 7               So the hypodermic needle that
 8    you say you found was not actually on your
 9    property.
10               It was on the public ground; is
11    that correct?
12               MR. MORRIS:  Objection.
13               You can answer.
14         A.    No.
15         Q.    It's on the other side of the
16    fence.
17               MR. MORRIS:  Objection.
18         A.    But my fence is in my yard.
19    It's on other side of the hedge row.  It's
20    my property.
21               So it was inside the hedge row
22    on the other side of the fence
23    (indicating).
24         Q.    All right.
25               That's not an area that your
```

307

1                    J. LEPPER

2     terms of adding any more wood, adding any

3     shingles, adding anything at all.

4          A.    No.

5                MR. MORRIS:  Objection.

6                THE WITNESS:  Sorry.

7          Q.    Have you had any discussions

8     with Ralph Scardino, the mayor of the

9     village, about the treehouse?

10         A.    In person?

11         Q.    Yes.

12         A.    One on one?

13         Q.    Yes.

14         A.    No.

15         Q.    Did you have any discussions

16    with Mayor Scardino by telephone one on

17    one?

18         A.    No.

19         Q.    Now, did you ever write to him

20    to complain about anything regarding the

21    treehouse?

22                MR. MORRIS:  Objection.

23                You can answer.

24         A.    No, I never wrote to the mayor

25    regarding -- I had nothing to complain

308

```
 1                    J. LEPPER
 2    about until after the violations.
 3         Q.    Did you write anything about
 4    the treehouse to the mayor?
 5               About the violations, anything
 6    that's related to the treehouse.
 7               MR. MORRIS:  Same objection.
 8         A.    No.  Not personally.
 9         Q.    Okay.
10               Did anybody write anything to
11    the mayor on your behalf?
12               MR. MORRIS:  Objection.
13               You can answer, if you know.
14         A.    Did anybody write anything on
15    my behalf?
16         Q.    Yes.
17         A.    Yes.
18         Q.    And who wrote to him on your
19    behalf?
20         A.    My attorney, for one, submitted
21    the complaint and the appeal.
22         Q.    Did anyone write a letter for
23    you to the mayor?
24               MR. MORRIS:  Objection.
25               To the extent you know if other
```

309

```
 1                    J. LEPPER
 2           people wrote letters to the mayor on
 3           your behalf, you can answer.
 4           A.    I don't know.
 5                 I do know there were several
 6   neighbors that supported the treehouse that
 7   went and spoke to the mayor directly or
 8   wrote him a letter.
 9                 I understand that he received
10   mail from supporters in the village
11   about -- regarding the treehouse.
12           Q.    And who told you that they
13   spoke to the mayor in person?
14                 MR. MORRIS:  Objection.
15                 You can answer.
16           A.    I don't recall but there's a
17   lot of senior members from my block.
18           Q.    Could you give me their names.
19           A.    No.  I can't tell you exactly
20   who.
21                 I wasn't there when they spoke
22   to him but I know they spoke to -- they
23   knocked on the mayor's door and they spoke
24   to him about it.
25           Q.    You said that they told you
```

310

```
 1                    J. LEPPER
 2    this.   Whose they?
 3                I'd like to know the names of
 4    the people you're talking about.
 5         A.    I have a list of people who
 6    supported.
 7                Who actually knocked on his
 8    door?
 9                I can't tell you.
10                There's about 50 people that
11    signed and supported the petition on the
12    block.   I can't tell you who actually
13    knocked on his door.
14         Q.    Did you prepare the petition?
15                MR. MORRIS:   Objection.
16                Were you done answering that
17         previous question?
18                THE WITNESS:   Yes.
19         A.    Did I prepare a petition?
20                No.
21                I just -- I didn't prepare a
22    petition.   I just got signatures from
23    people who showed up in the village court
24    in the 3, 4 times that we were down there.
25    And now it's the wintertime.   And we had a
```

311

```
 1                    J. LEPPER
 2    formal complaint in federal court.
 3              So I went and got names and
 4    addresses of everybody -- a whole lot of
 5    people that were available, they were in
 6    support or if they wanted to sign.  It
 7    wasn't a formal petition though.
 8         Q.    You said signatures.
 9              So you had something that
10    people signed for you.  Was it just a sheet
11    of paper?
12         A.    Just a sheet of paper.
13         Q.    Did you keep it?
14         A.    I did.
15         Q.    With all the names?
16         A.    I sure did.
17              MR. TOSCA:  I'm going to
18         request a copy of the sheet of paper
19         with all the names.
20              MR. MORRIS:  I just ask that
21         you follow up in writing.
22              We'll take it under advisement.
23         Q.    Is there more than one time
24    where people came and signed something that
25    they showed up for an event of yours?
```

312

1                    J. LEPPER

2              MR. MORRIS:  Objection.

3              You can answer.

4         A.    I've never had an event.  But

5    there was a lot of support from my block

6    and the community in the very first

7    hearing, the second and third hearing in

8    the village.

9              And they signed, like I said,

10   just a piece of paper.

11        Q.    Each and every one of those

12   times?

13        A.    No.

14        Q.    How many?

15        A.    The one time.

16        Q.    Just one?

17        A.    One time.

18             Cause now it was -- I don't

19   know.  It was in the middle of the winter.

20   This has been going on since May.  And

21   we've been in court since August.  And I

22   was going around cause now we were in a

23   different court, going from village court

24   to federal court so --

25        Q.    How did these people know about

313

1                    J. LEPPER
2    the court dates that you're talking about?
3                MR. MORRIS:  Objection.
4                You can answer.
5        A.    Court dates?
6        Q.    Yes.
7        A.    From the village?
8        Q.    Yes.
9        A.    Most of them were people from
10   the block.  You know, put a sign up.
11       Q.    Who put a sign up?
12       A.    I put a sign up.
13       Q.    Explaining that there was going
14   to be a court date at a certain time?
15       A.    Before the initial hearing on
16   August 14, 2018, I put a small sign up
17   saying support our treehouse, the date, the
18   time at the village court.
19       Q.    Did you ever make an
20   application for permits for any signs you
21   put up on your property?
22                MR. MORRIS:  You can answer.
23       A.    No.
24       Q.    The signs you're talking about,
25   they were prepared by you?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

314

```
 1                    J. LEPPER
 2        A.    Yes.
 3        Q.    And did you ever call people
 4    and tell them look.  I'm going on a court
 5    hearing.  I'd like you to come and support
 6    me.
 7              MR. MORRIS:  Objection.
 8              You can answer.
 9        A.    Call them?
10        Q.    Yes.
11        A.    Repeat the question, please.
12        Q.    Sure.
13              Did you ever telephone anyone,
14    either cell phone, landline, and tell
15    people, tell persons that you're having a
16    court date and you would like them to come
17    down?
18        A.    Yes.  I believe I did.
19        Q.    Did you do that every time you
20    had a court date?
21        A.    No.
22        Q.    Were some of the people who
23    showed up at these court events, were they
24    family members?
25        A.    Yes.
```

315

1                    J. LEPPER

2        Q.    About how many people who did

3    show up were family members?

4              MR. MORRIS:   On which date?

5        A.    Three?

6        Q.    How many?

7        A.    Maybe three.

8              MR. MORRIS:   Note my objection.

9              On which date?

10       A.    On which date?

11             My family wasn't there on every

12   date.  Mostly relatives and neighbors.  Not

13   relatives.  Mostly neighbors in support

14   from the block.

15       Q.    Were there any people that you

16   worked with who came down?

17       A.    Yes.

18             On which date?

19       Q.    The first date.

20       A.    The first date?

21       Q.    Yes.

22       A.    No.

23             I don't think so.

24       Q.    How about after that?

25             Did any people from your job

316

```
 1                   J. LEPPER
 2   come down?
 3        A.    Yes.
 4        Q.    By the way, do you have a rank
 5   in the fire department?
 6        A.    Yes, I do.
 7        Q.    What rank is that?
 8        A.    Pilot.
 9        Q.    Have you ever been subjected to
10   any disciplinary hearings in the fire
11   department?
12              MR. MORRIS:  Objection.
13              You can answer.
14        A.    No.
15        Q.    Has there been ever any
16   investigation regarding any of your conduct
17   related to the fire department matters?
18        A.    Yes, there has.
19        Q.    When was that?
20        A.    Just recently.
21        Q.    What was that about?
22        A.    An anonymous letter was
23   submitted stating that I showed up to
24   village court on August 14th wearing my
25   partial Class A uniform to my hearing.
```

317

```
 1                    J. LEPPER
 2              And I believe that they said
 3    that I was looking for some kind of special
 4    favoritism the Court.
 5        Q.    Are you permitted to wear your
 6    uniform to court --
 7              MR. MORRIS:  Objection.
 8        Q.    -- for non fire department
 9    activities.
10              MR. MORRIS:  Objection.
11              There's multiple uniforms.
12          Specify court.
13              Which one?
14        Q.    Well, the uniform that you did
15    wear on August 14th, were you permitted to
16    wear that according to fire department
17    regulations?
18        A.    I wasn't aware whether or not I
19    was allowed to wear my partial Class A
20    uniform.
21              But I did inform the Village of
22    Babylon and ask for an adjournment to a
23    later time and date, which I was
24    immediately denied because I had a plaque
25    dedication for a friend of mine who passed
```

318

```
 1              J. LEPPER
 2   away a year prior on August 14, 2017.
 3              And the plaque dedication was
 4   held in Manhattan at Marine Company 1 on
 5   the west side which I was denied and I was
 6   forced to leave the plaque dedication when
 7   they were still speaking in order to make
 8   it to the Babylon village court in my
 9   partial Class A uniform; meaning, my short
10   sleeved shirt and pants.
11       Q.    Now, you had mentioned though
12   that you had asked for an adjournment.
13              When ask you ask for an
14   adjournment for the August 14th hearing?
15       A.    Prior to the hearing.
16       Q.    When you say "prior", was that
17   by telephone or did you go in person to the
18   court and ask for an adjournment?
19       A.    I'm not sure.
20              I believe it was by telephone.
21       Q.    Did anybody go to the hearing
22   and ask for an adjournment on your behalf?
23       A.    No.
24              I didn't have representation.
25       Q.    Okay.
```

319

1                    J. LEPPER
2                Were you told over the
3       telephone that they would not adjourn the
4       hearing?
5                MR. MORRIS:  Objection.
6                You can answer.
7       A.    Yes.
8                I believe I was denied.  That's
9       why I was there on August 14th instead of
10      being at the plaque dedication where I
11      belong.
12      Q.    You wound up not going to the
13      plaque dedication because you had to go to
14      court.
15      A.    No.
16                I went.
17                MR. MORRIS:  Objection.
18      Q.    Even though you couldn't get
19      the adjournment you went?
20      A.    I went.
21      Q.    Did you tell the Court that you
22      were going to a plaque dedication and you'd
23      be late?
24                MR. MORRIS:  Objection.
25                Answer.

```
 1                 J. LEPPER
 2        A.    No.
 3              When I was called into the
 4   clerk's office to speak to Gerry Glass, the
 5   village attorney, I spoke to him and then I
 6   explained to him why I was there in my
 7   partial Class A uniform.
 8        Q.    And what did he say to you?
 9        A.    He didn't say anything to me.
10              He asked me about the case.  He
11   told me how much he liked the treehouse
12   that he saw and he asked me what was the
13   case about and I explained to him what the
14   case was about.
15        Q.    What time was the hearing, what
16   time were you supposed to be there on
17   August 14th?
18        A.    2 o'clock.
19        Q.    Did you make it at 2:00?
20        A.    I did.
21        Q.    Knowing that you needed to be
22   at court at 2 o'clock, did you bring any
23   kind of change of clothes with you to this
24   plaque dedication?
25              MR. MORRIS:  Objection.
```

# EXHIBIT "J"

COPY

RECEIVED

*56 - 1*

KELLY, RODE & KELLY, LLP

1
2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
3  ----------------------------------------X

4  JOHN LEPPER AND NOELLE LEPPER,

5              Plaintiffs,

6      - against -              Civil Action No.:
                                07011
7
   VILLAGE OF BABYLON; and individually and
8  in their official capacity, RALPH
   SCORDINO,Mayor, KEVIN MULDOWNEY, Deputy Mayor,
9  ROBYN SILVESTRI, Village Trustee, TONY
   DAVIDA,Village Trustee, MARY ADAMS, Village
10 Trustee; STEPHEN FELLMAN, Village of Babylon
   Building Inspector; SUZANNE SCHETTINO,
11 Department of Public Works; GERARD GLASS,
   Esq., Village of Babylon Attorney; DEBORAH
12 LONGO, Planning Board, Village of Babylon,

13             Defendants.

14 ----------------------------------------X

15                 72 East Main Street
                   Babylon, New York
16
                   July 5, 2019
17                 10:01 a.m.

18

19          DEPOSITION of the Defendant

20    GERARD GLASS, before Nancy Dionisio

21    a Notary Public of the State of New

22    York.

23

24      Rich Moffett Court Reporting, Inc.
         114 Old Country Road, Suite 630
25            Mineola, New York 11501
                 516-280-4664

9

```
 1
 2        A      Queens.
 3        Q      For what periods did you
 4   attend St. John's University?
 5        A      Well, just backtracking from
 6   law school, if I graduated law school in
 7   '85, that was a three-year period which
 8   would bring us to '82, so I would say
 9   right around 1981, '82 I graduated and I
10   attended that school for the years --
11   four years prior thereto.
12        Q      Did you receive any kind of
13   certificate of attendance?
14        A      Certificate of attendance?
15   I'm unaware of that.  I received a
16   degree.
17        Q      What degree did you receive?
18        A      Bachelor's.
19        Q      Did you attend any other
20   institution aside from St. John's?
21        A      Excuse me one second.
22               Sorry.  The office is closed
23   today so...
24               Did I attend any other
25   educational institution other than
```

```
 1                                          10

 2    St. John's?

 3         Q      Yes.

 4         A      No.

 5         Q      Were you awarded any honors

 6    for performance during your period of

 7    attendance at St. John's?

 8         A      Yes.

 9         Q      What awards were those or

10    honors?

11         A      It was a grade point -- I had

12    a high grade point average.

13         Q      Anything else?

14         A      No.

15         Q      What was your grade point

16    average for which you received an award?

17         A      3.85.

18         Q      Was that for one semester,

19    multiple semesters or something else?

20         A      It was for my entire tenure.

21         Q      Was it one award?

22         A      Yes.

23         Q      Were you awarded any honors

24    for performance during your period of

25    attendance at St. John's law school?
```

```
 1                                            11
 2        A      No.
 3        Q      Have you participated in any
 4   continuing legal education, CLE programs
 5   since graduating law school?
 6        A      Yes.
 7        Q      What CLE programs have you
 8   attended since?
 9        A      That's too voluminous of a
10   question to ask.
11        Q      For each CLE program that you
12   did attend, did you attend as an attendee
13   or member of the faculty or presenter?
14        A      An attendee.
15        Q      Do you know who the sponsors
16   of such CLE were?
17        A      I've done so many of them
18   that I wouldn't be able to remember -- to
19   list them.  I've been practicing law for
20   32 years, the CLE program probably came
21   into effect plus or minus 15, 20 years
22   ago.
23        Q      Where do you take CLE
24   programs?
25        A      I take them generally
```

1                                    12

2     electronically.

3          Q      Have you ever gone out of

4     town to take CLE programs?

5          A      No.

6          Q      To be clear, were you ever a

7     faculty member or presenter of CLE

8     program?

9                MR. TOSCA:  Objection.  Asked

10           and answered.  You can answer, go

11           ahead.

12         A      No.

13         Q      What was the level of the

14     subject matter treatment at the CLE

15     programs at which you attend?

16         A      I have no idea what that

17     question means.

18         Q      For each CLE was there a

19     grade of CLE?

20         A      Are they graded classes?

21         Q      So for instance, was it

22     beginners, did you take all beginners CLE

23     program, intermediate?

24         A      I've taken a wide variety of

25     CLE programs.  Some of them are right

13

1

2    above your head (indicating) of all

3    different types and varieties; beginner,

4    intermediate to advanced.

5        Q    What would the majority of

6    the programming that you've attended,

7    what category would it fall into?

8        A    Advanced.

9        Q    Could you describe some of

10   the advanced courses that you've

11   attended?

12       A    Estate planning, zoning, debt

13   collection, real estate practices that

14   are areas that are of interest to me and

15   that I work in.  Civil litigation.

16       Q    Anything else?

17       A    I'm sure there are others.

18       Q    Those estate planning CLE

19   programs, were all those taken online?

20       A    Yes.  All of the class were

21   taken either online or by some electronic

22   medium.

23       Q    So you've never attended an

24   estate planning program in person?

25       A    I don't believe so.

14

2      Q      Have you attended a zoning
3    CLE program in person?
4      A      I don't believe I've taken
5    any programs in person.
6      Q      Have you attended any debt
7    collection, real estate or civil
8    litigation programs in person?
9      A      My recollection is I have
10   done all of them by some electronic
11   format.
12     Q      When you say electronic
13   format, how is it that they would record
14   your attendance?
15     A      They were -- you'd have to
16   fill out a form to certify you attended.
17     Q      Would it require a code or
18   something else?
19     A      Yes.
20     Q      All those electronic CLE
21   program that you've taken, have you
22   entered the code?
23     A      Yes.
24     Q      Have you sat through the
25   entire program?

15

        A       I've listened to the entire
program.

        Q       And you earned credit for the
program, correct?

        A       Yes.

        Q       By whom are you employed at
the present time?

        A       I'm self-employed.  I'm the
principal of Gerard Glass and Associates,
P.C.

        Q       For how long have you been
the principal of Gerard Glass Associates?

        A       This firm, less than two
years.

        Q       By whom are you employed
after you graduated from law school?

        A       The Suffolk County Attorney's
office.

        Q       Were you employed at any time
during any of those periods you attended
school after your high school graduation?

                MR. TOSCA:  Wait a minute.

            Could you repeat that question.

                    (The reporter repeated the

1                                                    16

2              requested portion of the record.)

3          A      Yes.

4          Q      Where were you employed after

5     your high school graduation?

6          A      I had an assortment of part

7     time type jobs.

8          Q      Tell us the first one after

9     high school, please.

10         A      I was a clammer.

11         Q      Where were you a clammer?

12         A      Self-employed.

13         Q      Did you hold a license to

14    clam?

15         A      Yes.

16         Q      How long did you hold that

17    position for?

18         A      It was just, you know,

19    intermittent-type work.  We're talking

20    about all part time jobs, typical

21    college/high school type jobs.

22         Q      After you were a clammer,

23    what position did you hold after high

24    school graduation?

25         A      I think I did that

```
 1                                          17
 2     intermittently from time to time for a
 3     little while after high school.  I worked
 4     in my dad's upholstery shop.
 5            Q      What was the upholstery shop
 6     called?
 7            A      Baldwin Upholstery.
 8            Q      What was your father's name?
 9            A      Sherman.
10            Q      Sherman Glass?
11            A      Uh-hum.
12            Q      How long did you work at the
13     upholstery shop?
14            A      Intermittently from high
15     school until graduation from law school.
16            Q      Did you hold any other
17     positions after high school?
18            A      In what manner?  I've held --
19     I've held a multitude of positions after
20     high school.
21            Q      What were they?
22            A      That question is so broad,
23     you're talking about 32 years of
24     positions I've held, from elected office
25     to appointed to boards to, you know, you
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                      18
 2    got to limit the question.
 3         Q      After your graduation, but
 4    before attending law school, did you hold
 5    any other employment?
 6         A      Any other employment than
 7    what I've previously testified as to?  I
 8    don't think so.
 9         Q      How long did you work at the
10    Suffolk County Attorney's office for?
11         A      Four months.
12         Q      Who was your employer?
13         A      Martin Ashare, County of
14    Suffolk, Martin Ashare was the County
15    Attorney at the time.
16         Q      Can you, for the court
17    reporter, spell the last name?
18         A      A-S-H-A-R-E.
19         Q      How is it that you left the
20    Suffolk County Attorney's office?
21         A      I was elected to the
22    legislature.
23         Q      When were you elected to the
24    legislature?
25         A      '85.
```

19

2        Q       How long did you hold that

3    position for?

4        A       Four years.

5        Q       Did you do any other work

6    while you were the legislator of Suffolk

7    County New York?

8        A       I was a practicing attorney.

9        Q       In what position or role?

10       A       Self-employed.

11       Q       What was the name of the

12   entity for which you worked?

13       A       I practiced under my name, I

14   wasn't working for an entity.  It's a

15   solo practice.

16       Q       Did you incorporate as a solo

17   practice?

18       A       I did not.

19       Q       Did you do any work, any

20   other work, while you were legislator of

21   Suffolk County New York?

22       A       No.

23       Q       At what point did your term

24   of legislator end, in what year?

25       A       Plus or minus 1987, '88.

```
 1                                    20
 2          Q     So is it fair to say about
 3     1985 to 1988 you were legislator and
 4     self-employed?
 5          A     Yes.
 6          Q     After your term in the
 7     legislature what position, if any, did
 8     you hold?
 9          A     I was a managing partner of
10     Glass, Lazio and Glass.
11          Q     Can you spell Lazio for the
12     reporter?
13          A     L-A-Z-I-O.
14          Q     What were your job duties as
15     managing partner of that firm?
16          A     You know, I'm just thinking,
17     I am not sure if I was managing -- I
18     wasn't managing partner of Glass, Lazio
19     and Glass, I was a partner.  I was a
20     practicing attorney and partner in the
21     firm and, you know, it was a three
22     attorney law firm that practiced
23     generally.
24          Q     Who was the other Glass?
25          A     Maureen Glass.
```

1                                              21

2          Q        Who is Maureen Glass?

3          A        My sister-in-law.

4          Q        To whom is Ms. Maureen Glass

5     married?

6                   MR. TOSCA:   Objection.   You

7          can answer.

8          A        Michael Glass.

9          Q        Michael Glass is your

10    brother?

11         A        Correct.

12         Q        How long were you partner at

13    Glass, Lazio and Glass for?

14         A        Until Rick Lazio got elected

15    to the house of representatives which

16    was, I'm guessing, between -- about eight

17    years after its formation.   That's a

18    guess.

19         Q        Is it fair to say that you

20    started as partner of Glass, Lazio and

21    Glass around 1988?

22         A        Yes.

23         Q        How long were you a partner

24    at Glass, Lazio and Glass for?

25         A        That entire period.

```
 1                                        22
 2          Q       Eight years, would that bring
 3     us to 1996?
 4          A       Plus or minus.
 5          Q       When you say plus or minus --
 6          A       You're talking about events
 7     that I would need a resume to revisit.  I
 8     don't remember the times exactly, the
 9     years.  Approximate, all the dates I've
10     given you are approximate.
11          Q       We will keep it as that
12     period, is that okay?
13          A       I'm just telling you all the
14     dates I'm giving you are approximate
15     unless I say otherwise.
16          Q       After you were partner at
17     Glass, Lazio and Glass what was the next
18     position that you held?
19          A       I was the managing partner at
20     Glass and Glass which was the successor
21     firm.
22          Q       Was the other Glass Maureen
23     Glass?
24          A       Correct.
25          Q       How long did you remain a
```

1                                          23

2      partner at Glass and Glass?

3           A       Up until about two years ago.

4           Q       Is it fair to say about 1996

5      to about 2017?

6           A       Approximately, yes.

7           Q       About two decades?

8           A       Yes.

9           Q       In what areas did you

10     practice at Glass and Glass?

11          A       Same, general practice.

12          Q       When you say the same, the

13     same as Glass, Lazio and Glass?

14          A       Correct.

15          Q       After 2017, what position did

16     you hold after at Glass and Glass?

17                  MR. TOSCA:   After 2017 did

18          you say?

19          A       I'm the principal of Gerard

20     Glass and Associates, P.C.

21          Q       What was the reason for

22     forming Gerard Glass and Associates?

23          A       Because Glass and Glass came

24     to an end.

25          Q       Did Ms. Maureen Glass obtain

1                                      79

2          Q      Did you assist in the

3     production of the website for Glass,

4     Lazio and Glass?

5          A      You know, I don't think

6     Glass, Lazio and Glass had a website.

7     It's back a ways.

8          Q      When you refer to municipal

9     clients in publication, preparing for

10    publication articles in electronic media,

11    what type of clients are you referring

12    to?

13         A      You said municipal clients.

14         Q      Are you referring to

15    municipal entities or are you referring

16    to clients within a municipality or are

17    you referring to employees within a

18    municipality or are you referring to

19    clients who have municipal issues but are

20    not part of the municipality or is it

21    something else?

22         A      Generally it's the

23    municipality itself and it's elected

24    officials.

25         Q      Do you represent others than

```
 1                                      80
 2      the municipality itself and the elected
 3      officials?
 4           A      Well, I represent the boards
 5      and agencies of municipalities, so, yes.
 6           Q      What about other clients
 7      other than that?
 8           A      Yes, I'm sure I have done
 9      other work in that area for other clients
10      beyond municipalities.
11           Q      When you said that you
12      prepared material for publication with
13      regards to a press release to a public
14      statement, to what were you referring?
15           A      You asked the question and I
16      answered that I have done it on behalf of
17      both public and private clients.
18           Q      When you say "done it," are
19      you referring to press releases on behalf
20      of public and private clients in your
21      capacity as attorney?
22           A      Yes.
23                  MR. MORRIS:  Counsel, we're
24           going to ask for production of all
25           copies of publications that were
```

81

1
2          just mentioned here.

3                    MR. TOSCA:  We will take it

4          under advisement and we'll request

5          you put all requests in writing.

6          Q        Counsel, do you maintain a

7     website?

8          A        Yes.

9          Q        When did you first publish or

10    post your website?

11         A        I'm guessing about a year and

12    a half or so ago.

13         Q        Are you referring to Gerard

14    Glass and Associates, that website?

15         A        Yes.

16         Q        Has your website changed

17    since it was first posted online?

18         A        I don't think so.

19         Q        If it has --

20         A        There may have been some

21    modifications just to bring it more

22    current in terms of years.

23         Q        When you say modifications,

24    to what are you referring?

25         A        You know, if there is a

82

biography stating something that we have
done, that may have been updated.

Q      Are you responsible for the
updates?

MR. TOSCA:  Objection.

MR. MORRIS:  Withdrawn.

Q      Are you --

A      I guess I'm ultimately
responsible for everything.

Q      When you say "responsible for
everything," are you referring to the
content on your website?

A      Yes.

Q      For Gerard Glass and
Associates?

A      I think that's the role of --
if it's your firm you're ultimately
responsible for it.

Q      So is that a positive
response, you are responsible for that
content?

A      I said yes.

Q      Do you maintain any social
media accounts?

```
 1                                          83
 2          A       No -- oh, I have a -- for my
 3     firm?
 4          Q       At all.  In any capacity.
 5          A       Maintain, no.  Do I have,
 6     yes.
 7          Q       What social media accounts do
 8     you have?
 9          A       I have a Facebook account.
10          Q       Is that Facebook account
11     still open?
12          A       I don't know.
13          Q       Is the account still active?
14          A       I don't know.
15          Q       Do you have anything other
16     than a Facebook account?
17          A       No.
18          Q       Counsel, you represent
19     clients in your capacity as an attorney,
20     correct?
21          A       Yes.
22          Q       In your capacity as attorney
23     you maintain a website, correct?
24          A       Yes.
25          Q       The content on that website
```

84

1 is your product, right?

2     A     When you say your product,

3 it's the product of my firm.

4     Q     Correct.

5     A     There is a website

6 development company that helps you

7 develop it.

8     Q     Does it say on your website

9 Gerard Glass and Associates that you have

10 "big firm results?"

11     A     I do not know.

12     Q     As you sit here today, is

13 there anything that would refresh your

14 recollection?

15     A     Show me the website.

16         MR. MORRIS:  Counsel, I ask

17         that you please pullup the website

18         for Mr. Glass.

19         MR. TOSCA:  I ask that you do

20         it, Counselor, I'm not going to

21         pullup the website and how would we

22         mark that.

23         THE WITNESS:  While you're

24         pulling that up, can I ask for a

85

        two-minute bathroom break.

                MR. MORRIS:  The time is

        11:18.

                (A short recess was taken.)


CONTINUED EXAMINATION BY

MR. MORRIS:

                MR. MORRIS:  Back on the

        record it's 11:25.

        Q    Mr. Glass, I've pulled up on

a laptop a website

www.gglasslaw.com/about/.  Do you

recognize what I'm showing you now?

        A    Yes.

        Q    How do you quantify "big firm

results?"

        A    Well, I've been practicing

law for in excess of 30 years, I've

handled matters that are -- I would

consider to be complex types of

litigations, I've been involved in a

number of decisions that are published in

the books behind you.

                MR. MORRIS:  Let the record

86

1        reflect the books behind me as

2        attorney of New York Digest and --

3            THE WITNESS:  McKinney's.

4            MR. MORRIS:  And McKinney's.

5      Q    I'm sorry, Counsel, you were

6  saying?

7      A    And we had some modicum of

8  success.

9      Q    Does this website refresh

10  your recollection as to what's on your

11  website?

12      A    As to that page it does.

13      Q    The other Glass was Maureen

14  Glass, is that right?

15      A    Yes.

16      Q    What happened to Ms. Maureen

17  Glass?

18      A    Nothing.

19      Q    Why is Ms. Maureen Glass no

20  longer working with you as attorney?

21      A    Because the firm dissolved.

22      Q    Mr. Glass, have you really

23  handled thousands of real estate and

24  business cases over 32 years?

1                                          87

2          A       Yes.   It's actually many

3     thousands.

4          Q       Considering if you just

5     handled just 1,000 cases, that would be

6     approximately 31 cases per year, is that

7     right?

8          A       You're suggesting that I only

9     handled 1,000 cases?

10         Q       I'm asking you, if it was

11    just 1,000, that would be about 31 cases

12    per year, is that right?

13         A       I don't know.  You could do

14    the math.  I don't think you need me to

15    answer that question, do you, Cory?

16         Q       In the course of your regular

17    professional activities as attorney are

18    you aware of the phrase, "cases and

19    controversies?"

20         A       I've heard of that term.

21         Q       What does that term mean to

22    you?

23         A       Dispute.

24         Q       Do you understand the word

25    "cases" in the context of "cases and

88

 1  controversies?"

 2         A       No.

 3         Q       Are you aware of the source

 4  of the phrase "cases and controversies?"

 5         A       No.

 6         Q       Do you claim to have handled

 7  at least 32 "cases" each year over the

 8  last 32 years?

 9         A       Oh, sure.

10         Q       Did you handle --

11         A       Meaning having 32 clients?

12         Q       No, no, having 32 cases.

13         A       I don't know what you mean

14  when you say cases.

15         Q       Counsel, when you have a

16  client, do you consider that a case?

17         A       I've never really thought

18  about it that way.

19         Q       The point is do you consider

20  a real estate transaction a case?

21         A       I don't have a feeling one

22  way or another about it.

23         Q       Do you consider a real estate

24  transaction a "case and controversy?

1                                          89

2          A      Sometimes they are

3     controversy, but I've never really

4     thought about it in that context.

5          Q      Did you handle 32 cases each

6     year you were a member of the Suffolk

7     County legislature?

8          A      I don't know.  It's so long

9     ago.

10         Q      If the number of cases you

11    handled was only 2000 over those 32 years

12    of practice that would mean you handled

13    at least 62 cases each year?

14         A      If that's the math.  Show me

15    the language you're referring to about

16    cases and controversies, is that in my

17    website?

18         Q      Counsel, I'm not here to

19    answer questions.  It may be.

20         A      If you want me to answer

21    questions involving cases and

22    controversies and you're looking at my

23    website I will answer the question if you

24    show me the language, otherwise I'll tell

25    you I don't remember.

90

2      Q      Counsel, to the extent that
3  you've handled cases, do you consider
4  your real estate transactions cases, for
5  instance?
6      A      I haven't thought about it
7  one way or the other.  I would need to
8  think about that.
9      Q      If somebody called you to
10  request information and you provided that
11  information, would you consider that a
12  case?
13      A      In my professional capacity?
14  If they called for like a telephone
15  consultation?  No, I wouldn't consider it
16  a case because I wouldn't have been
17  retained.
18      Q      Counsel, would you consider a
19  case something in which you had to appear
20  in court?
21      A      Yes.
22      Q      In that vein, would you
23  consider a real estate transaction a
24  case?
25      A      I've answered that.

```
 1                                    91
 2          Q      Could I ask you again,
 3   Counsel, would you consider a real estate
 4   transaction a case?
 5          A      I've answered that.
 6                 MR. MORRIS:  Your client is
 7          not going to answer?  Mr. Tosca?
 8                 MR. TOSCA:  I'm not here to
 9          be deposed, so he's answered your
10          question, Mr. Morris, okay.
11          Q      Counsel, would the word
12   "matters" be more accurate than "cases"
13   when talking about the volume of your
14   practice?
15                 MR. TOSCA:  Objection --
16          A      I don't --
17                 MR. TOSCA:  -- there is no
18          foundation to that question.
19          A      I don't know even what you're
20   talking about.  So if you're referencing
21   something that I said on my website I
22   would suggest you show it to me or I'm
23   going to say I have no idea what you're
24   talking about.  It's completely
25   disjointed to ask the question that way.
```

92

2       Q     Counsel, did you appear in 32

3 cases each year when you were a

4 legislator?

5       A    I don't know.  I've answered

6 that question already.

7       Q    Did you file 32 notices of

8 appearance in court last year?

9           MR. TOSCA:  Objection.

10     A    Last year?  Way more than

11 that.

12     Q    What about in 2017?

13     A    Mr. Morris, I represent

14 municipal clients, there could be days

15 when I go in to a municipal Justice Court

16 and handle 80 cases.  So if you're

17 questioning whether or not I've handled

18 thousands of cases, you can take my

19 municipal clients alone where I have put

20 in notices -- represented the municipal

21 client on the record in separate criminal

22 proceedings in their local Justice Court

23 and come up with far in excess of that

24 total because it ranges from just a few

25 cases I may go in on to many, many cases.

*Rich Moffett Court Reporting, Inc.*

1                                        93

2          Q      In your capacity as attorney,

3    not as village attorney of Babylon or

4    Lindenhurst or any other village, have

5    you handled over 32 cases a year?

6               MR. TOSCA:  Objection.

7          A     Cases meaning -- I don't know

8    the answer.  Every year I don't know the

9    answer to that.

10         Q     Counsel, in your capacity as

11   attorney and not as village attorney,

12   have you filed 32 notices of appears in

13   2018?

14         A     I don't know.

15         Q     In your capacity as attorney

16   and not as village attorney, have you

17   filed 32 notices of appearance in 2017?

18         A     I don't know.

19         Q     Do you know how many notices

20   of appearance you filed in your capacity

21   as attorney but not as a village attorney

22   in the past decade?

23         A     I don't know how many I filed

24   in the last month.

25         Q     Is it more or less --

1                                                      94

2          A        Because I have a busy

3     practice, Mr. Morris.  I'm in court

4     regularly.  You see me there from time to

5     time and I run from Village Justice Court

6     to the appellate division and it could

7     be, you know, in two different Justice

8     Courts and the appellate term twice in a

9     month.  So it's just I have a very varied

10    practice and I am in court, be it

11    landlord-tenant court, District Court,

12    Supreme Court, Justice Court, you know,

13    with significant regularity.

14         Q        The name of your firm is

15    Gerard Glass and Associates, who works

16    for you aside from yourself?

17         A        Staff.

18         Q        Who are those staff?

19         A        I have Stacey Baltrusitis, I

20    have Maureen Impagaliazzo and I have

21    typically interns that work for me and

22    college students, law students, college

23    students that vary from time to time.

24         Q        Is there an associate

25    attorney that works for your office?

```
 1                                      95
 2        A       There is not.
 3        Q       Is there anyone to whom you
 4   attribute the title associate that works
 5   in Gerard Glass and Associates?
 6        A       At the moment, no.
 7        Q       Has there ever been somebody
 8   with the title of associate working at
 9   Gerard Glass and Associates?
10        A       No, but I do use, you know,
11   per diem attorneys to assist me with the
12   volume of work that I have.
13        Q       Are you reviewed by
14   Martindale-Hubbell?
15        A       I believe I am.
16        Q       Can you explain to me how
17   that process works?
18        A       It's peer rated review.
19        Q       Can you explain to me how you
20   were reviewed by Martindale-Hubbell,
21   please?
22        A       I don't know, you'd have to
23   ask Martindale-Hubbell.
24        Q       Did you pay any sums of money
25   to Martindale-Hubbell?
```

```
 1                                    96
 2        A      I did not.
 3        Q      The 1987 Water Protection
 4   Act, is that the act which you mentioned
 5   earlier?
 6        A      Yes.
 7        Q      Could you explain your role
 8   in authorship in that 1987 Water
 9   Protection Act, please?
10        A      I assisted in authoring the
11   legislation.
12        Q      What did you do?
13        A      I assisted in authoring the
14   legislation.
15        Q      What was your role in
16   authorship in that legislation?
17        A      I took a pen and a piece of
18   paper and I had some ideas and I worked
19   with others and wrote the law.
20        Q      When you say you wrote the
21   law, could you explain the process in
22   which you took the pen and piece of paper
23   and what you did with the product of that
24   result?
25        A      I just did.
```

97

2      Q      You said you were part of
3  civil litigation, that you do civil
4  litigation, can you explain what you mean
5  by that?
6      A      Disputes before arbitrators
7  and courts in the State of New York.
8      Q      Is that exclusive of personal
9  injury claims?
10     A      No, I don't do personal
11  injury work to any great degree.  I do --
12  it does include personal injury because I
13  do some personal injury defense or
14  uninsured clients.
15     Q      Have you ever tried a
16  personal injury case to a jury verdict?
17     A      Yes.
18     Q      How many?
19     A      I don't know the answer to
20  that.
21     Q      In your capacity as attorney
22  of Gerard Glass and Associates what kind
23  of services do you provide to your
24  clients?
25     A      The services that are

98

1

2     described on my website that's before

3     you.   It's a general practice.

4          Q      What is the

5     "state-of-the-art" technology your firm

6     employs?

7          A      Well, we have the same

8     research capabilities as a large firm,

9     for 1, for 2, we are electronically as

10    current as one would want their law firm

11    to be.

12         Q      Anything else?

13         A      That's what comes to mind

14    immediately.

15         Q      When you say research, what

16    is the service that you use for that

17    research?

18              MR. TOSCA:   Objection.   You

19         can answer.

20         A      Westlaw among others.

21         Q      What are those others?

22         A      I don't know the names, but

23    we have other, you know, subscription

24    type research aids that we use from time

25    to time.

99

2      Q       When you say electronically
3  as current as one would want, to what are
4  you referring aside from Westlaw?
5      A       Computer-related issues,
6  Internet, things of that nature.
7      Q       Can you explain what you mean
8  by computer-related issues?
9      A       Well, I dealt recently with
10 an attorney that didn't accept e-mail.
11     Q       I'm sorry, when you say as
12 current as one would want, are you
13 referring to having electronic mail?
14     A       As one of many -- I would say
15 we are electronically current.
16     Q       Aside from electronic mail,
17 can you explain what you mean when you
18 say electronically current?
19              MR. TOSCA:  Objection.
20     A       I think it speaks for itself.
21     Q       Is there anything aside from
22 Westlaw and electronic mail that provides
23 your firm with "state-of-the-art"
24 technology?
25              MR. TOSCA:  Objection.

100

A       Yes, there are other -- it's not what I do, but I know that my staff does and they have other software that I believe that they subscribe to and purchase, that is what the reference is to.

Q       What software is that?

A       I don't know --

MR. TOSCA:  Objection.  I'm going to Counsel the --

MR. MORRIS:  I'm going to move on.

MR. TOSCA:  I'm objecting.

Q       Counsel, are you aware that on May 10, 2018 the Village of Babylon building inspector Stephen Fellman sent a letter to John Lepper?

A       I'm not aware of the date.

Q       Are you aware that such a letter was sent to John Lepper?

A       I'm aware that he sent him some letter.

Q       Are you aware that a May 10, 2018 letter sent by the Village of

1                          327

2    attorney, are you aware of any efforts

3    made through its elected official,

4    appointed officials or employees, to

5    preserve, maintain the human, civil and

6    constitutional rights of the Lepper

7    family?

8              MR. TOSCA:  Objection.  If

9         you want to answer you can answer.

10        A    Am I aware of any --

11             MR. MORRIS:  Counsel, are you

12        stating something on the record?

13        It sounded like you were speaking

14        to your client.

15        A    He said you can answer it.

16             Am I aware of any --

17             THE WITNESS:  Could you

18        repeat it, I'm so sorry to do this

19        to you.

20             (The reporter repeated the

21         requested portion of the record.)

22             MR. TOSCA:  Objection to

23        form.

24        A    Specific to the Lepper

25    family?  I don't think the Lepper family

328

1

2    was treated differently than anyone else.

3    In fact, I think that what the village

4    strives to do is apply a uniform and

5    equal approach.  So I don't know that the

6    village has an obligation to go to the

7    Lepper family to explain themselves.  I

8    think the Lepper family has an obligation

9    to show that, like everyone else, they

10   will comply with the law, that's why the

11   summons were issued.  Because they are

12   looking to be treated differently than

13   everyone else.

14              MR. MORRIS:  It's 3:31 let's

15        go off the record.

16              (Discussion off the record.)

17              MR. MORRIS:  It's 3:43, we

18        are back on the record.

19        Q     Counsel, we went through a

20   significant amount of your background as

21   an attorney.  Who is R-A-U?

22        A     That's my niece.  She's also

23   an attorney.

24        Q     Are you currently Gerard

25   Glass and Associates?

*Rich Moffett Court Reporting, Inc.*

```
1                                      329
2        A       I am.
3        Q       What is Glass and R-A-U?
4        A       It's a separate firm.
5        Q       When did you become part of
6   that firm?
7        A       I'm not part of that firm.
8        Q       Who is the Glass in Glass
9   and --
10        A       The Glass that I was partners
11   with up until a year and three quarters
12   ago, a year and a half ago.
13        Q       Is that --
14        A       Maureen Glass.
15        Q       Maureen Glass?
16        A       Yes.
17        Q       What is the first name of
18   R-A-U the attorney?
19        A       Kelly.
20        Q       What is Kelly R-A-U, Rau, her
21   relationship with Ms. Maureen Glass?
22        A       She's her daughter.
23        Q       Is Glass and Glass dissolved
24   now?
25        A       Yes.
```

```
 1                                  330
 2          Q     Is it fair to say that Glass
 3    and Glass was dissolved Glass and Rau
 4    R-A-U was formed?
 5          A     Yes.  And Gerard Glass and
 6    Associates was formed.
 7                MR. TOSCA:  You don't hear
 8          too many mother/daughter firms.
 9          That's wonderful.
10                MR. MORRIS:  We are just
11          going to reserve the right to
12          recall this witness in light of the
13          enormous amount of court rulings
14          that we are seeking, both parties.
15                Mr. Glass, you are excused.
16          I just ask that we stay on the
17          record for other matters of which
18          of course you can stay.
19                THE WITNESS:  Do you want me
20          to see if I can raise Steve
21          Fellman?
22                MR. TOSCA:  Yes, please.
23                MR. MORRIS:  Counsel, in
24          light of today, we did make a
25          reservation to recall this witness
```

# EXHIBIT "K"

1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------x
JOHN LEPPER and NOELLE LEPPER, individually

and as parents and natural guardians of

their infant children, B.J.L and B.I.,

                    Plaintiffs,

        - against -

VILLAGE OF BABYLON; and, RALPH SCORDINO,

Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of

Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; DEBORAH LONGO, Planning

Board, Village of Babylon, each individually

and in their official capacity, and John

and/or Jane Doe, unnamed, unidentified

complainants,
                    Defendants.
Index No.:  2:18-cv-07011 JFB-GRB
--------------------------------------------x

                        400 Carleton Avenue
                        Central Islip, New York
STEPHEN FELLMAN
                        September 4, 2019
                        10:43 a.m.
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

5

1

2              MR. MORRIS:  Time is 10:16.

3   S T E P H E N   F E L L M A N, called as a

4        witness, having been duly sworn by a

5        Notary Public, was examined and

6        testified as follows:

7   EXAMINATION BY

8   MR. MORRIS:

9        Q.     Please state your full name for

10  the record.

11       A.     Stephen Fellman.

12       Q.     What is your Address?

13       A.     153 West Main Street, Babylon,

14  New York  11702.

15              MR. TOSCA:  Off the record.

16              (Whereupon, a discussion was held

17       off the record.)

18       Q.     Mr. Fellman, do you know how to

19  tell the truth?

20       A.     Do I know how to tell the truth,

21  yes.

22       Q.     You know you're under oath today?

23       A.     Yes.

24       Q.     You have testified under oath,

25  right?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

10

1                    STEPHEN FELLMAN

2        operating.

3                MR. TOSCA:  Okay.

4                Well, I'm objecting to the use of

5        the videotape.  This is not taken by --

6                MR. MORRIS:  Counsel, we've

7        reached --

8                MR. TOSCA:  -- different party,

9        it's not certified.

10               MR. MORRIS:  We reached this

11       issue a long time ago.

12               Do you have any other objection?

13       If so, let's have the witness step out

14       of the room.  You can make your

15       objections on the record.

16               MR. TOSCA:  I just made my

17       objection.

18               MR. MORRIS:  Anything else?

19               MR. TOSCA:  No.

20       Q.      Mr. Fellman, what is your date of

21    birth?

22       A.      XX/XX/1957.

23               MR. TOSCA:  Only the last four,

24       please.

25       Q.      Did you ever hold a veterinary

John Lepper v. Village of Babylon
Fellman, Stephen – September 4, 2019

11

1                    STEPHEN FELLMAN

2    license?

3              MR. TOSCA:  Objection.

4        A.    No.

5        Q.    Anyone with your name hold a

6    veterinarian license to your knowledge?

7              MR. TOSCA:  Objection.

8              MR. MORRIS:  Ask the question

9        first, please.

10       A.    I have no idea.

11       Q.    Aside from the license to

12   practice architecture in New York and in

13   Massachusetts, do you have any other

14   professional license we didn't discuss?

15             MR. TOSCA:  Objection to the

16       form.

17             You can answer over objection.

18       A.    No.

19       Q.    Are a high school graduate?

20       A.    Yes.

21       Q.    When did you graduate from high

22   school?

23       A.    1975.

24       Q.    From what high school did you

25   graduate?

Realtime Reporting Inc.  800-373-7172   realtimereporting.com

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

18

1                    STEPHEN FELLMAN
2    my summer vacations.
3         Q.    At some point did you do anything
4    other than blueprinting for your father's
5    architecture firm?
6         A.    Yes.
7         Q.    What did you do?
8         A.    Became the draftsman and helped
9    draw the drawings that were drawn by hand back
10   then.
11        Q.    How long did you do that for?
12        A.    Until he passed away.
13        Q.    How long was that?
14        A.    Twenty-five years ago.
15        Q.    Do you remember the year that you
16   first started working for your father?
17              MR. TOSCA:  Objection.
18              Asked and answered.
19        A.    Again, when I was in sixth grade.
20        Q.    Do you know what year that was?
21        A.    I have to do the math.
22        Q.    Take a minute.
23        A.    I was like 13 years old.
24        Q.    Was your father your boss at that
25   time?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

19

```
1                STEPHEN FELLMAN
2       A.      Yes.
3       Q.      Was anyone responsible for your
4  employment other than your father when you
5  were 13 years old?
6       A.      No.
7       Q.      What responsibilities did you
8  have for your father aside from blueprinting
9  and draftsman?
10      A.      Cleaning up the office and
11 keeping everything neat, helping put together
12 sets of plans and book specifications.
13      Q.      When you say plans and book
14 specifications, blueprinting, for whom did you
15 do these services?
16      A.      For my father.
17      Q.      Your father did those services
18 for himself or somebody else?
19      A.      It was his own firm.
20      Q.      Were those blueprints expected to
21 be used in structural designs by third
22 parties?
23      A.      Yes.
24      Q.      Were those drawings expected to
25 be used by third parties?
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

20

1                    STEPHEN FELLMAN
2        A.    Yes.
3        Q.    Were those third parties paying
4   your father for the services that you
5   rendered?
6        A.    Yes.
7        Q.    Were you licensed when you worked
8   for your father?
9        A.    Not at 13.  I was after 1983.
10       Q.    When you say after 1983, so you
11  had worked for your father since you were 13,
12  correct?
13       A.    Correct.
14       Q.    You were not licensed until you
15  were, until 1983, correct?
16       A.    Correct.
17       Q.    At what time did you work for
18  your father when you were 13 years old?
19       A.    I don't understand the question.
20       Q.    Sure.
21             Seven days a week, 24 hours a
22  day; what times did you work for your father
23  when you were 13?
24       A.    During the summer when school was
25  out, typically three days a week.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

21

1                    STEPHEN FELLMAN

2        Q.     Which three days?

3        A.     I don't know, they were different

4   weekly.

5        Q.     At some point did your working

6   hours change?

7        A.     I went in whenever I wanted to go

8   in type of thing.

9        Q.     By whom are you employed at the

10  present time?

11       A.     Village of Babylon.

12       Q.     Anybody else?

13       A.     Village of Farmingdale.

14       Q.     Anybody else?

15       A.     Village of Roslyn Harbor.

16       Q.     Anybody else?

17       A.     That's it.

18       Q.     Prior to your employment with

19  those three villages, did you maintain any

20  other employment?

21       A.     I have an architectural firm.

22       Q.     Do you still have an

23  architectural firm?

24       A.     Yes.

25       Q.     Are you employed by that

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

24

1                    STEPHEN FELLMAN

2        A.      Roslyn Estates.

3        Q.      Roslyn Estates.

4                Anything else you do for work

5   paid or unpaid?

6        A.      No.

7        Q.      Prior to this employment that you

8   just mentioned here, were you employed by

9   anyone else?

10               MR. TOSCA:   Objection.

11               At what point in time?

12       Q.      Do you understand the question?

13       A.      No, because, you know --

14               I'm employed by clients, if

15   that's what you mean.

16       Q.      Okay.

17               When you say employed by clients,

18   that's part of your architectural firm,

19   correct?

20       A.      Yes.   Yes.

21       Q.      From the time you worked with

22   your father, did you have any other jobs at

23   13, what was the next job you had aside from

24   working --

25       A.      I did some bartending during

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

25

```
 1                    STEPHEN FELLMAN
 2    college.
 3         Q.      Where did you bartend?
 4         A.      Place called the Nightclub in
 5    Hicksville.
 6         Q.      Any or jobs aside form working at
 7    the Nightclub in Hicksville?
 8         A.      Bartending in another place.
 9    What the heck was the name of it?  It's a
10    nightclub.  It was another place on 110, I
11    can't remember the name of it now.
12                 I bartended for a year or two.
13         Q.      Aside from bartending at the
14    Nightclub in Hicksville and the other club it
15    seems you mentioned was 110, and working for
16    your father, anything else you have done prior
17    to these seven jobs here you mentioned?
18         A.      No.
19         Q.      You worked for your father's
20    architectural firm until he passed away; is
21    that correct?
22         A.      Correct.
23         Q.      During that time, you bartended
24    as well; is that correct?
25         A.      There were a couple years of
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

26

1                    STEPHEN FELLMAN
2   overlap, maybe three years overlap.
3        Q.    Any other jobs overlap like those
4   bartending jobs for those years?
5        A.    No.
6        Q.    How long have you worked for the
7   Village of Babylon for?
8        A.    I think 26 years, 27.
9        Q.    What position do you maintain at
10  the Village of Babylon?
11       A.    Building inspector.
12       Q.    How long have you maintained that
13  position?
14       A.    The entire time.
15       Q.    Is that a full-time or a
16  part-time position?
17       A.    Part-time.
18       Q.    What are the hours worked?
19       A.    Hours, I work there Tuesday,
20  Wednesday, and Friday 1:00 to 5:00.
21       Q.    How much are you being paid?
22             MR. TOSCA:  Objection.
23             You can answer.
24       A.    $50 an hour.
25       Q.    By whom do you answer at the

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

27

1                    STEPHEN FELLMAN

2    Village of Babylon?

3         A.     Everybody feels like.

4    Specifically the mayor and four trustees.

5         Q.     For Farmingdale, what is the

6    position you maintain at Farmingdale?

7         A.     Superintendent of buildings and

8    grounds.

9         Q.     How long are have you maintained

10   that position?

11        A.     Nine years.

12        Q.     By whom are you employed?

13               MR. TOSCA:   Objection.

14        A.     The Village of Farmingdale.

15        Q.     To who do you answer at the

16   Village of Farmingdale?

17        A.     Same, the mayor and four

18   trustees.

19        Q.     Is that a full-time or part-time

20   position?

21        A.     Part-time.

22        Q.     How much are you being paid?

23        A.     $57 an hour.

24        Q.     How many hour do you work for

25   Farmingdale?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

76

1                    STEPHEN FELLMAN

2              MR. MORRIS:  That's not a proper

3        grounds for objection.

4              MR. TOSCA:  You asked him

5        multiple questions --

6              MR. MORRIS:  Counsel --

7              MR. TOSCA:  -- answer.

8              MR. MORRIS:  This is not your

9        deposition.

10             MR. TOSCA:  That is correct.

11             MR. MORRIS:  If there is any

12       problem, we can go upstairs.

13             MR. TOSCA:  Okay.

14        Q.    Do you understand what a website

15   is?

16        A.    Yes.

17        Q.    Do you go on the internet?

18        A.    Yes.

19        Q.    Do you use internet?

20        A.    Yes.

21        Q.    You understand there's these

22   websites, web pages, right, and people put

23   content on these pages?

24        A.    Yes.

25        Q.    And you have a website?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

77

1              STEPHEN FELLMAN

2      A.    Yes.

3      Q.    Who puts the content on your

4  website?

5      A.    Melissa.

6      Q.    Are you responsible for the

7  content that Melissa posts?

8            MR. TOSCA:  Objection.

9      A.    Yes.

10           MR. TOSCA:  He gave an answer to

11      that question.

12     A.    Are you responsible for the

13  maintenance of that website?

14           MR. TOSCA:  Objection.

15           You can answer.

16     A.    Melissa is responsible, I

17  delegate to her.

18     Q.    What about the website's

19  accessibility, are you responsible for that?

20           MR. TOSCA:  Objection.

21           You can answer over objection.

22     A.    I don't know what you mean by the

23  question.

24     Q.    Sure.

25           Are you familiar with the

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

78

1              STEPHEN FELLMAN
2    Americans with Disabilities Act?
3         A.    Yes.
4         Q.    Are familiar that compliance is
5    required in certain buildings for the
6    Americans with Disabilities Act?
7         A.    Yes.
8         Q.    Are you familiar that there's
9    compliance to be had on the internet for
10   websites pursuant to the Americans with
11   Disabilities Act?
12              MR. TOSCA:  Objection.
13              You can answer.
14        A.    Okay.
15        Q.    Are you familiar?
16        A.    Not that familiar.
17        Q.    Are you responsible for
18   maintaining the compliance with the Americans
19   with Disabilities Act?
20        A.    Yes.
21              MR. TOSCA:  Objection.
22   RL   Q.    The same thing for your building,
23   you're responsible for maintaining
24   your building's --
25              MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

79

1              STEPHEN FELLMAN

2                MR. MORRIS:  Counsel, are you

3        confused about this process at all?

4                MR. TOSCA:  I'm confused by your

5        question.  I'm not confused by the

6        process --

7                MR. MORRIS:  This is my

8        deposition.

9                MR. TOSCA:  -- I know the

10       process.

11               MR. MORRIS:  This is my

12       deposition --

13               MR. TOSCA:  I've asked --

14               MR. MORRIS:  Counsel, stop and if

15       you can't, we'll go --

16               MR. TOSCA:  I will not stop.

17               MR. MORRIS:  I'm going to ask

18       that you remove yourself, please.  We're

19       going to have to call the court.

20               (Witness leaves the room.)

21               We're staying on the record,

22       please.

23               (A phone call was placed to Judge

24       Brown's chambers.)

25               LAW CLERK:  Good morning, Judge

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

80

1                  STEPHEN FELLMAN

2        Brown's chambers.

3              MR. MORRIS:  This is attorney

4        Cory Morris.  I'm conducting a

5        deposition in the matter of Lepper

6        versus Village of Babylon.  We are on

7        the record, we are in the courthouse.

8              I'm having an issue here where

9        counsel keeps on interjecting, telling

10       the witness not to answer questions

11       without asserting privilege.  I've

12       instructed the witness to leave.  I'm

13       making this call now to either seek a

14       ruling or seek the supervision of the

15       Court in conducting the rest of this

16       deposition, please.

17             LAW CLERK:  Do we have both

18       counsel on the line?

19             MR. TOSCA:  I am here, yes.

20             MR. MORRIS:  Eric Tosca is here,

21       yes.

22             LAW CLERK:  Just to hear, what is

23       the objection, if it's a non-privilege

24       objection, is there a badgering issue?

25             MR. TOSCA:  There is both a

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

81

1          STEPHEN FELLMAN

2     badgering issue and the question is

3     palpably improper.

4          The question was, and we're far

5     afield of the issues in this case, but

6     the witness, Mr. Fellman is being

7     questioned, one, about a website whether

8     it complies with the Americans with

9     Disabilities Act, so that really is

10    badgering because it bears absolutely no

11    relation to this case, number 1, so the

12    form of, the question is palpably

13    improper in the first place.

14         The second place though, he then

15    asked are you responsible for your

16    building's compliance with the Americans

17    for Disability Act.  The witness has

18    already testified that he rents, or that

19    his business rents an office in a

20    building, so I ask what building are you

21    talking about and that's when Mr. Morris

22    kind of flew off the handle.  What

23    building is he talking about, the

24    question is so improper in form and

25    substance that regardless of the

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

82

STEPHEN FELLMAN

1

2      privilege, it boggles my mind as to what

3      the question means, so he can't ask the

4      palpably improper question and he can't

5      repeat questions when he's already given

6      an answer, so that is badgering the

7      witness, and the question is so improper

8      in form that I believe it should be

9      stricken.

10          MR. MORRIS:  This is --

11          LAW CLERK:  Mr. Morris, I'll see

12     if I can grab the judge.  I want to let

13     you know, the judge is busy with a

14     settlement conference this afternoon.

15     I'm not sure he's going to have time to

16     resolve this.  So this may be something

17     you can work out on your own.  Again, if

18     the settlement conference takes long, he

19     may not have much time to come out here

20     and hear any of this.

21          Mr. Morris, is this something you

22     can move on from and make a note on the

23     record and circle back to later.

24          MR. MORRIS:  Let me first, I've

25     tried to do that and counsel continues

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

83

1                STEPHEN FELLMAN

2       to speak, literally to the point where I

3       said, we could swear him in and he can

4       start giving testimony if he'd like to

5       do that.  I asked if he put content on a

6       website to which there was many speaking

7       objections.  There's no assertion of

8       privilege.

9            I'm at the point where to

10      continue this deposition, I might as

11      well swear in counsel because he

12      continues to testify.  I'm trying to get

13      through the deposition.  If counsel will

14      limit objection to just that.  He's

15      instructing the witness not to answer

16      without giving the grounds therefore.

17      If we can put that on the record, as

18      inappropriate as it may be, I can move

19      on here.

20            MR. TOSCA:  Despite -- May I

21      speak, I'm sorry.

22            LAW CLERK:  My position is, that

23      may be the best course of action to take

24      at this point.

25            Just so I'm clear, I believe you

John Lepper v. Village of Babylon
Fellman, Stephen – September 4, 2019

84

1           STEPHEN FELLMAN

2     actually have a conference with Judge

3     Brown this afternoon, correct?

4           MR. MORRIS:  We do.

5           LAW CLERK:  Okay.

6           I believe seeing if you can have

7     objections put on the record and try to

8     continue as best you can, I'll see if I

9     can get Judge Brown, but I don't believe

10    he going to be able to handle this

11    morning, it may be able to be raised

12    this afternoon, if it's something you

13    cannot take care of at the deposition.

14          MR. TOSCA:  May I be heard for

15    just one moment?  This is Eric Tosca on

16    behalf of defendant.

17          Despite Mr. Morris' unfounded

18    accusations regarding my objections,

19    when Mr. Morris asked me what my

20    objection was, I told him and then he

21    calls it a speaking objection.  He's

22    asked me, so that's why I told him,

23    that's 1.

24          Two is, I have objection, I've

25    let the client answer.  We have gotten

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

85

1           STEPHEN FELLMAN

2      to a point where this questioning now

3      has become harassment and not legitimate

4      questions concerning the issues in this

5      case, that's number 1.

6           Number 2 though is, the question

7      is palpably improper in its form.  I

8      don't believe that that's something that

9      witness would have to answer, and that

10     is why I directed the witness not to

11     answer the last question that was asked.

12          Since it's unfounded, a question

13     based on unfounded information.

14          LAW CLERK:  Okay.  Hold on one

15     moment, let me put you on a brief hold.

16     I'll see if the judge is available.

17     Again, I'm not sure if I can get him.

18          Hello, folks.

19          MR. TOSCA:  Good morning, your

20     Honor.

21          LAW CLERK:  This is Dan, the

22     judge's law clerk.  I'm sorry, the judge

23     is unavailable at the moment, he's still

24     out in the courtroom and it looks like

25     he's going to be for the foreseeable

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

86

1                  STEPHEN FELLMAN

2      future.  Since you both have a

3      conference with him this afternoon, I

4      think you -- I'll remind you under local

5      rules, counsel has to be cooperative for

6      discovery including depositions.  I

7      understand that you have to advocate for

8      your client, but this is something

9      you'll have do try to move on or try to

10     note the objections on the record, and

11     if something does persist and there are

12     issues, you can raise them with the

13     judge this afternoon at the conference.

14          MR. MORRIS:  Absolutely.

15          This is Cory Morris for the

16     plaintiff.

17          I'm fine with that as long as

18     counsel will note his objection which he

19     is doing, as long as there is no

20     speaking objection that follows or long

21     diatribe, and if he's got a basis for

22     stating why the witness should not

23     answer, I ask that he do that.  Provided

24     those things occur, I think we can move

25     on here.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

87

1          STEPHEN FELLMAN

2          MR. TOSCA:  If I may, counsel for

3     the defendants, the questions that are

4     being asked are, at least, at the time

5     we objected are improper form and can't

6     be answered in the form that counsel is

7     putting the questions.

8          To the extent that this question

9     is palpably improper, I'm going to

10    object.  To the extent that the

11    Mr. Morris is asking me what my

12    objection is, I believe I should be

13    speaking, how else am I going to answer

14    his question.

15          MR. MORRIS:  The

16    mischaracterization is clear here.  When

17    he says not to answer, I ask what's the

18    basis, and then a long diatribe as

19    opposed to privilege comes from defense

20    counsel's mouth.  I'm asking that he

21    limit it to the basis so we can move on

22    here.

23          MR. TOSCA:  The basis is whatever

24    I --

25          LAW CLERK:  Counsel --

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

88

1              STEPHEN FELLMAN

2         MR. TOSCA:  -- to say a long

3    diatribe is --

4         LAW CLERK:  -- your positions on

5    the objection, I think you will be able

6    to work through this and find sort of a

7    solution.  I understand it's a difficult

8    deposition, but it sounds like you both

9    have the idea as to what needs to be

10   done in order to get through this

11   deposition and raise any additional

12   objections with the judge this

13   afternoon.

14        MR. MORRIS:  Understood.  I will

15   do my best as plaintiff's counsel to get

16   through this as long as there is no

17   long-winded objections that go beyond

18   the basis of privilege or something

19   else, I think we can do that.

20            I'll get started now and thank

21   you for your time.

22        MR. TOSCA:  We'll take up what we

23   need to with his Honor this afternoon.

24            (Phone call ended.)

25        MR. MORRIS:  Do you need to speak

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

89

1                    STEPHEN FELLMAN

2       to your witness or do you want to call

3       him back in?

4              MR. TOSCA:  I don't know.

5              What are we doing with the last

6       question, are you reforming the

7       question.

8              MR. MORRIS:  She doesn't have it,

9       so do you want to bring him back in or

10      not?

11             MR. TOSCA:  I don't know what --

12             MR. MORRIS:  I'm going to ask

13      another question.  Please bring him back

14      in.

15             MR. TOSCA:  You're going with

16      another question, okay.

17             MR. MORRIS:  It's 11:36.

18             MR. TOSCA:  Excuse me for a

19      minute.

20             (The witness enters the room.)

21             MR. MORRIS:  11:36.

22             MR. TOSCA:  He's going to the

23      restroom.

24             MR. MORRIS:  Are you asking for a

25      break?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

93

                    STEPHEN FELLMAN

1
2       Q.      Is that the website to which we
3  have been discussing earlier?
4       A.      I guess.
5       Q.      Is there another website or is
6  this the only one?
7       A.      All I'm aware of.  I'm only aware
8  we have a Google listing.
9               Years back, they were toying
10 around with trying to create a website, I
11 didn't really -- it's not something we put a
12 lot of energy into.
13      Q.      When you say "we," to whom are
14 you referring?
15      A.      Staff and myself.
16      Q.      Do you agree that quote, we are
17 the proud achievers of many national, state
18 and local awards, and have designed more than
19 12,000 original plans, end quote?
20      A.      Yes.
21      Q.      What are the many national awards
22 that you have received?
23      A.      The entity since the beginning
24 with my father, they received national awards
25 for swimming pool designs for the Town of

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

94

1                    STEPHEN FELLMAN
2   Babylon, and we received awards for several
3   McDonalds that we've done like New Hyde Park,
4   Mattituck.  We received awards for helping
5   Town of Babylon with some pro bono stuff.
6           Q.     Those are all national awards?
7           A.     Awards to us.
8           Q.     Do you understand what I mean
9   when I say "national"?
10          A.     What do you mean by that?
11          Q.     National award, a nationwide
12  award, not awarded by, for instance, a
13  township or a village.  Babylon is a township,
14  correct?
15                 MR. TOSCA:  Objection.
16                 You can answer.
17          A.     Well, any awards we received
18  would be from within the state of New York.
19          Q.     Can you name one national award
20  that you received in your capacity as employee
21  or otherwise for SRF, P.C.?
22                 MR. TOSCA:  Objection to the
23      form.
24                 You can answer.
25          A.     There's no national award for

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

95

1                   STEPHEN FELLMAN

2      that entity.

3           Q.     Are you aware that the website

4      says quote, we are the proud achievers of many

5      national, state, and local awards, end quote?

6           A.     Yes, going from the origin of the

7      architectural center.

8           Q.     The origin of that architectural

9      center, what national award has the

10     architectural center received?

11          A.     They received a national award

12     for swimming pool design from the Town of

13     Babylon?

14          Q.     By whom?

15          A.     Something out the Washington, I

16     forget.

17          Q.     This SRF Architect, P.C., is this

18     in addition to Stephen Fellman, the

19     professional corporation that you mentioned?

20               MR. TOSCA:  Objection.

21               You can answer.

22          A.     That's the second.  The first one

23     was Stephen Ray Fellman Architect.  SRF is the

24     current.

25          Q.     SRF is the current?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

154

1               STEPHEN FELLMAN

2          You can answer.

3     A.    I don't know.  I know I can under

4  them, under the zoning code.

5     Q.    The answer is you don't know?

6     A.    That's my answer.

7     Q.    In the course of your regular

8  professional activities as Village of Babylon

9  building inspector, are you responsible for

10  enforcing the Village of Babylon code?

11     A.    Yes.

12     Q.    Are you a peace officer as

13  defined in the State of New York?

14          MR. TOSCA:  Objection.

15     A.    No.

16     Q.    Do you carry a weapon throughout

17  the course of your regular activities --

18     A.    No.

19     Q.    -- as Village of Babylon building

20  inspector?

21     A.    No.

22          MR. TOSCA:  Let him finish.

23     A.    No guns.

24     Q.    Are you licensed to carry a

25  weapon?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

155

1                  STEPHEN FELLMAN

2          A.    No.

3          Q.    Do you operate a vehicle owned by

4    the Village of Babylon?

5          A.    No.

6          Q.    Do you operate a vehicle at any

7    time owned by the Village of Farmingdale?

8          A.    No.

9          Q.    Do you operate a vehicle any time

10   owned by Roslyn Harbor?

11         A.    No.

12         Q.    Do you operate a vehicle owned by

13   SFR, P.C.?

14         A.    No.

15         Q.    Do you operate a vehicle at any

16   time owned by Lake Success?

17         A.    No.

18         Q.    Have you operated a vehicle at

19   any time owned by Roslyn Estates?

20         A.    No.

21         Q.    Have you ever operated a vehicle

22   owned by a public entity?

23         A.    No.

24         Q.    In the course of your regular

25   professional activities as Village of Babylon

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

185

| | | |
|---|---|---|
| 1 | | STEPHEN FELLMAN |
| 2 | A. | No, I don't know. |
| 3 | Q. | Did all the buildings you |

4   designed as a registered architect comply with
5   the provisions of the Fair Housing Act?
6                 MR. TOSCA:  Objection.
7                 You can answer.
8          A.      I believe we did.
9          Q.      Have you designed any buildings
10   since 2008?
11          A.      Yes.
12          Q.      Do all the buildings you designed
13   since 2008 comply with the provisions and
14   regulations under the Fair Housing Act?
15          A.      I believe so.
16          Q.      Who is ultimately responsible
17   with whether they comply with the Fair Housing
18   Act?
19          A.      Ultimately the drawings, so I'm
20   responsible.
21          Q.      Have you ever been known by any
22   other name?
23          A.      No.
24          Q.      Do you recognize the name
25   Patricia Maroni (phonetic) Fellman?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

186

1              STEPHEN FELLMAN

2       A.    Yes.

3       Q.    Who is that person?

4       A.    My wife.

5       Q.    Do you recognize the name

6  Patricia J. Fellman?

7       A.    My ex-wife.

8       Q.    Do you recognize the name

9  Patricia A. Fellman?

10      A.    That's my ex-wife.  I don't know

11  who J is.

12      Q.    Do you recognize the name Mark O.

13  Fellman?

14      A.    Mark O. Fellman?

15            I have the brother Mark Fellman.

16      Q.    Is your brother 68 years old,

17  approximately?

18      A.    Yes.

19      Q.    Do you recognize the name Denise

20  Ann Fellman?

21      A.    Yes.

22      Q.    Who is that?

23      A.    My evil stepmother.

24      Q.    Do you recognize the name

25  Ashley G. Fellman?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

187

1                    STEPHEN FELLMAN

2        A.      Ashley, that's my daughter.

3        Q.      Aside from the three electronic

4    mail addresses that you testified to earlier,

5    do you have any additional electronic mail

6    addresses?

7                MR. TOSCA:  Objection.

8                You can answer.

9        A.      Just the office mail at

10   Srfaia.com.

11       Q.      Do you have any other electronic

12   mail addresses or mediums to which you accept

13   electronic messages aside from those four

14   electronic mail addresses?

15       A.      Texts on my phone.

16       Q.      Do you utilize text on your phone

17   in your duties as Village of Babylon building

18   inspector?

19       A.      Yes.

20       Q.      Do you utilize texting on your

21   phone within your duties by the Village of

22   Farmingdale?

23       A.      Yes.

24       Q.      Do you utilize texting on your

25   phone within your ordinary duties through your

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

191

1                    STEPHEN FELLMAN
2     the subject of this litigation?
3              MR. TOSCA:  Objection.
4              You can answer.
5         A.    The attorneys that are here
6     and -- Debbie Longo.
7         Q.    Anyone else?
8         A.    I think that's it.
9         Q.    Have you deleted or destroyed any
10    e-mails since this litigation has commenced?
11        A.    No.
12        Q.    Do you reside at 3 True Harbor
13    Way, West Islip, New York 11795-5147?
14        A.    Yes.
15        Q.    Have you resided there
16    continuously since February 1, 2003 to today?
17        A.    I have been there for 16 years.
18        Q.    Do you receive mail at that
19    address from the United States Post Office?
20        A.    Yes.
21        Q.    There is a telephone number at
22    that address (631)669-1894.
23        A.    We don't use it.
24        Q.    Is that the telephone number at
25    that address?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

192

1              STEPHEN FELLMAN

2        A.     That was the phone number, we

3   disconnected the phone, we never use it.

4        Q.     Do you know that there are

5   19 registered sex offenders nearby?

6              MR. TOSCA:  Objection.

7        A.     No.

8        Q.     In the course of your regular

9   professional activities as the building

10  inspector for the Village of Roslyn, are you

11  aware of Title 8 of the Civil Rights Act?

12       A.     Ask that question again.

13       Q.     In the course of your

14  professional activities as the building

15  inspector for the Village of Roslyn, are you

16  aware of Title 8 of the Civil Rights Act?

17       A.     I'm aware of it.

18       Q.     In your work as a registered

19  architect, did you incorporate Title 8 of the

20  Fair Housing Act into your building designs?

21       A.     Yes.

22       Q.     Did there come a time, aside from

23  when we spoke, when you were prosecuted for

24  failure to exert the Fair Housing Provisions

25  in structures that you designed?

EXHIBIT "L"

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
JOHN LEPPER and NOELLE LEPPER, individually

and as parents and natural guardians of

their infant children, B.J.L and B.I.,

                             Plaintiffs,
       - against -

VILLAGE OF BABYLON; and, RALPH SCORDINO, mayor,

KEVIN MULDOWNEY, deputy mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of

Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; DEBORAH LONGO, Planning

Board, Village of Babylon, each individually

and in their official capacity, and John

and/or Jane Doe, unnamed, unidentified

complainants,
                           Defendants.

Index No.:  2:18-cv-07011 JFB-GRB
-------------------------------------------x

                    135 Pinelawn Road
                    Melville, New York
RALPH A. SCORDINO
                    December 5, 2019
                    10:11 a.m.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

2

1

2          Examination Before Trial of a

3   Defendant, RALPH A. SCORDINO, pursuant to

4   Subpoena, before Stephanie O'Keeffe, a Notary

5   Public of the State of New York.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

3

A P P E A R A N C E S :

    CORY H. MORRIS, ESQ.

    Attorney for Plaintiff

        33 Walt Whitman Road, Suite 310

        Dix Hills, New York 11746

    Coryhmorris@gmail.com

    631-450-2515


    KELLY, RODE & KELLY, LLP

    Attorneys for Defendants

        330 Old Country Road, Suite 305

        Mineola, New York 11501

    BY:  ERIC P. TOSCA, ESQ.

    Eptosca@krklaw.com

    516-739-0400


ALSO PRESENT:

        John Lepper, Plaintiff

        Gerard Glass, Esq., Defendant

        Mary Adams, Defendant

        Shannon E. Fillmore

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

4

1

2              S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED by and

5   between the attorneys for the respective

6   parties herein, that filing, sealing and

7   certification be and the same are hereby

8   waived.

9

10       IT IS FURTHER STIPULATED AND AGREED that

11   all objections, except as to the form of the

12   question shall be reserved to the time of the

13   trial.

14

15       IT IS FURTHER STIPULATED AND AGREED that

16   the within deposition may be signed and sworn

17   to before any officer authorized to administer

18   an oath, with the same force and effect as if

19   signed and sworn to before the Court.

20

21

22

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

5

1

2          MR. MORRIS:  Time is 10:11 a.m.

3  R A L P H   A .   S C O R D I N O, called as a

4       witness, having been duly sworn by a

5       Notary Public, was examined and

6       testified as follows:

7  EXAMINATION BY

8  MR. MORRIS:

9       Q.     Please state your full name for

10  the record.

11       A.     Ralph A. Scordino.

12       Q.     What is your address?

13       A.     89 Washington Street, Babylon

14  Village, New York 11702.

15          MR. TOSCA:  Before we begin, we

16       note our objection to the use of the

17       video camera as we have done before.  We

18       continue with the objection of the way

19       you're conducting the video.

20          MR. MORRIS:  Objection noted.

21       Q.     Mr. Scordino, any reason that you

22  can't tell the truth here today?

23       A.     Absolutely not.

24       Q.     You understand the penalties of

25  perjury, right?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

6

1                         R. SCORDINO

2          A.     I absolutely do.

3          Q.     You understand what happens if

4     you lie under oath?

5          A.     Yes.

6          Q.     Sir, when were you born?

7          A.     XX/XX/1949.

8                 MR. TOSCA:  Please only put the

9          year on the record.

10         Q.     How old are you now?

11         A.     70.

12         Q.     Have you ever been known by any

13    other name?

14         A.     No.

15         Q.     Did you recognize the name

16    Dina M. Vajelatos?

17         A.     I sure do.

18         Q.     How do you know Dina M.

19    Vajelatos?

20         A.     She is my daughter.

21         Q.     How old is she?

22         A.     I believe she is 40, over 40.

23         Q.     Do you interact with Dina M.

24    Vajelatos regularly?

25         A.     Sure.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

7

1                          R. SCORDINO

2          Q.    In any business capacity?

3          A.    No.

4          Q.    What about in your capacity as an

5    elected official?

6          A.    No.

7          Q.    Is Ms. Vajelatos married?

8          A.    Yes.

9          Q.    To whom?

10         A.    Spiro Vajelatos.

11         Q.    When were they married?

12         A.    I guess eight years ago.  I'm not

13   sure of the date.

14         Q.    When did you first meet Spiro

15   Vajelatos?

16         A.    I can't remember that.

17         Q.    Do you interact with Spiro

18   Vajelatos regularly?

19         A.    Yeah, he's my son in law.

20         Q.    Do you interact with him in

21   business?

22         A.    No.

23         Q.    In your capacity as an elected

24   official?

25         A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

8

1                          R. SCORDINO

2        Q.      What about socially?

3        A.      He's my son-in-law.

4        Q.      I take it the answer is yes?

5        A.      Yes.

6        Q.      Have you ever communicated with

7    Dina Vajelatos by electronic mail?

8        A.      No.

9        Q.      Have you ever communicated with

10   Dina Vajelatos through social media?

11       A.      No.

12       Q.      What about by telephone?

13       A.      Yes.

14       Q.      What about by text?

15       A.      No.

16       Q.      Any other means of writing?

17       A.      No.

18       Q.      How about Spiro Vajelatos, have

19   you ever communicated with him by electronic

20   mail?

21       A.      No.

22       Q.      What about through social media?

23       A.      No.

24       Q.      Do you recognize the name

25   Robert M. Scordino?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

```
                                                           9
 1                        R. SCORDINO

 2        A.      Yes.   He's my brother.

 3        Q.      Do you have any other brothers?

 4        A.      No.

 5        Q.      Do you interact with your brother

 6   regularly in business?

 7        A.      No.

 8        Q.      What about in your capacity as an

 9   elected official?

10        A.      No.

11        Q.      What about socially?

12        A.      Very rarely.

13        Q.      Where does your brother live now?

14        A.      Florida.

15        Q.      Where in Florida?

16        A.      Melbourne Beach.

17                MR. TOSCA:   Objection.

18        Q.      Have you ever communicated with

19   Robert M. Scordino by electronic mail?

20        A.      No.

21        Q.      What about through social media?

22        A.      No.

23        Q.      What about by telephone?

24        A.      Yes.

25        Q.      By text?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

10

1                          R. SCORDINO

2          A.      No.

3          Q.      What about by any other means in

4      writing?

5          A.      No.

6          Q.      Do you know who Ralph O. Scordino

7      is?

8          A.      Yes.

9          Q.      Who is Ralph O. Scordino?

10         A.      My father.

11         Q.      Where is your father now?

12         A.      Passed away.

13         Q.      When your father was alive, did

14     you interact with him in your business?

15         A.      No.

16         Q.      What about in your capacity as an

17     elected official?

18         A.      No.

19         Q.      Have you ever communicated with

20     Ralph O. Scordino by electronic mail?

21                 MR. TOSCA:   Objection.

22                 You can answer.

23         A.      He passed away.

24         Q.      In the past, when he was alive,

25     did you use electronic mail with him?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

11

1                    R. SCORDINO

2        A.     No.  No.  No.

3        Q.     You use electronic mail, right?

4        A.     Very rarely.

5        Q.     Did Ralph O. Scordino have a

6    social media account?

7        A.     No.

8        Q.     Do you recognize the name Paul D.

9    Scordino?

10       A.     Yes.

11       Q.     Who is Paul D. Scordino?

12       A.     My son.

13       Q.     How old is your son?

14       A.     36.

15       Q.     He is the union of what marriage?

16       A.     I don't --

17              MR. TOSCA:  Objection.

18       Q.     He the results of what

19   relationship?

20              MR. TOSCA:  Objection.

21       Q.     Who is his mother?

22       A.     Who is my --

23       Q.     Son's mother.

24       A.     Linda Scordino, my wife.

25       Q.     Okay.  That's what I'm asking.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

12

1                    R. SCORDINO

2    I'm not trying to trick you.

3            Do you interact with Paul D.

4    Scordino regularly?

5        A.      Yes.

6        Q.      Do you interact with Paul D.

7    Scordino in business?

8        A.      No.

9        Q.      Did you interact with Paul D.

10   Scordino in your capacity as elected official?

11       A.      No.

12       Q.      Have you ever communicated with

13   Paul D. Scordino by electronic mail?

14       A.      No.

15       Q.      What about through social media?

16       A.      No.

17       Q.      What about by telephone?

18       A.      Yes.

19       Q.      What about by text message?

20       A.      No.

21       Q.      Do you communicate with Paul D.

22   Scordino by any other means of writing?

23       A.      No.

24       Q.      Do you recognize the name

25   Marjorie A. Scordino?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

13

1                        R. SCORDINO

2          A.      Sure.

3          Q.      Who is Marjorie A. Scordino?

4          A.      She's my mother.

5          Q.      Where is your mother now?

6          A.      She passed away.

7          Q.      When your mother was alive, did

8    you interact with your mother in business?

9          A.      No.

10         Q.      What about in your capacity as an

11   elected official?

12         A.      No.

13         Q.      Have you ever communicated with

14   Marjorie A. Scordino by electronic mail?

15         A.      No.

16         Q.      What about social media?

17         A.      No.

18         Q.      By text message?

19         A.      No.

20         Q.      Any other means in writing?

21         A.      No.

22         Q.      You said earlier Linda N.

23   Scordino is your wife?

24         A.      Yes.

25         Q.      How long have you been married

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

14

1                    R. SCORDINO

2    for?

3         A.    Forty-three.  Forty-four.  Let go

4    with forty-four.

5         Q.    Forty-four years?

6         A.    Yes.

7         Q.    Do you have the date on which you

8    were married?

9         A.    August 17, forty years ago.

10        Q.    Is that '79?

11        A.    That's around that time.

12        Q.    Okay.

13              What are the circumstances under

14   which you first met Linda N. Scordino?

15        A.    Repeat that question again.

16              (Whereupon, the record was read

17         by the reporter.)

18              MR. TOSCA:  Objection.

19              You can answer over objection.

20        A.    I guess it was around 1972, we

21   both worked together.  Let's go back even

22   further, elementary school, we both went to

23   the same grammar school, St. Joseph's in

24   Babylon Village.  And then I didn't see her

25   for a while.  She went to West Islip school.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

15

1                      R. SCORDINO

2    I went to Babylon school.  And we ended up

3    being friends at Oquenock Elementary School

4    where she worked, where I worked also, for the

5    West Islip School District.

6          Q.    Do you share any business

7    relationship with Linda N. Scordino?

8          A.    No.

9          Q.    Has she ever worked for the

10   Village of Babylon under you?

11         A.    No.

12         Q.    Do you communicate with Linda N.

13   Scordino by electronic mail?

14         A.    Yes.  Occasionally.

15         Q.    When you say occasionally, how

16   many instances could you recall?

17         A.    If she texts me to pick up coffee

18   or milk on the way home and she calls.

19         Q.    Have you ever communicated with

20   Linda N. Scordino through social media?

21         A.    No.

22         Q.    Have you ever communicated with

23   Linda N. Scordino by any other means in

24   writing?

25         A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

16

1                       R. SCORDINO

2          Q.      Do you recognize the name Jerry

3     Don Moses?

4          A.      No.

5          Q.      Do you recognize the name James

6     Lawrence Manfre?

7          A.      Yes.

8          Q.      Who if James Lawrence Manfre?

9          A.      I believe he lived right across

10    the street from me.

11         Q.      Under what circumstances did you

12    first meet Mr. Manfre?

13         A.      That's too far back.  Neighbors

14    talking to each other back and forth as

15    neighbors going back a number of years.

16         Q.      Do you interact with James

17    Lawrence Manfre regularly?

18         A.      No.

19         Q.      When was that last time you spoke

20    or communicated with Mr. Manfre?

21         A.      Many years ago.

22         Q.      More or less than ten years ago?

23         A.      Pardon me.

24         Q.      More or less that ten years ago?

25         A.      More or less than ten years.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

17

                          R. SCORDINO

1

2    Probably more.

3          Q.    Have you ever communicated by

4    electronic mail --

5          A.    No.

6          Q.    -- with James Lawrence Manfre?

7          A.    No.

8          Q.    What about through social media?

9          A.    No.

10         Q.    Do you know the name Cornelia Ann

11   Downing-Manfre?

12         A.    I believe that was his wife.

13         Q.    When you say his, you're

14   referring to James Laurence Manfre?

15         A.    Yes.

16         Q.    Under what circumstances did you

17   come to know Cornelia Ann Downing-Manfre?

18         A.    As a neighbor.  That's all.

19         Q.    When did you first meet her?

20         A.    A number of years ago.

21         Q.    More than ten years ago?

22         A.    Probably more than that.

23         Q.    When was the last time you spoke

24   with her or communicated with her?

25         A.    Many years ago.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

18

1                    R. SCORDINO

2        Q.      More than ten years ago?

3        A.      More.

4        Q.      Have you ever communicated with

5    Cornelia Ann Downing-Manfre by electronic

6    mail?

7        A.      No.

8        Q.      What about by social media?

9        A.      No.

10       Q.      Have you ever held Tennessee

11   phone number area code 901?

12       A.      No.

13       Q.      Have you ever lived in the state

14   of Tennessee?

15       A.      No.

16       Q.      Have you ever had the phone

17   number (631)669-0058?

18       A.      Yes.

19       Q.      When did you first obtain that

20   telephone number?

21       A.      Fifty years ago.  I don't know.

22       Q.      Is that a home line, landline?

23       A.      Home line.

24       Q.      At what home is that line

25   connected?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

19

1                           R. SCORDINO

2         A.    89 Washington Avenue.

3         Q.    Do you still have that telephone

4    number?

5         A.    Yes, I do.

6         Q.    Have you ever had the phone

7    number (516)587-7226?

8         A.    No.

9         Q.    Have you ever had the telephone

10   number (631)365-9413?

11        A.    9413, I don't recall that number.

12              That other number that you call,

13   7226, is my parents' phone number.

14        Q.    When you say it's your parents'

15   phone number, did you live at the same house

16   as your parents at some point?

17        A.    At some point.

18        Q.    Was that a phone number which you

19   could be reached at some point?

20        A.    Yes.

21        Q.    Do you still have the phone

22   (516)587-7226?

23        A.    No.  I don't believe it was 516.

24        Q.    It was 631?

25        A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

20

1                        R. SCORDINO

2          Q.      When did you have that telephone

3    number?

4          A.      Back when I lived with my

5    parents.

6          Q.      What address?

7          A.      189 -- 152 Cadman Avenue.

8          Q.      Do you still have that telephone

9    number?

10         A.      Me, no.

11         Q.      Have you ever had the phone

12   number (631)365-9413?

13         A.      I don't recall that number.

14         Q.      Have you ever had the telephone

15   number (516)669-6923?

16                 MR. TOSCA:  Objection.

17                 You can answer over objection.

18         A.      I can't recall that number

19   either.

20         Q.      Have you ever had the telephone

21   number (631)583-5195?

22                 MR. TOSCA:  Objection.

23                 You can answer over objection.

24         A.      Yes.

25         Q.      What residence or facility or

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

21

1                         R. SCORDINO

2     property is the that telephone number located?

3          A.      That is my number for my

4     residence during the summer when I'm working

5     at Ocean Beach.

6          Q.      When you say Ocean Beach, are you

7     referring to Fire Island?

8          A.      Yes.

9          Q.      What is that address at the

10    residence at which you work?

11         A.      306 Cottage.

12         Q.      Cottage Road, Drive?

13         A.      Cottage.

14         Q.      That's Fire Island, New York?

15         A.      Yes.

16         Q.      Area code 11770?

17         A.      Yes.

18         Q.      What are you doing when you're

19    working at Fire Island?

20         A.      I'm a director of a day camp.

21         Q.      When did you first obtain the

22    telephone number (631)583-5195?

23         A.      Two years ago.

24         Q.      Do you still have that telephone

25    number?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

22

1                     R. SCORDINO

2        A.      Yes.

3        Q.      Have you had the phone number

4   (516)669-0058?

5                MR. TOSCA:  Objection.

6                You can answer.

7        A.      Same number as before, isn't it?

8   That's my house number.

9        Q.      Have you ever had the telephone

10   number (845)932-5084?

11                MR. TOSCA:  Objection.

12                You can answer.

13        A.      I can't remember that number.  I

14   don't know what that number is.

15        Q.      Have you had a telephone number

16   with an 845 area code?

17                MR. TOSCA:  Objection.

18                You can answer.

19        A.      845, I think that's the upstate

20   number.

21        Q.      When you say upstate number --

22        A.      My second house.  I have a second

23   house up in Sullivan County.

24        Q.      What is the address for the

25   second house?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

23

1                    R. SCORDINO

2              MR. TOSCA:  Objection.

3        A.      Burnas Road, B-U-R-N-A-S,

4   73 Burnas Road.

5        Q.      What county is that home located?

6        A.      In Sullivan County.

7        Q.      Do you have the area code?

8        A.      Area code, I think 845.

9        Q.      Zip code, excuse me?

10       A.      No, I'm not sure.  I think it's

11  12370, I think.  I'm not a hundred percent

12  sure.

13       Q.      So when did you first obtain the

14  (845)932-5084 telephone number?

15       A.      Six years ago.

16       Q.      Do you still have that telephone

17  number?

18       A.      Yes.

19       Q.      Do you work out of that home in

20  Sullivan County?

21       A.      In what capacity?  I'm not clear

22  with the question.

23       Q.      Sure.

24              Do you do any work in Sullivan

25  County?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

24

1                    R. SCORDINO

2        A.    No.

3        Q.    Do you do work remotely from

4    Sullivan County?

5        A.    No.

6        Q.    Have you ever maintained an

7    electronic mail account?

8        A.    No.

9        Q.    You have no e-mail account?

10       A.    For the Village, yes.

11       Q.    I'm looking for electronic mail

12   accounts that you have ever had, ever.

13       A.    Um-hum.

14       Q.    The answer is yes, you do have

15   electronic mail?

16       A.    Right, for the Village.

17       Q.    What is that electronic mail

18   account?

19       A.    I don't what you mean by -- I'm

20   very untechy [sic] guy.  I sit at the

21   computer, everything else is taken care of as

22   far as numbers and everything else, so I don't

23   know what you're talking about.

24       Q.    When you say taken care of, by

25   whom?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

25

1                       R. SCORDINO

2        A.      By the Village.

3        Q.      What do you do for the Village?

4        A.      I'm mayor.

5        Q.      You oversee the Village of

6    Babylon, correct?

7        A.      Right.  We have technical people

8    that take care of that.

9        Q.      Let's talk about that.

10               Who are those technical people?

11       A.      The deputy mayor takes care of

12   all our computers in the Village.

13       Q.      What is the Deputy Mayor's name?

14       A.      Kevin Muldowney.

15       Q.      How long has he taken care of all

16   the computers in the Village of Babylon?

17       A.      Since he has been as trustee.

18       Q.      How long has that been?

19       A.      I guess it's over 25 years, I

20   think.

21       Q.      Is he responsible for the

22   maintaining of electronic mail addresses?

23       A.      Yes.

24       Q.      Is he responsible for maintaining

25   your electronic mail address?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

26

1                          R. SCORDINO

2          A.      Yes.

3          Q.      As you sit here today, if someone

4    was to ask you for your e-mail account

5    information to send you e-mail, you don't know

6    what that is?

7          A.      Yes, I do. It's

8    mayor@VillageofBabylonNY.gov.

9          Q.      That username is associated with

10   you, correct?

11         A.      That is correct.

12         Q.      Because you are the mayor?

13         A.      Right.

14         Q.      How long have you maintained that

15   e-mail address?

16         A.      I think about two years.

17         Q.      Did you maintain an electronic

18   mail address prior to that e-mail address?

19         A.      It changed.  I think it was

20   RS@VillageofBabylon.gov, I believe.

21         Q.      When did it change?

22         A.      About two years ago.

23         Q.      Do you recall the date?

24         A.      No.

25         Q.      Do you recall the month?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

27

1                      R. SCORDINO

2        A.     No.

3        Q.     Was it in the year 2017?

4        A.     I don't remember.  I don't

5   remember exactly.

6        Q.     Do you regularly use electronic

7   mail?

8        A.     Yes, every day.

9        Q.     Did you use the

10   RS@VillageofBabylon.gov every day?

11       A.     Yes.

12       Q.     Do you still --

13       A.     That was the Village computer at

14   my desk.

15       Q.     Do you still use

16   RS@VillageofBabylon.gov?

17       A.     No.

18       Q.     When did you stop using it?

19       A.     When that e-mail changed.

20       Q.     What I'm asking is, what day did

21   that occur?

22       A.     I don't remember.  I think it was

23   about two years ago though.

24       Q.     Do you recall if it was in 2017?

25       A.     Could be.  I'm not sure.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

28

 1                    R. SCORDINO

 2        Q.    Is there anything that prevents

 3   you from recalling events that occurred

 4   previous to today?

 5              MR. TOSCA:  Objection.

 6              You can answer over objection.

 7        A.    No.

 8        Q.    You're not under any

 9   medication --

10        A.    No.

11        Q.    -- any alcohol or drugs?

12        A.    No.

13        Q.    You haven't drank in the past

14   24 hours, correct?

15        A.    No.

16              MR. TOSCA:  Objection.

17        Q.    Can you give me the month in

18   which your e-mail address changed from

19   RS@VillageofBabylon.gov, the e-mail that you

20   used every day, to mayor@VillageofBabylon.gov?

21              MR. TOSCA:  Objection.

22        A.    I don't recall the exact date.

23   It was within the last two years.

24        Q.    Do you remember the circumstances

25   under which it changed?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

29

1                    R. SCORDINO
2        A.      I believe it was because the
3   company wanted us to change the e-mail.
4        Q.      What company?
5        A.      That takes care of our computers,
6   also our security.
7        Q.      What company is that?
8        A.      I don't remember.  I can't
9   remember.
10        Q.      Are you responsible for the
11   hiring or firing of that company?
12        A.      No.
13        Q.      Who is responsible for employing
14   that company for Village of Babylon?
15        A.      It would be Kevin Muldowney who
16   would make the recommendations to the Board of
17   Trustees.
18        Q.      When you say, make the
19   recommendations to the Board of Trustees --
20        A.      If he wants to change the
21   company.
22        Q.      Did you approve the change of the
23   company?
24        A.      Yes.  Village Board did.
25        Q.      How did that occur?

30

```
1                        R. SCORDINO
2         A.      I can't remember.  It was a
3    number of years ago.
4         Q.      When you say, you can't remember,
5    so if you were to change the tech company, you
6    wouldn't know the process how that would occur
7    as the mayor of the Village of Babylon?
8         A.      You didn't ask that question.
9         Q.      So I'm asking you now.
10                How does that process occur?  Say
11   you want to change --
12        A.      If I want to change it, he would
13   probably come to us and make a recommendation,
14   they would like to change the company for the
15   computers.
16                We as the Trustees, the Board
17   would discuss it, look at all the numbers and
18   decide whether we wanted to do it or not.
19        Q.      Say you wanted to do it, what
20   would happen next?
21        A.      What would happen next is that we
22   probably have resolution to accept that
23   company to do the computers.
24        Q.      A resolution would be in writing?
25        A.      Sure.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

31

1                           R. SCORDINO
2          Q.     When you had that resolution,
3    what, if anything, would occur after that?
4          A.     I don't follow.  After the
5    resolution, we probably hire them.
6          Q.     When you say probably hire them,
7    is there a vote?
8          A.     Vote.
9          Q.     Would you participate in that
10   voting process?
11         A.     Yes.  Sure.
12         Q.     And that occurred when you
13   changed companies?
14         A.     Yes.
15         Q.     You don't recall when that was?
16         A.     No.
17                MR. TOSCA:  Objection.
18                Asked and answered.
19         Q.     What about the resolution, was
20   there a resolution when your e-mail address
21   changed from RS@VillageofBabylon.gov to
22   mayor@VillageofBabylon.gov?
23         A.     I'm not sure.
24         Q.     You don't know?
25         A.     I don't think there was a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

32

1                    R. SCORDINO

2    resolution.

3         Q.    How could it have occurred

4    without a resolution?

5              MR. TOSCA:  Objection.

6              You can answer over objection.

7         A.    Because it doesn't need a

8    resolution to change.

9         Q.    How would it occur without a

10   resolution?

11        A.    Just change with the company,

12   they would change it.

13        Q.    You're saying the deputy mayor

14   could take care of that without seeking

15   approval of the other Village of Babylon

16   members?

17             MR. TOSCA:  Objection.

18             You can answer.

19        A.    Yes, he could do that.

20        Q.    So your e-mail now is

21   mayor@VillageofBabylon.gov, correct.

22        A.    NY.gov.

23        Q.    NY.gov.

24             Aside from the two electronic

25   mails you mentioned, do you have any other

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

33

1                    R. SCORDINO

2    electronic mail address or have you had any

3    other electronic mail addresses?

4            MR. TOSCA:  Objection.

5            You can answer over objection.

6        A.    I don't believe so.  I don't

7    have -- they're the only ones I know.

8        Q.    Okay.

9            Aside from the

10   mayor@VillageofBabylonNY.gov, do you maintain

11   any other message accounts, electronic mail

12   accounts, anything else?

13       A.    No.

14       Q.    When you obtained the

15   mayor@VillageofBabylonNY.gov e-mail address,

16   was there a trustee meeting or resolution

17   regarding the change?

18       A.    No.  I don't believe so.

19            MR. TOSCA:  Objection.

20       Q.    How many electronic mail accounts

21   do you have access to at the present time?

22       A.    One.

23       Q.    Are you sure you understand what

24   I mean by asking you about the electronic mail

25   accounts you may have access to at the present

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

34

1                        R. SCORDINO

2    time, even if you are not the owner of these

3    accounts?

4              MR. TOSCA:  Objection.

5              You can answer over objection.

6         A.    Repeat the question again.

7              (Whereupon, the requested portion

8         was read back by the reporter.)

9         A.    That's the only one I really

10   have.

11        Q.    My question is, do you have

12   access to other Village of Babylon, New York

13   e-mail accounts?

14        A.    No.

15        Q.    You couldn't access them if you

16   wanted to, correct?

17              MR. TOSCA:  Objection.

18        A.    No.

19        Q.    Who is the internet service

20   provider for the electronic mail account that

21   you just mentioned?

22        A.    I'm not sure what the name is.

23        Q.    Are they paid by the Village of

24   Babylon?

25        A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

35

1                        R. SCORDINO

2          Q.     How are they paid?

3          A.     Voucher, I guess.

4          Q.     When you say you guess, do you

5     now know?

6          A.     Voucher.

7          Q.     Can you explain what you mean by

8     voucher?

9          A.     I guess we have a voucher system

10    where they send in a voucher and we pay it by

11    Village account through the treasurer's

12    office.

13         Q.     Do you have to approve the

14    voucher?

15         A.     Yes.

16         Q.     How does that process occur?

17         A.     Requisition goes in, I sign the

18    requisition, it goes back to the treasurer's

19    office, they pay the voucher.

20         Q.     You say you sign the requisition

21    for payment?

22         A.     Um-hum.

23         Q.     The payment was to the internet

24    service provider?

25         A.     Um-hum.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

36

1                          R. SCORDINO

2          Q.     You don't know who that is?

3                 MR. TOSCA:  Objection.

4                 Asked and answered.

5          A.     I can't remember.

6          Q.     You have signed -- any other

7     company that, I guess you sign payment to, you

8     just sign it, what is the process like for

9     that?

10         A.     Voucher comes in, okay, with the

11    name and I sign it on the bottom with the

12    amount.

13         Q.     You do that often for your

14    internet service provider?

15         A.     I'm not sure.  Probably every six

16    months.  I don't know if it's half-a-year

17    service, quarterly, monthly.

18         Q.     Who would know that?

19         A.     The deputy mayor would know that.

20         Q.     Does the deputy mayor act

21    independently of you?

22         A.     No.

23         Q.     Can you explain what you mean by

24    that?

25                MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

37

```
 1                   R. SCORDINO
 2      A.      Independently he confers with me
 3  a lot on different things.
 4      Q.      Do you answer to him or does he
 5  answer to you?
 6              MR. TOSCA:  Objection.
 7              You can answer.
 8              MR. MORRIS:  If you're going to
 9          object, object.
10              You're putting hand gestures,
11          speaking objection.
12              MR. TOSCA:  I'm not doing any
13          hand gestures, sir, I had my hand on the
14          table, okay.  That's not a hand gesture.
15          I can keep my hand on the table.
16          Please.
17              You can answer.
18              MR. MORRIS:  That's it.
19              For that matter, if your attorney
20          tells you not to answer, don't answer.
21              Objection, we still answer
22          question, right?
23              MR. TOSCA:  I said he can answer
24          the question.
25              MR. MORRIS:  I just want to make
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

38

1                    R. SCORDINO

2       sure because hands --

3            MR. TOSCA:  I just want to make

4       sure you're not misrepresenting what is

5       being said.

6            MR. MORRIS:  Of course, Counsel.

7       So don't put your hands or slap the

8       table.

9            MR. TOSCA:  I can put my hand on

10      the table if so desired.

11           MR. MORRIS:  Understood, it might

12      seem --

13           MR. TOSCA:  You have your hands

14      on the table and you lift your hands and

15      you make gestures with your hands.

16           MR. MORRIS:  Counsel, it just

17      might seem when you have your hand out

18      in front of a client who is about to

19      answer a question, it's almost as if

20      you're preventing him from being deposed

21      here today.

22           MR. TOSCA:  I'm asking him to

23      wait before I put my objection on the

24      record.

25           MR. MORRIS:  So object, and we'll

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

39

1                    R. SCORDINO

2        move on.

3              MR. TOSCA:  I can ask him to

4        pause before I object.

5              MR. MORRIS:  Okay, but when you

6        say -- ask him to pause --

7              MR. TOSCA:  If I'm putting my

8        hand to wait, okay, so I can say

9        objection.  That's permissible, Counsel.

10             MR. MORRIS:  You can object

11       without making hand gestures.

12             That's what I'm asking you to do.

13       Can you do that?

14             MR. TOSCA:  I'm going to ask you

15       not to use your hands okay.

16             I mean you realize how ridiculous

17       your request is, right?

18             MR. MORRIS:  Counsel, object and

19       we'll move on.  Okay.

20             MR. TOSCA:  I did object,

21       Counselor.

22             MR. MORRIS:  We're done.

23             MR. TOSCA:  Well then -- okay.

24       Go on.

25       Q.    Deputy mayor, does he answer to

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

40

1                     R. SCORDINO

2      you as mayor?

3           A.     Yes.

4           Q.     Because he's the deputy?

5           A.     Absolutely.

6           Q.     And you're the mayor?

7           A.     And I'm the mayor.

8           Q.     Okay.

9                  You don't know who it is that you

10     signed the vouchers for that your deputy --

11          A.     I can't remember the company,

12     okay.

13                 MR. TOSCA:   Objection.

14                 That's three times you've asked

15          that question.

16          Q.     Have you ever had the e-mail

17     address Rscordino@yahoo.com?

18          A.     I don't recall that e-mail.

19          Q.     Have you ever had a Yahoo e-mail

20     account?

21          A.     I'm not sure.

22          Q.     When you say you're not sue, is

23     there anything preventing you from recalling?

24          A.     I just don't remember.  You're

25     going back many, many years.  I don't

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

41

1                           R. SCORDINO

2    remember.  I don't remember that.

3           Q.    You don't recall if you ever used

4    Yahoo.

5           A.    You have to understand, I'm not a

6    techy guy, so I don't know.  I'm not a hundred

7    percent sure.  Okay.

8           Q.    You ever use google?

9           A.    Google, yes, I have used Google.

10          Q.    Did you ever look up directions

11   on the internet?

12          A.    Yes.

13          Q.    Do you ever use electronic mail

14   on the internet?

15                MR. TOSCA:  Objection.

16          A.    Yes.

17          Q.    Using electronic mail, did you

18   ever use Yahoo?

19          A.    I can't recall.

20          Q.    You can't recall?

21          A.    I didn't recall.

22          Q.    Do you have a home computer?

23          A.    Yes.

24          Q.    Anyone ask you to put aside

25   records that you had on the home computer --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

42

```
 1                    R. SCORDINO
 2        A.    No.  I haven't used my home
 3   computer in probably 20 years.
 4        Q.    Do you have an internet service
 5   provider at your house?
 6        A.    Yes.
 7        Q.    Who is your internet service
 8   provider at your home?
 9        A.    I believe it's Verizon.  I'm not
10   a hundred percent sure.  My wife uses that
11   computer.
12        Q.    Do you have any sort of access to
13   subscription television at your house?
14              MR. TOSCA:  Objection.
15        A.    Verizon, I guess.
16        Q.    You don't know if you have
17   Verizon or something else?
18        A.    I don't get involved in that.  I
19   don't get involved in any of the technical
20   stuff at all, whether it be television -- so I
21   can save you the trouble -- television,
22   computers, teching, phones, that's it.
23        Q.    Sir, do you watch television?
24        A.    Yes.
25        Q.    Do you use a remote to watch
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

43

1                    R. SCORDINO

2    television?

3        A.      Sure.

4        Q.      That remote, does it bear an

5    insignia?

6        A.      I couldn't remember what the

7    insignia -- LG maybe on there.  I'm not a

8    hundred percent sure.

9        Q.      What about the box terminal to

10   which the remote is pointed?

11       A.      I'm not sure.

12       Q.      You don't know what box you

13   utilize?

14               MR. TOSCA:  Objection.

15       A.      I'm not sure.

16       Q.      Do you watch subscription

17   television?

18               MR. TOSCA:  Objection.

19               You can answer.

20       A.      What do you mean.  I don't

21   understand what you mean.

22       Q.      For instance, there is Netflix;

23   for that matter, did you watch the Irishman?

24       A.      No.

25               MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

44

1                          R. SCORDINO
2          Q.     Do you know what movie I'm
3     referring to?
4          A.     Sure.
5                 MR. TOSCA:  These questions are
6          now starting to harass, what's the
7          purpose for these questions, so I'm
8          going to start objecting.
9                 MR. MORRIS:  Counsel, if you're
10         going to speak --
11                MR. TOSCA:  No relevance.
12                MR. MORRIS:  If you're going to
13         interrupt him, I'm going to have to
14         break this deposition and call the
15         judge.
16                MR. TOSCA:  You continue with
17         harassing questions --
18                MR. MORRIS:  I'm trying to figure
19         out --
20                MR. TOSCA:  -- to answer.
21                MR. MORRIS:  -- using an
22         electronic mail address that bears his
23         name, Counsel.
24                MR. TOSCA:  You've asked him
25         about his Verizon or whether it's

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

45

1                    R. SCORDINO

2        Verizon or not, television, this has

3        nothing to do --

4              MR. MORRIS:  This is someone who

5        purports to run -- a mayor.  You make

6        one more interruption, that's it.

7              MR. TOSCA:  That's it for what,

8        sir.

9              MR. MORRIS:  We call the judge

10       and you start paying for this.

11             MR. TOSCA:  No.  Look, Counsel,

12       ask your questions.

13             MR. MORRIS:  Object and stop.

14       You have a dialogue, we're going to ask

15       the witness to leave, understood?

16             MR. TOSCA:  If you want to have a

17       dialogue now, we'll ask the witness to

18       leave because I'm going to object to

19       harassing questions.

20             MR. MORRIS:  Again, you could

21       object, you can't break this deposition.

22       If you would like to do that, we'll call

23       the judge.

24             MR. TOSCA:  I'm not breaking the

25       deposition.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

46

1                    R. SCORDINO

2              MR. MORRIS:   Good.

3        Q.    Sir, do you have a cell phone?

4        A.    Sure.

5        Q.    What is the provider?

6        A.    I believe it's Verizon.

7        Q.    Do you pay for your cell phone?

8        A.    Do I pay, no.

9        Q.    Who pays it?

10       A.    My wife.

11       Q.    Have you been provided a phone by

12   the Village of Babylon?

13       A.    No.

14       Q.    What kind cellular phone do you

15   have?

16       A.    Samsung.

17       Q.    How long have you had the Samsung

18   phone for?

19       A.    Five years.

20       Q.    Is it what's called a smart

21   phone?

22       A.    I believe so.

23       Q.    Do you receive electronic mail on

24   the Samsung phone?

25       A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

47

1                              R. SCORDINO

2          Q.     What e-mail addresses do you use

3     on the Samsung phone?

4          A.     I don't have an e-mail for that

5     phone, I don't believe I get e-mail from it.

6          Q.     Can you access electronic mail on

7     you Samsung phone?

8          A.     I don't believe I do.

9          Q.     You don't believe --

10         A.     I don't have a password for it,

11    so I can't access it.

12         Q.     You don't have a password for

13    your phone?

14         A.     No.

15         Q.     How do you use your phone?

16         A.     Phone calls.

17         Q.     The answer to the question before

18    was you do not access electronic mail?

19         A.     Right.

20         Q.     Okay.

21                On what device do you access your

22    electronic mail?

23         A.     From my officer computer.

24         Q.     What computer is that?

25         A.     Same computer we talked about,

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

48

1                   R. SCORDINO

2    it's the one with the e-mail mayor@.

3         Q.    Is it a desktop, laptop,

4    something else?

5         A.    Desktop, I guess.

6         Q.    On that desktop, have you ever

7    used any internet service aside from the one

8    that Village of Babylon provides?

9         A.    No.

10        Q.    How is it that you access Google?

11        A.    Because it's on my screen and I

12   go to Google.

13        Q.    Have you ever gone to Yahoo?

14        A.    Maybe.  I'm not sure.  I don't

15   use the computer that often.  Okay.

16        Q.    You're not sure because you don't

17   use the computer that often?

18        A.    I don't even think Yahoo is on

19   the computer.  I think Google is because I use

20   it sometimes.

21        Q.    Is it your testimony under oath

22   that Rscordino is not an address that you

23   used?

24        A.    I believe --

25              MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

49

                          R. SCORDINO
1
2        A.      I don't remember that.  I don't
3   remember having that e-mail.  Okay.
4        Q.      You don't remember having a Yahoo
5   e-mail?
6        A.      No.
7        Q.      Do you have any other e-mails?
8        A.      No.
9        Q.      Do you remember sending e-mails.
10       A.      Pardon me?
11       Q.      Do you remember sending e-mails
12  about this case?
13       A.      No.
14       Q.      Have you ever been asked to
15  segregate your e-mail as a results of this
16  case?
17       A.      No.
18       Q.      Where are your e-mails stored?
19       A.      They're on the computer.
20       Q.      When you say, on the computer, is
21  there a server on your hard drive, something
22  else?
23       A.      I believe.  I guess it's on the
24  server.
25       Q.      You say, you guess, what is

50

1                       R. SCORDINO

2     internet application or applications that you

3     utilize?

4          A.      You have to understand, I'm going

5     the tell you one time, I'm not a techy guy,

6     okay.  I have no idea about any of this as far

7     as the computer is concerned, okay.  I very

8     rarely text.  You're asking me questions that

9     I don't know.  When I say I don't know.  I

10    don't know.

11         Q.      When you access your e-mail, can

12    you describe for us how you do it?

13         A.      When I answer my e-mails, if

14    there is workflow on my computer, I answer the

15    e-mails.

16         Q.      When you say, answer the e-mails,

17    what kind of e-mails do you answer?

18         A.      The workflows, if there is -- a

19    resident has access to our computer, they send

20    us a message about anything, could be roads,

21    parking, anything, and I would answer those

22    e-mails through the computer.

23         Q.      When you say through the

24    computer, you use the keyboard to type,

25    correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

51

1                          R. SCORDINO

2          A.     Yes.

3          Q.     You use the mouse to scroll,

4     correct?

5          A.     Right.

6          Q.     What is the program you use to

7     e-mail?

8          A.     Don't understand your question.

9     What do you mean program?

10         Q.     It just shows up on your computer

11    screen?

12         A.     Right.

13         Q.     Do you use --

14         A.     Go to my mail, I go to my mail

15    and it shows up, various e-mails, I guess you

16    would call them.

17         Q.     When you say, go to your mail,

18    how do you do that?

19         A.     Open my computer, okay, I go to

20    an icon on the computer, I access that, and

21    there is my mail on the computer.

22         Q.     Under that icon, is there any

23    text associated with such icon?

24         A.     Text, no.

25         Q.     The icon is just the e-mail icon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

52

1                     R. SCORDINO

2        A.      A mail icon.

3        Q.      There's no text associated with

4   that icon?

5        A.      After I go on the icon, then the

6   text comes up.

7        Q.      Do you know on what computer

8   application it comes up?

9                MR. TOSCA:  Objection.

10                You can answer.

11        A.      I don't follow your question, I

12   really don't.

13        Q.      Do you use Windows, is it a Mac,

14   is it --

15        A.      I think it's Windows.

16                MR. TOSCA:  Let him finish the

17        question.

18        Q.      When you start the computer,

19   there's a little insignia comes up --

20        A.      Windows.

21        Q.      It says Window, right?

22        A.      Um-hum.

23        Q.      It does that when you start the

24   computer, correct?

25        A.      Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

53

1                       R. SCORDINO

2          Q.      That's not a tech question,

3    right?

4          A.      No.

5          Q.      You start the computer, is it

6    password protected?

7          A.      Yes.

8          Q.      I don't want to know your

9    password, but do you enter a username?

10         A.      Yes.

11         Q.      There's a password associated

12   with your username, correct?

13         A.      Yes.

14         Q.      You gain access, correct?

15         A.      Yes.

16         Q.      You click on a mail icon; is that

17   what it is?

18         A.      I don't know if it's a mail icon,

19   I think it's probably -- I think maybe

20   outreach, I'm not a hundred percent sure.

21         Q.      Microsoft Outreach is the mail

22   program; is that right?

23         A.      I'm not sure.  I just go to the

24   icon and I press the button and there it is.

25         Q.      When you say residents send

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

54

1                      R. SCORDINO

2      messages, do you know how those messages show

3      up on your computer?

4           A.      I believe it's from our website

5      that they can do it through.

6           Q.      You receive the message from the

7      Village of Babylon website?

8           A.      Right.

9           Q.      That's the Village of Babylon,

10     New York, correct?

11          A.      Right.

12          Q.      When residents go to that

13     website, you are in receipt of the messages

14     received, correct?

15          A.      Right.

16          Q.      Sort of like a facsimiles that

17     are received at the office, correct?

18          A.      Yes.

19          Q.      You're the mayor of the Village

20     of Babylon, right?

21          A.      Um-hum.

22          Q.      All faxes come through you?

23          A.      That's correct.

24          Q.      That's because the only fax

25     machine is in your office, right?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

55

1                    R. SCORDINO

2        A.      There is a couple, I think there

3    is also one -- I'm not a hundred percent sure,

4    I think there's one -- no I believe that's the

5    only one.  I'm pretty sure it's the only one.

6        Q.      Take your time.

7        A.      It's the only one.

8        Q.      What's the number associated with

9    that?

10       A.      I think it's 631-669- I believe

11   1238, 1236, use 1236.

12       Q.      Do you use any other facsimile

13   number?

14       A.      No.

15       Q.      Do you have one as director of

16   the summer camp?

17       A.      Yes.

18       Q.      Do you utilize that?

19       A.      No.

20       Q.      To where do those facsimiles go?

21       A.      To the Ocean Beach office.

22       Q.      For example, they're not all

23   passed directly through you, like the Village

24   of Babylon facsimiles?

25               MR. TOSCA:  Objection to the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

56

1                    R. SCORDINO

2        form.

3                You can answer.

4        A.    Sometimes they are.

5        Q.    Okay.

6                When you say sometimes they are

7    from Ocean Beach, when they're addressed to

8    you, correct?

9        A.    Right.

10       Q.    As opposed to Village of Babylon?

11       A.    Um-hum.

12       Q.    Have you ever had the e-mail

13   address RScordino@pacbell.net?

14               MR. TOSCA:  Objection.

15               You can answer.

16       A.    No.

17       Q.    Did you ever utilize Pacific Bell

18   in your life?

19       A.    No.

20               MR. TOSCA:  Objection.

21               You can answer.

22       A.    No.

23       Q.    Have you ever had access to the

24   e-mail address Rscordino@SWbell.net?

25       A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

57

1                         R. SCORDINO

2         Q.    Have you ever utilized

3    Southwestern Bell in your life?

4         A.    No.

5         Q.    Sir, are you a fisherman?

6         A.    Yes.

7         Q.    Did you ever fish for tuna?

8         A.    Yes.

9         Q.    Bluefin tuna?

10        A.    Yes.

11        Q.    Did you ever have an e-mail

12   address bluefin1@gmail?

13        A.    Yes.

14        Q.    We just asked you about e-mails,

15   right?

16        A.    Um-hum.

17        Q.    Does this jar your memory?

18        A.    Now that you mention it, yes it

19   jarred my memory.

20        Q.    Did you ever use any other e-mail

21   addresses now that your memory is jarred?

22        A.    No.  You're going back almost

23   40 years on that.

24        Q.    You had an e-mail address

25   40 years ago?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

58

1                          R. SCORDINO

2          A.     That's the one, I think?

3          Q.     What internet service provider

4     did you have 40 --

5          A.     I have no idea about that.

6          Q.     When you say you have no idea,

7     who paid for it?

8          A.     My wife did.

9          Q.     You used the computer to access

10    electronic mail, correct?

11         A.     Yeah.

12         Q.     Do you know what computer that

13    was?

14         A.     Recent mail?

15         Q.     I'm talking about bluefin1.

16         A.     That was 40 years ago.  I have no

17    idea.  I can't remember.

18         Q.     I can't remember?

19         A.     No.

20         Q.     But you remember you had

21    bluefin1?

22         A.     Yes.

23         Q.     Do you remember the internet

24    service provider?

25         A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

59

1                          R. SCORDINO

2          Q.     Do you know the full electronic

3    mail address?

4          A.     No.

5          Q.     Does bluefin1@aol.com jar your

6    memory?

7          A.     Yes.

8          Q.     Is there anything else to which

9    you would like to testify now that you know

10   bluefin1@aol is your electronic mail address

11   from 40 years ago?

12         A.     Four years ago?

13         Q.     Forty.

14         A.     It's forty year ago, yes.

15         Q.     So you had AOL 40 years ago?

16         A.     I believe so, yeah.  Long time

17   ago.

18         Q.     Do you know if you were on a

19   month-to-month subscription or something else?

20         A.     I have no idea.

21                MR. TOSCA:  Objection.

22                You can answer.

23         Q.     Did you have a wireless modem, a

24   straight T-1 connection, did you dial-up?  Do

25   you remember how you utilized the AOL?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

```
                                                          60
 1                      R. SCORDINO
 2         A.    No.
 3         Q.    What computer did you utilize?
 4         A.    It was on my home computer.
 5         Q.    With whom did you communicate by
 6   that electronic mail address?
 7              MR. TOSCA:  Forty year ago --
 8         objection.
 9              MR. MORRIS:  Counsel, he's
10         testifying --
11              MR. TOSCA:  Counselor --
12              MR. MORRIS:  Sir, I'm going to
13         ask you.  I'm going to have to ask you
14         to please step out, so I can call the
15         Court.
16              MR. TOSCA:  He's a party, you
17         want to call the Court, he stays here.
18         Call the Court.  If the judge directs
19         him to leave, he can leave.
20              MR. MORRIS:  10:57.
21              (Counsel changed the battery in
22         video camera.)
23              MR. MORRIS:  10:58.
24              (Mr. Morris places a call to the
25         Court.  Phone answered by recording, and
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

61

1                    R. SCORDINO

2        Mr. Morris dials again.  )

3                MALE SPEAKER:  Judge Brown's

4        Chambers.

5   RL           MR. MORRIS:  Good morning.

6                This is attorney Cory Morris

7        calling in the matter of Lepper versus

8        Village of Babylon.  I'm calling to seek

9        a ruling from the Judge here based on

10       continued interruptions.  I've asked

11       counsel to excuse the deponent during

12       this deposition, everyone is still in

13       the room, so I'll make that known now.

14               MALE SPEAKER:  First, we -- if we

15       can go off the record for a second and

16       if you can tell me what the issue is so

17       I can summarize it for the Judge.

18               (Whereupon, a discussion was held

19       off the record from 11:00 through

20       11:08.)

21               (Whereupon, a discussion was held

22       off the record.)

23               MR. MORRIS:  Time now is 11:08.

24               MR. TOSCA:  One second.

25               MR. MORRIS:  Counsel, we have

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

62

1             R. SCORDINO

2        seven hours, it's going to be a long a

3        day.

4             Everybody ready?

5             MR. TOSCA:  Ready.

6             MR. MORRIS:  Time is now 11:09.

7        Q.    Sir, from the time you made

8    bluefin1@aol.com to the time you had

9    mayor@VillageofBabylon.com, what electronic

10   mail addresses did you utilize?

11       A.    The office computer, okay, my

12   Village office computer.

13       Q.    You didn't you --

14       A.    I didn't use any other computer,

15   okay, I've been a trustee -- Forgot it.  Go

16   on.

17       Q.    I'm sorry, were you --

18       A.    Forget about it.

19       Q.    So you access bluefin1@AOL.com

20   through the Village of Babylon?

21       A.    No.

22       Q.    Where did you access that e-mail

23   address?

24       A.    My home.

25       Q.    Is that the same computer you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

63

1                         R. SCORDINO
2    have now?
3         A.     I don't believe so.  I think I
4    got a new computer before that.
5         Q.     How long did you maintain
6    bluefin1@aol.com for?
7                MR. TOSCA:  Objection.
8         A.     I'm not sure.
9         Q.     With whom did communicate with
10   the electric mail address bluefin1@aol.com?
11        A.     To whom did I communicate.  I
12   can't recall.
13        Q.     Where are the e-mails in that
14   account stored?
15        A.     I don't believe so.
16        Q.     Where.  I asked where.
17        A.     I don't know.
18        Q.     Do you fish for bluefin tuna?
19        A.     Do I?  Sometimes.
20        Q.     Have you ever caught any?
21        A.     Sure.
22        Q.     What do you do with the game fish
23   that you catch?
24        A.     Eat.
25        Q.     Do you play golf?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

64

1                    R. SCORDINO

2        A.     Yes.

3        Q.     How often?

4        A.     During the summer months,

5   probably two times a week.

6        Q.     With whom do you play?

7        A.     Friends.

8        Q.     What is your handicap?

9               MR. TOSCA:  Objection.

10       A.     Twenty-eight.

11       Q.     Are you a righty or lefty?

12       A.     Righty.

13       Q.     Are you a member of a golf club?

14       A.     Yes.

15       Q.     What golf club are you a member?

16              MR. TOSCA:  Objection.

17       A.     Men's Golf Club at the Sumpwams

18   Creek Golf Course in Babylon Village.

19              MR. TOSCA:  Objection to form.

20       Q.     Does the Village of Babylon

21   maintain a golf club other than the one you

22   just mentioned?

23              MR. TOSCA:  Objection.

24       A.     I didn't hear the rest of -- end

25   of the question.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

65

1                        R. SCORDINO

2         Q.    I'm trying.

3               The golf club you just

4    mentioned --

5         A.    Right.

6         Q.    -- is that a Village of Babylon

7    golf club?

8         A.    Yes.

9         Q.    Is there another Village of

10   Babylon golf club that exists within the

11   Village of Babylon?

12        A.    Yes, I believe so, at that golf

13   course there is.  There's two women's and also

14   another men's.

15        Q.    Are you a member of those two

16   golf clubs?

17        A.    One, the one that plays on

18   Wednesday, this one plays on Tuesday.

19        Q.    What are the dues?

20        A.    I think that on Tuesday it's $65,

21   the one on Wednesday is $50.

22        Q.    Have you ever played golf with

23   any Village of Babylon employees?

24        A.    Yes.

25        Q.    With whom?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

66

1                    R. SCORDINO

2        A.    Trustee Kevin Muldowney, deputy

3    mayor Kevin Muldowney, and Trustee Tony

4    Davida.

5        Q.    Anyone else?

6        A.    No.

7        Q.    Have you played with any other

8    employees aside from the trustees you just

9    mentioned?

10            MR. TOSCA:  Objection.

11        A.    At that golf course?

12        Q.    At any golf course?

13        A.    Let's see.

14            THE WITNESS:  Can I speak to

15        counsel?

16            MR. MORRIS:  Not when a question

17        is pending.

18            MR. TOSCA:  You have to answer

19        the question.

20        A.    Yes.

21        Q.    Who are those people?

22        A.    Jack Rafter.

23        Q.    How often do you play golf with

24    Jack Rafter?

25        A.    Probably once every summer.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

67

1                    R. SCORDINO

2        Q.    Who is Jack Rafter?

3        A.    He is our judge.

4        Q.    Do you want to go speak to

5  counsel now?

6        A.    No, it's all right.

7        Q.    Is there something about Jack

8  Rafter that you need to seek legal advice?

9              MR. TOSCA:  Objection.

10       A.    I just wanted to find out if I

11 had to answer the question.

12       Q.    Any reason why you wouldn't want

13 to answer that question, sir?

14             MR. TOSCA:  Objection.

15       A.    Pardon me?

16       Q.    Any reason --

17       A.    I'm not an attorney.

18       Q.    And you thought it wise to seek

19 legal counsel?

20       A.    Because he's representing me.

21       Q.    You got two attorneys here?

22       A.    Right, Village attorney and --

23 yes.

24       Q.    You don't want to take a break?

25       A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

68

1                      R. SCORDINO

2        Q.    Jack Rafter is the Village judge,

3   correct?

4        A.    Yes.

5        Q.    The same judge that prosecuted

6   the gentleman to my right, correct?

7        A.    Yes.

8        Q.    You say you only play golf with

9   him how often?

10       A.    Once a summer.  I believe, I

11  think this year we didn't play at all.

12       Q.    You played with him last year?

13       A.    Yes.

14       Q.    How often do you see Jack Rafter?

15       A.    I see Jack ever Tuesday.

16       Q.    Is he your judge?

17       A.    Yes.

18       Q.    Judge for the Village of Babylon?

19       A.    Yes.

20       Q.    Bluefin1@aol.com, do you remember

21  the last year you had that electronic mail

22  address?

23       A.    No.

24       Q.    Do you remember the last decade

25  you had that electronic mail address?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

69

1                         R. SCORDINO

2          A.    No.

3          Q.    Did you still have that

4    electronic mail address when AOL used to give

5    you those CDs that come in the mail all the

6    time like bars of soap?

7                MR. TOSCA:  Objection.

8          A.    I don't know what you're talk

9    about.

10         Q.    You never got one of those AOL

11   CDs in the mail?

12         A.    I don't believe so.

13         Q.    You know what I'm talking about,

14   the --

15         A.    I don't know what you're talking

16   about.

17         Q.    Let's back up.

18               Sir, do you know what a compact

19   disks is?

20         A.    No.

21         Q.    Have you ever utilized a compact

22   audio disk player?

23         A.    The little cassette.

24         Q.    So right after cassettes --

25         A.    Right.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

70

1                    R. SCORDINO
2         Q.    -- for instance, there was
3    Batamax, VHS, eventually we got to the DVD
4    which was a disk.
5         A.    Right.
6         Q.    In the midst of the technological
7    revolution, cassette revolution, the cassette
8    tape was later transformed into a compact
9    disk, what's known as a CD ROM.
10        A.    Right, okay.
11        Q.    Have you ever received a CD
12   ROM --
13        A.    I can't remember.  I don't think
14   so.
15        Q.    How is it that you first signed
16   up for AOL?
17        A.    My wife did it all.
18        Q.    Did your wife make the bluefin1
19   name?
20        A.    No.  I did.
21        Q.    Why did you make it bluefin1?
22        A.    Because at that time, I had a
23   license plate on my -- also bluefin1.
24        Q.    When did you no longer have that
25   license plate number, bluefin1?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

71

1                          R. SCORDINO

2          A.      Forty years ago, fifty years ago,

3     four decades, five decades, maybe.

4          Q.      What kind of car was it?

5          A.      It was a blue Ram Charger.

6          Q.      Is that a Dodge car?

7          A.      Dodge.

8          Q.      You said it was a blue Charger?

9          A.      Blue Dodge.

10         Q.      Do you remember the license

11    plate?

12         A.      Bluefin1.

13         Q.      It was registered in the State of

14    New York?

15         A.      Yes.

16         Q.      Do you still have that car?

17         A.      No.

18         Q.      When did you get rid of that car?

19         A.      Late '70s, early '80s.

20         Q.      Do you remember the year?

21         A.      No.

22         Q.      Why did you get rid of the car?

23         A.      It was falling apart.

24         Q.      To be clear, you mentioned

25    Trustee Kevin, Tony Davida, Jack Rafter.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

72

1                           R. SCORDINO

2                 Is there anyone else employed or

3    within the employ of Village of Babylon that

4    you played golf with?

5         A.     Going back many years, Joel

6    Sikowitz I played with.  He's our Village

7    attorney.

8         Q.     Anyone else?

9         A.     I think that's about it.

10        Q.     Have you played golf with your

11   current Village attorney?

12        A.     No.  As a matter of fact, no.

13        Q.     Did you ever play golf with

14   Robert Kinnier?

15        A.     No, I don't believe so.

16        Q.     What about his wife?

17        A.     No.

18        Q.     Do you know who Bob Kinnier is?

19        A.     Yes.

20        Q.     Who is Bob Kinnier?

21        A.     I believe he's a resident, lives

22   on Wampum.

23        Q.     What were the circumstances under

24   which you first met Bob Kinnier?

25        A.     I believe I knew her as a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

73

1                      R. SCORDINO

2    resident many years ago; and as recently as,

3    she is the first one that sent me a complaint

4    about some of the issue that were on Wampum.

5         Q.    You said sent you a complaint

6    about some of the issues that were on Wampum.

7              How was that complaint sent to

8    you?

9         A.    E-mail.  I believe it was from

10   our workflow message I got.

11        Q.    What, if anything, did you do in

12   response to that workflow message?

13        A.    I checked her problem out.

14        Q.    What was her problem?

15        A.    There were a lot of cars parked

16   on Wampum, she couldn't get out of her

17   driveway.

18        Q.    You say there was a workflow

19   message --

20        A.    Yes.

21        Q.    -- did you speak to her?

22        A.    Yes, I called her.  And she

23   called me about it.  I told her it was being

24   taken care of.

25        Q.    What did you do to take care of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

74

1                    R. SCORDINO

2    it?

3        A.    Talked to the resident that was

4    blocking her driveway.

5        Q.    Who was that residence?

6        A.    It was Mike Domingo, I believe it

7    was.

8        Q.    What did you do?

9        A.    He moved the cars and he moved

10   the basketball court.

11       Q.    How do you get access to the

12   workflow message.

13       A.    Through my Village computer.

14       Q.    It was sent to the Village of

15   Babylon?

16       A.    Yes.

17       Q.    When you say, the workflow

18   message, is that sent to your electronic mail

19   address, another account?

20       A.    Sent to my account which is

21   mayor@VillageofBabylonNY.gov.

22       Q.    Your e-mail account?

23       A.    Right.

24       Q.    Have you ever had access to

25   electronic mail address DANABT1910@aol.com?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                                    75
1                          R. SCORDINO
2          A.    No.
3          Q.    Do you know whose electronic mail
4    address that is?
5          A.    I believe it's my daughter's, if
6    I'm not mistaken.
7          Q.    I asked you earlier if you had
8    any opportunity to correspond with your
9    daughter by electronic mail.
10         A.    Um-hum.
11         Q.    Have you had the opportunity to
12   correspond with your daughter by electronic
13   mail?
14               MR. TOSCA:  Objection.
15               You can answer.
16         A.    What do you mean correspond?  She
17   sends me something, I don't really because
18   correspond, if she's sending something to me,
19   I usually just call her.
20         Q.    I don't want you to say something
21   that you might not have done.
22               You know how to send an
23   electronic message, right?
24         A.    Yes.
25         Q.    You send it by e-mail, correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

76

1                    R. SCORDINO

2      A.      Yes.

3      Q.      You receive e-mails, right?

4      A.      Right.

5      Q.      Just like the one you received

6  from the Kinniers?

7      A.      Right.

8      Q.      In receiving such e-mails, you

9  have the ability to respond to those e-mails,

10 right?

11     A.      Yeah.

12     Q.      Have you received and have you

13 responded to e-mails sent by you daughter?

14     A.      I usually don't respond.  I

15 usually never respond or do it very, one

16 sentence, being taken care of, I'm looking

17 into it.  That's it.

18     Q.      So the answer is yes, you have

19 replied to your daughter's e-mail?

20     A.      No.  I said sometimes.  I'm not

21 sure if I did or not to her.

22     Q.      Have you ever sent an e-mail back

23 to your daughter?

24     A.      I can't remember.

25     Q.      You don't know?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

77

1                          R. SCORDINO

2          A.     I can't remember.

3          Q.     Is there anything that prevents

4      you from recalling that?

5          A.     No.

6                 MR. TOSCA:  Objection.

7          Q.     What about as the mayor of the

8      Village of Babylon, can you remember ever

9      responding to e-mail?

10         A.     I just told you two seconds ago.

11         Q.     Tell me, what did you --

12         A.     The one from Kinnier --

13         Q.     You responded to the e-mail?

14         A.     I guess I did, yeah.

15         Q.     I'm not asking you to guess.

16         A.     You're asking me questions over

17     and over again.  I resent the fact that you're

18     doing that.  It's just as my attorney just

19     said, it's harassing, okay, trickery and

20     I'm --

21                MR. TOSCA:  We're going to take a

22         break.

23         Q.     I'd just like an answer to that

24     question.

25                Did you --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

78

1                         R. SCORDINO

2        A.     I can't recall.

3        Q.     You can't recall if you responded

4    to Mr. Kinnier?

5        A.     I can't recall.

6        Q.     Is there anything --

7        A.     Can't recall.

8               MR. MORRIS:  Time is 11:24.

9               (Whereupon, a recess was taken

10        from 11:25 a.m. to 11:30 a.m.)

11              MR. MORRIS:  11:30, we're back on

12        the record.

13       Q.     Mr. Scordino, did you discuss

14   your testimony --

15              MR. TOSCA:  Objection.

16       A.     No.

17       Q.     Mr. Scordino, with whom do you

18   regularly play golf?

19       A.     Usually with deputy mayor Kevin

20   Muldowney and Trustee Tony Davida.

21       Q.     How often does that occur?

22       A.     Once or twice during the summer

23   months, a week.

24       Q.     Once or twice a week?

25       A.     Um-hum.

79

1                    R. SCORDINO
2       Q.    Is there a regular day in which
3   you play golf.
4       A.    Tuesdays, Wednesdays.
5       Q.    Just the three of you?
6       A.    Sometimes.  Sometime we have
7   other people.
8       Q.    What other people do you bring
9   along golfing?
10      A.    Friends periodically.
11      Q.    What are the names of those
12  persons?
13      A.    Well, Bruce Huminik, friends of
14  deputy mayor Kevin Muldowney or friends of
15  Tony Davida.  They vary.
16      Q.    Can I ask you for the name of
17  these people, please?
18      A.    Those ar ones I just recall right
19  now.
20      Q.    Anyone else that you recall right
21  now?
22      A.    No.  That's about it.
23      Q.    Anything that would refresh your
24  recollection?
25      A.    Refresh my recollection, no.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

80

1          R. SCORDINO

2  Those are the people I remember right now.

3          Q.     When you access this golf club,

4  is there a check-in process?

5          A.     Yes.

6          Q.     What is the check-in process?

7          A.     Check in at the clubhouse, who

8  the foursome are, sometimes there are

9  fill-ins.

10         Q.     When you say foursome, I

11  apologize, I don't play golf, can you play

12  golf with three people?

13         A.     Yeah, sometimes.

14         Q.     When you say check-in

15  foursomes --

16         A.     If there is somebody that's

17  single, they usually put that person with the

18  foursomes.

19         Q.     Who is that they?

20         A.     Pardon me.

21         Q.     Who is the "they" to whom you're

22  referring?

23         A.     That day, Tuesday, that we play

24  golf.

25         Q.     I'm saying, the they, they

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

81

1                        R. SCORDINO

2   usually put --

3        A.     The person at the desk organizes

4   the foursome.

5        Q.     How did they do that?  Do they do

6   that with a paper or --

7        A.     Paper.

8        Q.     You have to register as a

9   foursome?

10       A.     Sometimes.  Sometime you can go

11  out with a threesome, sometimes you can go out

12  with a twosome.

13       Q.     Can you go out with two twosomes?

14       A.     Yes.

15       Q.     When you do that, it's

16  registered, it's put on a piece of paper and

17  handed to you?

18       A.     Not handed to you, they keep

19  records.

20       Q.     Those records, who keeps those

21  records?

22       A.     Trustee, the deputy mayor Kevin

23  Muldowney, he's the overseer of the golf

24  course.

25       Q.     You go to his golf course

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

82

1                    R. SCORDINO

2   essentially?

3              MR. TOSCA:  Objection.

4        A.    No, Village golf course.

5        Q.    The Village keeps records of who

6   plays golf together?

7        A.    Yeah, I believe they do.

8        Q.    Do you maintain a locker at this

9   golf course?

10       A.    No.

11       Q.    Do you have any of your property

12  at this golf course?

13       A.    No.

14       Q.    Who pays for your membership in

15  the golf course?

16       A.    Me.

17       Q.    Is the money taken from your

18  paycheck, do you pay it out of a bank account,

19  or something else?

20       A.    I pay cash for it.

21       Q.    To whom do you give the cash?

22       A.    To the person who is putting the

23  foursomes together.

24       Q.    Is that the same person, a

25  different person?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

83

1                    R. SCORDINO

2       A.    Sometimes.   It varies.   There is

3   a number of employees that work there.

4       Q.    Do you know the names of the

5   employees that organize such foursomes?

6       A.    No.

7       Q.    DANABT1910@Aol.com is your

8   daughter's electronic e-mail address?

9       A.    I believe it is.

10      Q.    Was that an electronic mail

11  address that you created for your daughter?

12            MR. TOSCA:   Objection.

13      A.    No.

14      Q.    Did you ever pay for your

15  daughter's access to America Online?

16      A.    No.

17            MR. TOSCA:   Objection.

18      Q.    You said earlier that you reside

19  at 89 Washington Avenue, Babylon, New York

20  11702; is that right, sir?

21      A.    Correct.

22      Q.    How long have you resided there?

23      A.    About 40 years.

24      Q.    Do you recall the year in which

25  you purchased that residence?

84

1                           R. SCORDINO

2          A.     No, I can't recall.

3          Q.     Is that a residence you own?

4          A.     Yes.

5          Q.     Do you own it with anybody else?

6          A.     No.

7          Q.     Do you reside at that location

8    alone or with others?

9          A.     With my wife.

10         Q.     Anyone else?

11         A.     No.  Lola, my dog.

12         Q.     Okay.  What kind of dog is Lola?

13         A.     English cocker.

14         Q.     How long have you had Lola, the

15   dog?

16         A.     Ten years.

17         Q.     Aside from Lola, the dog, did

18   anyone else reside at that location besides

19   you and your wife?

20         A.     My son and daughter.

21         Q.     What year did they reside at such

22   location?

23         A.     I believe my daughter was four

24   and my son was one.

25         Q.     Okay.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

85

1                    R. SCORDINO

2              When you moved in; is that right?

3        A.    Yes.

4        Q.    You said that was about 40 years

5  ago?

6        A.    Um-hum.

7        Q.    Were you employed when you moved

8  into the residence?

9        A.    Yes.

10       Q.    By whom were you employed?

11             MR. TOSCA:  Objection.

12             You can answer.

13       A.    West Islip School District.

14       Q.    In what capacity were you

15  employed at West Islip School District?

16       A.    Physical education teacher.

17       Q.    When did you first start working

18  a physical education teacher in West Islip?

19       A.    1971.

20       Q.    You purchased the home about

21  1979; is that right?

22       A.    Um-hum.

23       Q.    How long did you maintain that

24  employment as physical education teacher at

25  the West Islip school District?

86
1                    R. SCORDINO
2        A.    I've been retired, I believe,
3    14 years now.
4        Q.    Did you maintain any other
5    employment when you resided at 89 Washington
6    Street in Babylon?
7        A.    Yes with the Town, Town of
8    Babylon.
9        Q.    You said the Town, sir?
10       A.    Right.
11       Q.    What position did you hold within
12   the Town of Babylon?
13       A.    Recreations specialist.
14       Q.    Is that a Civil Service position?
15       A.    No.
16       Q.    How did you obtain the
17   recreations specialist position?
18       A.    Applied for it.
19       Q.    With whom did you apply?
20       A.    Town of Babylon.
21       Q.    Aside from physical education
22   teacher and recreational specialist, did you
23   maintain any other employment?
24       A.    I also was a professional at the
25   Long Island Institute teaching the physical

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

87

1                           R. SCORDINO

2     education teachers adaptive physical

3     education.

4          Q.     Were you a full-time professor or

5     part-time?

6          A.     It was adjunct.

7          Q.     How long were you adjunct-ing?

8          A.     Probably about seven years.

9          Q.     You mentioned physical education

10    teacher, recreational specialist, and

11    professor at Long Island University.

12                Did you maintain any other

13    employment --

14         A.     No.

15         Q.     -- when you resided at

16    89 Washington Street?

17         A.     No.

18         Q.     Did you own any businesses?

19         A.     No.

20         Q.     Are you familiar with an address

21    173 Bernas, B-E-R-N-A-S, Road --

22         A.     Yes.

23         Q.     -- Cochecton, New York 12726?

24         A.     Um-hum.

25         Q.     What is that address?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

88

1                         R. SCORDINO

2          A.      That's my second house.

3          Q.      Is that the house to which you

4     referred was in Sullivan County?

5          A.      Um-hum.

6          Q.      Anyone reside at that house

7     currently?

8          A.      No.  It's nobody there.

9          Q.      When did you purchase that

10    residence?

11         A.      Six years ago.

12         Q.      How did you purchase the

13    residence?

14                 MR. TOSCA:  Objection.

15         A.      How did I purchase it?

16         Q.      Was that a sale, auction,

17    foreclosure?

18         A.      No.  I had it built.  I had the

19    property for many years, and I had it built.

20         Q.      In other words, you owned the

21    land and six years ago, you had it built?

22         A.      Right.

23         Q.      Which is why I asked the question

24    in such a manner.

25                 How long did you own the land on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

89

1                          R. SCORDINO

2    which 173 Bernas Road sits?

3         A.     Early '80s, I believe.

4         Q.     When you say early '80s, do you

5    know the year in which you acquired such land?

6         A.     It was done in separate things.

7    It was in the early '80, I bought 12 acres,

8    then I bought another 15 acres.  I'm not sure

9    of the date.

10        Q.     How did you purchase that

11   property?

12               MR. TOSCA:  Objection.

13               You can answer.

14        A.     Bought it.

15        Q.     Cash, mortgage?

16        A.     Cash.

17        Q.     Private purchaser?

18        A.     Um-hum.

19        Q.     You didn't buy it at an auction?

20        A.     No.

21        Q.     And you maintained that property

22   from the 1980s until about six years ago?

23               MR. TOSCA:  Objection.

24        A.     Yes.

25        Q.     You said you had a house built on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

90

1                    R. SCORDINO

2    that property?

3         A.    Um-hum.

4         Q.    How did you go about doing that,

5    sir?

6         A.    I bought it from a company Beaver

7    Mountain, and then I had to select a builder

8    and they took care of it.  It was like a kit,

9    they have a kit and they put it together.

10        Q.    Do you remember the name of the

11   builder selected?

12        A.    Oh geez, I don't remember his

13   first name.  My best guess is Bill, I'm not a

14   hundred percent sure.  He was from up there.

15        Q.    When you say up there, he was up

16   there?

17        A.    I think he was from Pennsylvania.

18   It's very close to Pennsylvania where the

19   house is.

20        Q.    Bill built the house; is that

21   right?

22        A.    Yes.

23        Q.    Did he use an architect, anything

24   like that?

25        A.    Beaver Mountain does the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

91

1                       R. SCORDINO

2     architect, they give them the plans.  We

3     designed it with Beaver Mountain.

4          Q.    What about governmental

5     compliance, who was responsible for that?

6          A.    The builder.

7               MR. TOSCA:  Objection.

8          Q.    Did you oversee what the builder

9     did?

10         A.    My wife did.  I was busy with

11    Sandy.

12         Q.    When you say Sandy, are you

13    referring to Super Storm?

14         A.    Yes.

15         Q.    That was six years ago?

16         A.    Going on our seventh year.

17         Q.    When you purchased that home from

18    the builder, did you take out a mortgage?

19         A.    No.

20         Q.    How did you purchase the

21    property?

22              MR. TOSCA:  Objection.

23              Don't answer the question.

24              MR. MORRIS:  Counsel, are you

25         telling him not to answer?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

92

1                    R. SCORDINO

2              MR. TOSCA:  Yes.

3              MR. MORRIS:  On what grounds?

4              MR. TOSCA:  Grounds of privilege.

5              MR. MORRIS:  You're telling me

6         where he purchased the property is

7         subject to attorney/client privilege?

8              MR. TOSCA:  Could you repeat?

9              MR. MORRIS:  Hold on, no.

10             Are you asserting attorney/client

11        privilege?

12             MR. TOSCA:  I need to know what

13        you said so I can respond.

14             Go ahead.

15             MR. MORRIS:  Counselor, stop.

16             MR. TOSCA:  No.  Don't stop, I'm

17        going to ask the question --

18             MR. MORRIS:  I'm going to

19        withdraw the question.

20             MR. TOSCA:  Okay.

21        Q.    Sir, did you take a mortgage out

22   when you purchased the property from the

23   builder?

24             MR. TOSCA:  Objection.

25             Don't answer the question.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

93

1                    R. SCORDINO

2          Q.     Sir, did you seek an attorney

3     when you purchased the property from the

4     builder?

5                    MR. TOSCA:  Objection.

6                    You can answer.

7          A.     No.

8          Q.     Did you speak to the attorney on

9     your left when you purchased that property?

10         A.     No.

11                   MR. TOSCA:  Objection.

12                   You can answer.

13         Q.     What about Mr. Glass?

14         A.     No.

15         Q.     What about the attorney before

16    Mr. Glass?

17         A.     No.

18         Q.     Did you speak to any attorney

19    before you bought that property?

20         A.     No.  My wife is very smart.

21         Q.     Is your wife an attorney?

22         A.     No, but she's smart, very smart.

23         Q.     Did you use an attorney in the

24    building of the property?

25         A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

94

1               R. SCORDINO

2               MR. TOSCA:  Objection.

3               You can answer.

4      Q.     So you paid for the property,

5   right?

6      A.     Um-hum.

7      Q.     How did you pay for the property?

8               MR. TOSCA:  Objection.

9               Don't answer the question.

10              MR. MORRIS:  Counsel, you're

11          asserting privilege on the basis of how

12          he paid?

13              MR. TOSCA:  Counsel, I'm telling

14          the witness not to answer the question.

15          I'm asserting the privilege.

16      Q.     Do you have any real estate

17   dealings, sir?

18      A.     Me?

19              MR. TOSCA:  Objection.

20              You can answer over objection.

21      A.     Absolutely not.

22      Q.     Did you ever consult an attorney

23   for real estate?

24              MR. TOSCA:  Objection.

25              You can answer.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

95

1                     R. SCORDINO

2          A.     When we purchased our house,

3    yeah, our house on 89 Washington.

4          Q.     Do you have any corporations?

5          A.     No.

6          Q.     What about a business, do you own

7    any business?

8          A.     No.

9          Q.     Do you have any partial ownership

10   in a business?

11         A.     No.

12         Q.     In ascertaining the building on

13   173 Bernas Road, is there a deed that exists

14   for that property?

15         A.     Yes.

16         Q.     Who is on the deed?

17         A.     My wife and I.

18         Q.     Anyone else?

19         A.     No.

20         Q.     Who prepared that deed?

21         MR. TOSCA:   Objection.

22         You can answer over objection.

23         A.     I have no idea.  I guess the

24   County did, you know.

25         Q.     Is the property encumbered at

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

96

1                              R. SCORDINO

2     all?

3                    MR. TOSCA:  Objection.

4                    You can answer.

5          A.    What do you mean by encumbered?

6          Q.    Do you owe any money on it?

7          A.    No.

8          Q.    Why not?

9                    MR. TOSCA:  Objection.

10                   You can answer over objection.

11         A.    Because we had the cash to do it.

12         Q.    You paid --

13         A.    We saved and paid cash.

14         Q.    You paid cash, right?

15         A.    Yes.

16         Q.    Any reason that an attorney would

17    object to such a question?

18                   MR. TOSCA:  Objection.

19                   Don't answer that question.

20                   It calls for a legal conclusion.

21         Q.    You paid cash for the building

22    that exists at 173 Bernas Road?

23                   MR. TOSCA:  Objection.

24                   Don't answer the question.

25    RL           MR. MORRIS:  Mark that for a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

97

```
 1                    R. SCORDINO
 2       ruling.
 3       Q.    Sir, do you maintain one bank
 4  account, multiple bank accounts, something
 5  else?
 6             MR. TOSCA:  Objection.
 7             You can answer.
 8       A.    My wife takes care of all the
 9  banking.
10       Q.    Are you responsible for the
11  management of money within the Village of
12  Babylon at all?
13       A.    Yes, absolutely.
14       Q.    Did you use any Village of
15  Babylon funds in the purchase --
16       A.    Absolutely not.
17             MR. TOSCA:  Let him finish his
18       question.
19       Q.    Just to be clear, no Village of
20  Babylon funds were expended in the purchase of
21  173 Bernas Road, correct?
22             MR. TOSCA:  Objection.
23             You can answer over objection.
24       A.    No.
25       Q.    Sir, you were busy dealing with
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

98

1                         R. SCORDINO
2     Hurricane Sandy at the time, correct?
3          A.     Yes.
4          Q.     Did the Village of Babylon
5     receive any financial assistance from any
6     government entity?
7          A.     Yes.
8          Q.     From what entity did it receive
9     assistance?
10         A.     New York Rising.
11         Q.     Anything else?
12         A.     Yes, that's it.  New York Rising.
13         Q.     In your receipt of New York
14    Rising money, you didn't spend any of that
15    New York Rising money on 173 Bernas Road,
16    correct?
17         A.     No.
18                MR. TOSCA:  Objection.
19                You can answer over objection.
20         A.     Voucher, no.
21         Q.     You didn't take the money out in
22    a duffle bag and pay for the house, did you?
23                MR. TOSCA:  Objection.
24                Hold on.
25                MR. MORRIS:  Objection.  Hold on?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

99

1              R. SCORDINO

2              MR. TOSCA:  Yes.  Okay, you're

3       not asking the witness --

4              MR. MORRIS:  Please note the

5       time.

6              MR. TOSCA:  You can answer that

7       question.

8              Repeat the question.

9              (Whereupon, the record was read

10      by the reporter.)

11      Q.    Seems like a pretty simple

12 question.

13      A.    A ridiculous question, but, you

14 know.

15      Q.    I'm just --

16      A.    Absolutely not.

17      Q.    Did you pay in check?

18      A.    No.  With a duffle bag.  Really.

19 Come on.

20      Q.    I'm just trying the ascertain why

21 the attorney would assert attorney/client --

22      A.    I told you why --

23             MR. TOSCA:  You didn't tell him

24      why.

25             It's a legal conclusion.  The

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

100

1                          R. SCORDINO

2          attorney has a legal reason for reciting

3          it.

4    RL          MR. MORRIS:  We'll mark it for a

5          ruling, and I hope to hear what that is

6          at some point.

7          Q.     From what period of time did you

8    reside at 173 Bernas Road, Cochecton?

9          A.     Reside.

10         Q.     Um-hum.

11         A.     I visit.  I don't reside there, I

12   visit there.  My main house where I sleep is

13   89 Washington Street.

14         Q.     How often do you visit there?

15         A.     About ten, average about ten days

16   a month.

17         Q.     So you own this home and ten days

18   a month, you're in that home; is that right?

19         A.     Yeah.

20         Q.     What about the --

21         A.     Average.

22         Q.     What about the Fire Island house,

23   how long are you there?

24                MR. TOSCA:  Objection.

25         A.     About three days a week for eight

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

101

1              R. SCORDINO

2    weeks in August, July and August.

3         Q.    That's when you are the director

4    of the camp that you mentioned earlier?

5         A.    Um-hum.

6         Q.    Before we return to that at a

7    later time, do you receive pay for your work

8    as the director of the camp?

9         A.    Yes.

10        Q.    It's a part-time job, right?

11        A.    Yes.

12        Q.    How is it that you travel to

13   173 Bernas Road, Cochecton, New York?

14        A.    Right.  How do I travel?  By car.

15        Q.    Okay.  What car do you utilize?

16        A.    The car that's given to me

17   through the Village.

18        Q.    When you say a car that's given

19   to you by the Village, what car are you

20   referring to, sir?

21        A.    The car that goes along with the

22   mayor's job.

23        Q.    What car is that, sir?

24        A.    Tahoe.

25        Q.    A Chevy Tahoe?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

102

1                         R. SCORDINO

2          A.     Yes.

3          Q.     What year is that Tahoe?

4          A.     2009, I believe.

5          Q.     So that is fairly recent car?

6          A.     Every four years.

7          Q.     When you say, every four years,

8     to what are you referring?

9          A.     When the mayor gets elected, the

10    job goes along with a car to use.

11         Q.     When you say the job goes along

12    with a car, is that a leased car or purchased

13    car?

14         A.     The Village purchases it.

15         Q.     When you say the Village

16    purchases it, the Village purchases a Tahoe

17    every four years?

18         A.     If that's what the mayor wants.

19    I had the Suburban one year, a Tahoe one year.

20         Q.     You choose the car?

21         A.     Yeah.

22         Q.     And was there any approval

23    required for the car of your choosing?

24         A.     Approval, no.  Usually it goes

25    with the appointment as the mayor.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

103

1                          R. SCORDINO

2         Q.     So as the mayor, you get to

3    choose whatever car you want?

4         A.     Yes.

5         Q.     You said every four years.

6                How many cars has the Village of

7    Babylon purchased for you over the year as

8    mayor?

9         A.     Every four years.

10        Q.     How many cars have you had?

11        A.     This will be my fifth one.

12        Q.     How long have you been the mayor

13   of the Village of Babylon?

14        A.     I think it's going to be 18 years

15   now.

16        Q.     When you say your fifth car, each

17   car is titled in your name; is that right?

18        A.     Village.

19        Q.     Who pays the insurance for these

20   cars?

21        A.     Village.

22        Q.     What about the registration?

23        A.     Village.

24        Q.     The car is registered to the

25   Village?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                                    104
1                        R. SCORDINO

2          A.     Yes.

3          Q.     What was the first car of which

4    the Village of Babylon purchased for you as

5    mayor of the Village of Babylon?

6          A.     I believe it was a Suburban.

7          Q.     Do you know the make of the

8    Suburban?

9          A.     Chevy.

10         Q.     Do you remember the year?

11         A.     2002.

12         Q.     Do you remember the color of that

13   car?

14         A.     Blue.

15         Q.     Blue Suburban, like bluefin tuna?

16         A.     Um-hum.

17                MR. TOSCA:  Objection.

18         A.     Darker.

19         Q.     Like your suit?

20         A.     Darker.

21         Q.     More yellowfin than bigeye?

22         A.     Right.

23                MR. TOSCA:  Objection.

24         Q.     That blue Suburban, where did you

25   park it at the end of the night?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

105

1                    R. SCORDINO

2        A.    My house.

3        Q.    Who paid for its gas?

4        A.    The Village did.  If I was using

5    it for personal use, I would pay for the gas.

6        Q.    Do you keep vouchers, receipts,

7    or some other method of determining --

8        A.    There is a record of how many

9    times you're allowed to get a gas allotment.

10       Q.    Eventually, that 2002 blue

11   Suburban, you had another car purchased for

12   you by the Village of Babylon, correct?

13       A.    Four years later.

14       Q.    What happened once that new car

15   was purchased by the Village of Babylon four

16   years later?

17            MR. TOSCA:  Objection to form.

18            You can answer.

19       A.    Probably traded.

20       Q.    When you say probably traded, do

21   you know what occurred to that car?

22       A.    I think it was traded in.  I

23   don't take care of that.  It's usually the

24   Superintendent of Highways takes care of that.

25       Q.    Who is the Superintendent of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

106

1                       R. SCORDINO

2    Highways?

3         A.      Skip Gardener.

4         Q.      Is Skip a nickname?

5         A.      Charles Skip Gardener.

6         Q.      How long has he maintained that

7    position?

8         A.      Over 50 years.

9         Q.      He was there before you were

10   mayor of the Village of Babylon; is that

11   right?

12        A.      That is correct.

13        Q.      Did you trade in the 2002

14   Suburban?

15        A.      Did I trade it in?  No, it's all

16   taken care of by Skip Gardener.  He traded it.

17        Q.      Did he receive the proceeds of

18   the 2002 trade-in?

19        A.      I have no idea.  You have the

20   check with the treasurer.

21        Q.      So there's records?

22        A.      Yes.

23        Q.      What was car the you got in 2006;

24   is that right?

25        A.      I believe it was a Suburban also.

107

1                          R. SCORDINO

2          Q.     Was it --

3                 Sorry.  I apologize. I didn't

4    mean to interrupt you.

5          A.     I'm waiting for you.

6          Q.     Was it also blue?

7          A.     Yes.

8          Q.     Was that a 2006 Suburban?

9          A.     Right.

10         Q.     You were reelected that year,

11   correct?

12         A.     Yes.

13         Q.     What was your salary as mayor of

14   the Village of Babylon in 2002?

15         A.     15,000.

16         Q.     Aside from the vehicle and the

17   gas allotments, did you receive any other

18   economic benefit?

19         A.     Yes.  We get health insurance

20   from the Village.

21         Q.     Anything else?

22         A.     No.

23         Q.     In 2006, you purchased a

24   Suburban?

25         A.     I didn't purchase it.  The

108

1                         R. SCORDINO

2      Village purchases it.

3                   MR. MORRIS:  Let me withdraw

4           that.

5           Q.    In 2006, the Suburban was

6      purchased by the Village of Babylon on behalf

7      of you, the mayor, right?

8           A.    Right.

9           Q.    Do you know where the car was

10     purchased from?

11          A.    I believe it's off the State bid.

12          Q.    Is that the same thing as the

13     2002 Suburban?

14          A.    State bid.

15          Q.    Eventually there came a time you

16     no longer drove the 2006 Suburban?

17          A.    It's traded in or it might be

18     added to our fleet also.

19          Q.    Did you receive a special license

20     plate?

21          A.    No.

22          Q.    That 2006 Suburban was eventually

23     replaced by another car purchased by the

24     Village of Babylon?

25          A.    Right.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

109

1                           R. SCORDINO

2          Q.     What car did you purchase and in

3     what year?

4          A.     Tahoe.

5                 MR. TOSCA:  Objection.

6          Q.     That was the Village of Babylon

7     that purchased the Tahoe on your behalf?

8          A.     Right.

9          Q.     Do you know what year that Tahoe

10    was?

11         A.     The year was probably right after

12    the next election.

13         Q.     2010?

14         A.     2010.

15         Q.     Every four years?

16         A.     Right.

17         Q.     After the 2010 to Tahoe --

18         A.     This isn't --

19                Go on.

20         Q.     I'm sorry.

21         A.     Getting the car is nothing new,

22    every mayor before me also had the privilege

23    of getting their own car, as well as the

24    chief, okay, so this is nothing new.  This is

25    a Ralph Scordino, this is procedure that was

110

```
1                    R. SCORDINO
2    done before I came and became mayor.  When I
3    took over in 2002, the mayor before us, he
4    also had, I believe, a car too, okay, so this
5    is --
6         Q.    What car --
7         A.    He had a different car.  He had,
8    I believe, I drove that car for many years too
9    because -- and it wasn't good in snow because
10   I go out in the snow, so I need a heavier car,
11   I need a four-wheel drive car so that I don't
12   end up in the woods somewhere when I inspect
13   the roads on a snowstorm.
14        Q.    When you say inspecting the
15   roads, can you describe to what you're
16   referring?
17        A.    Snowstorms, that's part of my
18   job.
19        Q.    When you say part of your job --
20        A.    As mayor.
21        Q.    You inspect the roads?
22        A.    Um-hum.
23        Q.    Anything else?
24              MR. TOSCA:  Objection.
25        A.    I travel all over the Village.  I
```

111

```
 1                      R. SCORDINO
 2    look, I look -- meet residents, talk to
 3    residents.
 4         Q.    You oversee the entire Village.
 5         A.    The entire Village.
 6         Q.    Do you oversee all the
 7    departments within the Village of Babylon?
 8         A.    I oversee -- yes, I'm responsible
 9    for them also.
10         Q.    When you say, meet the residents,
11    can you describe what you mean?
12         A.    Sometimes residents call me over
13    to talk to them.
14         Q.    When you say call you, how --
15         A.    Wave me down.  Wave at me, come
16    on over, talk to me.  How is everything going,
17    conversation.
18         Q.    This is when you're in the
19    Village of Babylon purchased vehicle?
20         A.    Yes.
21         Q.    Prior to 2002, before you were
22    mayor of Village of Babylon, did you have a
23    personal vehicle?
24         A.    No, I had my own vehicle.
25         Q.    What vehicle was that?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

112

1                          R. SCORDINO

2         A.      I believe I had a Suburban.

3         Q.      That was not purchased for you by

4    the Village of Babylon, correct?

5         A.      That is correct.

6         Q.      That was not owned by a

7    municipality?

8         A.      That was owned by me.  It wasn't

9    blue, by the way, it was turquoise.

10        Q.      Like the marlin?

11        A.      Close, like a bluefish maybe.

12        Q.      Have you ever had any accident

13   with a Village of Babylon vehicle?

14               MR. TOSCA:  Objection.

15               You can answer.

16        A.      Yeah.  I've had one fender

17   bender, I think I did.

18        Q.      Was that when you were working

19   for the Village of Babylon or were you doing

20   something else?

21        A.      In the Village car it was the

22   Village car.

23        Q.      Were you inspecting the roads

24   or --

25        A.      Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

113

1             R. SCORDINO

2          MR. TOSCA:  Let me finish the

3      question.

4             THE WITNESS:  Sorry.

5          MR. TOSCA:  That's okay.

6      Q.     When you said you meet residents,

7  you inspect the roads, you oversee the Village

8  of Babylon, is there anything else you do in

9  that car provided to you by the Village of

10 Babylon?

11      A.     It's for any personal use also,

12 might go to the store, might visit my

13 daughter.

14      Q.     After that 2010 Tahoe, did the

15 Village of Babylon purchase another vehicle

16 for the mayor, for you?

17      A.     Yes.

18      Q.     What vehicle was that?

19      A.     Tahoe.

20      Q.     Do you know the year of the new

21 Tahoe?

22      A.     Probably 2011.

23      Q.     2011?

24      A.     Right.  Right after 2010, if

25 we're going in the same direction, every four

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

114

1                          R. SCORDINO

2      years there is a new vehicle.

3            Q.     So I'm thinking four years after

4      the 2010 is probably 2014?

5            A.     Right.   2014.

6            Q.     Was it a 2014 Tahoe?

7            A.     Yes.

8            Q.     What color was that 2014 Tahoe?

9            A.     I think it was like a charcoal, I

10     believe.

11           Q.     The registration for the charcoal

12     Tahoe was paid for by the Village of Babylon?

13           A.     Um-hum.

14           Q.     The insurance for that charcoal

15     Tahoe was paid for by the Village of Babylon.

16           A.     Um-hum.

17           Q.     When you say um-hum, is that yes?

18           A.     Yes.

19           Q.     When you say fender bender, which

20     vehicle had the fender bender?

21           A.     I think it was that one, the gray

22     one or charcoal one.

23           Q.     After that gray or charcoal

24     fender bender, did you have another vehicle?

25           A.     Yes, another Tahoe.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

115

1                     R. SCORDINO

2          Q.     What color was that Tahoe?

3          A.     Blue.

4          Q.     What year was that Tahoe?

5          A.     Right after the other one, we're

6     going in a sequence.  That was the last one,

7     right?

8          Q.     2019, is that the new one?

9          A.     Yeah.

10         Q.     And in this 2019 Tahoe, is this

11    the same vehicle that you utilized to inspect

12    the road you mentioned and other thing?

13         A.     Um-hum.

14         Q.     You say, so you don't end up in

15    the woods, to what are you referring, sir?

16         A.     Well, it gets very, very slippery

17    sometimes, and I believe the car that the

18    mayor had before us was a Buick, and it was

19    very, very light and it really was very unsafe

20    on snowy roads.  I wanted to get a four-wheel

21    drive so I had it.

22         Q.     Okay.

23                Sir, are you familiar with the

24    address 631 P.O. Box, Ocean Beach, New York?

25         A.     Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

116

1                       R. SCORDINO
2        Q.     What is that address?
3        A.     For the Ocean Beach Youth Group.
4        Q.     When you say, that's for the
5    Ocean Beach Youth Group --
6        A.     For mail there.
7        Q.     When you say the mail there,
8    there is an address to which the camp would
9    receive mail?
10       A.     Yes.
11       Q.     Does anyone reside in that
12   location?
13       A.     It's closed up for the summer.
14       Q.     When it's not closed up, is that
15   the actual camp location?
16       A.     Um-hum.
17       Q.     How long is that camp?
18       A.     It's the house.  What are you
19   talking about, the P.O. Box, a P.O. Box is a
20   post office box.
21       Q.     Is that associated with the
22   residence or the camp?
23       A.     Camp.
24       Q.     It's not a personal residence,
25   correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

117

1                    R. SCORDINO

2      A.      No, post office, Ocean Beach Post

3  Office.

4      Q.      631 P.O. Box is located there?

5      A.      Yes.

6      Q.      What are the months of operation

7  of such summer camp?

8      A.      Usually the second week in June

9  to the second week in September.

10     Q.      Are you familiar with 152 Cadman

11  Avenue, Babylon, New York 11702?

12     A.      Yes.

13     Q.      What is that address?

14     A.      My parents' address.

15     Q.      Have you resided at 152 Cadman

16  Avenue?

17             MR. TOSCA:  Objection.

18     A.      Yes.

19     Q.      What years did you reside there?

20     A.      I don't recall.

21     Q.      Do you recall the decade?

22     A.      I'd be guessing.

23     Q.      I don't want you to guess, sir.

24     A.      Hum.

25     Q.      I don't want you to guess.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

118

1                          R. SCORDINO

2          A.      No.  I said I'd be guessing, that

3    means I don't want to.

4          Q.      I didn't want you to.

5                  Did you live at 152 Cadman

6    Avenue, Babylon, New York 11702 when you were

7    a teenager?

8          A.      Yes.

9          Q.      Did you live there when you were

10   married?

11         A.      No.

12         Q.      Did anyone else reside with you

13   at 152 Cadman Avenue, Babylon, New York when

14   you lived there?

15         A.      Yes.

16                 MR. TOSCA:  Objection.

17                 You can answer.

18         Q.      With whom did you reside at that

19   location?

20         A.      My brother.

21         Q.      Anyone else?

22         A.      That's it.

23         Q.      And your parents, correct?

24         A.      Um-hum.

25         Q.      Anyone else?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

119

```
 1                    R. SCORDINO
 2       A.      No.
 3       Q.      Do you recall when you moved out
 4  of that location?
 5       A.      Right after I got married.
 6       Q.      Where did you move?
 7       A.      22 Whaler's Cove.
 8       Q.      Do you know anyone at 26 Whalers
 9  Cove?
10       A.      26 Whalers Cove.  No.
11       Q.      When you moved into 22 Whaler's
12  Cove, Babylon, New York 11702, did you
13  purchase it, did you lease, something else?
14               MR. TOSCA:  Objection.
15               You can answer.
16       A.      I believe we got a mortgage for
17  it.  There was a mortgage.
18       Q.      Who is we?
19       A.      My wife and I.
20       Q.      Did you purchase the property as
21  tenants by the entirety?
22               MR. TOSCA:  Objection.
23               You can answer over the
24       objection.
25       A.      I don't understand the question.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

120

1           R. SCORDINO

2       Q.      Did you purchase the property as

3   a married couple or something else?

4       A.      Married couple.

5       Q.      Did you take a mortgage on this

6   property?

7       A.      Yes.

8       Q.      For what period of time did you

9   reside at 22 Whaler's Cove, Babylon, New York

10  11702?

11      A.      I believe it was five years.

12      Q.      Do you still own that property?

13      A.      No.

14      Q.      Did you sell that property?

15      A.      Yes.

16      Q.      When did you sell that property?

17      A.      Four years after I purchased it.

18      Q.      Who, aside from yourself and your

19  wife, resided at 22 Whaler's Cove?

20      A.      That's it.  My daughter.

21      Q.      I'm sorry.

22      A.      My daughter.

23      Q.      Anyone else?

24      A.      That's it.

25      Q.      Did you have the dog?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

121

                          R. SCORDINO

1

2      A.      No.

3      Q.      By whom were you employed when

4  you lived at 22 Whaler's Cove, Babylon, New

5  York 11702?

6      A.      West Islip School District, Town

7  of Babylon.

8      Q.      Anyplace else?

9      A.      That's it.

10     Q.      When you sold 22 Whaler's Cove,

11 Babylon, New York 11702, to where did you

12 move?

13     A.      89 Washington Street.

14     Q.      That's the home we mentioned

15 earlier, right?

16     A.      Yes.

17     Q.      Sir, did you ever maintain a

18 Facebook account?

19     A.      Facebook account, no.

20     Q.      Did anybody sign up for a

21 Facebook account on your behalf?

22     A.      I don't believe so.

23     Q.      Does the Village of Babylon

24 maintain a Facebook account?

25     A.      Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

122

1                           R. SCORDINO

2          Q.     Whom monitors such Facebook

3     account?

4          A.     One of our trustees.

5          Q.     Who is that?

6          A.     Mary Adams.

7          Q.     Does anyone else have access to

8     the Village of Babylon Facebook account?

9          A.     I believe -- no, it all goes

10    through Mary.

11         Q.     What is the username for the

12    Village of Babylon Facebook account?

13         A.     I don't know.  I have no idea.

14         Q.     Have you ever visited the Village

15    of Babylon --

16         A.     No.

17         Q.     -- Facebook page?

18         A.     No.

19                MR. TOSCA:  Let him finish the

20         question.

21         Q.     Sir, have you ever worked at the

22    Village of Babylon Justice Court?

23         A.     No.

24         Q.     Have you ever owned any property

25    which we have not mentioned so far?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

123

1                        R. SCORDINO

2          A.     No other property.

3          Q.     Are you a high school graduate?

4          A.     Yes.

5          Q.     When did you graduate from high

6     school?

7          A.     1967.

8          Q.     From what high school did you

9     graduate?

10         A.     Babylon High School.

11         Q.     Where was that high school

12    located?

13         A.     Babylon Village.

14         Q.     Did you attend any institution of

15    higher learning after you graduated high

16    school?

17         A.     Sure.

18         Q.     What institution.

19         A.     West Chester State University for

20    four years, Adelphi University got my Masters,

21    Brooklyn College, my SAS in administration.

22         Q.     West Chester State University,

23    where was that located?

24         A.     Pennsylvania, West Chester

25    Pennsylvania.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

124

1              R. SCORDINO

2      Q.     For what periods did you attend?

3      A.     '68 to '71.

4      Q.     Did you receive any kind of

5  certificate of attendance?

6      A.     Yes.  BS.

7      Q.     When you say BS, was that the

8  degree?

9      A.     Bachelors, yes in health and

10  physical education.

11      Q.     You said you later attended

12  Adelphi University?

13      A.     Yes.

14      Q.     For what periods did you attend?

15      A.     Like '73, '74 to '78.

16      Q.     Going back once again, were you

17  awarded any honors for your performance in

18  your period of attendance at West Chester

19  State University?

20      A.     No.

21      Q.     Did you participate in continuing

22  professional education programs since

23  graduating from West Chester State University

24  before you went to Adelphi University?

25      A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

125

1                    R. SCORDINO

2          Q.    The Adelphi University, where was

3     it located?

4          A.    Garden City.

5          Q.    Did you receive any kind of

6     certificate of attendance?

7          A.    Yes.

8          Q.    What was that?

9          A.    Masters in health and physical

10    education.

11         Q.    Were you awarded any honors for

12    you period of attendance at Adelphi?

13         A.    No.

14         Q.    Did you participate in any

15    continuing professional education programs --

16         A.    No.

17         Q.    -- since graduating from Adelphi

18    from?

19         A.    No.

20         Q.    After Adelphi University, you

21    attended Brooklyn College, sir?

22         A.    Hum.

23         Q.    Was that a yes?

24         A.    I didn't hear the question.

25         Q.    I asked if after you attended

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

126

1                          R. SCORDINO

2     Adelphi University, you attended Brooklyn

3     College?

4          A.     Not right after.  I believe it

5     was in the late '80s.  '83 to '86.

6          Q.     Did you receive any kind of

7     certificate of attendance?

8          A.     Yeah, SAS.

9          Q.     Were you awarded any honors for

10    your performance?

11         A.     No.

12         Q.     Did you participate in continuing

13    education programs since graduating from

14    Brooklyn College?

15         A.     No.

16         Q.     Do you hold any other license

17    aside from a driver's license?

18         A.     I have a pistol license to carry.

19         Q.     What state do you hold that

20    pistol carry license?

21         A.     Suffolk County, New York.

22         Q.     When did you first obtain that

23    pistol carry license?

24         A.     Two years ago.

25         Q.     Why did you on obtain the pistol

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

127

1                    R. SCORDINO

2    carry license?

3              MR. TOSCA:  Objection.

4              You can answer over objection.

5         A.    Because number 1, I felt that to

6    have a carry license, one of the examples

7    putting in there, there's a lot of money that

8    go in and out of Babylon Village, and also,

9    I'm a sportsman.

10        Q.    When you say sportsman, to what

11   are you referring?

12        A.    Sportsman, it's part of the

13   license, sportsman license.

14        Q.    Have you ever shot an animal with

15   a carry license permit?

16        A.    No.

17        Q.    Have you ever been hunting

18   before?

19        A.    Yes.

20        Q.    Have you ever shot an animal

21   before?

22        A.    Yes.

23        Q.    What have you shot?

24        A.    Deer.

25        Q.    Anything else?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

128

1                     R. SCORDINO

2            MR. TOSCA:  Objection.

3            You can answer.

4      A.     That's it.

5      Q.     The weapon to which you shot a

6  deer with, was that a weapon that you can

7  carry on your person?

8      A.     No.

9      Q.     You said there many reasons why

10  you obtained a carry license, one was there

11  was a lot of money in and out of Babylon.

12            What were the other reasons, sir?

13      A.     Security purposes, people come in

14  and out of Village Hall, that was one of

15  reasons, one of the criteria.  You, to get

16  interviewed, took about eighteen months to get

17  the carry license.  They scrutinize

18  everything, Suffolk County Police.

19      Q.     Was there a particular police

20  officer or sergeant or person within the

21  Suffolk Police to whom scrutinized your --

22      A.     Yes.

23      Q.     Who was that person?

24      A.     I can't recall who it was.

25      Q.     Was it a man or woman?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

129

1                    R. SCORDINO

2          A.    Man.

3          Q.    What is the gun to which you have

4     a carry license for?

5          A.    Glock 42 and a Ruger 22.

6          Q.    You said there's a lot of money

7     in and out of the Town of Babylon, can you

8     explain what you mean?

9          A.    Treasurer's office is upstairs

10    and court system downstairs.

11         Q.    When you say a lot of money, are

12    you referring to cash?

13         A.    Cash, tickets, cash from the

14    tickets, checks downstairs for permits, down

15    in the Village clerk's office.

16         Q.    Anything else, sir?

17         A.    That's about it.

18         Q.    You say checks for permits in the

19    Clerk's office, to what are you referring?

20         A.    Landscape permits, parking

21    permits.  Always we have taxes that are paid

22    there.

23         Q.    So you recently applied for this

24    pistol carry license?

25         A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

130

1                          R. SCORDINO

2          Q.      But yet you have been the mayor

3     for nearly two decades?

4          A.      Um-hum.

5          Q.      Why did you apply two to three

6     year ago as opposed to 20 years ago?

7                  MR. TOSCA:  Objection to form.

8                  You can answer.

9          A.      I think our society has changed a

10    little bit.

11         Q.      Can you explain?

12         A.      I think you have a lot of people

13    that are -- we don't know about -- that are on

14    the streets, a lot of people come into our

15    village that are either on drugs or liquor,

16    sometimes it's disheartening to see this, you

17    know, you have people at the railroad station,

18    it's different society today.

19         Q.      Anymore incidents that made you

20    apply for your carry license?

21         A.      No.

22         Q.      You say drugs and liquor, people

23    we don't know about.

24                 Can you explain?

25         A.      We have people to our Village

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

131

1                    R. SCORDINO

2    Hall at some of our meetings that are

3    definitely under the influence of alcohol.

4         Q.     Is it against the law to come to

5    a Village Hall meeting under the influence of

6    alcohol?

7         A.     Well, if they know how to --

8                MR. TOSCA:  Objection.

9                You can answer.

10        A.     If they know how to conduct

11   themselves.  Sometime they get out of hand.

12        Q.     Is there any incident of which

13   you can describe or recall for someone getting

14   out of hand at the Village of Babylon Village

15   Hall?

16        A.     No.

17        Q.     There's not one incident?

18        A.     No.

19        Q.     Are there many incidents?

20        A.     I would say maybe in a six-month

21   period, you get one or two.

22        Q.     Have you ever had to call the

23   police because of those incidents?

24        A.     We had them on standby.

25        Q.     Sir, have you ever had to call

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

132

1                       R. SCORDINO

2     the police because of one of these incidents?

3          A.     Yes.

4          Q.     When did you call the police?

5          A.     I think last year it was.  Can't

6     remember the exact date.

7          Q.     Aside from last year that you

8     can't recall the exact date, have you ever had

9     the opportunity to call the police otherwise?

10         A.     Yes, we have.

11         Q.     When did you do that?

12         A.     Exact date, I don't know the

13    exact date.  I can remember we did call them

14    for a disturbance in the Village Hall.

15         Q.     Do you remember the month and the

16    year, sir?

17         A.     No.

18         Q.     When you say disturbance in

19    Village Hall, in your capacity as mayor of the

20    Village of Babylon, what, if anything, other

21    than disturbance in Village Hall, have you

22    called the police for?

23                MR. TOSCA:  Objection.

24                You can answer over objection.

25         A.     That's about it.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

133

1                    R. SCORDINO

2        Q.    You said drugs, sir --

3        A.    Well, you don't know.  You don't

4    know if they're on drugs but that act kind of

5    peculiar.

6        Q.    You're the mayor of the Village

7    of Babylon.

8             Are there drugs within the

9    Village of Babylon?

10       A.    Oh, yeah.

11       Q.    What drugs are you referring to?

12       A.    Anything.You know, people are

13   using drugs all over Suffolk County.  We're

14   not immune from it.

15       Q.    In the past two years, you've

16   applied for a carry license?

17       A.    Um-hum.

18       Q.    Is there any particular drug

19   which has changed the past 20 years?

20       A.    We do have an opioid epidemic

21   right here in Suffolk County, so much that

22   we're even, I entered into a lawsuit against

23   opioid manufacturers with all the mayors, the

24   33 mayors in Suffolk County.  There is a

25   problem, there's not a secret to it.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

134

1                          R. SCORDINO

2          Q.    How did you learn that, sir?

3          A.    How did I learn it?  Reading the

4    newspaper.

5          Q.    Did any of your constituency

6    ever say that there was a problem with the

7    opioid crisis?

8          A.    I get records also from the

9    rescue, that rescue.  They have some overdoses

10   in the Village, and I'm told that.

11         Q.    By whom are you told?

12         A.    The chief.

13         Q.    The chief of what?

14         A.    Babylon Village Fire Department.

15         Q.    Who is that?

16         A.    Mike Olive.

17         Q.    Has it always been the same

18   chief?

19         A.    No.

20         Q.    Every four years they change.

21         A.    Who was the chief before him?

22         A.    Let's see.  It was Paul Twardy,

23   T-W-A-R-D-Y.

24         Q.    Under Paul Twardy, do you believe

25   you had an opioid crisis?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

135

                        R. SCORDINO

1

2       A.      Yes.

3       Q.      Yet you did not apply for a carry

4   license?

5       A.      No.

6               MR. TOSCA:   Objection.

7               You can answer.

8       A.      No.

9       Q.      Why?

10              MR. TOSCA:   Objection.

11              You can answer.

12      A.      Felt safer, I guess.

13      Q.      Has there been an increase in the

14  opioid problem since Paul Twardy?

15      A.      Yes.

16      Q.      Has there been an increase in the

17  amount of cash received from, among other

18  things, permits at the Village of Babylon?

19      A.      Yes.

20      Q.      Aside from your driver's license

21  and aside from your carry license, do you hold

22  any other certificate, CDL, anything like

23  that, sir?

24      A.      No.

25      Q.      When I say CDL, I'm referring to

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

136

1                     R. SCORDINO

2    a commercial driver's license.

3          A.    I know what it means.

4          Q.    Do you have a boating license?

5          A.    Oh, yeah, I do, yes.

6          Q.    That's why I'm asking.

7          A.    And hunting license.

8          Q.    Okay.

9                Boating license, hunting license,

10   carry license.

11               Do you have any other licenses?

12         A.    I do not.

13         Q.    To be clear, aside from the

14   boating license, the driver's license, the

15   carry license, and the hunting license, do you

16   have any other licenses or certificates here

17   or otherwise?

18         A.    No.  They're basically the ones I

19   know about.

20         Q.    For security purposes was one of

21   reasons you got the carry license?

22         A.    Um-hum.

23         Q.    Sir, have you ever been

24   threatened coming in or out of the Village of

25   Babylon Town Hall?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

137

1                    R. SCORDINO

2       A.      Threatened, yes.

3       Q.      By whom were you threatened?

4       A.      The gentleman right across the

5   table from us.

6       Q.      When you say the gentleman across

7   the table, are you referring to John Lepper?

8       A.      Yes.

9       Q.      How did he threaten you?

10      A.      He at threatened me at one of the

11  Village Board meetings.

12      Q.      What did he say?

13      A.      He was very threatening.  He was

14  using language that I felt was threatening.

15      Q.      What was that language, sir?

16      A.      I can't recall.  It's all on

17  tape, I guess, so you can see it for yourself.

18      Q.      When you say, it's all on tape,

19  what do you mean?

20      A.      The court where the Village Hall

21  meeting is all filmed.

22      Q.      You telling me you have that on

23  tape, Mr. Lepper threatening you?

24      A.      I believe so.  Or if it's erased,

25  I don't know if it's erased every 30 days.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

138

1                      R. SCORDINO

2    I'm not sure.

3         Q.    Did you ever call the police in

4    regards to those threats?

5         A.    Almost.

6         Q.    When you say almost, can you

7    explain why it was almost?

8         A.    It reached a point where I

9    thought he was out of control.

10        Q.    And this was all recorded?

11        A.    Was, yes.

12        Q.    Who maintains the recording?

13        A.    Treasurer -- the court system.

14        Q.    When you say court system, what

15   court system are you referring to?

16        A.    Village Hall.

17        Q.    Where did this occur?  Village

18   Hall; is that right?

19        A.    Yes.

20        Q.    It occurred in the court?

21        A.    Yes.  Where we have the Village

22   Hall meetings.

23        Q.    Understood.

24              So the Village of Babylon Justice

25   Court has the ability to record; is that

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

139

1              R. SCORDINO

2    right?

3         A.    Yes.

4         Q.    In those recording, you say John

5    Lepper had threatened you?

6         A.    Yes.

7         Q.    Did you give that recordings or

8    did you report that to anybody?

9         A.    No.

10        Q.    What, if anything, did you do?

11        A.    Nothing.

12        Q.    Were you carrying a weapon on

13   that day?

14        A.    No.

15        Q.    Was this before or after you had

16   your carry license?

17        A.    Sometimes I don't carry it.

18        Q.    Was this before or after you had

19   your carry license?

20        A.    It was before.  I'm sorry.

21        Q.    You didn't carry your weapon that

22   day?

23        A.    No.

24        Q.    Any written minutes of this

25   threatening action that supposedly occurred by

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

140

1                    R. SCORDINO

2    Mr. Lepper?

3        A.    Village clerk probably has the

4    records.

5        Q.    To whom are you referring?

6        A.    Ms. Parker, Jean Parker, Jean

7    Parker.

8        Q.    Jean Marie Parker?

9        A.    Yes.

10       Q.    As you sit here today, did you do

11   anything with either the minutes or the video

12   in regards to --

13       A.    No.

14       Q.    And you perceived these as

15   threats, correct?

16       A.    Yes.

17       Q.    You can't recall how you were

18   threatened; is that right?

19       A.    Verbally, body actions, body

20   movements.

21       Q.    What is the threat, what is the

22   verbal threat?

23       A.    The verbal threat was, he was

24   verbally attacking me about the letter.  The

25   letter that I was trying the explain to him,

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

141

1                      R. SCORDINO
2    the letter was never sent out, it was a draft
3    letter.
4         Q.    When you say draft letter, to
5    what letter are you referring?
6         A.    The letter that he suspects and
7    you do too that I wrote and sent out.  I was
8    trying to explain to Mr. Lepper that that
9    letter never went out; it was a draft letter.
10        Q.    Did you say that in response to
11   what you perceived as a threats?
12        A.    Yes.  He stormed out of the room.
13   I'll get you.  I said, okay.
14              If somebody said that to you,
15   wouldn't you think that was a threat?
16        Q.    Sir, I'm here giving deposition.
17   My questions are to you.
18              So I ask you sir, that language
19   is what you perceived a threat, correct?
20        A.    Yes.
21        Q.    Any other language you perceived
22   as a threat by John Lepper?
23        A.    No.
24        Q.    You never called the police,
25   correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

142

1                    R. SCORDINO

2       A.    No.

3       Q.    Did you ever call security?

4       A.    Yes.

5       Q.    Who did you call?

6       A.    Bill Whittier, Superintendent of

7  Code Enforcement.

8       Q.    How did you do that?

9       A.    How did I do that?  By phone.

10      Q.    Did you use your cellular phone,

11 landline, something else?

12      A.    I think I used the Village phone.

13      Q.    What did you say to Mr. Whittier?

14      A.    I think it would be a good idea

15 to come down here because Mr. Lepper seems to

16 be out of control.

17      Q.    Did he come down?

18      A.    I believe then Mr. Lepper left.

19      Q.    When did this occur?

20      A.    One of our Village Board meetings

21 about six months ago.

22      Q.    In 2019?

23      A.    Um-hum.

24      Q.    Aside from Mr. Wittier, did you

25 do anything else in regard to this threat?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

143

1                          R. SCORDINO

2          A.      No.  Told our Village attorney,

3     Gerard Glass.

4          Q.      How did you do that?

5          A.      Called him up and told him.

6          Q.      Anything else?

7          A.      No, that's it.

8          Q.      You said threatening body

9     language?

10         A.      Um-hum.

11         Q.      Where was Mr. Lepper when he said

12    these things?

13         A.      Right in the front row.

14         Q.      When you say threats body

15    language, what did you perceive to be

16    threatening body language?

17         A.      Standing up and approaching the

18    dais, waving his hands.

19         Q.      So he stood up and approached the

20    dais waving his hands?

21         A.      Um-hum.

22         Q.      Anything else?

23         A.      Using language that I thought was

24    very threatening.

25         Q.      What was that language, sir?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

144

1                        R. SCORDINO

2        A.      I can't remember.

3        Q.      Is there anything preventing you

4    from recalling?

5        A.      No.

6                MR. TOSCA:  Objection.

7        Q.      Anything that would refresh your

8    recollection?

9        A.      No.

10        Q.      Is there any documents to which

11    you can refer that would help you remember?

12        A.      No.

13        Q.      As you sit here today, there is

14    nothing that would allow you to recall the

15    words that Mr. Lepper said?

16        A.      I don't remember.

17        Q.      Were you under the influence of

18    any alcohol that day?

19        A.      Me?

20        Q.      Yes.

21        A.      No.

22        Q.      Were you under the influence of

23    any drugs that day?

24        A.      No.

25        Q.      You considered this a pretty

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

145

1                   R. SCORDINO

2    significant event, correct?

3         A.    I do, yes.

4    RQ            MR. MORRIS:  Call for production

5         of that video and those minutes.

6         Q.    Sir, since your graduation from

7    high school, have you ever written or prepared

8    any materials for publication or broadcast?

9         A.    No.

10        Q.    Did you ever send out a

11   newsletter?

12        A.    Yes.

13        Q.    I ask that question one more

14   time.

15              Since you graduated from high

16   school, have you ever written or prepared

17   anything for publication of for broadcast?

18              MR. TOSCA:  Objection.

19              You can answer.

20        A.    Me write it, write all of it?

21   No, I don't.  I thought I answered the right

22   way the first time.

23        Q.    When you say a newsletter was

24   produced, can you explain what you mean?

25        A.    Newsletter is put together by the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

146

1                      R. SCORDINO
2    PR Trustees and Board and it goes out with
3    information for our trustees to see.  I don't
4    write it.  I look over it.  I don't write it.
5    We have somebody doing that.  We have somebody
6    that's in charge of the newsletter.
7         Q.    Do you sign your name to it?
8         A.    Sure.
9         Q.    Do you sign your name to someone
10   else's writing?
11             MR. TOSCA:  Objection.
12        A.    Me?
13        Q.    Yes.
14        A.    Do I sign my name to other
15   people's -- no.
16        Q.    So you sign the newsletter,
17   correct?
18        A.    I don't sign the newsletter.
19   It's from the mayor and the Village of
20   Babylon.  I have a story about the upcoming
21   events.
22        Q.    Which mayor is it from?
23        A.    It's from the mayor and the
24   Village Board of Trustees.
25        Q.    From the mayor of what?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

147

```
 1              R. SCORDINO
 2       A.     The Village of Babylon.
 3       Q.     Is it signed by the mayor of the
 4  Village of Babylon?
 5       A.     I don't know what you mean by
 6  signed.  What are you talking about signed?
 7  My signature is not on there.
 8       Q.     That --
 9       A.     Meaning signed, signature, right?
10  Are you talking about a signature?
11       Q.     Is it attributed to you as the
12  mayor of the Village of Babylon?
13       A.     It's attributed to the Board of
14  Trustees and the many things that we have in
15  Babylon Village, that the tribute.
16       Q.     It's attributable to you as mayor
17  of Village of Babylon?
18       A.     I guess you would call that, you
19  know.
20       Q.     I didn't want you to guess, is it
21  or isn't it?
22       A.     It's your interpretation,
23  Mr. Morris.  It's not my interpretation.
24       Q.     Sir, it's a newsletter that goes
25  out that purports to be from the mayor of the
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

148

1                      R. SCORDINO

2    Village of Babylon and others?

3              MR. TOSCA:  Objection.

4         A.     I said before, the mayor and the

5    Board of Trustees.

6         Q.     When you say mayor and Board of

7    Trustees --

8         A.     Right.

9         Q.     You are that mayor, right?

10        A.     Right, and so is the Board of

11   Trustees.

12        Q.     It goes out on your behalf along

13   with the Board of Trustees?

14        A.     Right.

15        Q.     So in that regard, the newsletter

16   is attributed to you and others as mayor of

17   the Village of Babylon?

18        A.     Yes.

19        Q.     Aside from that newsletter, have

20   you prepared any material for publication or

21   broadcast?

22        A.     There's some information on

23   Facebook that goes out.

24        Q.     When you say some information on

25   Facebook that goes out, to what are you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

149

1                         R. SCORDINO

2    referring?

3         A.    Information goes to the person

4    who is in charge of Facebook and it goes on

5    the Facebook page.

6         Q.    This information isn't produced

7    through osmosis, correct?

8              MR. TOSCA:  Objection.

9         Q.    You produce it, right?

10             MR. TOSCA:  Objection.

11        A.    Listen to me, Mr. Morris, listen

12   very carefully, okay.  The information is

13   given to the person in charge of the Facebook

14   and she writes and puts it on Facebook.  Okay.

15        Q.    Do you produce that information?

16        A.    I give her the --

17             MR. TOSCA:  Objection.

18             You can answer.

19        A.    The materials are given to her,

20   okay, and then she writes it.  Okay.

21        Q.    Those materials, they're produced

22   by you, correct?

23        A.    The information, yes.

24        Q.    Yes.

25        A.    It's okayed by me what goes on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

150

 1                    R. SCORDINO

 2   Facebook.

 3         Q.      You oversee that process,

 4   correct?

 5         A.      Right.

 6         Q.      Because you're the mayor of the

 7   Village of Babylon?

 8         A.      That's very good.

 9         Q.      It's not done by Jean Marie

10   Parker, right?

11         A.      No.

12         Q.      Because she's the clerk?

13         A.      Right.

14         Q.      And you're the mayor?

15         A.      Right.

16         Q.      Aside from the Facebook web page

17   and aside from the newsletter publication,

18   since your graduation from high school, have

19   you ever written or prepared any material for

20   publication or broadcast?

21                 MR. TOSCA:  Objection.

22         A.      I don't recall.

23         Q.      You say you don't recall --

24         A.      I don't know.

25         Q.      You don't know?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

151

1                          R. SCORDINO

2        A.    I don't know.

3        Q.    Is it that you don't know or is

4   it that you don't recall?

5        A.    I don't know.

6        Q.    But you know about the Facebook,

7   right?

8        A.    Right.

9        Q.    You know about the newsletter?

10       A.    Right.

11       Q.    What else do you know about?

12             MR. TOSCA:  Objection.

13             You can answer over objection.

14       A.    I don't know what you're talking

15   about, other than things that, those are the

16   two things.

17       Q.    Did you ever prepare something

18   for broadcast on Twitter or Instagram?

19       A.    Twitter, no.

20       Q.    What about Myspace?

21       A.    No.

22       Q.    Did you ever prepare something

23   for production on American Online [sic]?

24       A.    No.

25       Q.    Did you ever prepare something on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

152

1                    R. SCORDINO

2   a school board website or publication?

3        A.    No.

4        Q.    Did you ever put out the greeting

5   card that said, from the Village of Babylon

6   mayor, Mayor Scordino?

7        A.    Yes.

8              MR. TOSCA:  Objection.

9        A.    Yes, we do.

10             That's not from the Village.

11       Q.    That from you?

12       A.    As what?

13       Q.    Publication.

14       A.    Right, it's a Better Babylon

15  Christmas card that goes out.  It's not a

16  Village card, it's Better Babylon Party.

17       Q.    I guess, let's make a note of

18  that.  We'll go back.

19             Better Babylon Village party?

20       A.    No.

21             Listen again, Better Babylon

22  Party.

23       Q.    Is that Better Babylon, like the

24  Town of Babylon or the Village or something

25  else?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

153

1                          R. SCORDINO

2          A.      Better Babylon Party.

3          Q.      Is that like a political party

4     or --

5          A.      That's the party, the independent

6     party that we have when we run for election.

7          Q.      In this independent party that

8     you run for election, are you referring to

9     yourself encompassed in that party?

10         A.      Yes.

11         Q.      Encompassed in that party, things

12    are prepared for publication?

13         A.      Yes.

14         Q.      And you prepared some of them?

15         A.      No.

16         Q.      You prepared none of them?

17         A.      I oversee them.

18         Q.      Do you ever sign them?

19         A.      Yes.

20         Q.      Did you ever approve them?

21         A.      Yes.

22         Q.      Is it fair to say some of these

23    things wouldn't go out unless you either

24    signed or approved them?

25         A.      Hard to tell.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

154

1                    R. SCORDINO

2        Q.    What makes it hard to tell?

3        A.    Because I don't know what you

4   mean.  I don't know what you're driving at.

5        Q.    Start with the Better Babylon

6   Party?

7        A.    Right.

8        Q.    When did you first participate in

9   the Better Babylon Party?

10        A.    1986.

11        Q.    Since 1986, have you ever

12   prepared any material for publication or

13   broadcast within the Better Babylon Party?

14             MR. TOSCA:  Objection.

15        A.    Public, no, nothing.  I didn't.

16   I've never prepared anything.

17        Q.    Did you ever make a holiday card?

18        A.    Holiday cards, we put out, yes.

19   We do that.

20        Q.    Anything other than the holiday

21   card?

22        A.    That's it.

23        Q.    Have you ever given them any

24   information put out in any material of any

25   sort?

155

1                        R. SCORDINO

2              MR. TOSCA:  Objection.

3         A.      There's information that goes out

4    all the time, you know what I mean, it goes to

5    one of our publications and they take care of

6    it, put it together.  Did you ever run a

7    campaign?

8         Q.      No, I haven't.

9         A.      There is a certain thing that you

10   have to understand, people, there are people

11   that are hired that do this stuff, and we get

12   the draft and we look at it and we okay it.

13   Okay.

14        Q.      And in this that process, I'm

15   going to ask you to consider that preparation

16   for material prior to publication or

17   broadcast.

18        A.      Okay.

19              MR. TOSCA:  Objection.

20        Q.      Aside from the holiday card, what

21   have you prepared for publication or broadcast

22   for the Better Babylon Party?

23              MR. TOSCA:  Objection.

24              You can answer.

25        A.      A number of things.

156

1                    R. SCORDINO

2        Q.    What are they?

3        A.    Well, advertisements, political

4    campaign literature.

5        Q.    What --

6        A.    Our brochure you mentioned

7    before, you know.

8        Q.    So start with advertisements,

9    what advertisements have you prepared for

10   either or broadcast within the Better Babylon

11   Party?

12       A.    Advertisements, I'm talking about

13   campaign literature.

14       Q.    It's subsuming campaign

15   literature?

16       A.    Pardon me?

17       Q.    It's subsumed, contained with?

18       A.    Yes.

19       Q.    For what persons did you prepare

20   such information as part of their political

21   campaign?

22       A.    For everyone that is a member of

23   the Better Babylon Party that's running for

24   election.

25       Q.    Since 1986 to the present, who

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

157

1                           R. SCORDINO

2    was that?

3          A.     Wasn't me in 1986.  From 2002,

4    say but not 1986.

5          Q.     Again, sir, since 1986, what have

6    you written or prepared for publication

7    broadcast in the Better Babylon Party for what

8    persons?

9          A.     I wasn't involved in anything

10   from 1986 to 2002, okay.  From 2002 to the

11   present time, okay, I was the overseer, I

12   guess, to the campaign literature that went

13   out for the people that were in the Better

14   Babylon Party.

15               MR. MORRIS:  Time now is 12:40.

16               (Mr. Morris changed battery in

17        video camera.)

18               MR. MORRIS:  Time is 12:42.

19         Q.     Sir, you participate in

20   campaigns, correct?

21         A.     Yes.

22         Q.     Those campaigns are for people?

23         A.     Yes.

24         Q.     Who are those people?

25         A.     Mary Adams, Kevin Muldowney, Tony

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

158

1                    R. SCORDINO

2    Davida, myself, Jack Rafter, Debbie Basile,

3    B-A-S-I-L-E, Alice Vanderbilt, Diane Gilmore,

4    a number of other people I can't remember now

5    their names going back.

6         Q.    Did you prepare or approve any of

7    the material as part of those campaigns?

8         A.    Yes.

9         Q.    Did you prepare or approve

10   material for Mary Adams?

11        A.    Yes.

12        Q.    Did you prepare or approve

13   material for Mr. Muldowney?

14        A.    Yes.

15        Q.    Did you prepare or approve

16   material for Mr. Davida?

17        A.    Yes.

18        Q.    Did you prepare or approve

19   material for Mr. Jack Rafter?

20        A.    Yes.

21        Q.    Did you prepare or approve

22   material for Debbie Basile?

23        A.    Yes.

24        Q.    Did you prepare or approve

25   material for Alice Vanderbilt?

Case 2:18-cv-07011-JMA-AYS  Document 127  Filed 07/26/21  Page 615 of 1193 PageID #: 4673

159

1                        R. SCORDINO

2          A.      Yes.

3          Q.      What about Diane Gilmore?

4          A.      Diane Gilmore.  You have to

5     understand, this is done.  Not only by myself

6     but with a campaign committee.

7          Q.      So others oversaw this process as

8     well.

9          A.      All the trustees that you just

10    mentioned there, plus other people are also

11    involved.

12         Q.      And you contributed to that; is

13    that correct?

14         A.      Yes.

15         Q.      Sir, do you maintain a website?

16         A.      Maintain a website, no.

17         Q.      Do you have a website?

18         A.      No.

19         Q.      Is there anything on the internet

20    that is your domain?

21         A.      No.

22         Q.      Do you maintain any social media

23    account?

24         A.      No.

25         Q.      Have you maintained any social

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

160

1                    R. SCORDINO

2    media account?

3         A.    No.

4         Q.    By whom are you employed at the

5    present time?

6         A.    Village of Babylon, Ocean Beach

7    Youth Group.

8         Q.    Anyone else?

9         A.    No.

10        Q.    For how long have you been an

11   employee of the Village of Babylon?

12        A.    Since 1987.

13        Q.    How long have you been employed

14   by the Ocean Beach Youth Group?

15        A.    Since 1999.

16        Q.    Were you employed at any time

17   during any of periods you attended school

18   after your high school graduation?

19        A.    After my high school graduation.

20   Town of Babylon I believe, 1970, that was my

21   year, and also with the Babylon Yacht Club as

22   a swimming instructor and lifeguard.

23        Q.    You said you worked at the Town

24   of Babylon from 1971 to what time?

25        A.    It was '70 to, I believe, it was

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

161

1                    R. SCORDINO

2   1986.

3        Q.    What position did you hold?

4        A.    Recreation specialist.

5        Q.    Did you hold any other position

6   before with Town of Babylon?

7        A.    No.

8        Q.    Is that a Civil Service position

9   or something else?

10       A.    No.

11       Q.    Did you apply for such position?

12       A.    Yes.

13       Q.    With whom did you apply?

14       A.    Town of Babylon.

15       Q.    Is there a person.

16       A.    No.

17       Q.    Who was your supervisor?

18       A.    Jack O'Donnell.

19       Q.    Was it always Jack O'Donnell or

20   did it change at some point?

21       A.    No, it was always him.

22       Q.    You said you were working at the

23   Babylon Youth Club; is that right?

24       A.    Ocean Beach Youth Group.

25       Q.    Excuse me, Babylon Yacht Club?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

162

1                       R. SCORDINO

2          A.     Yes.

3          Q.     You were a lifeguard?

4          A.     Lifeguard and swimming

5    instructor.

6          Q.     Do you have a license to be a

7    lifeguard?

8          A.     Yes.

9          Q.     Sir, we discussed earlier --

10         A.     I know, that's one I forgot.  I'm

11   sorry.  Lifeguard back how many years?  Come

12   on.

13         Q.     Sir, just as we're talking about

14   it now, obviously the gun permit might be a

15   little more recent --

16         A.     Right.

17         Q.     -- but do you have any other

18   licenses or certifications which --

19         A.     I can't recall but you just made

20   me recall the lifeguard license.

21   Certification, I don't even think it's a

22   license, a certification.

23         Q.     Just like the lifeguard is a

24   certification, any other certifications which

25   you now recall?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

163

1                    R. SCORDINO

2         A.     No.

3         Q.     How long did you act as a

4    lifeguard at the Yacht Club?

5         A.     '71, '72, '72 to '86, I believe.

6         Q.     What happened in '86?

7                MR. TOSCA:  Objection to the

8         form.

9                You can answer.

10        A.     Started to get too busy, couldn't

11   do it anymore.

12        Q.     Was that a full-time position,

13   part-time position?

14        A.     Part-time, summer position.

15        Q.     The Town of Babylon position, was

16   that a full-time or part-time?

17        A.     Part-time.

18        Q.     Did you hold any other employment

19   during these times?

20        A.     No.

21        Q.     Did you have any volunteer

22   positions during this time?

23        A.     No.

24        Q.     In 1987, you were employed by the

25   Village of Babylon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

164

1                          R. SCORDINO

2          A.     Yes.

3          Q.     In what capacity?

4          A.     Trustee.

5          Q.     Was that as part of the Better

6     Babylon Party?

7          A.     Yes.

8          Q.     Who else did you run with that

9     year?

10         A.     Yes.

11         Q.     Who else did you run with that

12    year?

13         A.     Don Conroy.

14         Q.     Anybody else?

15         A.     That's it.

16         Q.     How long did you maintain the

17    trustee position?

18         A.     Until about 2002, I believe.

19    Eight years before that I was deputy mayor.

20         Q.     When you say eight years before

21    that --

22         A.     2002, so it would be like '96.

23         Q.     You were part of the better

24    Babylon Village party when you were elected in

25    1987, as trustee, correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

165

1                          R. SCORDINO

2          A.     Right.

3          Q.     At some point, did you have to

4     run again for that position?

5          A.     Yes.

6          Q.     What year was that.

7          A.     '87 and four is '91, '91 would be

8     '95, '95 would be 2009, sorry '95 would be

9     1998 and 1998 to 2002, I was deputy mayor.  In

10    2002, I was appointed as deputy mayor.

11         Q.     Going back --

12         A.     Sorry, 2002, I was appointed as

13    mayor because Don Conroy passed away.

14         Q.     Going back to the 1991 election,

15    were you part of the Better Babylon Party?

16         A.     Yes.

17         Q.     With whom did you run with, if

18    anyone?

19         A.     I ran with Don Conroy and Ray

20    Accelletta.

21                A-C-C-E-L-L-E-T-T-A, that's close

22    enough.

23         Q.     Anyone else?

24         A.     That it?

25         Q.     What were Mr. Conroy and

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

166

1                           R. SCORDINO

2     Mr. Accelletta running for?

3           A.      Trustee.

4           Q.      Who was mayor at the time?

5           A.      Don Conroy.

6           Q.      Was he running for trustee or

7     mayor?

8           A.      Mayor.

9           Q.      Who was the Village of Babylon

10    justice at that time?

11          A.      I believe it was Vince Tennety,

12    T-E-N-N-E-T-Y.

13          Q.      Eventually there came a time in

14    1995 you ran again?

15          A.      Yes.

16          Q.      Were you part of the Better

17    Babylon Party?

18          A.      Yes.

19          Q.      With whom did you run?

20          A.      I believe at that time it was

21    myself, Don Conroy, again, myself and I

22    believe it was Alice Vanderbilt, I guess.   I'm

23    not a hundred percent sure.

24          Q.      What position was --

25          A.      Trustee.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

167

1                    R. SCORDINO

2        Q.    Don Conroy, what was he running

3    for?

4              MR. TOSCA:  Let him finish the

5        question.

6        Q.    Don Conroy, for what position was

7    he running for 1995 to 1998?

8        A.    Mayor.

9        Q.    Did there come a time in 1998 you

10   again ran for public election?

11       A.    Yes.

12       Q.    What position?

13       A.    Trustee.

14       Q.    Were you part of the Better

15   Babylon Party at the time?

16       A.    Yes.

17       Q.    With whom did you run?

18       A.    Mayor Conroy, myself, I guess,

19   Alice Vanderbilt again.

20       Q.    Anyone else?

21       A.    That's it.

22       Q.    In 2002, you were appointed as

23   the mayor; is that right?

24       A.    Correct.

25       Q.    Did you run for any

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

168

1                    R. SCORDINO

2    publicly-elected position in 2001 or 2002?

3         A.    No.

4         Q.    When was the next time after you

5    were appointed as the mayor of Village of

6    Babylon did you run for a publicly-elected

7    position?

8         A.    It was October of 2002.  We

9    ran -- let's see it was next -- it was 2003

10   was the next time I ran for mayor.

11        Q.    What party did you run?

12        A.    Better Babylon Party.

13        Q.    With whom did you run.

14        A.    Myself, Alice Vanderbilt, and

15   Tony Davida.

16        Q.    Anyone else?

17        A.    That's it.

18        Q.    Were you successful in the 2003

19   election?

20        A.    Yes.

21        Q.    What position did you obtain?

22        A.    Mayor.

23        Q.    And you held that position

24   consistently throughout the years?

25        A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

169

1                     R. SCORDINO
2        Q.     When was the next time after the
3    2003 election you had the run the position of
4    mayor?
5        A.     It was another four years, so it
6    would be 2007.
7        Q.     Which party did you run?
8        A.     Better Babylon Party.
9        Q.     With whom did you run?
10       A.     Tony Davida myself, the mayor
11   Tony Davida as trustee, and I believe it was
12   Debbie Basile.
13              B-A-S-I-L-E.
14       Q.     And you were running for mayor
15   that year?
16       A.     Yes.
17       Q.     You were successful that year?
18       A.     Yes.
19       Q.     Anyone else running that year?
20       A.     You have Tony Davida, right?
21       Q.     Yes.
22       A.     It's usually the mayor and two
23   trustees.
24       Q.     At some point after the 2003
25   election, have you ever ran for mayor of

170

1                       R. SCORDINO

2    Village of Babylon?

3           A.     Yes.

4           Q.     What year was that?

5           A.     2007.

6           Q.     With whom did you run?

7           A.     Mayor, myself as mayor, Tony

8    Davida as trustee and Debbie Basile as

9    trustee.

10          Q.     Was that with the Better Babylon

11   Party?

12          A.     Yes.

13          Q.     Were you successful in that

14   election?

15          A.     Yes.

16          Q.     After that 2007 election, did

17   there come a time you again ran?

18          A.     Yes. From --

19          Q.     What year was that?

20          A.     Another four years, so 2011.

21          Q.     For what position did you run?

22          A.     Mayor.

23          Q.     With which party?

24          A.     Better Babylon Party.

25          Q.     With whom did you run?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

171

```
 1                    R. SCORDINO
 2        A.    Same people, Tony Davida and
 3   Debbie Basile.
 4        Q.    Were you successful?
 5        A.    Yes.
 6        Q.    Did there come a time you again
 7   ran for public office?
 8        A.    Yes.
 9              It would be -- what's the last
10   date you have there?
11        Q.    2011?
12        A.    2011, be '15.
13        Q.    What position did you run?
14        A.    Mayor.
15        Q.    What party?
16        A.    Better Babylon Party.
17        Q.    With whom did you run?
18        A.    Tony Davida and Debbie Basile.
19        Q.    Were you successful?
20        A.    Yes.
21        Q.    Was Tony Davida successful?
22        A.    Yes.
23        Q.    Was Debbie Basile successful?
24        A.    Yes.
25        Q.    How long did Debbie Basile
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

172

1                    R. SCORDINO

2    maintain her position as trustee?

3          A.      I believe in the next year --

4    what year are you up to?

5          Q.      2015.

6          A.      2015, so I think, let's see,

7    would be in two thousand -- I think she

8    dropped out.  I believe she dropped out and we

9    put in a new person, Robyn Silvestri, that's

10   who it was.

11         Q.      Robyn Silvestri is now part of

12   the --

13         A.      Right, Better Babylon Party.

14         Q.      And she's also part of the

15   Village of Babylon Board, Town Board?

16         A.      Yes, she's trustee.

17         Q.      You said, "we determined."

18                 Who is we?

19         A.      The, again, the campaign

20   committee, we interviewed people.

21         Q.      Who is part of the campaign?

22         A.      All the trustees, myself, Jack

23   Conroy, Bruce Huminik, Bruce Zappia,

24   Z-A-P-P-I-A, A.  That's it.

25         Q.      Anyone else aside from, when you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

173

1                    R. SCORDINO

2    say trustees of Village of Babylon trustees?

3         A.     Yes.

4         Q.     Anyone else?

5         A.     That's it.

6         Q.     Does the judge participate?

7         A.     No.

8         Q.     Is the judge part of the Village

9    of Babylon --

10               Withdrawn.

11               Is Judge Rafter part of the

12   Better Babylon Party?

13        A.     He runs but there are certain

14   constraints he has to follow as a judge.  I

15   don't know what they are.

16        Q.     When you say he runs --

17        A.     Runs as part of the party, he

18   runs on that party.

19        Q.     Does the campaign committee

20   support him?

21        A.     Yes.

22        Q.     You're part of that campaign?

23        A.     Yes.

24        Q.     Has the campaign committee

25   supported any other judge for Village of

174

1                    R. SCORDINO

2    Babylon justice?

3         A.    Going back, Vince Tennety was a

4    judge, Jack, those are the only two I believe.

5         Q.    Under what circumstances did you

6    come to learn who Jack Rafter was?

7         A.    I believe he came to the campaign

8    committee.  I don't know.

9         Q.    What year?

10        A.    I'm not sure.

11        Q.    When he came to the campaign

12   committee, did you support him?

13        A.    Yes.

14        Q.    Did you have conversations with

15   him after he came to the campaign committee?

16        A.    No, we don't get into any of

17   that.  As I said, there's certain restrictions

18   he has.

19        Q.    Was there anyone else aside from

20   Robyn Silvestri that was discussed by the

21   campaign committee replacing Ms. Debbie

22   Basile?

23        A.    At that time, I think when she

24   first ran, there was nobody else that came

25   forward.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

175

1                         R. SCORDINO
2          Q.    Was there anyone aside from Jack
3    Rafter discussed by the campaign committee in
4    regards to replacement of Vince Tennety?
5          A.    No.
6          Q.    Were you ever introduced to Jack
7    Rafter by any person?
8          A.    No.   I knew Jack.   I knew Jack as
9    a resident, that's about it.
10         Q.    What were the circumstances under
11   which you first met Jack Rafter?
12         A.    I can't remember.
13         Q.    You knew him as a resident of
14   what?
15         A.    Resident of the village of
16   Babylon.
17         Q.    How did you come to learn he was
18   a resident of the village of Babylon?
19         A.    I used to see him in the village
20   of Babylon.
21         Q.    Where did you used to see him?
22         A.    The village of Babylon.
23         Q.    Sir, where within the village of
24   Babylon did you see him?
25         A.    Around his house, in village of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

176

1                    R. SCORDINO

2    Babylon business district.

3         Q.    There is a business district in

4    the village of Babylon?

5         A.    Yes.

6         Q.    When you say, his house, what

7    area did you see him?

8         A.    He lives off Little East Neck

9    Road.

10        Q.    Have you had occasion to be at

11   his house?

12        A.    I don't know if I've ever been to

13   his house.  No.

14        Q.    Sir, have you communicated with

15   Jack Rafter on a personal level?

16             MR. TOSCA:  Objection.

17             You can answer.

18        A.    No.  Not a personal level.  A

19   personal level, yes, playing golf, maybe.

20        Q.    You have attended functions where

21   he's been, correct?

22        A.    Yes.

23        Q.    You have seen him outside of the

24   village of Babylon, right?

25        A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

177

1                    R. SCORDINO

2          Q.     You have known him before you

3    were the mayor of Village of Babylon?

4          A.     I don't think so.  I mean when I

5    became mayor, I became more involved.  As a

6    trustee, you really don't get involved in a

7    lot of different things, other than the fact

8    that the area that you have which was the

9    pool, which I was really deep into.

10         Q.     You were deep into the pool?

11         A.     Because it was reconstructed back

12   in 1986, the reconstruction of the pool, so I

13   was very busy doing that and overseeing the

14   pool, which the like a six-month job; so you

15   really don't have time for anything else

16   during the summer months.

17         Q.     You come to use Jack Rafter as an

18   attorney outside of his role as the Village

19   Justice?

20         A.     No.

21         Q.     Have you had the opportunity to

22   consult with Jack Rafter as an attorney --

23         A.     No.

24         Q.     -- outside the Village Justice?

25         A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

178

1                        R. SCORDINO

2           Q.    You said the Village of Babylon

3     has a business district?

4           A.    Yes.

5           Q.    What is the business district of

6     the Village of Babylon?

7           A.    What is it?

8           Q.    Yes.

9           A.    Runs from Deer Park Avenue to

10    Montauk Highway.  From Montauk Highway to 231

11    and Argyle Lake on the westerly side.

12          Q.    Is there a financial district or

13    any other district aside from the business

14    district?

15          A.    No.  Just business district.

16          Q.    Is there an ocean district,

17    marina district?

18          A.    You have the -- I guess you would

19    call it the pool, the recreation area, the

20    bathing beach area.

21          Q.    Anything else?

22          A.    That's it.

23                MR. MORRIS:  It's now 1:04.

24          We're off the record.

25                (Whereupon, a lunch break was

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

179

1              R. SCORDINO

2       taken from 1:04 p.m. through 1:54 p.m.)

3              MR. MORRIS:  Time is now 1:54.

4       Q.    Mr. Scordino, did you discuss

5  your testimony with anyone during the break?

6              MR. TOSCA:  Objection.

7       A.    Yes.

8       Q.    With whom did you speak?

9       A.    My attorneys.

10      Q.    Without telling me the substance

11  of the conversation, what was the length of

12  the conversation?

13             MR. TOSCA:  Objection.

14             Don't answer the question.

15             MR. MORRIS:  You're telling him

16       not to answer how long the discussion

17       occurred?

18             MR. TOSCA:  Yes.

19       Attorney/client.

20      Q.    Did you discuss the nature of

21  your testimony; is that right?

22             MR. TOSCA:  Objection.

23             Don't answer the question.

24             Attorney/client.

25      Q.    Any testimony you would like to

180

1                         R. SCORDINO
2    change now that you had that discussion?
3                MR. TOSCA:  Objection.
4                Don't answer that question.
5                Well, you can answer the
6        question.
7        A.     I'm surprised at you, a man of
8    your quality missed one of the most important
9    certifications that I had.  You don't know?
10   Are you married?
11       Q.     I'm not.
12       A.     You're not.  I'm married.
13   Certificate, marriage certificate, make sure
14   it's in the minutes.
15       Q.     There you go.
16              Speaking of that, have you ever
17   served as a registrar of the Village of
18   Babylon?
19       A.     No.
20       Q.     Ocean Beach Youth Group, is that
21   the summer camp you mentioned earlier?
22       A.     Yes.
23       Q.     What is the Ocean Beach Youth
24   Group?
25       A.     What is it?  It's a day camp.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

181

1                    R. SCORDINO

2        Q.    Aside from director of that day

3    camp, have you had any association with the

4    Ocean Beach Youth Group?

5              MR. TOSCA:  Objection.

6              You can answer.

7        A.    Say it again, your last couple

8    words I didn't get.

9              (Whereupon, the requested portion

10        was read back by the reporter.)

11        A.    I don't know what the question

12    means.  Can you make it a little clearer?

13        Q.    You serve as director of the

14    Ocean Beach Youth Group?

15        A.    Yes.

16        Q.    When did you first start that

17    position?

18        A.    1999.

19        Q.    It's a position you have had

20    every summer up until this year?

21        A.    Right.  Including this year.

22        Q.    Aside from director, have you

23    ever served in any other capacity?

24        A.    No.

25        Q.    Have you ever served to fundraise

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

182

1                      R. SCORDINO

2    for the Ocean Beach Youth Group?

3         A.    Yes.

4         Q.    Anything like that, like

5    fundraising that you have done for the Ocean

6    Beach Youth Group, aside from what you've

7    testified to?

8         A.    Their Board of directors holds a

9    fundraiser that I partake in.

10        Q.    Do you disseminate any

11   publications with regard to that fundraiser?

12        A.    No.

13        Q.    What are your job duties as

14   director of Ocean Beach Youth Group?

15        A.    I oversee a hundred employees and

16   oversee about a hundred fifty campers a week

17   for eight weeks.

18        Q.    You said a hundred employees and

19   a hundred fifty campers?

20        A.    Um-hum.  A week.  They change

21   every week.

22        Q.    Is that right, is there one

23   employee for every one-and-a-half campers?

24        A.    Close to it.

25        Q.    When do you do this?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

183

1                    R. SCORDINO

2         A.    Usually opens the end of June to

3    the middle of August, the dates vary.  It's an

4    eight-week camp.

5         Q.    You do this while holding down

6    the title of mayor of Village of Babylon?

7         A.    Right.  I don't work on weekends.

8    I go off the island on Tuesdays and off on

9    Fridays.

10        Q.    How do you get on and off the

11   island?

12        A.    Boat.

13        Q.    What boat do you use?

14        A.    They gave me a both.

15        Q.    What is they?

16        A.    Ocean Beach Youth Group.

17        Q.    What boat is it?

18        A.    What boat is it?  Make?

19        Q.    Yes.

20        A.    Center console, 19-foot center

21   console.

22        Q.    Does the boat have a name?

23        A.    No.

24        Q.    In whose name is the boat

25   registered?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

184

1                    R. SCORDINO

2        A.      Ocean Beach.

3        Q.      Who pays the insurance?

4        A.      Ocean Beach Youth Group.

5        Q.      Where is the boat docked

6    regularly?

7        A.      Boat is docked at, right off side

8    of the Babylon Village dock on a private boat

9    slip.

10       Q.      When you say private boat slip,

11   to whom does the boat slip belong?

12       A.      Great Bay Marine.

13       Q.      Who pays for the boat slip?

14       A.      It's given to the Ocean Beach

15   Youth Group by the company who does the

16   repairs for our boat.

17       Q.      What company is that?

18       A.      Great Bay Marine.

19       Q.      Aside from using the boat to get

20   yourself back and forth to Fire Island, does

21   anyone else use that boat?

22       A.      No.

23       Q.      Is it fair to say you have

24   exclusive use of that boat?

25       A.      Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

185

1                       R. SCORDINO

2               Ocean Beach Youth Group also uses

3    the boat during the day comp.

4        Q.    You said it was right next to

5    something owned by the Village of Babylon?

6        A.    Village docks, yeah.  They have a

7    piece of property that's adjacent to our

8    Village dock.

9        Q.    How do you refuel the boat?

10       A.    I go to the gas station and fill

11   it.

12       Q.    Who pays for that?

13       A.    Ocean Beach Youth Group.

14       Q.    Which gas station do you utilize?

15       A.    We have two accounts, one at the

16   Babylon Bait Station on Sumpwams Creek,

17   S-U-M-P-W-A-M-S Creek; and the other one is at

18   Bay Shore Marina and another one is at, I

19   think, it's Saltaire, they have a gas station

20   there, I can fill it at Fire Island.

21       Q.    That's paid for by Ocean Beach

22   Youth Group?

23       A.    Yes.

24       Q.    What kind of village is the

25   Village of Babylon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

186

1                    R. SCORDINO
2              MR. TOSCA:  Objection.
3         A.    What kind -- I don't understand
4    the question.
5         Q.    Is it an incorporated village?
6         A.    Incorporated village.  All
7    villages are incorporated.
8         Q.    Do you know how villages are
9    classified in the State of New York?
10         A.    I think they're all incorporated
11    villages.  If you have a "Village" before your
12    name, then it's a Village, it's incorporated.
13         Q.    Do you know what class the
14    Village of Babylon is:  first class, second
15    class, third class?
16         A.    No.  I didn't even realize they
17    were classed.
18         Q.    Does the Village of Babylon
19    maintain waterfront property?
20         A.    Um-hum.
21         Q.    Where is that waterfront
22    property?
23         A.    Let's see, on a Sumpwams Creek,
24    we have boat slips that run from Shore Road
25    all the way down to the end of Shore Road.  We

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

187

1                          R. SCORDINO

2     have Lewis Circle, Lewis Pond which is another

3     number of boat slips that are there.  We have

4     Buoyance Canal which is right next to Lewis

5     Pond.  We have Beach Canal which is down by

6     the Village pool.  We have Lighthouse Road

7     that a number of slips on Lighthouse Road, and

8     at the end Mayhew Avenue we have property, we

9     don't have boat slips, and the Village pool,

10    and also our beach pool.

11          Q.      Do you know if you missed

12    property?

13          A.      Ends of property, ends of roads

14    that border the beach are also owned by the

15    Village.  Lighthouse Road is one, Araca Road,

16    Annuskemunnica.  Little East Neck, no Fred

17    Shores is a private club, we don't own that.

18    I believe that's it, pretty close to it.

19          Q.      Does the Village of Babylon

20    maintain parks?

21          A.      Yes.

22          Q.      What parks does it maintain?

23          A.      We have approximately eight

24    parks:  Lighthouse Road Park, Lewis Pond Park,

25    the Locust Avenue, I'm sorry Park Avenue,

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

188

1                        R. SCORDINO

2      Cooper Street Park, Fire Island Park.  I'm

3      sorry that's Lewis and Fire Island are the

4      same ones.  We have two ball fields that are

5      parks on Locust Avenue, one on Locust -- two

6      on Locust and one on Ralph Avenue.  We have

7      two dog parks, one on the end of George Street

8      and one at the entrance of Locust Avenue.  I

9      think I got them all.

10            Q.     Does the Village of Babylon have

11     public schools?

12            A.     No.

13            Q.     Does the Village of Babylon have

14     a railroad station?

15            A.     Yes.

16            Q.     Is that the Village of Babylon

17     Long Island Railroad branch?

18            A.     Yes.

19            Q.     Have you had any business

20     association with the Incorporated Village of

21     Babylon?

22                 MR. TOSCA:  Objection.

23                 You can answer.

24            A.     I don't know what you mean by the

25     question.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

189

1                    R. SCORDINO

2        Q.     Have you ever contracted with

3    Village of Babylon?

4        A.     No.

5        Q.     Have you ever provided services

6    to the Village of Babylon outside of your

7    capacity as elected official?

8        A.     No.

9        Q.     Were you ever employed outside of

10   your capacity as elected official by the

11   Incorporated Village of Babylon?

12       A.     No.

13       Q.     Before you mentioned a number of

14   elections.

15              Did you ever run opposed in any

16   of your elections?

17       A.     Unopposed, yes.

18       Q.     Which election?

19       A.     As mayor, I believe the first

20   four I believe were unopposed.

21       Q.     Have ever run opposed, has anyone

22   opposed you?

23       A.     Last year was the first year.

24       Q.     Aside from that last year, you

25   have never had opposition in any of your

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

190

1                       R. SCORDINO

2     campaigns?

3          A.     No.

4          Q.     In any of your campaigns?

5          A.     As trustee, I think there were a

6     couple, but usually I run unopposed because I

7     do such a great job.

8          Q.     What were the earnings from

9     employment with the Village of Babylon last

10    year?

11         A.     15,000.

12         Q.     Any other benefits accrued

13    towards a pension benefit?

14         A.     Yes.  Not accrued to it.  I

15    belong to a pension.  The pension.

16         Q.     When you say you belong to a

17    pension, is that a Village of Babylon pension?

18         A.     New York State.

19         Q.     Can you explain exactly what it

20    is in terms of that pension?

21         A.     It's a pension plan.  You have to

22    accrue so many days on it and you get credit

23    for it.

24         Q.     How many days do you need to

25    accrue?

191

1                    R. SCORDINO

2        A.    Let's see.  I think it's a third

3    of a day accumulates to a day.  A third of a

4    day, you know, you have to get two-thirds of a

5    day and you get credit for day.  I believe

6    that's it.

7        Q.    How much pension do you have

8    accrued so far from New York State?

9        A.    I think I have like 12 years, but

10   I also got credit for the Town too because

11   it's the same pension plan.

12       Q.    In addition to the 15,000, the

13   car, certain payments related to that car and

14   now the pension, is there any other benefit

15   along with that --

16       A.    Health insurance.

17       Q.    Anything else that we didn't

18   discuss?

19       A.    That's it.

20       Q.    How much did you make the year

21   before as the mayor of the Village of Babylon?

22       A.    Same, 15.

23       Q.    Did you ever hold elected office

24   anywhere other than the Village of Babylon?

25       A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

192

1                    R. SCORDINO

2        Q.    Aside from whatever party you

3   mentioned earlier, are you part of any other

4   political party?

5        A.    Yes.

6        Q.    What party?

7        A.    Republican party, committeeman.

8        Q.    Can you explain what you mean by

9   committeeman?

10       A.    Each ED in the Village of Babylon

11  is separated and there are two committeemen

12  for each ED.

13       Q.    When you say ED, what does ED

14  stand for?

15       A.    Election district.

16       Q.    You are the Republican election

17  district --

18       A.    Committeeman.

19       Q.    Which district?

20       A.    Fifteen.

21       Q.    ED 15, is that an appointed

22  position, elected position, or something else?

23       A.    I guess it's a -- I think, you

24  know, I think we're appointed to that

25  position.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

193

1               R. SCORDINO

2        Q.    By whom where you appointed?

3        A.    By the Republican chairman.

4        Q.    Who is that?

5        A.    Herb Hemmengdinger.  There's

6   another license.  I think I'm certified there

7   with another license from the County, Board of

8   Elections, I guess certifies it.  All these

9   things come to mind.

10       Q.    Is there anything you might have

11  a certification or license for which we

12  haven't discussed?

13       A.    No.

14       Q.    Have you --

15       A.    Pole watching certificate goes

16  with the committeeman.

17       Q.    Aside from the political campaign

18  to which you mentioned earlier, the Better

19  Babylon Party, have you ever been part of any

20  other election campaigns?

21       A.    Not really since I've been the

22  mayor.

23       Q.    Before you were mayor.

24       A.    I think in the first couple of

25  years as trustee and then I didn't really get

194

1                      R. SCORDINO

2    involved that much.

3         Q.    Have you ever been part of any

4    election campaign for anyone outside of the

5    Village of Babylon?

6         A.    No.

7         Q.    Were you involved in any Suffolk

8    County, New York State, any campaign on behalf

9    of the Republican party in any capacity?

10        A.    No.

11        Q.    As the mayor of the Incorporated

12   Village of Babylon, are you a marriage officer

13   permitted by the State of New York to perform

14   weddings?

15        A.    Yes.

16        Q.    Do you have any certification or

17   license for that?

18        A.    I don't believe so.  I think it

19   goes along with the mayorship.

20        Q.    How many weddings have you

21   performed as mayor of the Incorporated Village

22   of Babylon.

23        A.    About ten I think over the

24   18 years.

25        Q.    Have you been paid for performing

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

195

1                    R. SCORDINO
2    any of those weddings?
3         A.     In lieu of that, I usually have
4    the people write a check to some of the
5    organizations in the Village, usually the
6    Babylon Beautification Society.
7         Q.     Have you ever received any tips
8    or gratuity for performing a wedding?
9         A.     No.
10        Q.     Did you report any of the income
11   from any of weddings as income on your Federal
12   or State tax?
13        A.     No, because they make the
14   donation right to the organization.
15        Q.     And you never received any tips
16   or gratuities associated with that?
17        A.     No.
18        Q.     In that case, you never earned
19   any money for officiating a wedding?
20        A.     No, it's a service.
21        Q.     Did you ever serve as a coach in
22   any capacity?
23        A.     Yes.
24        Q.     Were you paid?
25        A.     Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

196

1                       R. SCORDINO

2          Q.      How much were you paid as a

3    coach?

4          A.      Varies.

5          Q.      What things did you coach?

6          A.      I coached a variety --

7    JV lacrosse over in West Islip when I was

8    teaching.  I was also coaching varsity

9    basketball in Babylon, JV, varsity gymnastics

10   for girls, junior high football in Babylon,

11   and junior high gymnastics over in West Islip.

12         Q.      Were you paid for any of those

13   positions?

14         A.      Yes.

15         Q.      Which ones?

16         A.      All of them.

17         Q.      How much were you paid?

18         A.      Varies again.  I can't recall

19   what the exact amounts, they ranged from 600,

20   back then from $600 for some of the junior

21   high positions to 1,200 for the varsity

22   positions.

23         Q.      By whom were you paid?

24         A.      School districts.

25         Q.      Which school districts?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

197

1                    R. SCORDINO

2        A.     West Islip and Babylon.

3        Q.     In your time coaching, did you

4    ever have an altercation as a coach with your

5    team?

6        A.     No.

7               MR. TOSCA:  Objection.

8        Q.     Was there a physical altercation

9    when you served as lacrosse coach?

10       A.     No.

11       Q.     Sir, do you recognize the name

12   Posh Salon in Babylon Village?

13       A.     Um-hum.

14       Q.     Have you ever had an association

15   with the Posh Salon in Babylon Village?

16       A.     Posh Salon, that's a business.

17       Q.     Have any association with --

18       A.     Sure, I know them.

19       Q.     What is the nature of such

20   association?

21       A.     I know they're a business in the

22   Village.

23       Q.     Were you ever employed by the

24   Posh Salon of Babylon Village?

25       A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

198

1               R. SCORDINO

2        Q.    Anyone in your family employed --

3        A.    No.

4        Q.    -- in any capacity.

5        A.    I don't recall.  My wife is not.

6    I don't think my daughter or my son was.

7        Q.    Aside from it being a business

8    within the Village of Babylon, what, if any

9    dealings do you have with the Posh Salon in

10   the Village of Babylon?

11              MR. TOSCA:  Objection.

12              You can answer.

13       A.    I don't recall, other than

14   visiting the store when we did our -- I don't

15   even know if it's in there now.  They're gone.

16   Aren't they?  I'm not sure.  Nothing, it's a

17   store business in the village.

18       Q.    You said you could recall, do you

19   visit any salons within the Village of

20   Babylon?

21       A.    Yeah.  In fact, I was in one the

22   other day.  We did an interview there.

23       Q.    What kind of interview?

24       A.    For our Facebook page.  I visit

25   all the businesses occasionally, it's part of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

199

1                    R. SCORDINO

2   my job.

3        Q.    Have you ever paid for services

4   at Posh Salon of Babylon Village Incorporated?

5        A.    Do I look like a salon guy?  Is

6   that what you're insinuating, Mr. Morris?  No.

7        Q.    Just to be clear, you have no

8   business dealings with Posh Salon --

9        A.    No.

10       Q.    -- of Babylon village?

11       A.    No.

12       Q.    As Village of Babylon mayor, do

13  you regularly report on your activities as

14  mayor to anyone?

15       A.    To my secretary.  If I'm not

16  going to be there, if I call in sick, which is

17  very rare.  If I'm going to a different

18  meeting, I call in to her.

19       Q.    Is there anyone to whom you

20  answer?

21       A.    No.

22       Q.    Do you report to anyone as

23  Village --

24       A.    No.  I'm the mayor of the

25  Village, I'm the one that oversees the whole

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

200

1                    R. SCORDINO

2     Village.

3          Q.    Okay.

4                When you say oversees the whole

5     Village, can you describe, starting with who

6     it is you oversee?

7          A.    Okay.  Trustees, my deputy mayor

8     is right below me, to the side are the three

9     trustees, okay.  My secretary is below me,

10    okay, she oversees most of the secretaries in

11    the different offices, reports back to me if

12    there's any problems.  I oversee the

13    treasurer's office.  I oversee the Building

14    Department.  I oversee the Village attorney.

15    I oversee the Village clerk.  I oversee the

16    Village court.  I oversee the Highway

17    Department.  I oversee the Sanitation

18    Department and I oversee the code enforcement.

19    Which is approximately about 80 people.

20         Q.    You mentioned Department of

21    Public Works in there?

22         A.    Yes, Highway.

23         Q.    Any part of the Village of

24    Babylon that you do not oversee?

25                MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

201

1                    R. SCORDINO

2       A.    Parks is also included in there.

3       Q.    Who are the persons who directly

4   report to you; for instance, you said you

5   oversee the attorney.

6             I assume you're talking about

7   Mr. Glass?

8       A.    Gerard Glass, yes.

9       Q.    Who else do you oversee that

10  directly reports to you?

11      A.    They all report to me.

12      Q.    Who from the treasurer's office

13  directly reports to you?

14      A.    It would be the treasurer, Andrew

15  Reichel.  R-E-I-C-H-E-L.

16      Q.    Who from the Building Department

17  directly reports to you?

18      A.    Debbie Longo and Steve Fellman.

19      Q.    That is the same person who is

20  the building inspector?

21      A.    Yes.

22      Q.    There is only one attorney for

23  the Village of Babylon?

24      A.    Right.

25      Q.    You said the deputy mayor has to

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

202

1                      R. SCORDINO

2    report to you?

3         A.      Right.

4         Q.      Who is the deputy mayor?

5         A.      Kevin Muldowney.  All the

6    trustees do.

7         Q.      When you say all the trustee, who

8    are those trustees?

9         A.      Kevin Muldowney is the deputy

10   mayor, Tony Davida is a trustee, Mary Adams is

11   a trustee and Robyn Silvestri is a trustee.

12        Q.      Anyone else?

13        A.      Trustees?

14        Q.      Um-hum.

15        A.      No one else.

16        Q.      Who in the Village of Babylon

17   Highway Department --

18        A.      Skip Gardner, Charles Gardner.

19        Q.      Who from the Village of Babylon

20   Parks reports to you?

21        A.      Okay, I left out one other thing

22   too.  Babylon Fire Department also reports to

23   me, it's usually the chief, Mike Golub.

24        Q.      Who was the chief before Mike?

25        A.      I think it was Paul Twardy.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

203

1                    R. SCORDINO

2        Q.        Who was the chief before Paul?

3        A.        Kevin Marrow, M-A-R-R-O-W.  I'm

4   sorry, I missed one there.  Mike Golub, right

5   after Mike Golub was Scott Glyn, G-L-Y-N.

6        Q.        Before Kevin Marrow, who was the

7   Babylon Fire Department person who reported to

8   you?

9        A.        It was, let's see, it was Kevin

10  Marrow.  Is that the last one you have?

11       Q.        Um-hum.

12       A.        Then you had Tony Cardalli,

13  C-A-R-D-A-L-L-I.  I think it was Richie

14  Rotsman, Jeff Weber.

15       Q.        What about Trustee Davida?

16       A.        He was later on.  That was a long

17  time ago.

18       Q.        When was he the Babylon Fire

19  Department chief?

20       A.        I'm not sure of the date he was

21  chief.

22       Q.        You mentioned before these were

23  some of the persons who responded to

24  emergencies like overdoses.

25       A.        They're four-year terms, these

204

1                    R. SCORDINO

2    guys; and they all move up in order, like, for

3    example, this April, Mike will leave as chief

4    and all the first assistants, second

5    assistants, third assistants move in, and the

6    Fire Department has another election for the

7    third assistant.

8         Q.    Do you know when Tony Davida who

9    is now the trustee had position of chief of

10   the Village of Babylon Fire Department?

11        A.    I'm not sure the date.

12        Q.    Do you recall the decade?

13        A.    Probably two decades, maybe even

14   three decades.

15        Q.    The '90s, the '80s?

16        A.    Probably the '90, early '90s.

17        Q.    Who from the Village of Babylon

18   Parks Department reports to you?

19        A.    Parks Department, under the

20   auspices of the Highway Department, Skip would

21   be the one I would talk to about it.

22        Q.    You said code enforcement?

23        A.    Yes.

24        Q.    Who is that?

25        A.    Bill Whittier.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

205

1          R. SCORDINO

2     Q.     Anyone else?

3     A.     No.

4     Q.     What about secretaries?  Who is

5  it that reports to you as secretary?

6     A.     Suzanne Schettino,

7  S-C-H-E-T-T-I-N-O.

8     Q.     Anybody else.

9     A.     If there is a problem with one of

10 the areas, then it would be one of the people

11 in those offices that I would ask a question

12 about.  For example, if there was a problem

13 with the Building Department, Debbie Longo I

14 would talk to if Steve Fellman wasn't there.

15 If Andrew wasn't there.  I would talk to Jane

16 Barth who is the deputy treasurer.

17    Q.     Anyone that we didn't mention

18 that reports directly to you?

19    A.     I think you have them all.  Fire

20 department you have, Parks, Highway, yes.

21    Q.     All of the departments of Village

22 of Babylon --

23    A.     Right.

24    Q.     -- essentially answer to you as

25 the Village of Babylon mayor?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

206

1                    R. SCORDINO

2        A.    Um-hum.

3        Q.    The Village of Babylon have a

4    clerk?

5        A.    Yes.

6        Q.    Village clerk.  What is her name?

7        A.    Jean Parker.

8        Q.    Is she a Civil Service position?

9        A.    She an appointment.

10       Q.    Who appointed her?

11       A.    Me.

12       Q.    At whose pleasure, if anyone,

13   does she serve?

14             MR. TOSCA:  Objection to form.

15             You can answer.

16       A.    She is an appointment that I

17   appointed.  I have the right to appoint a

18   person for that position.

19       Q.    Can you hire or fire the Village

20   of Babylon clerk?

21       A.    Sure.

22       Q.    Is there another clerk, a

23   district clerk of the Village of Babylon?

24       A.    Court clerk, district court

25   clerk?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

207

1                          R. SCORDINO
2          Q.      Um-hum.
3          A.      Yes, Irene Vanoff, V-A-N-O-F-F.
4          Q.      To whom does she report?
5          A.      She reports to, I believe she
6      reports to the judge because the court is a
7      different situation, but she reports to the
8      judge; but if there are problems with Village
9      and not having to do with the court, she would
10     report to me.
11         Q.      Does anyone else from the court
12     report to you in any other circumstance?
13         A.      No.
14         Q.      How do communicate with the
15     district clerk?
16         A.      Go downstairs and talk to her.
17         Q.      Were you ever the subject of
18     written communication from the district clerk?
19         A.      I don't understand your question.
20         Q.      Did you ever receive anything in
21     writing or give anything in writing to the
22     district clerk?
23         A.      I very rarely do, everything is
24     verbal.
25         Q.      When you say rarely do, in what

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

208

1                       R. SCORDINO

2    instances would that occur?

3          A.     If I see something on a -- I

4    might call her and tell her rather than going

5    downstairs.

6          Q.     When you say, see something, like

7    what?

8          A.     If I wanted to -- if I saw that

9    there was going to be a warning for snowstorms

10   or flooding, I would call her up and tell her,

11   say, listen, you have to put that on the

12   website.

13         Q.     When you say website, what

14   website are you --

15         A.     Village website.

16         Q.     Is the district clerk responsible

17   for doing that?

18         A.     No.  Village clerk.  Not district

19   clerk.  Which one are you talking about now?

20         Q.     I was talking about the district

21   clerk.

22         A.     Usually I have no -- you fouled

23   me up a little bit here.  Go back a little

24   bit.  If you were talking about the Village

25   clerk --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

209

1                    R. SCORDINO
2              MR. MORRIS:  I'm going to
3         withdraw the question.
4         Q.    Does the Village of Babylon Board
5    have regularly-scheduled meetings?
6         A.    Yes.
7         Q.    When are those meetings?
8         A.    Every second and fourth Tuesday
9    and every second, every second week in August,
10   there is not a fourth week in August and
11   December.
12             THE WITNESS:  I have to go to the
13        men's room.
14             MR. MORRIS:  Okay.
15             It's 2:26, off the record.
16             (Whereupon, a recess was taken
17        from 2:26 p.m. to 2:30 p.m.)
18             (Whereupon, a discussion was held
19        off the record.)
20             MR. MORRIS:  Time now is 2:30.
21        Back on the record
22        Q.    Mr. Scordino, other than the
23   meetings you just mentioned, are there other
24   meetings which you're aware of the trustees of
25   the Village of Babylon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

210

1                         R. SCORDINO
2          A.     We have work sessions every other
3     Tuesday.
4          Q.     Anything else?
5          A.     We have director meetings or
6     department head meetings once every four
7     months, three months.
8          Q.     Did you ever meet individually
9     with members of the Village of Babylon Board
10    or less than a majority of the members of the
11    Village of Babylon Board?
12         A.     Yes.  Playing golf.
13         Q.     How often?
14         A.     Social, twice a week, once a
15    week.
16         Q.     You started to say, but for what
17    reason would you have those meetings?
18         A.     Socially.
19         Q.     Golf.
20                Anything else?
21         A.     That's about it.
22         Q.     Aside from work sessions,
23    socially, and golf, any other such meetings?
24         A.     No.
25         Q.     We mentioned the department heads

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

211

1              R. SCORDINO

2    before quite in depth through it.

3              Is there anyone we missed here in

4    terms of oversight?

5         A.    Can you repeat them again?

6         Q.    Absolutely.

7              As the mayor of the Village of

8    Babylon, the treasurers' office, the Building

9    Department, the Village attorney, deputy

10   mayor, Code Enforcement, Babylon Village Fire

11   Department, the secretary, and the Department

12   of Highway reports to you; is that right?

13        A.    Yes.

14        Q.    Anyone else?

15        A.    Unless I missed one, but I don't

16   think so.  I think I got everybody.

17        Q.    And there is no one to whom you

18   report?

19        A.    No.

20        Q.    As mayor of the Village of

21   Babylon, are you acquainted with Deborah

22   Longo?

23        A.    Yes.

24        Q.    Under what circumstance did you

25   first become acquainted with Deborah Longo?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

212

1                    R. SCORDINO

2          A.    At an interview I had with her

3    when she applied for the job.

4          Q.    You said applied for the job.

5                What job was that?

6          A.    The secretary to the Building

7    Department.

8          Q.    When was that?

9          A.    Approximately ten years ago.

10         Q.    As mayor of Village of Babylon,

11   do you regularly interact with Deborah Longo?

12         A.    I would say at least twice a day

13   for various things.

14         Q.    Under what circumstances do you

15   interact with Deborah Longo?

16         A.    Questions.

17         Q.    Questions she asks you or

18   questions you ask her or something else?

19         A.    Both.  She might come in and ask

20   me a question.  If I can't answer it or

21   Suzanne can't answer it, then she asks me and

22   we try to come up with an answer.

23         Q.    She seeks your advice in that

24   regard?

25                MR. TOSCA:  Objection.

213

1                    R. SCORDINO

2        A.    Yes.  I think she first goes

3   through the channels, she probably goes to the

4   building inspector first to see if they can

5   get the answer.

6        Q.    Did you ever have a discussion

7   with her and the building inspector, as you

8   said, all at once?

9        A.    Might be, if a new restaurant is

10  coming in and we want to lead them down the

11  right path with applications for permits and

12  stuff.  If the building inspector is not there

13  and she's there, if I have a question, I might

14  call her over.  Lot's of times when you're

15  opening up a business in the Village, there

16  are things they should know.

17       Q.    And you help those persons in

18  that situation?

19       A.    Yeah.  Call them over and say,

20  listen, they're opening a business in the

21  Village, can you explain to them some of the

22  things they should be doing?

23       Q.    Do you communicate with Deborah

24  Longo by electronic mail?

25       A.    Occasionally.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

214

1                      R. SCORDINO

2          Q.     When you say, occasionally, on

3     what occasions?

4          A.     Asking her about, I send her an

5     e-mail I can't answer, I send to it over the

6     Building Department from the workflow.

7          Q.     How often do you communicate with

8     Deborah Longo by electronic mail?

9          A.     Once a month.

10         Q.     Under what circumstances do you

11    communicate with Deborah Longo by electronic

12    mail?

13         A.     If I get a workflow, can't answer

14    it, I send it over to her to follow up.

15         Q.     Does Deborah Longo report to you

16    as Village of Babylon mayor?

17                MR. TOSCA:  Objection.

18                You can answer.

19         A.     I would imagine so.  I mean, if

20    she went through -- she is running the office

21    and she's there full time, she would come ask

22    if there were questions if I was there.

23         Q.     Can you call upon Deborah Longo

24    any time?

25         A.     Any time, I wouldn't bother her

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

215

1                    R. SCORDINO

2    at home.

3         Q.    Can you call upon Deborah Longo

4    any time she is working?

5         A.    Yes.

6         Q.    Is Deborah Longo's employment

7    position protected under New York Civil

8    Service Law?

9                MR. TOSCA:  Objection.

10        A.    I believe she is.

11        Q.    Did you select Deborah Longo for

12   her position in the Village of Babylon?

13        A.    Yes.  The procedure that we have

14   is that usually we take it off the list of

15   prospective people.  We do a search for them,

16   break it down to three people, and we ask for

17   interviews, and they come in and they're

18   interviewed by Suzanne, and probably Suzanne

19   first, then I come in and I interview her

20   also, and we come up with, out of the three, a

21   selection, with one selection.  That's

22   basically how the interviews happen.

23        Q.    Do you have the power to

24   terminate Deborah Longo's employment?

25        A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

216

1                      R. SCORDINO

2            MR. TOSCA:  Objection.

3       Q.      Does Deborah Longo drive a

4  Village of Babylon vehicle?

5       A.      No.

6       Q.      As the mayor of the Village of

7  Babylon, are you acquainted with Suzanne

8  Schettino?

9       A.      Um-hum.

10       Q.      Under what circumstance did you

11  first become acquainted with Suzanne

12  Schettino?

13       A.      She worked in the Building

14  Department for many years, and when the job

15  opening happened, when my secretary Marybeth

16  Wright retired, I put her in that position as

17  an appointment.

18       Q.      You were responsible for

19  Ms. Schettino being hired?

20       A.      No.  Hired where?

21       Q.      At the Village of Babylon.

22       A.      In what position?

23       Q.      Any capacity.

24       A.      You got to be specific.

25       Q.      Have you been responsible for

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

217

1                       R. SCORDINO

2    Suzanne Schettino --

3          A.      No.

4                  MR. TOSCA:  Let him finish the

5          question.

6          Q.      As mayor of the Village of

7    Babylon, do you regularly interact with

8    Suzanne Schettino?

9          A.      Absolutely.

10         Q.      Under what circumstances do you

11   interact with Suzanne Schettino?

12         A.      I talk to her.  If there is a

13   question I might need to have an answer, I

14   might pass over a workflow or write, print out

15   the workflow and hand it to her. She gives me

16   a list of messages, you know, people calling,

17   I have to answer the messages.  If there's a

18   problem she'll call me.  If I'm not there or

19   if I'm on the road somewhere, she'll call me.

20   Constantly every day I'm checking in with her

21   all the time.

22         Q.      When you say pass along the

23   workflow, how would you do that?

24         A.      I print it out and hand it to

25   her.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

218

1                    R. SCORDINO

2        Q.    Do you communicate with Suzanne

3    Schettino by electronic mail?

4        A.    Yes.

5        Q.    How often do you communicate with

6    Suzanne Schettino by --

7        A.    Not that often.

8        Q.    -- electronic mail?

9        A.    Once a month.

10       Q.    Under what circumstances do you

11   communicate with Ms. Schettino by electronic

12   mail?

13       A.    If she's not there, you know,

14   I'll send it over to her e-mail.

15       Q.    When you say her e-mail?

16       A.    Her mail, her e-mail.  Her

17   e-mail.

18       Q.    Is she provided an e-mail address

19   by the Village of Babylon?

20       A.    Yes.

21       Q.    Does Suzanne Schettino report to

22   you as Village of Babylon mayor?

23             MR. TOSCA:  Objection.

24             You can answer.

25       A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

219

1                    R. SCORDINO

2        Q.    Can you call upon Suzanne

3    Schettino any time okay she's working?

4        A.    Yes.

5        Q.    Is Suzanne Schettino --

6        A.    And when she's not working.

7        Q.    Is Suzanne Schettino protected

8    under New York Civil Service Law?

9              MR. TOSCA:  Objection.

10             You can answer.

11       A.    I'm not a hundred percent sure on

12   that because I thing she accrues time as

13   building inspector.  I'm not sure.

14       Q.    Was Suzanne Schettino appointed?

15       A.    Yes.

16       Q.    By whom?

17       A.    I'm sorry.  Let me -- again, you

18   have to clarify because she worked in the

19   Building Department under a different

20   administrator, hired for that position, when

21   an opened happened during me as mayor, then,

22   appointed her out of the Building Department

23   to become my secretary administrator.

24       Q.    Did you select Suzanne Schettino

25   as secretary administrator?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

220

1                         R. SCORDINO

2          A.     Yes.

3          Q.     Do you have the power to

4     terminate her employment?

5          A.     Yes.

6          Q.     Does Ms. Schettino drive a

7     Village of Babylon vehicle?

8          A.     No.

9          Q.     As mayor of the Village of

10    Babylon are you acquainted with Stephen

11    Fellman?

12         A.     Um-hum.

13         Q.     Under what circumstances did you

14    first become acquainted with Stephen Fellman?

15         A.     He was there as the building

16    inspector probably back when I was a trustee,

17    in the middle there somewhere.  I'm not sure

18    what year he was hired.

19         Q.     So you first met him when you

20    were trustee?

21         A.     Yes.

22         Q.     Did you have any personal or

23    social interaction with him previous?

24         A.     No.

25         Q.     As mayor of the Village of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

221

1                     R. SCORDINO

2    Babylon, do you regularly interact with

3    Stephen Fellman?

4         A.    Yes.

5         Q.    Did you communicate with him by

6    electronic mail?

7         A.    No.

8         Q.    Do you text message him?

9         A.    No.

10        Q.    How often do you communicate with

11   Stephen Fellman by electronic mail, if at all?

12        A.    None.

13        Q.    Does Stephen Fellman report to

14   you as Village of Babylon mayor?

15        A.    Yes.

16        Q.    Can you call Stephen Fellman at

17   any time?

18        A.    Yes.

19        Q.    Is Stephen Fellman protected

20   under New York Civil Service Law?

21             MR. TOSCA:   Objection.

22             You can answer.

23        A.    I don't think so.

24        Q.    Was Stephen Fellman appointed?

25        A.    He -- I guess yeah, he's

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

222

1                    R. SCORDINO

2     appointed every year.

3          Q.     Did you select Stephen Fellman as

4     building inspector of Village of Babylon?

5          A.     No.

6          Q.     Who did?

7          A.     Don Conroy.

8          Q.     When you say he's appointed every

9     year, who appoints him?

10         A.     It's a resolution at our

11    reassignment meeting which is held every

12    April.

13         Q.     Is there a recommendation or

14    process by which Mr. Fellman is chosen as

15    opposed to other building inspectors?

16         A.     I guess, if we had a problem with

17    him, we would venture out and look for a

18    different building inspector.  As of now, he

19    does a good job.

20         Q.     Don Conroy initially appointed

21    Stephen Fellman?

22         A.     Right.

23         Q.     After Don Conroy was gone, who

24    appointed Stephen Fellman?

25                MR. TOSCA:  Over objection, you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

223

1                    R. SCORDINO

2          can answer.

3          A.     Myself and the Board.

4          Q.     Tell me exactly how you and the

5     Board appoint Stephen Fellman.

6          A.     Okay.  Every April, it's usually

7     the first Monday in April, he is done at our

8     reassignment meeting, okay.  It's one of the

9     resolutions that we put forth that is passed

10    at a public Village Board meeting and accepted

11    by the vote of the Board of Trustees.

12         Q.     Do you have the power to

13    terminate Stephen Fellman's employment?

14         A.     Yes.

15         Q.     Are you the one to bring the

16    resolution to the Board in regard to Stephen

17    Fellman's employment?

18         A.     Yes.

19         Q.     Can any trustee terminate an

20    employee?

21                MR. TOSCA:  Objection.

22         A.     No.

23         Q.     Can any trustee bring a

24    resolution to the Village of Babylon Board to

25    terminate an employee?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

224

1                    R. SCORDINO
2         A.    Before that would happen, there
3    would have to be some discussion with the
4    rest of Board of Trustees.
5         Q.    Can you tell me, can a trustee
6    bring a resolution to terminate an employee?
7         A.    I said, yeah, but there would
8    have to be some discussion before that.  You
9    just can't arbitrarily -- I guess you can, but
10   with our group, we all sit down and discuss
11   it.
12        Q.    In other words, in the Village of
13   Babylon, they have to bring it to you first?
14        A.    Right, they have to have some
15   discussion with it at either a work session or
16   a meeting meet we have.
17        Q.    Does Stephen Fellman drive a
18   Village of Babylon vehicle?
19        A.    No.
20        Q.    To whom does Stephen Fellman
21   report?
22        A.    To me.
23        Q.    As mayor of the Village of
24   Babylon, are you acquainted with Mary Adams?
25        A.    Yes.

225

1                         R. SCORDINO

2          Q.      Under what circumstance did you

3     first become acquainted with Mary Adams?

4          A.      Her dealings with the Babylon

5     Tuna Club and the Babylon Beautification

6     Society.  First woman president of the Babylon

7     Tuna Club.

8          Q.      Tuna like the game fish?

9          A.      Like bluefin.

10         Q.      Like bluefin.

11         A.      I thought you really knew about

12    fishing and stuff.  Now you're letting me down

13    here.

14         Q.      The Tuna Club and what was the --

15         A.      Beautification Society.  She's

16    done a lot of volunteerism and, of course, you

17    know, Babylon being so small, we get to see a

18    lot of different people and recognize faces,

19    and she is a very, very hard worker.

20         Q.      As the mayor of the Village of

21    Babylon, do you regularly interact with Mary

22    Adams?

23         A.      Yes.

24         Q.      Under what circumstance do you

25    interact with Mary Adams?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

226

1                        R. SCORDINO

2          A.     Mary Adams is also oversees the

3    parks and also oversees our greenhouse which

4    is part of Highway Department.  She is in

5    charge of our Facebook.  She does a lot of

6    work.  She does a lot of work with the Girl

7    Scouts for us.

8          Q.     When you say for us, the Village

9    of Babylon?

10         A.     Village of Babylon.

11         Q.     Do you communicate with Mary

12   Adams by electronic mail?

13         A.     No.

14         Q.     Have you ever sent Mary Adams an

15   e-mail?

16         A.     No.

17         Q.     Have you ever received an e-mail

18   from Mary Adams?

19         A.     Yes, occasionally.

20         Q.     From what e-mail account did you

21   receive such e-mail?

22         A.     Usually on my phone, she sends me

23   a message.

24         Q.     When you say on your phone, are

25   you referring to the Samsung phone?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

227

1                          R. SCORDINO

2          A.     Yes.

3          Q.     When you say a message, do you

4    receive electronic mails on your Samsung

5    phone?

6          A.     Yes.

7          Q.     How long have you had the Samsung

8    phone for?

9          A.     I don't know.  Five years.  I'm

10   not sure.

11         Q.     Have you ever deleted any

12   electronic mail off that Samsung phone in last

13   two years?

14         A.     I wouldn't know how to do it.

15         Q.     Does Mary Adams report to you as

16   the Village of Babylon mayor?

17         A.     Um-hum.

18         Q.     Is that a yes?

19         A.     Yes.

20         Q.     Can you call Mary Adams any time?

21         A.     Yes.

22         Q.     Is Mary Adams protected under

23   New York State Civil Service Law?

24         A.     No.

25                MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

228

1                    R. SCORDINO

2        Q.    Is Mary Adams appointed?

3        A.    Well, she was appointed by the

4   Better Babylon Campaign Committee and then ran

5   for her position.

6        Q.    When you say appointed, in what

7   year was she appointed by Better Babylon

8   Committee?

9        A.    Eight years, six years.  I think

10  six years.

11       Q.    Do you have the power to

12  terminate Mary Adams' employment?

13            MR. TOSCA:  Objection.

14            You can answer.

15       A.    No.

16       Q.    Do you have any dealings with

17  Mary Adams aside from her work within the

18  Village of Babylon?

19       A.    No.

20       Q.    Has Mary Adams acted as a realtor

21  for any of the purchases or sales within the

22  Village of Babylon?

23       A.    No.

24       Q.    Does Mary Adams drive a Village

25  of Babylon vehicle?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

229

1                          R. SCORDINO

2          A.    No.

3          Q.    In the Village of Babylon, there

4     are various departments, correct?

5          A.    Um-hum.

6          Q.    You have referred to some of the

7     persons and their names and titles, correct?

8          A.    Yes.

9          Q.    Are these persons Civil Service

10    or appointed?

11         A.    Civil service.

12         Q.    Do any of these persons drive a

13    Village of Babylon vehicle?

14         A.    Yes.

15         Q.    Who drives a Village of Babylon

16    vehicle aside from yourself?

17         A.    Skip Gardener and four chiefs.

18         Q.    When you say four chiefs, to whom

19    are you referring to?

20         A.    Chief, first assistant, second

21    assistant, third assistant.

22               Do you want it right now who it

23    is?

24         Q.    Please.

25         A.    Mike Olive, Joe Fracalverri,

230

```
 1                    R. SCORDINO

 2   F-R-A-C-A-L-V-E-R-R-I, Matt Arrendale, and

 3   Jimmy Meager.  And Code Enforcement also has a

 4   car, Bill Whittier.

 5        Q.      Anyone else?

 6        A.      That's it.

 7        Q.      Are there decals on this car,

 8   insignias, anything that demarcates that the

 9   ownership of such a vehicle is Village of

10   Babylon?

11        A.      They have Village of Babylon

12   license plates on all those vehicles.

13        Q.      Do you have a Village of Babylon

14   license plate on your vehicle?

15        A.      Yes, I do.

16        Q.      Are there any other persons whom

17   you have not mentioned who drive a Village of

18   Babylon vehicle?

19        A.      No.  I don't think so.  I think

20   we got all of them.

21        Q.      Is there anyone else to whom we

22   did not discuss who reports to you as the

23   Village of Babylon mayor?

24        A.      Got all of them.

25        Q.      As mayor of the Village of
```

231

1          R. SCORDINO

2   Babylon, are you acquainted with Gerard Glass?

3       A.    Yes.

4       Q.    Under what circumstance did you

5   first become acquainted with Gerard Glass?

6       A.    I know he was doing work for

7   Lindenhurst.  We had our past attorney retire

8   and we were in search of a replacement, and as

9   all the mayors talk to each other, I gave over

10  a call to Linderhurst and asked them about

11  Gerard and how he handles the Village of

12  Lindenhurst, and they were very, very

13  satisfied, and I felt that he could do a good

14  job, so I made the recommendation to the

15  rest of the Board.  They felt fine with that,

16  we put a resolution in.  At that same meeting

17  that happens the first Monday in April, the

18  resolution went in to hire him.

19      Q.    What was the first interaction

20  you had with Mr. Gerard Glass?

21      A.    When he came in, I told him we

22  were going to hire him.

23      Q.    First time you spoke to him, you

24  told him you were going to hire him?

25      A.    Yes.  I knew him from various --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

232

1                        R. SCORDINO

2    not know him personally, but I heard a

3    Lindenhurst mayor talk about how good he is.

4    I figured he would be good asset for us for

5    Village attorney.

6           Q.     Who was the mayor to which you

7    spoke who recommended Mr. Glass?

8           A.     Bill Brennan -- Tom Brennan of

9    Lindenhurst.

10          Q.     Do you know Gerard Glass

11   socially?

12          A.     No.

13          Q.     Did you know Mr. Glass when he

14   was a Suffolk County legislator?

15          A.     No.

16          Q.     As mayor of the Village of

17   Babylon, do you regularly interact with Gerard

18   Glass?

19          A.     Yes.

20          Q.     Under what circumstance do you

21   interact with Gerard Glass?

22          A.     If there is a problem, if he has

23   concerns, he usually calls me.  He learned the

24   first month that I don't answer texts, so I

25   don't text him back.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

233

1                        R. SCORDINO

2        Q.    Do you communicate with him by

3    electronic mail?

4        A.    No.

5        Q.    Did you ever receive an

6    electronic mail from Gerard Glass?

7        A.    It's usually sent to my -- any

8    correspondence is usually sent to my

9    secretary, Suzanne.

10       Q.    Have you received any electronic

11   mail from Mr. Glass?

12       A.    No.

13       Q.    Does Gerard Glass report to you

14   as Village of Babylon mayor?

15       A.    Yes.

16       Q.    Can you call Gerard Glass at any

17   time?

18       A.    Yes.

19       Q.    Is Mr. Glass protected under

20   New York State Civil Service Law?

21            MR. TOSCA:  Objection.

22            You can answer.

23       A.    I don't believe so.

24       Q.    Is Gerard Glass appointed?

25       A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

234

1                              R. SCORDINO

2          Q.    Who whom?

3          A.    Village Board.

4          Q.    Who made the appointment?

5          A.    Village Board.

6          Q.    Were you the one that brought the

7    resolution or was it the Village of Babylon

8    Board?

9          A.    The Board.

10         Q.    Basically, as the Village of

11   Babylon mayor, you oversee the Village of

12   Babylon?

13         A.    Yes.

14         Q.    Basically, the CEO, so to say?

15               MR. TOSCA:  Objection.

16         A.    I would say.

17         Q.    In the course or your regular

18   activities as mayor or the Village of Babylon,

19   do you correspond with anybody by electronic

20   mail?

21         A.    I might do an e-mail to some of

22   the officers, but it's very, very infrequent,

23   so I guess the answer to your question would

24   be yes.

25         Q.    With whom do you correspond by

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

235

1                        R. SCORDINO

2      electronic mail?

3            A.      Highway Department, Building

4      Department, Treasurer's office, court very,

5      very rarely I would say.

6            Q.      Where are those e-mails stored?

7            A.      I guess they would be on my

8      computer.

9            Q.      When you say on your computer,

10     computer within the Village of Babylon?

11           A.      Yes.

12           Q.      Where is that storage located?

13           A.      I don't understand the question.

14           Q.      Physically, where is the storage

15     of the electronic mail?

16           A.      On the computer.

17           Q.      And the physical location

18     within --

19           A.      In my office.

20           Q.      So it's in the Village Town Hall.

21           A.      Village Hall.

22           Q.      Main Street, Village of Babylon,

23     New York?

24           A.      Right.

25           Q.      Who is responsible for

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

236

1                          R. SCORDINO
2      information technology, IT in the Village of
3      Babylon?
4            A.     Kevin Muldowney.
5            Q.     Aside from the Facebook page
6      which you mentioned earlier, does the Village
7      of Babylon have any social media?
8            A.     Yes.
9            Q.     What is it?
10           A.     Facebook page.
11           Q.     Anything other than a Facebook
12     page?
13           A.     No.
14           Q.     Do you or other elected officials
15     within the Village of Babylon use Facebook or
16     Twitter to communicate with constituents?
17           A.     I think anything that is
18     communicated on the Facebook goes through
19     Mary.
20           Q.     What about Twitter?
21           A.     I don't believe we have a
22     Twitter.
23           Q.     What about the elected officials,
24     do they have Twitters?
25           A.     I don't believe so.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

237

1                        R. SCORDINO

2          Q.     Do they tweet?

3          A.     I don't believe so.

4          Q.     In the course of your regular

5     activities as mayor of the Village of Babylon,

6     do you communicate with your constituents

7     through e-mail?

8          A.     Sometimes.

9          Q.     When you say sometimes, on what

10    occasion?

11         A.     If they're requesting a phone

12    call or expressing a concern to me, I will

13    comment back to them, please give me a call.

14    Thank you very much for your concern.  Please

15    give me a call in my office.

16         Q.     Any such concerns or call come in

17    regarding John Lepper?

18         A.     Just that one from Tony Kinnier.

19         Q.     Where are such e-mails

20    maintained?

21                MR. TOSCA:  Objection.

22                You can answer.

23         A.     On my computer at 153 West Main

24    Street in my office, second floor.

25         Q.     Is that computer secured by a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

238

```
 1                    R. SCORDINO
 2    password?
 3         A.    Yes.
 4         Q.    Aside from the election campaign
 5    we mentioned earlier, have you actively
 6    participated in any other election campaign?
 7         A.    No.
 8         Q.    Have you been part of an election
 9    campaign outside of the Village of Babylon?
10         A.    No.
11         Q.    Are you acquainted with an
12    individual by the name of Peter, or Peter
13    Messina?
14         A.    Pete Messina works for us.
15         Q.    When you say for us --
16         A.    Village, he is a garbage man.
17         Q.    What is his title?
18         A.    Laborer.
19         Q.    Is he full-time or part-time?
20         A.    Full-time.
21         Q.    Does he do anything other than a
22    laborer for the Village of Babylon?
23         A.    No.
24         Q.    When did you first become
25    acquainted with Mr. Messina?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

239

1                          R. SCORDINO

2          A.      Twenty years ago.

3          Q.      How and under what circumstances

4    did you become acquainted with Mr. Messina?

5          A.      As one of our employees.

6          Q.      Do you recognize the name Misner

7    Auto Body?

8          A.      Yes.

9          Q.      Do you know whether Mr. Messina

10   is associated in any way with or employed by

11   Misner Auto Body?

12         A.      No idea.

13         Q.      Under what circumstances did you

14   come to learn the name Misner Auto Body?

15         A.      I believe they fix some of our

16   trucks or cars, too.

17         Q.      When was the last time you saw

18   Mr. Messina?

19         A.      Last week.

20         Q.      Have you ever done business with

21   Mr. Messina?

22         A.      I sold him my car, the original

23   bluefin.

24         Q.      Anything else?

25         A.      That's it.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

240

1                    R. SCORDINO

2        Q.    Have you had occasion to have any

3    motor vehicles repaired by or under the

4    supervision of Mr. Messina?

5        A.    No.

6        Q.    Have you had occasion to utilize

7    Misner Auto Body to fix a vehicle?

8             MR. TOSCA:  Objection.

9        A.    It's usually done by our Highway

10   Department head Skip Gardener.  He gets lowest

11   price.  I don't know if Misner comes in that

12   low.  I'm not affiliated with that.

13       Q.    Did you ever have a vehicle that

14   you drove fixed by Misner Auto Body?

15            MR. TOSCA:  Objection.

16            You can answer.

17       A.    I have no idea.

18       Q.    Did you ever have an accident

19   where you hit four cars with you truck?

20       A.    Four cars, no.

21       Q.    Two cars?

22       A.    No.  I told you the one car.

23       Q.    You hit one car?

24       A.    Yes.

25       Q.    What were the circumstances under

241

1                         R. SCORDINO

2      which caused you to need repair from hitting

3      that one car?

4               MR. TOSCA:  Objection.

5               You can answer.

6          A.     Coming out of the side street,

7      vehicle was going north and south and I came

8      out, I didn't see him, he didn't see me, and I

9      hit his back bumper.

10         Q.     You hit this person in the rear?

11         A.     On the side, side panel in the

12     rear.

13         Q.     Did the police investigate the

14     accident?

15         A.     No.

16         Q.     Was there a police accident

17     report for the accident?

18         A.     I don't believe so.

19         Q.     Did you file an MV104 for the

20     accident?

21         A.     I left it up to the Highway

22     Superintendent.

23         Q.     The answer is you did not?

24         A.     No.

25         Q.     You said you left it up to --

```
                                                          242
 1                         R. SCORDINO
 2          A.     Skip Gardener?
 3          Q.     Did you report the accident to an
 4   insurance carrier?
 5          A.     Yes, through our Village.
 6          Q.     What was the name of the
 7   insurance carrier to which you reported the
 8   accident?
 9                 MR. TOSCA:   Objection.
10                 You can answer.
11          A.     Norton Siegle, N-O-R-T-O-N
12   S-I-E-G-L-E.
13          Q.     Were there any personal injuries
14   or property damage associated with that
15   accident?
16          A.     No.
17          Q.     What time of day did this
18   accident occur?
19          A.     Around 5:30.
20          Q.     5:30 in the morning 5:30 --
21          A.     Afternoon.
22          Q.     What was the extent of the
23   property damage?
24          A.     There was no damage to my car,
25   very minimal to his car.
```

243

```
 1                    R. SCORDINO
 2        Q.    Any legal action of any kind
 3   associated with the accident?
 4        A.    No.
 5        Q.    Who paid for the repairs?
 6        A.    I guess the Village did.
 7        Q.    Do you know who paid for the
 8   repairs to the vehicle?
 9        A.    No.
10        Q.    When you say you guess the
11   Village did --
12        A.    Village paid.  If there was any
13   repairs, the Village did.
14        Q.    Do you know the gentleman whose
15   car to whom you hit?
16        A.    No.
17        Q.    Did you ever exchange insurance
18   with that person?
19        A.    Left it up to Skip Gardener.
20   Code Enforcement was also there.
21        Q.    After you hit the person, what,
22   if anything, did you do?
23              MR. TOSCA:  Objection.
24              You can answer.
25        A.    I didn't do anything.  It was
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

244

1                         R. SCORDINO

2    left up to the Highway Superintendent.

3          Q.    From where were you coming?

4          A.    Work, Village Hall.

5          Q.    As you left Village Hall, which

6    direction, which roadway did you proceed in

7    which direction?

8          A.    I was going eastbound.  Coming

9    out of Trolley Line Road, Railroad Avenue, he

10   was going northbound on Deer Park Avenue.

11         Q.    Has your family ever used the

12   Village of Babylon fuel depot to fuel their

13   personal vehicles?

14              MR. TOSCA:  Objection.

15         A.    No.

16         Q.    Do you have a fuel card?

17         A.    Yes.

18         Q.    By whom is that fuel card

19   provided?

20         A.    Village.  You're talking about

21   the tab for the Village fill-up, or are you

22   talking about a credit card?

23              THE WITNESS:  I have to take

24         another break, guys.

25              MR. MORRIS:  Time the 3:04.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

245

1              R. SCORDINO

2              (Whereupon, a recess was taken

3         from 3:04 p.m. to 3:10 p.m.)

4              MR. MORRIS:  3:10, back on the

5         record.

6         Q.    Mr. Scordino, any other accidents

7    with your Village of Babylon vehicle?

8         A.    No.

9         Q.    In other words, aside from the

10   accidents we just discussed, you have never

11   been involved in any other sort of accident or

12   as you described before fender bender?

13        A.    That's it.

14        Q.    Anyone else drive the motor

15   vehicle that is provided to you by the Village

16   of Babylon?

17        A.    No.

18        Q.    What is the license plate number

19   on the vehicle that you drive as part of the

20   Village of Babylon?

21        A.    Just says Village of Babylon on

22   it, has the number.  I don't know what the

23   number is.

24        Q.    Has it changed over the years?

25        A.    I'm not sure.  I'm not a hundred

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

246

1                     R. SCORDINO
2    percent sure.  I don't register the car, the
3    Highway Superintendent does.
4         Q.    Is there any other vehicle that
5    you utilize aside from Village of Babylon
6    vehicle?
7         A.    I occasionally use my wife's.
8         Q.    What car is your wife's?
9         A.    It's a white Chevy SS.
10        Q.    Did you ever operate the Village
11   of Babylon vehicle outside the area of the
12   village of Babylon or its immediate vicinity?
13        A.    Yes.
14        Q.    Where is the Village of Babylon
15   vehicle that you drive regularly stored,
16   parked?
17        A.    In front of my house.
18        Q.    Is it garaged?
19        A.    No.
20        Q.    To your knowledge, how many
21   vehicles does the Village of Babylon own?
22        A.    I would say around 50.
23        Q.    You use the Village of Babylon
24   vehicle that is given to you to drive from
25   your home to work?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

247

1                     R. SCORDINO

2        A.     Yes.

3        Q.     How many Village officials or

4   employees are allowed to use their Village of

5   Babylon vehicles to drive from home to work?

6        A.     Six.

7        Q.     Who are those six persons?

8        A.     Skip Gardener, he is our first

9   responder also in the Village.  Bill Whittier,

10  he is in charge of code enforcement.  Myself

11  and the four chiefs, that's seven.

12       Q.     Are the vehicles of which these

13  persons drive provided with a license plate

14  shield of any sort?

15       A.     I'm not sure.  I know mine

16  doesn't.

17       Q.     Do you have a license plate

18  shield covering your license plate?

19       A.     No.

20       Q.     Anything you added to the

21  vehicle, plate or cover on top of the license

22  plate?

23       A.     No.

24       Q.     How is your Village of Babylon

25  vehicle maintained?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

248

1                    R. SCORDINO

2       A.    Village.

3       Q.    By whom?

4       A.    Village.

5       Q.    Which person within the Village

6    of Babylon?

7       A.    Andrew, Andrew Alvarez,

8    A-L-V-A-R-E-Z, he is the head of the mechanic

9    shop.

10       Q.    When you say the head of the

11   mechanic shop, which mechanic shop?

12       A.    Village, we have a mechanic shop

13   under the Highway Department.

14       Q.    To whom does Mr. Alvarez answer?

15       A.    Skip Gardener.

16       Q.    Skip, in turn, answers to you?

17       A.    Right.

18       Q.    How many boats does the Village

19   of Babylon own?

20       A.    One.

21       Q.    Why would the Village of Babylon

22   own a both?

23             MR. TOSCA:  Objection.

24             You can answer.

25       A.    As you know, we have many canals

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

249

1          R. SCORDINO

2     in our Village and we have, the boat is used

3     to do water rescue and fight fires from the

4     water side.  It's under the Babylon Fire

5     Department.

6          Q.    What type of boat is it?

7          A.    Center console, I think it's

8     25 feet outboard.

9          Q.    Who has access to this boat?

10         A.    The fire department.

11         Q.    When was the boat first

12    purchased?

13         A.    Ten years ago.

14         Q.    Is the boat ever utilized to

15    access Fire Island?

16         A.    No.

17         Q.    Where is the Village of Babylon

18    boat docked?

19         A.    Lewis Circle, Lewis Pond.

20         Q.    Lewis Circle, that's part of the

21    Village of Babylon?

22         A.    Yes, Lewis Pond.

23         Q.    That's not privately owned?

24         A.    No, it's Village owned.

25         Q.    Are you acquainted with an

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

250

1              R. SCORDINO

2    individual by the name Chris or Christopher

3    Lewis?

4         A.     Yes.  Yes.

5         Q.     When did you first become

6    acquainted with Mr. Lewis?

7         A.     Chris Lewis does our web page

8    along with Jean Parker.

9         Q.     What circumstance did you first

10   become acquainted with Mr. Lewis?

11        A.     When he was doing our, I guess he

12   was doing our web page and Pat Corley

13   (phonetic), I think, who was our past Village

14   clerk, hired or asked him to maintain our

15   page, and I said fine.  She was fine with him,

16   so I don't get involved in that.

17        Q.     When you say you don't get

18   involved, Mr. Lewis maintains the Village of

19   Babylon website?

20        A.     Along with Jean Parker who is the

21   Village clerk.

22        Q.     How is Mr. Lewis paid?

23        A.     I don't believe -- I think he

24   does it -- it's a very, very minimal fee, if

25   there is one, but I think he does it gratis.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

251

1                     R. SCORDINO

2          Q.      Who would know?

3          A.      Village clerk.

4          Q.      Ms. Marie Parker [sic].

5          A.      Yes.

6          Q.      Are there any contracts between

7     the Village of Babylon and Mr. Lewis?

8          A.      Yes.

9          Q.      What contact is that?

10         A.      I think it's a resolution also,

11    and I think the contract is drawn up with Jean

12    Parker.  She would know.

13         Q.      What's the contract for?

14         A.      His services.

15         Q.      Services as what?

16         A.      As the web page organizer, I

17    guess it would be called.

18         Q.      Webmaster.

19         A.      Webmaster, that's a good word.

20         Q.      This contract for the webmaster,

21    this was approved by the Village of Babylon

22    Board?

23         A.      Yes.

24         Q.      Is there any other capacity of

25    which Mr. Lewis does business with the Village

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

252

1                    R. SCORDINO

2    of Babylon?

3         A.    No.

4         Q.    Is there any personal capacity in

5    which you do business with --

6         A.    No.

7         Q.    -- Mr. Lewis?

8               The boat earlier, is registered

9    with the State of New York?

10        A.    I imagine it would be, it's got

11   to qualify.

12        Q.    Do you know if the boat owned by

13   the Village of Babylon is documented by the

14   United States Coast Guard?

15        A.    I'm pretty sure it is.  I can't

16   imagine it wouldn't be be.

17        Q.    Who would know?

18        A.    Chief.

19        Q.    Chief of?

20        A.    Golab.

21        Q.    Of the Village of Babylon?

22        A.    Have you ever visited the Oak

23   Beach Inn?

24        A.    Years ago, years ago when it was

25   opened.  Actually, it was first opened my

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

253

1                         R. SCORDINO

2    senior year, and my cousin brought me over

3    there to have my first alcoholic beverage.

4         Q.      You said your senior year --

5         A.      Yeah, that would be 1967.

6         Q.      Your senior year of high school?

7         A.      Did you ever go there; were you

8    born yet because I went there when the floors,

9    you could look down and watch the inlet go in

10   and out while you were standing there.

11        Q.      Under what circumstances have you

12   visited the Oak Beach Inn?

13        A.      That was the only time.

14        Q.      Never been there since?

15        A.      No.

16        Q.      Does the Village of Babylon have

17   any jurisdiction over Fire Island?

18              MR. TOSCA:  Objection.

19        A.      No.

20        Q.      Any jurisdiction over Oak Beach?

21        A.      No.  Only fire.  It's one of our

22   fire districts.

23        Q.      Does the jurisdiction of Village

24   of Babylon end at the shore of Fire Island's?

25        A.      No.  It ends at the shoreline at

254

1                    R. SCORDINO

2    the south part of the Great South Bay.  The

3    only jurisdiction we have on the Fire Island

4    side is the two fire districts, two fire

5    districts east and west fire districts that

6    are owned by the Town.

7         Q.    Are you aware of any dead bodies

8    that were found recently within the Village of

9    Babylon?

10              MR. TOSCA:  Objection.

11              You can answer.

12        A.    Yes.

13        Q.    What dead bodies were found

14   within the Village of Babylon recently?

15        A.    No.

16        Q.    You saying there were not?

17        A.    No.

18        Q.    I thought you said yes.

19              You mentioned earlier Skip

20   Gardener; is that right?

21        A.    Yes.

22        Q.    When did you first become

23   acquainted with Mr. Gardener?

24        A.    When I was in high school.

25        Q.    Now, Mr. Gardener has

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

255

1            R. SCORDINO

2  associations with the Village of Babylon,

3  correct?

4        A.    Um-hum.

5        Q.    What associations does he have?

6        A.    Highway Superintendent.

7        Q.    Aside from Highway

8  Superintendent, does he maintain any other

9  associations with the Village of Babylon?

10       A.    He's also a member of the fire

11 department and he been there over 50 years.

12 He knows a lot of people, does a fantastic job

13 to keep Babylon beautiful.

14       Q.    The upstate home that, and was in

15 Coshaton (phonetic)?

16       A.    Cochecton.

17       Q.    Cochecton.

18             Is there a John Deere

19 utility-type vehicle on that property?

20       A.    Yes.  No, not a John Deere, no.

21 I don't have a John Deere.

22       Q.    John Deere-type vehicle?

23             MR. TOSCA:  John Deere what?

24             THE WITNESS:  Type vehicle.

25       Q.    Is there such a vehicle on that

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

256

1                     R. SCORDINO

2    property?

3         A.    Lawnmower, John Deere, I don't

4    know what you're talking about.  There's a lot

5    of John Deere type things, so you have to be

6    more specific, please.

7         Q.    Do you have a vehicle for

8    maintenance of the property?

9         A.    Kutoba Tractor K-U-T-O-B-A.

10        Q.    How long have you been using the

11   utility-type vehicle?

12              MR. TOSCA:  Objection.

13              You can answer.

14        A.    Four years.  I think it's

15   four-years old.

16        Q.    How did you obtain the

17   utility-type vehicle?

18              MR. TOSCA:  Objection.

19        A.    Bought it.

20        Q.    Does the Incorporated Village of

21   Babylon own the similar type of vehicle?

22        A.    No.

23        Q.    Does the Incorporated Village of

24   Babylon make purchases through a list

25   negotiated through the State of New York?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

257

1                    R. SCORDINO

2       A.      Yes.

3       Q.      Where is that list maintained?

4       A.      I would imagine it's in the

5    Highway Department.  You're talking about bid

6    prices, you're talk about my vehicle,

7    everything is done by bid.  We got the New

8    York State Bid, could be Town of Babylon Bid,

9    could be Suffolk County Bid.  Everything is

10   done by -- in the bid process.

11      Q.      That bid process is established

12   by New York State, correct?

13      A.      Yes.

14      Q.      Have you or your family purchased

15   anything for your own use from that New York

16   State list?

17      A.      No.  I really object -- I want to

18   interject something here, Mr. Morris, because

19   you're indicating that I'm doing something

20   illegal, and I don't know where you're getting

21   your information from, somebody must be

22   feeding you.  I just want to let you know,

23   okay, I'm probably the most honest person

24   there is.  I don't need to steal money, I

25   don't need to steal services, okay.  You're

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

258

1                    R. SCORDINO

2    insinuating that.

3         Q.     I'm asking you questions.

4         A.     Did you pay it with a bundle of

5    money?  That's insinuating, okay, that's

6    insinuating.

7         Q.     Sir, I'm ask you questions.

8    You're attorney is objecting --

9         A.     And you wrote the questions,

10   okay.  You're insinuating, you're going down

11   that trail again.

12        Q.     Did the --

13               MR. TOSCA:  All right, did you --

14               MR. MORRIS:  I'm literally asking

15        a question.  I'm literally speaking.

16               MR. TOSCA:  There is no question,

17        in light of --

18               MR. MORRIS:  If you want to take

19        a break in light --

20               MR. TOSCA:  There's no question.

21        I'd like to take a break.

22               MR. MORRIS:  Note the time, it's

23        3:25.  We'll go off record at the

24        request of the defendant.

25               (Whereupon, a recess was taken

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

259

1                    R. SCORDINO

2          from 3:25 p.m. to 3:30 p.m.)

3               MR. MORRIS:  Time now is 3:30.

4          Back on the record.

5          Q.    Mr. Scordino, did you discuss

6     your testimony during the break?

7               MR. TOSCA:  Objection.

8               Don't answer the question.

9          Q.    I'm not asking what you said.

10    I'm asking if you spoke about your testimony.

11              MR. TOSCA:  Objection.

12              Don't answer the question.

13              MR. MORRIS:  Why are you telling

14         him not to answer.  I'm asking if you

15         had a conversation, like Judge Brown

16         articulated that time, he used the John

17         Gotti reference, if he came and had a

18         conversation, that's not privileged

19         but --

20              MR. TOSCA:  You didn't ask him

21         that question, you asked him substance.

22         If you ask if he had a conversation,

23         with me, that's fine.

24         Q.    Did you have a conversation with

25    your attorney?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

260

1                    R. SCORDINO

2        A.    Yes.

3        Q.    Did you talk about your testimony

4    without mentioning the testimony?

5              MR. TOSCA:  Objection.

6              Don't answer the question.

7              MR. MORRIS:  Counsel, I'm

8        cautioning you, I'm going to seek a

9        ruling and we're going to seek the

10       appropriate remedy against you.

11             MR. TOSCA:  Okay.

12   RL        MR. MORRIS:  Mark that for a

13       ruling, please.

14       Q.    Code Enforcement at the Village

15   of Babylon, do they have a Civil Service

16   certification?

17       A.    I don't think so.

18       Q.    Are there ranks within the Code

19   Enforcement Department within the Village of

20   Babylon?

21       A.    Yes.

22       Q.    With are those ranks?

23       A.    I believe sergeant and next --

24   what would be below it, I'm not sure.  It's

25   all, nothing is certified, I didn't go through

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

261

1                        R. SCORDINO

2     the Village board.

3          Q.    Are there promotional

4     examinations for the different ranks?

5          A.    No.

6          Q.    Can Code Enforcement legally

7     issue summonses or violations?

8          A.    Yes.

9          Q.    What is the authority to do so?

10               MR. TOSCA:  Objection.

11               You can answer.

12         A.    Code book.

13         Q.    When you say code book, to what

14    are you referring?

15         A.    Village Code Book.

16         Q.    Where is that maintained?

17         A.    Village Hall.

18         Q.    When you say --

19         A.    I believe they have a copy of it

20    also.

21         Q.    Do you have a copy of it?

22         A.    Yes.

23         Q.    How long have you maintained such

24    a copy?

25         A.    Since I was mayor and trustee,

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

262

1                        R. SCORDINO
2      everybody has it.
3           Q.    Does it change at all?
4           A.    Yes.  It gets updated.
5           Q.    When it gets updated, how do you
6      receive the updates?
7           A.    New York State.
8           Q.    When you say New York State, what
9      occurs?
10          A.    We get an amendment to our code
11     book.
12          Q.    How to you get the amendment?
13          A.    Pardon me.
14          Q.    How do you get the amendment?
15          A.    It's mailed to us.  After a law
16     is passed, it comes down to us after a 30-day
17     waiting period.
18          Q.    The individual laws are updated,
19     not the book itself, necessarily?
20          A.    It go into the book itself as an
21     amendment to it.
22          Q.    Where is the book maintained now?
23          A.    My office, Suzanne's office.  I
24     believe the court has a book.  Highway
25     Superintendent has a book.  Village clerk has

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

263

1                      R. SCORDINO

2     a book.

3     RQ          MR. MORRIS:  I call for the

4          preservation and production of such book

5          as is maintained in the regular

6          course of business in the Village of

7          Babylon.

8          Q.    Have you ever taken out or

9     destroyed anything from that book?

10         A.    No.

11         Q.    Where is it physically located?

12         A.    Suzanne has one in her office.

13    Village clerk has one downstairs.  I believe

14    the court has one in her office.  I imagine

15    the Building Department has one.

16         Q.    Are code enforcement officers

17    legal peace officers?

18         A.    I don't know what the definition

19    is of peace officer.

20         Q.    Do the Village of Babylon peace

21    officers carry a weapon?

22         A.    No.

23         Q.    Can they make arrests?

24         A.    No.

25         Q.    Can they enforce the penal law?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

264

1                    R. SCORDINO

2        A.     No.

3        Q.     Can they enforce the building

4    code of another jurisdiction?

5        A.     No.

6               MR. TOSCA:   Objection.

7        Q.     To whom do the code enforcement

8    officers ultimately answer?

9        A.     Bill Whittier.

10       Q.     To whom does Bill Whittier

11   answer?

12       A.     Me.

13       Q.     Does Village of Babylon have code

14   enforcement vehicles?

15       A.     Yes.

16       Q.     Do those vehicles have red lights

17   or flashing lights?

18       A.     No.  I believe they're yellow.

19       Q.     When you say yellow lights, are

20   those strobe, something else?

21       A.     Strobed, I guess.  They have a

22   light bar on top.

23       Q.     When you say light bar, does it

24   flash in any sort of manner?

25       A.     Yeah.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

265

1                    R. SCORDINO

2        Q.     Flashes.  So not a strobe, but it

3    flashes sort of like a circular --

4        A.     No.  It strobes, I guess the

5    light bar has a strobe, it has white lights

6    and I believe it has yellow.

7        Q.     Is there any certifications

8    required to issue a summons from the code book

9    of which you mentioned earlier at the Village

10   of Babylon?

11             MR. TOSCA:  Objection.

12             You can answer.

13       A.     Certification, no.

14       Q.     Any sort of course or

15   requirement --

16       A.     No.

17       Q.     -- one must pass?

18       A.     No.

19       Q.     In other words, aside from their

20   employ, there is nothing else that needs to

21   occur for them to issue summonses within the

22   Village of Babylon?

23             MR. TOSCA:  Objection.

24       A.     They have to have knowledge of

25   the code book and they write it right from the

Realtime Reporting, Inc. 800-373-7172   realtimereporting.com

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

266

1                    R. SCORDINO
2     code book, any violations.
3              Usually in a situation like that,
4     they would consult Bill Whittier before they
5     would write the summons.  They would be
6     directed by Bill Whittier to write the
7     summons.
8          Q.    Code enforcement vehicles, you
9     said a yellow strobe.
10             Is there anything red on car?
11         A.    I'm not sure if it's red or not.
12         Q.    When you say you're not sure, has
13    it changed over time?
14         A.    No, because if -- there was a
15    ruling a while back about red lights, certain
16    people can use red lights; but I'm not a
17    hundred percent sure because they're also used
18    in our first responders, if you're closing a
19    road down, you have to have red strobe in
20    there, so I think some of them do and some of
21    them don't.  I'm not a hundred percent sure.
22         Q.    Are the Civil Service persons
23    promoted by examination?
24         A.    They're taken off a list, but I
25    don't think the code -- the code people aren't

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

267

1                         R. SCORDINO

2      taken off a list.

3           Q.    So the code enforcement is not

4      Civil Service?

5           A.    No.

6           Q.    What, if anything, are the code

7      enforcement officers, are they appointed, are

8      they hired?

9           A.    Apply and they're hired.

10          Q.    By who?

11          A.    Recommendation of Bill Whittier

12     and it goes to my office and I hire them.

13          Q.    So ultimately you are responsible

14     for the hiring?

15          A.    Yes.

16          Q.    Can Bill Whittier fire the code

17     enforcement officer?

18          A.    He can come and recommend that a

19     firing happen, but we have some discussion

20     there of why.

21          Q.    Ultimately who is responsible for

22     the firing --

23          A.    Myself and the Board of Trustees.

24          Q.    Who would do it?

25          A.    Have to be a resolution made for

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

268

1                           R. SCORDINO
2       hiring and fire.
3            Q.     Who would make such resolution?
4            A.     It would be myself or --
5            Q.     As the mayor of the Village of
6       Babylon?
7            A.     Right.
8            Q.     Are you acquainted with an
9       individual by the name Deborah Shea?
10           A.     Yes.
11           Q.     When did you first become
12      acquainted with Ms. Shea?
13           A.     When I hired her, back I don't
14      know how many years ago.
15           Q.     What was Mr. Shea's association
16      with the Village of Babylon?
17           A.     She worked in the Village clerk's
18      office.
19           Q.     What was her job title?
20           A.     I believe she's Deputy Village
21      clerk.
22           Q.     Is that a Civil Service position
23      protected under the Civil Service law of the
24      State of New York?
25                  MR. TOSCA:  Objection?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

269

1                          R. SCORDINO

2          A.     I believe she was taken off the

3    Civil Service list.

4          Q.     To whom did she report and who

5    was her direct supervisor?

6          A.     Village clerk.

7          Q.     Village clerk?

8          A.     Yes.

9          Q.     Who is her direct supervisor?

10         A.     Pat Carley.

11         Q.     I'm sorry, Pat?

12         A.     Carley, C-A-R-L-E-Y.

13         Q.     What was Pat Carley's title?

14         A.     Village clerk.

15         Q.     Just to be clear, what was

16   Ms. Shea's job title?

17         A.     Deputy, I believe, Village clerk.

18         Q.     How long did Ms. Shea work within

19   the Village of Babylon?

20         A.     I believe it was around eight

21   years.

22         Q.     Is Ms. Shea is still employed by

23   the Village of Babylon?

24         A.     No.

25         Q.     Do you know when Ms. Shea was

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

270

1                    R. SCORDINO

2    hired by the Village of Babylon?

3        A.      I don't know the exact date.

4        Q.      What were the circumstances

5    surrounding the end of Ms. Shea's employment

6    with the Incorporated Village of Babylon?

7        A.      She was let go.

8        Q.      What were the circumstances

9    surrounding her being let go?

10       A.      She stole money from the Village.

11       Q.      Did you report that to the police

12   departments?

13       A.      No.  Our Village attorney,

14   discussion, she gave back the money and for

15   retribution she paid back and she was just let

16   go.

17       Q.      When you say Village attorney,

18   was that Mr. Glass or somebody else?

19       A.      Joel Sikowitz.

20       Q.      Did you participate in any way in

21   the process which led to the hiring and firing

22   of Ms. Shea?

23       A.      I'm sorry?

24               (Whereupon, the requested portion

25       was read back by the reporter.)

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

271

1                          R. SCORDINO

2          A.     Yes.

3          Q.     Can you tell me how you

4    participated in the hiring of Ms. Shea?

5          A.     Through an interview.  She came

6    in, seemed to be qualified for the job.  I

7    hired her.  Put her downstairs.  She was just

8    a regular secretary, worked herself up to

9    deputy clerk, and then we had to fire her.

10   Put a resolution through with the rest of the

11   board.

12         Q.     When you say we had to fire her,

13   what was the participation in which you fired

14   her?

15         A.     Through a resolution through

16   Village at a Village Board meeting.

17         Q.     You participated in that

18   resolution; is that right?

19         A.     Yes.

20         Q.     Were there any meetings that led

21   up to such resolution?

22         A.     Um-hum.

23         Q.     What were those meetings?

24         A.     With our Village clerk and

25   Village attorney.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

272

1              R. SCORDINO

2        Q.    During the time that Ms. Shea was

3   employed by the Incorporated Village of

4   Babylon, did you have occasion to interact

5   with her during the course of your activities

6   as an employee of the Village?

7        A.    No.

8        Q.    Did you interact with Ms. Shea

9   during working hours at the Village?

10        A.    Absolutely.

11        Q.    How often did you interact with

12   Ms. Shea during working hours at the Village?

13        A.    Twice a day going down to the

14   Village clerk's office, maybe no times.  It

15   was in a week, maybe ten times.

16        Q.    Did you ever communicate with

17   Ms. Shea by electronic mail?

18        A.    No.

19        Q.    You never received an electronic

20   mail from Ms. Shea?

21        A.    No.

22        Q.    You never sent an electronic mail

23   to Ms. Shea?

24        A.    No.

25        Q.    Did you ever communicate with

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

273

1                     R. SCORDINO

2    Ms. Shea by telephone?

3         A.    I can't remember, I don't

4    remember.

5         Q.    Do you have any written

6    communication with Ms. Shea?

7         A.    No.

8         Q.    Do you ever meet with Ms. Shea

9    outside regular Village business hours during

10   the time she was employed by the Village of

11   Babylon?

12              MR. TOSCA:  Objection.

13              You can answer.

14        A.    Yes.  She lives, used to live on

15   our block, so I used to see her.

16        Q.    When you say on our block, is

17   that Washington?

18        A.    Yes.

19        Q.    That is in Village of Babylon?

20        A.    Yes.

21        Q.    Where did those meetings to which

22   you just testified occur?

23              MR. TOSCA:  Objection.

24              You can answer.

25        A.    What do you mean meetings?  I

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

274

                              R. SCORDINO
1
2    didn't say meetings.  I said we used to see
3    each other and say hello like every neighbor.
4         Q.    Where did those --
5         A.    On Washington Street.
6         Q.    Who, other than you and Ms. Shea,
7    were present at those meetings?
8               MR. TOSCA:  Objection.
9         A.    Nobody.
10        Q.    What was purpose of those
11   meetings?
12              MR. TOSCA:  Objection.
13              You can answer.
14        A.    Just to say hello, you know,
15   passing by.
16        Q.    At the period of time you were
17   meet with Ms. Shea away from the office and
18   outside business hours, were you married?
19              MR. TOSCA:  Objection.
20        A.    Yes.
21        Q.    To whom were you married?
22        A.    Linda Scordino.
23        Q.    For how long have you been
24   married to Linda Scordino?
25              MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

275

1                    R. SCORDINO

2              Asked answered.

3              You can answer again.

4    A.        Thirty years.

5    Q.        When did you and Linda Scordino

6    marry?

7              MR. TOSCA:  Objection.

8              You can answer.

9    A.        Eighty -- '76. I guess '76.

10   Q.        Where were you and Linda Scordino

11   married?

12   A.        St. Joseph's Church.

13   Q.        Are you still married to Linda

14   Scordino?

15   A.        Yes, I am.

16   Q.        In the time you were married, was

17   your wife employed?

18   A.        Yes.

19   Q.        Where?

20   A.        West Islip School District.

21   Q.        Was she actively working at that

22   time?

23   A.        Yes.

24   Q.        Is she still working at the West

25   Islip School District?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

276

1                      R. SCORDINO

2         A.    No.   She retired.

3         Q.    Does she collect a pension from

4    the West Islip School District?

5              MR. TOSCA:  Objection.

6              You can answer.

7         A.    New York State.

8         Q.    At the time your wife was

9    employed, did you ever have any social

10   interaction with any of her coworkers?

11        A.    Yes.

12        Q.    Which of those coworker's names

13   can you recall?

14        A.    I can't recall.

15        Q.    Was Judge Rafter's wife one of

16   those coworkers?

17        A.    I don't believe so.

18        Q.    Were any of those coworkers or

19   their spouses or significant others with whom

20   they might have been keeping company at that

21   time associated with the Village of Babylon?

22        A.    I don't recall.

23        Q.    Anything that would refresh your

24   recollection?

25        A.    No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

277

1              R. SCORDINO

2        Q.    Do you know whether or not your

3    wife had any social interaction the wife of

4    the Village Justice of Babylon?

5        A.    No.

6        Q.    Have you ever had any social

7    interaction with Village Justice of Babylon?

8             MR. TOSCA:  Objection.

9             You can answer.

10       A.    Babylon Village is very, very

11   small, you know passing in the business

12   district, I might see her, she might be

13   shopping in the village, I might see her.

14   That's about it.

15       Q.    So you have had interactions?

16       A.    Right.

17       Q.    During the time you were meeting

18   with Ms. Shea and outside of business hours,

19   was you wife ill?

20             MR. TOSCA:  Objection.

21             Do not answer the question.

22             MR. MORRIS:  On what grounds?

23             MR. TOSCA:  You're asking him to

24       give you information about his wife's

25       health.  That's not material here.  His

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

278

1                    R. SCORDINO

2        wife's health is privileged, so any

3        medical information, I'm going to object

4        to with regard to Mayor Scordino's wife.

5    RL              MR. MORRIS:  Mark that for a

6        ruling.

7        Q.    During the period of time you

8    were meeting with Ms. Shea outside of business

9    hours, was you wife aware of those meetings?

10       A.    I didn't hear the question.

11             MR. TOSCA:  That's all right.

12             I object.

13             He is not answering.

14             MR. MORRIS:  Can you repeat that

15       question.

16             (Whereupon, the requested portion

17       was read back by the reporter.)

18             MR. TOSCA:  First of all, he

19       already said it wasn't a meeting.

20             You can answer over objection.

21       A.    No.

22       Q.    Any reason why she was not?

23       A.    Not ill?

24             MR. TOSCA:  He asked if she was

25       aware.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

279

1                    R. SCORDINO

2        Q.    She was not aware of those

3   meetings?

4        A.    To say hello to somebody, I don't

5   think it would be necessary that I have to

6   tell her I said hello with one of the

7   neighbors.

8        Q.    Did you ever tell your wife you

9   were meeting with Ms. Shea away from the

10  office and outside of business hours?

11            MR. TOSCA:  Again, you're calling

12        it a meeting.  He didn't say it was a

13        meeting.

14            MR. MORRIS:  Counsel, if you're

15        going to testify, take an oath; if not,

16        please be quiet.

17            MR. TOSCA:  No, don't tell me to

18        be quiet.

19            MR. MORRIS:  Yes, you're

20        interrupting --

21            MR. TOSCA:  He already said it

22        wasn't the case, so objection.

23        Q.    Ms. Shea ever call your wife?

24        A.    Call my wife, yeah.  She used to

25  clean our house.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

280

1                    R. SCORDINO
2        Q.    Did you ever tell your wife you
3    were meeting with Ms. Shea away from the
4    office and outside of business hours?
5                MR. TOSCA:  Objection to the form
6        of the question.
7                You can answer over objection.
8        A.    No.
9        Q.    Did you ever travel together with
10   Ms. Shea away from the office and outside of
11   business hour?
12               MR. TOSCA:  Over objection you
13       can answer.
14       A.    Yes.
15       Q.    Who, if anyone, accompanied you
16   besides Ms. Shea?
17       A.    No one.
18       Q.    Where did you go?
19       A.    To her house to drop her off, it
20   was snowing out, so I dropped her off.
21       Q.    Did you and Ms. Shea ever attend
22   the Association of Towns meeting in New York
23   City at the same time?
24       A.    No.
25       Q.    Did you stay in the city

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

281

1                     R. SCORDINO

2   overnight during such meeting?

3       A.      Absolutely not.

4       Q.      Do you know whether Ms. Shea ever

5   stayed in the city overnight during any such

6   meeting?

7               MR. TOSCA:  Objection.

8       A.      I have no idea.

9       Q.      Who supplied the polling machine

10  in the 2019 election in the Village of

11  Babylon?

12              MR. TOSCA:  Objection.

13      A.      It's done by the Village clerk, I

14  guess the Board of Elections.

15      Q.      Do you not know?

16      A.      No.  It's usually done by the

17  Village clerk.

18      Q.      Who was that for 2019?

19      A.      It was Jean Parker.

20      Q.      For whom does Jean Parker work?

21      A.      She's the Village clerk.

22      Q.      To whom does she answer?

23      A.      To me.

24      Q.      As you sit here today, you don't

25  know who supplied the polling machines?

282

1                          R. SCORDINO

2          A.      I believe it was the Board of

3    Elections, Suffolk County Board of Elections.

4          Q.      What, if any, did you have to do

5    with the supplying of those polling machines

6    for the 2019 election in the Village?

7                  MR. TOSCA:  Objection.

8                  You can answer.

9          A.      Sign the contract.  I guess to

10   pay them.  That the only interaction I have.

11   It's done by resolution, too.

12         Q.      There was the contract

13   resolution?

14         A.      Yes.

15         Q.      Anything else memorializing your

16   involvement in the polling machines for the

17   2019 election for the Village of Babylon?

18                 MR. TOSCA:  Objection.

19         A.      No.

20         Q.      Did you ever serve as poll

21   counter for the Republican Committee in the

22   15th District?

23         A.      Yes.  Poll watcher, not counter,

24   poll watcher.

25         Q.      Is the Village clerk of the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

283

1                        R. SCORDINO

2    Incorporated Village of Babylon elected or

3    appointed?

4         A.      Appointed, I believe.  She is

5    appointed.

6         Q.      She was the one who was

7    responsible for the interactions that supplied

8    the polling machines for the 2019 election of

9    the Village of Babylon?

10        A.      Yes.

11        Q.      Where do these machines typically

12   come from?

13        A.      I don't know where they're

14   stored.

15        Q.      Do you know from where they came?

16        A.      I don't know where they're

17   stored.  I don't know where they came from.

18   They usually come from the Board of Elections.

19   I don't where they store them.

20        Q.      Do you know how they came to the

21   Village of Babylon?

22        A.      Board of Elections delivers them.

23        Q.      Who was responsible for

24   conducting and managing the Village election

25   in March 2019?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

284

1                      R. SCORDINO

2       A.      Village clerk.

3       Q.      Do you know who is responsible

4   for programming or placing the codes in the

5   polling machines?

6       A.      Board of elections.

7       Q.      Do you know who monitored the

8   work of the individual managing the Village of

9   Babylon election in March 2019?

10      A.      I don't understand your question.

11              MR. MORRIS:  Withdraw the

12      question.

13      Q.      What role, if any, do you play in

14  the Village election in which you are not

15  running for an elected official?

16      A.      I'm part of the campaign

17  committee.

18      Q.      Was the public high school in the

19  Village of Babylon a polling place in

20  March 2019 for Village of Babylon election?

21      A.      Yes.

22      Q.      Did you or your wife or both

23  of you visit the high school building on

24  election day in March 2019 in the early

25  morning hours of the next day?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                                    285

1                         R. SCORDINO

2               MR. MORRIS:  Let the record

3          reflect that everyone seems to be

4          staring at the defendant as he answers.

5               MR. TOSCA:  Aside from the

6          deponent, I haven't seen anyone else

7          staring.

8               MR. MORRIS:  -- three people

9          staring.

10    A.      I can't remember.

11    Q.      You can't recall?

12    A.      No.

13              MR. TOSCA:  The only person

14         staring at the witness is your client.

15              THE WITNESS:  Very threatening,

16         too.

17    Q.      You and your wife, were you

18    behind the high school at 5:00 a.m. on

19    March 20, 2019; yes or no?

20    A.      March when?

21    Q.      March 20, 2019.

22    A.      No, I can't remember what is

23    there.

24    Q.      Is it no or I can't remember.

25    A.      No, I can't remember.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

286

1                         R. SCORDINO

2          Q.      Have you had occasion to apply

3    for permits from any agency of the Village

4    government for the Village of Babylon?

5          A.      I don't know what you mean.  I

6    don't understand the question.

7          Q.      You know what permits are, right?

8          A.      Right.

9          Q.      You know what the Village of

10   Babylon is?

11         A.      Right.

12         Q.      Did you ever apply for a permit

13   in the Village of Babylon?

14         A.      Car permit?

15         Q.      Yes.

16         A.      My wife probably has, she's got a

17   permit on the car.

18         Q.      When did you purchase your home

19   on Washington Avenue?

20                 MR. TOSCA:  Objection.

21                 Asked and answered.

22                 You can answer.

23         A.      I believe it was '76, 1976.

24         Q.      At the time you purchased your

25   home on Washington Avenue, did there exist a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

287

1                    R. SCORDINO

2    deck and outdoor shower?

3         A.      Yes. No.  I had to apply for the

4    permit for the porch and the shower.

5         Q.      I just asked you if you applied

6    for a permit?

7         A.      See.  You're not being very

8    specific, Mr. Morris.  You know what I mean?

9              Did I apply for a building

10   permit, yes.  I am aboveboard applying for a

11   permit. I bought a permit for my window, for

12   my porch in the front, my bay window, my two

13   storage sheds in the back, the deck in the

14   back, and the shower.  I do get building

15   permits.

16        Q.      You said you bought the building

17   permits; is that right?

18        A.      I didn't buy the building

19   permits.  I got the building permits.

20        Q.      I'll try to ask this question

21   very specifically.

22        A.      Okay.

23        Q.      What were you and your wife doing

24   behind the Babylon High School at 5:00 a.m. on

25   March 20, 2019?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

288

1          R. SCORDINO

2          MR. MORRIS:  Let the record

3     reflect, counsel has placed his hand

4     squarely in front of the witness.

5          MR. TOSCA:  Yes.

6          Are you done with the question?

7          MR. MORRIS:  Are you done

8     interfering?

9          MR. TOSCA:  Are you done with the

10    question?

11         MR. MORRIS:  Counsel, he's

12    testifying, you're interfering.

13         MR. TOSCA:  I'm waiting for your

14    question to be done.

15         MR. MORRIS:  It's been done,

16    that's how this works.

17         MR. TOSCA:  The question is done?

18         MR. MORRIS:  Yes.

19         MR. TOSCA:  Then objection.

20         Don't answer the question.

21         MR. MORRIS:  On what grounds?

22         MR. TOSCA:  He's answered and now

23    you're asking him the question in an

24    improper form.

25         MR. MORRIS:  You're telling him

289

```
 1                      R. SCORDINO
 2          not to answer on what grounds?
 3               MR. TOSCA:  He's already answered
 4          the question, you're asking in improper
 5          form.
 6    RL          MR. MORRIS:  We'll mark that for a
 7          ruling and we'll seek the appropriate
 8          remedy at an appropriate time.
 9               Counsel, privilege is a reason
10          not to answer.  You're saying asked and
11          answered is now your reason?
12               MR. TOSCA:  Palpably improper
13          question.  It was already told, he gave
14          you testimony --
15               MR. MORRIS:  Trying to make it
16          specific, Counsel.
17               MR. TOSCA:  That's not making it
18          specific.  That's putting words in his
19          mouth.
20          Q.   Have you and your wife ever been
21    to Babylon High School?
22               MR. TOSCA:  Objection.
23               You can answer.
24          A.   Yes.
25          Q.   Have you ever been there at 5:00
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

290

1                    R. SCORDINO

2    in the morning?

3         A.    No.

4         Q.    So your testimony here under oath

5    is you have never been to Babylon High School

6    at 5:00 a.m. in March 2019?

7         A.    Probably, yes, I was. The year,

8    1999.

9         Q.    1999 was twenty years ago.

10        A.    In 2019 during the election, I

11   was there.  I was there for the -- because

12   this is the first time that we had the

13   election the Babylon High School and I wanted

14   to make sure everything was up and up.  That

15   was part of my job to go around and do that.

16        Q.    When you say up and up, to what

17   are you referring?

18        A.    That they had no problem with the

19   machines?

20        Q.    How do you do that?

21        A.    Asking the chairman of the

22   polling place, is everything okay.

23        Q.    Who --

24        A.    As a matter of fact, that morning

25   I went to all the polling places.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

291

1                      R. SCORDINO

2        Q.      Who did you ask?

3        A.      The chairman of the group that

4    was there.  I don't know exactly who that was,

5    but I did have a polling certificate for that

6    that I could do that.

7        Q.      To whom did you speak?

8        A.      I don't know.  I can't remember.

9        Q.      You don't know anyone to whom you

10   spoke that day?

11       A.      No.

12       Q.      Did you inform the persons to

13   whom you spoke that you were on the ballot?

14       A.      Yeah.  They knew I was on the

15   ballot, everybody knows me.

16       Q.      What, if anything, was their

17   response?

18       A.      Pardon me?

19       Q.      When you informed them, what, if

20   anything, was their response?

21               MR. TOSCA:  Objection.

22               You can answer.

23       A.      I can't recall exactly what they

24   said.

25       Q.      To your knowledge.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

292

1                        R. SCORDINO

2        A.     To the best of my knowledge.

3        Q.     Is there anything that would

4    refresh your recollection?

5        A.     No.

6        Q.     Seems like an important day.  Is

7    there anything that would prohibit you from

8    being able to recall that --

9               MR. TOSCA:  Objection.

10       Q.     -- conversation?

11       A.     No.

12              MR. MORRIS:  Let me finish the

13          question, please.

14              MR. TOSCA:  Objection.

15       Q.     The chair is responsible for each

16   polling location; is that right?

17       A.     I think there's one chairman for

18   the whole Babylon School polling place.

19       Q.     You don't recall who that was?

20       A.     No.

21       Q.     Was it a man or woman?

22       A.     I can't recall.

23       Q.     But you spoke to that person,

24   correct?

25       A.     Yeah.  I asked is everything

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

293

1                          R. SCORDINO

2    okay, are all the machines working?

3         Q.     Where did that conversation

4    occur?

5         A.     Right in the gymnasium.

6         Q.     You entered the polling place?

7         A.     Right.

8         Q.     You approached the chairman?

9         A.     Right.

10        Q.     Was anyone else there?

11        A.     Everybody was ready to work, I

12   guess.  They were all ready to go.

13        Q.     Was your wife present?

14        A.     I don't believe my wife was

15   there.

16        Q.     Did you speak to anyone else

17   after you spoke or before you spoke to the

18   chairman?

19        A.     No.

20        Q.     Is it the chairman's

21   responsibility to put in these codes and

22   access these machine?

23        A.     I believe she is.

24        Q.     Before and after the election,

25   correct?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

294

1                          R. SCORDINO

2          A.     I didn't go after the election.

3          Q.     I'm asking the responsibility of

4    the chairman, they're responsible for the --

5          A.     Yes, all the way up to the

6    closing of the polling place.

7          Q.     Is the deck and outdoor shower on

8    the Washington Avenue home on a Certificate of

9    Occupancy or deed of any sort?

10         A.     Yes.

11         Q.     Where is that?

12         A.     Village Hall.

13         Q.     Is it a deed, Certificate of

14   Occupancy, or something else?

15         A.     CO.

16         Q.     Did you apply for a Certificate

17   of Occupancy or building permit or any permit?

18         A.     Building permit.

19         Q.     When did you apply for that

20   building permit?

21         A.     When it was built.

22         Q.     What year was that?

23         A.     I believe it was in the early

24   '80s, or after I moved in, probably couple

25   years after that.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

295

1                         R. SCORDINO

2          Q.     Did you do the work on the

3    Washington Avenue property?

4          A.     No, a contractor did it.

5          Q.     Did you apply for the permits on

6    the Washington Avenue property?

7          A.     Yes.

8          Q.     Who submitted the permit

9    application?

10         A.     I believe I did.

11         Q.     Did anybody assist you in

12   submitting such permit application?

13         A.     No.

14         Q.     With whom did you speak from the

15   Village of Babylon for such permit?

16         A.     I can't recall.

17         Q.     Did you go down to the Village of

18   Babylon Hall for that permit?

19         A.     Yes.

20         Q.     Did you speak to a man or woman?

21         A.     I believe it was a woman.

22         Q.     Did you submit anything in

23   writing to that woman?

24         A.     No.   It was just a regular permit

25   to do a building permit.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

296

1                   R. SCORDINO

2        Q.    Why didn't you submit anything in

3   writing for a regular building permit?

4              MR. TOSCA:  Objection.

5              You can answer.

6        A.    You usually go there and fill out

7   the application and submit it.

8        Q.    Is there anything else to that

9   process?

10       A.    I guess you get a certificate

11  back if everything's okay and you get a

12  building permit.

13       Q.    I don't want you to guess.

14             As the mayor of the Village of

15  Babylon; is that the process?

16       A.    Yes.

17       Q.    Is there a quality of life

18  initiative within the Village of Babylon?

19             MR. TOSCA:  Objection to the

20        form.

21             You can answer.

22             MR. MORRIS:  Let me withdraw

23        that.

24             Counsel, what's wrong with the

25        form of that question?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

297

1                        R. SCORDINO
2               MR. TOSCA:  I'm sorry?
3               MR. MORRIS:  What's wrong with
4          the form of that question?
5               MR. TOSCA:  What's --
6               MR. MORRIS:  Is there a quality
7          of life initiative within the Village of
8          Babylon?
9               MR. TOSCA:  At what point, what
10         year, when?
11         Q.    Did you ever hear anyone say
12    quality of life initiative in your life?
13         A.    Yes.
14         Q.    When was the year in which this
15    occurred?
16         A.    We always have a quality of life
17    initiative.  We don't need somebody to tell
18    us.  That's part of our whole scheme of things
19    in the Village, and we take much pride in
20    doing that.
21         Q.    Is there a formal initiative or
22    has this always occurred?
23         A.    Always occurred.
24         Q.    So there's no formal initiative?
25         A.    Right.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

298

1                    R. SCORDINO
2        Q.      Is there any agreement between,
3   for instance, the Village of Babylon and MTA,
4   Metropolitan Transit Association?
5        A.      We work hand-in-hand with them to
6   try to make sure the quality of life at the
7   train station are upheld.
8        Q.      Is there anything associated with
9   the words "quality of life initiative" as it
10  exists between the Village of Babylon and the
11  Metropolitan Transit Association?
12       A.      Yeah.  We together to make sure
13  the quality of life at the train station is
14  promoted and continuing to be a good place to
15  be, safe place to be.
16       Q.      Safe?
17       A.      Safe.
18       Q.      Is there a record or writing that
19  bears quality of life initiative between or
20  among the Metropolitan Transit Association and
21  the Village of Babylon?
22       A.      I don't remember one.
23       Q.      You say you don't remember --
24       A.      I don't recall.
25       Q.      Is there anything that would

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

299

```
 1                    R. SCORDINO
 2    refresh your recollection?
 3          A.      No.
 4          Q.      Is there any documents to which
 5    you could refer?
 6          A.      No.
 7          Q.      All right.
 8                  So is the part of your mandate as
 9    mayor of the Village of Babylon quality of
10    life?
11          A.      Yes.
12          Q.      Is safety part of your mandate as
13    the mayor of the Village of Babylon?
14          A.      Very, very much.
15                  MR. TOSCA:  Objection.
16          Q.      Is this something that you run
17    upon as the mayor of the Village of Babylon?
18          A.      Yes.
19          Q.      Do you use it in your campaign
20    literature?
21          A.      Yes.
22          Q.      Is it something of which you are
23    proud?
24          A.      Yes.
25          Q.      Do you speak about it in regards
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

300

1                              R. SCORDINO
2       to the Village of Babylon?
3              A.      All the time.
4              Q.      Have you ever sent out a holiday
5       letter about a tree house?
6              A.      No.
7              Q.      Have you ever sent out an
8       initiative about a tree house that was picked
9       up in the news media?
10             A.      No.
11             Q.      Have you ever sent anything to
12      your constituents about a tree house?
13             A.      No.
14             Q.      To voters about a tree house?
15             A.      No.
16             Q.      Do you know if there are drugs
17      stored within John Lepper's neighbor's house
18      and/or tree house?
19                     MR. TOSCA:   Objection.
20                     You can answer over objection.
21             A.      I don't know.
22             Q.      Do you know if there was a house
23      neighboring John Lepper's house that was
24      raided for drugs?
25                     MR. TOSCA:   Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

301

1                    R. SCORDINO

2              You can answer.

3        A.    It was around his corner, not

4    next to him.  It was on the next street,

5    Wyandanch Avenue.

6        Q.    Where was it?

7        A.    One of the houses on Wyandanch.

8        Q.    How far from Mr. Lepper's house

9    was that house?

10       A.    Block, block away.

11       Q.    This house that was a block away,

12   what is your knowledge about the raid and the

13   drugs?

14       A.    It's been an ongoing thing with

15   this resident and son.  He's a known drug

16   dealer.

17       Q.    When you say known drug dealer,

18   known to whom?

19       A.    With the residents, they all

20   know.

21       Q.    Do you know?

22       A.    Yeah.

23       Q.    Do you know if there was a gun

24   recovered at that house?

25       A.    Um-hum.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

302

1                        R. SCORDINO

2       Q.    When was that gun recovered?

3       A.    Couple years ago.

4       Q.    Do you know if there was drug

5   activity within the Village of Babylon?

6              MR. TOSCA:  Objection.

7              You can answer.

8       A.    Yes.

9       Q.    The neighbor of Mr. Lepper's when

10  the gun was recovered from whom the house was

11  raided by drugs, is that house three houses

12  away from Mr. Lepper's?

13             MR. TOSCA:  Objection.

14      A.    No.  I don't believe so.

15      Q.    Do you know?

16      A.    The house that I'm talking about

17  is on Wyandanch Avenue.

18      Q.    Is there perhaps another house

19  that --

20      A.    Maybe.  I'm not sure.  I usually

21  know that by Code Enforcement, they usually

22  inform me, or the neighbors inform me.

23             Mr. Lepper never called me about

24  it, so I imagine that -- I don't know.

25      Q.    How do the neighbors inform you?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

303

1                        R. SCORDINO

2        A.      They call me.

3        Q.      They have your personal number?

4        A.      At Village Hall.

5        Q.      Okay.

6                Wyandanch, is there another house

7    that was raided for drugs?

8        A.      Yes.

9        Q.      What other house besides

10   Wyandanch?

11       A.      That's the only one I know, it's

12   been ongoing for at least five years.

13       Q.      Is there another house that's

14   three houses away from Mr. Lepper's?

15               MR. TOSCA:  Objection.

16       A.      I just told you, I don't know.  I

17   wasn't notified about it.  If there was a

18   concern, nobody called me.

19       Q.      What about another house that was

20   raided for drugs and had a gun within the

21   Village of Babylon, do you know of any other

22   such house?

23               MR. TOSCA:  Objection.

24       A.      I believe that's the one on

25   Wyandanch Avenue.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

304

1                        R. SCORDINO

2        Q.      How many houses away from Tony

3    Davida's house is the house on Wyandanch

4    Avenue to which you refer?

5                MR. TOSCA:  Objection.

6                You can answer.

7        A.      I would guess around ten houses.

8        Q.      Are you aware that was a school

9    bus stop in the neighborhood, the vicinity of

10   John Lepper's neighbor's tree house?

11       A.      I do.

12       Q.      Do you know --

13       A.      On Wyandanch Avenue, the bus

14   stop, yes.

15       Q.      Do you know that eventually that

16   bus stop had to be moved?

17       A.      Yes.

18       Q.      Do you know what kind of bus stop

19   is there?

20       A.      School bus.

21       Q.      Do you know what the age of

22   students picked up at that bus stop were?

23       A.      I guess they were young students,

24   first, second grade.  I don't know what the

25   requirements are for bus pick-up.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

305

1                          R. SCORDINO

2         Q.     Do you know it had to be moved?

3                MR. TOSCA:  Objection.

4                Asked and answered.

5                You can answer.

6         A.     I was told.

7         Q.     Do you know prior to it being

8    moved, there was a number of raids on the

9    house where guns were found?

10               MR. TOSCA:  Objection.

11               You can answer.

12        A.     Yes.

13        Q.     Do you know why the bus stop was

14   moved?

15        A.     Because of this activity right

16   across the street from where the bus stop is.

17        Q.     If there were guns and drugs

18   within the Village of Babylon, would that be

19   within the quality of life initiative we

20   discussed above?

21               MR. TOSCA:  Objection.

22               You can answer.

23        A.     You have to understand, okay, we

24   try as best as we can with our code

25   enforcement who have no arrest ability, we can

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

306

1                           R. SCORDINO

2     only enforce the codes, okay.  This is a

3     Suffolk County Police matter, okay.  We refer

4     many -- we refer these addresses and follow up

5     on the addresses, and Suffolk County Police

6     raided it because of the complaints that the

7     residents called Suffolk County and met with

8     Suffolk County, okay.

9                 The one on Mr. Lepper's street,

10    we were never ever told, even Mr. Lepper never

11    called, who visits Village Hall all the time,

12    who knows where my office is, knows where I

13    live, okay, never stopped and told me, so how

14    can we do anything if we don't know.

15                Every resident gets every

16    opportunity to either call me at my house,

17    call my office, e-mail me.

18        Q.    As the mayor of the Village of

19    Babylon, are guns and drugs within the Village

20    of Babylon consistent within the quality of

21    life within the Village of Babylon?

22                MR. TOSCA:  Objection.

23                You can answer.

24        A.    As far as I know, this is the

25    only incident that this house was raided and

307

1                    R. SCORDINO

2    found drugs and a gun.

3         Q.    When you say the only incident,

4    in which year did it occur?

5         A.    Pardon me?

6         Q.    In which year did such incident

7    occur?

8         A.    I believe it was a couple years

9    ago.  I'm not sure.

10        Q.    This is a known drug dealer?

11        A.    Yes.

12        Q.    This is something that the

13   Village of Babylon reported?

14        A.    We reported it with Suffolk

15   County.  I met residents that came to my

16   office to discuss it.  School officials called

17   me up, okay, and told me about the bus change.

18   It was a concern with those residents on

19   Wyandanch Avenue.

20        Q.    How did the Village of Babylon

21   report it to Suffolk County?

22        A.    Called the inspector.  I tell the

23   residents to really go to the, they have a

24   community meeting, I believe it's every first

25   day of the month and talk to Suffolk County

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

308

1                          R. SCORDINO

2     and tell them there is a problem there.

3              I also called an inspector.  We

4     also called COPE.  We have a very good rapport

5     with COPE.  We have another situation in the

6     Village where the DA was called, and we took

7     care of it on another street.  So, you know,

8     we take care of these things, but we have to

9     know first.

10        Q.     You said you knew an inspector;

11    is that right?

12        A.     Yes.

13        Q.     Which inspector do you know?

14        A.     Inspector Cain (phonetic).

15        Q.     What is Mr. Cain's first name?

16        A.     I'm not sure.

17        Q.     Or Ms. Cain, I apologize; is it a

18    man or woman?

19        A.     Woman, Inspector Cain.

20        Q.     When you contact Ms. Cain, on

21    what number do you call her?

22        A.     893, I think it's 1302.  I can't

23    remember.  I have is written down in my

24    office.

25        Q.     In other words, do you call her?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

309

1                          R. SCORDINO

2        A.      Call him, it's Mr. Cain.

3        Q.      Mr. Cain.

4                Do you call Mr. Cain at the

5    Suffolk County Police Department?

6        A.      First precinct.

7        Q.      No calling Mr. Cain's personal

8    phone, correct?

9        A.      No.

10       Q.      Any sort of report occurred on

11   the known drug dealing activity to which you

12   testified?

13       A.      I imagine so.  They must have a

14   report.

15       Q.      This is part of the quality of

16   life in the Village of Babylon, right?

17               MR. TOSCA:  Objection.

18       Q.      Do you not know the status of

19   such report?

20               MR. TOSCA:  Objection.

21               You can answer.

22       A.      I believe it's in the hands of

23   the First Precinct. I have full faith in them

24   that they would follow through and take care

25   of this problem.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

310

1                    R. SCORDINO

2        Q.    Do you know the status of the

3   report?

4        A.    No.

5        Q.    When is the last time that you

6   checked on the report?

7        A.    I didn't hear anymore complaints

8   about the house and I usually do.  I assume

9   it's taken care of.

10       Q.    When was the last time that you

11  checked on the report?

12       A.    About a month ago.

13       Q.    What was the status?

14       A.    Status is ongoing.

15       Q.    Prior to that month ago, when was

16  the last time you checked on this report that

17  is recently reported as ongoing?

18       A.    About a month before that.  We

19  stay on top of these things.

20       Q.    When you came to learn about the

21  drug activity, the paraphernalia on

22  Mr. Lepper's property, what, if anything, did

23  you do?

24       A.    Told Code Enforcement to make

25  extra trips down that street.  If you see

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

311

1                         R. SCORDINO

2    something that is concerning, make sure they

3    call Suffolk County, and that's basically what

4    we can do.  They find different havens where

5    they want to try to do different things, we

6    try to keep them clean.

7         Q.    When you sent Code Enforcement

8    out.

9              Is that something that you

10   regularly do?

11        A.    Yes.

12              Different areas, I get complaints

13   from residents about certain cars parking

14   overnight or late at night, I do tell them to

15   start making some visits to these places.

16        Q.    That's not a polite suggestion,

17   right?

18              MR. TOSCA:  Objection.

19        Q.    In other words, you're ordering

20   them to do something?

21        A.    No.  I'm ordering them to have

22   some concern about it, make sure that they're

23   doing it because there are concerns about it.

24        Q.    You're telling them to go

25   there --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

312

1                    R. SCORDINO

2        A.      Right.

3        Q.      -- and they follow up on your

4    order?

5        A.      And I follow up on that.

6        Q.      How did you follow up?

7        A.      Ask them if they did that, ask

8    them if it's on the routine, ask them if it's

9    on the night routine for the guys that work at

10   night.

11       Q.      How do you do that?

12       A.      I talk to Bill Whittier, the

13   superintendent.

14       Q.      Fair to say if you don't receive

15   information from Bill Whittier, you don't know

16   what's going on?

17       A.      He updates me every morning

18   before 9:30, every night before he leaves.

19       Q.      You know what's going on in the

20   prosecution in your Village, right?

21               MR. TOSCA:  Objection.

22       A.      Prosecution, no.

23               I know when I tell him to do

24   something, he's doing what I'm telling him to

25   do because I remind him.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

313

1                    R. SCORDINO

2      Q.    Same thing for Stephen Fellman?

3      A.    Yes.

4      Q.    What time does Bill Whittier go

5   home every day?

6      A.    Varies.  Usually he comes up

7   around 3:30 and comes up in the morning before

8   9:30.

9      Q.    Fair to say, if drug activity

10  happens before Bill Whittier goes home, he

11  might not be able to report that to you?

12     A.    We have nine people that are

13  aware of Suffolk County and radio and they're

14  aware of different things happening, they have

15  a night log that they keep.

16     Q.    Do these well-aware folks ever

17  report to you that one of properties for which

18  there is drug activity has a tree house?

19          MR. TOSCA:  Objection.

20     A.    No.  The first time I was

21  notified about this, we asked them to start

22  going down there and to look to see if anyone

23  was parking on Wampum, and they do a routine,

24  they go by it and check it, might do it once,

25  twice during the night.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

314

1                    R. SCORDINO

2            MR. MORRIS:  Let's give the court

3        reporter a break.  It's 4:18.

4            (Whereupon, a recess was taken

5        from 4:18 p.m. to 4:30 p.m.)

6            MR. MORRIS:  The time is now

7        4:30.

8        Q.    Mr. Scordino, did you discuss

9    your testimony during the break?

10           MR. TOSCA:  Objection.

11           Don't answer the question.

12           MR. MORRIS:  I'm asking if a

13       discussion happened, not the substance

14       of the discussion.

15           MR. TOSCA:  No.  You asked him if

16       he discussed his testimony.  If you ask

17       him if he had a discussion with his

18       attorney, you're welcome to that.

19       Q.    Did you have a discussion with

20   your attorney?

21       A.    Yes.

22       Q.    Any testimony you would like to

23   change after that discussion?

24           MR. TOSCA:  Objection.

25           You can answer over objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

315

1                          R. SCORDINO

2          A.     No.

3          Q.     Do you know a man McSweeney?

4          A.     First name?

5          Q.     Terry McSweeney.

6          A.     Yes.

7          Q.     Who is Terry McSweeney?

8          A.     He is a resident over on

9    Ketawomoke, K-E-T-A-W-O-M-O-K-E.

10         Q.     Did you swear Mr. McSweeney in

11   after he was elected as Town of Babylon

12   councilman?

13         A.     No.

14         Q.     Do you know if Mr. McSweeney has

15   reported any drug activity to you?

16         A.     No.

17         Q.     What does Mr. McSweeney do?

18         A.     I believe he is a fireman and I

19   also believe he's a Town councilman.

20         Q.     Fireman for who?

21         A.     City of New York.

22         Q.     Mayor, as you sit here today, are

23   you aware of any other guns that were produced

24   as a result of a raid of a property within the

25   Village of Babylon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

316

1                    R. SCORDINO

2              MR. TOSCA:  Objecting.

3              You can answer.

4        A.    The only raid I know of is the

5   one on Wyandanch Avenue, that's the only one I

6   know about.

7        Q.    The one within a block proximity

8   to Mr. Lepper?

9        A.    Yes, it's around the corner,

10  like, I would say 200, 300 yards away from him

11  going down Wampum, couple houses down from

12  Wyandanch.

13       Q.    What year did you first become

14  aware of the activity?

15       A.    I guess it was about three years

16  ago.

17       Q.    How did you become aware of such

18  activity.

19       A.    Neighbors called me on it.

20       Q.    Which neighbors?

21       A.    I think the next door neighbor

22  called me, Tony Davida called me on it,

23  there's some issue.  The school called me on

24  it, and we followed up with the First

25  Precinct, with Bill Whittier.

317

1                      R. SCORDINO

2         Q.      Aside from Bill Whittier and Tony

3    Davida, what other persons did you speak with

4    in regards to that house?

5         A.      Max Waters who lives right next

6    door.

7         Q.      Who else?

8         A.      That's the only ones that really

9    come to my mind.

10        Q.      When you say Tony Davida, is that

11   the same as trustee Tony Davida?

12        A.      Yes.

13        Q.      What was your conversation with

14   Mr. Davida about this property?

15        A.      There seemed to be some activity

16   and that, you know, we should be calling the

17   First Precinct.  I said fine, I'll let the

18   First Precinct know, and I also let Code

19   Enforcement know.

20        Q.      When you say you'd let First

21   Precinct know and you'd let Code Enforcement

22   know, to whom did you speak?

23        A.      Bill Whittier and the inspector.

24   I always believe I talked to Jeff Boloskowitz

25   (phonetic) who is the, I don't know what the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

318

1                          R. SCORDINO

2      ranks are, but he's in charge of COPE.

3               Boloskowitz, I'm sorry, I don't

4      know that.

5          Q.     This was about three years ago?

6          A.     Yes.  It's been going on for a

7      long time.

8          Q.     Did Tony Davida ever report any

9      overdose activity in the area?

10         A.     No, but I'm not sure, but I know

11     he's aware because he is a fireman in the

12     Village, so he's aware of some overdoses in

13     the Village from the fire department and I

14     also get some updates from the chief.

15         Q.     How do you get those updates?

16         A.     He comes in and tells me.

17         Q.     Do you know where Tony Davida

18     lives?

19         A.     Yes.

20         Q.     How far is Tony Davida home from

21     this home here, the one with the gun.

22         A.     Ten houses to the west of him on

23     the same side of the street.

24         Q.     Is Mr. Davida's house closer than

25     Mr. Lepper's house to this house at which a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                          319

1                         R. SCORDINO

2    gun was --

3         A.    I think probably closer, both of

4    them are about the same.

5         Q.    Okay.  Equal distance?

6         A.    Yes.

7         Q.    Have you ever been in a tree

8    house in your life?

9         A.    Me?

10        Q.    Yes.

11        A.    No.

12        Q.    Have you ever seen a tree house?

13        A.    Seen the tree house, yeah.

14        Q.    What tree houses have you seen?

15        A.    Some tree houses upstate, I've

16   seen some tree houses on TV, there's a show

17   about it.  I've seen a variety of different

18   tree houses that are in the Village.  I

19   know of one on Thompson.  I know of

20   Mr. Lepper's, I've seen that.  Basically,

21   they're the only two I really know in the

22   Village.

23        Q.    As you sit here today, have you

24   ever seen any other tree house within the

25   Village of Babylon?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

320

1                    R. SCORDINO

2      A.      Those are the only two.

3      Q.      As you now sit here today, are

4   you aware of any other Village of Babylon tree

5   houses aside from the Thompson tree house and

6   the Lepper tree house?

7      A.      They're the only two.

8      Q.      Have you ever looked at the

9   property to which this drug activity has been

10  reported to see if there is a tree house?

11             MR. TOSCA:  Objection.

12             You can answer.

13     A.      On Wyandanch.  No, I didn't

14  realize that there was the tree house there.

15     Q.      I'm asking you if you ever

16  looked.

17     A.      Yeah, I looked.  I look at the

18  front of the house, I see it.  I've gone by a

19  couple times, but I didn't know there was a

20  tree house there.

21     Q.      Have you looked into the

22  backyard?

23     A.      Not personally going in the

24  backyard, no.  I usually would not go in

25  somebody's property without being invited.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

321

```
 1                    R. SCORDINO
 2        Q.      Without going on the property,
 3   have you ever looked into the Wyandanch
 4   property to see if there was a tree house?
 5        A.      No, never caught my eye.
 6        Q.      If it had caught your eye, it
 7   would been different?
 8        A.      Yeah.
 9        Q.      Would you have done something
10   about it?
11        A.      Sure.  If I thought there was
12   something that was not proper, I would notify
13   the Building Department to take a look at it.
14        Q.      As the mayor of the Village of
15   Babylon, that's part of your job, right?
16              MR. TOSCA:  Objection.
17        A.      Yes.
18        Q.      What about problems at the Long
19   Island Railroad within the Village of Babylon,
20   is that part of your job?
21              MR. TOSCA:  Objection.
22        A.      Yes.
23        Q.      Are you aware of whether people
24   are being arrested for drug activity?
25        A.      Yes.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

322

1                          R. SCORDINO

2          Q.      Are you aware of whether people

3    are being arrested for drinking at the train?

4          A.      Yes.

5          Q.      Are you aware people being

6    arrested for smoking on the Village of Babylon

7    Long Island Railroad Train Station?

8          A.      Yes.

9          Q.      Are you aware as you sit here

10   today how long people have spent in jail for

11   smoking a cigarette at the Village of Babylon

12   Train Station?

13                 MR. TOSCA:   Objection.

14         A.      I'm not sure.   I think that

15   arrest that I'm thinking about happened in

16   this train station.   I don't know how many

17   days they put him in jail.   I wouldn't know.

18   Our people didn't do the arrest.   It was MTA

19   that did it.

20         Q.      Can you explain to what you're

21   referring?

22         A.      There was an incident where I

23   believe somebody was smoking right underneath

24   the no smoking sign, and I guess the MTA

25   Police came and gave him a summons.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

323

1                        R. SCORDINO

2           Q.      Is there anything between the

3    Village of Babylon and the MTA Police

4    referring to the quality of life initiative?

5           A.      Um-hum.

6           Q.      What is that?

7           A.      To make sure that the quality of

8    life issues are taken care of underneath the

9    train station and around the train station.

10          Q.      What are those quality of life

11   issues?

12          A.      They shouldn't be urinating.

13   There shouldn't any active panhandling, any

14   selling drugs.  There shouldn't be, you know,

15   interfering with people's routes after they

16   come off the train, making sure they're not

17   loitering, making sure they're not keeping up

18   shelters underneath the railroad station,

19   they're basically the ones that we try to make

20   sure are clear.  More aggressive things,

21   Suffolk County takes care of.

22          Q.      So the things that Village of

23   Babylon takes care of, does that include a

24   citation for smoking a cigarette on Long

25   Island Railroad Property?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

324

1                    R. SCORDINO
2          A.    I don't believe that they can
3    issue, it would have to be MTA because I think
4    it's an MTA sign, but I'm sure they would
5    probably be warned by us.  If they got overly
6    active or aggressive, maybe Suffolk County
7    would be called.  Thin line there that they do
8    these things with.
9          Q.    Are you aware of the prosecutions
10   that occur within the Village of Babylon
11   Justice Court?
12         A.    Yes.
13         Q.    What is prosecuted by the Village
14   of Babylon in the Village of Babylon Justice
15   Court?
16              MR. TOSCA:  Objection.
17              You can answer.
18         A.    How many?  How many prosecutions,
19   I wouldn't know.
20         Q.    Do you know the types of
21   prosecutions?
22         A.    I would imagine that if they're
23   in the Village court, there is something on
24   code they violated, whether it be parking,
25   meter parking, or illegal parking, two-way

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

325

1                          R. SCORDINO

2     parking, anything that our code can do.  They

3     can't do any arresting, they can't arrest

4     anybody.  They can't search anyone, that would

5     be Suffolk County Police, but all non-moving

6     violations our Code Enforcement can enforce

7     and also quality of life issues, such as, you

8     know, vagrancy, sleeping, drinking, urinating,

9     panhandling, active panhandling.

10         Q.    What about smoking a cigarette on

11    railroad property?

12         A.    I don't think they can do that.

13    I'm not sure.

14         Q.    As you sit here today, you're not

15    sure whether --

16         A.    I don't think they can.

17         Q.    As you sit here today, you're not

18    aware whether the Village of Babylon can

19    prosecute smoking under the Long Island

20    Railroad Village of Babylon property?

21         A.    I don't know.

22         Q.    Who would know?

23         A.    Bill Whittier.

24         Q.    Anyone else?

25         A.    No.  Bill would know.

326

1                    R. SCORDINO

2          Q.    Are you aware of whether people

3     who are arrested by the MTA Police and to be

4     produced in the Village of Babylon Court are

5     arrested for code violations or these quality

6     of life violations?

7          A.    Yes.

8          Q.    What is your knowledge of that?

9          A.    Just that they go to our court.

10         Q.    So if someone gets arrested by

11    the MTA Police for smoking a cigarette at the

12    Village of Babylon Train Station at what court

13    would they appear.

14         A.    Not one hundred percent sure if

15    they go to the Village Court or they might go

16    out to -- Suffolk County might bring them

17    somewhere else.  I'm not sure. Or MTA might

18    bring them somewhere else.

19         Q.    Did you ever check?

20         A.    No.

21         Q.    Are there any overdoses at the

22    Village of Babylon Train Station?

23         A.    Yes.

24               MR. TOSCA:  Objection.

25               You can answer.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

327

1                     R. SCORDINO

2       Q.     How many?

3       A.     I'm not sure.  I'd be guessing.

4       Q.     More or less than ten?

5       A.     One once a month.  It's kind of

6  calmed down a little bit now.  I know there

7  was a period of time there was a little more.

8  It's overdose, you have to make a judgment

9  too, it could be drug overdose or alcohol

10 overdose.

11      Q.     If we consider overdose in the

12 form of any substance, how many overdoses

13 are --

14      A.     I would say once a month.  It's

15 quiet recently.

16      Q.     How many overdoses are occurring

17 at the Village of Babylon Village Hall?

18             MR. TOSCA:  Objection.

19             You can answer.

20      A.     Village Hall, none.

21      Q.     Do you know how many individuals

22 have gone to jail for smoking a cigarette at

23 the Village of Babylon Long Island Railroad

24 Station?

25             MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

328

1                       R. SCORDINO

2          A.     No.

3          Q.     Is there a school along the Long

4    Island Railroad Station Village of Babylon?

5          A.     Yes.

6          Q.     What is the name of that school?

7          A.     Babylon High School.

8          Q.     Is that part of the Village of

9    Babylon?

10         A.     Yes.

11         Q.     Do you know how many overdoses

12   occurred at that high school within the

13   Incorporated Village of Babylon?

14                MR. TOSCA:  Objection.

15                You can answer.

16         A.     I wouldn't be privy to that

17   information unless somebody calls me from the

18   school.

19         Q.     The answer is that you do not

20   know; is that right?

21         A.     That's correct.

22         Q.     Has anyone ever reported an

23   overdose to you that occurred?

24         A.     Only if it came from fire

25   department.  Sometimes they're very leery

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

329

1                    R. SCORDINO

2    about giving us special types of things like

3    that because they have rules and regulations,

4    HIPAA laws and everything else.

5          Q.    Are you familiar with a person

6    named Jimmy Mack (phonetic)?

7          A.    Jimmy Mac.  No.

8          Q.    How many prosecutions has the

9    Village of Babylon had over smoking cigarettes

10   at the Long Island Railroad Property?

11               MR. TOSCA:  Objection.

12               You can answer.

13         A.    I have no idea.

14         Q.    How many prosecutions has the

15   Village of Babylon had over a tree house?

16               MR. TOSCA:  Objection.

17               You can answer.

18         A.    One, I guess.  Mr. Lepper.

19         Q.    Is there still the threat of

20   criminal prosecution against Mr. Lepper and

21   his family over the tree house that exists on

22   his property?

23               MR. TOSCA:  Objection to the form

24          of the question.

25               You can answer over objection.

330

```
 1                    R. SCORDINO
 2        A.    He's in the court.  I don't have
 3   any control over the judge.
 4        Q.    Let me ask the question again.
 5              Is there a threat of criminal
 6   prosecution against Mr. Lepper and his family?
 7              MR. TOSCA:  Objection.
 8        A.    I don't know.
 9        Q.    You've only prosecuted one tree
10   house in the Village of Babylon, is that
11   right, to your knowledge?
12        A.    This one, yes.
13        Q.    In fact, you have seen many tree
14   houses, correct?
15        A.    No, I didn't say that.  I said I
16   saw two, Mr. Lepper's and the one on Thompson.
17        Q.    In your life?
18        A.    Oh, in my life I've seen many.
19        Q.    Your life has encompassed quite
20   some time in the Village of Babylon, has it
21   not?
22              MR. TOSCA:  Objection.
23              You can answer.
24        A.    Yes, very much so.
25        Q.    How many tool sheds have you
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

331

1                      R. SCORDINO
2    prosecuted?
3          A.     Tool sheds.  I have no idea.
4          Q.     Have you ever heard of a
5    prosecution over a chicken coop?
6                 MR. TOSCA:  Objection.
7                 You can answer over objection.
8          A.     No.
9          Q.     You have heard about the arrest
10   over smoking on Long Island Railroad property,
11   right?
12         A.     Yes.
13         Q.     To your knowledge, you don't know
14   whether people are put in jail for such a
15   thing, correct?
16                MR. TOSCA:  Objection.
17                You can answer.
18         A.     Yes.
19         Q.     They are put in jail?
20         A.     Yes.
21         Q.     Do you know how long someone
22   spent in jail because they smoked a cigarette
23   at the Village of Babylon Long Island Railroad
24   Train Station?
25                MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

332

1                          R. SCORDINO

2          A.     No.

3          Q.     Anyone report to about how much

4     resources are being spent on the

5     prosecution of people for smoking a cigarette

6     at Village of Babylon Train Station?

7                 MR. TOSCA:   Objection.

8          A.     No.

9          Q.     How many lawsuits have occurred,

10    if any, for the arrests that occurred at the

11    Village of Babylon Railroad Station?

12         A.     In my tenure as a mayor, I think

13    this is the only one.

14         Q.     Before you were mayor, is there

15    any others?

16         A.     I don't believe so.  I can't

17    remember.  I wouldn't know.  It's going back

18    too far.  I wouldn't be privy as the trustee

19    too, that's basically, that would have been

20    the other mayor.

21         Q.     Any document that would refresh

22    your recollection?

23         A.     No.

24         Q.     To be clear, you have served as

25    an elected official in the Village of Babylon

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

333

```
 1                    R. SCORDINO

 2   for how long now?

 3        A.     Fifteen and a half and seventeen.

 4        Q.     Fair to say that it's been about

 5   32 years?

 6        A.     Right on, and a half.

 7        Q.     And a half.

 8               In that 32 and a half years, have

 9   you come to learn of anyone within the Village

10   of Babylon being prosecuted for a tool shed?

11               MR. TOSCA:  Objection.

12               You can answer.

13        A.     No.

14        Q.     In that 32 and a half years as an

15   elected official within the Village of

16   Babylon, have you heard anyone being

17   prosecuted over a chicken coop?

18               MR. TOSCA:  Objection.

19               You can answer.

20        A.     Not to my recollection.

21        Q.     In 32 and a half years as an

22   elected official in the Village of Babylon,

23   have you ever heard of anyone being threatened

24   with daily fines?

25        A.     Yes.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

334

1                        R. SCORDINO

2          Q.       Who?

3          A.       Couple of people, people that

4    haven't kept their houses in good shape,

5    people that constantly park boats illegally on

6    their property.  We stay abreast of these

7    things, and if they don't listen the first

8    time, we give them another summons.  Sometimes

9    the summons make them think a little bit, you

10   know, maybe they should follow the code book.

11   Everybody has a right to ignore it, but

12   they're gonna get reprimanded for it.

13         Q.       Who are those persons who

14   received the threat of daily fines?

15         A.       We have a couple of abandoned

16   houses that we looked at, finally had to go to

17   their attorney and say you got to clean up the

18   house.  One was on Paumanake.  There's another

19   down the end of Peninsula.  There was another

20   one on the corner of Mulberry and Peninsula,

21   the upkeep of the property, storing boats on

22   the property, couldn't get them off the

23   property, people were complaining.

24         Q.       The answer I'm looking for is

25   something that consist of a name, who?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

335

1                    R. SCORDINO

2        A.      The names of these people?

3        Q.      Yes.

4        A.      I don't know the names.  I don't

5   get involved.  I'm looking at the infraction

6   rather than the name, the property, the

7   location, the address.

8        Q.      Did your niece ever have an

9   abandoned home after Hurricane Sandy?

10       A.      Yes.

11       Q.      Did she ever receive the threat

12  of daily fines?

13       A.      She was getting fines also.  She

14  was in our court.  It was an embarrassment to

15  me.  The whole family is not even talking to

16  me because of the fines on that because she

17  didn't listen.  My cousin.

18       Q.      Did she receive the threat of

19  daily fines?

20       A.      She got a lot of fines.  I don't

21  know if they were daily or not but she got a

22  lot of fines.

23       Q.      Sir, you're sitting in a chair,

24  correct?

25       A.      Sure.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

336

1                    R. SCORDINO

2        Q.      Came here by car?

3        A.      Yes.

4        Q.      Did your cousin receive the

5   threat of daily fines; yes or no?

6        A.      I believe --

7                MR. TOSCA:  Objection.

8                You can answer over.

9        A.      I believe she did.

10       Q.      By whom?

11       A.      By the Building Department.

12       Q.      What person?

13       A.      Steven Fellman.

14       Q.      What was the authority by which

15   he issued that threat?

16               MR. TOSCA:  Objection.

17       A.      Very important thing, which is

18   relevant to this case.  Do you know what the

19   word was?

20       Q.      What was the word?

21       A.      Safety.  The house was leaning

22   off to the side.  Safety.  Just like

23   Mr. Lepper's tree house, safety, safety,

24   safety.  I didn't want anybody to get hurt or

25   killed on that tree house, so I gave it over

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

337

1                          R. SCORDINO

2      to the Building Department to take care of,

3      okay, it's a very unsafe situation, just like

4      my cousin, okay.

5             Q.     Did you make a determination that

6      Mr. Lepper's tree house was unsafe?

7             A.     No.  The Building Department.

8      Building inspector.

9             Q.     You said safety, you repeated it

10     a few times as you leaned into the mic?

11            A.     Right.

12            Q.     Who made that determination?

13            A.     I believe the inspector did.

14            Q.     Did you ever see a report that

15     was provided as to the safety of the tree

16     house?

17            A.     I believe not.

18            Q.     Are you aware that such a

19     report --

20            A.     I don't micromanage.  It's the

21     building inspector's responsibility to take

22     care of it, not me.

23            Q.     The building inspector answers to

24     you, right?

25            A.     Yeah.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

338

1                       R. SCORDINO

2          Q.     Are you aware of whether a report

3    was submitted by Mr. Lepper attesting to the

4    safety of the tree house?

5                  MR. TOSCA:  Objection.

6          A.     I don't know.  I don't recall.

7          Q.     You don't recall.

8          A.     If he sent it to the building

9    inspector, I don't know.

10         Q.     You're the subject of a federal

11   lawsuit, you know that right?

12                 MR. TOSCA:  Objection

13         A.     Absolutely.

14         Q.     Any other lawsuits in your life?

15         A.     Yes.

16         Q.     How many times have you been

17   sued?

18         A.     I don't recall exact number.

19         Q.     So many you can't recall?

20         A.     No, so few I can't remember.

21                 MR. TOSCA:  Objection.

22         Q.     Ever been sued in Federal Court

23   before?

24         A.     Yes.  And won, by the way, and

25   won.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

339

1                    R. SCORDINO

2        Q.      Good.

3                By whom were you sued?

4        A.      Mrs. Burrows (phonetic) wanted to

5    put a heroin recovery office right next to

6    where the school is and we spent a lot of

7    money in federal court, a lot of attorneys

8    because it wasn't part of our quality of life

9    in our Village, so we fought very hard not to

10   have that there.

11       Q.      Who made that determination?

12       A.      One of the judges.

13       Q.      Who made the determination it was

14   not part of your quality of life?

15               MR. TOSCA:  Objection.

16       A.      I was a trustee then, it went

17   back, it was another mayor that made that

18   decision.

19       Q.      Did you support that decision?

20       A.      Absolutely.

21       Q.      And today, who makes the

22   decisions about the quality of life in the

23   Village?

24               MR. TOSCA:  Objection.

25       A.      I do.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

340

1                          R. SCORDINO

2          Q.      Do you know if Mr. Fellman ever

3    inspected or went in or determined the safety

4    of Mr. Lepper's tree house?

5          A.      You have to ask Mr. Fellman.

6          Q.      Do you know?

7          A.      No.  Ask Mr. Fellman.

8          Q.      Does it matter?

9          A.      Yeah.

10         MR. TOSCA:  Objection.

11         A.      You're asking the question, it

12   must matter to you right, so I would ask him.

13   I don't get involved in it.  I don't get

14   involved.  Building inspector, they take care

15   of their stuff, treasury, they take care of

16   their stuff.  Highway Superintendent takes

17   care of their -- Code Enforcement takes care

18   of their -- I oversee everybody, if there is a

19   problem, they come to me.  Obviously it's not

20   a problem, he took care of it.

21         Q.      These are the folks that answer

22   to you, right?

23         MR. TOSCA:  Objection.

24         A.      Yes.

25         Q.      So as you sit here today, the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

341

1                     R. SCORDINO
2    threat of daily fines still exists for
3    Mr. Lepper; is that right?
4              MR. TOSCA:  Objection.
5         A.    You have to ask the building
6    inspector.  I don't know.  I have no idea.
7         Q.    Have you spoken to the building
8    inspector?
9         A.    Have I spoken, I speak to him a
10   lot, not about this issue.
11        Q.    You don't speak to him about
12   Mr. Lepper's case.
13        A.    No.
14        Q.    When you got sued, what were you
15   doing?
16        A.    What was I doing?
17        Q.    Um-hum.
18        A.    I have no idea.
19        Q.    Did you receive notice of this
20   lawsuit?
21        A.    Yes.
22        Q.    What, if anything, did you do?
23        A.    I did nothing.  Nothing.  Gerard
24   gives us, the Village attorney gives us
25   updates on it, send it to Gerard.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

342

1                        R. SCORDINO

2          Q.     Did you send it to Gerard?

3          A.     Yes.

4          Q.     Did you come to learn that there

5     was filings in such a case?

6          A.     Yes.

7          Q.     In those filings, did you learn

8     that a survey was produced?

9                 MR. TOSCA:  Objection.

10         A.     I don't really know.  You're

11    talking about building inspector stuff, I

12    don't get involved in that.  I let the

13    attorneys take care of it.

14         Q.     You're the one who testified

15    earlier that you patrol the streets in a

16    vehicle provided and paid for by the Village

17    of Babylon --

18         A.     I'm listening.  I want to make

19    sure I'm close enough to hear you.

20         Q.     The same car that the insurance

21    is paid, the gas is paid for which you patrol

22    the streets, you're sitting here and telling

23    me you have no knowledge of whether anything

24    was done after the tickets that were issued to

25    Mr. Lepper?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

343

1                    R. SCORDINO

2              MR. TOSCA:  Objection.

3         A.    I don't get involved.  I don't

4    get involved.  I don't get involved in the

5    building inspector's projects or the court,

6    okay.  I patrol, again I'll give you the ward,

7    okay, the safety, safety and welfare of all

8    the residents in Babylon Village.  You know

9    why, I take an oath for that to follow the

10   Constitution of the United States, the

11   Constitution in the State of New York, just

12   like Mr. Lepper, he's a fireman.  He took the

13   same oath when he became a fireman.  The codes

14   and regulations of the Village of Babylon, he

15   didn't do it, he didn't get a building permit

16   for it, so I handed it over to the Building

17   Department and the attorneys and let them

18   filter out the situation.

19        Q.    Safety, right?

20        A.    Safety.

21        Q.    Who made that determination?

22              MR. TOSCA:  Objection.

23        Q.    Sir, you're under oath.

24              MR. TOSCA:  Objection.

25        Q.    Who made the determination?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

344

1                    R. SCORDINO

2        A.      I made the determination by

3   visually looking at it and passed the

4   information over to the Building Department.

5   You would have to be an idiot not to realize

6   that there is safety issues with that tree

7   house.  Come on.  Some kids gets up there and

8   falls off, breaks their head, breaks their

9   neck on our property, who is responsible?  Who

10  is responsible?  Who is responsible?  Who is

11  responsible?  Answer my question now.

12       Q.      The safety determination --

13       A.      No.  Who is responsible if a kid

14  gets up there somehow, we know children today,

15  and falls off and breaks their neck, who is

16  responsible?  On our property.

17              MR. MORRIS:  It's 4:59.  Let's

18       take a minute.

19              (Whereupon, a recess was taken at

20       this time.)

21              (The deposition was concluded at

22       5:00 p.m.)

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

345

2       A C K N O W L E D G M E N T

STATE OF NEW YORK    )
                     )  SS:
COUNTY OF            )

6           I, RALPH A. SCORDINO, hereby certify

7    that I have read the transcript of my

8    testimony taken under oath in my deposition of

9    December 5, 2019; that the transcript is a

10   true, complete and correct record of my

11   testimony, and that the answers on the record

12   as given by me are true and correct.

16           _____

17                   RALPH A. SCORDINO

19   Signed and subscribed to before
     me, this _____day
20   of_____, 20__.

21   _____
     Notary Public, State of New York

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

346

```
1

2      ----------------I N D E X--------------------

3      WITNESS              EXAMINATION BY       PAGE

4      RALPH A. SCORDINO  MR. MORRIS            5

5      RULINGS: 61, 96, 100, 260, 278, 279

6

7      ------------------REQUESTS------------------

8      PAGE  145    Video and minutes of Board of

9                   Trustee meeting

10          263    Code book as maintained in the

11                 regular course of business in the

12                 Village of Babylon

13

14

15

16

17

18

19

20

21

22

23

24

25
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

347

1

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              ) SS:
5    COUNTY OF SUFFOLK        )

6

7          I, STEPHANIE O'KEEFFE, a Notary

8    Public within and for the State of New York,

9    do hereby certify:

10         That RALPH A. SCORDINO, the witness

11   whose deposition is hereinbefore set forth,

12   was duly sworn by me and that such deposition

13   is a true record of the testimony given by

14   such witness.

15         I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20   set my hand this 5th day of December, 2019.

21

22

23

24         _____

25         STEPHANIE O'KEEFFE

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

348

*** ERRATA SHEET ***

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702

NAME OF CASE:  LEPPER V VILLAGE OF BABYLON
DATE OF DEPOSITION:  DECEMBER 5, 2019
NAME OF WITNESS:  RALPH A. SCORDINO

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |

                              _____
                              RALPH A. SCORDINO

Signed and subscribed to before me,
this ___ day of_____, 20__.

_____
Notary Public, State of New York

**A**

**A-C-C-E-L-L-E-T-T-A** 165:21

**A-L-V-A-R-E-Z** 248:8

**a.m** 1:24 5:2 78:10,10 285:18 287:24 290:6

**abandoned** 334:15 335:9

**ability** 76:9 138:25 305:25

**able** 292:8 313:11

**above** 305:20

**aboveboard** 287:10

**abreast** 334:6

**absolutely** 5:23 6:2 40:5 94:21 97:13,16 99:16 211:6 217:9 272:10 281:3 338:13 339:20

**Accelletta** 165:20 166:2

**accept** 30:22

**accepted** 223:10

**access** 33:21,25 34:12,15 42:12 47:6,11,18,21 48:10 50:11,19 51:20 53:14 56:23 58:9 62:19 62:22 74:11,24 80:3 83:15 122:7 249:9,15 293:22

**accident** 112:12 240:18 241:14,16,17,20 242:3,8 242:15,18 243:3 245:11

**accidents** 245:6,10

**accompanied** 280:15

**account** 11:6 24:7,9,18 26:4 34:20 35:11 40:20 63:14 74:19,20,22 82:18 97:4 121:18,19,21,24 122:3,8,12 159:23 160:2 226:20

**accounts** 24:12 33:11,12 33:20,25 34:3,13 97:4 185:15

**accrue** 190:22,25

**accrued** 190:12,14 191:8

**accrues** 219:12

**accumulates** 191:3

**acquainted** 211:21.25 216:7,11 220:10,14 224:24 225:3 231:2,5 238:11,25 239:4 249:25 250:6,10 254:23 268:8,12

**acquired** 89:5

**acres** 89:7,8

**across** 16:9 137:4,6 305:16

**act** 36:20 133:4 163:3

**acted** 228:20

**action** 139:25 243:2 347:16

**actions** 140:19

**active** 323:13 324:6 325:9

**actively** 238:5 275:21

**activities** 199:13 234:18 237:5 272:5

**activity** 302:5 305:15 309:11 310:21 313:9,18 315:15 316:14,18 317:15 318:9 320:9 321:24

**actual** 116:15

**Actually** 252:25

**Adams** 1:11 3:21 122:6 157:25 158:10 202:10 224:24 225:3,22,25 226:2 226:12,14,18 227:15,20 227:22 228:2,17,20,24

**Adams'** 228:12

**adaptive** 87:2

**added** 108:18 247:20

**addition** 191:12

**address** 5:12 20:6 21:9 22:24 25:25 26:15,18,18 28:18 31:20 33:2,15 40:17 44:22 48:22 56:13 56:24 57:12,24 59:3,10 60:6 62:23 63:10 68:22 68:25 69:4 74:19,25 75:4 83:8,11 87:20,25 115:24 116:2,8 117:13,14 218:18 335:7

**addressed** 56:7

**addresses** 25:22 33:3 47:2 57:21 62:10 306:4,5

**Adelphi** 123:20 124:12,24 125:2,12,17,20 126:2

**adjacent** 185:7

**adjunct** 87:6

**adjunct-ing** 87:7

**administer** 4:17

**administration** 123:21

**administrator** 219:20,23 219:25

**advertisements** 156:3,8,9 156:12

**advice** 67:8 212:23

**affiliated** 240:12

**after** 31:3,4 52:5 69:24 109:11,17 113:14,24 114:3,23 115:5 119:5 120:17 123:15 125:20,25 126:4 139:15,18 160:18 160:19 168:4 169:2,24 170:16 174:15 203:5 222:23 243:21 262:15,16 293:17,24 294:2,24,25 314:23 315:11 323:15 335:9 342:24

**Afternoon** 242:21

**again** 14:15 34:6 45:20 61:2 77:17 124:16 152:21 157:5 165:4 166:14,21 167:10,19 170:17 171:6 172:19 181:7 196:18 211:5 219:17 258:11 275:3 279:11 330:4 343:6

**against** 1:7 131:4 133:22 260:10 329:20 330:6

**age** 304:21

**agency** 286:3

**aggressive** 323:20 324:6

**ago** 7:12 14:9 16:21,22,24 17:20,21,25 18:2,21 21:23 23:15 26:22 27:23 30:3 57:25 58:16 59:11

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 350

59:12,14,15,17 60:7 71:2
71:2 73:2 77:10 85:5
88:11,21 89:22 91:15
126:24 130:6,6 142:21
203:17 212:9 239:2
249:13 252:24,24 268:14
290:9 302:3 307:9 310:12
310:15 316:16 318:5
**AGREED** 4:4,10,15
**agreement** 298:2
**ahead** 92:14
**alcohol** 28:11 131:3,6
144:18 327:9
**alcoholic** 253:3
**Alice** 158:3,25 166:22
167:19 168:14
**alive** 10:13,24 13:7
**all** 4:11 17:18 25:12,15
30:17 42:20 54:22 55:22
67:6 68:11 69:5 70:17
96:2 97:8,12 106:15
110:25 111:6 122:9
133:13,23 137:16,18,21
138:10 145:20 155:4
159:9 172:22 186:6,10,25
188:9 193:8 196:16
198:25 201:11 202:5,7
204:2,4 205:19,21 213:8
217:21 221:11 224:10
230:12,20,24 231:9
258:13 260:25 262:3
278:11,18 290:25 293:2
293:12 294:5 299:7 300:3
301:19 306:11 325:5
343:7
**allotment** 105:9
**allotments** 107:17
**allow** 144:14
**allowed** 105:9 247:4
**almost** 38:19 57:22 138:5,6
138:7
**alone** 84:8
**along** 79:9 101:21 102:10

102:11 148:12 191:15
194:19 217:22 250:8,20
328:3
**already** 278:19 279:21
289:3,13
**also** 3:18 15:4 29:6 55:3
65:13 70:23 86:24 106:25
107:6 108:18 109:22
110:4 111:9 113:11 127:8
134:8 159:10 160:21
172:14 185:2 187:10,14
191:10 196:8 201:2
202:22 215:20 226:2,3
230:3 243:20 247:9
251:10 255:10 261:20
266:17 308:3,4 315:19
317:18 318:14 325:7
335:13
**altercation** 197:4,8
**Alvarez** 248:7,14
**always** 129:21 134:17
161:19,21 297:16,22,23
317:24
**am** 275:15 287:10 347:15
347:17
**amendment** 262:10,12,14
262:21
**America** 83:15
**American** 151:23
**among** 135:17 298:20
**amount** 36:12 135:17
**amounts** 196:19
**an** 4:18 7:4,23 9:8 10:16
13:10 22:16 24:6 26:17
42:4 43:4 44:21 47:4
48:22 51:20 57:11,24
67:17 75:22 76:22 77:23
83:10 87:20 89:19 90:23
93:2,21,23 94:22 96:16
116:8 127:14,20 133:20
134:25 135:13,16 160:10
177:17,22 178:16 183:3
186:5 192:21 197:4,14

198:22 206:9,16 212:2,22
214:4 216:17 217:13
218:18 219:21 223:19,25
224:6 226:14,17 233:5
234:21 238:8,11 240:18
241:19 242:3 249:25
262:10,20 268:8 271:5
272:6,19,22 279:15
284:15 288:23 289:8
292:6 300:7 301:14 308:3
308:10 322:22 324:4
328:22 332:25 333:14,21
335:8,14 343:9 344:5
**and/or** 1:18 300:18
**Andrew** 201:14 205:15
248:7,7
**animal** 127:14,20
**Ann** 17:10,17 18:5
**Annuskemunnica** 187:16
**another** 65:9,14 74:19 89:8
105:11 108:23 113:15
114:24,25 169:5 170:20
185:18 187:2 193:6,7
204:6 206:22 244:24
264:4 302:18 303:6,13,19
308:5,7 334:8,18,19
339:17
**answered** 31:18 36:4 60:25
145:21 275:2 286:21
288:22 289:3,11 305:4
**answering** 278:13
**answers** 248:16 285:4
337:23 345:11
**anybody** 84:5 121:20
139:8 164:14 205:8
234:19 295:11 325:4
336:24
**anymore** 130:19 163:11
310:7
**anyone** 41:24 66:5 72:2,8
79:20 84:10,18 88:6
95:18 116:11 118:12,21
118:25 119:8 120:23

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 351

122:7 160:8 165:18,23
167:20 168:16 169:19
172:25 173:4 174:19
175:2 179:5 184:21
189:21 194:4 198:2
199:14,19,22 202:12
205:2,17 206:12 207:11
211:3,14 230:5,21 245:14
280:15 285:6 291:9
293:10,16 297:11 313:22
325:4,24 328:22 332:3
333:9,16,23
**Anyplace** 121:8
**anything** 28:2 31:3 33:12
40:23 50:20,21 59:8
73:11 77:3 78:6 79:23
90:23 98:11 107:21
110:23 113:8 127:25
129:16 132:20 135:22
139:10 140:11 142:25
143:6,22 144:3,7 145:17
154:16,20 157:9 159:19
177:15 178:21 182:4
191:17 193:10 207:20,21
210:4,20 230:8 236:11,17
238:21 239:24 243:22,25
247:20 257:15 263:9
266:10 267:6 276:23
282:15 291:16,20 292:3,7
295:22 296:2,8 298:8,25
300:11 306:14 310:22
323:2 325:2 341:22
342:23
**Anything.You** 133:12
**anywhere** 191:24
**AOL** 59:15,25 69:4,10
70:16
**apart** 71:23
**apologize** 80:11 107:3
308:17
**appear** 326:13
**application** 50:2 52:8
295:9,12 296:7

**applications** 50:2 213:11
**applied** 86:18 129:23
133:16 212:3,4 287:5
**apply** 86:19 130:5,20
135:3 161:11,13 267:9
286:2,12 287:3,9 294:16
294:19 295:5
**applying** 287:10
**appoint** 206:17 223:5
**appointed** 165:10,12
167:22 168:5 192:21,24
193:2 206:10,17 219:14
219:22 221:24 222:2,8,20
222:24 228:2,3,6,7
229:10 233:24 267:7
283:3,4,5
**appointment** 102:25 206:9
206:16 216:17 234:4
**appoints** 222:9
**approached** 143:19 293:8
**approaching** 143:17
**appropriate** 260:10 289:7
289:8
**approval** 32:15 102:22,24
**approve** 29:22 35:13
153:20 158:6,9,12,15,18
158:21,24
**approved** 153:24 251:21
**approximately** 187:23
200:19 212:9
**April** 204:3 222:12 223:6,7
231:17
**ar** 79:18
**Araca** 187:15
**arbitrarily** 224:9
**architect** 90:23 91:2
**area** 18:11 21:16 22:16
23:7,8 176:7 177:8
178:19,20 246:11 318:9
**areas** 205:10 311:12
**aren't** 198:16 266:25
**Argyle** 178:11
**around** 14:11,20 175:25

242:19 246:22 269:20
290:15 301:3 304:7 313:7
316:9 323:9
**Arrendale** 230:2
**arrest** 305:25 322:15,18
325:3 331:9
**arrested** 321:24 322:3,6
326:3,5,10
**arresting** 325:3
**arrests** 263:23 332:10
**articulated** 259:16
**ascertain** 99:20
**ascertaining** 95:12
**aside** 32:24 33:9 41:24
48:7 66:8 84:17 86:21
107:16 120:18 126:17
132:7 135:20,21 136:13
142:24 148:19 150:16,17
155:20 172:25 174:19
175:2 178:13 181:2,22
182:6 184:19 189:24
192:2 193:17 198:7
210:22 228:17 229:16
236:5 238:4 245:9 246:5
255:7 265:19 285:5 317:2
320:5
**ask** 26:4 30:8 39:3,6,14
41:24 45:12,14,17 60:13
60:13 79:16 92:17 141:18
145:13 155:15 205:11
212:18,19 214:21 215:16
258:7 259:20,22 287:20
291:2 312:7,7,8 314:16
330:4 340:5,7,12 341:5
**asked** 31:18 36:4 40:14
44:24 49:14 57:14 61:10
63:16 75:7 88:23 125:25
231:10 250:14 259:21
275:2 278:24 286:21
287:5 289:10 292:25
305:4 313:21 314:15
**asking** 11:25 27:20 30:9
33:24 38:22 39:12 50:8

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 352

77:15,16 99:3 136:6
214:4 258:3,14 259:9,10
259:14 277:23 288:23
289:4 290:21 294:3
314:12 320:15 340:11
**asks** 212:17,21
**assert** 99:21
**asserting** 92:10 94:11,15
**asset** 232:4
**assist** 295:11
**assistance** 98:5,9
**assistant** 204:7 229:20,21
229:21
**assistants** 204:4,5,5
**associated** 26:9 51:23 52:3
53:11 55:8 116:21 195:16
239:10 242:14 243:3
276:21 298:8
**association** 181:3 188:20
197:14,17,20 268:15
280:22 298:4,11,20
**associations** 255:2,5,9
**assume** 201:6 310:8
**attacking** 140:24
**attend** 123:14 124:2,14
280:21
**attendance** 124:5,18 125:6
125:12 126:7
**attended** 124:11 125:21,25
126:2 160:17 176:20
**attesting** 338:3
**attorney** 1:15 3:4 37:19
61:6 67:17,22 72:7,11
77:18 93:2,8,15,18,21,23
94:22 96:16 99:21 100:2
143:2 177:18,22 200:14
201:5,22 211:9 231:7
232:5 258:8 259:25
270:13,17 271:25 314:18
314:20 334:17 341:24
**attorney/client** 92:7,10
99:21 179:19,24
**attorneys** 3:11 4:5 67:21

179:9 339:7 342:13
343:17
**attributable** 147:16
**attributed** 147:11,13
148:16
**auction** 88:16 89:19
**audio** 69:22
**August** 14:9 101:2,2 183:3
209:9,10
**auspices** 204:20
**authority** 261:9 336:14
**authorized** 4:17
**Auto** 239:7,11,14 240:7,14
**Avenue** 19:2 20:7 83:19
117:11,16 118:6,13 178:9
187:8,25,25 188:5,6,8
244:9,10 286:19,25 294:8
295:3,6 301:5 302:17
303:25 304:4,13 307:19
316:5
**average** 100:15,21
**awarded** 124:17 125:11
126:9
**aware** 209:24 254:7 278:9
278:25 279:2 304:8
313:13,14 315:23 316:14
316:17 318:11,12 320:4
321:23 322:2,5,9 324:9
325:18 326:2 337:18
338:2
**away** 10:12,23 13:6 165:13
274:17 279:9 280:3,10
301:10,11 302:12 303:14
304:2 316:10

---

**B**

**B-A-S-I-L-E** 158:3 169:13
**B-E-R-N-A-S** 87:21
**B-U-R-N-A-S** 23:3
**B.I** 1:5
**B.J.L** 1:5
**Bachelors** 124:9
**back** 14:21 16:13,14,15

20:4 34:8 35:18 40:25
57:22 69:17 72:5 76:22
78:11 124:16 152:18
158:5 162:11 165:11,14
174:3 177:11 181:10
184:20 196:20 200:11
208:23 209:21 220:16
232:25 237:13 241:9
245:4 259:4 266:15
268:13 270:14,15,25
278:17 287:13,14 296:11
332:17 339:17
**backyard** 320:22,24
**bag** 98:22 99:18
**Bait** 185:16
**ball** 188:4
**ballot** 291:13,15
**bank** 82:18 97:3,4
**banking** 97:9
**bar** 264:22,23 265:5
**bars** 69:6
**Barth** 205:16
**based** 61:9
**basically** 136:18 215:22
234:10,14 311:3 319:20
323:19 332:19
**Basile** 158:2,22 169:12
170:8 171:3,18,23,25
174:22
**basis** 94:11
**basketball** 74:10 196:9
**Batamax** 70:3
**bathing** 178:20
**battery** 60:21 157:16
**bay** 184:12,18 185:18
254:2 287:12
**be** 4:7,12,16 19:19 27:25
29:15 30:24 42:20 50:20
62:2 71:24 97:19 103:11
103:14 108:17 117:22
118:2 136:13 142:14,16
143:15 147:25 162:6,14
164:22 165:7,8,8 169:6

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 353

171:9,12 172:7 176:10
199:7,16 201:14 204:21
205:10 208:9 213:9,22
216:24 224:3,8 232:4
234:24 235:7 251:17
252:10,16,16 253:5 256:5
257:8,9,21 260:24 266:5
267:25 268:4 269:15
271:6 277:12 279:5,16,18
285:3 288:14 298:14,15
298:15 304:16 305:2,18
313:11 317:15,16 323:12
323:14 324:3,5,7,24
325:5 326:3 327:3,9
328:16 332:18,24 344:5
**beach** 9:16 21:5,6 55:21
56:7 115:24 116:3,5
117:2 160:6,14 161:24
178:20 180:20,23 181:4
181:14 182:2,6,14 183:16
184:2,4,14 185:2,13,21
187:5,10,14 252:23
253:12,20
**bear** 43:4
**bears** 44:22 298:19
**Beautification** 195:6 225:5
225:15
**beautiful** 255:13
**Beaver** 90:6,25 91:3
**became** 110:2 177:5,5
343:13
**because** 26:12 29:2 32:7
38:2 40:4 45:18 48:11,16
48:19 54:24 67:20 70:22
75:17 96:11 110:9,9
127:5 131:23 132:2
142:15 150:6,12 154:3
165:13 177:11 190:6
191:10 195:13 207:6
219:12,18 253:8 257:18
266:14,17 290:11 305:15
306:6 311:23 312:25
318:11 324:3 329:3

331:22 335:16,16 339:8
**become** 211:25 216:11
219:23 220:14 225:3
231:5 238:24 239:4 250:5
250:10 254:22 268:11
316:13,17
**been** 5:4 6:12 13:25 25:17
25:18 46:11 49:14 62:15
86:2 103:12 127:17 130:2
134:17 135:13,16 136:23
160:10,13 176:12,21
193:19,21 194:3,25
216:25 238:8 245:11
253:14 255:11 256:10
274:23 276:20 288:15
289:20,25 290:5 301:14
303:12 318:6 319:7 320:9
321:7 332:19 333:4
338:16,22
**before** 2:2,4 4:17,19 5:15
5:17 22:7 38:23 39:4
47:17 63:4 93:15,19
101:6 106:9 109:22 110:2
110:3 111:21 115:18
124:24 127:18,21 134:21
139:15,18,20 148:4 156:7
161:6 164:19,20 177:2
186:11 189:13 191:21
193:23 202:24 203:2,6,22
211:2 224:2,8 245:12
266:4 293:17,24 310:18
312:18,18 313:7,10
332:14 338:23 345:19
348:21
**begin** 5:15
**behalf** 108:6 109:7 121:21
148:12 194:8
**behind** 285:18 287:24
**being** 15:3 38:5,20 73:23
76:16 198:7 216:19
225:17 270:9 287:7 292:8
305:7 320:25 321:24
322:3,5 332:4 333:10,16

333:23
**Bell** 56:17 57:3
**belong** 184:11 190:15,16
**below** 200:8,9 260:24
**bender** 112:17 114:19,20
114:24 245:12
**benefit** 107:18 190:13
191:14
**benefits** 190:12
**Bernas** 87:21 89:2 95:13
96:22 97:21 98:15 100:8
101:13
**besides** 84:18 280:16 303:9
**best** 90:13 292:2 305:24
**better** 152:14,16,19,21,23
153:2 154:5,9,13 155:22
156:10,23 157:7,13 164:5
164:23 165:15 166:16
167:14 168:12 169:8
170:10,24 171:16 172:13
173:12 193:18 228:4,7
**between** 4:5 251:6 298:2
298:10,19 323:2
**beverage** 253:3
**bid** 108:11,14 257:5,7,8,8
257:9,10,11
**bigeye** 104:21
**Bill** 90:13,20 142:6 204:25
230:4 232:8 247:9 264:9
264:10 266:4,6 267:11,16
312:12,15 313:4,10
316:25 317:2,23 325:23
325:25
**bit** 130:10 208:23,24 327:6
334:9
**block** 273:15,16 301:10,10
301:11 316:7
**blocking** 74:4
**blood** 347:17
**blue** 71:5,8,9 104:14,15,24
105:10 107:6 112:9 115:3
**bluefin** 57:9 63:18 104:15
225:9,10 239:23

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

bluefin1 58:15,21 70:18,21
    70:23,25 71:12
bluefin1@aol 59:10
bluefin1@aol.com 59:5
    62:8,19 63:6,10 68:20
bluefin1@gmail 57:12
bluefish 112:11
board 1:16 29:16,19,24
    30:16 137:11 142:20
    146:2,24 147:13 148:5,6
    148:10,13 152:2 172:15
    172:15 182:8 193:7 209:4
    210:9,11 223:3,5,10,11
    223:16,24 224:4 231:15
    234:3,5,8,9 251:22 261:2
    267:23 271:11,16 281:14
    282:2,3 283:18,22 284:6
    346:8
boat 183:12,13,17,18,22,24
    184:5,7,8,10,11,13,16,19
    184:21,24 185:3,9 186:24
    187:3,9 249:2,6,9,11,14
    249:18 252:8,12
boating 136:4,9,14
boats 248:18 334:5,21
Bob 72:18,20,24
bodies 254:7,13
body 140:19,19 143:8,14
    143:16 239:7,11,14 240:7
    240:14
Boloskowitz 317:24 318:3
book 261:12,13,15 262:11
    262:19,20,22,24,25 263:2
    263:4,9 265:8,25 266:2
    334:10 346:10
border 187:14
born 6:6 253:8
both 14:21,22 183:14
    212:19 248:22 284:22
    319:3
bother 214:25
bottom 36:11
bought 89:7,8,14 90:6

93:19 256:19 287:11,16
box 43:9,12 115:24 116:19
    116:19,20 117:4
branch 188:17
break 44:14 45:21 67:24
    77:22 178:25 179:5
    215:16 244:24 258:19,21
    259:6 314:3,9
breaking 45:24
breaks 344:8,8,15
Brennan 232:8,8
bring 79:8 223:15,23 224:6
    224:13 326:16,18
broadcast 145:8,17 148:21
    150:20 151:18 154:13
    155:17,21 156:10 157:7
brochure 156:6
Brooklyn 123:21 125:21
    126:2,14
brother 9:2,5,13 118:20
brothers 9:3
brought 234:6 253:2
Brown 259:15
Brown's 61:3
Bruce 79:13 172:23,23
BS 124:6,7
Buick 115:18
builder 90:7,11 91:6,8,18
    92:23 93:4
building 1:12 93:24 95:12
    96:21 200:13 201:16,20
    205:13 211:8 212:6 213:4
    213:7,12 214:6 216:13
    219:13,19,22 220:15
    222:4,15,18 235:3 263:15
    264:3 284:23 287:9,14,16
    287:18,19 294:17,18,20
    295:25 296:3,12 321:13
    336:11 337:2,7,8,21,23
    338:8 340:14 341:5,7
    342:11 343:5,15,16 344:4
built 88:18,19,21 89:25
    90:20 294:21

bumper 241:9
bundle 258:4
Buoyance 187:4
Burnas 23:3,4
Burrows 339:4
bus 304:9,13,16,18,20,22
    304:25 305:13,16 307:17
business 7:2,21 9:6 10:14
    12:7 13:8 15:6 95:6,7,10
    176:2,3 178:3,5,13,15
    188:19 197:16,21 198:7
    198:17 199:8 213:15,20
    239:20 251:25 252:5
    263:6 273:9 274:18
    277:11,18 278:8 279:10
    280:4,11 346:11
businesses 87:18 198:25
busy 91:10 97:25 163:10
    177:13
but 39:5 53:9 58:20 93:22
    99:13 130:2 133:4 151:6
    157:4 159:6 162:17,19
    173:13 190:6 191:9 207:7
    207:8 210:16 211:15
    224:7,9 232:2 234:22
    250:25 259:19 265:2
    266:16,24 267:19 291:5
    292:23 308:8 318:2,10,10
    320:19 324:4 325:5
    334:11 335:21
button 53:24
buy 89:19 287:18

**C**

C 3:2 5:3 345:2 347:2,2
C-A-R-D-A-L-L-I 203:13
C-A-R-L-E-Y 269:12
Cadman 20:7 117:10,15
    118:5,13
Cain 308:14,17,19,20
    309:2,3,4
Cain's 308:15 309:7
call 19:12 44:14 45:9,22

51:16 60:14,17,18,24
75:19 111:12,14 131:22
131:25 132:4,9,13 138:3
142:3,5 145:4 147:18
178:19 199:16,18 208:4
208:10 213:14,19 214:23
215:3 217:18,19 219:2
221:16 227:20 231:10
233:16 237:12,13,15,16
263:3 279:23,24 303:2
306:16,17 308:21,25
309:2,4 311:3
**called** 5:3 46:20 73:22,23
132:22 141:24 143:5
251:17 302:23 303:18
306:7,11 307:16,22 308:3
308:4,6 316:19,22,22,23
324:7
**calling** 61:7,8 217:16
279:11 309:7 317:16
**calls** 15:18 47:16 96:20
232:23 328:17
**calmed** 327:6
**came** 108:15 110:2 166:13
174:7,11,15,24 231:21
241:7 259:17 271:5
283:15,17,20 307:15
310:20 322:25 328:24
336:2
**camera** 5:17 60:22 157:17
**camp** 21:20 55:16 101:4,8
116:8,15,17,22,23 117:7
180:21,25 181:3 183:4
**campaign** 155:7 156:4,13
156:14,21 157:12 159:6
172:19,21 173:19,22,24
174:7,11,15,21 175:3
193:17 194:4,8 228:4
238:4,6,9 284:16 299:19
**campaigns** 157:20,22
158:7 190:2,4 193:20
**campers** 182:16,19,23
**can't** 5:22 7:16 20:18

22:13 29:8 30:2,4 36:5
40:11 41:19,20 45:21
47:11 58:17,18 63:12
70:13 76:24 77:2 78:2,3,5
78:7 84:2 128:24 132:5,8
137:16 140:17 144:2
158:4 162:19 175:12
196:18 212:20,21 214:5
214:13 224:9 252:15
273:3 276:14 285:10,11
285:22,24,25 291:8,23
292:22 295:16 308:22
325:3,3,4 332:16 338:19
338:20
**Canal** 187:4,5
**canals** 248:25
**capacity** 1:17 7:2,4,23 9:8
10:16 12:10 13:10 23:21
85:14 132:19 164:3
181:23 189:7,10 194:9
195:22 198:4 216:23
251:24 252:4
**car** 71:4,6,16,18,22 101:14
101:15,16,18,19,21,23
102:5,10,12,12,13,20,23
103:3,16,17,24 104:3,13
105:11,14,21 106:23
108:9,23 109:2,21,23
110:4,6,7,8,10,11 112:21
112:22 113:9 115:17
191:13,13 230:4,7 239:22
240:22,23 241:3 242:24
242:25 243:15 246:2,8
266:10 286:14,17 336:2
342:20
**card** 152:5,15,16 154:17
154:21 155:20 244:16,18
244:22
**Cardalli** 203:12
**cards** 154:18
**care** 24:21,24 25:8,11,15
29:5 32:14 73:24,25
76:16 90:8 97:8 105:23

105:24 106:16 155:5
308:7,8 309:24 310:9
323:8,21,23 337:2,22
340:14,15,17,17,20
342:13
**carefully** 149:12
**Carley** 269:10,12
**Carley's** 269:13
**carrier** 242:4,7
**carry** 126:18,20,23 127:2,6
127:15 128:7,10,17 129:4
129:24 130:20 133:16
135:3,21 136:10,15,21
139:16,17,19,21 263:21
**carrying** 139:12
**cars** 73:15 74:9 103:6,10
103:20 239:16 240:19,20
240:21 311:13
**case** 49:12,16 195:18
279:22 336:18 341:12
342:5 348:5
**cash** 82:20,21 89:15,16
96:11,13,14,21 129:12,13
129:13 135:17
**cassette** 69:23 70:7,7
**cassettes** 69:24
**catch** 63:23
**caught** 63:20 321:5,6
**caused** 241:2
**cautioning** 260:8
**CD** 70:9,11
**CDL** 135:22,25
**CDs** 69:5,11
**cell** 46:3,7
**cellular** 46:14 142:10
**center** 183:20,20 249:7
**CEO** 234:14
**certain** 155:9 173:13
174:17 191:13 266:15
311:13
**certificate** 124:5 125:6
126:7 135:22 180:13,13
193:15 291:5 294:8,13,16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 356

296:10
**certificates** 136:16
**certification** 4:7 162:21,22
 162:24 193:11 194:16
 260:16 265:13
**certifications** 162:18,24
 180:9 265:7
**certified** 193:6 260:25
**certifies** 193:8
**certify** 345:6 347:9,15
**chair** 292:15 335:23
**chairman** 193:3 290:21
 291:3 292:17 293:8,18
 294:4
**chairman's** 293:20
**Chambers** 61:4
**change** 26:21 29:3,20,22
 30:5,11,12,14 32:8,11,12
 33:17 134:20 161:20
 180:2 182:20 262:3
 307:17 314:23
**changed** 26:19 27:19 28:18
 28:25 31:13,21 60:21
 130:9 133:19 157:16
 245:24 266:13
**channels** 213:3
**charcoal** 114:9,11,14,22,23
**charge** 146:6 149:4,13
 226:5 247:10 318:2
**Charger** 71:5,8
**Charles** 106:5 202:18
**check** 80:7 99:17 106:20
 195:4 313:24 326:19
**check-in** 80:4,6,14
**checked** 73:13 310:6,11,16
**checking** 217:20
**checks** 129:14,18
**Chester** 123:19,22,24
 124:18,23
**Chevy** 101:25 104:9 246:9
**chicken** 331:5 333:17
**chief** 109:24 134:12,13,18
 134:21 202:23,24 203:2

203:19,21 204:3,9 229:20
 252:18,19 318:14
**chiefs** 229:17,18 247:11
**children** 1:5 344:14
**choose** 102:20 103:3
**choosing** 102:23
**chosen** 222:14
**Chris** 250:2,7
**Christmas** 152:15
**Christopher** 250:2
**Church** 275:12
**cigarette** 322:11 323:24
 325:10 326:11 327:22
 331:22 332:5
**cigarettes** 329:9
**Circle** 187:2 249:19,20
**circular** 265:3
**circumstance** 207:12
 211:24 216:10 225:2,24
 231:4 232:20 250:9
**circumstances** 14:13 16:11
 17:16 28:24 72:23 174:5
 175:10 212:14 214:10
 217:10 218:10 220:13
 239:3,13 240:25 253:11
 270:4,8
**citation** 323:24
**city** 125:4 280:23,25 281:5
 315:21
**Civil** 86:14 161:8 206:8
 215:7 219:8 221:20
 227:23 229:9,11 233:20
 260:15 266:22 267:4
 268:22,23 269:3
**clarify** 219:18
**class** 186:13,14,15,15
**classed** 186:17
**classified** 186:9
**clean** 279:25 311:6 334:17
**clear** 23:21 71:24 97:19
 136:13 199:7 269:15
 323:20 332:24
**clearer** 181:12

**clerk** 140:3 150:12 200:15
 206:4,6,20,22,23,24,25
 207:15,18,22 208:16,18
 208:19,21,25 250:14,21
 251:3 262:25 263:13
 268:21 269:6,7,14,17
 271:9,24 281:13,17,21
 282:25 284:2
**clerk's** 129:15,19 268:17
 272:14
**click** 53:16
**client** 38:18 285:14
**close** 90:18 112:11 165:21
 182:24 187:18 342:19
**closed** 116:13,14
**closer** 318:24 319:3
**closing** 266:18 294:6
**club** 64:13,15,17,21 65:3,7
 65:10 80:3 160:21 161:23
 161:25 163:4 187:17
 225:5,7,14
**clubhouse** 80:7
**clubs** 65:16
**CO** 294:15
**coach** 195:21 196:3,5
 197:4,9
**coached** 196:6
**coaching** 196:8 197:3
**Coast** 252:14
**Cochecton** 87:23 100:8
 101:13 255:16,17
**cocker** 84:13
**code** 18:11 21:16 22:16
 23:7,8,9 142:7 200:18
 204:22 211:10 230:3
 243:20 247:10 260:14,18
 261:6,12,13,15 262:10
 263:16 264:4,7,13 265:8
 265:25 266:2,8,25,25
 267:3,6,16 302:21 305:24
 310:24 311:7 317:18,21
 324:24 325:2,6 326:5
 334:10 340:17 346:10

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 357

codes 284:4 293:21 306:2
  343:13
coffee 15:17
collect 276:3
College 123:21 125:21
  126:3,14
color 104:12 114:8 115:2
come 17:17 30:13 54:22
  69:5 99:19 111:15 128:13
  130:14 131:4 142:15,17
  162:11 167:9 170:17
  171:6 174:6 175:17
  177:17 193:9 212:19,22
  214:21 215:17,19,20
  237:16 239:14 267:18
  283:12,18 317:9 323:16
  333:9 340:19 342:4 344:7
comes 36:10 52:6,8,19
  240:11 262:16 313:6,7
  318:16
coming 136:24 213:10
  241:6 244:3,8
comment 237:13
commercial 136:2
committee 159:6 172:20
  173:19,24 174:8,12,15,21
  175:3 228:4,8 282:21
  284:17
committeeman 192:7,9,18
  193:16
committeemen 192:11
communicate 12:21 15:12
  60:5 63:9,11 207:14
  213:23 214:7,11 218:2,5
  218:11 221:5,10 226:11
  233:2 236:16 237:6
  272:16,25
communicated 8:6,9,19
  9:18 10:19 12:12 13:13
  15:19,22 16:20 17:3,24
  18:4 176:14 236:18
communication 207:18
  273:6

community 307:24
comp 185:3
compact 69:18,21 70:8
companies 31:13
company 29:3,4,7,11,14,21
  29:23 30:5,14,23 32:11
  36:7 40:11 90:6 184:15
  184:17 276:20
complainants 1:19
complaining 334:23
complaint 73:3,5,7
complaints 306:6 310:7
  311:12
complete 345:10
compliance 91:5
computer 24:21 27:13
  41:22,25 42:3,11 47:23
  47:24,25 48:15,17,19
  49:19,20 50:7,14,19,22
  50:24 51:10,19,20,21
  52:7,18,24 53:5 54:3 58:9
  58:12 60:3,4 62:11,12,14
  62:25 63:4 74:13 235:8,9
  235:10,16 237:23,25
computers 25:12,16 29:5
  30:15,23 42:22
concern 237:12,14 303:18
  307:18 311:22
concerned 50:7
concerning 311:2
concerns 232:23 237:16
  311:23
concluded 344:21
conclusion 96:20 99:25
conduct 131:10
conducting 5:19 283:24
confers 37:2
connected 18:25
connection 59:24
Conroy 164:13 165:13,19
  165:25 166:5,21 167:2,6
  167:18 172:23 222:7,20
  222:23

consider 155:15 327:11
considered 144:25
consist 334:25
consistent 306:20
consistently 168:24
console 183:20,21 249:7
constantly 217:20 334:5
constituency 134:5
constituents 236:16 237:6
  300:12
Constitution 343:10,11
constraints 173:14
consult 94:22 177:22 266:4
contact 251:9 308:20
contained 156:17
continue 5:18 44:16
continued 61:10
continuing 124:21 125:15
  126:12 298:14
contract 251:11,13,20
  282:9,12
contracted 189:2
contractor 295:4
contracts 251:6
contributed 159:12
control 138:9 142:16 330:3
conversation 111:17
  179:11,12 259:15,18,22
  259:24 292:10 293:3
  317:13
conversations 174:14
coop 331:5 333:17
Cooper 188:2
COPE 308:4,5 318:2
copy 261:19,21,24
Corley 250:12
Cornelia 17:10,17 18:5
corner 301:3 316:9 334:20
corporations 95:4
correct 25:6 26:10,11
  28:14 32:21 34:16 50:25
  51:4 52:24 53:12,14
  54:10,14,17,23 56:8

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

58:10 68:3,6 75:25 83:21
97:21 98:2,16 105:12
106:12 107:11 112:4,5
116:25 118:23 140:15
141:19,25 145:2 146:17
149:7,22 150:4 157:20
159:13 164:25 167:24
176:21 229:4,7 255:3
257:12 292:24 293:25
309:8 328:21 330:14
331:15 335:24 345:10,12
**correspond** 75:8,12,16,18
234:19,25
**correspondence** 233:8
**Cory** 3:3 61:6
**Coryhmorris@gmail.com**
3:7
**Coshaton** 255:15
**Cottage** 21:11,12,13
**could** 15:16 19:19 27:25
32:3,14,19 45:20 50:20
92:8 198:18 231:13 253:9
257:8,9 291:6 299:5
327:9
**couldn't** 34:15 43:6 73:16
163:10 334:22
**councilman** 315:12,19
**counsel** 38:6,16 39:9,18
44:9,23 45:11 60:9,21
61:11,25 66:15 67:5,19
91:24 94:10,13 260:7
279:14 288:3,11 289:9,16
296:24
**Counselor** 39:21 60:11
92:15
**counter** 282:21,23
**Country** 3:12
**county** 22:23 23:5,6,20,25
24:4 88:4 95:24 126:21
128:18 133:13,21,24
193:7 194:8 232:14 257:9
282:3 306:3,5,7,8 307:15
307:21,25 309:5 311:3

313:13 323:21 324:6
325:5 326:16 345:4 347:5
**couple** 55:2 120:3,4 181:7
190:6 193:24 294:24
302:3 307:8 316:11
320:19 334:3,15
**course** 38:6 64:18 65:13
66:11,12 81:24,25 82:4,9
82:12,15 225:16 234:17
237:4 263:6 265:14 272:5
346:11
**court** 1:2 4:19 60:15,17,18
60:25 74:10 122:22
129:10 137:20 138:13,14
138:15,20,25 200:16
206:24,24 207:6,9,11
235:4 262:24 263:14
314:2 324:11,15,23 326:4
326:9,12,15 330:2 335:14
338:22 339:7 343:5
**cousin** 253:2 335:17 336:4
337:4
**Cove** 119:7,9,10,12 120:9
120:19 121:4,10
**cover** 247:21
**covering** 247:18
**coworker's** 276:12
**coworkers** 276:10,16,18
**created** 83:11
**credit** 190:22 191:5,10
244:22
**Creek** 64:18 185:16,17
186:23
**criminal** 329:20 330:5
**crisis** 134:7,25
**criteria** 128:15
**current** 72:11
**currently** 88:7

---
**D**
---

**D** 5:3 11:8,11 12:3,6,9,13
12:21 345:2 346:2
**DA** 308:6

**daily** 333:24 334:14 335:12
335:19,21 336:5 341:2
**dais** 143:18,20
**damage** 242:14,23,24
**DANABT1910@aol.com**
74:25 83:7
**Darker** 104:18,20
**date** 7:13 14:7 26:23 28:22
89:9 132:6,8,12,13
171:10 203:20 204:11
270:3 348:6
**dates** 183:3
**daughter** 6:20 75:9,12
76:13,23 83:11 84:20,23
113:13 120:20,22 198:6
**daughter's** 75:5 76:19 83:8
83:15
**Davida** 1:10 66:4 71:25
78:20 79:15 158:2,10
168:15 169:10,11,20
170:8 171:2,18,21 202:10
203:15 204:8 316:22
317:3,10,11,14 318:8,17
318:20
**Davida's** 304:3 318:24
**day** 21:20 27:8,10,20 28:20
62:3 79:2 80:23 139:13
139:22 144:18,23 180:25
181:2 185:3 191:3,3,4,5,5
198:22 212:12 217:20
242:17 272:13 284:24,25
291:10 292:6 307:25
313:5 345:19 347:20
348:21
**days** 100:15,17,25 137:25
190:22,24 322:17
**dead** 254:7,13
**dealer** 301:16,17 307:10
**dealing** 97:25 309:11
**dealings** 94:17 198:9 199:8
225:4 228:16
**Debbie** 158:2,22 169:12
170:8 171:3,18,23,25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 359

174:21 201:18 205:13
**Deborah** 1:15 211:21,25
212:11,15 213:23 214:8
214:11,15,23 215:3,6,11
215:24 216:3 268:9
**decade** 68:24 117:21
204:12
**decades** 71:3,3 130:3
204:13,14
**decals** 230:7
**December** 1:23 209:11
345:9 347:20 348:6
**decide** 30:18
**decision** 339:18,19
**decisions** 339:22
**deck** 287:2,13 294:7
**deed** 95:13,16,20 294:9,13
**deep** 177:9,10
**deer** 127:24 128:6 178:9
244:10
**Deere** 255:18,20,21,23
256:3,5
**Deere-type** 255:22
**defendant** 2:3 3:20,21
258:24 285:4
**Defendants** 1:19 3:11
**definitely** 131:3
**definition** 263:18
**degree** 124:8
**deleted** 227:11
**delivers** 283:22
**demarcates** 230:8
**department** 1:13 134:14
200:14,17,18,20 201:16
202:17,22 203:7,19 204:6
204:10,18,19,20 205:13
205:20 210:6,25 211:9,11
211:11 212:7 214:6
216:14 219:19,22 226:4
235:3,4 240:10 248:13
249:5,10 255:11 257:5
260:19 263:15 309:5
318:13 321:13 328:25

336:11 337:2,7 343:17
344:4
**departments** 111:7 205:21
229:4 270:12
**deponent** 61:11 285:6
**deposed** 38:20
**deposition** 4:16 44:14
45:21,25 61:12 141:16
344:21 345:8 347:11,12
348:6
**depot** 244:12
**depth** 211:2
**deputy** 1:9 25:11,13 32:13
36:19,20 39:25 40:4,10
66:2 78:19 79:14 81:22
164:19 165:9,10 200:7
201:25 202:4,9 205:16
211:9 268:20 269:17
271:9
**describe** 50:12 110:15
111:11 131:13 200:5
**described** 245:12
**designed** 91:3
**desired** 38:10
**desk** 27:14 81:3
**desktop** 48:3,5,6
**destroyed** 263:9
**determination** 337:5,12
339:11,13 343:21,25
344:2,12
**determined** 172:17 340:3
**determining** 105:7
**device** 47:21
**dial-up** 59:24
**dialogue** 45:14,17
**dials** 61:2
**Diane** 158:3 159:3,4
**didn't** 14:24 30:8 41:21
62:13,14 64:24 68:11
89:19 98:14,21 99:23
107:3,25 118:4 125:24
139:21 147:20 154:15
181:8 186:16 191:17

193:25 205:17 241:8,8
243:25 259:20 260:25
274:2 278:10 279:12
287:18 294:2 296:2 310:7
320:13,19 322:18 330:15
335:17 336:24 343:15,15
**different** 37:3 82:25 110:7
130:18 177:7 199:17
200:11 207:7 219:19
222:18 225:18 261:4
311:4,5,12 313:14 319:17
321:7
**Dina** 6:16,18,23 8:7,10
**direct** 269:5,9
**directed** 266:6
**direction** 113:25 244:6,7
**directions** 41:10
**directly** 55:23 201:3,10,13
201:17 205:18
**director** 21:20 55:15 101:3
101:8 181:2,13,22 182:14
210:5
**directors** 182:8
**directs** 60:18
**discuss** 30:17 78:13 179:4
179:20 191:18 224:10
230:22 259:5 307:16
314:8
**discussed** 162:9 174:20
175:3 193:12 245:10
305:20 314:16
**discussion** 61:18,21 179:16
180:2 209:18 213:6 224:3
224:8,15 267:19 270:14
314:13,14,17,19,23
**disheartening** 130:16
**disk** 69:22 70:4,9
**disks** 69:19
**disseminate** 182:10
**distance** 319:5
**district** 1:2,2 15:5 85:13,15
85:25 121:6 176:2,3
178:3,5,12,13,14,15,16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 360

178:17 192:15,17,19
206:23,24 207:15,18,22
208:16,18,20 275:20,25
276:4 277:12 282:22
**districts** 196:24,25 253:22
254:4,5,5
**disturbance** 132:14,18,21
**Dix** 3:6
**dock** 184:8 185:8
**docked** 184:5,7 249:18
**docks** 185:6
**document** 332:21
**documented** 252:13
**documents** 144:10 299:4
**Dodge** 71:6,7,9
**Doe** 1:18
**does** 9:13 30:10 35:16
36:20 37:4 39:25 43:4
52:23 57:17 59:5 64:20
78:21 90:25 116:11
121:23 122:7 173:6,19
183:22 184:11,15,20
186:18 187:19,22 188:10
188:13 192:13 206:13
207:4,11 209:4 214:15
216:3 218:21 220:6
221:13 222:19 224:17,20
226:5,6 227:15 228:24
233:13 236:6 238:21
246:3,21 248:14,18 250:7
250:24,25 251:25 253:16
253:23 255:5,8,12 256:20
256:23 262:3 264:10,13
264:23 276:3 281:20,22
313:4 315:17 323:23
340:8
**doesn't** 32:7 247:16
**dog** 84:11,12,15,17 120:25
188:7
**doing** 21:18 37:12 77:18
90:4 112:19 146:5 177:13
208:17 213:22 231:6
250:11,12 257:19 287:23

297:20 311:23 312:24
341:15,16
**domain** 159:20
**Domingo** 74:6
**Don** 16:3 164:13 165:13,19
166:5,21 167:2,6 222:7
222:20,23
**donation** 195:14
**done** 5:17 39:22 75:21 89:6
110:2 150:9 159:5 182:5
223:7 225:16 239:20
240:9 257:7,10 281:13,16
282:11 288:6,7,9,14,15
288:17 321:9 342:24
**door** 316:21 317:6
**down** 111:15 129:14
142:15,17 183:5 186:25
187:5 213:10 215:16
224:10 225:12 253:9
258:10 262:16 266:19
272:13 295:17 308:23
310:25 313:22 316:11,11
327:6 334:19
**Downing-Manfre** 17:11,17
18:5
**downstairs** 129:10,14
207:16 208:5 263:13
271:7
**draft** 141:2,4,9 155:12
**drank** 28:13
**drawn** 251:11
**drinking** 322:3 325:8
**drive** 21:12 49:21 110:11
115:21 216:3 220:6
224:17 228:24 229:12
230:17 245:14,19 246:15
246:24 247:5,13
**driver's** 126:17 135:20
136:2,14
**drives** 229:15
**driveway** 73:17 74:4
**driving** 154:4
**drop** 280:19

**dropped** 172:8,8 280:20
**drove** 108:16 110:8 240:14
**drug** 133:18 301:15,17
302:4 307:10 309:11
310:21 313:9,18 315:15
320:9 321:24 327:9
**drugs** 28:11 130:15,22
133:2,4,8,11,13 144:23
300:16,24 301:13 302:11
303:7,20 305:17 306:19
307:2 323:14
**dues** 65:19
**duffle** 98:22 99:18
**duly** 5:4 347:12
**during** 21:4 61:11 64:4
78:22 160:17 163:19,22
177:16 179:5 185:3
219:21 259:6 272:2,5,9
272:12 273:9 277:17
278:7 281:2,5 290:10
313:25 314:9
**duties** 182:13
**DVD** 70:3

---

**E**

**E** 3:2,2,22 345:2,2 346:2
347:2,2
**e-mail** 24:9 26:4,5,15,18
27:19 28:18,19 29:3
31:20 32:20 33:15 34:13
40:16,18,19 47:2,4,5 48:2
49:3,5,15 50:11 51:7,25
56:12,24 57:11,20,24
62:22 73:9 74:22 75:25
76:19,22 77:9,13 83:8
214:5 218:14,15,16,17,18
226:15,17,20,21 234:21
237:7 306:17
**e-mails** 49:7,9,11,18 50:13
50:15,16,17,22 51:15
57:14 63:13 76:3,8,9,13
235:6 237:19
**each** 1:16 16:14 103:16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 361

| | | |
|---|---|---|
| 192:10,12 231:9 274:3 292:15 | 290:10,13 293:24 294:2 | 329:4 |
| **earlier** 13:22 75:7 83:18 | **elections** 189:14,16 193:8 | **else's** 146:10 |
| 101:4 121:15 162:9 | 281:14 282:3,3 283:18,22 | **embarrassment** 335:14 |
| 180:21 192:3 193:18 | 284:6 | **emergencies** 203:24 |
| 236:6 238:5 252:8 254:19 | **electric** 63:10 | **employ** 72:3 265:20 |
| 265:9 342:15 | **electronic** 8:7,19 9:19 | **employed** 72:2 85:7,10,15 |
| **early** 71:19 89:3,4,7 | 10:20,25 11:3 12:13 | 121:3 160:4,13,16 163:24 |
| 204:16 284:24 294:23 | 13:14 15:13 17:4 18:5 | 189:9 197:23 198:2 |
| **earned** 195:18 | 24:7,11,15,17 25:22,25 | 239:10 269:22 272:3 |
| **earnings** 190:8 | 26:17 27:6 32:24 33:2,3 | 273:10 275:17 276:9 |
| **east** 176:8 187:16 254:5 | 33:11,20,24 34:20 41:13 | **employee** 160:11 182:23 |
| 348:4 | 41:17 44:22 46:23 47:6 | 223:20,25 224:6 272:6 |
| **eastbound** 244:8 | 47:18,22 58:10 59:2,10 | **employees** 65:23 66:8 83:3 |
| **EASTERN** 1:2 | 60:6 62:9 68:21,25 69:4 | 83:5 182:15,18 239:5 |
| **Eat** 63:24 | 74:18,25 75:3,9,12,23 | 247:4 |
| **economic** 107:18 | 83:8,10 213:24 214:8,11 | **employing** 29:13 |
| **ED** 192:10,12,13,13,21 | 218:3,8,11 221:6,11 | **employment** 85:24 86:5,23 |
| **education** 85:16,18,24 | 226:12 227:4,12 233:3,6 | 87:13 163:18 190:9 215:6 |
| 86:21 87:2,3,9 124:10,22 | 233:10 234:19 235:2,15 | 215:24 220:4 223:13,17 |
| 125:10,15 126:13 | 272:17,19,22 | 228:12 270:5 |
| **effect** 4:18 | **elementary** 14:22 15:3 | **encompassed** 153:9,11 |
| **eight** 7:12 100:25 164:19 | **else** 24:21,22 33:12 42:17 | 330:19 |
| 164:20 182:17 187:23 | 48:4 49:22 59:8,19 66:5 | **encumbered** 95:25 96:5 |
| 228:9 269:20 | 72:2,8 79:20 82:19 84:5 | **end** 64:24 104:25 110:12 |
| **eight-week** 183:4 | 84:10,18 95:18 97:5 | 115:14 183:2 186:25 |
| **eighteen** 128:16 | 98:11 107:21 110:23 | 187:8 188:7 253:24 270:5 |
| **Eighty** 275:9 | 112:20 113:8 118:12,21 | 334:19 |
| **either** 20:19 130:15 140:11 | 118:25 119:13 120:3,23 | **ended** 15:2 |
| 153:23 156:10 224:15 | 121:8 122:7 127:25 | **ends** 187:13,13 253:25 |
| 306:16 | 129:16 142:11,25 143:6 | **enforce** 263:25 264:3 306:2 |
| **elected** 7:5,23 9:9 10:17 | 143:22 151:11 152:25 | 325:6 |
| 12:10 13:11 102:9 164:24 | 160:8 161:9 164:8,11,14 | **enforcement** 142:7 200:18 |
| 189:7,10 191:23 192:22 | 165:23 167:20 168:16 | 204:22 211:10 230:3 |
| 236:14,23 283:2 284:15 | 169:19 172:25 173:4 | 243:20 247:10 260:14,19 |
| 315:11 332:25 333:15,22 | 174:19,24 177:15 178:21 | 261:6 263:16 264:7,14 |
| **election** 109:12 153:6,8 | 184:21 191:17 192:22 | 266:8 267:3,7,17 302:21 |
| 156:24 165:14 167:10 | 201:9 202:12,15 205:2,8 | 305:25 310:24 311:7 |
| 168:19 169:3,25 170:14 | 207:11 210:4,20 211:14 | 317:19,21 325:6 340:17 |
| 170:16 189:18 192:15,16 | 212:18 230:5,21 239:24 | **English** 84:13 |
| 193:20 194:4 204:6 238:4 | 245:14 264:20 265:20 | **enough** 165:22 342:19 |
| 238:6,8 281:10 282:6,17 | 270:18 282:15 285:6 | **enter** 53:9 |
| 283:8,24 284:9,14,20,24 | 293:10,16 294:14 296:8 | **entered** 133:22 293:6 |
| | 317:7 325:24 326:17,18 | **entire** 111:4,5 |

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 362

entirety 119:21
entity 98:6,8
entrance 188:8
epidemic 133:20
Eptosca@krklaw.com 3:15
Equal 319:5
erased 137:24,25
ERIC 3:14
ERRATA 348:2
Esq 1:14 3:3,14,20
essentially 82:2 205:24
established 257:11
estate 94:16,23
even 14:21 34:2 48:18 133:22 162:21 186:16 198:15 204:13 306:10 335:15
event 145:2
events 28:3 146:21
eventually 70:3 105:10 108:15,22 166:13 304:15
every 27:8,10 28:20 36:15 66:25 102:6,7,17 103:5,9 109:15,22 113:25 134:20 137:25 181:20 182:21,23 209:8,9,9 210:2,6 217:20 222:2,8,11 223:6 274:3 306:15,15 307:24 312:17 312:18 313:5
everybody 62:4 211:16 262:2 291:15 293:11 334:11 340:18
everyone 61:12 156:22 285:3
everything 24:21,22 111:16 128:18 207:23 257:7,9 290:14,22 292:25 329:4
everything's 296:11
exact 28:22 132:6,8,12,13 196:19 270:3 338:18
exactly 27:5 190:19 223:4

291:4,23
examination 2:2 5:7 266:23 346:3
examinations 261:4
examined 5:5
example 55:22 204:3 205:12
examples 127:6
except 4:11
exchange 243:17
exclusive 184:24
excuse 23:9 61:11 161:25
exist 286:25
exists 65:10 95:13 96:22 298:10 329:21 341:2
expended 97:20
explain 35:7 36:23 129:8 130:11,24 138:7 140:25 141:8 145:24 190:19 192:8 213:21 322:20
expressing 237:12
extent 242:22
extra 310:25
eye 321:5,6

### F

F 347:2
F-R-A-C-A-L-V-E-R-R-I 230:2
Facebook 121:18,19,21,24 122:2,8,12,17 148:23,25 149:4,5,13,14 150:2,16 151:6 198:24 226:5 236:5 236:10,11,15,18
faces 225:18
facility 20:25
facsimile 55:12
facsimiles 54:16 55:20,24
fact 72:12 77:17 177:7 198:21 290:24 330:13
fair 153:22 184:23 312:14 313:9 333:4
fairly 102:5

faith 309:23
falling 71:23
falls 344:8,15
familiar 87:20 115:23 117:10 329:5
family 198:2 244:11 257:14 329:21 330:6 335:15
fantastic 255:12
far 16:13 24:22 50:6 122:25 191:8 301:8 306:24 318:20 332:18
father 10:10,11,13
fax 54:24
faxes 54:22
federal 195:11 338:10,22 339:7
fee 250:24
feeding 257:22
feet 249:8
Fellman 1:12 201:18 205:14 220:11,14 221:3 221:11,13,16,19,24 222:3 222:14,21,24 223:5 224:17,20 313:2 336:13 340:2,5,7
Fellman's 223:13,17
felt 127:5 135:12 137:14 231:13,15
fender 112:16 114:19,20 114:24 245:12
few 337:10 338:20
fields 188:4
Fifteen 192:20 333:3
fifth 103:11,16
fifty 18:21 71:2 182:16,19
fight 249:3
figure 44:18
figured 232:4
file 241:19
filing 4:6
filings 342:5,7
fill 185:10,20 296:6

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 363

**fill-ins** 80:9
**fill-up** 244:21
**Fillmore** 3:22
**filmed** 137:21
**filter** 343:18
**finally** 334:16
**financial** 98:5 178:12
**find** 67:10 311:4
**fine** 231:15 250:15,15
  259:23 317:17
**fines** 333:24 334:14 335:12
  335:13,16,19,20,22 336:5
  341:2
**finish** 52:16 97:17 113:2
  122:19 167:4 217:4
  292:12
**fire** 21:7,14,19 100:22
  134:14 184:20 185:20
  188:2,3 202:22 203:7,18
  204:6,10 205:19 206:19
  211:10 249:4,10,15
  253:17,21,22,24 254:3,4
  254:4,5 255:10 267:16
  268:2 271:9,12 318:13
  328:24
**fired** 271:13
**fireman** 315:18,20 318:11
  343:12,13
**fires** 249:3
**firing** 29:11 267:19,22
  270:21
**first** 7:14 14:14 16:12
  17:19 18:19 21:21 23:13
  61:14 70:15 72:24 73:3
  85:17 90:13 104:3 126:22
  145:22 154:8 174:24
  175:11 181:16 186:14
  189:19,23 193:24 204:4
  211:25 213:2,4 215:19
  216:11 220:14,19 223:7
  224:13 225:3,6 229:20
  231:5,17,19,23 232:24
  238:24 247:8 249:11

250:5,9 252:25 253:3
254:22 266:18 268:11
278:18 290:12 304:24
307:24 308:9,15 309:6,23
313:20 315:4 316:13,24
317:17,18,20 334:7
**fish** 57:7 63:18,22 225:8
**fisherman** 57:5
**fishing** 225:12
**five** 46:19 71:3 120:11
  227:9 303:12
**fix** 239:15 240:7
**fixed** 240:14
**flash** 264:24
**flashes** 265:2,3
**flashing** 264:17
**fleet** 108:18
**flooding** 208:10
**floor** 237:24
**floors** 253:8
**Florida** 9:14,15
**folks** 313:16 340:21
**follow** 31:4 52:11 173:14
  214:14 306:4 309:24
  312:3,5,6 334:10 343:9
**followed** 316:24
**follows** 5:6
**football** 196:10
**force** 4:18
**foreclosure** 88:17
**Forget** 62:18
**forgot** 62:15 162:10
**form** 4:11 56:2 64:19
  105:17 130:7 163:8
  206:14 280:5 288:24
  289:5 296:20,25 297:4
  327:12 329:23
**formal** 297:21,24
**forth** 16:14 184:20 223:9
  347:11
**forty** 14:9 59:13,14 60:7
  71:2
**forty-four** 14:3,4,5

**Forty-three** 14:3
**forward** 174:25
**fought** 339:9
**fouled** 208:22
**found** 254:8,13 305:9
  307:2
**four** 59:12 71:3 84:23
  102:6,7,17 103:5,9
  105:13,15 109:15 113:25
  114:3 120:17 123:20
  134:20 165:7 169:5
  170:20 189:20 210:6
  229:17,18 240:19,20
  247:11 256:14
**four-wheel** 110:11 115:20
**four-year** 203:25
**four-years** 256:15
**foursome** 80:8,10 81:4,9
**foursomes** 80:15,18 82:23
  83:5
**fourth** 209:8,10
**Fracalverri** 229:25
**Fred** 187:16
**Fridays** 183:9
**friends** 15:3 64:7 79:10,13
  79:14
**front** 38:18 143:13 246:17
  287:12 288:4 320:18
**fuel** 244:12,12,16,18
**full** 5:9 59:2 214:21 309:23
**full-time** 87:4 163:12,16
  238:19,20
**functions** 176:20
**fundraise** 181:25
**fundraiser** 182:9,11
**fundraising** 182:5
**funds** 97:15,20
**further** 4:10,15 14:22
  347:15

---
**G**
---

**G** 345:2
**G-L-Y-N** 203:5

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 364

gain 53:14
game 63:22 225:8
garaged 246:18
garbage 238:16
Garden 125:4
Gardener 106:3,5,16
    229:17 240:10 242:2
    243:19 247:8 248:15
    254:20,23,25
Gardner 202:18,18
gas 105:3,5,9 107:17
    185:10,14,19 342:21
gave 183:14 231:9 270:14
    289:13 322:25 336:25
geez 90:12
gentleman 68:6 137:4,6
    243:14
George 188:7
Gerard 1:14 3:20 143:3
    201:8 231:2,5,11,20
    232:10,17,21 233:6,13,16
    233:24 341:23,25 342:2
gesture 37:14
gestures 37:10,13 38:15
    39:11
get 42:18,19 47:5 71:18,22
    73:16 74:11 103:2 105:9
    107:19 115:20 128:15,16
    131:11,21 134:8 141:13
    155:11 163:10 174:16
    177:6 181:8 183:10
    184:19 190:22 191:4,5
    193:25 213:5 214:13
    225:17 250:16,17 262:10
    262:12,14 287:14 296:10
    296:11 311:12 318:14,15
    334:12,22 335:5 336:24
    340:13,13 342:12 343:3,4
    343:4,15
gets 102:9 115:16 240:10
    262:4,5 306:15 326:10
    344:7,14
getting 109:21,23 131:13

    257:20 335:13
Gilmore 158:3 159:3,4
Girl 226:6
girls 196:10
give 28:17 69:4 82:21 91:2
    139:7 149:16 207:21
    237:13,15 277:24 314:2
    334:8 343:6
given 101:16,18 149:13,19
    154:23 184:14 246:24
    345:12 347:13
gives 217:15 341:24,24
giving 141:16 329:2
Glass 1:14 3:20 93:13,16
    143:3 201:7,8 231:2,5,20
    232:7,10,13,18,21 233:6
    233:11,13,16,19,24
    270:18
Glock 129:5
Glyn 203:5
go 14:3,21 39:24 48:12
    51:14,14,17,19 52:5
    53:23 54:12 55:20 61:15
    62:15 67:4 81:10,11,13
    81:25 90:4 92:14 109:19
    110:10 113:12 127:8
    152:18 153:23 180:15
    183:8 185:10 207:16
    208:23 209:12 253:7,9
    258:23 260:25 262:20
    270:7,9,16 280:18 290:15
    293:12 294:2 295:17
    296:6 307:23 311:24
    313:4,24 320:24 326:9,15
    326:15 334:16
goes 35:17,18 101:21
    102:10,11,24 122:9 146:2
    147:24 148:12,23,25
    149:3,4,25 152:15 155:3
    155:4 193:15 194:19
    213:2,3 236:18 267:12
    313:10
going 16:15 37:8 39:14

    40:25 44:8,10,12,13
    45:14,18 50:4 57:22
    60:12,13 62:2 72:5 77:21
    91:16 92:17,18 103:14
    111:16 113:25 115:6
    124:16 155:15 158:5
    165:11,14 174:3 199:16
    199:17 208:4,9 209:2
    231:22,24 241:7 244:8,10
    258:10 260:8,9 272:13
    278:3 279:15 312:16,19
    313:22 316:11 318:6
    320:23 321:2 332:17
Golab 252:20
golf 63:25 64:13,15,17,18
    64:21 65:3,7,10,12,16,22
    66:11,12,23 68:8 72:4,10
    72:13 78:18 79:3 80:3,11
    80:12,24 81:23,25 82:4,6
    82:9,12,15 176:19 210:12
    210:19,23
golfing 79:9
Golub 202:23 203:4,5
gone 48:13 198:15 222:23
    320:18 327:22
gonna 334:12
good 46:2 61:5 110:9
    142:14 150:8 222:19
    231:13 232:3,4 251:19
    298:14 308:4 334:4 339:2
google 41:8,9,9 48:10,12
    48:19
got 63:4 67:21 69:10 70:3
    73:10 106:23 119:5,16
    123:20 136:21 188:9
    191:10 211:16 216:24
    230:20,24 252:10 257:7
    286:16 287:19 324:5
    334:17 335:20,21 341:14
Gotti 259:17
government 98:6 286:4
governmental 91:4
grade 304:24

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 365

**graduate** 123:3,5,9
**graduated** 123:15 145:15
**graduating** 124:23 125:17
  126:13
**graduation** 145:6 150:18
  160:18,19
**grammar** 14:23
**gratis** 250:25
**gratuities** 195:16
**gratuity** 195:8
**gray** 114:21,23
**great** 184:12,18 190:7
  254:2
**greenhouse** 226:3
**greeting** 152:4
**grounds** 92:3,4 277:22
  288:21 289:2
**group** 116:3,5 160:7,14
  161:24 180:20,24 181:4
  181:14 182:2,6,14 183:16
  184:4,15 185:2,13,22
  224:10 291:3
**Guard** 252:14
**guardians** 1:4
**guess** 7:12 14:20 25:19
  35:3,4,9 36:7 42:15 48:5
  49:23,25 51:15 77:14,15
  90:13 95:23 117:23,25
  135:12 137:17 147:18,20
  152:17 157:12 166:22
  167:18 178:18 192:23
  193:8 221:25 222:16
  224:9 234:23 235:7 243:6
  243:10 250:11 251:17
  264:21 265:4 275:9
  281:14 282:9 293:12
  296:10,13 304:7,23
  316:15 322:24 329:18
**guessing** 117:22 118:2
  327:3
**gun** 129:3 162:14 301:23
  302:2,10 303:20 307:2
  318:21 319:2

**guns** 305:9,17 306:19
  315:23
**guy** 24:20 41:6 50:5 199:5
**guys** 204:2 244:24 312:9
**gymnasium** 293:5
**gymnastics** 196:9,11

---

**H**

**H** 3:3 5:3
**had** 18:16 19:6,9 20:11,14
  20:20 22:3,9,15 24:12
  31:2 33:2 37:13 40:16,19
  41:25 46:17 56:12,23
  57:24 58:20 59:15 62:8
  67:11 68:21,25 70:22
  74:24 75:7,11 84:14
  88:18,18,19,21 89:25
  90:7 96:11 102:19 103:10
  105:11 109:22 110:4,7,7
  111:24 112:2,12,16
  114:20 115:18,21 131:22
  131:24,25 132:8 134:25
  139:5,15,18 169:3 176:10
  177:21 180:2,9 181:3,19
  188:19 189:25 197:14
  203:12 204:9 212:2
  222:16 227:7 231:7,20
  240:2,6 259:15,17,22
  271:9,12 277:3,6,15
  286:2 287:3 290:12,18
  303:20 304:16 305:2
  314:17 321:6 329:9,15
  334:16
**half** 333:3,6,7,8,14,21
**half-a-year** 36:16
**Hall** 128:14 131:2,5,15
  132:14,19,21 136:25
  137:20 138:16,18,22
  235:20,21 244:4,5 261:17
  294:12 295:18 303:4
  306:11 327:17,20
**hand** 37:10,13,13,14,15
  38:9,17 39:8,11 131:11

131:14 217:15,24 288:3
  347:20
**hand-in-hand** 298:5
**handed** 81:17,18 343:16
**handicap** 64:8
**handles** 231:11
**hands** 38:2,7,13,14,15
  39:15 143:18,20 309:22
**happen** 30:20,21 215:22
  224:2 267:19
**happened** 105:14 163:6
  216:15 219:21 314:13
  322:15
**happening** 313:14
**happens** 6:3 231:17 313:10
**harass** 44:6
**harassing** 44:17 45:19
  77:19
**hard** 49:21 153:25 154:2
  225:19 339:9
**has** 15:9 25:15,17,18 45:2
  50:19 100:2 103:6 106:6
  130:9 133:19 134:17
  135:13,16 138:25 140:3
  173:14,24 174:18 178:3
  189:21 201:25 204:6
  228:20 230:3 232:22
  244:11 245:22,24 249:9
  254:25 262:2,24,25,25
  263:12,13,14,15 265:5,5
  265:6 266:12 286:16
  288:3 297:22 313:18
  315:14 320:9 328:22
  329:8,14 330:19,20
  334:11
**haven't** 28:13 42:2 155:8
  193:12 285:6 334:4
**havens** 311:4
**having** 5:4 49:3,4 207:9
**he's** 7:19 8:3 9:2 40:4 60:9
  60:16 67:20 72:6,21
  81:23 176:21 221:25
  222:8 255:10 288:11,22

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 366

289:3 301:15 312:24 315:19 318:2,11,12 330:2 343:12
**head** 210:6 240:10 248:8 248:10 344:8
**heads** 210:25
**health** 107:19 124:9 125:9 191:16 277:25 278:2
**hear** 64:24 100:5 125:24 278:10 297:11 310:7 342:19
**heard** 232:2 331:4,9 333:16,23
**heavier** 110:10
**held** 18:10 61:18,21 168:23 209:18 222:11
**hello** 274:3,14 279:4,6
**help** 144:11 213:17
**Hemmengdinger** 193:5
**her** 14:24 17:19,24,24 72:25 73:13,14,16,21,22 73:23 74:4 75:19 76:21 149:16,19 172:2 199:18 206:6,10 207:16 208:4,4 208:10,10 212:2,18 213:7 213:14 214:4,4,14,25 215:12,19 216:16 217:12 217:15,20,25 218:14,15 218:16,16,16 219:22 220:4 225:4 228:5,17 263:12,14 268:13,19 269:5,9 270:9 271:7,7,9 271:12,14 272:5 273:15 276:10 277:12,13 279:6 280:19,19,20 308:21,25
**Herb** 193:5
**here** 5:22 26:3 38:21 60:17 61:9 67:21 133:21 136:16 140:10 141:16 142:15 144:13 208:23 211:3 225:13 257:18 277:25 281:24 290:4 315:22 318:21 319:23 320:3

322:9 325:14,17 336:2 340:25 342:22
**hereby** 4:4,7 345:6 347:9
**herein** 4:6
**hereinbefore** 347:11
**hereunto** 347:19
**heroin** 339:5
**herself** 271:8
**high** 123:3,5,8,10,11,15 145:7,15 150:18 160:18 160:19 196:10,11,21 253:6 254:24 284:18,23 285:18 287:24 289:21 290:5,13 328:7,12
**higher** 123:15
**Highway** 178:10,10 200:16 200:22 202:17 204:20 205:20 211:12 226:4 235:3 240:9 241:21 244:2 246:3 248:13 255:6,7 257:5 262:24 340:16
**Highways** 105:24 106:2
**Hills** 3:6
**him** 7:20 8:19 10:14,25 37:4 38:20,22 39:3,6 44:13,24 52:16 60:19 68:9,12 91:25 97:17 99:23 122:19 134:21 140:25 143:5,5 161:21 167:4 173:20 174:12,15 175:13,19,21,24 176:7,23 177:2 179:15 217:4 220:19,23 221:5,8 222:9 222:17 231:18,21,22,23 231:24,24,25 232:2,25 233:2 239:22 241:8 250:14,15 259:14,20,21 277:23 288:23,25 301:4 309:2 312:23,24,25 314:15,17 316:10 318:22 322:17,25 340:12 341:9 341:11
**HIPAA** 329:4

**hire** 31:5,6 206:19 231:18 231:22,24 267:12
**hired** 155:11 216:19,20 219:20 220:18 250:14 267:8,9 268:13 270:2 271:7
**hiring** 29:11 267:14 268:2 270:21 271:4
**his** 11:21 17:12,13 44:22 44:25 72:16 81:25 90:12 97:17 143:18,20 175:25 176:6,11,13 177:18 238:17 241:9 242:25 251:14 277:24,25 288:3 289:18 301:3 314:16,17 329:21,22 330:6
**hit** 240:19,23 241:9,10 243:15,21
**hitting** 241:2
**hold** 86:11 92:9 98:24,25 126:16,19 135:21 161:3,5 163:18 191:23
**holding** 183:5
**holds** 182:8
**holiday** 154:17,18,20 155:20 300:4
**home** 15:18 18:22,23,24 23:5,19 41:22,25 42:2,8 60:4 62:24 85:20 91:17 100:17,18 121:14 215:2 246:25 247:5 255:14 286:18,25 294:8 313:5,10 318:20,21 335:9
**honest** 257:23
**honors** 124:17 125:11 126:9
**hope** 100:5
**hour** 280:11
**hours** 28:14 62:2 272:9,12 273:9 274:18 277:18 278:9 279:10 280:4 284:25
**house** 19:15 22:8,22,23,25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 367

42:5,13 88:2,3,6 89:25
90:19,20 95:2,3 98:22
100:12,22 105:2 116:18
175:25 176:6,11,13
246:17 279:25 280:19
300:5,8,12,14,17,18,22
300:23 301:8,9,11,24
302:10,11,16,18 303:6,9
303:13,19,22 304:3,3,10
305:9 306:16,25 310:8
313:18 317:4 318:24,25
318:25 319:8,12,13,24
320:5,6,10,14,18,20
321:4 329:15,21 330:10
334:18 336:21,23,25
337:6,16 338:4 340:4
344:7
**houses** 301:7 302:11
303:14 304:2,7 316:11
318:22 319:14,15,16,18
320:5 330:14 334:4,16
**Hum** 117:24 125:22
**Huminik** 79:13 172:23
**hundred** 23:11 41:6 42:10
43:8 53:20 55:3 90:14
166:23 182:15,16,18,19
219:11 245:25 266:17,21
326:14
**hunting** 127:17 136:7,9,15
**Hurricane** 98:2 335:9
**hurt** 336:24

**I**

**I'd** 77:23 117:22 118:2
258:21 327:3
**I'll** 61:13 141:13 218:14
287:20 317:17 343:6
**I've** 61:10 62:15 86:2
112:16 154:16 176:12
193:21 319:15,17,20
320:18 330:18
**icon** 51:20,22,23,25,25
52:2,4,5 53:16,18,24

**idea** 50:6 58:5,6,17 59:20
95:23 106:19 122:13
142:14 239:12 240:17
281:8 329:13 331:3 341:6
341:18
**idiot** 344:5
**ignore** 334:11
**ill** 277:19 278:23
**illegal** 257:20 324:25
**illegally** 334:5
**imagine** 214:19 252:10,16
257:4 263:14 302:24
309:13 324:22
**immediate** 246:12
**immune** 133:14
**important** 180:8 292:6
336:17
**improper** 288:24 289:4,12
**INC** 348:3
**incident** 131:12,17 306:25
307:3,6 322:22
**incidents** 130:19 131:19,23
132:2
**include** 323:23
**included** 201:2
**Including** 181:21
**income** 195:10,11
**incorporated** 186:5,6,7,10
186:12 188:20 189:11
194:11,21 199:4 256:20
256:23 270:6 272:3 283:2
328:13
**increase** 135:13,16
**independent** 153:5,7
**independently** 36:21 37:2
**Index** 1:20
**indicating** 257:19
**individual** 238:12 250:2
262:18 268:9 284:8
**individually** 1:3,16 210:8
**individuals** 327:21
**infant** 1:5
**influence** 131:3,5 144:17

144:22
**inform** 291:12 302:22,22
302:25
**information** 26:5 146:3
148:22,24 149:3,6,12,15
149:23 154:24 155:3
156:20 236:2 257:21
277:24 278:3 312:15
328:17 344:4
**informed** 291:19
**infraction** 335:5
**infrequent** 234:22
**initially** 222:20
**initiative** 296:18 297:7,12
297:17,21,24 298:9,19
300:8 305:19 323:4
**injuries** 242:13
**inlet** 253:9
**Inn** 252:23 253:12
**insignia** 43:5,7 52:19
**insignias** 230:8
**insinuating** 199:6 258:2,5
258:6,10
**inspect** 110:12,21 113:7
115:11
**inspected** 340:3
**inspecting** 110:14 112:23
**inspector** 1:13 201:20
213:4,7,12 219:13 220:16
222:4,18 307:22 308:3,10
308:13,14,19 317:23
337:8,13,23 338:9 340:14
341:6,8 342:11
**inspector's** 337:21 343:5
**inspectors** 222:15
**Instagram** 151:18
**instance** 43:22 70:2 201:4
298:3
**instances** 15:16 208:2
**Institute** 86:25
**institution** 123:14,18
**instructor** 160:22 162:5
**insurance** 103:19 107:19

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 368

114:14 184:3 191:16 242:4,7 243:17 342:20
**interact** 6:23 7:17,20 9:5 10:14 12:3,6,9 13:8 16:16 212:11,15 217:7,11 221:2 225:21,25 232:17,21 272:4,8,11
**interaction** 220:23 231:19 276:10 277:3,7 282:10
**interactions** 277:15 283:7
**interested** 347:18
**interfering** 288:8,12 323:15
**interject** 257:18
**internet** 34:19 35:23 36:14 41:11,14 42:4,7 48:7 50:2 58:3,23 159:19
**interpretation** 147:22,23
**interrupt** 44:13 107:4
**interrupting** 279:20
**interruption** 45:6
**interruptions** 61:10
**interview** 198:22,23 212:2 215:19 271:5
**interviewed** 128:16 172:20 215:18
**interviews** 215:17,22
**into** 70:8 76:17 85:8 119:11 130:14 133:22 174:16 177:9,10 262:20 320:21 321:3 337:10
**introduced** 175:6
**investigate** 241:13
**invited** 320:25
**involved** 42:18,19 157:9 159:11 177:5,6 194:2,7 245:11 250:16,18 335:5 340:13,14 342:12 343:3,4 343:4
**involvement** 282:16
**Irene** 207:3
**Irishman** 43:23
**island** 21:7,14,19 86:25

87:11 100:22 183:8,11 184:20 185:20 188:2,3,17 249:15 253:17 254:3 321:19 322:7 323:25 325:19 327:23 328:4 329:10 331:10,23
**Island's** 253:24
**Islip** 14:25 15:5 85:13,15 85:18,25 121:6 196:7,11 197:2 275:20,25 276:4
**isn't** 22:7 109:18 147:21 149:6
**issue** 61:16 73:4 261:7 265:8,21 316:23 324:3 341:10
**issued** 336:15 342:24
**issues** 73:6 323:8,11 325:7 344:6
**its** 105:3 246:12
**itself** 262:19,20

---

**J**

**Jack** 66:22,24 67:2,7 68:2 68:14,15 71:25 158:2,19 161:18,19 172:22 174:4,6 175:2,6,8,8,11 176:15 177:17,22
**jail** 322:10,17 327:22 331:14,19,22
**James** 16:5,8,16 17:6,14
**Jane** 1:18 205:15
**jar** 57:17 59:5
**jarred** 57:19,21
**Jean** 140:6,6,8 150:9 206:7 250:8,20 251:11 281:19 281:20
**Jeff** 203:14 317:24
**Jerry** 16:2
**JFB-GRB** 1:20
**Jimmy** 230:3 329:6,7
**job** 101:10,22 102:10,11 110:18,19 177:14 182:13 190:7 199:2 212:3,4,5

216:14 222:19 231:14 255:12 268:19 269:16 271:6 290:15 321:15,20
**Joe** 229:25
**Joel** 72:5 270:19
**John** 1:3,17 3:19 137:7 139:4 141:22 237:17 255:18,20,21,22,23 256:3 256:5 259:16 300:17,23 304:10
**Joseph's** 14:23 275:12
**judge** 44:15 45:9,23 60:18 61:3,9,17 67:3 68:2,5,16 68:18 173:6,8,11,14,25 174:4 207:6,8 259:15 276:15 330:3
**judges** 339:12
**judgment** 327:8
**July** 101:2
**June** 117:8 183:2
**junior** 196:10,11,20
**jurisdiction** 253:17,20,23 254:3 264:4
**just** 32:11 34:21 36:8 37:25 38:3,16 40:24 51:10,25 53:23 57:14 64:22 65:3 66:8 67:10 75:19 76:5 77:10,18,18 77:23 79:5,18 97:19 99:15,20 159:9 162:13,19 162:23 178:15 199:7 209:23 224:9 237:18 245:10,21 257:22 269:15 270:15 271:7 273:22 274:14 287:5 295:24 303:16 326:9 336:22 337:3 343:11
**justice** 122:22 138:24 166:10 174:2 177:19,24 277:4,7 324:11,14
**JV** 196:7,9

---

**K**

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 369

**K** 345:2
**K-E-T-A-W-O-M-O-K-E** 315:9
**K-U-T-O-B-A** 256:9
**keep** 37:15 81:18 105:6 255:13 311:6 313:15
**keeping** 276:20 323:17
**keeps** 81:20 82:5
**KELLY** 3:10,10
**kept** 334:4
**Ketawomoke** 315:9
**Kevin** 1:9 25:14 29:15 66:2 66:3 71:25 78:19 79:14 81:22 157:25 202:5,9 203:3,6,9 236:4
**keyboard** 50:24
**kid** 344:13
**kids** 344:7
**killed** 336:25
**kind** 46:14 50:17 71:4 84:12 124:4 125:5 126:6 133:4 185:24 186:3 198:23 243:2 304:18 327:5
**Kinnier** 72:14,18,20,24 77:12 78:4 237:18
**Kinniers** 76:6
**kit** 90:8,9
**knew** 72:25 175:8,8,13 225:11 231:25 291:14 308:10
**knowledge** 246:20 265:24 291:25 292:2 301:12 326:8 330:11 331:13 342:23
**known** 6:12 61:13 70:9 177:2 301:15,17,18 307:10 309:11
**knows** 255:12 291:15 306:12,12
**Kutoba** 256:9

**L**

**L** 4:2 5:3 345:2
**laborer** 238:18,22
**lacrosse** 196:7 197:9
**Lake** 178:11
**land** 88:21,25 89:5
**landline** 18:22 142:11
**Landscape** 129:20
**language** 137:14,15 141:18 141:21 143:9,15,16,23,25
**laptop** 48:3
**last** 16:19 17:23 28:23 68:12,21,24 115:6 132:5 132:7 171:9 181:7 189:23 189:24 190:9 203:10 227:12 239:17,19 310:5 310:10,16
**late** 71:19 126:5 311:14
**later** 70:8 101:7 105:13,16 124:11 203:16
**Laurence** 17:14
**law** 7:19 131:4 215:8 219:8 221:20 227:23 233:20 262:15 263:25 268:23
**Lawnmower** 256:3
**Lawrence** 16:6,8,17 17:6
**laws** 262:18 329:4
**lawsuit** 133:22 338:11 341:20
**lawsuits** 332:9 338:14
**lead** 213:10
**leaned** 337:10
**leaning** 336:21
**learn** 134:2,3 174:6 175:17 239:14 310:20 333:9 342:4,7
**learned** 232:23
**learning** 123:15
**lease** 119:13
**leased** 102:12
**least** 212:12 303:12
**leave** 45:15,18 60:19,19 204:3
**leaves** 312:18

**led** 270:21 271:20
**leery** 328:25
**left** 93:9 142:18 202:21 241:21,25 243:19 244:2,5
**lefty** 64:11
**legal** 67:8,19 96:20 99:25 100:2 243:2 263:17
**legally** 261:6
**legislator** 232:14
**length** 179:11
**Lepper** 1:3,3 3:19 61:7 137:7,23 139:5 140:2 141:8,22 142:15,18 143:11 144:15 237:17 302:23 306:10 316:8 320:6 329:18,20 330:6 338:3 341:3 342:25 343:12 348:5
**Lepper's** 300:17,23 301:8 302:9,12 303:14 304:10 306:9 310:22 318:25 319:20 330:16 336:23 337:6 340:4 341:12
**less** 16:22,24,25 210:10 327:4
**let** 14:3 52:16 97:17 108:3 113:2 122:19 167:4 217:4 219:17 257:22 270:7,9,15 285:2 288:2 292:12 296:22 317:17,18,20,21 330:4 342:12 343:17
**let's** 14:21 25:9 66:13 69:17 134:22 152:17 168:9 172:6 186:23 191:2 203:9 314:2 344:17
**letter** 140:24,25 141:2,3,4 141:5,6,9,9 300:5
**letting** 225:12
**level** 176:15,18,19
**Lewis** 187:2,2,4,24 188:3 249:19,19,20,22 250:3,6 250:7,10,18,22 251:7,25 252:7

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 370

**LG** 43:7
**license** 70:23,25 71:10
  108:19 126:16,17,18,20
  126:23 127:2,6,13,13,15
  128:10,17 129:4,24
  130:20 133:16 135:4,20
  135:21 136:2,4,7,9,9,10
  136:14,14,15,15,21
  139:16,19 162:6,20,22
  193:6,7,11 194:17 230:12
  230:14 245:18 247:13,17
  247:18,21
**licenses** 136:11,16 162:18
**lie** 6:4
**lieu** 195:3
**life** 56:18 57:3 296:17
  297:7,12,12,16 298:6,9
  298:13,19 299:10 305:19
  306:21 309:16 319:8
  323:4,8,10 325:7 326:6
  330:17,18,19 338:14
  339:8,14,22
**lifeguard** 160:22 162:3,4,7
  162:11,20,23 163:4
**lift** 38:14
**light** 115:19 258:17,19
  264:22,23 265:5
**Lighthouse** 187:6,7,15,24
**lights** 264:16,17,19 265:5
  266:15,16
**like** 30:14 36:8 45:22 54:16
  55:23 59:9 69:6 76:5
  77:23 90:8,24 99:11
  104:15,19 112:10,11
  114:9 124:15 135:22
  152:23 153:3 162:23
  164:22 177:14 179:25
  182:4,4 191:9 199:5
  203:24 204:2 208:6 225:8
  225:9,10 258:21 259:15
  265:3 266:3 274:3 292:6
  314:22 316:10 329:2
  336:22 337:3 343:12

**Linda** 11:24 13:22 14:14
  15:7,12,20,23 274:22,24
  275:5,10,13
**Lindenhurst** 231:7,12
  232:3,9
**Linderhurst** 231:10
**line** 18:22,23,24 244:9
  324:7 348:7
**liquor** 130:15,22
**list** 215:14 217:16 256:24
  257:3,16 266:24 267:2
  269:3
**listen** 149:11,11 152:21
  208:11 213:20 334:7
  335:17
**listening** 342:18
**literally** 258:14,15
**literature** 156:4,13,15
  157:12 299:20
**little** 52:19 69:23 130:10
  162:15 176:8 181:12
  187:16 208:23,23 327:6,7
  334:9
**live** 9:13 19:15 118:5,9
  273:14 306:13
**lived** 16:9 18:13 20:4
  118:14 121:4
**lives** 72:21 176:8 273:14
  317:5 318:18
**LLP** 3:10
**located** 21:2 23:5 117:4
  123:12,23 125:3 235:12
  263:11
**location** 84:7,18,22 116:12
  116:15 118:19 119:4
  235:17 292:16 335:7
**locker** 82:8
**Locust** 187:25 188:5,5,6,8
**log** 313:15
**loitering** 323:17
**Lola** 84:11,12,14,17
**long** 13:25 25:15,18 26:14
  46:17 59:16 62:2 63:5

  83:22 84:14 85:23 86:25
  87:7,11 88:25 100:23
  103:12 106:6 116:17
  160:10,13 163:3 164:16
  171:25 179:16 188:17
  203:16 227:7 256:10
  261:23 269:18 274:23
  318:7 321:18 322:7,10
  323:24 325:19 327:23
  328:3 329:10 331:10,21
  331:23 333:2
**longer** 70:24 108:16
**Longo** 1:15 201:18 205:13
  211:22,25 212:11,15
  213:24 214:8,11,15,23
  215:3,11 216:3
**Longo's** 215:6,24
**look** 30:17 41:10 45:11
  111:2,2 146:4 155:12
  199:5 222:17 253:9
  313:22 320:17 321:13
**looked** 320:8,16,17,21
  321:3 334:16
**looking** 24:11 76:16
  334:24 335:5 344:3
**lot** 37:3 73:15 127:7
  128:11 129:6,11 130:12
  130:14 177:7 225:16,18
  226:5,6 255:12 256:4
  335:20,22 339:6,7 341:10
**Lot's** 213:14
**low** 240:12
**lowest** 240:10
**lunch** 178:25

        **M**
**M** 6:16,18,23 8:25 9:19
  345:2
**M-A-R-R-O-W** 203:3
**Mac** 52:13 329:7
**machine** 54:25 281:9
  293:22
**machines** 281:25 282:5,16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

| | | |
|---|---|---|
| 283:8,11 284:5 290:19 293:2 | **make** 29:16,18 30:13 37:25 38:3,15 45:5 61:13 70:18 70:21 104:7 152:17 154:17 180:13 181:12 183:18 191:20 195:13 256:24 263:23 268:3 289:15 290:14 298:6,12 310:24 311:2,22 323:7,19 327:8 334:9 337:5 342:18 | 278:5 289:6 |
| **Mack** 329:6 | | **marlin** 112:10 |
| **made** 62:7 130:19 162:19 231:14 234:4 267:25 337:12 339:11,13,17 343:21,25 344:2 | | **marriage** 11:15 180:13 194:12 347:17 |
| | | **married** 7:7,11 13:25 14:8 118:10 119:5 120:3,4 180:10,12 274:18,21,24 275:11,13,16 |
| **mail** 8:7,20 9:19 10:20,25 11:3 12:13 13:14 15:13 17:4 18:6 24:7,11,15,17 25:22,25 26:18 27:7 33:2 33:3,11,20,24 34:20 41:13,17 44:22 46:23 47:6,18,22 51:14,14,17 51:21 52:2 53:16,18,21 58:10,14 59:3,10 60:6 62:10 63:10 68:21,25 69:4,5,11 74:18,25 75:3,9 75:13 83:10 116:6,7,9 213:24 214:8,12 218:3,8 218:12,16 221:6,11 226:12 227:12 233:3,6,11 234:20 235:2,15 272:17 272:20,22 | | **Marrow** 203:3,6,10 |
| | **makes** 154:2 339:21 | **marry** 275:6 |
| | **making** 39:11 289:17 311:15 323:16,17 | **Mary** 1:11 3:21 122:6,10 157:25 158:10 202:10 224:24 225:3,21,25 226:2 226:11,14,18 227:15,20 227:22 228:2,12,17,20,24 236:19 |
| | **MALE** 61:3,14 | |
| | **man** 128:25 129:2 180:7 238:16 292:21 295:20 308:18 315:3 | |
| | **management** 97:11 | **Marybeth** 216:15 |
| | **managing** 283:24 284:8 | **Masters** 123:20 125:9 |
| | **mandate** 299:8,12 | **material** 148:20 150:19 154:12,24 155:16 158:7 158:10,13,16,19,22,25 277:25 |
| | **Manfre** 16:6,8,12,17,20 17:6,14 | |
| **mailed** 262:15 | **manner** 88:24 264:24 | **materials** 145:8 149:19,21 |
| **mails** 32:25 227:4 | **manufacturers** 133:23 | **Matt** 230:2 |
| **main** 100:12 235:22 237:23 348:4 | **many** 15:16 16:21 17:25 33:20 40:25,25 72:5 73:2 88:19 103:6,10 105:8 110:8 128:9 131:19 147:14 162:11 190:22,24 194:20 216:14 246:20 247:3 248:18,25 268:14 304:2 306:4 322:16 324:18,18 327:2,12,16,21 328:11 329:8,14 330:13 330:18,25 332:9 338:16 338:19 | **matter** 37:19 43:23 61:7 72:12 290:24 306:3 340:8 340:12 347:18 |
| **maintain** 26:17 33:10 63:5 64:21 82:8 85:23 86:4,23 87:12 97:3 121:17,24 159:15,16,22 164:16 172:2 186:19 187:20,22 250:14 255:8 | | **Max** 317:5 |
| | | **may** 4:16 33:25 |
| | | **maybe** 43:7 48:14 53:19 71:3 112:11 131:20 176:19 204:13 272:14,15 302:20 324:6 334:10 |
| | | **Mayhew** 187:8 |
| **maintained** 24:6 26:14 89:21 106:6 159:25 237:20 247:25 257:3 261:16,23 262:22 263:5 346:10 | | **mayor's** 25:13 101:22 |
| | **March** 283:25 284:9,20,24 285:19,20,21 287:25 290:6 | **mayor@VillageofBabyl...** 62:9 |
| | | **mayor@VillageofBabyl...** 28:20 31:22 32:21 |
| **maintaining** 25:22,24 | **Marie** 140:8 150:9 251:4 | **mayor@VillageofBabyl...** 26:8 33:10,15 74:21 |
| **maintains** 138:12 250:18 | **marina** 178:17 185:18 | **mayors** 133:23,24 231:9 |
| **maintenance** 256:7 | **Marine** 184:12,18 | **mayorship** 194:19 |
| **majority** 210:10 | **Marjorie** 12:25 13:3,14 | |
| | **mark** 96:25 100:4 260:12 | |

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 372

**McSweeney** 315:3,5,7,10
315:14,17
**Meager** 230:3
**mean** 24:19 33:24 35:7
36:23 39:16 43:20,21
51:9 75:16 96:5 107:4
111:11 129:8 137:19
145:24 147:5 154:4 155:4
177:4 188:24 192:8
214:19 273:25 286:5
287:8
**Meaning** 147:9
**means** 8:16 10:3 12:22
13:20 15:23 118:3 136:3
181:12
**mechanic** 248:8,11,11,12
**media** 8:10,22 9:21 11:6
12:15 13:16 15:20 17:8
18:8 159:22 160:2 236:7
300:9
**medical** 278:3
**medication** 28:9
**meet** 7:14 16:12 17:19
111:2,10 113:6 210:8
224:16 273:8 274:17
**meeting** 33:16 131:5
137:21 199:18 222:11
223:8,10 224:16 231:16
271:16 277:17 278:8,19
279:9,12,13 280:3,22
281:2,6 307:24 346:9
**meetings** 131:2 137:11
138:22 142:20 209:5,7,23
209:24 210:5,6,17,23
271:20,23 273:21,25
274:2,7,11 278:9 279:3
**Melbourne** 9:16
**Melville** 1:22
**member** 64:13,15 65:15
156:22 255:10
**members** 32:16 210:9,10
**membership** 82:14
**memorializing** 282:15

**memory** 57:17,19,21 59:6
**men's** 64:17 65:14 209:13
**mention** 57:18 205:17
**mentioned** 32:25 34:21
64:22 65:4 66:9 71:24
87:9 101:4 115:12 121:14
122:25 156:6 159:10
180:21 189:13 192:3
193:18 200:20 203:22
209:23 210:25 230:17
236:6 238:5 254:19 265:9
**mentioning** 260:4
**message** 12:19 13:18 33:11
50:20 54:6 73:10,12,19
74:12,18 75:23 221:8
226:23 227:3
**messages** 54:2,2,13 217:16
217:17
**Messina** 238:13,14,25
239:4,9,18,21 240:4
**met** 14:14 72:24 175:11
220:19 306:7 307:15
**meter** 324:25
**method** 105:7
**Metropolitan** 298:4,11,20
**mic** 337:10
**micromanage** 337:20
**Microsoft** 53:21
**middle** 183:3 220:17
**midst** 70:6
**might** 38:11,17 75:21
108:17 113:12,12 162:14
193:10 208:4 212:19
213:9,13 217:13,14
234:21 276:20 277:12,12
277:13 313:11,24 326:15
326:16,17
**Mike** 74:6 134:16 202:23
202:24 203:4,5 204:3
229:25
**milk** 15:18
**mind** 193:9 317:9
**mine** 247:15

**Mineola** 3:13
**minimal** 242:25 250:24
**minute** 344:18
**minutes** 139:24 140:11
145:5 180:14 346:8
**Misner** 239:6,11,14 240:7
240:11,14
**misrepresenting** 38:4
**missed** 180:8 187:11 203:4
211:3,15
**mistaken** 75:6
**modem** 59:23
**Monday** 223:7 231:17
**money** 82:17 96:6 97:11
98:14,15,21 127:7 128:11
129:6,11 195:19 257:24
258:5 270:10,14 339:7
**monitored** 284:7
**monitors** 122:2
**Montauk** 178:10,10
**month** 26:25 28:17 100:16
100:18 132:15 214:9
218:9 232:24 307:25
310:12,15,18 327:5,14
**month-to-month** 59:19
**monthly** 36:17
**months** 36:16 64:4 78:23
117:6 128:16 142:21
177:16 210:7,7
**more** 16:22,24,25 17:2,21
17:22 18:2,3 45:6 104:21
145:13 162:15 177:5
256:6 323:20 327:4,7
**morning** 61:5 242:20
284:25 290:2,24 312:17
313:7
**mortgage** 89:15 91:18
92:21 119:16,17 120:5
**Moses** 16:3
**most** 180:8 200:10 257:23
**mother** 11:21,23 13:4,5,7,8
**motor** 240:3 245:14
**Mountain** 90:7,25 91:3

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 373

mouse 51:3
mouth 289:19
move 39:2,19 119:6 121:12 204:2,5
moved 74:9,9 85:2,7 119:3 119:11 294:24 304:16 305:2,8,14
movements 140:20
movie 44:2
Mrs 339:4
Ms 7:7 140:6 174:21 216:19 218:11 220:6 251:4 268:12 269:16,18 269:22,25 270:5,22 271:4 272:2,8,12,17,20,23 273:2,6,8 274:6,17 277:18 278:8 279:9,23 280:3,10,16,21 281:4 308:17,20
MTA 298:3 322:18,24 323:3 324:3,4 326:3,11 326:17
much 133:21 191:7,20 194:2 196:2,17 237:14 297:19 299:14 330:24 332:3
Mulberry 334:20
Muldowney 1:9 25:14 29:15 66:2,3 78:20 79:14 81:23 157:25 158:13 202:5,9 236:4
multiple 97:4
municipality 112:7
must 257:21 265:17 309:13 340:12
MV104 241:19
myself 158:2 159:5 166:21 166:21 167:18 168:14 169:10 170:7 172:22 223:3 247:10 267:23 268:4
Myspace 151:20

**N**

N 3:2 4:2 5:3 13:22 14:14 15:7,12,20,23 345:2,2 346:2
N-O-R-T-O-N 242:11
name 5:9 6:13,15 8:24 11:8 12:24 16:2,5 17:10 25:13 34:22 36:11 44:23 70:19 79:16 90:10,13 103:17 146:7,9,14 183:22,24 186:12 197:11 206:6 238:12 239:6,14 242:6 250:2 268:9 308:15 315:4 328:6 334:25 335:6 348:5 348:6
named 329:6
names 79:11 83:4 158:5 229:7 276:12 335:2,4
natural 1:4
nature 179:20 197:19
nearly 130:3
necessarily 262:19
necessary 279:5
neck 176:8 187:16 344:9 344:15
need 32:7 67:8 92:12 110:10,11 190:24 217:13 241:2 257:24,25 297:17
needs 265:20
negotiated 256:25
neighbor 17:18 274:3 302:9 316:21
neighbor's 300:17 304:10
neighborhood 304:9
neighboring 300:23
neighbors 16:13,15 279:7 302:22,25 316:19,20
Netflix 43:22
never 69:10 76:15 141:2,9 141:24 154:16 189:25 195:15,18 245:10 253:14 272:19,22 290:5 302:23 306:10,10,13 321:5

new 1:2,22 2:5 3:6,13 5:14 21:14 34:12 54:10 63:4 71:14 83:19 87:23 98:10 98:12,13,15 101:13 105:14 109:21,24 113:20 114:2 115:8,24 117:11 118:6,13 119:12 120:9 121:4,11 126:21 172:9 186:9 190:18 191:8 194:8 194:13 213:9 215:7 219:8 221:20 227:23 233:20 235:23 252:9 256:25 257:7,12,15 262:7,8 268:24 276:7 280:22 315:21 343:11 345:3,21 347:4,8 348:4,23
news 300:9
newsletter 145:11,23,25 146:6,16,18 147:24 148:15,19 150:17 151:9
newspaper 134:4
next 30:20,21 109:12 168:4 168:9,10 169:2 172:3 185:4 187:4 260:23 284:25 301:4,4 316:21 317:5 339:5
nickname 106:4
niece 335:8
night 104:25 311:14 312:9 312:10,18 313:15,25
nine 313:12
nobody 88:8 174:24 274:9 303:18
NOELLE 1:3
non-moving 325:5
none 153:16 221:12 327:20
north 241:7
northbound 244:10
Norton 242:11
Notary 2:4 5:5 345:21 347:7 348:23
note 5:16 99:4 152:17 258:22

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 374

noted 5:20
nothing 45:3 109:21,24
  139:11 144:14 154:15
  198:16 260:25 265:20
  341:23,23
notice 341:19
notified 303:17 313:21
notify 321:12
now 6:10 9:13 10:11 13:5
  30:9 32:20 35:5 44:6
  45:17 57:18,21 59:9
  61:13,23 62:6 63:2 67:5
  79:19,21 80:2 86:3
  103:15 157:15 158:4
  162:14,25 172:11 178:23
  179:3 180:2 191:14
  198:15 204:9 208:19
  209:20 222:18 225:12
  229:22 254:25 259:3
  262:22 288:22 289:11
  314:6 320:3 327:6 333:2
  344:11
number 16:15 17:20 18:11
  18:17,20 19:4,7,10,11,12
  19:13,15,18 20:3,9,12,13
  20:15,18,21 21:2,3,22,25
  22:3,7,8,10,13,14,15,20
  22:21 23:14,17 30:3 55:8
  55:13 70:25 83:3 127:5
  155:25 158:4 187:3,7
  189:13 245:18,22,23
  303:3 305:8 308:21
  338:18
numbers 24:22 30:17
NY.gov 32:22,23

─────── O ───────

O 4:2 5:3,3 10:6,9,20 11:5
  345:2
O'Donnell 161:18,19
O'Keeffe 2:4 347:7,25
Oak 252:22 253:12,20
oath 4:18 6:4 48:21 279:15

290:4 343:9,13,23 345:8
object 37:9,9 38:25 39:4
  39:10,18,20 45:13,18,21
  96:17 257:17 278:3,12
objecting 44:8 258:8 316:2
objections 4:11
obtain 18:19 21:21 23:13
  86:16 126:22,25 168:21
  256:16
obtained 33:14 128:10
obviously 162:14 340:19
occasion 176:10 237:10
  240:2,6 272:4 286:2
occasionally 15:14,15
  198:25 213:25 214:2
  226:19 246:7
occasions 214:3
Occupancy 294:9,14,17
occur 27:21 29:25 30:6,10
  31:3 32:9 35:16 78:21
  138:17 142:19 208:2
  242:18 265:21 273:22
  293:4 307:4,7 324:10
occurred 28:3 31:12 32:3
  105:21 138:20 139:25
  179:17 297:15,22,23
  309:10 328:12,23 332:9
  332:10
occurring 327:16
occurs 262:9
ocean 21:5,6 55:21 56:7
  115:24 116:3,5 117:2
  160:6,14 161:24 178:16
  180:20,23 181:4,14 182:2
  182:5,14 183:16 184:2,4
  184:14 185:2,13,21
October 168:8
off 61:15,19,22 108:11
  176:8 178:24 183:8,8,10
  184:7 209:15,19 215:14
  227:12 258:23 266:24
  267:2 269:2 280:19,20
  323:16 334:22 336:22

344:8,15
office 35:12,19 54:17,25
  55:21 62:11,12 116:20
  117:2,3 129:9,15,19
  171:7 191:23 200:13
  201:12 211:8 214:20
  235:4,19 237:15,24
  262:23,23 263:12,14
  267:12 268:18 272:14
  274:17 279:10 280:4,10
  306:12,17 307:16 308:24
  339:5
officer 4:17 47:23 128:20
  194:12 263:19 267:17
officers 234:22 263:16,17
  263:21 264:8 267:7
offices 200:11 205:11
official 1:17 7:5,24 9:9
  10:17 12:10 13:11 189:7
  189:10 284:15 332:25
  333:15,22
officials 236:14,23 247:3
  307:16
officiating 195:19
often 36:13 48:15,17 64:3
  66:23 68:9,14 78:21
  100:14 210:13 214:7
  218:5,7 221:10 272:11
Oh 90:12 133:10 136:5
  330:18
okay 11:25 14:12 33:8
  36:10 37:14 39:5,8,15,19
  39:23 40:8,12 41:7 47:20
  48:15 49:3 50:6,7 51:19
  56:5 62:11,15 70:10
  77:19 84:12,25 92:20
  99:2 101:15 109:24 110:4
  113:5 115:22 136:8
  141:13 149:12,14,20,20
  155:12,13,18 157:10,11
  200:3,7,9,10 202:21
  209:14 219:3 223:6,8
  257:23,25 258:5,10

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 375

260:11 287:22 290:22 293:2 296:11 303:5 305:23 306:2,3,8,13 307:17 319:5 337:3,4 343:6,7
**okayed** 149:25
**old** 3:12 6:10,21 11:13 256:15
**Olive** 134:16 229:25
**once** 66:25 68:10 78:22,24 105:14 124:16 210:6,14 213:8 214:9 218:9 313:24 327:5,14
**one-and-a-half** 182:23
**ones** 33:7 79:18 136:18 188:4 196:15 317:8 323:19
**ongoing** 301:14 303:12 310:14,17
**Online** 83:15 151:23
**only** 6:8 33:7 34:9 54:24 55:5,5,7 68:8 159:5 174:4 201:22 253:13,21 254:3 282:10 285:13 303:11 306:2,25 307:3 316:4,5 317:8 319:21 320:2,7 328:24 330:9 332:13
**Open** 51:19
**opened** 219:21 252:25,25
**opening** 213:15,20 216:15
**opens** 183:2
**operate** 246:10
**operation** 117:6
**opioid** 133:20,23 134:7,25 135:14
**opportunity** 75:8,11 132:9 177:21 306:16
**opposed** 56:10 130:6 189:15,21,22 222:15
**opposition** 189:25
**Oquenock** 15:3
**order** 204:2 312:4
**ordering** 311:19,21

**organization** 195:14
**organizations** 195:5
**organize** 83:5
**organizer** 251:16
**organizes** 81:3
**original** 239:22
**osmosis** 149:7
**other** 6:13 8:16 9:3 10:3 12:22 13:20 15:23 16:14 19:12 32:15,25 33:3,11 34:12 36:6 49:7 55:12 57:20 62:14 64:21 66:7 79:7,8 86:4,23 87:12 88:20 105:7 107:17 115:5 115:12 123:2 126:16 128:12 132:20 135:17,22 136:11,16 141:21 146:14 151:15 154:20 158:4 159:10 161:5 162:17,24 163:18 173:25 177:7 178:13 181:23 185:17 190:12 191:14,24 192:3 193:20 198:13,22 202:21 207:12 209:22,23 210:2 210:23 222:15 224:12 230:16 231:9 236:11,14 238:6,21 245:6,9,11 246:4 251:24 255:8 265:19 274:3,6 303:9,21 308:25 311:19 315:23 317:3 319:24 320:4 332:20 338:14
**others** 84:8 148:2,16 159:7 276:19 332:15
**otherwise** 132:9 136:17
**our** 5:16 25:12 29:5,6 50:19 54:4 67:3 72:6 73:10 91:16 95:2,3 108:18 122:4 130:9,14,25 131:2 142:20 143:2 146:3 155:5 156:6 184:16 185:7 187:10 198:14,24 222:10 223:7 224:10 226:3,5

231:7 239:5,15 240:9 242:5 247:8 249:2 250:7 250:11,12,13,14 253:21 262:10 266:18 270:13 271:24 273:15,16 279:25 297:18 305:24 322:18 325:2,6 326:9 335:14 339:8,9 344:9,16
**out** 23:19 38:17 44:19 60:14 67:10 73:13,16 81:11,11,13 82:18 91:18 92:21 98:21 110:10 119:3 127:8 128:11,14 129:7 131:11,14 136:24 138:9 141:2,7,9,12 142:16 145:10 146:2 147:25 148:12,23,25 152:4,15 153:23 154:18,24 155:3 157:13 172:8,8 202:21 215:20 217:14,24 219:22 222:17 241:6,8 244:9 253:10 263:8 280:20 296:6 300:4,7 311:8 326:16 343:18
**outboard** 249:8
**outcome** 347:18
**outdoor** 287:2 294:7
**outreach** 53:20,21
**outside** 176:23 177:18,24 189:6,9 194:4 238:9 246:11 273:9 274:18 277:18 278:8 279:10 280:4,10
**over** 6:22 14:19 20:17,23 25:19 28:6 32:6 33:5 34:5 77:16,17 94:20 95:22 96:10 97:23 98:19 103:7 106:8 110:3,25 111:12,16 119:23 127:4 132:24 133:13 146:4 151:13 194:23 196:7,11 213:14,19 214:5,14 217:14 218:14 222:25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 376

231:9 245:24 253:2,17,20
255:11 266:13 278:20
280:7,12 300:20 314:25
315:8 329:9,15,21,25
330:3 331:5,7,10 333:17
336:8,25 343:16 344:4
**overdose** 318:9 327:8,9,10
327:11 328:23
**overdoses** 134:9 203:24
318:12 326:21 327:12,16
328:11
**overly** 324:5
**overnight** 281:2,5 311:14
**oversaw** 159:7
**oversee** 25:5 91:8 111:4,6
111:8 113:7 150:3 153:17
182:15,16 200:6,12,13,14
200:15,15,16,17,18,24
201:5,9 234:11 340:18
**overseeing** 177:13
**overseer** 81:23 157:11
**oversees** 199:25 200:4,10
226:2,3
**oversight** 211:4
**owe** 96:6
**own** 84:3,5 87:18 88:25
95:6 100:17 109:23
111:24 120:12 187:17
246:21 248:19,22 256:21
257:15
**owned** 88:20 112:6,8
122:24 185:5 187:14
249:23,24 252:12 254:6
**owner** 34:2
**ownership** 95:9 230:9

---

**P**

**P** 3:2,2,14 4:2 5:3
**p.m** 179:2,2 209:17,17
245:3,3 259:2,2 314:5,5
344:22
**P.O** 115:24 116:19,19
117:4

**Pacific** 56:17
**page** 122:17 149:5 150:16
198:24 236:5,10,12 250:7
250:12,15 251:16 346:3,8
348:7
**paid** 34:23 35:2 58:7 94:4
94:12 96:12,13,14,21
105:3 114:12,15 129:21
185:21 194:25 195:24
196:2,12,17,23 199:3
243:5,7,12 250:22 270:15
342:16,21,21
**Palpably** 289:12
**panel** 241:11
**panhandling** 323:13 325:9
325:9
**paper** 81:6,7,16
**paraphernalia** 310:21
**Pardon** 16:23 49:10 67:15
80:20 156:16 262:13
291:18 307:5
**parents** 1:4 19:16 20:5
118:23
**parents'** 19:13,14 117:14
**park** 104:25 178:9 187:24
187:24,25 188:2,2 244:10
334:5
**parked** 73:15 246:16
**Parker** 140:6,6,7,8 150:10
206:7 250:8,20 251:4,12
281:19,20
**parking** 50:21 129:20
311:13 313:23 324:24,25
324:25 325:2
**parks** 187:20,22,24 188:5
188:7 201:2 202:20
204:18,19 205:20 226:3
**part** 110:17,19 127:12
156:20 158:7 164:5,23
165:15 166:16 167:14
172:11,14,21 173:8,11,17
173:22 192:3 193:19
194:3 198:25 200:23

**Pat** 226:4 238:8 245:19
249:20 254:2 284:16
290:15 297:18 299:8,12
309:15 321:15,20 328:8
339:8,14
**part-time** 87:5 101:10
163:13,14,16,17 238:19
**partake** 182:9
**partial** 95:9
**participate** 31:9 124:21
125:14 126:12 154:8
157:19 173:6 270:20
**participated** 238:6 271:4
271:17
**participation** 271:13
**particular** 128:19 133:18
**parties** 4:6 347:16
**party** 60:16 152:16,19,22
153:2,3,5,6,7,9,11 154:6
154:9,13 155:22 156:11
156:23 157:7,14 164:6,24
165:15 166:17 167:15
168:11,12 169:7,8 170:11
170:23,24 171:15,16
172:13 173:12,17,18
192:2,4,6,7 193:19 194:9
**pass** 217:14,22 265:17
**passed** 10:12,23 13:6 55:23
165:13 223:9 262:16
344:3
**passing** 274:15 277:11
**password** 47:10,12 53:6,9
53:11 238:2
**past** 10:24 28:13 133:15,19
231:7 250:13
**Pat** 250:12 269:10,11,13
**path** 213:11
**patrol** 342:15,21 343:6
**Paul** 11:8,11 12:3,6,9,13
12:21 134:22,24 135:14
202:25 203:2
**Paumanake** 334:18
**pause** 39:4,6

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 377

pay 35:10,19 46:7,8 82:18
82:20 83:14 94:7 98:22
99:17 101:7 105:5 258:4
282:10
paycheck 82:18
paying 45:10
payment 35:21,23 36:7
payments 191:13
pays 46:9 82:14 103:19
184:3,13 185:12
peace 263:17,19,20
peculiar 133:5
penal 263:25
penalties 5:24
pending 66:17
Peninsula 334:19,20
Pennsylvania 90:17,18
123:24,25
pension 190:13,15,15,17
190:17,20,21 191:7,11,14
276:3
people 25:7,10 66:21 79:7
79:8,17 80:2,12 128:13
130:12,14,17,22,25
133:12 155:10,10 157:13
157:22,24 158:4 159:10
171:2 172:20 195:4
200:19 205:10 215:15,16
217:16 225:18 255:12
266:16,25 285:8 313:12
321:23 322:2,5,10,18
326:2 331:14 332:5 334:3
334:3,5,23 335:2
people's 146:15 323:15
perceive 143:15
perceived 140:14 141:11
141:19,21
percent 23:11 41:7 42:10
43:8 53:20 55:3 90:14
166:23 219:11 246:2
266:17,21 326:14
perform 194:13
performance 124:17

126:10
performed 194:21
performing 194:25 195:8
perhaps 302:18
period 100:7 120:8 124:18
125:12 131:21 262:17
274:16 278:7 327:7
periodically 79:10
periods 124:2,14 160:17
perjury 5:25
permissible 39:9
permit 127:15 162:14
286:12,14,17 287:4,6,10
287:11,11 294:17,17,18
294:20 295:8,12,15,18,24
295:25 296:3,12 343:15
permits 129:14,18,20,21
135:18 213:11 286:3,7
287:15,17,19,19 295:5
permitted 194:13
person 80:17 81:3 82:22,24
82:25 128:7,20,23 149:3
149:13 161:15 172:9
175:7 201:19 203:7
206:18 241:10 243:18,21
248:5 257:23 285:13
292:23 329:5 336:12
personal 105:5 111:23
113:11 116:24 176:15,18
176:19 220:22 242:13
244:13 252:4 303:3 309:7
personally 232:2 320:23
persons 79:12 156:19
157:8 201:3 203:23
213:17 229:7,9,12 230:16
247:7,13 266:22 291:12
317:3 334:13
Pete 238:14
Peter 238:12,12
phone 18:11,16 19:6,13,15
19:18,21 20:11 22:3 46:3
46:7,11,14,18,21,24 47:3
47:5,7,13,15,16 60:25

142:9,10,12 226:22,24,25
227:5,8,12 237:11 309:8
phones 42:22
phonetic 250:13 255:15
308:14 317:25 329:6
339:4
physical 85:16,18,24 86:21
86:25 87:2,9 124:10
125:9 197:8 235:17
physically 235:14 263:11
pick 15:17
pick-up 304:25
picked 300:8 304:22
piece 81:16 185:7
Pinelawn 1:22
pistol 126:18,20,23,25
129:24
place 284:19 290:22
292:18 293:6 294:6
298:14,15
placed 288:3
places 60:24 290:25 311:15
placing 284:4
Plaintiff 3:4,19
Plaintiffs 1:6
plan 190:21 191:11
Planning 1:15
plans 91:2
plate 70:23,25 71:11
108:20 230:14 245:18
247:13,17,18,21,22
plates 230:12
play 63:25 64:6 66:23 68:8
68:11 72:13 78:18 79:3
80:11,11,23 284:13
played 65:22 66:7 68:12
72:4,6,10
player 69:22
playing 176:19 210:12
plays 65:17,18 82:6
please 5:9 6:8 37:16 60:14
79:17 99:4 229:24 237:13
237:14 256:6 260:13

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

279:16 292:13
**pleasure** 206:12
**plus** 159:10
**point** 19:16,17,19 100:6
138:8 161:20 165:3
169:24 297:9
**pointed** 43:10
**Pole** 193:15
**police** 128:18,19,21 131:23
132:2,4,9,22 138:3
141:24 241:13,16 270:11
306:3,5 309:5 322:25
323:3 325:5 326:3,11
**polite** 311:16
**political** 153:3 156:3,20
192:4 193:17
**poll** 282:20,23,24
**polling** 281:9,25 282:5,16
283:8 284:5,19 290:22,25
291:5 292:16,18 293:6
294:6
**Pond** 187:2,5,24 249:19,22
**pool** 177:9,10,12,14 178:19
187:6,9,10
**porch** 287:4,12
**portion** 34:7 181:9 270:24
278:16
**Posh** 197:12,15,16,24
198:9 199:4,8
**position** 86:11,14,17 106:7
161:3,5,8,11 163:12,13
163:14,15 164:17 165:4
166:24 167:6,12 168:2,7
168:21,23 169:3 170:21
171:13 172:2 181:17,19
192:22,22,25 204:9 206:8
206:18 215:7,12 216:16
216:22 219:20 228:5
268:22
**positions** 163:22 196:13,21
196:22
**post** 116:20 117:2,2
**power** 215:23 220:3

223:12 228:11
**PR** 146:2
**precinct** 309:6,23 316:25
317:17,18,21
**preparation** 155:15
**prepare** 151:17,22,25
156:19 158:6,9,12,15,18
158:21,24
**prepared** 95:20 145:7,16
148:20 150:19 153:12,14
153:16 154:12,16 155:21
156:9 157:6
**present** 3:18 33:21,25
156:25 157:11 160:5
274:7 293:13
**preservation** 263:4
**president** 225:6
**press** 53:24
**pretty** 55:5 99:11 144:25
187:18 252:15
**preventing** 38:20 40:23
144:3
**prevents** 28:2 77:3
**previous** 28:4 220:23
**price** 240:11
**prices** 257:6
**pride** 297:19
**print** 217:14,24
**prior** 26:18 111:21 155:16
305:7 310:15
**private** 89:17 184:8,10
187:17
**privately** 249:23
**privilege** 92:4,7,11 94:11
94:15 109:22 289:9
**privileged** 259:18 278:2
**privy** 328:16 332:18
**probably** 17:2,22 30:13,22
31:5,6 36:15 42:3 53:19
64:5 66:25 87:8 105:19
105:20 109:11 113:22
114:4 140:3 204:13,16
213:3 215:18 220:16

257:23 286:16 290:7
294:24 319:3 324:5
**problem** 73:13,14 133:25
134:6 135:14 205:9,12
217:18 222:16 232:22
290:18 308:2 309:25
340:19,20
**problems** 200:12 207:8
321:18
**procedure** 109:25 215:13
**proceed** 244:6
**proceeds** 106:17
**process** 30:6,10 31:10
35:16 36:8 80:4,6 150:3
155:14 159:7 222:14
257:10,11 270:21 296:9
296:15
**produce** 149:9,15
**produced** 145:24 149:6,21
315:23 326:4 342:8
**production** 145:4 151:23
263:4
**professional** 86:24 124:22
125:15
**professor** 87:4,11
**program** 51:6,9 53:22
**programming** 284:4
**programs** 124:22 125:15
126:13
**prohibit** 292:7
**projects** 343:5
**promoted** 266:23 298:14
**promotional** 261:3
**proper** 321:12
**properties** 313:17
**property** 21:2 82:11 88:19
89:11,21 90:2 91:21 92:6
92:22 93:3,9,19,24 94:4,7
95:14,25 119:20 120:2,6
120:12,14,16 122:24
123:2 185:7 186:19,22
187:8,12,13 242:14,23
255:19 256:2,8 295:3,6

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 379

310:22 315:24 317:14
320:9,25 321:2,4 323:25
325:11,20 329:10,22
331:10 334:6,21,22,23
335:6 344:9,16
**prosecute** 325:19
**prosecuted** 68:5 324:13
330:9 331:2 333:10,17
**prosecution** 312:20,22
329:20 330:6 331:5 332:5
**prosecutions** 324:9,18,21
329:8,14
**prospective** 215:15
**protected** 53:6 215:7 219:7
221:19 227:22 233:19
268:23
**proud** 299:23
**provided** 46:11 113:9
189:5 218:18 244:19
245:15 247:13 337:15
342:16
**provider** 34:20 35:24
36:14 42:5,8 46:5 58:3,24
**provides** 48:8
**proximity** 316:7
**public** 1:14 2:5 5:5 154:15
167:10 171:7 188:11
200:21 223:10 284:18
345:21 347:8 348:23
**publication** 145:8,17
148:20 150:17,20 152:2
152:13 153:12 154:12
155:16,21 157:6
**publications** 155:5 182:11
**publicly-elected** 168:2,6
**purchase** 88:9,12,15 89:10
91:20 97:15,20 107:25
109:2 113:15 119:13,20
120:2 286:18
**purchased** 83:25 85:20
91:17 92:6,22 93:3,9 95:2
102:12 103:7 104:4
105:11,15 107:23 108:6

108:10,23 109:7 111:19
112:3 120:17 249:12
257:14 286:24
**purchaser** 89:17
**purchases** 102:14,16,16
108:2 228:21 256:24
**purports** 45:5 147:25
**purpose** 44:7 274:10
**purposes** 128:13 136:20
**pursuant** 2:3
**put** 6:8 38:7,9,23 41:24
80:17 81:2,16 90:9
145:25 152:4 154:18,24
155:6 172:9 208:11
216:16 223:9 231:16
271:7,10 293:21 322:17
331:14,19 339:5
**puts** 149:14
**putting** 37:10 39:7 82:22
127:7 289:18

### Q

**qualified** 271:6
**qualify** 252:11
**quality** 180:8 296:17 297:6
297:12,16 298:6,9,13,19
299:9 305:19 306:20
309:15 323:4,7,10 325:7
326:5 339:8,14,22
**quarterly** 36:17
**question** 4:12 14:15 23:22
30:8 34:6,11 37:22,24
38:19 40:15 47:17 51:8
52:11,17 53:2 64:25
66:16,19 67:11,13 77:24
88:23 91:23 92:17,19,25
94:9,14 96:17,19,24
97:18 99:7,8,12,13 113:3
119:25 122:20 125:24
145:13 167:5 179:14,23
180:4,6 181:11 186:4
188:25 205:11 207:19
209:3 212:20 213:13

217:5,13 234:23 235:13
258:15,16,20 259:8,12,21
260:6 277:21 278:10,15
280:6 284:10,12 286:6
287:20 288:6,10,14,17,20
288:23 289:4,13 292:13
296:25 297:4 314:11
329:24 330:4 340:11
344:11
**questions** 44:5,7,17 45:12
45:19 50:8 77:16 141:17
212:16,17,18 214:22
258:3,7,9
**quiet** 279:16,18 327:15
**quite** 211:2 330:19

### R

**R-E-I-C-H-E-L** 201:15
**radio** 313:13
**Rafter** 66:22,24 67:2,8
68:2,14 71:25 158:2,19
173:11 174:6 175:3,7,11
176:15 177:17,22
**Rafter's** 276:15
**raid** 301:12 315:24 316:4
**raided** 300:24 302:11
303:7,20 306:6,25
**raids** 305:8
**railroad** 130:17 188:14,17
244:9 321:19 322:7
323:18,25 325:11,20
327:23 328:4 329:10
331:10,23 332:11
**Ralph** 1:8,23 2:3 5:11 10:6
10:9,20 11:5 109:25
188:6 345:6,17 346:4
347:10 348:6,20
**Ram** 71:5
**ran** 165:19 166:14 167:10
168:9,10 169:25 170:17
171:7 174:24 228:4
**ranged** 196:19
**ranks** 260:18,22 261:4

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 380

318:2
rapport 308:4
rare 199:17
rarely 9:12 11:4 50:8
   207:23,25 235:5
rather 208:4 335:6
Ray 165:19
reached 19:19 138:8
read 14:16 34:8 99:9
   181:10 270:25 278:17
   345:7
Reading 134:3
ready 62:4,5 293:11,12
real 94:16,23
realize 39:16 186:16
   320:14 344:5
really 34:9 52:12 75:17
   99:18 115:19 177:6,9,15
   193:21,25 225:11 257:17
   307:23 317:8 319:21
   342:10
REALTIME 348:3
realtor 228:20
rear 241:10,12
reason 5:21 67:12,16 96:16
   100:2 210:17 278:22
   289:9,11 348:7
reasons 128:9,12,15
   136:21
reassignment 222:11 223:8
recall 15:16 19:11 20:13,18
   26:23,25 27:24 28:22
   31:15 40:18 41:3,19,20
   41:21 63:12 78:2,3,5,7
   79:18,20 83:24 84:2
   117:20,21 119:3 128:24
   131:13 132:8 137:16
   140:17 144:14 150:22,23
   151:4 162:19,20,25
   196:18 198:5,13,18
   204:12 276:13,14,22
   285:11 291:23 292:8,19
   292:22 295:16 298:24

338:6,7,18,19
recalling 28:3 40:23 77:4
   144:4
receipt 54:13 98:13
receipts 105:6
receive 46:23 54:6 76:3
   98:5,8 101:7 106:17
   107:17 108:19 116:9
   124:4 125:5 126:6 207:20
   226:21 227:4 233:5 262:6
   312:14 335:11,18 336:4
   341:19
received 54:14,17 70:11
   76:5,12 135:17 195:7,15
   226:17 233:10 272:19
   334:14
receiving 76:8
recent 58:14 102:5 162:15
recently 73:2 129:23 254:8
   254:14 310:17 327:15
recess 78:9 209:16 245:2
   258:25 314:4 344:19
reciting 100:2
recognize 6:15 8:24 11:8
   12:24 16:2,5 197:11
   225:18 239:6
recollection 79:24,25 144:8
   276:24 292:4 299:2
   332:22 333:20
recommend 267:18
recommendation 30:13
   222:13 231:14 267:11
recommendations 29:16
   29:19
recommended 232:7
reconstructed 177:11
reconstruction 177:12
record 5:10 6:9 14:16
   38:24 61:15,19,22 78:12
   99:9 105:8 138:25 178:24
   209:15,19,21 245:5
   258:23 259:4 285:2 288:2
   298:18 345:10,11 347:13

recorded 138:10
recording 60:25 138:12
   139:4
recordings 139:7
records 41:25 81:19,20,21
   82:5 106:21 134:8 140:4
recovered 301:24 302:2,10
recovery 339:5
recreation 161:4 178:19
recreational 86:22 87:10
recreations 86:13,17
red 264:16 266:10,11,15
   266:16,19
reelected 107:10
refer 144:11 299:5 304:4
   306:3,4
reference 259:17
referred 88:4 229:6
referring 17:14 21:7 44:3
   80:22 91:13 101:20 102:8
   110:16 115:15 127:11
   129:12,19 133:11 135:25
   137:7 138:15 140:5 141:5
   149:2 153:8 226:25
   229:19 261:14 290:17
   322:21 323:4
reflect 285:3 288:3
refresh 79:23,25 144:7
   276:23 292:4 299:2
   332:21
refuel 185:9
regard 142:25 148:15
   182:11 212:24 223:16
   278:4
regarding 33:17 237:17
regards 138:4 140:12
   175:4 299:25 317:4
register 81:8 246:2
registered 71:13 81:16
   103:24 183:25 252:8
registrar 180:17
registration 103:22 114:11
regular 79:2 234:17 237:4

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 381

263:5 271:8 273:9 295:24 296:3 346:11
regularly 6:24 7:18 9:6 12:4 16:17 27:6 78:18 184:6 199:13 212:11 217:7 221:2 225:21 232:17 246:15 311:10
regularly-scheduled 209:5
regulations 329:3 343:14
Reichel 201:15
related 191:13 347:16
relationship 11:19 15:7
relevance 44:11
relevant 336:18
remedy 260:10 289:8
remember 7:16 22:13 27:4 27:5,22 28:24 29:8,9 30:2 30:4 36:5 40:11,24 41:2,2 43:6 49:2,3,4,9,11 58:17 58:18,20,23 59:25 68:20 68:24 70:13 71:10,20 76:24 77:2,8 80:2 90:10 90:12 104:10,12 132:6,13 132:15 144:2,11,16 158:4 175:12 273:3,4 285:10,22 285:24,25 291:8 298:22 298:23 308:23 332:17 338:20
remind 312:25
remote 42:25 43:4,10
remotely 24:3
repair 241:2
repaired 240:3
repairs 184:16 243:5,8,13
repeat 14:15 34:6 92:8 99:8 211:5 278:14
repeated 337:9
replaced 108:23
replacement 175:4 231:8
replacing 174:21
replied 76:19
report 139:8 195:10 199:13,22 201:4,11 202:2

207:4,10,12 211:18 214:15 218:21 221:13 224:21 227:15 233:13 241:17 242:3 269:4 270:11 307:21 309:10,14 309:19 310:3,6,11,16 313:11,17 318:8 332:3 337:14,19 338:2
reported 203:7 242:7 307:13,14 310:17 315:15 320:10 328:22
reporter 14:17 34:8 99:10 181:10 270:25 278:17 314:3
REPORTING 348:3
reports 200:11 201:10,13 201:17 202:20,22 204:18 205:5,18 207:5,6,7 211:12 230:22
representing 67:20
reprimanded 334:12
Republican 192:7,16 193:3 194:9 282:21
request 39:17 258:24
requested 34:7 181:9 270:24 278:16
requesting 237:11
REQUESTS-------------... 346:7
required 102:23 265:8
requirement 265:15
requirements 304:25
requisition 35:17,18,20
rescue 134:9,9 249:3
resent 77:17
reserved 4:12
reside 83:18 84:7,18,21 88:6 100:8,9,11 116:11 117:19 118:12,18 120:9
resided 83:22 86:5 87:15 117:15 120:19
residence 20:25 21:4,10 74:5 83:25 84:3 85:8

88:10,13 116:22,24
resident 50:19 72:21 73:2 74:3 175:9,13,15,18 301:15 306:15 315:8
residents 53:25 54:12 111:2,3,10,12 113:6 301:19 306:7 307:15,18 307:23 311:13 343:8
resolution 30:22,24 31:2,5 31:19,20 32:2,4,8,10 33:16 222:10 223:16,24 224:6 231:16,18 234:7 251:10 267:25 268:3 271:10,15,18,21 282:11 282:13
resolutions 223:9
resources 332:4
respective 4:5
respond 76:9,14,15 92:13
responded 76:13 77:13 78:3 203:23
responder 247:9
responders 266:18
responding 77:9
response 73:12 141:10 291:17,20
responsibility 293:21 294:3 337:21
responsible 25:21,24 29:10 29:13 91:5 97:10 111:8 208:16 216:18,25 235:25 267:13,21 283:7,23 284:3 292:15 294:4 344:9,10,10 344:11,13,16
rest 64:24 224:4 231:15 271:10
restaurant 213:9
restrictions 174:17
result 315:24
results 11:18 49:15
retire 231:7
retired 86:2 216:16 276:2
retribution 270:15

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 382

return 101:6
revolution 70:7,7
Richie 203:13
rid 71:18,22
ridiculous 39:16 99:13
righty 64:11,12
Rising 98:10,12,14,15
RL 61:5 96:25 100:4
  260:12 278:5 289:6
road 1:22 3:5,12 21:12
  23:3,4 87:21 89:2 95:13
  96:22 97:21 98:15 100:8
  101:13 115:12 176:9
  186:24,25 187:6,7,15,15
  187:24 217:19 244:9
  266:19
roads 50:20 110:13,15,21
  112:23 113:7 115:20
  187:13
roadway 244:6
Robert 8:25 9:19 72:14
Robyn 1:9 172:9,11 174:20
  202:11
RODE 3:10
role 177:18 284:13
ROM 70:9,12
room 61:13 141:12 209:13
Rotsman 203:14
routes 323:15
routine 312:8,9 313:23
row 143:13
RQ 145:4 263:3
RS@VillageofBabylon.g...
  26:20 27:10,16 28:19
  31:21
Rscordino 48:22
RScordino@pacbell.net
  56:13
Rscordino@SWbell.net
  56:24
Rscordino@yahoo.com
  40:17
Ruger 129:5

rules 329:3
ruling 61:9 97:2 100:5
  260:9,13 266:15 278:6
  289:7
RULINGS 346:5
run 45:5 153:6,8 155:6
  164:8,11 165:4,17 166:19
  167:17,25 168:6,11,13
  169:3,7,9 170:6,21,25
  171:13,17 186:24 189:15
  189:21 190:6 299:16
running 156:23 166:2,6
  167:2,7 169:14,19 214:20
  284:15
runs 173:13,16,17,18
  178:9

_____ S _____

S 3:2 4:2,2 5:3
S-C-H-E-T-T-I-N-O 205:7
S-I-E-G-L-E 242:12
S-U-M-P-W-A-M-S
  185:17
safe 298:15,16,17
safer 135:12
safety 299:12 336:21,22,23
  336:23,24 337:9,15 338:4
  340:3 343:7,7,19,20
  344:6,12
said 13:22 37:23 38:5 71:8
  73:5 76:20 77:19 83:18
  85:4 86:9 89:25 92:13
  103:5 113:6 118:2 124:11
  128:9 129:6 133:2 141:13
  141:14 143:8,11 144:15
  148:4 152:5 160:23
  161:22 172:17 174:17
  178:2 182:18 185:4
  198:18 201:4,25 204:22
  212:4 213:8 224:7 241:25
  250:15 253:4 254:18
  259:9 266:9 274:2 278:19
  279:6,21 287:16 291:24

  308:10 317:17 330:15
  337:9
salary 107:13
sale 88:16
sales 228:21
salon 197:12,15,16,24
  198:9 199:4,5,8
salons 198:19
Saltaire 185:19
same 4:7,18 14:23 19:15
  22:7 47:25 62:25 68:5
  82:24 108:12 113:25
  115:11 134:17 171:2
  188:4 191:11,22 201:19
  231:16 280:23 313:2
  317:11 318:23 319:4
  342:20 343:13
Samsung 46:16,17.24 47:3
  47:7 226:25 227:4,7,12
Sandy 91:11,12 98:2 335:9
Sanitation 200:17
SAS 123:21 126:8
satisfied 231:13
save 42:21
saved 96:13
saw 208:8 239:17 330:16
saying 32:13 80:25 254:16
  289:10
says 52:21 245:21
scheme 297:18
Schettino 1:13 205:6 216:8
  216:12,19 217:2,8,11
  218:3,6,11,21 219:3,5,7
  219:14,24 220:6
school 14:22,23,25 15:2,3
  15:5 85:13,15,25 121:6
  123:3,6,8,10,11,16 145:7
  145:16 150:18 152:2
  160:17,18,19 196:24,25
  253:6 254:24 275:20,25
  276:4 284:18,23 285:18
  287:24 289:21 290:5,13
  292:18 304:8,20 307:16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 383

**316:**23 328:3,6,7,12,18 339:6
**schools** 188:11
**Scordino's** 278:4
**Scott** 203:5
**Scouts** 226:7
**screen** 48:11 51:11
**scroll** 51:3
**scrutinize** 128:17
**scrutinized** 128:21
**sealing** 4:6
**search** 215:15 231:8 325:4
**second** 22:22,22,25 61:15 61:24 88:2 117:8,9 186:14 204:4 209:8,9,9 229:20 237:24 304:24
**seconds** 77:10
**secret** 133:25
**secretaries** 200:10 205:4
**secretary** 199:15 200:9 205:5 211:11 212:6 216:15 219:23,25 233:9 271:8
**secured** 237:25
**security** 29:6 128:13 136:20 142:3
**see** 14:24 66:13 68:14,15 130:16 134:22 137:17 146:3 168:9 172:6 175:19 175:21,24 176:7 186:23 191:2 203:9 208:3,6 213:4 225:17 241:8,8 273:15 274:2 277:12,13 287:7 310:25 313:22 320:10,18 321:4 337:14
**seek** 61:8 67:8,18 93:2 260:8,9 289:7
**seeking** 32:14
**seeks** 212:23
**seem** 38:12,17
**seemed** 271:6 317:15
**seems** 99:11 142:15 285:3 292:6

**seen** 176:23 285:6 319:12 319:13,14,16,17,20,24 330:13,18
**segregate** 49:15
**select** 90:7 215:11 219:24 222:3
**selected** 90:11
**selection** 215:21,21
**sell** 120:14,16
**selling** 323:14
**send** 26:5 35:10 50:19 53:25 75:22,25 145:10 214:4,5,14 218:14 341:25 342:2
**sending** 49:9,11 75:18
**sends** 75:17 226:22
**senior** 253:2,4,6
**sent** 73:3,5,7 74:14,18,20 76:13,22 141:2,7 226:14 233:7,8 272:22 300:4,7 300:11 311:7 338:8
**sentence** 76:16
**separate** 89:6
**separated** 192:11
**September** 117:9
**sequence** 115:6
**sergeant** 128:20 260:23
**serve** 181:13 195:21 206:13 282:20
**served** 180:17 181:23,25 197:9 332:24
**server** 49:21,24
**service** 34:19 35:24 36:14 36:17 42:4,7 48:7 58:3,24 86:14 161:8 195:20 206:8 215:8 219:8 221:20 227:23 229:9,11 233:20 260:15 266:22 267:4 268:22,23 269:3
**services** 189:5 199:3 251:14,15 257:25
**session** 224:15
**sessions** 210:2,22

**set** 347:11,20
**seven** 62:2 87:8 247:11
**seventeen** 333:3
**seventh** 91:16
**shall** 4:12
**Shannon** 3:22
**shape** 334:4
**share** 15:6
**she** 6:20,21,22 13:6 14:25 15:4,9,17,18 73:3,16,22 75:16 149:14,20 172:7,8 174:23 200:10 206:8,9,13 206:16 207:4,5,5,7,9 212:3,17,19,21,23 213:2 213:3 214:20,20,21 215:4 215:10 216:13 217:15 218:18 219:12,18 225:19 226:4,5,6,22 228:3,7 250:15 251:12 268:17 269:2,4 270:7,10,14,15 270:15 271:5,7 273:10,14 275:21,24 276:2,3 277:12 278:22,24 279:2,24 281:22 283:4,6 293:23 335:11,13,13,16,18,20,21 336:9
**she'll** 217:18,19
**she's** 13:4 75:18 93:22 150:12 172:14,16 213:13 214:21 218:13 219:3,6 225:15 268:20 281:21 286:16
**Shea** 268:9,12 269:18,22 269:25 270:22 271:4 272:2,8,12,17,20,23 273:2,6,8 274:6,17 277:18 278:8 279:9,23 280:3,10,16,21 281:4
**Shea's** 268:15 269:16 270:5
**shed** 333:10
**sheds** 287:13 330:25 331:3
**SHEET** 348:2

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 384

shelters 323:18
shield 247:14,18
shop 248:9,11,11,12
shopping 277:13
shore 185:18 186:24,25
253:24
shoreline 253:25
Shores 187:17
shot 127:14,20,23 128:5
should 213:16,22 317:16
334:10
shouldn't 323:12,13,14
show 54:2 319:16
shower 287:2,4,14 294:7
shows 51:10,15
sic 24:20 151:23 251:4
sick 199:16
side 178:11 184:7 200:8
241:6,11,11 249:4 254:4
318:23 336:22
Siegle 242:11
sign 35:17,20 36:7,8,11
121:20 146:7,9,14,16,18
153:18 282:9 322:24
324:4
signature 147:7,9,10
signed 4:16,19 36:6 40:10
70:15 147:3,6,6,9 153:24
345:19 348:21
significant 145:2 276:19
Sikowitz 72:6 270:19
Silvestri 1:10 172:9,11
174:20 202:11
similar 256:21
simple 99:11
since 25:17 124:22 125:17
126:13 135:14 145:6,15
150:18 154:11 156:25
157:5 160:12,15 193:21
253:14 261:25
single 80:17
sir 6:6 37:13 42:23 45:8
46:3 57:5 60:12 62:7

67:13 69:18 83:20 86:9
90:5 92:21 93:2 94:17
97:3,25 101:20,23 115:15
115:23 117:23 121:17
122:21 125:21 128:12
129:16 131:25 132:16
133:2 134:2 135:23
136:23 137:15 141:16,18
143:25 145:6 147:24
157:5,19 159:15 162:9,13
175:23 176:14 197:11
258:7 335:23 343:23
sit 24:20 26:3 140:10
144:13 224:10 281:24
315:22 319:23 320:3
322:9 325:14,17 340:25
sits 89:2
sitting 335:23 342:22
situation 207:7 213:18
266:3 308:5 337:3 343:18
six 23:15 36:15 88:11,21
89:22 91:15 142:21 228:9
228:10 247:6,7
six-month 131:20 177:14
Skip 106:3,4,5,16 202:18
204:20 229:17 240:10
242:2 243:19 247:8
248:15,16 254:19
slap 38:7
sleep 100:12
sleeping 325:8
slip 184:9,10,11,13
slippery 115:16
slips 186:24 187:3,7,9
small 225:17 277:11
smart 46:20 93:20,22,22
smoked 331:22
smoking 322:6,11,23,24
323:24 325:10,19 326:11
327:22 329:9 331:10
332:5
snow 110:9,10
snowing 280:20

snowstorm 110:13
snowstorms 110:17 208:9
snowy 115:20
soap 69:6
social 8:10,22 9:21 11:6
12:15 13:16 15:20 17:8
18:8 159:22,25 210:14
220:23 236:7 276:9 277:3
277:6
socially 8:2 9:11 210:18,23
232:11
society 130:9,18 195:6
225:6,15
sold 121:10 239:22
some 19:16,17,19 73:4,6
100:6 105:7 131:2 134:9
148:22,24 153:14,22
161:20 165:3 169:24
195:4 196:20 203:23
213:21 224:3,8,14 229:6
234:21 239:15 266:20,20
267:19 311:15,22 316:23
317:15 318:12,14 319:15
319:16 330:20 344:7
somebody 80:16 141:14
146:5,5 257:21 270:18
279:4 297:17 322:23
328:17
somebody's 320:25
somehow 344:14
someone 26:3 45:4 131:13
146:9 326:10 331:21
something 42:17 48:4
49:21 59:19 67:7 75:17
75:18,20 82:19 97:4
112:20 119:13 120:3
142:11 151:17,22,25
152:24 161:9 185:5
192:22 208:3,6 212:18
257:18,19 264:20 294:14
299:16,22 307:12 311:2,9
311:20 312:24 321:9,12
324:23 334:25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 385

**Sometime** 79:6 81:10 131:11
**sometimes** 48:20 56:4,6 63:19 76:20 79:6 80:8,13 81:10,11 83:2 111:12 115:17 130:16 139:17 237:8,9 328:25 334:8
**somewhere** 110:12 217:19 220:17 326:17,18
**son** 7:19 11:12,13 84:20,24 198:6 301:15
**Son's** 11:23
**son-in-law** 8:3
**sorry** 62:17 107:3 109:20 113:4 120:21 139:20 162:11 165:8,12 187:25 188:3 203:4 219:17 269:11 270:23 297:2 318:3
**sort** 42:12 54:16 154:25 245:11 247:14 264:24 265:3,14 294:9 309:10
**south** 241:7 254:2,2
**Southwestern** 57:3
**speak** 44:10 66:14 67:4 73:21 93:8,18 179:8 291:7 293:16 295:14,20 299:25 317:3,22 341:9,11
**SPEAKER** 61:3,14
**speaking** 37:11 180:16 258:15
**special** 108:19 329:2
**specialist** 86:13,17,22 87:10 161:4
**specific** 216:24 256:6 287:8 289:16,18
**specifically** 287:21
**spend** 98:14
**spent** 322:10 331:22 332:4 339:6
**Spiro** 7:10,14,17 8:18
**spoke** 16:19 17:23 231:23 232:7 259:10 291:10,13

292:23 293:17,17
**spoken** 341:7,9
**sportsman** 127:9,10,12,13
**spouses** 276:19
**squarely** 288:4
**SS** 246:9 345:4 347:4
**St** 14:23 275:12
**stand** 192:14
**standby** 131:24
**standing** 143:17 253:10
**staring** 285:4,7,9,14
**start** 44:8 45:10 52:18,23 53:5 85:17 154:5 156:8 181:16 311:15 313:21
**started** 163:10 210:16
**starting** 44:6 200:5
**state** 2:5 5:9 18:13 71:13 108:11,14 123:19,22 124:19,23 126:19 186:9 190:18 191:8 194:8,13 195:12 227:23 233:20 252:9 256:25 257:8,12,16 262:7,8 268:24 276:7 343:11 345:3,21 347:4,8 348:23
**States** 1:2 252:14 343:10
**station** 130:17 185:10,14 185:16,19 188:14 298:7 298:13 322:7,12,16 323:9 323:9,18 326:12,22 327:24 328:4 331:24 332:6,11
**status** 309:18 310:2,13,14
**stay** 280:25 310:19 334:6
**stayed** 281:5
**stays** 60:17
**steal** 257:24,25
**step** 60:14
**Stephanie** 2:4 347:7,25
**Stephen** 1:12 220:10,14 221:3,11,13,16,19,24 222:3,21,24 223:5,13,16 224:17,20 313:2

**Steve** 201:18 205:14
**Steven** 336:13
**still** 19:3,21 20:8 21:24 23:16 27:12,15 37:21 61:12 69:3 71:16 120:12 269:22 275:13,24 329:19 341:2
**STIPULATED** 4:4,10,15
**stole** 270:10
**stood** 143:19
**stop** 27:18 45:13 92:15,16 304:9,14,16,18,22 305:13 305:16
**stopped** 306:13
**storage** 235:12,14 287:13
**store** 113:12 198:14,17 283:19
**stored** 49:18 63:14 235:6 246:15 283:14,17 300:17
**storing** 334:21
**Storm** 91:13
**stormed** 141:12
**story** 146:20
**straight** 59:24
**street** 5:13 16:10 86:6 87:16 100:13 121:13 188:2,7 235:22 237:24 241:6 274:5 301:4 305:16 306:9 308:7 310:25 318:23 348:4
**streets** 130:14 342:15,22
**strobe** 264:20 265:2,5 266:9,19
**Strobed** 264:21
**strobes** 265:4
**students** 304:22,23
**stuff** 42:20 155:11 213:12 225:12 340:15,16 342:11
**subject** 92:7 207:17 338:10
**submit** 295:22 296:2,7
**submitted** 295:8 338:3
**submitting** 295:12
**Subpoena** 2:4

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 386

subscribed 345:19 348:21
subscription 42:13 43:16
59:19
substance 179:10 259:21
314:13 327:12
subsumed 156:17
subsuming 156:14
Suburban 102:19 104:6,8
104:15,24 105:11 106:14
106:25 107:8,24 108:5,13
108:16,22 112:2
successful 168:18 169:17
170:13 171:4,19,21,23
such 51:23 76:8 83:5 84:21
88:24 89:5 96:17 117:7
122:2 156:20 161:11
190:7 197:19 210:23
226:21 230:9 237:16,19
255:25 261:23 263:4
268:3 271:21 281:2,5
295:12,15 303:22 307:6
309:19 316:17 325:7
331:14 337:18 342:5
347:12,14
sue 40:22
sued 338:17,22 339:3
341:14
Suffolk 126:21 128:18,21
133:13,21,24 194:7
232:14 257:9 282:3 306:3
306:5,7,8 307:14,21,25
309:5 311:3 313:13
323:21 324:6 325:5
326:16 347:5
suggestion 311:16
suit 104:19
Suite 3:5,12 348:4
Sullivan 22:23 23:6,20,24
24:4 88:4
summarize 61:17
summer 21:4 55:16 64:4
66:25 68:10 78:22 116:13
117:7 163:14 177:16

180:21 181:20
summons 265:8 266:5,7
322:25 334:8,9
summonses 261:7 265:21
Sumpwams 64:17 185:16
186:23
Super 91:13
superintendent 105:24,25
142:6 241:22 244:2 246:3
255:6,8 262:25 312:13
340:16
supervision 240:4
supervisor 161:17 269:5,9
supplied 281:9,25 283:7
supplying 282:5
support 173:20 174:12
339:19
supported 173:25
supposedly 139:25
sure 6:17,25 7:13 13:2
23:10,12,23 27:25 30:25
31:11,23 33:23 34:22
36:15 38:2,4 40:21 41:7
42:10 43:3,8,11,15 44:4
46:4 48:14,16 53:20,23
55:3,5 63:8,21 76:21 89:8
90:14 123:17 138:2 146:8
166:23 174:10 180:13
197:18 198:16 203:20
204:11 206:21 219:11,13
220:17 227:10 245:25
246:2 247:15 252:15
260:24 266:11,12,17,21
290:14 298:6,12 302:20
307:9 308:16 311:2,22
318:10 321:11 322:14
323:7,16,17,20 324:4
325:13,15 326:14,17
327:3 335:25 342:19
surprised 180:7
surrounding 270:5,9
survey 342:8
suspects 141:6

Suzanne 1:13 205:6 212:21
215:18,18 216:7,11 217:2
217:8,11 218:2,6,21
219:2,5,7,14,24 233:9
263:12
Suzanne's 262:23
swear 315:10
swimming 160:22 162:4
sworn 4:16,19 5:4 347:12
system 35:9 129:10 138:13
138:14,15

T

T 4:2,2 345:2 347:2,2
T-1 59:24
T-E-N-N-E-T-Y 166:12
T-W-A-R-D-Y 134:23
tab 244:21
table 37:14,15 38:8,10,14
137:5,7
Tahoe 101:24,25 102:3,16
102:19 109:4,7,9,17
113:14,19,21 114:6,8,12
114:15,25 115:2,4,10
take 8:4 25:8 32:14 55:6
67:24 73:25 77:21 91:18
92:21 98:21 105:23 120:5
155:5 215:14 244:23
258:18,21 279:15 297:19
308:8 309:24 321:13
337:2,21 340:14,15
342:13 343:9 344:18
taken 24:21,24 25:15
73:24 76:16 78:9 82:17
106:16 179:2 209:16
245:2 258:25 263:8
266:24 267:2 269:2 310:9
314:4 323:8 344:19 345:8
takes 25:11 29:5 97:8
105:24 323:21,23 340:16
340:17
talk 25:9 69:8 111:2,13,16
204:21 205:14,15 207:16

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 387

217:12 231:9 232:3 257:6 260:3 307:25 312:12
talked 47:25 74:3 317:24
talking 16:14 24:23 58:15 69:13,15 116:19 147:6,10 151:14 156:12 162:13 201:6 208:19,20,24 244:20,22 256:4 257:5 302:16 335:15 342:11
tape 70:8 137:17,18,23
tax 195:12
taxes 129:21
teacher 85:16,18,24 86:22 87:10
teachers 87:2
teaching 86:25 196:8
team 197:5
tech 30:5 53:2
teching 42:22
technical 25:7,10 42:19
technological 70:6
technology 236:2
techy 41:6 50:5
teenager 118:7
telephone 8:12 9:23 12:17 18:20 19:3,9 20:2,8,14,20 21:2,22,24 22:9,15 23:14 23:16 273:2
television 42:13,20,21,23 43:2,17 45:2
tell 5:22 50:5 61:16 77:11 99:23 153:25 154:2 208:4 208:10 223:4 224:5 271:3 279:6,8,17 280:2 297:17 307:22 308:2 311:14 312:23
telling 91:25 92:5 94:13 137:22 179:10,15 259:13 288:25 311:24 312:24 342:22
tells 37:20 318:16
ten 16:22,24,25 17:21 18:2 84:16 100:15,15,17

194:23 212:9 249:13 272:15 304:7 318:22 327:4
tenants 119:21
Tennessee 18:10,14
Tennety 166:11 174:3 175:4
tenure 332:12
terminal 43:9
terminate 215:24 220:4 223:13,19,25 224:6 228:12
terms 190:20 203:25 211:4
Terry 315:5,7
testified 5:6 182:7 273:22 309:12 342:14
testify 59:9 279:15
testifying 60:10 288:12
testimony 48:21 78:14 179:5,21,25 259:6,10 260:3,4 289:14 290:4 314:9,16,22 345:8,11 347:13
text 8:14 9:25 12:19 13:18 50:8 51:23,24 52:3,6 221:8 232:25
texts 15:17 232:24
than 16:22,25 17:21,22 18:2 64:21 104:21 132:21 151:15 154:20 177:7 191:24 198:13 208:4 209:22 210:10 236:11 238:21 274:6 318:24 327:4 335:6
Thank 237:14
that's 11:25 14:11 16:13 17:18 21:14 22:8,19 34:9 37:14,18 39:9,12 40:14 42:22 45:6,7 53:2 54:9,23 54:24 55:4 58:2 72:9 76:17 79:22 80:16 88:2 98:12 101:3,16,18 102:18 110:17 113:5 116:4

118:22 120:20,24 121:9 121:14 128:4 129:17 132:25 136:6 143:7 146:6 150:8 152:10 153:5 154:22 156:23 162:10 164:15 165:21 167:21 168:17 172:9,24 173:5 175:9 178:22 185:7,21 187:18 188:3 191:6,19 197:16 210:21 215:21 230:6 239:25 245:13 247:11 249:20,23 251:19 258:5,5 259:18,23 277:14 277:25 278:11 288:16 289:17,18 297:18 303:11 303:13,24 311:3,16 316:5 317:8 321:15 328:21 332:19
their 1:5,17 109:23 156:20 158:5 182:8 229:7 244:12 247:4 265:19 276:19 291:16,20 334:4,6,17 340:15,16,17,18 344:8,8 344:15
them 31:5,6 34:15 51:16 91:2 111:9,13 131:24 132:13 153:14,16,17,18 153:20,24 154:23 188:9 196:16 197:18 205:19 211:5 213:10,19,21 215:15 230:20,24 231:10 237:13 265:21 266:20,21 267:12 282:3 283:19,22 291:19 298:5 308:2 309:23 311:6,14,20,21,24 312:7,8,8 313:21 319:4 326:16,18 334:8,9,22 343:17
themselves 131:11
then 14:24 39:23 52:5 89:8 90:7 142:18 149:20 186:12 193:25 196:20 203:12 205:10 212:21

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 388

215:19 219:21 228:4
271:9 288:19 339:16
**there's** 52:3,19 53:11 55:4
65:13 106:21 127:7 129:6
131:17 133:25 148:22
155:3 174:17 193:5
200:12 217:17 256:4
258:20 292:17 297:24
316:23 319:16 334:18
**these** 34:2 44:5,7 79:17
103:19 132:2 140:14
143:12 153:22 163:19
193:8 203:22,25 229:9,12
247:12 283:11 293:21,22
306:4 308:8 310:19
311:15 313:16 324:8
326:5 334:6 335:2 340:21
**they're** 33:7 49:19 55:22
56:7 133:4 136:18 149:21
186:10 197:21 198:15
203:25 213:20 215:17
237:11 264:18 266:17,24
267:9 283:13,16 294:4
311:22 313:13 319:21
320:7 323:16,17,19
324:22 328:25 334:12
**Thin** 324:7
**thing** 108:12 115:12 155:9
202:21 219:12 301:14
313:2 331:15 336:17
**things** 37:3 89:6 135:18
143:12 147:14 151:15,16
153:11,23 155:25 177:7
193:9 196:5 212:13
213:16,22 256:5 297:18
308:8 310:19 311:5
313:14 323:20,22 324:8
329:2 334:7
**think** 22:19 23:8,10,11
25:20 26:16,19 27:22
31:25 48:18,19 52:15
53:19,19 55:2,4,10 58:2
63:3 65:20 68:11 70:13

72:9 90:17 103:14 105:22
112:17 114:9,21 130:9,12
132:5 141:15 142:12,14
162:21 172:6,7 174:23
177:4 185:19 186:10
188:9 190:5 191:2,9
192:23,24 193:6,24
194:18,23 198:6 202:25
203:13 205:19 211:16,16
213:2 221:23 228:9
230:19,19 236:17 249:7
250:13,23,25 251:10,11
256:14 260:17 266:20,25
279:5 292:17 308:22
316:21 319:3 322:14
324:3 325:12,16 332:12
334:9
**thinking** 114:3 322:15
**third** 186:15 191:2,3 204:5
204:7 229:21
**Thirty** 275:4
**this** 44:14 45:2,4,10,21
49:12,15 50:6 57:17 61:6
61:12 65:18 68:11 80:3
82:8,12 100:17 103:11
109:18,24,24,25 110:4
111:18 115:10,10 120:5
129:23 130:16 138:10,17
139:15,18,24 142:19,25
144:25 149:6 153:7
155:11,14 159:5,7 163:22
181:20,21 182:25 183:5
204:3 230:7 241:10
242:17 249:9 251:20,21
287:20 288:16 290:12
297:14,22 299:16 301:11
301:15 305:15 306:2,24
306:25 307:10,12 309:15
309:25 310:16 313:21
317:14 318:5,21,25 320:9
322:16 330:12 332:13
336:18 341:10,19 344:20
345:19 347:16,18,20

348:21
**Thompson** 319:19 320:5
330:16
**those** 25:10 50:21 54:2
55:20 65:15 66:21 69:5
69:10 76:9 79:11,18 80:2
81:20,20 131:23 138:4
139:4 145:5 149:21
151:15 157:22,24 158:7
174:4 195:2 196:12 202:8
205:11 209:7 210:17
213:17 230:12 235:6
247:7 260:22 264:16,20
271:23 273:21 274:4,7,10
276:12,16,18 278:9 279:2
282:5 307:18 318:15
320:2 323:10 334:13
342:7
**though** 27:23
**thought** 67:18 138:9
143:23 145:21 225:11
254:18 321:11
**thousand** 172:7
**threat** 140:21,22,23 141:15
141:19,22 142:25 329:19
330:5 334:14 335:11,18
336:5,15 341:2
**threaten** 137:9
**threatened** 136:24 137:2,3
137:10 139:5 140:18
333:23
**threatening** 137:13,14,23
139:25 143:8,16,24
285:15
**threats** 138:4 140:15
141:11 143:14
**three** 40:14 79:5 80:12
100:25 130:5 200:8
204:14 210:7 215:16,20
285:8 302:11 303:14
316:15 318:5
**threesome** 81:11
**through** 8:10,22 9:21

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

12:15 15:20 17:8 35:11
50:22,23 54:5,22 55:23
61:19 62:20 74:13 101:17
122:10 149:7 179:2 211:2
213:3 214:20 236:18
237:7 242:5 256:24,25
260:25 271:5,10,15,15
309:24
**throughout** 168:24
**tickets** 129:13,14 342:24
**time** 4:12 5:2 14:11 16:19
17:23 33:21 34:2 50:5
55:6 59:16 61:23 62:6,7,8
69:6 70:22 78:8 98:2
99:5 100:7 101:7 108:15
120:8 145:14,22 155:4
157:11,15,18 160:5,16,24
163:22 166:4,10,13,20
167:9,15 168:4,10 169:2
170:17 171:6 174:23
177:15 179:3 197:3
203:17 209:20 214:21,24
214:25 215:4 217:21
219:3,12 221:17 227:20
231:23 233:17 239:17
242:17 244:25 253:13
258:22 259:3,16 266:13
272:2 273:10 274:16
275:16,22 276:8,21
277:17 278:7 280:23
286:24 289:8 290:12
300:3 306:11 310:5,10,16
313:4,20 314:6 318:7
327:7 330:20 334:8
344:20
**times** 40:14 64:5 105:9
163:19 213:14 272:14,15
320:19 337:10 338:16
**tips** 195:7,15
**title** 183:6 238:17 268:19
269:13,16
**titled** 103:17
**titles** 229:7

**today** 5:22 26:3 28:4 38:21
130:18 140:10 144:13
281:24 315:22 319:23
320:3 322:10 325:14,17
339:21 340:25 344:14
**together** 14:21 82:6,23
90:9 145:25 155:6 280:9
298:12
**told** 73:23 77:10 99:22
134:10,11 143:2,5 231:21
231:24 240:22 289:13
303:16 305:6 306:10,13
307:17 310:24
**Tom** 232:8
**Tony** 1:10 66:3 71:25
78:20 79:15 157:25
168:15 169:10,11,20
170:7 171:2,18,21 202:10
203:12 204:8 237:18
304:2 316:22 317:2,10,11
318:8,17,20
**too** 16:13 110:4,8 141:7
163:10 191:10 202:22
239:16 282:11 285:16
327:9 332:18,19
**took** 90:8 110:3 128:16
308:6 340:20 343:12
**tool** 330:25 331:3 333:10
**top** 247:21 264:22 310:19
**towards** 190:13
**Town** 86:7,7,9,12,20 121:6
129:7 136:25 152:24
160:20,23 161:6,14
163:15 172:15 191:10
235:20 254:6 257:8
315:11,19
**Towns** 280:22
**Tractor** 256:9
**trade** 106:13,15
**trade-in** 106:18
**traded** 105:19,20,22
106:16 108:17
**trail** 258:11

**train** 298:7,13 322:3,7,12
322:16 323:9,9,16 326:12
326:22 331:24 332:6
**transcript** 345:7,9
**transformed** 70:8
**Transit** 298:4,11,20
**travel** 101:12,14 110:25
280:9
**treasurer** 106:20 138:13
201:14 205:16
**treasurer's** 35:11,18 129:9
200:13 201:12 235:4
**treasurers'** 211:8
**treasury** 340:15
**tree** 300:5,8,12,14,18
304:10 313:18 319:7,12
319:13,14,15,16,18,24
320:4,5,6,10,14,20 321:4
329:15,21 330:9,13
336:23,25 337:6,15 338:4
340:4 344:6
**trial** 2:2 4:13
**tribute** 147:15
**trick** 12:2
**trickery** 77:19
**trips** 310:25
**Trolley** 244:9
**trouble** 42:21
**truck** 240:19
**trucks** 239:16
**true** 345:10,12 347:13
**trustee** 1:10,11,11 25:17
33:16 62:15 66:2,3 71:25
78:20 81:22 164:4,17,25
166:3,6,25 167:13 169:11
170:8,9 172:2,16 177:6
190:5 193:25 202:7,10,11
202:11 203:15 204:9
220:16,20 223:19,23
224:5 261:25 317:11
332:18 339:16 346:9
**trustees** 29:17,19 30:16
66:8 122:4 146:2,3,24

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 390

147:14 148:5,7,11,13 159:9 169:23 172:22 173:2,2 200:7,9 202:6,8 202:13 209:24 223:11 224:4 267:23
**truth** 5:22
**try** 212:22 287:20 298:6 305:24 311:5,6 323:19
**trying** 12:2 44:18 65:2 99:20 140:25 141:8 289:15
**Tuesday** 65:18,20 68:15 80:23 209:8 210:3
**Tuesdays** 79:4 183:8
**tuna** 57:7,9 63:18 104:15 225:5,7,8,14
**turn** 248:16
**turquoise** 112:9
**TV** 319:16
**Twardy** 134:22,24 135:14 202:25
**tweet** 237:2
**twenty** 239:2 290:9
**Twenty-eight** 64:10
**twice** 78:22,24 210:14 212:12 272:13 313:25
**Twitter** 151:18,19 236:16 236:20,22
**Twitters** 236:24
**two** 21:23 26:16,22 27:23 28:23 32:24 64:5 65:13 65:15 67:21 77:10 81:13 126:24 130:3,5 131:21 133:15 151:16 169:22 172:7 174:4 185:15 188:4 188:5,7 192:11 204:13 227:13 240:21 254:4,4 287:12 319:21 320:2,7 330:16
**two-thirds** 191:4
**two-way** 324:25
**twosome** 81:12
**twosomes** 81:13

**type** 50:24 249:6 255:24 256:5,21
**types** 324:20 329:2
**typically** 283:11

### U

**U** 4:2
**ultimately** 264:8 267:13,21
**um-hum** 24:13 35:22,25 52:22 54:21 56:11 57:16 75:10 78:25 85:6,22 87:24 88:5 89:18 90:3 94:6 100:10 101:5 104:16 110:22 114:13,16,17 115:13 116:16 118:24 130:4 133:17 136:22 142:23 143:10,21 182:20 186:20 197:13 202:14 203:11 206:2 207:2 216:9 220:12 227:17 229:5 255:4 271:22 301:25 323:5 341:17
**under** 6:4 14:13 15:10 16:11 17:16 28:8,25 48:21 51:22 72:23 131:3 131:5 134:24 144:17,22 174:5 175:10 204:19 211:24 212:14 214:10 215:7 216:10 217:10 218:10 219:8,19 220:13 221:20 225:2,24 227:22 231:4 232:20 233:19 239:3,13 240:3,25 248:13 249:4 253:11 268:23 290:4 325:19 343:23 345:8
**underneath** 322:23 323:8 323:18
**understand** 5:24 6:3 33:23 41:5 43:21 50:4 51:8 119:25 155:10 159:5 186:3 207:19 235:13 284:10 286:6 305:23

**understood** 38:11 45:15 138:23
**unidentified** 1:18
**union** 11:15
**United** 1:2 252:14 343:10
**University** 87:11 123:19 123:20,22 124:12,19,23 124:24 125:2,20 126:2
**unless** 153:23 211:15 328:17
**unnamed** 1:18
**unopposed** 189:17,20 190:6
**unsafe** 115:19 337:3,6
**untechy** 24:20
**until** 89:22 164:18 181:20
**up** 15:2,17 22:23 41:10 51:10,15 52:6,8,19 54:3 69:17 70:16 90:14,15,15 110:12 115:14 116:13,14 121:20 143:5,17,19 172:4 181:20 204:2 208:10,23 212:22 213:15 214:14 215:20 241:21,25 243:19 244:2 251:11 271:8,21 290:14,14,16,16 294:5 300:9 304:22 306:4 307:17 312:3,5,6 313:6,7 316:24 323:17 334:17 344:7,14
**upcoming** 146:20
**updated** 262:4,5,18
**updates** 262:6 312:17 318:14,15 341:25
**upheld** 298:7
**upkeep** 334:21
**upon** 214:23 215:3 219:2 299:17
**upstairs** 129:9
**upstate** 22:19,21 255:14 319:15
**urinating** 323:12 325:8
**us** 29:3 30:13 50:12,20

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 391

| | **V** | |
|---|---|---|
| 110:3 115:18 137:5 226:7 | **V** 348:5 | 277:10,10 285:15 287:7 |
| 226:8 232:4 238:14,15 | **V-A-N-O-F-F** 207:3 | 287:21 299:14,14 308:4 |
| 262:15,16 297:18 324:5 | **vagrancy** 325:8 | 328:25 330:24 336:17 |
| 329:2 341:24,24 | **Vajelatos** 6:16,19,24 7:7 | 337:3 339:9 |
| **use** 5:16 10:25 11:3 27:6,9 | 7:10,15,18 8:7,10,18 | **VHS** 70:3 |
| 27:15 39:15 41:8,13,18 | **Vanderbilt** 158:3,25 | **vicinity** 246:12 304:9 |
| 42:25 47:2,15 48:15,17 | 166:22 167:19 168:14 | **video** 5:17,19 60:22 140:11 |
| 48:19 50:24 51:3,6,13 | **Vanoff** 207:3 | 145:5 157:17 346:8 |
| 52:13 55:11,12 57:20 | **varies** 83:2 196:4,18 313:6 | **villages** 186:7,8,11 |
| 62:14 90:23 93:23 97:14 | **variety** 196:6 319:17 | **Vince** 166:11 174:3 175:4 |
| 102:10 105:5 113:11 | **various** 51:15 212:13 | **violated** 324:24 |
| 142:10 177:17 183:13 | 229:4 231:25 | **violations** 261:7 266:2 |
| 184:21,24 236:15 246:7 | **varsity** 196:8,9,21 | 325:6 326:5,6 |
| 246:23 247:4 257:15 | **vary** 79:15 183:3 | **visit** 100:11,12,14 113:12 |
| 266:16 299:19 | **vehicle** 107:16 111:19,23 | 198:19,24 284:23 |
| **used** 28:20 41:3,9 42:2 | 111:24,25 112:13 113:15 | **visited** 122:14 252:22 |
| 48:7,23 58:9 69:4 142:12 | 113:18 114:2,20,24 | 253:12 |
| 175:19,21 244:11 249:2 | 115:11 216:4 220:7 | **visiting** 198:14 |
| 259:16 266:17 273:14,15 | 224:18 228:25 229:13,16 | **visits** 306:11 311:15 |
| 274:2 279:24 | 230:9,14,18 240:7,13 | **visually** 344:3 |
| **username** 26:9 53:9,12 | 241:7 243:8 245:7,15,19 | **volunteer** 163:21 |
| 122:11 | 246:4,6,11,15,24 247:21 | **volunteerism** 225:16 |
| **uses** 42:10 185:2 | 247:25 255:19,22,24,25 | **vote** 31:7,8 223:11 |
| **using** 27:18 41:17 44:21 | 256:7,11,17,21 257:6 | **voters** 300:14 |
| 105:4 133:13 137:14 | 342:16 | **voting** 31:10 |
| 143:23 184:19 256:10 | **vehicles** 230:12 240:3 | **voucher** 35:3,6,8,9,10,14 |
| **usually** 75:19 76:14,15 | 244:13 246:21 247:5,12 | 35:19 36:10 98:20 |
| 78:19 80:17 81:2 102:24 | 264:14,16 266:8 | **vouchers** 40:10 105:6 |
| 105:23 117:8 169:22 | **venture** 222:17 | |
| 183:2 190:6 195:3,5 | **verbal** 140:22,23 207:24 | **W** |
| 202:23 208:22 215:14 | **verbally** 140:19,24 | **W** 345:2 |
| 223:6 226:22 232:23 | **Verizon** 42:9,15,17 44:25 | **wait** 38:23 39:8 |
| 233:7,8 240:9 266:3 | 45:2 46:6 | **waiting** 107:5 262:17 |
| 281:16 283:18 296:6 | **versus** 61:7 | 288:13 |
| 302:20,21 310:8 313:6 | **very** 9:12 11:4 24:20 50:7 | **waived** 4:8 |
| 320:24 | 76:15 90:18 93:20,22 | **Walt** 3:5 |
| **utility-type** 255:19 256:11 | 115:16,16,19,19,19 | **Wampum** 72:22 73:4,6,16 |
| 256:17 | 137:13 143:24 149:12 | 313:23 316:11 |
| **utilize** 43:13 50:3 55:18 | 150:8 177:13 199:17 | **want** 30:11,12 37:25 38:3 |
| 56:17 60:3 62:10 101:15 | 207:23 225:19,19 231:12 | 45:16 53:8 60:17 67:4,12 |
| 185:14 240:6 246:5 | 231:12 234:22,22 235:4,5 | 67:24 75:20 103:3 117:23 |
| **utilized** 57:2 59:25 69:21 | 237:14 242:25 250:24,24 | 117:25 118:3,4 147:20 |
| 115:11 249:14 | | 213:10 229:22 257:17,22 |

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 392

258:18 296:13 311:5 336:24 342:18
wanted 29:3 30:18,19 34:16 67:10 115:20 208:8 290:13 339:4
wants 29:20 102:18
ward 343:6
warned 324:5
warning 208:9
Washington 5:13 19:2 83:19 86:5 87:16 95:3 100:13 121:13 273:17 274:5 286:19,25 294:8 295:3,6
wasn't 110:9 112:8 157:3,9 205:14,15 278:19 279:22 303:17 339:8
watch 42:23,25 43:16,23 253:9
watcher 282:23,24
watching 193:15
water 249:3,4
waterfront 186:19,21
Waters 317:5
Wave 111:15,15
waving 143:18,20
way 5:18 15:18 112:9 145:22 186:25 239:10 270:20 294:5 338:24 347:17
we'll 38:25 39:19 45:17,22 100:4 152:18 258:23 289:6,7
we're 39:22 45:14 77:21 78:11 113:25 115:5 133:13,22 162:13 178:24 192:24 260:9
weapon 128:5,6 139:12,21 263:21
web 150:16 250:7,12 251:16
Weber 203:14
webmaster 251:18,19,20

website 54:4,7,13 152:2 159:15,16,17 208:12,13 208:14,15 250:19
wedding 195:8,19
weddings 194:14,20 195:2 195:11
Wednesday 65:18,21
Wednesdays 79:4
week 64:5 78:23,24 100:25 117:8,9 182:16,20,21 209:9,10 210:14,15 239:19 272:15
weekends 183:7
weeks 101:2 182:17
welcome 314:18
welfare 343:7
well 39:23 79:13 109:23 115:16 131:7 133:3 156:3 159:8 180:5 228:3
well-aware 313:16
went 14:22,25 15:2 124:24 141:9 157:12 214:20 231:18 253:8 290:25 339:16 340:3
west 14:25 15:5 85:13,15 85:18,25 121:6 123:19,22 123:24 124:18,23 196:7 196:11 197:2 237:23 254:5 275:20,24 276:4 318:22
westerly 178:11
Whaler's 119:7,11 120:9 120:19 121:4,10
Whalers 119:8,10
what's 44:6 46:20 55:8 70:9 171:9 251:13 296:24 297:3,5 312:16,19
whatever 103:3 192:2
where 9:13,15 10:11 13:5 15:4,4 35:10 49:18 55:20 62:22 63:13,16,16 90:18 92:6 100:12 104:24 108:9 119:6 121:11 123:11,23

125:2 137:20 138:8,17,21 143:11 175:21,23 176:20 184:5 186:21 193:2 216:20 235:6,12,14 237:19 240:19 244:3 246:14 249:17 257:3,20 261:16 262:22 263:11 273:21 274:4 275:10,19 280:18 283:11,13,15,16 283:17,19 293:3 294:11 301:6 305:9,16 306:12,12 308:6 311:4 318:17 322:22 339:6
WHEREOF 347:19
Whereupon 14:16 34:7 61:18,21 78:9 99:9 178:25 181:9 209:16,18 245:2 258:25 270:24 278:16 314:4 344:19
whether 30:18 42:20 44:25 239:9 277:2 281:4 321:23 322:2 324:24 325:15,18 326:2 331:14 338:2 342:23
which 14:7,14 19:18 21:10 28:18,25 43:10 59:8 70:4 72:24 74:20 79:2 83:24 88:3,23 89:2,5 104:3 114:19 116:8 122:25 128:5 129:3 131:12 133:19 144:10 146:22 162:18,24 169:7 170:23 175:11 177:8,9,14 185:14 187:2,4,5 189:18 192:19 193:11,18 196:15,25 199:16 200:19 208:19 209:24 222:11,14 226:3 232:6 236:6 241:2 242:7 244:5,6,7 247:12 248:5 248:11 251:25 252:5 265:9 270:21 271:13 273:21 276:12 284:14 297:14 299:4,22 304:4

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 393

307:4,6 308:13 309:11
313:17 316:20 318:25
320:9 336:14,17 342:21
**while** 14:25 183:5 253:10
266:15
**white** 246:9 265:5
**Whitman** 3:5
**Whittier** 142:6,13 204:25
230:4 247:9 264:9,10
266:4,6 267:11,16 312:12
312:15 313:4,10 316:25
317:2,23 325:23
**whole** 199:25 200:4 292:18
297:18 335:15
**whom** 7:9 24:25 60:5 63:9
63:11 64:6 65:25 78:17
80:21 82:21 85:10 86:19
118:18 121:3 122:2
128:21 134:11 137:3
140:5 160:4 161:13
165:17 166:19 167:17
168:13 169:9 170:6,25
171:17 179:8 184:11
193:2 196:23 199:19
207:4 211:17 219:16
224:20 229:18 230:16,21
234:2,25 243:15 244:18
248:3,14 264:7,10 269:4
274:21 276:19 281:20,22
291:7,9,13 295:14 301:18
302:10 317:22 336:10
339:3
**whose** 75:3 183:24 206:12
243:14 347:11
**why** 67:12 70:21 71:22
88:23 96:8 99:20,22,24
126:25 128:9 130:5 135:9
136:6 138:7 248:21
259:13 267:20 278:22
296:2 305:13 343:9
**wife** 11:24 13:23 17:12
42:10 46:10 58:8 70:17
70:18 72:16 84:9,19

91:10 93:20,21 95:17
97:8 119:19 120:19 198:5
275:17 276:8,15 277:3,3
277:19 278:4,9 279:8,23
279:24 280:2 284:22
285:17 286:16 287:23
289:20 293:13,14
**wife's** 246:7,8 277:24
278:2
**will** 103:11 204:3 237:12
**window** 52:21 287:11,12
**Windows** 52:13,15,20
**wireless** 59:23
**wise** 67:18
**withdraw** 92:19 108:3
209:3 284:11 296:22
**Withdrawn** 173:10
**within** 4:16 28:23 65:10
72:3 86:11 97:11 111:7
128:20 133:8 154:13
156:10 175:23 198:8,19
228:17,21 235:10,18
236:15 248:5 254:8,14
260:18,19 265:21 269:18
296:18 297:7 300:17
302:5 303:20 305:18,19
306:19,20,21 315:24
316:7 319:24 321:19
324:10 328:12 333:9,15
347:8
**without** 32:4,9,14 39:11
179:10 260:4 320:25
321:2
**witness** 5:4 45:15,17 66:14
94:14 99:3 113:4 209:12
244:23 255:24 285:14,15
288:4 346:3 347:10,14,19
348:6
**Wittier** 142:24
**woman** 128:25 225:6
292:21 295:20,21,23
308:18,19
**women's** 65:13

**won** 338:24,25
**woods** 110:12 115:15
**word** 251:19 336:19,20
**words** 88:20 144:15 181:8
224:12 245:9 265:19
289:18 298:9 308:25
311:19
**work** 21:10 23:19,24 24:3
83:3 101:7 183:7 210:2
210:22 224:15 226:6,6
228:17 231:6 244:4
246:25 247:5 269:18
281:20 284:8 293:11
295:2 298:5 312:9
**worked** 14:21 15:4,4,9
122:21 160:23 216:13
219:18 268:17 271:8
**worker** 225:19
**workflow** 50:14 73:10,12
73:18 74:12,17 214:6,13
217:14,15,23
**workflows** 50:18
**working** 21:4,19 85:17
112:18 161:22 215:4
219:3,6 272:9,12 275:21
275:24 293:2
**works** 1:14 200:21 238:14
288:16
**wouldn't** 30:6 67:12
141:15 153:23 214:25
227:14 252:16 322:17
324:19 328:16 332:17,18
**Wright** 216:16
**write** 145:20,20 146:4,4
195:4 217:14 265:25
266:5,6
**writes** 149:14,20
**writing** 8:16 10:4 12:22
13:20 15:24 30:24 146:10
207:21,21 295:23 296:3
298:18
**written** 139:24 145:7,16
150:19 157:6 207:18

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 394

273:5 308:23
**wrong** 296:24 297:3
**wrote** 141:7 258:9
**Wyandanch** 301:5,7
302:17 303:6,10,25 304:3
304:13 307:19 316:5,12
320:13 321:3

---

**X**

**x** 1:3,21
**X**------------------- 346:2
**XX/XX/1949** 6:7

---

**Y**

**Yacht** 160:21 161:25 163:4
**Yahoo** 40:19 41:4,18 48:13
48:18 49:4
**yards** 316:10
**yeah** 7:19 58:11 59:16
76:11 77:14 80:13 82:7
95:3 100:19 102:21
112:16 115:9 126:8
133:10 136:5 185:6
198:21 213:19 221:25
224:7 253:5 264:25
279:24 291:14 292:25
298:12 301:22 319:13
320:17 321:8 337:25
340:9
**year** 6:9 27:3 59:14 60:7
68:11,12,21 71:20 83:24
84:21 89:5 91:16 102:3
102:19,19 103:7 104:10
107:10 109:3,9,11 113:20
115:4 130:6 132:5,7,16
160:21 164:9,12 165:6
169:15,17,19 170:4,19
172:3,4 174:9 181:20,21
189:23,23,24 190:10
191:20 220:18 222:2,9
228:7 253:2,4,6 290:7
294:22 297:10,14 307:4,6
316:13
**yellow** 264:18,19 265:6

266:9
**yellowfin** 104:21
**yet** 130:2 135:3 253:8
**York** 1:2,22 2:5 3:6,13
5:14 21:14 34:12 54:10
71:14 83:19 87:23 98:10
98:12,13,15 101:13
115:24 117:11 118:6,13
119:12 120:9 121:5,11
126:21 186:9 190:18
191:8 194:8,13 215:7
219:8 221:20 227:23
233:20 235:23 252:9
256:25 257:8,12,15 262:7
262:8 268:24 276:7
280:22 315:21 343:11
345:3,21 347:4,8 348:4
348:23
**you'd** 317:20,21
**you're** 5:19 17:13 21:18
24:23 28:8 32:13 37:8,10
38:4,20 40:6,22,24 44:9
44:12 48:16 50:8 54:19
57:22 69:8,15 77:16,17
80:21 92:5 94:10 99:2
100:18 105:9 110:15
111:18 133:6 150:6,14
151:14 154:4 173:22
179:15 180:12 199:6
201:6 209:24 213:14
225:12 244:20 256:4
257:5,6,19,20,25 258:8
258:10,10 266:12,18
277:23 279:11,14,19
287:7 288:12,23,25 289:4
289:10 311:19,24 314:18
322:20 325:14,17 335:23
338:10 340:11 342:10,14
342:22 343:23
**you've** 40:14 44:24 133:15
182:6 330:9
**young** 304:23
**yourself** 120:18 137:17

153:9 184:20 229:16
**Youth** 116:3,5 160:7,14
161:23,24 180:20,23
181:4,14 182:2,6,14
183:16 184:4,15 185:2,13
185:22

---

**Z**

**Z-A-P-P-I-A** 172:24
**Zappia** 172:23
**Zip** 23:9

---

**0**

---

**1**

**1** 127:5
**1,200** 196:21
**1:04** 178:23 179:2
**1:54** 179:2,3
**10:11** 1:24 5:2
**10:57** 60:20
**10:58** 60:23
**100** 346:5
**11:00** 61:19
**11:08** 61:20,23
**11:09** 62:6
**11:24** 78:8
**11:25** 78:10
**11:30** 78:10,11
**11501** 3:13
**11702** 5:14 83:20 117:11
118:6 119:12 120:10
121:5,11 348:4
**11746** 3:6
**11770** 21:16
**12** 89:7 191:9
**12:40** 157:15
**12:42** 157:18
**1236** 55:11,11
**12370** 23:11
**1238** 55:11
**124** 348:4
**12726** 87:23
**1302** 308:22

---

| | | |
|---|---|---|
| **135** 1:22 | **2002** 104:11 105:10 106:13 | **305** 3:12 |
| **14** 86:3 | 106:18 107:14 108:13 | **306** 21:11 |
| **145** 346:8 | 110:3 111:21 157:3,10,10 | **310** 3:5 |
| **15** 89:8 171:12 191:22 | 164:18,22 165:9,10,12 | **32** 333:5,8,14,21 |
| 192:21 | 167:22 168:2,8 | **33** 3:5 133:24 |
| **15,000** 107:15 190:11 | **2003** 168:9,18 169:3,24 | **330** 3:12 |
| 191:12 | **2006** 106:23 107:8,23 | **36** 11:14 |
| **152** 20:7 117:10,15 118:5 | 108:5,16,22 | |
| 118:13 | **2007** 169:6 170:5,16 | **4** |
| **153** 237:23 | **2009** 102:4 165:8 | **4:18** 314:3,5 |
| **15th** 282:22 | **2010** 109:13,14,17 113:14 | **4:30** 314:5,7 |
| **17** 14:9 | 113:24 114:4 | **4:59** 344:17 |
| **173** 87:21 89:2 95:13 96:22 | **2011** 113:22,23 170:20 | **40** 6:22,22 57:23,25 58:4 |
| 97:21 98:15 100:8 101:13 | 171:11,12 | 58:16 59:11,15 83:23 |
| **18** 103:14 194:24 | **2014** 114:4,5,6,8 | 85:4 |
| **189** 20:7 | **2015** 172:5,6 | **42** 129:5 |
| **19-foot** 183:20 | **2017** 27:3,24 | |
| **1967** 123:7 253:5 | **2019** 1:23 115:8,10 142:22 | **5** |
| **1970** 160:20 | 281:10,18 282:6,17 283:8 | **5** 1:23 345:9 346:4 348:6 |
| **1971** 85:19 160:24 | 283:25 284:9,20,24 | **5:00** 285:18 287:24 289:25 |
| **1972** 14:20 | 285:19,21 287:25 290:6 | 290:6 344:22 |
| **1976** 286:23 | 290:10 345:9 347:20 | **5:30** 242:19,20,20 |
| **1979** 85:21 | 348:6 | **50** 65:21 106:8 246:22 |
| **1980s** 89:22 | **202** 348:4 | 255:11 |
| **1986** 154:10,11 156:25 | **22** 119:7,11 120:9,19 121:4 | **516** 19:23 |
| 157:3,4,5,10 161:2 | 121:10 129:5 | **516-739-0400** 3:16 |
| 177:12 | **231** 178:10 | **516)587-7226** 19:7,22 |
| **1987** 160:12 163:24 164:25 | **24** 28:14 | **516)669-0058** 22:4 |
| **1991** 165:14 | **25** 25:19 249:8 | **516)669-6923** 20:15 |
| **1995** 166:14 167:7 | **26** 119:8,10 | **5th** 347:20 |
| **1998** 165:9,9 167:7,9 | **260** 346:5 | |
| **1999** 160:15 181:18 290:8 | **263** 346:10 | **6** |
| 290:9 | **278** 346:5 | **600** 196:19,20 |
| | **279** 346:5 | **61** 346:5 |
| **2** | | **631** 19:24 115:24 117:4 |
| **2:18-cv-07011** 1:20 | **3** | **631-450-2515** 3:8 |
| **2:26** 209:15,17 | **3:04** 244:25 245:3 | **631-669-** 55:10 |
| **2:30** 209:17,20 | **3:10** 245:3,4 | **631)365-9413** 19:10 20:12 |
| **20** 42:3 130:6 133:19 | **3:25** 258:23 259:2 | **631)583-5195** 20:21 21:22 |
| 285:19,21 287:25 345:20 | **3:30** 259:2,3 313:7 | **631)669-0058** 18:17 |
| 348:21 | **30** 137:25 | **65** 65:20 |
| **200** 316:10 | **30-day** 262:16 | **68** 124:3 |
| **2001** 168:2 | **300** 316:10 | |
| | | **7** |

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

Page 396

**70** 6:11 160:25
**70s** 71:19
**71** 124:3 163:5
**72** 163:5,5
**7226** 19:13
**73** 23:4 124:15
**74** 124:15
**76** 275:9,9 286:23
**78** 124:15
**79** 14:10

**8**

**80** 89:7 200:19
**80s** 71:19 89:3,4 126:5
  204:15 294:24
**83** 126:5
**845** 22:16,19 23:8
**845)932-5084** 22:10 23:14
**86** 126:5 163:5,6
**87** 165:7
**89** 5:13 19:2 83:19 86:5
  87:16 95:3 100:13 121:13
**893** 308:22

**9**

**9:30** 312:18 313:8
**90** 204:16
**901** 18:11
**90s** 204:15,16
**91** 165:7,7
**9413** 19:11
**95** 165:8,8,8
**96** 164:22 346:5

# EXHIBIT "M"

# State of New York County of Suffolk

*In the matter of the claim of*

## JOHN LEPPER and NOELLE LEPPER,



*–against–*

**VILLAGE OF BABYLON;**
**RALPH SCORDINO**, Mayor, **KEVIN MULDOWNEY**, Deputy
Mayor, **ROBYN SILVESTRI**, Village Trustee, **TONY DAVIDA**,
Village Trustee, **MARY ADAMS**, Village Trustee;
**STEPHEN FELLMAN**, Village of Babylon Building Inspector;
**SUZANNE SCHETTINO**, Department of Public Works; **GERARD**
**GLASS**, Esq., Village of Babylon Attorney; **DEBORAH LONGO**,
Planning Board, Village of Babylon; and

**JOHN AND JANE DOE** (municipal agents, employees,
consultants and/or independent contractors) ##1–10 who might
be further identified in further prosecution of this claim,

*Respondents*

# NOTICE OF CLAIM

CORY H. MORRIS
*Attorney for Defendant*
VICTOR JOHN YANNACONE, JR., *of counsel*

To: **VILLAGE OF BABYLON**
153 West Main Street
Babylon, New York 11702

2

# NOTICE OF CLAIM

1. **The name and post office address of claimant and claimant's attorney is:**

<u>**Claimant(s)**</u>:                    <u>**Attorney(s)**</u>:

                                    **Cory H. Morris**
**John and Noelle Lepper**        The Law Offices of Cory H. Morris
59 Cockenoe Avenue                33 Walt Whitman Rd, suite 310
Babylon , New York 11702          Dix Hills, New York 11746

## 2. The nature of the claim:

Claimant John and Noelle Lepper sustained emotional injuries in violation of their civil rights, including but not limited to loss of emotional integrity, loss of dignity, loss of comfort, extreme mental stress, emotional scarring, psychological damages, damage to name and reputation, stigma associated with being labeled a criminal, monetary damages, special damages/costs/fees, loss of income and related damages incurred by and on behalf of Claimants John and Noelle Lepper for the recklessness, carelessness, gross negligence, negligence, intentional conduct, malicious conduct, violation of civil rights, and unlawful conduct of RESPONDENTS, VILLAGE OF BABYLON; RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon; and JOHN AND JANE DOE (collectively referred to herein as "Respondents"), individually and collectively.

### 3. The time when, place where and the manner in which the claim arose:

The claim arose in the incorporated Village of Babylon, Town of Babylon, Suffolk County, NY starting on or about May 10, 2018 and continuing to this day. Respondents, collectively, knew and had reason to know that this claim was forthcoming and such claims prior to the ninety-days from the filing of the instant notice of claim are incorporated fully herein:

In April, 2018, Claimant John Lepper found a syringe, a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard when he was playing with his children. Mr. John Lepper informed his neighbors immediately and was outspoken to the Village of Babylon in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

On or about May 3, 2018, after conferring with Claimant NOELLE LEPPER, Claimant John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of Babylon.

On or about May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that "It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit." At no point did Claimants John Lepper or Noelle Lepper (hereinafter "Claimant" or "Claimants") break the law. Respondents, collectively, labored to target otherwise innocent persons within the Village of Babylon for the purpose of extracting sums of money by virtue of enforcement of an ambiguous an

4

arbitrary Village of Babylon code and local ordinance(s). Claimants endeavored to comply with all applicable state and local laws.

At some point in July, 2018, albeit dated May 21, 2018, Stephen Fellman sent Mr. Lepper a letter titled "Notice of Violation" stating that the letter was to serve as notice that Mr. Lepper "that the aforementioned violations must be corrected before May 23, 2018 or an appearance ticket may be issued." This was done knowing that the Claimant was guilty of no wrongdoing and attempted to comply with the law by submitting, *inter alia,* a building permit to the Village of Babylon as early as May, 2018.

On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per Section 116 Unsafe Structures of the International Building Code ("IBC") the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

Building Inspector Fellman never identified the nature and manner he claimed the treehouse was an unsafe treehouse. In addition, there is no proof that Babylon Village properly adopted the IBC. Respondents, collectively, filed false charges, entered the property/curtilage of Claimant's home, proceeded to prosecute Claimant on purported Village of Babylon code violations that were ambigious and did so for the purpose of causing harm, limiting the use of claimant's property and the ability of his children to utilize such property, and extracting monies to which Respondents had no legitimate title or basis to demand.

At a trial against Mr. Lepper, the "testimony of Stephan Fellman...established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office that a treehouse was being constructed," yet no such complaint

5

was ever shown to Mr. Lepper although he requested a copy on several occasions, the last of which was in writing.

On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a *pro se* defendant in a quasi-criminal proceeding, Mr. Lepper was found in violation of Section 365–26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

The next day, October 18, 2018, Babylon Village Attorney Gerard Glass sent a letter to the Lepper Family, stating, *in toto*, that "As you know this office is counsel to the Village of Babylon. The Court has rendered its decision. Please let me know your intentions. Thank you for your attention and courtesies herein."

The day after Attorney Glass sent his letter, Building Inspector Fellman ordered the treehouse removed. Two days after the Order was issued, Building Inspector Fellman state that "On October 17, 2018 Village Justice John Rafter found you guilty of each offense listed on various summonses you received regarding the construction of a treehouse within your front yard setback. I, as Building Inspector, am ordering the continuation of the stop work order barring any further construction or occupancy of the tree house."

Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

These acts, culminating with the October 19, 2018 letter coupled with statements made in open court show that no legitimate basis

6

existed for the alleged permitting process and that the decision to limit the use of the Claimant's property was a forgone conclusion.

Respondents, all of them, knew and had reason to know that the Claimant's use of the property was related to the hypodermic needles found on and around Claimant's property.

Respondents, all of them, knew and had reason to know that the Claimant's use of property, in erecting a child's play tree house, was for the purpose of Claimant's child(ren) in both their protection and in directing the upbringing and education of Claimant's youth, free from the scourge of Heroin that has undertaken Long Island, New York.

Respondents, all of them, acted, defrauded, conspired and took affirmative steps at the direction of, with the assistance of, encouragement and support of private actors, including but not limited to a Claimant's neighbor who, upon information and belief, shares intimate relations with some of the Respondents claimed herein.

Respondents, cloaked with the authority of law, did falsely accuse, maliciously prosecute, defame, slander and intimidate the Claimants to limit the use of their property, silence the public statements of Claimants, silence Claimant's criticism of Respondents' actions, or lack of therein, relating to the ongoing criminal element surrounding Claimant's property, depriving Claimant of fair legal process, denying Claimant full and fair use of Claimant's property and subjecting claimant to unwarranted and excessive fines.

**4. The items of damage and injury claimed are:**

Claimant sustained emotional injuries in violation of his civil rights, including but not limited to loss of emotional integrity, loss of dignity, loss of comfort, extreme mental stress, emotional scarring, psychological damages, damage to name and reputation, stigma associated with being labeled a criminal, monetary damages, special damages/costs/fees, loss of income and related damages incurred by and on behalf of Claimant for the recklessness, carelessness, gross negligence, negligence, intentional conduct, malicious conduct, violation of civil rights, and unlawful conduct of RESPONDENTS individually and collectively.

The undersigned claimant therefore, presents this claim for adjustment and payment of continuing damages amounting in excess of $100,000 in damages, fines and reasonable attorney's fees. You are notified that unless it is adjusted and paid within the time provided by law from date of presentation to you, the claimant intends to commence an action on this claim or incorporate such state law claims into an existing action.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

8

DATED AT   Dix Hills, New York
December 6, 2018

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Claimant*
Office & P.O. Address
33 Walt Whitman Rd, *suite* 310
Dix Hills, New York 11746
Phone: (631) 450-2515
FAX: (631) 223-7377
email Cory.H.Morris@protonmail.com

## INDEPENDENT VERIFICATION

State of New York
County of Suffolk } ss:

    Noelle Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the claimants filing this Notice of Claim; that I have read the foregoing Notice of Claim and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of
perjury on December 6, 2018

 

_____
NOELLE LEPPER

Sworn before me on the
6th of December, 2018

_____
NOTARY PUBLIC

LINDA T. INGODEN
Notary Public, State of New York
No. 4147660
Qualified in Nassau County
Commission Expires February 27, 20 19

## INDEPENDENT VERIFICATION

State of New York } ss:
County of Suffolk }

John Lepper duly affirming under the penalty of perjury deposes and says that I am the one of the claimants filing this Notice of Claim; that I have read the foregoing Notice of Claim and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief.

Duly affirmed under penalty of
perjury on December 6, 2018

JOHN LEPPER

Sworn before me on the
6th of December, 2018

NOTARY PUBLIC

LINDA T. DRYDEN
Notary Public, State of New York
No. 4947560
Qualified in Nassau County
Commission Expires February 27, 20 19

# EXHIBIT "N"

# State of New York County of Suffolk

*In the matter of the claim of*

### JOHN LEPPER,

*–against–*

**VILLAGE OF BABYLON;**
**RALPH SCORDINO,** Mayor, **KEVIN MULDOWNEY,** Deputy
Mayor, **ROBYN SILVESTRI,** Village Trustee, **TONY DAVIDA,**
Village Trustee, **MARY ADAMS,** Village Trustee;
**STEPHEN FELLMAN,** Village of Babylon Building Inspector;
**SUZANNE SCHETTINO,** Department of Public Works; **GERARD
GLASS,** Esq., Village of Babylon Attorney; **DEBORAH LONGO,**
Planning Board, Village of Babylon; and

**JOHN AND JANE DOE** (municipal agents, employees,
consultants and/or independent contractors) ##1–10 who might
be further identified in further prosecution of this claim,

*Respondents*

# NOTICE OF CLAIM

CORY H. MORRIS
*Attorney for John Lepper*
VICTOR JOHN YANNACONE, JR., *of counsel*

To:  **VILLAGE OF BABYLON**
     153 West Main Street
     Babylon, New York 11702



2

## NOTICE OF CLAIM

1. The name and post office address of claimant and claimant's attorney is:

**Claimant(s):**

John Lepper
59 Cockenoe Avenue
Babylon, New York 11702

**Attorney(s):**

Cory H. Morris
The Law Offices of Cory H. Morris
135 Pinelawn Road, Suite 250s
Melville NY 11747

2. The nature of the claim:

Claimant John Lepper sustained emotional injuries in violation of their civil rights, including but not limited to loss of emotional integrity, loss of dignity, loss of comfort, extreme mental stress, emotional scarring, psychological damages, damage to name and reputation, stigma associated with being labeled a criminal, monetary damages, special damages/costs/fees, loss of income and related damages incurred by and on behalf of Claimant John Lepper for the recklessness, carelessness, gross negligence, negligence, intentional conduct, malicious conduct, violation of civil rights, and unlawful conduct of RESPONDENTS, VILLAGE OF BABYLON; RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon; and JOHN AND JANE DOE (collectively referred to herein as "Respondents"), individually and collectively.

3

**3. The time when, place where and the manner in which the claim arose:**

The claim regarding malicious prosecution results as the dismissal of charges that initially arose in the incorporated Village of Babylon, Town of Babylon, Suffolk County, NY starting on or about May 10, 2018 which culminated in the reversal and dismissal of accusatory instruments against John Lepper. Respondents, know and have reason to know that this claim for malicious prosecution was forthcoming and such claims prior to the ninety-days from the filing of the instant notice of claim are incorporated fully herein:

In April, 2018, Claimant John Lepper found a syringe, a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard when he was playing with his children. Mr. John Lepper informed his neighbors immediately and was outspoken to the Village of Babylon in trying to find a remedy to shield his children from potential disease and harm caused by used hypodermic needles.

On or about May 3, 2018, after conferring with NOELLE LEPPER, Claimant John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of Babylon.

On or about May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that "It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit." At no point did John Lepper or Noelle Lepper (hereinafter "Claimant" or "Claimants") break the law. Respondents, collectively, labored to target otherwise innocent persons within

4

the Village of Babylon for the purpose of extracting sums of money by virtue of enforcement of an ambiguous an arbitrary Village of Babylon code and local ordinance(s). Claimants endeavored to comply with all applicable state and local laws.

At some point in July, 2018, albeit dated May 21, 2018, Stephen Fellman sent Mr. Lepper a letter titled "Notice of Violation" stating that the letter was to serve as notice that Mr. Lepper "that the aforementioned violations must be corrected before May 23, 2018 or an appearance ticket may be issued." This was done knowing that the Claimant was guilty of no wrongdoing and attempted to comply with the law by submitting, *inter alia*, a building permit to the Village of Babylon as early as May, 2018.

On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that "Per Section 116 Unsafe Structures of the International Building Code ("IBC") the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."

Building Inspector Fellman never identified the nature and manner he claimed the treehouse was an unsafe treehouse. In addition, there is no proof that Babylon Village properly adopted the IBC. Respondents, collectively, filed false charges, entered the property/curtilage of Claimant's home, proceeded to prosecute Claimant on purported Village of Babylon code violations that were ambigious and did so for the purpose of causing harm, limiting the use of claimant's property and the ability of his children to utilize such property, and extracting monies to which Respondents had no legitimate title or basis to demand.

At a trial against Mr. Lepper, the "testimony of Stephan Fellman…established that he visited the premises in question on May 9, 2018, following receipt of a complaint in the Mayor's office

5

that a treehouse was being constructed," yet no such complaint was ever shown to Mr. Lepper although he requested a copy on several occasions, the last of which was in writing.

On or about October 17, 2018, after a trial singularly deficient in the procedural due process which should have been afforded a *pro se* defendant in a quasi-criminal proceeding, Mr. Lepper was found in violation of Section 365–26 of the Village of Babylon Code based upon a reference by Hon. John T. Rafter to the Merriam-Webster definition of a building without any citation to the edition and year of publication of that dictionary or explanation of whether it had ever been adopted as an element of the Village of Babylon Code.

Such guilty finding against John Lepper was reversed on or about December 20, 2019. Babylon Village Attorney Gerard Glass did admit to press outlets that he knew the accusatory instrument was insufficient yet prosecuted John Lepper pro-se nonetheless.

The next day, October 18, 2018, Babylon Village Attorney Gerard Glass sent a letter to the Lepper Family, stating, *in toto*, that "As you know this office is counsel to the Village of Babylon. The Court has rendered its decision. Please let me know your intentions. Thank you for your attention and courtesies herein."

Based on the guilty conviction that has now been reversed and dismissed, the day after Attorney Glass sent his letter, Building Inspector Fellman ordered the treehouse removed. Two days after the now-reversed-and-dismissed Order was issued, Building Inspector Fellman state that "On October 17, 2018 Village Justice John Rafter found you guilty of each offense listed on various summonses you received regarding the construction of a treehouse within your front yard setback. I, as Building Inspector, am ordering the continuation of the stop work order barring any further construction or occupancy of the tree house."

6

Building Inspector Fellman concluded his October 19, 2018 letter with the threat that the Lepper Family "must remove the tree house in its entirety or summonses may be issued on a daily basis."

These acts, culminating with the October 19, 2018 letter coupled with statements made in open court show that no legitimate basis existed for the alleged permitting process and that the decision to limit the use of the Claimant's property was a forgone conclusion.

Respondents, all of them, knew and had reason to know that the Claimant's use of the property was related to the hypodermic needles found on and around Claimant's property.

Respondents, all of them, knew and had reason to know that the Claimant's use of property, in erecting a child's play tree house, was for the purpose of Claimant's child(ren) in both their protection and in directing the upbringing and education of Claimant's youth, free from the scourge of Heroin that has undertaken Long Island, New York.

Respondents, all of them, acted, defrauded, conspired and took affirmative steps at the direction of, with the assistance of, encouragement and support of private actors, including but not limited to a Claimant's neighbor who, upon information and belief, shares intimate relations with some of the Respondents claimed herein together with the Village of Babylon Judge, John Rafter.

Respondents, cloaked with the authority of law, did falsely accuse, maliciously prosecute, defame, slander and intimidate the Claimant to limit the use of his property, silence the public statements of Claimant, silence Claimant's criticism of Respondents' actions, or lack of therein, relating to the ongoing

7

criminal element surrounding Claimant's property, depriving Claimant of fair legal process, denying Claimant full and fair use of Claimant's property and subjecting claimant to unwarranted and excessive fines.

Additionally, Respondents did contact the Suffolk County Police Department and make false allegations seeking to have John Lepper falsely arrested. To wit, Respondent Mayor Sciordino did contact the Suffolk County Police Department that visited with John Lepper and did inform John Lepper that he was the subject of a criminal complaint by, among others, Respondent Mayor Sciordino.

**4. The items of damage and injury claimed are:**

Claimant sustained emotional injuries in violation of his civil rights, including but not limited to loss of emotional integrity, loss of dignity, loss of comfort, extreme mental stress, emotional scarring, psychological damages, damage to name and reputation, stigma associated with being labeled a criminal, monetary damages, special damages/costs/fees, loss of income and related damages incurred by and on behalf of Claimant for the recklessness, carelessness, gross negligence, negligence, intentional conduct, malicious conduct, violation of civil rights, and unlawful conduct of RESPONDENTS individually and collectively.

The undersigned claimant therefore, presents this claim for adjustment and payment of continuing damages amounting in excess of $2,000,000 in damages, fines and reasonable attorney's fees.

You are notified that unless it is adjusted and paid within the time provided by law from date of presentation to you, the claimant intends to commence an action on this claim or incorporate such state law claims into an existing action.

8

DATED AT  Melville, New York
March 10, 2020

CORY H. MORRIS (CM 5225)
THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Claimant*
Office & P.O. Address
135 Pinelawn Road, Suite 250s
Melville NY 11747
Phone: (631) 450–2515
FAX: (631) 223–7377
email Cory.H.Morris@protonmail.com

9

## ATTORNEY VERIFICATION

State of New York } ss:
County of Suffolk

Cory H. Morris duly affirming under the penalty of perjury deposes and says that I am the attorney representing the claimant filing this Notice of Claim; that I have read the foregoing Notice of Claim and know the contents thereof; that the same is true to deponents' own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters the source of my information and the basis for my belief is a review of the file I maintain on this matter, investigation, and communications with the claimant, and that as to those matters deponent believes it to be true

Duly affirmed under penalty of perjury on March 10, 2020

Cory H. Morris

# State of New York County of Suffolk

*In the matter of the claim of*

### JOHN LEPPER,

*–against–*

VILLAGE OF BABYLON;
RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy
Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA,
Village Trustee, MARY ADAMS, Village Trustee;
STEPHEN FELLMAN, Village of Babylon Building Inspector;
SUZANNE SCHETTINO, Department of Public Works; GERARD
GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon; and
Municipal agents, employees, consultants and independent
contractors ##1–10 who might be further identified in further
prosecution of this claim,

*Respondents*

# NOTICE OF CLAIM

### LAW OFFICES OF CORY H. MORRIS
*Attorneys for John Lepper*
135 Pinelawn Road, Suite 250s
Melville NY 11747
Phone: 631–450–2515 | FAX: 631–223–7377

To: **VILLAGE OF BABYLON**
153 West Main Street
Babylon, New York 11702

EXHIBIT "O"

Page 1

1
2
    50-h HEARING
3   ----------------------------------------X
    In the Matter of the Claim of
4
    JOHN LEPPER,
5
                              CLAIMANT,
6
7        -against-
8
    VILLAGE OF BABYLON; RALPH SCORDINO, Mayor,
9   KEVIN MULDOWNEY, Deputy Mayor, ROBYN
    SILVESTRI, Village Trustee, TONY DAVIDA,
10  Village Trustee, MARY ADAMS, Village
    Trustee; STEPHEN FELLMAN, Village of Babylon
11  Building Inspector; SUZANNE SCHETTINO,
    Department of Public Works, GERARD GLASS,
12  ESQ., Village of Babylon Attorney; DEBORAH
    LONGO, Planning Board, Village of Babylon;
13  and JOHN AND JANE DOE (municipal agents,
    employees, consultants and/or independent
14  contractors) #1-10 who might be further
    identified in further prosecution of this
15  claim,
16                            RESPONDENTS.
    ----------------------------------------X
17                      DATE: July 20, 2020
18                      TIME: 10:38 a.m.
19
20
21       VIDEOCONFERENCE 50-h HEARING of JOHN
22  LEPPER, the Claimant in the above-entitled
23  matter, pursuant to a Statute, before Nicole
24  Veltri, RPR, CRR, a Notary Public of the
25  State of New York.

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    THE LAW OFFICES OF CORY H. MORRIS
          Attorney for the Claimant
 5        135 Pinelawn Road, Suite 250s
          Melville, New York 11747
 6        BY: CORY H. MORRIS, ESQ.
 7
 8
      KELLY RODE KELLY, LLP
 9        Attorney for the Respondents
          330 Old Country Road
10        Mineola, New York 11501
          BY: ERIC TOSCA, ESQ.
11        File #: 148530752
12
      ALSO PRESENT:
13    SHANNON FILMORE ESQ.: Associate with Kelly
      Rode Kelly, LLP
14    GERARD GLASS, ESQ.: Village of Babylon
      Attorney
15
16         *           *           *
17
18
19
20
21
22
23
24
25
```

```
 1                    J. LEPPER
 2   J O H N    L E P P E R, called as a witness,
 3   having been first duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. TOSCA:
 8        Q.    Please state your name for the
 9   record.
10        A.    John Lepper.
11        Q.    What is your address?
12            MR. MORRIS:   This is done pursuant
13        to Section 50-h.   This will not be
14        video recorded.   In other words, we do
15        not consent to any video recording.   I
16        would like to note for the record, we
17        have present here, it looks like Gerard
18        Glass, Shannon Filmore, John Lepper,
19        me, Cory Morris, Eric Tosca, and
20        someone from Veritext.   Is that
21        correct?   Counsel, is that correct?
22            MR. TOSCA:   You have noted
23        everybody who's present during the
24        video, yes.
25            MR. MORRIS:   Is anyone else
```

Page 4

```
 1               J. LEPPER
 2      present who I have not noted, counsel?
 3           MR. TOSCA:  Not that I know of.
 4      Is there anybody present on your end
 5      other than people who have appeared
 6      here?
 7           MR. MORRIS:  No.  I just put it on
 8      the record.  That's why I'm asking you.
 9           MR. TOSCA:  Okay.
10           MR. MORRIS:  Are you video
11      recording this?
12           MR. TOSCA:  Of course, it's video
13      recorded.  It's here on video.  If you
14      want to object to any video display,
15      you can do what you wish; but the point
16      is, I don't know that a video recording
17      is objectionable anyway.
18           MR. MORRIS:  Sure.  John, please
19      turn off your video.
20           MR. TOSCA:  I'm going to object to
21      that.  There's no reason that his video
22      should be off.
23           MS. FILMORE:  I think what the
24      problem is, is that the difference -- I
25      mean, this technically isn't being
```

Page 5

1                    J. LEPPER
2       video recorded.  It's being recorded,
3       but it's not being recorded on a thing
4       that can be played again.  Does that
5       make sense?
6            MR. TOSCA:  I haven't hired a
7       videographer for this.  Not that I
8       shouldn't have been able to if I
9       wanted, but I did not; and to that
10      extent, I'm going to request that
11      Mr. Lepper turn on the video.
12           MR. MORRIS:  I'm sorry.  You cut
13      out, counsel.
14           MR. TOSCA:  In light of the fact
15      that there's no video recording not
16      that I think that that's a fair
17      objection, it is not.  It doesn't
18      matter because we have no videographer,
19      and this is just live streaming; so in
20      light of that, I do expect Mr. Lepper's
21      appearance and request that the video
22      be on.
23           MR. MORRIS:  Counsel, essentially
24      can we confirm that you will not be
25      recording this?

Page 6

1                    J. LEPPER

2           MR. TOSCA:  It's been confirmed

3    already.  I think you heard Ms. Veltri.

4           MR. MORRIS:  Okay.  I'm asking you

5    to confirm that you are not video

6    recording this.

7           MR. TOSCA:  I am not video

8    recording this.

9           MS. FILMORE:  Neither am I.

10          MR. MORRIS:  All right, because,

11   again, we don't consent to video

12   recording.

13          Mr. Lepper, please put your video

14   back on.

15          MR. TOSCA:  Thank you.  Okay.

16   Shall we begin?  We need your name and

17   address.

18          MR. MORRIS:  Note my objection.

19   You're here relative to the occurrence

20   and the extent of the injuries and

21   damages pursuant to section 50-h.  He's

22   appearing through counsel.  If not, I

23   would like everyone here to give me

24   their personal address.

25          MR. TOSCA:  You're not going to

1                    J. LEPPER

2        get my personal address.  That's number

3        one, and I'm not asking for yours; and

4        this is ridiculous, okay?  The first

5        question we're going to have a problem

6        with, you know, Mr.  --

7            MR. MORRIS:  Counsel, mark it for

8        a ruling.

9            MR. TOSCA:  Understand if you

10       impede the 50-h hearing, there are

11       remedies to that; and I'll exercise

12       them.  But in any event, are you not

13       permitting your client to give his

14       address?  I don't know what you mean by

15       mark it for a ruling.  Are you

16       directing your witness not to give his

17       address?

18           MR. MORRIS:  Counsel, I've placed

19       on the record our objection.  It's now

20       10:42.

21           MR. TOSCA:  Are you not permitting

22       the witness to give his address?

23           MR. MORRIS:  He's appearing

24       through counsel, 135 Pinelawn Road,

25       Suite 250S --

Page 8

J. LEPPER

1

2          MR. TOSCA:  This is getting

3      nowhere.

4      Q.   Mr. Lepper, what is your address?

5          MR. MORRIS:  Mr. Lepper, note my

6      objection.  Don't answer.

7      Q.   Mr. Lepper, presently you're

8  appearing for a 50-h hearing; do you

9  understand that?

10     A.   Yes, I do.

11         MR. MORRIS:  Objection.

12     Examination.

13     Q.   Do you understand that in this

14  hearing your testimony is being taken under

15  oath?

16     A.   Yes, I do.

17     Q.   And you've been sworn in and

18  you're swearing to tell the truth, correct?

19         MR. MORRIS:  Objection.

20     A.   Yes.

21     Q.   So, Mr. Lepper, the address where

22  you're currently sitting, where is that?

23     A.   I'm not sure.

24     Q.   Is it at an office of Mr. Morris?

25     A.   Yes.

Page 9

1                    J. LEPPER

2        Q.    Is anyone else in the room with

3    you?

4        A.    No.

5        Q.    All right.

6              Mr. Lepper, are you familiar with

7    the Notice of Claim that you served in this

8    matter?

9              MR. MORRIS:   Objection.

10       Q.    I'm sorry?

11             MR. MORRIS:   Note my objection.

12             MR. TOSCA:   Okay.   Will you allow

13       your witness to answer --

14       A.    Yes.

15       Q.    How many Notices of Claim have you

16   filed against the Village of Babylon?

17       A.    I don't recall.

18       Q.    Do you recall at least one of

19   them?

20       A.    Yes.

21       Q.    Do you recall two?

22       A.    I don't recall.

23             MR. TOSCA:   Nicole, if you could

24       mark as Exhibit A for the 50-h hearing

25       the Notice of Claim and put it on the

1            J. LEPPER

2       screen for the witness.

3            (Whereupon, the aforementioned

4       Notice of Claim was marked as

5       Respondents' Exhibit A for

6       identification as of this date by the

7       Reporter.)

8            MR. MORRIS:  It's now 10:47 a.m.

9       Can we note for the record counsel is

10      having difficulty admitting an exhibit,

11      displaying an exhibit to the claimant.

12      I'm going to suggest maybe that you

13      want to take a few minutes, Mr. Tosca,

14      and figure out the technical

15      difficulties perhaps now and return in

16      five or ten minutes.

17           MR. TOSCA:  If you wish to do

18      that.  That's fine.  Five minutes is

19      all I think I need.  The host disabled.

20           (Whereupon, a short recess was

21      taken.)

22           MR. TOSCA:  The time now is 10:55.

23      Counsel, have you resolved the

24      technical difficulties of which you

25      experienced earlier.

Page 11

1                    J. LEPPER

2              MR. TOSCA:  With regard to this,

3         we come to a reconciliation to admit

4         the Notice of Claim to the witness.

5         Q.    Mr. Lepper, I'm going to ask you

6    are you able to see on the screen the Notice

7    exhibit?

8         A.    I can see it, but I can't read it.

9         Q.    You can't read it; is it too

10   blurry or something?

11        A.    It's too small.

12             MR. TOSCA:  Is there any way you

13        can enlarge this for the witness to

14        see?

15        Q.    Now that we've enlarged it,

16   Mr. Lepper, is it visible for you to see?

17        A.    I can see it.  It's still very

18   small, and my glasses are fogging up.  Can I

19   get a printed copy?

20        Q.    Well, your attorney should have

21   one.

22             MR. TOSCA:  Mr. Morris, do you

23        have a printed copy for him?

24             MR. MORRIS:  Let me see.  The

25        document that you're displaying seems

1                    J. LEPPER

2      to be 11 pages.  I'm not sure how that

3      can be but --

4           MR. TOSCA:  How many pages are

5      your document?

6           MR. MORRIS:  I'm not sure to which

7      document you're referring, but I know

8      we didn't serve an 11-page Notice of

9      Claim.

10          MR. TOSCA:  Okay.  I have a

11     ten-page Notice of Claim with a

12     one-page face sheet.  So how many pages

13     is your Notice of Claim?

14          MR. MORRIS:  I'm not sure to which

15     Notice of Claim you are referring and

16     for that matter --

17          MR. TOSCA:  This is the one that

18     was served in March.  Mr. Morris, are

19     you there?

20          MR. MORRIS:  I'm here.

21          MR. TOSCA:  I'm asking you about

22     the Notice of Claim.  You said that you

23     don't have an 11-page Notice of Claim,

24     and I explained that the first page is

25     just a front sheet.  First page is the

Page 13

```
 1                       J. LEPPER
 2        face sheet, so there should be ten
 3        pages.  Is your Notice of Claim not ten
 4        pages?
 5              MR. MORRIS:  Counsel, I suggest as
 6        the time now is 10:59 a.m. that you ask
 7        questions as Section 50-h of the
 8        General Municipal Law contemplates.
 9              MR. TOSCA:  You're being
10        obstructionist.
11              MR. MORRIS:  It would appear as to
12        what that is.
13              MR. TOSCA:  I'm sorry.  I didn't
14        hear you.
15              MR. MORRIS:  I understand.  That's
16        why I'm trying to speak slowly and not
17        speak over you.  So I'm going to
18        continue.  I'm going to read Section
19        50-h into the record, the first
20        admission, so that it is clear.  Quote,
21        wherever a Notice of Claim is filed
22        against a city, county, town, village,
23        fire district, ambulance district, or
24        school district, the city, county,
25        town, village, fire district, ambulance
```

1              J. LEPPER

2       district, or school district shall have

3       the right to demand an examination of

4       the claimant relative to the occurrence

5       and extent of the injuries or damages

6       for which a claim is made, which

7       examination shall be upon oral

8       questions unless the parties otherwise

9       stipulate and may include a physical

10      examination of the claimant by a duly

11      qualified physician, end quote.

12           It continues, if I suggest to you

13      that you ask questions as the law

14      considers relative to the occurrence

15      and extent of the injuries or damages.

16      If you would like, counselor, we can

17      stipulate to the Notice of Claim being

18      just that.

19           MR. TOSCA:  In any event, do you

20      have a hard copy to show your witness?

21           MR. MORRIS:  I don't have a hard

22      copy of what you presented, counselor.

23           MR. TOSCA:  Okay.  You don't have

24      a hard copy of the Notice of Claim that

25      you filed with the village?

Page 15

J. LEPPER

1
2          MR. MORRIS:  Counselor, please
3      proceed in your question.
4          MR. TOSCA:  We'll do as best we
5      can with what's on the screen.
6      Q.   So if you can scroll down, page
7  two, all right.  Mr. Lepper, you had
8  indicated in the Notice of Claim that your
9  address at the time the Notice of Claim was
10 filed was 59 Cockenoe Avenue in Babylon, New
11 York, 11702; is that correct?
12         MR. MORRIS:  Note my objection.
13     Do not answer.
14     Q.   Is that an incorrect address?
15         MR. MORRIS:  Note my objection.
16     Do not answer.  If you could scroll
17     down,.
18     Q.   Mr. Lepper, are you claiming
19 emotional injuries due to this claim?
20         MR. MORRIS:  Note my objection.
21     Are you asking him to read off a screen
22     right now, or are you asking him
23     questions as the law contemplates?
24     Q.   Well, number one, Mr. Lepper, are
25 you able to read the screen that's in front

Page 16

1                    J. LEPPER
2  of you?
3           MR. MORRIS:  Counsel, please
4       answer my question before you proceed
5       in showing him this document and asking
6       questions.
7           MR. TOSCA:  I am not going to
8       answer these questions.  I am not here
9       for a hearing.
10           MR. MORRIS:  The time now is
11       11:02.  Counsel, I suggest we take five
12       minutes and you figure it out, okay?
13           MR. TOSCA:  No.  There's no reason
14       to take five minutes.
15           MR. MORRIS:  Mr. Lepper, turn your
16       video off.
17           MR. TOSCA:  You're obstructing the
18       50-h hearing.  You're obstructing the
19       50-h hearing.
20           MR. MORRIS:  Counsel, do you want
21       to show him a document; or do you want
22       to ask him questions because what
23       you've done with the document, we're
24       going to ask that you put it aside.
25       Since we cannot do that and we are

Page 17

                    J. LEPPER

1

2       accommodating your request, right, you

3       adjust the claim, right?  You either

4       show him the document and then once

5       you're finished take the document off

6       the screen like any other examination;

7       or if you want to ask him about the

8       document, not ask him questions while

9       you show him a document, we'll allow

10      you to proceed.

11              MR. TOSCA:  I will ask the

12      questions as I see fit.  They are not

13      objectionable.  What you're doing is

14      obstructing the deposition.  It began

15      with a very simple question, what's

16      your address.  Now, your objections are

17      just --

18              MR. MORRIS:  Your video is

19      breaking up.

20              MR. TOSCA:  I said your questions

21      are impeding this 50-h hearing,

22      detrimental to the rights of the

23      defendants in this case and ask

24      questions in a 50-h --

25              MR. MORRIS:  You're a respondent.

J. LEPPER

1
2    Perhaps you don't understand the law.
3    Your a respondent because we haven't
4    sued you, not yet.
5         MR. TOSCA:  Mr. Morris, you say
6    what you wish, okay?  In the meantime,
7    you're impeding the ability of the
8    village to take a 50-h hearing.  We'll
9    proceed, but your conduct today is
10   detrimental to the rights of the
11   village and the other respondents.
12        MR. MORRIS:  Counselor, are you
13   done?  I don't want to cut you off.
14        MR. TOSCA:  No.  I'm done.
15        MR. MORRIS:  Madam Court Reporter,
16   are you able to take down all the of
17   this?  Mr. Tosca, we object to your
18   characterization.  Would you like to
19   ask the witness questions, or would you
20   like to show him a document?  Please
21   let us know so we can proceed today.
22        MR. TOSCA:  Number one, I can do
23   both.  I'm showing him a document,
24   looked at the Notice of Claim; and I've
25   asked him if he could read that at

1          J. LEPPER

2      which time you objected.

3          MR. MORRIS:  Note my objection.

4          MR. TOSCA:  I'm asking him if he's

5      claiming emotional injuries.  You

6      objected.

7          MR. MORRIS:  Are you asking him

8      about the document, or are you asking

9      him if he's claiming emotional injuries

10     because if that's the case --

11         MR. TOSCA:  My questions --

12         MR. MORRIS:  Counsel, I did not

13     interrupt you.  I ask that we be

14     allowed to speak.  If you can't do

15     that, we're done.

16         MR. TOSCA:  Go on, Mr. Morris.

17         MR. MORRIS:  If you are done

18     presenting the document to him, we ask

19     that you take it off the screen as we

20     would do in any other examination.

21     That is it.  If you cannot do that

22     because of technical difficulties of

23     which you have already demonstrated

24     here today, then we will not have to

25     proceed in this matter.  You will take

Page 20

1                    J. LEPPER

2         your time.  You will figure out how to

3         use a computer, and we will proceed.

4              MR. TOSCA:  You know, your remarks

5         are uncalled for.  There have been no

6         technical difficulties.  We've been

7         trying to accommodate your client with

8         a screen that he says he could not see.

9         That's not a technical difficulty.

10        That's a difficulty with your client

11        being able to see something in front of

12        him.  If he says he can't read it, we

13        made it bigger for him.

14             Now, with that being said, I'm

15        asking him questions.  There's a

16        document on the screen.  I will be

17        asking him questions about the

18        document, and I will be asking him

19        questions that pertain to the document.

20        So there's no reason to take the

21        document off the screen.

22             MR. MORRIS:  Madam Court Reporter,

23        what do you mean he cut out?  Can you

24        explain.

25             COURT REPORTER:  I didn't hear

Page 21

1                    J. LEPPER
2         what he said.
3              MR. MORRIS:  If you could please
4         place that on the record.
5              MR. TOSCA:  Can you read back what
6         I said, Ms. Veltri.
7              (Whereupon, the referred to
8         colloquy was read back by the
9         reporter.)
10             MR. MORRIS:  Note my objection.
11        Counselor, once you're done with the
12        document, are you able to take it off
13        the screen?
14             MR. TOSCA:  After I'm done with
15        the document, we are able to remove it.
16             MR. MORRIS:  Very good.
17             Mr. Lepper, please turn your video
18        back on.  The time now is 11:08 a.m.
19        Q.   Looking at the document that's now
20    on the screen, Mr. Lepper, can you read
21    that?
22        A.   No.
23        Q.   Can we go to the next page?  Are
24    you able to read what's designated as page
25    three as far as the time, place, where, and

Page 22

```
 1                    J. LEPPER
 2   manner in which the claim arose?
 3            MR. MORRIS:  Note my objection,
 4        I'm looking here it says page four of
 5        11.
 6            MR. TOSCA:  Top of the page it
 7        says three.
 8            MR. MORRIS:  Counsel, that's your
 9        testimony.  Not the client.  I'm
10        looking at a document that has eleven
11        pages, which it might be at the top of
12        page three.  Again, are you
13        representing --
14            MR. TOSCA:  It does say four of
15        eleven.
16            MR. MORRIS:  Okay.  So the record
17        is clear, you're referring to a page
18        three on a document that has eleven
19        pages.  Perhaps you should have
20        provided this in advance of today.
21            MR. TOSCA:  It's something you
22        already have.  Any way, are you going
23        to let your witness answer the
24        question?
25            MR. MORRIS:  Do you want to send
```

1                    J. LEPPER

2         it to me so we have a physical copy and

3         maybe we'll print it out?  For that

4         matter, it looks like Shannon Filmore

5         is speaking; but we can't hear her.

6              MR. TOSCA:  Shannon, are you

7         talking?

8              MS. FILMORE:  No.  I'm talking to

9         myself.  I just got an email from

10        somebody.

11             MR. TOSCA:  Anyway, it has nothing

12        to do with this.

13             MS. FILMORE:  It has nothing to do

14        with this.

15             MR. TOSCA:  Mr. Morris, we don't

16        need to send that to you.  The exhibits

17        were -- this is a Notice of Claim that

18        you had filed.  Stop.

19             MR. MORRIS:  If it's a Notice of

20        Claim that I have filed, what's the

21        confusion here?  You're going to ask my

22        client to read it?

23             MR. TOSCA:  No.  I want to know if

24        he's reading what's on the screen, and

25        I want him to identify the document.

1                    J. LEPPER

2        If he's not able to read it, which I

3        don't understand, but he'll tell us

4        that.  I don't need you to tell me.

5             MR. MORRIS:  Let me explain this

6        to you, counselor.  Again, let me

7        explain this to, counsel, you're making

8        representations of a document that's

9        eleven pages long.  We have not

10       received the document that you're

11       marking and relying on.  Should you

12       wish to rely on the document and you

13       would like to provide me a copy, I will

14       again accommodate your request in

15       printing it out and presenting it to

16       the witness to avoid the technical

17       difficulties of which we have now

18       experienced here for almost 45 minutes.

19            MR. TOSCA:  There's no technical

20       difficulty.  You're being an

21       obstructionist.

22            MR. MORRIS:  Would you like me to

23       print out the document, counselor, and

24       that will avoid the situation?

25            MR. TOSCA:  Please print out the

Page 25

1                    J. LEPPER

2          document, Mr. Morris.

3               MR. MORRIS:  Perhaps if you send

4          it to me, I'll have it.  Would you like

5          to send it to me?

6               MR. TOSCA:  So that there's no

7          confusion, Ms. Veltri, can you send him

8          the Notice of Claim?

9               MR. MORRIS:  Counsel, perhaps you

10         would like to ask him the questions so

11         we can as the law suggests examine the

12         claimant relative to the occurrence and

13         the extent of the injuries.

14              MR. TOSCA:  I'm trying to do that

15         except that you're obstructing that

16         ability.

17              MR. MORRIS:  Counsel, note my

18         objection; and at this point, let's

19         mark it for a record.  Madam Court

20         Reporter, you're taking this all down,

21         correct?

22              I would like to note for the

23         record and ask that the Court make a

24         ruling that counselor has an inability

25         to demonstrate that he is able to use

Page 26

```
 1              J. LEPPER
 2     technology or provide documents in
 3     advance of today.  Let us mark it for a
 4     ruling.  I object to your
 5     characterization.  It seems that you
 6     have not learned how to use the
 7     computer just like when you came here
 8     with a flip phone to examine a
 9     hypodermic needle.
10          Counselor, if you would like us to
11     look at a document, provide it to us in
12     advance.  The fact that you're saying
13     this is page three when it's page four,
14     it's a misrepresentation.
15          MR. TOSCA:  No, it's not a
16     misrepresentation.  You can see number
17     three at the top of the page.  It's a
18     ten-page Notice of Claim.  The first
19     page is a face sheet to the Notice of
20     Claim.
21          Mr. Morris, you are splitting
22     hairs.  There's no technical
23     difficulty.  You're being an
24     obstructionist.  I object to this.
25     We'll continue with the deposition.
```

Page 27

1                   J. LEPPER

2              MR. MORRIS:  Note my objection.

3         Counselor, this is an examination.  Not

4         a deposition.

5              MR. TOSCA:  Examination Under

6         Oath.  Off the record.

7              MR. MORRIS:  I just got it now.

8         Let's just go off the record just a

9         moment so I can talk to my client.

10             MR. TOSCA:  Okay.

11             (Whereupon, an off-the-record

12        discussion was held.)

13             MR. MORRIS:  I just handed the

14        document to my client.  Appears to be

15        eleven pages.  The first page dated

16        looks like March 12th, 2020.  It

17        appears to have a Village of Babylon

18        letterhead on it.  There's no Bates

19        stamp numbers or any identification

20        other than that.

21             MR. TOSCA:  Are we ready?

22             MR. MORRIS:  I am ready.

23        Q.    Mr. Lepper, now you have a hard

24   copy of a document that's been marked

25   Exhibit A for today; but you looked through

Page 28

```
1                     J. LEPPER
2    the document?
3        A.   Yes.  You're breaking up.  Yes.  I
4    could see it.  My glasses are fogging up,
5    but I could see it.
6        Q.   Do you recognize the document?
7        A.   Yes.
8        Q.   What do you recognize that
9    document to be?
10       A.   Notice of Claim.
11       Q.   Is this a Notice of Claim that you
12   filed with the village?
13       A.   Can you repeat that?  You're
14   breaking up.
15       Q.   Is this a Notice of Claim that you
16   filed with the village?
17            MR. MORRIS:  Note my objection.
18       You can answer.
19       A.   Yes.
20       Q.   Did you personally serve that
21   Notice of Claim upon the village?
22            MR. MORRIS:  Note my objection.
23       A.   Yes.  It says it right there on
24   page two.  Lower right-hand corner.
25       Q.   Do you remember the date that you
```

Page 29

1                    J. LEPPER

2    did that?

3         A.    It says it right there on page

4    two, lower right-hand corner.

5         Q.    What date is that, sir?

6              MR. MORRIS:   Note my objection.

7         A.    March 12th.

8         Q.    If we could turn now to the page

9    enumerated number two at the top of the

10   third page of that exhibit, do you see that?

11        A.    Page three, number two?

12        Q.    Correct.

13        A.    Notice of Claim.

14        Q.    Now --

15        A.    I'm sorry, I didn't hear you.

16        Q.    Yes.   If we could look at the

17   address that's provided there for you, was

18   that your address at the time the Notice of

19   Claim was served?

20             MR. MORRIS:   Note my objection.

21        Don't answer.   We've been through this

22        counsel.   Move on.

23        Q.    Do you see where it says nature of

24   claim, number two of that page, Mr. Lepper?

25        A.    Yes.

Page 30

1                        J. LEPPER

2          Q.    And there are claims that you are

3    asserting, you are asserting against the

4    village that are noted there.  Are you able

5    to read that in front of you?

6              MR. MORRIS:  Note my objection.

7         Move to strike everything before can

8         you read that in front of you.

9              MR. TOSCA:  Is he answering the

10        question?

11             MR. MORRIS:  Counsel, I suggest

12        you move on.  Start asking questions

13        about the claim, not the Notice of

14        Claim filed by counsel.

15             MR. TOSCA:  I'm going to ask him

16        what I am going to ask him.

17         Q.    Are you able to read what's under

18    number two, the nature of the claim?

19         A.    Yes.  When my glasses aren't

20    fogging, yes.

21         Q.    Are those the claims you are

22    asserting against the Village of Babylon and

23    the other respondents named in the Notice of

24    Claim?

25         A.    Yes.

Page 31

1                    J. LEPPER
2        Q.   Go to the next page that's
3    enumerated number three at the top of the
4    page.  Are you able to read that page?
5        A.   Yes.
6        Q.   Do you see where it says time
7    when, place where, and manner in which the
8    claim arose?
9             MR. MORRIS:  Note for the record
10        that counsel's microphone is breaking
11        up.
12        Q.   Did you hear the question,
13    Mr. Lepper?
14        A.   Can you repeat it?
15        Q.   Yes.
16             Do you see number three of the
17    Notice of Claim where it says the time when,
18    place where, the manner in which the claim
19    arose; do you see that?
20             MR. MORRIS:  Note my objection.
21        You're referring to the document that
22        you've marked, correct, counsel?
23             MR. TOSCA:  Correct.
24        A.   Yes.
25        Q.   I would ask you to look through

1                    J. LEPPER

2    the pages of the Notice of Claim turning to

3    three, four, five, six, seven, up through

4    number four.

5              MR. MORRIS:  Again, note my

6         objection.  When you say three, four,

7         five, six, seven, are you referring

8         to -- again, counsel, let me finish,

9         please -- are you referring to pages

10        four, five, six, seven, eight; or are

11        you referring to page three?

12             MR. TOSCA:  Referring to the

13        numbers at the top of each of those

14        pages, typewritten.  Let me know when

15        you're done reading, Mr. Lepper.

16        A.   How many pages would you like me

17   to read again?

18        Q.   I would like you to read the

19   entire section of number three, Notice of

20   Claim, as to time, when, place, where, in

21   the manner in which the claim arose.

22             MR. MORRIS:  And note --

23        Q.   And the numbers at the top of the

24   pages I'm asking you to look at, the

25   typewritten numbers at the top of each page,

Page 33

1                         J. LEPPER

2      three, four, five, six, seven?

3                MR. MORRIS:  Again, note my

4           objection.  The reference of this

5           document as the Notice of Claim.  This

6           is the document that you've marked,

7           counsel.  Mr. Lepper, to the extent

8           he's asking you to read the document in

9           front of you, please go ahead and do

10          that.

11          A.   Again, I'm going to turn my camera

12     off and take a few minutes to review it.

13          Q.   He's reviewing it during the

14     session.  I'm going to ask that he keep the

15     camera on, please.

16               MR. MORRIS:  Mr. Lepper, if you

17          could keep your camera on, please,

18          while you read the document.

19               THE WITNESS:  I'm going to have to

20          review it in a different location where

21          I can take my mask off because my

22          glasses are fogging up.

23               MR. TOSCA:  Tell you what, why

24          don't we take five minutes.  Let

25          Mr. Lepper look at the document; and we

Page 34

```
 1                    J. LEPPER
 2        can come back, okay?
 3             MR. MORRIS:  You're asking for
 4        five minutes?  It's now 11:28 a.m.
 5             MR. TOSCA:  We'll take five
 6        minutes.  Mr. Lepper can take the
 7        document since he can't read it in
 8        front of him; and he can read the
 9        entire document, okay?
10             (Whereupon, a short recess was
11        taken.)
12        Q.   Mr. Lepper, have you had an
13   opportunity to examine the document and read
14   through?
15             MR. MORRIS:  Let me just note for
16        the record it's now 11:42.  Again,
17        counsel, you're referring to the
18        document that you've marked as Exhibit
19        A, correct?
20             MR. TOSCA:  Correct.
21        Q.   Mr. Lepper, I don't think we got
22   an answer.
23             MR. MORRIS:  Will you repeat the
24        question, please.
25        Q.   Had you had an opportunity to
```

```
 1                      J. LEPPER
 2    review Exhibit A today?
 3         A.    I'm sorry, you broke up.  Can you
 4    repeat?
 5         Q.    Did you review Exhibit A?
 6         A.    I read through quickly.
 7         Q.    Did you read that document before
 8    you served it, before you served the Notice
 9    of Claim on the village?
10              MR. MORRIS:  Objection.  You're
11         asking him did he write Exhibit A, the
12         document that you've just produced
13         today?
14              MR. TOSCA:  Correct.
15              MR. MORRIS:  Okay.  Objection.
16         The characterization calls for a legal
17         conclusion.
18         Q.    The Notice of Claim that you
19    served on the village, that Notice of Claim
20    Exhibit A?
21              MR. MORRIS:  Again, note my
22         objection.
23         Q.    Mr. Lepper, you're pausing.  Are
24    you reviewing the document again?
25              MR. MORRIS:  Note my objection.
```

Page 36

1                    J. LEPPER

2        A.   Was there a question?

3        Q.   Yes.   I said you were pausing.

4   Are you reviewing the document again?

5             MR. MORRIS:   Note my objection.

6        Strike everything before are you

7        reviewing the document again.

8        A.   No.   I was waiting for a question.

9        Q.   I asked you the Notice of Claim

10  that you served on the village, is that the

11  same document that's in front of you as part

12  of Exhibit A?

13            MR. MORRIS:   Note my objection.

14       A.   I'm not sure.   I just received

15  Exhibit A.

16       Q.   Okay.

17            Well, did you get a chance to look

18  at Exhibit A?

19            MR. MORRIS:   Note my objection.

20       Asked and answered.   Counsel, it's now

21       11:45.   I suggest you start --

22       Q.   Mr. Lepper, did you look --

23            MR. MORRIS:   Please let me finish.

24       Note for the record --

25            MR. TOSCA:   You're obstructing the

Page 37

1                     J. LEPPER
2          deposition.
3               MR. MORRIS:  Counsel, you're
4          speaking over me; and I have given you
5          every courtesy.
6               MR. TOSCA:  No, you have not.
7               MR. MORRIS:  You're speaking over
8          me.  Let me know when you are finished,
9          sir.
10              MR. MORRIS:  You have not given me
11         any courtesy.  You're obstructing the
12         50-h hearing.  I'm done.
13              MR. MORRIS:  You're done?  Again,
14         note my objection.  Counsel, this is
15         not a deposition.  No matter how much
16         you would like it it be, it is not a
17         deposition.  It is an examination under
18         General Municipal Law Section 50-h.  I
19         suggest you get started.
20              MR. TOSCA:  Are you not letting
21         him answer the last question?
22              MR. MORRIS:  What is the last
23         question?  You're asking him about the
24         document.
25              MR. TOSCA:  Read back the

Page 38

```
 1                    J. LEPPER
 2        question, please.
 3             (Whereupon, the referred to
 4        question was read back by the
 5        reporter.)
 6             MR. MORRIS:  Go ahead and answer
 7        the question, Mr. Lepper.  I don't
 8        understand what the confusion is here.
 9        A.   I read through it just now as it
10   was handed to me.
11        Q.   Is that a copy of the Notice of
12   Claim that you served on the village?
13             MR. MORRIS:  Again, note my
14        objection.
15        Q.   Please answer the question,
16   Mr. Lepper.
17        A.   I have a copy of Exhibit A in
18   front of me.  I don't have a copy of what
19   was submitted to the village in front of me.
20        Q.   So you don't know?
21             MR. MORRIS:  Objection.  He
22        testified.  Move on.
23        Q.   Is your answer you don't know?
24             MR. MORRIS:  Objection.  The
25        testimony speaks for itself.  Counsel,
```

Page 39

J. LEPPER

1

2     move on.

3         Q.   Mr. Lepper, are you claiming

4     emotional injuries from this claim?

5         A.   Yes.

6              MR. MORRIS:  Counsel, are you done

7         with the document?  Would you like the

8         witness to continue to refer to it, or

9         can he place it aside?

10             MR. TOSCA:   No.  I am not done

11        with the document.  He can place it

12        aside if he so chooses.  I'm not done

13        with it by any means.  You are impeding

14        my ability to ask him questions about

15        it.

16             MR. MORRIS:  Mr. Lepper, please

17        put the document aside.  Thank you.

18        Q.   Mr. Lepper, are you claiming

19    emotional injuries due to the claim?

20        A.   Yes.

21        Q.   What are the emotional injuries

22    that you're claiming?

23        A.   Can you repeat the question?

24             MR. TOSCA:   Repeat the question,

25        Ms. Reporter, for the witness.

Page 40

```
                              J. LEPPER
 1                          J. LEPPER
 2                  (Whereupon, the referred to
 3          question was read back by the
 4          reporter.)
 5          A.    I believe that the threats of the
 6   fines created a lot of stress and emotional
 7   stress.
 8          Q.    Any other emotional injuries?
 9          A.    I think that's enough.
10          Q.    The fines that caused you stress,
11   what fines are they that you're referring
12   to?
13          A.    All of them.
14          Q.    Will you tell me which ones?
15                MR. MORRIS:  Objection.
16          Q.    When you say all of them, what are
17   all of them?
18                MR. MORRIS:  Objection.  You can
19          answer.
20          Q.    Mr. Lepper, --
21          A.    Yes.
22          Q.    -- would you answer the question?
23          A.    Can you repeat the question?
24                MR. MORRIS:  Note my objection.
25                MR. TOSCA:  Will the reporter
```

Page 41

```
 1                    J. LEPPER
 2        please read back the question.
 3             (Whereupon, the referred to
 4        question was read back by the
 5        reporter.)
 6             MR. MORRIS:  Again, note my
 7        objection for the record.
 8        A.    I believe I answered that question
 9   already.
10        Q.    How much in fines are we talking
11   about?
12        A.    All of the fines and all of the
13   threats of the fines, continued threats of
14   the fines.
15        Q.    Let's talk about the fines that
16   were levied.  What is the amount of the
17   fines that you received?
18             MR. MORRIS:  Note my objection.
19        A.    I don't recall.
20        Q.    The amount of fines that were
21   received, did they exceed $1,000?
22             MR. MORRIS:  Note my objection.
23        A.    Was that a question?
24        Q.    I'll have the question repeated
25   for you.
```

Page 42

1              J. LEPPER

2         MR. TOSCA:  Ms. Reporter, can you

3     read back the question.

4         (Whereupon, the referred to

5     question was read back by the

6     reporter.)

7     A.   I don't recall.  I know that I was

8  threatened with numerous fines.  I know that

9  the fines that were received were already

10 overruled and ordered to be returned.  I

11 don't know what that amount was.

12    Q.   Have you made any attempt to get

13 the fines refunded?

14    A.   I believe that was ordered by the

15 Court.

16        MR. MORRIS:  Note my objection and

17    counsel -- note my objection.  And

18    counsel, before you ask another

19    question, I don't want to interrupt

20    you.

21        MR. TOSCA:  What are you -- you're

22    objecting to the question, right?

23        MR. MORRIS:  Before you ask

24    another question, this is a claim

25    pursuant to Section 50-h.  You have an

Page 43

```
 1                    J. LEPPER
 2        examination of the claimant, quote,
 3        relative to the occurrence and extent
 4        of the injuries or damages, end quote.
 5             MR. TOSCA:  Okay.
 6             MR. MORRIS:  Surely you're not
 7        going to allow us to go back three
 8        years, right?  You're going to allow us
 9        to go back 90 days.  Otherwise, you'll
10        claim it's time barred, right?  That's
11        what the Notice of Claim is; so I
12        suggest you start answering question,
13        again, quote, relative to the
14        occurrence and extent of the injuries
15        or damages, end quote.
16             MR. TOSCA:  Your objections are
17        repetitive and improper.  I'm going to
18        try to do the best I can here, but
19        you're interrupting every question I
20        ask.  Every question I ask is valid.
21        You're simply trying to obstruct the
22        hearing.
23             MR. MORRIS:  Counselor --
24             MR. TOSCA:  You are making it very
25        difficult.
```

J. LEPPER

1

2     MR. MORRIS:  -- I suggest you seek

3     a ruling if you're going to continue

4     calling me obstructionist and you can't

5     learn how to display a document which

6     you keep calling the Notice of Claim

7     when it's, in fact, Exhibit A in an

8     examination and not a deposition, I

9     suggest you seek a ruling; and we'll

10    give you all the opportunity to do

11    that.

12         MR. TOSCA:  Are you done with the

13    insults, Mr. Morris?

14         MR. MORRIS:  Again, I object to

15    your characterization.  Are you going

16    to start asking questions as the law

17    contemplates?

18         MR. TOSCA:  The questions have

19    been as the law contemplates.  You're

20    trying to obstruct the law.

21    Q.   Mr. Lepper, have you made any

22    attempt at a refund of the fines?

23    A.   I think I answered that already.

24    Q.   I don't remember the answer.  What

25    was your answer?

Page 45

1                     J. LEPPER

2               MR. MORRIS:  Note my objection.

3          The record speaks for itself.  Counsel,

4          move on.

5          Q.    Did you ever appear in village

6     hall with your two children to obtain a

7     refund of any fines that were levied?

8          A.    Yes.

9          Q.    Do you remember the date you did

10    that?

11         A.    No.

12         Q.    Do you remember the department you

13    went to to get the -- to try to get the

14    refund?

15         A.    Yes.

16         Q.    Did you see the mayor during that

17    time?

18              MR. MORRIS:   Objection.

19         A.    Yes.

20         Q.    Did you speak to Ms. Suzanne

21    Schettino at that time?

22         A.    I don't recall who I spoke to.

23         Q.    Do you recall telling any of your

24    children to ask anyone in the village to

25    have the mayor refund the money that he

Page 46

1                    J. LEPPER

2   stole from them?

3             MR. MORRIS:  Note my objection.

4        A.   No.  I don't recall saying that.

5        Q.   Do you recall your daughter asking

6   that question?

7             MR. MORRIS:  Note my objection.

8        Counselor, move on.

9             MR. TOSCA:  I am moving.

10       Q.   Do you recall your daughter asking

11  that question at the village --

12             MR. MORRIS:  Madam Court Reporter,

13        can you note on the record the

14        technical difficulties that we're

15        seeing of counsel who's asking the same

16        question over and over again.

17             Again, I'm going to object.  We're

18        going to mark it for a ruling.  And

19        you're going to move on.

20       Q.   Mr. Lepper, do you recall your

21  daughter asking a question of anyone at the

22  village office to the extent that she

23  indicated the mayor stole money from her?

24             MR. MORRIS:  Note my objection.

25        Let's mark it for a ruling.  Do not

Page 47

```
 1                    J. LEPPER
 2      answer.  Counsel, please proceed.
 3      Q.    When you went down to the village
 4 hall, was it both your children you went
 5 with?
 6           MR. MORRIS:  Note my objection.
 7      Counsel, move on.
 8           MR. TOSCA:  Are you not allowing
 9      him to answer the question?
10           MR. MORRIS:  We're going to mark
11      it for a protective orders because it
12      seems that you're more concerned with
13      the children and fines than the claims
14      that assert among other things that
15      police came to my client's house.
16           MR. TOSCA:  The fines are not part
17      of --
18           MR. MORRIS:  I'm sorry.  I was
19      speaking.
20           MR. TOSCA:  Go ahead.
21           MR. MORRIS:  And that the village
22      attorney made statements about
23      essentially malicious prosecution of my
24      claim.  It's outlined in the Notice of
25      Claim that we filed.
```

Page 48

1                       J. LEPPER
2               To the extent that you want to,
3        again, ask questions pursuant to
4        General Municipal Laws Section 50-h, I
5        suggest you do so.
6               MR. TOSCA:   Those questions are
7        being posed.
8        Q.   Mr. Lepper, did you get a return
9   of any of the fines that were assessed?
10       A.   Can you repeat that?
11       Q.   Did you get a return on any of the
12   fines that were assessed and that you paid?
13              MR. MORRIS:   Note my objection.
14       A.   I don't know.
15       Q.   Do you recall ever receiving a
16   check from the village or a refund for any
17   fines that you paid?
18       A.   No, I did not.
19       Q.   When you went down to village
20   hall, did you receive any money from the
21   village at that time when you had gone down
22   with your children to get a refund of the
23   fines?
24              MR. MORRIS:   Note my objection.
25       A.   No, I did not.

Page 49

1                    J. LEPPER

2          Q.    Did anyone tell you at the village

3    that it would be a refund coming in some

4    way?

5          A.    I don't recall.

6          Q.    Do you know how many times you

7    went down to the village to ask for a

8    refund?

9               MR. MORRIS:   Objection.   Madam

10         Court Reporter, can you read that

11         question back, please.

12              (Whereupon, the referred to

13         question was read back by the

14         reporter.)

15         A.    Just the one time.

16         Q.    In terms of the emotional damages

17   that you're claiming, Mr. Lepper, have you

18   gone for any treatment related to the

19   emotional damages?

20         A.    Yes.

21         Q.    Did you see a medical doctor?

22         A.    I see a therapist.

23         Q.    What is the therapist's name?

24              MR. MORRIS:   Note my objection.

25         A.    Dr. Villina.

Page 50

```
 1                    J. LEPPER
 2      Q.    Would you please spell it?
 3      A.    V-I-L-L-I-N-A.
 4      Q.    Where is Dr. Villina located?
 5      A.    In the Village of Babylon.
 6      Q.    When for the first time did you
 7  see Dr. Villina?
 8           MR. MORRIS:  Again, note my
 9      objection.
10      A.    I don't recall.
11      Q.    When was the last time you saw Dr.
12  Villina?
13           MR. MORRIS:  Note my objection.
14      A.    I still speak to him virtually.
15           MR. MORRIS:  Counsel, before you
16      ask another question, again, when are
17      we getting to the occurrence and the
18      extent of injuries of damages here?
19      It's 12:02.
20           MR. TOSCA:  Are you going to stop?
21      I need to ask questions, all right?
22      All these questions are related to the
23      claims that you're making.
24           MR. MORRIS:  How much longer do
25      you anticipate, counselor?
```

Page 51

1                    J. LEPPER

2          MR. TOSCA:  I don't know; but at

3      this rate, we haven't even begun

4      because you keep objecting.  And you

5      keep obstructing the deposition.  It's

6      impossible to get this going.  I have

7      not been able to ask any questions at

8      this point and get any substantiative

9      answers.  The point is, if you continue

10     to object, you're making it very

11     difficult to do the 50-h hearing.

12     You're just --

13         MR. MORRIS:  Let me know when

14     you're done.

15         MR. TOSCA:  I'm done.

16         MR. MORRIS:  If you're done, that

17     means you stop speaking.  Are you done

18     because I would like to note my

19     objection on the record?

20         Again, you keep on characterizing

21     this and treating this as a deposition

22     when it is not.  It is an examination.

23     Again, your characterization is

24     improper.  Ask questions that are,

25     quote, relative to the occurrence and

Page 52

1                    J. LEPPER

2      the extent of the injuries or damages,

3      end quote; and if you can't give us a

4      time here, let me know because believe

5      it or not, this is not going to be an

6      all day thing.  So ask your questions,

7      and please let us move on.

8            MR. TOSCA:  Is your objection over

9      with?

10           MR. MORRIS:  Counsel, I'm

11     finished.

12           MR. TOSCA:  Okay.  I intend to ask

13     questions, and we'll ask all questions

14     necessary to affect the 50-h hearing.

15     You're obstructing that.

16           MR. MORRIS:  Again, note my

17     objection.  Why don't we seek a ruling?

18     To the extent that you consider this

19     obstruction, counsel, why don't you

20     seek a ruling here?  I don't like this

21     characterization.

22           MR. TOSCA:  Mr. Morris, this claim

23     is not in court; so there are remedies

24     available by law for an obstructive

25     50-h hearing.  Since this is an

```
 1                    J. LEPPER
 2        Examination Under Oath.  You can
 3        rightfully call it a deposition as
 4        well.  The point is, is that I would
 5        like to continue; so you've made your
 6        objection, and that's that.
 7        Q.   Mr. Lepper, you said you're still
 8   seeing Dr. Villina virtually.  When was the
 9   last time you spoke to Dr. Villina
10   virtually?
11             MR. MORRIS:  Objection.
12        A.   I don't recall.
13        Q.   Was it within the last month?
14             MR. MORRIS:  Note my objection.
15        Q.   Is there any frequency that you
16   speak to Dr. Villina?
17        A.   Yes.
18        Q.   What is the frequency with which
19   you speak to him?
20        A.   It would depend on his
21   availability and my availability, pretty
22   regularly.  Typically weekly.
23        Q.   Is Dr. Villina part of a practice?
24        A.   Say it again.
25        Q.   Is Dr. Villina a part of a
```

Page 54

```
 1                    J. LEPPER
 2    practice?
 3         A.   I believe he's the owner of the
 4    practice.
 5         Q.   Is there a name to that practice?
 6         A.   I don't know.
 7         Q.   Did you see him for the first time
 8    more than a year ago?
 9              MR. MORRIS:  Note my objection.
10         Don't answer.  Move on.
11         Q.   Did you see Dr. Villina more than
12    90 days ago?
13              MR. MORRIS:  Note my objection.
14         Do not answer.  Move on.
15         Q.   Did you see Dr. Villina in the
16    last three months?
17              MR. MORRIS:  Note my objection.
18         Move on, counsel.
19         Q.   Did you see Dr. Villina in his
20    office at any time?
21              MR. MORRIS:  Note my objection.
22         Q.   Mr. Lepper, --
23         A.   Yes.
24         Q.   -- when was the last time you saw
25    Dr. Villina in his office?
```

Page 55

                    J. LEPPER

1

2          MR. MORRIS:  Note my objection.

3     Asked and answered.  Counsel, move on;

4     or we'll mark it for a protective

5     order.

6          Q.   Mr. Lepper, when was the last time

7     you saw Dr. Villina in his office?

8          MR. MORRIS:  Counsel, perhaps you

9          don't understand when I say move on and

10         we'll mark it for protective order.

11         Don't answer.  Note our objection.

12         We'll mark it for a ruling.  Please

13         move on.

14         MR. TOSCA:  Your objection is

15         noted.

16         Q.   When was the first time you saw

17    Dr. Villina in his office?

18         MR. MORRIS:  Note my objection.

19         We're moving for a protective order on

20         this subject topic.  Counsel, please

21         move on.

22         Q.   Aside from Dr. Villina, have you

23    seen any other therapists, medical

24    providers, specialists in reference to the

25    claimed emotional injuries?

Page 56

1                        J. LEPPER

2        A.    I don't recall.

3        Q.    You said Dr. Villina was a

4    therapist.  Does he have any degrees to your

5    knowledge?

6             MR. MORRIS:  Note my objection.

7        Strike everything before you said Dr.

8        Villina was a therapist.  You can

9        answer.

10       A.    I don't know.

11       Q.    To your knowledge, does he have

12   any licenses?

13       A.    I don't know.

14       Q.    Has the stress that you testified

15   to regarding the fines or the threatened

16   fines caused you any inability to function

17   in your daily life?

18       A.    At times, yes.

19       Q.    In what ways?

20       A.    Well, the constant threat of fines

21   was pretty heavy weight to carry in my

22   house.

23       Q.    How did that disable you in any

24   way?

25             MR. MORRIS:  Objection.  You can

Page 57

1                    J. LEPPER
2        answer.
3        A.    Well, losing focus on what I
4    needed to focus on and focusing on the
5    threats issued by the village.
6        Q.    What is it that you need to focus
7    on that you're not able to?
8        A.    Normal everyday life.
9        Q.    Like?
10       A.    Normal everyday life.
11       Q.    Could you give us an example?
12            MR. MORRIS:  Note my objection.
13       Q.    The answer was no?
14            MR. MORRIS:  Again, note my
15       objection.
16            MR. TOSCA:  Are you letting him
17       answer?
18            MR. MORRIS:  Counsel, I said note
19       my objection.
20            MR. TOSCA:  Okay.
21       Q.    So, Mr. Lepper, then, can you tell
22   us any examples of what it is that you're
23   disabled from doing in your daily life?
24            MR. MORRIS:  Note my objection.
25       A.    Anything that takes away from it.

Page 58

                    J. LEPPER

1

2       Q.    Like what?

3       A.    Anything that takes away --

4             MR. MORRIS:  Note my objection.

5       A.    -- from my job or my family due to

6    threats from the village is emotional.

7       Q.    What is it about your job that you

8    can't do because of the threats?

9       A.    Can you repeat that?  I lost you

10   again.

11      Q.    Sure.

12            MR. TOSCA:  Ms. Reporter, can you

13        read back the question.

14            (Whereupon, the referred to

15        question was read back by the

16        reporter.)

17      A.    Any focus that takes away from my

18   daily life due to threats by the village

19   affects me.

20      Q.    How does it affect your job?

21      A.    Because without the threats, I

22   wouldn't have to think about them.

23            MR. MORRIS:  Note my objection.

24      Q.    What is it about your job that you

25   cannot do or cannot do well because of the

Page 59

J. LEPPER

1  threats?

2

3      A.   Well, if I'm thinking about the

4  threats and the effects that it's having on

5  myself and my family, then I'm not thinking

6  about what I'm doing at work; am I?  If the

7  threats were not present, I wouldn't be

8  thinking about them; would I?

9      Q.   What is it in your job that you

10  have a problem doing because of the things

11  you're thinking about the threats?

12          MR. MORRIS:   Note my objection.

13      A.   Whatever it is that I'm doing,

14  Ms. Tosca, when I'm thinking about the

15  threats and the affects of my family.

16  That's it.

17      Q.   Can you give us any specific

18  examples of what you did at work, you have a

19  problem doing because of the thinking about

20  these threats?

21          MR. MORRIS:   Note my objection.

22      Mr. Lepper, please answer; and,

23      counsel, move on.

24      A.   I think I just did that.

25      Q.   What is it about your home life

Page 60

1                    J. LEPPER
2    that you have any problems with in terms of
3    thinking about these fines?
4         A.   I think I just gave you an
5    explanation in the last question.
6         Q.   I'm asking, that was about your
7    job.  I'm asking about your home life now.
8              MR. MORRIS:  Objection.
9         A.   I'll give you the same answer.
10             MR. MORRIS:  Note my objection.
11        A.   And you can have the same answer.
12        Q.   The same answer so the -- give me
13   a specific example of what you're not able
14   to do or not performing well in terms of
15   your home life as opposed to to your job
16   life?
17             MR. MORRIS:  Note my objection.
18        A.   Like I said before, any time I'm
19   thinking about threats from the village,
20   focusing on threats from the village, it's
21   taking away anything in my normal life when
22   I wouldn't need to focus on threats from the
23   village.
24        Q.   I understand that.  I'm asking for
25   specific examples, Mr. Lepper.  Can you give

Page 61

```
 1                    J. LEPPER
 2    us a specific example?
 3            MR. MORRIS:  Note my objection.
 4        Asked and answered.  Counsel, move on.
 5            MR. TOSCA:  You're not allowing
 6        him to answer?
 7            MR. MORRIS:  Counsel, I'm not
 8        allowing you to harass him with the
 9        same question over and over again.
10            MR. TOSCA:  I would like to get an
11        answer.
12        A.   That was my answer.
13        Q.   Aside from emotional problems,
14    have you any other damages that you're
15    seeking with regard to the claim in the
16    Notice of Claim?
17            MR. MORRIS:  Note my objection.
18        A.   Can you rephrase the question?
19        Q.   Sure.
20            Aside from the emotional damage,
21    are you making any claim for any other
22    damages related to the Notice of Claim?
23        A.   You're going to have to be more
24    specific.  You have the exhibit in front of
25    you.
```

Page 62

```
 1                    J. LEPPER
 2        Q.   Are you making any claim for
 3   attorney's fees?
 4             MR. MORRIS:  Note my objection.
 5        You may answer.
 6        A.   Yes, I am.
 7        Q.   Have you expended any money in
 8   attorney's fees related to the Notice of
 9   Claim?
10             MR. MORRIS:  Note my objection.
11        We're going to assert attorney/client
12        privilege.  Do not answer.
13             MR. TOSCA:  It's a claim you're
14        making.
15             MR. MORRIS:  Counsel, where is
16        your confusion?
17             MR. TOSCA:  We have --
18             MR. MORRIS:  Please let me finish.
19             MR. TOSCA:  You asked me where is
20        your confusion.  That was the question,
21        and I just answered it.  You asked a
22        question, and I gave you an answer.
23        When you ask me where is your
24        confusion, I answered that, okay?  If
25        you don't want an answer, then don't
```

Page 63

```
 1              J. LEPPER
 2      ask the question.
 3          MR. MORRIS:  Counselor, the rest
 4      of the question before I was
 5      interrupted was where is your confusion
 6      to the assertion of a privilege; so
 7      that little part where you interjected
 8      and interrupted me and didn't allow me
 9      to speak, where is your confusion to
10      the assertion of a privilege?  Okay.
11      Now I'm done.  If you want an answer to
12      that, let me know.
13          MR. TOSCA:  Say that again.  If
14      you want --
15          MR. MORRIS:  If you would like to
16      answer that question, I am done asking
17      the question; so, please, I invite the
18      opportunity to hear what you think.
19          MR. TOSCA:  I am not confused by
20      the attorney/client privilege.  I'm
21      confused by an objection that is
22      totally improper for a claim that's
23      being asserted by Mr. Lepper.  So --
24          MR. MORRIS:  I'm sorry you're
25      confused.
```

Page 64

```
 1              J. LEPPER
 2         MR. TOSCA:  I'm not done yet.  If
 3    you're making the claim, you can't then
 4    say, "Well, it's privileged so you
 5    can't have the information as to the
 6    damages."
 7         MR. MORRIS:  I'm sorry you're
 8    confused --
 9         MR. TOSCA:  If you're not letting
10    him answer the question, that's fine.
11    I'll move on, Mr. Morris.
12         MR. MORRIS:  Madam Court Reporter,
13    did you get down what I said earlier?
14    Let the record reflect there seems to
15    be technical difficulties on the behalf
16    of Mr. Tosca.
17         MR. TOSCA:  There's no technical
18    difficulty.
19    Q.    Mr. Lepper, if you spent any money
20 out of pocket related to the damages that
21 you're asserting in the Notice of Claim?
22         MR. MORRIS:  Note my objection.
23    Attorney/client privilege.  Counsel,
24    please move on.
25    Q.    The answer is either yes or no?
```

Page 65

```
 1                    J. LEPPER
 2            MR. MORRIS:  Perhaps, again,
 3        you're confused about the assertion to
 4        a privilege, counsel.  Please move on.
 5        Q.   The damages that you're seeking,
 6   are they monetary?
 7        A.   I'm sorry, you broke up.  Can you
 8   repeat that?
 9            MR. TOSCA:  Can you repeat that,
10        Ms. Reporter.
11            (Whereupon, the referred to
12        question was read back by the
13        reporter.)
14        A.   Yes.
15        Q.   How much money have you spent out
16   of pocket in total related to the claims in
17   the Notice of Claim?
18            MR. MORRIS:  Note my objection.
19        A.   I don't recall.  Whatever I was
20   found guilty of with the fines that was
21   overturned and loss of pay from work.
22        Q.   How much in pay did you lose
23   related to the claims in the Notice of
24   Claim?
25        A.   I lost vacation after the Notice
```

Page 66

1                    J. LEPPER

2    of Claim was put in through the fire

3    department.  I had to go down and represent

4    myself.

5         Q.   Is it one day you're claiming, one

6    day lost pay?

7              MR. MORRIS:  Objection.

8         A.   No.

9         Q.   How many days are you claiming

10   that you lost relating to this claim?

11             MR. MORRIS:  Note my objection.

12        A.   There was a few.

13        Q.   More than five?

14        A.   Yes.

15        Q.   More than ten?

16        A.   I don't recall.

17             MR. MORRIS:  Note my objection.

18        Q.   Do you have any record of all the

19   time you've lost from work related to this

20   claim?

21        A.   I'm not sure.

22        Q.   You said you had to take a day's

23   vacation for an anonymous complaint.  When

24   was that?

25             MR. MORRIS:  Note my objection.

Page 67

J. LEPPER

1

2    Move to strike everything before when

3    was that.

4        Q.   Mr. Lepper, did you hear the

5    question?

6        A.   I did.  I don't recall.

7        Q.   How much money is one day's

8    vacation day amount to?

9             MR. MORRIS:  Note my objection.

10       Q.   I didn't hear the answer.  Could

11   you repeat the answer, Mr. Lepper?

12       A.   I don't know.

13       Q.   What was the substance -- I did

14   get it now.  What was the substance of the

15   anonymous claim that was made to the fire

16   department?

17            MR. MORRIS:  Note my objection.

18       A.   An anonymous claim was sent to the

19   commissioner of the fire department stating

20   that I went to the village court with the

21   intention of swaying the Court's decision by

22   wearing a partial uniform when, in fact, I

23   asked the village for an adjournment on

24   August 14th, which I was denied; and I had

25   to leave a friend, a colleague, who passed

Page 68

                        J. LEPPER

1    away from 9/11 related injuries and had to

2    go to a memorial ceremony in Manhattan,

3    which I had to leave -- and the anonymous

4    claims were overturned, which must have come

5    from the village because only the people in

6    the courtroom knew that I showed up right

7    from a memorial service in my partial Class

8    A uniform.

9         Q.   What was the date that you went to

10   court in your partial uniform?

11        A.   August 14th, 2018.

12        Q.   When you had gone that day, did

13   you appear in a courtroom?

14        A.   I did.

15        Q.   Was that at village hall?

16        A.   It was.

17        Q.   At that time, how many people were

18   in the room when you entered the room?

19             MR. MORRIS:  Objection.

20        A.   The courthouse was full with

21   neighbors and supporters of the tree house.

22        Q.   Did you alert them that you were

23   coming that day to appear in court?

24             MR. MORRIS:  Note my objection.

                        J. LEPPER

1

2    Counsel, are you referring to something

3    in 2018?

4         MR. TOSCA:  I am.  We're talking

5    about the day he went to court.

6         MR. MORRIS:  Note my objection.

7    And let me repeat the law for you

8    again.  Section 50-h, Subsection 1,

9    quote, relative to the occurrence and

10   extent of the injuries for damages, end

11   quote.

12        MR. TOSCA:  You're only delaying

13   this --

14        MR. MORRIS:  I suggest you start

15   asking questions about -- I'm only

16   delaying this?  Is that your response

17   to requesting questions about 2018?

18        MR. TOSCA:  My response is that

19   your objections and your constant

20   reading of the statute, I'm well aware

21   of.  I fear that you don't know what a

22   50-h hearing is; but the point is, that

23   you're delaying this process with your

24   constant objections, repetitive remarks

25   that are impeding my ability to conduct

1                    J. LEPPER
2       this 50-h hearing.
3            MR. MORRIS:  Note my objection.
4       Counsel, how much do you have left?  So
5       let me make arrangements for the rest
6       of the day?  It's now 12:27.
7            MR. TOSCA:  If this continues, the
8       rest of the day.
9            MR. MORRIS:  Why don't we take
10      lunch then if that's the case?
11           MR. TOSCA:  If you wish to take
12      lunch, you may.  How long do you need
13      for lunch, Mr. Morris?
14           MR. MORRIS:  We'll probably take
15      an hour to an hour and a half.  I mean,
16      do you know how much time you have
17      left?
18           MR. TOSCA:  I don't know.  At this
19      rate, I can't even forecast because
20      number one, you're constantly
21      objecting; and there are some pauses in
22      your client's responses, which is fine.
23      I expect him to deliberate on his
24      answers; but the point is, is that it's
25      further delaying the process.

Page 71

J. LEPPER

1
2       MR. MORRIS:  I object to your
3   characterizations.  Counsel, do you
4   want to give us an approximate time; or
5   are you just going to take all the
6   village's money today in taking an
7   entire day for a 50-h?
8       MR. TOSCA:  I'm not going to grace
9   that with a response.  I'm telling you
10  that I'm going to be able -- I want to
11  do a deposition.  If you continue to
12  obstruct, we're not going to get done.
13  If you continue to obstruct, we're just
14  not going to get done.
15      MR. MORRIS:  Note my objection to
16  your characterization.
17      MR. TOSCA:  We could have been
18  well on the way.
19      MR. MORRIS:  Counsel, can you give
20  me an approximation?  No, I can't.  Not
21  with your constant objections.  No, I
22  cannot.  So we'll go for the rest of
23  the day and see where it leads us,
24  okay?  If you want to take an hour for
25  lunch, fine.  Let's takes an hour for

Page 72

```
 1              J. LEPPER
 2   lunch.  It's up to you, Mr. Morris.
 3        MR. MORRIS:  Mr. Lepper, how
 4   much -- I didn't realize we would be
 5   here at this point.  I mean, how much
 6   time do you want to go?  Do you want to
 7   wait 30 minutes?  You tell me.
 8        THE WITNESS:  You know, I'm
 9   getting a little hungry.  I could eat.
10        MR. MORRIS:  You tell me.  Do you
11   want to break now?
12        THE WITNESS:  Sure.
13        MR. MORRIS:  Okay.  Time now is
14   12:29.
15        MR. TOSCA:  I don't want to
16   interrupt you, Mr. Morris.  Are you
17   done?
18        MR. MORRIS:  I'm done.
19        MR. TOSCA:  Okay.  So we'll take
20   an hour.  An hour and a half I think is
21   a little much.
22        MR. MORRIS:  We'll take an hour.
23        MR. TOSCA:  Great.
24        MR. MORRIS:  12:30 now.  We'll see
25   you at 1:30.
```

Page 73

1                    J. LEPPER
2           MR. TOSCA:  Thank you.
3           (Whereupon, a short recess was
4      taken.)
5           MR. TOSCA:  Can you read back the
6      last question.
7           (Whereupon, the referred to
8      question was read back by the
9      reporter.)
10     Q.   Did you alert your friends and
11 neighbors that you were going to court that
12 day?
13          MR. MORRIS:  Note my objection.
14     Again, counselor, are you referring to
15     events of 2018?
16          MR. TOSCA:  Again, yes.
17          MR. MORRIS:  I don't want to keep
18     marking it for a ruling, but I'm just
19     going to again reserve my right.  I'm
20     going to say mark it for a ruling.  If
21     you can, anything in 2018 --
22          MR. MORRIS:  I'll tell you what,
23     why don't you just object?  You're not
24     going to let your client answer, then
25     just tell him not to answer.  I'll move

Page 74

1                    J. LEPPER

2       on; but I would note that, you know,

3       any objections you make and any

4       direction you're telling your witness

5       not to answer obstructs this hearing.

6       But I would like to get it done.

7            MR. MORRIS:  Again, note my

8       objection to the use of obstruction;

9       and let me repeat the law, General

10      Municipal Law Section 50-h.  You can

11      demand, quote, an examination of the

12      claimant relative to the occurrence and

13      extent of the injuries or damages, end

14      quote.

15           Counsel, tell me, are you going to

16      allow us to bring claims from 2018 and

17      2019 pursuant to this 2020 Notice of

18      Claim?

19           MR. TOSCA:  Your witness mentioned

20      this incident.  I'm asking about it.

21           MR. MORRIS:  Counsel, again, are

22      you going to allow us to bring in

23      claims from 2018 and --

24           MR. TOSCA:  I will object to

25      anything that you request that's beyond

1              J. LEPPER

2      the parameters of the law.  I don't

3      have to tell you what the law is.

4           MR. MORRIS:  I'm glad that we

5      agree on something because -- to the

6      extent you're going to ask things, we

7      agree on the extent that you're going

8      to ask things from 2018 and 2019.

9      We're going to object, and we're going

10     to mark it for a ruling; and I'm just

11     going to proceed in that manner for the

12     duration now that it's 1:30 in the

13     afternoon of this 50-h.

14          MR. TOSCA:  You're objecting and

15     you're telling him not to answer

16     because there are times where you

17     object and you have him answer.  So

18     just clarify when you want your witness

19     not the answer the question.  We

20     reserve our right to your not allowing

21     the 50-h to go.

22          If you are going to object,

23     object.  If you're telling your witness

24     not to answer the question, then follow

25     with that also.  There are times when

                    J. LEPPER

1
2       you are objecting where you're allowing
3       the witness to answer, so we need to be
4       perfectly clear as to what you're
5       directing your witness to do.
6            If you're objecting and telling
7       him not to answer, so be it.  We will
8       contest these objections because they
9       are not allowing us to proceed with a
10      50-h hearing as allowed by law.
11           MR. MORRIS:  Counsel, are you
12      done?  I don't want to interrupt you.
13           MR. TOSCA:  I'm done.
14           MR. MORRIS:  Counsel, if you're
15      not allowing us to bring in claims from
16      2018 and 2019, all right, we're going
17      the say it's beyond the scope of the
18      examination under General Municipal Law
19      Section 50-h; so to the extent that
20      you're going to continue to ask about
21      events in 2018, we're going to object
22      and we're going to mark it for a
23      ruling.  And, yes, I'm not going to
24      have him answer questions about 2018 or
25      2019.

1           J. LEPPER

2           MR. TOSCA:  Just note for the

3      record that he made this part of the

4      claim as he's testifying.  Whether it's

5      legitimate or not is another question.

6      He's saying this is a claim.  Since he

7      brought it up, I'm allowed inquiry.

8           MR. MORRIS:  Counsel, I'm sorry.

9      I signed the Notice of Claim.  That's

10     me.  What's the confusion here now?

11          MR. TOSCA:  I'm telling you what

12     he testified to before.  You heard him

13     testify.  I'm entitled to probe.  I

14     don't really think this discussion is

15     going anywhere, and I think it's quite

16     honestly delaying the 50-h hearing.

17          MR. MORRIS:  Note an objection to

18     that.  Counsel, proceed.  Ask questions

19     again as Municipal Law Section 50-h

20     requires.

21          MR. TOSCA:  I've been doing that;

22     and it's been a problem because you've

23     been, you know, blocking very

24     legitimate questions.  Again, if you're

25     not going to have your witness answer,

Page 78

1                    J. LEPPER

2      please say that on the record.

3           MR. TOSCA:  Counsel, it's 1:35.

4      When do you plan on moving forward and

5      asking questions within the 90-day

6      period in which the claim was filed?

7           MR. TOSCA:  I'm absolutely trying

8      to.  You're making that impossible.

9           MR. MORRIS:  2018 is not within

10     that time frame; is it not?

11          MR. TOSCA:  I don't know what your

12     client's claims are.  He's here to tell

13     us what they are.  He's here to tell us

14     what his damages are, what he feels

15     he's entitled to.  That's what we're

16     here for, so I'm getting that; and he

17     tells me that there's an incident where

18     somebody complained about his uniform.

19     So I want to inquire, and that's what

20     I'm doing.

21          Again, are you not allowing him to

22     answer the last question, yes or no?

23          MR. MORRIS:  I already placed the

24     objections on the record.

25          MR. TOSCA:  Well, I don't know.

1                    J. LEPPER

2         Are you telling him not to answer?

3              MR. MORRIS:  Counsel, we already

4         placed --

5              MR. TOSCA:  I'll repeat the

6         question.

7         Q.   Did you tell your friends and

8    neighbors about the hearing in court?

9              MR. MORRIS:  Objection.

10        A.   I posted a sign about the hearing.

11        Q.   Okay.

12             Where did you post that sign?

13        A.   I don't recall.

14        Q.   How many people attended that

15   you've notified about this hearing?

16             MR. MORRIS:  Objection.  What

17        hearing, what time frame?  Was there

18        only one hearing, counselor?

19             MR. TOSCA:  There's only the one

20        he spoke about.

21             MR. MORRIS:  If it's in 2018, mark

22        it for a ruling.  Move on.

23        Q.   When you appeared on that date,

24   what were you coming to court to do at the

25   time you wore your partial uniform?

Page 80

1                  J. LEPPER

2            MR. MORRIS:  Note my objection.

3       Mark it for a ruling.  Please move on.

4       Q.   Did you in reference to your

5  emotional damages claims, have you taken any

6  medications related to those claims?

7       A.   No.

8       Q.   Have you been prescribed any

9  medications related to those claims?

10      A.   No.

11      Q.   Other than counseling, has there

12  been any therapy that you've undergone

13  related to the emotional damages claims?

14      A.   No, just therapy.

15      Q.   Have you had any physical injury

16  related to any of the claims you made in the

17  Notice of Claim?

18      A.   Physical injury?

19      Q.   Yes.

20      A.   No.

21      Q.   Had you received tickets in

22  reference to the tree house that's the

23  subject of this claim?

24            MR. MORRIS:  Objection.  When,

25       counsel?

1              J. LEPPER

2          MR. TOSCA:  At any time.

3          MR. MORRIS:  Objection.  Provided

4      that it is within the Notice of Claim

5      and under General Municipal Law Section

6      50-h for which we are here, I'll allow

7      him to answer.  If not, I'm going to

8      mark it for a ruling, counsel.

9      Counsel?

10         MR. TOSCA:  I'm waiting for the

11     answer.

12     A.   Can you repeat the question?

13         MR. TOSCA:  Madam Reporter, please

14     read it back.

15         (Whereupon, the referred to

16     question was read back by the

17     reporter.)

18         MR. MORRIS:  Note my objection.

19     Counsel, do you want to clarify the

20     question so we can ask him an

21     appropriate question?

22         MR. TOSCA:  I've asked him the

23     question.  Are you not allowing him to

24     answer?

25         MR. MORRIS:  I'm asking for a time

Page 82

1              J. LEPPER

2    frame.

3         MR. TOSCA:  I'm not giving you

4    one.  I want to know if he received any

5    tickets period.  We'll go on with the

6    time frame once he gives me an answer.

7         MR. MORRIS:  Okay.  Go on with the

8    time frame.  Mark it for a ruling.

9         MR. TOSCA:  You're not allowing

10   him to answer that question?

11        MR. MORRIS:  What's your confusion

12   as to mark it for a ruling, counsel?

13        MR. TOSCA:  Mark it for a ruling

14   could be you're putting an objection on

15   the record, and he should answer the

16   question; so I'm going to ask you to

17   let me know -- let the reporter know

18   which questions you're allowing him to

19   answer and which ones you aren't.

20        Does mark it for a ruling mean

21   you're directing him not to answer the

22   question, Mr. Morris?

23        MR. MORRIS:  As it's now 1:41, I

24   suggest you move on.

25        MR. TOSCA:  You're not telling us

Page 83

```
 1              J. LEPPER
 2    whether you're allowing him to answer
 3    or not allowing him.
 4         MR. MORRIS:  Counsel, I've made a
 5    statement -- I'm sorry, can we note for
 6    the record that counsel's Internet
 7    connection is choppy.
 8         MR. TOSCA:  We can't note that for
 9    the record.  My Internet connection is
10    fine.
11         MR. MORRIS:  Can you please repeat
12    what was said just before that
13    statement.
14         (Whereupon, the referred to
15    colloquy was read back by the
16    reporter.)
17         MR. MORRIS:  Counsel, again,
18    anything outside of the scope of this
19    examination we are going to ask for a
20    ruling.  To the extent you continue to
21    do so, I'm not going to explain this
22    again.  He's not going to answer.
23    We're going to mark it for a ruling.
24    Is there anything confusing or that you
25    don't understand?
```

Page 84

1                      J. LEPPER

2            MR. TOSCA:  I think I quite

3       understand what's happening; and we'll

4       take this up at the appropriate time,

5       all right?

6       Q.   At any rate, Mr. Lepper, when did

7   you first start construction on the tree

8   house?

9            MR. MORRIS:  Objection.  Mark it

10      for a ruling.  Please continue.

11      Q.   Mr. Lepper, where is the tree

12  house that is the subject of your Notice of

13  Claim?

14           MR. MORRIS:  Objection.  It's

15      malicious prosecution that's the

16      subject of the Notice of Claim.

17      Q.   Mr. Lepper, are you claiming that

18  there was a tree house that you built for

19  which you received?

20      A.   Repeat the question.

21           MR. TOSCA:  Madam Reporter, can

22      you repeat the question back for the

23      witness.

24           (Whereupon, the referred to

25      question was read back by the

Page 85

1                    J. LEPPER

2        reporter.)

3        A.    In which I received what?

4        Q.    Tickets.

5        A.    Summonses?

6        Q.    Yes.

7        A.    Yes.

8        Q.    Where is that tree house located?

9        A.    59 Cockonoe Avenue, Babylon, New

10   York.

11        Q.    Is the tree house completed?

12        A.    No.

13              MR. MORRIS:   Objection.

14        Q.    Is there any work left to be done

15   on the tree house?

16              MR. MORRIS:   Note my objection.

17        You can answer again.

18        A.    Yes.

19        Q.    What work needs to be done on the

20   tree house?

21        A.    I think we went over that in the

22   deposition prior to today's examination;

23   didn't we?

24        Q.    We're here for a 50-h hearing

25   related to the claims that you made, so I'm

Page 86

```
 1                    J. LEPPER
 2    asking you to answer the question related to
 3    the claims you're making.
 4         A.   I answered that question.
 5              MR. MORRIS:  Repeat the -- note my
 6         objection.  You don't need to repeat
 7         the question because I think Mr. Lepper
 8         said it quite well.  You've already
 9         answered that, and this is not a
10         deposition.  Counsel, move on.
11              MR. TOSCA:  You're making this
12         impossible.  This is, you know, you're
13         obstructing a 50-h hearing without any
14         basis.
15              MR. MORRIS:  Counsel, it's now
16         1:36 p.m.  I suggest you move on.
17         Q.   When was the last time you
18    performed any work on the tree house?
19              MR. MORRIS:  Note my objection.
20         Don't answer the question.  Mark it for
21         a ruling.
22         Q.   Is the tree house still up?
23         A.   Yes.
24         Q.   When was the last time you were in
25    the tree house?
```

Page 87

1                    J. LEPPER

2          MR. MORRIS:  Note my objection.

3     Do not answer.  Mark it for a ruling.

4     Q.    When was the last time you saw the

5 tree house?

6          MR. MORRIS:  Note my objection.

7     Mark it for a ruling.  Counsel, move

8     on.

9     Q.    Has anyone made use of the tree

10 house in the last year?

11         MR. MORRIS:  Counsel, move on.

12    Mark it for a ruling.

13    Q.    When was the last time you

14 received any summonses related to the tree

15 house?

16         MR. MORRIS:  Objection.  Asked and

17    answered.  We'll mark it for a ruling.

18    He's not answering again.

19    Q.    When was the first time you

20 received any summonses related to the tree

21 house?

22         MR. MORRIS:  Objection.  Mark it

23    for a ruling.

24    Q.    You have a Notice of Claim.  Are

25 you claiming those claims related to any

Page 88

                         J. LEPPER

1

2    specific summonses?

3             MR. MORRIS:  Objection.  Move to

4        strike you have a Notice of Claim.

5        Q.   Did you receive any summonses in

6    July 2018?

7             MR. MORRIS:  Mark it for a ruling.

8        2018, counsel.  Move on.

9        Q.   Did you receive refunds for any

10   summonses or related to any summonses

11   related to the tree house?

12            MR. MORRIS:  Objection.  Asked and

13       answered, answered.  Answered again.

14       We're here at 1:48, counsel.  Ask your

15       questions and move on.

16       Q.   Which summonses was it that you

17   believe you were entitled to refunds for?

18            MR. MORRIS:  Objection.  Mark it

19       for a ruling.  Move on.

20       Q.   How many summonses did you receive

21   related to the tree house?

22       A.   Again, I believe I answered all

23   these questions in my prior deposition.  Did

24   I not?

25       Q.   I don't know.  Did you give an

Page 89

J. LEPPER

1

2      answer?  You didn't give an answer.  You

3      said you said it in the prior deposition.

4      That's not an answer.

5              MR. MORRIS:  Counsel --

6          A.   We did the deposition.

7              MR. MORRIS:  That's correct.  Note

8          the objection to this 50-h examination

9          inquiry.  This is not a deposition.  No

10         matter how many times you

11         mischaracterize it or that you attempt

12         to make it one.

13             MR. TOSCA:  I'll say it again.  I

14         can ask all questions related to the

15         claims in the Notice of Claim.

16         Q.   Your malicious prosecution claim,

17     Mr. Lepper, is that brought in this Notice

18     of Claim in reference to any specific

19     summons?

20         A.   Yes.

21         Q.   And which summonses are they that

22     you are claiming malicious prosecution of in

23     this Notice of Claim?

24             MR. MORRIS:  Note my objection.

25         The Notice of Claim speaks for itself.

Page 90

```
 1                    J. LEPPER
 2        Are you asking him generally, or are
 3        you asking him about the document?
 4             MR. TOSCA:  I'm asking him what
 5        claims he is making with regard to
 6        malicious prosecution.  He's making the
 7        claim.  Let me hear what he has to say.
 8        That's why we're here.
 9        A.    Can I answer?
10        Q.    Yes.
11        A.    What is the malicious -- can you
12   repeat the question?
13             MR. TOSCA:  Madam Reporter, can
14        you read back the question for him.
15             (Whereupon, the referred to
16        question was read back by the
17        reporter.)
18        A.    All of them.
19        Q.    Which ones?
20        A.    There are three that we had prior
21   to that that were already overruled and
22   overturned; and then I believe there was a
23   few after and also the threat and the order
24   to remove the tree house in its entirety
25   when I could be fined on a daily basis, that
```

Page 91

1                    J. LEPPER
2    was malicious.  The threat of being fined
3    daily.  I'm up to a thousand dollars.
4         Q.   Who, specifically, made those
5    claims?
6         A.   I believe it was in the letter to
7    Mr. Fellman.
8         Q.   Did anyone make verbal threats to
9    you regarding daily fines?
10        A.   No.  I have a written threat.
11        Q.   How many written threats do you
12   have?
13        A.   I don't know.  The one was enough.
14        Q.   Did you keep records of all the
15   written threats that you received?
16        A.   I kept records of all the
17   documents received from the village.
18        Q.   Do those records contain the
19   written threats you're talking about?
20             MR. MORRIS:  Objection.  You can
21        answer again.
22        A.   I found it to be malicious in the
23   order to remove a tree house, and that I
24   could be fined daily.
25        Q.   How many documents say that?

Page 92

|    |    |
|----|----|
| 1  | J. LEPPER |
| 2  | MR. MORRIS:  Objection. |
| 3  | A.    I don't recall.  At least one. |
| 4  | Q.    Do you know who wrote that, the |
| 5  | one that you don't remember? |
| 6  | MR. MORRIS:  Objection.  Asked and |
| 7  | answered.  Move on, counsel. |
| 8  | Q.    Did you speak to Mr. Fellman about |
| 9  | your claimed threat? |
| 10 | MR. MORRIS:  Objection.  Counsel, |
| 11 | you're referring to something in 2018 |
| 12 | or 2019? |
| 13 | MR. TOSCA:  I'm referring to |
| 14 | whatever he's talking about that's |
| 15 | documented he's referring to.  I don't |
| 16 | know when it was.  He's telling me. |
| 17 | MR. MORRIS:  Mark it for a ruling. |
| 18 | Move on. |
| 19 | MR. TOSCA:  You're not letting him |
| 20 | answer that question? |
| 21 | MR. MORRIS:  Counsel, what's the |
| 22 | confusion?  When I say mark it for a |
| 23 | ruling and say move on, that means move |
| 24 | on. |
| 25 | MR. TOSCA:  I don't understand why |

1          J. LEPPER

2     you keep obstructing this hearing.

3          MR. TOSCA:  Note our objection.

4     It's 1:54.  You're asking -- counsel,

5     let me finish.  You're asking about

6     things in 2018 and 2019.  Stop.  We're

7     marking it for a ruling.  If you don't

8     stop, then go to court and explain to

9     them how you want to rehash a

10    deposition of which you oversaw for

11    seven hours of which you were there;

12    and the best part about it is, we're in

13    a federal litigation.

14          So when you do that, be sure to

15    explain how you tried to reintroduce

16    every question asked at a deposition.

17    So when you do that, I'm marking it for

18    a ruling and we intend to introduce

19    just that, that it wasn't some other

20    attorney, it was you.  And you know

21    what's going on very well here, so we

22    made malicious prosecution claims --

23    I'm not done.  We made malicious

24    prosecution claims.  We put it in a

25    ten-page Notice of Claim.  This is your

Page 94

1                    J. LEPPER

2       opportunity to ask questions about

3       that, what's missing; and, again,

4       General Municipal Law Section 50-h

5       relative to the occurrence and extent

6       of injuries or damages.  You don't get

7       a deposition.  It's an examination; and

8       at this point, it's gone on since

9       10:30.

10              So ask your questions and ask

11       about -- again, things that are well

12       before the time frames that a Notice of

13       Claim is applicable to I'm going to

14       object.  I'm going to mark it for a

15       ruling.

16              MR. TOSCA:  Are you done?

17              MR. MORRIS:  Counsel, I'm done.

18       Are you done?

19              MR. TOSCA:  We've been here since

20       10:30.  Most of the talking has been

21       done by you.  Your client has hardly

22       answered any questions; and I think if

23       we had to do a word count, you come

24       very far ahead of anyone here for no

25       legitimate reason whatsoever.  And we

Page 95

1                    J. LEPPER

2        consider this delay -- now, I will go

3        on; but we reserve the right to dismiss

4        any claims brought related to this

5        Notice of Claim.  This hearing is being

6        obstructed.  So I'll go on.

7             MR. MORRIS:  If that's your

8        position, then you're going to move to

9        dismiss, let's end it now.

10            MR. TOSCA:   No.  I'm ready to go

11       on.

12            MR. MORRIS:  So you're going to

13       withdraw that statement that you just

14       made.

15            MR. TOSCA:  No.  I'm not

16       withdrawing anything.  I'm warning you

17       we're going to --

18            MR. MORRIS:  Why don't we take a

19       five minute -- why don't you take a

20       five-minute break?

21            MR. TOSCA:  I don't need a

22       five-minute break.  I'm fine.

23            MR. MORRIS:  Mr. Lepper, please

24       turn off your video.  Please take five

25       minutes.

Page 96

1        J. LEPPER

2            MR. TOSCA:  I don't want to take a

3        five-minute break.  I'm fine with going

4        on.  I'm just telling you that we

5        reserve our right based on your

6        obstructions making a motion at the

7        appropriate time.  Putting it on the

8        record.  That's all, okay?

9            MR. MORRIS:  We're not proceeding

10       if you're putting us on warning.  We're

11       not going to let you take an eight-hour

12       Notice of Claim examination pursuant to

13       50-h; and then you're going to seek to

14       dismiss so -- counsel, I am speaking.

15           MR. TOSCA:  Go ahead, talk.  You

16       looked like you stopped because you

17       paused; so when you pause, everything

18       stops.  So now I can say something, so

19       don't tell me to be quiet.  Enough.

20       Your insults are really something else

21       here.

22           MR. MORRIS:  Again, note my

23       objection.  To the extent that you are

24       going to reserve your right to dismiss,

25       we are going to end this now.

Page 97

1              J. LEPPER

2          MR. TOSCA:  If you end it now,

3     then as far as I'm concerned, you

4     violated the terms of 50-h under

5     General Municipal Law not only by

6     obstructing questions but now by trying

7     to terminate the hearing.  I am not

8     prepared to terminate this, but I'm

9     putting you on warning that this

10    conduct is so obstructive that we

11    reserve rights to move based on that.

12         MR. MORRIS:  I don't want to

13    interrupt you, so I'm going to speak --

14         MR. TOSCA:  That's all right.  Go

15    ahead.

16         MR. MORRIS:  Counsel, to the

17    extent you're making a representation

18    that you're reserving a right for

19    moving to dismiss, we are not going to

20    proceed.

21         MR. TOSCA:  I'm not ready to

22    terminate the proceeding.  If you do

23    so, you do so at your peril, sir, all

24    right?

25         MR. MORRIS:  Whenever you're ready

Page 98

J. LEPPER

1
2    to remove your claim that you're going
3    to move to dismiss this because you
4    didn't have an opportunity to ask
5    questions at two o'clock in the
6    afternoon on July 20, 2020, whenever
7    you're ready to remove that, we'll
8    proceed.
9         MR. TOSCA:  I reserve -- I'm
10   sorry.  Go ahead.
11        MR. MORRIS:  For a General
12   Municipal Law Section 50-h, examination
13   not deposition, that started at
14   10:30 a.m. this morning.  Counsel, you
15   let me know when you're ready to
16   withdraw; and I'll continue the
17   examination.
18        MR. TOSCA:  We continue to reserve
19   our right to make any appropriate
20   motion with regard to claims.  We are
21   not being given a full and fair
22   opportunity to conduct a hearing, an
23   Examination Under Oath, that the
24   village and the other respondents are
25   entitled to at this time.  Put the

Page 99

1                    J. LEPPER
2       client back on.  We'll continue.  Is
3       Mr. Lepper back?
4              MR. MORRIS:  Counsel, we're not
5       going to allow you to move to dismiss.
6       Maybe we should make a motion, and
7       maybe we should have the court evaluate
8       this before continuing.
9              MR. TOSCA:  You know what the
10      remedies are, Mr. Morris.  You exercise
11      whatever remedies you see fit.
12             MR. MORRIS:  Okay.  If you're
13      going to take that position, we're
14      going to end this.
15             MR. TOSCA:  And we consider that a
16      default, intentional default.
17             MR. MORRIS:  Again, you're not
18      going to continue and then later move
19      to dismiss; can we agree?
20             MR. TOSCA:  No.  I can't agree to
21      anything because you've been
22      obstructive throughout this entire
23      process.
24             MR. MORRIS:  Have a great day.
25      We're now -- have a great day.  We're

1              J. LEPPER

2    now ending this.  Thank you so much.

3         MR. TOSCA:  Let the record reflect

4    that the witness has left.  Let's close

5    the hearing at this point.  They're not

6    appearing, and they're not speaking; so

7    I have to assume that they have

8    terminated.  They already said they've

9    terminated this hearing --

10        MR. GLASS:  It looks like we lost

11   the attorney, Morris.

12        MS. FILMORE:  He definitely hung

13   up.  John Lepper is still on.

14        MR. TOSCA:  He could be with John

15   Lepper.

16        In the event though, just note the

17   time that the deposition had finalized;

18   and that the 50-h hearing has been

19   terminated by Mr. Lepper and his

20   attorney, and we'll reserve our rights.

21   Thank you.

22        (Whereupon, at 2:02 p.m., the

23   Examination of this witness was

24   concluded.)

25

Page 101

1                    J. LEPPER

2              D E C L A R A T I O N

3

4        I hereby certify that having been first

5    duly sworn to testify to the truth, I gave

6    the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10   of the testimony given by me at the time and

11   place specified hereinbefore.

12

13

14

                 _____

15                    JOHN LEPPER

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21

     _____
22     NOTARY PUBLIC

23

24

25

Page 102

1                    J. LEPPER

2                 E X H I B I T S

3

4    RESPONDENTS' EXHIBITS:

5

6    EXHIBIT              EXHIBIT              PAGE

7    Exh A            Notice of Claim          10

8

9                    I N D E X

10

11   EXAMINATION BY                           PAGE

12   MR. TOSCA                                  3

13

14        QUESTIONS MARKED FOR RULINGS

15   PAGE 3    LINE 11

16             What is your address?

17   PAGE 46   LINE 10

18             Do you recall your daughter asking

19   that question at the village --

20   PAGE 46   LINE 20

21             Mr. Lepper, do you recall your

22   daughter asking a question of anyone at the

23   village office to the extent that she

24   indicated the mayor stole money from her?

25   PAGE 47   LINE 3

Page 103

1                           J. LEPPER

2               When you went down to the village

3    hall, was it both your children you went

4    with?

5    PAGE 55   LINE 6

6               Mr. Lepper, when was the last time

7    you saw Dr. Villina in his office?

8    PAGE 73   LINE 10

9               Did you alert your friends and

10   neighbors that you were going to court that

11   day?

12   PAGE 79   LINE 14

13              How many people attended that

14   you've notified about this hearing?

15   PAGE 79   LINE 23

16              When you appeared on that date,

17   what were you coming to court to do at the

18   time you wore your partial uniform?

19   PAGE 80   LINE 21

20              Had you received tickets in

21   reference to the tree house that's the

22   subject of this claim?

23   PAGE 84   LINE 6

24              At any rate, Mr. Lepper, when did

25   you first start construction on the tree

```
1                    J. LEPPER
2    house?
3    PAGE 86   LINE 17
4             When was the last time you
5    performed any work on the tree house?
6    PAGE 86   LINE 24
7             When was the last time you were in
8    the tree house?
9    PAGE 87   LINE 4
10            When was the last time you saw the
11   tree house?
12   PAGE 87   LINE 9
13            Has anyone made use of the tree
14   house in the last year?
15   PAGE 87   LINE 13
16            When was the last time you
17   received any summonses related to the tree
18   house?
19   PAGE 87   LINE 19
20            When was the first time you
21   received any summonses related to the tree
22   house?
23   PAGE 88   LINE 5
24            Did you receive any summonses in
25   July 2018?
```

Page 105

1                       J. LEPPER

2     PAGE 88   LINE 16

3             Which summonses was it that you

4     believe you were entitled to refunds for?

5     PAGE 92   LINE 8

6             Did you speak to Mr. Fellman about

7     your claimed threat?

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1                    J. LEPPER

2

3             C E R T I F I C A T E

4

5   STATE OF NEW YORK     )

                          :   SS.:

6   COUNTY OF SUFFOLK     )

7

8        I, NICOLE VELTRI, RPR, CRR, a Notary

9   Public for and within the State of New York,

10  do hereby certify:

11       That the witness whose examination is

12  hereinbefore set forth was duly sworn and

13  that such examination is a true record of

14  the testimony given by that witness.

15       I further certify that I am not related

16  to any of the parties to this action by

17  blood or by marriage and that I am in no way

18  interested in the outcome of this matter.

19       IN WITNESS WHEREOF, I have hereunto set

20  my hand this 31th day of July 2020.

21

22              *Nicole Veltri*

23              NICOLE VELTRI, RPR, CRR

24

25

Page 107

1           ERRATA SHEET
            VERITEXT/NEW YORK REPORTING, LLC
2

    CASE NAME: Lepper, John And Noelle Lepper v. Villiage Of Babylon,
Raph Scordino, Kevin Muldowney, Robyn Silvestri, Tony Davida, Mary
Adams, Stephen Feldman, Suzanne Schettino, Gerard Glass, And Deborah
Longo
3   DATE OF DEPOSITION: 7/20/2020
    WITNESSES' NAME: John Lepper
4
5       PAGE   LINE (S)        CHANGE              REASON
6   ____|____|____|_____|_____

7   ____|____|____|_____|_____

8   ____|____|____|_____|_____

9   ____|____|____|_____|_____

10  ____|____|____|_____|_____

11  ____|____|____|_____|_____

12  ____|____|____|_____|_____

13  ____|____|____|_____|_____

14  ____|____|____|_____|_____

15  ____|____|____|_____|_____

16  ____|____|____|_____|_____

17  ____|____|____|_____|_____

18  ____|____|____|_____|_____

19  ____|____|____|_____|_____

20  ____|____|____|_____|_____

21                          _____
                            John Lepper
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS _____ DAY OF _____, 20___.
23
24
25  _____          _____
    (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

| 1 | | | |
|---|---|---|---|

**1** 69:8
**1,000** 41:21
**1-10** 1:14
**10** 102:7,17 103:8
**10:30** 94:9,20
98:14
**10:38** 1:18
**10:42** 7:20
**10:47** 10:8
**10:55** 10:22
**10:59** 13:6
**11** 12:2,8,23 22:5
102:15
**11501** 2:10
**11702** 15:11
**11747** 2:5
**11:02** 16:11
**11:08** 21:18
**11:28** 34:4
**11:42** 34:16
**11:45** 36:21
**12:02** 50:19
**12:27** 70:6
**12:29** 72:14
**12:30** 72:24
**12th** 27:16 29:7
**13** 104:15
**135** 2:5 7:24
**14** 103:12
**148530752** 2:11
**14th** 67:24 68:12
**16** 105:2
**17** 104:3
**19** 104:19
**19900** 106:22
**1:30** 72:25 75:12
**1:35** 78:3
**1:36** 86:16
**1:41** 82:23

**1:48** 88:14
**1:54** 93:4

| 2 | | | |
|---|---|---|---|

**20** 1:17 98:6
101:19 102:20
107:22
**2018** 68:12 69:3,17
73:15,21 74:16,23
75:8 76:16,21,24
78:9 79:21 88:6,8
92:11 93:6 104:25
**2019** 74:17 75:8
76:16,25 92:12
93:6
**2020** 1:17 27:16
74:17 98:6 106:20
**21** 103:19
**23** 103:15
**24** 104:6
**250s** 2:5 7:25
**2:02** 100:22

| 3 | | | |
|---|---|---|---|

**3** 102:12,15,25
**30** 72:7
**31th** 106:20
**330** 2:9

| 4 | | | |
|---|---|---|---|

**4** 104:9
**45** 24:18
**46** 102:17,20
**47** 102:25

| 5 | | | |
|---|---|---|---|

**5** 104:23
**50** 1:2,21 3:13
6:21 7:10 8:8 9:24
13:7,19 16:18,19
17:21,24 18:8
37:12,18 42:25
48:4 51:11 52:14

52:25 69:8,22
70:2 71:7 74:10
75:13,21 76:10,19
77:16,19 81:6
85:24 86:13 89:8
94:4 96:13 97:4
98:12 100:18
**55** 103:5
**59** 15:10 85:9

| 6 | | | |
|---|---|---|---|

**6** 103:5,23

| 7 | | | |
|---|---|---|---|

**7/20/2020** 107:3
**73** 103:8
**79** 103:12,15

| 8 | | | |
|---|---|---|---|

**8** 105:5
**80** 103:19
**84** 103:23
**86** 104:3,6
**87** 104:9,12,15,19
**88** 104:23 105:2

| 9 | | | |
|---|---|---|---|

**9** 104:12
**9/11** 68:2
**90** 43:9 54:12 78:5
**92** 105:5

| a | | | |
|---|---|---|---|

**a.m.** 1:18 10:8
13:6 21:18 34:4
98:14
**ability** 18:7 25:16
39:14 69:25
**able** 5:8 11:6
15:25 18:16 20:11
21:12,15,24 24:2
25:25 30:4,17
31:4 51:7 57:7
60:13 71:10

**absolutely** 78:7
**accommodate**
20:7 24:14
**accommodating**
17:2
**action** 106:16
**adams** 1:10 107:2
**address** 3:11 6:17
6:24 7:2,14,17,22
8:4,21 15:9,14
17:16 29:17,18
102:16
**adjournment**
67:23
**adjust** 17:3
**admission** 13:20
**admit** 11:3
**admitting** 10:10
**advance** 22:20
26:3,12
**affect** 52:14 58:20
**aforementioned**
10:3
**afternoon** 75:13
98:6
**agents** 1:13
**ago** 54:8,12
**agree** 75:5,7 99:19
99:20
**ahead** 33:9 38:6
47:20 94:24 96:15
97:15 98:10
**alert** 68:23 73:10
103:9
**allow** 9:12 17:9
43:7,8 63:8 74:16
74:22 81:6 99:5
**allowed** 19:14
76:10 77:7
**allowing** 47:8 61:5
61:8 75:20 76:2,9

76:15 78:21 81:23
82:9,18 83:2,3
**ambulance** 13:23
13:25
**amount** 41:16,20
42:11 67:8
**anonymous** 66:23
67:15,18 68:4
**answer** 8:6 9:13
15:13,16 16:4,8
22:23 28:18 29:21
34:22 37:21 38:6
38:15,23 40:19,22
44:24,25 47:2,9
54:10,14 55:11
56:9 57:2,13,17
59:22 60:9,11,12
61:6,11,12 62:5,12
62:22,25 63:11,16
64:10,25 67:10,11
73:24,25 74:5
75:15,17,19,24
76:3,7,24 77:25
78:22 79:2 81:7
81:11,24 82:6,10
82:15,19,21 83:2
83:22 85:17 86:2
86:20 87:3 89:2,2
89:4 90:9 91:21
92:20
**answered** 36:20
41:8 44:23 55:3
61:4 62:21,24
86:4,9 87:17
88:13,13,13,22
92:7 94:22
**answering** 30:9
43:12 87:18
**answers** 51:9
70:24

**anticipate** 50:25
**anybody** 4:4
**anyway** 4:17
23:11
**appear** 13:11 45:5
68:14,24
**appearance** 5:21
**appeared** 4:5
79:23 103:16
**appearing** 6:22
7:23 8:8 100:6
**appears** 27:14,17
**applicable** 94:13
**appropriate** 81:21
84:4 96:7 98:19
**approximate** 71:4
**approximation**
71:20
**arose** 22:2 31:8,19
32:21
**arrangements**
70:5
**aside** 16:24 39:9
39:12,17 55:22
61:13,20
**asked** 18:25 36:9
36:20 55:3 61:4
62:19,21 67:23
81:22 87:16 88:12
92:6 93:16
**asking** 4:8 6:4 7:3
12:21 15:21,22
16:5 19:4,7,8
20:15,17,18 30:12
32:24 33:8 34:3
35:11 37:23 44:16
46:5,10,15,21 60:6
60:7,24 63:16
69:15 74:20 78:5
81:25 86:2 90:2,3
90:4 93:4,5

102:18,22
**assert** 47:14 62:11
**asserted** 63:23
**asserting** 30:3,3
30:22 64:21
**assertion** 63:6,10
65:3
**assessed** 48:9,12
**associate** 2:13
**assume** 100:7
**attempt** 42:12
44:22 89:11
**attended** 79:14
103:13
**attorney** 1:12 2:4
2:9,14 11:20
47:22 62:11 63:20
64:23 93:20
100:11,20
**attorney's** 62:3,8
**august** 67:24
68:12
**availability** 53:21
53:21
**available** 52:24
**avenue** 15:10 85:9
**avoid** 24:16,24
**aware** 69:20

**b**

**b** 102:2
**babylon** 1:8,10,12
1:12 2:14 9:16
15:10 27:17 30:22
50:5 85:9 107:2
**back** 6:14 21:5,8
21:18 34:2 37:25
38:4 40:3 41:2,4
42:3,5 43:7,9
49:11,13 58:13,15
65:12 73:5,8
81:14,16 83:15

84:22,25 90:14,16
99:2,3
**barred** 43:10
**based** 96:5 97:11
**basis** 86:14 90:25
**bates** 27:18
**began** 17:14
**begun** 51:3
**behalf** 64:15
**believe** 40:5 41:8
42:14 52:4 54:3
88:17,22 90:22
91:6 105:4
**best** 15:4 43:18
93:12
**beyond** 74:25
76:17
**bigger** 20:13
**blocking** 77:23
**blood** 106:17
**blurry** 11:10
**board** 1:12
**break** 72:11 95:20
95:22 96:3
**breaking** 17:19
28:3,14 31:10
**bring** 74:16,22
76:15
**broke** 35:3 65:7
**brought** 77:7
89:17 95:4
**building** 1:11
**built** 84:18

**c**

**c** 2:2 101:2 106:3,3
**call** 53:3
**called** 3:2
**calling** 44:4,6
**calls** 35:16
**camera** 33:11,15
33:17

[carry - counsel]                                                                      Page 3

| | | | |
|---|---|---|---|
| carry 56:21 | 44:6 47:24,25 | 99:2 | considers 14:14 |
| case 17:23 19:10 | 52:22 61:15,16,21 | client's 47:15 | constant 56:20 |
| 70:10 107:2 | 61:22 62:2,9,13 | 70:22 78:12 | 69:19,24 71:21 |
| caused 40:10 | 63:22 64:3,21 | close 100:4 | constantly 70:20 |
| 56:16 | 65:17,24 66:2,10 | cockenoe 15:10 | construction 84:7 |
| ceremony 68:3 | 66:20 67:15,18 | cockonoe 85:9 | 103:25 |
| certify 101:4,8 | 74:18 77:4,6,9 | colleague 67:25 | consultants 1:13 |
| 106:10,15 | 78:6 80:17,23 | colloquy 21:8 | contain 91:18 |
| chance 36:17 | 81:4 84:13,16 | 83:15 | contemplates 13:8 |
| change 107:5 | 87:24 88:4 89:15 | come 11:3 34:2 | 15:23 44:17,19 |
| characterization | 89:16,18,23,25 | 68:5 94:23 | contest 76:8 |
| 18:18 26:5 35:16 | 90:7 93:25 94:13 | coming 49:3 68:24 | continue 13:18 |
| 44:15 51:23 52:21 | 95:5 96:12 98:2 | 79:24 103:17 | 26:25 39:8 44:3 |
| 71:16 | 102:7 103:22 | commission | 51:9 53:5 71:11 |
| characterizations | claimant 1:5,22 | 107:25 | 71:13 76:20 83:20 |
| 71:3 | 2:4 10:11 14:4,10 | commissioner | 84:10 98:16,18 |
| characterizing | 25:12 43:2 74:12 | 67:19 | 99:2,18 |
| 51:20 | claimed 55:25 | complained 78:18 | continued 41:13 |
| check 48:16 | 92:9 105:7 | complaint 66:23 | continues 14:12 |
| children 45:6,24 | claiming 15:18 | completed 85:11 | 70:7 |
| 47:4,13 48:22 | 19:5,9 39:3,18,22 | computer 20:3 | continuing 99:8 |
| 103:3 | 49:17 66:5,9 | 26:7 | contractors 1:14 |
| chooses 39:12 | 84:17 87:25 89:22 | concerned 47:12 | copy 11:19,23 |
| choppy 83:7 | claims 30:2,21 | 97:3 | 14:20,22,24 23:2 |
| city 13:22,24 | 47:13 50:23 65:16 | concluded 100:24 | 24:13 27:24 38:11 |
| claim 1:3,15 9:7 | 65:23 68:5 74:16 | conclusion 35:17 | 38:17,18 |
| 9:15,25 10:4 11:4 | 74:23 76:15 78:12 | conduct 18:9 | corner 28:24 29:4 |
| 12:9,11,13,15,22 | 80:5,6,9,13,16 | 69:25 97:10 98:22 | correct 3:21,21 |
| 12:23 13:3,21 | 85:25 86:3 87:25 | confirm 5:24 6:5 | 8:18 15:11 25:21 |
| 14:6,17,24 15:8,9 | 89:15 90:5 91:5 | confirmed 6:2 | 29:12 31:22,23 |
| 15:19 17:3 18:24 | 93:22,24 95:4 | confused 63:19,21 | 34:19,20 35:14 |
| 22:2 23:17,20 | 98:20 | 63:25 64:8 65:3 | 89:7 101:9 |
| 25:8 26:18,20 | clarify 75:18 | confusing 83:24 | cory 2:4,6 3:19 |
| 28:10,11,15,21 | 81:19 | confusion 23:21 | counsel 3:21 4:2 |
| 29:13,19,24 30:13 | class 68:8 | 25:7 38:8 62:16 | 5:13,23 6:22 7:7 |
| 30:14,18,24 31:8 | clear 13:20 22:17 | 62:20,24 63:5,9 | 7:18,24 10:9,23 |
| 31:17,18 32:2,20 | 76:4 | 77:10 82:11 92:22 | 13:5 16:3,11,20 |
| 32:21 33:5 35:9 | client 7:13 20:7,10 | connection 83:7,9 | 19:12 22:8 24:7 |
| 35:18,19 36:9 | 22:9 23:22 27:9 | consent 3:15 6:11 | 25:9,17 29:22 |
| 38:12 39:4,19 | 27:14 62:11 63:20 | consider 52:18 | 30:11,14 31:22 |
| 42:24 43:10,11 | 64:23 73:24 94:21 | 95:2 99:15 | 32:8 33:7 34:17 |

[counsel - doe]                                                                    Page 4

36:20 37:3,14
38:25 39:6 42:17
42:18 45:3 46:15
47:2,7 50:15
52:10,19 54:18
55:3,8,20 57:18
59:23 61:4,7
62:15 64:23 65:4
69:2 70:4 71:3,19
74:15,21 76:11,14
77:8,18 78:3 79:3
80:25 81:8,9,19
82:12 83:4,17
86:10,15 87:7,11
88:8,14 89:5 92:7
92:10,21 93:4
94:17 96:14 97:16
98:14 99:4
**counsel's** 31:10
83:6
**counseling** 80:11
**counselor** 14:16
14:22 15:2 18:12
21:11 24:6,23
25:24 26:10 27:3
43:23 46:8 50:25
63:3 73:14 79:18
**count** 94:23
**country** 2:9
**county** 13:22,24
106:6
**course** 4:12
**court** 18:15 20:22
20:25 25:19,23
42:15 46:12 49:10
52:23 64:12 67:20
68:11,24 69:5
73:11 79:8,24
93:8 99:7 103:10
103:17

**court's** 67:21
**courtesy** 37:5,11
**courthouse** 68:21
**courtroom** 68:7
68:14
**created** 40:6
**crr** 1:24 106:8,23
**currently** 8:22
**cut** 5:12 18:13
20:23

**d**

**d** 101:2 102:9
**daily** 56:17 57:23
58:18 90:25 91:3
91:9,24
**damage** 61:20
**damages** 6:21 14:5
14:15 43:4,15
49:16,19 50:18
52:2 61:14,22
64:6,20 65:5
69:10 74:13 78:14
80:5,13 94:6
**date** 1:17 10:6
28:25 29:5 45:9
68:10 79:23
103:16 107:3
**dated** 27:15
**daughter** 46:5,10
46:21 102:18,22
**davida** 1:9 107:2
**day** 52:6 66:5,6
67:8 68:13,24
69:5 70:6,8 71:7
71:23 73:12 78:5
99:24,25 101:19
103:11 106:20
107:22
**day's** 66:22 67:7
**days** 43:9 54:12
66:9

**deborah** 1:12
107:2
**decision** 67:21
**default** 99:16,16
**defendants** 17:23
**definitely** 100:12
**degrees** 56:4
**delay** 95:2
**delaying** 69:12,16
69:23 70:25 77:16
**deliberate** 70:23
**demand** 14:3
74:11
**demonstrate**
25:25
**demonstrated**
19:23
**denied** 67:24
**department** 1:11
45:12 66:3 67:16
67:19
**depend** 53:20
**deposition** 17:14
26:25 27:4 37:2
37:15,17 44:8
51:5,21 53:3
71:11 85:22 86:10
88:23 89:3,6,9
93:10,16 94:7
98:13 100:17
107:3
**deputy** 1:9
**designated** 21:24
**detrimental** 17:22
18:10
**difference** 4:24
**different** 33:20
**difficult** 43:25
51:11
**difficulties** 10:15
10:24 19:22 20:6

24:17 46:14 64:15
**difficulty** 10:10
20:9,10 24:20
26:23 64:18
**directing** 7:16
76:5 82:21
**direction** 74:4
**disable** 56:23
**disabled** 10:19
57:23
**discussion** 27:12
77:14
**dismiss** 95:3,9
96:14,24 97:19
98:3 99:5,19
**display** 4:14 44:5
**displaying** 10:11
11:25
**district** 13:23,23
13:24,25 14:2,2
**doctor** 49:21
**document** 11:25
12:5,7 16:5,21,23
17:4,5,8,9 18:20
18:23 19:8,18
20:16,18,19,21
21:12,15,19 22:10
22:18 23:25 24:8
24:10,12,23 25:2
26:11 27:14,24
28:2,6,9 31:21
33:5,6,8,18,25
34:7,9,13,18 35:7
35:12,24 36:4,7,11
37:24 39:7,11,17
44:5 90:3
**documented** 92:15
**documents** 26:2
91:17,25
**doe** 1:13

[doing - five]                                                                Page 5

**doing** 17:13 57:23 59:6,10,13,19 77:21 78:20
**dollars** 91:3
**dr** 49:25 50:4,7,11 53:8,9,16,23,25 54:11,15,19,25 55:7,17,22 56:3,7 103:7
**due** 15:19 39:19 58:5,18
**duly** 3:3 14:10 101:5 106:12
**duration** 75:12

**e**

**e** 2:2,2 3:2,2 101:2 102:2,9 106:3,3
**earlier** 10:25 64:13
**eat** 72:9
**effects** 59:4
**eight** 32:10 96:11
**either** 17:3 64:25
**eleven** 22:10,15,18 24:9 27:15
**email** 23:9
**emotional** 15:19 19:5,9 39:4,19,21 40:6,8 49:16,19 55:25 58:6 61:13 61:20 80:5,13
**employees** 1:13
**enlarge** 11:13
**enlarged** 11:15
**entered** 68:19
**entire** 32:19 34:9 71:7 99:22
**entirety** 90:24
**entitled** 1:22 77:13 78:15 88:17 98:25 105:4

**enumerated** 29:9 31:3
**eric** 2:10 3:19
**errata** 107:1
**esq** 1:12 2:6,10,13 2:14
**essentially** 5:23 47:23
**evaluate** 99:7
**event** 7:12 14:19 100:16
**events** 73:15 76:21
**everybody** 3:23
**everyday** 57:8,10
**examination** 3:6 8:12 14:3,7,10 17:6 19:20 27:3,5 37:17 43:2 44:8 51:22 53:2 74:11 76:18 83:19 85:22 89:8 94:7 96:12 98:12,17,23 100:23 102:11 106:11,13
**examine** 25:11 26:8 34:13
**examined** 3:5
**example** 57:11 60:13 61:2
**examples** 57:22 59:18 60:25
**exceed** 41:21
**exercise** 7:11 99:10
**exh** 102:7
**exhibit** 9:24 10:5 10:10,11 11:7 27:25 29:10 34:18 35:2,5,11,20 36:12 36:15,18 38:17 44:7 61:24 102:6

102:6
**exhibits** 23:16 102:4
**expect** 5:20 70:23
**expended** 62:7
**experienced** 10:25 24:18
**expires** 107:25
**explain** 20:24 24:5 24:7 83:21 93:8 93:15
**explained** 12:24
**explanation** 60:5
**extent** 5:10 6:20 14:5,15 25:13 33:7 43:3,14 46:22 48:2 50:18 52:2,18 69:10 74:13 75:6,7 76:19 83:20 94:5 96:23 97:17 102:23

**f**

**f** 106:3
**face** 12:12 13:2 26:19
**fact** 5:14 26:12 44:7 67:22
**fair** 5:16 98:21
**familiar** 9:6
**family** 58:5 59:5 59:15
**far** 21:25 94:24 97:3
**fear** 69:21
**federal** 93:13
**feels** 78:14
**fees** 62:3,8
**feldman** 107:2
**fellman** 1:10 91:7 92:8 105:6

**figure** 10:14 16:12 20:2
**file** 2:11
**filed** 9:16 13:21 14:25 15:10 23:18 23:20 28:12,16 30:14 47:25 78:6
**filmore** 2:13 3:18 4:23 6:9 23:4,8,13 100:12
**finalized** 100:17
**fine** 10:18 64:10 70:22 71:25 83:10 95:22 96:3
**fined** 90:25 91:2 91:24
**fines** 40:6,10,11 41:10,12,13,14,15 41:17,20 42:8,9,13 44:22 45:7 47:13 47:16 48:9,12,17 48:23 56:15,16,20 60:3 65:20 91:9
**finish** 32:8 36:23 62:18 93:5
**finished** 17:5 37:8 52:11
**fire** 13:23,25 66:2 67:15,19
**first** 3:3 7:4 12:24 12:25 13:19 26:18 27:15 50:6 54:7 55:16 84:7 87:19 101:4 103:25 104:20
**fit** 17:12 99:11
**five** 10:16,18 16:11,14 32:3,7,10 33:2,24 34:4,5 66:13 95:19,20,22 95:24 96:3

[flip – hypodermic]

Page 6

flip   26:8
focus   57:3,4,6
   58:17 60:22
focusing   57:4
   60:20
fogging   11:18 28:4
   30:20 33:22
follow   75:24
follows   3:5
forecast   70:19
foregoing   101:8
forth   106:12
forward   78:4
found   65:20 91:22
four   22:4,14 26:13
   32:3,4,6,10 33:2
frame   78:10 79:17
   82:2,6,8
frames   94:12
frequency   53:15
   53:18
friend   67:25
friends   73:10 79:7
   103:9
front   12:25 15:25
   20:11 30:5,8 33:9
   34:8 36:11 38:18
   38:19 61:24
full   68:21 98:21
function   56:16
further   1:14,14
   70:25 101:8
   106:15

g

general   13:8 37:18
   48:4 74:9 76:18
   81:5 94:4 97:5
   98:11
generally   90:2
gerard   1:11 2:14
   3:17 107:2

getting   8:2 50:17
   72:9 78:16
give   6:23 7:13,16
   7:22 44:10 52:3
   57:11 59:17 60:9
   60:12,25 71:4,19
   88:25 89:2
given   37:4,10
   98:21 101:10
   106:14
gives   82:6
giving   82:3
glad   75:4
glass   1:11 2:14
   3:18 100:10 107:2
glasses   11:18 28:4
   30:19 33:22
go   19:16 21:23
   27:8 31:2 33:9
   38:6 43:7,9 47:20
   66:3 68:3 71:22
   72:6 75:21 82:5,7
   93:8 95:2,6,10
   96:15 97:14 98:10
going   4:20 5:10
   6:25 7:5 10:12
   11:5 13:17,18
   16:7,24 22:22
   23:21 30:15,16
   33:11,14,19 43:7,8
   43:17 44:3,15
   46:17,18,19 47:10
   50:20 51:6 52:5
   61:23 62:11 71:5
   71:8,10,12,14
   73:11,19,20,24
   74:15,22 75:6,7,9
   75:9,11,22 76:16
   76:20,21,22,23
   77:15,25 81:7
   82:16 83:19,21,22

83:23 93:21 94:13
   94:14 95:8,12,17
   96:3,11,13,24,25
   97:13,19 98:2
   99:5,13,14,18
   103:10
good   21:16
grace   71:8
great   72:23 99:24
   99:25
guilty   65:20

h

h   1:2,21 2:4,6 3:2
   3:13 6:21 7:10 8:8
   9:24 13:7,19
   16:18,19 17:21,24
   18:8 37:12,18
   42:25 48:4 51:11
   52:14,25 69:8,22
   70:2 71:7 74:10
   75:13,21 76:10,19
   77:16,19 81:6
   85:24 86:13 89:8
   94:4 96:13 97:4
   98:12 100:18
   102:2
hairs   26:22
half   70:15 72:20
hall   45:6 47:4
   48:20 68:16 103:3
hand   28:24 29:4
   106:20
handed   27:13
   38:10
happening   84:3
harass   61:8
hard   14:20,21,24
   27:23
he'll   24:3
hear   13:14 20:25
   23:5 29:15 31:12

63:18 67:4,10
   90:7
heard   6:3 77:12
hearing   1:2,21
   7:10 8:8,14 9:24
   16:9,18,19 17:21
   18:8 37:12 43:22
   51:11 52:14,25
   69:22 70:2 74:5
   76:10 77:16 79:8
   79:10,15,17,18
   85:24 86:13 93:2
   95:5 97:7 98:22
   100:5,9,18 103:14
heavy   56:21
held   27:12
hereinbefore
   101:11 106:12
hereunto   106:19
hired   5:6
home   59:25 60:7
   60:15
honestly   77:16
host   10:19
hour   70:15,15
   71:24,25 72:20,20
   72:22 96:11
hours   93:11
house   47:15 56:22
   68:22 80:22 84:8
   84:12,18 85:8,11
   85:15,20 86:18,22
   86:25 87:5,10,15
   87:21 88:11,21
   90:24 91:23
   103:21 104:2,5,8
   104:11,14,18,22
hung   100:12
hungry   72:9
hypodermic   26:9

[identification - lepper]                                              Page 7

**i**

identification  10:6
  27:19
identified  1:14
identify  23:25
impede  7:10
impeding  17:21
  18:7 39:13 69:25
impossible  51:6
  78:8 86:12
improper  43:17
  51:24 63:22
inability  25:24
  56:16
incident  74:20
  78:17
include  14:9
incorrect  15:14
independent  1:13
indicated  15:8
  46:23 102:24
information  64:5
injuries  6:20 14:5
  14:15 15:19 19:5
  19:9 25:13 39:4
  39:19,21 40:8
  43:4,14 50:18
  52:2 55:25 68:2
  69:10 74:13 94:6
injury  80:15,18
inquire  78:19
inquiry  77:7 89:9
inspector  1:11
insults  44:13
  96:20
intend  52:12 93:18
intention  67:21
intentional  99:16
interested  106:18
interjected  63:7

internet  83:6,9
interrupt  19:13
  42:19 72:16 76:12
  97:13
interrupted  63:5,8
interrupting  43:19
introduce  93:18
invite  63:17
issued  57:5

**j**

j  3:1,2 4:1 5:1 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1

98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
jane  1:13
job  58:5,7,20,24
  59:9 60:7,15
john  1:4,13,21
  3:10,18 4:18
  100:13,14 101:15
  107:2,3,21
july  1:17 88:6 98:6
  104:25 106:20

**k**

keep  33:14,17 44:6
  51:4,5,20 73:17
  91:14 93:2
kelly  2:8,8,13,13
kept  91:16
kevin  1:9 107:2
knew  68:7
know  4:3,16 7:6
  7:14 12:7 18:21
  20:4 23:23 32:14
  37:8 38:20,23
  42:7,8,11 48:14
  49:6 51:2,13 52:4
  54:6 56:10,13
  63:12 67:12 69:21
  70:16,18 72:8
  74:2 77:23 78:11
  78:25 82:4,17,17
  86:12 88:25 91:13
  92:4,16 93:20
  98:15 99:9
knowledge  56:5
  56:11

**l**

l  3:2 50:3,3 101:2
law  2:4 13:8 14:13
  15:23 18:2 25:11

37:18 44:16,19,20
  52:24 69:7 74:9
  74:10 75:2,3
  76:10,18 77:19
  81:5 94:4 97:5
  98:12
laws  48:4
leads  71:23
learn  44:5
learned  26:6
leave  67:25 68:4
left  70:4,17 85:14
  100:4
legal  35:16
legitimate  77:5,24
  94:25
lepper  1:4,22 3:1
  3:10,18 4:1 5:1,11
  6:1,13 7:1 8:1,4,5
  8:7,21 9:1,6 10:1
  11:1,5,16 12:1
  13:1 14:1 15:1,7
  15:18,24 16:1,15
  17:1 18:1 19:1
  20:1 21:1,17,20
  22:1 23:1 24:1
  25:1 26:1 27:1,23
  28:1 29:1,24 30:1
  31:1,13 32:1,15
  33:1,7,16,25 34:1
  34:6,12,21 35:1,23
  36:1,22 37:1 38:1
  38:7,16 39:1,3,16
  39:18 40:1,20
  41:1 42:1 43:1
  44:1,21 45:1 46:1
  46:20 47:1 48:1,8
  49:1,17 50:1 51:1
  52:1 53:1,7 54:1
  54:22 55:1,6 56:1
  57:1,21 58:1 59:1

**[lepper - morris]**

59:22 60:1,25
61:1 62:1 63:1,23
64:1,19 65:1 66:1
67:1,4,11 68:1
69:1 70:1 71:1
72:1,3 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1,6,11,17 85:1
86:1,7 87:1 88:1
89:1,17 90:1 91:1
92:1 93:1 94:1
95:1,23 96:1 97:1
98:1 99:1,3 100:1
100:13,15,19
101:1,15 102:1,21
103:1,6,24 104:1
105:1 106:1 107:2
107:2,3,21
**lepper's** 5:20
**letter** 91:6
**letterhead** 27:18
**letting** 37:20 57:16
64:9 92:19
**levied** 41:16 45:7
**licenses** 56:12
**life** 56:17 57:8,10
57:23 58:18 59:25
60:7,15,16,21
**light** 5:14,20
**line** 102:15,17,20
102:25 103:5,8,12
103:15,19,23
104:3,6,9,12,15,19
104:23 105:2,5
107:5
**litigation** 93:13
**little** 63:7 72:9,21
**live** 5:19

**llc** 107:1
**llp** 2:8,13
**located** 50:4 85:8
**location** 33:20
**long** 24:9 70:12
**longer** 50:24
**longo** 1:12 107:2
**look** 26:11 29:16
31:25 32:24 33:25
36:17,22
**looked** 18:24
27:25 96:16
**looking** 21:19 22:4
22:10
**looks** 3:17 23:4
27:16 100:10
**lose** 65:22
**losing** 57:3
**loss** 65:21
**lost** 58:9 65:25
66:6,10,19 100:10
**lot** 40:6
**lower** 28:24 29:4
**lunch** 70:10,12,13
71:25 72:2

**m**

**madam** 18:15
20:22 25:19 46:12
49:9 64:12 81:13
84:21 90:13
**making** 24:7 43:24
50:23 51:10 61:21
62:2,14 64:3 78:8
86:3,11 90:5,6
96:6 97:17
**malicious** 47:23
84:15 89:16,22
90:6,11 91:2,22
93:22,23
**manhattan** 68:3

**manner** 22:2 31:7
31:18 32:21 75:11
**march** 12:18
27:16 29:7
**mark** 7:7,15 9:24
25:19 26:3 46:18
46:25 47:10 55:4
55:10,12 73:20
75:10 76:22 79:21
80:3 81:8 82:8,12
82:13,20 83:23
84:9 86:20 87:3,7
87:12,17,22 88:7
88:18 92:17,22
94:14
**marked** 10:4
27:24 31:22 33:6
34:18 102:14
**marking** 24:11
73:18 93:7,17
**marriage** 106:17
**mary** 1:10 107:2
**mask** 33:21
**matter** 1:3,23 5:18
9:8 12:16 19:25
23:4 37:15 89:10
106:18
**mayor** 1:8,9 45:16
45:25 46:23
102:24
**mean** 4:25 7:14
20:23 70:15 72:5
82:20
**means** 39:13 51:17
92:23
**medical** 49:21
55:23
**medications** 80:6
80:9
**melville** 2:5

**memorial** 68:3,8
**mentioned** 74:19
**microphone** 31:10
**mineola** 2:10
**minute** 95:19,20
95:22 96:3
**minutes** 10:13,16
10:18 16:12,14
24:18 33:12,24
34:4,6 72:7 95:25
**mischaracterize**
89:11
**misrepresentation**
26:14,16
**missing** 94:3
**moment** 27:9
**monetary** 65:6
**money** 45:25
46:23 48:20 62:7
64:19 65:15 67:7
71:6 102:24
**month** 53:13
**months** 54:16
**morning** 98:14
**morris** 2:4,6 3:12
3:19,25 4:7,10,18
5:12,23 6:4,10,18
7:7,18,23 8:5,11
8:19,24 9:9,11
10:8 11:22,24
12:6,14,18,20 13:5
13:11,15 14:21
15:2,12,15,20 16:3
16:10,15,20 17:18
17:25 18:5,12,15
19:3,7,12,16,17
20:22 21:3,10,16
22:3,8,16,25 23:15
23:19 24:5,22
25:2,3,9,17 26:21
27:2,7,13,22 28:17

[morris - number]                                                    Page 9

| | | | |
|---|---|---|---|
| 28:22 29:6,20 | 86:19 87:2,6,11,16 | nature  29:23 | 55:11,18 56:6 |
| 30:6,11 31:9,20 | 87:22 88:3,7,12,18 | 30:18 | 57:12,14,18,24 |
| 32:5,22 33:3,16 | 89:5,7,24 91:20 | necessary  52:14 | 58:4,23 59:12,21 |
| 34:3,15,23 35:10 | 92:2,6,10,17,21 | need  6:16 10:19 | 60:10,17 61:3,17 |
| 35:15,21,25 36:5 | 94:17 95:7,12,18 | 23:16 24:4 50:21 | 62:4,10 64:22 |
| 36:13,19,23 37:3,7 | 95:23 96:9,22 | 57:6 60:22 70:12 | 65:18 66:11,17,25 |
| 37:10,13,22 38:6 | 97:12,16,25 98:11 | 76:3 86:6 95:21 | 67:9,17 68:25 |
| 38:13,21,24 39:6 | 99:4,10,12,17,24 | needed  57:4 | 69:6 70:3 71:15 |
| 39:16 40:15,18,24 | 100:11 | needle  26:9 | 73:13 74:2,7 77:2 |
| 41:6,18,22 42:16 | motion  96:6 98:20 | needs  85:19 | 77:17 80:2 81:18 |
| 42:23 43:6,23 | 99:6 | neighbors  68:22 | 83:5,8 85:16 86:5 |
| 44:2,13,14 45:2,18 | move  29:22 30:7 | 73:11 79:8 103:10 | 86:19 87:2,6 89:7 |
| 46:3,7,12,24 47:6 | 30:12 38:22 39:2 | neither  6:9 | 89:24 93:3 96:22 |
| 47:10,18,21 48:13 | 45:4 46:8,19 47:7 | new  1:25 2:5,10 | 100:16 |
| 48:24 49:9,24 | 52:7 54:10,14,18 | 3:4 15:10 85:9 | noted  3:22 4:2 |
| 50:8,13,15,24 | 55:3,9,13,21 59:23 | 106:5,9 107:1 | 30:4 55:15 |
| 51:13,16 52:10,16 | 61:4 64:11,24 | nicole  1:23 9:23 | notice  9:7,25 10:4 |
| 52:22 53:11,14 | 65:4 67:2 73:25 | 106:8,23 | 11:4,6 12:8,11,13 |
| 54:9,13,17,21 55:2 | 79:22 80:3 82:24 | noelle  107:2 | 12:15,22,23 13:3 |
| 55:8,18 56:6,25 | 86:10,16 87:7,11 | normal  57:8,10 | 13:21 14:17,24 |
| 57:12,14,18,24 | 88:3,8,15,19 92:7 | 60:21 | 15:8,9 18:24 |
| 58:4,23 59:12,21 | 92:18,23,23 95:8 | notary  1:24 3:3 | 23:17,19 25:8 |
| 60:8,10,17 61:3,7 | 97:11 98:3 99:5 | 101:22 106:8 | 26:18,19 28:10,11 |
| 61:17 62:4,10,15 | 99:18 | 107:25 | 28:15,21 29:13,18 |
| 62:18 63:3,15,24 | moving  46:9 55:19 | note  3:16 6:18 8:5 | 30:13,23 31:17 |
| 64:7,11,12,22 65:2 | 78:4 97:19 | 9:11 10:9 15:12 | 32:2,19 33:5 35:8 |
| 65:18 66:7,11,17 | muldowney  1:9 | 15:15,20 19:3 | 35:18,19 36:9 |
| 66:25 67:9,17 | 107:2 | 21:10 22:3 25:17 | 38:11 43:11 44:6 |
| 68:20,25 69:6,14 | municipal  1:13 | 25:22 27:2 28:17 | 47:24 61:16,22 |
| 70:3,9,13,14 71:2 | 13:8 37:18 48:4 | 28:22 29:6,20 | 62:8 64:21 65:17 |
| 71:15,19 72:2,3,10 | 74:10 76:18 77:19 | 30:6 31:9,20 32:5 | 65:23,25 74:17 |
| 72:13,16,18,22,24 | 81:5 94:4 97:5 | 32:22 33:3 34:15 | 77:9 80:17 81:4 |
| 73:13,17,22 74:7 | 98:12 | 35:21,25 36:5,13 | 84:12,16 87:24 |
| 74:21 75:4 76:11 | | 36:19,24 37:14 | 88:4 89:15,17,23 |
| 76:14 77:8,17 | **n** | 38:13 40:24 41:6 | 89:25 93:25 94:12 |
| 78:9,23 79:3,9,16 | n  2:2 3:2 50:3 | 41:18,22 42:16,17 | 95:5 96:12 102:7 |
| 79:21 80:2,24 | 101:2 102:9 | 45:2 46:3,7,13,24 | notices  9:15 |
| 81:3,18,25 82:7,11 | name  3:8 6:16 | 47:6 48:13,24 | notified  79:15 |
| 82:22,23 83:4,11 | 49:23 54:5 107:2 | 49:24 50:8,13 | 103:14 |
| 83:17 84:9,14 | 107:3 | 51:18 52:16 53:14 | number  7:2 15:24 |
| 85:13,16 86:5,15 | named  30:23 | 54:9,13,17,21 55:2 | 18:22 26:16 29:9 |

[number - people]                                          Page 10

29:11,24 30:18
31:3,16 32:4,19
70:20
**numbers** 27:19
32:13,23,25
**numerous** 42:8

**o**

**o** 3:2 101:2
**o'clock** 98:5
**oath** 8:15 27:6
53:2 98:23
**object** 4:14,20
18:17 26:4,24
44:14 46:17 51:10
71:2 73:23 74:24
75:9,17,22,23
76:21 94:14
**objected** 19:2,6
**objecting** 42:22
51:4 70:21 75:14
76:2,6
**objection** 5:17
6:18 7:19 8:6,11
8:19 9:9,11 15:12
15:15,20 19:3
21:10 22:3 25:18
27:2 28:17,22
29:6,20 30:6
31:20 32:6 33:4
35:10,15,22,25
36:5,13,19 37:14
38:14,21,24 40:15
40:18,24 41:7,18
41:22 42:16,17
45:2,18 46:3,7,24
47:6 48:13,24
49:9,24 50:9,13
51:19 52:8,17
53:6,11,14 54:9,13
54:17,21 55:2,11
55:14,18 56:6,25

57:12,15,19,24
58:4,23 59:12,21
60:8,10,17 61:3,17
62:4,10 63:21
64:22 65:18 66:7
66:11,17,25 67:9
67:17 68:20,25
69:6 70:3 71:15
73:13 74:8 77:17
79:9,16 80:2,24
81:3,18 82:14
84:9,14 85:13,16
86:6,19 87:2,6,16
87:22 88:3,12,18
89:8,24 91:20
92:2,6,10 93:3
96:23
**objectionable** 4:17
17:13
**objections** 17:16
43:16 69:19,24
71:21 74:3 76:8
78:24
**obstruct** 43:21
44:20 71:12,13
**obstructed** 95:6
**obstructing** 16:17
16:18 17:14 25:15
36:25 37:11 51:5
52:15 86:13 93:2
97:6
**obstruction** 52:19
74:8
**obstructionist**
13:10 24:21 26:24
44:4
**obstructions** 96:6
**obstructive** 52:24
97:10 99:22
**obstructs** 74:5

**obtain** 45:6
**occurrence** 6:19
14:4,14 25:12
43:3,14 50:17
51:25 69:9 74:12
94:5
**office** 8:24 46:22
54:20,25 55:7,17
102:23 103:7
**offices** 2:4
**okay** 4:9 6:4,15
7:4 9:12 12:10
14:23 16:12 18:6
22:16 27:10 34:2
34:9 35:15 36:16
43:5 52:12 57:20
62:24 63:10 71:24
72:13,19 79:11
82:7 96:8 99:12
**old** 2:9
**once** 17:4 21:11
82:6
**ones** 40:14 82:19
90:19
**opportunity** 34:13
34:25 44:10 63:18
94:2 98:4,22
**opposed** 60:15
**oral** 14:7
**order** 55:5,10,19
90:23 91:23
**ordered** 42:10,14
**orders** 47:11
**outcome** 106:18
**outlined** 47:24
**outside** 83:18
**overruled** 42:10
90:21
**oversaw** 93:10
**overturned** 65:21
68:5 90:22

**owner** 54:3

**p**

**p** 2:2,2 3:2,2
**p.m.** 86:16 100:22
**page** 12:8,11,12,23
12:24,25 15:6
21:23,24 22:4,6,12
22:17 26:13,13,17
26:18,19 27:15
28:24 29:3,8,10,11
29:24 31:2,4,4
32:11,25 93:25
102:6,11,15,17,20
102:25 103:5,8,12
103:15,19,23
104:3,6,9,12,15,19
104:23 105:2,5
107:5
**pages** 12:2,4,12
13:3,4 22:11,19
24:9 27:15 32:2,9
32:14,16,24
**paid** 48:12,17
**parameters** 75:2
**part** 36:11 47:16
53:23,25 63:7
77:3 93:12
**partial** 67:22 68:8
68:11 79:25
103:18
**parties** 14:8
106:16
**passed** 67:25
**pause** 96:17
**paused** 96:17
**pauses** 70:21
**pausing** 35:23
36:3
**pay** 65:21,22 66:6
**people** 4:5 68:6,18
79:14 103:13

[perfectly - rate]                                                                 Page 11

**perfectly** 76:4
**performed** 86:18
  104:5
**performing** 60:14
**peril** 97:23
**period** 78:6 82:5
**permitting** 7:13
  7:21
**personal** 6:24 7:2
**personally** 28:20
**pertain** 20:19
**phone** 26:8
**physical** 14:9 23:2
  80:15,18
**physician** 14:11
**pinelawn** 2:5 7:24
**place** 21:4,25 31:7
  31:18 32:20 39:9
  39:11 101:11
**placed** 7:18 78:23
  79:4
**plan** 78:4
**planning** 1:12
**played** 5:4
**please** 3:8 4:18
  6:13 15:2 16:3
  18:20 21:3,17
  24:25 32:9 33:9
  33:15,17 34:24
  36:23 38:2,15
  39:16 41:2 47:2
  49:11 50:2 52:7
  55:12,20 59:22
  62:18 63:17 64:24
  65:4 78:2 80:3
  81:13 83:11 84:10
  95:23,24
**pocket** 64:20
  65:16
**point** 4:15 25:18
  51:8,9 53:4 69:22

70:24 72:5 94:8
  100:5
**police** 47:15
**posed** 48:7
**position** 95:8
  99:13
**post** 79:12
**posted** 79:10
**practice** 53:23
  54:2,4,5
**prepared** 97:8
**prescribed** 80:8
**present** 2:12 3:17
  3:23 4:2,4 59:7
**presented** 14:22
**presenting** 19:18
  24:15
**presently** 8:7
**pretty** 53:21 56:21
**print** 23:3 24:23
  24:25
**printed** 11:19,23
**printing** 24:15
**prior** 85:22 88:23
  89:3 90:20
**privilege** 62:12
  63:6,10,20 64:23
  65:4
**privileged** 64:4
**probably** 70:14
**probe** 77:13
**problem** 4:24 7:5
  59:10,19 77:22
**problems** 60:2
  61:13
**proceed** 15:3 16:4
  17:10 18:9,21
  19:25 20:3 47:2
  75:11 76:9 77:18
  97:20 98:8

**proceeding** 96:9
  97:22
**process** 69:23
  70:25 99:23
**produced** 35:12
**prosecution** 1:14
  47:23 84:15 89:16
  89:22 90:6 93:22
  93:24
**protective** 47:11
  55:4,10,19
**provide** 24:13
  26:2,11
**provided** 22:20
  29:17 81:3
**providers** 55:24
**public** 1:11,24 3:4
  101:22 106:9
  107:25
**pursuant** 1:23
  3:12 6:21 42:25
  48:3 74:17 96:12
**put** 4:7 6:13 9:25
  16:24 39:17 66:2
  93:24 98:25
**putting** 82:14 96:7
  96:10 97:9

**q**

**qualified** 14:11
**question** 7:5 15:3
  16:4 17:15 22:24
  30:10 31:12 34:24
  36:2,8 37:21,23
  38:2,4,7,15 39:23
  39:24 40:3,22,23
  41:2,4,8,23,24
  42:3,5,19,22,24
  43:12,19,20 46:6
  46:11,16,21 47:9
  49:11,13 50:16
  58:13,15 60:5

61:9,18 62:20,22
  63:2,4,16,17 64:10
  65:12 67:5 73:6,8
  75:19,24 77:5
  78:22 79:6 81:12
  81:16,20,21,23
  82:10,16,22 84:20
  84:22,25 86:2,4,7
  86:20 90:12,14,16
  92:20 93:16
  102:19,22
**questions** 13:7
  14:8,13 15:23
  16:6,8,22 17:8,12
  17:20,24 18:19
  19:11 20:15,17,19
  25:10 30:12 39:14
  44:16,18 48:3,6
  50:21,22 51:7,24
  52:6,13,13 69:15
  69:17 76:24 77:18
  77:24 78:5 82:18
  88:15,23 89:14
  94:2,10,22 97:6
  98:5 102:14
**quickly** 35:6
**quiet** 96:19
**quite** 77:15 84:2
  86:8
**quote** 13:20 14:11
  43:2,4,13,15 51:25
  52:3 69:9,11
  74:11,14

**r**

**r** 2:2 3:2 101:2
  106:3
**ralph** 1:8
**raph** 107:2
**rate** 51:3 70:19
  84:6 103:24

[read - responses]                                                                 Page 12

**read**  11:8,9 13:18
  15:21,25 18:25
  20:12 21:5,8,20,24
  23:22 24:2 30:5,8
  30:17 31:4 32:17
  32:18 33:8,18
  34:7,8,13 35:6,7
  37:25 38:4,9 40:3
  41:2,4 42:3,5
  49:10,13 58:13,15
  65:12 73:5,8
  81:14,16 83:15
  84:25 90:14,16
**reading**  23:24
  32:15 69:20
**ready**  27:21,22
  95:10 97:21,25
  98:7,15
**realize**  72:4
**really**  77:14 96:20
**reason**  4:21 16:13
  20:20 94:25 107:5
**recall**  9:17,18,21
  9:22 41:19 42:7
  45:22,23 46:4,5,10
  46:20 48:15 49:5
  50:10 53:12 56:2
  65:19 66:16 67:6
  79:13 92:3 102:18
  102:21
**receive**  48:20 88:5
  88:9,20 104:24
**received**  24:10
  36:14 41:17,21
  42:9 80:21 82:4
  84:19 85:3 87:14
  87:20 91:15,17
  103:20 104:17,21
**receiving**  48:15
**recess**  10:20 34:10
  73:3

**recognize**  28:6,8
**reconciliation**
  11:3
**record**  3:9,16 4:8
  7:19 10:9 13:19
  21:4 22:16 25:19
  25:23 27:6,8,11
  31:9 34:16 36:24
  41:7 45:3 46:13
  51:19 64:14 66:18
  77:3 78:2,24
  82:15 83:6,9 96:8
  100:3 106:13
**recorded**  3:14
  4:13 5:2,2,3
**recording**  3:15
  4:11,16 5:15,25
  6:6,8,12
**records**  91:14,16
  91:18
**refer**  39:8
**reference**  33:4
  55:24 80:4,22
  89:18 103:21
**referred**  21:7 38:3
  40:2 41:3 42:4
  49:12 58:14 65:11
  73:7 81:15 83:14
  84:24 90:15
**referring**  12:7,15
  22:17 31:21 32:7
  32:9,11,12 34:17
  40:11 69:2 73:14
  92:11,13,15
**reflect**  64:14 100:3
**refund**  44:22 45:7
  45:14,25 48:16,22
  49:3,8
**refunded**  42:13
**refunds**  88:9,17
  105:4

**regard**  11:2 61:15
  90:5 98:20
**regarding**  56:15
  91:9
**regularly**  53:22
**rehash**  93:9
**reintroduce**  93:15
**related**  49:18
  50:22 61:22 62:8
  64:20 65:16,23
  66:19 68:2 80:6,9
  80:13,16 85:25
  86:2 87:14,20,25
  88:10,11,21 89:14
  95:4 104:17,21
  106:15
**relating**  66:10
**relative**  6:19 14:4
  14:14 25:12 43:3
  43:13 51:25 69:9
  74:12 94:5
**rely**  24:12
**relying**  24:11
**remarks**  20:4
  69:24
**remedies**  7:11
  52:23 99:10,11
**remember**  28:25
  44:24 45:9,12
  92:5
**remove**  21:15
  90:24 91:23 98:2
  98:7
**repeat**  28:13 31:14
  34:23 35:4 39:23
  39:24 40:23 48:10
  58:9 65:8,9 67:11
  69:7 74:9 79:5
  81:12 83:11 84:20
  84:22 86:5,6
  90:12

**repeated**  41:24
**repetitive**  43:17
  69:24
**rephrase**  61:18
**reporter**  10:7
  18:15 20:22,25
  21:9 25:20 38:5
  39:25 40:4,25
  41:5 42:2,6 46:12
  49:10,14 58:12,16
  64:12 65:10,13
  73:9 81:13,17
  82:17 83:16 84:21
  85:2 90:13,17
**reporting**  107:1
**represent**  66:3
**representation**
  97:17
**representations**
  24:8
**representing**
  22:13
**request**  5:10,21
  17:2 24:14 74:25
**requesting**  69:17
**requires**  77:20
**reserve**  73:19
  75:20 95:3 96:5
  96:24 97:11 98:9
  98:18 100:20
**reserving**  97:18
**resolved**  10:23
**respondent**  17:25
  18:3
**respondents**  1:16
  2:9 10:5 18:11
  30:23 98:24 102:4
**response**  69:16,18
  71:9
**responses**  70:22

[rest - stop]

| | | | |
|---|---|---|---|
| **rest** 63:3 70:5,8 71:22 | **s** | **sense** 5:5 | **speak** 13:16,17 19:14 45:20 50:14 |
| **return** 10:15 48:8 48:11 | **s** 2:2 102:2 107:5 | **sent** 67:18 | 53:16,19 63:9 |
| **returned** 42:10 | **saw** 50:11 54:24 55:7,16 87:4 | **serve** 12:8 28:20 | 92:8 97:13 105:6 |
| **review** 33:12,20 35:2,5 | 103:7 104:10 | **served** 9:7 12:18 29:19 35:8,8,19 | **speaking** 23:5 37:4,7 47:19 |
| **reviewing** 33:13 35:24 36:4,7 | **saying** 26:12 46:4 77:6 | 36:10 38:12 | 51:17 96:14 100:6 |
| **ridiculous** 7:4 | **says** 20:8,12 22:4 22:7 28:23 29:3 | **service** 68:8 | **speaks** 38:25 45:3 89:25 |
| **right** 6:10 9:5 14:3 15:7,22 17:2,3 | 29:23 31:6,17 | **session** 33:14 | **specialists** 55:24 |
| 28:23,24 29:3,4 42:22 43:8,10 | **schettino** 1:11 45:21 107:2 | **set** 106:12,19 | **specific** 59:17 60:13,25 61:2,24 |
| 50:21 68:7 73:19 75:20 76:16 84:5 | **school** 13:24 14:2 | **seven** 32:3,7,10 33:2 93:11 | 88:2 89:18 |
| 95:3 96:5,24 97:14,18,24 98:19 | **scope** 76:17 83:18 | **shannon** 2:13 3:18 23:4,6 | **specifically** 91:4 |
| **rightfully** 53:3 | **scordino** 1:8 107:2 | **sheet** 12:12,25 | **specified** 101:11 |
| **rights** 17:22 18:10 97:11 100:20 | **screen** 10:2 11:6 15:5,21,25 17:6 | 13:2 26:19 107:1 | **spell** 50:2 |
| **road** 2:5,9 7:24 | 19:19 20:8,16,21 | **short** 10:20 34:10 73:3 | **spent** 64:19 65:15 |
| **robyn** 1:9 107:2 | 21:13,20 23:24 | **show** 14:20 16:21 | **splitting** 26:21 |
| **rode** 2:8,13 | **scroll** 15:6,16 | 17:4,9 18:20 | **spoke** 45:22 53:9 79:20 |
| **room** 9:2 68:19,19 | **section** 3:13 6:21 13:7,18 32:19 | **showed** 68:7 | **ss** 106:5 |
| **rpr** 1:24 106:8,23 | 37:18 42:25 48:4 | **showing** 16:5 18:23 | **stamp** 27:19 |
| **ruling** 7:8,15 25:24 26:4 44:3,9 | 69:8 74:10 76:19 77:19 81:5 94:4 | **sign** 79:10,12 | **start** 30:12 36:21 43:12 44:16 69:14 |
| 46:18,25 52:17,20 55:12 73:18,20 | 98:12 | **signature** 106:22 | 84:7 103:25 |
| 75:10 76:23 79:22 | **see** 11:6,8,14,16,17 11:24 17:12 20:8 | **signed** 77:9 | **started** 37:19 98:13 |
| 80:3 81:8 82:8,12 82:13,20 83:20,23 | 20:11 26:16 28:4 | **silvestri** 1:9 107:2 | **state** 1:25 3:4,8 106:5,9 |
| 84:10 86:21 87:3 87:7,12,17,23 88:7 | 28:5 29:10,23 31:6,16,19 45:16 | **simple** 17:15 | **statement** 83:5,13 |
| 88:19 92:17,23 93:7,18 94:15 | 49:21,22 50:7 54:7,11,15,19 | **simply** 43:21 | 95:13 |
| **rulings** 102:14 | 71:23 72:24 99:11 | **sir** 29:5 37:9 97:23 | **statements** 47:22 |
| | **seeing** 46:15 53:8 | **sitting** 8:22 | **stating** 67:19 |
| | **seek** 44:2,9 52:17 52:20 96:13 | **situation** 24:24 | **statute** 1:23 69:20 |
| | **seeking** 61:15 65:5 | **six** 32:3,7,10 33:2 | **stephen** 1:10 107:2 |
| | **seen** 55:23 | **slowly** 13:16 | **stipulate** 14:9,17 |
| | **send** 22:25 23:16 25:3,5,7 | **small** 11:11,18 | **stole** 46:2,23 102:24 |
| | | **somebody** 23:10 78:18 | |
| | | **sorry** 5:12 9:10 13:13 29:15 35:3 47:18 63:24 64:7 65:7 77:8 83:5 98:10 | **stop** 23:18 50:20 51:17 93:6,8 |

[stopped - today]                                                    Page 14

| | | | |
|---|---|---|---|
| stopped  96:16 | swaying  67:21 | 82:25 92:16 96:4 | threat  56:20 90:23 |
| stops  96:18 | swearing  8:18 | tells  78:17 | 91:2,10 92:9 |
| streaming  5:19 | sworn  3:3 8:17 | ten  10:16 12:11 | 105:7 |
| stress  40:6,7,10 | 101:5,18 106:12 | 13:2,3 26:18 | threatened  42:8 |
| 56:14 | 107:22 | 66:15 93:25 | 56:15 |
| strike  30:7 36:6 | **t** | terminate  97:7,8 | threats  40:5 41:13 |
| 56:7 67:2 88:4 | t  101:2 102:2 | 97:22 | 41:13 57:5 58:6,8 |
| subject  55:20 | 106:3,3 | terminated  100:8 | 58:18,21 59:2,4,7 |
| 80:23 84:12,16 | take  10:13 16:11 | 100:9,19 | 59:11,15,20 60:19 |
| 103:22 | 16:14 17:5 18:8 | terms  49:16 60:2 | 60:20,22 91:8,11 |
| submitted  38:19 | 18:16 19:19,25 | 60:14 97:4 | 91:15,19 |
| subscribed  101:18 | 20:20 21:12 33:12 | testified  3:5 38:22 | three  21:25 22:7 |
| 107:22 | 33:21,24 34:5,6 | 56:14 77:12 | 22:12,18 26:13,17 |
| subsection  69:8 | 66:22 70:9,11,14 | testify  77:13 101:5 | 29:11 31:3,16 |
| substance  67:13 | 71:5,24 72:19,22 | testifying  77:4 | 32:3,6,11,19 33:2 |
| 67:14 | 84:4 95:18,19,24 | testimony  8:14 | 43:7 54:16 90:20 |
| substantiative | 96:2,11 99:13 | 22:9 38:25 101:6 | tickets  80:21 82:5 |
| 51:8 | taken  8:14 10:21 | 101:10 106:14 | 85:4 103:20 |
| sued  18:4 | 34:11 73:4 80:5 | thank  6:15 39:17 | time  1:18 10:22 |
| suffolk  106:6 | takes  57:25 58:3 | 73:2 100:2,21 | 13:6 15:9 16:10 |
| suggest  10:12 13:5 | 58:17 71:25 | therapist  49:22 | 19:2 20:2 21:18 |
| 14:12 16:11 30:11 | talk  27:9 41:15 | 56:4,8 | 21:25 29:18 31:6 |
| 36:21 37:19 43:12 | 96:15 | therapist's  49:23 | 31:17 32:20 43:10 |
| 44:2,9 48:5 69:14 | talking  23:7,8 | therapists  55:23 | 45:17,21 48:21 |
| 82:24 86:16 | 41:10 69:4 91:19 | therapy  80:12,14 | 49:15 50:6,11 |
| suggests  25:11 | 92:14 94:20 | thing  5:3 52:6 | 52:4 53:9 54:7,20 |
| suite  2:5 7:25 | technical  10:14,24 | things  47:14 59:10 | 54:24 55:6,16 |
| summons  89:19 | 19:22 20:6,9 | 75:6,8 93:6 94:11 | 60:18 66:19 68:18 |
| summonses  85:5 | 24:16,19 26:22 | think  4:23 5:16 | 70:16 71:4 72:6 |
| 87:14,20 88:2,5,10 | 46:14 64:15,17 | 6:3 10:19 34:21 | 72:13 78:10 79:17 |
| 88:10,16,20 89:21 | technically  4:25 | 40:9 44:23 58:22 | 79:25 81:2,25 |
| 104:17,21,24 | technology  26:2 | 59:24 60:4 63:18 | 82:6,8 84:4 86:17 |
| 105:3 | tell  8:18 24:3,4 | 72:20 77:14,15 | 86:24 87:4,13,19 |
| supporters  68:22 | 33:23 40:14 49:2 | 84:2 85:21 86:7 | 94:12 96:7 98:25 |
| sure  4:18 8:23 | 57:21 72:7,10 | 94:22 | 100:17 101:10 |
| 12:2,6,14 36:14 | 73:22,25 74:15 | thinking  59:3,5,8 | 103:6,18 104:4,7 |
| 58:11 61:19 66:21 | 75:3 78:12,13 | 59:11,14,19 60:3 | 104:10,16,20 |
| 72:12 93:14 | 79:7 96:19 | 60:19 | times  49:6 56:18 |
| surely  43:6 | telling  45:23 71:9 | third  29:10 | 75:16,25 89:10 |
| suzanne  1:11 | 74:4 75:15,23 | thousand  91:3 | today  18:9,21 |
| 45:20 107:2 | 76:6 77:11 79:2 | | 19:24 22:20 26:3 |

[today - want]                                                                 Page 15

27:25 35:2,13
71:6
**today's** 85:22
**tony** 1:9 107:2
**top** 22:6,11 26:17
29:9 31:3 32:13
32:23,25
**topic** 55:20
**tosca** 2:10 3:7,19
3:22 4:3,9,12,20
5:6,14 6:2,7,15,25
7:9,21 8:2 9:12,23
10:13,17,22 11:2
11:12,22 12:4,10
12:17,21 13:9,13
14:19,23 15:4
16:7,13,17 17:11
17:20 18:5,14,17
18:22 19:4,11,16
20:4 21:5,14 22:6
22:14,21 23:6,11
23:15,23 24:19,25
25:6,14 26:15
27:5,10,21 30:9,15
31:23 32:12 33:23
34:5,20 35:14
36:25 37:6,20,25
39:10,24 40:25
42:2,21 43:5,16,24
44:12,18 46:9
47:8,16,20 48:6
50:20 51:2,15
52:8,12,22 55:14
57:16,20 58:12
59:14 61:5,10
62:13,17,19 63:13
63:19 64:2,9,16,17
65:9 69:4,12,18
70:7,11,18 71:8,17
72:15,19,23 73:2,5
73:16 74:19,24

75:14 76:13 77:2
77:11,21 78:3,7,11
78:25 79:5,19
81:2,10,13,22 82:3
82:9,13,25 83:8
84:2,21 86:11
89:13 90:4,13
92:13,19,25 93:3
94:16,19 95:10,15
95:21 96:2,15
97:2,14,21 98:9,18
99:9,15,20 100:3
100:14 102:12
**total** 65:16
**totally** 63:22
**town** 13:22,25
**transcript** 101:9,9
**treating** 51:21
**treatment** 49:18
**tree** 68:22 80:22
84:7,11,18 85:8,11
85:15,20 86:18,22
86:25 87:5,9,14,20
88:11,21 90:24
91:23 103:21,25
104:5,8,11,13,17
104:21
**tried** 93:15
**true** 101:9 106:13
**trustee** 1:9,10,10
**truth** 8:18 101:5
**try** 43:18 45:13
**trying** 13:16 20:7
25:14 43:21 44:20
78:7 97:6
**turn** 4:19 5:11
16:15 21:17 29:8
33:11 95:24
**turning** 32:2
**two** 9:21 15:7
28:24 29:4,9,11,24

30:18 45:6 98:5
**typewritten** 32:14
32:25
**typically** 53:22

**u**

**uncalled** 20:5
**undergone** 80:12
**understand** 7:9
8:9,13 13:15 18:2
24:3 38:8 55:9
60:24 83:25 84:3
92:25
**uniform** 67:22
68:9,11 78:18
79:25 103:18
**use** 20:3 25:25
26:6 74:8 87:9
104:13

**v**

**v** 50:3 107:2
**vacation** 65:25
66:23 67:8
**valid** 43:20
**veltri** 1:24 6:3
21:6 25:7 106:8
106:23
**verbal** 91:8
**veritext** 3:20
107:1
**video** 3:14,15,24
4:10,12,13,14,16
4:19,21 5:2,11,15
5:21 6:5,7,11,13
16:16 17:18 21:17
95:24
**videoconference**
1:21
**videographer** 5:7
5:18

**village** 1:8,9,10,10
1:10,12,12 2:14
9:16 13:22,25
14:25 18:8,11
27:17 28:12,16,21
30:4,22 35:9,19
36:10 38:12,19
45:5,24 46:11,22
47:3,21 48:16,19
48:21 49:2,7 50:5
57:5 58:6,18
60:19,20,23 67:20
67:23 68:6,16
91:17 98:24
102:19,23 103:2
**village's** 71:6
**villiage** 107:2
**villina** 49:25 50:4
50:7,12 53:8,9,16
53:23,25 54:11,15
54:19,25 55:7,17
55:22 56:3,8
103:7
**violated** 97:4
**virtually** 50:14
53:8,10
**visible** 11:16

**w**

**wait** 72:7
**waiting** 36:8 81:10
**want** 4:14 10:13
16:20,21 17:7
18:13 22:25 23:23
23:25 42:19 48:2
62:25 63:11,14
71:4,10,24 72:6,6
72:11,15 73:17
75:18 76:12 78:19
81:19 82:4 93:9
96:2 97:12

[wanted - york]                                     Page 16

| | |
|---|---|
| **wanted**  5:9 | **works**  1:11 |
| **warning**  95:16 | **write**  35:11 |
| 96:10 97:9 | **written**  91:10,11 |
| **way**   11:12 22:22 | 91:15,19 |
| 49:4 56:24 71:18 | **wrote**  92:4 |
| 106:17 | |

| x |
|---|
| **x**  1:3,16 102:2,9 |

| y |
|---|
| **year**  54:8 87:10 |
| 104:14 |
| **years**  43:8 |
| **york**  1:25 2:5,10 |
| 3:4 15:11 85:10 |
| 106:5,9 107:1 |

**ways**  56:19
**we've**   11:15 20:6
29:21 94:19
**wearing**  67:22
**weekly**  53:22
**weight**  56:21
**went**  45:13 47:3,4
48:19 49:7 67:20
68:10 69:5 85:21
103:2,3
**whatsoever**  94:25
**whereof**  106:19
**wish**  4:15 10:17
18:6 24:12 70:11
**withdraw**  95:13
98:16
**withdrawing**
95:16
**witness**  3:2 7:16
7:22 9:13 10:2
11:4,13 14:20
18:19 22:23 24:16
33:19 39:8,25
72:8,12 74:4,19
75:18,23 76:3,5
77:25 84:23 100:4
100:23 106:11,14
106:19
**witnesses'**  107:3
**word**  94:23
**words**  3:14
**wore**  79:25 103:18
**work**  59:6,18
65:21 66:19 85:14
85:19 86:18 104:5

Diamond Reporting
A Veritext Company

# EXHIBIT "P"

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
JOHN LEPPER and NOELLE LEPPER, individually

and as parents and natural guardians of

their infant children, B.J.L and B.I.,

                    Plaintiffs,

      - against -

VILLAGE OF BABYLON; and RALPH SCORDINO,

Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of

Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; DEBORAH LONGO, Planning

Board, Village of Babylon, each individually

and in their official capacity, and John

and/or Jane Doe, unnamed, unidentified

complainants,

                Defendants.

Index No.:  2:18-cv-07011 JFB-GRB
-------------------------------------------x
               135 Pinelawn Road
               Melville, New York
DEBORAH LONGO
               October 7, 2019
               9:55 a.m.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

2

1

2              Examination Before Trial of a

3     Defendant, DEBORAH LONGO, pursuant to

4     Subpoena, before Stephanie O'Keeffe, a Notary

5     Public of the State of New York.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

3

APPEARANCES:

    CORY H. MORRIS, ESQ.

    Attorneys for Plaintiff

        33 Walt Whitman Road, Suite 310

        Dix Hills, New York 11746

    BY:  CORY H. MORRIS, ESQ.

    Coryhmorris@gmail.com

    631-450-2515


    KELLY, RODE & KELLY, LLP

    Attorneys for Defendants

        330 Old Country Road, Suite 305

        Mineola, New York 11501

    BY:  ERIC P. TOSCA, ESQ.

    Eptosca@krklaw.com

    516-739-0400

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

4

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective
parties herein, that filing, sealing and
certification be and the same are hereby
waived.


IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question shall be reserved to the time of the
trial.


IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed and sworn
to before any officer authorized to administer
an oath, with the same force and effect as if
signed and sworn to before the Court.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

5

1

2          MR. MORRIS:  Time now is 9:55.

3  D E B O R A H    L O N G O, called as a witness,

4      having been duly sworn by a Notary

5      Public, was examined and testified as

6      follows:

7  EXAMINATION BY

8  MR. MORRIS:

9      Q.    Please state your full name for

10  the record.

11      A.    Deborah Longo.

12      Q.    What is your Address?

13      A.    53 Thompson Avenue, Babylon,

14  New York 11702.

15          MR. TOSCA:  Before we begin, we

16      are going to reiterate our objection to

17      the use of a video camera.  It's not

18      being take by a third party to certify

19      the record.  We object to the use of the

20      video.

21          MR. MORRIS:  Counsel, your

22      objection is noted, we ask that you

23      follow up in writing.

24      Q.    Ms. Longo, you know how to tell

25  the truth, right?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

6

1                      Longo

2        A.    Yes.

3        Q.    You know you're under oath,

4   right?

5        A.    Yes.

6        Q.    Have you testified under oath

7   before?

8        A.    Nope.

9        Q.    Do you understand the penalties

10  for lying under oath?

11       A.    Yes.

12       Q.    Is there anything preventing you

13  from telling the truth here today?

14       A.    No.

15       Q.    Are you on any drugs, alcohol, or

16  medication that would impact your ability to

17  testify here today?

18       A.    No.

19       Q.    Do you understand the penalties

20  for knowingly making a materially false

21  statement?

22       A.    Yes.

23       Q.    Have you prepared for this

24  deposition here today?

25       A.    Yes.

7

1                      Longo

2        Q.    Tell me everything you did to get

3   ready for this deposition?

4              MR. TOSCA:  Objection.

5              Attorney/client privilege.

6        Q.    Excepting conversation that you

7   had with your attorney, tell me everything you

8   did to get ready for this deposition today.

9        A.    Nothing further, nothing more.

10        Q.    You're under oath.

11              Did you take a look at any

12   documents before today?

13        A.    No.

14        Q.    Did you review any transcripts to

15   get ready for this deposition today?

16        A.    No.

17        Q.    Did you ever visit John Lepper's

18   house?

19        A.    I have driven by because I have a

20   friend who lives on the street a few doors

21   down.

22        Q.    What friend.

23        A.    Holly Gar (phonetic).

24        Q.    When did you do that?

25        A.    Months ago.  I don't know the

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

8

1                            Longo

2    date.

3         Q.    When you say months ago, was it

4    within 2019?

5         A.    2019, probably.

6         Q.    Was it in the past three months?

7         A.    No.

8         Q.    In the past six months?

9         A.    Maybe.

10        Q.    When you say maybe, do you recall

11   what time of day it was?

12        A.    Midday.

13        Q.    Was it during the week or a

14   weekend?

15        A.    During the week.

16        Q.    For what purpose did you visit

17   your friend?

18        A.    I wasn't visiting.  I drove past

19   because she had decorated her porch and wanted

20   us to see it for a graduation party.

21              So maybe it's more than six

22   months.

23        Q.    When you say graduation party --

24        A.    She was having a graduation party

25   for her daughter.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

```
                                                      9
 1                        Longo
 2         Q.    What is her daughter's name?
 3         A.    I think it was Lindsay.
 4         Q.    From where did Lindsay did
 5   graduate?
 6         A.    St. John's.
 7         Q.    Was that high school,
 8   undergraduate --
 9         A.    High school.
10         Q.    Presumably this was in the
11   summer?
12         A.    Yes, I believe it was late summer
13   before she went to school.
14         Q.    Was this the summer of 2019?
15         A.    No.
16               Would have been last year, I
17   think. I think it was.
18         Q.    When you think, what was the year
19   you think it was?
20         A.    I believe 2018.
21         Q.    When you say you drove by
22   Mr. Lepper's house, from where were you
23   coming?
24         A.    Deer Park Avenue.
25         Q.    From what location were you
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

10

1                          Longo

2    coming?

3          A.    East.  Well, north and then east

4    because you would make a right.

5          Q.    From what location were you

6    coming north and then east?

7          A.    From Deer Park Avenue to, I

8    believe it's past Cockenoe because I don't go

9    up there all the time, so I went to whatever

10   the next street is and made a right and came

11   down?

12         Q.    You got in your car that day,

13   correct?

14         A.    I got in my car, yes.

15         Q.    You weren't in somebody else's

16   car, right?

17         A.    No.

18         Q.    When you got in your car, where

19   was your car parked?

20         A.    At work.

21         Q.    So you went from the Village of

22   Babylon?

23         A.    Around lunchtime or later in the

24   day, I don't remember exactly.

25         Q.    What car was that?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

11

1                    Longo

2         A.      My car.

3         Q.      What is your car?

4         A.      A 2016 Cadillac ATS.

5         Q.      When you went in your car and you

6    passed Mr. Lepper's house, you were working

7    that day?

8         A.      Yes.

9         Q.      Where were you working?

10        A.      Village Hall.

11        Q.      In what capacity?

12        A.      I work in the Building

13   Department.

14        Q.      During your work, you left to

15   pass by Mr. Lepper's house?

16        A.      I went to go to Holly's house to

17   see the, like I said decorations, we had all

18   bought mums.  Not mums.  Big pots of flowers

19   at Best Market, so she was decorating for a

20   party.

21               And I believe we all went past it

22   different times.

23        Q.      Who is we all?

24        A.      Girls in the office.

25        Q.      Who are these girls in the

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

12

                        Longo

 1

 2   office?

 3        A.     Well, Jeanette works in the

 4   office, I don't know whether she went or not,

 5   but we were talking about it, Jeanette Yantz,

 6   Y-A-N-T-Z.

 7        Q.     When you say girls in the office,

 8   is there anyone else aside from Jeanette Yantz

 9   in the office?

10        A.     At the time, it was myself,

11   Jeanette, and Holly.

12        Q.     You paid for flowers; is that

13   right?

14        A.     I had bought them earlier and

15   told her.  She was decorating, so she was

16   looking for big pots of flowers to put on her

17   porch.

18        Q.     How did you pay for those pots of

19   flowers?

20        A.     How did I pay?  I would assume

21   cash or a debit card.

22        Q.     As you sit here today, do you

23   know?

24        A.     No.

25        Q.     You went to Best Market?

Realtime Reporting Inc.  800-373-7172    realtimereporting.com

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

13

1                        Longo
2        A.      Yes.
3        Q.      When did you go to Best Market
4    for those flowers?
5        A.      I would say probably a few days
6    before that.
7        Q.      Who else aside from Lindsay's
8    daughter was graduating for this graduation
9    party?
10       A.      No one that I'm aware.
11       Q.      And why did you buy flowers for
12   this graduation party?
13       A.      I did not buy flowers for the
14   graduation party.  I bought flowers for my
15   home and told Holly they were a good deal.
16   She was looking for big pots of flowers.
17       Q.      How did you tell her this?
18       A.      In my office.
19       Q.      When you say you told her in your
20   office, by what means?
21       A.      Verbally.
22       Q.      Does she work in the office?
23       A.      She did up until couple months
24   ago.
25       Q.      What happened a couple months ago

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

14

1                        Longo

2    to Holly?

3           A.     She got a different job.

4           Q.     She voluntarily separated from

5    the Village of Babylon?

6           A.     Yes.

7           Q.     What was her position?

8           A.     She worked for the assessor, she

9    was secretary for the assessor.

10          Q.     So at the time, who were the

11   girls in the office aside from Jeanette?

12          A.     Myself, Holly, and Jeanette.

13          Q.     Anyone else?

14          A.     Ellie Rubino worked part time, I

15   believe.  I'm not sure if she had left at that

16   point.  It could be her or Kathleen McLean,

17   I'm not sure of the time.

18                 E-L-L-I-E R-U-B-I-N-O.  Kathleen,

19   M-C-L-E-A-N.

20          Q.     Jeanette, Rubino, McLean, Holly,

21   yourself, anyone else in that office to which

22   you referred?

23          A.     Well, Mr. Fellman works out of

24   the office, although he's not there very

25   often.  He's out in the field.  Richard Meyer

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

15

1                          Longo

2    is the rental housing inspector out in the

3    field.  That's it.

4         Q.    What is name of office to which

5    you are referring?

6         A.    Building Department.

7         Q.    Building Department where?

8         A.    At the Village of Babylon.

9         Q.    So those persons you mentioned

10   earlier, that's the Village of Babylon

11   Building Department?

12        A.    Yes.

13        Q.    Anyone else compose of the

14   Village of Babylon --

15        A.    Excuse me.

16        Q.    Does anyone else compose the

17   Village of Babylon Building Department?

18        A.    No.

19        Q.    Do you act as the head of the

20   Village of Babylon Building Department?

21        A.    Technically Mr. Fellman is the

22   head of the Building Department.

23        Q.    What is your title?

24        A.    Secretary to the building

25   inspector.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

21

1                          Longo

2          Q.      Has the mayor of the Village of

3     Babylon changed since your employ at the

4     Village of Babylon?

5          A.      No.

6                  (Mr. Glass entered the deposition

7          room.)

8          Q.      Ms. Longo, as secretary to the

9     building inspector for the Village of Babylon,

10    is there a written job description for your

11    title?

12         A.      No.

13         Q.      Is there a civil service job

14    description for your title?

15         A.      I was hired as a senior clerk

16    typist.  I believe they changed that since,

17    but I don't know what it is.

18         Q.      Who hired you as a senior clerk

19    typist?

20         A.      The mayor.

21         Q.      What year was that?

22         A.      2008.

23         Q.      What where your day-to-day job

24    duties when you were hired as a senior clerk

25    typist by the mayor of the Village of Babylon?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

22

1                         Longo
2          A.       Any day-to-day correspondence,
3    any letters, that kind of thing that the
4    building inspector would ask me to do.   I
5    also -- you know.   Let me think for minute.   I
6    have to report to the State, the local school
7    districts on any new housing, the yearly, I
8    have to do a report to the State about all
9    permits that we've taken care of.   The
10   day-to-day administrative and/or clerical work
11   that go along with being a secretary.
12         Q.       Have your job duties changed
13   since 2008?
14         A.       No.
15         Q.       Have the persons responsible for
16   your employ at the Village of Babylon changed
17   since 2008?
18         A.       No.
19         Q.       To whom do you answer at the
20   Village of Babylon as secretary to the
21   building inspector for the Village of Babylon?
22         A.       Directly to the building
23   inspector.
24         Q.       Who is that?
25         A.       Stephen Fellman.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

23

1                        Longo

2         Q.     Throughout your tenure of employ

3    for the Village of Babylon, has the building

4    inspector changed?

5         A.     No.

6         Q.     Do you answer to anyone other

7    than the building inspector for the Village of

8    Babylon?

9         A.     We all answer to the mayor.

10        Q.     Who is the mayor?

11        A.     Mayor Ralph Scordino.

12        Q.     Explain when you say "we all

13   answer."

14        A.     Ultimately, he is, I guess, in

15   charge of the office, so I would think

16   ultimately he would be who we would answer to.

17        Q.     Have you answered to the mayor

18   previously?

19        A.     Previous to my employment?

20        Q.     Previous to today?

21        A.     If he asks me a question about

22   something, certainly I would answer him.

23        Q.     Aside from asking you a question,

24   does he send you correspondence?

25        A.     Not usually directly.  It's

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

40

1                        Longo
2        Q.     This is the first time you have
3   ever been sued?
4        A.     Yes, sir.
5        Q.     You can't recall when you gave
6   over electronic mail correspondence about this
7   lawsuit?
8        A.     No.
9        Q.     But you didn't do it more than a
10  couple months ago, correct?
11       A.     No.
12       Q.     Did you ever receive --
13              Withdrawn.
14              Mr. Fellman is the one who taught
15  you what documents are required to issue
16  certificate of occupancies; is that right?
17       A.     Yes.
18       Q.     How did he do that?
19       A.     Verbally.
20       Q.     Any other form than verbally?
21       A.     No.
22       Q.     Did you take notes?
23       A.     I don't remember.  It would have
24  been years ago.
25       Q.     The reason you can't recall is

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

41

1                    Longo

2    because it was so many years ago, correct?

3         A.    Yes.

4         Q.    Aside from those verbal

5    instructions, was there anything else that he

6    showed you in which to perform your job

7    functions?

8         A.    No.

9         Q.    Did you take any notes?

10        A.    Did I take notes, I don't

11   remember.

12              I'm sure at time years ago when I

13   was first starting.  I don't remember.

14        Q.    How did you take those notes?

15        A.    With pen and paper.

16        Q.    Did you maintain that pen and

17   paper at the office?

18        A.    From 2008?  I would assume.

19        Q.    Where did you take these notes?

20        A.    I'm sorry.

21        Q.    Where did you take these notes?

22        A.    In the office.

23        Q.    Where do you maintain these

24   notes?

25              MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

42

1                    Longo

2           You can answer.

3      A.      They're probably in the garbage

4   somewhere.

5      Q.      You destroyed those notes?

6           MR. TOSCA:  Objection.

7           You can answer.

8      A.      I didn't destroy them.  If I was

9   done with the notebook, I wouldn't have saved

10  it from ten years ago.

11     Q.      So you put these notes in a

12  notebook; is that right?

13     A.      Steno pad.

14     Q.      Where is that steno pad now?

15          MR. TOSCA:  Objection.

16          You can answer.

17     A.      Probably in the landfill.

18     Q.      When did you put it in the

19  landfill?

20     A.      Ten years ago.

21     Q.      So you took the notes and you

22  threw them out; is that right?

23          MR. TOSCA:  Objection.

24          You can answer.

25     A.      I don't remember exactly.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

43

1                           Longo

2          Q.      To what is it that you refer if

3    you need to figure out whether you're doing

4    your job right?

5          A.      If I have a question, I ask

6    Mr. Fellman.

7          Q.      Mr. Fellman is the authority on

8    the subject; is that right?

9          A.      On something like building code,

10   yes.

11         Q.      Anyone else to whom you refer if

12   you don't know the answer to a question?

13         A.      No.

14         Q.      Are you employed full time or

15   part time by the Village of Babylon as the

16   secretary to the building inspector?

17         A.      Full time.

18         Q.      How much are you being paid?

19         A.      $46,000.

20         Q.      Is that a yearly salary?

21         A.      Yes.

22         Q.      How many hours do you work for

23   the Village of Babylon?

24         A.      Thirty-five.

25         Q.      Do you maintain any other

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

44

1                    Longo
2    employment currently?
3         A.    No.
4         Q.    Prior to your employment at the
5    Village of Babylon, where did you work?
6         A.    I ran a dance studio.
7         Q.    Where did you run that dance
8    studio?
9         A.    Lindenhurst and Massapequa.
10        Q.    What was the name of that dance
11   studio?
12        A.    L A Dance Studio.
13        Q.    What were the years in which you
14   maintained LA Dance Studio?
15        A.    Maybe -- I don't know exactly,
16   approximately 1998 to 2008.
17        Q.    To be clear, did you work for
18   someone?
19        A.    Yes.
20        Q.    Who did you work for?
21        A.    Linda Accardi, A-C-C-A-R-D-I.
22        Q.    What were your job duties at LA
23   Dance Studio?
24        A.    I managed the studio.
25        Q.    To what did that consist?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

45

1                     Longo

2         A.    Billing, scheduling, costuming.

3         Q.    What was your job title at LA

4    Dance Studio?

5         A.    Studio manager.

6         Q.    Did it ever change?

7         A.    No.

8         Q.    They maintained multiple

9    locations, that being LA Dance Studio?

10        A.    Yes.

11        Q.    Which location did you report?

12        A.    Both of them.

13        Q.    Was that a full-time or part-time

14   job?

15        A.    Part-time.

16        Q.    As manager, to whom did you

17   answer?

18        A.    Linda.

19        Q.    Anyone other than Ms. Accardi?

20        A.    No.

21        Q.    Was Mr. Accardi the owner of LA

22   Dance Studio?

23        A.    Yes.

24        Q.    As part the LA Dance Studio, did

25   you maintain electronic mail?

John Lepper v. Village of Babylon
Deborah Longo  – October 7, 2019

46

1                          Longo

2          A.      No.

3          Q.      As part of LA Dance Studio, did

4    you maintain a website?

5          A.      No.

6          Q.      As part of LA Dance Studio, did

7    you maintain a personal cellular phone?

8          A.      No.

9          Q.      Prior to working for LA Dance

10   Studio, what if any, employment did you hold?

11         A.      It would be before my children.

12         Q.      When you say, before your

13   children, what year would that where?

14         A.      Prior to the 1984.

15         Q.      Did you maintain employment when

16   you went to high school?

17         A.      Yes.

18         Q.      Where did you maintain employment

19   throughout high school?

20         A.      Now Stop & Shop, whatever it was

21   then, Edwards or Finest supermarket.

22         Q.      How old were you when you worked

23   at Edwards or Finest supermarket?

24         A.      Sixteen, seventeen.

25         Q.      What was your job title?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

47

1                         Longo
2          A.      Checker, I don't know what it is,
3    checker, I checked people out.
4          Q.      To whom did you answer?
5          A.      I have no idea.
6          Q.      How long did you maintain that
7    position at Edwards?
8          A.      Maybe two years, I really don't
9    remember.   Three years.
10         Q.      What year did you first start at
11   Edwards?
12         A.      '75, possibly.   I don't know.
13         Q.      How did you apply to Edwards?
14         A.      I don't remember.
15         Q.      You were hired at Edwards; is
16   that right?
17         A.      Yes.
18         Q.      Did you maintain any other
19   position aside from the checker position?
20         A.      No.
21         Q.      Do you know who hired you at
22   Edwards?
23         A.      No.
24         Q.      At some point, the employment at
25   Edwards ended; is that right?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

                                                            48

1                        Longo

2       A.      Yes.

3       Q.      How did it end?

4       A.      I assume I left.  I don't

5  remember.  I didn't get fired, I left for

6  whatever reason.

7       Q.      So you remember you did not get

8  fired?

9       A.      No.

10       Q.      Do you recall your reason for

11  leaving?

12       A.      I don't remember.

13       Q.      Did you maintain employment after

14  Edwards?

15       A.      I guess after school.  I don't

16  remember if I had something else after there.

17       Q.      Aside from Edwards, the Village

18  of Babylon and the dance studio, LA Dance

19  Studio, did you maintain any other employment?

20       A.      I worked at Doft & Company on

21  Wall Street.  D-O-F-T.  I think that was the

22  name.  I don't even remember.

23       Q.      When did you work for Doft?

24       A.      Maybe '78, '79, something like

25  that.

Realtime Reporting Inc.  800-373-7172    realtimereporting.com

John Lepper v. Village of Babylon
Deborah Longo  – October 7, 2019

49

```
1                        Longo
2        Q.     Who hired you?
3        A.     I don't remember.
4        Q.     Do you recall if you applied for
5   the position?
6        A.     I don't remember.
7        Q.     What was your job title?
8        A.     I worked with the trader.  I
9   don't know what my job title was, I worked
10  with one of the traders.
11       Q.     Was it full time or part time?
12       A.     Full time.
13       Q.     Where was it located?
14       A.     Wall Street.  I don't know where.
15       Q.     When you say Wall Street, New
16  York City?
17       A.     Yes, New York.
18       Q.     How long did you maintain
19  employment at Doft?
20       A.     Until 1980.
21       Q.     What occurred, if anything, in
22  1980.
23       A.     I got married.
24       Q.     How did you leave Doft?
25       A.     I resigned.
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

50

1                    Longo

2        Q.      What, if any, employment did you

3    have after Doft?

4        A.      Mergenthaler Linotype.

5    Merganthaler, L-I-N-O-T-Y-P-E, in Melville on

6    Old Country Road.

7        Q.      What year did you start with that

8    firm?

9        A.      1980.

10       Q.      Going back a second to Doft, for

11   whom did you work at Doft?

12       A.      I can't -- I can't remember his

13   name.  Norman Gotleib.

14       Q.      Did you report to anyone else

15   other than Norman Gotleib at Doft?

16       A.      No.

17       Q.      In 1980, you started working for

18   another firm?

19       A.      Merganthaler Linotype.

20       Q.      How did you come to be employed

21   by that firm?

22       A.      I don't remember.

23       Q.      Did you submit a job application?

24       A.      I just don't remember.  I would

25   assume.  I don't know.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

51

1                    Longo

2        Q.      Did your husband help with you

3   with the employment at --

4        A.      No.

5        Q.      How long did you work for

6   Morganthaler Linotype?

7        A.      Four years.

8        Q.      What was your job title?

9        A.      Secretary to the vice president

10  of finance.

11       Q.      Who was the vice president of

12  finance?

13       A.      Brian Burke.

14       Q.      What were your day-to-day job

15  duties?

16       A.      Clerical.  I don't remember much

17  more.

18       Q.      Physically, what did you do day

19  to day?

20       A.      Type letters, take shorthand,

21  just don't remember much besides that.

22       Q.      Did there come a time that you

23  stopped working for Mr. Burke?

24       A.      Yes.

25       Q.      What happened?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

52

1                         Longo

2         A.     I had a baby.

3         Q.     Your first child?

4         A.     Yes.

5         Q.     What year was your child born?

6         A.     1984.

7         Q.     Did you quit, were you

8    terminated, something else?

9         A.     No, I left.  I wasn't going to

10   work.

11        Q.     When was the next time you were

12   employed?

13        A.     Not until I worked at the dance

14   studio.

15        Q.     Is it fair to say from 1984 to

16   1988, you were not employed in any form or

17   fashion?

18        A.     No.

19               MR. TOSCA:  Objection.

20        Q.     In 2008, you left the dance

21   studio; is that right?

22        A.     Yes.  Um-hum.

23        Q.     How did you leave?

24        A.     Resigned.

25        Q.     Was there a gap in between your

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

53

1                      Longo
2      employment at LA Dance Studio and the Village
3      of Babylon?
4           A.     Just a couple of months.
5           Q.     Why did you leave the dance
6      studio and have a couple months of
7      unemployment?
8           A.     Because my children were grown
9      out of it and I wasn't gonna do it anymore.
10          Q.     How many children went to the
11     dance studio?
12          A.     Three.
13          Q.     What are their names?
14          A.     Meghann, M-E-G-H-A-N-N, Delaney,
15     D-E-L-A-N-E-Y, and Donovan, D-O-N-O-V-A-N.
16          Q.     When you say they grew out of it,
17     who was the last child that grew out of it?
18          A.     Donovan.
19          Q.     How old was Donovan in 2008?
20          A.     I guess 17.
21          Q.     When did you first take the civil
22     service exam?
23          A.     I think it was spring of 2008 or
24     maybe the fall of 2007.
25          Q.     What was the civil service exam

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

54

1                    Longo
2    that you took?
3         A.    Senior clerk typist.
4         Q.    That's the same position that you
5    currently hold?
6         A.    Yes.
7         Q.    Are you part of a union?
8         A.    No.
9         Q.    Have you received any pay raises
10   throughout your tenure at the Village of
11   Babylon as secretary to the building
12   inspector?
13        A.    Yes.
14        Q.    When were those raises?
15        A.    Everybody gets a yearly $1,000
16   raise.
17        Q.    Is that part of a step program?
18        A.    I don't know.  It's just what it
19   is.
20        Q.    Do you maintain a website?
21        A.    No.
22        Q.    Do you blog?
23        A.    No.
24        Q.    Do you maintain any social media
25   accounts?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

55

| | Longo |
|---|---|

1              Longo

2        A.      None at all.

3        Q.      When did you first become

4   involved in the Village of Babylon

5   administration?

6        A.      You mean, when did I start

7   working there?

8        Q.      Yes.

9        A.      2008.

10        Q.      To whom did you initially report

11   to within the Village of Babylon?

12        A.      Stephen Fellman.

13        Q.      Who, if anyone, reports to you?

14        A.      Jeanette Yantz, it was Holly Gar,

15   now Marietta Menchini, M-E-N-C-H-I-N-I.

16        Q.      Those persons, what are their job

17   titles?

18        A.      Clerk typists.

19        Q.      Is that the same job title as you

20   or something different?

21        A.      I guess it's basically the same,

22   and one would be the senior clerk typist.

23        Q.      How is it that those persons came

24   the report to you?

25        A.      They were hired after me.  I

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

56

1                    Longo
2  never had full-time people when I started,
3  just had part-time clerical.
4       Q.    As part of your hire with the
5  Village of Babylon as secretary to the
6  building inspector, do you complete any forms?
7       A.    Application form, I would
8  imagine.  I don't remember.
9       Q.    Anything else?
10      A.    I would imagine payroll
11  information.
12            MR. MORRIS:  Counsel, you didn't
13       produce this witness' personnel file,
14       did you?
15            MR. TOSCA:  Counsel, I'm not
16       going to respond to questions on the
17       record that you're asking me about stuff
18       that's unrelated.
19            We're here for a deposition of
20       Ms. Longo.  Please continue with the
21       deposition.  You got responses from us,
22       so what you have is what you have.
23  RQ          MR. MORRIS:  We're going to
24       request copies of the forms completed,
25       job applications, any interview notes

Realtime Reporting Inc.  800-373-7172    realtimereporting.com

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

57

1                    Longo

2          and things that witness has mentioned

3          here today.

4          Q.     Ms. Longo, do you hold any

5     licenses such as a notary public?

6          A.     No.

7          Q.     Driver's license?

8          A.     Yes.

9          Q.     Anything other than a driver's

10    license?

11         A.     No.

12         Q.     Ms. Longo, are you a high school

13    graduate?

14         A.     Yes.

15         Q.     When did you graduate from high

16    school?

17         A.     1976.

18         Q.     From what high school did you

19    graduate?

20         A.     West Islip.

21         Q.     Where is that high school

22    located?

23         A.     On Higby Lane in West Islip.

24         Q.     Did you attend any

25    institutions of higher learning after you

Realtime Reporting Inc.  800-373-7172    realtimereporting.com

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

58

1                        Longo

2    graduated high school?

3         A.      I just went to SUNY Farmingdale

4    for two years?

5         Q.      Anything else?

6         A.      No.

7         Q.      Where was SUNY Farmingdale

8    located?

9         A.      Route 110 in Farmingdale?

10        Q.      For what periods did you attend?

11        A.      1976 to 1978.

12        Q.      When did you start in 1976 at

13   SUNY Farmingdale?

14        A.      When?  September.

15        Q.      When did you end?

16        A.      May, I guess.

17        Q.      That was May of what year?

18        A.      '78.

19        Q.      Did you receive any kind of

20   certificate of attendance?

21        A.      An associate's degree.

22        Q.      When did you receive your

23   associate's degree?

24        A.      May of '78.

25        Q.      Were there any focus on that

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

59

1                          Longo
2     associate's degree?
3          A.      I think business.  I don't even
4     remember.
5          Q.      Did you go on to get anything
6     other than your associate's degree?
7          A.      No.
8          Q.      Were you awarded any honors for
9     performance during your period of attendance
10    at SUNY Farmingdale?
11         A.      No.
12         Q.      Have you participated in any
13    continuing education programs since you
14    graduated from Farmingdale?
15         A.      No.
16         Q.      Do you operate a vehicle owned by
17    the Village of Babylon?
18         A.      No.
19         Q.      How many hours are you on duty
20    for the Village of Babylon?
21         A.      Thirty-five.
22         Q.      Are you paid by the hour by the
23    Village of Babylon?
24         A.      No.
25         Q.      How long is your workday in the

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

152

1                      Longo
2  received from Mr. Fellman in regards to the
3  tree house?
4        A.    Say that again.
5        Q.    Did you relay, receive on
6  Mr. Fellman's behalf or then give to
7  Mr. Fellman any communications regarding a
8  tree house?
9        A.    From anybody?
10        Q.    Um-hum.
11        A.    I mean, I don't know if I
12  received something and then forwarded it to
13  Mr. Fellman, I can't say for certain.  I don't
14  know.  I don't know.
15        Q.    Why don't you know?
16        A.    Because I don't remember.
17              MR. TOSCA:  Objection.
18        Q.    I just want to be clear.
19              Is it that you don't know or is
20  it that you can't recall?
21        A.    I don't recall.
22        Q.    As secretary to the building
23  inspector for the Village of Babylon, you
24  would be responsible for relaying messages to
25  Mr. Fellman, correct?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

153

1                     Longo
2        A.     Yes.
3        Q.     Mr. Fellman handled the tree
4   house matter, correct?
5        A.     Yes.
6        Q.     You don't know if you ever
7   referred a communication to Mr. Fellman
8   regarding the tree house matter?
9               MR. TOSCA:  Objection.
10              You can answer over objection.
11       A.     I just don't remember.  I don't
12   remember dates and when that would have
13   happened.  Sometime in the last year.
14       Q.     You have all those
15   communications?
16       A.     Yes.
17       Q.     Because you haven't deleted any
18   of them, correct?
19       A.     No.
20       Q.     You provided them all to counsel?
21              MR. TOSCA:  Objection.
22              Don't answer the question.
23       Q.     Have you provided them to a third
24   party?
25              MR. TOSCA:  You can answer that.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

154

1                    Longo

2        A.    I believe so.

3        Q.    Who?

4        A.    Jean Parker.

5        Q.    When you gave it to Jean Parker,

6    what, if anything, did she do with it?

7        A.    I have no idea.

8        Q.    Those records are maintained in

9    the regular course of business at the Village

10   of Babylon?

11       A.    Yes.

12       Q.    In fact, when you gave them to

13   Jean Parker, she was employed by the Village

14   of Babylon, correct?

15       A.    Yes.

16       Q.    Those documents that you gave to

17   Jean Parker, were they numbered in any fashion

18   or sorted in any fashion?

19       A.    I don't believe so.

20       Q.    How did you give them to

21   Ms. Parker?

22       A.    I just made copies of them.

23       Q.    How did you make copies?

24       A.    I printed them from the computer.

25       Q.    Village of Babylon computer,

John Lepper v. Village of Babylon
Deborah Longo - October 7, 2019

155

```
 1              Longo
 2  correct?
 3      A.     Yes.
 4      Q.     Then gave them to Jean Parker, a
 5  Village of Babylon employee?
 6      A.     Village clerk.
 7      Q.     She works for the Village of
 8  Babylon, correct?
 9      A.     Yes.
10      Q.     What about the Village of Babylon
11  Planning Board, as secretary to the building
12  inspector for the Village of Babylon, have you
13  ever communicated with the Planning Board?
14      A.     Yes.  I'm secretary to the
15  Planning Board as well.
16      Q.     How did you obtain that position?
17      A.     It was told to me that that's
18  what I was going to be doing once I started,
19  the Village.
20      Q.     When you say told, how did that
21  happen?
22      A.     It became part of the job.
23      Q.     When you say told to you, how did
24  that happen?
25             MR. TOSCA:  Objection.
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

156

1                          Longo
2              You can answer.
3        A.      I just became part of the job,
4    and by the way, you're secretary to the
5    Planning Board.
6        Q.      It wasn't through osmosis, did
7    somebody tell you?
8              MR. TOSCA:  Objection.
9              You can answer.
10       A.      I guess the mayor, I would say.
11       Q.      So the mayor told you it was part
12   of the job, correct?
13       A.      I would say yes.  I don't recall
14   exactly a conversation about it, it just
15   landed.
16       Q.      Has the mayor done anything that
17   just landed in that way that you became the
18   secretary to the Planning Board?
19       A.      Suzanne was prior to me and then
20   she moved over to the mayor's office upon
21   Marybeth Wright retiring, and I took over for
22   Suzanne and that was part of her duties so it
23   became part of mine.
24       Q.      As secretary to the Planning
25   Board, that's another title that you hold,

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

157

1                      Longo

2    correct?

3          A.    Yes.

4          Q.    What are your job duties in that

5    title?

6          A.    I basically do the minutes for

7    them.  I prepare their folders if somebody --

8    it's very limited, if they come in and have to

9    go in front of the Planning Board for a

10   driveway or second story balcony or something

11   of that nature, I would keep track of the

12   folders, send the calendar to the Beacon

13   though the clerk's office, they send it to the

14   Beacon because it has to be published, and

15   they write their own letters, and I type the

16   minutes for them and distribute them, that's

17   it.

18         Q.    Any other limited duties to which

19   you did not mention in regards to you're being

20   secretary to the Planning Board?

21         A.    No.

22         Q.    What hours do you operate as

23   secretary to the Planning Board?

24         A.    Just within my normal course of

25   day.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

158

1                        Longo

2          Q.      Are you paid extra for being the

3   secretary to the planning board?

4          A.      I get a stipend, I think it's

5   $1,500 a year.

6          Q.      Do you know if the secretary to

7   the planning board is an elected position?

8          A.      No, it's an appointed position.

9          Q.      Who is responsible of the

10  appointment of the secretary to the planning

11  board of the Village of Babylon?

12         A.      The mayor and the Board of

13  Trustees.

14         Q.      Was there a vote that made you

15  secretary to the planning board?

16         A.      I'm not aware.

17         Q.      What, if any, capacity do the

18  trustees have in regards to the appointment of

19  the secretary of the planning board position

20  for the Village of Babylon?

21         A.      I don't know the answer to that.

22         Q.      Did any trustee tell you that you

23  would be doing the secretary to the planning

24  board position?

25         A.      No.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

159

1                      Longo

2          Q.    Just the mayor, correct?

3          A.    I believe the mayor and Suzanne,

4    but, again, it's a long time ago.

5          Q.    Who is on the planning board of

6    the Village of Babylon?

7          A.    James Slack, Robert Waters,

8    Richard Tisoro (phonetic), James Cansler

9    (phonetic), Judy Skillen (phonetic), and

10   there's one more.  I can't think of their name

11   right now.

12         Q.    Six persons.

13         A.    Six.

14         Q.    As secretary to the planning

15   board of the Village of Babylon, what are you

16   day-to-day duties in regard to that position?

17         A.    Taking in any applications,

18   calendaring them, sending the calendar to the

19   clerk's office for publication in the Beacon,

20   and then doing their minutes based on Judy

21   Skillen's handwritten minutes, typing them for

22   her.

23         Q.    You say minutes.

24               Are those audio recorded?

25         A.    No.

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

160

1                        Longo

2           Q.       How are the minutes taken?

3           A.       She takes them longhand.

4           Q.       You convert those longhand notes

5    into actual minutes?

6           A.       Yes.

7           Q.       Have you ever communicated with

8    Village of Babylon planning board or any of

9    its members?

10          A.       Yes.  They come up to my office

11   to review the folders, whatever I collected

12   over the course of the month.

13          Q.       What are the circumstances under

14   which you have occasion to communicate with

15   those persons?

16          A.       They come in to look at the

17   folder to see what's going to be on the

18   calendar.

19          Q.       And your office maintains these

20   folders?

21          A.       Yes.

22          Q.       In the course of your duties as

23   secretary to the building inspector for the

24   Village of Babylon or the secretary to the

25   planning board for the Village of Babylon, do

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

161

1                    Longo
2    you have occasion to communicate with the
3    Village of Babylon trustees?
4         A.      On occasion, yes.
5         Q.      Under what circumstance do you
6    have occasion to communicate with the trustees
7    of the Village of Babylon?
8         A.      Any number of things.  I mean, I
9    don't have anything specific.  It could be
10   anything they ask about.
11        Q.      Can you explain anything that
12   they might ask about?
13        A.      Something happening in the
14   Village, something happening with a particular
15   job, a vacant house, could be -- it's winter,
16   it could be snow on the sidewalk, could be
17   multiple things.
18        Q.      Ms. Longo, where do you live?
19        A.      Babylon.
20        Q.      Do you live in the Village?
21        A.      Yes.
22        Q.      Where did you live before that?
23        A.      The village of Lindenhurst.
24        Q.      Where did you live before the
25   village of Lindenhurst, if anywhere?

Realtime Reporting Inc.  800-373-7172    realtimereporting.com

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

162

1                      Longo

2        A.     West Islip.

3        Q.     Prior to West Islip, did you live

4   anywhere before that?

5        A.     No.  In Brooklyn when I was a

6   baby.

7        Q.     During the time which you lived

8   in the village of Babylon, have you observed

9   any tree houses?

10       A.     No, I have not seen a tree house.

11       Q.     You are aware there are more than

12  one tree house in the Village of Babylon?

13       A.     I only know of one other.

14       Q.     You know of two tree houses; is

15  that right?

16       A.     Um-hum.

17       Q.     Are you aware there are more than

18  those two tree houses in the village?

19       A.     I wouldn't know.

20       Q.     Why not?

21       A.     I just don't know anything about

22  them if they are.

23       Q.     Have your kids ever played in a

24  child's tree house?

25       A.     No.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

163

1                      Longo

2        Q.      Have you ever seen a child's tree

3   house?

4        A.      I've seen pictures, yes.

5        Q.      So you're aware that children

6   play in tree houses, right?

7                MR. TOSCA:  Objection.

8        A.      Not mine.

9        Q.      Are you aware of any children

10  playing in the village of Babylon in a tree

11  house?

12       A.      No.

13       Q.      In the course of your regular

14  professional activities as Village of Babylon

15  secretary to the building inspector, have you

16  ever issued a Certificate of Occupancy for a

17  garage?

18       A.      Yes.

19       Q.      In the course of your regular

20  professional activities as the secretary to

21  the building inspector for the Village of

22  Babylon, have you ever issued a Certificate of

23  Occupancy for a structure less than 90-square

24  feet?

25       A.      For a structure less than

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

164

1                       Longo
2    90-square feet, no.  I don't think so.
3         Q.      In the course of your regular
4    professional activities as the secretary to
5    the building inspector for the Village of
6    Babylon, do you investigate circumstances
7    under which there is a violation of the
8    Village of Babylon Building Department based
9    on a complaint?
10        A.      That would be up to the building
11   inspector.
12        Q.      Have you ever investigated
13   circumstances under which there is a violation
14   of the Village of Babylon code?
15        A.      That would be the building
16   inspector.
17        Q.      To be clear, you would not do
18   that, correct?
19        A.      Not unless I was instructed by
20   the building inspector.
21        Q.      Have you been instructed by the
22   building inspector?
23        A.      On occasion, yes.
24        Q.      In the course of your
25   professional activities as secretary to the

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

165

1                     Longo

2   building inspector for the Village of Babylon,

3   please tell us the circumstances under which

4   you have investigated whether there is a

5   violation of the Village of Babylon code based

6   on a complaint.

7        A.    Trying to think of something in

8   particular.  We have had people building

9   garages without permits.  We have had to send

10  somebody.  We have had complaints about a

11  property on Sumpwams Avenue, S-U-M-P-W-A-M-S.

12  I'm trying to think.  I can't think of an

13  exact address or something to give you.  I've

14  sent him down to Salt Meadow when somebody was

15  gutting a kitchen, that was only a couple

16  months ago, we sent Mr. Fellman down there and

17  I had to send them a notice of violation.

18       Q.    In the course of your activities

19  as the secretary to the building inspector for

20  the Village of Babylon, do you investigate

21  circumstances under which there is a violation

22  of the Village of Babylon code based upon a

23  complaint from Kevin Muldowney?

24       A.    The only thing that he complained

25  about is this property on Sumpwams to me

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

166

1                         Longo
2     directly.
3          Q.      Explain your involvement in that
4     investigation?
5          A.      They're a New York Rising house,
6     so it's been -- they're involved in a lawsuit,
7     their contractor stole hundreds of thousands
8     of dollars from them, so we have been on top
9     of them, I would say, for property maintenance
10    and trying to work with them to rectify this
11    situation, and by we, I don't mean me, I mean
12    the board.
13         Q.      To be clear, the board is
14    involved in that investigation?
15         A.      The board of trustees along with
16    the building inspector.
17         Q.      In the course of your regular
18    professional activities as the Village of
19    Babylon secretary to the building inspector,
20    do you investigate circumstances under which
21    there is a violation of the Village of Babylon
22    code based upon a complaint by Robyn
23    Silvestri?
24         A.      No.
25         Q.      In the course of your regular

John Lepper v. Village of Babylon
Deborah Longo - October 7, 2019

167

1                    Longo

2    professional activities as the secretary to

3    the building inspector for the Village of

4    Babylon, do you investigate circumstances

5    under which there is a violation of the

6    Village of Babylon code based on a complaint

7    from Tony Davida?

8         A.    Yes.

9         Q.    Can you explain the circumstances

10   of that investigation?

11        A.    Mr. Lepper's tree house.

12        Q.    Tell us what occurred.

13              MR. TOSCA:  Objection.

14              You can answer.

15        A.    He came in the office one day

16   last year and said there was a platform being

17   built very close to the street in a tree.

18        Q.    Are there any other circumstances

19   under you have had opportunity to investigate

20   a complaint brought by Mr. Davida?

21        A.    I don't recall.

22        Q.    When you say you investigated a

23   complaint about Mr. Lepper's tree house, can

24   you explain on behalf of who you investigated

25   such complaint?

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

168

1                        Longo
2        A.      Who complained?
3        Q.      On behalf of whom did you
4   investigate such complaint?
5        A.      He stated it to Mr. Fellman, so
6   when Mr. Fellman left the office, he went past
7   it, is my recollection, he went past the
8   platform.
9        Q.      What, if anything, occurred?
10       A.      He took a picture, and then he
11  would have either come back to the office or
12  called the office and asked me to send a
13  letter saying he might need a building permit.
14       Q.      Anything else?
15       A.      At that time, no.
16       Q.      What about a later time?
17       A.      When there was -- at some point a
18  notice of violation was sent when, I believe
19  there was no answer.  I know Mr. Lepper came
20  up at one point and then didn't, I believe
21  didn't follow through, and a notice of
22  violation was sent and then the summonses were
23  written.
24       Q.      When you say didn't follow
25  through, can you explain to what you're

John Lepper v. Village of Babylon
Deborah Longo   - October 7, 2019

169

1                      Longo

2    referring?

3         A.     I'm try to remember.  I know that

4    he came up with some drawings, and I said I

5    would show them -- I said I would take them

6    in, give them to the building inspector.  The

7    building inspector said he wanted plans, not

8    hand drawn and I had left a message on

9    Mr. Lepper's phone to that effect that plans

10   were required, and we never heard from him

11   again.  And then Mr. Fellman asked me to send

12   a violation.

13        Q.     What number did you use?

14        A.     What phone number?  Whatever was

15   one the building permit application, that he

16   gave me with his hand drawing for the tree

17   house.

18        Q.     You were responsible for --

19               Withdrawn.

20               You were responsible for issuing

21   that notice of violation?

22               MR. TOSCA:  Objection.

23               You can answer.

24        A.     No, I wasn't responsible.

25   Mr. Fellman asked me to send it.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

170

1                    Longo
2       Q.     Who is responsible?
3              MR. TOSCA:  Objection.
4              You can answer.
5       A.     Mr. Fellman.
6       Q.     Not you, right?
7              MR. TOSCA:  Objection.
8       A.     No.
9       Q.     Who is responsible for making the
10   determination of which you mentioned earlier?
11      A.     Mr. Fellman.
12      Q.     Not you?
13             MR. TOSCA:  Objection.
14      A.     No.
15      Q.     Is it fair to say that you just
16   follow orders from Mr. Fellman?
17             MR. TOSCA:  Objection.
18      A.     Yes.
19      Q.     When you conducted the
20   investigation involving Mr. Lepper, on whose
21   behalf did you conduct the investigation?
22      A.     Say that again.
23             (Whereupon, the record was read
24      by the reporter.)
25      A.     I didn't conduct an

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

171

Longo

 1    investigation.  Mr. Fellman did.  I have no

 2    authority to conduct an investigation.

 3         Q.     On whose behalf did Mr. Fellman

 4    conduct an investigation involving Mr. Lepper?

 5         A.     The Village of Babylon's behalf.

 6         Q.     In the course of your regular

 7    professional activities as secretary to the

 8    building inspector for the Village of Babylon,

 9    do you investigate the circumstances under

10    which there is a violation of the Village of

11    Babylon code based upon a complaint from Ralph

12    Scordino?

13         A.     Yes.

14         Q.     Under what circumstances?

15         A.     He might drive around and see

16    construction being done and call me and ask if

17    there is a permit on it.

18         Q.     What, if anything, would you do?

19         A.     Look in the file and see if there

20    was a permit.

21         Q.     At whose direction would you do

22    that?

23         A.     On the request of the mayor.

24         Q.     In other words, you would act

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

172

1                    Longo
2  pursuant to the mayor speaking, correct?
3        A.    If he asked me about a permit or
4  lack thereof, yes.
5        Q.    Do you recall the last time the
6  mayor did that?
7        A.    Possibly within the last month or
8  two.  I don't remember.  I can't give you an
9  exact address.
10       Q.    What about before that month or
11 two?
12       A.    Could have been a month or two
13 before that as well.
14       Q.    Is it that you don't know or you
15 can't recall or something else?
16       A.    I don't know.  I can't recall an
17 exact address or time.  The mayor is active
18 and will ask if there is a permit on things as
19 he see them driving around the village.
20       Q.    Is there anything that would
21 refresh your recollection?
22       A.    No.  No.
23       Q.    As you sit here today, you can't
24 recall if there's anything that would refresh
25 your recollection?

# EXHIBIT "Q"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                        Plaintiffs,

    - against -

VILLAGE OF BABYLON; and, RALPH
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                        Defendants.
------------------------------------------------------------------X

Docket No.: 2:18-cv-07011
JMA, AYS

**AFFIDAVIT**

**Judge: Honorable
Joan M. Azrack, U.S.D.J.
(Shields, A., U.S.M.J.)**

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF SUFFOLK   )

Stephen Fellman, being duly sworn deposes and says:

    1.    I make this affidavit in support of the motions to dismiss the complaint of the

plaintiffs in this matter.

    2.    I am the Village of Babylon Building Inspector and have served as building

inspector since 1991.

3.    I am fully familiar with the facts and circumstances of this matter involving a building that was erected in 2018 by John Lepper in a tree on his property located at 59 Cockenoe Avenue in the Village of Babylon.

4.    After I was notified in May 2018 of the commencement of construction of the building, which Mr. Lepper describes as a treehouse, I contacted Mr. Lepper and advised him in writing that he may need a permit for what appeared when I first observed the construction to be the platform to a building structure.

5.    As construction continued, I warned Mr. Lepper in writing that he required a permit for the building.

6.    He provided a permit application in late May 2018.  Even though he was not issued a permit on the application, he continued to build without a permit resulting in a set of tickets in July and August of 2018 and again in October 2018 for violating Village Code.  The basis for my issuing the tickets was his continued violation of village code by erecting a building without obtaining a permit.  Specifically, Section 365-26 of the Babylon Village Code requires a permit for the construction of a building such as the tree house.

7.    In late July 2018, Mr. Lepper met with me in Village Hall, and I explained to him that a permit was required before he could continue building.  Because of the proximity of the building to the property line, it was apparent that he required a variance.  I told him to submit signed and sealed plans and a survey prepared by a licensed surveyor to complete the application.  I needed to see plans by a licensed professional providing detail of the construction to assess design safety.  Mr. Lepper still did not comply and to this day has not completed the application.  In order to appear before the Zoning Board of Appeals to obtain a variance, he would need plans by a licensed professional and a survey by a licensed surveyor.

8.    At our meeting in July 2018, Mr. Lepper told me about a hypodermic needle he found on the property. It was strange that he brought the subject up and I advised him that he should consult with the police. The alleged finding had nothing to do with the building permit application.

9.    All actions undertaken by the Village of Babylon as to the treehouse at the Lepper property were to promote safety and compliance with Village codes. Any drug problems alleged by Mr. Lepper bear no relation to the Village's enforcement of Village Code and Mr. Lepper's claimed disclosure of any issues with illegal narcotics was not related to the enforcement of the building code.

10.    I am advised that plaintiffs allege unequal treatment and refer to a prior application from the Baldauf residence. That application for the described treehouse was not approved initially by the building department and the Baldauf family made application to the Zoning Board of Appeals. The Baldaufs were required to proceed through the same approval process as Mr. Lepper is subject to. They provided signed and sealed plans by a licensed professional and a survey from a licensed surveyor. In fact, in order to obtain a permit, the Baldaufs were required to abide the setback provisions of the code as determined by the Zoning Board of Appeals. There was no unequal treatment.

11.    In connection with information obtained from contentions made in this lawsuit, I learned of building structures in backyards at various addresses. Those structures are very different from the treehouse of John Lepper. Of significant difference is the fact that none of the structures which I required permit applications and granted permits violated the setback requirements of the Village of Babylon Code. They did not pose a danger to the public since they did not abut the street or the public walkway. Those structures did not require a variance to

be decided by the Zoning Board of Appeals. Those structures are different in size and height above the ground. They are not like kind structures.

12.    I have learned of a report by Joseph Danatzko, P.E., who inspected the tree house at the Lepper residence. I have never inspected the interior of the tree house. Based on the findings of Mr. Danatzko, no permit could ever be issued because the structure is not safe. When I testified to the safety of the tree house, I relied on a statement of plaintiff's retained professional engineer. It turns out that plaintiff's retained professional expert was limited in his review. The safety was limited to the ability of the tree house to remain structurally intact. However, by July 31, 2020, Mr. Danatzko noted signs of structural compromise, and dangers inherent to the very foundation of the tree house and interior electrical currents. Given these violations of safety protocols, the tree house could never be issued a permit.

13.    Mr. Lepper's request for a permit must adhere to both safety standards and comply with the Village's zoning ordinances in order to be eligible for a permit. The request for a permit should precede the building of the structure. However, Mr. Lepper wrongfully built the tree house without first making application for a permit. But for the fact that the tree house violated the setback requirements and assuming that Mr. Lepper met the applicable standards for safety, I would have issued a permit.

14.    I had issued permits approximately seven years before this incident when Mr. and Ms. Lepper constructed additions to their property in conformance with code. Neither I nor anyone in the Village harbored any reason to deny a permit for the treehouse other than to enforce the code. It was apparent that the treehouse required a variance since it was not setback from the property line in conformance with the Village Code. Mr. Lepper needed approval from the Zoning Board of Appeals. Unlike the Baldauf applicants, Mr. Lepper refused to proceed

with making application to the Zoning Board of Appeals.

15.     I am told that Mr. Lepper complained of reports made about him to the fire department and the police department. I have not made any reports or complaints concerning Mr. Lepper to the fire department or to the police department. I was not consulted about making any such reports and no one has requested that I participate or make any decisions about reporting or complaining about Mr. Lepper to the police department or the fire department or any other agency.

16.     I am advised that a complaint was filed by John Lepper in January 2021. No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2021 with reference to this matter. I have not waived service of the summons and complaint.

Stephen Fellman

Sworn to before me this

22 day of June 2021.

NOTARY PUBLIC
MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
My Commission Expires April 18, 2023

# EXHIBIT "R"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually    Docket No.: 2:18-cv-07011 JFB-GRB
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                Plaintiffs,        **ATTORNEY AFFIRMATION**

- against -

                              **Justice: Honorable**
VILLAGE OF BABYLON; and,                  **Joan M. Azrack (U.S.D.J.)**
KEVIN MULDOWNEY,                  **(Shields Anne Y., M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                Defendants.
-------------------------------------------------------------------X

      Gerard Glass, an attorney admitted to practice before this Court, and the Courts of

the State of New York, hereby affirms and declares under penalty of perjury as follows:

      1.    I am the sole principal of the law office Gerard Glass & Associates, P.C. located

at 72 East Main Street, Babylon, New York. I am a named defendant in this action.

      2.    I have served as Village Attorney by appointment of the Board of Trustees of the

Village of Babylon (alternatively referred as "the Village") from February 13, 2018 to April 5,

2021. I had served as the Village prosecutor for entire time that I had been Village Attorney.

The Village retained to provide services in connection with the tree house litigation and retained

me to monitor and provide assistance on behalf of the Village in the instant matter. I was

compensated for those services.

3.     I submit this affirmation in support of the defendants' motion for summary judgment and motion to dismiss presented by the Defendants' attorneys.

4.     I submit that this Honorable Court should grant the motion to dismiss the complaint, including dismissal of each and every cause of action and request for relief set forth in the plaintiffs' complaints and amended complaints.

5.     I make this affirmation based on my personal knowledge of my activity and my role prosecuting tickets that were issued against John Lepper in Village Court of the Village of Babylon, a justice court in the State of New York. I also have knowledge based on my discussions with Cory Morris and John Lepper. All discussions and interactions with Cory Morris and John Lepper were undertaken in my role as Village Attorney and in my role prosecuting the tickets on behalf of the Village of Babylon. I visited the property at 59 Cockenoe Avenue in the Village of Babylon on July 31, 2020, during a site inspection attended by Stephen Fellman and Eric P. Tosca, when Joseph Danatzko, P.E. inspected the tree house. Mr. Danatzko inspected the interior of the tree house.

6.     My first interaction with Cory Morris was when in 2018 he showed up at my office without an appointment and dropped the original complaint on my desk. He advised that "This all goes away" if the Village of Babylon allows the tree house. Despite Mr. Morris' *quid pro quo* representation, the Village was not in a position to afford special preference to Mr. Lepper to build a tree house in violation of applicable building and zoning codes to the exclusion of other residents in the Village.

7.     No tickets were ever issued to Noelle Lepper or the Lepper children. No prosecution was ever undertaken against anyone in connection with the tree house except John

Lepper.

8.      I was called upon to prosecute tickets issued by Stephen Fellman in his role as building inspector.

9.      Tickets were prosecuted and heard in a trial before Honorable Judge John Rafter, Village Justice. My sole role in the prosecution of the tickets was as prosecutor on behalf of the Village. Stephen Fellman testified about the tickets that he issued in connection with the tree house.

10.     The tickets issued were based on Mr. Lepper's constructing a tree house without a permit and in violation of the Babylon Village Code. The applicable sections of the Village Code have never been declared unconstitutional.  I did not think, and never told anyone that I thought, that the tickets were insufficient to serve as a basis to prosecute. The comments alleged in the complaint purportedly found in a *Newsday* article refer to my thinking that after the appeal was filed that there may be a colorable basis to challenge the tickets on facial sufficiency. Before the appeal, no issue was raised by Mr. Lepper concerning the facial sufficiency of the tickets that were heard by Judge Rafter. Mr. Lepper had the opportunity to obtain counsel to represent him. In conferences with John Lepper, I recommended that he obtain counsel. Village Justice Rafter also advised him to obtain counsel. However, he did not seek counsel and decided to go forward representing himself.

11.     John Lepper's tree house required a permit that could not be issued without application to the Zoning Board of Appeals because the tree house abutted the property line with Wampum Avenue in violation of the Village zoning code setback provisions.

12.     John Lepper failed to exhaust his administrative remedies. He failed to submit the application with signed and sealed plans and a survey by a licensed surveyor so that he could

apply for a variance. Mr. Lepper also did not go to the Zoning Board of Appeals to contest the Village of Babylon building department's refusal to issue a permit.

13.     On September 18, 2018, a trial was held on tickets issued to John Lepper related to the tree house built without a permit. On October 17, 2018, Honorable Judge Rafter issued a decision finding Mr. Lepper guilty of charges and assessed fines amounting to approximately $500 for ticket numbers 494213 and 494214 that had been issued in July 2018, and ticket numbers 494215 and 494222 that had been issued to Mr. Lepper in August 2018.

14.     Tickets issued on October 20, 2018 and October 31, 2018 to John Lepper have not been adjudicated and there is a pending motion in the Village Court related to those tickets.

15.     John Lepper appealed the order of October 17, 2018 regarding the first series of tickets. The Appellate Term of the Supreme Court in the Second Department issued an order finding that the tickets were procedurally defective inasmuch as the Appellate Term found the tickets to be facially deficient. *See People v. Lepper (John)*, 66 Misc. 3d 133(A), 120 N.Y.S.3d 563 (App. Term 2019). I thought the tickets were sufficient to charge Mr. Lepper as did the trial judge. However, the Appellate Term disagreed. The decision of the Appellate Term did not contest the validity of the Village code provisions and did not pass upon the constitutionality of the code provisions. There is no question that Mr. Lepper constructed the tree house without a permit. There was probable cause for all tickets issued to John Lepper.

16.     John Lepper argued that the code provisions did not apply to his tree house, despite that he applied for a permit.

17.     I was not personally served with the complaint filed with this Honorable Court in January 2021 or any amended complaint thereafter. Mr. Lepper had come into my office, and he handed a summons and complaint to someone in my office at 72 East Main Street in January

2021.  No further service was made in connection with this complaint.  I have not and do not waive service of the summons and complaint.

18.      The complaint made allegations of reports or complaints to the police department and his employer the New York City Fire Department.  I did not make any report or complaint to the police department or fire department about Mr. Lepper and have not made any report or complaint to any agency in connection to the allegations in the complaint.  Someone from the New York City Fire Department called me and advised that the fire department received a complaint and asked for information.  I did not participate and was not asked to participate in any hearing regarding the complaint.

**WHEREFORE,** it is respectfully submitted that the motions of the Defendants in their entirety, together with such other and further relief as to this Court may deem just and proper.

Dated: Mineola, New York
       June 23, 2021

                                                    _____
                                                          Gerard Glass

EXHIBIT "S"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                   Plaintiffs,

    - against -

VILLAGE OF BABYLON; and, RALPH
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                   Defendants.
-------------------------------------------------------------------X

Docket No.: 2:18-cv-07011
JMA, AYS

**AFFIDAVIT**

**Judge: Honorable
Joan M. Azrack, U.S.D.J.
(Shields, A., U.S.M.J.)**

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF Suffolk   )

Suzanne Schettino being duly sworn deposes and says:

1.    I am a defendant in this litigation improperly designated as Department of Public

Works.

2.    I make this affidavit in support of the motions to dismiss the complaint.

3. I began employment with Village of Babylon in 1997. From 2008 until my last day of employment with the Village of Babylon, I served as Secretary to the Mayor. My last date of employment with the Village of Babylon was April 29, 2021.

4. I have held no office with the Village of Babylon.

5. I am familiar with the claims of the Plaintiffs and make this affidavit based on personal knowledge of my activity related to the subject building structure on the property of John and Noelle Lepper that they call a tree house.

6. My duties at the Village of Babylon were administrative in nature. I do not make and have not made decisions related to the tree house or enforcement or prosecution of any matters related to the Plaintiffs' claims.

7. My duties have been to handle calls and correspondences for the Mayor. However, responses to any calls and correspondences are decided by the Mayor.

8. Other than transmitting any correspondences with the Mayor's office between the Mayor or the Trustees, I have not been engaged in deciding how to respond to correspondences between any of the Plaintiffs and the Village of Babylon.

9. I understand that the Village of Babylon sought to enforce codes related to the tree house alleged in the complaint. I know of no wrongful acts or omissions on the part of any defendant in this case as alleged in the complaint of the Plaintiffs.

10. I am advised that Mr. Lepper complained of reports made about him to the fire department and the police department. I have not made any reports or complaints concerning Mr. Lepper to the fire department or to the police department. I was not consulted about making

any such reports and no one has requested that I participate or make any decisions about reporting or complaining about Mr. Lepper to the police department or the fire department or any other agency.

11.     I know of a summons and complaint that John Lepper filed in January 2021. No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2020 or 2021 with reference to this matter. I have not waived service of the summons and complaint.    The summons and complaint had come to my desk in January 2021 after Mr. Lepper handed the summons and complaint to one of the employees of the Village outside the Village Hall Building.

Suzanne Schettino

Sworn to before me this

22 day of June 2021.

NOTARY PUBLIC
MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
My Commission Expires April 18, 2023

# EXHIBIT "T"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant          JMA, AYS
children, B.J.L. and B.I.,

                        Plaintiffs,                    **AFFIDAVIT**

- against -

                                                       **Judge: Honorable**
VILLAGE OF BABYLON; and, RALPH                         **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,                      **(Shields, A., U.S.M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                        Defendants.
------------------------------------------------------------------X

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF   SUFFOLK      )

        Kevin Muldowney, being duly sworn deposes and says:

        1.      I am a defendant in this litigation and make this affidavit in support of the

motions to dismiss the complaint.

        2,      My position with the Village of Babylon since and for all times mentioned in the

amended complaint of the Plaintiffs has been a Trustee and Deputy Mayor for the Village of

Babylon until September 1, 2020, when I no longer served as Trustee or Deputy Mayor and have

held no position with the Village of Babylon since September 1, 2020.

3,      I have held no other office or position with the Village of Babylon other than my

positions as Deputy Mayor and Trustee. I am familiar with the claims of the Plaintiffs and make

this affidavit based on personal knowledge of my activity related to the subject building structure

on the property of John and Noelle Lepper that they call a tree house.

4,      I have had no discussion with John or Noelle Lepper about the tree house or any

matters related to the tree house.

5.      In my role as Trustee and Deputy Mayor, I was kept advised of the status of the

matter involving John Lepper by our counsel Gerard Glass and by Stephen Fellman.

6.      All action undertaken by the Village of Babylon through the building department

or through the prosecution of tickets undertaken by the attorney for the Village of Babylon was

to enforce codes related to the tree house alleged in the complaint. I have been advised that

some tickets issued to Mr. Lepper were dismissed on appeal on procedural grounds. I know of

no wrongful acts or omissions on the part of any defendant in this case as alleged in the

complaint of the Plaintiffs.

7.      I am told that Mr. Lepper complained of reports made about him to the fire

department and the police department. I have not made any reports or complaints concerning

Mr. Lepper to the fire department or to the police department. I was not consulted about making

any such reports and no one has requested that I participate or make any decisions about

reporting or complaining about Mr. Lepper to the police department or the fire department or any

other agency.

8.      I am advised that a complaint was filed by John Lepper in January 2021. No

process server and no one on behalf of John Lepper has handed me or served me with a

summons or complaint in 2021 with reference to this matter. I have not waived service of the

summons and complaint.

Kevin Muldowney

Sworn to before me this

19 day of June 2021,

NOTARY PUBLIC
JAMES H. WOOD
Notary Public, State of New York
Suffolk County No. 4767467
Term Expires March 23, 19___
1/31/2023

EXHIBIT "U"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant                 JMA, AYS
children, B.J.L. and B.I.,

                              Plaintiffs,                    **AFFIDAVIT**

        - against -

                                                            **Judge: Honorable**
VILLAGE OF BABYLON; and, RALPH                              **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,                          **(Shields, A., U.S.M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                              Defendants.
------------------------------------------------------------------X

STATE OF NEW YORK        )
                          ) ss.:
COUNTY OF   SUFFOLK      )


        Deborah Longo being duly sworn deposes and says:

        1.      I am a defendant in this litigation improperly designated as Planning Board,

Village of Babylon. I make this affidavit in support of the motions to dismiss the complaint.

        2.      My position with the Village of Babylon since 2008 and for all times mentioned in

the amended complaint of the Plaintiffs has been Secretary to the Planning Board, except I ended

my employment with the Village of Babylon on August 1, 2020.

3.      I have held no office with the Village of Babylon.

4.      I am familiar with the claims of the Plaintiffs and make this affidavit based on personal knowledge of my activity related to the subject building structure on the property of John and Noelle Lepper that they call a tree house.

5.      My duties at the Village of Babylon are administrative in nature. I do not make and have not made decisions related to the tree house or enforcement or prosecution of any matters related to the Plaintiffs' claims.

6.      My duties included taking applications for permits at the front desk of the Building Department. I had taken an application for a permit from John Lepper related to a tree house he was building on his property. I advised Mr. Lepper at that time that I would refer the application to the building inspector. I made no representation that the permit would be issued. My job duties did not include decisions on permit applications and did not include decisions whether permits should or should not be issued.  My role was limited to taking Mr. Lepper's application.  I forwarded the application to building inspector Stephen Fellman for review.  I was not involved in the decision making process as to the issuance of a permit or any action undertaken to enforce the Village of Babylon codes.

7.      I was not engaged in deciding how to respond to correspondences between any of the Plaintiffs and the Village of Babylon.

8.      I understand that the Village of Babylon sought to enforce codes related to the tree house alleged in the complaint.  I know of no wrongful acts or omissions on the part of any defendant in this case as alleged in the complaint of the Plaintiffs.

9.      I am told that Mr. Lepper complained of reports made about him to the fire department and the police department.  I have not made any reports or complaints concerning Mr. Lepper to the fire department or to the police department.  I was not consulted about making any such reports and no one has requested that I participate or make any decisions about reporting or complaining about Mr. Lepper to the police department or the fire department or any other agency.

10.     I am advised that a complaint was filed by John Lepper in December 2020.  No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2020 or 2021 with reference to this matter.  I have not waived service of the summons and complaint.

_Deborah Longo_
Deborah Longo

Sworn to before me this

22 day of June 2021.

_Marietta C Menchini_

NOTARY PUBLIC

MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
My Commission Expires April 18, 20 26

# EXHIBIT "V"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                        Plaintiffs,

    - against -

VILLAGE OF BABYLON; and, RALPH
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                        Defendants.
-----------------------------------------------------------------X

Docket No.: 2:18-cv-07011
        JMA, AYS

**AFFIDAVIT**

**Judge: Honorable
Joan M. Azrack, U.S.D.J.
(Shields, A., U.S.M.J.)**

STATE OF NEW YORK    )
                    ) ss.:
COUNTY OF  SUFFOLK  )

      Anthony Davida, being duly sworn deposes and says:

      1.     I am a defendant in this litigation and make this affidavit in support of the motion

for summary judgment dismissing the complaint.

      2,     My position with the Village of Babylon since November 8, 2002 and for all

times mentioned in the amended complaint of the Plaintiffs has been a Trustee for the Village of

Babylon.  Effective December 31, 2020, I no longer serve as Trustee and hold no position with

the Village of Babylon.

3,      I have held no other office or position with the Village of Babylon.

I am familiar with the claims of the Plaintiffs and make this affidavit based on personal

knowledge of my activity related to the subject building structure on the property of John and

Noelle Lepper that they call a tree house.

4,      In May 2018, I observed the beginning construction of what I later learned was

intended to be a tree house at 59 Cockenoe Avenue in the Village of Babylon, New York.  After

observing the condition, I notified building inspector Stephen Fellman of my observation.  I left

it to Mr. Fellman to decide whether further action was necessary.  I did not issue any tickets or

the prosecution of any tickets.  Any stop work order or enforcement activity is handled by the

building department and code enforcement officer of the Village of Babylon.  I have had no

discussions with the plaintiffs about the tree house or any matters related to the tree house.

5.      In my role as Trustee, I was kept advised of the status of the matter involving

John Lepper by our counsel Gerard Glass and by Stephen Fellman.

6.      All action undertaken by the Village of Babylon through the building department

or through the prosecution of tickets undertaken by the attorney for the Village of Babylon was

to enforce codes related to the tree house alleged in the complaint.  I was told that some tickets

were dismissed on appeal on procedural grounds.  I know of no wrongful acts or omissions on

the part of any defendant in this case as alleged in the complaint of the Plaintiffs.

7.      I am told that Mr. Lepper complained of reports made about him to the fire

department and the police department.  I have not made any reports or complaints concerning

Mr. Lepper to the fire department or to the police department.  I was not consulted about making

any such reports and no one has requested that I participate or make any decisions about

reporting or complaining about Mr. Lepper to the police department or the fire department or any

other agency.

8.     I am advised that a complaint was filed by John Lepper in January 2021.  No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2021 with reference to this matter.  I have not waived service of the summons and complaint.


_Anthony Davida_

Anthony Davida


Sworn to before me this

21 day of June 2021.

_Marietta C Menchini_

NOTARY PUBLIC
MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239066
Qualified In Suffolk County
My Commission Expires April 18, 2023

EXHIBIT "W"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

JOHN LEPPER and NOELLE LEPPER, individually     Index No.: 2:18-cv-07011 JMA/AYS
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

                            Plaintiffs,          *AFFIDAVIT*

            - against -

                                                 **Justice: Honorable**
VILLAGE OF BABYLON; and, RALPH                   **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                            Defendants.

----------------------------------------------------------------X

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF RICHMOND       )

        Joseph M. Danatzko, P.E., being duly sworn, deposes and says:

        1.      I am a duly licensed professional engineer in the State of New York. I attach my

*curriculum vitae* to this affidavit. I am employed by Affiliated Engineering Laboratories, Inc. at

777 New Durham Road, Edison, New Jersey 08817. Details of my experience and education are

provided in my *curriculum vitae*, attached as Exhibit "A". This affidavit is based upon my

7/31/2020 site inspection, professional knowledge, education, training, licensure, experience,

technical research and materials regularly relied upon in the field of engineering and building

inspection.

2.     Following my inspection of the building structure (i.e., the "treehouse") at 59 Cockenoe Avneue in Babylon Village, New York on 7/31/2020, I authored a letter to Eric P. Tosca Esq. and Mr. Stephen Fellman (the Village of Babylon New York Building Inspector). See attached Exhibit "B".

3.     After my site inspection and after review of documentary material, I authored a report dated December 28, 2020, with attached photographs taken by me at the time of my site inspection on 7/31/2020 attached as Exhibit "C". The contents of the report reflect the documentary material I reviewed as well as my findings and opinions after review of the documentary material and my inspection of 7/31/2020.

4.     The documentary material is what I read. My measurements included in the report are true and accurate. My review of codes/standards are contained in the report attached as Exhibit C, and my technical research/references, as well as my explanation of the various code provisions, is true and accurate. My findings, the details of my inspection, my calculations and my opinions are true to a reasonable degree of engineering certainty.

Joseph M. Danatzko, P.E.

Sworn to before me this
27ᵗʰ day of May, 2021.

Benjamin Borshchevsky
NOTARY PUBLIC

BENJAMIN A BORSHCHEVSKY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BO6403783
Qualified in Richmond County
My Commission Expires 02-03-2024

EXHIBIT "A"

**AFFILIATED ENGINEERING LABORATORIES, INC.**
*Engineering Consultants*

777 New Durham Road
Edison, NJ 08817

Phone: (732) 429-1200                                                    Fax: (732) 429-1201

| | |
|---|---|
| **Resume:** | **JOSEPH M. DANATZKO** |
| **Education:** | Bachelor of Science – Civil Engineering<br>Lafayette College, Easton, PA, 2007<br><br>Master of Science – Civil/Structural Engineering<br>The Ohio State University, Columbus, OH, 2010 |
| **Professional:** | Professional Engineer – New Jersey License No. 24GE04963800<br>Professional Engineer – New York License No. 092836<br>Professional Engineer – Pennsylvania License No. PE081326<br>Professional Engineer – North Carolina Certificate No. 047419<br>Building Inspector – New Jersey License No. 010903<br>    Residential and Small Commercial Specialist<br>    Industrial and Commercial Specialist<br>    Mechanical Inspector – 1 and 2 Family<br>Residential and Commercial Building/Mechanical Inspector –<br>    Commonwealth of Pennsylvania Certification No. 05933<br>ICC Certified Residential Building Inspector<br>ICC Certified Residential Mechanical Inspector<br>ICC Certified Commercial Building Inspector<br>ICC Certified Commercial Mechanical Inspector<br>Member – American Society of Civil Engineers (ASCE)<br>Member – American Society of Civil Engineers (ASCE) – Structural<br>    Engineering Institute (SEI)<br>Member – Snow and Ice Management Association (SIMA) |
| **Continuing Education:** | Structural Forensic Engineering<br>Underpinning and Strengthening of Foundations<br>Machine Foundations<br>Analysis and Design of Liquid Structures<br>Evaluation of Reinforced Concrete Structures<br>Epoxy Grouts in Industrial Environments<br>High Strength Concrete and Steel Reinforcement<br>Shear Wall Systems<br>Portland Limestone Cements |

**JOSEPH M. DANATZKO**

-2-

> Blast Testing for Structural Performance
> Wooden Truss Design
> Residential Decks/Balconies/Roofs
> Residential Hurricane Tie Systems
> Occupational Safety & Health Administration (OSHA) Courses:
>> OSHA 510: Occupational Safety & Health for the
>> Construction Industry
>> OSHA 7505: Accident Investigations
>> OSHA 30-hr Construction Outreach Training
>> OSHA 2055: Cranes in Construction
>> OSHA 2264: Permit-Required Confined Space Entry
>> OSHA 3015: Excavation, Trenching and Soil Mechanics
>> OSHA 3115: Fall Protection
>> OSHA 7500: Introduction to Safety & Health Management
>> OSHA: Expectations and Accountability for Managing Fall Hazards
>> in Multiple Employer Construction Sites
> ASTM Workshop on Multifactorial Analysis of Slip and Fall Events
> Various Continuing Education Courses in building code implementation,
> construction safety and environmental hazards

**Professional Experience:**

**Pennsylvania Department of Transportation**, Allentown, PA
Civil Engineering Intern

Assistant to Pennsylvania D.O.T. Project Supervisor on roadway repaving projects with responsibilities including: project inspector; budget management and project tracking; field inspections of paving/resurfacing projects and adjacent structures; record keeping; monitoring of contractor procedures for compliance with contract requirements; safety inspections.

**Perini Corporation- Civil Division**, Newark, NJ
Civil Engineering Intern

Assistant to Project Manager and Construction Manager on a bridge deck reconstruction project with responsibilities including: field inspections of structural members and installation; supervision of construction work; safety inspections; review of shop drawings and as-built calculations; technical project submissions.

**Bohler Engineering**, Warren, NJ
Design Engineering Intern

Design Engineer supporting Project Manager for commercial and residential subdivision site design with responsibilities including: site

**JOSEPH M. DANATZKO**

-3-

inspections including evaluation of adjacent structures; production of conceptual designs and site plan drawings; design of parking areas, drive aisles and walkways; stormwater management and runoff calculations; site grading plans; design of retention, detention and underground stormwater management systems; sizing of piping and outlet structures; design of on-site utilities and lighting; review of township and state codes.

**Washington Group International**, Princeton, NJ
Engineer I - Nuclear Division Structural Group

Design Engineer for nuclear power plant upgrades/modifications with responsibilities including: structural design and analysis including affects from adjacent construction; field inspections of structural systems and constructability reviews; design of concrete and steel structures; analysis of existing steel and concrete structures; development and review of construction drawings; analysis of structural elements through calculations and computer-aided-design (CAD); production and review of detailed engineering calculations; development of calculation standards and training of employees regarding American Institute of Steel Construction (AISC) specifications.

**CDI Corporation,** Princeton, NJ
Structural Engineer

Consulting Engineer for an upgrade project at a Florida Power and Light facility involving trolley cranes. Responsibilities included: design, analysis and qualification of new, modified and existing concrete and steel structures; assessment and evaluation of adjacent structures relative to proposed construction; development and review of construction drawings; detailed design of steel and concrete connections; review of steel and concrete calculations; AISC and ACI code compliance; inspections and constructability reviews; ensuring conformance with Independent Spent Fuel Storage Installation (ISFSI) requirements per NRC guidelines.

**Inglese Architecture and Engineer**, East Rutherford, NJ
Project Drafter/Structural Engineer

Project Drafter/Structural Engineer supporting one-, two and multi-family residential construction projects including commercial structures and mixed-use residential/commercial with responsibilities including: site inspections including field constructability reviews and assessment of exiting structures; structural investigations involving building rehabilitation and demolition; generation of construction drawing packages for construction, planning board submission and bid; conceptual building

**JOSEPH M. DANATZKO**

-4-

design; generation and revision of detail drawings; design of stormwater management systems, including retention and detention basins; design of stormwater outlet structures; design and specification of structural members and materials; design and analysis of steel, concrete and timber structures; design of parking structures and on-site parking; design of driveways, drive aisles and walkways; design and specification of structural shear-wall systems; design and evaluation of retaining wall systems; design and revision of heating, ventilation and air-conditioning (HVAC) systems, plumbing systems, electrical systems, lighting plans, drainage systems and grading; analysis of designs for United State Green Building Council LEED rating.

**The Ohio State University**, Columbus, OH
Graduate Research Assistant/Student Project Team Advisor

Conducted research in the field of Sustainable Structural Design and Engineering; performed research related to prestressed and precast concrete design; research into asphalt pavement designs, the impact of structural vibrations of structural elements and progressive structural collapse; served as advisor and mentor to Student Project Teams.

**The Spear Group**, Norcross, GA
Consulting Civil/Design Engineer

Consultant under contract to Public Service Electric & Gas and Consolidated Edison, Inc.

**Public Service Electric & Gas**, Newark, NJ

Responsibilities included: site inspections involving constructability reviews and assessment of adjacent structures; field assessment related to emergency investigations and storm damage response; conceptual designs; field engineering; design of concrete foundations, piling and steel structures for electrical equipment; design and analysis of A-frames associated with electrical equipment; design and review of submittal packages for new and existing structures; generation of structural details and drawings; development of design aids and programs; design of drainage systems and grading; design and review related to spill prevention countermeasure and containment plans.

**Consolidated Edison, Inc.**, New York, NY

Responsibilities included: site inspections involving constructability

**JOSEPH M. DANATZKO**

-5-

reviews and assessment of adjacent structures; field assessment related to emergency investigations and storm damage response; development of spill prevention countermeasures and containment in new designs and plans; transformer replacements and upgrades throughout the New York metropolitan area, review of in-house and vendor submittal packages.

**Affiliated Engineering Laboratories, Inc.**, Edison, NJ
Engineering Consultant

Forensic engineering investigation and evaluation of design and construction elements related to civil, structural and safety engineering, including: walkways, stairways, roadways, site improvements and building construction. Engineering and safety analyses related to building code compliance and accident evaluation cause and origin analysis.

EXHIBIT "B"

# AFFILIATED ENGINEERING LABORATORIES, INC.
### *Engineering Consultants*

Physical Location:
777 New Durham Road
Edison, NJ 08817

P.O. Box 3300
Edison, NJ 08818-3300

Phone (732) 429-1200
Fax (732) 429-1201
www.affiliatedinc.net

July 31, 2020

Kelly, Rode & Kelly, LLP
330 Old Country Road
Suite 305
Mineola, New York 11501-4143

Attention:  Eric P. Tosca, Esq and Stephen Fellman (Village of Babylon Building Inspector)

Re:   Lepper v. Village of Babylon, et al.
Firm File No. PDG/EPT 148530-752
Our File No. W-1539

Dear Mr. Tosca and Mr. Fellman:

During my site inspection on Friday, July 31, 2020 (7/31/2020), I evaluated the subject structure (i.e. the "treehouse") located on the property at 59 Cockenoe Avenue, Babylon, New York related to the captioned matter. During my inspection I observed that the subject structure appeared to be an unsafe structure, a structure unfit for human occupancy, contain unsafe equipment, and may present an imminent danger to life-safety in accordance with Section 116 of the 2015 International Building Code as adopted by the State of New York and amended by Section 101.2.6.7 of the New York State Building Standards and Codes 2017 Uniform Code Supplement. Please let this letter serve as notice that the above may exist at the referenced property. Additionally, pursuant to your direction, it is my understanding this letter and its contents will be transmitted as soon as possible to the appropriate representative/agent of Mr. John Lepper so that Mr. Lepper might be informed that: my inspection revealed the above; the subject structure should not be occupied and/or employed for use. Please confirm in writing that this letter will be transmitted to the representative/agent of Mr. Lepper.

Very truly yours,

Joseph M. Danatzko, P.E.
Engineering Consultant

EXHIBIT "C"

# AFFILIATED ENGINEERING LABORATORIES, INC.
*Engineering Consultants*

Physical Location:
777 New Durham Road
Edison, NJ 08817

**P.O. Box 3300**
**Edison, NJ 08818-3300**

Phone (732) 429-1200
Fax (732) 429-1201
www.affiliatedinc.net

December 28, 2020

Kelly, Rode & Kelly, LLP
330 Old Country Road
Suite 305
Mineola, New York 11501-4143

Attention: Eric P. Tosca, Esq.

Re:   Lepper v. Village of Babylon, et al.
Our File No. W-1539

Dear Mr. Tosca:

In accordance with your request, the writer traveled to and conducted an inspection at the property located at 59 Cockenoe Avenue in Babylon, New York [Suffolk County New York Tax Map Parcel ID: 0102–004.00–01.00–100.00] on 7/31/2020. The purpose of the writer's inspection was to evaluate a structure (i.e. a "treehouse") at that location. Representative photographs numbered 1 through 55, taken during the writer's inspection, have been included herewith for information and general reference. The subject property was located on the northwest corner of the intersection of Cockenoe Avenue and Wampum Road. The property fronted Cockenoe Avenue, which ran in a general north-south direction, and all directions in this report are as viewed looking at the property from that roadway. In addition to the site inspection the writer reviewed the following file material relative to the captioned matter [all legal documents are understood to have been provided relative to United States District Court for the Eastern District of New York Civil Action No. 2:18–cv–07011 JFB-GRB]:

- Amended Verified Complaint, dated 11/16/2018
- "*Preliminary Injunction – Copy of Architect's Report*" Letter with attachments by Cory H. Morris, Esq., dated 2/20/2019
- "*Treehouse*" Letter by James R. Brown, Ph.D., P.E., dated 3/1/2019
- Deposition Testimony of John Lepper [Redacted] with Exhibits A-J and L-N, dated 6/27/2019
- Deposition Testimony of Gerard Glass, dated 7/5/2019
- Deposition Testimony of Stephen Fellman, dated 9/4/2019
- Plaintiffs Supplemental Disclosures, dated 2/5/2020

Re:   Lepper v. Village of Babylon, et al.
        December 28, 2020
        Page 2 of 32

- Google Earth Historical Aerial and Streetview Imagery of the subject property
- Tax Assessment Records and Property Information relative to the subject property

The following represents the writer's understandings, comments and opinions relative to the captioned matter, to a reasonable degree of engineering certainty:

## PROPERTY DESCRIPTION

The subject property contained a 2,314-square-foot, two-story, colonial-style, single-family dwelling located on a 50-foot by 150-foot rectangular lot (Photos 1–2). The exterior of the residence was finished with vinyl siding and contained asphalt shingle gable roofs throughout. The front of the property contained a grass/landscaped area and abutted Cockenoe Avenue. The left side of the property contained a grass/landscaped area and abutted a neighboring property (Photo 3). The right side of the property contained a grass/landscaped area and abutted Wampum Road (Photos 4–5). The rear of the property contained a grasses/landscaped area, a patio and a detached two-car garage accessed via a concrete driveway from Wampum Road, along with an elevated structure bearing upon a natural, organic object (i.e. a tree) located on the property (Photos 6–9). The property was reportedly owned by Mr. John and Mrs. Noelle Lepper and had been originally constructed in 1923. Mr. and Mrs. Lepper reportedly purchased the property on or about 5/7/2012 and it has served as the primary residence for their family since that time. Multiple parties were present during the writer's inspection.

## UNDERSTANDINGS

It is the writer's understanding that Mr. Lepper reportedly observed a syringe [a hypodermic needle] on his property in April 2018. It is the writer's additional understanding that Mr. and Mrs. Lepper subsequently resolved to construct a structure bearing upon a natural, organic object (i.e. a tree) in the rear yard of the subject property [the subject "treehouse"]. It is also the writer's understanding that on 5/3/2018 Mr. Lepper began construction of the subject structure without having submitted an application to the Village of Babylon for a building permit.

It is the writer's understanding that 5/10/2018 Mr. Stephen Fellman (the Village of Babylon Building Inspector) sent a letter to Mr. Lepper indicating that the construction of the subject treehouse "*may require a building permit*" and requested to be contacted to discuss the matter. It is the writer's additional understanding that on 5/21/2018 a Village of Babylon Notice of Violation of Babylon Village Code Section 365-26 was issued to Mr. Lepper and that construction of the subject structure ceased. It is also the writer's understanding that on 5/21/2018 Mr. Lepper visited the Village of Babylon Building Department and submitted a portion of an application for a building permit along with a hand-drawn sketch of the proposed construction and property survey. It is the writer's understanding that no building permit was issued for the proposed construction and on 6/15/2018 Mr. Lepper contacted the Village of Babylon Building Department via telephone whereby he was informed that no determination had been made regarding his application for a

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 3 of 32

building permit. It is the writer's further understanding that on, or about, 7/7/2018 Mr. Lepper resumed construction of the subject treehouse without a building permit having been issued by the Village of Babylon Building Department.

It is the writer's understanding that on 7/19/2018 the Village of Babylon Building Department issued violations of Babylon Village Code Section 365-26 to Mr. Lepper regarding the construction of the subject treehouse without a building permit. It is the writer's additional understanding that on 8/14/2018 Mr. Fellman issued a letter to Mr. Lepper deeming the subject treehouse unsafe in accordance with the New York State Building Code (International Building Code). It is also the writer's understanding that on or about 2/20/2019 computer aided drawings bearing the signature and seal of James R. Brown, Ph.D., P.E., along with calculations, were produced and a subsequent 3/1/2019 "*Treehouse*" Letter by James R. Brown Ph.D., P.E. alleged that the "*the treehouse structure supported in the tree is structurally stable and meets code loading for wind, snow and LL* [live load] *as prescribed by IBC and local requirements.*"

It is the writer's understanding that it has been alleged that the actions by and/or on behalf of the Village of Babylon deprived the Leppers of their civil, constitutional and human rights. These allegations serve as the basis for the captioned matter.

## REVIEW OF FILE MATERIAL

The 11/16/2018 Amended Verified Complaint included, alleged and/or stated, in relevant parts, the following: "1. *Plaintiffs, John Lepper and Noelle Lepper, individually and as the parents and guardians of their infant son, B.J.L., and daughter, B.L., collectively referred to herein as the 'Lepper family,' allege that Defendants, jointly and severally, individually and collectively, intentionally, knowingly, wantonly, negligently, and/or recklessly, sought to and did wrongfully deprive the Lepper family of their civil, constitutional, and human rights by committing acts under color of law which depriving the Lepper family of their civil, constitutional, and human rights*"; "2...*was negligent in training, hiring and supervising its Building Inspector, Defendant Stephen Fellman and was deliberately indifferent to the need to train its Building Inspectors...allege that Defendant Village of Babylon is liable to the Plaintiffs for abuse of process, malicious prosecution, and for conspiring to condone and encourage such civil rights violations and for conspiring to violate Plaintiffs' Civil Rights*"; "12. *Plaintiffs have exhausted any potentially effective administrative remedies*"; "17. *John Lepper and Noelle Lepper his wife are the lawful owners of 59 Cockenoe Avenue, a corner lot of 7,575 square feet (0.1739 acres) with 50.50 feet frontage along Cockenoe Avenue, a 50 foot public roadway, and 150 feet frontage along Wampum Road, a 33 foot public roadway. in the Incorporated Village of Babylon, in the Town of Babylon, Suffolk County, New York and identified on the Suffolk County Tax Map as parcel 0102–004.00–01.00–100.00*"; "28. *In April 2018, when he was playing with his children, Plaintiff, John Lepper, found a syringe, a hypodermic needle which he reasonably presumed to be utilized in illegal drug use, in his front yard. He informed his neighbors immediately and was outspoken in trying to find a remedy to shield his children from potential disease and harm caused by used*

Re: Lepper v. Village of Babylon, et al.
December 28, 2020
Page 4 of 32

hypodermic needles"; "*30. **On or about May 3, 2018, after conferring with Plaintiff Noelle Lepper, Plaintiff John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from potential contact with the hypodermic needles he found in and around his property** at 59 Cockenoe Avenue within the Village of Babylon.*"; "*32. By letter dated May 10, 2018, Village of Babylon Building Inspector Stephen Fellman informed Mr. Lepper that 'It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit'*"; "*35. In response to the May 10, 2018 letter from Defendant Fellman, Plaintiffs stopped work on the treehouse for their children*"; "*38. **On or about May 21st, 2018, Plaintiff John Lepper visited the Building Department office of Defendant Village of Babylon; completed a building permit application and submitted a front elevation/framing drawing with a copy of a recent survey of the Lepper Family Homestead**"; "*46. **Plaintiff John Lepper**, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of drugs in his community, **spoke to and informed everyone present in the building department on May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018** to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon*"; "*47. **Defendants**, jointly and severally, individually and collectively, **apparently intended to take advantage of the voluntary, but not legally required, application filed by John Lepper for a permit** to construct a tree house for his children as **a vehicle to charge Plaintiffs with violations of Village of Babylon Code Section 365–26** and collect fines from Plaintiffs by simply refusing to consider and act upon the application by Plaintiff, John Lepper*"; "*49. Plaintiff John Lepper immediately ceased construction and assembly of the partially fabricated treehouse as soon as he was ordered to do so by Building Inspector Fellman*"; "*50. **Determined to either delay construction of an innocuous and code-compliant treehouse** solely for the benefit of minor children, or harass and intimidate the Lepper family by destroying their infant son's eagerly anticipated birthday present, the **Defendants, jointly and severally, individually and collectively, refused to issue the appropriate building permit**.*" "*52. **On July 19, 2018, Plaintiffs, received by certified mail three accusatory instruments** dated July 11th,12th & 13th each of **which stated Mr. Lepper was in violation of Village of Babylon Code § 365–26 for construction of a treehouse without a permit**"; "*63. **On or about August 14, 2018, Stephen Fellman, as Babylon Village Building Inspector wrote to Mr. Lepper declaring that 'Per Section 116 Unsafe Structures of the International Building Code the tree house at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued'*"; "*64. **There is no evidence that the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code**"; "*65. **No substantial credible evidence has ever been presented showing that the Lepper family treehouse is in any way unsafe for its intended use** by the Lepper children and other children*"; "*83. **Village of Babylon Code Village Judge Rafter finds that 'Defendant** [Mr. **Lepper] did apply for a permit'** but then states without any reference to the record, **'but his application was deemed incomplete as it did not contain a drawing from a licensed architect or engineer'**"; "*124. **Defendant Village of Babylon has not established any association between**

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 5 of 32

*__Village of Babylon Code Section 365–26 and the public health, safety and welfare of the residents of the Village of Babylon__*"; "*125. That there is __no substantial credible evidence that the Lepper family children's treehouse represents a threat, much less a danger, to the health, safety, and welfare of the residents__ of the Village of Babylon*" (emphasis added).

The 2/20/2019 "*Preliminary Injunction-Copy of Architect's Report*" Letter with attachments by Cory H. Morris Esq. included a 2/18/2019 "*Tree House As-Built*" Drawing Sheet [T-100.00; Project 15-155] bearing the signature and seal of James R. Brown Ph.D., P.E., which included the computer aided drawings below:



The provided drawings were noted to include/specify the following: plan view dimensions of only of the subject structure interior (i.e. the full structure exterior dimensions were excluded from the drawing); that four (4) 12-inch long by 1/2-inch diameter lag bolt fasteners connected a 4-inch by 6-inch vertical timber at each "support arm" to a 20-inch diameter spruce tree; that the diagonal

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 6 of 32

brace and horizontal members of the "support arm" were nominal 4 inch by 4 inch and 4 inch by 6 inch wood members, respectively; no connection was specified between the 4-inch by 6-inch horizontal timber and 4-inch by 6-inch vertical timber at each "support arm"; all window openings had typical dimensions of 20 inches by 30 inches; no means of ingress/egress was identified; no connection types or details were specified for roof framing members or intermediate nominal 2 inch by 6 inch floor supports; the document included no written notations and/or specifications indicating the building code or loading conditions by which the structure had been evaluated; the document included no information regarding evaluation of the structure's foundation (i.e. the "spruce" tree, subsurface root system, surrounding subsurface material [soils], etc.) or wood construction design standards applicable to the structure's construction. The provided letter additionally included seven (7) pages of handwritten notes/calculations/sketches entitled "*Treehouse-Calcs Structure*," understood to have been produced by James R. Brown, Ph.D., P.E. relative to the 2/18/2019 "*Tree House As-Built*" Drawing Sheet. The following was noted regarding the provided calculations: page 1 of the document indicated that a "*live*" load of 40 pounds per square foot and a "*snow*" load of 25 pounds per square foot ("*ground snow*") were to be design loads for the evaluation of the structure; however, the analysis included on that same page only evaluated the structure under conditions of "*dead*" load and no subsequent page within the document evaluated the structure under other loading conditions; page 1 of the document indicated that a "*wind*" speed of 115 miles per hour under Category "*Exposure B*" was to be included in design loads for the evaluation of the structure and calculated a "*wind pressure*" of 21 pounds per square foot; however, the analysis included on that same page only evaluated the structure under conditions of "*dead*" load and no subsequent page within the document evaluated the structure including wind loading; the document included no calculations evaluating connections between wood framing members or the subject structure foundation (i.e. the "spruce" tree, subsurface root system, surrounding subsurface material [soils], etc.); the calculations evaluated the bending capacity of the horizontal member of the "support arm" as a nominal 4 inch by 6 inch wood member; the calculations did not evaluate roof/ridge joists of the structure, their supporting members or connections upon which roof framing members were supported.

The 3/1/2019 "*Treehouse*" Letter by James R. Brown Ph.D., P.E. stated, in relevant part, the following:

"*I find that **the treehouse structure supported in the tree is structurally stable and meets code loading for wind, snow and LL** [live load] **as prescribed by IBC and local requirements.** In other words the structure* [a.k.a. the 'treehouse structure'] *is able to withstand all weather-related events that are in accordance with code-induced loading criteria*" (descriptions/emphasis added).

The following was noted regarding the document: the date of Dr. Brown's inspection of the subject structure was not identified on the subject documents, however, if conducted, would have reasonably occurred prior to 2/20/2019 [i.e. the date of the "*Preliminary Injunction-Copy of Architect's Report*" Letter with attachments by Cory H. Morris Esq.] and at least 1 year, 5 months

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 7 of 32

prior to the writer's 7/31/2020 site inspection; while Dr. Brown's Letter addressed the "*treehouse structure*," the letter did not indicate that he had concluded that the foundation of the structure (i.e. the tree, the tree's root system or the soils surrounding the tree roots) was either a stable foundation or structurally stable.

The 2/5/2020 Plaintiff's Supplemental Disclosures included the *"New York City Fire Department, Bureau of Investigations and Trials - April 18, 2019 - Interview of Firefighter John Lepper, Transcript of the Proceedings"* which stated in relevant part, *"Q. Have you received any offers about a survey or an engineer report in relation to your treehouse done pro bono?-A. Yes.- Q. Did you accept?-A. Yes."* The document additionally included an 8/14/2018 *"Re: 59 Cockonoe Avenue Babylon, NY"* Letter from Mr. Stephen Fellman (Village of Babylon Building Inspector) to Mr. John Lepper (59 Cockonoe Avenue, Babylon, NY 11702) which stated, *"Dear Mr. Lepper, Per Section 116 Unsafe Structures of the International Building Code the treehouse at the above referenced premises is hereby deemed an unsafe structure and may not be occupied until such time a Certificate of Occupancy is issued."* The document further included an 10/18/2018 *"Re: Order of Removal"* Letter from Mr. Stephen Fellman (Village of Babylon Building Inspector) to Mr. John Lepper which stated, *"Dear Mr. Lepper: Per the decision and order of Village Justice John Rafter dated October 27, 2018 you have been found guilty of each of the offenses and are ordered to remove the treehouse immediately. Further, any and all work must cease on the treehouse and it may not be used from the date of this letter."*

The writer noted that no documentation had been provided which indicated that Mr. Lepper and/or a representative of the subject property had filed an application for an inspection with the New York Board of Fire Underwriters or the Long Island Electrical Inspection Service, Inc. for the construction of the subject treehouse.

<u>**DEPOSITION TESTIMONY**</u>

John Lepper testified in deposition on 6/27/2019 to the following[1]: *"Q. And who are the titled owners of that premises?-A. Myself and my wife.-Q. When did you purchase the premises?- A. May of 2012."* (p.12/13); *"Q. Cockenoe Avenue, has that always been a one-family premises?- A. As far as I know."* (p.14); *"Q. Have you ever seen the certificate of occupancy for the home?- A. Yes, I have.-Q. Do you know if it says one family on the C of O?-A. I believe it does.-Q. Do you have the C of O?-A. Yes, I do.-Q. What is the size of the property?-A. Um, 150 -- 50 by 150."* (p.15); *"Q. And the property, does it abut any streets?-A. Yes.-Q. Okay.-A. It's a corner property.- Q. It's a corner property?-A. It's Cockenoe Avenue and Wampum, W-A-M-P-U-M.-Q. Wampum Avenue, Street?-A. Road."* (p.16); *"Q. When you did those renovations, did you hire an engineer?- A. Yes, I did. Architect."* (p.17); *"Q. You hired an architect but not an engineer?-A. Correct.-Q. Okay. And who was the architect you had hired at that time?-A. Actually, somebody who grew up*

---

[1] The document provided to this writer for review was partially Redacted. However, the writer noted that no Redacted portion of the document appeared to include information or testimony that would alter the opinions offered in this report.

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 8 of 32

on the block. Rich Cosi.-Q. And generally, what were the renovations you performed on the home
a couple of months after you purchased it?-A. A full renovation.-Q. What does that mean?-A. That
means we demoed the interior of the house, removed the front porch and the existing kitchen."
(p.18); "Q. Was there a contractor that you hired to perform the work? One contractor or more
than one?-A. Yes, it was multiple subcontractors.-Q. Was there a main general contractor?-A. I
was the acting general contractor." (p.19/20); "Q. Do you have any experience as a general
contractor?-A. Yes, I do.-Q. Do you have a business where you engage in general contracting?-
A. Not currently, no.-Q. Okay. Did you ever?-A. My own personal business?-Q. Yes.-A. No.-Q.
Did you ever perform work as a contractor outside of your personal homes or properties?-A. Yes.-
A. I've been in the business my entire life. Grew up working with my father, worked for a contractor
when I was in high school, electrical contractor when I was in high school. And in my mid twenties,
I worked for a general contractor in Manhattan up until I was hired by the fire department."
(p.20/21); "Q. And where did you pull those permits from?-A. The village.-Q. The Village of
Babylon?-A. Architect pulled the permits.-Q. And did you fill out the applications yourself at that
time and signed off on them?-A. No." (p.23); "Q. Were you familiar with the building codes at that
time?-A. No, I wasn't." (p.24); "Q. During the time that you had worked as a contractor, had you
ever dealt with building codes?-A. No.-Q. Did you ever advertise for work as a contractor?-A.
No." (p.26/27); "Q. And did you ever have any inspection of the trees on the property?-A. No. I
had one tree removed during the construction." (p.30); "Q. If we start with Exhibit A." (p.32); "Q.
In the foreground, do you see a small looking house and tree?-A. Yes.-Q. All right. Is that on the
property that you own at 59 Cockenoe Avenue?-A. Yes.-Q. Do you know who built that home?-A.
Yes.-Q. Who?-A. I did." (p.33/34); "Q. Exhibit D.-Q. That's part of your property along Mampum
Road, correct?-A. Yes.-Q. The structure that's attached to a tree, do you see that?-A. Yes.-Q. You
make allegations regarding a treehouse. Is that the treehouse that you're alleging in your
complaint?-A. Yes." (p.35); "Q. Did you seek to get any permits before doing the electrical work?-
A. No, I didn't.-Q. Do you know if any permits are required for something like that?-A. No, I
don't.-Q. Did you inquire?-A. No, I didn't." (p.49); "Q. Who decided which tree to put this
treehouse on?-A. My wife. We both discussed it briefly, I guess.-Q. And what made you determine
to put it on that tree?-A. That was the tree that was closest -- it was the tree closest to what was
their play area in the backyard." (p.58); "Q. The tree that you attached it to before you put the
treehouse on there, did you do any inspection of that tree to make sure that it wasn't dying or that
it wasn't weak or something else?-A. The trees were -- when we were doing the renovation on the
property and the one tree was removed. The rest of the trees were pruned and maintained. And at
that time, all the trees were very healthy." (p.58/59); "Q. Where did you get the wood to make the
treehouse?-A. Some of the wood -- most of the heavy timber and the siding was reclaimed from a
boathouse that we -- a property we owned in Amityville was damaged during Sandy. And the
boathouse had to be demoed, demolished. And that's most of the material from that." (p.60); "Q.
When you say the wood was reclaimed, what does that mean?-A. After the boathouse was
demolished, I asked the contractor to save me certain timbers so that I can use it." (p.61); "Q. So
it's fair to say that the demolition of the boathouse took place less than six months before you
started construction of the treehouse.-A. Yes. I believe so. It was close. It was right around the
same time it was going on." (p.64); "Q. So what wood did you use in terms of the construction of

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 9 of 32

*the treehouse that's not from the reclaimed lumber or timber?-A. The cedar shake shingles.-A. Cedar shake shingles, some of the siding and some of the 2 by 4 framing.*" (p.65); "*Q. What do you have supporting that?-A. I have the frame structure that you see in the Exhibit. 4 by 12's. This is all in the engineer drawing. It's 4 by 6.-Q. Those pieces of wood that support the platform -- -A. Yes.-Q. -- are attached to the tree?-A. The framing is attached to the tree, correct.*" (p.68/69); "*Q. Does that provide support to the platform?-A. Yes.-Q. Where did you get the wood to put that framing in?-A. That was from the demolished boathouse.*" (p.69); "*Q. Now, the wood that's attached, who attached it to the tree?- A. I installed it.-Q. What is it attached to the tree with?-A. Half inch by 12 inch galvanized lag bolts. Four on each leg.-Q. The angled wood that's attached to the corners of each treehouse -- -Q. and then to the wood that you said you attached with galvanized lag bolts, how are they attached to the lateral pieces of wood on the tree itself?-A. They're attached timber frame style. They're mortised into each leg and fastened with lag bolt.*" (p.70/71); "*A. The vertical that's attached with the lag bolts to the tree and then there is a horizontal coming out and then you have a horizontal coming out supporting the platform. And then a 45 4 by 6 mortise and tenon. And it's lagged together. And then the platform is screwed to the frame work with timber bolts.-A. Timber bolts. Six inch timber bolts.-Q. That's what attaches the platform to the -- -A. To the frame work.*" (p.72/73); "*Q. Now, in terms of the design of the treehouse, did you work off of any designs when you started construction of the treehouse?-A. Not a design. A picture that I saw.-Q. Where did you see a picture?-A. I saw it on-line.*" (p.74/75); "*A. The kids were getting a little older for their playground that was in the backyard. I'm not sure.-Q. You said they had a playground in the backyard. What type of playground did they have?-A. Just a plastic Step2.-Q. A plastic what?-A. A plastic Type 2.-Q. Like the No. 2?-A. Yes. With a bridge.-Q. How long did you have that in the backyard?-A. I don't know.*" (p.76/77); "*Q. Did anyone assist you in building the treehouse?-A. No. A few people handed me a couple of pieces of wood but I wouldn't say anybody helped me. A few people helped me, passed up some wood. But I wouldn't say helped me.*" (p.81); "*Q. In determining what the size was going to be of this treehouse, did you draft anything in order to construct the treehouse in the size that it appears now?-A. I did. I submitted it with my permit application.-Q. When you said 'it', you're talking about what?-A. Full front elevation drawing.-Q. When?-A. And the survey with the location.-Q. Okay. When did you prepare the drawing?-A. That was after I received a letter stating that I had already put the platform up. And I received the letter on May 10th stating that I was putting a structure that may require a permit.*" (p.81/82); "*Q. And had used anything to work from; any plans, any drawings, pictures to work from in order to build the platform?-A. No. Just used the picture as an idea.*" (p.83); "*Q. Did you work off of any instructions in order to build the treehouse structure?-A. No. I did have some experience when I was younger working for a framing contractor.*" (p.83/84); "*Q. Were there any written documents that you looked at before building the platform?-A. As far as what?-Q. As far as any pictures, diagrams, any measurements, any specifications. Anything in writing that you looked at in order to build the platform and the framing.-A. No.*" (p.84/85); "*Q. Is the treehouse completed at this point?-A. No.*" (p.86); "*Q. Was there anything additional you wanted to do to the treehouse?-A. Finish?-Q. Yes.-A. Finish.-Q. What do you have to do to finish the treehouse?-A. Um, I have to finish putting the roof on, shutters, secure the windows to make it safe for the kids to play up there and install the hatch in the floor so that the kids can actually*

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 10 of 32

*access it.*" (p.87); "*Q. And the hatch you were talking about, that's on the floor?-A. Yes.-Q. Is that the entryway to the Treehouse?-A. It will be. It doesn't exist right now. There is no hatch.*" (p.88); "*Q. How would the hatch give you access to the treehouse other than using a ladder?-A. There is a ladder up the tree.-A. You know, it would be ladder on the tree. There's already wood that's attached to the tree that the kids could climb up, open the hatch and they would just access the hatch through the floor.-Q. So the hatch actually is something that once they climb the ladder, go through the opening of the floor, they would close the hatch so that the opening would be closed; am I correct?-A. Correct.*" (p.89/90); "*Q. When you go up those steps -- -Q. -- is there an opening that you can go through at this point?-A. No.-Q. So the entire floor is -- -A. Sealed.-Q. -- sealed? Closed, right?-A. Yes.*" (p.91); "*Q. What type of ladder are you talking about that you would use in order to get access through the window of the treehouse?-A. A fiberglass 12-foot A-frame ladder.*" (p.92); "*Q. Now, you pull the walls up. How would you attach them and put them together, assemble them?-A. How did I attach them to one another?-Q. And to the platform. If you did.-A. When the walls were framed, the base plate and the header overlap one another. So you put it in position, you plumb the wall up; meaning, you level the wall. Once the wall is leveled, you screw the two together and then I used six-inch timber bolts to screw to the platform deck.*" (p.96/97); "*Q. What type of wood did you use for the roof?-A. 2 by 4 header and 2 by 4 rafters.*" (p.98); "*Q. Well, what I'm talking about is the part of the roof that -- -A. The rafters?-Q. Not the rafters. The covering, the plywood.-A. The sheathing?-Q. Yes, the sheathing.-A. It's 1 by 6 pine.-Q. Was this something that you also got from the boathouse?-A. No.-Q. And where did you get that wood from?-A. Lowes.-Q. And you bought it new, I guess?-A. No.-Q. You bought it used?-A. I did.*" (p.138); "*Q. Have either of your children been up in the treehouse?-A. Up until today?-Q. Yes.-A. Yes.*" (p.139); "*Q. Did you have a birthday party for your son in July of 2018?-A. Yes.-Q. Did he have other children attend?-A. Yes.-Q. Did they go up on the treehouse?-A. No. I don't believe so.-Q. Did any other children other than your own children go up into the treehouse?-A. When? Until now?-Q. Up until today.-A. Yes. Yes.-Q. ... time that there were any other children other than your own children who went up to the treehouse?-A. Well, I recently got a new neighbor and they have gone up to see the treehouse. So I let them see the treehouse.*" (p.140/141); "*Q. ...children up into the treehouse?- A. No. I let them see the treehouse. I told them they were not allowed to be in the treehouse so I let them look from the ladder.*" (p.143); "*Q. Did you put a ladder up for them to climb up to the treehouse?-A. I did.-Q. Did they go inside the treehouse?-A. They observed it from the ladder and I did let them walk in there real quick and then they came back out.*" (p.144); "*Q. Well, did you have any discussion as to whether those drawings are supposed to be done by a professional engineer -- -Q. -- or a registered architect?-A. No. Whoever received it in the building department made a comment that they don't typically get detailed drawing of this level from a homeowner. And I explained to them that I went to drafting school in Amityville where Mr. Fellman owns his architectural firm and I mentioned if he needs a spec that's not on there, I'll be more than happy to give it to him.-Q. Do you hold any professional licenses?- A. No.*" (p.263/264); "*Q. So who told you that it was sufficient?-A. Whoever I spoke to in the building department when they asked for the survey. Or like I said, when I went there to fill out the permit application they told me everything that I brought down was acceptable.-Q. Did they make any representation to you that a permit could be issued based on what you submitted to*

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 11 of 32

*them?-A. Yes.-Q. Who told you this? You said they. So it was more than one person?-A. Like I said, I don't know her name. I believe there was three girls. The only one I know is Holly which is my neighbor. I'm not sure what the other one's name was. When she took the permit application, she took it away. I think she went to another room, brought it back and she said it was acceptable.*" (p.269/270); "*Q. Has Miss Lepper ever been up in the treehouse?-A. Has she ever been up there? Yes. I believe so.*" (p.393). Defendant's Exhibits A-J were marked for identification during the testimony (p.5). Defendant's Exhibit M included the following: a 5/10/2018 "*Re: 59 Cockonoe Avenue, Babylon*" Letter [also marked Exhibit 1 dated 9/18/2018] by Stephen Fellman to Mr. John Lepper which stated in relevant part: "*It has come to my attention that you are building a structure, in the rear/front yard of the above referenced premises, that may require a building permit. Please contact me at the number above to discuss the matter*"; a 5/21/2018 Village of Babylon Notice of Violation [also marked Exhibit 3 dated 9/18/2018] to "*John Lepper*" which stated, in relevant part: "*Place of Occurrence-59 Cockonoe Ave – please take notice there exists a violation of Babylon Village Code Section 365-26 at the premises described above in that-building permit required*"; an undated Village of Babylon Building Department Building Permit Form [also marked Exhibit 5 dated 9/18/2018] which appeared to bear the signature of Mr. John Lepper for the property located at 59 Cockenoe Avenue with sections entitled "*Present use of property*," "*Proposed use*" and "*Description of proposed work*" left blank; the undated Village of Babylon Building Department Building Permit Form appeared to include a hand drawn sketch of a proposed structure; the hand drawn sketch specified a roof slope of "*10:12 to match house roof lines*," and an apparent "*tree*" diameter of 2 feet, 2 inches; the hand drawn sketch did not include a plan view of the proposed structure, specifications or details regarding wood framing members/connections as well as proposed exterior finishes, specifications or details regarding proposed means of ingress/egress, specifications or details regarding the number of supports serving as a foundation for the structure or bear the signature/seal of a registered design professional; the undated Village of Babylon Building Department Building Permit Form appeared to also include a property survey depicting a location of the proposed structure with plan dimensions of 8 feet wide by 8 feet long.

Gerard Glass testified in deposition on 7/5/2019 to the following: "*Q. In the course of your regular professional activities as the Village of Babylon Village of Babylon, do you prosecute accusatory instruments filed for violations of the Village of Babylon code?-A. Yes.-Q. Does anyone else?-A. Yes.-Q. Who?-A. The issuing officer.-Q. Who is that?-A. There are many of them.-Q. Can you list each one, please?-A. I can't.-Q. Why not?-A. There are too many of them and I don't know all their names.*" (p.114); "*Q. In the course your regular professional activities as the village attorney for the Village of Babylon, are you aware of whether the Village of Babylon has adopted the International Building Code?-A. I believe it has by operation of law because it adopted the State Code which in turn adopted the International Code.*" (p.119); "*Q. In that regard did you ever litigate any other cases under Village of Babylon Code 365-25.-A. Meaning prosecute?-Q. (Continuing) aside from John Lepper.-A. Meaning prosecute or try?-Q. In any regard, in any capacity.-A. I think yes.-Q. Can you tell me any other instances where you litigated cases under that section?-A. I cannot.-Q. In the course of your regular professional activities as an attorney or attorney for the Village of Babylon, do you know whether there have been any other*

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 12 of 32

*prosecutions under Village of Babylon Code 365-25?-A. I think yes.-Q. In the course of your regular professional activities as an attorney or attorney for the Village of Babylon, do you know whether there have been any other trials under Village of Babylon Code 365-25?-A. I think yes.*" (p.135/136); "*Q. In the course of your regular professional activities as the Village of Babylon village attorney, are you aware of the progress of that building permit application?-A. I'm aware now. But I wasn't aware of the progress as it was ongoing in current time.-Q. What is the progress of that building permit application?-A. His application was incomplete. Be clear here that these are not determinations I made, these are determinations made by the building department building inspector.*" (p.164/165); "*Q. Are you aware of the current status of the Lepper family application for a building permit?-A. There is an incomplete application.*" (p.171); "*Q. In the course of your regular professional activities as the Village of Babylon village attorney, are you aware of how Village of Babylon Code 365-26 is enforced?-A. Same way as all codes are enforced.-Q. How is that?-A. I think generally the Village of Babylon tries to gain voluntary compliance and if they can't, they write violations.*" (p.178); "*Q. In the course of your regular professional activities as attorney or as the Village of Babylon village attorney, are you aware of Village of Babylon codes that use square footage in determining what is an what is not illegal?- A. There are standards in the village code for certain types of structures that allow one to not follow more rigorous building permit procedures.-Q. When you say not follow, to what are you referring? What do you mean?- A. There's different procedures for certain structures that are smaller.-Q. When you say not follow, that means they wouldn't need a permit, correct?-A. It means whatever the code says.-Q. In that instance which you mentioned, would they or would they not need a permit?-A. They might, you know, it all depends. There's other qualifying factors. Like you may have a requirement that a shed under a certain number of square feet doesn't require a permit. But there's other qualifying factors including like your tree house, its proximity to a setback.*" (p.182/183); "*Q. As Village of Babylon village attorney, did you become aware of complaints from residents regarding needles?- A. I'm aware of one complaint.-Q. As Village of Babylon village attorney did you become aware of complaints from residents?-A. I'm aware of one complaint.*" (p.185); "*Q. Is Stephen Fellman in his capacity as building inspector responsible for the administration of the Village of Babylon code?- A. Yes. Portions of code, not the entire code.-Q. What portions of the code?-A. Those that relate to building structure that are under the charge of building inspector.*" (p.316); "*A. You know, there is a lot of things that people just don't know that are in that code book, that's sort of the way things work, though. There is not an obligation on the part of the village to sit and spoon feed every resident every section of the code. People are duty bound just by law to be familiar with the laws that regulate them. That goes not only for the Village of Babylon but for the Town of Babylon, the County of Suffolk, the State of New York. Just because you don't know about something, Cory, as you know as an attorney, doesn't mean you're not bound to comply with the law.*" (p.322)

Stephen Fellman testified in deposition on 9/4/2019 to the following: "*Q. Mr. Fellman, are you an architect licensed to practice in the State of New York?-A. Yes.-Q. When were you licensed to practice architecture in the State of New York?-A. 1983.*" (p.6); "*Q. To be clear, you're not licensed in any other state to practice architecture?- A. No. I hold an NACRB license which is the*

*license, which if I want to apply to different states to be licensed, I can pay a fee and become licensed.-Q. What does NACRB stands for?-A. National Architectural something something Board." (p.7); "Q. Does your license or registration in New York as an architect include the right to act as a structural engineer?-A. Yes." (p.9); "Q. By whom are you employed at the present time?-A. Village of Babylon.-Q. Anybody else?-A. Village of Farmingdale.-Q. Anybody else?-A. Village of Roslyn Harbor.-Q. Anybody else?-A. That's it.-Q. Prior to your employment with those three villages, did you maintain any other employment?-A. I have an architectural firm.-Q. Do you still have an architectural firm?-A. Yes.-Q. Are you employed by that architectural firm currently?-A. I do not draw a paycheck, but I own it; so however you want to classify that." (p.21/22); "Q. Any other jobs that you didn't mention other than those four jobs?-A. I'm on the architectural review board for Lake Success and Roslyn Estates.-Q. Anything else?-A. That's it." (p.23); "Q. What position do you maintain at the Village of Babylon?-A. Building inspector.-Q. How long have you maintained that position?-A. The entire time.-Q. Is that a full-time or a part-time position?-A. Part-time.-Q. What are the hours worked?-A. Hours, I work there Tuesday, Wednesday, and Friday 1:00 to 5:00." (p.26); "Q. When you say issue building permits, can you please explain to what that job duty consists?-A. Consists of when an application comes in for a building permit, we review the plans and make sure they're adequate and correct and all the paperwork is in order, then we issue a building permit for construction.-Q. Who is 'we'?-A. The Department, I would sign off on it, it would be processed by the secretary." (p.29); "Q. What are your job duties as the Village of Babylon building inspector?-A. Pretty similar to Farmingdale, but it's only me, so I do all the inspections in Babylon.-Q. Explain what you mean by that.-A. I'm the only building inspector. In Farmingdale, they have a full-time building inspector, so he does most of the fieldwork and the inspections there. There's only me in the Village of Babylon, so I have to do all the inspections." (p.30); "Q. When you say drive through, can you explain what you mean?-A. Again, just drive through the village. They don't want any construction going on on the weekends, so a code enforcement guy goes through on Saturday, I go through on Sunday to make sure there is not construction taking place.-Q. What is your job title at Roslyn Harbor?-A. Building inspector." (p.32); "Q. How long has the architectural firm you operate been in business?-A. What are you talking about?-Q. The architectural firm you operate now.-A. Twelve years." (p.55); "Q. When you sign the plans as an architect, what responsibility do you assume for the structure depicted in the plan?-A. You're assuming that it's designed correctly and it's gonna stand up.-Q. Explain what you mean, stand up?-A. Not going to fail, it's going to be structurally sound.-Q. When you say structurally sound, are you referring to safety or something else?-A. Safety and the building is not gonna collapse and fall down or blow down in a hurricane." (p.98/99); "Q. What are your duties as the Village of Babylon building inspector?-A. What are my duties?-Q. Yes.-A. To review plans for construction, to issue building permits, to inspect construction, to issue Certificates of Occupancy or completion at the end of construction, issue violations if there are violations to the zoning code." (p.117); "Q. Mr. Fellman, did there come a time in the course of your professional activities as the building inspector for the Village of Babylon where you became aware of an arboreal structure at 59 Cockenoe Avenue, Village of Babylon, County of Suffolk, State of New York?-A. I don't what that word means, arboreal?-Q. A structure in a tree, a tree structure.-A. Okay. Yes.-Q. What were the circumstances under which this arboreal structure came*

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 14 of 32

*to your attention?-A. One of our trustees brought it to my attention.-Q. When you say one of your trustees, to whom are you referring?-A. Tony, Tony Davida.-Q. How did you bring it to your attention?-A. I was at Village Hall and he said, oh, Steve, looks like somebody's building something in a tree over on Cockenoe, you better go check it out.*" (p.137/138); "*Q. What, if anything, did you do in response to that conversation?-A. I did what I normally do. When a trustee or the mayor suggests something, that means, do it right now, so I went over there to take a look.*" (p.138/139); "*Q. When you say you went over there to take a look, what did you do, where did you go?-A. I went over to Cockenoe and I saw what looked to be a big flat platform built in with a tree, about eight feet off the ground.*" (p.139); "*Q. Did you ever make a determination that the arboreal structure at 59 Cockenoe Avenue, Village of Babylon, State of New York was unsafe?-A. No, I made no determination.-Q. So you have no opinion of the safety of the structure at 59 Cockenoe Avenue Village of Babylon?-A. I do now.-Q. When you say you do now, when did you make the determination that the structure at 59 Cockenoe Avenue Village of Babylon was unsafe?-A. I didn't make a determination that it was unsafe.-Q. Who did?-A. I don't know that anybody did. We wanted to make sure it was safe and that Mr. Lepper supplied information from a structural engineer showing that it should be safe.-Q. Is it your opinion that the structure is safe?-A. It would be my opinion that I would trust the certification of an engineer, if he says it's safe, that's good by me.-Q. An engineer took a look at the structure at Mr. Lepper's house, correct?-A. That's my understanding.-Q. And the engineer made a report correct?-A. Yes.*" (p.146/147); "*Q. As you sit here today, the arboreal structure that Mr. Lepper has, the tree house, is it safe?-A. It's my belief that it's safe.-Q. You never made a determination that the arboreal structure at 59 Cockenoe was unsafe; is that your testimony?-A. Yes.-Q. Did there come a time you wrote a summons or accusatory instruments regarding that structure at 59 Cockenoe, Village of Babylon?-A. Yes.-Q. What were the basis for those violations?-A. The basis were doing construction without a building permit.-Q. How many violations did you issue?-A. I don't know. I think at least three or four.*" (p.148/149); "*Q. What's the purpose of obtaining a building permit for the arboreal structure at 59 Cockenoe Avenue, Village of Babylon, State of New York.-A. What was the purpose? Well, multiple purposes. First, what are you building? Is it going to be safe? And most, biggest concern I had is, it appeared to be within the front yard setback which would require a variance from the Zoning Board of appeals to locate it where it's located.-Q. Safety was a concern of yours; is that right?-A. Absolutely.*" (p.150/151); "*Q. Are you aware of whether there are any other tree houses in the Incorporated Village of Babylon?-A. I know of one other.-Q. The answer is yes, one other?-A. Yes, one other.*" (p.158); "*Q. Did you look at Mr. Lepper's tree house?-A. One.-Q. I didn't -- just from the street.*" (p.160/161); "*Q. If a person within the Village of Babylon was building a large dog house and you observed it, would you tell that person to go out and get a building permit?-A. Yes.*" (p.203); "*Q. In the course of your regular professional activities as a Village of Babylon building inspector, have you issued Certificate of Occupancy for a tree house?-A. (p.207); "*Q. In the course of your regular professional activities as Village of Babylon building inspector, have you ever issued a Certificate of Occupancy for a tool shed?-A. Yes.-Q. In the course of your regular professional activities as Village of Babylon building inspector, have you ever issued a Certificate of Occupancy for a garage?-A. Yes.*" (p.209); "*Q. In the course of your regular professional activities as the Village of Babylon building inspector, do you refer to the Babylon Village code*

Re: Lepper v. Village of Babylon, et al.
    December 28, 2020
    Page 15 of 32

*when you write an accusatory instrument?-A. Depends if it's Village code violation, I would cite the Village code. If it's a State code violation, I would cite the State code violation."* (p.220); *"Q. What are the criteria that you use to determine whether there has been a violation of the Babylon Village code?-A. Depends on what it is. I mean, you know, it's different types of violations I think. We have setback problems, you have height problems, we have FEMA elevation problems with flooding. Then we have construction without a building permit. We have occupancy without a Certificate of Occupancy."* (p.221); *"Q. In the course of your regular professional activities as the Village of Babylon building inspector, do you investigate circumstance under which there is a violation of the Village of Babylon code based upon a complaint from anyone other than your own department or you?-A. Yes.-Q. Who?-A. We are obligated to respond to any complaint even if it's anonymous."* (p.227); *"Q. In the course of your regular professional activities as Village of Babylon building inspector, do you investigate alleged violations of the Village of Babylon code at the insistence of any member of the Village of Babylon government?-A. I don't understand 'insistence.' If I receive a complaint from anybody, I'm going to check it out."* (p.228); *"Q. What caused you initiate the investigation of a complaint of the tree house for the Lepper children?-A. Again, it wasn't a complaint, it was an observation by Tony Davida, the trustee.-Q. You're saying observation by Tony Davida. Can tell me what you consider an observation by Tony Davida, the trustee?-A. When he came to Village Hall, I guess he went down that block and he said he observed them building something in a tree, I'm not sure what it is. I said, all right, let's go have a look."* (p.229); *"Q. Do you know what the purpose of Mr. Lepper's tree house was?-A. Well, I had two conversations with him where he explained to me that he found a hypodermic needle in his bushes and felt for the safety of his kids, he wanted to build a tree house.-Q. As you sit here today, do you know if the tree house was for the use of John Lepper's kids?-A. That's what he told me it was for."* (p.232)

## INSPECTION FINDINGS

The writer directed his attention to the subject property and treehouse and noted the following (Photos 10-11): the subject structure was elevated above the adjacent grade and employed an approximately 2 foot, 2 inch diameter natural, organic object (i.e. a tree) located in the rear yard of the subject property[2] as a foundation; the north exposure of the structure contained what appeared to be an operable two-piece hinged door; the centerline of the tree containing the structure (the subject tree) was located 13 feet, 1 inch from the interior edge of the concrete curb along Wampum Road and 4 feet, 6 inches from wood fencing adjacent to Wampum Road; the centerline of the subject tree was located approximately 9 feet, 10-1/2 inches east and 25 feet north of the single familiar residence on the property; the centerline of the subject tree was located approximately 22 feet, 9-1/2 inches south of the detached two-car garage on the property; the subject structure was supported at its corners by four (4) wood braces which consisted of nominal 10 inch by 3 inch horizontal members supported by diagonal nominal 4 inch by 6 inch members and a vertical nominal 4 inch by 6 inch members along with intermediate nominal wood members

---

[2] Relative to Cockenoe Avenue.

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 16 of 32

below flooring of the structure (Photos 12–13); the four wood braces all displayed staining consistent with exposure to exterior elements over an extended period of time and did not display evidence of painting or a surface coating (i.e. sealant, pressure treated lumber, etc.) (Photo 14); the connections between the horizontal wood members and vertical wood members of the braces had been constructed with non-traditional framing methods[3] and did not contain fasteners (Photos 15–16); the connections between the brace angled wood members and horizontal/vertical wood members contained mortised connections with the top connections being a bearing type connection with no fasteners and the bottom connections containing 1-1/4 inch deep countersunk holes with what appeared to be single lag bolts intended to fasten both the angled wood members and vertical wood members to the tree (Photo 17); the vertical wood members appeared to each be fastened to the subject tree by three (3) additional lag bolts[4] installed in 1-1/4 inch deep countersunk holes; the northwest and northeast brace horizontal members displayed evidence of checking along its length (Photos 18–20); the northeast brace vertical member was non-continuous with a lower section containing two additional lag bolts installed in 1-1/4 inch deep countersunk holes and was not in contact with, nor supporting, an upper section or the structure above (Photos 21–24); the southwest brace displayed evidence of displacement due to dead load (i.e. gravity/self-weight) consistent with an ongoing/progressive structural failure at the non-traditional connection between the horizontal and vertical wood members (Photos 25–29); a wood shim had been installed between the southwest brace vertical member and the subject tree and a lag bolt at that member was noted to not have been fully engaged during installation (Photos 30–33); the southeast brace displayed evidence of physical damage to surfaces of the vertical wood member either prior to, during or post construction (Photos 34–36); a platform of nominal 2 inch by 10 inch wood members was constructed atop the four (4) wood braces and intermediate nominal wood members; the finished floor of the platform surface measured 8 feet, 8-13/16 inches above adjacent grade and had plan dimensions of 9 feet, 10-1/4 inches by 11 feet, 4 inches covering a total lot area of 111.7 square feet; metal conduit was noted to be fastened to the subject tree and structure and appeared to provide electrical power to the tree house (Photos 37–40); the subject structure contained four framed walls with a gable roof atop the platform and did not appear to contain a means of ingress/egress as access to the interior could only be achieved through openings (i.e. "windows") in the structure's exterior walls via the use of an appropriately placed extension ladder; the interior of the subject structure contained exposed wood framing which displayed evidence of staining consistent with the exposure to elements over an extended period of time and exposed electrical wiring (Photos 41–48); the walls of the structure were framed with nominal 2 inch by 4 inch wood members spaced approximately 16 inches on center; the interior floor area of the structure had plan dimensions of 9 feet, 7-1/2 inches by 8 feet, 1 inch covering a total lot area of 77.8 square feet; the structure's roof and ridge joists were supported by non-traditional framing methods and bore upon what appeared to be vertically oriented wood fence posts [which displayed

---

[3] Understood to have been the "*timber framed style*" and/or "*mortised*" connections referred to by Mr. Lepper during his 6/27/2019 deposition testimony

[4] Understood to have been the 1/2-inch diameter by 12-inch long lag bolts referred to by Mr. Lepper during his 6/27/2019 deposition testimony. The writer noted that destructive testing/removal of the observed lag bolts would be required to confirm Mr. Lepper's testimony.

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 17 of 32

evidence of physical damage to surfaces either prior to, during or post construction] and a nominal 2 inch by 4 inch wood member fastened to the subject tree by screws[5] (Photos 49-55); nominal wood 2 inch by 4 inch wall framing studs bore markings/stamping indicating the material (i.e. wood/lumber) had not been pressure-treated and no other evidence was observed that the members were otherwise protected from the exterior elements to which they were exposed (i.e. painting, sealant, etc.); chairs, a hammock and children's toys were observed within the structure at the time of the inspection.

## OPINIONS

Based upon the writer's 7/31/2020 site inspection, review of file material and technical research, along with the writer's education, licensure, experience and the foregoing, the writer offers the following opinions to a reasonable degree of engineering certainty:

1. The subject structure (i.e. the "treehouse") was a "*building*" as defined by Section 365-3 of the Code of the Village of Babylon, entitled "*Definitions and word usage*." In this regard, that code section stated the following in relevant parts:

   "*A. Unless otherwise stated expressly, as used in this chapter, the following terms shall have the meanings indicated:*"

   "*BUILDING-A structure having a roof supported by columns or walls for the shelter, support or enclosure of persons, animals or chattels.*"

   "*STRUCTURE-A combination of materials other than a building to form a construction that is safe and stable, and includes among other things stadiums, swimming pools, gospel and circus tents, reviewing stands, platforms, stagings, observation towers, radio towers, sheds, coal bins, walls, gas pumps, fences over six feet in height and display signs. The term 'structure' shall be construed as though followed by the words 'or part thereof.'*"

   "*B. The words 'used for' include 'designed for' and vice versa; words used in the present tense include the future; words in the singular include the plural number and vice versa; the word 'dwelling' includes the word 'residence'; the word 'building' includes the word 'structure'; the word 'lot' includes the word 'plot'; and the word 'shall' is always mandatory and not discretionary or directory.*"

---

[5] The diameter and dimensions of the subject screws were not identifiable during the inspection nor provided in Mr. Lepper's 6/27/2019 deposition testimony.

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 18 of 32

Additionally, during the 7/31/2020 site inspection the subject structure was observed to contain a "*roof supported by walls*" and contained chairs, a hammock and children's toys such that structure appeared to be intended for use for "*shelter…or enclosure of persons*." Similarly, the 11/16/2018 Amended Verified Complaint stated, in relevant part, the following: "*30. On or about May 3, 2018, after conferring with Plaintiff Noelle Lepper, Plaintiff John Lepper began to utilize timbers from an old boat house that was destroyed in Superstorm Sandy to create a treehouse to insulate his children from potential contact with the hypodermic needles he found in and around his property at 59 Cockenoe Avenue within the Village of Babylon.*"; "*46. Plaintiff John Lepper, confident he was protecting his family and speaking out toward remedying the crime occurring on his property and the scourge of drugs in his community, spoke to and informed everyone present in the building department on May 21, 2018 that it was his intention to build the treehouse for his son's birthday on July 7th, 2018 to allow his son the liberty and free use of the subject premises while maintaining a safe distance from the criminal activity in the neighborhood and the larger criminal narcotic problem known to the Village of Babylon.*" Likewise, Mr. John Lepper testified in deposition on 6/27/2019 to the following: "*Q. Is the treehouse completed at this point?-A. No.*" (p.86); "*Q. Was there anything additional you wanted to do to the treehouse?-A. Finish?-Q. Yes.-A. Finish.-Q. What do you have to do to finish the treehouse?-A. Um, I have to finish putting the roof on, shutters, secure the windows to make it safe for the kids to play up there and install the hatch in the floor so that the kids can actually access it.*" (p.87); "*Q. Now, you pull the walls up. How would you attach them and put them together, assemble them?-A. How did I attach them to one another?-Q. And to the platform. If you did.-A. When the walls were framed, the base plate and the header overlap one another. So you put it in position, you plumb the wall up; meaning, you level the wall. Once the wall is leveled, you screw the two together and then I used six-inch timber bolts to screw to the platform deck.*" (p.96/97); "*Q. What type of wood did you use for the roof?-A. 2 by 4 header and 2 by 4 rafters.*" (p.98); "*Q. Have either of your children been up in the treehouse?-A. Up until today?-Q. Yes.-A. Yes.*" (p.139). Therefore, the writer determined that the subject structure was a "*structure having a roof supported by columns or walls*" intended to be used/employed by Mr. Lepper and his family "*for the shelter, support or enclosure of persons, animals or chattels.*" Therefore, the writer concluded that the subject structure (i.e. the "treehouse") was a "*building*" as defined by Section 365-3 of the Code of the Village of Babylon, entitled "*Definitions and word usage.*"

2.  The construction of the subject structure (i.e. the "treehouse") required a construction permit issued by the Building Inspector of the Village of Babylon in accordance with Section 365-26(A) of the Code of the Village of Babylon, entitled "*Permit required; material to be submitted.*" In this regard, the code section stated, in relevant part, the following:

    "*A. **No building shall hereafter be erected** and no existing building shall be structurally altered or added to on any lot, plot or premises and no*

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 19 of 32

> *excavation or work of any nature shall commence in connection therewith,
> nor shall any use of an existing building be changed **until a permit
> authorizing the same shall have been issued by the Building Inspector.
> The Building Inspector shall require that the application for a permit and
> the accompanying plot plan, plans and specifications shall contain all
> information necessary to enable him to determine whether the proposed
> building addition** or structural alterations or change of use to an existing
> building **comply with the provisions of this chapter** and Chapter 171, Flood
> Damage Prevention, where applicable. [Amended 10-24-2006 by L.L. No.
> 8-2006; 7-14-2015 by L.L. No. 5-2015]"* (emphasis added).

Additionally, as previously addressed, the subject structure (i.e. the "treehouse") was a
"*building*" as defined by Section 365-3 of the Code of the Village of Babylon, entitled
"*Definitions and word usage*." Also, 11/16/2018 Amended Verified Complaint stated, in
relevant part, the following: "*30. **On or about May 3, 2018, after conferring with Plaintiff
Noelle Lepper, Plaintiff John Lepper began** to utilize timbers from an old boat house that
was destroyed in Superstorm Sandy **to create a treehouse** to insulate his children from
potential contact with the hypodermic needles he found in and around his property **at 59
Cockenoe Avenue within the Village of Babylon***"; "*38. **On or about May 21st, 2018,
Plaintiff John Lepper visited the Building Department** office of Defendant Village of
Babylon; **completed a building permit application and submitted a front
elevation/framing drawing with a copy of a recent survey** of the Lepper Family
Homestead*" (emphasis added). Therefore, the writer determined that on 5/3/2018 Mr.
Lepper began to erect a new building at the subject property within the Village of Babylon.
Therefore, the writer concluded that the construction of the subject structure (i.e. the
"treehouse") required a construction permit issued by the Building Inspector of the Village
of Babylon in accordance with Section 365-26 of the Code of the Village of Babylon,
entitled "*Permit required; material to be submitted.*"

3.  Section 365-26(C)(3) of the Code of the Village of Babylon was neither applicable nor
    enforceable to the subject structure (i.e. the "treehouse"). In this regard, Section 365-3 of
    the Code of the Village of Babylon, entitled "*Definitions and word usage,*" provided the
    following definition or "*Lot Area*":

    > "*LOT AREA-The total horizontal area within the boundary lines of a lot,
    > excluding any portion of an abutting street, whether publicly or privately
    > owned.*"

    Additionally, Section 365-26(C)(3) of the Code of the Village of Babylon stated:

    > "*C. Decks/patios; outdoor playgrounds and gyms. [Added 9-9-1986 by L.L.
    > No. 4-1986; amended 1-11-1994 by L.L. No. 1-1994]*

Re:   Lepper v. Village of Babylon, et al.
       December 28, 2020
       Page 20 of 32

> *(3) A building permit shall be required when an outdoor playground or gym
> (or any combination) exceeds a lot area of 90 square feet.*"

As previously addressed, subject structure (i.e. the "treehouse") was a "*building*" as defined by Section 365-3 of the Code of the Village of Babylon, entitled "*Definitions and word usage,*" and no evidence has been reviewed to conclude that the structure was an "*outdoor playground or gym (on any combination)*." Regardless, during the 7/31/2020 site inspection, the writer measured the finished floor surface of the platform of the subject structure to have plan dimensions of 9 feet, 10-1/4 inches by 11 feet, 4 inches, covering a total horizontal area within the boundary lines of the subject lot of 111.7 square feet. The writer also noted that, Section 365-26(C)(3) of the Code of the Village of Babylon directed that "a *building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet*" and did not specify when (or if) a building permit would be required for a structure of such type with a lot area of less than, or equal to, 90 square feet. Therefore, the writer determined that: the subject structure was not an "*outdoor playground or gym (on any combination)*"; while the structure would not be identified as an "*outdoor playground or gym (on any combination)*", the "*lot area*" of the subject structure exceeded 90 square feet and a building permit would be required; and, Section 365-26(C)(3) of the Code of the Village of Babylon would allow for the requirement of a building permit for an "*outdoor playground or gym (on any combination)*" structure with a lot area of less than, or equal to, 90 square feet. Therefore, the writer concluded that Section 365-26(C)(3) of the Code of the Village of Babylon was neither applicable nor enforceable to the subject structure (i.e. the "treehouse").

4.   A request by the Village of Babylon Building Official for construction documents prepared by a New York State registered architect or licensed professional engineer along with such other information and documentation as may be necessary to determine whether the proposed work conformed with the New York State Uniform Fire Prevention and Building Code (the "Uniform Code") and Energy Code was in accordance with the requirements of the Code of the Village of Babylon, the Uniform Code and 19 NYCRR Part 1203 entitled "*Uniform Code: Minimum Standards for Administration and Enforcement.*" In this regard, the undated Village of Babylon Building Department Building Permit Form [marked during the 6/27/2019 deposition testimony of Mr. John Lepper and also marked Exhibit 5 dated 9/18/2018] appeared to include a hand drawn sketch of a proposed structure. The hand drawn sketch did not include a plan view of the proposed structure, specifications or details regarding wood framing members/connections as well as proposed exterior finishes, specifications or details regarding proposed means of ingress/egress, specifications or details regarding the number of supports serving as a foundation for the structure or bear the signature/seal of a registered design professional. Additionally, during the 7/31/2020 site inspection the following was observed: the four wood braces all displayed staining consistent with exposure to exterior elements over an extended period of time and did not display evidence of painting or a surface coating (i.e. sealant, pressure treated lumber, etc.);

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 21 of 32

the connections between the horizontal wood members and vertical wood members of the braces had been constructed with non-traditional framing methods and did not contain fasteners; the southwest brace displayed evidence of displacement due to dead load (i.e. gravity/self-weight) consistent with an ongoing/progressive structural failure at the non-traditional connection between the horizontal and vertical wood members; the subject structure contained four framed walls with a gable roof atop the platform and did not appear to contain a means of ingress/egress as access to the interior could only be achieved through openings (i.e. "windows") in the structure's exterior walls via the use of an appropriately placed extension ladder; the interior of the subject structure contained exposed wood framing which displayed evidence of staining consistent with the exposure to elements over an extended period of time and exposed electrical wiring; the structure's roof and ridge joists were supported by non-traditional framing methods and bore upon what appeared to be vertically oriented wood fence posts [which displayed evidence of physical damage to surfaces either prior to, during or post construction] and a nominal 2 inch by 4 inch wood member fastened to the subject tree by screws; and, chairs, a hammock and children's toys were observed within the structure at the time of the inspection. Section 365-26(A) of the Code of the Village of Babylon, entitled "*Permit required; material to be submitted*" stated, in relevant part, the following:

> "*A. **No building shall hereafter be erected** and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed **until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall contain all information necessary to enable him to determine whether the proposed building addition** or structural alterations or change of use to an existing building **comply with the provisions of this chapter** and Chapter 171, Flood Damage Prevention, where applicable. [Amended 10-24-2006 by L.L. No. 8-2006; 7-14-2015 by L.L. No. 5-2015]*" (emphasis added).

Section 365-30 of the Code of the Village of Babylon, entitled "*Requirements for issuance of certificate of occupancy*" stated, in relevant part, the following:

> "***No certificate of occupancy shall be issued by the Building Inspector until he has satisfactory evidence*** *of the following:*
> *A. **Construction**, alteration or remodeling **of the building and the installation of equipment therein has been completed in accordance with the provisions of the New York State Uniform Fire Prevention and Building Code** and any other applicable code or codes adopted by this Village*" (emphasis added).

Re: Lepper v. Village of Babylon, et al.
    December 28, 2020
    Page 22 of 32

Similarly, Section 108.4 of the New York State Building Standards and Codes 2017 Uniform Code Supplement entitled *"Applications for Building Permits"* stated, in relevant part, the following:

> *"A person or entity applying for a Building Permit shall submit an application to the Authority Having Jurisdiction. **An application for a Building Permit shall include:***
> *1. the information and documentation required by the stricter of the Authority Having Jurisdiction's Code Enforcement Program or a Part 1203-Compliant Code Enforcement Program;*
> *2. **construction documents (drawings and/or specifications) that define the scope of the proposed work and satisfy the requirements of the stricter of the Authority Having Jurisdiction's Code Enforcement Program or a Part 1203-Compliant Code Enforcement Program**; and*
> *3. **such other information and documentation as the Authority Having Jurisdiction may determine to be necessary** to allow the Authority Having Jurisdiction to determine whether the proposed work conforms with the Uniform Code and Energy Code"* (emphasis added).

Moreover, 19 NYCRR Part 1203 entitled *"Uniform Code: Minimum Standards for Administration and Enforcement"* contained section 1203.3 entitled *"Minimum features of a program for administration and enforcement of the Uniform Code"* which stated, in relevant part, the following:

> *"**A program for administration and enforcement of the Uniform Code shall, include all features described in subdivisions (a) through (j) of this section**. A government or agency charged with or accountable for administration and enforcement of the code must provide for each of the listed features through legislation or other appropriate means.*
> ***(a) Building permits.***
> *(1) **Building permits shall be required for work which must conform to the Uniform Code.** A government or agency charged with or accountable for administration and enforcement of the Uniform Code may exempt from the requirement for a permit the categories of work listed in subparagraphs (i) through (xii) of this paragraph. An exemption from the requirement to obtain a permit shall not be deemed an authorization for work to be performed in violation of the Uniform Code. The following categories of work may be excluded from the requirement for a building permit: (i) construction or installation of one story detached structures associated with one- or two-family dwellings or multiple single-family dwellings (townhouses) which are used for tool and storage sheds, playhouses or*

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 23 of 32

similar uses, provided the gross floor area does not exceed 144 square feet
(13.88m2); (ii) installation of swings and other playground equipment
associated with a one- or two-family dwelling or multiple single-family
dwellings (townhouses); (iii) installation of swimming pools associated
with a one- or two-family dwelling or multiple single-family dwellings
(townhouses) where such pools are designed for a water depth of less than
24 inches and are installed entirely above ground; (iv) installation of fences
which are not part of an enclosure surrounding a swimming pool; (v)
construction of retaining walls unless such walls support a surcharge or
impound Class I, II or IIIA liquids; (vi) construction of temporary motion
picture, television and theater stage sets and scenery; (vii) installation of
window awnings supported by an exterior wall of a one-or two- family
dwelling or multiple single-family dwellings (townhouses); (viii)
installation of partitions or movable cases less than 5'-9" in height; (ix)
painting, wallpapering, tiling, carpeting, or other similar finish work; (x)
installation of listed portable electrical, plumbing, heating, ventilation or
cooling equipment or appliances; (xi) replacement of any equipment
provided the replacement does not alter the equipment's listing or render it
inconsistent with the equipment's original specifications; and (xii) repairs,
provided that such repairs do not involve: (a) the removal or cutting away
of a loadbearing wall, partition, or portion thereof, or of any structural
beam or load bearing component; (b) the removal or change of any
required means of egress, or the rearrangement of parts of a structure in a
manner which affects egress; (c) the enlargement, alteration, replacement
or relocation of any building system; (d) the removal from service of all or
part of a fire protection system for any period of time.

(2) _**An application for a building permit shall request sufficient
information to permit a determination that the intended work accords with
the requirements of the Uniform Code and shall require submission of**_ the
following information and documentation: (i) a description of the proposed
work; (ii) the tax map number and the street address; (iii) the occupancy
classification of any affected building or structure; (iv) where applicable, a
statement of special inspections prepared in accordance with the provisions
of the Uniform Code; and (v) _**at least two sets of construction documents
(drawings and/or specifications) that define the scope of the proposed
work**_.

(3) _**Construction documents shall not be accepted as part of an application
for a building permit unless such documents: (i) are prepared by a New
York State registered architect or licensed professional engineer where so
required by the Education Law; (ii) indicate with sufficient clarity and
detail the nature and extent of the work proposed; (iii) substantiate that
the proposed work will comply with the Uniform Code and the State**_

Re: Lepper v. Village of Babylon, et al.
December 28, 2020
Page 24 of 32

> ***Energy Conservation Construction Code;*** *(iv) where applicable, include a site plan that shows any existing and proposed structures on the site, the location of any existing or proposed well or septic system, the location of the intended work, and the distances between the structures and the lot lines"* (emphasis added).

Therefore, the writer determined that the undated Village of Babylon Building Department Building Permit Form and the included hand drawn sketch of a proposed structure did not contain all information necessary to determine whether the proposed structure complied with the provisions of Chapter 365 of the Code of the Village of Babylon. Therefore, the writer concluded that a request by the Village of Babylon Building Official for construction documents prepared by a New York State registered architect or licensed professional engineer along with such other information and documentation as may be necessary to determine whether the proposed work conformed with the Uniform Code and Energy Code was in accordance with the requirements of the Code of the Village of Babylon, the Uniform Code and 19 NYCRR Part 1203.

5. The installation of electrical wiring within the subject structure (i.e. the "*treehouse*") violated Chapter 133 of the Code of the Village of Babylon entitled, "*Electrical Inspection*". In this regard, Section 133-5 of the Code of the Village of Babylon entitled, "*Prohibited Acts*" stated:

> "***It shall be a violation of this chapter for any person***, *firm or corporation* ***to install or cause to be installed or to alter any electrical wiring installation, device*** *or equipment for light, heat or power* ***in or upon any building or construction in the Village prior to the filing of an application for inspection with the New York Board of Fire Underwriters or the Long Island Electrical Inspection Service, Inc***. *It shall be a violation of this chapter for any person, firm or corporation to connect or cause to be connected any electrical wiring, installation device or equipment for light, heat or power for any building or construction to any source of electrical energy supply prior to the issuance of a temporary certificate or a certificate of compliance by the New York Board of Fire Underwriters or the Long Island Electrical Inspection Service, Inc*." (emphasis added).

Additionally, the following was observed during the 7/31/2020 site inspection: the interior of the subject structure contained exposed electrical wiring. Also, Mr. John Lepper testified in deposition on 6/27/2019 to the following: "*Q. Did you seek to get any permits before doing the electrical work?-A. No, I didn't.-Q. Do you know if any permits are required for something like that?-A. No, I don't.-Q. Did you inquire?-A. No, I didn't.*" Furthermore, the writer noted that no documentation had been provided which indicated that Mr. Lepper and/or a representative of the subject property had filed an application for inspection with

the New York Board of Fire Underwriters or the Long Island Electrical Inspection Service, Inc. for the construction of the subject treehouse. As such, the writer concluded that the installation of electrical wiring within the subject structure (i.e. the "*treehouse*") violated Chapter 133 of the Code of the Village of Babylon entitled, "*Electrical Inspection.*"

6. The condition of the subject structure observed during the 7/31/2020 site inspection appeared to be consistent with an unsafe condition/structure as well as dangerous to the life, health, property or safety of the public or to the occupants of the structure and may present a clear and imminent threat to human life, safety or health as defined by Section 116.1 of the 2015 International Building Code, entitled "*Conditions,*" and Section 101.2.6.7 of the New York State Building Standards and Codes 2017 Uniform Code Supplement, entitled "*Unsafe structures and equipment.*" In this regard, The State of New York Fire Prevention and Building Code Council (the "Code Council") adopted the 2015 Editions of the Code Books published by the International Code Council (the "2015 I-Codes") as amended by the 2017 Uniform Code Supplement as the New York State Uniform Fire Prevention and Building Code (the "Uniform Code") effective between July 2017 and 5/12/2020. The Uniform Code included both the 2015 International Building and Residential Codes. Additionally, the 11/16/2018 Amended Verified Complaint and 6/27/2019 deposition testimony of Mr. John Lepper indicated the following: he was the owner of the property at 59 Cockenoe Avenue in Babylon, New York; he initially began construction of the subject structure on or about April/May 2018; he filed an application for a construction permit (a Building Permit Form) with the Village of Babylon, New York on approximately 5/10/2018. As such, the Uniform Code was effective in the Village of Babylon, New York during both the time that Mr. Lepper initially began construction as well as when Mr. Lepper filed an application for a construction permit. Furthermore, Section 116.1 of the 2015 International Building Code, entitled "*Conditions,*" stated the following:

> "***Conditions.*** *Structures or existing equipment that are or hereafter become unsafe, insanitary or deficient because of inadequate means of egress facilities, inadequate light and ventilation, or that constitute a fire hazard or are otherwise dangerous to human life or the public welfare, or that involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition. Unsafe structures shall be taken down and removed or made safe, as the building official deems necessary and as provided for in this section. A vacant structure that is not secured against entry shall be deemed unsafe.*"

Similarly, Section 101.2.6.7 of the New York State Building Standards and Codes 2017 Uniform Code Supplement, entitled "*Unsafe structures and equipment,*" stated the following:

Re:   Lepper v. Village of Babylon, et al.
December 28, 2020
Page 26 of 32

"*101.2.6.7 Unsafe structures and equipment. If during the inspection of a premises, building or structure, or any building system or equipment, in whole or in part, there exists a clear and imminent threat to human life, safety or health, the authority having jurisdiction charged with the administration and enforcement of the Uniform Code shall exercise its powers in due and proper manner so as to extend to the public protection from the hazards of threat to human life, safety, or health.*

*101.2.6.7.1 Unsafe structures. An unsafe structure is one that is found to be dangerous to the life, health, property or safety of the public or to the occupants of the structure by not providing minimum safeguards to protect or warn occupants in the event of fire; or because such structure contains unsafe equipment or is so damaged, decayed, dilapidated, or structurally unsafe; or is of such faulty construction or unstable foundation that partial or complete collapse is possible. A vacant structure that is not secured against unauthorized entry as required by Section 311 of the 2015 IFC shall be deemed unsafe.*

*101.2.6.7.2 Unsafe equipment. Unsafe equipment includes any boiler, heating equipment, elevator, moving stairway, electrical wiring or device, flammable liquid containers or any other equipment on the premises or within the structure that is in such disrepair or condition that the equipment is a hazard to life, health, property or safety of the public or occupants of the premises or structure.*

*101.2.6.7.3 Structure unfit for human occupancy. A structure is unfit for human occupancy whenever the structure is unsafe, unlawful, or because of the degree to which the structure is in disrepair or lacks maintenance or the location of the structure constitutes a hazard to the occupants of the structure or to the public.*

*101.2.6.7.4 Unlawful structure. An unlawful structure is one found in whole or in part to be occupied by more persons than are permitted under the 2015 IFC, or was erected, altered or occupied contrary to law.*

*101.2.6.7.5 Closing of vacant structures. If the structure is vacant and unfit for human habitation and occupancy, and is not in danger of structural collapse, a placard of condemnation shall be posted on the premises, and the structure shall be closed up so as not to be an unattractive nuisance.*

*101.2.6.7.6 Prohibited occupancy. No person shall occupy a placarded structure.*

*101.2.6.7.6.1 Placard removal. The placard shall be removed whenever the defect or defects on which the condemnation and placarding action were based have been eliminated.*

*101.2.6.7.7 Notice. Whenever a structure or equipment has been condemned under the provisions of this section, a notice shall be posted in a conspicuous place in or about the structure affected by such notice. If the*

Re:  Lepper v. Village of Babylon, et al.
     December 28, 2020
     Page 27 of 32

> notice pertains to equipment, it shall also be placed on the condemned
> equipment.
> **101.2.6.7.8 Imminent danger.** The occupants shall vacate premises when
> there exists:
> 1. Imminent danger of failure or collapse of a building or structure which
>    endangers life;
> 2. A structure where the entire or part of the structure has fallen and life
>    is endangered by the occupation of the structure;
> 3. Actual or potential danger to the building occupants or those in the
>    proximity of any structure because of explosives, explosive fumes or
>    vapors or the presence of toxic fumes, gases or materials; or
> 4. Operation of defective or dangerous equipment. There shall be posted
>    at each entrance to such structure a notice reading as follows: 'This
>    Structure is Unsafe and its Occupancy Has Been Prohibited by the Code
>    Enforcement Official.' It shall be unlawful for any person to enter such
>    structure except for the purpose of securing the structure, making the
>    required repairs, removing the hazardous condition or demolishing the
>    structure.
> There shall be posted at each entrance to such structure a notice reading
> as follows: 'This Structure is Unsafe and its Occupancy Has Been
> Prohibited by the Code Enforcement Official.' It shall be unlawful for any
> person to enter such structure except for the purpose of securing the
> structure, making the required repairs, removing the hazardous condition
> or demolishing the structure.
> **101.2.6.7.9 Fire department notification.** The fire chief shall notify the
> code enforcement official of any fire or explosion involving any structural
> damage, fuel-burning appliance, chimney, flue or gas vent."

Finally, the following was observed during the 7/31/2020 site inspection: the subject structure contained four framed walls with a gable roof atop the platform and did not appear to contain a means of ingress/egress as access to the interior could only be achieved through openings (i.e. "windows") in the structure's exterior walls via the use of an appropriately placed extension ladder; the subject structure was elevated above the adjacent grade and employed an approximately 2 foot, 2 inch diameter natural, organic object (i.e. a tree) located in the rear yard of the subject property as a foundation; the centerline of the tree containing the structure (the subject tree) was located 13 feet, 1 inch from the interior edge of the concrete curb along Wampum Road and 4 feet, 6 inches from wood fencing along what appeared to be the property line adjacent to Wampum Road; the centerline of the subject tree was located approximately 9 feet, 10-1/2 inches east and 25 feet north of the single familiar residence on the property; the centerline of the subject tree was located approximately 22 feet, 9-1/2 inches south of the detached two-car garage on the property; the connections between the horizontal wood members and vertical wood members of the

braces had been constructed with non-traditional framing methods and did not contain fasteners; the northeast brace vertical member was non-continuous with a lower section containing two additional lag bolts installed in 1-1/4 inch deep countersunk holes and was not in contact with, nor supporting, a upper section or the structure above; the southwest brace displayed evidence of displacement due to dead load (i.e. gravity/self-weight) consistent with an ongoing/progressive structural failure at the non-traditional connection between the horizontal and vertical wood members; a wood shim had been installed between the southwest brace vertical member and the subject tree and lag bolt at that member was noted to not have been fully engaged during installation; chairs, a hammock and children's toys were observed within the structure at the time of the inspection; the four wood braces all displayed staining consistent with exposure to exterior elements over an extended period of time and did not display evidence of painting or a surface coating (i.e. sealant, pressure treated lumber, etc.); nominal wood 2 inch by 4 inch wall framing studs bore markings/stamping indicating the material (i.e. wood/lumber) had not been pressure-treated and no other evidence was observed that the members were otherwise protected from the exterior elements to which they were exposed (i.e. painting, sealant, etc.); the interior of the subject structure contained exposed electrical wiring. As such, the writer determined the following: the subject structure appeared to contain inadequate means of egress facilities and did not contain minimum safeguards to protect or warn occupants in the event of fire; the subject structure contained unsafe equipment; the subject structure appeared to be dangerous to human life and/or the public welfare and was observed to contain faulty construction or unstable foundation as the foundation of the structure was not constructed of materials with known or specified physical properties, as well as that the radius of collapse of the tree and structure due to overturning of the sub-surface support system included residential structures and a public roadway[6]; the subject structure appeared to be dangerous to human life and/or the public welfare and damaged, decayed, dilapidated, or structurally unsafe as wood framing members and connections forming the structure's flooring supports had displaced as a result of material self-weight due to the force of gravity; the subject structure appeared to involve an illegal or improper occupancy and had been erected, altered or occupied contrary to law as no evidence has been reviewed to conclude that either a Construction Permit or Certificate of Occupancy had been issued by the governing municipal entity (i.e. the Village of Babylon, New York); the subject structure appeared to have been inadequately maintained and contain faulty construction as no evidence was observed of treatment of wood framing members for protection from the exterior elements to which they were exposed and connections between wood framing members were inconsistent with connection types specified in applicable codes, standards and ordinances[7]. Therefore, the writer concluded that the condition of the

---

[6] The writer noted that the location of the subject structure (i.e. elevated above the adjacent grade and supported by the subject tree) was such that lateral forces due to wind would be applied to the surfaces of the structure's framed walls/roof and bear upon the subject tree and its unknown/unidentified sub-surface support system (i.e. the tree's root system).

[7] The National Design Specification [NDS] for Wood Construction with 2015 Supplement [ANSI AWC NDS-2015]

subject structure observed during the 7/31/2020 site inspection appeared to be consistent with an unsafe condition/structure as well as dangerous to the life, health, property or safety of the public or to the occupants of the structure and may present a clear and imminent threat to human life, safety or health as defined by Section 116.1 of the 2015 International Building Code, entitled "*Conditions,*" and Section 101.2.6.7 of the New York State Building Standards and Codes 2017 Uniform Code Supplement, entitled "*Unsafe structures and equipment.*"

7. The allegation that "*there is no evidence the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code*" contained in the 11/16/2018 Amended Verified Complaint was misleading, speculative and without basis. In this regard, as addressed earlier in this report, The State of New York Fire Prevention and Building Code Council (the "Code Council") adopted the 2015 Editions of the Code Books published by the International Code Council (the "2015 I-Codes") as amended by the 2017 Uniform Code Supplement as the New York State Uniform Fire Prevention and Building Code (the "Uniform Code") effective between July 2017 and 5/12/2020. The Uniform Code included both the 2015 International Building and Residential Codes. Additionally, Chapter 96 of the Code of the Village of Babylon, entitled "*Building Construction and Fire Prevention,*" stated:

> "*§ 96-1 Purpose.* ***This chapter shall provide the basic method for administration and enforcement of the New York State Uniform Fire Prevention and Building Code in the Village of Babylon*** *and shall establish powers, duties and responsibilities in connection therewith.*
>
> *§ 96-2 Enforcement officials.* ***The Building Inspector and the Fire Inspector are hereby designated to administer and enforce the New York State Uniform Fire Prevention and Building Code within the Village of Babylon***" (emphasis added).

As such, the writer determined that both the 2015 International Building Codes (i.e. the "*International Building Code*") along with its incorporated Section 116, entitled "*Unsafe Structures and Equipment,*" had been adopted by the Code of the Village of Babylon and were applicable/enforceable to the subject structure at the time of its construction. Therefore, the writer concluded that the allegation that "*there is no evidence the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code*" contained in the 11/16/2018 Amended Verified Complaint was misleading, speculative and without basis.

8. The writer reviewed the 2/20/2019 "*Preliminary Injunction-Copy of Architect's Report*" Letter by Mr. Cory H. Morris, Esq., with attachments, as well as the 3/1/2019 "*Treehouse*"

Letter by James R. Brown, Ph.D., P.E. Dr. Brown's 3/1/2019 "*Treehouse*" Letter alleged, in relevant part, the following:

"*I find that **the treehouse structure supported in the tree is structurally stable and meets code loading for wind, snow and LL* [live load] *as prescribed by IBC and local requirements.** In other words the structure* [a.k.a. the "treehouse structure"] *is able to withstand all weather-related events that are in accordance with code-induced loading criteria*" (descriptions/emphasis added).

The writer concluded that Dr. Brown's conclusion was misleading, speculative and without basis. In this regard, the 2/18/2019 "*Tree House As-Built*" Drawing Sheet [T-100.00; Project 15-155], bearing the signature and seal of James R. Brown, Ph.D., P.E., included/specified the following: that the diagonal brace and horizontal members of the "support arm" were nominal 4 inch by 4 inch and 4 inch by 6 inch wood members, respectively; no connection was specified between the 4 inch by 6 inch horizontal timber and 4 inch by 6 inch vertical timber at each "support arm"; the document included no written notations and/or specifications indicating the building code or loading conditions by which the structure had been evaluated; the document included no information regarding evaluation of the structure's foundation (i.e. the "spruce" tree, subsurface root system, surrounding subsurface material [soils], etc.) or wood construction design standards applicable to the structure's construction. However, during the 7/31/2020 inspection it was determined that that the diagonal brace and horizontal members of the "support arm" were, in actuality, nominal 4 inch by 6 inch and 10 inch by 3 inch wood members, respectively. Similarly, the seven (7) pages of handwritten notes/calculations/ sketches entitled "*Treehouse-Calcs Structure,*" understood to have been produced by James R. Brown, Ph.D., P.E., included/specified the following: the analysis only evaluated the structure under conditions of "*dead*" load and the structure was not evaluated under other loading conditions (i.e. "live load", "wind load", etc.); that a "*wind*" speed of 115 miles per hour under Category "*Exposure B*" was to be included in design loads for the evaluation of the structure; the document included no calculations evaluating connections between wood framing members or the subject structure foundation (i.e. the "spruce" tree, subsurface root system, surrounding subsurface material [soils], etc.); the calculations evaluated the bending capacity of the horizontal member of the "support arm" as a nominal 4 inch by 6 inch wood member and not the constructed condition of a nominal 10 inch by 3 inch wood member observed during the writer's inspection. It should be noted that Table 1.5-1 of the American Society of Civil Engineers/Structural Engineering Institute [ASCE/SEI] Standard 7-10, entitled "*Minimum Design Loads for Buildings and Other Structures,*" identified in Chapter 35 of the 2015 International Building Code, entitled "*Reference Standards*" specified that the subject structure would be analyzed under Risk Category III ["*Buildings and other structures, the failure of which could pose a substantial*

*risk to human life*"][8]. Moreover, Figure 26.5-1B of ASCE/SEI 7-10 specified that the location of the subject property required analysis of the subject Risk Category III structure under an applied wind loading velocity of 140 miles per hour[9]. As such, the writer determined that: Dr. Brown's 2/18/2019 "*Tree House As-Built*" Drawing Sheet misrepresented the dimensions/properties of the subject structure's wood framing members and plan dimensions; Dr. Brown's "*Treehouse-Calcs Structure*" calculations misrepresented the applicable 2015 International Building Code required applied wind loading for the structure; Dr. Brown's "*Treehouse-Calcs Structure*" calculations did not analyze the subject structure or evaluate the foundation system supporting the structure and included calculations regarding the capacities of structural members that were unrelated to an analysis of the subject structure. The writer additionally noted that the observation made during the 7/31/2020 site inspection that the southwest brace displayed evidence of displacement due to dead load (i.e. gravity/self-weight) consistent with an ongoing/progressive structural failure at the non-traditional connection between the horizontal and vertical wood members would reinforce that Dr. Brown's calculations and certification relied upon an improper basis for the analysis of the structure. Therefore, the writer concluded that: Dr. Brown's calculations and certification relied upon an improper basis for the analysis of the structure under applied wind loading and did not demonstrate that the foundation of the structure was either stable or structurally capable of withstanding required design loading in accordance with applicable codes, standards and ordinances; and Dr. Brown's conclusion was misleading, speculative and without basis.

## CONCLUDING OPINIONS

Based upon the writer's 7/31/2020 site inspection, review of file material and technical research, along with the writer's education, licensure, experience and the foregoing, the writer offers the following concluding opinions to a reasonable degree of engineering certainty: the subject structure (i.e. the "treehouse") was a "*building*" as defined by Section 365-3 of the Code of the Village of Babylon, entitled "*Definitions and word usage*"; the construction of the subject structure (i.e. the "treehouse") required a construction permit issued by the Building Inspector of the Village of Babylon in accordance with Section 365-26 of the Code of the Village of Babylon, entitled "*Permit required; material to be submitted*"; Section 365-26(C)(3) of the Code of the Village of Babylon was neither applicable nor enforceable to the subject structure (i.e. the "treehouse"); a request by the Village of Babylon Building Official for construction documents prepared by a New York State registered architect or licensed professional engineer along with such other information and documentation as may be necessary to determine whether the proposed work conformed with the Uniform Code and Energy Code was in accordance with the requirements of the Code of the Village of Babylon, the Uniform Code and 19 NYCRR Part 1203;

---

[8] The cited sections would also be consistent with the specifications/requirements of Section 1604.5 and Table 1604.5 of the 2015 International Building Code (i.e. the New York State Uniform Fire Prevention and Building Code).

[9] The cited Figure would also be consistent with the specifications/requirements of Figure 1609.3(2) of the 2015 International Building Code (i.e. the New York State Uniform Fire Prevention and Building Code).

Re:   Lepper v. Village of Babylon, et al.
      December 28, 2020
      Page 32 of 32

the installation of electrical wiring within the subject structure (i.e. the "*treehouse*") violated Chapter 133 of the Code of the Village of Babylon entitled, "*Electrical Inspection*"; the condition of the subject structure observed during the 7/31/2020 site inspection appeared to be consistent with an unsafe condition/structure as well as dangerous to the life, health, property or safety of the public or to the occupants of the structure and may present a clear and imminent threat to human life, safety or health as defined by Section 116.1 of the 2015 International Building Code, entitled "*Conditions,*" and Section 101.2.6.7 of the New York State Building Standards and Codes 2017 Uniform Code Supplement, entitled "*Unsafe structures and equipment*"; the allegation that "*there is no evidence the Village of Babylon ever adopted the International Building Code nor incorporated its Section 116 as part of the Village of Babylon Code*" contained in the 11/16/2018 Amended Verified Complaint was misleading, speculative and without basis; Dr. Brown's calculations and certification relative to the matter relied upon an improper basis for the analysis of the structure under applied wind loading and did not demonstrate that the foundation of the structure was either stable or structurally capable of withstanding required design loading in accordance with applicable codes, standards and ordinances; and, Dr. Brown's conclusion was misleading, speculative and without basis.

The writer reserves the right to supplement or amend this report should any additional information become available for review. Should you wish to discuss the matter please do not hesitate to contact the writer.

                                        Very truly yours,

                                        Joseph M. Danatzko, P.E.
                                        Engineering Consultant

JMD/jl

EXHIBIT "C"

AEL - No. 1

AEL - No. 2

AEL - No. 3

AEL - No. 4

AEL - No. 5

AEL - No. 6

AEL - No. 7

AEL - No. 8

AEL - No. 9

AEL - No. 10

**AEL - No. 11**

**AEL - No. 12**

**AEL - No. 13**

**AEL - No. 14**

AEL - No. 15

AEL - No. 16

AEL - No. 17

AEL - No. 18

**AEL - No. 19**

**AEL - No. 20**

AEL - No. 21

AEL - No. 22

AEL - No. 23

AEL - No. 24

AEL - No. 25

AEL - No. 26

AEL - No. 27

AEL - No. 28

AEL - No. 29

AEL - No. 30

AEL - No. 31

AEL - No. 32

AEL - NO. 33

AEL - No. 35

AEL - No. 36

**AEL - No. 37**

**AEL - No. 38**

**AEL - No. 39**

**AEL - No. 40**

AEL - No. 41

AEL - No. 42

**AEL - No. 43**

**AEL - No. 44**

AEL - No. 45

AEL - No. 46

AEL - No. 47

AEL - No. 48

**AEL - No. 49**

**AEL - No. 50**

AEL - No. 51

AEL - No. 52

AEL - No. 53

AEL - No. 54



**AEL - No. 55**

# EXHIBIT "X"

2:18–cv–07011 JFB-GRB

# United States District Court

## Eastern District of New York

JOHN LEPPER AND NOELLE LEPPER,

*Plaintiffs*

*–against–*

VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants,

*Defendants*

# PLAINTIFFS' EXHIBIT 1

CORY H. MORRIS
*Attorney for Defendant*
VICTOR JOHN YANNACONE, JR., *of counsel*



ZONING BOARD OF APPEALS
Bruce E. Humenik, *Chairman*
John J. Conroy, *Secretary*
Christopher Reach
Rachel A. Scelfo
Frank Seibert
Jeffrey C. Weber

INCORPORATED 1893

153 West Main Street
Babylon Village
New York 11702
(631) 669-1500

November 18, 2016

Mr. Mark Anthony Munisteri
Mark Anthony Architects
1563 Bellmore Avenue
Bellmore, NY 11710

RE:   Baldauf, 50 Thompson Avenue, Babylon, NY

Dear Mr. Munisteri,

After due consideration of the testimony given and evidence submitted, it was voted by the Board to GRANT this amended application for permission to maintain a garage requiring a variance to reduce the minimum side yard setback of 15 feet required for the garage to 5.27 feet proposed and to reduce the minimum side yard setback for the accessory building from 15 feet required to 3.67 feet proposed; and to DENY the minimum side yard setback of 15 feet required for the tree house to 7.2 feet proposed; the increase of the height limits of the accessory building from 15 feet permitted to 21.1 feet proposed; and the increase of the square feet permitted for the tree house/playground from 90 square feet permitted to 192 square feet proposed. Property located in Residence A-11 District. Suffolk County Real Property Tax Map District 0102, Section 13, Block 2, Lot 6. Application made in accordance with Section 365-13.

The variance relief requested by the Applicant to maintain the tree house and build an accessory building requiring a height variances are in the nature of Area Variances and the standards of Village Law Article 7, Section 712b[3], are applicable. Accordingly, in making its determination, the Zoning Board of Appeals is required to take into consideration the benefit to the Applicant, if the Variances are granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community by such grant. In short, the legislature has dictated that a balance test be applied. The statute further requires that in making such determination, the Board shall also consider the following:

1.      Whether an undesirable change will be produced in the character of the neighborhood, or a detriment to nearby properties will be created by the granting of the Area Variances.

NOV 21 2016

2.     Whether the benefits sought by the Applicants can be achieved by some method feasible for the applicant to pursue other than Area Variances.

3.     Whether the requested Area Variances are substantial.

4.     Whether the proposed Variances will have an adverse effect or impact on the physical or environmental conditions of the neighborhood or community, and

5.     Whether the alleged difficulty was self-created.

The consideration as to whether or not an alleged difficulty is self-created is by virtue of the statute to be considered as relevant, "but shall not necessarily preclude the granting of an Area Variance."

Pursuant to the Village Code Section 248-32, the Board of Appeals is required to consider prior to granting an approval, the criteria set forth in Section 248-32 B.1[a] through [d] and 2[a] through [1].

The Board feels that the request for the variances for the tree house (height, side yard, and area) the proposed accessory building would not be in keeping with area zoning or with the character of the neighborhood. Furthermore, there are alternative means of gaining the benefits sought under this request without the need for these variances. In particular the Board finds that:

1.     The variances to reduce the minimum side yard setback of 15 feet required for the tree house to 7.2 feet proposed, the increased height from 15 ft. allowed to 21ft. proposed and to increase the square footage permitted for the tree house/playground from 90 square feet permitted to 192 square feet proposed would all be undesirable changes having an adverse impact. The limitations as to height size and setback for the accessory structure are intended to preserve open space and limit intensity of use, especially within close proximity to adjoining properties. To grant these variances, especially in the aggregate for a single accessory structure is contrary to the purposes of the ordinance.

2.     The benefits can otherwise be achieved by the Applicant. In particular the applicant can reduce the size and height of the accessory structure and relocate same.

3.     The requested variances are each substantial and in the aggregate the variances are even more significant because they all relocate to the same structure.

4.   The variances if granted would adversely affect the aesthetic characteristics having a negative impact on the surrounding properties.

5.   The difficulty is self-created, arising only by reason of the Applicant's desire to construct a tree house and an accessory building which exceeds the height and area limits and to locate the structure closer to the side yard than permitted.

This constitutes the decision of the Board.

Very truly yours,

JOHN J. CONROY, SECRETARY
ZONING BOARD OF APPEALS

JJC/ke

Enclosure

cc:   Ralph A. Scordino, Mayor
      Steve Fellman, Bldg. Inspector
      James Slack, Planning Board Chairman
      Patricia C. Carley, Village Clerk
      David Roth, Esq.

# VILLAGE OF BABYLON

## APPLICATION TO THE ZONING BOARD OF APPEALS
### (page 1 of 4)

RECEIVED
APR 29 2016
VILLAGE CLERK'S OFFICE

COUNTY OF SUFFOLK
SS:
STATE OF NEW YORK

_Mark Anthony Munisteri_ being duly sworn,

deposes and says that he/she (or) they is/are _Agent of Owner_ of the property
described below.                                    Owner or Agent of owner

That all statements made in this application are true to the best of his (or) her knowledge and belief, except as to the matters therein stated to be alleged on information and belief and as to the matters he (or) she believes the same to be true.  He (or) she understands the requirements of this application with regards to the submittal of plot plans, other drawings and the posting of public notices.

(if owner is applicant, **all owners** must sign)

ALBERT J ROCCO
Notary Public, State of New York
Registration #01RO6335696
Qualified in Nassau County
Commission Expires Jan. 19, 20___

Sworn before me this
29 Day of April 20 16

_Alberto Rocco_
Notary Public, Suffolk County

In the Matter of the Application of:

|  | Owner of Property if Other Than Applicant |
|---|---|
| Applicant's Name: Mark Anthony Architects | Name: Harold Baldauf |
| Address: 1563 Bellmore Ave | Address: 50 Thompson Ave |
| Bellmore NY 11710 | Babylon, NY 11702 |

Telephone No: 516-409-1900        Alternate Telephone No: ___

Property Address or Description of Location: 50 Thompson Ave
Babylon, NY 11702

---

FOR VILLAGE CLERK ONLY:

Zoned: **A-11**        Section **13**        Block **2**        Lot **6**

For Plans Examiner Only:

Plans Reviewed _____        No Variance Required ____   Variance Required ____   (see attached
            (date)                                                               comments)

3

(Revised 7/7/2015)
Lepper    105

# VILLAGE OF BABYLON

## APPLICATION TO THE BOARD OF APPEALS
### (page 2 of 4)

Description of relief sought, attach separate sheet if necessary:

We are asking for a Minimum Side Yard setback of
7.2' for the treehouse, 5.27' for the garage and 3.67'
for the shed. We are also requesting a shed height of
21.1' and a treehouse/playground of 192 s.f.

### *** PLEASE NOTE ***

Variances required will be included whether or not listed above, as deemed necessary, and as determined by the Site Plans Examiner and the Zoning Board of Appeals, after review of the plans submitted with this application. The legal notice for this application will be derived based on the plans submitted.

1.  Has a building permit been refused by Building Inspector? *No* ....

2.  Is there a school, house of worship, or hospital within 500 ft. of this premises? *No*.

3.  Approximate cost of work this application is made for?$ *$45,000.* ....

4.  Is this premises with 500 feet of (Answer Yes or No):

    . *No* . . . Boundary of any Village or Town

    . *No* . . . Boundary of any existing or proposed County, State, or Federal park.

    . . *No* . . . The right of way of any existing or proposed County or State parkway, thruway, expressway, road or highway.

    . . *No* . . The existing or proposed right of way of any stream or drainage Channel owned by the County or for which the County has established Channel lines.

    . . . *No* . . The existing or proposed boundary of any other County, State or Federal owned land.

    . *Yes* . . The Atlantic Ocean, Long Island Sound, any bay in Suffolk County, Or estuary of any of the foregoing bodies of water.

(Revised 7/7/2015)
Lepper   106

# VILLAGE OF BABYLON

## APPLICATION TO THE ZONING BOARD OF APPEALS
### (page 1 of 4)

RECEIVED
APR 29 2016
VILLAGE CLERK'S OFFICE

COUNTY OF SUFFOLK
SS:
STATE OF NEW YORK

____Mark Anthony Munisteri____ being duly sworn,

deposes and says that he/she (or) they is/are ____Agent of Owner____ of the property
described below.                                                    Owner or Agent of owner

That all statements made in this application are true to the best of his (or) her knowledge and
belief, except as to the matters therein stated to be alleged on information and belief and as to
the matters he (or) she believes the same to be true. He (or) she understands the requirements
of this application with regards to the submittal of plot plans, other drawings and the posting of
public notices.

ALBERT J ROCCO
Notary Public, State of New York
Registration #01RO6335899
Qualified in Nassau County
Commission Expires Jan. 19, 202__

(if owner is applicant, all owners must sign)

Sworn before me this
..29.... Day of April
....Albert Rocco....
Notary Public, Suffolk County

## In the Matter of the Application of:

Owner of Property if Other Than Applicant

Applicant's Name: Mark Anthony Architects   Name: Harold Baldauf

Address: 1563 Bellmore Ave   Address: 50 Thompson Ave

Bellmore NY 11710   Babylon, NY 11702

Telephone No: 516-409-1900   Alternate Telephone No: ..............

Property Address or Description of Location: 50 Thompson Ave
Babylon, NY 11702

FOR VILLAGE CLERK ONLY:

Zoned: A-11   Section 13   Block 2   Lot 6

For Plans Examiner Only:

Plans Reviewed _____ No Variance Required ____ Variance Required ____ (see attached
(date)                                                                                        comments)

3

(Revised 7/7/2015)
Lepper   107

# VILLAGE OF BABYLON

## APPLICATION TO THE ZONING BOARD OF APPEALS
### (page 1 of 4)

RECEIVED

APR 29 2016

VILLAGE CLERK'S OFFICE

COUNTY OF SUFFOLK
SS:
STATE OF NEW YORK

Mark Anthony Munisteri being duly sworn,

deposes and says that he/she (or) they is/are ___Agent of Owner___ of the property
described below.                               Owner or Agent of owner

That all statements made in this application are true to the best of his (or) her knowledge and belief, except as to the matters therein stated to be alleged on information and belief and as to the matters he (or) she believes the same to be true. He (or) she understands the requirements of this application with regards to the submittal of plot plans, other drawings and the posting of public notices.

ALBERT J ROCCO
Notary Public, State of New York
Registration #01RO6335699
Qualified In Nassau County
Commission Expires Jan. 19, 20__

Sworn before me this                                    (if owner is applicant, all owners must sign)

..29.... Day of ...

..............Rocco...........
Notary Public, Suffolk County

## In the Matter of the Application of:

Owner of Property if Other Than Applicant

Applicant's Name: Mark Anthony Architects  Name: Harold Baldauf

Address: 1563 Bellmore Ave            Address: 50 Thompson Ave
........Bellmore NY 11710                    ........Babylon, NY 11702

Telephone No: 516-409-1900        Alternate Telephone No: ......

Property Address or Description of Location: ..50 Thompson Ave
............................................................Babylon, NY 11702

FOR VILLAGE CLERK ONLY:

Zoned: ___A-11___   Section ___13___   Block ___2___   Lot ___6___

For Plans Examiner Only:

Plans Reviewed _____   No Variance Required ____   Variance Required ____   (see attached
                    (date)                                                                              comments)

3

(Revised 7/7/2015)
Lepper        109

# VILLAGE OF BABYLON

## APPLICATION TO THE BOARD OF APPEALS
### (page 2 of 4)

Description of relief sought, attach separate sheet if necessary:

We are asking for a Minimum side yard setback of 7.2' for the treehouse, 5.27' for the garage and 3.67' for the shed. We are also requesting a shed height of 21.1' and a treehouse/playground of 192 s.f.

### *** PLEASE NOTE ***

Variances required will be included whether or not listed above, as deemed necessary, and as determined by the Site Plans Examiner and the Zoning Board of Appeals, after review of the plans submitted with this application. The legal notice for this application will be derived based on the plans submitted.

1. Has a building permit been refused by Building Inspector? . No . . . .

2. Is there a school, house of worship, or hospital within 500 ft. of this premises? No .

3. Approximate cost of work this application is made for?$ . $45,000 . . . .

4. Is this premises with 500 feet of (Answer Yes or No):

. No . . . Boundary of any Village or Town

. No . . . Boundary of any existing or proposed County, State, or Federal park.

. . No . . . The right of way of any existing or proposed County or State parkway, thruway, expressway, road or highway.

. . No . . The existing or proposed right of way of any stream or drainage Channel owned by the County or for which the County has established Channel lines.

. . . No . . The existing or proposed boundary of any other County, State or Federal owned land.

. Yes . . The Atlantic Ocean, Long Island Sound, any bay in Suffolk County, Or estuary of any of the foregoing bodies of water.

(Revised 7/7/2015)
Lepper 110

# *Office of the Village Clerk*

Date received  11 | 10 | 16          **REQUIRED RESPONSE DATE**  11 | 17 | 16

DEPARTMENT to compile documents requested and to receive FOIL
request:
(circle)
~~Village Clerk~~
~~Joel~~
~~Mayor~~
Treasurer
~~Building~~
~~ZBA~~
~~architectural Review~~

(circle who to get copies) other than Village Clerk and above:

~~Joel~~

~~Mayor~~
Treasurer
~~Building~~

Total pages_____Fee due @ .25 per page_____

Date documents will be available if not on response date_____

Letter sent_____

*[handwritten: PM 5/16
- Ms. Parenti called and if decision ltr. is ready after ZBA meeting marked for FOIL]*

**APPLIC.** *[handwritten: ON]* **C RECOR** *[stamp: RECEIVED NOV 10 2016 VILLAGE CLERK'S OFFICE]* *[handwritten: 11³⁰ am]*

TO: **RECORDS ACCESS OFFICER**
**VILLAGE OF BABYLON**
**153 W MAIN ST**
**BABYLON, NEW YORK 11702**

*[handwritten: 12/6/16
- called to see if she still wanted FOIL - LM]*

I hereby apply to (check one) _____

Or  ✓  :cord:

① *[handwritten: Architectural revis ____ ...s, in regards to 50 Thompson Ave March 31, 2016 Babylon, NY]*

Print name ___ *[handwritten: Jeanette Parenti]*

Mailing address ___ *[handwritten: 7 Troy Place Merrick, NY 11566]*

Daytime Phone # ___ *[handwritten: 516 510 7134]*

Signature ___ *[handwritten signature]*

Representing ___ *[handwritten: Harold Baldauf]*

*[handwritten: ② 6-15-16 Zoning Board Meeting minutes in relation to 50 Thompson Ave Babylon, NY]*

*[handwritten: ③ 7-20-16 Zoning Board Meeting minutes in relation to 50 Thompson Ave Babylon, NY]*

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

APPROVED _____  OR
DENIED _____ ( FOR THE REASON CHECKED BELOW):

_____ CONFIDENTIAL DISCLOSURE _____ PART OF INVESTIGATORY FILES
_____ UNWARRANTED INVASION OF PERSONAL PRIVACY
_____ RECORD OF WHICH THIS AGENCY AS LEGAL CUSTODIAN CANNOT BE FOUND
_____ EXEMPTED BY STATUTE OTHER THAN THE FREEDOM OF INFORMATION ACT
_____ OTHER _____

SIGNATURE _____   TITLE _____   DATE _____

Notice: You have the right to appeal a denial of this application to the Board of Trustees, Village of Babylon, 153 West Main Street, Babylon, New York 11702, who must fully explain the reasons for such denial in writing seven days after receipt of an appeal.

I hereby appeal:

Signature _____   Date _____

Lepper   112

# EXHIBIT "Y"



**CM &M CAMPOLO, MIDDLETON & McCORMICK, LLP**

May 26, 2021

**BY ECF**

Honorable Joan M. Azrack
U.S. District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**Re:  John Lepper, et al. v. Village of Babylon, et al.**
**2:18-cv-7011 (JMA)(AYS)**

Dear Judge Azrack:

This firm represents nonparty Linda Scordino in connection with a subpoena served by Plaintiffs'
counsel, dated May 18, 2021 ("Subpoena"). The Subpoena seeks the production of "Proof of death
of Ralph Scordino, including but not limited to a certified copy of a death certificate." The
Subpoena is dated May 18, 2021, and returnable today, May 26, 2021.

Despite the brief return date, Mrs. Scordino has obtained a copy of the certified death certificate
and intends to produce it. However, Mrs. Scordino respectfully requests that production of the
certified death certificate be subject to a confidentiality agreement or protective order prohibiting
Plaintiffs from disseminating it on social media, in the press, or any other public forums.
Unfortunately, Plaintiffs have previously engaged in conduct designed to embarrass Mrs. Scordino
and her family by, among other things, publishing deposition testimony and harassing them on
social media. Mrs. Scordino and her family fear that Plaintiffs will resort to their harassing antics
if they receive a copy of the death certificate.

I contacted Plaintiffs' counsel by e-mail on May 25, 2021, asking whether Plaintiffs would execute
a confidentiality agreement. I have not received a response. Accordingly, Mrs. Scordino requests
the Court issue a protective order prohibiting Plaintiffs from distributing the death certificate to
any person not a party to this litigation or from publishing the death certificate or its contents on
any form of social media or any other public forum.

Thank you for your consideration. We are available at the Court's convenience to address any
questions.

Respectfully submitted,

**CAMPOLO, MIDDLETON
& McCORMICK, LLP**

*/s/ Patrick McCormick*
By: Patrick McCormick, Esq.
Attorneys for Linda Scordino

cc:     *All parties via ECF*



# CM
# &M CAMPOLO, MIDDLETON & McCORMICK, LLP

June 7, 2021

## BY ECF

Honorable Joan M. Azrack
U.S. District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**Re:** **John Lepper, et al. v. Village of Babylon, et al.**
**2:18-cv-7011 (JMA)(AYS)**

Dear Judge Azrack:

This firm represents nonparty Linda Scordino in connection with a subpoena served by Plaintiffs' counsel, dated May 18, 2021 ("Subpoena"). We write in response to Plaintiffs' counsel's letter dated May 28, 2021 (ECF Doc. No. 118), wherein he objects to the production of Mr. Scordino's certified death certificate conditioned on a confidentiality agreement or protective order.

As acknowledged by Plaintiffs' counsel in his letter, it is the public policy of New York State that certified death certificates are not publicly available for everyone to access. If they were, Plaintiffs' counsel would not have to resort to the subpoena process. In accordance with that policy, Mrs. Scordino merely requests that the status quo continue and that her late husband's certified death certificate not be made publicly available and its use limited to genuine litigation purposes only.

Additionally, Plaintiffs' and their counsel's history of harassing conduct provides further basis for shielding Mr. Scordino's certified death certificate from public viewing. During the deposition of Mr. Scordino in a case about the propriety of the tree house, Plaintiffs' counsel seized the opportunity to embarrass him by asking lines of completely irrelevant and inappropriate questions. For example, Mr. Scordino was questioned about his marriage, infidelity, and his wife's health issues.

Just months after Mr. Scordino's death, Plaintiff John Lepper posted on social media that he was willing to send the "video depositions" to anyone who asked and that he was "not afraid to share any and ALL of the public records involving me!" Based on this information and showing of prior conduct demonstrating how Plaintiffs and their counsel are willing to use public documents to harass and humiliate Mr. Scordino and his family, it leads to the conclusion that Plaintiffs may attempt to use the certified death certificate in the same way. This is not a fear a family should have when producing a death certificate in the course of litigation while they still grieve the loss of a loved one.

*June 7, 2021*
*Page 2*

Thank you for your consideration. We are available at the Court's convenience to address any questions.

Respectfully submitted,

**CAMPOLO, MIDDLETON
& McCORMICK, LLP**

*/s/ Patrick McCormick*
By: Patrick McCormick, Esq.
Attorneys for Linda Scordino

cc:     *All parties via ECF*



## Vote for Babylon
@voteforbabylon · Political Organization

Learn More

sites.google.com



Vote for Babylon
February 22 · ▪

An update from the Vote for Babylon campaign.

Key take-aways:
1. We will NOT be on the official ballot on 3/16.
2. We are STILL RUNNING and plan to win via write-in campaign.
3. We need your support now more than ever! Message us if you can volunteer or make a contribution.

#writethemontheballot #votethemin

As you may know, a Village resident filed a formal Challenge with the Village Clerk and Suffolk County Board Elections (SCBOE) against the signature petitions we collected. Unfortunately, it was found that we used an incorrect nominating petition document (a party form instead of individual form.) We were hopeful that the BOE would overlook this minor error and would respect the intent of the 250+ residents that signed our petitions and wanted to see our four names on the 2021 ballot

We were informed Saturday afternoon of the BOE's decision to uphold the challenge and deem our Nominating Petition invalid. Sadly, our names, as your candidates, will not appear on the official ballot and we will not be permitted to have poll watchers on site the day of the election to witness the counting of your votes. Despite following up regularly on this pending decision, our candidates were the last to be notified about this. The local newspapers, Village, Town and County elected officials and even our election attorney had the information before we did. This points to the fact that political connections WIN and average citizens who want to step up, do the right thing, and lead their communities are left behind

This was a shock to us as it is widely known that elected officials have mutually agreed to NOT challenge election petitions this year given the challenge inherent with collecting in-person signatures during a global pandemic. It seems that this common courtesy was overlooked in our case

We are certain our neighbor who filed this challenge did not act alone. The documents filed included information and detail above the experience level of the average layperson. We urge you to ask yourself Who stands to gain from this filing and decision, and who loses with this decision? It is clear that the Vote for Babylon party was deemed to be a threat and someone has gone to great lengths and expense to keep us off the ballot. This should be extremely disturbing to every citizen to this village. When will they try to silence you?

DOCS.GOOGLE.COM

Letter from VFB 2/22/2021
February 22, 2021 To all Babylon Village residents, As you may kno...







**All Comments**

Write a comment...

**Andrew Cone**
Your team filled out the paperwork incorrect on an election to run a village. They had plenty of people who could look to make sure it was correct. It should be disturbing that with all the help that was around them they failed.

Like · Reply · 17w                                                                  1

13 Replies

**Annette Wanderer**
Has the Party filed a Freedom of Information Request to find out who the "concerned citizen" is?

Like · Reply · 17w                                                                  3

1 Reply

**Eddie May**
Funny how their campaign literature call themselves the experience party when 3 candidates all have less than 3 months on the board.

Like · Reply · 17w                                                                  5

9 Replies

**Kelly Peckholdt**
We are so looking forward to the opportunity to serve you, the village residents. You deserve a choice!



Vote for Babylon          Learn More          Like          Message

Like · Reply · 17w                                                                  7

**JC Jennifer**
Definitely will be writing all your names on the ballot!

Like · Reply · 17w                                                                  7

**Kathy Collins Hoffman**
Shout from the rooftops, share with everyone you know...do not allow them to silence you.

Like · Reply · 17w · Edited                                                          6

**Oo Jeo**
The BBP lost any credibility with this move. Babylon village residents deserve a choice!

Like · Reply · 17w                                                                  7

**Dennis Mulhall**
I am more determined to see ur team elected.

Like · Reply · 17w                                                                  6

**Christine Chapman**
Some very petty and pathetic people out there. This guy



6/23/2021                                      (1) Vote for Babylon - Posts | Facebook

                      

 **John Lepper**
Corruption at every level of government... These people are dirty and pathetic!!! Happy to help any way I can... love to share my story and my experiences with the BBP... in fact I have the video depositions of the former BBP everyone can watch it for themselves! I'm not afraid to share any and ALL of the public records involving me! Can't say the same for the BBP! Send me your email and I'll send you a copy

Like · **Reply** · 17w · Edited

**Write a comment...**

**OTHER POSTS**

 **Vote for Babylon**
March 17 · 

On behalf of our campaign team, we want to thank the record number of Babylon residents who not only took the time to come out and vote last night but made the extra effort to learn the process and physically write our names on the ballot. Never in Babylon history has this effort been made and we owe you all tremendous thanks.

We also received tremendous support along the way and met some really caring people with amazing suggestions. We hope to keep up this momentum of cit... **See More**

 39                                    20 Comments  4 Shares

|  Like |  Comment |  Share |

Most Relevant 

 Write a comment...           

 **Becca Kennedy Seibert Nast**
It would be so great if you all take the next few years to get more experience with local government processes

Like · **Reply** · 13w                              1

**View 11 more comments**

 **Vote for Babylon** is in **Babylon, New York**.
March 16 · 

Voted!!! So proud to have voted and to be a part of this election! Thank you all from the bottom of my heart for your amazing support!

Please VOTE today!... **See More**





# EXHIBIT "Z"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant          JMA, AYS
children, B.J.L. and B.I.,

                     Plaintiffs,          **AFFIDAVIT**

   - against -

VILLAGE OF BABYLON; and, RALPH          **Judge: Honorable**
SCORDINO, Mayor, KEVIN MULDOWNEY,          **Joan M. Azrack, U.S.D.J.**
Deputy Mayor, ROBYN SILVESTRI, Village          **(Shields, A., U.S.M.J.)**
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                    Defendants.
-------------------------------------------------------------------X

STATE OF NEW YORK          )
                  ) ss.:
COUNTY OF          )

    Mary Adams, being duly sworn deposes and says:

    1.    I am a defendant in this litigation and make this affidavit in support of the

motions to dismiss the complaint.

    2,    I served as Village Trustee from June 15, 2016, until the untimely death of the

late Mayor Ralph Scordino. I was inaugurated to the office of Mayor of the Village of Babylon

on October 30, 2020, and I have served as Mayor since October 30, 2020.

    3,    I have held no other office or position with the Village of Babylon other than my

positions as Trustee and Mayor. I am familiar with the claims of the Plaintiffs and make this affidavit based on personal knowledge of my activity related to the subject building structure on the property of John and Noelle Lepper that they call a tree house.

4.     I have had no discussion with John or Noelle Lepper about the tree house or any matters related to the tree house.

5.     In my role as Trustee and Mayor, I was kept advised of the status of the matter involving John Lepper by our counsel Gerard Glass and by Stephen Fellman.  Both Gerard Glass, who had served as Village Attorney, and Stephen Fellman, who has been serving as building inspector, have reported to me in their official capacities while I am Mayor.  Before I became Mayor they reported to the late Ralph Scordino.

6.     All action undertaken by the Village of Babylon through the building department or through the prosecution of tickets undertaken by the attorney for the Village of Babylon was to enforce codes related to the tree house alleged in the complaint. I have been advised that some tickets issued to Mr. Lepper were dismissed on appeal on procedural grounds. I know of no wrongful acts or omissions on the part of any defendant in this case as alleged in the complaint of the Plaintiffs.

7.     I am told that Mr. Lepper complained of reports made about him to the fire department and the police department. I have not made any reports or complaints concerning Mr. Lepper to the fire department or to the police department. I was not consulted about making any such reports and no one has requested that I participate or make any decisions about reporting or complaining about Mr. Lepper to the police department or the fire department or any other agency.

8.     John Lepper has appeared at public meetings and made statements. At times, his

conduct was belligerent in tone. The office of Code Enforcement for the Village of Babylon has requested police presence at board meetings, but no report was made to the police specifically about John Lepper. Rather, police had been called to avoid conflict during the meetings.

9.      I am advised that a complaint was filed by John Lepper in January 2021. No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2021 with reference to this matter. I have not waived service of the summons and complaint.

10.     The Village does not waive proper service of the summons and complaint.

Mary Adams

Sworn to before me this

day of June 2021.

NOTARY PUBLIC

Graceanne Sawczyn
Notary Public, State of New York
No. 01SA6225053
Qualified in Suffolk County

7/19/22.

EXHIBIT "AA"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant          JMA, AYS
children, B.J.L. and B.I.,

                          Plaintiffs,                          **AFFIDAVIT**

          - against -

                                                               **Judge: Honorable**
VILLAGE OF BABYLON; and, RALPH                                 **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,                             **(Shields, A., U.S.M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                          Defendants.
-----------------------------------------------------------------X


STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF _Suffolk_      )



Robyn Silvestri, being duly sworn deposes and says:

     1.     I am a defendant in this litigation and make this affidavit in support of the

motions to dismiss the complaint.

2,     I have been a Trustee with the Village of Babylon since July 2018 and currently serve as Trustee.

3,     I have held no other office or position with the Village of Babylon other than my position as Trustee. I am familiar with the claims of the Plaintiffs and make this affidavit based on personal knowledge of my activity related to the subject building structure on the property of John and Noelle Lepper that they call a tree house.

4,     I have had no discussion with John or Noelle Lepper about the tree house or any matters related to the tree house.

5.     In my role as Trustee, I was kept advised of the status of the matter involving John Lepper by our counsel Gerard Glass.

6.     All action undertaken by the Village of Babylon through the building department or through the prosecution of tickets undertaken by the attorney for the Village of Babylon was to enforce codes related to the tree house alleged in the complaint. I have been advised that some tickets issued to Mr. Lepper were dismissed on appeal on procedural grounds. I know of no wrongful acts or omissions on the part of any defendant in this case as alleged in the complaint of the Plaintiffs.

7.     I am told that Mr. Lepper complained of reports made about him to the fire department and the police department. I have not made any reports or complaints concerning Mr. Lepper to the fire department or to the police department. I was not consulted about making any such reports and no one has requested that I participate or make any decisions about reporting or complaining about Mr. Lepper to the police department or the fire department or any other agency.

8.     I am advised that a complaint was filed by John Lepper in January 2021. No process server and no one on behalf of John Lepper has handed me or served me with a summons or complaint in 2021 with reference to this matter. I have not waived service of the summons and complaint.

Robyn Silvestri

Sworn to before me this

22 day of June 2021.

NOTARY PUBLIC

MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
My Commission Expires April 18, 2023

# EXHIBIT "AB"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant          JMA, AYS
children, B.J.L. and B.I.,

                       Plaintiffs,          **AFFIDAVIT**

   - against -

                                **Judge: Honorable**
VILLAGE OF BABYLON; and, RALPH          **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,          **(Shields, A., U.S.M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                       Defendants.
--------------------------------------------------------------------X


STATE OF NEW YORK      )
                     ) ss.:
COUNTY OF SUFFOLK    )


    Jean Marie Parker being duly sworn deposes and says:

    1.    I am not a named party to this litigation.

    2.    I serve and have served as Village Clerk for the Village of Babylon since June 25,

2018.

3.     On January 4, 2021, one of my office staff, Jennifer Lister, brought a packet of papers to me that was handed to her at the front door of Village Hall. I looked at the papers and recognized them to be copies of a summons and complaint with docket number CV-21 0014.

4.     I have not designated any person to accept service of process on my behalf.

5.     Neither John Lepper nor anyone on his behalf handed me papers with docket number CV-21 0014.

6.     I had asked Jennifer Lister, who received papers at the door, if John Lepper had handed her the papers. She did not know. I showed her a photograph of John Lepper that I found on the internet. She recognized the photograph of John Lepper to be the man who had handed her the papers.

7.     There is no record of attempted service of the summons and complaint under docket number CV-21 0014 on anyone in my office other than the papers handed to Jennifer Lister on January 4, 2021.

Jean Marie Parker

Jean Marie Parker

Sworn to before me this

23 day of June 2021.

Marietta C Menchini

NOTARY PUBLIC
MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
Commission Expires April 18, 2023

# EXHIBIT "AC"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JOHN LEPPER and NOELLE LEPPER, individually          Docket No.: 2:18-cv-07011
and as parents and natural guardians of their infant              JMA, AYS
children, B.J.L. and B.I.,

                            Plaintiffs,                 **AFFIDAVIT**

        - against -

                                                       **Judge: Honorable**
VILLAGE OF BABYLON; and, RALPH                         **Joan M. Azrack, U.S.D.J.**
SCORDINO, Mayor, KEVIN MULDOWNEY,                      **(Shields, A., U.S.M.J.)**
Deputy Mayor, ROBYN SILVESTRI, Village
Trustee, TONY DAVIDA, Village Trustee, MARY
ADAMS, Village Trustee; STEPHEN FELLMAN,
Village of Babylon Building Inspector; SUZANNE
SCHETTINO, Department of Public Works;
GERARD GLASS, Esq., Village of Babylon
Attorney; DEBORAH LONGO, Planning Board,
Village of Babylon, each individually and in their
official capacity, and John and/or Jane Doe,
unnamed, unidentified complainants,

                            Defendants.

-------------------------------------------------------------------X

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF SUFFOLK          )

        Jennifer Lister being duly sworn deposes and says:

        1.      I am not a party to this litigation.

        2.      I am an office assistant to the Babylon Village Clerk, Jean Marie Parker, and I
started my employment with the Village of Babylon in October 2020.

        3.      On January 4, 2021, I was working at Village Hall in the Village Clerk's Office
when someone called the office and spoke to me on the telephone. A man, who did not identify

himself, said he had papers to drop off and did not identify what type of papers they were. I answered the door and was handed a packet of papers. The man, who was wearing a COVID mask, told me that the papers were for everyone listed. I did not know that he was handing me copies of a summons and complaint at that time.

4.     I am not and have not been designated as a party authorized to accept service of process on behalf of the Village of Babylon, the Village Clerk or any parties to this lawsuit.

5.     I did not represent to the man that I could accept service on behalf of any party.

6.     After I brought the papers into the office, I gave the papers to Jean Marie Parker. Ms. Parker asked me if the man who gave me the papers was John Lepper. I had not seen him before, so I did not know who he was. Ms. Parker then showed me a picture of John Lepper taken from the internet. Underneath the internet photograph was the name John Lepper. The man who handed me the papers looked like the internet photograph of John Lepper.

7.     Another man with a clipboard stood behind Mr. Lepper at the time Mr. Lepper handed me the packet of papers. I do not know who that man is.

Jennifer Lister

Sworn to before me this

23 day of June 2021.

NOTARY PUBLIC

MARIETTA C MENCHINI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME6239065
Qualified in Suffolk County
My Commission Expires April 18, 20 23