John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

168

                    Longo

1                   Longo
2           A.    Who complained?
3           Q.    On behalf of whom did you
4    investigate such complaint?
5           A.    He stated it to Mr. Fellman, so
6    when Mr. Fellman left the office, he went past
7    it, is my recollection, he went past the
8    platform.
9           Q.    What, if anything, occurred?
10          A.    He took a picture, and then he
11   would have either come back to the office or
12   called the office and asked me to send a
13   letter saying he might need a building permit.
14          Q.    Anything else?
15          A.    At that time, no.
16          Q.    What about a later time?
17          A.    When there was -- at some point a
18   notice of violation was sent when, I believe
19   there was no answer.  I know Mr. Lepper came
20   up at one point and then didn't, I believe
21   didn't follow through, and a notice of
22   violation was sent and then the summonses were
23   written.
24          Q.    When you say didn't follow
25   through, can you explain to what you're

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

169

```
 1                    Longo
 2  referring?
 3       A.     I'm try to remember.  I know that
 4  he came up with some drawings, and I said I
 5  would show them -- I said I would take them
 6  in, give them to the building inspector.  The
 7  building inspector said he wanted plans, not
 8  hand drawn and I had left a message on
 9  Mr. Lepper's phone to that effect that plans
10  were required, and we never heard from him
11  again.  And then Mr. Fellman asked me to send
12  a violation.
13       Q.     What number did you use?
14       A.     What phone number?  Whatever was
15  one the building permit application, that he
16  gave me with his hand drawing for the tree
17  house.
18       Q.     You were responsible for --
19              Withdrawn.
20              You were responsible for issuing
21  that notice of violation?
22              MR. TOSCA:  Objection.
23              You can answer.
24       A.     No, I wasn't responsible.
25  Mr. Fellman asked me to send it.
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

202

                        Longo

1
2    to look at it or see if it was progressing

3    without benefit of permit.  That would be it.

4    It wasn't like a topic of discussion.

5          Q.     But after you were sued, it

6    became a topic of discussion, right?

7                  MR. TOSCA:  Objection.

8          A.     No.

9          Q.     You had discussion about being

10   upset about the tree house, correct?

11                 MR. TOSCA:  Objection.

12                 You can answer.

13         A.     Any normal person would.

14         Q.     Ma'am, did you issue a letter to

15   John Lepper stating that he could be fined

16   daily?

17         A.     Yes.

18         Q.     Do you think that would upset

19   Mr. Lepper?

20                 MR. TOSCA:  Objection.

21         A.     I wouldn't know what would upset

22   him.

23         Q.     If you receive a letter that said

24   you could be fined daily, would you be upset?

25                 MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

211

```
 1              Longo
 2   correct?
 3              MR. TOSCA:  Objection.
 4      A.    I didn't review them.
 5      Q.    Have you ever make a
 6   determination that the Lepper family tree
 7   house is unsafe?
 8              MR. TOSCA:  Objection.
 9      A.    Me?  No.
10      Q.    Did anyone make such a
11   determination?
12              MR. TOSCA:  Objection.
13              You can answer.
14      A.    I don't know that that could be
15   made.
16      Q.    Why not?
17      A.    We don't have any plans.
18      Q.    So if the Village of Babylon
19   Building Department said that the tree house
20   was unsafe, you don't know that determination
21   could be made?
22              MR. TOSCA:  Objection.
23              You can answer.
24      A.    I have no idea.  If Mr. Fellman
25   determined it, I don't know how I would be
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

212

Longo

1    involved in that.  That's not my job.

3        Q.    Ma'am, you're the secretary to
4    the building inspector for the Village of
5    Babylon, correct?

6            MR. TOSCA:  Objection.

7        A.    Correct.

8        Q.    It's your job to relay messages
9    to and Stephen Fellman --

10       A.    Yes.

11       Q.    -- the Village of Babylon
12   building inspector?

13       A.    Yes.

14       Q.    Did you do so in the matter of a
15   tree house?

16       A.    Yes.

17       Q.    Do you agree with this statement
18   purportedly made --

19            Withdrawn.

20            Are you aware of whether the
21   mayor stated quote, structures like this tree
22   house require a building permit to make sure
23   they are safe, not a fire hazard and that they
24   don't unfairly impact the privacy and other
25   rights of homeowner neighbors end quote?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

213

1                    Longo

2          MR. TOSCA:  Objection.

3      A.    I don't know whether he stated

4  that or not.

5      Q.    Is it that you don't remember,

6  you don't recall, or something else?

7      A.    I just don't recall.

8      Q.    Do you know if Mr. Fellman ever

9  had inspected the Lepper family tree house?

10         MR. TOSCA:  Objection.

11         You can answer.

12     A.    Not to my knowledge.

13     Q.    What about to somebody else's

14 knowledge?

15         MR. TOSCA:  Objection.

16         You can answer.

17     A.    I wouldn't know.  I don't know.

18     Q.    What do you know, did he or did

19 he not inspect?

20     A.    As far as I know, he did not.

21     Q.    Reasonable to assume that as

22 secretary to the building inspector for the

23 Village of Babylon, you would know whether or

24 not inspections occur within the Village of

25 Babylon, correct?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

214

1                    Longo

2        A.     Yes.

3               MR. TOSCA:  Objection.

4        Q.     Is there any confusion as to

5   whether an inspection occurred at the Lepper

6   family residence regarding a tree house?

7        A.     There's no confusion.  I didn't

8   ask him, send him inspections to do anything.

9   He never asked me to put it in his book.  I

10  don't know anything about it.  If he did it,

11  he did it outside the parameters of working at

12  the Village.

13       Q.     Because you would know as the

14  secretary to the building inspector for the

15  Village of Babylon?

16              MR. TOSCA:  Objection.

17              MR. MORRIS:  Counsel, are you

18       instructing your witness not to answer?

19       It seems like she's waiting --

20              MR. TOSCA:  That wasn't a

21       question, you made a statement to her.

22       Q.     Did you ask Mr. Fellman to

23  inspect Mr. Lepper's tree house?

24       A.     No.

25              MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

215

1                     Longo

2         A.     He went past it, not to inspect

3    it.

4         Q.     As secretary to the building

5    inspector for the Village of Babylon, was

6    there inspection done on Mr. Lepper's tree

7    house?

8                 MR. TOSCA:  Objection.

9                 You can answer.

10        A.     An inspection, not to my

11   knowledge.

12        Q.     So you don't know?

13        A.     No.

14        Q.     Who would know?

15        A.     Mr. Fellman.

16                MR. MORRIS:  Can I have this

17           marked, please.

18                (Whereupon, a document entitled a

19           letter from the Mayor about tree houses

20           and other things was marked as Longo

21           Exhibit 1 for identification as of

22           today's date.)

23        Q.     Ms. Longo, I'm going to pass you

24   what has been marked as Plaintiff's Exhibit 1.

25        A.     (Witness perusing document.)

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

216

1                       Longo

2          Q.     Ma'am, have you had an

3    opportunity to review that document?

4          A.     Um-hum.

5          Q.     Have you ever seen what has been

6    marked as Longo Exhibit 1 for identification?

7          A.     Now that I'm looking at it, a

8    very vague recollection of it but.

9          Q.     So the answer is yes, right?

10         A.     Um-hum.

11         Q.     What were the circumstances under

12   which you first saw the document in front of

13   you?

14         A.     I believe -- I'm trying to

15   remember.  Possibly it was given me to have

16   Steve look at.

17         Q.     Is that your testimony, ma'am?

18         A.     Yeah.

19         Q.     So where were you when you first

20   received this?

21         A.     I honestly don't remember.  I

22   don't remember.

23         Q.     Ma'am, the mayor ever write about

24   a tree house before?

25         A.     No.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

217

1                       Longo

2          Q.    Do you know where this document

3     was originally located when you saw it?

4          A.    I don't remember whether it was

5     e-mailed to or handed to me for Steve to

6     review.

7          Q.    You say for Steve to review.

8                Under what circumstances did you

9     receive this document?

10         A.    I would imagine -- I don't know

11    exactly, just for him to review is my

12    recollection.  I guess because his name is in

13    it.

14         Q.    When you received the document

15    initially, did you review it?

16         A.    I'm sure I looked at it quickly,

17    yes.

18         Q.    Did you agree with the document?

19               MR. TOSCA:  Objection.

20               You can answer.

21         A.    It's not my job.

22         Q.    Do you understand my question?

23         A.    Yes.

24         Q.    You have opinions about things,

25    right?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

218

```
 1                    Longo
 2        A.    Um-hum.
 3        Q.    Do you or do you not agree with
 4   this document that's set before you?
 5              MR. TOSCA:  Objection.
 6              You can answer.
 7        A.    Do I think it's safe?  I wouldn't
 8   let my children play in it, so yes I do agree,
 9   it's not safe.
10        Q.    Do you know from where this
11   document came, this Longo Exhibit 1?
12        A.    No.
13        Q.    Do you know who wrote it.
14        A.    I don't know.  I assume the
15   mayor.
16        Q.    When you say you assume the
17   mayor, you work in the Village of Babylon,
18   right?
19        A.    Yes.
20        Q.    Do you know if the mayor sent
21   this?
22        A.    I don't know.
23        Q.    Why don't you know?
24              MR. TOSCA:  Objection.
25              You can answer.
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

219

1                      Longo
2        A.      I don't keep track of the mayor's
3    correspondence.
4        Q.      Do you receive correspondence
5    from the mayor throughout the course of your
6    duties as secretary to the building inspector
7    for the Village of Babylon?
8        A.      On occasion, just what we talked
9    about.
10       Q.      The answer is yes.
11       A.      Um-hum.
12       Q.      You received this in the course
13   of your duties as secretary to the building
14   inspector for Village of Babylon, correct?
15              MR. TOSCA:  Objection.
16              You can answer.
17       A.      Yes.
18       Q.      From where did it come?
19              MR. TOSCA:  Objection.
20              You can answer.
21       A.      I would say probably Suzanne.  I
22   don't recall.
23       Q.      Ma'am, who does Suzanne work for?
24       A.      The mayor.
25       Q.      The mayor of what?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

223

1                    Longo

2    is safe.

3         Q.    That's why these tickets were

4    issued.

5              Is that your testimony?

6              MR. TOSCA:  Objection.

7              You can answer over objection.

8         A.    I would think so.  I didn't issue

9    them so.

10        Q.    When you sent out the request to

11   either remove the tree house in its entirety,

12   you sent out that request, right?

13        A.    I believe so.

14        Q.    Because there is no other tree

15   house to which you sent such a request, right?

16        A.    No.

17        Q.    Just so we're clear, the request

18   that you sent out to remove the tree house in

19   its entirety or face daily fines, does this

20   letter comport with your understanding as to

21   why that letter was sent out by you?

22             MR. TOSCA:  Objection.

23             You can answer over objection.

24        A.    Yes.

25        Q.    Did you ever communicate with

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

228

Longo

1

2          object and move on.

3          Q.     Do you have knowledge of the

4    mayor speaking to residents about the Village

5    of Babylon tree house involving Mr. Lepper;

6    yes or no?

7          A.     Yes, from this letter.

8          Q.     Has anyone ever communicated to

9    you in any fashion, telephone, e-mail

10   face-to-face conversation outside the Village

11   of Babylon about the Lepper family tree house?

12              MR. TOSCA:  Objection.

13              You can answer.

14         A.     Outside of the Village, no.

15         Q.     Did you ever have a conversation

16   with Mr. Glass about the Lepper family tree

17   house?

18         A.     Yes.

19         Q.     Did you have conversations with

20   Mr. Glass about Lepper family tree house

21   before the summonses were issued?

22         A.     I don't remember.

23         Q.     Did you have any participation in

24   the trial of John Lepper in the Village of

25   Babylon?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

231

```
 1                    Longo
 2   it's a three or four times a year newsletter.
 3        Q.    When you say three or four times
 4   a year newsletter, to what are you referring?
 5        A.    Babylon Village newsletter that
 6   every resident in the Village gets, that's the
 7   only thing that would have come from the
 8   Village to my home.
 9        Q.    When I mentioned the mayor, you
10   mentioned the newsletter.
11              Is the mayor responsible for the
12   Babylon Village newsletter?
13              MR. TOSCA:  Objection.
14              You can answer.
15        A.    No, but there is usually a,
16   what's it called, a letter or notice or
17   something from the mayor in there.
18        Q.    Is this where what's been marked
19   as Longo Exhibit 1, is this where that letter
20   was when you first saw it?
21        A.    No.
22        Q.    You saw the letter prior to it
23   becoming part of something else; is a right?
24              MR. TOSCA:  Objection.
25        A.    I was given it to go give to
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

232

1                    Longo
2    Steve is my recollection.
3         Q.    Who gave it to you?
4         A.    Suzanne.
5         Q.    Did you ever speak to the mayor
6    about this letter?
7         A.    No.
8         Q.    Anyone ever tell you quote open
9    the link below and listen to some excellent
10   Cali Reggae the next time the fireman breaks
11   balls?
12        A.    My husband.
13        Q.    Ma'am, you said that very quickly
14   as if you remember your husband said that to
15   you.
16        A.    I do remember.
17        Q.    When you say the fireman breaks
18   balls, to what is he referring?
19        A.    Mr. Lepper.
20        Q.    Why would your husband say that
21   the fireman was breaking balls?
22        A.    Because of this whole thing going
23   on.
24        Q.    Can you explain what you mean
25   when you say thing?

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

                                                    233

                          Longo
1
2          A.     The tree house.
3          Q.     Why is it that your husband is
4    saying that, quote, fireman breaks balls?
5                 MR. TOSCA:  Objection.
6                 You can answer over objection.
7          A.     You would have to ask him.
8          Q.     You need to ask him, is that
9    your --
10         A.     No.  You would have to ask him.
11   I don't know why he would say anything.
12         Q.     He has knowledge of this lawsuit?
13         A.     No, just that I'm named in it.
14         Q.     That would be knowledge, correct?
15                MR. TOSCA:  Objection.
16                You can answer.
17         A.     His wife is named in it,
18   certainly.
19         Q.     Has he used that term break balls
20   with other people before?
21                MR. TOSCA:  Objection.
22                You can answer.
23         A.     Probably.
24         Q.     Do you feel like quote --
25                Withdrawn.

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

234

```
 1                      Longo
 2             Do you feel like the fireman
 3    broke your balls?
 4             MR. TOSCA:  Objection.
 5             You can answer over objection.
 6        A.   I don't feel like anything.
 7        Q.   What, if anything, did you say in
 8    response to, quote, fireman break balls end
 9    quote?
10        A.   I didn't say anything in response
11    to it.
12        Q.   Never mentioned it again, right?
13        A.   No.
14        Q.   Ma'am, do you agree with the
15    quote, the homeowner chose to build this tree
16    house without getting the proper permits, it
17    is now up to him to try the get it right, end
18    quote?
19             MR. TOSCA:  Objection.
20             You can answer.
21        A.   Yes.
22        Q.   Ma'am, who wrote the first letter
23    that you sent to John Lepper?
24             MR. TOSCA:  Objection.
25             You can answer.
```

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

235

1                    Longo

2          A.    I would have wrote it at

3    Mr. Fellman's direction.  He would have told.

4    Actually called me to tell me over the phone

5    what I should put in there.

6          Q.    Did you write it or did he write

7    it?

8          A.    I wrote it at his direction.  He

9    told me what to say in the letter.

10         Q.    Mr. Fellman gave you an order to

11   write a letter to Mr. Lepper, correct?

12         A.    Yes.

13         Q.    You followed that order, correct?

14         A.    Yes.

15         MR. MORRIS:  Time now is 2:13.

16         I'm going to reserve the right to recall

17         this witness based on document

18         production.  I'm going to examine the

19         record to see if we should call

20         Mr. Longo's husband in regards to these

21         notes and his knowledge.

22         MR. TOSCA:  Note my objection.

23         MR. MORRIS:  Record is now

24         closed, 2:14.

25              (Time noted:  2:14 p.m.)

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

236

1

2              A C K N O W L E D G M E N T

3

STATE OF NEW YORK    )
4                            ) SS:
COUNTY OF            )

5

6          I, DEBORAH LONGO, hereby certify

7    that I have read the transcript of my

8    testimony taken under oath in my deposition

9    of October 7, 2019; that the transcript is a

10   true, complete and correct record of my

11   testimony, and that the answers on the record

12   as given by me are true and correct.

13

14

15

16                    _____

17                    DEBORAH LONGO

18

19   Signed and subscribed to before
     me, this _____day
20   of_____, 20__.

21   _____
     Notary Public, State of New York
22

23

24

25

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

237

1

2       ----------------I N D E X--------------------

3       WITNESS          EXAMINATION BY        PAGE

4       DEBORAH LONGO     MR. MORRIS            5

5

6       RULINGS:  64, 67

7

8       ----------------REQUESTS-------------------

9       Page  56   Copies of the forms completed, job

10                 applications, any interview notes

11                 and things the witness mentioned

12                 today

13           76    Preserve and produce privilege logs

14                 for electronic mailings between

15                 Ms. Longo and Mr. Glass

16          114    All e-mails that we requested from

17                 the beginning and pursuant to the

18                 federal rules, if you're

19                 withholding any e-mails, we would

20                 like to know about them

21          120    Preservation and production of all

22                 written notes taken in regards to

23                 this matter including the book

24                 testified to by Ms. Longo

25

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

238

1

2    --------------REQUESTS (continued)------------

3         180   Preservation and

4               production of copy of

5               list of fees

6         208   Entire records as it

7               relates to Mr. Lepper,

8               including the return

9               receipt request

10        224   All e-mails in this case

11

12   -------INFORMATION TO BE FURNISHED-----------

13   PAGE  37   Husband's email address

14

15   -----------------EXHIBITS--------------------

16   LONGO                          FOR I.D.

17   1     Document entitled a letter

18         from the Mayor about tree houses

19         and other things             216

20            (Counsel retained exhibits.)

21

22

23

24

25

John Lepper v. Village of Babylon
Deborah Longo  - October 7, 2019

239

1

2                    C E R T I F I C A T E

3

     STATE OF NEW YORK        )
4                             ) SS:
     COUNTY OF SUFFOLK        )

5

6            I, STEPHANIE O'KEEFFE, a Notary

7    Public within and for the State of New York,

8    do hereby certify:

9            That DEBORAH LONGO, the witness whose

10   deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true

12   record of the testimony given by such witness.

13           I further certify that I am not

14   related to any of the parties to this action

15   by blood or marriage; and that I am in no way

16   interested in the outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto

18   set my hand this 7th day of October, 2019.

19

20

21

22   _____

23   STEPHANIE O'KEEFFE

24

25

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
JOHN LEPPER and NOELLE LEPPER, individually

and as parents and natural guardians of

their infant children, B.J.L and B.I.,

                          Plaintiffs,

          - against -

VILLAGE OF BABYLON; and, RALPH SCORDINO, mayor,

KEVIN MULDOWNEY, deputy mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of

Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; DEBORAH LONGO, Planning

Board, Village of Babylon, each individually

and in their official capacity, and John

and/or Jane Doe, unnamed, unidentified

complainants,

                          Defendants.

Index No.:  2:18-cv-07011 JFB-GRB
----------------------------------------x
                     135 Pinelawn Road
                     Melville, New York

RALPH A. SCORDINO
                     December 5, 2019
                     10:11 a.m.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

66

1                    R. SCORDINO

2        A.    Trustee Kevin Muldowney, deputy

3   mayor Kevin Muldowney, and Trustee Tony

4   Davida.

5        Q.    Anyone else?

6        A.    No.

7        Q.    Have you played with any other

8   employees aside from the trustees you just

9   mentioned?

10            MR. TOSCA:  Objection.

11       A.    At that golf course?

12       Q.    At any golf course?

13       A.    Let's see.

14            THE WITNESS:  Can I speak to

15       counsel?

16            MR. MORRIS:  Not when a question

17       is pending.

18            MR. TOSCA:  You have to answer

19       the question.

20       A.    Yes.

21       Q.    Who are those people?

22       A.    Jack Rafter.

23       Q.    How often do you play golf with

24   Jack Rafter?

25       A.    Probably once every summer.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

67

                        R. SCORDINO
 1
 2       Q.     Who is Jack Rafter?
 3       A.     He is our judge.
 4       Q.     Do you want to go speak to
 5  counsel now?
 6       A.     No, it's all right.
 7       Q.     Is there something about Jack
 8  Rafter that you need to seek legal advice?
 9              MR. TOSCA:  Objection.
10       A.     I just wanted to find out if I
11  had to answer the question.
12       Q.     Any reason why you wouldn't want
13  to answer that question, sir?
14              MR. TOSCA:  Objection.
15       A.     Pardon me?
16       Q.     Any reason --
17       A.     I'm not an attorney.
18       Q.     And you thought it wise to seek
19  legal counsel?
20       A.     Because he's representing me.
21       Q.     You got two attorneys here?
22       A.     Right, Village attorney and --
23  yes.
24       Q.     You don't want to take a break?
25       A.     No.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

68

1                    R. SCORDINO

2        Q.     Jack Rafter is the Village judge,

3    correct?

4        A.     Yes.

5        Q.     The same judge that prosecuted

6    the gentleman to my right, correct?

7        A.     Yes.

8        Q.     You say you only play golf with

9    him how often?

10       A.     Once a summer.  I believe, I

11   think this year we didn't play at all.

12       Q.     You played with him last year?

13       A.     Yes.

14       Q.     How often do you see Jack Rafter?

15       A.     I see Jack ever Tuesday.

16       Q.     Is he your judge?

17       A.     Yes.

18       Q.     Judge for the Village of Babylon?

19       A.     Yes.

20       Q.     Bluefin1@aol.com, do you remember

21   the last year you had that electronic mail

22   address?

23       A.     No.

24       Q.     Do you remember the last decade

25   you had that electronic mail address?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

130

1                    R. SCORDINO

2          Q.    But yet you have been the mayor

3     for nearly two decades?

4          A.    Um-hum.

5          Q.    Why did you apply two to three

6     year ago as opposed to 20 years ago?

7                MR. TOSCA:  Objection to form.

8                You can answer.

9          A.    I think our society has changed a

10    little bit.

11         Q.    Can you explain?

12         A.    I think you have a lot of people

13    that are -- we don't know about -- that are on

14    the streets, a lot of people come into our

15    village that are either on drugs or liquor,

16    sometimes it's disheartening to see this, you

17    know, you have people at the railroad station,

18    it's different society today.

19         Q.    Anymore incidents that made you

20    apply for your carry license?

21         A.    No.

22         Q.    You say drugs and liquor, people

23    we don't know about.

24                Can you explain?

25         A.    We have people to our Village

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

133

R. SCORDINO

1

2      Q.      You said drugs, sir --

3      A.      Well, you don't know.  You don't

4  know if they're on drugs but that act kind of

5  peculiar.

6      Q.      You're the mayor of the Village

7  of Babylon.

8              Are there drugs within the

9  Village of Babylon?

10     A.      Oh, yeah.

11     Q.      What drugs are you referring to?

12     A.      Anything.You know, people are

13  using drugs all over Suffolk County.  We're

14  not immune from it.

15     Q.      In the past two years, you've

16  applied for a carry license?

17     A.      Um-hum.

18     Q.      Is there any particular drug

19  which has changed the past 20 years?

20     A.      We do have an opioid epidemic

21  right here in Suffolk County, so much that

22  we're even, I entered into a lawsuit against

23  opioid manufacturers with all the mayors, the

24  33 mayors in Suffolk County.  There is a

25  problem, there's not a secret to it.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

146

```
 1                    R. SCORDINO
 2   PR Trustees and Board and it goes out with
 3   information for our trustees to see.  I don't
 4   write it.  I look over it.  I don't write it.
 5   We have somebody doing that.  We have somebody
 6   that's in charge of the newsletter.
 7        Q.    Do you sign your name to it?
 8        A.    Sure.
 9        Q.    Do you sign your name to someone
10   else's writing?
11             MR. TOSCA:  Objection.
12        A.    Me?
13        Q.    Yes.
14        A.    Do I sign my name to other
15   people's -- no.
16        Q.    So you sign the newsletter,
17   correct?
18        A.    I don't sign the newsletter.
19   It's from the mayor and the Village of
20   Babylon.  I have a story about the upcoming
21   events.
22        Q.    Which mayor is it from?
23        A.    It's from the mayor and the
24   Village Board of Trustees.
25        Q.    From the mayor of what?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

147

                        R. SCORDINO

1

2          A.      The Village of Babylon.

3          Q.      Is it signed by the mayor of the

4    Village of Babylon?

5          A.      I don't know what you mean by

6    signed.  What are you talking about signed?

7    My signature is not on there.

8          Q.      That --

9          A.      Meaning signed, signature, right?

10   Are you talking about a signature?

11         Q.      Is it attributed to you as the

12   mayor of the Village of Babylon?

13         A.      It's attributed to the Board of

14   Trustees and the many things that we have in

15   Babylon Village, that the tribute.

16         Q.      It's attributable to you as mayor

17   of Village of Babylon?

18         A.      I guess you would call that, you

19   know.

20         Q.      I didn't want you to guess, is it

21   or isn't it?

22         A.      It's your interpretation,

23   Mr. Morris.  It's not my interpretation.

24         Q.      Sir, it's a newsletter that goes

25   out that purports to be from the mayor of the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

148

1                         R. SCORDINO

2      Village of Babylon and others?

3                    MR. TOSCA:  Objection.

4           A.     I said before, the mayor and the

5      Board of Trustees.

6           Q.     When you say mayor and Board of

7      Trustees --

8           A.     Right.

9           Q.     You are that mayor, right?

10          A.     Right, and so is the Board of

11     Trustees.

12          Q.     It goes out on your behalf along

13     with the Board of Trustees?

14          A.     Right.

15          Q.     So in that regard, the newsletter

16     is attributed to you and others as mayor of

17     the Village of Babylon?

18          A.     Yes.

19          Q.     Aside from that newsletter, have

20     you prepared any material for publication or

21     broadcast?

22          A.     There's some information on

23     Facebook that goes out.

24          Q.     When you say some information on

25     Facebook that goes out, to what are you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

149

1                     R. SCORDINO

2     referring?

3          A.     Information goes to the person

4     who is in charge of Facebook and it goes on

5     the Facebook page.

6          Q.     This information isn't produced

7     through osmosis, correct?

8               MR. TOSCA:  Objection.

9          Q.     You produce it, right?

10              MR. TOSCA:  Objection.

11         A.     Listen to me, Mr. Morris, listen

12    very carefully, okay.  The information is

13    given to the person in charge of the Facebook

14    and she writes and puts it on Facebook.  Okay.

15         Q.     Do you produce that information?

16         A.     I give her the --

17              MR. TOSCA:  Objection.

18              You can answer.

19         A.     The materials are given to her,

20    okay, and then she writes it.  Okay.

21         Q.     Those materials, they're produced

22    by you, correct?

23         A.     The information, yes.

24         Q.     Yes.

25         A.     It's okayed by me what goes on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

150

1                        R. SCORDINO

2    Facebook.

3           Q.      You oversee that process,

4    correct?

5           A.      Right.

6           Q.      Because you're the mayor of the

7    Village of Babylon?

8           A.      That's very good.

9           Q.      It's not done by Jean Marie

10   Parker, right?

11          A.      No.

12          Q.      Because she's the clerk?

13          A.      Right.

14          Q.      And you're the mayor?

15          A.      Right.

16          Q.      Aside from the Facebook web page

17   and aside from the newsletter publication,

18   since your graduation from high school, have

19   you ever written or prepared any material for

20   publication or broadcast?

21                  MR. TOSCA:  Objection.

22          A.      I don't recall.

23          Q.      You say you don't recall --

24          A.      I don't know.

25          Q.      You don't know?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

151

1                    R. SCORDINO
2        A.     I don't know.
3        Q.     Is it that you don't know or is
4   it that you don't recall?
5        A.     I don't know.
6        Q.     But you know about the Facebook,
7   right?
8        A.     Right.
9        Q.     You know about the newsletter?
10       A.     Right.
11       Q.     What else do you know about?
12              MR. TOSCA:   Objection.
13              You can answer over objection.
14       A.     I don't know what you're talking
15  about, other than things that, those are the
16  two things.
17       Q.     Did you ever prepare something
18  for broadcast on Twitter or Instagram?
19       A.     Twitter, no.
20       Q.     What about Myspace?
21       A.     No.
22       Q.     Did you ever prepare something
23  for production on American Online [sic]?
24       A.     No.
25       Q.     Did you ever prepare something on

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

152

1                    R. SCORDINO

2    a school board website or publication?

3         A.    No.

4         Q.    Did you ever put out the greeting

5    card that said, from the Village of Babylon

6    mayor, Mayor Scordino?

7         A.    Yes.

8              MR. TOSCA:  Objection.

9         A.    Yes, we do.

10             That's not from the Village.

11        Q.    That from you?

12        A.    As what?

13        Q.    Publication.

14        A.    Right, it's a Better Babylon

15   Christmas card that goes out.  It's not a

16   Village card, it's Better Babylon Party.

17        Q.    I guess, let's make a note of

18   that.  We'll go back.

19             Better Babylon Village party?

20        A.    No.

21             Listen again, Better Babylon

22   Party.

23        Q.    Is that Better Babylon, like the

24   Town of Babylon or the Village or something

25   else?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

153

1                          R. SCORDINO
2          A.     Better Babylon Party.
3          Q.     Is that like a political party
4    or --
5          A.     That's the party, the independent
6    party that we have when we run for election.
7          Q.     In this independent party that
8    you run for election, are you referring to
9    yourself encompassed in that party?
10         A.     Yes.
11         Q.     Encompassed in that party, things
12   are prepared for publication?
13         A.     Yes.
14         Q.     And you prepared some of them?
15         A.     No.
16         Q.     You prepared none of them?
17         A.     I oversee them.
18         Q.     Do you ever sign them?
19         A.     Yes.
20         Q.     Did you ever approve them?
21         A.     Yes.
22         Q.     Is it fair to say some of these
23   things wouldn't go out unless you either
24   signed or approved them?
25         A.     Hard to tell.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

154

```
 1                      R. SCORDINO
 2       Q.     What makes it hard to tell?
 3       A.     Because I don't know what you
 4  mean.  I don't know what you're driving at.
 5       Q.     Start with the Better Babylon
 6  Party?
 7       A.     Right.
 8       Q.     When did you first participate in
 9  the Better Babylon Party?
10       A.     1986.
11       Q.     Since 1986, have you ever
12  prepared any material for publication or
13  broadcast within the Better Babylon Party?
14            MR. TOSCA:  Objection.
15       A.     Public, no, nothing.  I didn't.
16  I've never prepared anything.
17       Q.     Did you ever make a holiday card?
18       A.     Holiday cards, we put out, yes.
19  We do that.
20       Q.     Anything other than the holiday
21  card?
22       A.     That's it.
23       Q.     Have you ever given them any
24  information put out in any material of any
25  sort?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

155

1           R. SCORDINO

2           MR. TOSCA:  Objection.

3      A.      There's information that goes out

4  all the time, you know what I mean, it goes to

5  one of our publications and they take care of

6  it, put it together.  Did you ever run a

7  campaign?

8      Q.      No, I haven't.

9      A.      There is a certain thing that you

10 have to understand, people, there are people

11 that are hired that do this stuff, and we get

12 the draft and we look at it and we okay it.

13 Okay.

14     Q.      And in this that process, I'm

15 going to ask you to consider that preparation

16 for material prior to publication or

17 broadcast.

18     A.      Okay.

19          MR. TOSCA:  Objection.

20     Q.      Aside from the holiday card, what

21 have you prepared for publication or broadcast

22 for the Better Babylon Party?

23          MR. TOSCA:  Objection.

24          You can answer.

25     A.      A number of things.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

165

1                    R. SCORDINO

2        A.    Right.

3        Q.    At some point, did you have to

4  run again for that position?

5        A.    Yes.

6        Q.    What year was that.

7        A.     '87 and four is '91, '91 would be

8  '95, '95 would be 2009, sorry '95 would be

9  1998 and 1998 to 2002, I was deputy mayor.  In

10  2002, I was appointed as deputy mayor.

11        Q.    Going back --

12        A.    Sorry, 2002, I was appointed as

13  mayor because Don Conroy passed away.

14        Q.    Going back to the 1991 election,

15  were you part of the Better Babylon Party?

16        A.    Yes.

17        Q.    With whom did you run with, if

18  anyone?

19        A.    I ran with Don Conroy and Ray

20  Accelletta.

21              A-C-C-E-L-L-E-T-T-A, that's close

22  enough.

23        Q.    Anyone else?

24        A.    That it?

25        Q.    What were Mr. Conroy and

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

176

1                    R. SCORDINO
2    Babylon business district.
3        Q.     There is a business district in
4    the village of Babylon?
5        A.     Yes.
6        Q.     When you say, his house, what
7    area did you see him?
8        A.     He lives off Little East Neck
9    Road.
10       Q.     Have you had occasion to be at
11   his house?
12       A.     I don't know if I've ever been to
13   his house.  No.
14       Q.     Sir, have you communicated with
15   Jack Rafter on a personal level?
16            MR. TOSCA:  Objection.
17            You can answer.
18       A.     No.  Not a personal level.  A
19   personal level, yes, playing golf, maybe.
20       Q.     You have attended functions where
21   he's been, correct?
22       A.     Yes.
23       Q.     You have seen him outside of the
24   village of Babylon, right?
25       A.     Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                            219

1                        R. SCORDINO

2          Q.    Can you call upon Suzanne

3     Schettino any time okay she's working?

4          A.    Yes.

5          Q.    Is Suzanne Schettino --

6          A.    And when she's not working.

7          Q.    Is Suzanne Schettino protected

8     under New York Civil Service Law?

9                MR. TOSCA:  Objection.

10               You can answer.

11         A.    I'm not a hundred percent sure on

12    that because I thing she accrues time as

13    building inspector.  I'm not sure.

14         Q.    Was Suzanne Schettino appointed?

15         A.    Yes.

16         Q.    By whom?

17         A.    I'm sorry.  Let me -- again, you

18    have to clarify because she worked in the

19    Building Department under a different

20    administrator, hired for that position, when

21    an opened happened during me as mayor, then,

22    appointed her out of the Building Department

23    to become my secretary administrator.

24         Q.    Did you select Suzanne Schettino

25    as secretary administrator?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

220

```
 1                    R. SCORDINO
 2        A.     Yes.
 3        Q.     Do you have the power to
 4   terminate her employment?
 5        A.     Yes.
 6        Q.     Does Ms. Schettino drive a
 7   Village of Babylon vehicle?
 8        A.     No.
 9        Q.     As mayor of the Village of
10   Babylon are you acquainted with Stephen
11   Fellman?
12        A.     Um-hum.
13        Q.     Under what circumstances did you
14   first become acquainted with Stephen Fellman?
15        A.     He was there as the building
16   inspector probably back when I was a trustee,
17   in the middle there somewhere.  I'm not sure
18   what year he was hired.
19        Q.     So you first met him when you
20   were trustee?
21        A.     Yes.
22        Q.     Did you have any personal or
23   social interaction with him previous?
24        A.     No.
25        Q.     As mayor of the Village of
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

221

1                      R. SCORDINO
2    Babylon, do you regularly interact with
3    Stephen Fellman?
4         A.    Yes.
5         Q.    Did you communicate with him by
6    electronic mail?
7         A.    No.
8         Q.    Do you text message him?
9         A.    No.
10        Q.    How often do you communicate with
11   Stephen Fellman by electronic mail, if at all?
12        A.    None.
13        Q.    Does Stephen Fellman report to
14   you as Village of Babylon mayor?
15        A.    Yes.
16        Q.    Can you call Stephen Fellman at
17   any time?
18        A.    Yes.
19        Q.    Is Stephen Fellman protected
20   under New York Civil Service Law?
21              MR. TOSCA:  Objection.
22              You can answer.
23        A.    I don't think so.
24        Q.    Was Stephen Fellman appointed?
25        A.    He -- I guess yeah, he's

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

222

                        R. SCORDINO

1

2    appointed every year.

3         Q.    Did you select Stephen Fellman as

4    building inspector of Village of Babylon?

5         A.    No.

6         Q.    Who did?

7         A.    Don Conroy.

8         Q.    When you say he's appointed every

9    year, who appoints him?

10        A.    It's a resolution at our

11   reassignment meeting which is held every

12   April.

13        Q.    Is there a recommendation or

14   process by which Mr. Fellman is chosen as

15   opposed to other building inspectors?

16        A.    I guess, if we had a problem with

17   him, we would venture out and look for a

18   different building inspector.  As of now, he

19   does a good job.

20        Q.    Don Conroy initially appointed

21   Stephen Fellman?

22        A.    Right.

23        Q.    After Don Conroy was gone, who

24   appointed Stephen Fellman?

25                MR. TOSCA:  Over objection, you

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

223

1                        R. SCORDINO
2         can answer.
3         A.      Myself and the Board.
4         Q.      Tell me exactly how you and the
5    Board appoint Stephen Fellman.
6         A.      Okay.  Every April, it's usually
7    the first Monday in April, he is done at our
8    reassignment meeting, okay.  It's one of the
9    resolutions that we put forth that is passed
10   at a public Village Board meeting and accepted
11   by the vote of the Board of Trustees.
12        Q.      Do you have the power to
13   terminate Stephen Fellman's employment?
14        A.      Yes.
15        Q.      Are you the one to bring the
16   resolution to the Board in regard to Stephen
17   Fellman's employment?
18        A.      Yes.
19        Q.      Can any trustee terminate an
20   employee?
21               MR. TOSCA:  Objection.
22        A.      No.
23        Q.      Can any trustee bring a
24   resolution to the Village of Babylon Board to
25   terminate an employee?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

224

R. SCORDINO

1

2      A.     Before that would happen, there
3  would have to be some discussion with the
4  rest of Board of Trustees.
5      Q.     Can you tell me, can a trustee
6  bring a resolution to terminate an employee?
7      A.     I said, yeah, but there would
8  have to be some discussion before that.  You
9  just can't arbitrarily -- I guess you can, but
10  with our group, we all sit down and discuss
11  it.
12      Q.     In other words, in the Village of
13  Babylon, they have to bring it to you first?
14      A.     Right, they have to have some
15  discussion with it at either a work session or
16  a meeting meet we have.
17      Q.     Does Stephen Fellman drive a
18  Village of Babylon vehicle?
19      A.     No.
20      Q.     To whom does Stephen Fellman
21  report?
22      A.     To me.
23      Q.     As mayor of the Village of
24  Babylon, are you acquainted with Mary Adams?
25      A.     Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

225

1                          R. SCORDINO

2          Q.     Under what circumstance did you

3    first become acquainted with Mary Adams?

4          A.     Her dealings with the Babylon

5    Tuna Club and the Babylon Beautification

6    Society.  First woman president of the Babylon

7    Tuna Club.

8          Q.     Tuna like the game fish?

9          A.     Like bluefin.

10         Q.     Like bluefin.

11         A.     I thought you really knew about

12   fishing and stuff.  Now you're letting me down

13   here.

14         Q.     The Tuna Club and what was the --

15         A.     Beautification Society.  She's

16   done a lot of volunteerism and, of course, you

17   know, Babylon being so small, we get to see a

18   lot of different people and recognize faces,

19   and she is a very, very hard worker.

20         Q.     As the mayor of the Village of

21   Babylon, do you regularly interact with Mary

22   Adams?

23         A.     Yes.

24         Q.     Under what circumstance do you

25   interact with Mary Adams?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

226

R. SCORDINO

1

2      A.     Mary Adams is also oversees the

3   parks and also oversees our greenhouse which

4   is part of Highway Department.  She is in

5   charge of our Facebook.  She does a lot of

6   work.  She does a lot of work with the Girl

7   Scouts for us.

8      Q.     When you say for us, the Village

9   of Babylon?

10     A.     Village of Babylon.

11     Q.     Do you communicate with Mary

12  Adams by electronic mail?

13     A.     No.

14     Q.     Have you ever sent Mary Adams an

15  e-mail?

16     A.     No.

17     Q.     Have you ever received an e-mail

18  from Mary Adams?

19     A.     Yes, occasionally.

20     Q.     From what e-mail account did you

21  receive such e-mail?

22     A.     Usually on my phone, she sends me

23  a message.

24     Q.     When you say on your phone, are

25  you referring to the Samsung phone?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

227

1                    R. SCORDINO

2          A.     Yes.

3          Q.     When you say a message, do you

4    receive electronic mails on your Samsung

5    phone?

6          A.     Yes.

7          Q.     How long have you had the Samsung

8    phone for?

9          A.     I don't know.  Five years.  I'm

10   not sure.

11         Q.     Have you ever deleted any

12   electronic mail off that Samsung phone in last

13   two years?

14         A.     I wouldn't know how to do it.

15         Q.     Does Mary Adams report to you as

16   the Village of Babylon mayor?

17         A.     Um-hum.

18         Q.     Is that a yes?

19         A.     Yes.

20         Q.     Can you call Mary Adams any time?

21         A.     Yes.

22         Q.     Is Mary Adams protected under

23   New York State Civil Service Law?

24         A.     No.

25                MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

228

1                      R. SCORDINO

2          Q.     Is Mary Adams appointed?

3          A.     Well, she was appointed by the

4    Better Babylon Campaign Committee and then ran

5    for her position.

6          Q.     When you say appointed, in what

7    year was she appointed by Better Babylon

8    Committee?

9          A.     Eight years, six years.  I think

10   six years.

11         Q.     Do you have the power to

12   terminate Mary Adams' employment?

13                MR. TOSCA:  Objection.

14                You can answer.

15         A.     No.

16         Q.     Do you have any dealings with

17   Mary Adams aside from her work within the

18   Village of Babylon?

19         A.     No.

20         Q.     Has Mary Adams acted as a realtor

21   for any of the purchases or sales within the

22   Village of Babylon?

23         A.     No.

24         Q.     Does Mary Adams drive a Village

25   of Babylon vehicle?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

229

1                    R. SCORDINO

2        A.     No.

3        Q.     In the Village of Babylon, there

4   are various departments, correct?

5        A.     Um-hum.

6        Q.     You have referred to some of the

7   persons and their names and titles, correct?

8        A.     Yes.

9        Q.     Are these persons Civil Service

10  or appointed?

11       A.     Civil service.

12       Q.     Do any of these persons drive a

13  Village of Babylon vehicle?

14       A.     Yes.

15       Q.     Who drives a Village of Babylon

16  vehicle aside from yourself?

17       A.     Skip Gardener and four chiefs.

18       Q.     When you say four chiefs, to whom

19  are you referring to?

20       A.     Chief, first assistant, second

21  assistant, third assistant.

22              Do you want it right now who it

23  is?

24       Q.     Please.

25       A.     Mike Olive, Joe Fracalverri,

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

230

R. SCORDINO

1
2       F-R-A-C-A-L-V-E-R-R-I, Matt Arrendale, and
3       Jimmy Meager.  And Code Enforcement also has a
4       car, Bill Whittier.
5              Q.     Anyone else?
6              A.     That's it.
7              Q.     Are there decals on this car,
8       insignias, anything that demarcates that the
9       ownership of such a vehicle is Village of
10      Babylon?
11             A.     They have Village of Babylon
12      license plates on all those vehicles.
13             Q.     Do you have a Village of Babylon
14      license plate on your vehicle?
15             A.     Yes, I do.
16             Q.     Are there any other persons whom
17      you have not mentioned who drive a Village of
18      Babylon vehicle?
19             A.     No.  I don't think so.  I think
20      we got all of them.
21             Q.     Is there anyone else to whom we
22      did not discuss who reports to you as the
23      Village of Babylon mayor?
24             A.     Got all of them.
25             Q.     As mayor of the Village of

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

                                                      231

 1                    R. SCORDINO
 2   Babylon, are you acquainted with Gerard Glass?
 3        A.    Yes.
 4        Q.    Under what circumstance did you
 5   first become acquainted with Gerard Glass?
 6        A.    I know he was doing work for
 7   Lindenhurst.  We had our past attorney retire
 8   and we were in search of a replacement, and as
 9   all the mayors talk to each other, I gave over
10   a call to Linderhurst and asked them about
11   Gerard and how he handles the Village of
12   Lindenhurst, and they were very, very
13   satisfied, and I felt that he could do a good
14   job, so I made the recommendation to the
15   rest of the Board.  They felt fine with that,
16   we put a resolution in.  At that same meeting
17   that happens the first Monday in April, the
18   resolution went in to hire him.
19        Q.    What was the first interaction
20   you had with Mr. Gerard Glass?
21        A.    When he came in, I told him we
22   were going to hire him.
23        Q.    First time you spoke to him, you
24   told him you were going to hire him?
25        A.    Yes.  I knew him from various --

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

232

1                          R. SCORDINO

2     not know him personally, but I heard a

3     Lindenhurst mayor talk about how good he is.

4     I figured he would be good asset for us for

5     Village attorney.

6           Q.    Who was the mayor to which you

7     spoke who recommended Mr. Glass?

8           A.    Bill Brennan -- Tom Brennan of

9     Lindenhurst.

10          Q.    Do you know Gerard Glass

11    socially?

12          A.    No.

13          Q.    Did you know Mr. Glass when he

14    was a Suffolk County legislator?

15          A.    No.

16          Q.    As mayor of the Village of

17    Babylon, do you regularly interact with Gerard

18    Glass?

19          A.    Yes.

20          Q.    Under what circumstance do you

21    interact with Gerard Glass?

22          A.     If there is a problem, if he has

23    concerns, he usually calls me.  He learned the

24    first month that I don't answer texts, so I

25    don't text him back.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

233

1                    R. SCORDINO

2        Q.    Do you communicate with him by

3   electronic mail?

4        A.    No.

5        Q.    Did you ever receive an

6   electronic mail from Gerard Glass?

7        A.    It's usually sent to my -- any

8   correspondence is usually sent to my

9   secretary, Suzanne.

10       Q.    Have you received any electronic

11  mail from Mr. Glass?

12       A.    No.

13       Q.    Does Gerard Glass report to you

14  as Village of Babylon mayor?

15       A.    Yes.

16       Q.    Can you call Gerard Glass at any

17  time?

18       A.    Yes.

19       Q.    Is Mr. Glass protected under

20  New York State Civil Service Law?

21             MR. TOSCA:  Objection.

22             You can answer.

23       A.    I don't believe so.

24       Q.    Is Gerard Glass appointed?

25       A.    Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

234

1                          R. SCORDINO

2          Q.      Who whom?

3          A.      Village Board.

4          Q.      Who made the appointment?

5          A.      Village Board.

6          Q.      Were you the one that brought the

7     resolution or was it the Village of Babylon

8     Board?

9          A.      The Board.

10         Q.      Basically, as the Village of

11    Babylon mayor, you oversee the Village of

12    Babylon?

13         A.      Yes.

14         Q.      Basically, the CEO, so to say?

15               MR. TOSCA:   Objection.

16         A.      I would say.

17         Q.      In the course or your regular

18    activities as mayor or the Village of Babylon,

19    do you correspond with anybody by electronic

20    mail?

21         A.      I might do an e-mail to some of

22    the officers, but it's very, very infrequent,

23    so I guess the answer to your question would

24    be yes.

25         Q.      With whom do you correspond by

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

237

1                        R. SCORDINO

2       Q.      Do they tweet?

3       A.      I don't believe so.

4       Q.      In the course of your regular

5    activities as mayor of the Village of Babylon,

6    do you communicate with your constituents

7    through e-mail?

8       A.      Sometimes.

9       Q.      When you say sometimes, on what

10   occasion?

11      A.      If they're requesting a phone

12   call or expressing a concern to me, I will

13   comment back to them, please give me a call.

14   Thank you very much for your concern.  Please

15   give me a call in my office.

16      Q.      Any such concerns or call come in

17   regarding John Lepper?

18      A.      Just that one from Tony Kinnier.

19      Q.      Where are such e-mails

20   maintained?

21              MR. TOSCA:  Objection.

22              You can answer.

23      A.      On my computer at 153 West Main

24   Street in my office, second floor.

25      Q.      Is that computer secured by a

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

300

```
 1                    R. SCORDINO
 2    to the Village of Babylon?
 3         A.    All the time.
 4         Q.    Have you ever sent out a holiday
 5    letter about a tree house?
 6         A.    No.
 7         Q.    Have you ever sent out an
 8    initiative about a tree house that was picked
 9    up in the news media?
10         A.    No.
11         Q.    Have you ever sent anything to
12    your constituents about a tree house?
13         A.    No.
14         Q.    To voters about a tree house?
15         A.    No.
16         Q.    Do you know if there are drugs
17    stored within John Lepper's neighbor's house
18    and/or tree house?
19              MR. TOSCA:  Objection.
20              You can answer over objection.
21         A.    I don't know.
22         Q.    Do you know if there was a house
23    neighboring John Lepper's house that was
24    raided for drugs?
25              MR. TOSCA:  Objection.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

301

                         R. SCORDINO

1

2                You can answer.

3        A.      It was around his corner, not

4    next to him.  It was on the next street,

5    Wyandanch Avenue.

6        Q.      Where was it?

7        A.      One of the houses on Wyandanch.

8        Q.      How far from Mr. Lepper's house

9    was that house?

10       A.      Block, block away.

11       Q.      This house that was a block away,

12   what is your knowledge about the raid and the

13   drugs?

14       A.      It's been an ongoing thing with

15   this resident and son.  He's a known drug

16   dealer.

17       Q.      When you say known drug dealer,

18   known to whom?

19       A.      With the residents, they all

20   know.

21       Q.      Do you know?

22       A.      Yeah.

23       Q.      Do you know if there was a gun

24   recovered at that house?

25       A.      Um-hum.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

302

```
 1                      R. SCORDINO
 2         Q.     When was that gun recovered?
 3         A.     Couple years ago.
 4         Q.     Do you know if there was drug
 5    activity within the Village of Babylon?
 6                MR. TOSCA:  Objection.
 7                You can answer.
 8         A.     Yes.
 9         Q.     The neighbor of Mr. Lepper's when
10    the gun was recovered from whom the house was
11    raided by drugs, is that house three houses
12    away from Mr. Lepper's?
13                MR. TOSCA:  Objection.
14         A.     No.  I don't believe so.
15         Q.     Do you know?
16         A.     The house that I'm talking about
17    is on Wyandanch Avenue.
18         Q.     Is there perhaps another house
19    that --
20         A.     Maybe.  I'm not sure.  I usually
21    know that by Code Enforcement, they usually
22    inform me, or the neighbors inform me.
23                Mr. Lepper never called me about
24    it, so I imagine that -- I don't know.
25         Q.     How do the neighbors inform you?
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

303

                              R. SCORDINO

1

2        A.      They call me.

3        Q.      They have your personal number?

4        A.      At Village Hall.

5        Q.      Okay.

6                Wyandanch, is there another house

7    that was raided for drugs?

8        A.      Yes.

9        Q.      What other house besides

10   Wyandanch?

11       A.      That's the only one I know, it's

12   been ongoing for at least five years.

13       Q.      Is there another house that's

14   three houses away from Mr. Lepper's?

15               MR. TOSCA:  Objection.

16       A.      I just told you, I don't know.  I

17   wasn't notified about it.  If there was a

18   concern, nobody called me.

19       Q.      What about another house that was

20   raided for drugs and had a gun within the

21   Village of Babylon, do you know of any other

22   such house?

23               MR. TOSCA:  Objection.

24       A.      I believe that's the one on

25   Wyandanch Avenue.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

304

R. SCORDINO

1

2      Q.     How many houses away from Tony

3   Davida's house is the house on Wyandanch

4   Avenue to which you refer?

5             MR. TOSCA:  Objection.

6             You can answer.

7      A.     I would guess around ten houses.

8      Q.     Are you aware that was a school

9   bus stop in the neighborhood, the vicinity of

10  John Lepper's neighbor's tree house?

11     A.     I do.

12     Q.     Do you know --

13     A.     On Wyandanch Avenue, the bus

14  stop, yes.

15     Q.     Do you know that eventually that

16  bus stop had to be moved?

17     A.     Yes.

18     Q.     Do you know what kind of bus stop

19  is there?

20     A.     School bus.

21     Q.     Do you know what the age of

22  students picked up at that bus stop were?

23     A.     I guess they were young students,

24  first, second grade.  I don't know what the

25  requirements are for bus pick-up.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

305

                        R. SCORDINO

1

2      Q.      Do you know it had to be moved?

3              MR. TOSCA:  Objection.

4              Asked and answered.

5              You can answer.

6      A.      I was told.

7      Q.      Do you know prior to it being

8   moved, there was a number of raids on the

9   house where guns were found?

10             MR. TOSCA:  Objection.

11             You can answer.

12     A.      Yes.

13     Q.      Do you know why the bus stop was

14  moved?

15     A.      Because of this activity right

16  across the street from where the bus stop is.

17     Q.      If there were guns and drugs

18  within the Village of Babylon, would that be

19  within the quality of life initiative we

20  discussed above?

21             MR. TOSCA:  Objection.

22             You can answer.

23     A.      You have to understand, okay, we

24  try as best as we can with our code

25  enforcement who have no arrest ability, we can

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

308

1                    R. SCORDINO
2    and tell them there is a problem there.
3              I also called an inspector.  We
4    also called COPE.  We have a very good rapport
5    with COPE.  We have another situation in the
6    Village where the DA was called, and we took
7    care of it on another street.  So, you know,
8    we take care of these things, but we have to
9    know first.
10        Q.    You said you knew an inspector;
11   is that right?
12        A.    Yes.
13        Q.    Which inspector do you know?
14        A.    Inspector Cain (phonetic).
15        Q.    What is Mr. Cain's first name?
16        A.    I'm not sure.
17        Q.    Or Ms. Cain, I apologize; is it a
18   man or woman?
19        A.    Woman, Inspector Cain.
20        Q.    When you contact Ms. Cain, on
21   what number do you call her?
22        A.    893, I think it's 1302.  I can't
23   remember.  I have is written down in my
24   office.
25        Q.    In other words, do you call her?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

313

1                    R. SCORDINO

2          Q.    Same thing for Stephen Fellman?

3          A.    Yes.

4          Q.    What time does Bill Whittier go

5     home every day?

6          A.    Varies.  Usually he comes up

7     around 3:30 and comes up in the morning before

8     9:30.

9          Q.    Fair to say, if drug activity

10    happens before Bill Whittier goes home, he

11    might not be able to report that to you?

12         A.    We have nine people that are

13    aware of Suffolk County and radio and they're

14    aware of different things happening, they have

15    a night log that they keep.

16         Q.    Do these well-aware folks ever

17    report to you that one of properties for which

18    there is drug activity has a tree house?

19              MR. TOSCA:  Objection.

20         A.    No.  The first time I was

21    notified about this, we asked them to start

22    going down there and to look to see if anyone

23    was parking on Wampum, and they do a routine,

24    they go by it and check it, might do it once,

25    twice during the night.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

316

```
 1                     R. SCORDINO
 2              MR. TOSCA:  Objecting.
 3              You can answer.
 4       A.      The only raid I know of is the
 5  one on Wyandanch Avenue, that's the only one I
 6  know about.
 7       Q.      The one within a block proximity
 8  to Mr. Lepper?
 9       A.      Yes, it's around the corner,
10  like, I would say 200, 300 yards away from him
11  going down Wampum, couple houses down from
12  Wyandanch.
13       Q.      What year did you first become
14  aware of the activity?
15       A.      I guess it was about three years
16  ago.
17       Q.      How did you become aware of such
18  activity.
19       A.      Neighbors called me on it.
20       Q.      Which neighbors?
21       A.      I think the next door neighbor
22  called me, Tony Davida called me on it,
23  there's some issue.  The school called me on
24  it, and we followed up with the First
25  Precinct, with Bill Whittier.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

317

1                    R. SCORDINO

2       Q.    Aside from Bill Whittier and Tony

3  Davida, what other persons did you speak with

4  in regards to that house?

5       A.    Max Waters who lives right next

6  door.

7       Q.    Who else?

8       A.    That's the only ones that really

9  come to my mind.

10      Q.    When you say Tony Davida, is that

11 the same as trustee Tony Davida?

12      A.    Yes.

13      Q.    What was your conversation with

14 Mr. Davida about this property?

15      A.    There seemed to be some activity

16 and that, you know, we should be calling the

17 First Precinct.  I said fine, I'll let the

18 First Precinct know, and I also let Code

19 Enforcement know.

20      Q.    When you say you'd let First

21 Precinct know and you'd let Code Enforcement

22 know, to whom did you speak?

23      A.    Bill Whittier and the inspector.

24 I always believe I talked to Jeff Boloskowitz

25 (phonetic) who is the, I don't know what the

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

329

|   |   |
|---|---|
| 1 | R. SCORDINO |
| 2 | about giving us special types of things like |
| 3 | that because they have rules and regulations, |
| 4 | HIPAA laws and everything else. |
| 5 | Q.     Are you familiar with a person |
| 6 | named Jimmy Mack (phonetic)? |
| 7 | A.     Jimmy Mac.  No. |
| 8 | Q.     How many prosecutions has the |
| 9 | Village of Babylon had over smoking cigarettes |
| 10 | at the Long Island Railroad Property? |
| 11 | MR. TOSCA:  Objection. |
| 12 | You can answer. |
| 13 | A.     I have no idea. |
| 14 | Q.     How many prosecutions has the |
| 15 | Village of Babylon had over a tree house? |
| 16 | MR. TOSCA:  Objection. |
| 17 | You can answer. |
| 18 | A.     One, I guess.  Mr. Lepper. |
| 19 | Q.     Is there still the threat of |
| 20 | criminal prosecution against Mr. Lepper and |
| 21 | his family over the tree house that exists on |
| 22 | his property? |
| 23 | MR. TOSCA:  Objection to the form |
| 24 | of the question. |
| 25 | You can answer over objection. |

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

330

```
 1                      R. SCORDINO
 2        A.     He's in the court.  I don't have
 3   any control over the judge.
 4        Q.     Let me ask the question again.
 5               Is there a threat of criminal
 6   prosecution against Mr. Lepper and his family?
 7               MR. TOSCA:  Objection.
 8        A.     I don't know.
 9        Q.     You've only prosecuted one tree
10   house in the Village of Babylon, is that
11   right, to your knowledge?
12        A.     This one, yes.
13        Q.     In fact, you have seen many tree
14   houses, correct?
15        A.     No, I didn't say that.  I said I
16   saw two, Mr. Lepper's and the one on Thompson.
17        Q.     In your life?
18        A.     Oh, in my life I've seen many.
19        Q.     Your life has encompassed quite
20   some time in the Village of Babylon, has it
21   not?
22               MR. TOSCA:  Objection.
23               You can answer.
24        A.     Yes, very much so.
25        Q.     How many tool sheds have you
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

331

```
 1                     R. SCORDINO
 2    prosecuted?
 3         A.     Tool sheds.  I have no idea.
 4         Q.     Have you ever heard of a
 5    prosecution over a chicken coop?
 6               MR. TOSCA:  Objection.
 7               You can answer over objection.
 8         A.     No.
 9         Q.     You have heard about the arrest
10    over smoking on Long Island Railroad property,
11    right?
12         A.     Yes.
13         Q.     To your knowledge, you don't know
14    whether people are put in jail for such a
15    thing, correct?
16               MR. TOSCA:  Objection.
17               You can answer.
18         A.     Yes.
19         Q.     They are put in jail?
20         A.     Yes.
21         Q.     Do you know how long someone
22    spent in jail because they smoked a cigarette
23    at the Village of Babylon Long Island Railroad
24    Train Station?
25               MR. TOSCA:  Objection.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

332

1                    R. SCORDINO

2        A.      No.

3        Q.      Anyone report to about how much

4    resources are being spent on the

5    prosecution of people for smoking a cigarette

6    at Village of Babylon Train Station?

7                MR. TOSCA:  Objection.

8        A.      No.

9        Q.      How many lawsuits have occurred,

10   if any, for the arrests that occurred at the

11   Village of Babylon Railroad Station?

12       A.      In my tenure as a mayor, I think

13   this is the only one.

14       Q.      Before you were mayor, is there

15   any others?

16       A.      I don't believe so.  I can't

17   remember.  I wouldn't know.  It's going back

18   too far.  I wouldn't be privy as the trustee

19   too, that's basically, that would have been

20   the other mayor.

21       Q.      Any document that would refresh

22   your recollection?

23       A.      No.

24       Q.      To be clear, you have served as

25   an elected official in the Village of Babylon

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

333

1                           R. SCORDINO
2      for how long now?
3           A.      Fifteen and a half and seventeen.
4           Q.      Fair to say that it's been about
5      32 years?
6           A.      Right on, and a half.
7           Q.      And a half.
8                   In that 32 and a half years, have
9      you come to learn of anyone within the Village
10     of Babylon being prosecuted for a tool shed?
11                  MR. TOSCA:  Objection.
12                  You can answer.
13          A.      No.
14          Q.      In that 32 and a half years as an
15     elected official within the Village of
16     Babylon, have you heard anyone being
17     prosecuted over a chicken coop?
18                  MR. TOSCA:  Objection.
19                  You can answer.
20          A.      Not to my recollection.
21          Q.      In 32 and a half years as an
22     elected official in the Village of Babylon,
23     have you ever heard of anyone being threatened
24     with daily fines?
25          A.      Yes.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

334

R. SCORDINO

1

2     Q.     Who?

3     A.     Couple of people, people that

4  haven't kept their houses in good shape,

5  people that constantly park boats illegally on

6  their property.  We stay abreast of these

7  things, and if they don't listen the first

8  time, we give them another summons.  Sometimes

9  the summons make them think a little bit, you

10  know, maybe they should follow the code book.

11  Everybody has a right to ignore it, but

12  they're gonna get reprimanded for it.

13     Q.     Who are those persons who

14  received the threat of daily fines?

15     A.     We have a couple of abandoned

16  houses that we looked at, finally had to go to

17  their attorney and say you got to clean up the

18  house.  One was on Paumanake.  There's another

19  down the end of Peninsula.  There was another

20  one on the corner of Mulberry and Peninsula,

21  the upkeep of the property, storing boats on

22  the property, couldn't get them off the

23  property, people were complaining.

24     Q.     The answer I'm looking for is

25  something that consist of a name, who?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

335

R. SCORDINO

1

2      A.     The names of these people?

3      Q.     Yes.

4      A.     I don't know the names.  I don't

5  get involved.  I'm looking at the infraction

6  rather than the name, the property, the

7  location, the address.

8      Q.     Did your niece ever have an

9  abandoned home after Hurricane Sandy?

10     A.     Yes.

11     Q.     Did she ever receive the threat

12  of daily fines?

13     A.     She was getting fines also.  She

14  was in our court.  It was an embarrassment to

15  me.  The whole family is not even talking to

16  me because of the fines on that because she

17  didn't listen.  My cousin.

18     Q.     Did she receive the threat of

19  daily fines?

20     A.     She got a lot of fines.  I don't

21  know if they were daily or not but she got a

22  lot of fines.

23     Q.     Sir, you're sitting in a chair,

24  correct?

25     A.     Sure.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

336

1                    R. SCORDINO

2      Q.    Came here by car?

3      A.    Yes.

4      Q.    Did your cousin receive the

5  threat of daily fines; yes or no?

6      A.    I believe --

7           MR. TOSCA:  Objection.

8           You can answer over.

9      A.    I believe she did.

10     Q.    By whom?

11     A.    By the Building Department.

12     Q.    What person?

13     A.    Steven Fellman.

14     Q.    What was the authority by which

15  he issued that threat?

16          MR. TOSCA:  Objection.

17     A.    Very important thing, which is

18  relevant to this case.  Do you know what the

19  word was?

20     Q.    What was the word?

21     A.    Safety.  The house was leaning

22  off to the side.  Safety.  Just like

23  Mr. Lepper's tree house, safety, safety,

24  safety.  I didn't want anybody to get hurt or

25  killed on that tree house, so I gave it over

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

337

```
 1                   R. SCORDINO
 2   to the Building Department to take care of,
 3   okay, it's a very unsafe situation, just like
 4   my cousin, okay.
 5        Q.    Did you make a determination that
 6   Mr. Lepper's tree house was unsafe?
 7        A.    No.  The Building Department.
 8   Building inspector.
 9        Q.    You said safety, you repeated it
10   a few times as you leaned into the mic?
11        A.    Right.
12        Q.    Who made that determination?
13        A.    I believe the inspector did.
14        Q.    Did you ever see a report that
15   was provided as to the safety of the tree
16   house?
17        A.    I believe not.
18        Q.    Are you aware that such a
19   report --
20        A.    I don't micromanage.  It's the
21   building inspector's responsibility to take
22   care of it, not me.
23        Q.    The building inspector answers to
24   you, right?
25        A.    Yeah.
```

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

338

1                    R. SCORDINO

2          Q.    Are you aware of whether a report

3    was submitted by Mr. Lepper attesting to the

4    safety of the tree house?

5                    MR. TOSCA:  Objection.

6          A.    I don't know.  I don't recall.

7          Q.    You don't recall.

8          A.    If he sent it to the building

9    inspector, I don't know.

10         Q.    You're the subject of a federal

11   lawsuit, you know that right?

12                   MR. TOSCA:  Objection

13         A.    Absolutely.

14         Q.    Any other lawsuits in your life?

15         A.    Yes.

16         Q.    How many times have you been

17   sued?

18         A.    I don't recall exact number.

19         Q.    So many you can't recall?

20         A.    No, so few I can't remember.

21                   MR. TOSCA:  Objection.

22         Q.    Ever been sued in Federal Court

23   before?

24         A.    Yes.  And won, by the way, and

25   won.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

339

1                    R. SCORDINO

2        Q.      Good.

3                By whom were you sued?

4        A.      Mrs. Burrows (phonetic) wanted to

5    put a heroin recovery office right next to

6    where the school is and we spent a lot of

7    money in federal court, a lot of attorneys

8    because it wasn't part of our quality of life

9    in our Village, so we fought very hard not to

10   have that there.

11       Q.      Who made that determination?

12       A.      One of the judges.

13       Q.      Who made the determination it was

14   not part of your quality of life?

15               MR. TOSCA:  Objection.

16       A.      I was a trustee then, it went

17   back, it was another mayor that made that

18   decision.

19       Q.      Did you support that decision?

20       A.      Absolutely.

21       Q.      And today, who makes the

22   decisions about the quality of life in the

23   Village?

24               MR. TOSCA:  Objection.

25       A.      I do.

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

343

1            R. SCORDINO

2            MR. TOSCA:  Objection.

3       A.    I don't get involved.  I don't

4  get involved.  I don't get involved in the

5  building inspector's projects or the court,

6  okay.  I patrol, again I'll give you the ward,

7  okay, the safety, safety and welfare of all

8  the residents in Babylon Village.  You know

9  why, I take an oath for that to follow the

10  Constitution of the United States, the

11  Constitution in the State of New York, just

12  like Mr. Lepper, he's a fireman.  He took the

13  same oath when he became a fireman.  The codes

14  and regulations of the Village of Babylon, he

15  didn't do it, he didn't get a building permit

16  for it, so I handed it over to the Building

17  Department and the attorneys and let them

18  filter out the situation.

19       Q.    Safety, right?

20       A.    Safety.

21       Q.    Who made that determination?

22            MR. TOSCA:  Objection.

23       Q.    Sir, you're under oath.

24            MR. TOSCA:  Objection.

25       Q.    Who made the determination?

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

344

R. SCORDINO

1

2      A.      I made the determination by

3   visually looking at it and passed the

4   information over to the Building Department.

5   You would have to be an idiot not to realize

6   that there is safety issues with that tree

7   house.  Come on.  Some kids gets up there and

8   falls off, breaks their head, breaks their

9   neck on our property, who is responsible?  Who

10  is responsible?  Who is responsible?  Who is

11  responsible?  Answer my question now.

12      Q.      The safety determination --

13      A.      No.  Who is responsible if a kid

14  gets up there somehow, we know children today,

15  and falls off and breaks their neck, who is

16  responsible?  On our property.

17              MR. MORRIS:  It's 4:59.  Let's

18      take a minute.

19              (Whereupon, a recess was taken at

20      this time.)

21              (The deposition was concluded at

22      5:00 p.m.)

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

345

1

2             A C K N O W L E D G M E N T

3

STATE OF NEW YORK      )

4                      ) SS:

COUNTY OF              )

5

6             I, RALPH A. SCORDINO, hereby certify

7     that I have read the transcript of my

8     testimony taken under oath in my deposition of

9     December 5, 2019; that the transcript is a

10    true, complete and correct record of my

11    testimony, and that the answers on the record

12    as given by me are true and correct.

13

14

15

16                       _____

17                       RALPH A. SCORDINO

18

19    Signed and subscribed to before
      me, this _____day

20    of_____, 20__.

21    _____
      Notary Public, State of New York

22

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

346

1

2      -----------------I N D E X--------------------

3      WITNESS              EXAMINATION BY       PAGE

4      RALPH A. SCORDINO   MR. MORRIS            5

5      RULINGS: 61, 96, 100, 260, 278, 279

6

7      -----------------REQUESTS------------------

8      PAGE   145    Video and minutes of Board of

9                    Trustee meeting

10            263    Code book as maintained in the

11                   regular course of business in the

12                   Village of Babylon

13

14

15

16

17

18

19

20

21

22

23

24

25

John Lepper v. Village of Babylon
SCORDINO, RALPH A. - December 5, 2019

347

1

2            C E R T I F I C A T E

3

4   STATE OF NEW YORK        )
                             ) SS:
5   COUNTY OF SUFFOLK        )

6

7            I, STEPHANIE O'KEEFFE, a Notary

8   Public within and for the State of New York,

9   do hereby certify:

10            That RALPH A. SCORDINO, the witness

11   whose deposition is hereinbefore set forth,

12   was duly sworn by me and that such deposition

13   is a true record of the testimony given by

14   such witness.

15            I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19            IN WITNESS WHEREOF, I have hereunto

20   set my hand this 5th day of December, 2019.

21

22

23

24            _____

25                  STEPHANIE O'KEEFFE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN LEPPER and NOELLE LEPPER, individually            Index No.: 2:18-cv-07011 JFB-GRB
and as parents and natural guardians of their infant
children, B.J.L. and B.I.,

<div align="center">Plaintiffs,</div>

    -against-                                   STIPULATION EXTENDING
                                                        TIME TO ANSWER THE
                                                        AMENDED COMPLAINT

VILLAGE OF BABYLON; and, RALPH SCORDINO,
Mayor, KEVIN MULDOWNEY, Deputy Mayor,
ROBYN SILVESTRI, Village Trustee, TONY
DAVIDA, Village Trustee, MARY ADAMS, Village
Trustee; STEPHEN FELLMAN, Village of Babylon
Building Inspector; SUZANNE SCHETTINO,
Department of Public Works; GERARD GLASS, Esq.,
Village of Babylon Attorney; DEBORAH LONGO,
Planning Board, Village of Babylon, each individually
and in their official capacity, and John and/or Jane
Doe, unnamed, unidentified complainants,

<div align="center">Defendants.</div>
-------------------------------------------------------------------X

**IT IS HEREBY STIPULATED** that the time for the defendants, VILLAGE OF

BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO,

Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH

LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and

John and/or Jane Doe, unnamed, unidentified complainants, to appear and to answer, amend or

supplement the answer as of course but not to make any motion with relation to the

Summons and Amended Complaint in this action, be and the same hereby is extended to and

including the 4th day of February, 2019.

**IT IS HEREBY FURTHER STIPULATED** that defendants, VILLAGE OF BABYLON; and, RALPH SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN SILVESTRI, Village Trustee, TONY DAVIDA, Village Trustee, MARY ADAMS, Village Trustee; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants, hereby waive their right to the affirmative defense of lack of improper service and jurisdiction.

**IT IS HEREBY FURTHER STIPULATED** that said defendants are not required to serve and file an answer to plaintiff's summons and complaint dated December 10, 2018.

Dated: January 9, 2019

LAW OFFICES OF CORY H. MORRIS
Attorney for Plaintiffs

KELLY, RODE & KELLY LLP
Attorneys for Defendants
Our File No.: PDG/EPT 148530-752

SO ORDERED:

_____





 ORIGINAL SCANNED   PDG/EPT/CMG 148530-752

RECEIVED

JUL - 2 2019

KELLY, RODE & KELLY, LLP

1

2     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
3     ------------------------------------------X
      JOHN LEPPER and NOELLE LEPPER, individually
4     and as parents and natural guardians of
      their infant children, B.J.L. and B.I.,
5

6                                    PLAINTIFFS,

7           -against-               Index No.
                                    2:18-cv-07011
8                                   JFB-GRB

9     VILLAGE OF BABYLON; and, RALPH SCORDINO,
      Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN
10    SILVESTRI, Village Trustee, TONY DAVIDA,
      Village Trustee, MARY ADAMS, Village
11    Trustee; STEPHEN FELLMAN, Village of
      Babylon Building Inspector; SUZANNE
12    SCHETTINO, Department of Public Works;
      GERARD GLASS, Esq., Village of Babylon
13    Attorney; DEBORAH LONGO, Planning Board,
      Village of Babylon, each individually and
14    in their official capacity, and John and/or
      Jane Doe, unnamed, unidentified
15    complainants,

16                                   DEFENDANTS.
      ------------------------------------------X
17

18            DATE:  June 27, 2019

19            TIME:  11:41 A.M.

20

21

22        (DEPOSITION OF JOHN LEPPER.)

23

24

25



DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

1                    J. LEPPER

2            Where are the trees located?

3      A.    On -- on the Wampum Road side

4   of the house.

5      Q.    Are they next to each other

6   pretty much?

7            MR. MORRIS:  Objection.

8            You can answer.

9      A.    They're close in proximity

10   about 15 feet apart.

11      Q.    All right.

12            And the tree that the treehouse

13   is on, is that the first tree from the

14   front of the property?

15            MR. MORRIS:  Objection.

16            You can answer.

17      A.    No.

18      Q.    Which number is it?

19            There are three, right?

20            There is one in front of it?

21      A.    There is two in front of it.

22      Q.    Two.

23            So this is behind the other two

24   trees.

25      A.    Correct.

```
 1                    J. LEPPER
 2        Q.    So it's the rearmost tree of
 3   the property?
 4              MR. MORRIS:  Objection.
 5              You can answer.
 6        A.    Yes.
 7        Q.    Who decided which tree to put
 8   this treehouse on?
 9        A.    My wife.
10              We both discussed it briefly, I
11   guess.
12        Q.    And what made you determine to
13   put it on that tree?
14              MR. MORRIS:  Objection.
15              You can answer.
16        A.    That was the tree that was
17   closest -- it was the tree closest to what
18   was their play area in the backyard.
19        Q.    The tree that you attached it
20   to before you put the treehouse on there,
21   did you do any inspection of that tree to
22   make sure that it wasn't dying or that it
23   wasn't weak or something else?
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
 1                    J. LEPPER
 2        A.    The trees were -- when we were
 3   doing the renovation on the property and
 4   the one tree was removed.  The rest of the
 5   trees were pruned and maintained.
 6              And at that time, all the trees
 7   were very healthy.
 8        Q.    Who told you this?
 9        A.    I think -- whoever removed the
10   tree.
11        Q.    Do you know the company that
12   did that?
13        A.    No.
14        Q.    Do you have any records of the
15   company that removed the tree?
16              MR. MORRIS:  Objection.
17              You can answer.
18        A.    I don't believe so.
19        Q.    Did you mention to him that you
20   intended to put a treehouse on one of the
21   trees?
22              MR. MORRIS:  Objection.
23              You can answer.
24        A.    No.
25              At that time, we had no
```

```
1                    J. LEPPER
2    intention to put a treehouse in the tree.
3         Q.    The material for the treehouse,
4    is that all wood?
5         A.    Yes.
6         Q.    Where did you get the wood to
7    make the treehouse?
8         A.    Some of the wood -- most of the
9    heavy timber and the siding was reclaimed
10   from a boathouse that we -- a property we
11   owned in Amityville was damaged during
12   Sandy.  And the boathouse had to be demoed,
13   demolished.  And that's most of the
14   material from that.
15        Q.    Before constructing this
16   treehouse, did you ever build any other
17   treehouses?
18        A.    Only for myself when I was a
19   kid.
20        Q.    Other than that?
21        A.    No.
22        Q.    By the way, do you belong to
23   any organizations regarding treehouses?
24        A.    No.
25        Q.    The wood that you said you had
```

```
 1                    J. LEPPER
 2    used was from a boathouse in Amityville.
 3                    Was that property you owned
 4    with your wife?
 5                    MR. MORRIS:  Objection.
 6                    You can answer.
 7         A.    No.
 8                    My parents owned that property.
 9         Q.    When you say the wood was
10    reclaimed, what does that mean?
11         A.    After the boathouse was
12    demolished, I asked the contractor to save
13    me certain timbers so that I can use it.
14         Q.    When you asked the contractor
15    to do that, was it your intention to use
16    the wood for a treehouse at that time?
17                    MR. MORRIS:  Objection.
18                    You can answer.
19         A.    I'm not sure.
20         Q.    You said the boathouse was
21    demolished.
22                    Did this happen during a storm?
23         A.    No.
24         Q.    How did it become demolished?
25         A.    It had to be removed in order
```

```
 1                    J. LEPPER
 2    to install new bulkhead.
 3          Q.    And when was --
 4          A.    It was damaged during the
 5    storm.
 6          Q.    It was what?
 7          A.    It was damaged during the
 8    storm.
 9          Q.    The boathouse or the bulkhead
10    or both?
11          A.    Both.
12          Q.    You're talking about during the
13    storm.
14                You're talking about Hurricane
15    Sandy?
16          A.    Correct.
17          Q.    When was it that you were given
18    the wood from the boathouse?
19          A.    I don't recall.
20          Q.    Do you remember approximately
21    how long before you actually started
22    construction of the treehouse that you were
23    given this wood?
24                MR. MORRIS:  Objection.
25                You can answer.
```

```
 1                   J. LEPPER
 2        A.    I don't recall when they did
 3   the demo that I was actually intending on
 4   doing this at that time.  I just was asking
 5   for the wood because I actually do build
 6   other things.  And what I asked him for was
 7   for stuff that I could use for whatever I
 8   needed it for.
 9        Q.    How long before you actually
10   started construction on the treehouse did
11   you get the wood from the person who did
12   the demolition?
13              MR. MORRIS:  Objection.
14              You can answer.
15        A.    I'm not sure of the date.  It
16   was kind of going on at the same time.  I'm
17   not sure if the demo -- if they were
18   demoing.  I'm not sure if they were demoing
19   the boathouse -- you know, I'm not sure
20   when they demoed the boathouse.  I know it
21   kind of all happened around the same time.
22        Q.    When you say it kind of
23   happened around the same time, what was it
24   that happened at the same time?
25        A.    The boathouse might have been
```

1                    J. LEPPER

2      demoed at the same time when we found the

3      hypodermic needle in our bushes when we

4      made the decision.

5           Q.    Was this more than one year

6      before you started construction on the

7      treehouse?

8                 MR. MORRIS:  Objection.

9                 You can answer.

10          A.    No.

11          Q.    Was it more than six months?

12                MR. MORRIS:  Objection.

13                You can answer.

14          A.    No.

15          Q.    So it's fair to say that the

16     demolition of the boathouse took place less

17     than six months before you started

18     construction of the treehouse.

19                MR. MORRIS:  Objection.

20                You can answer.

21          A.    Yes.  I believe so.

22                It was close.  It was right

23     around the same time it was going on.

24          Q.    Any of the wood that was used

25     for the treehouse came from this reclaimed

```
 1                    J. LEPPER
 2   wood from the boathouse; is that correct?
 3        A.    Not all of it, no.
 4        Q.    Okay.
 5              So what wood did you use in
 6   terms of the construction of the treehouse
 7   that's not from the reclaimed lumber or
 8   timber?
 9        A.    The cedar shake shingles.
10              MR. MORRIS:  Counsel, are you
11         still using this exhibit
12         (indicating)?
13              MR. TOSCA:  No.
14        Q.    Anything else?
15        A.    Um --
16        Q.    Hold on.
17              If you need to look at the
18   photographs in order to refresh your memory
19   that's fine.
20        A.    Cedar shake shingles, some of
21   the siding and some of the 2 by 4 framing.
22        Q.    I'd like to look at the
23   photograph now.
24              Exhibit I, do you see the
25   platform of the treehouse (handing)?
```

```
 1                    J. LEPPER
 2        A.    (Complying.)
 3              I do.
 4        Q.    Okay.
 5              Now, the timber from the
 6   boathouse, was that used to build the
 7   platform (indicating)?
 8              MR. MORRIS:  Counsel, let the
 9          record reflect you're putting your
10          finger on, looks like the middle of
11          the photograph.
12              MR. TOSCA:  Bottom plank.
13              MR. MORRIS:  No Bate stamps on
14          these, right?
15              MR. TOSCA:  Correct.
16              MR. MORRIS:  On Exhibit I
17          you're placing your finger.
18              MR. TOSCA:  A couple of inches
19          from the page.
20              You want me to put it over here
21          again?
22              MR. MORRIS:  It's very
23          difficult for the record to reflect
24          what it is that you're pointing to.
25              MR. TOSCA:  Why don't we let
```

```
 1                    J. LEPPER
 2          the witness point out where the
 3          platform to this treehouse is.
 4          Q.    Could you point out where the
 5     platform to your treehouse is.
 6          A.    (Indicating.)
 7          Q.    Are we talking about the bottom
 8     floor of the treehouse?
 9               MR. MORRIS:  Objection.
10          Q.    Or I should say the floor of
11     the treehouse is the bottom.
12               MR. MORRIS:  Objection.
13               You can answer.
14          Q.    Are we talking about the floor
15     to the treehouse?
16          A.    The platform, yes.
17          Q.    All right.
18               Is the platform buttressed in
19     any way?
20.         A.    Can you rephrase.
21               I don't know what buttressed
22     is.
23          Q.    Anything that supports --
24               MR. GLASS:  It's a support.
25          Q.    Anything that supports the
```

```
 1                    J. LEPPER
 2    platform.
 3                MR. MORRIS:  Objection.
 4                You can answer.
 5        A.    Can you repeat the question.
 6        Q.    Yes.
 7                Do you have something
 8    supporting the platform?
 9        A.    Yes.
10        Q.    What do you have supporting
11    that?
12        A.    I have the frame structure that
13    you see in the Exhibit.  4 by 12's.  This
14    is all in the engineer drawing.  It's 4 by
15    6.
16        Q.    Those pieces of wood that
17    support the platform --
18        A.    Yes.
19        Q.    -- are attached to the tree?
20                MR. MORRIS:  Objection.
21                Counsel, are you referring to
22            the photograph or are you asking him
23            from his memory?
24        Q.    I'm referring to the wood
25    that's in the photograph.
```

```
 1                      J. LEPPER
 2        A.    The framing is attached to the
 3   tree, correct.
 4        Q.    Okay.
 5              Is that what you're calling
 6   framing?
 7        A.    Yes.
 8        Q.    Does that provide support to
 9   the platform?
10        A.    Yes.
11        Q.    Where did you get the wood to
12   put that framing in?
13        A.    That was from the demolished
14   boathouse.
15        Q.    Okay.
16              And there's wood attached to
17   the tree.  Studs or wood studs.
18              Do you see that?
19              MR. MORRIS:  Objection.
20              You can answer.
21        A.    Attached to the tree?
22        Q.    Yes.
23              In other words, they're lateral
24   supports that go up and down the tree.
25              Do you see them?
```

```
 1                    J. LEPPER
 2              MR. MORRIS:  Counsel, you're
 3          referring to Exhibit I?
 4              MR. TOSCA:  Yes.
 5              MR. MORRIS:  You're asking if
 6          he sees something in the photograph?
 7              MR. TOSCA:  Correct.
 8      A.    Yes.
 9      Q.    Let me ask you this:  If you
10   didn't see it in the photograph, would you
11   have remembered this?
12      A.    Yes.
13      Q.    Okay.
14              Now, the wood that's attached,
15   who attached it to the tree?
16              MR. MORRIS:  Let the record
17          reflect counsel is pointing --
18              MR. TOSCA:  To a lateral piece
19          of wood on the tree itself.
20              MR. MORRIS:  A lateral piece of
21          wood, not the tree itself in Exhibit
22          I.
23      A.    I installed it.
24      Q.    What is it attached to the tree
25   with?
```

```
 1                    J. LEPPER
 2         A.    Half inch by 12 inch galvanized
 3    lag bolts.  Four on each leg.
 4         Q.    The angled wood that's attached
 5    to the corners of each treehouse --
 6         A.    Uh-hum.
 7         Q.    -- and then to the wood that
 8    you said you attached with galvanized lag
 9    bolts, how are they attached to the lateral
10    pieces of wood on the tree itself?
11              MR. MORRIS:  Note my objection.
12              Also, counsel is referring to
13         what looks like, again, the middle of
14         Exhibit I pointing to pieces of wood
15         attached to a tree.  And what looks
16         like the treehouse in this case.
17         A.    They're attached timber frame
18    style.  They're mortised into each leg and
19    fastened with lag bolt.
20         Q.    And how are they fastened, if
21    at all, to the platform of the treehouse?
22              MR. MORRIS:  Objection.
23              You can answer.
24         A.    Say that.  Repeat the question.
25         Q.    Sure.
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
 1                    J. LEPPER
 2              How are they fastened to the
 3    platform of the treehouse, if they are?
 4                    MR. MORRIS:  Note my objection.
 5                    You can answer.
 6         A.    Can you point out what you're
 7    talking about.
 8         Q.    Well, in other words, I'm
 9    talking about:  You have four pieces of
10    wood that are attached to the lateral
11    support that's attached to the tree.
12         A.    Correct.
13         Q.    And then it's attached to the
14    corner of the platforms.
15                    Do you see that?
16                    MR. MORRIS:  Note my objection.
17         Q.    Not attached.
18                    That the platform rests on.
19                    MR. MORRIS:  Note my objection.
20                    Also, counsel is pointing to
21              the photograph that's in Defendants'
22              Exhibit I when asking these
23              questions.
24                    MR. TOSCA:  Yes.
25         A.    The vertical that's attached
```

```
 1                    J. LEPPER
 2          photograph.
 3          A.    Can you repeat the question.
 4          Q.    Yes.
 5                How many horizontal supports
 6      are there under the platform?
 7                MR. MORRIS:  Objection.
 8                You can answer.
 9          A.    There's eight.  Four that are
10      attached to the frame work and four that
11      are attached to the platform.
12          Q.    Now, those horizontal supports,
13      are they connected to the tree itself at
14      all?
15          A.    Um, the four that are part of
16      the frame work are.
17          Q.    And how are they connected to
18      the tree itself?
19          A.    They're connected to the
20      vertical member that's supporting them.
21          Q.    Now, in terms of the design of
22      the treehouse, did you work off of any
23      designs when you started construction of
24      the treehouse?
25          A.    Not a design.  A picture that I
```

```
 1                    J. LEPPER
 2    saw.
 3         Q.    Where did you see a picture?
 4         A.    I saw it on-line.
 5               (At this time Mr. Glass exited
 6          the room.)
 7         Q.    Were you actually looking for
 8    something on-line in order to build your
 9    treehouse, some ideas?
10               MR. MORRIS:  Objection.
11               You can answer.
12         A.    I believe I was looking for
13    ideas, yes.
14         Q.    When did you start looking
15    on-line for ideas to build a treehouse?
16         A.    I don't know.
17               (At this time Mr. Glass entered
18          the room.)
19         Q.    Was it before April of 2018?
20         A.    It could have been.
21               MR. MORRIS:  Objection.
22               You can answer.
23         A.    I don't know.
24         Q.    All right.
25               You mentioned that you found
```

```
 1                    J. LEPPER
 2   hypodermic needles or hypodermic needle in
 3   the bushes.
 4             Was it before that that you
 5   were looking on-line for ideas to build a
 6   treehouse?
 7             MR. MORRIS:  Objection.
 8             You can answer.
 9       A.    I don't know.
10       Q.    What, if anything, gave you the
11   idea that you'd want to build a treehouse?
12       A.    Because I had a treehouse when
13   I was a kid, and I have two young children
14   who I thought would enjoy it.
15             But I'm not sure if I was --
16   the hypodermic needle would kind of -- when
17   we found the needle, that's when we decided
18   that, what we were going to do.
19             Was I thinking about it before
20   it?  I'm not really sure.  Might have been.
21   The kids were getting a little older for
22   their playground that was in the backyard.
23   I'm not sure.
24       Q.    You said they had a playground
25   in the backyard.
```

```
 1                        J. LEPPER
 2              What type of playground did
 3    they have?
 4         A.   Just a plastic Step2.
 5         Q.   A plastic what?
 6         A.   A plastic Type 2.
 7         Q.   Like the No. 2?
 8         A.   Yes.
 9              With a bridge.
10         Q.   How long did you have that in
11    the backyard?
12         A.   I don't know.
13         Q.   By the way, is there a garage
14    on the property?
15         A.   Yes.
16         Q.   Is it attached or detached?
17         A.   Detached.
18         Q.   How far back from the house is
19    the garage?
20              MR. MORRIS:  Objection.
21              You can answer.
22         A.   From the back of the house?
23         Q.   Yes.
24         A.   I guess it's about 40, 50 feet.
25         Q.   Does the driveway extend from
```

```
 1                     J. LEPPER
 2    the front of the house towards the back of
 3    the house towards the house?
 4               MR. MORRIS:  Objection.
 5               You're talking about his home?
 6               MR. TOSCA:  Yes.
 7         A.    The driveway and the garage are
 8    on the Wampum Road side.
 9         Q.    So the driveway actually --
10         A.    Of the property.
11         Q.    -- leads from Wampum Road to
12    the garage?
13         A.    Yes.
14         Q.    The plastic Step2, where in
15    relation to the garage was that play area?
16         A.    It was right here (indicating).
17    Directly behind the treehouse.  Towards the
18    garage.
19               MR. MORRIS:  Let the record
20          reflect you're referring to
21          Defendants' Exhibit I.
22               You're pointing to a portion of
23          that picture; is that right?
24               Mr. Lepper?
25               THE WITNESS:  Yes.
```

```
 1                    J. LEPPER
 2              MR. MORRIS:  Counsel, are you
 3         still using these exhibits?
 4              If we're not, I ask that we put
 5         them aside.
 6              MR. TOSCA:  Okay.
 7         Q.   So I'd like you to look at
 8  Exhibit F (handing).
 9              Is any part of the garage
10  depicted in the photograph here
11  (indicating)?
12         A.   (Complying.)
13              MR. MORRIS:  Objection.
14         A.   Very small (indicating).
15         Q.   The roof of the garage?
16         A.   Yes.
17         Q.   And that's on the left side of
18  the photograph in between two trees?
19              MR. MORRIS:  Let the record
20         reflect defense counsel is referring
21         to Exhibit F.  If looks like a single
22         photograph.  There is no Bate stamp
23         identification on it.
24              He's pointing to portions of
25         the photograph on the top left.
```

```
1                      J. LEPPER
2        A.    And that's the neighbor's roof.
3    Just above the hedge row is the roof to the
4    garage.
5        Q.    Okay.
6              So in terms of the playground
7    Step2 that you had, is that between the
8    garage and the treehouse?
9        A.    No.
10             MR. MORRIS:  Just let the
11          record reflect counsel is pointing to
12          the treehouse in this photograph on
13          the left-hand side.
14       A.    It's not a good photograph to
15    show where it was.
16             Directly behind the treehouse,
17    in between the treehouse and the garage.
18       Q.    Is it still there today?
19       A.    No.
20       Q.    When was that taken away?
21       A.    I don't know.
22       Q.    Was it before or after you had
23    constructed the treehouse or during?
24             MR. MORRIS:  Objection.
25             You can answer.
```

```
 1                    J. LEPPER
 2        A.    I'm not sure.
 3        Q.    Did anyone assist you in
 4   building the treehouse?
 5        A.    No.
 6              A few people handed me a couple
 7   of pieces of wood but I wouldn't say
 8   anybody helped me.  A few people helped me,
 9   passed up some wood.  But I wouldn't say
10   helped me.
11              MR. MORRIS:  Counsel, are you
12         referring to Defendants' Exhibit F?
13              MR. TOSCA:  I am.
14              MR. MORRIS:  The same places.
15        Q.    Now, the picture that you said
16   you found on-line of a treehouse, did you
17   work from that in terms of constructing
18   this treehouse?
19              MR. MORRIS:  Objection.
20              You can answer.
21        A.    I used the picture as an idea.
22        Q.    In determining what the size
23   was going to be of this treehouse, did you
24   draft anything in order to construct the
25   treehouse in the size that it appears now?
```

```
 1                    J. LEPPER
 2             MR. MORRIS:  Objection.
 3             You can answer.
 4       A.    I did.
 5             I submitted it with my permit
 6    application.
 7       Q.    When you said "it", you're
 8    talking about what?
 9       A.    Full front elevation drawing.
10       Q.    When?
11       A.    And the survey with the
12    location.
13       Q.    Okay.
14             When did you prepare the
15    drawing?
16       A.    That was after I received a
17    letter stating that I had already put the
18    platform up.  And I received the letter on
19    May 10th stating that I was putting a
20    structure that may require a permit.
21       Q.    So the framing and the platform
22    had already been installed by the time you
23    got that letter?
24             MR. MORRIS:  Objection.
25             You can answer.
```

```
 1                    J. LEPPER
 2         A.    Yes.
 3         Q.    And had used anything to work
 4    from; any plans, any drawings, pictures to
 5    work from in order to build the platform?
 6                MR. MORRIS:  Objection.
 7                You can answer.
 8         A.    No.
 9                Just used the picture as an
10    idea.
11         Q.    That picture, do you have a
12    copy of it?
13         A.    No.  Not here (indicating).
14         Q.    Do you have it at home?
15         A.    No.
16                I don't have a copy.  I know
17    where I got it.
18         Q.    Where did you get it from?
19         A.    I believe I found it on
20    Pinterest.
21         Q.    Did you work off of any
22    instructions in order to build the
23    treehouse structure?
24                MR. MORRIS:  Objection.
25                You can answer.
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
 1                    J. LEPPER
 2       A.    No.
 3             I did have some experience when
 4    I was younger working for a framing
 5    contractor.
 6       Q.    When you worked with a framing
 7    contractor, did you work pursuant to plans?
 8       A.    Not always.
 9       Q.    Whenever you built a housing
10    structure, did you work pursuant to plans?
11             MR. MORRIS:  Objection.
12             You can answer.
13       A.    Not always.
14             I don't know if they were
15    required.
16             MR. MORRIS:  Off the record.
17             (Whereupon, an off-the-record
18         discussion was held.)
19             MR. MORRIS:  Back on.
20       Q.    Were there any written
21    documents that you looked at before
22    building the platform?
23             MR. MORRIS:  Objection.
24             You can answer.
25       A.    As far as what?
```

```
 1                    J. LEPPER
 2         Q.    As far as any pictures,
 3    diagrams, any measurements, any
 4    specifications.
 5              Anything in writing that you
 6    looked at in order to build the platform
 7    and the framing.
 8              MR. MORRIS:  Objection.
 9              You can answer.  You can
10         answer.
11         A.    No.
12         Q.    What type of tools did you use
13    to build the treehouse?
14         A.    Chop saw, compound miter saw,
15    table saw, drill, skill saw.
16              You want them all?
17         Q.    Yes.
18         A.    Screw gun, nail gun, speed
19    square, framing square, pencils,
20    screwdrivers.
21         Q.    Measuring tape?
22         A.    Tape measure.
23         Q.    Hammers?
24         A.    Hammers.
25         Q.    Screwdrivers?
```

```
 1                     J. LEPPER
 2         A.    Screwdrivers.
 3         Q.    Did you use any scaffolding to
 4   build the treehouse?
 5               MR. MORRIS:  Objection.
 6               You can answer.
 7         A.    No.
 8               I just used ladders.
 9         Q.    You said somebody helped you or
10   some people helped you hand you things; is
11   that right?
12               MR. MORRIS:  Objection.
13          Objection.
14         A.    Yes.
15               A few people might have handed
16   me some material.
17         Q.    Did anybody do any physical
18   work on the structure itself where they
19   would attach things, put anything up?
20               MR. MORRIS:  Objection.
21               You can answer.
22         A.    No.
23         Q.    Is the treehouse completed at
24   this point?
25         A.    No.
```

```
 1                         J. LEPPER
 2          Q.    Was there anything additional
 3   you wanted to do to the treehouse?
 4          A.    Finish?
 5          Q.    Yes.
 6          A.    Finish.
 7          Q.    What do you have to do to
 8   finish the treehouse?
 9          A.    Um, I have to finish putting
10   the roof on, shutters, secure the windows
11   to make it safe for the kids to play up
12   there and install the hatch in the floor so
13   that the kids can actually access it.
14          Q.    You mentioned shutters.
15                Where were the shutters going?
16          A.    There's supposed to be shutters
17   on each of the windows.
18          Q.    How many windows are there by
19   the way?
20          A.    Three.
21                No.   Five.
22                I'm sorry.
23          Q.    Five?
24          A.    Uh-hum.
25          Q.    Is there any skylight on the
```

```
 1                    J. LEPPER
 2    roof of the treehouse?
 3         A.    No.
 4         Q.    You said secure the windows.
 5               What do you mean by secure the
 6    windows?
 7               How would you do that?
 8         A.    I was going to put -- there's
 9    going to be shutters -- there's going to be
10    a plantation shutter up on the dog house
11    for ventilation, wood shutters on lower
12    windows with half inch pipe going across.
13    Probably two on each window for the kids so
14    they can be secure, can't fall out and keep
15    safe.
16               That's all.
17         Q.    And the hatch you were talking
18    about, that's on the floor?
19         A.    Yes.
20         Q.    Is that the entryway to the
21    treehouse?
22               MR. MORRIS:  Objection.
23               You can answer.
24         A.    It will be.  It doesn't exist
25    right now.  There is no hatch.
```

```
 1                    J. LEPPER
 2         Q.    How do you get into the
 3    treehouse now, if you can at all?
 4               MR. MORRIS:  Objection.
 5               You can answer.
 6         A.    Only through ladder.
 7         Q.    Through ladder?
 8         A.    Ladder and a window.
 9         Q.    I'm not sure how the hatch
10    gives you access.
11               How would the hatch give you
12    access to the treehouse other than using a
13    ladder?
14         A.    There is a ladder up the tree
15    (indicating).
16         Q.    Okay.
17         A.    You know, it would be ladder on
18    the tree.  There's already wood that's
19    attached to the tree that the kids could
20    climb up, open the hatch and they would
21    just access the hatch through the floor.
22         Q.    So the hatch actually is
23    something that once they climb the ladder,
24    go through the opening of the floor, they
25    would close the hatch so that the opening
```

```
1                       J. LEPPER
2    would be closed; am I correct?
3                   MR. MORRIS:  Objection.
4                   You can answer.
5         A.    Correct.
6         Q.    So when you say gain access,
7    right now you got access to the treehouse,
8    right?
9                   It's just that there is no
10   hatch there; am I correct?
11                  MR. MORRIS:  Objection.
12                  You can answer.
13                  (At this time Mr. Glass exited
14        the room.)
15        A.    No.
16                  There is only access with the
17   ladder going through the window.
18        Q.    There is only access --
19        A.    There's only access if you put
20   up ladder and climb through the window.
21        Q.    Well, you said there is a
22   ladder on the tree.
23                  Is that what you're talking
24   about?
25                  MR. MORRIS:  Objection.
```

```
 1                         J. LEPPER
 2                You can answer.
 3        A.      There's, you know, there's
 4    pieces of wood, reclaimed 2 by 4 wood that
 5    goes up the tree to where the hatch would
 6    be but it does not exist right now.
 7        Q.      When you go up those steps --
 8        A.      Uh-hum.
 9        Q.      -- is there an opening that you
10    can go through at this point?
11        A.      No.
12        Q.      So the entire floor is --
13        A.      Sealed.
14        Q.      -- sealed?
15                Closed, right?
16        A.      Yes.
17        Q.      So right now if you want to get
18    into the treehouse, you have to actually
19    climb the ladder and then go through the
20    window?
21                MR. MORRIS:  Objection.
22        Q.      Is that what you have to do?
23        A.      Yes.
24        Q.      Otherwise, you have no access
25    to the treehouse.
```

1                    J. LEPPER

2          A.    Yes.

3          Q.    Was there any ladder that's

4    specifically designed for the treehouse or

5    you're just using an extension ladder?

6                MR. MORRIS:  Objection.

7                You can answer.

8          A.    As far as the work was?

9          Q.    No.

10                I guess it's a bad question.

11   Let me rephrase the question.

12                Did you build a ladder

13   specifically to get through the window of

14   the treehouse?

15         A.    No.

16         Q.    What type of ladder are you

17   talking about that you would use in order

18   to get access through the window of the

19   treehouse?

20         A.    A fiberglass 12-foot A-frame

21   ladder.

22         Q.    And do you have a fiberglass

23   A-frame ladder?

24         A.    Yes.

25                But like I said, that's just

```
 1                    J. LEPPER
 2   for work, not for the kids to access.
 3        Q.    Fine.
 4              (At this time Mr. Glass entered
 5   the room.)
 6        Q.    When you built the platform, at
 7   that point before you put any walls on,
 8   right, you had gotten a letter you said
 9   from the village?
10              MR. MORRIS:  Objection.
11              You can answer.
12        A.    Yes.
13        Q.    And that was in May 2018?
14        A.    Yes.
15        Q.    Did you continue construction
16   after the letter?
17              MR. MORRIS:  Objection.
18              You can answer.
19        A.    No.
20              I held off on construction.  I
21   submitted the building permit with the
22   elevation drawing and the survey.
23        Q.    And after you submitted that,
24   did you commence construction or recommence
25   construction?
```

1                    J. LEPPER
2              MR. MORRIS:  Objection.
3              You can answer.
4         A.    No.
5              I called the village in the
6    middle of June to check the status of the
7    application.
8         Q.    And again, we're talking about
9    June of 2018, correct?
10        A.    2018.
11        Q.    All right.
12             Did you continue construction
13   after you called?
14        A.    It was somewhere in the middle
15   of June, the week before my son's birthday;
16   June 30th.  I had already prefabbed the
17   walls in the garage, and I just erected the
18   walls.  I believe it was June 30th.
19        Q.    Okay.
20             So when you say prefabbed the
21   walls, is that something you did on the
22   ground, I guess?
23        A.    That's correct.
24        Q.    All right.
25             And where did you keep those

95

```
 1                    J. LEPPER
 2   walls?
 3        A.    In the garage.
 4        Q.    When were those completed?
 5              When did you finish the
 6   prefabrication of the walls?
 7        A.    I don't know.
 8        Q.    Was that before May of 2018?
 9        A.    No.
10              MR. MORRIS:  Objection.
11              You can answer.
12        Q.    Was it before you called in
13   June of 2018?
14              MR. MORRIS:  Objection.
15              You can answer.
16        A.    I don't think so, no.
17        Q.    Okay.
18              So at some point after June of
19   2018 after you made the call, you had done
20   the walls?
21              MR. MORRIS:  Objection.
22              You can answer.
23        A.    Yes.
24        Q.    And did you take those walls up
25   and put them up?
```

```
 1                    J. LEPPER
 2         A.    On June 30th, yes.
 3         Q.    Did anybody help you carry
 4    those walls up to the platform?
 5               MR. MORRIS:  Objection.
 6               You can answer.
 7         A.    I don't remember if anybody was
 8    there.  I used a -- a pulley system, 4 to 1
 9    pulley system to pull them up.
10         Q.    Okay.
11         A.    Somebody might have been there.
12    Maybe a work colleague might have just held
13    them in place.  I know he had to go -- he
14    might have helped me pull them up.  I think
15    I pulled most of them up with the pulley
16    system.
17         Q.    Who is the work colleague?
18    What's his name?
19         A.    I believe it was Michael Luisi
20    (phonetic).  I believe so.
21         Q.    When you say "work colleague",
22    you mean the fire department?
23         A.    Yes.
24         Q.    Now, you pull the walls up.
25               How would you attach them and
```

1                     J. LEPPER

2    put them together, assemble them?

3                 MR. MORRIS:  Objection.

4                 You can answer.

5         A.    How did I attach them to one

6    another?

7         Q.    And to the platform.

8                 If you did.

9         A.    When the walls were framed, the

10   base plate and the header overlap one

11   another.

12                So you put it in position, you

13   plumb the wall up; meaning, you level the

14   wall.  Once the wall is leveled, you screw

15   the two together and then I used six-inch

16   timber bolts to screw to the platform deck.

17        Q.    In order to level the walls,

18   did you use some kind of level device?

19        A.    Yes.

20        Q.    The roof, was that

21   prefabricated?

22        A.    No.

23        Q.    Did you build that from the

24   platform, the walls?

25        A.    Did I build it?

```
 1                      J. LEPPER
 2              Yes, I built it from the
 3    platform.  After the walls were erected.
 4         Q.    So did anyone help you build
 5    the roof?
 6         A.    No.
 7              MR. MORRIS:  Objection.
 8              You can answer.
 9         Q.    Was there framing first before
10    you actually put any covering?
11              MR. MORRIS:  Objection.
12              You can answer.
13         A.    Say that again?
14         Q.    Was there framing to the roof?
15         A.    Framing to the roof?
16         Q.    Yes.
17         A.    No.
18              The exterior walls were framed.
19         Q.    Okay.
20              What type of wood did you use
21    for the roof?
22         A.    The roof?
23         Q.    Yes.
24         A.    2 by 4 header and 2 by 4
25    rafters.
```

```
 1                    J. LEPPER
 2          Q.    On the roof itself, besides the
 3    wood, is there anything covering the wood?
 4                Any shingles?  Are there
 5    shingles on the roof?
 6          A.    Partial.
 7          Q.    What kind of shingles are
 8    there?
 9          A.    Cedar shake.
10          Q.    When you say "partial", is that
11    the way you designed it or you didn't get
12    to complete it or something else?
13                MR. MORRIS:  Objection.
14                You can answer.
15          A.    I didn't get to complete it.
16                The village judge gave us a
17    verbal stop work order on September 4th and
18    asked us to unplug the light that was
19    preexisting.
20          Q.    Did you unplug the light?
21          A.    I did.
22          Q.    And then did you plug it in
23    again?
24          A.    I did.
25          Q.    And when was that that you
```

```
 1                    J. LEPPER
 2   plugged it in again?
 3        A.    That was after the verdict, the
 4   judge's ruling came down.  The judge's
 5   ruling came down which was sometime in
 6   October, late October.
 7        Q.    Of 2018, correct?
 8        A.    Yes.
 9        Q.    And you said there was a verbal
10   stop work order and you were told to unplug
11   the light --
12            MR. MORRIS:  Objection.
13        Q.    Did you get any directive that
14   allowed you to plug it in again?
15            MR. MORRIS:  Objection.
16            You can answer again.
17        A.    Yes.
18            By law if you're going to fly
19   the national colors at night, they need to
20   be illuminated.  By law if you're going to
21   fly the flag at night, it needs to be
22   illuminated so it's illuminated from dusk
23   till dawn.
24        Q.    You couldn't use another light
25   to do that?
```

```
 1                    J. LEPPER
 2              MR. MORRIS:  Objection.
 3              You can answer.
 4      A.    No.
 5      Q.    Why not?
 6      A.    I didn't have another light.
 7   That's the light that I had.
 8      Q.    Could you have purchased one?
 9              MR. MORRIS:  Objection.
10              You can answer.
11      A.    No.
12      Q.    Why not?
13      A.    Because that's the light that I
14   installed to deter, to illuminate the flag
15   and to deter people from parking on Wampum
16   Road and maybe discarding their heroin
17   needles in my bushes.
18      Q.    What prevented you from hiring
19   somebody from getting the light bulb and
20   the light installed to do all this stuff?
21              MR. MORRIS:  Objection.
22              You can answer.
23      A.    Say that again?
24      Q.    Yes.
25              What prevented you from hiring
```

```
 1                    J. LEPPER
 2    an electrician to install a lighting
 3    fixture to effect the things that you
 4    wanted to effect like flag and light that
 5    part of Wampum Road?
 6                MR. MORRIS:  Objection.
 7                You can answer.
 8         A.    Because I have the ability to
 9    do that myself.
10         Q.    Well, did you do it?
11         A.    I did.
12         Q.    I'm talking about put up a
13    light bulb somewhere else --
14                MR. MORRIS:  Objection.
15         Q.    -- where a judge did not have a
16    stop work order.
17                MR. MORRIS:  Objection,
18           Counselor.
19                Are you going to ask about
20           light bulbs or about this case?
21                You're asking about a
22           hypothetical.
23                MR. TOSCA:  Yes, about this
24           case.
25                Are you going to let him
```

```
1                    J. LEPPER
2        answer?
3              MR. MORRIS:  I will.
4              But if you're going keep on
5        asking about hypotheticals, I think
6        that's the appropriate time to call a
7        judge.
8              MR. TOSCA:  Okay.
9              MR. MORRIS:  Do you need the
10       question repeated?
11             THE WITNESS:  I do.
12       Q.    Was there anything that
13   prevented you from installing a light
14   somewhere else on the property to
15   illuminate what you wanted to illuminate?
16             MR. MORRIS:  Note my objection.
17             You can answer.
18       A.    Is there anything that
19   prevented me from installing another light?
20       Q.    Yes.
21       A.    I still don't understand.
22             Why would I need to install
23   another light?
24       Q.    I'm asking you.
25             Was there anything preventing
```

```
 1                    J. LEPPER
 2   you from doing that; yes or no?
 3             MR. MORRIS:  Objection.
 4             You can answer again.
 5        A.   Yes.
 6        Q.   And what was it that prevented
 7   you?
 8        A.   Because I installed another
 9   light.
10             MR. MORRIS:  Objection.
11        A.   A light was already installed.
12        Q.   I'm asking you though:  Is
13   there anything that prevented you from
14   installing the light somewhere else on the
15   property to illuminate what you needed to
16   illuminate?
17             MR. MORRIS:  Objection.
18             You can answer.  You can answer
19        again.
20        A.   I didn't have another light.  I
21   wasn't looking to go purchase another light
22   to illuminate the flag that I already had a
23   light to illuminate.
24        Q.   Did you go back to the judge
25   who issued this stop work order to ask if
```

```
 1                    J. LEPPER
 2    you can reconnect the light fixture?
 3         A.    No.
 4               It wasn't until after our next
 5    violations, set of violations for the light
 6    fixture, I believe, installation of a light
 7    fixture without a building permit that we
 8    went back to village court.
 9         Q.    The judge who said this, what
10    was his name?
11         A.    Judge --
12               MR. MORRIS:  Objection.
13               Who said what?
14         Q.    Who said to unplug the light
15    fixture?
16         A.    Judge Rafter.
17         Q.    And is he the village justice?
18               MR. MORRIS:  Objection.
19               The village justice of what?
20               MR. TOSCA:  Babylon.
21         A.    Yes.
22         Q.    Now, you said at some point you
23    had gotten a violation for the fixture.
24               When was that?
25               MR. MORRIS:  Objection.
```

```
1                    J. LEPPER
2              The record speaks for itself.
3              MR. TOSCA:  The record speaks
4        for what?
5              When he got the violation.
6              MR. MORRIS:  Ask him questions.
7         Q.   When did you get the violation
8    for the light fixture?
9         A.   I'm not sure.
10              Sometime in November.
11         Q.   And that's 2018, correct?
12         A.   Yes.
13         Q.   Did you appear in court for
14    that ticket or violation?
15              MR. MORRIS:  Objection.
16              You can answer.
17         A.   Yes.
18         Q.   When is it that you appeared in
19    court?
20         A.   I'm not sure of the date.
21    Sometime in November.
22         Q.   And do you know what the result
23    of that violation was?
24         A.   I believe that meeting
25    everything was off the record.  I believe
```

```
 1                    J. LEPPER
 2    at that hearing everything was off the
 3    record between Judge Rafter, Gerry Glass
 4    and Steve Fellman.  Gerry Glass; the
 5    village attorney.  And Steve Fellman; the
 6    building inspector.
 7         Q.    Did you have a hearing?
 8               MR. MORRIS:  Objection.
 9               You can answer.
10         A.    No.
11               They made a request and had
12    asked me to get -- they had made a request
13    and said that we would discuss it at our
14    next hearing which was for the same
15    violation, Building Code 36526 that I
16    received with my wife and kids as we went
17    out trick and treating on Halloween.
18         Q.    Let's go back to the lighting
19    fixture violation.
20               You said you had gotten that in
21    November; am I correct?
22               MR. MORRIS:  Objection.
23               The record speaks for itself.
24         You want to ask him a question, ask
25         him a question.
```

```
 1                    J. LEPPER
 2        Q.    The lighting fixture that you
 3   got in November of 2018, the lighting
 4   fixture violation that you received in
 5   November 2018, did you appear before Judge
 6   Rafter for that violation?
 7        A.    Yes.
 8              That was the hearing that was
 9   off the record.  There is no transcript.
10        Q.    Now, this hearing that was off
11   the record and for which there is no
12   transcript, were you present?
13        A.    I was.
14        Q.    Did you have an attorney
15   representing you at that time?
16        A.    I did not.
17        Q.    And did you consult with an
18   attorney before you went to the hearing?
19              MR. MORRIS:  Objection.
20              To the extent it calls for
21         attorney/client privilege, I'm going
22         to direct the client not to answer.
23              MR. TOSCA:  The answer is yes
24         or no.  I don't think that's
25         attorney/client privilege.  I'm not
```

```
1                    J. LEPPER
2         asking what was said.  I'm just
3         asking if he consulted with an
4         attorney.
5              MR. MORRIS:  I guess you can
6         answer that.
7              THE WITNESS:  Okay.
8         A.   I spoke to a family friend who
9    was an attorney but he is not a civil
10   attorney.  And when I spoke to Mr. Glass
11   and Mr. Fellman in the vestibule and
12   explained it to them -- that's not the
13   case.  I explained to them that he was not
14   my attorney and he was asking for an
15   adjournment.
16              I believe this was all in --
17   this is prior to what you're asking me.
18        Q.   Well, I'm kind of confused
19   here, Mr. Lepper.
20              I'm not sure what we're talking
21   about at this point.  So let's back up for
22   a minute.
23              I'm talking about a time when
24   you appeared on November 2018 in reference
25   to the violation received for the lighting
```

110

1                    J. LEPPER

2    fixture.

3         A.    Okay.

4               MR. MORRIS:  Wait for a

5          question.

6         Q.    So at that time, you had a

7    hearing off the record you said.

8               MR. MORRIS:  Objection.

9               The record speaks for itself.

10        Q.    Well, did you have a hearing

11   off the record at that time?

12        A.    What time?

13        Q.    In November 2018 in reference

14   to the violation for the lighting fixture.

15               (At this time Mr. Glass exited

16          the room.)

17        A.    There were two hearings in

18   November.

19        Q.    And was one of them for the

20   violation for the lighting fixture, both of

21   them?

22        A.    One of them was, yes.

23        Q.    Okay.

24               So let's talk about the hearing

25   you had in reference to the violation for

```
 1                    J. LEPPER
 2    the lighting fixture.
 3              Was any of it on the record?
 4              MR. MORRIS:  Objection.
 5              You can answer.
 6    A.    No, I don't believe it was.
 7    Q.    Okay.
 8              When you had this hearing,
 9    Judge Rafter was present at that time?
10    A.    Yes.
11    Q.    Was anybody else present?
12    A.    Gerard Glass; the village
13    attorney.
14    Q.    Anyone else?
15    A.    Steve Fellman.
16    Q.    Anyone else?
17    A.    Building inspector.
18              I think it's probably a half a
19    dozen village residents from my block that
20    were there in support.
21    Q.    And you were there.
22    A.    Yes.
23    Q.    What happened at this hearing?
24    A.    Are you talking about the
25    hearing that was off the record?
```

1                      J. LEPPER

2          Q.     Yes.

3          A.     Judge Rafter asked us to

4    approach the bench.  He explained to -- he

5    explained to me because apparently at this

6    point I spoke to the media already and

7    Congressman King.

8                      And he explained to me that

9    Court will not be -- these decisions will

10   not be swayed by the media, nor

11   congressman.

12                     And I explained to the judge

13   that that wasn't my intention.  That he had

14   already ruled on this matter.  And I felt

15   that I was being mistreated and I felt that

16   my family was being mistreated.  And that's

17   why I spoke to the media.

18                     And I didn't have any other

19   remedy at this point with the village

20   because he had already ruled.  And I had

21   continued to get violations without due

22   process and being afforded the opportunity

23   to seek counsel and appeal.

24                     And at that hearing -- that's

25   it.  I mean at that hearing Mr. Fellman and

```
1                      J. LEPPER
2              MR. MORRIS:  Same objection.
3              You can answer.
4      A.    How many times did I contact
5   them?
6      Q.    Yes.
7      A.    I contacted --
8              I don't recall.
9              I only contacted them
10  initially.  And then I believe everyone
11  else was contacted through them.
12             I'm not really sure.
13     Q.    Well, specifically Newsday, did
14  you ever contact them about a court hearing
15  or a court date?
16             MR. MORRIS:  Objection.
17             You can answer.
18     A.    I believe I contacted the
19  reporter from Newsday after she wrote the
20  article.  After she wrote the first
21  article, I guess.
22     Q.    Okay.
23             And what did you tell them at
24  that time?
25     A.    I just asked her if she was
```

```
 1                    J. LEPPER
 2    coming to court.  If she was taking off --
 3    taken off of the case or taken off of the
 4    story.
 5         Q.    Had you contacted Newsday and
 6    told them to come to court or told them
 7    that you were going to be at a hearing at
 8    court?
 9              MR. MORRIS:  Objection.
10              You can answer.
11         A.    Did I contact them and tell
12    them that I was going to be at a hearing?
13         Q.    In any kind of hearing or any
14    kind of proceeding in court.  Any court.
15         A.    I don't recall.
16         Q.    Had you ever been on television
17    and given any statements on television?
18              MR. MORRIS:  Objection.
19              You want to know if he's been
20         on television or you want to know if
21         he's given --
22              MR. TOSCA:  To both.
23         Q.    Have you ever appeared on
24    television with reference to the treehouse?
25         A.    Yes.
```

```
 1                    J. LEPPER
 2         Q.    How many times?
 3         A.    I believe it was all just the
 4   one day.
 5               No.   That's not true.
 6               I don't know.
 7         Q.    Do you remember what channels?
 8         A.    I don't know.
 9               Like I said, I was looking to
10   speak to Newsday.   They reached out and
11   everybody showed up on the one day.
12         Q.    When you say "everybody", whose
13   everybody?
14         A.    I believe -- I believe it was
15   2, 4, 7 and 12.
16         Q.    And did you appear in any news
17   clips, to your knowledge?
18         A.    Yes.
19         Q.    Did you actually see these
20   televised clips?
21         A.    The television?
22               I thought you meant the
23   newspaper.
24         Q.    No.
25               I'm talking about clips on the
```

```
 1                    J. LEPPER
 2    television.  On news channels.
 3         A.    Yes, I saw them.
 4         Q.    Were you interviewed in any of
 5    those news channels?
 6         A.    I believe I was interviewed by
 7    all of them.
 8         Q.    Were the statement you made
 9    televised?
10         A.    Yes.
11               You know, I don't know what
12    they edited but, yes, it was televised.
13         Q.    Do you remember appearing in an
14    interview with Newsday --
15         A.    Um --
16         Q.    -- that it was televised or
17    appeared on the Internet, actually.
18         A.    They did that interview at my
19    house.  I think it was that day that you're
20    referring to when everybody showed up.
21         Q.    When you say they showed up --
22               I'm sorry?
23         A.    I'm not sure.  I can't recall.
24    I don't know if that was actually the same
25    day.  I'm not sure.
```

1                  J. LEPPER

2        Q.     But when you say "they showed

3    up", was that at your house, in court or

4    someplace else?

5               MR. MORRIS:  Objection.

6               You can answer.

7        A.     Everybody came to the house.

8        Q.     Okay.

9               And this was after the

10   Halloween tickets?

11       A.     Yes.

12       Q.     Do you know how long after you

13   had an interview, you had a televised

14   interview with Newsday?

15       A.     It was in between the Halloween

16   summonses and the off-the-record hearing

17   with Gerry Glass, Steve Fellman and Judge

18   Rafter.

19               I don't know the date but it

20   was in between Halloween and the

21   off-the-record hearing.  I don't know what

22   that date was in November.

23       Q.     Did anyone else participate in

24   that interview besides yourself and the

25   reporter?

```
 1                    J. LEPPER
 2        A.    And Newsday?
 3        Q.    Yes.
 4        A.    And Newsday?
 5              No, I don't think so.
 6        Q.    Now, you mentioned before about
 7    the chapel.
 8              Was it during that interview
 9    you spoke about a chapel?
10              MR. MORRIS:  Objection.
11              You can answer.
12        A.    I believe so.
13        Q.    Did you retain a copy of that?
14        A.    No.
15        Q.    It's accessible on the
16    internet; am I correct?
17              MR. MORRIS:  Objection.
18              It speaks for itself.
19              You can answer.
20        A.    I believe so.
21        Q.    Did you review that video
22    before you came here to testify?
23        A.    No.
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
 1                     J. LEPPER
 2          A.    No, I didn't.
 3          Q.    Do you recall telling anyone at
 4     Newsday that this was a GFY chapel?
 5          A.    Yes.
 6          Q.    And GFY stands for what again?
 7          A.    Good for you.
 8          Q.    Now, the Good For You Chapel,
 9     did you ever tell them that you and your
10     family were using the treehouse to pray in?
11               MR. MORRIS:  Note my objection.
12               You can answer.
13          A.    Did I ever tell them that we
14     were going to pray up there?
15          Q.    Or that you were using it to
16     pray.  You had services there.
17          A.    No, I didn't tell them I had
18     services there.  No.  No.
19          Q.    Did you ever tell them that you
20     and your family prayed in the treehouse?
21               MR. MORRIS:  Objection.
22               You can answer again.
23          A.    I don't recall.
24          Q.    Do you recall if you told them
25     that this was a religious freedom issue of
```

```
 1                    J. LEPPER
 2    the treehouse?
 3                MR. MORRIS:  Objection.
 4                You can answer.
 5        A.    Say it again.
 6        Q.    Yes.
 7                Did you ever tell them that you
 8    believed this was a religious freedom or a
 9    religious liberty issue?
10                MR. MORRIS:  Objection.
11                You can answer.
12        A.    Did I tell them it was a
13    religious freedom?
14                I think I told them I thought
15    we were protected under that because I felt
16    like our rights were being violated
17    already.
18        Q.    Do you remember specifically
19    what you said?
20        A.    No.
21                MR. MORRIS:  Objection.
22        Q.    Let me see if I can refresh
23    your memory.
24        A.    Refresh me.
25                MR. MORRIS:  No.
```

```
 1                    J. LEPPER

 2              That doesn't come off well

 3          there (indicating).

 4      Q.    I'm just going to ask you to

 5   listen to this clip from Newsday for the

 6   time being without asking you any

 7   questions.

 8              MR. MORRIS:  Counsel, are you

 9          representing that this clip is from

10          Newsday?

11              Have you turned this over in

12          discovery?

13              MR. TOSCA:  This is from

14          Newsday.  This is something that's on

15          the internet.

16              MR. MORRIS:  Can you just tell

17          us what internet address you're

18          addressing.

19              MR. TOSCA:  Google dot com

20          Lepper treehouse video.

21              MR. MORRIS:  Okay.

22              So I can make sure.  Lepper

23          video?

24              That's what you used?

25              MR. TOSCA:  No, I did not.
```

```
 1                    J. LEPPER
 2            I used Lepper treehouse.  And
 3        then you go to videos and you Google
 4        it and it shows up in one of the
 5        clips.
 6            MR. MORRIS:  Okay.
 7            Is this the clip from Newsday,
 8        November 21st, 2018 so we have a full
 9        record here?
10            MR. TOSCA:  Yes.
11            In fact, why don't we mark the
12        video as -- not the video.  The CD as
13        an exhibit.  And I will make a copy
14        for you if you need it.
15            MR. MORRIS:  Please, Counsel.
16            MR. TOSCA:  Why don't we do
17        this.
18            I don't know if she should mark
19        the CD itself but I'll mark the
20        housing to the CD and then it will be
21        the CD that's in here.
22            And then if you have burning
23        capabilities, you can do it right
24        here.
25            MR. MORRIS:  I don't know if we
```

```
 1                    J. LEPPER
 2        can burn.
 3             MR. TOSCA:  You don't have a
 4        blank CD?
 5             MR. MORRIS:  No.
 6             MR. TOSCA:  Please mark this
 7        (handing).
 8             (Whereupon, the aforementioned
 9        CD housing was marked as Defendants'
10        Exhibit K for identification as of
11        this date by the Reporter.)
12             MR. TOSCA:  We're playing a
13        video recording from November 21,
14        2018.
15             "So we're building a treehouse
16        for my son's sixth birthday.  We
17        started it back in May.  The village
18        sent us a letter stating that we
19        might require a building permit, gave
20        the village an elevation drawing with
21        the survey with the location of the
22        treehouse on which they accepted.
23             Since then we waited for them
24        to get back to us.  We waited till I
25        think June 30th, somewhere around
```

```
 1                      J. LEPPER
 2         there and never heard from the
 3         village so I put the walls together
 4         in the garage and I just put it up
 5         that weekend.
 6              They didn't come back and tell
 7         us anything until July 19th.  They
 8         came by and gave us a certified
 9         envelope, certified mail with three
10         violations in construction without a
11         permit.
12              I think we got the ruling
13         October 17th that we were found
14         guilty of these three violations.  We
15         had to go pay the fine and we were
16         ordered by the -- not by the judge
17         but by the building inspector to
18         remove the treehouse and we can
19         receive fines every day after.
20              So now we've made it into a
21         chapel.  So now it's the GFY Chapel,
22         the Good For You Chapel.
23              So we go up there and we -- we
24         do our prayers.  But I think now -- I
25         think there's a good chance that
```

```
 1                      J. LEPPER
 2           we're protected under the first
 3           amendment; freedom of religion now
 4           that we made it a chapel.  And we'll
 5           leave up as a symbol for the kids to
 6           maybe get into politics of law, fix
 7           the corruption of local politics of
 8           the flawed legal system that doesn't
 9           allow us to have a treehouse in our
10           backyard."
11           Q.   Do you need to look at it
12      again, sir?
13           A.   No.
14                I'm good.
15                MR. MORRIS:  Just so the record
16           is clear, Mr. Glass is leaving now.
17                (At this time Mr. Glass exited
18           the room.)
19                MR. TOSCA:  Yes, he's leaving.
20                MR. MORRIS:  There was
21           laughing, I mean close tension
22           between both clients.
23           Q.   Mr. Lepper, did you have an
24      opportunity to review the video that we
25      just played?
```

```
 1                    J. LEPPER
 2        A.    Yes.
 3        Q.    And you heard it?
 4        A.    Yes, I did.
 5        Q.    And that's the video that's on
 6   disk that's marked as Defendants' Exhibit
 7   K.
 8              Does that refresh your memory
 9   as to what you said about using the
10   treehouse as a chapel?
11        A.    Yes.
12        Q.    And, in fact, did you use it as
13   a chapel?
14              MR. MORRIS:  Objection.
15              You can answer.
16        A.    No.
17        Q.    Did your children or you ever
18   pray up there?
19        A.    I don't know.
20              I might have.
21              But no, I never used it as a
22   chapel.
23        Q.    Now, is there a reason that you
24   told the news media that you were using
25   that as a chapel?
```

```
 1                    J. LEPPER

 2         A.    Is there a reason?

 3         Q.    Yes.

 4         A.    Well, like I told you earlier,

 5    the only reason why I reached out to the

 6    media is because I felt like my family was

 7    being mistreated and our rights were being

 8    violated.

 9              So at that point, I wasn't

10    really sure what we could do to protect

11    ourselves, and I did not have counsel at

12    that time.

13         Q.    Is what you told them not true?

14              MR. MORRIS:  Objection.

15         A.    Rephrase that question.

16         Q.    What you told them what you saw

17    in that video, is that not true?

18              MR. MORRIS:  Objection.

19              It's 1 minute and 20 something

20         seconds.

21              What are you referring,

22         Counsel?

23         Q.    When you told them that you

24    used the treehouse as a chapel, was that

25    true?
```

```
 1                   J. LEPPER
 2        A.    You're going to have to play it
 3    again.
 4              I said I think we're going to
 5    use it as a chapel.  I think that we're
 6    protected under the second amendment.  But,
 7    again, I don't know.
 8        Q.    I think you said exactly --
 9    well, we'll play it again.  I think what
10    you said was --
11              MR. TOSCA:  We could read it
12         back.  It's on the record.
13              So why don't we read back on
14         the record what was said in terms of
15         his using it as a chapel.  It's
16         towards the middle.
17        A.    You could play it again.
18              MR. MORRIS:  Do you want to
19         hear the video or do you want to hear
20         the court reporter?
21              THE WITNESS:  I want the hear
22         the video again.
23              MR. TOSCA:  Then that's fine.
24        Q.    Let's see if you can hear it
25    without the speakers.  Otherwise, I'll go
```

```
1                    J. LEPPER
2    through the exercise of putting them on
3    again.
4              If you can't hear it at the
5    level that it's at let, me know and I'll
6    put the speakers on.
7              All right?
8              MR. TOSCA:  Do you want the
9         reporter to take down again what was
10        being played?
11             MR. MORRIS:  We're on the
12        record here as far as I'm concerned.
13             MR. TOSCA:  Okay.
14   Q.    Let me know if you can hear
15   this, Mr. Lepper.
16             "So we're building a treehouse
17        for my son's sixth birthday.  We
18        started it back in May.  The village
19        sent us a letter stating that we
20        might require a building permit, gave
21        the village an elevation drawing with
22        the survey with the location of the
23        treehouse on which they accepted.
24             Since then we waited for them
25        to get back to us.  We waited till I
```

1                    J. LEPPER

2          think June 30th, somewhere around

3          there and never heard from the

4          village so I put the walls together

5          in the garage and I just put it up

6          that weekend.

7               They didn't come back and tell

8          us anything until July 19th.  They

9          came by and gave us a certified

10         envelope, certified mail with three

11         violations in construction without a

12         permit.

13              I think we got the ruling

14         October 17th that we were found

15         guilty of these three violations.  We

16         had to go pay the fine and we were

17         ordered by the -- not by the judge

18         but by the building inspector to

19         remove the treehouse and we can

20         receive fines every day after.

21              So now we've made it into a

22         chapel.  So now it's the GFY Chapel,

23         the Good For You Chapel.

24              So we go up there and we -- we

25         do our prayers.  But I think now -- I

```
 1                    J. LEPPER
 2          think there's a good chance that
 3          we're protected under the first
 4          amendment; freedom of religion now
 5          that we made it a chapel.  And we'll
 6          leave up as a symbol for the kids to
 7          maybe get into politics of law, fix
 8          the corruption of local politics of
 9          the flawed legal system that doesn't
10          allow us to have a treehouse in our
11          backyard."
12          Q.    Mr. Lepper, was the statement
13  you made that now you use it as a chapel
14  for you and your children true?
15          A.    Was the statement that I made
16  that now we use it as a chapel true?
17                No.
18          Q.    Now, the person who is speaking
19  in that clip, that's you; is that correct?
20          A.    That's correct.
21          Q.    And who are you speaking to?
22  To whom were you speaking?
23          A.    I don't know.  I don't recall.
24          Q.    You don't know the person's
25  name?
```

1                    J. LEPPER

2        A.    It said News 12.

3              I don't know the person's name.

4        Q.    I think it said Newsday.  It's

5    a Newsday clip.

6              Do you remember giving any kind

7    of interview to News 12?

8        A.    Yes.

9        Q.    Did you tell them about your

10   using the treehouse as a chapel also?

11             MR. MORRIS:  Objection.

12             You can answer.

13       A.    Yes.

14             Like I said, they were all

15   there on the same day.

16       Q.    Just so I can go through a

17   little bit of the timeline because you had

18   mentioned something about a hyperdermic

19   needle.

20             When was it that you found a

21   hypodermic needle in your backyard?

22       A.    I don't recall the exact that

23   we found it in our bushes.  I think we

24   submitted a photo.  I don't recall the

25   exact date.

```
 1                      J. LEPPER
 2             Two of my neighbors had spoke
 3    to us prior to I think us even finding ours
 4    that they had found -- or maybe when we
 5    found ours, we told them what we had found.
 6    And then they had said that they found the
 7    same thing at different locations.
 8             Q.   So was it one hypodermic needle
 9    or more than one that you found?
10             A.   One that I found.
11             Q.   Was it on more than one day
12    that you found the hypodermic needle on
13    your property?
14             A.   No.
15             Q.   Have you ever found hypodermic
16    needles anywhere near your property within
17    say --
18             A.   Well --
19             Q.   Hold on.
20             A.   Sorry.
21             Q.   Have you ever personally ever
22    found any hypodermic needles within a
23    300-foot radius of your property?
24             A.   Just that one.
25             Q.   Okay.
```

```
 1                    J. LEPPER
 2         A.    The two other neighbors that I
 3    spoke to about it, they each found one and
 4    then the neighbor I spoke to the other day
 5    just found one.
 6              MR. TOSCA:  Move to strike the
 7         portion not responsive.
 8         Q.    I'm going to get to that.
 9              But I'm just talking about you
10    personally right now.
11              MR. MORRIS:  Objection.
12              You're asking him questions.
13         He's giving you answers.
14              MR. TOSCA:  In response to that
15         part that's unresponsive.
16         Q.    With respect to the hypodermic
17    needle that you located, what time of day
18    was this that you found the hypodermic
19    needle?
20         A.    I don't recall.
21              Morning or afternoon.
22              I was in the hammock with my
23    kids.
24         Q.    In the what?
25         A.    Swinging in the hammock with my
```

```
 1                    J. LEPPER
 2    kids.
 3         Q.    Was this before the treehouse
 4    was constructed?
 5         A.    Yes.
 6               I don't know.  I don't recall.
 7         Q.    Where was the hammock?
 8               Was it connected to trees or
 9    something or freestanding?
10         A.    It's connected to Tree 1 and 2.
11         Q.    And it was in the morning
12    weekday, weekend?
13               Do you remember?
14         A.    I don't recall.
15         Q.    Do you remember what month?
16               MR. MORRIS:  Objection.
17               You can answer.
18         A.    I don't recall.
19         Q.    Do you remember the year?
20               MR. MORRIS:  Same objection.
21               You can answer.
22         A.    I don't recall.
23               I believe it was 2018.
24         Q.    Okay.
25         A.    I was sitting in the hammock
```

```
1                    J. LEPPER
2    during the day with my kids with me right
3    next to the fence post within reach of my
4    children.
5         Q.    Were your children playing in
6    the backyard at the time?
7         A.    With me in the hammock.
8         Q.    Okay.
9               So they were by you.
10              They weren't at that play set
11   that you had for them, right?
12        A.    No.
13        Q.    And did you see it first, did
14   they see it, something else?
15        A.    I saw it.
16        Q.    You mentioned something about
17   the bushes.
18              Was it in the bushes, was it
19   next to the bushes?
20              Where was it exactly?
21        A.    It was directly next to the
22   fence post within arm's reach of my kids.
23   If it was from the street, it would be in
24   back of the bushes right next to the fence.
25   Somebody must have been discarded it out of
```

1                    J. LEPPER

2    a car, whatever, walking.  I don't know.

3    Just threw it.

4          Q.     You don't know how it got

5    there.

6          A.     I don't know how it got there.

7          Q.     Could you describe the

8    hypodermic needle, what it physically

9    looked like.

10         A.     Like a hypodermic needle.

11   Looked like a white syringe with the orange

12   tip.  With an orange tip.

13         Q.     Were there any contents in that

14   orange tip?

15         A.     Not that I know of.

16         Q.     Did you ever take photographs

17   of that hypodermic needle?

18         A.     I did.

19         Q.     How many photographs did you

20   take?

21         A.     I don't recall how many

22   photographs I took of it.

23         Q.     Did you keep the hypodermic

24   needle?

25         A.     I did.

```
 1                    J. LEPPER
 2         Q.    You still have it?
 3         A.    I do.
 4         Q.    You do?
 5         A.    (Nodding.)
 6              MR. TOSCA:  I'm going to
 7         request that I be able to see it.
 8         Q.    You didn't bring it here today,
 9    did you?
10              MR. MORRIS:  Hold on.
11              Note my objection for the
12         record.
13              Counsel, just so I'm clear, did
14         you say you wanted to see the needle?
15              MR. TOSCA:  Yes.
16              MR. MORRIS:  You're going to
17         inspect the needle?
18              MR. TOSCA:  Yes.
19              I want to see what it looks
20         like.  I'd like to take photographs
21         of it.
22              MR. MORRIS:  We're just going
23         to again ask that you follow up in
24         writing.
25              And we'll take it under
```

```
 1                    J. LEPPER

 2          advisement.

 3                    MR. TOSCA:  Not a problem.

 4          Q.    Where is that hypodermic

 5     needle?

 6          A.    It's in my treehouse case file.

 7          Q.    You have a treehouse case file?

 8          A.    I do.

 9          Q.    Does that file contain

10     communications what your attorney?

11          A.    As far as what?

12                Documents that we submitted to

13     court?

14          Q.    No.

15                I'm sorry.

16                Any communications that you had

17     between you and Mr. Morris.

18          A.    What do you mean?

19                Notes?

20          Q.    Notes, letters, e-mail

21     correspondence.

22                I don't know.  Whatever else

23     you have in terms of communication.

24          A.    No.

25                Just legal documents that were
```

```
 1                    J. LEPPER
 2    submitted to court.
 3              MR. TOSCA:  Then I'm going to
 4         ask for a copy of the treehouse case
 5         file that Mr. Lepper has kept.
 6              MR. MORRIS:  I'm going to ask
 7         again that you follow up in writing.
 8              MR. TOSCA:  And to the extent
 9         that there may be legal privilege
10         attached to anything, that I would
11         understand if it's exempted.
12         Q.    Now, the box that you're
13    talking about and the hypodermic needles,
14    did you keep it in some sort of plastic
15    wrapper or something?
16              MR. MORRIS:  Objection.
17              You can answer.
18         A.    It's in a Ziploc bag.
19         Q.    By looking at the hypodermic
20    needle, could you tell what it's used for?
21              MR. MORRIS:  Objection.
22         Q.    What it was used for.
23              MR. MORRIS:  Objection.
24              You can answer.
25         A.    I don't know.
```

```
 1                    J. LEPPER
 2           How could you tell?
 3           There's no -- no, I can't tell.
 4      Q.   Have you ever seen within a
 5   300-foot radius of your home anybody using
 6   or taking drugs, illegal drugs?
 7           MR. MORRIS:  Objection.
 8           You can answer.
 9      A.   Have I ever seen anybody taking
10   drugs?
11      Q.   Yes.
12           Illegal drugs, illegal
13   substances.
14      A.   Taking them?  Physically taking
15   them?
16      Q.   That's correct.
17      A.   No.
18      Q.   Have you ever seen anybody
19   possessing any illegal drugs within a
20   300-foot radius of your home?
21           MR. MORRIS:  Objection.
22           You can answer.
23      A.   I've seen exchange.
24      Q.   Were you able to physically
25   tell what they were exchanging?
```

```
 1                    J. LEPPER
 2        A.    No.
 3        Q.    So it's your suspicion that it
 4   was drug related?
 5              MR. MORRIS:  Objection.
 6              It's his testimony.
 7              What are you looking for?
 8              Ask him a question.
 9              MR. TOSCA:  All right.
10        Q.    Do you know if they were
11   exchanging drugs?
12        A.    For sure?
13              Was I in the window of the car?
14              I seen a hand-to-hand
15   transaction.
16        Q.    Did you know what that
17   transaction was?
18        A.    In the vicinity of our
19   elementary school bus stop.
20              Did I know what the transaction
21   was?
22        Q.    Yes.
23        A.    Did I see it from across the
24   street?
25              No.
```

```
 1                    J. LEPPER

 2              I just seen a hand go in the

 3     window and a hand come out of the window on

 4     multiple occasions.

 5          Q.    How many occasions did you see

 6     that?

 7          A.    I can't put a number on it.

 8     More than I care to see.

 9          Q.    When did these exchanges take

10     place?

11          A.    Frequently.

12          Q.    When you say "frequently", when

13     was the first time you saw that?

14              MR. MORRIS:  Objection.

15              You can answer.

16          A.    I'm not sure.

17              Like I said, I was informed by

18     a couple of neighbors of what they found.

19     And I informed them of what I found.

20              And then I kind of had an idea,

21     you know, was keeping an eye out because of

22     what they've seen and then I witnessed it

23     myself.

24          Q.    Did you see the hand-to-hand

25     exchange for the first time before you
```

1               J. LEPPER

2    found the hypodermic needle near the fence

3    post?

4          MR. MORRIS:  Objection.

5          You can answer.

6    A.    No.  I don't think so, no.

7    Q.    Did you see the hand-to-hand

8    exchange after the construction of the

9    treehouse?

10          MR. MORRIS:  Objection.

11          Counsel, what hand-to-hand

12      exchange?

13          It sounds like you're referring

14      to plural.  There's only one.

15    Q.    Okay.

16          The first hand-to-hand

17    exchange.

18    A.    I'm not really sure.

19          When the neighbors notified me

20    of what they were seeing, I'm not sure what

21    that date was, whether it was prior to me

22    finding the needle and when I observed, you

23    know, I started keeping an eye out.

24          You know what?  I'm not sure.

25    I'm not sure.

```
 1                    J. LEPPER
 2              I think it was prior to.
 3         Q.    You had mentioned you'd gotten
 4    a letter in May 2018, correct?
 5              MR. MORRIS:  Objection.
 6         Q.    Was the hypodermic needle found
 7    before or after you received that letter?
 8              MR. MORRIS:  Same objection.
 9         A.    Was that before or after we saw
10    that hypodermic needle?
11              Gee, I can't recall a date.
12              I think I said earlier that it
13    was -- everything was going on around the
14    same time.
15              I can't give you an exact date.
16         Q.    Before your first court
17    appearance, with reference to the
18    treehouse, did you find a hypodermic
19    needle?
20              MR. MORRIS:  Objection.
21              Asked and answered.
22              You can answer again.
23         A.    Repeat the question.
24         Q.    Sure.
25              Before your first court date
```

```
 1                    J. LEPPER
 2    with reference to the treehouse, did you
 3    find the hypodermic needle?
 4              MR. MORRIS:  Same objection.
 5        A.    Yes.
 6        Q.    Before your first court date,
 7    did you see the first hand-to-hand
 8    exchange?
 9              MR. MORRIS:  Same objection.
10              You can answer.
11        A.    Yes.
12        Q.    When was the last time you saw
13    hand-to-hand exchange?
14        A.    I don't recall.
15        Q.    Were all these hand-to-hand
16    exchanges made near the elementary school?
17        A.    They weren't all hand to hand.
18    A lot of them -- there was a couple hand to
19    hand and -- not actually -- a couple were
20    actual hand to hand.  Hand in the window,
21    hand out of the window.
22              A couple of them were just
23    walking to the car and not actually seeing
24    hand to hand.
25              It happens frequently.
```

1                        J. LEPPER

2          Q.    The last time you saw that, was

3    that at the elementary school?

4          A.    It was never at the elementary

5    school.  The elementary school bus stop.

6          Q.    All right.

7                Where is that bus stop?

8          A.    On the -- southeast corner of

9    Cockenoe and Wampum.

10         Q.    Across the street from your

11   house.

12         A.    Diagonally across the street

13   from my house.

14         Q.    Now, the elementary school bus

15   stop, what elementary school was that?

16         A.    It's Babylon elementary.

17         Q.    Do your children attend that

18   school?

19         A.    Yes.

20         Q.    When you found the hypodermic

21   needle, did you do anything with regard to

22   reporting it?

23               MR. MORRIS:  Objection.

24               You can answer.

25         A.    I put it in my pocket and

```
 1                    J. LEPPER
 2    reported it to my wife and told her what I
 3    just found next to our fence post.  I have
 4    a four year old.
 5         Q.    Go ahead.  I'm sorry.
 6               I thought you were done.
 7               Are you done?
 8         A.    I'm done.
 9         Q.    Okay.
10               What did your wife say?
11         A.    She was obviously as upset as I
12    was that it was within arm's reach of our
13    children and we had a discussion and
14    notified the neighbors.
15         Q.    Now, who were the neighbors
16    that you notified?
17         A.    Patrick and Kiersten Murphy.
18         Q.    Who else?
19         A.    Kevin and Lindsay Cunningham.
20         Q.    Anyone else?
21         A.    I believe those were the only
22    two that were notified at that time.  I
23    think after we notified other people.  That
24    was the only two that we spoke to
25    immediately following.
```

```
1                       J. LEPPER
2          Q.    Where do Mr. and Mrs. Murphy
3     reside?
4          A.    Directly across the street from
5     me.
6          Q.    On Cockenoe?
7          A.    On Cockenoe.
8          Q.    Do you know the address?
9          A.    No.
10               They're -- northwest corner --
11    they're the northeast corner.
12         Q.    Of Cockenoe and Wampum, right?
13         A.    Uh-hum.
14         Q.    Where do Mr. and Mrs.
15    Cunningham reside?
16         A.    Directly across the street from
17    me on Cockenoe.  I believe they have a
18    Wampum address.
19         Q.    You think the front of their
20    house is on Wampum?
21         A.    The front of their house is on
22    Wampum.  I believe it's a Wampum address.
23         Q.    What did you say to them?
24               MR. MORRIS:  Objection.
25         Q.    When you say you notified them,
```

```
 1                    J. LEPPER
 2   you notified them verbally?
 3        A.    I notified them verbally.  I
 4   told them what they had already notified me
 5   about.  I had found one myself.
 6        Q.    Somebody had told you about
 7   finding hypodermic needles before you found
 8   your hypodermic needle?
 9              MR. MORRIS:  Objection.
10              You can answer.
11        A.    I believe so.  I believe the
12   Murphys told us that -- they told us there
13   was an issue.  I told them what we had
14   found, then they told me they had also by
15   their storm drain, I think.
16        Q.    Before you found the hypodermic
17   needle, what was it that they told you?
18        A.    That they noticed there were
19   suspicions of drug activity or drug
20   exchanges going on in the corner.
21        Q.    Had they mentioned anything
22   about finding hypodermic needles before you
23   found your hypodermic needle?
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
1                    J. LEPPER
2          A.    I'm not sure.
3          Q.    The Cunninghams, when you spoke
4     to them before you found the hypodermic
5     needle, what did you tell them?
6               MR. MORRIS:  Objection.
7          Q.    I'm sorry.
8               When they spoke to you before
9     you found the hypodermic needle, what did
10    they say to you?
11              MR. MORRIS:  Objection.
12              You can answer.
13         A.    Same thing.
14              That they observed what
15    appeared to be drug transactions on the
16    corner directly across from their house.
17         Q.    When the Murphys told you about
18    the drug transactions that they saw before
19    you had found your hypodermic needle, what
20    did you respond to them?
21              What did you tell them?
22              MR. MORRIS:  Objection.
23              You can answer.
24         A.    They said that, you know, if
25    you wouldn't mind keeping an eye out, this
```

```
 1                    J. LEPPER
 2    is what I feel we saw.  I said no problem.
 3    I'll take a look.  I'll watch.  If I see
 4    anything, I'll let you guys now.
 5         Q.    And the Cunninghams, what did
 6    you say to them in response to their
 7    telling you about the drug transaction they
 8    had seen before you found the hypodermic
 9    needle?
10              MR. MORRIS:  Speak.
11         A.    Same thing.
12              I don't think -- Kevin told me
13    about what he witnessed on the corner.
14    Just keep an eye out, heads up.  And I
15    don't think he ever told me that he
16    personally found a hypodermic needle but I
17    told him what I found.
18         Q.    Now, you said you told others.
19              Who else did you tell about the
20    hypodermic needle or the drug transactions?
21              MR. MORRIS:  Objection.
22              You can answer.
23         A.    I don't recall.
24              Now, actually --
25         Q.    Go ahead.
```

```
 1                      J. LEPPER
 2              I'm sorry.
 3      A.      I just told them what I told
 4  them.  That I'd keep an eye out.
 5              I told Gerry Glass.
 6      Q.      You told Gerry Glass?
 7      A.      I did.
 8      Q.      And when did you tell him about
 9  finding any hypodermic needles?
10      A.      August 14th 2018.
11      Q.      And where was this that this
12  discussion occurred?
13      A.      In the village clerk's office
14  before the hearing.  Before the initial
15  hearing.
16      Q.      What did he say to you?
17      A.      He said that I have to make a
18  case.
19      Q.      Do you know what he meant by
20  that?
21              MR. MORRIS:  Objection.
22              You can answer.
23      A.      Did I know what he meant by
24  that?
25      Q.      Yes.
```

```
 1                     J. LEPPER
 2        A.    I believe I understood what he
 3   was saying.
 4        Q.    What did you understand him to
 5   say?
 6        A.    He was basically telling me to
 7   make a case about what I had found in the
 8   bushes.
 9        Q.    What did you understand by
10   making a case?
11              MR. MORRIS:  Objection.
12              You can answer.
13        A.    I guess that he --
14              I don't know.  I don't know.
15              I told him I wasn't interested
16   in making any case.
17        Q.    Did he say anything else?
18        A.    I said I'm not interested in
19   making any case.  We all watch out for one
20   another over there.  Just tell me what the
21   village needs for me to make this go away.
22        Q.    Why did you bring up the
23   hypodermic needle on August 14, 2018?
24        A.    Because it was in my case file.
25   It was everything I explained to you.  Why
```

202

```
1                    J. LEPPER
2    we are where we are today.
3         Q.    You said you had spoken to Mr.
4    Glass in the village clerk's office.
5                 Did you make a specific
6    appointment to see Mr. Glass?
7                 What was your purpose for being
8    at the village clerk's office that day?
9         A.    That was the initial hearing on
10   August 14, 2018.
11        Q.    Was that on the record, that
12   discussion?
13                 MR. MORRIS:  Objection.
14        A.    That discussion in the clerk's
15   office was off the record.  The hearing was
16   on the record.
17        Q.    Did you approach Mr. Glass or
18   did he approach you initially?
19                 MR. MORRIS:  Objection.
20                 You can answer.
21                 THE WITNESS:  Answer?
22                 MR. MORRIS:  Yes.
23        A.    Mr. Glass asked me to speak
24   with him in the clerk's office prior to
25   being called to the bench.
```

```
 1                      J. LEPPER
 2           Q.     Did he say why he wanted to
 3      speak to you?
 4           A.     Once I got into the room.
 5           Q.     What did he say?
 6           A.     In front of his intern.
 7                  Well, that was the very first
 8      meeting, and he was a gentleman.  And he
 9      said that I just want you to know I went by
10      your house and you did a beautiful job with
11      your treehouse.
12                  What's the issue?
13                  So I explained to him
14      everything that I explained to you.  Told
15      him what I found.  I told him that we
16      received a letter or I started building the
17      platform on May 3rd and we received the
18      letter on May 10th stating about what we're
19      building in the yard may require a permit.
20                  I believe I showed him a copy
21      of the permit application with the drawing
22      and everything that I submitted.  Told him
23      that we waited, you know, whatever till
24      somewhere in the middle of June, checked
25      the status of our treehouse permit
```

1                    J. LEPPER

2    application, told him no determination had

3    been made.

4              And I told him what I said on

5    the record earlier.  We erected the walls

6    on June 30th, the week before my son's

7    birthday just to show him what I was doing

8    and that we received the three violations

9    via certified mail on -- July 19th my wife

10   signed for the certified envelope with the

11   three violations in it.  I brought them to

12   the village.  They told me I needed to take

13   a meeting with Mr. Fellman.  I did so

14   somewhere the next week or the following

15   week.

16             And then we discussed the three

17   violations.  I asked him about the building

18   code and why he complained.  It was pretty

19   sure he didn't give us any information as

20   far as the building code.  He didn't give

21   us any information as far as what we were

22   not in compliance of.

23             So I complained to Mr. Glass

24   and then he said that he would see us in

25   court.  And then also on the back page I

1                       J. LEPPER

2       showed him that we found this needle in the

3       bushes.  And he said are you going to make

4       a case about that?  I said Mr. Glass, I'm

5       not interested in making a case.  I'm

6       interested in making this go away.  What do

7       I need to make this go away?

8                       And then that was it until we

9       were called to the bench.  His intern I

10      believe was present.  And there was a few

11      people in the clerk's office.  I don't know

12      what they did hear or didn't hear.

13                      We had about probably 30 to 40

14      neighbors there in support that day for us

15      and all we did was plead not guilty.  And

16      it was adjourned to a later date.

17           Q.    Okay.

18           A.    September 11th.

19           Q.    Did you discuss with Mr. Glass

20      a resolution to these violations?

21           A.    No.  Not at the time.

22           Q.    Did you bring a hypodermic

23      needle with you that evening?

24           A.    That evening?

25           Q.    Afternoon.

```
 1                      J. LEPPER
 2            When did you go on August 14th?
 3       A.   That afternoon.
 4       Q.   Okay.
 5            Did you bring the hypodermic
 6  needle with you?
 7       A.   It was in the folder.
 8       Q.   Did you show it to Mr. Glass?
 9       A.   I did.
10       Q.   Did you tell him anything about
11  what other neighbors were talking about
12  these drug transactions that they thought
13  that there might have been?
14       A.   I don't recall.
15            I don't think he asked at that
16  time.
17       Q.   Did he ask you about the
18  hypodermic needle or did you bring up the
19  subject first?
20            MR. MORRIS:  Objection.
21            You can answer.
22       A.   Um, he just asked me about the
23  case and I went through the case and that
24  was the last page of the file.
25       Q.   All right.
```

```
 1                    J. LEPPER
 2            When you say it was the last
 3   page of the file, do you mean the
 4   hypodermic needle?
 5        A.    Yes.
 6        Q.    Did you report any drug
 7   activity or finding a hypodermic needle to
 8   the police department?
 9        A.    I had called the police after
10   but I don't think I reported that to
11   anybody but the neighbors that I told you
12   about.
13            I have called the police on
14   occasion after I witnessed them hand to
15   hand but I don't believe I reported after I
16   found the hypodermic needle to anyone other
17   than the two neighbors that I told you I
18   spoke to about.
19        Q.    Were you suspicious that this
20   hypodermic needle might be a sign of drug
21   activity?
22        A.    Yes.
23        Q.    Didn't you think it was
24   important to notify the authorities?
25            MR. MORRIS:   Objection.
```

```
 1                      J. LEPPER
 2             Authorities?
 3             Objection.
 4        Q.   Didn't you think it was
 5   important to notify the police?
 6        A.   I'm pretty aware of the opioid
 7   epidemic.  I'm a fireman.  I did notify
 8   them.  After I notified my neighbors, and I
 9   saw what they were speaking of.
10        Q.   When did you call the police?
11        A.   I don't recall.
12        Q.   And you told the police about
13   the hypodermic needle?
14             MR. MORRIS:  Objection.
15        A.   No.
16             I told the police about what I
17   suspected to be a hand-to-hand transaction.
18        Q.   Okay.
19             What precinct did you go to?
20        A.   911.
21        Q.   I'm sorry.
22             You didn't go to the police.
23             You actually called on the
24   telephone?
25             MR. MORRIS:  That's why I'm
```

```
 1                      J. LEPPER
 2           objecting to the assumption of facts.
 3                      MR. TOSCA:  That's fine.
 4           Q.    Did you report this to the
 5    police over the telephone, in person or
 6    something else?
 7           A.    Telephone.
 8           Q.    And how many telephone contacts
 9    did you make with the police about the drug
10    activity?
11           A.    I'm not sure.
12                 Not as many as I saw.
13           Q.    What response did you get from
14    the people you called at 911?
15                 MR. MORRIS:  Objection.
16                 You can answer.
17           A.    I assume the quickest report I
18    could get from 911 when you're witnessing
19    the transaction.  I don't think anybody was
20    going appear out of nowhere.
21                 So, obviously, the transaction
22    was reported before the police showed up.
23           Q.    But did any police come to the
24    scene?
25           A.    I don't think I ever saw
```

```
 1                     J. LEPPER
 2    anybody.
 3         Q.    Was there a reason you didn't
 4    wait?
 5               MR. MORRIS:  Objection.
 6               You could answer.
 7         A.    Is there a reason?
 8               I don't recall.  I don't know
 9    when it happened or what I was doing at the
10    time.
11         Q.    Did the police ever take any
12    statements from you regarding what you saw
13    and found?
14               MR. MORRIS:  Objection.
15         A.    Personally?
16               I mean in person?
17         Q.    Yes.
18               Come to your house and take a
19    statement.
20         A.    No.
21         Q.    Did you identify yourself when
22    you called?
23               MR. MORRIS:  Objection.
24         A.    I don't recall.
25         Q.    Do you know, did any of your
```

```
 1                    J. LEPPER

 2    neighbors tell you that they had made

 3    contact with the police about drug

 4    activity?

 5         A.    Um, yes.

 6         Q.    Who told you they had also made

 7    contact --

 8         A.    No.

 9               I'm sorry.

10               No.

11         Q.    No what?

12         A.    No, they never told me that

13    they called the police but -- myself and

14    Pat Murphy, I can't recall the date but

15    last year we had called the police because

16    I suspected somebody was parked next to my

17    bushes of doing something, some kind of

18    drug activity.

19               So we called the police then.

20    But --

21         Q.    Did the police come to the

22    house?

23         A.    I'm sure they did but we didn't

24    even take a statement.  We left before they

25    showed up.
```

```
 1                    J. LEPPER
 2        Q.    Did you see the police actually
 3   arrive?
 4        A.    No.
 5        Q.    Did you make any complaints in
 6   writing to the police about the drug
 7   activity?
 8        A.    No.
 9        Q.    Did you make any complaints to
10   any other governmental agencies about drug
11   activity in the area?
12              MR. MORRIS:  Objection.
13              You can answer.
14        A.    I don't recall.
15        Q.    Did you ever notify the school,
16   the elementary school, about the drug
17   activity near the bus stop?
18        A.    No.
19        Q.    Do you know if anybody did
20   notify the school?
21        A.    About what I had found?
22        Q.    About drug activity in general
23   in the area.
24        A.    I'm sure at one point they did.
25        Q.    Why are you so sure that they
```

```
 1                    J. LEPPER
 2    did?
 3         A.    Because they relocated the
 4    Wyandanch and Wampum elementary school bus
 5    stop because of known drug activity over
 6    there.
 7         Q.    How do you know they relocated
 8    for that reason?
 9         A.    Neighbors told me.
10         Q.    Did you have any discussion
11    with the bus company or with the school
12    about that?
13              MR. MORRIS:  Objection.
14              Which one?  The bus company or
15         the school?
16              MR. TOSCA:  Either.
17              Because I think the answer is
18         probably going to allow me to
19         abbreviate that question.
20         A.    Can you repeat the question.
21         Q.    Did you notify the bus company
22    that stops at that stop or the school to
23    which the bus was going to about --
24         A.    At my bus stop?
25         Q.    -- about drug activity in the
```

```
 1                      J. LEPPER
 2    area or the changing of the bus stop?
 3         A.    At my children's bus stop?
 4         Q.    At Wampum and Cockenoe.
 5         A.    Wampum and Cockenoe?
 6         Q.    Isn't that where the bus stop
 7    was?
 8         A.    Yes.
 9              That's when my children's bus
10    stop was there.
11         Q.    So that was changed; am I
12    correct?
13         A.    No.
14         Q.    What bus stop was changed?
15         A.    Wampum and Wyandanch.
16         Q.    I'm sorry.
17              I thought you meant -- I
18    misunderstood.
19              So the Wyandanch and Wampum bus
20    stop was changed to where?
21         A.    It got relocated from the
22    corner of Wampum and Wyandanch to -- it was
23    now one stop was relocated to two stops.
24              So in the middle of each block
25    is where the new bus stop is located.
```

```
 1                      J. LEPPER
 2          Q.    Did you speak --
 3          A.    That was done prior to me
 4    moving.
 5          Q.    I'm sorry?
 6          A.    That was all done prior to me
 7    moving into the neighborhood.
 8          Q.    The bus stop change happened
 9    before you even moved into the house at
10    Cockenoe?
11          A.    That's correct.
12          Q.    Is it your testimony?
13          A.    Yes.
14          Q.    And --
15          A.    Actually, I don't know.  I'm
16    not sure.  I'm not sure when it was moved
17    because I really didn't pay attention until
18    my kids went to school but I just know it
19    was changed.
20          Q.    Did you discuss the changing of
21    the bus stop at Wyandanch and Wampum with
22    the school authorities?
23                MR. MORRIS:  Objection.
24                You can answer.
25          Q.    Or anyone at the school.
```

```
 1                    J. LEPPER
 2        A.    No.
 3        Q.    Did you discuss that change
 4    with the police?
 5        A.    No.
 6        Q.    Did you discuss that change
 7    with the bus company?
 8        A.    No.
 9        Q.    Had you ever had any
10    discussions with anybody at the bus company
11    or the school about your activity or
12    changing bus stops?
13              MR. MORRIS:  Objection.
14              You can answer.
15        A.    No.
16        Q.    All right.
17        A.    Village.
18        Q.    Okay.
19              So aside from the village,
20    anybody else?
21        A.    No.
22        Q.    Before you received any
23    tickets, did you speak to anybody at the
24    village about the drug activity in the
25    area?
```

```
1                    J. LEPPER
2              MR. MORRIS:  Objection.
3              When you say tickets --
4              MR. TOSCA:  The violations.
5              MR. MORRIS:  From the Village
6         of Babylon?
7              MR. TOSCA:  Correct.
8              MR. MORRIS:  Okay.
9         A.    I want to see you one second.
10             MR. MORRIS:  You have to answer
11         the question first.
12        A.    Repeat the question.
13             MR. TOSCA:  Could you read back
14         the back, please.
15             (Whereupon, the referred to
16         question was read back by the
17         Reporter.)
18        A.    I think we just put on the
19    record that I -- when I found what I
20    found -- actually, prior to that I believe
21    the neighbors told me about what they had
22    saw.  And when I found the hypodermic
23    needle on my property, I spoke to my
24    neighbors about it which was all prior to
25    the violations.
```

```
 1                     J. LEPPER
 2        Q.    So maybe I misunderstood.
 3              Had you spoken to any of the
 4     defendants in this case --
 5              MR. MORRIS:  Objection.
 6        Q.    -- about drug activity in the
 7     area before you received any violations?
 8              MR. MORRIS:  Objection.
 9              You can answer.
10        A.    Um, any of the defendants?
11        Q.    Correct.
12        A.    Yes.
13        Q.    To whom did you speak?
14              Which defendant did you speak
15     to about drug activity in the area before
16     you received any violations?
17              MR. MORRIS:  Objection.
18              You can answer.
19        A.    Actually, I got to take that
20     back.
21              I spoke to the -- I don't know
22     if they're named defendants.
23              I spoke to the building
24     department when I submitted the permit to
25     whoever was there.
```

```
 1                    J. LEPPER
 2            I don't know if they're named
 3      defendants though.
 4            MR. MORRIS:  Just before you
 5            answer, did you want to ask me
 6            something?
 7            THE WITNESS:  Yes.
 8            Are we going to have Noelle
 9            come here?
10            MR. MORRIS:  Off the record.
11            (Whereupon, an off-the-record
12            discussion was held.)
13            MR. MORRIS:  Counsel, we
14            confirmed the deposition of both
15            plaintiff John Lepper and plaintiff
16            Noelle Lepper.  She's made
17            arrangements.  I spoke to Sandra from
18            your office yesterday.  Not only did
19            she ask -- she asked for 11:30 and
20            she asked for Diamond Court
21            Reporting.  We're producing them
22            here.  I mean they're here.  We're
23            ready to go.
24            MR. TOSCA:  Number one, having
25            the witness starting 4:30 is not
```

```
 1                      J. LEPPER
 2          question and answer.
 3                  (Whereupon, the referred to
 4          testimony was read back by the
 5          Reporter.)
 6          Q.    Well, do you know the names of
 7     the persons you spoke to?
 8          A.    I didn't hear the question.
 9                I'm sorry.
10                MR. MORRIS:  Please read it
11          back for context.
12                  (Whereupon, the referred to
13          question was read back by the
14          Reporter.)
15          Q.    All right.
16                Do you know the name of the
17     person you spoke to?
18          A.    I spoke to one of my neighbors;
19     Holly.
20          Q.    Okay.
21                And Holly, do you know her last
22     name?
23          A.    I'm not sure.
24          Q.    Do you know if she works with
25     the building department or in the village?
```

```
 1                    J. LEPPER
 2         A.    Yes.
 3         Q.    Do you know what her position
 4    is?
 5         A.    Her official title?
 6               I'm not sure.
 7         Q.    Okay.
 8               Do you know what department she
 9    works in with the village?
10         A.    Building department.
11         Q.    Do you know if she's an
12    inspector?
13               MR. MORRIS:  Objection.
14               You can answer.
15         A.    No, I don't.
16               MR. MORRIS:  I apologize.
17               Can we go off the record for a
18         moment.
19               I'm getting a call from the
20         Court.
21               MR. TOSCA:  Yes.
22               (Whereupon, a short recess was
23         taken.)
24               THE LAW CLERK:  The judge was
25         able to finish up his hearing a
```

```
 1                    J. LEPPER
 2        little early.
 3             Were you able to work anything
 4        out?  If not, he's available now.
 5             MR. TOSCA:  On behalf of the
 6        defendants, yes.  The sticking point
 7        was taking was Mrs. Lepper's
 8        deposition out of order.
 9             After consultation with counsel
10        and working things out, I've allowed,
11        I'm conceding that we'll take my
12        deposition on July 5th and Mrs.
13        Lepper could be taken out of order.
14             THE LAW CLERK:  Okay.
15             MR. MORRIS:  This is
16        plaintiff's counsel.
17             I would respectfully request to
18        be heard by the judge on this matter,
19        as well just to make the record
20        completely clear.
21             MR. TOSCA:  Okay.
22             THE LAW CLERK:  Sure.
23             Just to be clear, the court
24        reporter has already recorded all of
25        this?
```

J. LEPPER

1

2          MR. MORRIS:  I want to put on

3      the record in terms of the

4      depositions.  And yes, I'd like to

5      put something on the record before

6      the judge in regards to an issue that

7      was raised during the deposition

8      here.

9          THE LAW CLERK:  Okay.

10         Hold on one second.

11         Which issue is that?  Is that

12     the one we spoke about this morning

13     about the in-court issues and the

14     hearsay issues?

15         MR. MORRIS:  No, no, no.

16         It's the first day of summer.

17     It's a case about a treehouse.  Two

18     young children are still deprived of

19     that treehouse.  We'd like to be

20     heard on that matter.

21         MR. TOSCA:  This is the first

22     I'm hearing of this.

23         So could Mr. Morris tell me

24     what exactly the issue is that he

25     wants to be heard on?

```
1                  J. LEPPER
2           MR. MORRIS:  Defense counsel
3      has illicited a great deal of
4      testimony about access to the
5      treehouse, asking about access to the
6      treehouse.
7           In light of what may be an
8      ambiguity, and certainly I think
9      there's going to be an issue in the
10     future, I'd like to have it heard
11     now, please.
12          MR. TOSCA:  I don't know what
13     we're hearing but okay.  If he wants
14     to talk to the judge, let him speak
15     to the judge.
16          MR. MORRIS:  Unless defense
17     counsel will stipulate to the
18     children being able to utilize the
19     treehouse, yes, I think we need --
20          MR. TOSCA:  No, I will not
21     stipulate to that.
22          LAW CLERK:  Okay.
23          Give me one second, folks.  Let
24     me grab the judge for you.  Please
25     have everyone on the line.
```

```
 1                    J. LEPPER
 2              Do we have the court reporter
 3         there also?
 4              MR. MORRIS:  She's taking all
 5         of this down.
 6              THE LAW CLERK:  Okay.
 7         Fantastic.
 8              I'm going to place you on hold
 9         and grab the judge.
10              MR. MORRIS:  Thank you.
11              MR. TOSCA:  Good afternoon,
12         Your Honor.
13              MR. MORRIS:  Good afternoon,
14         Your Honor.
15              Plaintiff's counsel here, Cory
16         Morris, on behalf of Mr. Lepper.
17         With me is Eric Tosca on behalf of
18         the defendants, Your Honor.
19              MR. TOSCA:  Good afternoon,
20         Your Honor.
21              JUDGE BROWN:  Do we have a
22         court reporter taking it down?
23              MR. TOSCA:  We do.  We do, Your
24         Honor.
25              JUDGE BROWN:  Okay.
```

```
 1                    J. LEPPER
 2             I'm going to ask the court
 3         reporter to make it a separate
 4         section of the transcript.  It will a
 5         ruling of the Court, and it will be
 6         filed with appropriate counsel.
 7             With that in mind, go ahead.
 8             (Whereupon, at 3:52, the
 9         judge's ruling was placed in a
10         separate booklet.)
11             (Whereupon, at 4:00, the
12         deposition continued.)
13             MR. TOSCA:  Could you read back
14         the last question.
15             (Whereupon, the referred to
16         question was read back by the
17         Reporter.)
18         Q.   Holly, does she live anywhere
19     near you?
20         A.   Yes.
21         Q.   Where does she live?
22         A.   She lives down the block.  Same
23     side of the street of Cockenoe.
24         Q.   And how long have you known
25     her?
```

```
 1                    J. LEPPER
 2        A.    Just since I moved there.
 3   Since we moved into the house in April of
 4   2013.
 5        Q.    Do you know if Holly has
 6   children?
 7        A.    Yes, she has.
 8              She has two college-aged girls.
 9        Q.    How many occasions have you
10   spoken to her about drug activity in the
11   area?
12        A.    I believe just the one.
13        Q.    And what date was that?
14        A.    The date of the permit
15   application.
16        Q.    So that's the date you went in
17   after the letter was sent to your home, the
18   May 2018 letter?
19        A.    Yes.
20              That I spoke to her about the
21   activity, yes.
22        Q.    Had you occasions to speak to
23   her about anything prior to receiving the
24   letter from the village, the May 2018
25   letter?
```

1                           J. LEPPER

2          A.     The May 10th stating that I may

3     require a permit?

4          Q.     Right.

5          A.     I did speak to her once before

6     that.  She was walking her dog and I just

7     asked her regarding the treehouse and why

8     are they asking for a permit.

9          Q.     But that would have been after

10    the letter, right?

11         A.     After the letter, right?

12         Q.     No.

13                I asked before that letter, did

14    you speak to Holly about anything?

15         A.     Other than, you know, being

16    neighborly hi and bye, that was it.

17         Q.     And you never mentioned

18    anything about drug activity to her before

19    the letter?

20                MR. MORRIS:  Objection.

21                You can answer.

22         A.     No, I don't.

23                Not until I submitted the

24    application.  That's when I spoke to her

25    about it.

```
 1                      J. LEPPER
 2          Q.    When you spoke to her, was it
 3     at the building department itself?
 4          A.    Yes.
 5          Q.    And she was working at the
 6     time?
 7          A.    Yes.
 8          Q.    And did she respond at all
 9     regarding the drug activity issues?
10          A.    Yes.
11                We were having a private
12     conversation.
13          Q.    And what was she saying about
14     it or did she say anything about it?
15                Put it this way:  What did she
16     tell you?
17                MR. MORRIS:  Objection.
18                You can answer.
19          A.    She said that, um, she was
20     aware of some of the activity I was
21     speaking of and that, you know, I wanted
22     her to speak to possibly the parents and I
23     said no.  I didn't see anybody physically
24     put it there.  I'm just saying that I have
25     an idea that it was one of -- idea of it
```

```
1                      J. LEPPER
2    was somebody in the area that I suspected
3    but I couldn't positively identify because
4    I didn't see anybody physically put it
5    there.
6         Q.    Other than the hypodermic
7    needle, did you tell her also about the
8    hand-to-hand transactions you had seen?
9         A.    I don't know -- no, I didn't
10   speak to her about that.
11        Q.    And did you also speak to her
12   about the treehouse and the need for a
13   permit?
14             MR. MORRIS:  Objection.
15             You can answer.
16        A.    I was -- yes, I submitted the
17   application.  They told me what to fill out
18   and I gave them the elevation drawing and
19   the survey with the location of it.
20        Q.    So Holly was the person you
21   handed the application to?
22        A.    No.
23        Q.    Do you know the name of the
24   person you handed the application to?
25        A.    No, I don't know the name.
```

```
 1                    J. LEPPER
 2              It might be Debbie but I'm not
 3    sure who the other girl was.  Another girl
 4    took the application and brought it to
 5    another room, brought it back and said it
 6    was acceptable.
 7         Q.    Well, did you know her last
 8    name at the time?
 9         A.    Whose?
10         Q.    Debbie.
11              The person that you think might
12    be Debbie.
13         A.    I don't even know that her
14    first name is Debbie.  I don't know her
15    name.  I just know it was three people in
16    the office and speaking to Holly.  I didn't
17    even know Holly's last name at that time.
18         Q.    Could you describe the person
19    that you think might be Debbie.
20         A.    Brown hair, maybe 5-6, 5-5.
21              I don't know.  I don't know.  I
22    can't describe other than she's got brown
23    hair.  I just considered there was three
24    girls in the office.
25         Q.    How did you get the application
```

```
  1                    J. LEPPER
  2    for the permit?
  3         A.    I believe I filled it out right
  4    there in front of him.
  5         Q.    So in other words, the day that
  6    you went was the day that you filled out
  7    the application at the village?
  8         A.    Yes.
  9               I believe that I spoke to them
 10    prior to it and he said they needed a
 11    drawing of the treehouse.  They didn't
 12    specify architectural drawings.  They just
 13    said drawing and location of it on a
 14    survey.
 15               And I asked if I could use a
 16    recent survey from my home renovation to
 17    locate it on there.  And they said that was
 18    fine.  And I brought that with me when I
 19    filled out the application in their office.
 20         Q.    When did you have this
 21    discussion about what you needed for the
 22    permit application?
 23               MR. MORRIS:  Objection.
 24               You can answer.
 25         A.    I don't know.
```

```
 1                      J. LEPPER
 2              After.
 3         Q.    Would it have been before the
 4    day you went there with the permit
 5    application?
 6              MR. MORRIS:  Objection.
 7              You can answer.
 8         A.    It would be after I received a
 9    letter stating that a permit might be
10    required.
11         Q.    Did you call before you went
12    down to the building department?
13         A.    Yes.
14         Q.    Was there was a conversation
15    over the phone with someone as to what you
16    needed?
17         A.    Just what I just told you.
18         Q.    Okay.
19              But that was over the phone,
20    that conversation?
21         A.    Yes.
22         Q.    And do you remember who it was
23    that you spoke to over the phone?
24         A.    No.
25         Q.    Do you know if it was Holly?
```

1                          J. LEPPER

2          A.     No.

3                 MR. MORRIS:  Objection.

4                 You can answer.

5          Q.     When you went down in person

6     for the first time after receiving the

7     May 10th letter, did you bring anything

8     with you, any documents with you?

9          A.     Yes.

10                I brought what they requested.

11    The drawing that I produced for them and

12    the recent copy of the survey with the

13    location.

14         Q.     Had you had the permit

15    application itself before you showed them

16    the drawing and the survey?

17                MR. MORRIS:  Objection.

18                You can answer.

19         A.     No, I don't believe so.

20         Q.     Okay.

21                Did you hand write the permit

22    application?

23         A.     Yes.

24         Q.     And did you do it there?

25         A.     Yes.

```
 1                    J. LEPPER
 2              MR. MORRIS:  Objection.
 3              You can answer.
 4      A.      Yes.
 5              I believe so.
 6      Q.      Let me just show you --
 7              THE WITNESS:  Can I respond to
 8          my wife?
 9              She's just texting me.
10      Q.      Sure.
11              (Whereupon, a short recess was
12          taken.)
13      Q.      Aside from Holly, Mr. Glass,
14      did you speak to anybody else about drug
15      activity in the area at Babylon?
16              MR. MORRIS:  Objection.
17              You can answer.
18      A.      Say that again?
19      Q.      Aside from Holly, Mr. Glass,
20      did you speak to anybody from the Village
21      of Babylon, the governmental entity about
22      drug activity in the area in Babylon?
23              MR. MORRIS:  Objection.
24              You can answer.
25      A.      Just in terms of village, from
```

```
 1                    J. LEPPER
 2    the village?
 3          Q.     Correct.
 4          A.     Mr. Fellman.
 5          Q.     Okay.
 6                 When did you speak to Mr.
 7    Fellman about this?
 8          A.     After my wife received the
 9    violation July 19th, I went up to the
10    village to ask them, you know, what it was
11    in regard to.
12                 They told me I need to speak to
13    Mr. Fellman.  They scheduled it somewhere
14    about a week later.  And at that meeting I
15    brought it up to Mr. Fellman.
16          Q.     So it wasn't on July 19th.
17                 It was the week after July 19th
18    that you spoke to Mr. Fellman about the
19    drug activity in the area?
20          A.     Somewhere thereabout.
21          Q.     Okay.
22                 Who did you schedule that
23    meeting with?
24                 MR. MORRIS:  Objection.
25                 You can answer.
```

```
 1                    J. LEPPER
 2        Q.    In other words, did somebody
 3   give you a time and place to come down?
 4        A.    I was in person at the building
 5   office.  I brought the violations with me,
 6   and I'm not even sure who scheduled it for
 7   me.  One of the girls in the building
 8   department office.
 9        Q.    Did you have a set time to meet
10   them or did they just say come in that day?
11        A.    No.
12              Set time.
13        Q.    And what time was it?
14              Do you remember?
15        A.    I believe it was the following
16   week or the week after on a Tuesday or
17   Thursday.  I don't want to commit to a
18   date.
19              It was a couple of week after I
20   spoke to them.  It was, I believe, in the
21   afternoon.
22        Q.    Were you speaking alone with
23   him or were there some other people there?
24        A.    No.
25              Just me and Mr. Fellman.
```

```
 1                      J. LEPPER
 2          Q.    Did you speak in a room, out in
 3    the hall or somewhere else?
 4          A.    We spoke in the conference room
 5    of the village hall, second floor.
 6          Q.    Did you bring documents with
 7    you to talk to him?
 8          A.    I did.
 9                I brought the violations and
10    the envelope that they came in.
11          Q.    Anything else?
12          A.    No.
13          Q.    Did he have any documents with
14    him when he spoke to you?
15          A.    No.
16          Q.    Well, you first spoke to him,
17    what did you say?
18                MR. MORRIS:  Objection.
19                You can answer.
20          A.    We sat down at the table and he
21    asked hi.  Could I help you?
22                And I said to him my wife
23    signed for this certified envelope.  She
24    receives -- you know, we received three
25    violations in there.
```

```
 1                    J. LEPPER
 2             I'm just inquiring what they
 3    were for.
 4        Q.    And what did he say to you?
 5        A.    As I pulled each one out
 6    individually, he started giving me dollar
 7    amounts what they were for; 250, 500 and a
 8    thousand dollars.
 9        Q.    Did he say anything else
10    besides dollar amounts?
11        A.    Um, no.
12             Regarding how much it was for
13    or explaining to me what they were about?
14        Q.    Anything.
15             Anything about these
16    violations.
17             Did he say anything other than
18    telling you dollar amounts?
19        A.    Well, I explained to him that
20    how could you expect me to pay for three
21    violations that come in one envelope for
22    three separate violations?
23             And then the conversation went
24    onto, you know -- I said, you know, I don't
25    know if I called him Steve, Mr. Fellman.
```

```
 1                    J. LEPPER
 2    You were more than a gentleman when I was
 3    renovated my property.  I had no issues.
 4              Could you explain to me what me
 5    what Building Code 365-26 is.  And he
 6    didn't do that.
 7         Q.   Did he give you any
 8    explanations as to what the tickets were
 9    for?
10         A.   No.  No.
11              He told me that the mayor's
12    office received a number of complaints.
13         Q.   Did he tell you what
14    complaints, who gave complaints, anything
15    like that?
16         A.   No.
17              I asked but he -- he refused to
18    tell me who the complainant was or what the
19    violations was in reference to.
20         Q.   Did you say anything else to
21    him?
22         A.   What did I say to him?
23              I need for you to explain to me
24    the violations of the complaints.  I
25    explained to him that I understand that you
```

1                    J. LEPPER

2    have a duty to act on a complaint.  You are

3    in the village also.  Could you come over

4    there and inspect it, do your job and tell

5    me what I need to do to be in compliance.

6              Or if I am in compliance with

7    the code, then you can go back to whoever

8    complained, then you would have done your

9    job for everybody.

10        Q.    And how did he respond to that?

11        A.    He didn't entertain that.

12        Q.    So he just didn't respond.

13              MR. MORRIS:  Objection.

14              You can answer.

15        A.    I don't recall what his

16   response was but he was not coming by to

17   measure it or tell me what the violations

18   was for or what I wasn't in compliance of.

19        Q.    Did you discuss the permit

20   application with him?

21              MR. MORRIS:  Objection.

22              You can answer.

23        A.    I don't recall what was said

24   but I'm sure it was brought up cause I did

25   apply already at that time.

```
 1                    J. LEPPER
 2        A.    Yes.
 3        Q.    Was there a reason you used
 4   this survey instead of the one after the
 5   renovations?
 6        A.    I don't really know.
 7              But they asked for a recent
 8   copy of a survey.  I might have told them
 9   that this was from 2000 --
10              Where is this from
11   (indicating)?
12              This is from 2012.  So it was
13   probably the closing.  Yes.  March 2012.
14   They said that this was a -- sufficient.
15              MR. MORRIS:  To be clear,
16         you're talking about the survey
17         contained within Exhibit M?
18              MR. TOSCA:  Yes.
19        Q.    So who told you that it was
20   sufficient?
21        A.    Whoever I spoke to in the
22   building department when they asked for the
23   survey.  Or like I said, when I went there
24   to fill out the permit application they
25   told me everything that I brought down was
```

```
 1                    J. LEPPER
 2    acceptable.
 3         Q.     Did they make any
 4    representation to you that a permit could
 5    be issued based on what you submitted to
 6    them?
 7         A.     Yes.
 8         Q.     Who told you this?  You said
 9    they.
10               So it was more than one person?
11               MR. MORRIS:  Objection.
12               You can answer.
13         A.     Like I said, I don't know her
14    name.  I believe there was three girls.
15    The only one I know is Holly which is my
16    neighbor.
17               I'm not sure what the other
18    one's name was.  When she took the permit
19    application, she took it away.  I think she
20    went to another room, brought it back and
21    she said it was acceptable.
22         Q.     Well, when she said it was
23    acceptable, did she say it was acceptable
24    for?
25               MR. MORRIS:  Objection.
```

```
 1                    J. LEPPER
 2              You can answer.
 3       A.    No.
 4              I'm not sure.  Acceptable
 5   meaning the way I understood was that they
 6   were going to review it.
 7              So the way I understood when
 8   she said acceptable when she took it away
 9   and brought it back was, I guess, the
10   building department would review my
11   publication with what I submitted and, I
12   guess, determine whether it was -- whether
13   they have an issue with the permit or not.
14       Q.    Now, the survey, there is a
15   preprinted portion.  It looks like there is
16   something that was superimposed on there, a
17   drawing superimposed on there.
18              Do you see what I'm talking
19   about?
20              MR. MORRIS:  Counsel, are you
21         talking about the survey within
22         Exhibit M?
23              MR. TOSCA:  Yes.
24       Q.    Do you see what I'm talking
25   about?
```

J. LEPPER

A. Yes.
What you're referring to is the location of the treehouse.
Q. Okay.
Now, who drew the small drawing that has the numbers three around a circle?
A. I did at the request of the village.
They wanted an approximate location cause the trees don't show up in the survey. They wanted an approximate location of the -- where the treehouse would be built.
Q. Okay.
There are measurements around the square. I can't really make it out. I'm not sure if that's an eight-foot but could you tell me what the top of the small square is that you had drawn.
MR. MORRIS: To be clear, within Defendants' Exhibit M?
MR. TOSCA: Yes, the survey within Defendants' Exhibit M.
A. It looks like eight feet.

```
 1                    J. LEPPER
 2         Q.    You wrote that eight feet?
 3         A.    Yes.
 4         Q.    And do you see on the side, is
 5    that also eight feet then?
 6         A.    Yes.
 7         Q.    Now, when you had prepared this
 8    drawing, the platform had already been in
 9    place; am I correct?
10         A.    Yes.
11               This is after I received the
12    letter.
13         Q.    So did you use a ruler to
14    measure all this?
15         A.    To measure what?
16         Q.    To figure out eight feet or was
17    that an estimate or did you use a ruler?
18               Is that exact dimensions?
19               What is that?
20               MR. MORRIS:  Objection.
21               You can answer.
22         A.    It's, um -- that was a
23    guesstimate.  That was what they asked for
24    and no structure was built other than the
25    platform at that point.
```

```
 1                      J. LEPPER
 2          Q.    Okay.
 3                What I'm talking about:  The
 4     eight feet is the dimension of the
 5     platform, isn't it?
 6                MR. MORRIS:  Objection.
 7                You can answer.
 8          A.    Um, I can't give you the exact
 9     dimension.  You have the engineer drawing.
10                I have to refer to that, the
11     exact dimensions.
12          Q.    I'm not asking you to refer to
13     that right now.
14                I'm just asking to you look at
15     this and tell me if those are exact
16     dimensions or if they were just estimates
17     that you had visually -- I mean --
18                I'm sorry.
19                Are those exact measurements or
20     are those measurements from what you
21     visually estimated?
22                MR. MORRIS:  Objection.
23                You can answer.
24          A.    Those were estimates based on I
25     believe -- again.  It's a long time ago.  I
```

```
 1                      J. LEPPER
 2   believe the conversation when they asked
 3   for the sketch of the treehouse, of the
 4   sketching not based on actual dimensions
 5   because I didn't have the actual
 6   dimensions.
 7              They just wanted the
 8   approximate location of where it would show
 9   up on property.
10              So that's what I put there for
11   them.  Again, which one it was submitted
12   they said was acceptable.
13        Q.   And when you say they wanted,
14   are you talking about whoever you spoke to
15   over the telephone?
16              MR. MORRIS:  Objection.
17        A.   Yes.
18              That's what they asked for on
19   the phone and that's what I brought down
20   when I fill out the application.
21        Q.   Do you see the number three in
22   there?
23              Is that three feet?
24              MR. MORRIS:  Again, you're
25         referring to Exhibit M.  The survey
```

```
 1                    J. LEPPER
 2        within Exhibit M?
 3               MR. TOSCA:  Yes.
 4               MR. MORRIS:  Specifically
 5        within a box there's three three's.
 6               MR. TOSCA:  I see four.
 7               MR. MORRIS:  Excuse me.
 8               Four three's.
 9        A.    Yes.
10        Q.    And does that mean three feet?
11        A.    What that means there?
12               Yes.
13        Q.    So is that the measurement from
14   the tree trunk to the edge of the platform
15   on all four sides?
16        A.    No.
17        Q.    What does the three mean then?
18        A.    Again, this is before anything
19   was actually constructed.
20               Other than the platform, that's
21   an approximation of what the dimensions
22   would be.  Approximately, I wrote three
23   feet on each side of the tree.
24               So I understand what you're
25   saying.
```

```
 1                       J. LEPPER
 2          Q.    That's fine.
 3                What did you mean by 2 feet to
 4     3 inches by 10 inches from property line on
 5     the survey?
 6          MR. MORRIS:   Within Exhibit M?
 7          MR. TOSCA:   Yes.   Yes.
 8          A.    Honestly, I don't recall.
 9                But I think I drew in the hedge
10     row here the hedges on my property within
11     the fence line.
12                And it might have been from
13     what I assumed was the property line
14     without taking an actual survey which is
15     where I dropped a plumb bomb.  A plumb line
16     from my brushes or from my fence.
17          Q.    Before this lawsuit, did you
18     hire a surveyor to perform any survey at
19     the property after the treehouse was
20     constructed?
21          A.    No.
22          Q.    Had anybody told you that --
23          A.    The survey was done.
24                I didn't hire anybody though.
25          Q.    When was the survey done?
```

```
 1                    J. LEPPER
 2        A.    I don't recall.
 3              I guess after Judge Bianco
 4    asked -- the Honorable Judge Bianco asked
 5    that we get the drawings and the surveys.
 6              Somewhere within two weeks of
 7    that, I believe.
 8        Q.    That was after the lawsuit had
 9    been commenced.
10        A.    Yes.
11        Q.    Now, going to Exhibit M, there
12    is a page that's marked Exhibit 3 dated
13    9/18/2018 (handing).
14              I ask you to look at that.
15              Do you recognize what's
16    depicted there?
17        A.    (Complying.)
18              MR. MORRIS:  Just so the record
19         is clear, it bears the Village of
20         Babylon insignia on the top left,
21         notice of violation.
22              Again, Exhibit 3 KM 9/18/18.
23         And it appears to be a photocopy
24         bearing a date on the bottom left of
25         5/21/18.
```

```
 1                    J. LEPPER
 2        Q.    Did you ever see that document
 3   before today?
 4        A.    Yes.
 5        Q.    It's dated May 21st, 2018.
 6              Do you see that at the bottom?
 7        A.    Yes.
 8              MR. MORRIS:  Objection.
 9        Q.    Is that when you received the
10   violation?
11        A.    No.
12        Q.    When did you receive the
13   violations?
14        A.    Never.
15        Q.    You never got that May 21, 2018
16   violations?
17        A.    No.
18              I didn't see that until court
19   September 18, 2018.
20        Q.    When was the first time you saw
21   any violation?
22              MR. MORRIS:  Objection.
23              The Village of Babylon
24         violation?
25              MR. TOSCA:  Yes.
```

```
 1                    J. LEPPER
 2              I'm sorry.
 3         Q.    When was the first time you saw
 4    any Babylon Village violation after May 10,
 5    2018?
 6         A.    I never saw any violation until
 7    my wife signed for the certified envelope
 8    July 19th with three violations in it.
 9         Q.    In that conversation with Mr.
10    Fellman that you had the week after you
11    received a July 19th violation, did you
12    speak about the fact that a permit had not
13    been issued for the building of the
14    treehouse?
15              MR. MORRIS:  Objection.
16              You can answer.
17         A.    Repeat the question.
18         Q.    Yes.
19              In the conversation you had
20    with Mr. Fellman at the village building
21    department when you had the conversation
22    the week after the July 19th violations
23    that you received, was there any discussion
24    that you did not get a permit for the
25    treehouse?
```

```
 1                    J. LEPPER
 2              MR. MORRIS:  Objection.
 3              You can answer.
 4        A.    At the meeting?
 5        Q.    Yes.
 6        A.    At the building department with
 7   Mr. Fellman?
 8        Q.    Yes.
 9        A.    Was there any part of that
10   discussion that we discussed about the
11   building permit?
12        Q.    That you did not get it.
13        A.    I don't recall.
14        Q.    Did he tell you that you're in
15   violation because you built the treehouse
16   without a permit?
17              MR. MORRIS:  Objection.
18              You can answer.
19        A.    No.
20              I had the violations in my hand
21   already.  I was asking what they were in
22   reference to.
23        Q.    Did you know you got them
24   because you didn't have a permit to build
25   this treehouse?
```

```
 1                    J. LEPPER
 2        A.    Well, that was -- it was pretty
 3   vague on the violation.  It had said it was
 4   construction of the treehouse without a
 5   permit.
 6        Q.    It did say that.
 7        A.    It did say that on the
 8   violation.
 9        Q.    So you knew that you didn't
10   have a permit and that you built the
11   treehouse without having the permit.
12              Am I correct?
13              MR. MORRIS:  Objection.
14        A.    No.
15              Because prior to that, I never
16   received anything other than the letter
17   stating that a permit may be required.  I
18   filed for the permit.
19        Q.    Before you started your
20   continuation of building the treehouse, did
21   you call and find out if you had a permit?
22              MR. MORRIS:  Objection.
23              You can answer.
24        A.    I called somewhere in the
25   middle of June to check the status of the
```

```
 1                    J. LEPPER
 2    permit application.
 3          Q.    Okay.
 4               Did anybody tell you that it
 5    was issued?
 6          A.    No determination had been made.
 7          Q.    And you continued to build the
 8    treehouse anyway.
 9          A.    No.
10          Q.    Did you do something before you
11    started to build the treehouse again?
12          A.    Um, I believe I waited and
13    called one more time.  I waited and might
14    have called one more time until the week
15    before my son's birthday like I said on the
16    record earlier.  I believe it was June 30th
17    that I just erected the walls.
18          Q.    And by that time, you had not
19    gotten a permit yet, correct?
20          A.    No.
21          Q.    That's not correct?
22          A.    No, I didn't get a permit.
23               I didn't get anything.
24          Q.    And you went ahead and built it
25    anyway.
```

```
 1                    J. LEPPER

 2        A.    Um, I erected the walls to let

 3   my son know on his birthday so that my son

 4   could see on his birthday what dad was

 5   doing in the garage so he knew what our

 6   intentions was on his birthday.

 7        Q.    And at some point, you put a

 8   roof on also.

 9             MR. MORRIS:  Objection.

10             You can answer.

11        A.    No.

12        Q.    You never put a roof on the

13   treehouse?

14        A.    Yes, we did.

15        Q.    Okay.

16             And when you put the roof on,

17   you knew that you didn't have a permit.

18             Am I correct?

19             MR. MORRIS:  Objection.

20             You can answer.

21        A.    After my meeting with Mr.

22   Fellman when he neglected his job to

23   explain to me what Building Code 365 was,

24   so I had left the building that day.  And I

25   went downstairs to get a copy of the
```

```
 1                    J. LEPPER
 2    Building Code 365-26.
 3         Q.    Do you have access to the
 4    Internet?
 5              Do you use a computer?
 6         A.    I do.
 7         Q.    Did you go on the Babylon
 8    Village website?
 9              MR. MORRIS:  Objection.
10              At what time?
11              MR. TOSCA:  Let's see.
12         Q.    Before you went down to look at
13    the code, did you go on the Internet to
14    review the Babylon Village code?
15         A.    No.
16         Q.    Did somebody give you the
17    code --
18              MR. MORRIS:  Objection.
19              You can answer.
20         Q.    -- at the building department.
21         A.    Not until after I received the
22    three violations.
23         Q.    And how many pages did they
24    give you of the code?
25         A.    They didn't give me anything.
```

```
 1                    J. LEPPER
 2              I had to copy, photocopy I
 3    guess the book.  There were copies of the
 4    book of Building Code 36526.
 5         Q.    Did you copy the entire book or
 6    did you just take the pile of pages?
 7         A.    The entire code.
 8         Q.    The entire code.
 9              How many pages is that?
10         A.    I don't know.
11         Q.    Did you know that you could
12    have gone on Internet and just accessed it
13    on the Internet?
14         A.    Yes, I know that.
15              I didn't know that at the time.
16    I went to speak to Mr. Fellman in person to
17    get an explanation of what building code
18    36526 was, of what I was being violated
19    for.
20         Q.    You said that outside of
21    discussing the permit and asking him what
22    the code provision was and what it meant
23    and you said he didn't tell or you or he
24    didn't explain it to you, did you speak
25    about anything else at that time?
```

```
 1                    J. LEPPER
 2               MR. MORRIS:  Objection to
 3          everything except for did you speak
 4          to anything else at that time.
 5     A.    Did we speak?
 6           Yes.
 7               We spoke about everything we
 8     just spoke about.  We spoke about the
 9     violations and the code, that we
10     complained.
11               And I don't know what else.
12     Q.    Well, you mentioned something
13     about a hypodermic needle previously and I
14     want to know:  Did you speak to him about
15     the hypodermic needle during that
16     conversation?
17               MR. MORRIS:  Objection.
18               Asked and answered.
19     A.    Yes, it did come up in the
20     conversation.
21     Q.    At what point in the
22     conversation did it come up?
23     A.    I'm not sure.
24               It was in the conversation.
25     Probably towards -- maybe towards the end.
```

```
 1                    J. LEPPER

 2            I don't know.

 3       Q.   Okay.

 4            Who brought up the hypodermic

 5   needle?

 6            What raised the issue first?

 7       A.   Obviously, I did because he

 8   didn't know about it.

 9       Q.   Okay.

10            What did you tell him?

11            MR. MORRIS:  Objection.

12            You can answer.

13       A.   I told him what we had found in

14   the bushes while we were playing with our

15   kids.

16       Q.   I'm sorry.

17            I didn't hear you, actually.

18            Did you say just now I told him

19   why we put the treehouse up?

20            MR. MORRIS:  Could we get a

21        read back, please.

22            (Whereupon, the referred to

23        answer was read back by the

24        Reporter.)

25       Q.   Did you tell him why you put
```

```
 1                        J. LEPPER
 2    the treehouse up?
 3                   MR. MORRIS:  Note my objection.
 4                   You can answer.
 5         A.    I told him why we decided we
 6    were going to put the treehouse up and what
 7    we had found in our bushes.
 8         Q.    Okay.
 9                   What was the connection between
10    the two?
11         A.    The connection between the two
12    is I found a hypodermic needle in my bushes
13    within arm's reach of my children.  And I
14    put a lock on my gate in a place where I
15    thought I would never have to put a lock on
16    my gate and decided at some point that we
17    were going to put a treehouse so we could
18    keep our kids safe in our backyard and away
19    from what we were finding in the street or
20    the bushes or wherever else.
21         Q.    Was the purpose for your
22    putting up the treehouse related to the
23    hypodermic needle you found in the bushes?
24                   MR. MORRIS:  Objection.
25                   You can answer.
```

```
 1                      J. LEPPER
 2        A.     What's the purpose of putting?
 3               Repeat that.
 4               MR. TOSCA:  Sure.
 5               Could you repeat it.
 6               (Whereupon, the referred to
 7           question was read back by the
 8           Reporter.)
 9               MR. MORRIS:  Note my objection.
10               You can answer.
11        A.     That was -- it firmed it up.
12    Like I said, I don't know if we discussed
13    it prior to ever, you know, putting up a
14    treehouse.
15               But finding that needle
16    definitely was the reason why we said
17    that's what we were going to do.  That's
18    what we were going to do with the wood that
19    we reclaimed from the boathouse.  That was
20    the most.
21        Q.     How would the treehouse resolve
22    any issues regarding a hypodermic needle
23    that you found?
24               How is that related at all?
25        A.     How is it related at all?
```

1                    J. LEPPER

2        Q.    Yes.

3        A.    Well, keeping my kids safe in

4   my backyard where I could actually

5   supervise them and watch them in my

6   backyard.

7        Q.    Right.

8              And how is the treehouse going

9   to protect them from hypodermic needles?

10       A.    Probably spend less time on the

11  street where these needles seem to be

12  frequently found.  Cause I don't think

13  they're going to be found in my backyard,

14  although we did find one next to my fence.

15       Q.    You found the hypodermic

16  needles on the property.

17              Am I correct?

18       A.    Yes.

19       Q.    And the area where you found

20  the hypodermic needle is adjacent to the

21  walkway, the side public walkway?

22       A.    No, there is no side public

23  walkway.

24              I found it next to the fence.

25       Q.    Okay.

```
 1                   J. LEPPER
 2    about until after the violations.
 3         Q.    Did you write anything about
 4    the treehouse to the mayor?
 5               About the violations, anything
 6    that's related to the treehouse.
 7               MR. MORRIS:  Same objection.
 8         A.    No.  Not personally.
 9         Q.    Okay.
10               Did anybody write anything to
11    the mayor on your behalf?
12               MR. MORRIS:  Objection.
13               You can answer, if you know.
14         A.    Did anybody write anything on
15    my behalf?
16         Q.    Yes.
17         A.    Yes.
18         Q.    And who wrote to him on your
19    behalf?
20         A.    My attorney, for one, submitted
21    the complaint and the appeal.
22         Q.    Did anyone write a letter for
23    you to the mayor?
24               MR. MORRIS:  Objection.
25               To the extent you know if other
```

```
 1                    J. LEPPER
 2          people wrote letters to the mayor on
 3          your behalf, you can answer.
 4          A.    I don't know.
 5                I do know there were several
 6   neighbors that supported the treehouse that
 7   went and spoke to the mayor directly or
 8   wrote him a letter.
 9                I understand that he received
10   mail from supporters in the village
11   about -- regarding the treehouse.
12          Q.    And who told you that they
13   spoke to the mayor in person?
14                MR. MORRIS:  Objection.
15                You can answer.
16          A.    I don't recall but there's a
17   lot of senior members from my block.
18          Q.    Could you give me their names.
19          A.    No.  I can't tell you exactly
20   who.
21                I wasn't there when they spoke
22   to him but I know they spoke to -- they
23   knocked on the mayor's door and they spoke
24   to him about it.
25          Q.    You said that they told you
```

```
 1                    J. LEPPER
 2    this.  Whose they?
 3                 I'd like to know the names of
 4    the people you're talking about.
 5         A.    I have a list of people who
 6    supported.
 7                 Who actually knocked on his
 8    door?
 9                 I can't tell you.
10                 There's about 50 people that
11    signed and supported the petition on the
12    block.  I can't tell you who actually
13    knocked on his door.
14         Q.    Did you prepare the petition?
15                 MR. MORRIS:  Objection.
16                 Were you done answering that
17        previous question?
18                 THE WITNESS:  Yes.
19         A.    Did I prepare a petition?
20                 No.
21                 I just -- I didn't prepare a
22    petition.  I just got signatures from
23    people who showed up in the village court
24    in the 3, 4 times that we were down there.
25    And now it's the wintertime.  And we had a
```

```
 1                    J. LEPPER
 2        Q.    Previously, you mentioned about
 3   Ralph Scardino, Mayor Scardino.
 4              Did you ever talk to him in a
 5   group of people, with a group of people
 6   there?
 7              MR. MORRIS:  Objection.
 8              You can answer.
 9        A.    Yes.
10        Q.    On how many occasions?
11        A.    Two or three.
12        Q.    And what did you say on those 2
13   or 3 occasions?
14        A.    I don't recall.
15              I was at a board of trustees
16   meeting I believe they're referring to.
17        Q.    Did you say anything?
18              What was at least the subject
19   matter of what you were talking about?
20        A.    The subject matter was, um --
21   well, I was there to see, try to figure out
22   how this village works and try to inform
23   myself on what goes down in the village.
24              So I sat down on a couple of
25   trustee meetings just to hear the issues.
```

1                    J. LEPPER

2      Not that I had really much concern about it

3      because I'm busy raising a six and a five

4      year old.

5                    But I think when I did speak

6      out about the, um, the treehouse, it was

7      just to inform whatever residents might

8      have been there at the meeting of how we

9      were spending our tax dollars.

10          Q.     And did Mayor Scardino say

11     anything in response to what you had to

12     say?

13          A.     Like I said, I believe it was 2

14     or 3 separate occasions that I actually

15     spoke up there.  I believe on the first

16     meeting that I attended where I actually

17     spoke up and asked how much of the village

18     taxpayer dollars are we looking to spend on

19     this?

20                   I don't believe he spoke up.  I

21     think he differed to Mr. Glass.

22          Q.     What did Mr. Glass say?

23          A.     I don't recall.

24                   I do recall that he didn't

25     answer the question.

```
 1                    J. LEPPER
 2          Q.    In terms of taxpayer dollars,
 3    what was your complaint with respect to the
 4    spending of taxpayer dollars?
 5                 MR. MORRIS:  Objection.
 6                 I don't think he characterized
 7           it as a complaint.
 8          Q.    Okay.
 9                 What did you say about taxpayer
10    dollars?
11          A.    What did I say about taxpayer
12    dollars?
13                 I was just asking how much Mr.
14    Glass invoiced the village taxpayers
15    regarding the treehouse case and that he
16    pretty much brought it on himself.
17          Q.    How did he bring that on
18    himself?
19          A.    I believe I put it on the
20    record when I was explaining the case to
21    him I saw a hypodermic needle.  He was the
22    one that said you have to make a case to
23    this.
24                 All I did was plead not guilty.
25    I never thought we'd be here today.
```

```
 1                    J. LEPPER
 2        Q.    And again, I'm not clear.
 3              What is it about what he said
 4    that you conclude is spending taxpayer's
 5    dollars?
 6              MR. MORRIS:  Note my objection.
 7              Except that clarity is needed,
 8         you can answer again.
 9        A.    Um, can you repeat the
10    question.
11        Q.    Yes.
12              What is it about taxpayer
13    dollars?
14              How is that related to what he
15    said?
16              MR. MORRIS:  What who said?
17        A.    What who said?
18        Q.    As far as what Mr. Glass told
19    you.
20        A.    As far as what?
21        Q.    You had said that they're
22    spending taxpayer dollars based upon what
23    Mr. Glass said.
24              MR. MORRIS:  Note my objection.
25        Q.    What was the relationship
```

1                     J. LEPPER

2       between Mr. Glass and spending taxpayer

3       dollars in terms of what you spoke up at

4       the meeting about?

5                     MR. MORRIS:  Objection.

6                     You want to ask him what he

7              said at the meeting because that

8              would provide your responses of what

9              he said at the meeting.

10      Q.     All right.

11                    What did you say at the meeting

12      about taxpayer dollars and specifically

13      related to Mr. Glass?

14                    MR. MORRIS:  Note my objection.

15      A.     Like I said, there were a

16      couple of different meetings.  I believe

17      the first one, the only question I had was

18      how much has he invoiced the Village of

19      Babylon regarding the treehouse case?

20                    Cause at this point, we were

21      probably 6 to 8 months into this case.

22      Q.     And when you're talking about

23      "this case", are you talking about the

24      federal court case or are you talking about

25      the village court case?

```
 1                   J. LEPPER
 2        A.    I'm talking about from day one
 3   of my life, my kids' life and my wife's
 4   life.
 5        Q.    Well, you're saying taxpayer
 6   dollars in the court case.
 7              What case are you referring to?
 8              MR. MORRIS:  Note my objection.
 9        A.    Whichever you want to refer to.
10              I don't know.
11        Q.    That's not what I want to refer
12   to.
13              I'm asking what you're
14   referring to.
15              MR. MORRIS:  Hold on.
16              Counsel, he's provided an
17         answer to this question 3, 4, 5, 6
18         times.
19              MR. TOSCA:  No, I don't think
20         so.
21              I asked him what court case are
22         we talking about.
23              That's all.
24              MR. MORRIS:  Okay.
25              MR. TOSCA:  And he's telling me
```

```
 1                        J. LEPPER
 2         whatever one I want to pick.
 3                I don't want to pick any.
 4                MR. MORRIS:  Let's read back
 5         the question.
 6                Let's see what the question is,
 7         let's see what the answer is, please.
 8                (Whereupon, the referred to
 9         testimony was read back by the
10         Reporter.)
11                MR. MORRIS:  We submit that
12         he's answered the question.
13                To the extent that you need to
14         ask it again, just note our
15         objection.
16         Q.     Which case are you referring
17    to?
18         A.     I'm referring to whatever he's
19    invoiced the village.  And that's what I
20    said.
21                How much have you invoiced the
22    Village of Babylon regarding the treehouse
23    case?
24                That was how I phrased the
25    question.  I don't know anything related to
```

```
 1                    J. LEPPER
 2     the treehouse.
 3               That's all I asked.
 4          Q.    Anything related to the
 5     treehouse?
 6          A.    Yes.
 7          Q.    And he responded to that?
 8          A.    Um, no.
 9          Q.    Okay.
10          A.    Political response.
11          Q.    What was the political response
12     then?
13          A.    Words without an answer.
14          Q.    Do you know what those words
15     were?
16          A.    No.  I don't recall.
17               I just recall I didn't really
18     -- he redirected the answer, didn't answer
19     the question for anybody that was there to
20     listen.
21          Q.    Do you know who Robyn
22     Silvestri?
23          A.    I know of her, yes.  I know who
24     she is.
25          Q.    Who is she?
```

333

```
  1                    J. LEPPER
  2        A.    She's a trustee in the village.
  3        Q.    Did you ever speak to her about
  4   the treehouse?
  5        A.    Directly?
  6        Q.    Yes.
  7        A.    No.
  8        Q.    Did you ever e-mail her or text
  9   her about the treehouse?
 10              MR. MORRIS:  Objection.
 11              You can answer.
 12        Q.    Did you ever use e-mails to
 13   communicate with any Village of Babylon
 14   representatives?
 15        A.    No.
 16              I don't believe so.
 17              MR. TOSCA:  Is that why you
 18        want an objection?
 19              You just don't want to use the
 20        word?
 21              MR. MORRIS:  It's, like,
 22        representative.  Like, who represents
 23        the village.
 24              I mean employees but that's
 25        just my head running.
```

```
 1                    J. LEPPER
 2              MR. TOSCA:  Let me use the word
 3         employees.
 4         Q.    Did you ever e-mail any
 5    employees from the village?
 6         A.    I don't believe so.
 7         Q.    Did you ever use texting to
 8    communicate with any of the defendants in
 9    this case?
10         A.    I don't believe so, no.
11         Q.    Did anyone ever e-mail or text
12    you of the defendants in this case?
13         A.    Rephrase that.
14         Q.    Did the defendants in this case
15    or any of the defendants in this case
16    e-mail or text you?
17         A.    I don't believe so.
18         Q.    Do you know who Tony Davida is?
19         A.    Yes.
20         Q.    And who do you know him to be?
21         A.    The village trustee also.
22         Q.    Did you ever have any
23    conversation with Mr. Davida?
24         A.    Um, at a trustee meeting, I
25    directed a question.
```

```
 1                       J. LEPPER
 2          Q.    And what did you say to him?
 3          A.    I asked is the Mr. Davida who
 4     lives on Wyandanch Avenue, if he knew why
 5     the Wyandanch and Wampum elementary school
 6     bus stop was relocated to directly in front
 7     of his house.
 8          Q.    Directly in front of his house?
 9          A.    That's correct.
10          Q.    Okay.
11                And what did he say?
12          A.    He said -- I believe he said he
13     didn't know.  I believe he said he didn't
14     know.
15                It was a -- a school issue or
16     something.
17                I don't know.  I don't recall
18     his answer.  He didn't know.
19          Q.    Was there a purpose for your
20     asking him that question?
21          A.    Yes.
22          Q.    What was that?
23          A.    I think I explained it to him.
24          Q.    You think you explained it to
25     him you said?
```

```
 1                    J. LEPPER
 2        A.    I believe so.
 3        Q.    What did you tell him?
 4              MR. MORRIS:  Objection.
 5              You can answer.
 6        A.    Well, I don't recall.
 7              You can't quote me because I
 8   don't know exactly what I said.  But I
 9   basically explained to him that are you
10   familiar with the Newsday article of
11   May 4th, 2011?
12        Q.    Before we go there, when you
13   had this interchange with Mr. Davida, it
14   was at a trustee meeting?
15        A.    Yes.
16        Q.    When was this meeting?
17        A.    I don't know.
18        Q.    Was it after you received the
19   violation, the first violation?
20              MR. MORRIS:  Objection.
21              You can answer.
22        A.    It was well after.
23        Q.    Well after.
24              And you mentioned a May 4,
25   2011, Newsday article?
```

```
 1                    J. LEPPER
 2        A.    Don't quote me on the date.  I
 3   believe that was the day that -- don't
 4   quote me on the date.
 5             After -- after everybody
 6   learned of what we were going through and
 7   now we were in federal court, that's when
 8   somebody explained to me what had happened
 9   and why that bus stop was relocated and
10   there is a Newsday article about it.
11             I'm not sure if that's the
12   exact date but I asked if Mr. Davida knew
13   why and when he told me no, I told them
14   there was a Newsday article because it
15   because it's his neighbor four doors down.
16        Q.    What's the article about?
17        A.    About known drug activity
18   coming from the house.  And the house was
19   raided so I was just wondering if he was
20   aware of that.
21        Q.    And this event where the
22   article at least refers to an event where
23   the house nearby was raided because of drug
24   activity, was that in the article itself?
25             That's how you learned of all
```

```
1                    J. LEPPER
2    of this?
3         A.    I learned it from neighbors who
4    told me about it.
5         Q.    All right.
6               But the article, the Newsday
7    article, did you ever read it?
8         A.    Did I ever read the article?
9         Q.    Yes.
10        A.    I'm not sure if I ever read the
11   article.
12        Q.    You said that this drug house
13   or this house where there was drug activity
14   and raided, do you know when that happened?
15              MR. MORRIS:  Objection.
16              You can answer.
17        A.    No.
18              And I didn't call it a drug
19   house.  It's people with children who have
20   a problem who I never wanted to name.
21        Q.    Okay.
22              Do you know if they still live
23   there?
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
 1                    J. LEPPER
 2        A.    Yes, they do.
 3        Q.    With regard to raiding the
 4   house --
 5        A.    Yes.
 6        Q.    -- do you know when that raid
 7   took place?
 8              MR. MORRIS:  Objection.
 9              You can answer.
10        A.    Before I lived in the
11   neighborhood.
12              I wasn't told of it until after
13   we were already in federal court.
14        Q.    With respect to that house, do
15   you know those people?
16              MR. MORRIS:  Who are those
17        people?
18              MR. TOSCA:  The people that
19        live in the house that was raided
20        because of drug activity.
21        A.    Do I know them personally?
22        Q.    Well, do you know them; period.
23        A.    I know of them.
24        Q.    Have you spoken to them?
25        A.    I have.
```

```
 1                      J. LEPPER
 2          Q.     Have they made any complaints
 3     to you about anything?
 4          A.     No.
 5          Q.     Have you made any complaints to
 6     them?
 7          A.     Yes.
 8          Q.     What complaints did you make to
 9     them?
10          A.     Although I never really seen
11     this kid too many in the past how many
12     years I've lived there, I do know of him.
13     I knew of him.  Actually, before, I think.
14               I heard before one of our court
15     hearings, actually, his father screaming
16     out the door, throwing him out the door at
17     one point.  And I never had any interaction
18     with him.
19               After that, I can't recall the
20     date but I did have an interaction with him
21     and his father because --
22               Actually, I was in the hospital
23     that day for kidney stones.  I came home,
24     my kids came home from school.  I was
25     having cookies in the kitchen with my kids.
```

```
 1                    J. LEPPER
 2    I believe it was snowing out probably so it
 3    was winter.  Obviously, one of our last
 4    snowfalls.  And I look out my kitchen door,
 5    and I see a car pull into my driveway.
 6         Q.   Okay.
 7         A.   I'm not done.
 8         Q.   I'm sorry.
 9              Go ahead.
10         A.   So I didn't recognize the car.
11    I just thought they were coming in to pull
12    in, pull out and I see somebody walking
13    towards my house.  I noticed it was this
14    kid.  The car is still in the driveway so I
15    went outside cause I thought they were
16    going to do a transaction in my driveway.
17         Q.   Are you done?
18         A.   Yes.
19              They drove off when I got
20    outside.
21         Q.   Did you actually speak to the
22    father about this incident?
23         A.   Yes.
24         Q.   What did you say to him, what
25    did he say to you?
```

```
 1                    J. LEPPER
 2         A.    After the kid walked off, I
 3    went back inside, put my shoes on, went
 4    down and spoke to his father.
 5         Q.    And what did he say, and what
 6    did you say?
 7         A.    I asked him if he knows who I
 8    was.  And I believe he said no.  I said I
 9    think you do.  I said I'm the guy fighting
10    the world about a treehouse trying to
11    protect his kids from the shit that maybe
12    your kid put in my bushes.  Maybe.  I
13    didn't accuse him.
14              I know that's -- I don't know.
15    I just -- that's what we said.  That's what
16    was exchanged.  And his neighbor came out
17    and explained to me that they have a lot of
18    information on that house.
19         Q.    The father, what did he say to
20    you?
21              MR. MORRIS:  Objection.
22              You can answer.
23         A.    I don't recall.
24              I think he was just yelling at
25    his son to get in the house.
```

```
 1                    J. LEPPER
 2         Q.    You called him a kid.
 3         A.    He's not a kid.  He is a grown
 4    man.
 5         Q.    How old do you think he is?
 6         A.    I think 20s, early 30s.  He's a
 7    man.
 8               THE STENOGRAPHER:  Can we take
 9         a break.
10               (Whereupon, a short recess was
11         taken.)
12         Q.    Did you ever have any other
13    conversations with your neighbor other than
14    that one time where you spoke to him about
15    your son -- not your son.  His son.
16         A.    No.
17         Q.    What is the neighbor's name?
18         A.    The son or the last name of the
19    house?
20         Q.    Give me the son's name first of
21    all.
22               THE WITNESS:  Do I have to name
23         them?
24               MR. MORRIS:  You can't ask me.
25               I'm not objecting.  I'm not
```

```
 1                    J. LEPPER
 2       objecting.
 3       A.    The kid's name is Christian
 4  Lopetto (phonetic).
 5       Q.    And the father's name?
 6       A.    I don't know.
 7       Q.    This conversation that you had
 8  with Mr. Lopetto and his father, was that
 9  after you asked Mr. Davida about the May 4,
10  2011, article in the Newsday?
11       A.    I don't know.
12       Q.    Is there any connection between
13  your next door neighbor and the treehouse
14  in your view?
15       A.    My next door neighbor?
16       Q.    Yes.
17             Mr. Lopetto.
18             MR. MORRIS:  Objection.
19             You can answer.
20       A.    Is there any connection?
21       Q.    Yes.
22             Do you think that there's any
23  connection?
24             MR. MORRIS:  Note my objection.
25       A.    Do I think there's any
```

```
1                    J. LEPPER
2      connection?
3                  I only know of two kids who
4      have an issue with substance.  I never
5      accused either one of them cause I never
6      seen them actually put it in there even
7      when I spoke to Mrs. Holly.
8                  Strike that.
9                  I don't want to bring her up.
10                 I knew of the situation.  I was
11     going to speak to their parents.  You can't
12     speak to any of these parents.  I'm a
13     44 year old man.  I didn't see them
14     directly put it in there.
15                 I just heard of these problems.
16     I seen things that I probably didn't want
17     to see.
18                 That's all.
19         Q.    Other than that, do you think
20     there's any relation to your treehouse
21     issues?
22         A.    With that family?
23         Q.    Yes.
24               MR. MORRIS:  Note my objection.
25               You can answer.
```

```
 1                    J. LEPPER
 2         A.    Do I have any issue with their
 3    family?
 4         Q.    No.
 5         A.    Say the question again.
 6         Q.    My question is:  Is there any
 7    relationship --
 8         A.    Yes.
 9         Q.    -- between your issues with
10    that family and the issues concerning the
11    treehouse in this case?
12              MR. MORRIS:  Objection.
13              You can answer.
14         A.    There's no issues with the
15    family, no.
16         Q.    There's no relationship between
17    the issues with that family and the issues
18    concerning the treehouse in this case?
19              MR. MORRIS:  Objection.
20              You can answer.
21         A.    If you want to know the irony,
22    again, I'm not accusing them because I
23    didn't see them actually do anything, put
24    anything in my bushes or leave anything
25    around.
```

1                    J. LEPPER

2                I just know they've done stuff

3    in the past.  But the irony of that house

4    is that they have some kind of treehouse in

5    their backyard.

6                It doesn't have an issue.  I

7    find it ironic that a possible drug issue

8    that might be related to what I'm trying to

9    protect my kids from, possibly that

10   household has a treehouse structure in

11   their backyard.

12               So I think that's ironic, don't

13   you, that you can see visibly from the

14   street.  But there is no issue.  Not that I

15   ever brought them up about why I was

16   building the treehouse.

17        Q.    The treehouse on that property

18   of that family, when did you first see it?

19        A.    I don't recall when.

20               After we were in court cause I

21   never paid attention to anybody else's

22   property what they're doing on their

23   property.

24        Q.    Did you report that there's a

25   treehouse there?

```
 1                    J. LEPPER
 2        A.    To who?
 3        Q.    To the village.
 4        A.    No.
 5              It's not a treehouse.  It's a
 6   playground with the house on it.
 7        Q.    Isn't it a tree?
 8        A.    It's not in a tree.
 9              It's a playground with a
10   platform that would appear as big as mine
11   with a house structure in the middle of it
12   with a roof with everything that the
13   village is telling me they have a problem
14   with it.
15              You can't see it now because
16   it's overgrown but in the winter it's clear
17   as day.  And I noticed it after we were in
18   court.
19        Q.    Did you ever take pictures of
20   it?
21        A.    No.
22        Q.    And the playground with the
23   platform, you said it has a house on it?
24              MR. MORRIS:  Objection.
25              You can answer.
```

```
 1                    J. LEPPER
 2        A.    Yes, it has a house on it.
 3              It's a playground.  It's a
 4   playground with a house structure in the
 5   middle of it with a roof on it.  Everything
 6   that the village is telling me I
 7   misinterpreted everybody else seems to
 8   have.
 9        Q.    How far from the property line
10   is it?
11        A.    I don't know.
12              I don't go in the backyard.  I
13   just can see it in the wintertime from the
14   street from the stop sign.
15        Q.    Is that close to the property
16   line?
17        A.    It looks like it's close to the
18   property line.
19              It's in the backyard though.
20        Q.    It's in the backyard?
21        A.    It's in the backyard, yes.
22        Q.    But it doesn't abut the street?
23              MR. MORRIS:  Objection.
24              You can answer.
25        Q.    Am I correct?
```

```
 1                    J. LEPPER
 2         A.    Um, does it abut the street?
 3         Q.    Yes.
 4         A.    Well, their property at the
 5    stop sign has a big side yard.
 6               So when you're sitting at the
 7    stop sign and you look to the right, you
 8    see pretty much their side yard into their
 9    backyard.
10               But from what I visually saw
11    from the street -- and again, I don't care
12    what people do on their property.  I wasn't
13    inspecting their properties.  I just
14    happened to notice the thing was there in
15    backyard in the winter with no leaves.  And
16    it would appear to be close to their
17    property line.
18               Where it is?  I have no idea.
19    I'm not going back there measuring their
20    backyard or whatever they have in their
21    backyard.
22               It just looks like it's in the
23    back corner where normal people would put
24    their playground in their yard.
25         Q.    How big is this structure?
```

```
 1                    J. LEPPER
 2        A.    Again, I'm looking at it from
 3    the street.
 4        Q.    Are you able to estimate?
 5              MR. MORRIS:   Objection.
 6        A.    Am I able to estimate?
 7              I can't really estimate.
 8              The platform looks like it's
 9    close to the size of my platform.   The
10    house that sits on the top of the platform
11    is relatively smaller than my house but it
12    does state that it's -- I mean it does have
13    four walls and a permanent roof.
14        Q.    Do you know if there are
15    children in that family?
16        A.    I don't know if there's any
17    kids.
18              I just know that he's in his
19    late 20s, 30s.  I don't know if he has
20    siblings.  I don't know what the story is
21    over there.
22        Q.    Have you seen any other
23    treehouses in the Village of Babylon other
24    than your treehouse?
25        A.    Have I?
```

1                      J. LEPPER

2          Q.    Yes.

3          A.    Yes.

4          Q.    Where have you seen them?

5          A.    I don't have addresses but I've

6    seen them.

7          Q.    You didn't take note as to the

8    addresses of where these treehouses are?

9          A.    I know of one other case that

10   we got which we requested in the FOIL, in

11   the FOIL request.

12               We did get another case where

13   there was a treehouse so I don't mind

14   speaking of that one.

15               But other than that, I wasn't

16   writing down addresses of everybody's

17   treehouse that I spotted.

18               Again, I don't really mind what

19   other people do on their property but I

20   have seen other treehouses.  Four walls and

21   a permanent roof.

22         Q.    Okay.

23               The treehouse you're talking

24   about that you had found through the FOIL

25   request, had you seen that before you

```
 1                    J. LEPPER
 2   received the information from the FOIL
 3   request?
 4        A.    No.
 5        Q.    Do you know where it is?
 6        A.    I do know.
 7        Q.    Where is it?
 8        A.    I don't recall.
 9              We got the information.  I
10   don't recall where it is.  We have the
11   address.
12              You have the address, I
13   believe.
14        Q.    Do you know the name of the
15   property owner?
16        A.    I don't recall.
17        Q.    Do you remember the name
18   balance to have Baldauf, B-A-L-D-A-U-F?
19        A.    Yes, I remember the name.
20        Q.    Is that the same treehouse
21   you're talking about?
22        A.    Yes.
23        Q.    Other than that, is there any
24   treehouse that you can identify by name or
25   address that you've seen in the Village of
```

```
 1                    J. LEPPER
 2    Babylon?
 3              MR. MORRIS:  Objection.
 4              You can answer.
 5         A.    I do know of other ones.  But
 6    no, nothing that I can name by address
 7    right now.
 8         Q.    Did you take any photographs of
 9    these treehouses?
10         A.    Not yet.
11         Q.    Do you intend to?
12         A.    I don't want to bring anybody
13    else into what we got going on here;
14    period.  I don't care what other people do
15    on their property.  I don't really want to
16    but if you need them, then I guess you're
17    going to force me to.
18              Okay?  It's on you.  I'm not
19    looking to name my neighbors.
20         Q.    So Tony Davida, aside from that
21    one conversation you had with him about
22    moving this bus stop, did you have any
23    other discussion with him, whether in the
24    context of a hearing or in any other venue?
25              MR. MORRIS:  Note my objection.
```

```
 1                    J. LEPPER
 2          A.    I believe I met him at the
 3   Babylon pool last year, said hello, shook
 4   his hand that one time.
 5                Other than that, he lives
 6   around the corner.
 7          Q.    Did you have any conversation
 8   about the treehouse with him?
 9          A.    No.
10          Q.    Do you know who Mary Adams is?
11          A.    Yes.
12          Q.    And who is Mary Adams?
13          A.    The other trustee.
14          Q.    Okay.
15                Did you have any discussions
16   with her?
17          A.    Not directly, no.
18          Q.    Did you correspond with her in
19   any way?
20          A.    Only at the -- couple of
21   trustee meetings where I spoke.
22          Q.    When you say you didn't speak
23   to her directly, you're talking about when
24   you spoke to all the trustees and said what
25   you had to say?
```

356

```
 1                      J. LEPPER
 2         A.    I spoke to them as a whole.
 3         Q.    Did she say anything?
 4         A.    No.
 5         Q.    Suzanne Schettino, do you know
 6   who she is?  Do you know who Suzanne
 7   Schettino is?
 8         A.    I believe so.
 9               She's the mayor's personal
10   assistant.
11         Q.    Okay.
12               Did you ever have any
13   discussions with her?
14         A.    No.
15         Q.    Do you know who Deborah Longo
16   is?
17         A.    I'm not a hundred percent but I
18   believe she's -- she might be the one that
19   I spoke to in the building department.
20               Is she in the building
21   department?
22               I'm not a hundred percent so I
23   don't know.
24         Q.    Somebody said that you thought
25   the name might be Debbie.
```

```
 1                     J. LEPPER
 2        A.    I don't know.
 3        Q.    You don't know?
 4        A.     If her name is Longo.
 5        Q.     You made allegations in your
 6   complaint that you signed to that she was
 7   involved in whatever your claims are.
 8              What's the basis of your filing
 9   a complaint against her?
10              MR. MORRIS:  Objection.
11              By Counsel, if you have
12         questions about the pleadings,
13         certainly, they speak for themselves.
14              To the extent that you question
15         my client, I'm going to object.
16              MR. TOSCA:  The basis of his
17         knowledge is what she did or didn't
18         do.
19              MR. MORRIS:  No, no, no.
20              If you're going to ask about
21         the basis of knowledge, absolutely.
22              If you're going to ask why his
23         attorney put it the complaint --
24              MR. TOSCA:  That he verified?
25              MR. MORRIS:  That he verified
```

```
 1                    J. LEPPER
 2        to its truth and accuracy.
 3              But not to the legal basis
 4        therefore.
 5              MR. TOSCA:  I'm not going for a
 6        conclusion of law.
 7        Q.    I'd like to know factually what
 8   is your understanding was her involvement
 9   in this.
10        A.    What is?
11              What's her position?
12        Q.    I'm asking you, sir, not the
13   other way around.
14              You're the one that filed the
15   complaint.  You have to tell me.
16              All right?
17              MR. MORRIS:  Again, note my
18        objection.
19        A.    I believe she works in the
20   building department.  So I guess if she was
21   reviewing or if she accepted, I'm not sure
22   100 percent.
23              If she was the one that
24   accepted the application or said that it
25   was sufficient or if she's the one on the
```

J. LEPPER

1
2    phone that told me that you needed the
3    sketch and the survey, I don't know what
4    her involvement is.
5              But everybody in there is
6    familiar with this case and what's going on
7    with this case, I'm sure had an opportunity
8    to review or have an opinion or make the
9    decision on it.
10        Q.    Other than whatever she told
11   you, if it was her, the clerk at the
12   village?
13        A.    I don't know.
14        Q.    But this clerk that said the
15   application was fine and she was taking it
16   in, other than that discussion, did you
17   have any other discussion with that clerk?
18        A.    With that clerk?
19              Yes.
20              I was up there probably after I
21   submitted my application, FOILED my house.
22        Q.    I'm sorry.
23              And what?
24              FOILED?
25        A.    Submitted a FOIL request for my

```
 1                    J. LEPPER
 2   house, and she was probably in the office.
 3        Q.    And you recognize her to be the
 4   same person that took your application?
 5        A.    Yes.
 6              But again, I don't know if
 7   that's her last name.
 8              I believe that's her.
 9        Q.    Let's talk about the person,
10   whatever her name may be.
11        A.    Uh-hum.
12        Q.    The person that took the
13   application from you and the person who you
14   said you made a FOIL request to, I guess.
15              What did she say to you about
16   the FOIL request?
17        A.    She gave me one piece of paper
18   to fill out.  I filled it out.  She gave me
19   copies of everything that was in my file
20   and charged me for the copies.  I don't
21   remember what it cost.  Whatever it was
22   that I needed, I took.
23        Q.    Did any of these defendants who
24   you name in the lawsuit make any complaints
25   to you that you have made any issues with
```

```
 1                    J. LEPPER
 2    regard regarding drug activity in the
 3    Village of Babylon?
 4              MR. MORRIS:  Objection.
 5              You can answer.
 6         A.    Have any of the people in the
 7    -- made any complaints against me?
 8         Q.    Yes.
 9              In other words, well, no.  I
10    don't think that's what my question was.
11              So I'll repeat it or rephrase
12    it.
13              Did any of the named
14    defendants, Ralph Scardino, Kevin
15    Muldowney, Robyn Silvestri, Tony Davida,
16    Stephen Fellman, Suzanne Schettino, Gerard
17    Glass, Deborah Longo, did any of them tell
18    you that they had problems with your
19    talking about the drug activity in the
20    Village of Babylon?
21              MR. MORRIS:  Objection.
22              You can answer.
23         A.    Did any of them tell me --
24              No.  I don't think so.
25         Q.    Did you make --
```

1                    J. LEPPER

2          A.     Other than Gerard Glass

3     speaking to me in the clerk's office.

4          Q.     About what?

5          A.     About the needle that I showed

6     him when I was presenting the case, he

7     basically told me how you have to make a

8     case about this.

9                Other than that, nothing.

10         Q.     Do you have any information

11    that any of these people that I just named

12    had any personal vendetta against you?

13                MR. MORRIS:   Objection.

14                He can answer.

15         A.     I don't know.

16                Not that I know of, no.

17         Q.     Before the tickets were issued,

18    did you have any confrontations with any of

19    the named defendants?

20                MR. MORRIS:   Objection.

21                You can answer.

22         A.     Say that again?

23         Q.     Did you have any confrontations

24    where there were arguments or there were

25    disputes with any of the people I just

```
 1                    J. LEPPER
 2  mentioned?
 3                Any of the named defendants.
 4        A.    No.
 5                I don't think I spoke to any of
 6  them prior to the violations.
 7        Q.    Do you have any information
 8  that any of the named defendants was
 9  favoring any party that you did have a
10  dispute with?
11        A.    Can you rephrase that or ask it
12  again.
13        Q.    Yes.
14                In other words, do you have any
15  information that any of the parties here in
16  this lawsuit are biased towards any party
17  that had a dispute with you?
18        A.    Biased with anybody that had a
19  dispute with me?
20                Are you referring to the
21  complainant?
22        Q.    You're the complainant.
23                I don't know what you mean by
24  -- you're talking about the person who
25  complained about the treehouse you're
```

```
 1                      J. LEPPER
 2   talking about.
 3        A.    Yes.
 4        Q.    Do you know who it was that
 5   complained about the treehouse?
 6              MR. MORRIS:  Objection.
 7              You can answer.
 8        A.    Yes.  Yes.
 9        Q.    Did anybody complain to you
10   directly about the treehouse?
11        A.    No.
12        Q.    And who is it that you think
13   the complainant is?
14              MR. MORRIS:  Objection.
15              You can answer.
16        A.    I think you have copies of the
17   complaint too.  Tony and Bob Kinnear.
18        Q.    And where do they live?
19        A.    And Tony Davida.  Trustee Tony
20   Davida.
21        Q.    You said Tony and Bob Kinnear.
22              When did you learn that they
23   complained about anything on your property?
24        A.    I can't gave you an exact date.
25              But after the -- after the
```

```
 1                    J. LEPPER
 2    letter and maybe -- maybe after the
 3    violations came.
 4              I don't know.
 5         Q.    Did Mr. or Mrs. Kinnear ever
 6    complain to you directly about any
 7    condition on your property?
 8         A.    Um, no.
 9         Q.    Did they ever complain to your
10    wife?
11         A.    No.
12         Q.    Did you make any complaints to
13    them about any property issues?
14         A.    Did I make any complaints to
15    them about their property or my property?
16         Q.    Either one.
17         A.    No.
18         Q.    Tony and Bob Kinnear, do you
19    know where they live now?
20         A.    Yes.
21         Q.    Where do they live now?
22         A.    101 Wampum.
23         Q.    And at the time that the
24    treehouse was built, do you know where they
25    lived?
```

```
 1                    J. LEPPER

 2        A.    Same location.

 3        Q.    Okay.

 4              Are they next door to you?

 5        A.    No.

 6        Q.    Where do they live in relation

 7    to your property?

 8        A.    Diagonally across the street on

 9    Wampum.

10        Q.    Before Mr. and Mrs. Sini moved

11    in, do you know who lived there?

12        A.    Yes.

13        Q.    Who lived there?

14        A.    Joe and Joanne Minia

15    (phonetic).

16        Q.    Did you ever have any issues

17    with Joe or Joanne Minia about property

18    issues?

19        A.    Never.

20        Q.    About the cars?

21        A.    Never.

22        Q.    Did you have any issues with

23    parked cars with Mr. and Mrs. Kinnear?

24        A.    Not that I know of.

25              I saw it in the Complaint but I
```

```
1                       J. LEPPER
2       don't know if that was even referring to
3       me.
4                  Might have been my other
5       neighbor.
6            Q.    Did you ever speak to Mr. and
7       Mrs. Kinnear before the treehouse was
8       built?
9            A.    Yes.
10           Q.    Were there any confrontational
11      discussions?
12           A.    Never.
13           Q.    Just --
14           A.    Very neighborly.
15           Q.    Just neighborly type?
16           A.    Yes.
17           Q.    Did anybody ever make any
18      verbal complaint to you about the
19      treehouse?
20                 MR. TOSCA:   Let me withdraw
21            that.
22           Q.    Other than any violations or
23      letters you received from the village, did
24      anyone ever make any verbal complaints
25      about your treehouse to you?
```

```
 1                    J. LEPPER
 2        A.    No.
 3        Q.    Did you ever send any letters,
 4   either anonymous or not, to the village
 5   complaining about signs or commercial signs
 6   in the area?
 7        A.    Did I ever make a complaint?
 8        Q.    Yes, you.
 9        A.    No.
10        Q.    Did anybody ever make
11   complaints to you about signs on your
12   property?
13             MR. MORRIS:  Objection.
14             You can answer.
15        A.    Nobody made a complaint to me,
16   no.
17        Q.    In any of the meetings that you
18   went to at the village hall, were you ever
19   escorted out due to any behavioral issues?
20        A.    No.
21        Q.    Were you ever asked to leave?
22        A.    No.
23        Q.    Did you ever have any
24   confrontations outside of any village
25   meetings with anyone?
```

1                     J. LEPPER

2          A.    A confrontation outside of the

3     village hall?

4          Q.    Yes.

5                Any arguments, physical

6     altercations.

7          A.    No.

8          Q.    Did you ever claim to anyone

9     that your house, your treehouse was a gym

10    or playground?

11         A.    Say that again.

12         Q.    Yes.

13               Did you make any claim to

14    anyone that your treehouse was actually a

15    gym or a playhouse?

16               MR. MORRIS:  Objection.

17               You can answer.

18         A.    Yes.

19               I think so.

20         Q.    To whom did you say that?

21         A.    I don't recall.

22               I just know that, you know, we

23    used the term playground or outdoor gym or

24    whatever I called it.

25         Q.    When you represented yourself

```
 1                    J. LEPPER

 2   in the village court, did you ever maintain

 3   that your treehouse was a play or a gym?

 4              MR. MORRIS:  Note my objection.

 5              You can answer.

 6        A.    Repeat the question.

 7        Q.    Yes.

 8              When you were in village court

 9   representing yourself, did you ever

10   maintain that your treehouse was a play or

11   a gym?

12              MR. MORRIS:  Objection.

13              You can answer.

14        A.    I don't recall but I might have

15   been quoting the code, quoting the

16   paragraph in the code that says, um,

17   playground, slash, outdoor gym.  I might

18   have quoted that.

19        Q.    Did you ever raise that in any

20   papers you filed with the village?

21        A.    Did I raise what?

22        Q.    That you actually had a

23   playground or gym up in the tree.

24              MR. MORRIS:  Objection.

25        A.    I don't know that I ever filed
```

```
 1                    J. LEPPER
 2    anything that said playground or outdoor
 3    gym.
 4               I just know that that's
 5    building code 36526.
 6          Q.    I'm sorry.
 7               Go ahead.
 8          A.    After it was not explained to
 9    me by the building inspector, they
10    represented they were supposed to explain
11    to me.  I took a copy of it home.
12               That's what it says in the
13    code.
14          Q.    When did you first maintain
15    that this was a playground or a gym?
16               MR. MORRIS:  Objection.
17               You can answer.
18          A.    When did I maintain that it was
19    a playground or a gym?
20          Q.    The first time.
21               MR. MORRIS:  Objection.
22               Are you referring to a
23          playground or a gym or are you
24          referring to the code?
25               It's not only inherently
```

```
 1                    J. LEPPER
 2         confusing, but it's directly at issue
 3          in this lawsuit.
 4         Q.     Let me put it this way:  Did
 5    you make a determination that the structure
 6    that you built in the tree was a playground
 7    or a gym under the code?
 8              MR. MORRIS:  Objection.
 9              You can answer.
10         A.     I didn't make that
11    determination.
12              I made a determination that
13    they give a square footage for playground
14    or outdoor gym and that the square footage
15    a permit is not required.
16         Q.     Did you ever tell anyone that
17    you thought that Judge Rafter knew somebody
18    personally who had complaints against you?
19         A.     Did I --
20              Say that again.
21         Q.     Yes.
22              Did you ever tell anyone that
23    Judge Rafter, the village court justice,
24    that you had your trials before --
25         A.     Uh-hum.
```

J. LEPPER

2      Q.    -- knew somebody personally or

3   his wife knew somebody personally who had a

4   dispute with you?

5      A.    Did I ever say?

6            Yes.

7      Q.    Well, was it Judge Rafter or

8   his wife knew the person?

9      A.    This is before we got a copy of

10  the Complaint.  Through the information

11  what I was told on who complained, I was

12  told also that their wives work together.

13  The judge's wife, Judge John Rafter's wife

14  and Tony Kinnear, the chief complainant.

15     Q.    And that was -- at what time

16  you learned that?

17     A.    We just recently got a copy of

18  the Complaint but I was told that that

19  Complaint came from the Kinnear house long

20  before we just got a copy of the Complaint.

21     Q.    Well, when did you learn that

22  the Complaint allegedly came from the

23  Kinnear house?

24     A.    It's not alleged anymore

25  because now we have a copy of the

```
 1                    J. LEPPER
 2   Complaint.
 3        Q.    I don't know if you read what's
 4   in there.  I'm not too sure you're correct.
 5             Let's just go with --
 6        A.    What's the question again?
 7        Q.    Yes.
 8             When did you learn that Judge
 9   Rafter's wife worked with someone who
10   complained about your treehouse?
11        A.    Um, I don't recall the date.
12        Q.    Was it before you received the
13   notice concerning the possible need for the
14   permit, the May 10th notice?
15        A.    No.
16        Q.    Was it before your trial
17   started?
18             MR. MORRIS:  Objection.
19        A.    I don't recall.
20        Q.    The first trial at village
21   court.
22        A.    I don't recall if it was before
23   the first trial.
24        Q.    Who told you that Judge
25   Rafter's wife worked with the person that
```

```
 1                      J. LEPPER
 2    complained about the treehouse?
 3          A.     Google.
 4          Q.     Google.
 5                 So how did you find out that
 6    they work together?
 7                 MR. MORRIS:  You say they.
 8                 Do you want to identify who
 9          this is.
10          Q.    Judge Rafter's wife and Tony
11    Kinnear, how did you find out that they
12    worked together?
13                 MR. TOSCA:  Is that better?
14                 MR. MORRIS:  Yes.
15          A.     Like I said, the information
16    started coming in.  I started looking up
17    all the players.
18          Q.     Well, do you know Judge
19    Rafter's wife's name?
20          A.     Not offhand, no.
21          Q.     Did you make any complaints
22    about the connection between Judge Rafter's
23    wife and Tony Kinnear to any governmental
24    agencies?
25          A.     I believe it's on the record in
```

```
 1                    J. LEPPER
 2     the village.
 3          Q.    When you say "on the record",
 4     what do you mean?
 5                Did you mention this in court?
 6          A.    In the transcripts from village
 7     court.
 8          Q.    Did you make a complaint to
 9     Judge Rafter about this?
10          A.    Did I make a complaint to Judge
11     Rafter about it?
12          Q.    Yes.
13                In other words, did you speak
14     to him on record about it?
15                MR. MORRIS:  Objection.
16                You can answer.
17          A.    Yes.
18          Q.    What was his response to you?
19          A.    Actually, the response was to
20     Cory.
21                He said he didn't know Mrs.
22     Rafter.
23          Q.    Judge Rafter said he didn't
24     know --
25          A.    Judge Rafter denied knowing
```

1                      J. LEPPER

2    Mrs. Kinnear.

3          Q.    Do you know where Judge

4    Rafter's wife works?

5          A.    I believe they both worked at

6    West Babylon or West Islip schools.

7          Q.    Are they teachers?

8          A.    I don't know what their tiles

9    are.

10         Q.    You learned this through the

11   Internet?

12         A.    That's correct.

13         Q.    With some kind of Google

14   search?

15         A.    That's correct.

16         Q.    Did you ever confront Ms.

17   Kinnear about any of the treehouse issues?

18         A.    No.

19               I confronted her husband; Bob

20   Kinnear.

21         Q.    When did you confront him?

22         A.    August 22nd, 2018.

23         Q.    And at that time, was it your

24   understanding that she had complained about

25   the treehouse?

```
 1                    J. LEPPER
 2         A.    I was informed that they were
 3    the complainant in the case.
 4         Q.    Who told you that?
 5         A.    I don't recall who told me.
 6    People told me.
 7         Q.    On August 22nd, you seem to
 8    remember that date.
 9              Was there anything in
10    particular that made you remember that
11    date --
12         A.    Yes.
13         Q.    -- specifically?
14         A.    My ten-year wedding anniversary
15    and we went away to Lake George.  And I
16    just posted a sign on the treehouse that
17    stated about the drug activity that I found
18    in the bushes and the square footage of the
19    treehouse and what I felt to be the
20    wrongful accusation.
21         Q.    With regard to the sign you say
22    you put up, you put that on the --
23              I'm sorry.
24              On the tree or the treehouse?
25         A.    I put it on the treehouse.
```

```
1                    J. LEPPER

2              Depends what time.  It went up

3    a couple of times.

4         Q.   Do you still have a copy of

5    that sign?  Not a copy.

6              Do you still have that sign?

7         A.   I do.

8         Q.   Okay.

9              MR. TOSCA:  I'm going to ask

10            that that be preserved for discovery

11            and inspection.

12             MR. MORRIS:  We just ask that

13            you follow up in writing, please.

14             MR. TOSCA:  Yes.

15        Q.   Do you have pictures of it?

16        A.   I do.

17             MR. TOSCA:  We're going to

18            request pictures of the sign.

19             MR. MORRIS:  We ask that you

20            follow up in writing.

21             We probably already have some

22            of the stuff that you're requesting

23            for.

24             MR. TOSCA:  Okay.

25        Q.   When did you first put the sign
```

```
 1                    J. LEPPER
 2    up?
 3         A.    August 22nd, 2018.
 4         Q.    How long did you keep it up
 5    for?
 6         A.    I don't recall.
 7         Q.    Is it still up there?
 8         A.    No.
 9         Q.    Is there a time where you took
10    it down, then put it back up?
11         A.    Yes.
12         Q.    How many times did you take it
13    down and put it back up?
14         A.    Put it up once, took it down,
15    put it up another time.
16         Q.    Was there a specific purpose
17    for putting it up?
18         A.    To inform the residents in my
19    community of what I found in case they
20    weren't aware of why we were in federal
21    court.
22         Q.    Were any of the times that you
23    put the sign up in connection with any
24    election activities?
25         A.    The first time, no.  The second
```

```
 1                    J. LEPPER
 2   time, um, the election might have been
 3   going on at that time.
 4        Q.    Have you ever run for public
 5   office?
 6        A.    No, I have not.
 7        Q.    Have you ever endorsed any
 8   persons who ran for public office anywhere?
 9        A.    Endorsed you mean?
10        Q.    Well, I mean actively
11   participated in any campaigning.
12              MR. MORRIS:  Objection.
13              I mean do you want to describe
14        what it is you're asking him that he
15        did or didn't do?
16              MR. TOSCA:  Well, I have to
17        find out if he did first of all.  If
18        he says no, then he didn't.
19        A.    Are you talking as far as lawn
20   signs and who I was sorting?
21        Q.    I'm talking if you put up lawn
22   signs if you actually campaigned for
23   anyone.
24              MR. MORRIS:  Note my objection.
25        A.    Yes.
```

```
 1                    J. LEPPER
 2        Q.    Okay.
 3              Let's started with signs.
 4              Either in front of your house
 5    or on the side of the house or anywhere on
 6    the house or the property.
 7              Did you ever put signs
 8    endorsing any people running for office?
 9        A.    Yes.
10        Q.    When for the first time did you
11    do that?
12        A.    I don't know the date.
13              I put a sign up for supporting
14    Congressman King, Congressman Peter King.
15        Q.    When was that?
16        A.    I don't recall the date.
17        Q.    Any other politicians that you
18    put up signs for for people running for
19    elective office?
20        A.    Yes.
21              I was supporting Mike Tenety
22    for trustee when he was running in the
23    village.
24        Q.    And when was that?
25        A.    That was March 19th.
```

```
 1                    J. LEPPER
 2        Q.    March 19th of 2019?
 3        A.    That's correct.
 4        Q.    Any other candidates?
 5        A.    Kathy Hoffman.
 6              Everyone who was on that
 7    ticket.
 8        Q.    For the last village election
 9    you're talking about?
10        A.    Yes.
11        Q.    Have you ever put up signs in
12    favor of -- for the time that you lived in
13    the Babylon Village for any of the
14    defendants?
15        A.    Putting up signs for any of the
16    defendants?
17        Q.    Yes.
18              When they were running for
19    office.
20        A.    In support of them?
21        Q.    Yes.
22        A.    No.
23        Q.    Did you go out and campaign for
24    anybody back in March or thereabouts?
25              Did you campaign for any of the
```

```
 1                    J. LEPPER
 2   people running for village elective office?
 3        A.    Yes, I did.
 4        Q.    In what way did you do that?
 5        A.    Just, um, handing outdoor
 6   hangers.  I put their campaign signs on the
 7   lawn.
 8        Q.    I'd like to ask you a little
 9   bit about your children and the treehouse.
10              Did you tell both your son and
11   your daughter --
12              MR. TOSCA:  And for the record,
13         we'll keep it at son and daughter.
14        Q.    Did you tell both your son and
15   daughter that you were building a treehouse
16   for both of them, either of them?
17        A.    Um, yes.
18        Q.    All right.
19              I'm talking about before you
20   started construction.
21        A.    No.
22        Q.    When did you first say anything
23   to either of your children?
24        A.    I think I had to.  Obviously, I
25   wanted to keep it a surprise but I can't
```

```
 1                      J. LEPPER
 2    keep it -- I can't put the platform up and
 3    they ask what that was for.  So that was
 4    when --
 5           Q.    It that how you wound up
 6    telling him?
 7                 Because you had the platform
 8    up?
 9           A.    Yes.
10                 But they didn't really
11    understand what it was about when I had the
12    platform up.
13                 So that's why I erected the
14    wall so they can see that it was a house.
15           Q.    Did they have any reaction to
16    this?
17           A.    Every day.
18           Q.    What was the reaction?
19           A.    They love it.  Can't wait to
20    play in it.
21                 My son just wrote me a letter
22    the other day.  The last day of school
23    comes home with his book binder every month
24    everything he did at school.
25                 My daughter too, everything
```

```
 1                    J. LEPPER
 2   that we don't get during the course the
 3   year that they don't bring home.  She wrote
 4   a nice letter in the picture of what we
 5   made.
 6        Q.    Do you want to take a couple of
 7   minutes?
 8        A.    No. No.
 9              I'm good.
10              But that's what I got every
11   day.  The kids want to go past the
12   treehouse, they want to play in the
13   treehouse.
14        Q.    Do you have copies of what they
15   brought home in their binders and the
16   letter that they wrote?
17              It's your son that wrote the
18   letter and drew the pictures?
19        A.    They both had.  That was just
20   one that my son wrote the other day.  My
21   daughter had stuff that she made during the
22   course of the year too that I never knew
23   that she wrote in school.
24        Q.    I'm going to ask for copies of
25   the pictures and letters that you do have.
```

```
 1                    J. LEPPER
 2        A.    Okay.
 3              MR. MORRIS:  I'm going to ask
 4         that you follow up in writing.
 5              MR. TOSCA:  Sure.
 6              MR. MORRIS:  Again, we'll take
 7          it under advisement.
 8        Q.    Did they make any complaints to
 9    you regarding not being able to use the
10    treehouse?
11        A.    Yes.
12        Q.    What did they say?
13        A.    When are we going to be able to
14    use the treehouse?  When can we go up in
15    the treehouse?
16        Q.    Both your son and daughter said
17    this?
18        A.    Multiple times.
19        Q.    What was your response to them?
20        A.    When the judge says we can go,
21    you can play.
22        Q.    As far as the treehouse is
23    concerned, it's fair to say that you did
24    not have a permit before you told them that
25    you would build a treehouse for them; is
```

```
 1                     J. LEPPER
 2    that correct?
 3               MR. MORRIS:  Note my objection.
 4               You can answer.
 5         A.    Repeat the question.
 6         Q.    Yes.
 7               Before you told them that you
 8    were going to build this treehouse, did you
 9    know that you had a permit or --
10               I'm sorry.
11               You knew you didn't have a
12    permit; is that correct?
13               MR. MORRIS:  Note my objection.
14               You can answer.
15         A.    Like I said, I can't recall
16    exact date.
17               I probably told them when I put
18    the platform up.  We started early May.  I
19    didn't think the permit was required so
20    that's why I didn't file for it at that
21    time.  And I probably told them.  I'm
22    pretty sure I told them as soon as the
23    platform was up that we were trying to do
24    that.
25               I didn't know that a permit was
```

```
 1                    J. LEPPER
 2    required at that time or that I even file
 3    for it.  I didn't receive a letter.  I
 4    thought I was building the kids a treehouse
 5    for kids.  I didn't think a permit was
 6    required.
 7         Q.    When you found out that there
 8    was a permit required, did you explain to
 9    your children that the treehouse may not be
10    able to be built?
11              MR. MORRIS:  Objection to the
12         first part of that when he found out
13         a permit was required.
14              Strike that and the question
15         will remain if you leave it like
16         that.
17         A.    You want to rephrase?
18         Q.    Yes.  I guess I do.
19              Let me ask it this way:  Did
20    you ever explain to your children that you
21    would not be able to build a treehouse?
22         A.    No.
23              Because when we received the
24    letter on May 10th, we stopped
25    construction.  We filed for the permit.
```

```
 1                    J. LEPPER
 2    Just never anticipating that we wouldn't
 3    get it.  I don't think we ever had that
 4    discussion.
 5              I told you.
 6         Q.    On July 4th, is it not the case
 7    that you were building the treehouse even
 8    though you didn't have a permit and you
 9    expected a stop work order; is that
10    correct?
11              MR. MORRIS:  Objection.
12         A.    No.
13         Q.    All right.
14              If we go back to your affidavit
15    --
16         A.    On June --
17              MR. MORRIS:  Let him ask a
18         question.
19              You answered it.
20         Q.    Let me ask it to you this way.
21              MR. MORRIS:  If you read off
22         the affidavit, I ask that you read it
23         accurately.
24              MR. TOSCA:  I'll read it
25         accurately?
```

```
 1                   J. LEPPER
 2        Q.    Is it true that on the week of
 3   July 4th you expected to either receive a
 4   stop work order or a building permit?
 5               MR. MORRIS:  Again.
 6               MR. TOSCA:  It's paraphrasing.
 7               MR. MORRIS:  I'm going to
 8          object.
 9               If you read off the document,
10          let's have an accurate transcription.
11               MR. TOSCA:  I'm going read the
12          sentence and then I'll ask the
13          question.
14        Q.    In paragraph 28 of your
15   affidavit that you had signed on
16   December 6, 2018, there is a statement of:
17   The week of July 4th I expected to either
18   receive a stop work order or our building
19   permit.
20               In light of that, in the week
21   of July 4th did you expect that you may
22   receive a stop work order?
23               MR. MORRIS:  Objection.
24               The affidavit speaks for
25          itself.
```

```
 1                    J. LEPPER
 2              You can answer the question.
 3         A.    Like I told you before, we
 4    waited till June 30th and just erected the
 5    walls just so he can see what I was
 6    building.
 7              After erecting the walls, you
 8    pretty much quoted what I said there.  I
 9    either expected to either get issued the
10    building permit or a stop work order.
11              That's the way it goes.  If I'm
12    going to stop working on this while until
13    they issue the permit, they will issue the
14    permit.
15         Q.    So the week of July 4th, did
16    you ever tell either your son or your
17    daughter that you may not be able to
18    complete the treehouse?
19              MR. MORRIS:  Objection.
20              You can answer.
21         A.    Um, no.
22              I believe I said it right after
23    that that never receiving either one, the
24    stop work order or the permit, we continued
25    to work on it until such time that we
```

1                    J. LEPPER

2       received something, you know?

3                 I didn't know we were going to

4       receive three violations in one envelope.

5            Q.    Has Miss Lepper ever been up in

6       the treehouse?

7            A.    Has she ever been up there?

8                 Yes.  I believe so.

9            Q.    Do you know the last time she

10      was up there?

11           A.    No.

12           Q.    In terms of the children, had

13      you had any issues where you had to go to

14      school in reference to any issues

15      concerning the treehouse?

16                 MR. MORRIS:  Objection.

17                 MR. TOSCA:  I'm going rephrase

18           the question.

19           Q.    Did anybody from school call

20      you about any behavioral issues connected

21      with the treehouse for either your son or

22      your daughter?

23                 MR. MORRIS:  I'm also going to

24           object on the grounds of FEPRA;

25           Federal Education Privacy Rights Act.

```
 1                      J. LEPPER
 2    it's all anybody ever asks about.
 3                      So those are the stresses that
 4    we brought to our therapist.
 5           Q.    So what about the treehouse is
 6    causing problems between you and your wife?
 7           A.    What about the treehouse?
 8           Q.    Yes.
 9           A.    The fact that we were violated,
10    that I feel like my children are being
11    violated and we can't protect our kids in
12    the manner which we see fit and that the
13    village is telling us that we
14    misinterpreted their code and we don't feel
15    that we misinterpreted it.
16                      Those types of stresses.  The
17    fact that a year later after my son's sixth
18    birthday which is going to be next week,
19    that he still doesn't have his treehouse
20    and he walks past his treehouse that he
21    can't go up to and that they can't play in
22    their yard in their treehouse.  And that
23    the fact that my daughter and my son both
24    during the course of the school year were
25    writing letters in their books to their
```

```
  1                    J. LEPPER
  2    teachers that I wasn't aware of till the
  3    other day about their treehouse and that
  4    dad built them a treehouse.
  5             Those types of stresses.
  6        Q.    Do you or your wife have any
  7    difference of opinion as to the treehouse
  8    and how to respond to the violations?
  9             MR. MORRIS:  Objection.
 10             It sound like there's two
 11        questions there.
 12             Difference of opinion over the
 13        treehouse and response to the
 14        violations.
 15             If you preface every question
 16        with a statement, I'm going to
 17        continue to object.  And now it's
 18        7:11.
 19             So ask him a question that
 20        doesn't assume the fact of a previous
 21        statement.
 22             MR. TOSCA:  I don't know what
 23        you're objecting to.
 24             I'm asking him if his wife and
 25        he have any differences of opinion of
```

```
 1                    J. LEPPER
 2         the treehouse or the violations, in
 3         response to the violations.
 4              So I don't know how that's a
 5         statement.  It's a question.
 6              MR. MORRIS:  There's two
 7         different parts to that.
 8              MR. TOSCA:  I don't know the
 9         statement part of it.
10              That's the part I'm having a
11         problem with.
12         Q.    So let's start with the
13    treehouse yourself.
14              Do you and your wife have any
15    differences of opinion as to whether the
16    treehouse should be built or should have
17    been built?
18         A.    My wife and I agree on the
19    manner in which we chose to protect our
20    children and the decision that we made
21    together to build the treehouse.
22         Q.    Okay.
23              And after that, have there been
24    any differences in opinion with regard to
25    the treehouse?
```

```
 1                    J. LEPPER
 2        A.    Maybe a little bit with the
 3    threat of losing our house with fines of up
 4    to a thousand dollars every day, yes.
 5               That could scare my wife out of
 6    fighting for our kids, her kids.
 7        Q.    And does she want the treehouse
 8    removed?
 9        A.    No, she doesn't.
10               Does she want to lose her
11    house?
12               No, she doesn't.
13        Q.    Did she ever tell you she
14    wanted to take the treehouse down?
15        A.    No.
16        Q.    So what's the difference of
17    opinion then?
18        A.    She wants the burden and the
19    stress to go away.
20        Q.    And how does she think that
21    should be done?
22               MR. MORRIS:  Objection.
23               You can answer.
24        A.    Obviously, if we ever get
25    through this court case, the judge will
```

```
 1                    J. LEPPER
 2   rule on that.
 3        Q.    Well, I'm talking about you and
 4   your wife.
 5        A.    What was the question again?
 6        Q.    The question is:  Did she ever
 7   tell you that she wanted the treehouse
 8   taken down?
 9              MR. MORRIS:  Objection.
10              You can answer.
11        A.    No.
12        Q.    Did she and you have any
13   difference of opinion in how to respond to
14   the issues of the violations concerning the
15   treehouse?
16              MR. MORRIS:  Note my objection.
17              You can answer.
18        A.    The violations?
19        Q.    Yes.
20        A.    No.
21              We never had a difference of
22   opinion on how to respond to the violations
23   issued from the village.
24        Q.    Have you had any arguments with
25   your wife concerning the treehouse?
```

```
 1                    J. LEPPER

 2        A.     Yes.

 3        Q.     Okay.

 4               What were the arguments about?

 5        A.     What were the arguments about?

 6        Q.     Yes.

 7        A.     The threat of daily fines of up

 8   to a thousand dollars a day.  That was

 9   pretty scary for my wife.  That's been the

10   pressure on my wife's shoulders for the

11   last year.  The threat that the village

12   might take our house away and the threat of

13   daily fines.

14        Q.     Whoever threatened you that

15   they were going to take your house away,

16   Mr. Lepper?

17        A.     Well, I can't afford it if they

18   fine me a thousand dollars a day all the

19   way back to July 19th of last year.

20               So how can I afford to live in

21   my house?

22        Q.     Did anybody ever threaten you

23   that they would take your house away?

24               MR. MORRIS:  Objection.

25               You can answer.
```

1                    J. LEPPER

2          A.    I was threatened 2 or 3 days

3    after I was found guilty in the Village of

4    Babylon.  I was ordered without afforded

5    the opportunity to file an appeal.

6                    Two to three days after which

7    were found guilty in the Village of

8    Babylon, we received a letter from the

9    building inspector.  Before the initial

10   violations were even due where we were

11   afforded the opportunity to appeal the

12   judge's decision, we were threatened, we

13   were ordered to remove the treehouse in its

14   entirety or we'd be fined on a daily basis.

15                   According to the fines, it

16   shows me a thousand dollars a day.  So

17   that's the way I read that, and that's the

18   way my wife read it.

19        Q.    And so you read into that.

20        A.    I didn't read into it.

21                   I read the paper that stated

22   you could be fined on a daily basis.

23        Q.    But nobody threatened to take

24   your house away, right?

25                   MR. MORRIS:  Objection.

```
 1                      J. LEPPER
 2              Asked, answered, explained.
 3              No confusion.
 4              You asked him the same question
 5         again.
 6              I want you to read back.
 7              MR. TOSCA:  Then answer is
 8         either yes or no.  That's not an
 9         answer when I ask did anyone threaten
10         you to take your house away.
11              That's not an answer.  Either
12         they did or they didn't.
13              MR. MORRIS:  He explained what
14         a thousand dollars a day, the accrual
15         fines to his house.
16         Q.    Other than reading the letter
17    about fines that somehow you calculate to
18    be a thousand dollars a day, other than
19    that, did anybody threaten to take your
20    house away?
21         A.    You are hereby ordered to
22    remove the treehouse in its entirety or you
23    will be fined on a daily basis.
24              That I took as a threat.
25         Q.    All right.
```

```
 1                    J. LEPPER
 2              Other than that, was there
 3    anything else that was said or written to
 4    you that you took as a threat?
 5        A.    Only the violations, the two
 6    pending violations that came after that.
 7        Q.    Other than that, was there
 8    anything else that you took as a threat
 9    that somebody was going to take your house
10    away?
11        A.    The fact that the village is
12    still looking to prosecute.  And they said
13    that in open court when we filed the
14    federal complaint.
15        Q.    The village said in open court
16    that they threatened to prosecute.
17              What are you talking about?
18              When did this happen?
19        A.    December 10th when we wound up
20    in federal court, Gerard Glass, now a named
21    defendant, before the counsel was assigned
22    said in open court after asked by the
23    Honorable Judge Bianco to refrain from the
24    fines until such time as the federal court
25    hears this case.
```

```
 1                          J. LEPPER

 2                  Gerard Glass said he was a

 3       named defendant and he cannot concede that

 4       for the village.

 5                  So I took that as they were

 6       still looking to possibly fine me or found

 7       guilty, fine me all the way back till this

 8       July 19 initial violation.

 9                  That's how I read it.

10            Q.    Was there anyone else there

11       when you said this?

12            A.    Yes.

13            Q.    Who else?

14            A.    The judge, the court reporter,

15       my attorney and a couple of neighbors,

16       relatives, friends.

17            Q.    Was Mrs. Lepper there?

18            A.    On December 10th?

19                  I don't know.

20            Q.    All right.

21                  Now, other than what you

22       mentioned, was there anyone else that you

23       conceived or thought to be a threat to take

24       away your home?

25                  MR. MORRIS:  Objection.
```

```
 1                    J. LEPPER
 2              You can answer.
 3       A.     Repeat the question.
 4       Q.     Sure.
 5              Other than what you mentioned
 6   so far, was there any other statements or
 7   actions that you perceived as somebody
 8   threatening to take away your home?
 9       A.     It was indirect.  It was
10   indirect scaring us with fines.  Nobody
11   directly said they were going to directly
12   take my home.  They were indirectly telling
13   us that we could be fined of up to a
14   thousand dollars a day.
15       Q.     Did somebody say that it was a
16   thousand dollars a day?
17       A.     That's what the violation
18   reads.
19       Q.     But did anybody tell you that?
20              MR. MORRIS:  Objection.
21              You can answer.
22       A.     Yes.
23       Q.     Who?
24       A.     250, 500 and $1,000.
25              That's what I was told.
```

```
 1                    J. LEPPER
 2              MR. MORRIS:  Are you referring
 3         to the violation itself?
 4              THE WITNESS:  The initial three
 5         violations that came in the first
 6         certified envelope together.
 7              MR. MORRIS:  You want to ask
 8         him --
 9         A.    250, 500 and $1,000.
10              That was my own calculation
11    after he calculated it for me.
12         Q.    First of all, who is he
13    calculating?
14         A.    It's Village of Babylon
15    building inspector; Stephen Fellman.
16         Q.    That was that meeting you had
17    with him; is that correct?
18         A.    That is correct.
19         Q.    After that, did he mention
20    anything about how much the fines were?
21              MR. MORRIS:  Objection.
22         Q.    I'm sorry.
23         A.    Unless it was printed on the
24    violation.
25         Q.    All right.
```

```
 1                    J. LEPPER
 2            Did he ever say to you they're
 3    going to take your house away?  Did anybody
 4    specifically say that.
 5            Don't tell me what you
 6    interpreted.
 7            Did he specifically tell you
 8    that he or the village was going to or
 9    anybody from the village was going to take
10    away your house?
11            MR. MORRIS:  Objection.
12            You can answer.
13       A.   I am ordering you to remove the
14    treehouse in its entirety two days after
15    the verdict came down.  I'm ordering you to
16    remove the treehouse in its entirety or you
17    can be fined on a daily basis.
18            That's what he told me
19    (indicating).
20       Q.   Did he tell you that he or
21    anyone from the village was going to take
22    away your house specifically?
23       A.   He wrote it to me in a letter.
24       Q.   That he's going take your house
25    away?
```

```
 1                    J. LEPPER

 2               MR. MORRIS:  Objection.

 3      A.      No.

 4               Just what I just quoted to you.

 5      Q.      Okay.

 6               But did he tell you either in

 7      the letter or verbally that he or anybody

 8      else in the village was going to take your

 9      house away?

10               MR. MORRIS:  Objection.

11               Whose he, whose anyone else?

12      Q.      Did Mr. Fellman tell you that

13      he or anyone from the village would take

14      your house away?

15      A.      Mr. Fellman ordered me to

16      remove the treehouse in its entirety or he

17      would fine me on a daily basis.

18               That's what he told me.

19      Q.      I'm going continue to ask the

20      question that will you answer, Mr. Lepper.

21               MR. MORRIS:  I am going to

22          object.

23      Q.      Did he specifically tell you,

24      did Mr. Fellman specifically tell you that

25      he or anyone else from the Village of
```

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------x
JOHN LEPPER and NOELLE LEPPER, individually

and as parents and natural guardians of

their infant children, B.J.L and B.I.,

                         Plaintiffs,

         - against -

VILLAGE OF BABYLON; and, RALPH SCORDINO,

Mayor, KEVIN MULDOWNEY, Deputy Mayor, ROBYN

SILVESTRI, Village Trustee, TONY DAVIDA,

Village Trustee, MARY ADAMS, Village Trustee;

STEPHEN FELLMAN, Village of Babylon Building

Inspector; SUZANNE SCHETTINO, Department of

Public Works; GERARD GLASS, Esq., Village of

Babylon Attorney; DEBORAH LONGO, Planning

Board, Village of Babylon, each individually

and in their official capacity, and John

and/or Jane Doe, unnamed, unidentified

complainants,
                         Defendants.
Index No.:  2:18-cv-07011 JFB-GRB
--------------------------------------------x

                         400 Carleton Avenue
                         Central Islip, New York

STEPHEN FELLMAN
                         September 4, 2019
                         10:43 a.m.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

98

1                  STEPHEN FELLMAN

2        Q.    The 36 years of practicing as an

3   architect, how many buildings have you

4   prepared plans for?

5        A.    As I said 3 to 4,000.

6              Could you ask again that

7   question, that question?

8              (Whereupon, the record was read

9        by the reporter.)

10       A.    I'm sorry, probably like 6,000

11       Q.    Of those 6,000 plans, have you

12  signed all those plans?

13       A.    Yes.

14       Q.    When you sign the plans as an

15  architect, what responsibility do you assume

16  for the structure depicted in the plan?

17             MR. TOSCA:  Objection.

18             You can answer.

19       A.    You're assuming that it's

20  designed correctly and it's gonna stand up.

21       Q.    Explain what you mean, stand up?

22       A.    Not going to fail, it's going to

23  be structurally sound.

24       Q.    When you say structurally sound,

25  are you referring to safety or something else?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

99

1                STEPHEN FELLMAN

2        A.     Safety and the building is not

3   gonna collapse and fall down or blow down in a

4   hurricane.

5        Q.     Or like a microburst.

6        A.     Microburst?

7        Q.     Are you familiar with that term?

8        A.     Not really, no.

9        Q.     Are you familiar that a

10  microburst might have hit Long Island

11  recently?

12       A.     Storm, yes.

13       Q.     Are you familiar with a very

14  large storm that hit Babylon?

15       A.     Yep.

16       Q.     As you sit here today, that's the

17  first time you have ever heard the word

18  "microburst"?

19       A.     Yeah.

20       Q.     When you operated Stephen

21  Fellman, PLLC, what was the nature of your

22  practice during that period?

23       A.     General architecture, residential

24  and commercial projects.

25       Q.     Anything else?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

                                                          100

 1                    STEPHEN FELLMAN

 2         A.      I don't know if there is anything

 3    else.

 4         Q.      Did you work for any public

 5    entities?

 6                 MR. TOSCA:  Objection.

 7                 You can answer over objection.

 8         A.      Yeah, just for the towns and

 9    whatever.

10         Q.      What public entities?

11         A.      Town of Babylon.

12         Q.      Anyone else?

13         A.      We have done supervision work for

14    the Village of Lake Success.  We do quite a

15    bit of that.

16         Q.      Any other public entities?

17         A.      Not off the top of my head.

18         Q.      During the period you operated

19    out of the PLLC, did you advise clients that

20    you had any special competence or special

21    experience in any particular area of

22    architecture or architecture practice?

23         A.      No.

24         Q.      During the course of your

25    practice as you operated the PLLC, have you

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

146

1                    STEPHEN FELLMAN

2        A.      No.

3        Q.      Did you ever make a determination

4   that the arboreal structure at 59 Cockenoe

5   Avenue, Village of Babylon, State of New York

6   was unsafe?

7                MR. TOSCA:  Objection.

8                You can answer over objection.

9        A.      No, I made no determination.

10       Q.      So you have no opinion of the

11  safety of the structure at 59 Cockenoe Avenue

12  Village of Babylon?

13               MR. TOSCA:  Objection.

14               You can answer.

15       A.      I do now.

16       Q.      When you say you do now, when did

17  you make the determination that the structure

18  at 59 Cockenoe Avenue Village of Babylon was

19  unsafe?

20               MR. TOSCA:  Objection.

21               You can answer.

22       A.      I didn't make a determination

23  that it was unsafe.

24       Q.      Who did?

25       A.      I don't know that anybody did.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

147

```
1              STEPHEN FELLMAN
2   We wanted to make sure it was safe and that
3   Mr. Lepper supplied information from a
4   structural engineer showing that it should be
5   safe.
6         Q.    Is it your opinion that the
7   structure is safe?
8              MR. TOSCA:  Objection.
9              You can answer over objection.
10        A.    It would be my opinion that I
11  would trust the certification of an engineer,
12  if he says it's safe, that's good by me.
13        Q.    An engineer took a look at the
14  structure at Mr. Lepper's house, correct?
15             MR. TOSCA:  Objection.
16        A.    That's my understanding.
17        Q.    And the engineer made a report
18  correct?
19        A.    Yes.
20             MR. TOSCA:  Objection.
21        Q.    And that report in this case
22  evaluated the tree house, correct?
23             MR. TOSCA:  Objection.
24        A.    Yes.
25        Q.    The same arboreal structure of
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

148

1              STEPHEN FELLMAN

2    which we discussed, correct?

3              MR. TOSCA:  Objection.

4         A.    Yes.

5         Q.    Based on that opinion --

6              Withdrawn.

7              As you sit here today, the

8    arboreal structure that Mr. Lepper has, the

9    tree house, is it safe?

10             MR. TOSCA:  Objection.

11        A.    It's my belief that it's safe.

12        Q.    In the course of your regular

13   professional activities as Village of Babylon

14   building inspector, how did you determine that

15   the arboreal structure at 59 Cockenoe is safe?

16             MR. TOSCA:  Objection.

17             You can answer.

18        A.    I just said I'm accepting the

19   report from the engineer as proof.

20        Q.    You never made a determination

21   that the arboreal structure at 59 Cockenoe was

22   unsafe; is that your testimony?

23             MR. TOSCA:  Objection.

24        A.    Yes.

25        Q.    Did there come a time you wrote a

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

149

```
 1              STEPHEN FELLMAN
 2   summons or accusatory instruments regarding
 3   that structure at 59 Cockenoe, Village of
 4   Babylon?
 5        A.    Yes.
 6        Q.    What were the basis for those
 7   violations?
 8        A.    The basis were doing construction
 9   without a building permit.
10        Q.    How many violations did you
11   issue?
12        A.    I don't know.  I think at least
13   three or four.
14        Q.    What was the basis for those
15   three or four violations?
16        A.    Construction without a building
17   permit.
18        Q.    When you say you don't know, were
19   all of them construction without a building
20   permit?
21        A.    I think so.
22        Q.    In the course of your regular
23   professional activities as the building
24   inspector for the Village of Babylon, have you
25   the authority to implement the international
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

150

                    STEPHEN FELLMAN

1

2    building code?

3         A.     Yes.

4         Q.     Did the Village of Babylon adopt

5    the international building code?

6         A.     Yes.

7         Q.     What is the international

8    building code?

9         A.     That is the code that New York

10   State has adopted as the building code for the

11   State of New York with a 200-page supplement

12   that kind of tweaks that code a little bit.

13        Q.     How is it that you had the

14   Village of Babylon adopt the international

15   building code?

16               MR. TOSCA:  Objection.

17        A.     Not that I had it, the State

18   requires you to adopt the State code.

19        Q.     What's the purpose of obtaining a

20   building permit for the arboreal structure at

21   59 Cockenoe Avenue, Village of Babylon, State

22   of New York.

23        A.     What was the purpose?  Well,

24   multiple purposes.  First, what are you

25   building?  Is it going to be safe?  And most,

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

158

1               STEPHEN FELLMAN

2        Q.     When you say knowledge of

3   construction, can you explain what you mean?

4        A.     Understand how buildings are

5   supposed to get built, and how the drawings

6   are supposed to be prepared for them, so gives

7   me a background to monitor the construction

8   process.

9        Q.     Anything else?

10       A.     Such as?

11       Q.     Anything about building structure

12  and being a licensed architect that qualifies

13  you to be building inspector for the Village

14  of Babylon?

15       A.     That's it.  You have to be a CEO,

16  you can't -- I can be a nuclear physicist, I

17  can't be building inspector if I don't have

18  that certification.

19       Q.     Are you aware of whether there

20  are any other tree houses in the Incorporated

21  Village of Babylon?

22       A.     I know of one other.

23       Q.     The answer is yes, one other?

24       A.     Yes, one other.

25       Q.     Are you aware whether there are

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

159

                    STEPHEN FELLMAN
1
2    any tree houses in the Village of Farmingdale?
3              MR. TOSCA:   Objection.
4         A.    I don't know of any.
5         Q.    Are you aware if there are any
6    tree houses in Roslyn Harbor?
7         A.    There used to be one.  It's not
8    there anymore.
9         Q.    When you say used to be one,
10   explain what you mean.
11        A.    There was a tree house built way
12   up high, petty high up in a tree by the
13   homeowner, and the neighbor to the backyard
14   had a direct view of it from her backyard and
15   it was bothersome to her that she was afraid,
16   you know, it was dangerous, it was pretty
17   spooky looking, but she was concerned with how
18   it looked and its safety.
19        Q.    When you say not anymore, what
20   happened?
21        A.    Well, I contacted the homeowner
22   and it turned out, this was when I just
23   started working there, and he said actually he
24   built it for his kids, his kids were older
25   now, and never got around to taking it down so

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

160

STEPHEN FELLMAN

1

2     he just took it down.

3           Q.     Are you aware of whether there

4     are any tree houses in Lake Success?

5           A.     I'm not aware of any.

6           Q.     Are you aware if there are any

7     tree houses within Roslyn Estates?

8           A.     I'm not aware of any.

9           Q.     Are you aware if there's any tree

10    houses within the Town of Babylon?

11          A.     I'm not aware.  There may be.

12    I'm not aware.

13          Q.     Have you ever looked at or

14    examined any of the tree houses in the

15    Incorporated Village of Babylon?

16          A.     There's only one other.

17          Q.     Have you looked at or examined

18    any of the tree houses in the Incorporated

19    Village of Babylon?

20                 MR. TOSCA:  Objection.

21                 You can answer.

22          A.     Didn't I just answer.

23          Q.     Did you look at Mr. Lepper's tree

24    house?

25          A.     I didn't -- just from the street.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

161

1              STEPHEN FELLMAN

2       Q.     Did you look at any other tree

3  house aside from Mr. Lepper's tree house?

4       A.     One.

5       Q.     Which one?

6       A.     One down on -- what street was it

7  on?  Another application we had a couple years

8  back.  What street is that?  Years back.  Just

9  south of Montauk.  I forgot the street it's

10 on.

11      Q.     Baudorf (phonetic) sound

12 familiar?

13      A.     That's the property owner, that

14 does sound familiar.

15      Q.     Have you ever looked at the

16 Baudorf tree house?

17      A.     Yes.

18      Q.     Have you ever examined the

19 Baudorf tree house?

20      A.     Yes.

21      Q.     Have you ever examined

22 Mr. Lepper's tree house?

23      A.     No.

24      Q.     Have you ever found a permit

25 application for any tree house in the Village

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

162

                    STEPHEN FELLMAN

1

2    of Babylon?

3         A.    One.

4         Q.    Aside from that one, any other

5    permits ever during your tenure for any tree

6    house?

7         A.    Not that I'm aware of.

8         Q.    Were there any permits issued for

9    any of those tree houses within the Village of

10   Babylon?

11        A.    The one.

12        Q.    Is there a Certificate of

13   Occupancy for any of the Village of Babylon

14   tree houses?

15        A.    The one.

16        Q.    When you say the one, to which

17   one of are you referring?

18        A.    The Baudorf.

19        Q.    Are you the person responsible

20   for issuing Certificates of Occupancy within

21   the Village of Babylon?

22        A.    Yes.

23        Q.    Is there anyone else within the

24   Village of Babylon that can issue a

25   Certificate of Occupancy?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

163

1                    STEPHEN FELLMAN

2        A.     No.

3        Q.     Does the issuance of a

4   Certificate of Occupancy within the Village of

5   Babylon require a physical inspection?

6        A.     Yes.

7        Q.     In the course of your regular

8   professional activities as Village of Babylon

9   building inspector, is there a list or form

10  you use prior to the issuing a Certificate of

11  Occupancy in the Village of Babylon?

12       A.     No.

13       Q.     In the course of your regular

14  professional activities as Village of Babylon

15  building inspector, did you ever have the

16  opportunity the physically inspect the

17  arboreal structure at 59 Cockenoe Avenue?

18             MR. TOSCA:  Objection.

19       Q.     Village of Babylon, State of New

20  York.

21             MR. TOSCA:  Objection.

22             You can answer.

23       A.     No, other than observing from the

24  street.

25       Q.     Did anyone refuse you the right

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

164

```
                        STEPHEN FELLMAN
 1
 2    to inspect that tree house?
 3          A.     No.
 4          Q.     In the course of your regular
 5    professional activities as Village of Babylon
 6    building inspector, have you ever physically
 7    inspected any other arboreal structure within
 8    the Village of Babylon?
 9                 MR. TOSCA:  Objection.
10                 You can answer.
11          A.     Just the one.
12          Q.     When you say just the one, to
13    which one are you referring?
14          A.     Balcor, whatever his name is.
15          Q.     What did you do to physically
16    inspect that tree house?
17          A.     You go to the site and you look
18    at it from all different angles and then you
19    walk up, go up in it and jump up and down a
20    little bit.  I figure my 200 pounds is a spot
21    load to see how it's wobbling around or
22    anything.
23          Q.     When you say 200 pounds is a spot
24    load, what do you mean by that?
25          A.     I'm 200 pounds so, jump in one
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

165

```
1                    STEPHEN FELLMAN
2      spot, that's a point load, you try to get it
3      mid span and jump, and if it's weak at all,
4      you're gonna feel a deflection.
5           Q.    Doing that spot load of the
6      Baudorf tree house, that was sufficient?
7           A.    I felt it was, yeah.
8           Q.    The visual inspection, that was
9      sufficient?
10          A.    Yes.
11          Q.    Sufficient for what?
12          A.    Sufficient for me to issue a
13     final Certificate of Occupancy.
14          Q.    What determination were you
15     trying to make by doing those inspections?
16          A.    Make sure it's built solidly and
17     seemed to be all attached and anchored
18     correctly.
19          Q.    Why did you want to determine
20     those things, for what purpose?
21          A.    Safety.
22          Q.    In the course of your regular
23     professional activities as Village of Babylon
24     building inspector, did you come to inspect
25     the tree houses located in the homes
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

166

STEPHEN FELLMAN

1

2  surrounding the plaintiffs, the Lepper family

3  in this manner?

4                 MR. TOSCA:  Objection.

5                 You can answer.

6        A.     I'm not aware of any other tree

7  houses.

8        Q.     As you sit here today, are you

9  aware of whether any tree houses or arboreal

10 structure exists in the Incorporated Village

11 of Babylon with the exception of the one that

12 you inspected?

13       A.     No.

14       Q.     You mentioned before you were

15 sued, right?

16       A.     Yeah, at my architectural firm,

17 yeah.

18       Q.     Starting with first lawsuit, when

19 were you sued?

20       A.     Oh, I don't know the dates.

21       Q.     How many times were you sued?

22                 MR. TOSCA:  Objection.

23                 You can answer.

24       A.     Which entity?

25       Q.     Any entity.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

177

1           STEPHEN FELLMAN

2  referring to?

3        A.     Yes.

4        Q.     How did you resolve, if at all,

5  this lawsuit that you referred to as a

6  handicap lawsuit?

7              MR. TOSCA:  Objection.

8              You can answer.

9        A.     Again, that was a settlement Paul

10 settled, agreed to do those things, they

11 concluded the case.

12       Q.     Was there a consent decree, does

13 that sound familiar?

14       A.     That does sound familiar.

15       Q.     Were you issued a litigation hold

16 notice, does that sound familiar?

17       A.     I don't know what that is.

18       Q.     You said a foot case, somebody's

19 foot injury of some sort where you were a

20 defendant?

21       A.     Yes.

22       Q.     Were you represented by counsel

23 during that case?

24       A.     No.

25       Q.     How did that case resolve?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

187

1                    STEPHEN FELLMAN

2        A.      Ashley, that's my daughter.

3        Q.      Aside from the three electronic

4   mail addresses that you testified to earlier,

5   do you have any additional electronic mail

6   addresses?

7                MR. TOSCA:  Objection.

8                You can answer.

9        A.      Just the office mail at

10  Srfaia.com.

11       Q.      Do you have any other electronic

12  mail addresses or mediums to which you accept

13  electronic messages aside from those four

14  electronic mail addresses?

15       A.      Texts on my phone.

16       Q.      Do you utilize text on your phone

17  in your duties as Village of Babylon building

18  inspector?

19       A.      Yes.

20       Q.      Do you utilize texting on your

21  phone within your duties by the Village of

22  Farmingdale?

23       A.      Yes.

24       Q.      Do you utilize texting on your

25  phone within your ordinary duties through your

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

188

1             STEPHEN FELLMAN

2    employment at Roslyn Harbor?

3         A.    Yes.

4         Q.    Do you utilize texting on your

5    phone through your ordinary duties with your

6    position at Lake Success?

7         A.    Yes.

8         Q.    Do you utilize texting on your

9    phone within your duties at Roslyn Estates?

10        A.    Yes.

11        Q.    Did you review a consent decree

12   as part of the handicap lawsuit you mentioned

13   earlier?

14             MR. TOSCA:  Objection.

15             You can answer over objection.

16        A.    Yes.

17        Q.    Within that 2015 consent decree,

18   did you review the phrase litigation hold?

19        A.    I don't recall.

20        Q.    Do you understand what is

21   required by a litigation hold?

22        A.    No.

23        Q.    Have you complied with the

24   litigation hold notice that was served upon

25   you in this case?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

189

```
 1                    STEPHEN FELLMAN
 2              MR. TOSCA:  Objection.
 3              You can answer over objection.
 4        A.    I don't know.  I don't know what
 5   it is.
 6        Q.    Have you ever communicated by
 7   e-mail in your capacity as the Village of
 8   Babylon building inspector?
 9        A.    Communicated by e-mail, yeah.
10        Q.    Have you ever communicated with
11   Ralph Scordino by e-mail?
12        A.    No.
13        Q.    Have you ever communicated with
14   Kevin Muldowney by e-mail?
15        A.    No.
16        Q.    Have you ever communicated with
17   Robyn Silvestri by e-mail?
18        A.    No.
19        Q.    Have you ever communicated with
20   Mary Adams by e-mail?
21        A.    Did I e-mail her?
22              If I get the e-mail on my phone,
23   I text back, what do you consider that?
24        Q.    That, I would consider an e-mail.
25        A.    Okay.
```

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

190

STEPHEN FELLMAN

1
2      Q.     To the extent any questions, I
3  assure you the answers are not with the other
4  persons in this room.  I'm looking for answers
5  from you.
6              MR. MORRIS:  I notice the witness
7        is trailing off to the left?
8      Q.     So when I ask you for e-mail --
9      A.     I'm trying to understand what
10 you're asking me.
11     Q.     Let me ask you again:  The
12 persons I mentioned earlier, have you ever
13 sent or received e-mail from those persons?
14     A.     No.  Mary Adams I have.
15     Q.     Have you ever sent or received
16 e-mail from Suzanne Schettino?
17     A.     Yes.
18     Q.     Have you ever sent or received
19 e-mail from Gerard Glass?
20     A.     Yes.
21     Q.     Have you ever sent or received
22 e-mail from Deborah Longo?
23     A.     Yes.
24     Q.     Have you ever communicated with
25 anyone by e-mail about the tree house that is

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

191

1               STEPHEN FELLMAN

2     the subject of this litigation?

3               MR. TOSCA:  Objection.

4               You can answer.

5          A.    The attorneys that are here

6     and -- Debbie Longo.

7          Q.    Anyone else?

8          A.    I think that's it.

9          Q.    Have you deleted or destroyed any

10    e-mails since this litigation has commenced?

11         A.    No.

12         Q.    Do you reside at 3 True Harbor

13    Way, West Islip, New York 11795-5147?

14         A.    Yes.

15         Q.    Have you resided there

16    continuously since February 1, 2003 to today?

17         A.    I have been there for 16 years.

18         Q.    Do you receive mail at that

19    address from the United States Post Office?

20         A.    Yes.

21         Q.    There is a telephone number at

22    that address (631)669-1894.

23         A.    We don't use it.

24         Q.    Is that the telephone number at

25    that address?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

192

1                    STEPHEN FELLMAN

2          A.     That was the phone number, we

3    disconnected the phone, we never use it.

4          Q.     Do you know that there are

5    19 registered sex offenders nearby?

6                 MR. TOSCA:   Objection.

7          A.     No.

8          Q.     In the course of your regular

9    professional activities as the building

10   inspector for the Village of Roslyn, are you

11   aware of Title 8 of the Civil Rights Act?

12         A.     Ask that question again.

13         Q.     In the course of your

14   professional activities as the building

15   inspector for the Village of Roslyn, are you

16   aware of Title 8 of the Civil Rights Act?

17         A.     I'm aware of it.

18         Q.     In your work as a registered

19   architect, did you incorporate Title 8 of the

20   Fair Housing Act into your building designs?

21         A.     Yes.

22         Q.     Did there come a time, aside from

23   when we spoke, when you were prosecuted for

24   failure to exert the Fair Housing Provisions

25   in structures that you designed?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

193

1               STEPHEN FELLMAN

2          MR. TOSCA:  Objection.

3          You can answer over objection.

4     A.    We just discussed it, the Paul

5  Aniboli project.

6     Q.    And that consent decree has an

7  admission that you violated the Civil Rights

8  Act, right?

9          MR. TOSCA:  Objection.

10          You can answer.

11     A.    That, I don't know.

12     Q.    You don't know?

13     A.    No.

14     Q.    Did you ever sign something that

15  says you violated the Civil Rights Act?

16     A.    I signed something, but I don't

17  recall what it was.

18     Q.    You don't know what you signed?

19     A.    I did at the time.  It was a long

20  time ago.

21     Q.    Violation of Civil Rights is a

22  fairly important accusation, don't you think?

23          MR. TOSCA:  Objection.

24     A.    I think so.

25     Q.    You don't recall whether you

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

194

1                 STEPHEN FELLMAN

2     signed an admission that you violated

3     somebody's civil rights?

4                 MR. TOSCA:  Objection.

5                 You can answer.

6          A.     Again, we got a settlement with

7     the United States Government and, again, Joe

8     Walsh helped guide me through that.

9          Q.     Did you sign the accusatory

10    instruments you filed against John Lepper?

11         A.     Yes.

12         Q.     Did you sign the consent decree

13    that you violated civil rights?

14                MR. TOSCA:  Objection.

15                You can answer over objection.

16         A.     I don't understand the question.

17                MR. MORRIS:  Repeat the question.

18                (Whereupon, the requested portion

19          was read back by the reporter.)

20         Q.     Did you sign a consent degree

21    with the United States Government that says

22    you violated civil rights?

23                MR. TOSCA:  Over objection, you

24          can answer.

25         A.     I signed some kind of settlement

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

195

1              STEPHEN FELLMAN
2  document.
3       Q.    Did that settlement document say
4  that you violated civil rights?
5              MR. TOSCA:  Objection.
6       A.    I don't recall.
7       Q.    Do you recall what the accusatory
8  instrument against Mr. Lepper said?
9       A.    For construction without a
10  building permit?
11       Q.    Do you recall what it said?
12       A.    Not verbatim, no.
13       Q.    How did you become aware of the
14  other tree houses in the Village of Babylon?
15              MR. TOSCA:  Objection to form.
16              You can answer over objection.
17       A.    I said I'm only aware of one
18  other.
19       Q.    Does the Village of Babylon keep
20  track of tree houses within the Village of
21  Babylon?
22              MR. TOSCA:  Objection.
23              You can answer.
24       A.    No.  We're -- I'm only aware of
25  one other tree house.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

196

1            STEPHEN FELLMAN

2            MR. MORRIS:  Counsel, you object.

3      Unless you tell him not to answer, I

4      assume he knows at this point.

5            MR. TOSCA:  I just said he can

6      answer the question.

7            You heard me, right?

8            MR. MORRIS:  Yeah.  A lot of

9      speaking afterwards.  It sort of changes

10     the way that the demeanor of the witness

11     looks, people look at him and he also --

12           MR. TOSCA:  I don't know what --

13           MR. MORRIS:  Let me please

14     finish.  I didn't interrupt you.

15           MR. TOSCA:  You just -- go ahead.

16           MR. MORRIS:  The demeanor of this

17     witness changes when he looks over in

18     your direction or Mr. Glass' direction,

19     so I'm just -- if you're going to

20     object, object and move on, please.

21           MR. TOSCA:  I've done that

22     already.

23           And as far as his demeanor is

24     concerned, I notice nothing in his

25     demeanor, okay, so why make that

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

197

                    STEPHEN FELLMAN

 1
 2          representation. I don't understand it.
 3                    MR. MORRIS:  Okay.
 4          Q.     Are tree houses assessed within
 5     the Village of Babylon?
 6          A.     I don't know.
 7          Q.     Any kind of special fee for a
 8     tree house within the Village of Babylon?
 9          A.     Special fee, no.
10          Q.     In the course of your regular
11     professional activities as the building
12     inspector of the Village of Babylon, have you
13     become familiar with the code provision
14     regarding tree houses within the Village of
15     Babylon?
16                    MR. TOSCA:  Objection.
17                    You can answer over objection.
18          A.     Code regarding tree houses.  I'm
19     not sure what you're referring to.
20          Q.     Babylon has a Village code,
21     correct?
22          A.     Yes.
23          Q.     Is there a provision regarding
24     tree houses in that code; yes or no?
25          A.     Specifically address tree houses,

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

198

1                STEPHEN FELLMAN
2    not that I'm aware of.
3         Q.    In the course of your regular
4    professional activities as an architect or
5    private citizen or the building inspector of
6    the Village of Babylon, did you participate in
7    the drafting of any of the provisions of the
8    Village of Babylon code?
9         A.    No.
10        Q.    In the course of your regular
11   professional activities as building
12   inspector of the Village of Babylon, have you
13   had occasion to become familiar with the New
14   York State building code?
15        A.    Yes.
16        Q.    Did you become familiar with the
17   New York State building code in your capacity
18   as an architect or as a Village of Babylon
19   building inspector?
20             MR. TOSCA:  Objection.
21        A.    Both.
22        Q.    When did you become familiar with
23   the New York State building code?
24        A.    I'm familiar with it for 36
25   years.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

199

1                    STEPHEN FELLMAN

2         Q.      Fair to say when you became a

3    licensed architect, you became familiar with

4    the New York State building code?

5         A.      Yes.

6         Q.      In the course of your regular

7    professional activities as the building

8    inspector of Village of Babylon, have you had

9    occasion to become familiar with the

10   international building code?

11        A.      Yes.

12        Q.      Is there anything in any of those

13   code provisions that refers to a tree house?

14        A.      Not that I'm aware of.

15        Q.      Prior to the issuing of the

16   summons against John Lepper, did you have any

17   discussion with anyone working at or for the

18   Village of Babylon?

19        A.      About the tree house, many

20   discussions.

21        Q.      With whom?

22        A.      The mayor's office.

23        Q.      Anyone else?

24        A.      Mayor's officer meaning the mayor

25   and the trustees.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

200

STEPHEN FELLMAN

1

2      Q.     Anyone else?

3      A.     My staff.

4      Q.     Who are those persons?

5      A.     Debbie Longo.  It came back.

6  Mostly Debbie Longo.

7      Q.     Just to be clear, the Debbie that

8  you were referring to before who you did not

9  know the name --

10      A.     I went blank, it was Debbie

11  Longo.

12      Q.     Is Debbie Long on the Planning

13  Board Village of Babylon?

14      A.     No, she is the secretary.

15      Q.     When you say Debbie, is that

16  Deborah Longo?

17      A.     Yes.

18      Q.     What is her title?

19      A.     She is the secretary to the

20  building department.

21      Q.     Anyone else that you did not

22  mention?  You said your staff, Deborah Longo,

23  who else?

24      A.     Debbie Longo, Holly was there,

25  she's gone, she left.  Jeanette is the other

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

201

                    STEPHEN FELLMAN

1

2    girl.

3         Q.    Sorry, Holly, what was her last

4    name?

5         A.    Holly, I don't know her last

6    name.

7         Q.    Was it Sapallo (phonetic)?

8         A.    Might be.  I never called her by

9    her last name.

10        Q.    What about Jeanette, do you know

11   her last name

12        A.    Jeanette, I do not.

13        Q.    Anyone else to whom you spoke?

14        A.    Gerard Glass.

15        Q.    Anyone else?

16        A.    The judge at the Village, Bill

17   Whittier, W-H-I-T-T-I-E-R, head of code

18   enforcement.

19        Q.    Did you ever have communication

20   with anyone in form or manner stating tree

21   house prior to serving accusations to

22   Mr. Lepper?

23             MR. TOSCA:  Objection.

24             You can answer.

25        A.    I don't understand the question.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

212

1              STEPHEN FELLMAN

2    inspections you would be making that

3    particular day?

4         A.    I get an e-mail from Debbie Longo

5    of my inspections.

6         Q.    Was that the regular course of

7    business at the Village of Babylon?

8         A.    Yeah.

9         Q.    Did you receive an e-mail prior

10   to going to the corner of Wampum and Cockenoe

11   Avenue for this to see if construction was

12   continuing purpose?

13        A.    I'm trying to -- again, I get it

14   on my phone, so I don't know if it was a text

15   or e-mail that came.

16        Q.    Have you deleted any of these

17   texts or e-mails?

18        A.    No.

19   RQ        MR. MORRIS:  I call not only for

20           the preservation but for the production

21           of all texts or e-mails regarding such

22           inspections.

23        Q.    In the course of your --

24           Withdrawn.

25           Has anyone ever communicated to

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

213

1              STEPHEN FELLMAN

2    you in any fashion, telephone, e-mail,

3    face-to-face conversation about this Lepper

4    family tree house?

5              MR. TOSCA:  Objection.

6              You can answer.

7         A.    Again, I thought I did answer it.

8              We talked about the mayor and

9    trustees and -- we all talked about it.

10        Q.    After it was built, did you have

11   any communication in any fashion, telephone,

12   e-mail, face-to-face conversation about this

13   Lepper family tree house?

14        A.    The same, same as my first

15   answer.

16        Q.    To be clear, you spoke to the

17   mayor, the trustees?

18        A.    Yeah, it's a continuing

19   conversation.

20        Q.    Under what circumstances did such

21   conversations occur?

22        A.    Now with the lawsuits and things,

23   it's when is the depositions, when's this,

24   when's that, what's happening.

25        Q.    Prior to the lawsuit, were the

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

214

1               STEPHEN FELLMAN

2    same persons involved in those conversations?

3        A.    Yes.

4        Q.    Under what circumstances did you

5    have those conversations?

6        A.    When I would be at Village Hall,

7    you know, they constantly wanted updates on

8    what's happening with the tree house.

9        Q.    When you say Village Hall, was

10   that during your normal work hours?

11       A.    Yes.

12       Q.    When you say they wanted updates,

13   who is "they"?

14       A.    Mayor and trustees.

15       Q.    When you say mayor and trustees,

16   to what trustees are you referring?

17       A.    All of them.

18       Q.    To be clear, there was an

19   election, you said there was a new trustee, to

20   what trustees are you referring at the time of

21   the building but before the lawsuit who wanted

22   updates?

23       A.    The mayor Kevin Muldowney, Mary

24   Adams, Tony Davida.  Robyn really wasn't

25   involved, that's the new trustee, she wasn't

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

215

1                    STEPHEN FELLMAN
2    really involved that much.
3         Q.    Under what circumstances were you
4    approached?
5                    MR. TOSCA:  Objection.
6                    You can answer over objection.
7         A.    Whenever they see me, they go,
8    what's happening with the tree house?
9         Q.    All five of these persons were
10   together at the same time and whenever --
11        A.    No.  There's different, you know,
12   whoever happened to be there at the time.
13        Q.    Where did these conversations
14   occur?
15        A.    Village Hall.
16        Q.    What was the substance of these
17   conversations with the mayor?
18        A.    Depends on what point we were
19   with this.
20        Q.    Let's start right after the first
21   conversation of which you testified earlier.
22                   Tell us, upon your second visit,
23   what, if any, conversation did you have with
24   the mayor of the Village of Babylon regarding
25   the Lepper family tree house?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

216

1                 STEPHEN FELLMAN

2        A.    Had a conversation that he's

3    continuing construction and we have to get him

4    in here to get a building permit because I

5    know it's in the front yard setback, so we got

6    a zoning problem here.

7        Q.    Did you have any conversations

8    with any trustee on this day?

9        A.    Which day?

10       Q.    The day you spoke to the mayor

11   and had that conversation?

12       A.    It was the same conversation

13   every time I walked in the building depending

14   on who happened to be standing there.

15       Q.    Did the mayor approach you or did

16   you approach the mayor?

17       A.    Typically he'll summon me in to

18   give him an update on stuff.

19       Q.    Did you ever discuss this case

20   with the Village Justice John Rafter?

21       A.    This case, in terms of this case

22   now or the tree house?

23       Q.    The tree house.

24       A.    The tree house.  Well, at the

25   court.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

217

1              STEPHEN FELLMAN

2         Q.    Did you ever discuss the Lepper

3    family tree house with Gerard Glass?

4         A.    Yes.

5         Q.    When did you first have that

6    conversation?

7         A.    It was pretty early on.

8         Q.    Those conversations with attorney

9    Gerard Glass, did they occur before the

10   summonses were issued or after?

11        A.    Before.

12        Q.    Those conversation with Judge

13   Rafter, did they occur before the summonses

14   were issued or after the summonses were

15   issued?

16        A.    The conversations were at the

17   trial.

18        Q.    Were you the principal witness

19   for the Village of Babylon in the

20   prosecution of John Lepper?

21        A.    Yes.

22              MR. TOSCA:  Objection.

23        Q.    Did you stay throughout the

24   entire trial and hear the testimony of

25   Mr. Lepper?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

218

1                  STEPHEN FELLMAN

2        A.      Yes.

3        Q.      At any time during the course of

4   that trial, did you have any conversations

5   with Mr. Glass?

6                  MR. TOSCA:  Objection.

7                  You can answer.

8        A.      During the course the trial?

9        Q.      During the course of that trial.

10       A.      During the course of that trial,

11  just the questions he was asking me.

12       Q.      Aside from the questions asked on

13  the stand, did you have any conversations with

14  Mr. Glass during the course of the trial?

15                 MR. TOSCA:  Objection.

16                 You can answer.

17       A.      I'm not understanding what you

18  mean by the course of the trial, that day or

19  you know?

20       Q.      You came to the Village of

21  Babylon to have the trial for the prosecution

22  of Mr. Lepper, correct?

23       A.      Yes.

24       Q.      Before the trial, other matters

25  were heard?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

219

STEPHEN FELLMAN

1

2        A.      Yes.

3        Q.      Did you have a conversation with

4    Mr. Glass before the trial?

5        A.      Yes.

6        Q.      The trial occurred, correct?

7        A.      Yes.

8        Q.      Did you have a conversation with

9    Mr. Glass after the trial of Mr. Lepper?

10       A.      We had a brief conversation.

11       Q.      Did you speak to anyone else that

12   day?

13       A.      Probably just Debbie Longo.

14       Q.      During the course of the trial of

15   Mr. John Lepper, did you speak to anyone else

16   aside from Deborah Longo and Mr. Gerard Glass?

17       A.      The day of the trial, I think it

18   was just Gerard and Debbie.

19       Q.      During the course of the trial,

20   did you pass Mr. Glass any notes or documents?

21       A.      No.

22               MR. TOSCA:  Objection.

23       Q.      Did Mr. Glass present to you any

24   notes or documents during the trial of

25   Mr. Lepper?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

220

1              STEPHEN FELLMAN

2       A.      No.

3       Q.      Prior to the trial of John

4  Lepper, did you have any conversations with

5  Mr. Glass regarding the prosecution of John

6  Lepper?

7       A.      Yes.

8       Q.      Prior to the commencement of the

9  trial, did you have any conversations with

10 Judge Rafter about John Lepper of this case?

11      A.      No.

12      Q.      In the course of your regular

13 professional activities as the Village of

14 Babylon building inspector, do you refer to

15 the Babylon Village code when you write an

16 accusatory instrument?

17      A.      Depends, if it's Village code

18 violation, I would cite the Village code.  If

19 it's a State code violation, I would cite the

20 State code violation.

21      Q.      In the course of your regular

22 professional activities as Village of Babylon

23 building inspector, do you refer to the

24 Babylon Village code when you write an

25 accusatory instrument involving the Village of

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

221

1                    STEPHEN FELLMAN
2    Babylon code?
3         A.    Yes.
4         Q.    In the course of your regular
5    professional activities as building inspector,
6    do you have occasions to make judgments as to
7    whether or not there has been a violation of
8    the Babylon Village code?
9                    MR. TOSCA:  Objection.
10                   You can answer.
11        A.    Yes.
12        Q.    What are the criteria that you
13   use to determine whether there has been a
14   violation of the Babylon Village code?
15        A.    Depends on what it is.  I mean,
16   you know, it's different types of violations I
17   think.  We have setback problems, you have
18   height problems, we have FEMA elevation
19   problems with flooding.  Then we have
20   construction without a building permit.  We
21   have occupancy without a Certificate of
22   Occupancy.
23        Q.    What are the criteria you used in
24   those examples that you provided?
25                   MR. TOSCA:  Objection.

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

222

STEPHEN FELLMAN

1

2        A.      Depends on what it is.  Too vague

3    a question.

4                Again, if I notice something that

5    doesn't look right, then I will investigate it

6    a little more to determine what's going on or

7    what might be wrong.

8        Q.      For instance, how do you

9    investigate elevation requirements?

10       A.      Elevation requirements are --

11   well, first thing we determine is, is

12   construction going to take place in the

13   floodplain, that's the first question, you

14   know, not all of our staff, about a third of

15   our stuff is in the floodplain elevations.  So

16   that's the first thing.  Then, you know, which

17   floodplain are they in because there are

18   different heights depending on what block you

19   are south of Montauk Highway.  Then we want to

20   make sure they're going to end up with an

21   elevation certificate that's going to prove to

22   us that they raised it to a proper height from

23   the surveyor.

24       Q.      How do you make sure that they

25   raised it to the proper height?

John Lepper v. Village of Babylon
Fellman, Stephen - September 4, 2019

236

         C E R T I F I C A T E

STATE OF NEW YORK        )
                         ) SS:
COUNTY OF SUFFOLK        )


          I, STEPHANIE O'KEEFFE, a Notary

Public within and for the State of New York,

do hereby certify:

          That STEPHEN FELLMAN, the witness

whose deposition is hereinbefore set forth,

was duly sworn by me and that such deposition

is a true record of the testimony given by

such witness.

          I further certify that I am not

related to any of the parties to this action

by blood or marriage; and that I am in no way

interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 4th day of September, 2019.



          _____
                STEPHANIE O'KEEFFE

1

ORIGINAL

*POG/EPT/LMG-148530-752*

RECEIVED

2     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK          SEP 2 4 2019

3     ------------------------------------------X
      JOHN LEPPER AND NOELLE LEPPER,     KELLY, RODE & KELLY, LLP

4
                                    PLAINTIFFS,
5
                    -against-          Case No.:
6                                      18CV07011

7     VILLAGE OF BABYLON; and individually
      and in their official capacity, RALPH
8     SCORDINO, Mayor, KEVIN MULDOWNEY, Deputy
      Mayor, ROBYN SILVESTRI, Village Trustee,
9     TONY DAVIDA, Village Trustee, MARY ADAMS,
      Village Trustee; STEPHEN FELDMAN, Village
10    of Babylon Building Inspector; SUZANNE
      SCHETTINO, Department of Public Works;
11    GERARD GLASS, Esq., Village of Babylon
      Attorney; DEBORAH LONGO, Planning Board,
12    Village of Babylon,

13                                    DEFENDANTS.
      ------------------------------------------X
14

15                    DATE: September 6, 2019

16                    TIME: 12:19 P.M.

17

18          DEPOSITION of the Plaintiff,

19    NOELLE LEPPER, taken by the Defendants,

20    pursuant to a Stipulation and to the

21    Federal Rules of Civil Procedure, held at

22    the offices of Diamond Reporting, Inc., 150

23    Broadhollow Road, Melville, New York 11747,

24    before Jennifer Scirica, a Notary Public of

25    the State of New York.

```
 1                    N. LEPPER
 2    house at 59 Cockonoe?
 3               MR. MORRIS:  Well, the subject
 4          of this lawsuit is you want to two
 5          certificates of occupancy for two
 6          houses.  You ask the question and now
 7          you're interrupting me.
 8               MR. TOSCA:  You want to know
 9          what house.
10.        Q.    Okay, the house at 59 Cockonoe,
11    before you moved into that house --
12               MR. TOSCA:  Can you repeat the
13          question?
14               (Whereupon, the referred to
15          question was read back by the
16          Reporter.)
17         A.    My mom did for a little while.
18         Q.    What is her name?
19         A.    Colleen.
20         Q.    Her last name?
21         A.    Patton.
22         Q.    How long did --
23         A.    I'm sorry, that's her maiden
24    name.
25         Q.    What is her married name?
```

1                          N. LEPPER

2          A.     Yes, sir.

3          Q.     Where is there a building?

4                 MR. MORRIS:  Objection.

5          A.     Are you talking about a

6    structure?

7          Q.     Yes.

8          A.     I have a treehouse.

9          Q.     Where is that treehouse?

10         A.     It's on the last tree.

11         Q.     That's not one that is adjacent

12   to the house?

13                MR. MORRIS:  Objection.  You

14          can answer.

15         A.     I'm sorry, repeat the question?

16         Q.     The tree where the treehouse

17   is, that's not adjacent to the house?

18                MR. MORRIS:  Note my objection,

19          you can answer.

20         A.     No, sir.

21         Q.     The treehouse, other than the

22   treehouse on one of the trees, are there

23   any other building structures on any other

24   tree?

25                MR. MORRIS:  Objection.

```
1                        N. LEPPER
2              Building structure or treehouse, what
3              are you looking for?
4         Q.    Are there any other building
5    structures on any trees?
6                   MR. MORRIS:  Note my objection
7              to building structure, you can
8              answer.
9         A.    No, sir.
10        Q.    The treehouse that you were
11   talking about, how long has that been
12   there?
13        A.    We started in May.
14        Q.    Of what year?
15        A.    2018.
16        Q.    How long did it take to build
17   the treehouse in the configuration that now
18   exists?
19                  MR. MORRIS:  Objection.  You
20             can answer.
21        A.    It's not complete, sir.
22        Q.    But in the configuration that
23   exists right now, how long did it take to
24   build it in that configuration?
25                  MR. MORRIS:  Objection.
```

```
1                    N. LEPPER

2            Configuration.  You can answer.

3            A.    Maybe a couple months, a month.

4       It's not complete.

5            Q.    You said it's not complete, so,

6       what do you mean?

7            A.    I mean my husband is not

8       finished.

9            Q.    Who built the treehouse?

10           A.    My husband.

11           Q.    Did anyone assist him in

12      building the treehouse?

13               MR. MORRIS:  Note my objection,

14           you can answer.

15           A.    He had someone just help him

16      put up the sides.

17           Q.    Did he have anybody assist him

18      on any other part of the treehouse?

19               MR. MORRIS:  Note my objection,

20           you can answer.

21           A.    No, sir.

22           Q.    You said he had somebody help

23      him with the sides, who helped him with the

24      sides?

25               MR. MORRIS:  Note my objection,
```

```
 1                    N. LEPPER
 2         you can answer.
 3         A.    Someone from work.  One of his
 4    work friends.
 5         Q.    What is his name?
 6         A.    I don't recall.
 7         Q.    Was the person paid?
 8               MR. MORRIS:  Objection.  You
 9         can answer.
10         A.    No, sir.
11         Q.    Did you assist in any way in
12    constructing the treehouse?
13               MR. MORRIS:  Objection.  You
14         can answer.
15         A.    With the construction part of
16    it?
17         Q.    Yes.
18         A.    No, sir.
19         Q.    Did you help with the design of
20    the treehouse in any way?
21         A.    No, sir.
22         Q.    Before the treehouse was built,
23    did you have any discussion with Mr. Lepper
24    about the treehouse?
25         A.    Yes, sir.
```

```
 1                    N. LEPPER
 2         Q.    During the construction of the
 3    treehouse, did you have a discussion with
 4    him about the treehouse?
 5         A.    Sir, we're always talking about
 6    the treehouse.
 7         Q.    You said that it's not
 8    completed, what else has to be completed on
 9    the treehouse?
10              MR. MORRIS:  Note my objection,
11          you can answer.
12         A.    Sure.  So, I know he wants to
13    build a hatch for the kids to be able to
14    climb up to, um, he has got a lot of plans,
15    so I am not sure 100 percent about
16    everything, but the windows aren't complete
17    and I know he's got a lot of other fine
18    details that I'm not sure of.
19         Q.    When you say, you're not sure,
20    did he ever discuss those fine details with
21    you?
22              MR. MORRIS:  Objection.  You
23          can answer.
24         A.    That's okay.  I know he wants
25    to make a little area where the kids can
```

```
 1                    N. LEPPER
 2    play inside put it like an area where they
 3    can sit and relax and --
 4         Q.    Have your children ever been up
 5    into the treehouse?
 6         A.    Yes, sir.
 7         Q.    Both of them?
 8         A.    Yes, sir.
 9         Q.    When was the first time that
10    any of your children went up to the
11    treehouse?
12         A.    I can't recall.
13         Q.    Did they go up to the treehouse
14    when it had not had a roof?
15              MR. MORRIS:  Objection.  You
16         can answer.
17         A.    Yes, sir.
18         Q.    Did they go up into the
19    treehouse where it didn't have walls?
20              MR. MORRIS:  Note my objection,
21         you can answer.
22         A.    Yes, sir.
23         Q.    How did they get up there for
24    the first time when it didn't have walls or
25    roof?  How did they get up to the
```

```
 1                    N. LEPPER
 2    treehouse?
 3              MR. MORRIS:  Note my objection,
 4         you can answer.
 5         A.    With a ladder, sir.
 6         Q.    What kind of ladder?
 7         A.    A ladder that you climb up into
 8    a treehouse.
 9         Q.    Is it an A Frame ladder,
10    extension ladder or something else?
11              MR. MORRIS:  Objection.  You
12         can answer.
13         A.    An A frame.
14         Q.    A frame?
15         A.    Yes, sir.
16         Q.    The A frame, how high is that A
17    frame ladder?
18              MR. MORRIS:  Note my objection.
19         You can answer.
20         A.    I'm not sure, sir.  High enough
21    to reach the treehouse.
22         Q.    Whose ladder is that?
23         A.    I assume it's ours.
24         Q.    Has it always been in the house
25    for as long as you lived at the house?
```

1                          N. LEPPER

2          A.     Yes, sir, as far as I know.

3          Q.     When they used the ladder to

4     get to the platform before the walls and

5     the roof went up, was the A frame extended?

6                 MR. MORRIS:  Note my objection.

7                 You're asking if it was

8             extended or you want all that other

9             stuff in there as well?

10                MR. TOSCA:  I asked the

11            question, she can answer, please let

12            her answer the question.

13                MR. MORRIS:  Note my objection.

14         Q.     If you want me to repeat the

15    question, that's fine.  Do you understand

16    the question?

17         A.     Do you mind repeating it?

18         Q.     Not at all.

19                (Whereupon, the referred to

20            question was read back by the

21            Reporter.)

22         A.     Yes, sir.

23         Q.     How was it extended?

24         A.     I'm not sure what you mean.  It

25    was extended out.

```
 1                        N. LEPPER
 2         Q.    In other words, it was put out
 3    into the shape of an A?
 4         A.    Correct, sir.
 5         Q.    Was there a locking mechanism
 6    on the ladder for them to go up?
 7              MR. MORRIS:  Objection.  You
 8          can answer.
 9         A.    Yes, sir.
10         Q.    Was the ladder kept there where
11    they can go up whenever they wanted?
12         A.    Absolutely not, sir.
13         Q.    Where was the ladder stored?
14         A.    In our garage.
15         Q.    Was it taken out when you
16    wanted the children to go up?
17              MR. MORRIS:  Objection.  You
18          can answer.
19         A.    Are you asking me was the
20    ladder kept out other than when we wanted
21    to go up?
22         Q.    That's correct.  That's what I
23    am asking.
24         A.    Otherwise it was kept in the
25    garage.
```

```
 1                        N. LEPPER
 2      had talked about it.
 3           Q.    Had you ever discussed it
 4      before you got married?
 5           A.    About building a treehouse, no,
 6      but we talked about treehouses just that he
 7      had one and I had one when we were both
 8      young.
 9           Q.    At some point after you were
10      married, but before you moved to 59
11      Cockonoe, had you ever discussed that at
12      some point you wanted to build a treehouse?
13                MR. MORRIS:  Objection.  You
14           can ask, answer again.
15           A.    After we were married, yeah, we
16      had talked about it.  I can't give you an
17      exact date of like when we talked about,
18      but, you know, it would come up in
19      conversation, talk about all sorts of
20      things.
21           Q.    Before he brought up building
22      this particular treehouse that exists
23      presently in May of 2018, before that, did
24      you discuss with him any plans, general
25      plans to have a treehouse at 59 Cockonoe?
```

```
 1                        N. LEPPER
 2                  MR. MORRIS:  Note my objection
 3            to basically the entire clause before
 4            that question, you can answer.
 5       A.    Yes, I'm sorry, do you mind
 6   repeating it for me?
 7       Q.    Sure.  Before Mr. Lepper spoke
 8   to you in May of 2018 about building that
 9   treehouse that exists presently, had you
10   and he talked about building a treehouse at
11   the 59 Cockonoe property?
12       A.    Not that I recall.
13                  MR. MORRIS:  Note my objection.
14       Q.    In May of 2018 when he spoke to
15   you the first time about this treehouse,
16   what did he say to you?
17                  MR. MORRIS:  Note my objection.
18            The characterization of the record.
19            You can answer.
20       A.    Well, we talked about building
21   a treehouse at that point because we had
22   found a hypodermic needle in our bushes.
23       Q.    So, you when you say, we found,
24   did you and Mr. Lepper find that together?
25       A.    No, sir, my husband found it.
```

```
 1                    N. LEPPER
 2    He was --
 3         Q.    Go ahead.
 4         A.    No, he was out playing with the
 5    kids.
 6              MR. MORRIS:  Hold on, you're
 7         asking her a question --
 8              MR. TOSCA:  She sounded like
 9         she was done.
10         Q.    Are you done with your answer?
11              MR. MORRIS:  Please finish your
12         answer.
13         A.    Okay, so we were outside, he
14    was outside playing with the kids and I was
15    inside and he found a hypodermic needle, I
16    think he was on the swing with the kids.
17    We have a hammock next to our side of
18    Wampum and he found a hypodermic needle
19    right within the reach of our kids.
20         Q.    What month was it that he found
21    the hypodermic needle?
22         A.    It was in April sometime.
23         Q.    Do you remember the day?
24         A.    No, sir.
25         Q.    Do you remember the day of the
```

1                          N. LEPPER

2       week?

3              A.    No, sir.

4              Q.    Do you still have the

5       hypodermic needle?

6              A.    I'm not sure, sir.

7              Q.    You said you found it where?

8                    MR. MORRIS:  Objection.  You

9              can answer again.

10             A.    We have a swing, a hammock

11      between two trees and the kids were

12      swinging in there, my husband was pushing

13      them and right next to that we have a fence

14      and it was right on our fence, like, on the

15      ground right where the kids were.

16             Q.    The hammock, you said it's

17      between two trees, which trees are they

18      between?

19                   MR. MORRIS:  Objection.  You

20             can answer.

21             A.    The trees that we spoke about.

22             Q.    The ones that are adjacent to

23      the house?

24             A.    Correct.

25             Q.    Was the hammock connected to

```
 1                    N. LEPPER
 2     the tree where the treehouse is now?
 3          A.    No, sir.
 4          Q.    The bushes you're talking
 5     about, are they bushes that are adjacent to
 6     Wampum?
 7               MR. MORRIS:  Objection.  You
 8           can answer.
 9          A.    Yes, sir, they are on the fence
10     line.
11          Q.    Where were you when he was
12     outside with your children by the hammock?
13               MR. MORRIS:  Objection.  He.
14          Q.    Mr. Lepper.  Where were you
15     when Mr. Lepper was by the hammock with his
16     children?
17          A.    I believe I was in the kitchen.
18          Q.    Do you know if it was a
19     weekend?
20               MR. MORRIS:  Objection.
21          A.    Sir, I don't remember.
22          Q.    How did you learn about the
23     hypodermic needle?
24          A.    My husband came and called me
25     right outside and showed me.  I was very
```

```
 1                      N. LEPPER
 2    upset.
 3          Q.    Did he yell out to you, call
 4    you on the telephone, how did he get you to
 5    come outside?
 6                MR. MORRIS:  Objection.  You
 7           can answer.
 8          A.    I think he just called my name.
 9          Q.    When you went outside, where
10    was the hypodermic needle?
11          A.    Well, at that point he had
12    picked it up and he showed me.
13          Q.    Was it in his hand?
14          A.    Yes, sir.
15          Q.    What did he tell you about the
16    hypodermic needle?
17                MR. MORRIS:  Objection.  You
18           can answer.
19          A.    Well, his exact words, had a
20    few curse words in there, like, I found
21    this dirty hypodermic needle right where
22    the kids were, right where our kids were
23    swinging, right where they could have
24    picked it up, right where they could have
25    been stabbed by a dirty hypodermic needle.
```

```
 1                    N. LEPPER
 2          Q.    Prior to that time, have you or
 3    your husband ever found a hypodermic needle
 4    on any part of your property?
 5          A.    No, sir.
 6          Q.    After your husband found that
 7    hypodermic needle, have you or your husband
 8    ever found hypodermic needles on any other
 9    part of the property?
10          A.    No, only my neighbor has found
11    a hypodermic needle.
12          Q.    Let's talk about your property
13    for now.
14               MR. MORRIS:  Objection.  You
15          asked her if they found in and around
16          the property.
17               MR. TOSCA:  No, I did not.  I
18          asked on the property.
19          Q.    So, on the property, has anyone
20    found a hypodermic needle on your property
21    of 59 Cockonoe?
22          A.    Not on my property.
23          Q.    The hypodermic needle, how did
24    you know it was a hypodermic needle, how
25    could you tell?
```

```
 1                       N. LEPPER
 2         A.    I'm an RN.
 3         Q.    Was there anything in the
 4    hypodermic needle, any substance?
 5         A.    Not that I noticed.
 6         Q.    Could you tell by looking at it
 7    if it had been used or not?
 8               MR. MORRIS:  Objection.  You
 9          can answer.
10         A.    It was a dirty needle, sir.
11         Q.    What do you mean by dirty?
12         A.    It was a needle that was found
13    on the side of my yard, it was in dirt
14    right in the bushes.
15               MR. MORRIS:  Objection.
16         Q.    Was it in the bushes, in the
17    dirt, where was it?
18         A.    It was on the ground.
19         Q.    On the ground by the bushes?
20         A.    Correct.
21         Q.    Was it on dirt?
22               MR. MORRIS:  Objection.
23         A.    Was it on dirt?  No.
24         Q.    What was it on?
25         A.    Where he pointed it was right
```