1                    N. LEPPER

2    next to the grass where he pointed that he

3    found it.

4         Q.    When you say it was dirty, what

5    do you mean by dirty?

6         A.    It was a needle, hypodermic

7    needle.

8         Q.    I understand that, but you said

9    it was dirty, so what do you mean by dirty?

10        A.    Do you mean -- I'm not saying

11   there was dirt on it.

12        Q.    What are you saying?

13             MR. MORRIS:  Note my objection.

14        Let her finish her answer.

15             MR. TOSCA:  I did.  You're

16        going to have to stop this at some

17        point.

18             MR. MORRIS:  No, there is --

19             MR. TOSCA:  She did finish,

20        okay.

21        Q.    What do you mean by dirty?

22             MR. MORRIS:  Note my objection.

23        Q.    What is it about the needle

24   that makes you say it's dirty?

25             MR. MORRIS:  Note my objection.

```
 1                         N. LEPPER
 2          You can answer.  Let us know when
 3          you're finished with this answer,
 4          please.
 5          A.    It was a hypodermic needle that
 6   I found on the ground, my husband found,
 7   excuse me, on the ground.
 8          Q.    You said it was dirty, so what
 9   is it about it that makes you think it was
10   dirty?
11              MR. MORRIS:  Note my objection,
12          you can answer.
13          A.    I mean, it wasn't like dirty
14   with dirt on it, obviously, it was a needle
15   that was found.
16          Q.    Well, you qualified it as being
17   a dirty hypodermic needle.  I'm trying to
18   figure out what you mean by dirty?
19          A.    Why else would there be a
20   needle outside on the ground, on my kids
21   property?
22          Q.    Does that make it dirty just by
23   the fact that it's on the ground?
24              MR. MORRIS:  Objection.
25          Q.    Is there anything about the
```

1                    N. LEPPER

2    needle that you --

3         A.    Yes, I would think that it

4    makes it dirty.

5         Q.    Just the fact that it was on

6    the ground?

7         A.    Not the fact that it was on the

8    ground, but it was a hypodermic needle that

9    was found.

10        Q.    Okay.  All right.  Is there

11   anything about the needle that indicated to

12   you that it was even used?

13             MR. MORRIS:  Objection.  You

14        can answer.

15        A.    No.

16        Q.    What did Mr. Lepper do with the

17   hypodermic needle after he showed it to

18   you?

19             MR. MORRIS:  Objection.  You

20        can answer.

21        A.    He put it in a plastic bag.

22        Q.    Did he keep it in the house

23   someplace?

24        A.    I'm not sure where he kept it.

25        Q.    Did he show it to anyone?

```
 1                    N. LEPPER
 2        A.    Yes.
 3        Q.    Was this a big concern for you?
 4        A.    Absolutely.
 5        Q.    Was that a big concern for
 6   Mr. Lepper?
 7        A.    It was a huge concern for the
 8   both of us.  We found a dirty -- a needle,
 9   hypodermic needle found on our property
10   where my kids can reach it and get HIV or
11   Hep C or any other disease.
12        Q.    Were there any other concerns?
13        A.    Concerns were for my kids
14   safety, my dog's safety, my safety.
15             MR. MORRIS:  She is not done.
16        Do not interrupt her.
17             MR. TOSCA:  She just finished,
18        okay --
19             MR. MORRIS:  No, no, she went
20        about dogs --
21             MR. TOSCA:  She finished.
22             MR. MORRIS:  No, she didn't.
23        You cut her off.
24        Q.    Are you done with your answer,
25   Mrs. Lepper?
```

```
1                        N. LEPPER
2          A.    Not only myself, but anybody
3     that was on my property it could have, they
4     could have picked it up by accident.  We do
5     have kids that are over all the time.
6          Q.    Okay.  Did you draw any
7     conclusions from the fact that there was a
8     hypodermic needle in your bushes?
9               MR. MORRIS:  Objection.  You
10          can answer.
11         A.    I'm not sure what you mean by
12    conclusion.
13         Q.    I mean, did you draw any
14    conclusion as to there being any problems
15    generally because you found a hypodermic
16    needle in your bushes?
17              MR. MORRIS:  Objection.
18          Conclusion.  Generally.  You can
19          answer.
20         A.    My conclusion was that I just
21    found a hypodermic needle on the ground
22    where my kids could reach it and get
23    stabbed by it.
24         Q.    Any other conclusion?
25         A.    I think that's the biggest
```

1                              N. LEPPER

2      conclusion is safety of my kids, protecting

3      them.

4           Q.    Did you draw any conclusion on

5      the fact that you found a hypodermic needle

6      other than what you have told us?

7                MR. MORRIS:  Objection.  You

8            can answer again.

9           A.    I mean that is my biggest --

10     you keep using the word conclusion, but

11     that's my biggest -- I'm going to use the

12     word concern.  That's my biggest concern is

13     that I found a hypodermic needle on the

14     side of my property when my kids could

15     reach it and get stabbed by it and pick it

16     up accidently because they are kids.

17          Q.    Did you tell anyone about the

18     hypodermic needle?

19          A.    Yes, sir.

20          Q.    Who did you tell about the

21     hypodermic needle?

22          A.    All of our neighbors.

23          Q.    Could you name them, please?

24                MR. MORRIS:  Objection.  You

25            can answer.

1                    N. LEPPER

2          A.     As I mentioned before, Pat and

3    Kiersten Murphy and at that point they told

4    us that they also found a needle right on

5    their side property as well.

6          Q.     Anyone else?

7          A.     That we told?

8          Q.     Yes.

9          A.     We told everybody.  We told our

10   neighbors across the street.

11         Q.     What are their names?

12         A.     The Cunningham's.

13         Q.     Do you know their address?

14         A.     No, sir.

15         Q.     Across the street, across the

16   street on Cockonoe?

17         A.     If I'm looking at my house,

18   they are across the street from me.  If I'm

19   looking straight out of my house, they are

20   across the street from me.

21         Q.     You told the Cunningham's, you

22   said?

23         A.     Correct.  We told the Mineo's,

24   we told the neighbors across the street

25   diagonal, their last name is escaping me,

```
 1                      N. LEPPER
 2   some criminal activity when you found the
 3   hypodermic needle?
 4              MR. MORRIS:  Objection.  You
 5         can answer.
 6         A.    So, I would answer that, yes,
 7   by telling you that I know there was
 8   activity because our neighbors were all
 9   concerned about the drug deals that were
10   being done on our streets, the corner of
11   Wampum and across the street.
12         Q.    When was the first time you
13   learned of any drug deals that were
14   allegedly done on Cockonoe?
15              MR. MORRIS:  Objection.  You
16         can answer.
17         A.    I'm going to say maybe three
18   years ago, four, you know, I can't be
19   certain of the time.
20         Q.    Well, learning about drug deals
21   in and around the area, was that before you
22   found the hypodermic needle or after?
23              MR. MORRIS:  Objection.  You
24         can answer.
25         A.    Before.
```

```
 1                          N. LEPPER
 2          Q.    Who was it that first told you
 3     about drug deals near your home?
 4                MR. MORRIS:  Objection.  You
 5           can answer.
 6          A.    It was the Cunningham's across
 7     the street.
 8          Q.    What did they say to you about
 9     the drug deals?
10                MR. MORRIS:  Objection.  You
11           can answer.
12          A.    They said they were making us
13     aware that it was going on, bringing it to
14     our attention and asking us if, you know,
15     we see it, can we try and get the license
16     so we can report it to the police.  You
17     know, they have two young children as well,
18     so obviously it's a concern and they also
19     told the Murphy's, so the Murphy's were
20     aware of it as well.
21          Q.    Well, how do you know they told
22     the Murphy's?
23          A.    We had discussed it with the
24     Murphy's prior.
25          Q.    To speaking to the Cunningham's
```

```
 1                    N. LEPPER
 2   about it?
 3        A.   Yeah, we're on the corner, you
 4   know, there is four houses, so we're all
 5   looking out for each other making sure we
 6   can keep each other safe.
 7        Q.   Now --
 8        A.   We all have small kids, so --
 9        Q.   You said that the Cunningham's
10   have two young children, do you know their
11   ages, approximately?
12        A.   Sure.  So, the little guy is
13   probably four and then her, the daughter is
14   my daughter's age.
15        Q.   So, she's eight, seven?
16        A.   So, she's five, six.
17        Q.   The Cunningham children, had
18   they ever been up to the treehouse?
19             MR. MORRIS:  Objection.  You
20         can answer.
21        A.   Not that I recall.
22        Q.   Did the Cunningham's tell you
23   that they had reported drug activity to
24   anyone else other than Mr. and Mrs. Murphy?
25        A.   I mean, I think they told the
```

```
 1                    N. LEPPER
 2     do you mean -- there are two kids we're
 3     talking about then?
 4          A.    Yes.
 5          Q.    Two people.  How old is this
 6     other person?
 7          A.    He's approximately the same age
 8     as the other one, probably late twenties,
 9     thirties, could be late thirties, I'm not
10     sure.
11          Q.    So, the one you saw in front of
12     Pat and Kiersten's house?
13          A.    Yes, he lives on Cockonoe.
14          Q.    He lives on Cockonoe?
15          A.    Yes -- I'm sorry, the other one
16     lives on Wyandanch.
17          Q.    So, the one that lives on
18     Wyandanch, he is the one that you saw in
19     your driveway?
20          A.    Correct.
21          Q.    Is he the one that got out of
22     the car?
23          A.    Yes.
24          Q.    Have you reported any of them
25     to the police?
```

```
 1                    N. LEPPER
 2    house; am I correct?
 3          A.    That's correct, sir.
 4          Q.    You let your children use the
 5    yard without restriction since you have
 6    owned the house; am I correct?
 7                MR. MORRIS:  Objection.  You
 8           can answer again.
 9          A.    I'm sorry, repeat that again?
10          Q.    You let your children use the
11    yard to play without restriction since you
12    have owned the house; is that correct?
13                MR. MORRIS:  Note my objection,
14           you can answer again.
15          A.    I'm always out there with them
16    or an adult is out there with them to watch
17    them and make sure and keep them safe.
18          Q.    Other than being out there to
19    watch them, you haven't stopped them from
20    going out in the yard, have you?
21                MR. MORRIS:  Objection.  You
22           can answer.
23          A.    No, sir.
24          Q.    Have you limited where they can
25    play in the yard ever?
```

```
 1                     N. LEPPER
 2          A.    I'm sorry, I don't know.
 3          Q.    Does your work provide you with
 4     health insurance?
 5          A.    They do.  I have dental and we
 6     have -- I have eye insurance, eye care.
 7          Q.    Through your employment?
 8          A.    That's correct.
 9          Q.    What about health care?
10          A.    I don't use my health care
11     anymore.  We used to have joint, so that's
12     why I can't answer, I'm not sure who we
13     filed through.
14          Q.    Who was your health insurer
15     when you would do both, when you would
16     jointly use them?
17          A.    I don't recall.
18          Q.    Was this through Good Samaritan
19     Hospital?
20          A.    No.
21          Q.    Was it through St. Francis?
22          A.    That's correct.
23          Q.    Do you have any records at home
24     who your health insurer was at St. Francis?
25          A.    That I don't probably have, no.
```

1                     N. LEPPER

2          Q.    Did you keep any cards,

3     insurance cards?

4          A.    All I know right now I have

5     GHI.

6          Q.    That's through --

7          A.    FDNY.

8          Q.    Okay.  It's GHI that handles

9     the health insurance?

10         A.    That's correct.

11         Q.    The treehouse, has it had any

12    affect on your children?

13         A.    Tremendous affect on my kids.

14         Q.    How so?

15         A.    Every day when we walk outside

16    they want to go in the treehouse.  Every

17    time we have a play date all the kids want

18    to go in the treehouse.  Every time they

19    are at school all the kids want to ask them

20    about the treehouse.  Everywhere we would

21    go they are always talking about it.  "When

22    is the treehouse going to be done?  When

23    can we go in the treehouse?  When are they

24    going to let us go up in the treehouse,

25    Mom, we want to go up in the treehouse,

1              N. LEPPER

2    treehouse in the backyard, they have a huge

3    playhouse in the backyard.

4         Q.    Could you describe what the

5    playhouse looks like?

6         A.    It's tall, has a ladder, has a

7    slide coming off of it, has swings, takes

8    up a large part of their yard.

9         Q.    How far is it from the property

10   line?

11        A.    Right on the side of their

12   property.

13        Q.    How far is it from the property

14   line to the street?

15        A.    I'm not sure, sir.

16        Q.    Have your children ever played

17   in that playhouse?

18        A.    No, my daughter went over there

19   once.  She was on the swing once.

20        Q.    Have you ever discussed the

21   playhouse with the Cunningham's have with

22   them?

23        A.    I commented and I thought it

24   was nice.

25        Q.    Is the playhouse attached to

1                    N. LEPPER

2     the ground?

3          A.    I'm not sure.  You mean is it

4     like nailed down?

5          Q.    Right.

6          A.    I'm not sure.

7          Q.    Is it in a tree?

8          A.    It's not in a tree, sir.

9          Q.    Is it off the ground for any

10    distance?

11         A.    You mean is it raised up?

12         Q.    Yes.

13         A.    No.

14         Q.    Have you seen any treehouses in

15    the Village of Babylon?

16         A.    There is one over on Wyandanch.

17         Q.    A treehouse?

18         A.    Yes, sir.  It's not in a tree,

19    it's raised up from the ground.

20         Q.    It's not in a tree?

21         A.    No, sir.

22         Q.    Why would you call it a

23    treehouse if it's not in a tree?

24         A.    It's large, it's right next to

25    the tree.

```
 1                      N. LEPPER
 2          Q.     Have you spoken to Robyn
 3     Silvestri?
 4          A.     No, sir.
 5          Q.     Have you spoken to Mary Adams
 6     ever?
 7          A.     No, sir.
 8          Q.     Have you spoken to Steven
 9     Feldman other than the time he came to your
10     house for the extension, did you ever speak
11     to him ever?
12          A.     Not that I recall.
13          Q.     Did you ever speak to Suzanne
14     Schettino?
15          A.     No, sir.
16          Q.     Have you ever spoken to Gerard
17     Glass?
18          A.     Yes, sir, he just offered me
19     some water.
20          Q.     Okay.  Other than his offering
21     of water, had you spoke to him before that?
22          A.     Not directly, just when we were
23     in Court.
24          Q.     Have you ever spoken to Debra
25     Longo?
```

```
 1                    N. LEPPER
 2          A.    No, sir.
 3          Q.    Is there any Village employee
 4    that you have ever spoken to?
 5                MR. MORRIS:  Objection.
 6            Village?
 7                MR. TOSCA:  I'm sorry, I'll
 8            rephrase the question.
 9          Q.    Is there any Village of Babylon
10    employee that you have ever spoken to?
11          A.    I'm sure, but I don't know
12    their names -- Holly, she's my neighbor,
13    I'm not sure of her last name.
14          Q.    Is it Zappalla?
15          A.    It could be.
16          Q.    Did Holly once work for the
17    Village of Babylon?
18          A.    Yes, sir.
19          Q.    Where does she live?
20          A.    Down the street from me on
21    Cockonoe.
22          Q.    Have you ever spoken to her
23    about the treehouse?
24          A.    I don't think directly, not
25    that I recall.
```

```
 1                    N. LEPPER
 2         Q.    Have you ever spoken to her
 3    indirectly?
 4              MR. MORRIS:  Objection.  You
 5         can answer.
 6         A.    I have had conversations with
 7    her, I don't think it was directly
 8    regarding the treehouse.
 9         Q.    Do you know if she has ever
10    said anything about the treehouse?
11              MR. MORRIS:  Objection.  You
12         can answer.
13         A.    She has spoken to my husband
14    because he went down into Town when he
15    filed for the permit.  So, she spoke to him
16    and he was telling her he is building a
17    treehouse for his son's birthday and he
18    told her what he found in the bushes, the
19    hypodermic needle.
20         Q.    Did he tell you what she said
21    to him?
22              MR. MORRIS:  Objection.  You
23         can answer.
24         A.    She said that she might have
25    known where the needle came from because
```

1                    N. LEPPER

2    she knows of the drug issues on the streets

3    around us and that she is aware of the

4    neighbor across the street that he has a

5    very bad drug problem.

6              I'm going to stand for a

7    minute.  You can continue.

8         Q.    Did you speak to anyone other

9    than your neighbors about the drug issues?

10             MR. MORRIS:  Objection.  You

11         can answer.

12        A.    I'm sorry, can you say it in a

13    different way?

14        Q.    Have you spoken to anyone else

15    about the drug issues in the Village of

16    Babylon other than the neighbors you have

17    mentioned?

18        A.    I talked about it with my

19    family in Florida, I have talked about with

20    my co-workers, talked about it with my

21    husband's family, talked about with you,

22    um, just the neighbors around the

23    neighborhood who stopped by and commented

24    about the treehouse asking, you know, the

25    story how it all started.  I couldn't give

```
 1                    N. LEPPER
 2   you their names.  We have people who drive
 3   by every day and stop every day and ask
 4   about the treehouse and make comments about
 5   it and how much, how beautiful it is and
 6   how they wish their kids could have one and
 7   how amazing it is and how they always
 8   wanted a treehouse when they were younger.
 9        Q.    Are you aware of Mr. Lepper
10   speaking to anyone other than the neighbors
11   about the drug issues in the Village of
12   Babylon?
13             MR. MORRIS:  Objection.  You
14        can answer.
15        A.    Yes, sir.
16        Q.    Who?
17        A.    Everybody we have come in
18   contact too.  This is, you know, a huge --
19   everybody is always asking about the
20   treehouse.  They want to know who it
21   started and we told them the whole story,
22   this is been going on for over a year and a
23   half, so yes, everybody we come in contact
24   with knows about the drug problem and the
25   drug paraphernalia we found and people, you
```

1                    N. LEPPER

2    know, we have seen during the drug deals

3    with.

4             So, I couldn't give you exact

5    names, but, yes, there are many people.

6         Q.   Did anyone ever tell you that

7    they were upset that you were talking about

8    the drug issues in the Village of Babylon?

9             MR. MORRIS:  Objection.  You

10        can answer.

11        A.   Upset, no, they are upset that

12   there is a drug problem, not upset that

13   we're exchanging conversations about it.

14        Q.   Did anyone ever tell you that

15   they are upset about Mr. Lepper speaking

16   about the drug issues in the Village of

17   Babylon?

18            MR. MORRIS:  Objection.  You

19        can answer.

20        A.   Can you repeat the question?

21            (Whereupon, the referred to

22        question was read back by the

23        Reporter.)

24            MR. MORRIS:  Objection.  You

25        can answer.

1                   N. LEPPER

2         A.    Well, I know that they are

3    upset because there was complaints made

4    about the treehouse and how we made the

5    treehouse and how it all started in the

6    first place.

7         Q.    When you say, you know that

8    they are upset, who is "they"?

9         A.    The people around town that are

10   upset about the drug problem.

11        Q.    Are they upset that Mr. Lepper

12   spoke about the drug problem?

13        A.    I'm sure the Town is not happy

14   that we're talking about a drug problem,

15   why would they be?

16        Q.    When you say, "the Town," what

17   do you mean, the Town of Babylon?

18        A.    Yes, the Village of Babylon.

19        Q.    Which one, Town or Village?

20        A.    The Village.

21        Q.    So, did anyone tell you that

22   the Village of Babylon was unhappy that you

23   spoke about the, or that you and Mr. Lepper

24   spoke about the drug problem?

25        A.    Did anyone tell me personally?

```
 1                    N. LEPPER
 2        Q.    Yes.
 3        A.    No one came to me personally to
 4   tell me that.
 5        Q.    Did you learn from any source
 6   that anybody at the Village was unhappy
 7   that you spoke about the drug problem?
 8             MR. MORRIS:  Objection.  You
 9         can answer.
10        A.    Well, I think I have been to
11   Court over like 50 times for a treehouse
12   that was put up because we have a drug
13   problem.
14        Q.    Are you aware of anyone in the
15   Village whose made a complaint that you
16   spoke out or that Mr. Lepper spoke out
17   about the drug problem in the Village of
18   Babylon?
19             MR. MORRIS:  Objection.  You
20         can answer again.
21        A.    I can't give you any direct
22   names, no, sir.
23        Q.    Your children, do they go to a
24   certain bus stop presently?
25        A.    Yes, sir.
```

1                    N. LEPPER

2        Q.     Where is that bus stop located?

3        A.     On Cockonoe.

4        Q.     And where?

5        A.     Wampum.

6        Q.     Is it on the corner?

7        A.     Yes, sir.

8        Q.     How long have they been using

9    that bus stop?

10        A.     As long as they started at the

11    elementary school.

12        Q.     Did you ever know that there

13    was a bus stop anywhere else other than the

14    corner of Cockonoe and Wampum?

15        A.     There is a ton of bus stops,

16    but are you referring to the one that was

17    changed on Wyandanch?

18        Q.     I guess, yes.  Was that, in

19    other words, the bus stop that is at

20    Cockonoe and Wampum, was that always there?

21        A.     I can't tell you for how long

22    it's been there.

23        Q.     How did you come to learn that

24    a bus stop was changed?

25        A.     My husband told me.

```
 1                    N. LEPPER
 2         Q.    Do you know from any other
 3    source other than what your husband told
 4    you?
 5         A.    Yes, Barbara, one of my
 6    neighbors had told me because she was there
 7    when it happened.
 8         Q.    Did she tell you what the
 9    circumstances surrounding the change?
10         A.    Yes, the neighbor who I spoke
11    about has a drug problem and he was
12    arrested and the bus stop was right in
13    front of his house or diagonal to his
14    house.
15         Q.    Did she tell you that was the
16    reason they changed it?
17         A.    Yes, to protect the kids.
18         Q.    When did she tell you about
19    that?
20         A.    Oh, I don't recall.
21         Q.    Did that happen before you had
22    moved into the house?
23              MR. MORRIS:    Objection.
24         A.    I'm not sure how many years ago
25    it happened.
```

```
1                    N. LEPPER
2         Q.    But you weren't there when that
3    happened?  You weren't living there when
4    that happened, correct?
5         A.    I'm not sure because my kids
6    weren't going to school, so I couldn't tell
7    if we were living there or not.
8         Q.    Well, did Barbara or your
9    husband tell you when that happened?
10        A.    I don't recall.
11        Q.    Have you ever filed for divorce
12   or separation?
13        A.    No, sir.
14        Q.    Before your husband built the
15   treehouse, did you have any discussion with
16   him about obtaining any permits or making
17   applications for the building of the
18   treehouse?
19             MR. MORRIS:  Objection.  You
20        can answer.
21        A.    No, sir.
22        Q.    At some point did you learn
23   that a permit was necessary for the
24   building of the treehouse?
25             MR. MORRIS:  Objection.  You
```

```
 1                    N. LEPPER
 2        can answer.
 3        A.    Well, a permit wasn't required
 4   for the treehouse because it's less than
 5   the square footage that's required for a
 6   permit.
 7        Q.    Did you read the building code?
 8             MR. MORRIS:  Objection.  What
 9        building code?
10.            MR. TOSCA:  Of the Village of
11        Babylon?
12        A.    No, sir.
13        Q.    Are you familiar with the
14   zoning code of the Village of Babylon?
15             MR. MORRIS:  Objection.  You
16        can answer.
17        A.    No, sir.
18        Q.    Are you familiar that there is
19   set back requirements that are set forth in
20   the Village code?
21             MR. MORRIS:  Objection.  You
22        are asking for a legal conclusion.
23             MR. TOSCA:  I'm asking if she's
24        aware.
25             MR. MORRIS:  Okay, are you
```

```
 1                    N. LEPPER
 2          aware of set backs in the Village of
 3          Babylon?
 4                  THE WITNESS:  No, sir.
 5          Q.    At any time while the treehouse
 6     was being constructed, did you read the
 7     building code?
 8                  MR. MORRIS:  Objection.  You
 9           can answer.
10          A.    No, sir.
11          Q.    Did you or Mr. Lepper ever make
12     any inquiry to the Building Department
13     regarding constructing the building of the
14     treehouse before you started building the
15     treehouse?
16                  MR. MORRIS:  Objection.  You
17           can answer.
18          A.    No, sir, my kids wanted a
19     treehouse, so he said he would build them a
20     treehouse for their birthday and we were
21     building it to keep our kids safe to give
22     every kid their dream of a treehouse.
23          Q.    Would you agree with me that
24     when you build something it should be
25     compliant with the local codes?
```

1                        N. LEPPER

2                MR. MORRIS:  Objection.

3        Q.    Would you agree with that

4    statement?

5        A.    It is compliant, sir.

6        Q.    Do you agree that it should be

7    compliant?

8                MR. MORRIS:  Objection.  Asked

9          and answered.  You can answer again.

10       A.    It is compliant, sir.

11       Q.    Would you agree that any

12   building structure should be compliant with

13   the building code?

14               MR. MORRIS:  Objection.  If

15         you're going to ask the same question

16         over and over again, we are going to

17         have the same discourse, she's giving

18         an answer.

19               MR. TOSCA:  She's talking about

20         the treehouse in particular and I am

21         not -- I'm talking about any building

22         structure that you put on your

23         property.

24       Q.    Do you agree that should be

25   compliant with the local building codes?

```
 1                      N. LEPPER
 2              MR. MORRIS:  Like what?  A bird
 3         house?  A dog house?
 4         Q.    No, anybody building structure
 5    that you put on your property should it not
 6    be compliant with the local Village code?
 7              MR. MORRIS:  Note my objection,
 8         you can answer.
 9         A.    Yes, sir.
10         Q.    Before the construction of the
11    treehouse, did you obtain any building
12    plans?
13              MR. MORRIS:  Objection.  You
14         can answer.
15         A.    No, sir.
16         Q.    Before the construction of the
17    treehouse, did you obtain any design
18    drawings?
19              MR. MORRIS:  Objection.  You
20         can answer.
21         A.    No, sir.
22         Q.    Have you seen any design
23    drawings for the treehouse?
24              MR. MORRIS:  Objection.  You
25         can answer.
```

```
 1                    N. LEPPER

 2         A.     Only the ones that my husband

 3    gave.

 4         Q.     Those design drawings, were

 5    they -- when did you see them for the first

 6    time?

 7         A.     I don't recall, sir.

 8         Q.     Did you see the design drawings

 9    before the commencement of the construction

10    of the treehouse or after?

11              MR. MORRIS:  Objection.  You

12         can answer.

13         A.     He had made pictures of the

14    treehouse, but it wasn't, didn't -- there

15    wasn't any measurements on there.

16         Q.     Did you consult with either an

17    architect or engineer before the treehouse

18    was constructed?

19              MR. MORRIS:  Objection.  You

20         can answer.

21         A.     No, sir.

22         Q.     Have you gone up and personally

23    taken measurements of the treehouse?

24         A.     Sorry, that's funny.

25         Q.     I take that as a no?
```

```
 1                    N. LEPPER
 2         A.    No, sir.
 3         Q.    Do you know anyone who has
 4    taken measurements of the treehouse?
 5         A.    Yes, sir.
 6         Q.    Who?
 7         A.    My husband.
 8         Q.    Were you there when he took the
 9    measurements?
10         A.    Yes, sir.
11         Q.    Do you know anyone else who
12    took measurements of the treehouse?
13         A.    An architect and a Google
14    engineer, I'm not sure who else, maybe --
15    I'm not sure who else.
16         Q.    When did you first learn of any
17    notices from the Village concerning the
18    treehouse?
19              MR. MORRIS:  Objection.  You
20         can answer.
21         A.    I think it was in,
22    approximately, June.
23         Q.    Of 2018?
24         A.    Correct.
25         Q.    How did that notice come to
```

```
 1                    N. LEPPER
 2    you?
 3        A.    It came in the mail.
 4        Q.    Do you remember what the notice
 5    said?
 6        A.    It was a notice from Steven
 7    Feldman saying that it was noted that there
 8    was a structure being built on our
 9    property.
10        Q.    Did you speak about that with
11    your husband?
12        A.    Yes, sir.
13        Q.    What did you say to him, what
14    did he say to you?
15            MR. MORRIS:  Note my objection.
16            You can answer.
17        A.    It was very casual, you know,
18    it says we're building a structure and he
19    said that he would, you know, he was going
20    to talk to them.  I don't remember anything
21    more than that or even if it was -- I
22    believe, that was all that was said, very
23    casual.
24        Q.    Were you aware of any notices
25    of violation for the treehouse?
```

```
 1                    N. LEPPER
 2        A.    Not at that time when Steven
 3   Feldman gave us that, no.
 4        Q.    Did your husband tell you what
 5   he was going to do in response to the first
 6   notice that you learned about?
 7              MR. MORRIS:  Objection.  You
 8         can answer.
 9        A.    He was going to speak to
10   Steven, Mr. Feldman.
11        Q.    Do you know if he went down?
12              MR. MORRIS:  Objection.  He.
13         Down.
14        Q.    Do you know if Mr. Lepper went
15   down to Village of Babylon?
16        A.    Yes, he spoke with Mr. Feldman.
17        Q.    Did your husband tell you what
18   happened at that time?
19        A.    Mr. Feldman didn't like the
20   treehouse.
21        Q.    Did he say why he didn't like
22   the treehouse?
23              MR. MORRIS:  Objection.  You
24         can answer.
25        A.    Only thing I can recall he
```

```
 1                    N. LEPPER
 2   didn't like it.
 3        Q.    What did your husband say about
 4   that?
 5             MR. MORRIS:  Objection.  You
 6         can answer.
 7        A.    He just said my treehouse is
 8   beautiful and I'm building this for the
 9   kids.
10        Q.    Did he say that Mr. Feldman
11   said there were any, that anything was
12   needed in terms of the treehouse, any
13   documents?
14             MR. MORRIS:  Objection.  You
15         can answer again.
16        A.    At that time I don't think --
17   you're asking me if he mentioned a permit
18   and at that time I don't believe a permit
19   was mentioned, but I can't recall.
20        Q.    Did you ever learn that signed
21   sealed plans were necessary or were
22   required by the Village?
23        A.    Did I know that?  No, sir.  Did
24   my husband know that when we made that
25   treehouse?  No.
```

```
 1                      N. LEPPER
 2        Q.     Sometime after he built the
 3   treehouse, was he told that signed sealed
 4   plans should be submitted to obtain a
 5   permit?
 6              MR. MORRIS:  Objection.
 7         Treehouse for permit.  Note my
 8         objection, you can answer.
 9        A.     I'm not sure what signed and
10   sealed means, sir, but if you're referring
11   to the permit, yes, we were told that they
12   wanted a permit.
13        Q.     Did you submit a permit
14   application?
15        A.     Yes, sir.
16        Q.     Was a permit ever issued?
17        A.     No, sir, that's why we are
18   here, sir.
19        Q.     Even though the permit was not
20   issued, did Mr. Lepper continue to build
21   the treehouse?
22              MR. MORRIS:  Objection.  You
23         can answer.
24        A.    Yes, sir.
25        Q.     Are you done with the answer?
```

1                    N. LEPPER

2         A.    I'm done.

3         Q.    Did you have any discussion

4    with Mr. Lepper as to whether or not you

5    should get an engineer to prepare drawings

6    for the treehouse prior to December 2018?

7              MR. MORRIS:  Objection.  You

8         can answer.

9         A.    Absolutely not.

10        Q.    Did you ever voice any opinion

11   to Mr. Lepper that you believe you should

12   have gone forward with the permit?

13             MR. MORRIS:  Objection.  You

14        can answer.

15        A.    Not that I'm aware of.  I knew

16   when my husband was building this treehouse

17   it was safe.  He built our house, he's

18   built a bed for me, he's built so many

19   things, I can't even -- I have a piano in

20   my house, the man is always building, he's

21   an excellent carpenter, construction, he

22   knows how to do everything.

23        Q.    Did you ever express an opinion

24   to him that he should go forward and try to

25   get the permit?

```
 1                                          1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    ------------------------------------------X

 4    JOHN LEPPER AND NOELLE LEPPER,

 5                 Plaintiffs,

 6       - against -           Civil Action No.:
                                 07011
 7
      VILLAGE OF BABYLON; and individually and
 8    in their official capacity, RALPH
      SCORDINO,Mayor, KEVIN MULDOWNEY, Deputy Mayor,
 9    ROBYN SILVESTRI, Village Trustee, TONY
      DAVIDA,Village Trustee, MARY ADAMS, Village
10    Trustee; STEPHEN FELLMAN, Village of Babylon
      Building Inspector; SUZANNE SCHETTINO,
11    Department of Public Works; GERARD GLASS,
      Esq., Village of Babylon Attorney; DEBORAH
12    LONGO, Planning Board, Village of Babylon,

13                 Defendants.

14    ------------------------------------------X

15                      72 East Main Street
                        Babylon, New York
16
                        July 5, 2019
17                      10:01 a.m.

18

19            DEPOSITION of the Defendant

20       GERARD GLASS, before Nancy Dionisio

21       a Notary Public of the State of New

22       York.

23

24       Rich Moffett Court Reporting, Inc.
           114 Old Country Road, Suite 630
25             Mineola, New York 11501
                    516-280-4664
```

```
1                                      111

2      the accusatory instruments with the

3      Village of Babylon building inspector

4      Stephen Fellman?

5             MR. TOSCA:  Objection.  You

6          can answer.

7          A     Yes.

8          Q     When?

9             MR. TOSCA:  Objection.  I

10         Counsel the witness not to answer

11         that question on the basis of

12         privilege.

13         Q     Counsel, in the course of

14     your regular professional activities as

15     the village attorney for the Village of

16     Babylon, did you have occasion to review

17     language of the accusatory instruments

18     with the Village of Babylon building

19     inspector prior to their issuance?

20            MR. TOSCA:  Objection.  You

21         can answer.

22         A     I think so.

23         Q     On how many occasions has

24     that occurred?

25            MR. TOSCA:  Objection.  I
```

*Rich Moffett Court Reporting, Inc.*

```
1                                      112

2          Counsel the witness not to answer

3          the question on the basis of

4          privilege.

5                  MR. MORRIS:  Counsel, we are

6          asking for a number not the

7          content.

8                  MR. TOSCA:  I understand.

9                  MR. MORRIS:  You're asserting

10         privilege?

11                 MR. TOSCA:  Yes.  You mark

12         these at the end.

13                 MR. MORRIS:  Yes, please.

14         Q      In the course of your regular

15    professional activities as the Village of

16    Babylon village attorney, did you ever

17    have occasion to prepare an accusatory

18    instrument for use within the Village of

19    Babylon?

20                 MR. TOSCA:  Objection.

21                 THE WITNESS:  Don't answer?

22                 MR. TOSCA:  Yes, you can

23         answer.

24         A      I think I already said yes to

25    that.
```

*Rich Moffett Court Reporting, Inc.*

```
1                                         137
2     you aware of whether there have been any
3     prosecutions under Village of Babylon
4     Code 365-25 involving a playhouse?
5                MR. TOSCA:  Objection.  You
6          can answer.
7          A     Are you referring to during
8     my tenure as village attorney?
9                MR. MORRIS:  Can you repeat
10          the question, please.
11               (The reporter repeated the
12           requested portion of the record.)
13               MR. TOSCA:  Again, objection.
14          A     I don't -- I'm unaware.
15          Q     In the course of your regular
16     professional activities as an attorney or
17     attorney for the Village of Babylon, are
18     you aware of whether there have been any
19     prosecutions under Village of Babylon
20     Code 365-25 involving a structure in a
21     tree?
22          A     I am unaware.
23          Q     In the course of your regular
24     professional activities as an attorney or
25     attorney for the Village of Babylon, are
```

```
 1                                    138

 2     you aware of whether there have been any

 3     prosecutions under Village of Babylon

 4     Code 365-25 involving a tree house?

 5           A      I am aware of one involving

 6     your client.

 7           Q      Excepting the one involving

 8     my client, in the course of your regular

 9     professional activities as an attorney or

10     attorney for the Village of Babylon, are

11     you aware of whether there have been any

12     prosecutions under Village of Babylon

13     Code 365-25 involving a tree house?

14           A      I am not aware.

15           Q      In the course of your regular

16     professional activities as an attorney or

17     an attorney for the Village of Babylon,

18     are you aware of whether there have been

19     any prosecutions under Village of Babylon

20     Code 365-25 involving arboreal playhouse?

21                  MR. TOSCA:   Objection.

22           A      I don't know what the term

23     arboreal means.  Is that a playhouse

24     within a tree?

25           Q      Counsel, you've held yourself
```

*Rich Moffett Court Reporting, Inc.*

149

```
1                                           149

2         A       Well, the code speaks for

3    itself, but I do not believe there is

4    within the body of the code.

5         Q       In the course of your regular

6    professional activities as the Village of

7    Babylon village attorney, are you aware

8    of any provision of the Village of

9    Babylon code which uses the word "tree

10   house?"

11        A       I do not believe there is.

12        Q       In the course of your regular

13   professional activities as the Village of

14   Babylon village attorney, are you aware

15   of any section of the Village of Babylon

16   code which states a resident building a

17   tree house would be subject to a criminal

18   prosecution?

19                MR. TOSCA:  Objection.  You

20        can answer.

21        A       Where it uses the specific

22   language that you just used?

23        Q       Do you understand the

24   question, Counsel?

25        A       You're asking me is there a
```

165

professional activities as the Village of

Babylon village attorney, are you aware

of the progress of that building permit

application?

          A     I'm aware now.  But I wasn't

aware of the progress as it was ongoing

in current time.

          Q     What is the progress of that

building permit application?

          A     His application was

incomplete.  Be clear here that these are

not determinations I made, these are

determinations made by the building

department building inspector.

          Q     In the course of your regular

professional activities as Village of

Babylon village attorney, do you render

legal advice to the building department

of the Village of Babylon?

          A     I do.

          Q     To whom do you render legal

advice at the Village of Babylon building

department?

          A     Well, the building department

*Rich Moffett Court Reporting, Inc.*

166

is run primarily by Debbie Longo, so I render advice to her and to the building inspector.  But from time to time I give advice to other clerks within the department that are asking me day-to-day various and sundry questions.

Q       What other clerks do you render legal advice to?

A       I don't know them all by name.

Q       How many are there?

A       Three.

Q       Have you rendered legal advice to all the persons within the building department at the Village of Babylon?

A       I'm not really sure of that. Sometimes you go in the building department and one of them asks you a question and you know, the other ones chime in, so I would suppose I've from time to time had interactions with all of them.

Q       How often do you provide

*Rich Moffett Court Reporting, Inc.*

```
1                                              173

2         A       Stephen Fellman.

3         Q       In the course of your regular

4    professional activities as the Village of

5    Babylon village attorney, do you render

6    legal advice to the Village of Babylon

7    legal department?

8                 MR. TOSCA:  Objection.

9         A       You asked that and I do.

10        Q       In the course of your regular

11   professional activities as Village of

12   Babylon village attorney, did you render

13   legal advice to the Village of Babylon

14   building department in 2018?

15        A       I did.

16        Q       In the course of your regular

17   professional activities as an attorney

18   for the Village of Babylon, did you

19   render legal advice to the building of

20   Babylon building department in May 2018

21   regarding a tree house?

22                MR. TOSCA:  Objection.  You

23        can answer.

24        A       I don't know if it was May of

25   2018, but I did render legal advice in
```

*Rich Moffett Court Reporting, Inc.*

```
1                                           174

2      connection with the tree house.

3              Q      How did you do that?

4              MR. TOSCA:  Objection.  Okay,

5         I'm going to Counsel the witness

6         not to answer on the grounds of

7         privilege.

8              MR. MORRIS:  You're not going

9         to let him say whether he

10        communicated in writing,

11        communicated on the phone?

12             MR. TOSCA:  That's not what

13        your question was.  You said how,

14        so when you asked how, how means a

15        number of things, Mr. Morris.  So

16        to the extent that it invades upon

17        a legal privilege I'm going to

18        object.  You want to ask him those

19        other questions I'll take each

20        question as it comes.

21             MR. MORRIS:  Can you pull

22        that question back up?

23             Mr. Glass, I hate to do this

24        in your office, may I respectfully

25        request that you excuse yourself
```

*Rich Moffett Court Reporting, Inc.*

```
1                                    175

2         from the conference room so we can

3         call the court for a decision.

4              MR. TOSCA:  He's a client.

5         He's entitled to be here.

6              MR. MORRIS:  Okay,

7         understood.

8              MR. TOSCA:  So you can ask

9         the court if he can be excused if

10        you want, but he is a client.

11             MR. MORRIS:  Understood.

12        It's just we are seeking a ruling

13        on questions to the deponent.

14             MR. TOSCA:  Well, to the

15        extent that the question was how

16        did you communicate.

17             THE WITNESS:  Why don't you

18        just mark it for a ruling, Cory,

19        you're going to have 100 other

20        issues.  Otherwise you're going to

21        be calling him every five minutes,

22        you're going to have to have a

23        conference on these rulings, never

24        mind trying to resolve it in one

25        conference you're just going to
```

176

2      irritate the law secretary in my

3      opinion.

4             (Dialing.)

5             MR. MORRIS:  I'll try one

6      more time, either way we are

7      marking this for a ruling, but I'll

8      try one more time.

9             (Dialing.)

10            We will mark it for a ruling

11     and we'll try to move on.

12     Q      Counsel, in the course of

13 your regular professional activities as

14 the Village of Babylon village attorney,

15 did you render legal advice to the

16 Village of Babylon building department

17 prior to the issuance of an accusatory

18 instrument over a tree house?

19            MR. TOSCA:  Objection.  You

20     can answer over objection.

21     A      Well, there are a few

22 accusatory instruments.  Are you

23 referring to the first accusatory

24 instrument involving Mr. Lepper's tree

25 house?

*Rich Moffett Court Reporting, Inc.*

177

Q      I'm referring to any accusatory instrument ever regarding a tree house?

A      Yes.

Q      When did you render that legal advice prior to the issuance of the accusatory instruments?

A      I don't know.

Q      To whom did you render that legal advice without discussing the substance?

MR. TOSCA:  Objection.  You can answer over objection.

A      The building department.

Q      To whom in the building department?

MR. TOSCA:  Objection.  You can answer over objection.

A      The building inspector and Debbie Longo.

Q      Do you recall in what month of what year --

A      I don't.

Q      Do you recall in regards to

*Rich Moffett Court Reporting, Inc.*

```
1                                    178

2     whom you rendered that legal advice?

3          A     I'm referring to Mr. Lepper.

4          Q     In the course of your regular

5     professional activities as the Village of

6     Babylon village attorney, are you aware

7     of how Village of Babylon Code 365-26 is

8     enforced?

9               MR. TOSCA:  Objection.  You

10          can answer.

11         A     Same way as all codes are

12    enforced.

13         Q     How is that?

14         A     I think generally the Village

15    of Babylon tries to gain voluntary

16    compliance and if they can't, they write

17    violations.

18         Q     In the course of your regular

19    professional activities as Village of

20    Babylon village attorney, are you aware

21    of any statute in Village of Babylon code

22    which provides a metric for the

23    determination of square footage?

24              MR. TOSCA:  Objection.

25         A     The code speaks for itself, I
```

*Rich Moffett Court Reporting, Inc.*

1                                      179

2    have no clue.

3         Q     Are you not aware of any

4    provision of Village of Babylon code that

5    mentions square footage?

6               MR. TOSCA:  Objection.

7         A     I don't know what you mean

8    when you say metric.  If you mean are

9    there other sections of the code that

10   have square footage mentioned in them, I

11   can answer that.

12        Q     Sure.  In terms of metric, do

13   you understand what I mean when I say

14   metric?

15        A     Well, I just tried to define

16   that.

17        Q     In the course of your regular

18   professional activities as Village of

19   Babylon village attorney, are you aware

20   of any such Village of Babylon code which

21   provides an amount for the determination

22   of square footage?

23              MR. TOSCA:  Objection.

24        A     An amount for the

25   determination of square footage, I don't

```
 1                                         180

 2      understand the question.

 3           Q       Mr. Glass, you regularly

 4      handle real estate matters, correct?

 5           A       I do.

 6           Q       Litigation matters?

 7           A       Yes.

 8           Q       Ever hear of a certain square

 9      footage allowed for minimum occupancy

10      standards?

11           A       Yes.

12           Q       What about maximum occupancy

13      standards?

14           A       I think there are some codes

15      that -- that reference the maximum number

16      of occupants that can exist in a certain

17      defined square footage.

18           Q       If occupants were a metric

19      for square footage, would there be a

20      correlation in such an example as to how

21      many occupants for how many square feet,

22      are you aware of such a code or

23      provision?

24           A       I don't understand the

25      question.
```

181

2      Q      Are you aware of a code that

3   allows for a certain amount of people per

4   square footage?

5      A      Anywhere?

6      Q      Anywhere, at any time, in any

7   place.

8      A      There are codes like that.

9      Q      As an attorney admitted to

10   practice in New York you've seen these

11   codes, right?

12                MR. TOSCA:  Objection.

13      A      I'm not sure I understand the

14   question.

15      Q      Have you seen codes that

16   mention square footage and minimum or

17   maximum occupancy?  Yes or no?

18      A      There's some sections of the

19   State Building Code that reference that.

20      Q      What about a code that says

21   you can't have a shed without a certain

22   size of square footage?

23                MR. TOSCA:  Objection.

24      A      That's a completely different

25   question.  You asked about occupancy, not

*Rich Moffett Court Reporting, Inc.*

```
1                                         182
2    square footage of a structure.
3         Q      What about square footage of
4    a structure, would you consider metric in
5    the amount of square footage?
6         A      I don't know what you mean
7    with the term metric.  If you want to
8    define metric as meaning are there codes
9    that you're familiar with that limit or
10   have square footage limits within them, I
11   would say yes I am.
12        Q      In the course of your regular
13   professional activities as attorney or as
14   the Village of Babylon village attorney,
15   are you aware of Village of Babylon codes
16   that use square footage in determining
17   what is and what is not illegal?
18               MR. TOSCA:  Objection.
19        A      There are standards in the
20   village code for certain types of
21   structures that allow one to not follow
22   more rigorous building permit procedures.
23        Q      When you say not follow, to
24   what are you referring?  What do you
25   mean?
```

*Rich Moffett Court Reporting, Inc.*

183

     A      There's different procedures
for certain structures that are smaller.

     Q      When you say not follow, that
means they wouldn't need a permit,
correct?

     A      It means whatever the code
says.

     Q      In that instance which you
mentioned, would they or would they not
need a permit?

     A      They might, you know, it all
depends.  There's other qualifying
factors.  Like you may have a requirement
that a shed under a certain number of
square feet doesn't require a permit.
But there's other qualifying factors
including like your tree house, its
proximity to a setback.

     Q      In the course of your regular
professional activities as the Village of
Babylon village attorney, had you ever
had occasion to render legal advice
regarding a determination of the area of
square footage of structures within the

```
 1                                       184

 2    Village of Babylon?

 3         A      I have not.  I don't make

 4    those decisions, the building department

 5    does.

 6         Q      When you say the building

 7    department, to whom are you referring?

 8         A      The building inspector

 9    ultimately.

10         Q      And the building inspector

11    answers to who ultimately?

12         A      The mayor and village board.

13         Q      In the course of your regular

14    professional activities as the Village of

15    Babylon village attorney, do you know

16    whether there is any provision of the

17    Village of Babylon code dealing with

18    hyperdermic needles?

19              MR. TOSCA:  Objection.

20         A      Specifically using the term

21    hyperdermic needles?  No.

22         Q      Do you have any understanding

23    of whether hyperdermic needles in the

24    environment pose a threat to children?

25         A      I don't.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                    185
 2               MR. TOSCA:  Objection.
 3        Q      Are you a resident of the
 4   Village of Babylon?
 5        A      I am not.
 6        Q      But you maintain a
 7   professional office within the Village of
 8   Babylon?
 9        A      I do.
10        Q      We are sitting in that office
11   now, right?
12        A      We are.  Lovely downtown
13   Babylon.
14        Q      As Village of Babylon village
15   attorney, did you become aware of
16   complaints from residents regarding
17   hyperdermic needles?
18        A      I'm aware of one complaint.
19        Q      As Village of Babylon village
20   attorney did you become aware of
21   complaints from residents?
22        A      I'm aware of one complaint.
23        Q      General complaints --
24        A      And I'm also aware of those
25   complaining about the complaining.
```

*Rich Moffett Court Reporting, Inc.*

```
1                                    186

2          Q       In that regard as --

3          A       So if that's included in your

4   question.

5          Q       As Village of Babylon village

6   attorney, did you become aware of

7   complaints from residents?

8          A       Not residents.  From a

9   resident.

10         Q       Aside from that one resident,

11  have you received any other complaint as

12  a Village of Babylon village attorney?

13         A       I have not.

14         Q       By whom was such complaint

15  made?

16         A       John Lepper.

17         Q       Aside from John Lepper,

18  you've never received a complaint from a

19  Village of Babylon village resident?

20                 MR. TOSCA:  Objection.

21         A       Regarding hyperdermic

22  needles?

23         Q       Regarding anything.

24         A       No, I have received

25  complaints from other residents.  I've
```

```
1                                    216

2     authority to a higher authority or an

3     appeal could simply be a request to

4     someone for a decision or opinion.

5           Q      Can you explain the appeal

6     process?

7           A      No.

8                  MR. TOSCA:  Objection.

9           Objection.

10          A      The appeal process for what?

11    The appeal process to get dinner at 7

12    o'clock at my house or -- which is more

13    involved than most of the appeal

14    processes I do at work.

15          Q      Can you explain the appeal

16    process that you do at work?

17          A      No.  Because you'd have to be

18    more specific.  There are many different

19    appeal processes that I deal with in this

20    office ranging from administrative

21    appeals to zoning board appeals, to

22    appeals of Village Justice Court

23    decisions to appeals of Supreme Court

24    matters.  So they all have widely

25    different processes that are involved in
```

217

connection with an appeal.  So your question is so broad I would say you'd have to be more specific.

Q     Can you explain the appeal process within the Village of Babylon Justice Court?

MR. TOSCA:  Objection.  I'll let him answer over objection.

A     So the appeal process in the Village of Babylon Justice Court is one files a notice of appeal and there is a record created.  And then ultimately the appeal is perfected before the appellate term and the village is required to respond and then sometime later a decision is rendered by the Appellate Court.

Q     In the course of your regular professional activities as attorney for the Village of Babylon, did you ever communicate with John Lepper after Judge Rafter rendered his initial decision?

A     I think I sent that letter to him right after saying, what do you want

```
 1                                           218

 2    to do.

 3         Q      What was the context and

 4    contents of that communication?

 5         A      You read it.

 6         Q      In the course of your regular

 7    professional activities as attorney for

 8    Village of Babylon, did you ever state to

 9    John Lepper in a letter, "please let me

10    know your intentions?"

11         A      You asked that question.

12         Q      And you said that, right?

13         A      You asked the question.  I

14    answered it already.  Do you want to get

15    out of here tonight?  Come on.

16         Q      What intentions were you

17    expecting him to say?

18         A      What do you want to do?  Do

19    you want to apply for -- my intentions

20    were -- you asked me what did I mean by

21    that?  What I meant was what are you

22    going to do?  Are you going to legalize

23    this or are you going to take it down.

24    What do you want to do.  It was a very

25    soft letter.
```

*Rich Moffett Court Reporting, Inc.*

219

1

2          Q        In the course of your regular

3     professional activities as the Village of

4     Babylon village attorney, are you aware

5     that sometime in October of 2018 building

6     inspector Stephen Fellman sent a letter

7     to John Lepper?

8          A        I'm not.  I know he sent some

9     letters to him, I just don't know when.

10         Q        Are you aware of whether a

11    letter was sent in October 2018 by

12    Stephen inspector Fellman?

13         A        I said no.

14         Q        In the course of your regular

15    professional activities as Village of

16    Babylon village attorney, are you aware

17    of whether the Village of Babylon

18    building inspector has the ability to

19    issue a stop work order?

20         A        I am.

21         Q        What is a stop work order?

22         A        It's a directive to stop

23    work.

24         Q        What is the process whereby

25    the Village of Babylon building inspector

```
1                                     220

2    can issue a stop work order?

3              MR. TOSCA:  Objection.  You

4         can answer over objection.

5         A     What's my understanding of

6    the process?  I'm not the building

7    inspector so you'd have to ask him.  I

8    can tell you what my understanding is if

9    you'd like.

10        Q     Under what section of Village

11   of Babylon code can a stop work order be

12   issued?

13        A     I don't know.

14        Q     In the course of your regular

15   professional activities as Village of

16   Babylon village attorney, are you aware

17   of whether or not a Village of Babylon

18   attorney is to be consulted before a stop

19   work order is to be issued?

20             MR. TOSCA:  Objection.

21        A     It's not my jurisdiction,

22   it's his.

23        Q     Who is "his?"

24        A     The building inspector.

25             MR. MORRIS:  It's 1:43, let's
```

*Rich Moffett Court Reporting, Inc.*

```
1                                      221
2          take a momentary break.
3                (A short recess was taken.)
4    CONTINUED EXAMINATION BY
5    MR. MORRIS:
6                MR. MORRIS:  1:43.
7          Q      In the course of your regular
8    professional activities as the Village of
9    Babylon village attorney, are you aware
10   of whether you as the Village of Babylon
11   attorney are to be consulted before a
12   stop work order is issued.
13               MR. TOSCA:  Can I maybe have
14          the question read back or please
15          repeat the question, Counsel.
16               MR. MORRIS:  You are not
17          answering the question.  What is
18          the basis for you to ask that?
19               MR. TOSCA:  Because I need to
20          know what the question is before
21          it's answered.  I didn't catch the
22          entire question so I'm going to ask
23          for it to be repeated for me,
24          please.
25               (The reporter repeated the
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                      222
 2           requested portion of the record.)
 3                MR. TOSCA:  Over objection
 4      you can answer.
 5           A     That's a decision that needs
 6      to be made by the building inspector
 7      there's no requirement by code that I be
 8      consulted.
 9           Q     In the course of your regular
10      professional activities as the Village of
11      Babylon village attorney, do you have the
12      authority to issue a stop work order?
13           A     I do not.
14           Q     In the course of your regular
15      professional activities as the Village of
16      Babylon village attorney, are you aware
17      of whether the building inspector of the
18      Village of Babylon has the authority to
19      order removal of a structure?
20           A     He does.
21           Q     How?
22           A     State laws.
23           Q     Under what circumstances?
24           A     Dangerous structure,
25      structure that violates the code, exigent
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                     223
 2     circumstances.
 3          Q      Are you consulted prior to
 4     the order of removal?
 5          A      Sometimes.
 6          Q      In the course of your regular
 7     professional activities as the Village of
 8     Babylon village attorney, can you issue
 9     an order of removal?
10          A      No.  That's a figment of
11     state and local code.  And the authority
12     is vested in the building inspector.  You
13     know, can I direct the building inspector
14     to do it?  It's not really -- it's not
15     really something that is explicit in any
16     code.  It depends on what municipality is
17     and what authority the local
18     administration vests in their municipal
19     attorney.
20          Q      What provision of local code
21     allows for the order of removal within
22     the Village of Babylon?
23          A      I do not know that off the
24     top of my head, it's in the village code.
25          Q      Is there anything that would
```

*Rich Moffett Court Reporting, Inc.*

```
1                                              224
2    refresh your recollection?
3         A      The village code.
4         Q      Do you have a copy of it with
5    you here?
6         A      I don't.
7                MR. TOSCA:  Objection.
8         A      I don't have it handy.  I
9    have it and it's online of course.  But
10   I'm happy to look at it if you have it.
11        Q      Is there anything that would
12   improve your memory at the present time
13   so that you can tell us whether --
14        A      The village code.
15               MR. TOSCA:  Objection.
16        Q      Would you like to consult the
17   village code in answering that question?
18        A      I would not.
19               MR. TOSCA:  Objection.
20        A      I would not.  But if you have
21   it handy I'll look at it, I'm happy to
22   cooperate.  There is more than one
23   section.
24        Q      Can you name any section
25   which would authorize the issuance of an
```

*Rich Moffett Court Reporting, Inc.*

1                                          232

2          for a ruling.

3          Q      In the course of your regular

4     professional activities as the attorney

5     for the Village of Babylon, did you ever

6     have occasion to read the accusatory

7     instruments served upon John Lepper?

8          A      Yes.  I tried the case.  I

9     handled the appeal so at some point I

10    must have read it.  You read the

11    arguments.

12         Q      In the course of your regular

13    professional activities as the attorney

14    for the Village of Babylon, did you

15    become aware of ordinance 365-26?

16         A      Ever?  Yes.

17         Q      Is there any mention in the

18    Village of Babylon ordinance 365-26 about

19    drawings?

20         A      I don't remember, but the

21    ordinance speaks for itself so you can

22    read it and your answer will be contained

23    therein.

24         Q      Would you like to consult

25    with the ordinance?

*Rich Moffett Court Reporting, Inc.*

```
                                         233

 1
 2        A     No.
 3        Q     Is there any mention in the
 4   Village of Babylon order 365-26 about
 5   engineers?
 6        A     Just so we understand this,
 7   you're asking me questions about a code.
 8   The code speaks for itself.  So to move
 9   it along I'm just going to just answer
10   the code speaks for itself.  You can read
11   it and I can read it.  And my opinion
12   about whether it says it or not, it's
13   either there or it's not.  So I'm not
14   understanding the point of the question.
15        Q     If a homeowner asked you if
16   there were drawings required by the
17   Village of Babylon ordinance 365-26,
18   would you say yes or would you say no?
19        A     I would say look at the code.
20        MR. TOSCA:  Objection.
21        Q     In the course of your regular
22   professional activities as the Village of
23   Babylon village attorney, did you appear
24   in Federal Court representing the Village
25   of Babylon?
```

*Rich Moffett Court Reporting, Inc.*

```
1                                    234
2          A      I did.
3          Q      Was your appearance on behalf
4    of the Village of Babylon approved by the
5    Village of Babylon board?
6                MR. TOSCA:  Objection.
7          A      My appearance was
8    necessitated by the fact that the village
9    had submitted this claim to its insurance
10   carrier and it was at that point without
11   Counsel, so I had to go, I didn't have a
12   choice.  You can say I went as both a
13   named Defendant and representative of the
14   Village of Babylon, but somebody had to
15   show up because I didn't have -- the
16   village didn't have Counsel yet.
17               MR. TOSCA:  Move to strike
18          reference to insurance.
19         Q      Was there a resolution on
20   behalf of the Village of the Babylon, the
21   village board, authorizing your
22   appearance in Federal Court?
23         A      I don't think so.
24         Q      In the course of your regular
25   professional activities as the Village of
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          235
 2      Babylon village attorney, did you give
 3      notice of the pendency of this lawsuit to
 4      any insurance carrier?
 5                   MR. TOSCA:  Objection.
 6           A      Yes.
 7           Q      When did you give such
 8      notice?
 9           A      I don't know.  Soon after it
10      was served.
11                   MR. MORRIS:  Counsel, I call
12              upon you to produce a copy of that
13              notice.
14                   MR. TOSCA:  Objection.  But
15              put your request in writing,
16              please.  We will take it under
17              advisement.
18           Q      Who is the insurance carrier
19      to whom you gave notice?
20                   MR. TOSCA:  Objection.  You
21              can answer.
22           A      I think it was to Gladfelter
23      claim service, I actually gave the
24      complaint to the village's insurance
25      agent.
```

*Rich Moffett Court Reporting, Inc.*

1                                           236

2          Q      Did they reply with any

3    reservation of rights?

4                 MR. TOSCA:  Objection.  You

5          can answer.

6          A      I think they almost always

7    do.

8          Q      Did they in this instance?

9          A      I don't know, I don't

10   remember.  I don't have the letter with

11   me.

12         Q      You don't know if there was a

13   reservation of rights?

14         A      I don't know.

15         Q      Did the insurance carrier

16   assign Counsel?

17         A      They did.

18                MR. TOSCA:  Objection.

19         Q      Is that Kelly, Rode and

20   Kelly?

21                MR. TOSCA:  Objection.  You

22         can answer.

23         A      Ultimately, yes.

24         Q      Were you interviewed by any

25   representative of the insurance carrier

*Rich Moffett Court Reporting, Inc.*

```
1                                        237

2     or Kelly, Rode and Kelly?

3          A     Yes.

4          Q     Were you in court, Counsel,

5     when Judge Bianco suggested that the

6     Lepper family submit a survey and

7     engineer's report to the Village of

8     Babylon?

9               MR. TOSCA:  Objection.  You

10          can answer over objection.

11         A     I was.

12         Q     Are you aware that shortly

13    thereafter John Lepper submitted a survey

14    and then engineer's report?

15         A     I don't know if it was

16    shortly thereafter, I think it took him a

17    lot longer than it was supposed to.

18         Q     Are you aware that John

19    Lepper submitted a survey and engineer's

20    report?

21         A     Ultimately.

22         Q     So that's a yes?

23         A     Yes.

24         Q     Did you read the engineer's

25    report?
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                    238

 2          A       Yes.

 3          Q       Did you examine the survey?

 4          A       I did.

 5          Q       Do you hold yourself out as a

 6    competent and qualified person to examine

 7    a real property survey?

 8                  MR. TOSCA:  Objection.  You

 9          can answer over objection.

10          A       I don't.  I don't hold myself

11    out as one commonly, but can I, yes.

12          Q       In the course of your regular

13    professional activities as an attorney,

14    do you examine real property surveys?

15          A       Yes.

16          Q       And you do that for your

17    clients, correct?

18          A       Sure.

19          Q       And you handle thousands of

20    cases since you've become a lawyer,

21    correct?

22          A       Cases?  Now we are getting

23    back -- have I looked at thousands of

24    surveys?  Where are we going?  You got to

25    be specific here.  I've looked at many,
```

```
 1                                        239
 2     many surveys over the years if that helps
 3     you.
 4          Q      Have you ever handled a real
 5     estate transaction?
 6          A      I've handled many of them.
 7          Q      How many is many?
 8          A      In excess of 5,000.
 9          Q      In those 5,000 real estate
10     transactions, did you examine a real
11     property survey?
12          A      I looked at many, many
13     surveys.  Although I don't hold myself
14     out to be qualified as you asked, I've
15     already explained that I think I'm
16     qualified based upon years of looking at
17     these.
18          Q      And you examined the
19     engineer's report submitted by John
20     Lepper?
21          A      I did.
22          Q      Is there anything in the
23     engineer's report submitted by John
24     Lepper that indicates that the arboreal
25     tree house may be unsafe?
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                    240
 2               MR. TOSCA:  Objection.
 3        A      That calls for a conclusion I
 4   am not capable of seeing, but as a
 5   layperson I would say he didn't indicate
 6   it as unsafe.
 7        Q      So there is nothing that
 8   indicates that the arboreal tree house is
 9   unsafe?
10               MR. TOSCA:  Objection.
11        A      Lepper had the letter
12   written, it doesn't mean it's safe, it
13   means that engineer said there was
14   nothing immediate indicating it was
15   unsafe.
16        Q      In the course of your regular
17   professional activities as the Village of
18   Babylon village attorney, have you had
19   occasion to examine the Village of
20   Babylon Code 365-25?
21        A      I'm not sure.
22        Q      In the course of your regular
23   professional activities as the Village of
24   Babylon village attorney, are you aware
25   of whether there are any financial
```

```
                                               241
 1
 2   penalties associated with 365-26 of the
 3   Village of Babylon?
 4                MR. TOSCA:  Objection.
 5        A     I'm not sure.  The code
 6   speaks for itself.
 7        Q     Are there fines associated
 8   with Village of Babylon Code 365-26?
 9        A     The code speaks for itself.
10        Q     Counsel, I'm just looking for
11   yes or no.
12                MR. TOSCA:  Objection.
13        A     I will tell you, you're
14   asking me a question and to make it a lot
15   easier, if you just had the code before
16   you, the code speaks for itself, Cory.
17   Who cares?  Who really cares?  This is
18   not a trial it's a deposition, so I will
19   just tell you I'm not looking to be
20   obstructionist, The code speaks for
21   itself.  If the code says there is a
22   penalty, there is.  You're asking me to
23   have a recollection about an independent
24   code section by citing a number.  There's
25   a thousand sections in the code, I don't
```

*Rich Moffett Court Reporting, Inc.*

                                                        242

2      remember if that code section calls for a

3      penalty.  I don't know.

4            Q      You prosecuted John Lepper

5      under that provision, correct?

6            A      I don't know.  Show me the

7      section of the code, show me the

8      violation and I can tell you.

9            Q      You don't know?

10           A      I don't independently know.

11     I know I prosecuted him under certain

12     sections of the code and I know he's got

13     certain violations pending under certain

14     sections of the code.  It is in the 365

15     range, I just don't know if it's that

16     exact number therein.

17           Q      In regard to 365 range, are

18     there fines associated with such

19     violations?

20           A      For what John Lepper did,

21     yes, there are.

22           Q      Are these fines cumulative in

23     nature?

24                  MR. TOSCA:  Objection.

25           A      Are they cumulative?  No,

*Rich Moffett Court Reporting, Inc.*

```
 1                                        258
 2        A       Presumably Joel Zikowitz, he
 3    was my predecessor.  That was circa when?
 4    Do you have a date?  I think it's
 5    pre-2018.
 6        Q       In the course of your regular
 7    professional activities as the Village of
 8    Babylon village attorney, have you ever
 9    had occasion to examine any part of a
10    file maintained by the Village of Babylon
11    with respect to the Boldorf tree house?
12        A       I have.
13        Q       In the course of your regular
14    professional activities as the Village of
15    Babylon village attorney, are you aware
16    of whether building application files
17    maintained by the Village of Babylon are
18    public records?
19        A       They are.
20        Q       In the course of your regular
21    professional activities as the Village of
22    Babylon village attorney, are you aware
23    of whether the building applications or
24    permit applications maintained by the
25    Village of Babylon are subject to
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                    276

 2     considered criminal process?

 3               MR. TOSCA:  Objection.

 4        A     I don't know what you mean by

 5     that.

 6        Q     By virtue of the process

 7     served against John Lepper is he subject

 8     to a fine and possible incarceration if

 9     convicted?

10        A     As a violation.

11        Q     Is the answer yes?

12        A     Yes.

13        Q     Counsel, is it not a civil

14     process in nature that it could also be

15     subject to a civil remedy?

16               MR. TOSCA:  Objection.  That

17          calls for a legal conclusion.

18          Counseling the witness not to

19          answer.

20               MR. MORRIS:  Please mark that

21          for a ruling.

22        Q     On August 14, 2018, what kind

23     of proceeding was scheduled involving

24     Plaintiff John Lepper?

25        A     I have no idea.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                      277

 2          Q       On that date, August 14,

 3     2018, did you appear in the Village of

 4     Babylon Court on behalf of the Village of

 5     Babylon?

 6          A       I have no idea.

 7          Q       Would anything refresh your

 8     recollection?

 9          A       The transcript.  A court

10     file.

11          Q       Do you have the court file

12     with you?

13          A       I don't.

14          Q       Do you have a transcript with

15     you?

16          A       I don't.

17          Q       Do you have access to any

18     records that would refresh your

19     recollection as to where you were on

20     August --

21          A       I don't, not as I sit here at

22     this moment.

23          Q       Are they in your office?

24          A       They could be, I don't know.

25     I suspect they are because I answered
```

*Rich Moffett Court Reporting, Inc.*

278

```
 1                                        278
 2    your FOIL request which included all the
 3    court records.
 4         Q      Since those records are in
 5    your office, do you need to refer to
 6    those records to refresh your
 7    recollection?
 8         A      No.  It's easier just to tell
 9    you I don't remember and if you want to
10    refresh my recollection since you went
11    through the work of pulling the records
12    to show me.  But for me to stop what I'm
13    doing and try to find those records we
14    could be here for a half an hour for
15    every question, because the file is four
16    feet thick.
17         Q      And the file is located
18    within this office?
19         A      All of the files are that
20    you're testifying to that I have, other
21    than this Federal Court file, but there
22    have been several litigations, FOIL
23    litigations, so I have copies of all the
24    documents that relate to that.  So the
25    answer is yeah, they are, other than the
```

```
1                                      279
2    Federal case, and I have some of the
3    documents from that.
4         Q     Counsel, we will give you the
5    opportunity to review that file and
6    answer the question appropriately.
7                MR. TOSCA:  Objection.  Don't
8           respond, please.  If you want I'll
9           respond for him.
10               MR. MORRIS:  You're
11          instructing the witness not to
12          respond?
13               MR. TOSCA:  Right, you're
14          giving him not a question, you're
15          giving him --
16               MR. MORRIS:  An opportunity.
17               MR. TOSCA:  An opportunity.
18          I don't think you're giving him --
19          if you want me to respond to that I
20          will, Counsel, otherwise I'm asking
21          the witness not to respond to that.
22          I would respond on his behalf.
23               MR. MORRIS:  You're
24          instructing him not to answer?
25               MR. TOSCA:  That's not an
```

*Rich Moffett Court Reporting, Inc.*

```
1                                    280
2        answer, there is no question in
3        play, so there's no answer needed.
4              MR. MORRIS:  No response.
5              MR. TOSCA:  You want him to
6        produce documents --
7              MR. MORRIS:  Counsel, at some
8        point you have to end the
9        discussion.  Are you telling him
10       not to utter any statements in
11       response to what I just said?
12             MR. TOSCA:  I'm asking the
13       witness not to respond and I will
14       respond on his behalf.
15             MR. MORRIS:  Let the record
16       reflect that given the opportunity
17       that this deponent has access to
18       the files and he has exercised
19       through Counsel not to do that.
20             MR. TOSCA:  Okay.  And let
21       the record reflect that any
22       documents that need to be produced
23       will be produced in preparation for
24       this deposition by Counsel to show
25       my witness.
```

*Rich Moffett Court Reporting, Inc.*

281

```
 1                                           281
 2          Q       Counsel, on August 14, 2018,
 3   do you recollect whether you had a
 4   conversation with John Lepper?
 5          A       I do not.
 6          Q       Do you know whether you were
 7   in the Village of Babylon Court on that
 8   day?
 9          A       I do not.
10          Q       Do you require an
11   authorization from the village board or
12   the Village of Babylon to appear at a
13   Criminal Court proceeding in the Village
14   of Babylon Court involving John Lepper?
15                  MR. TOSCA:  Objection.  I'm
16          going to let you answer.
17          A       I do not.
18          Q       You don't know if you need an
19   authorization --
20          A       No, I do not.  I don't.  I
21   don't require an authorization, I'm an
22   attorney for the village.
23          Q       And you handled the
24   prosecution involving John Lepper?
25          A       Correct.  I did.  And I have
```

*Rich Moffett Court Reporting, Inc.*

```
1                                        282

2     -- I am authorized to prosecute

3     violations in the name of the village.

4          Q      And prior to the appearance

5     on August 14, 2018, do you know if John

6     Lepper had requested an adjournment of

7     the appearance?

8          A      Every adjournment that was

9     given, Mr. Lepper requested.  The day he

10    tried the case was, from my memory, done

11    at his insistence.

12         Q      Did you at some point as the

13    attorney for the Incorporated Village of

14    Babylon become aware that John Lepper

15    requested an adjournment of the August

16    14, 2018 proceeding?

17         A      Was that the date the trial

18    was conducted?

19         Q      Counsel, to the best of --

20         A      I can't answer the question.

21    Because I don't know if the trial -- I

22    can tell you that if you're asking -- he

23    asked for every adjournment before the

24    date of the trial.  If August 14th was

25    the date of the trial my recollection is
```

**2:18-cv-07011**–JMA-AYS
(consolidated with 2:21-cv-00014–JMA-AYS)

# United States District Court
*for the*
# Eastern District of New York

JOHN LEPPER and NOELLE LEPPER, individually and as parents and natural guardians of their infant children, B.J.L. AND B.I.,

*Plaintiffs*

—v—

VILLAGE OF BABYLON; and
ESTATE OF RALPH SCORDINO, Mayor–decedent, KEVIN MULDOWNEY, current/former Deputy Mayor, ROBYN SILVESTRI, current/former Village Trustee, TONY DAVIDA, current/former Village Trustee, MARY ADAMS, current/former Village Trustee and acting Mayor; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., current/former Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants,

*Defendants*

## PLAINTIFFS' AFFIDAVIT OPPOSING DEFENDANTS' REQUEST FOR PRELIMINARY RELIEF

LAW OFFICE OF CORY H. MORRIS
*Attorney for Plaintiffs*
Cory.H.Morris@protonmail.com
VICTOR JOHN YANNACONE, JR., *of counsel*
barrister@yannalaw.com

# PLAINTIFF'S AFFIDAVIT OPPOSING
## DEFENDANTS' REQUEST FOR PRELIMINARY RELIEF AND SUMMARY JUDGMENT

State of New York
County of Suffolk   } *ss*:

**JOHN LEPPER**, being duly sworn, deposes and says:

1. I am a Plaintiff in the within action.

2. Sometime in April while I was swinging on a hammock with my daughter Brianna who was 4 years old at the time, I observed a syringe and hypodermic needle in my yard.

3. On or around May 3, 2018, I started to construct a platform for a treehouse for my children.

4. The treehouse I was constructing for my children was an expression of my concern over the opioid crisis and the lack of any attention, concern , or response by the Administration of the Village of Babylon.

5. I have been involved in the construction industry and worked as a carpenter for professional contractors since I was 18 years old. I hold a degree in Building and Construction Management from NYU and I have experience in electrical work as well.

6. On May 10, 2018, I received a letter from Village of Babylon Building Inspector Steve Fellman, stating it has come to the attention of the village that I am putting up a structure that may require a permit.

7. I never received any warning from Defendant Building Inspector Fellman until a certified mail arrived at my home on June 14, 2018 containing three Appearance Tickets charging, "Without a permit — tree house" (Plaintiffs' Exhibit 26.)

8. I stopped work on the treehouse after receiving the letter from Mr. Fellman dated May 10, 2018. (Plaintiffs' Exhibit 2.).

9. After receiving the letter from Defendant Building Inspector Fellman (Exhibit 2), I reached out to Spiro, Mayor Scordino's son-in-law who is also a FDNY firefighter whom my wife and I befriended when we meet at our kids preschool. I told Spiro about the letter that I had received and asked him to just ask his father-in-law what the Village was looking for? He told me that he spoke with his father-in-law and for me to give Debbie Shea, the Mayor's secretary a call to see what was required.

10. I called Debbie Shea and was directed to the Village of Babylon Building Department.

11. Holly Zappala, an employee of the Village of Babylon building department, told me to come to Village Hall and fill out a building permit application. I was told to bring a hand drawing of what I was building and a recent survey. So that is what I brought.

12. On or about May 21st, 2018, I went to the Village Hall and filled out the permit application to the satisfaction of Holly Zappala and submitted a recent survey showing the location of the treehouse and a front elevation drawing to scale. (Plaintiffs' Exhibit 27.)

13. As I filed the application, I had a lengthy discussion with Holly Zappala. I told her about the needle that I found while swinging with my daughter in our hammock and how that

was a reason why I decided to build the treehouse. She told me that she was familiar with the drug problem in the neighborhood and she told me that she was familiar with the one of the neighbors that had a drug problem for years.

14.     We discussed Christian Reppetto who lived in the neighborhood and had been arrested for distribution of heroin and possession of an illegal firearm. This was apparently alarming enough that the school board relocated the elementary school bus stop which was across the street from the Repetto's home on the corner of Wyandanch Ave and Wampum Rd. just three houses away from ours, to two different stops mid-block on Wyandanch Ave to the East and West of the corner. One of those stops be directly in front of Defendant Trustee Tony Davida's house just four houses away from the Repetto house which also had a treehouse on their property. Nevertheless, Defendant Davida claims he has never seen a treehouse in the Village of Babylon in his 50 years of living there other than on the Lepper property.

15.     Mr. Davida stops at a stop sign every day in front of the Repetto house just four houses away from his own. (Plaintiffs' Exhibit 46)

16.     Between May 21, 2018 and June 30, 2018, I made telephone calls checking on the status of the permit.

17.     By June 30, 2018, there was still no action on the permit application.

18.     In my garage, from May 10, 2018 through June 30, 2018, I prefabricated the external walls for the treehouse.

19.     One week prior to my sons sixth birthday, July 7th, I erected the exterior walls that had been pre-constructed in

my garage, so that my children could see what the platform was for—a treehouse, not just a platform.

20.     I continued to work on the tree house during my days off until July 19, 2018.

21.     From May 10, 2018 until July 19, 2018, I did not receive any notices or other written communications from the Village of Babylon.

22.     On May 21. 2018 I did understand that when I submitted the permit application that it was accepted as per my conversation with Defendant Deborah Longo as to what was required to file the permit, I had submitted everything I was required to submit. I was told that I needed a recent survey and a sketch of what I was building.

23.     On or about July 19, 2018, my wife called me to tell me that we received a certified letter from the Village of Babylon containing three summons each charging separate violations of Village of Babylon Code §365–26 alleging construction of a treehouse without a permit.

24.     On or about July 20th, 2018, after coming home from a 24-hour shift from the firehouse, I took the violations down to the Village of Babylon to inquire what the violations were for and I was told by Holly Zappala that I had to meet with Village Building Inspector Stephen Fellman who had issued the violations. The meeting with Steve Fellman was scheduled for July 26, 2018 at 2:30 pm.

25.     On or about July 26, 2018 at 2:30 in the afternoon, I had the meeting with Mr. Fellman and he told me I owed on all (3) violations which were for $250, $500 and $1000.

26.     There was no stop-work order and no notices of violations had been issued before those in the letter to me on July 19, 2018.

27.     I asked Mr. Fellman why he had sent (3) violations in (1) envelope with no opportunity to respond to the 1st violation.

28.     I asked Mr. Fellman for an explanation of the violations. He would not explain but said that the Village of Babylon Mayor's office received many complaints.

29.     Mr. Fellman concluded the meeting by saying, "We'll see you in court on August 14, 2018."

30.     At that meeting on July 26, 2018, Mr. Fellman never told me I needed a Zoning Variance for my children's treehouse or that I needed plans signed and sealed by a licensed professional.

31.     No "stop-work" order had been issued and I continued to work on my children's treehouse.

32.     At that meeting on July 26, 2018, I told Defendant Village Building Inspector Steve Fellman about the hypodermic needle I found on the property and my desire to build an arboreal treehouse for my children.

33.     One week prior to August 14th,  2018, I called the Village of Babylon Justice Court to adjourn the August 14, 2018 hearing due to a plaque dedication at the New York City Fire Department for a colleague of mine who had passed away.  I was denied the adjournment and I had to go to court on August 14, 2018.

34.     On August 14, 2018 at approximately 2:30  I appeared for the hearing in the Babylon Village Court. My family and 50 to 60 neighbors and friends also appeared to support my family and me.

35.    Because I could not obtain an adjournment or even a delay in the time set for the appearance, I had to leave the plaque dedication memorial ceremony for my deceased colleague in Manhattan in order to make court by the scheduled time in Babylon.

36.    Prior to my case being called, Village Attorney Gerard Glass called me into the court clerk's office and after introducing himself, asked what the hearing was all about.

37.    I explained to Village Attorney Glass all the details through the meeting with Steve Fellman. In addition, I showed him the needle which I found behind my bushes while I was on the hammock with my 4-year-old daughter.  After he saw the needle Village Attorney Glass replied, "You need to make a case about that."

38.    I also explained to Village Attorney Glass that I was wearing my partial class A firefighter's uniform because I had to leave during the ceremony for my deceased colleague as a result of the Court denying my request for an adjournment.

39.    The Village Justice called my case and asked me to plead. I pleaded not guilty and he then adjourned the case to September 18, 2018.

40.    I appeared at the Babylon Village Court on September 18, 2018, again with the support of 30 to 40 friends and neighbors.

41.    Before the case was called, Village Attorney Glass asked me to come out to the vestibule with Steve Fellman. Steven Fellman asked me if I got the drawing that he asked about.  I said, "What drawing?" He said that I needed architectural drawings.  I replied, "I read your code 365–26 and my

treehouse is less than 90 square feet and does not require a permit."

42.    This was the first time I was told that I needed signed and sealed drawings by a licensed architect or professional engineer.

43.    Village Attorney Glass then said, "I'm not prepared to try the case today," and I said, That's your problem."

44.    Village Attorney Glass said, "Are you aware that there are more violations," and I said, "No."  I asked what the charges were and he said there was another violation for building a tree house without a permit and installation of a light without a permit.

45.    When the Village Justice called the case, I told him I was ready to be heard and Village Attorney Glass asked for an adjournment. Village Justice John Rafter granted him the adjournment until on or about September 25, 2018.

46.    At the hearing of September 18, 2018, Village Justice Rafter issued a "Stop Work Order."

47.    At the time the Stop Work Order was issued the treehouse was still under construction and there was no permanent means of ingress or egress.

48.    It was in the vestibule of the Babylon Village Court during the September 18th hearing that Defendant Village Building Inspector Steve Fellman first told me I might need a variance and signed drawings sealed by a licensed architect or professional engineer.

49.    On September 25, 2018 I appeared for trial without an attorney, but with the support of multiple neighbors and friends.

50.     Village attorney Jerry Glass presented his case through the testimony of Defendant Village Building Inspector Steve Fellman. They told the Village Justice that there was a notice of violation which was issued on May 21, 2018.  I tried to object, but Village Justice Rafter said, "it doesn't work that way, and told me to sit down."

51.     Eventually, Village Justice Rafter asked me what I was objecting about, I told him I never received a notice of violation.

52.     Village Justice Rafter ruled on or about October 8, 2018 that I was guilty of violating Village of Babylon Code §365–26 and ordering me to pay fines of $435.   He said according to the international building code that my structure would be considered a building and quoted the definition of building from the Merriam Webster dictionary.

53.     On Oct. 19, 2018, I received a letter from Village Attorney Glass stating that, "the Justice has made his ruling please let us know your intentions."

54.     On Oct. 20, 2018, I received a letter from Steve Fellman ordering the removal of the tree house in its entirety or I could be fined up to $1000 on a daily basis if I did not comply. See Plaintiffs' Exhibit 19.

55.     On or about, October 31, 2018, Bill Whitter of Village of Babylon code enforcement stopped myself, my wife and my children as we were taking the kids through the neighborhood for Halloween "trick or treating" and served us with two more summons charging violations of Village of Babylon Code §365–26, building a tree house without a permit.

56.     I pugged an a SJ cord "extension cord" from the Treehouse into an exterior GFI outlet. The extension cord

runs from the exterior GFI outlet and goes up the tree is protected by greenfield which is an armored cable which is tamper proof to protect the kids. The SH cord powers an exterior light which is on a time clock to illuminate the flag of the United States mounted outside of the treehouse.

57.     Sometime in mid-April 2019 I received a phone call from Eric Bishof, Staten Island Trustee for the Uniform Firefighters Association, my Union representative who proceeded to tell me that I was being investigated by the Bureau of Internal Investigations regarding an anonymous letter that was sent to the chief of department, Daniel Nigro, saying that I used my status of a NY City Firefighter to influence the Justice of Babylon Court.

58.     I had to retain counsel, TJ McMannis, on this investigation to defend myself.

59.     When I received notice of this investigation, I was on vacation with my family.

60.     As a result of this unfounded anonymous charge, I had to take time away from my family, without pay, and for the first time in my 20-year career was questioned about my integrity. I never had an infraction with the NY City Firefighter throughout my career.

61.     As a result of this unfounded anonymous charge, I had to appear before the Bureau of Internal Investigations and explain to them why I was wearing my partial class A uniform in the Village of Babylon Court. I presented to the investigator the FDNY 652 announcement that was sent to the entire FDNY regarding the plaque dedication for Maine CO. 1 which took place on August 14, 2018.

62.     After completing their investigation, the Bureau of Internal Investigations, saw that it was a retaliation from the Village of Babylon.  The case was marked unfounded and no disciplinary action was taken.

63.     I have personally observed and photographed a number of arboreal structures—treehouses—most of which were constructed without permits or variances. (Plaintiffs' Exhibits 6, 9, 12, 13, 29.)

THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK

**2:18-cv-07011–JMA-AYS | 2:21-cv-00014-JMA-AYS**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱
*for the*
## Eastern District of New York

JOHN LEPPER and NOELLE LEPPER, individually and as parents and natural guardians of their infant children,
B.J.L. AND B.I.,,

*Plaintiffs*

–v–

VILLAGE OF BABYLON; and
ESTATE OF RALPH SCORDINO, Mayor-decedent, KEVIN MULDOWNEY, current/former Deputy Mayor, ROBYN SILVESTRI, current/former Village Trustee, TONY DAVIDA, current/former Village Trustee, MARY ADAMS, current/former Village Trustee and acting Mayor; STEPHEN FELLMAN, Village of Babylon Building Inspector; SUZANNE SCHETTINO, Department of Public Works; GERARD GLASS, Esq., current/former Village of Babylon Attorney; DEBORAH LONGO, Planning Board, Village of Babylon, each individually and in their official capacity, and John and/or Jane Doe, unnamed, unidentified complainants,

*Defendants*

---

## PLAINTIFFS' AFFIDAVIT OPPOSING DEFENDANTS' REQUEST FOR PRELIMINARY RELIEF

---

LAW OFFICE OF CORY H. MORRIS
*Attorney for Plaintiffs*
Cory.H.Morris@protonmail.com
VICTOR JOHN YANNACONE, JR., *of counsel*
barrister@yannalaw.com

# Plaintiffs' Affidavit Opposing Defendants' Request For Preliminary Relief

State of New York
County of Suffolk } *ss:*

I, John Lepper, a Plaintiff in this action being duly sworn, depose and say that the following statements are true and correct, to the best of my knowledge:

1. I am a Plaintiff in this action.

2. I built the treehouse which is the subject of this action as a playhouse for my two elementary school age children around a solid tree, approximately 60' in diameter, on my property at 59 Cockonoe Ave. in the Incorporated Village of Babylon.

3. I was permitted to visit, examine, and photograph the treehouse at 250 Fire Island Ave. for which a Certificate of Occupancy was issues by Defendant building inspector Stephen Fellman years after it was erected.



4. The comparison between the treehouse I built for my children and the treehouse at 250 Fire Island Avenue, Village of Babylon, is shown by the photographs I have included in this affidavit, each of which is a true and accurate copy of what I actually observed.

5. Over the last three years, the treehouse which I built for my children has survived micro bursts, 70mph and 100mph winds, and Tropical storm Isiah without any signs of damage.

6. The treehouse which I built for my children uses four 3" X 6" vertical braces anchored to the tree with 3-1/2" x 12" galvanized bolts in each vertical brace with a mitered mortise and tenon jointed diagonal brace to the underside of the platform:



3

7.   The treehouse which I built for my children is of much more sturdy construction that the treehouse at 250 Fire Island Ave. for which a Certificate of Occupancy was recently issued.





8.     For example, the treehouse at 250 Fire Island Avenue is supported by four timber screws on each side of a 2" x 6" board screwed directly into the tree.



9.    The treehouse at 250 Fire Island Ave. has 4" X 4" bracing at approximately a 45 degree angle screwed directly into the tree. There is nothing supporting the bracing which is mitered and directly screwed into a tree which is already showing signs of wear and damage.







10. The reason for the vertical bracing on the 59 Cockonoe treehouse is so that All of the weight of the treehouse is locked into the tree and completely supported by the tree, even the angled bracing are supported vertically because of the vertical bracing and the mortise and tenon joint.

11. The 250 Fire Island Treehouse bracing is just cut at  a 45 degree angle and screwed directly into the tree.

12. The 250 Fire Island Treehouse bracing could possibly fail and the bracing would be rendered worthless and possibly slide right down the tree.

13. This could never happen at 59 Cockonoe, the treehouse that I built, because of the way that the vertical bracing is fastened to the tree and the mortise and tenon joint.

14. There is no reason to consider the treehouse I built for my children any less entitled to a Certificate of Occupancy that on the premises at 250 Fire Island Avenue.


THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK

8

DATED AT   Melville, New York
June 26, 2021

John Lepper

State of new York
County of nassau

On the 26 day of June 2021 John Lepper personally
appeared before me and provided valid a NYS I.D.

Lillian Squitire

LILLIAN A. SQUITIRE
Notary Public, State of New York
No. 01SQ6404170
Qualified in Nassau County
Commission Expires February 10, 2024

9

# Permit not needed for Babylon treehouse, court rules

**N** newsday.com/long-island/suffolk/babylon-treehouse-1.40198321



**Long IslandSuffolk**
A large treehouse in a Babylon neighborhood does not require a permit, a judge ruled.
Credit: Jessica Rotkiewicz

An appeals court ruled that a Babylon Village man was within his right to build an 86-square-foot treehouse without a permit, records show.

The Appellate Division of the State Supreme Court handed down the Dec. 20 decision that reversed a lower court's ruling that John Lepper, who built the treehouse for his children, violated village code.

The higher court found that the village failed to establish facts, including that the treehouse constituted a building as defined in village code, thereby requiring a permit.

**Village fines Babylon man over treehouse** John Lepper, of Babylon Village, built a treehouse in his backyard for his son's birthday. On Nov. 5, he discussed problems he has had with the village over the structure, which he has been ordered to take down. (Credit: Jessica Rotkiewicz)

Village Court Judge John Rafter had convicted Lepper on four charges of violating village code and imposed sentences, including fines and ordered the treehouse removed.

Lepper paid the $475 fine and appealed the decision.

"I feel great," Lepper said.

Babylon Village attorney Gerard Glass says the decision is no surprise because village officials knew there was an issue in the way the summons was written, and they could not correct it after the fact.

Get the latest breaking news as it happens.

By clicking Sign up, you agree to our privacy policy.

"This has no impact on the case whatsoever," Glass said. "This has nothing to do with the substantive issues of the cause of why he didn't get a building permit."

Lepper has been battling with village officials since spring 2018 over the treehouse. He began constructing it at his Cockenoe Avenue home for his children Bayden, 6, and Brianna, 5.

He said he didn't think he needed a permit because the 86-square-foot treehouse is less than the 90 square feet permitted in the village code for gyms and playgrounds.

But after he started building the structure, he received a letter from village officials saying he needed a permit and was later told he also needed a survey and architectural drawings.

He applied for a building permit and submitted the survey and architectural drawings, his Dix Hills-based attorney Cory Morris said.

Rafter ruled in October 2018 that the treehouse is a building, not a gym or playground, and is subject to building laws.

Lepper also sued the village and its officials in federal court over violating his First Amendment rights. He said the village has targeted him because he reported finding a medical syringe on his property.

All sides agreed that while the case winds its way through federal court, Lepper will not continue work on the treehouse and village officials will not further fine or remove the structure.

"I'm going to take this decision back to federal court to see what the judge has to say," Lepper said. "Hopefully the stay will be lifted and allow the kids to use their treehouse and leave this family alone and enjoy their property."

Deborah Morris is a native Long Islander and covers the town of Huntington.

# Babylon Village Proposes Budget Increase Of 5%, Tax Rate Increase Of 2%

**iB** homeinbabylon.com/2020/04/07/babylon-village-proposes-budget-to-increase-five-percent

Gary

April 7, 2020



At last night's Babylon Village Annual Budget Meeting, Babylon Village Treasurer Andrew Reichel announced that total expenditures for the proposed FY2021 budget would be $11,888,817 which represents an increase of 5.31% over the FY2020 budget. The budget includes a tax rate increase of 2.01% about 30 cents per $100 of assessed value.

Some of the increased expenses include salary increases on overtime costs for Village employees, legal expenses for ongoing and anticipated litigation, central garage costs due to the aging vehicle fleet, cancer coverage for BV fire department personnel and increased expenditure on highway improvement so that the village can fully utilize New York State CHIPS funds.

Reichel noted that the 2.01% tax rate increase will not break the New York State property tax cap. Babylon Village had previously gone six years without a tax rate increase.

The meeting was held remotely via the teleconferencing app Zoom and live streamed on Babylon Village's new YouTube channel

In virtual attendance were Mayor Ralph Scordino, Deputy Mayor Kevin Muldowney, Trustee Mary Adams, Trustee Robin Silvestri, Village Clerk Jean Marie Park, Deputy Village Clerk Jeanine Finelli, Treasurer Andrew Reichel and Village Attorney Gerard Glass.

Babylon Village residents who have questions, comments or concerns about the proposed budget can send them via e-mail to babylonbudget@villageofbabylonny.gov



Watch Video At:  https://youtu.be/3iysLM_9f5Y

# Permit not needed for Babylon treehouse, court rules

**N** **newsday.com**/long-island/suffolk/babylon-treehouse-1.40198321



**Long IslandSuffolk**
A large treehouse in a Babylon neighborhood does not require a permit, a judge ruled.
Credit: Jessica Rotkiewicz

An appeals court ruled that a Babylon Village man was within his right to build an 86-square-foot treehouse without a permit, records show.

The Appellate Division of the State Supreme Court handed down the Dec. 20 decision that reversed a lower court's ruling that John Lepper, who built the treehouse for his children, violated village code.

The higher court found that the village failed to establish facts, including that the treehouse constituted a building as defined in village code, thereby requiring a permit.

**Village fines Babylon man over treehouse** John Lepper, of Babylon Village, built a treehouse in his backyard for his son's birthday. On Nov. 5, he discussed problems he has had with the village over the structure, which he has been ordered to take down. (Credit: Jessica Rotkiewicz)

Village Court Judge John Rafter had convicted Lepper on four charges of violating village code and imposed sentences, including fines and ordered the treehouse removed.

Lepper paid the $475 fine and appealed the decision.

"I feel great," Lepper said.

Babylon Village attorney Gerard Glass says the decision is no surprise because village officials knew there was an issue in the way the summons was written, and they could not correct it after the fact.

Get the latest breaking news as it happens.

By clicking Sign up, you agree to our privacy policy.

"This has no impact on the case whatsoever," Glass said. "This has nothing to do with the substantive issues of the cause of why he didn't get a building permit."

Lepper has been battling with village officials since spring 2018 over the treehouse. He began constructing it at his Cockenoe Avenue home for his children Bayden, 6, and Brianna, 5.

He said he didn't think he needed a permit because the 86-square-foot treehouse is less than the 90 square feet permitted in the village code for gyms and playgrounds.

But after he started building the structure, he received a letter from village officials saying he needed a permit and was later told he also needed a survey and architectural drawings.

He applied for a building permit and submitted the survey and architectural drawings, his Dix Hills-based attorney Cory Morris said.

Rafter ruled in October 2018 that the treehouse is a building, not a gym or playground, and is subject to building laws.

Lepper also sued the village and its officials in federal court over violating his First Amendment rights. He said the village has targeted him because he reported finding a medical syringe on his property.

All sides agreed that while the case winds its way through federal court, Lepper will not continue work on the treehouse and village officials will not further fine or remove the structure.

"I'm going to take this decision back to federal court to see what the judge has to say," Lepper said. "Hopefully the stay will be lifted and allow the kids to use their treehouse and leave this family alone and enjoy their property."

Deborah Morris is a native Long Islander and covers the town of Huntington.

# Man Files 2nd Lawsuit Against Village Officials Over Treehouse

patch.com/new-york/babylonvillage/man-files-2nd-lawsuit-against-village-officials-over-treehouse

February 2, 2021

**The local man recently filed the new lawsuit after a legal battle with village officials over a treehouse he built in 2018.**



- **Priscila Korb**, Patch Staff
- Posted Tue, Feb 2, 2021 at 11:23 am ET



Local resident John Lepper has been in a legal battle with village officials since 2018 when he decided to build a treehouse for his son's birthday. (Shutterstock)

BABYLON VILLAGE, NY — A Babylon man recently filed a second lawsuit after a three years legal battle with village officials over a treehouse he built for his children in 2018, claiming he was targeted.

The situation began in 2018 after local resident John Lepper began building a treehouse in the backyard of his home for his son's birthday. Shortly after, he received a letter from Village of Babylon building inspector stating that he needed a permit for the treehouse. Lepper claims he believed he did not need the permit since the village code states that permits are required for structures over 90 square feet.

1/5

Regardless, Lepper says he applied for the permit after receiving the letter but still received multiple building code violations for the structure and was charged with over $1,000 in fines.

In the second lawsuit he filed against village officials, he claims he was targeted by village officials after he became outspoken when he found a syringe and hypodermic needle in his yard which led him to build the treehouse for his children in order to protect them.

He says that his neighbors have similar structures in their yards, yet none had to undergo the same requirements.

According to the lawsuit, village officials allegedly "intended to take advantage of the voluntary, but not legally required, application" in order to collect fines.

After building the structure for his son's birthday in July 2018, Lepper received three summons for the treehouse. During a meeting with the village building inspector he was told that it violated the village code and that he owed $1,750 in fines. Lepper claims that the fines were unwarranted since he did not receive a notice of violation. A month later, they took the matter to court.

The village judge ruled that Lepper did violate the code since his application did not include a drawing of the structure. The lawsuit claims he paid the fines and then went to appeal. The appellate court ruled that he did not require a permit for the treehouse.

Reply

After years in courts and spending money on fines and court fees, Lepper filed the first was to seek "injunctive relief" for the destruction and removal of the treehouse, according to the lawsuit.

His second lawsuit is seeking damages for violating his constitutional rights.

"He was attacked just for living in the Village of Babylon and raising his children as he sees fit," Lepper's attorney, Cory Morris said.

See more local news



## Neighbor Posts

---

**peggie**, Neighbor
Does anyone know this adorable, friendly, white and grey kitty? I believe he/she was born in my yard over the summer - seen on my property on Fenimore Ave N Babylon daily ever since, never a collar. Being neutered this morning and checked for a chip. If no one comes forward as having a bond with him/her I'll be placing it for adoption (I'm allergic to cat/rabbit fur). Neighbor says they've seen him/her sheltering outdoors in their yard. Please let me know if you have an attachment to this puddytat as we will be placing him/her in a forever home as soon as possible. God bless and have an awesome day y'all! - Peggie Walsh Murano Fabian

Babylon Village, NY|Local Post|Jan 25

**Priscila Korb**, Patch Staff
Now more than ever, local businesses need support from the community, so share your favorite business in or around Babylon in the comments below.

Babylon Village, NY|Local Question|Jan 22

**Priscila Korb**, Patch Staff

Do you currently meet New York's qualifications for receiving the COVID-19 vaccine? If so, have you been able to get your shot, and what has your experience been like?

Babylon Village, NY|Neighbor Post|Jan 17

### James Mendolai, Neighbor
WE HAVE A WONDERFUL POOL WITH ALOT OF ROOM FOR A KIDS SPRINKLER PARK, SKATE PARK OR SOMTHING FOR OUR RESIDENTS WITH FAMILYS AND OUR VILLAGE YOUTH. THE DROVES OF KIDS ON BIKES ARE GOOD KIDS WITH NOTHING TO DO IN OUR VILLAGE. LETS CHANGE THAT!

Babylon Village, NY|Neighbor Post|Jan 16

### Mary Adams, Local Business
Babylon Village's Better Babylon Party is proud to announce its slate of candidates, including incumbents Mayor Mary E. Adams and her team of Trustees, Frank J. Seibert, Dominic P. Bencivenga and Anthony M. Cardali, for the upcoming Babylon Village elections taking place on Tuesday, March 16, 2021.
With decades of combined community service, this team of elected officials has a proven track record working hard to continue and improve upon the Babylon Village traditions that protect home values and make our Village a highly desirable place to live and raise a family on the South Shore. If you love living in Babylon Village, come show your support at a petition gathering event which will take place on Saturday, January 16th from 10 AM-3 PM at 72 E. Main Street. Everyone who attends will receive a free Babylon Village sticker! Please remember to follow COVID-19 protocols and wear a mask to keep our Village residents safe. For more details on how you can meet the candidates (in-person and via Zoom) please visit www.betterbabylonparty.com or check us out on Facebook @betterbabylonparty.

### Devin Moran, Neighbor
[PLEASE READ!] Hey everyone! My name is Devin Moran and I'm a college student who lives in your neighborhood. My friend Vignesh Subramanian (whose previous posts you may have seen) and I volunteer for TeleHealth Access for Seniors, a student-led 501(c)(3) nonprofit that collects smart devices for low-income seniors to virtually interface with their doctors and loved ones. As the COVID-19 crisis worsens, elderly populations are still in need of medical care, but many patients do not have electronic access to telehealth services or know how to use telehealth apps. We coordinate device drop-offs as well as provide guides on tech support and how to order grocery & pharmacy delivery.

We're helping collect camera-enabled devices to donate to the Union Community Health Center in the Bronx, the Center for Urban Community Services in Upper Manhattan, and nursing homes & long-term care facilities across Long Island. As you replace your electronics with newer models and give back to charities this holiday season, please consider donating any gently used phones, laptops, and tablets to our organization. We can accept iPhone 4s

and above, second-generation iPads and above, Android models, and any laptops with integrated webcams, among others. If you have any of these electronics on hand and don't use them often, please consider how they might be used to save lives elsewhere.

We also accept GoFundMe donations used to purchase devices and chargers for patients in need. Our GoFundMe is available below. Please select the referring state (New York) from which you're donating. All donations are tax-deductible.
https://www.gofundme.com/telehealth-access-for-seniors?
pc=em_dn_contacts_r&rcid=r01-159068822396-

Please email us at vig.check@gmail.com if you are willing to donate a device. If you're not sure whether a particular device is acceptable, we would be happy to clarify for you. Chargers are preferred, but if you can't find them, don't worry - we will find and buy them ourselves.

Thank you for your support!

See more neighbor posts

## Local Classifieds

Featured Classified|Announcement|23h

## Behind The Scoreboard: NYC Homecoming For MLB Player

See more classifieds

# Report: Long Island treehouse dispute cost taxpayers tens of thousands of dollars

**radio.com**/wcbs880/articles/news/babylon-treehouse-dispute-cost-taxpayers-thousands-report

Sophia Hall                                                                 September 28, 2020



**BABYLON, N.Y. (WCBS 880) —** A dispute on Long Island over a treehouse has reportedly led to some hefty costs to residents.

The dispute started back in May 2018, when a resident in the Village of Babylon built a treehouse in his backyard for his children. He faced numerous summonses and fines for not having a building permit.

In the end, the homeowner won the fight in court, but Newsday reports that the legal battle cost village taxpayers more than $54,000 dollars.

The village attorney reportedly charged $300 per hour — on top of the annual retainer he is paid to handle other village matters — and the fight is not over yet.

The homeowner is now suing the village in federal court for $2 million, saying what the village to did him was a violation of his civil rights.

WCBS 880's Sophia Hall has reached out to the village mayor for commnet.

Meanwhile, the treehouse remains in the homeowner's backyard.

# Babylon man fined for backyard treehouse sues village

**N** newsday.com/long-island/suffolk/babylon-man-fined-for-backyard-treehouse-sues-the-village-1.24453151

**Long Island Suffolk**

John Lepper says his 86-square-foot treehouse is legal. The village says he needs a building permit for it because of its size.

John Lepper, of Babylon Village, built a tree house in his backyard for his son's birthday. On Nov. 5, he discussed problems he has had with the village over the structure, which he has been ordered to take down. (Credit: Jessica Rotkiewicz)

**By Rachel O'Brien** Updated December 11, 2018 3:34 PM

Print

A federal judge issued an injunction Monday against the Village of Babylon, preventing it from further fining a man who built an illegal treehouse in his yard while the matter plays out in court.

The treehouse that John Lepper began building for his 6-year-old son, Bayden, last summer has been the subject of underlined_hundreds of dollars in fines, court appearances, and now, a civil suit that he filed in the U.S. District Court for the Eastern District of New York.

The suit claims the village, the mayor, his secretary, each of the four trustees, the building inspector, a member of the planning board and the village's attorney were "punishing" Lepper and pursuing "personal animosity in violation of [Lepper's] civil and constitutional rights."

Village Justice John Rafter fined Lepper $475 on Oct. 17, for building the treehouse, categorized as a building, without a building permit.

Lepper has appealed, saying his 86-square-foot treehouse is legal, because the village code states a playground or gym of less than 90 square feet doesn't need a permit.

While an architect and Google engineer offered their services to file a completed building permit application, Lepper won't take it.

"I know that I'm right," he said. "We're not asking for anything other than to be left alone."

The village's attorney, Gerard Glass, noted another homeowner in the village got a building permit and constructed a treehouse within the last two years.

Lepper's attorney Cory Morris said, "We want to know why they targeted this family. He voiced his concerns, he reported a crime."

Lepper said he found a needle in his yard and told his neighbors about it, but he didn't report it to the village. He said he started building the treehouse afterward to provide a safe place for his children to play.

"I didn't go to anybody, notifying anybody of anything," he said.

He mentioned the needle in court after he was fined.

Neither Glass, nor Mayor Ralph Scordino, both defendants in the suit, would comment but said the village would get another attorney to handle the case. Lepper is seeking unspecified monetary damages.

**By Rachel O'Brien**

**<u>Nassau reassessment gets public airing</u>**

# FDNY firefighter says he will continue fight to keep his kids' tree house

nypost.com/2019/01/17/fdny-firefighter-says-he-will-fight-to-keep-his-kids-tree-house

January 17, 2019

Metro

By Lorena Mongelli and Chris Perez

January 17, 2019 | 7:38pm | Updated

Modal Trigger



John Lepper Victor Alcorn

see also

An FDNY firefighter from Long Island who was ordered by local officials to tear down his kids' tree house says he will continue to duke

it out with them in court — even though his family is facing a fortune in fines if he loses.

"We're afraid this case is going to cost us our house," John Lepper, the 45-year-old smoke-eater, told The Post on Thursday.

## Long Island firefighter battling court to keep family tree house

"All I want is to be left alone," he said. "This is about my kids and my rights."

Lepper, a father of two from Babylon Village, is battling local officials in federal court over the right to keep his children's wooden tree house up in his yard. The former Marine says he built the structure back in May after discovering a hypodermic needle near his home.

"There is a heroin problem on my street and this was my solution," Lepper explained. "The needle I found was close enough for my kids to grab."

Babylon officials — speaking in court Thursday over speaker phone — said that they were prepared to start issuing summonses, with the amount of potential fines ranging as high as $1,000 a day. But Eastern District Judge Joseph Bianco insisted that they wait until a decision is reached first.

He pointed out how both sides had agreed that Lepper, who appeared in court Thursday with his attorney, would not use the tree house and the village would not fine him while the case was pending.

More On:

lawsuits

## Woman suing Columbia over inappropriate relationship now wants $60M

## Hubby behind 'Shakespearean plot' to poison wife for life insurance: suit

# Anti-immigration group sues SPLC over inclusion on hate list

## Salt Bae swiped our tips, then fired us for complaining: suit

When Babylon Village Attorney Eric Tosca argued that the structure was "potentially dangerous," Lepper's lawyer, Cory Morris, fired back: "The only harm it's caused is his children…The village is not harmed."

Judge Bianco, at one point, appeared dismayed that a settlement hadn't been reached yet.

"I anticipated that from then until now, that both sides would have attempted to resolve the case," he said. "But apparently that hasn't happened."

Lepper maintains that his tree house is below 90 square feet and does not need a permit, as per village code 365-25, which states: "A building code shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet."

He filed for a permit anyway, but the village told him the application was incomplete because he failed to turn in a proper building survey and architectural rendering.

In an Oct. 17 ruling, Village Justice John Rafter ordered Lepper to remove the tree house — referring to a " Merriam-Webster" definition of a building as a "structure that is designed or intended for support, enclosure, shelter or protection of persons, animals."

"The law is unconstitutional because it's broad," Morris said. "According to them, even a bird house would need a permit."

## Share this article:

Read Next

L Train shutdown is officially cancelled: MTA

SPONSORED STORIES

Recommended by

# Long Island firefighter battling court to keep family tree house

**nypost.com**/2018/12/11/long-island-firefighter-battling-court-to-keep-family-tree-house/

December 11, 2018

Metro

By Lorena Mongelli and Tamar Lapin

December 11, 2018 | 12:46am



John Lepper and his two children (left) are fighting to keep the tree house he built (right)   Victor Alcorn

A Long Island father is going out on a limb to save his kids' tree house.

FDNY firefighter John Lepper, 45, is battling the town of Babylon in federal court for ordering him to rip down the structure — which he built out of wood reclaimed from a boat wrecked by Hurricane Sandy, according to a notice of claim filed Monday.

"It's bigger than the tree house. It's about my constitutional rights," Lepper said Monday. "I did everything I need to be in compliance, but yet it's still a problem."

The former Marine says he built the structure in May for his 6-year-old son, Bayden, and 5-year-old daughter, Brianna, after finding a hypodermic needle while playing with the kids in his front

yard, according to the claim.

"I built the tree house to keep my kids safe," Lepper told The Post.

But later that month, building inspector Stephen Fellman told Lepper he may need a permit. Village code states that any playground larger than 90 square feet requires a permit.

Lepper, who worked as a contractor and went to drafting school, says the tree house is only 86 square feet, but he still submitted a permit application in May, according to court papers.

He claims the town never reviewed the application.

"Mr. Lepper has exhausted all available remedies and yet the threat of daily, excessive, and continuing fines for the existence of a child's play set . . . persists," the court papers say.

Village Justice John Rafter said in an Oct. 17 ruling that Lepper's tree house needs a permit because it is deemed a "building" according to Merriam-Webster. He ordered Lepper to pay $475 in fines.

The village says Lepper's application for a permit wasn't complete and that he needed to submit a building survey and architectural drawings — which could cost him up to $2,000, he said.

"He didn't submit building plans that were stamped by an architect or an engineer and the survey predates the tree house," said Gerard Glass, the town's attorney, who is also named in the suit.

"It really is a health and safety issue. The village is not anti-tree house," he added. "We're not going after him vigorously. We just issued a couple of fines. This is a structure perched in a tree. They have a legal obligation under state code to get a building permit."

Lepper said he's received a slew of summonses and fines.

In court Monday, Judge Joseph Bianco ruled that the town must stop issuing summonses and fines until the next hearing date, Jan. 17. The village will also be unable to enter the property and remove the tree house while the case is pending.

Lepper, too, was ordered not to enter the tree house or to let anyone inside of it.

Read Next

Teen fatally struck by ambulette after argument in the Bro...

