UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

JOHN LEPPER and NOELLE LEPPER,
*individually and as parents and natural guardians
of their infant children*, B.J.L. AND B.I.,

                             Plaintiffs,

              -against-

VILLAGE OF BABYLON; RALPH SCORDINO,
*Mayor*; KEVIN MULDOWNEY, *Deputy Mayor*;
ROBYN SILVESTRI, *Village Trustee*; TONY
DAVIDA, *Village Trustee*; MARY ADAMS,
*Village Trustee*; STEPHEN FELLMAN, *Village
of Babylon Building Inspector*; SUZANNE
SCHETTINO, *Department of Public Works*;
GERARD GLASS, Esq., *Village of Babylon
Attorney*; DEBORAH LONGO, *Planning Board,
Village of Babylon*, *each individually and in their
official capacity*, and John and/or Jane Doe,
*unnamed, unidentified complainants*,

                         Defendants.

----------------------------------------------------------------X

For Online Publication Only

**FILED**
**CLERK**

3:41 pm, Mar 29, 2022

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
18-cv-7011 (JMA) (AYS)

**APPEARANCES:**

Cory H. Morris
Law Offices of Cory H. Morris
33 Walt Whitman Rd, Suite 310
Dix Hills, NY 11746
      *Attorney for Plaintiffs*

Eric P. Tosca
Kelly Rode & Kelly
330 Old Country Road
Mineola, NY 11580
      *Attorney for Defendants*

**AZRACK, United States District Judge:**

      Plaintiffs, John Lepper ("Lepper") and Noelle Lepper, individually and on behalf of their

minor children, B.J.L. and B.I. (together "Plaintiffs")[1], bring this action against the Village of Babylon (the "Village"), Ralph Scordino (Mayor of Babylon[2]), Kevin Muldowney (Deputy Mayor), Robyn Silvestri (Village Trustee), Tony Davida (Village Trustee), Mary Adams (Village Trustee), Stephen Fellman (Village of Babylon Building Inspector), Suzanne Schettino (Secretary to the Mayor[3]), Gerard Glass (Village of Babylon Attorney), Deborah Longo (Secretary to the Planning Board[4]), in their individual and official capacities, and John and/or Jane Doe, unnamed, unidentified complainants, (together, "Defendants").  Plaintiffs ask the Court to declare that the Village of Babylon Zoning Code § 365-26 is unconstitutional.  Plaintiffs also bring a host of claims against all individual Defendants in their official and personal capacities.  Plaintiffs allege federal claims of First Amendment retaliation, equal protection, due process, excessive fines in violation of the Eighth Amendment, unconstitutional taking of property, double jeopardy, malicious prosecution, abuse of process, and conspiracy.  (ECF No. 105.)  Plaintiffs allege <u>Monell</u> liability against the Village.  Plaintiffs also raise state law claims for malicious prosecution, abuse of process, negligence, negligent and/or intentional infliction of emotional distress, defamation, and prima facie tort.  (<u>Id.</u>)  Defendants have moved for summary judgment on all claims.  For the reasons stated below, Defendants' motion is **GRANTED**.

---

[1]   The Amended Consolidated Complaint also states that Lepper brings this action, "individually and, as a resident taxpayer of the Incorporated Village of Babylon, on behalf of all those other resident taxpayers of the Incorporated Village of Babylon so unfortunate as to be similarly afflicted and suffering economic damage as a result of the expenditure of Village funds for the inappropriate and improper defense of individual village officials engaged in the persecution of John Lepper for providing a treehouse in which his infant children might play."  Plaintiffs do not raise this theory in their summary judgment briefing.  The Court finds that Plaintiffs have abandoned this theory.

[2]   Scordino passed away in 2021.  There is an argument between the parties about whether Scordino's estate should be substituted.

[3]   The case caption states that Schettino works in the Department of Public Works.  Schettino submitted an affidavit stating that she worked as the Secretary to the Mayor from 2008 until April 2021.  (Def. Ex. S.)  Plaintiffs have submitted nothing to refute this.

[4]   The case caption says that Longo is the "Planning Board."  Longo submitted an affidavit that she was the secretary to the planning board at all relevant times. (Def. Ex. U.)   Plaintiffs have submitted nothing to refute this.

# I. BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements, the declarations, exhibits, and testimony referenced therein, and any additional statements of material facts provided in the parties' briefings. The facts are undisputed unless otherwise noted. When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant," in this case Plaintiffs. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

## A. **Factual Background**

### 1. Building the Tree House

This case is about a tree house. Plaintiffs, Lepper and Noelle Lepper, own the house and property located at 59 Cockenoe Road in the Village (the "Property"). (ECF No. 127-3, Pl. Resp. to 56.1 ¶ 1.) Plaintiffs have two minor children. (Pl. Resp. to 56.1 ¶ 2.) Plaintiffs testified that in April 2018, Lepper found a hypodermic needle on the Property where his children play. (ECF No. 127-7 at 36-68, Def. Resp. to Pl. 56.1 Counterstatement, ¶ 2-3; Pl. Ex. 42, Dep. of Noelle Lepper 90:20-24.) Plaintiffs testified that they were concerned about their children's safety and wanted to build a tree house because of the hypodermic needle. (Def. Resp. to Pl. 56.1 Counterstatement at ¶¶ 6-13.) Lepper also testified that he was concerned about drug use in his neighborhood. Lepper and Noelle Lepper testified that they told neighbors about the hypodermic needle. (Def. Resp to Pl. 56.1 Counterstatement ¶ 8.) Lepper testified that at some point, he called 911 to report illegal drug use in his neighborhood. He could not recall when he made this telephone call. Specifically, he called to report a suspected hand-to-hand drug transaction. Lepper was also unable to recall if he identified himself when he made the call. (Def. Resp to Pl. 56.1 Counterstatement ¶ at 31; J. Lepper Depo. at 207-212.) Lepper and Noelle Lepper testified that they spoke to other

residents in the Village about drug use.  (Def. Resp. to Pl. 56.1 Counterstatement at ¶¶ 46-47.)

At least some of the Defendants were aware of drug abuse issues in the Village.  (Def. Resp to Pl. 56.1 Counterstatement at ¶ 34; see, e.g., Pl. Ex. 37, Scordino Depo. at 133 ("We do have an opioid epidemic right here in Suffolk County, so much . . . I entered into a lawsuit against opioid manufacturers with all the mayors, the 33 mayors in Suffolk County. There is a problem, there's not a secret to it."); id. at 301 (testifying that there was a house a block away from Plaintiffs' where there was a drug raid)).

In or before May 2018, Lepper commenced construction of a wooden tree house on the Property.  (Pl. Resp. to 56.1 ¶ 4.)  Prior to starting construction, Lepper did not make an application for a permit.  (Pl. Resp. to 56.1 ¶ 5.)  At all relevant times, Defendant Fellman was the Building Inspector for the Village.  (Pl. Resp. to 56.1 ¶¶ 6-7.)  Defendant Davida, a Village Trustee, was a neighbor of Lepper.  (Def. Resp to Pl. 56.1 Counterstatement at ¶ 41.)  Davida testified that he was driving by the Property when he observed either a structure or "new timbers" being built in a tree on the Property and saw that there was no permit in the window.  (Pl. Resp. to 56.1 at ¶ 7; Pl. Ex. 28, Davida Depo. 148-49; Pl. 56.1 Counterstatement at ¶ 23.)   Davida testified that he informed Fellman of his observations.  (Pl. Resp. to 56.1 at ¶ 7.)

Plaintiffs allege that their neighbor, Tony Kinnier, called Scordino regarding Lepper.  Defendants maintain that this complaint from Kinnier was about a parking issue.  (Def. Resp. to Pl. 56.1 Counterstatement at ¶ 24.)  Lepper testified that Kinnier complained about the tree house.  (Lepper Depo. at 364.)  A letter from Scordino, discussed infra, also states that the Mayor's office received complaints from Lepper's neighbors about the tree house.

On May 10, 2018, in his capacity as Building Inspector, Defendant Fellman transmitted a letter advising Lepper that he may require a permit for a wooden structure in the tree without a

roof and walls, and advising John Lepper to contact him.  (Pl. Resp. to 56.1 at ¶ 7; Pl. Ex. 2.)  In the past, Fellman had issued permits to the Leppers for work performed on their house, unrelated to the tree house.  (Pl. Resp. to 56.1 at ¶ 48.)  The parties dispute whether Lepper stopped or continued work on the tree house after receiving the letter from Fellman.  (Pl. Resp. to 56.1 ¶ 8.)

On May 21, 2018, the Village issued a notice of violation to Lepper for failing to obtain a permit and informed him that he was in violation of Village of Babylon Code Section 365-26. (Def. Resp. to Pl. 56.1 Counterstatement at ¶ 73; Pl. Ex. 15.)  Lepper claims that he did not receive any violation until July 19, 2018.[5]  (Id.)  Also, on May 21, 2018, Lepper went to the Village Hall to obtain a permit[6] and gave his application to Defendant Longo.  (Pl. Resp. to 56.1 at ¶¶ 9, 41.)

Lepper testified that on the day he went to the Village Hall and submitted the permit application, he had a "private conversation" with his neighbor, Holly Zappalla—a Building Department employee—about the hypodermic needle he had found.  (Def. Resp. to Pl. 56.1 Counterstatement at ¶¶ 51, 60; John Lepper Depo. 229-30, 235-239.)  The exchange from Lepper's deposition concerning this conversation is set out below:

Q. Do you know the name of the person you spoke to?

A. I spoke to one of my neighbors; Holly . . . .

Q. And you never mentioned anything about drug activity to her before the letter? . . .

A. No, I don't. Not until I submitted the application. That's when I spoke to her about it.

Q. When you spoke to her, was it at the building department itself?

---

[5]  While Lepper denies receipt of this notice of violation, that is insufficient to raise a factual dispute on the question of whether the May 21, 2018 violation was issued.  Moreover, even assuming arguendo that the May 21, 2018 violation was not issued as Plaintiffs claim, the Court's ruling on the motion would still, ultimately, be the same.

[6]  While Lepper maintains that he did not receive the May 21, 2018 notice of violation, he does not explain why, coincidentally, he ended up going to Village Hall that same day to apply for a permit.

A. Yes

Q. And she was working at the time?

A. Yes.

Q. And did she respond at all regarding the drug activity issues?

A. Yes. We were having a private conversation.

Q. And what was she saying about it or did she say anything about it? Put it this way: What did she tell you? . . .

A. She said that, um, she was aware of some of the activity I was speaking of and that, you know, I wanted her to speak to possibly the parents and I said no. I didn't see anybody physically put it there. I'm just saying that I have an idea that it was one of -- idea of it was somebody in the area that I suspected but I couldn't positively identify because I didn't see anybody physically put it there.

Q. Other than the hypodermic needle, did you tell her also about the hand-to-hand transactions you had seen?

A. I don't know -- no, I didn't speak to her about that.

(John Lepper Depo. 229-30, 235-239.)

Lepper testified that he called the Building Department to check on the status of the permit in June 2018[7]. (Def. Resp. to Pl. 56.1 Counterstatement at ¶ 65.) No permit was issued and Lepper was aware that no permit had been issued.[8] (Pl. Resp to 56.1 at ¶¶ 28, 41.) Lepper nevertheless continued construction on the tree house. (Pl. Resp to 56.1 at ¶ 25.) Within hours of his son's birthday party on July 7, 2018, Lepper decided to complete building the tree house. (Am. Consol. Compl. at ¶ 63.) Lepper did not apply for a variance with the Zoning Board of Appeal of the Village and did not seek any type of appeal or other remedy from the Zoning Board of Appeals,

---

[7] Defendants dispute that Lepper called the Building Department to check on the status. (Def. Resp. to Pl. 56.1 Counterstatement ¶ 65.) Lepper does not identify what he was allegedly told when made he made this call.

[8] The parties do not state that Lepper ever received a denial of his permit application, only that a permit was never issued.

concerning his permit application.  (Pl. Resp to 56.1 at ¶¶ 27-28.)  As discussed infra, Lepper

would eventually receive three tickets from Fellman in July 2018 for constructing the tree house

without a permit.  Lepper subsequently met with Fellman later in July about the tickets, and would

end up fighting these and other tickets in Village Court beginning in August 2018.

Lepper's permit application did not include signed and sealed plans by a professional

engineer or architect.  (Pl. Resp to 56.1 at ¶ 10.)  Fellman states in his affidavit that at his meeting

with Lepper in late July 2018, he told Lepper:  "a permit was required before he could continue

building.  Because of the proximity of the building to the property line, it was apparent that he

required a variance. I told him to submit signed and sealed plans and a survey prepared by a

licensed surveyor to complete the application."  (ECF No. 127, Def. Ex. Q, Fellman Aff. ¶ 7.)

Lepper disputes this point.  He claims that at this meeting, Fellman did not tell him to submit

signed and sealed plans by a professional engineer or architect, or that he needed a variance.  (Pl.

Ex. 44, Lepper Aff. ¶ 30.)  Rather, Lepper claims that the first time he was told that he needed

signed and sealed drawings by a licensed architect or professional engineer was on September 18,

2018 when he appeared in Village Court.  (Id. ¶¶ 41-42.)  Lepper maintains that:

> Before the case was called, Village Attorney Glass asked me to come out to the
> vestibule with Steve Fellman. Steven Fellman asked me if I got the drawing that he
> asked about. I said, "What drawing?" He said that I needed architectural drawings.
> I replied, "I read your code 365–26 and my treehouse is less than 90 square feet and
> does not require a permit." This was the first time I was told that I needed signed
> and sealed drawings by a licensed architect or professional engineer.

(Id.)  Lepper still did not comply after he was told about this requirement in September 2018, and

to this day has still not submitted signed and sealed plans to the Building Department or the Zoning

Board of Appeals.[9]  (Fellman Aff. ¶ 7.)  Fellman also explains in his affidavit that: "In order to

---

[9]  Plaintiffs insist that they eventually submitted a "sealed letter opinion and work papers from a licensed professional
engineer."  (Pl. Resp. to Def. 56.1 at ¶ 10.)  However, Plaintiffs cite to a March 1, 2019 letter and report from a

appear before the Zoning Board of Appeals to obtain a variance, [Lepper] would need plans by a licensed professional and a survey by a licensed surveyor."  (Id.)

    2. Zoning Code

Village of Babylon Code § 365-26, Zoning, is at issue in this case.[10]  Section 365-26 states, in relevant part:

> A. No building shall hereafter be erected and no existing building shall be structurally altered or added to on any lot, plot or premises and no excavation or work of any nature shall commence in connection therewith, nor shall any use of an existing building be changed until a permit authorizing the same shall have been issued by the Building Inspector. The Building Inspector shall require that the application for a permit and the accompanying plot plan, plans and specifications shall contain all information necessary to enable him to determine whether the proposed building addition or structural alterations or change of use to an existing building comply with the provisions of this chapter and Chapter 171, Flood Damage Prevention, where applicable.
>
> B. Decks/patios; outdoor playgrounds and gyms
>  . . .
>
> > (3) A building permit shall be required when an outdoor playground or gym (or any combination) exceeds a lot area of 90 square feet.

(See Pl. Resp. to 56.1 at ¶ 29.)  Section 365-3 of the Village Code defines "building" as a "structure having a roof supported by columns or walls for the shelter, support or enclosure of persons, animals or chattels."  A structure is defined as: "[A] combination of materials other than a building to form a construction that is safe and stable, and includes among other things stadiums, swimming pools, gospel and circus tents, reviewing stands, platforms, stagings, observation towers, radio towers, sheds, coal bins, walls, gas pumps, fences over six feet in height and display signs."

---

professional engineer, James Brown, regarding the safety of the tree house which was obtained in connection with Plaintiffs' motion for preliminary relief in this litigation and which was filed with this Court.  (Pl. Ex. 7, 8.)  There is no evidence that Plaintiffs ever submitted this letter to the Building Department or the Zoning Board of Appeals, updated the permit application in anyway, or ever submitted this report with a request for a variance.

[10] See https://ecode360.com/6595348.  The Court takes judicial notice of the Village of Babylon Code, Section 365, Zoning.

Section 365-3 defines "lot area" as "[t]he total horizontal area within the boundary lines of a lot excluding any portion of an abutting street, whether publicly or privately owned."

Plaintiffs maintain that they did not need a permit for the tree house because the tree house is allegedly an outdoor playground/gym that has a lot area of less than 90 square feet.  (Pl. Opp at 33; Am. Consol. Compl. at ¶¶ 111-112.)  Defendants maintain that Plaintiffs needed to obtain a permit for the tree house because it is a "building," which requires a permit, and that even if the tree house is considered an outdoor playground/gym, it has a lot area greater than 90 square feet, still would require a permit.

The Village Code has different setback requirements based on zoning district.  According to Lepper's permit application, the Property is in zone A-7.  (Pl. Ex. 3.)  For zone A-7, the Village Code requires that:

Each lot shall have front, side and rear yards not less than the following depths:

(1) For a single-family dwelling:

a.   Front yard: 25 feet. In a flood zone, an exterior elevator or lift will be considered an allowable front yard or rear yard encroachment.

b.   Side yards: not less than six feet; but the sum of two side yards shall not be less than 20 feet, except that if a dwelling shall be constructed hereafter without garage space for at least one automobile, additional side and/or rear yard shall be provided to permit the construction of detached or connected garage space with proper access to accommodate one automobile without encroaching upon the required side and/or rear yards, and the location of such space and access shall be indicated on the filed plans.

c.   Rear yard: 25% of the depth of the lot, but not less than 25 feet, except that an accessory building not over 15 feet in height may be placed in the rear yard, but not nearer the rear lot line than five feet. In the case of a boathouse, the height may be increased and/or the distance from the rear lot line may be decreased as a special exception by the Board of Appeals.

>    d.  A corner lot shall have a front yard on each street on which the
>        lot abuts. It shall have a side yard of not less than five feet
>        measured parallel to the shorter dimension of the lot and a side
>        yard of not less than 25 feet measured parallel to the longer
>        dimension of the lot.

(Village Code § 365-15.)

The Property is on a corner lot and fronts two public streets, Cockenoe Avenue on one side and Wampum Road on the other.  (Pl. Ex. 3; Pl. Resp. to Def. 56.1 at ¶ 3.)  The tree house is on the Wampum Road side of the Property.  (Pl. Ex. 3.)  According to the Village Code, the tree house is in a front yard.  (Village Code § 365-15 (1)(d)).  Fellman explains in his affidavit that "the tree house abutted the property line with Wampum [Road] in violation of the Village zoning code setback provisions" and that "[b]ecause of the proximity of the building to the property line, it was apparent that [Lepper] required a variance."  (Fellman Aff. at ¶¶ 7, 11.)  Defendants state in their 56.1 Statement that "[a]ll or part of the treehouse is situated less than ten feet from property line on the Wampum side of the [P]roperty."  (Def. 56.1 at ¶ 11.)  In support of this, Defendants cite to Fellman's affidavit that the tree house violated the setback requirements and to the report of licensed professional engineer Danatzko which measured that the treehouse is located 13 feet, 1 inch from the interior edge of the curb along Wampum Road and 4 feet, 6 inches from wood fencing adjacent to Wampum Road.  (Pl. Resp. to Def. 56.1 at ¶ 12.)  In their response to Defendants' 56.1 Statement, Plaintiffs dispute that the tree house is less than 10 feet from the property line.  However, Defendants only cite to photos of the tree house from which it is impossible to glean any measurements.  (Id. at ¶ 11.)  Furthermore, a drawing included with Lepper's permit application states that the tree house is "2' To 3"x10" from property line" on Wampum Road.  (Pl. Ex. 3.)  Plaintiffs do not cite to any provision of the Village Code to show that Lepper was in compliance with the setback requirements, nor do they point to any

measurements, by Lepper or professional engineer James Brown, of how far the tree house is set back.[11]   Accordingly, under the Village Code, Plaintiffs needed a variance based on these setback requirements.

### 3. Tickets and Prosecution

As noted earlier, on May 21, 2018, the Town sent Lepper a notice of violation from the Building Department regarding the tree house because he had not obtained a permit.  (Pl. Ex. 15.) Although Lepper subsequently submitted a permit application on May 21, the permit application had not been granted when Lepper decided to simply continue constructing the treehouse without a permit.

Fellman testified that he met with the Mayor's office, including Scordino and the Trustees, about the tree house prior to issuing any tickets.  (Pl. 56.1 Counterstatement at ¶ 49; Fellman Dep. at 199.)  On July 19, 2018, Lepper received three tickets dated July 11, 12, and 13 stating that he was in violation of the Zoning Code § 365-26 for construction of a tree house without a permit. (Am. Consol. Compl. ¶ 73; Pl. Ex. 26; Fellman Aff. ¶ 6.)

In late July 2018, Lepper met with Fellman regarding the tickets.  (Lepper Aff. ¶¶ 25-32; Fellman Aff. ¶ 7.)  The parties dispute what was discussed at this meeting.  Fellman states that he told Lepper:  "a permit was required before he could continue building. Because of the proximity of the building to the property line, it was apparent that he required a variance. I told him to submit signed and sealed plans and a survey prepared by a licensed surveyor to complete the application." (Fellman Aff. ¶ 7.)  As noted earlier, Lepper states that Fellman did not tell him he needed the

---

[11]  Plaintiffs bear the burden of proof on all claims.  For example, the burden is on Plaintiffs to show that the alleged comparators they cite were similarly situated to Plaintiffs.  Plaintiffs have failed to show that they were in compliance with the Village's setback requirements, as the other three tree houses—63 Wyandanch, 99 Park, 250 Fire Island— were.  Lepper's attempts to show that his tree house was also in compliance with the setback requirements is woefully insufficient.

signed and sealed plans or a variance until September 2018.  (Lepper Aff. ¶¶ 41-42.)  Lepper states

that at this meeting Fellman "told me I owed on all (3) violations which were for $250, $500 and

$1000."  (Id. at ¶¶ 24-25.)  The parties agree that Lepper told Fellman about the hypodermic needle

at this meeting.  (Lepper Aff. ¶ 37; Fellman Aff. ¶ 8.)  Fellman states that he told Lepper that "he

should consult with the police" about the hypodermic needle.  (Fellman Aff. ¶ 8.)

On August 14, 2018, Fellman issued a letter informing Lepper that the tree house was

deemed an "unsafe structure" and could not be occupied until a certificate of occupancy was

issued. (Pl. Ex. 17.)  In his affidavit, Glass states that two additional tickets were issued in August

2018. (Def. Ex. R, Glass Aff. ¶ 13.)  However, Plaintiffs argue in their summary judgment briefing

that the tickets were issued on only two occasions, and Lepper's affidavit maintains that tickets

were only issued to him in July 2018 and later in October 2018 on Halloween[12].  (Pl. Opp. Brief

at 43; Lepper Aff. ¶¶ 23, 55.)

Justice Rafter presided over the prosecution of Lepper for the tickets in the Village Justice

Court.  (Glass Aff. ¶ 9.)  Lepper appeared pro se and Defendant Glass represented the Village.

(Id.)  On October 17, 2018, following a bench trial, Justice Rafter found Lepper guilty of four

violations of Section 365-26.  (Pl. Ex. 20, Appellate Court Decision.)  According to the Glass

Affidavit, Justice Rafter "assessed fines amounting to approximately $500.[13]  (Glass Aff. ¶ 14.)

On October 18, 2018, Fellman sent a letter to Lepper informing him of Justice Rafter's decision

and ordering him to stop work on the tree house.  (Pl. Ex. 19.)  The letter also told Lepper that he

"must remove the tree house in its entirety or summonses may be issued on a daily basis."  (Id.)

---

[12]  Lepper was prosecuted for four tickets so it seems that he must have received at least one additional ticket after the three tickets in July but prior to the October 17 decision.

[13]  Plaintiffs do not identify in their summary judgment briefing the amount of the fines imposed by Justice Rafter for the tickets.  In his affidavit, Lepper states that Fellman "told me I owed on all (3) violations which were for $250, $500 and $1000."  (Lepper Aff. ¶¶ 24-25.)

In late October 2018, Fellman issued additional tickets regarding the tree house.  (Fellman Aff. ¶ 6; Glass Aff. ¶ 14; Lepper Aff. ¶ 55.)  Those tickets have not been adjudicated.  (Glass Aff. ¶ 14.)

Lepper appealed his conviction for the tickets to the Supreme Court Appellate Term for the 9th and 10th Judicial Districts.   (Pl. Ex. 20, Appellate Court Decision.)  On October 10, 2019, the Appellate Term reversed the convictions finding that the accusatory instruments were facially deficient.   (Id.)   Specifically, the Appellate Term reasoned that the factual portions of the accusatory instruments stated only "WITHOUT A PERMIT-TREEHOUSE" and failed to allege facts establishing that the tree house constituted a building within the meaning of the code and failed to allege facts establishing the nature of the work done on the tree house.  (Id.)

Plaintiffs also allege that Defendant Glass was paid over $50,000 for his work relating to the tree house. (Pl. Opp. at 3, citing a Newsday article).

4. Inspections/Reports from Engineers

In the context of this litigation, Defendants obtained an inspection and report from licensed professional engineer, Joseph Danatzko.  (Def. Ex. W.)  Danatzko performed an inspection on July 31, 2020.  (Id.)  The tree house was made, at least in part, from old timber from a boathouse that had been destroyed in Superstorm Sandy and from wood that was not pressure treated.  (Pl. Resp. to Def. 56.1 ¶¶ 13, 16.)  The lot area of the platform base of the tree house measured 111.7 square feet.  (Id. ¶ 17.)  Danaztko found that there is electrical wiring to the tree house, which is used in part to provide electricity to an outdoor light on the exterior of the tree house.  (Id. ¶19.)  Regarding how far the tree house was set back from the property line, Danatzko found that the treehouse is located 13 feet, 1 inch from the interior edge of the curb along Wampum Road and 4 feet, 6 inches from wood fencing adjacent to Wampum Road.  (Id. ¶ 12.)  Dantzko concluded that the tree house

was a "building" within the definition of the Code and required a permit.  (Def. Ex. W, Danatzko Report at 17-19.)  Danatzko found conditions in violation of the building code and opined that there were unsafe conditions in the tree house.  (Pl. Resp. to Def. 56.1 ¶ 21.)

Plaintiffs did not retain an expert.  However, they designated James Brown ("Brown"), a professional engineer, as a fact witness.  (Def. Reply at 13; see ECF No. 97.)  Plaintiffs include a letter from Brown dated March 1, 2019, which Plaintiff previously submitted to the Court "[p]er the request and direction of Judge Bianco" in connection with Plaintiffs' motion for preliminary relief.  (Pl. Ex. 7.)  The letter states that "the treehouse structure . . . is structurally stable and meets code loadings for wind, snow and LL as prescribed by IBC [International Building Code] and local requirements. In other words the structure is able to withstand all weather-related events that are in accordance with code-induced loading criteria."  (Id.; Pl Ex. 8.)  Plaintiffs also attach notes from Brown's inspection, which include measurements of the tree house.  (Pl. Ex. 8.)  Brown, however, did not measure outside the four walls of the tree house.  (Def. Resp. to Pl. 56.1 Counterstatement at ¶ 18, Brown Depo. at 15.)  Brown measured "the inside area of the tree house and then [] measured the wall thickness."  (Brown Depo. at 15.)  Plaintiffs do not put forward any evidence refuting Danatzko's measurements as to the lot area of the tree house, or the setback measurements.

5. Other Tree Houses in the Village

Plaintiffs include photos of four other tree houses in the Village with their 56.1 Counterstatement.

The Baldauf family built one such tree house prior to the Leppers.  (Pl. Resp. to Def. 56.1 at ¶¶ 46-47.)  Fellman's affidavit explains that:

Th[e] application for the [Baldauf] treehouse was not approved initially by the building department and the Baldauf family made application to the Zoning Board of Appeals. The Baldaufs were required to proceed through the same approval process as Mr. Lepper is subject to. They provided signed and sealed plans by a

licensed professional and a survey from a licensed surveyor. In fact, in order to obtain a permit, the Baldaufs were required to abide the setback provisions of the code as determined by the Zoning Board of Appeals.

(Fellman Aff. ¶ 10.)  (Def. Ex. X, Nov. 18, 2016, Zoning Board of Appeals Decision as to Baldauf Tree House.)  The Baldauf's application to the Zoning Board of Appeals sought to approval to maintain a 192 square foot tree house, to reduce the minimum setback requirement from 15 feet to 7.2 feet, and to increase the allowed height of the structure.  (Def. Ex. X.)  The Zoning Board of Appeals denied the request for the variances.  (Id.)  Specifically, the Zoning Board of Appeals stated:

> The variances to reduce the minimum side yard setback of 15 feet required for the tree house to 7.2 feet proposed, the increased height from 15 ft. allowed to 21ft. proposed and to increase the square footage permitted for the tree house/playground from 90 square feet permitted to 192 square feet proposed would all be undesirable changes having an adverse impact. The limitations as to height size and setback for the accessory structure are intended to preserve open space and limit intensity of use, especially within close proximity to adjoining properties. To grant these variances, especially in the aggregate for a single accessory structure is contrary to the purposes of the ordinance. The benefits can otherwise be achieved by the Applicant.  In particular the applicant can reduce the size and height of the accessory structure and relocate same . . . The difficulty is self-created, arising only by reason of the Applicant's desire to construct a tree house and an accessory building which exceeds the height and area limits and to locate the structure closer to the side yard than permitted.

(Def. Ex. X.)  According to Fellman, the Baldaufs were required to move their tree house in order to be in compliance with the setback requirements.  (Def. Ex. X; Fellman Aff. ¶ 10.)

Defendants Fellman, Davida, and Scordino testified that, at the time of their depositions, they were not aware of any other tree houses in the Village besides the Lepper and Baldauf tree houses.  (Def. Resp. to Pl. 56.1 Counterstatement ¶¶ 39, 55, 101.)

Plaintiffs point to three other tree houses located in the Village located at 250 Fire Island Avenue, 99 Park Avenue, and 63 Wyandanch Avenue.  (Am. Consol. Compl at ¶¶ 66-68; Pl Exs. 9, 10, 11, 12.)  Plaintiffs characterize these tree houses as "longstanding treehouses."  (Pl. Opp. at

3-4.)  Fellman submitted an affidavit stating he learned of other "building structures in backyards at various addresses" in connection with information obtained during the instant lawsuit, and that, upon learning of these other treehouses, he required permit applications for them.  (Fellman Aff. ¶ 11.)

Fellman sent a letter to property owners at 63 Wyandanch in February 2020 informing them that "[i]t has come to our attention, that there is a 'play house' structure in your yard that was built without a permit. Please be advised that you must make an application to the Building Department for said structure within 7 days of receiving this letter. Failure to do so will result in the issuance of a summons."  (Pl. Ex. 12.)  Fellman sent the same letter to the property owners of 250 Fire Island in June 2020.  (Pl. Exs. 9-10.)  It is not clear from the record if the owners of 99 Park Avenue received the same letter.  Regardless, the owners of all three properties submitted permit applications.  (Fellman Aff. ¶ 11; Pl. Ex. 9-12.)  Permits were issued by the Building Department for these three tree houses on July 2, 2020, June 30, 2020, and June 25, 2020, respectively.  (Pl. Ex. 9-12.)  Fellman states in his affidavit that none of these structures violated the setback requirements and, thus, did not require a variance from the Zoning Board of Appeals. (Fellman Aff. ¶ 11.)  Plaintiffs have not put forth any evidence that these other tree houses were in violation of the setback requirements.

Plaintiffs argue that circumstantial evidence shows that Defendants knew about these tree houses because:  (1) the 250 Fire Island tree house "stood for decades down the block from the Village of Babylon Town Hall"; and (2) the 63 Wyandanch Avenue "play structure" was located on Davida's neighbor's property and had been raided for drugs and guns[14].  (Pl. Opp. 42-43; Pl.

---

[14]  Plaintiffs argue they should have received information from Defendants about these tree houses during discovery. However, Defendants argue they only learned about these tree houses in connection with this lawsuit.  Regardless, the time for discovery is now closed.

56.1 Counterstatement ¶¶ 36, 40.)

    6. <u>Additional Facts about Lepper's Conduct and Alleged Retaliation</u>

On October 24, 2018, Lepper wrote a letter to Congressman Peter King about the tree house and asked him to speak to Mayor Scordino to see if he would consider overturning the decision to take down the tree house.  (Pl. Ex. 22; Def. Resp. to Pl. 56.1 Counterstatement at ¶ 134.)  The letter does not say anything about drug issues in the Village.

Plaintiffs also highlight that Lepper testified that he spoke to <u>Newsday</u> and other outlets about his court proceedings in the Village Justice Court in November 2018.  (Def. Resp. to Pl. 56.1 Counterstatement ¶ 134; J. Lepper Depo. at 110-112.)

 Defendants agree that Lepper spoke with news outlets in November 2018, and note that Lepper told media outlets that he was looking to use the tree house as a chapel under the name of the G.F.Y. Chapel or Good For You Chapel. (Def. Resp. to Pl. 56.1 Counterstatement ¶ 120; Def. Br. at 23; Reply at 8; Lepper Dep. at 170.)  At his deposition, Lepper was asked about a media interview he gave in which he stated:  "So now we've made it into a chapel. So now it's the GFY Chapel, the Good For You Chapel. So we go up there and we [] do our prayers. But I think now -- I think there's a good chance that we're protected under the first amendment; freedom of religion now that we made it a chapel."  (Lepper Dep. at 177-78.)  When asked at his deposition why he told media outlets this, Lepper testified "the only reason why I reached out to the media is because I felt like my family was being mistreated and our rights were being violated. So at that point, I wasn't really sure what we could do to protect ourselves, and I did not have counsel at that time."  (<u>Id.</u> at 174.)  When asked at his deposition if it was true that his family had used it as a chapel, Lepper said no.  (<u>Id.</u> at 178.)

Lepper is an FDNY firefighter.  At an appearance before Justice Rafter on August 14, 2018,

he wore his FDNY uniform.  Lepper maintains that he wore his uniform because prior to the court appearance, he attended a memorial service for a colleague. (Lepper Aff. ¶ 38.)  Lepper states that at this appearance "[m]y family and 50 to 60 neighbors and friends also appeared to support my family and me."  (Id. ¶ 34.)  Lepper's affidavit states that in April 2019, he received a phone call from his union representative telling him that he was being investigated "regarding an anonymous letter that was sent to the chief of department, Daniel Nigro, saying that I used my status of a NY City Firefighter to influence the Justice of Babylon Court."  (Id. ¶ 57.)  Lepper's affidavit also states that "[a]s a result of this unfounded anonymous charge, I had to appear before the Bureau of Internal Investigations and explain to them why I was wearing my partial class A uniform in the Village of Babylon Court."  (Id. ¶¶ 57, 61.)  Lepper's affidavit states that "the Bureau of Internal Investigations, saw that it was retaliation from the Village of Babylon. The case was marked unfounded and no disciplinary action was taken." (Id. ¶ 62.)  Lepper cites to no additional evidence regarding this anonymous complaint, the investigation, or the outcome of the investigation.

Plaintiffs also rely on a letter from Scordino entitled "A Letter from the Mayor about Treehouses and other Things" in support of their Monell claim.  (Pl. Ex. 21.)  Plaintiffs allege that this letter was sent out to residents of the Village during the 2018 holiday season.[15]  (Def. Resp. to Pl. 56.1 Counterstatement at ¶¶ 107-108.)  In the letter, Scordino discusses the Lepper's tree house.

---

[15] Defendants maintain that this letter was a draft that was never sent out.  To support their claim that this letter was actually sent, Plaintiffs rely primarily on Davida's testimony.  Notably, Plaintiffs do not contend that they ever received a copy of this letter.  Nor have Plaintiffs offered evidence from any other resident indicating that they received this letter.  When Davida was showed the letter during his deposition and asked if he had seen it before, he said "[v]aguely on, I believe, it's our newsletter. It says happy holidays, I'm assuming it's the Christmas, winter letter that goes out." (Pl. Ex. 28, Davida Depo. at 171.)  Davida testified that it "probably [was sent out] before the holidays of 2018" and that he received a copy of the newsletter.  (Id. at 172-73.)  Davida then directed counsel to ask their questions about the letter to Scordino.  (Id. at 175.)  Defendants dispute that this letter was ever sent, and Scordino testified that the letter was a draft that was a never sent out.  (Def. Resp. to Pl. 56.1 Counterstatement at ¶ 108.)  Defendants argue that "Davida believed and assumed the letter went out. He was basing his answer on seeing a that was part of the document production. He referred questions to Mayor Scordino about the letter."  (Id.)

The letter states in full:

### A Letter from the Mayor about Treehouses and Other Things ...

From time to time I have used this page to comment on matters of interest here in the Village. Today, I am writing about something you may have heard about or read about in the news - a treehouse a Village resident decided to erect in his yard. At first blush this may seem like no big deal. Why should the Village care to interfere with a homeowner's right to build his kids a treehouse in his own yard? Well, that's what I thought at first too.

To begin with, this all started with complaints to my office from the homeowner's own neighbors. They complained this was no ordinary treehouse tucked away in someone's backyard. They explained it was nearly 100 square feet. The treehouse had sidewalls, a pitched roof and electric, and that the homeowner built the treehouse nearly on the property line along a residential street.

I referred the neighbors' complaints to our Building Inspector who by the way, is also a licensed architect. He advised me that pursuant to State law and the Village Code the homeowner would need to obtain a building permit This means he would have to submit plans to assure the treehouse was properly built and show the treehouse complied with local zoning.

The Building Inspector commented to me our laws in the Village are no different than anywhere else. Structures like this treehouse require a building permit to make sure they are safe, not a fire hazard and that they don't unfairly impact the privacy and other rights of the homeowner's neighbors. This seemed reasonable to me.

In any event, the problem snowballed because the homeowner refused to comply and go through the process to legalize the structure. Summonses were issued. The homeowner decided rather than apply for a permit he would challenge the summonses in court. He demanded a trial. Well, after having a fair opportunity to be heard, the homeowner lost. The Court told the homeowner he had to follow the same rules as everyone else. Instead, the homeowner went to the media to pressure the Village to change its position. To date, the homeowner has not applied to legalize the treehouse.

I've read that people say this is all about taxes -it's not. Someone could get hurt. Then, you guessed it, the Village could get sued and you, the taxpayers, would pay. I want you to know for the Village reasonable compliance with the law is not an option. We are legally and morally obligated to treat everyone the same.

The homeowner chose to build this treehouse without getting the proper permit.  It is now up to him to try to make it right.

Best wishes for the Holiday Season.

(Pl. Ex. 21.)

Finally, Plaintiffs allege that Defendants, and particularly Scordino, asked the Suffolk County Police Department to arrest Lepper in 2020.  (Am. Consol. Compl. at ¶¶ 243, 245, 249.) In support of this contention, Plaintiffs cite only to an affidavit from Lepper's brother, Charlie Lepper, stating that on February 4, 2020, the Suffolk County Police came to Lepper's home while Charlie Lepper was there and told him that Scordino and Town of Babylon councilman, Terry McSweeny, had called the police to inform them that Lepper had threatened them and requested that they arrest Lepper[16].  (Pl. Ex. 35.)

**B. Procedural Background**

On December 10, 2018, Plaintiffs initiated this action by filing a complaint and order to show cause for a preliminary injunction, and subsequently filed an amended complaint.  (ECF Nos. 1-4, 8.)  Defendants filed an answer and counterclaim.  (ECF No. 28.)

At three conferences before the Hon. Joseph F. Bianco in December 2018 and January 2019, the parties agreed, on the record, to the interim relief that the Town would not issue any additional tickets to Lepper regarding the treehouse or remove the treehouse, and Plaintiffs' children would not use the treehouse.  (ECF No. 48, Transcript Dec. 10, 2018; ECF No. 49, Transcript Jan. 17, 2019; ECF No. 50, Jan. 28, 2019.)

In February 2019, Plaintiffs filed additional motions for preliminary injunctions.  (ECF Nos. 29, 32.)  On May 29, 2019, the parties filed cross motions for judgment on the pleadings, which remain pending.  (ECF Nos. 45, 47.)

On June 19, 2020, this case was reassigned to the undersigned while the parties were in the

---

[16]  Defendants argue that this is inadmissible, first, because the venue of the affidavit is listed as New York and the notary is in Florida.  Second, the affidavit contains hearsay statements that are inadmissible.  (Def. Reply at 9-10.) The Court agrees that the relevant assertions in this affidavit are inadmissible hearsay.

midst of discovery.  On June 18, 2020, Plaintiffs filed a motion for preliminary relief to allow the children to use the treehouse. (ECF No. 85.)   On August 17, 2020, Defendants moved for preliminary relief to remove the treehouse.  (ECF No. 88.)  The Court ultimately denied the parties' motions for preliminary relief and informed the parties they could submit any motions for preliminary relief on the complete record once discovery was completed.  (Electronic Order, March 19, 2021.)

On January 4, 2021, rather than request leave to amend, Plaintiffs filed a new action (21-cv-0014) alleging substantially similar allegations and causes of action as the amended complaint in this action.  The Court consolidated this action (18-cv-7011) and the new action (21-cv-0014). (Electronic Order, January 14, 2021.)   On March 4, 2021, again without leave of the Court, Plaintiffs then filed an Amended Consolidated Complaint.  (ECF No. 105, "Am. Consol. Compl.") Although Plaintiffs did not follow the proper procedure for filing an amended complaint, the Court considers the Amended Consolidated Complaint to be the operative pleading.

The parties completed discovery in March 2021.  On May 18, 2021, the Court set a briefing schedule for Defendants' motion for summary judgment and the parties' motions for preliminary relief.  (Electronic Order, May 18, 2021.)  Defendants motion for summary judgment and motion for a preliminary injunction are now fully briefed.  (ECF Nos. 124, 127.)

## II.  DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant bears the burden of demonstrating that "no genuine issue

of material fact exists." Marvel Characters, Inc., 310 F.3d at 286 (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita, 475 U.S. at 587 (internal quotation marks and citation omitted).  The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586 (citations omitted).

Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment.  See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate.  Anderson, 477 U.S. at 249.

In a discrimination or retaliation cases where intent is at issue, a "trial court must be cautious about granting summary judgment to" the defendant.  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Because direct evidence of discriminatory or retaliatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination" or retaliation.  Id.  The

Second Circuit has recognized, however, that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Thus, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

Plaintiffs seek a declaratory judgment that the Village of Babylon Zoning Code § 365-26 is unconstitutional. Plaintiffs also bring a host of claims against all individual Defendants in their official and individual capacities. Plaintiffs allege federal claims of First Amendment retaliation, equal protection, due process, excessive fines in violation of the Eighth Amendment, double jeopardy, unconstitutional taking of property, malicious prosecution, abuse of process, and conspiracy. (ECF No. 105.) Plaintiffs allege Monell liability against the Village. Plaintiffs also raise state law claims for malicious prosecution, abuse of process, negligence, negligent and/or intentional infliction of emotional distress, defamation, and prima facie tort. (Id.)

## B. Declaratory Judgement - Section 365-26 of the Babylon Village Code

Plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. §§ 2201–2202, that Section 365-26 of the Babylon Village Code is unconstitutional.

Although not a model of clarity, Plaintiffs' Amended Consolidated Complaint appears to argue that Section 365-26 is unconstitutional, under Due Process Clause of the Fourteenth Amendment, both facially and as applied to Lepper. Plaintiffs allege that the ordinance is "vague and overbroad," "does not provide guidance to ordinary homeowners as to whether building a treehouse for their infant children might be construed as a violation subjecting them to criminal prosecution," "fails to give Plaintiff John Lepper fair notice that building a treehouse of less than

90 square feet is forbidden by the Code," and forecloses "age-appropriate private rights of association on arbitrary and capricious grounds." (Am. Consol. Compl. at ¶¶ 198, 199, 201, 204, p. 41.) In their summary judgment briefing, Plaintiffs specifically argue that the word "building" in the ordinance is vague. (Pl. Opp. at 19.) Defendants argue that "[t]he ordinance is facially clear," "fairly apprises someone of the requirement to file a permit with the Village Building Department," and "specifically identifies the structures where a permit is necessary." (Def. Br. at 7-11.)

First, to the extent, Plaintiffs argue that the ordinance forecloses "age-appropriate association," Plaintiffs fail to put forth any evidence in support of this claim or even mention this beyond a heading in the Amended Consolidated Complaint. (Am. Consol. Compl. at p.41.) Accordingly, the Court finds that Plaintiffs have abandoned any claim that zoning ordinance violates the First Amendment, and regardless, have failed to support this claim with any evidence from the record.[17] Second, with regard to Plaintiffs' allegation in the Amended Consolidated Complaint that the ordinance is overbroad, Plaintiffs fail to put forward any further allegations or evidence in support beyond stating vaguely in the Amended Consolidated Complaint that the ordinance is overbroad. (Am. Consol. Compl. at ¶ 199.) This is plainly insufficient on summary judgment.

Next, the Court considers Plaintiffs' claims pursuant to the Due Process Clause. "As is the preferred practice, the Court will first consider Plaintiffs' as-applied challenge, and then turn to Plaintiffs' facial challenge." Jones v. Schneiderman, 974 F. Supp. 2d 322, 340 (S.D.N.Y. 2013).

### 1. Due Process

Plaintiffs contend that the ordinance is "vague, subject to arbitrary prosecution and does

---

[17] Plaintiffs do not allege, or argue in their summary judgment briefing, that the ordinance implicates any other First Amendment concerns.

not afford persons of ordinary intelligence notice of what is illegal and legal." (Pl. Opp. at 12.) Specifically, Plaintiffs argue that the term "building" is unclear.  (Pl. Opp. at 18-19.)

A statute may be void for vagueness (i) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (ii) "if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  The former ground requires that individuals receive "fair notice or warning of what specific conduct is prohibited, whereas the latter is concerned with providing explicit standards for officials who enforce the law, thereby avoiding resolution on an ad hoc and subjective basis." Jones, 974 F. Supp. 2d at 339–40.

Plaintiffs' conclusory allegations are plainly insufficient at the summary judgment stage. Moreover, the Court finds that the ordinance is not vague.  Despite Plaintiffs' argument that there is confusion as to the definition of the term "building", a section of the ordinance itself defines "building" as "[a] structure having a roof supported by columns or walls for the shelter, support or enclosure of persons, animals or chattels."[18]  (Village Code § 365-3; Def. Br. at 9.)  The ordinance is equally clear that a permit was required for a building and for an "outdoor playground or gym (or any combination) [that] exceeds a lot area of 90 square feet."  (Village Code § 365-26.)

Plaintiffs argue that the ordinance failed to provide notice that an outdoor gym or playground under 90 square feet required a permit.  However, this argument fails.  Defendants do not assert that outdoor gyms or playgrounds under 90 square foot require a permit.  Rather, Defendants merely assert that both buildings and outdoor gyms/playgrounds that are over 90 square feet require permits.  The inspection performed by Datzanko shows that the tree house is a building, within the meaning in the code and that, even if it is considered an outdoor

─────────────

[18] See Village of Babylon Code § 365-3, https://ecode360.com/6594960.

playground/gym, it has a lot area of 111.7 square feet.  (Pl. Resp to 56.1 at ¶ 17.)  Plaintiffs put

forward no evidence to refute this.  Rather, Plaintiffs state in their 56.1 Counterstatement that

"Defendants knew that the Lepper Family Treehouse was reported to be under 90 square feet and

that it would not require a permit."  (Pl. 56.1 Counterstatement at ¶ 59.)  To support this, Plaintiffs

cite to Leppers' affidavit in which he states that he told Glass in September 2018 that the tree house

was less than 90 square feet, and to Davida's deposition in which Davida states that Lepper "said

it was under 86 square feet or something."  (Id.; Davida Depo. at 157; Lepper. Aff. ¶ 41.)  Lepper's

statements with nothing more are plainly insufficient to rebut the evidence Defendants have put

forth at summary judgment.  Lepper has merely pointed to statements that Lepper previously made

to Defendants.  There is no proof that Lepper himself ever measured the lot area of the tree house.

Moreover, Lepper's statements about the size of the tree house are irrelevant to the question of

whether the tree house is a building.  Building is clearly defined in the Village Code and the tree

house falls within that definition.[19]  Plaintiffs also fail to put forth any support for their allegation

that the "authorizes or even encourages arbitrary and discriminatory enforcement."  Accordingly,

Plaintiff's as applied challenge fails.

    With respect to Plaintiffs facial challenge, "[i]n the absence of First Amendment concerns,

courts generally view vagueness challenges to a statute as applied to the defendant's case."  United

States v. Farhane, 634 F.3d 127, 138 (2d Cir. 2011).  To the extent that "a facial challenge may be

maintained against a statute that does not reach conduct protected by the First Amendment, the . .

. test is, in fact, only a variation on as-applied analysis, requiring the defendant to show 'that the

---

[19]  Notably, Lepper does not advance any relevant arguments about the definition of "building" in the Village Code.
Lepper asserts, without any factual support, that, during the proceedings in Village Court, Justice Rafter relied on the
dictionary definition of the "building" and did not rely on the definition of "building" in the Village Code.  (Pl. Opp.
16-17, 38.)  Not only is there no evidence in support of these assertions, but, more importantly, this point is irrelevant.
The Village Code defines the term "building" and that definition is not unconstitutionally vague as applied to Lepper's
treehouse.

law is impermissibly vague in all of its applications.'"   Id. at 138–39.  The Court concludes that ordinance is not facially vague.  Plaintiffs have not me their heavy burden of establishing that these terms, in all of their applications, either leave the public uncertain as to what conduct is prohibited or lack appropriate standards of enforcement.  Jones, 974 F. Supp. 2d at 346.

## C. **Claims Pursuant to Sections 1983, 1985, 1986**

Plaintiffs allege a host of claims pursuant to Section 1983:  First Amendment retaliation, Equal Protection, Due Process, Takings Clause, malicious prosecution, abuse of process, excessive fines under the Eighth Amendment, Double Jeopardy, and conspiracy.  Additionally, Plaintiffs allege Monell claims against the Village.   Plaintiffs also allege a conspiracy claim pursuant to Sections 1985 and 1986.

Section 1983 provides a remedy for constitutional deprivations occasioned by state actors. To prevail on a Section 1983 claim, the plaintiff must allege that the conduct complained of: (1) was committed by a person acting under color of state law; and (2) deprived the plaintiff of rights, privileges, or immunities secured by the United States Constitution or laws of the United States.  See Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).

### 1. **Individual Defendants**

Plaintiffs assert each claim against all Defendants.  Defendants argue that Plaintiffs do not make any specific allegations against certain individual defendants and do not even mention some of them in the summary judgment briefing.  (Def. Reply 3-4.)  Specifically, Defendants argue that Plaintiffs have made no individualized allegations or pointed to any evidence for any claim regarding Muldowney (Deputy Mayor), Adams (Trustee and current acting mayor), Schettino (Secretary to the Mayor), or Silvestri (Trustee).  (Id.)   The Court agrees. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

With regard to Adams and Muldowney, Plaintiffs' summary judgment brief does not even mention them except in the case caption. As to Silvestri, the only mention in the summary judgment briefing is that, in support of the conspiracy claim, Plaintiffs argue "[a]ll Defendants, including Silvestri and Davida, sought 'constant updates'" about the tree house. (Pl. Opp. 31.) The citations to the record in support of this statement are to the deposition testimony of Fellman and Davida stating that the Trustees had meetings and ongoing conversations about the tree house. (Pl. 56.1 Counterstatement at ¶¶ 135-36.) The testimony they point to from Fellman states that "Robyn [Silvestri] really wasn't involved, that's the new trustee, she wasn't really involved that much" with these conversations. (Fellman Dep. 214-15.) The only mention of Schettino, who was the secretary to the Mayor, is in Plaintiffs' brief where they argue that "[w]hether Deborah Longo and Suzanne Schettino who allegedly serve administrative functions participated in the enforcement of code provisions and the tickets issued are material issue of fact to be determined by a jury after a trial on the merits . . . These Defendants were implicit in First Amendment retaliation and failing to intervene." (Pl. Opp. at 31.) However, none of the citations that Plaintiffs point to in their 56.1 Counterstatement even mention Schettino. Furthermore, Schettino, who does not seem to have been deposed, submitted an affidavit stating that her duties were administrative in nature. (Def. Ex. S.) These conclusory and non-existent allegations against Muldowney, Adams, Schettino, and Silvestri are plainly insufficient at summary judgment. Plaintiffs cannot make broad stroke allegations against all defendants with nothing more.

Accordingly, the Court finds that the claims against these defendants should be dismissed.

### 2. First Amendment Retaliation

Plaintiffs allege a First Amendment retaliation claim against all Defendants. (Pl. Opp. at

18, 30-31.)  Plaintiffs argue that Defendants retaliated against Lepper by using the legal process, fines, and prosecution shortly after he spoke out about drug activity happening in the Village. (Am. Consol. Compl at ¶¶ 165-177.)  Plaintiffs allege that Defendants ordered immediate removal of the tree house in response to Lepper telling people about the hypodermic needle he found.  (Id.) Defendants argue that there is no factual support for the argument that Defendants required a permit and ticketed Lepper because he discussed drug activity or that there is any connection between the zoning issues and Lepper's statements about drug activity.  (Def. Br. at 18-19.)

To prevail on a First Amendment retaliation claim, plaintiff must prove "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right."  Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).

Here, Plaintiffs have not put forward any evidence that the actions taken by Defendants were in anyway motivated or substantially caused by Plaintiffs' discussions about the hypodermic needle or drug use, which Plaintiff maintains constitutes activity protected by the First Amendment.  Rather, the undisputed facts do not show a sufficient connection from which a jury could infer that any actions at issue were motivated by Plaintiffs' alleged protected activity[20].

There are three categories of statements about drug use that Plaintiffs argue motivated or substantially caused Defendants' actions: (1) Plaintiffs' statements to his neighbors about the hypodermic needle and generally, illegal drug use in the Village; (2) Lepper's undated 911 phone call about drug use in his neighborhood and a hand-to-hand drug transaction he witnessed; and (3)

---

[20]  Plaintiffs do not argue that the Court should find causation because of comparators who were allegedly treated differently.  Accordingly, this argument is waived and abandoned.  To the extent Plaintiffs do argue this, the Court addresses comparators infra with regard to the equal protection claim and finds that they are not sufficiently similar to Plaintiffs.  Even when considered in light of all the relevant the evidence, these alleged comparators are insufficient to raise an inference of retaliatory motivation.

Lepper's statement to Holly Zappalla when he submitted a permit.

With regard to Plaintiffs' statements to unidentified neighbors about finding hypodermic needles and drug use generally, there is no evidence in the record that these conversations were communicated to any of the Defendants.

As to the 911 phone call, it is unclear when Lepper made this phone call, and there is no evidence that any Defendants even knew about this phone call. Lepper could not recall when he made this phone call or whether he even identified himself on the phone call. This is plainly insufficient to infer causation based on temporal proximity.

With regard to Lepper's statement to Zappalla, Lepper testified at his deposition that when he was at the Village Hall on May 21, he saw his neighbor Zappalla and they had the following conversation:

> Q. Do you know the name of the person you spoke to?
>
> A. I spoke to one of my neighbors; Holly . . . .
>
> Q. And you never mentioned anything about drug activity to her before the letter? . . .
>
> A. No, I don't. Not until I submitted the application. That's when I spoke to her about it.
>
> Q. When you spoke to her, was it at the building department itself?
>
> A. Yes
>
> Q. And she was working at the time?
>
> A. Yes.
>
> Q. And did she respond at all regarding the drug activity issues?
>
> A. Yes. We were having a private conversation.
>
> Q. And what was she saying about it or did she say anything about it? Put it this way: What did she tell you? . . .

> A. She said that, um, she was aware of some of the activity I was speaking of and that, you know, I wanted her to speak to possibly the parents and I said no. I didn't see anybody physically put it there. I'm just saying that I have an idea that it was one of -- idea of it was somebody in the area that I suspected but I couldn't positively identify because I didn't see anybody physically put it there.
>
> Q. Other than the hypodermic needle, did you tell her also about the hand-to-hand transactions you had seen?
>
> A. I don't know -- no, I didn't speak to her about that.

(J. Lepper Depo. 229-30, 235-238.)

At that point, Plaintiff had already received the May 10 letter, which showed that he was already on the Building Department's radar and that the Building Department believed he might need a permit for this structure <u>before</u> this conversation with Zappalla. Additionally, the record also shows that Plaintiff had been issued the May 21 notice of violation from the Building Inspector prior to this conversation with Zappalla.[21] Moreover, there is no evidence that Zappalla communicated her conversation with Plaintiff to any Defendant in this case. Plaintiffs chose not to depose Ms. Zappalla and there is no evidence in the record suggesting that she shared this conversion with anyone else. Additionally, the circumstances and content of this conversation, in which Plaintiff simply mentioned that he found a hypodermic needle to his neighbor in a "private conversation" do not suggest a scenario where Defendants would have a plausible motivation to retaliate against Plaintiff. There is simply not a sufficient connection between any of Plaintiffs' statements about drug abuse in the Village and the Defendants' actions regarding the tree house for a jury to infer that the Defendants' actions were motivated Plaintiff's statements to Zappalla.

---

[21] While Lepper denies receipt of the May 21 notice of violation, a jury could not infer from that denial that the notice of violation was not issued on May 21. Moreover, even assuming <u>arguendo</u> that the May 21 notice of violation was not issued as Plaintiffs claim, Lepper's retaliation claim still fails because, <u>inter alia</u>, the May 10 letter from the Building Department was sent prior to Plaintiff's conversations with Zappalla and Fellman. <u>Cf. Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001), <u>as amended</u> (June 6, 2001) ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Moreover, the fact at least some Defendants, including Mayor Scordino, knew that drug abuse was a problem in the Village and that Scordino knew that a house near Plaintiffs' Property was raided for drugs, also does not help Plaintiffs.  The fact that Defendants knew about a drug problem in the Village does not show that they knew about Plaintiffs' statements to Zappalla and his neighbors about the drug problem or that the actions they took regarding the tree house were in anyway related to those statements.

Plaintiffs' claim that Defendants ordered immediate removal of the tree house in response to Lepper telling people about the hypodermic needle he found is absurd.  Defendants only demanded that Lepper remove the tree house in October 2018 after:  (1) the Village received at least one complaint about the treehouse; (2)  the Village issued the May 10, letter, the May 21 notice of violation, and at least four tickets; and (3) Lepper, who insisted that no permit was necessary for the tree house, lost at trial before Justice Rafter.

Plaintiffs also suggest that Lepper's October 24, 2018 letter to Congressman King and November 2018 contact with news media are protected First Amendment speech.  However, while the letter and those contacts constitutes protected activity, this letter was sent well after Lepper had already received the notice of violation and tickets and had made his first appearance in the Village Justice Court.  Accordingly, a reasonable jury could not infer that Defendants' actions of issuing tickets and prosecuting those tickets was motivated by Lepper's statements to media or to Congressman King.

Plaintiff also points to an anonymous complaint that was allegedly made to the Chief of the FDNY about Lepper wearing his FDNY uniform at an appearance at the Village Justice Court. Plaintiffs suggest that one of the Defendants made this complaint but point to absolutely no evidence that this was the case.  There were other people at the court that day including the Village

Justice and Lepper states in his own affidavit that there were 50-60 neighbors and friends in attendance. (Lepper. Aff. at ¶ 34.)  From this evidence, a reasonable jury could not find that any of the individual defendants were involved in the alleged complaint against Lepper. Nor could a reasonable jury find involvement of Scordino sufficient to show a <u>Monell</u> claim. From this record, a reasonable jury could not infer that that the complaint was made by one of the Defendants in retaliation for protected activity.

Ultimately, Plaintiffs have not shown a sufficient connection between the statements about drug use and the prosecution of Lepper.

Accordingly, the Court grants summary judgment as to Plaintiffs' First Amendment Retaliation claim.

### 3. <u>Equal Protection</u>

Plaintiffs allege that Lepper was subject to selective enforcement of the Village code and that the term "building" in the Village code was selectively enforced against him. (Am. Consol. Compl. at ¶ 223; Pl. Opp. at 19.)  Plaintiffs also allege that Lepper, a class of one, was treated differently than others similarly situated. (Pl. Opp. at 4-42.)  Defendants argue that the facts do not show that "others similarly situated were shown any favor and that [Lepper] was singled out." (Def. Br. at 18.)

"To state a claim for equal protection, a plaintiff can proceed on both a selective enforcement and a class-of-one theory." <u>Dean v. Town of Hempstead</u>, 527 F. Supp. 3d 347, 430 (E.D.N.Y. 2021).  Under a selective enforcement theory, a plaintiff must show that: "(1) compared with others similarly situated, plaintiff was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Milfort v.</u>

Prevete, 922 F. Supp. 2d 398, 410 (E.D.N.Y. 2013) (quoting Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004)). Equal protection claims based on a so-called "class of one" theory involve claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Dean, 527 F. Supp. 3d at 431 (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam). For example, "[w]here a plaintiff challenges a zoning decision, that standard requires her to identify comparators who are similarly situated to her with regard to the zoning board's 'principal reasons' for denying the application." Pappas v. Town of Enfield, 602 F. App'x 35, 36 (2d Cir. 2015) (concluding that although other businesses won approval, "[a]bsent any evidence that those other projects raised any of the same concerns cited by the [c]ommission to explain its denial of [the plaintiff's] application, [including concerns about traffic safety and community opposition, the plaintiff] cannot carry her burden of establishing that they were comparators"); see also LaTrieste Rest. v. Vill. of Port Chester, 188 F.3d 65, 69 (2d Cir. 1999) ("While ... the previous occupants of the premises violated the zoning restriction and ... the [v]illage did not enforce the restriction against them, [the plaintiff] failed to show that the [v]illage knew about these violations. Absent such proof, [the plaintiff] would be hard-pressed to show that it was singled out for selective treatment.").

The central issue under both theories is whether Plaintiffs have shown that there are similarly situated comparators who were treated differently. Under either theory, the Court finds that Plaintiffs have not met their burden of showing that Lepper was treated differently compared to others similarly situated. Plaintiffs include evidence of four other tree houses in the Village in their 56.1 Counterstatement.

*i. Baldauf Tree House*

34

The first tree house is the Baldauf family tree house that was built prior to the Lepper's tree house.   (Pl. Resp. to Def. 56.1 Counterstatement at ¶¶ 46-47.)   The Baldaufs submitted an application to the Building Department to maintain a tree house they had built.  The "application for the [Baldauf] treehouse was not approved initially by the building department and the Baldauf family made [an] application to the Zoning Board of Appeals." (Fellman Aff. ¶ 10.)  Fellman states in his affidavit that the Baldaufs "were required to proceed through the same approval process as Mr. Lepper is subject to" and "provided signed and sealed plans by a licensed professional and a survey from a licensed surveyor." (Id.)  The Baldauf's application to the Zoning Board of Appeals sought to maintain a 192 square foot tree house, to reduce the minimum setback requirement from 15 feet to 7.2 feet, and to increase the allowed height of the structure.  (Def. Ex. X.)  In November 2016, the Zoning Board of Appeals denied the request for the variances.  (Id.)  According to Fellman, the Baldaufs were ultimately required to move their tree house in order to obtain a permit and to be in compliance with the setback requirements.  (Def. Ex. X; Fellman Aff. ¶10.)

Plaintiffs have not shown that they were treated differently from the Baldaufs or that the Baldaufs were similarly situated in all respects.  The Baldaufs' permit application was similarly not granted.  However, unlike Lepper, the Baldaufs appealed that decision to the Zoning Board of Appeals, and the Baldaufs' variance request was denied and they were ultimately required to move their tree house in order to comply with setback requirements.  The Baldaufs and Plaintiffs appear to have been similarly treated in that they both were denied permits for tree houses.  The Baldaufs, however, chose to appeal the decision and ultimately moved their tree house, which Plaintiffs did not do.  Here, Plaintiffs have litigated this case in federal court for the more than three years, but have chosen not to update their permit application with signed and sealed plans, submit the

required application to the Zoning Board of Appeals, or move their tree house like the Baldaufs.

*ii. Other Tree Houses*

Plaintiffs also submit evidence of three other tree houses in the Village located at 250 Fire Island Avenue, 99 Park Avenue, and 63 Wyandanch Avenue.  (Am. Consol. Compl. at ¶¶ 66-68; Pl Exs. 9-12.)  Defendants Fellman, Davida, and Scordino testified that, at the time of their depositions, they were not aware of any other tree houses in the Village besides the Lepper and Baldauf tree houses.  (Def. Reply 56.1 at ¶¶ 39, 55, 101.)

Fellman submitted an affidavit stating he only learned of other "building structures" in the Village in connection with information obtained during the instant lawsuit.  (Fellman Aff. ¶ 11.)  Once Fellman learned about these tree houses, Fellman sent notices of violation to at least two of the owners, 63 Wyandanch and 250 Fire Island, informing them that they needed to make an application to the Building Department within seven days or would receive summonses.  All three owners were required to apply for and obtain permits, and all received permits.  Fellman states in his affidavit that these structures are different from the Lepper's because:  "none of the structures . . . violated the setback requirements of the Village of Babylon Code. They did not pose a danger to the public since they did not abut the street or the public walkway. Those structures did not require a variance to be decided by the Zoning Board of Appeals."  (Id.)  Plaintiffs have not submitted any evidence disputing Fellman's statements that the other tree houses did not violate the setback requirements or abut the street or public walkway.  As noted earlier, various pieces of evidence—including Lepper's own plans—show that his tree house violated the setback requirements.

Plaintiffs also argue that Defendants knew about the tree houses prior to this litigation because:  (1) the 250 Fire Island tree house "stood for decades down the block from the Village of

Babylon Town Hall"; and (2) the 63 Wyandanch Avenue "play structure" was located on Davida's neighbor's property and had been raided for drugs and guns.  (Pl. Opp. 42-43; Pl. 56.1 Counterstatement ¶¶ 36, 40.)  Plaintiffs seem to argue that they were treated differently because Davida, or the other Defendants, did not complain about these other tree houses and Fellman did not ticket them.  Defendants Fellman, Davida, and Scordino testified that, at the time of their depositions, they were not aware of any other tree houses in the Village besides the Lepper and Baldauf tree houses.  (Def. Reply 56.1 at ¶¶ 39, 55, 101.)  Regardless, to the extent Plaintiffs argue the selective enforcement claim against Davida on this ground, that claim fails.  As stressed above, none of these other treehouses violated the setback requirements and needed a variance. Additionally, all Davida did was inform Fellman that he saw a new structure being built on the Lepper's Property and that there was no permit in the window.  Davida did not decide whether to ticket Lepper and there is no evidence that <u>Fellman</u> was aware of these other treehouses. Moreover, the record does not establish when these tree houses were built or that Davida, or any Defendant observed the structures in the process of construction, which is what triggered him to inform Fellman about the Lepper's tree house in the first place.  Indeed, Plaintiffs' brief states just the opposite—that these other tree houses were "longstanding treehouses."  (Pl. Opp. 3-4.)  The fact that the Lepper's tree house was reported to the Building Department while construction was ongoing further distinguishes those tree houses from the Lepper's tree house.  The other tree houses are also not similarly situated to the Lepper's tree house because there is no evidence that—prior to Lepper complaining about them during this litigation—anyone had previously complained to the Village about the other tree houses.  Finally, even if any of the Defendants had previously observed these other treehouses at some point, the fact that the other treehouses were "longstanding" and had, in at least one instance, been around "for decades" is a further reason to

distinguish them from Lepper's tree house.  A defendant who observed such a longstanding tree house could easily assume that such a tree house had already received any necessary permit.  For these reasons, the Court finds that Plaintiffs have not shown sufficient evidence that these are similarly situated comparators.

With respect to the class of one theory, there is also no evidence that there is no rational basis for the difference in treatment.  As explained, Plaintiffs' tree house was in the process of being built, and additionally required a variance for the setback requirements.  With respect to the selective enforcement theory, Plaintiffs also fail to show evidence that the enforcement was done with the intent to inhibit Plaintiffs' constitutional rights or with malice or ill-will.  As explained previously in relation to Plaintiffs' First Amendment retaliation claim, Plaintiffs have not put forward evidence from which a jury could infer that Defendants issued Lepper tickets with the intent to inhibit or punish Lepper's discussions about drug use in the Village or other protected speech.  And, Plaintiffs point to no other evidence of impermissible consideration or malicious intent.

Accordingly, the Court grants summary judgment as to this claim.

**4. Due Process**

Plaintiffs argue that "property (a treehouse) and monies were sought without due process of law." (Pl. Opp. at 45.)  Defendants argue that Lepper was afforded adequate due process—he was given the opportunity to file a permit but did submit the complete application; he had an opportunity to institute an Article 78 proceeding if a Village official failed to act on the permit application but did not; and had the opportunity to appeal the withholding of the permit to Zoning Board of Appeals and to seek a variance but did not do so.  (Def. Br. at 17-18.)  Defendants argue that there were remedies to redress Lepper's claims that he chose not to avail himself of.

Plaintiffs do not provide any further explanation as to how Lepper's due process rights were violated or even cite to any case law concerning procedural due process. With regard to the tickets, the undisputed facts show that Lepper received a letter stating that he might require a permit prior to tickets being issued, was at least sent a notice of violation, was given an opportunity to submit a permit application, and after the tickets were issued, was given the opportunity to contest the tickets in the Village Justice Court and appeal the decision of the Village Justice Court. Plaintiffs fail to explain how that process was deficient. Plaintiffs also put forth no allegations or argument as to how the remedies afforded to Lepper to contest the Village's decision to withhold the permit were deficient and violated due process. Plaintiffs' bare allegation that he was not afforded due process with nothing more is plainly insufficient survive a motion for summary judgment.

### 5. Takings Claim

Plaintiffs argue that their "rights were violated by . . . takings . . . by state actors acting under color of State law." (Pl. Opp. at 32.) Defendants argue that "Plaintiff has no constitutionally protected property interest at stake" and cites to a New York State Supreme Court case for the proposition that:

> [i]n the land-use context, 42 USC § 1983 protects against municipal actions that violate a property owner's rights to . . . just compensation for the taking of property . . . § 1983 is not simply an additional vehicle for judicial review of land-use determinations . . . denial of a permit-even an arbitrary denial redressable by an article 78 or other state law proceeding-is not tantamount to a constitutional violation under 42 USC § 1983; significantly more is required.

(Def Br. at 19.)

The Takings Clause of the Fifth Amendment provides that private property "shall [not] be taken for public use, without just compensation." U.S. Const., Amend. V. "Under the Takings Clause, the government must compensate a landowner if it effects a 'permanent

physical occupation' of his property, or if a regulatory action forces him to 'sacrifice all economically beneficial uses in the name of the common good.'" Vanderveer v. Zoning Bd. of Appeals, No. 19-CV-3833, 2020 WL 7042669, at *2 (E.D.N.Y. Dec. 1, 2020), aff'd sub nom. Vanderveer v. Zoning Bd. of Appeals Town of E. Hampton, No. 20-cv-4252, 2021 WL 3745741 (2d Cir. Aug. 25, 2021) (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992)).  In rare cases, government action that merely "impede[s] the use of property without depriving the owner of all beneficial use" may constitute a regulatory taking "based on a complex of factors" enunciated in Penn Central Transp. Co. v. City of New York, "including [1] the regulation's economic effect on the landowner, [2] the extent to which the regulation interferes with reasonable investment-backed expectations; and [3] the character of the government action." Murr v. Wisconsin, 137 S.Ct. 1933, 1943 (2017) (citing Penn Cent. Transp. Co., 438 U.S. 104, 124 (1978)).

Here, Plaintiffs do not provide any further allegations or evidence in support their Takings Clause claim under any of these theories.  Plaintiffs have made no allegations nor proffered any evidence to support a conclusion that the Village's enforcement of the zoning ordinance and decision to require Lepper to either conform to the zoning ordinance, obtain a permit, or tear down the tree house amounts to a "permanent physical occupation" of his property, or forces him to "sacrifice all economically beneficial uses in the name of the common good." Lucas, 505 U.S. at 1019; see Murr, 137 S.Ct. at 1949 (finding no "compensable taking" where a landowner "can use the property for residential purposes"); see also Vanderveer, 2020 WL 7042669, at *2 (finding no violation of the Takings Clause where plaintiffs' application for non-conforming use for four acre residentially zoned lot containing a barn was denied).  Nor have Plaintiffs even attempted to argue that Defendants' actions meet the complex factors outlined in Penn Central.

Accordingly, the Court finds that Defendants' motion for summary judgment on the Takings Clause claim is granted.

### 6. <u>Malicious Prosecution</u>

Plaintiffs argue that there was no probable cause to issue the tickets and "prosecute this unfinished tree house." (Pl. Opp. at 33.) Plaintiffs also argue that "[t]he dismissal and continued prosecution, after providing legal advice, evidences malicious intent that, coupled with a huge profit incentive, evidences constitutional violations if not issues of material fact precluding summary judgment." (<u>Id.</u>) Plaintiffs argue that "when compared with others similarly situated [Lepper] was selectively prosecuted with malicious or bad faith intent to injure John Lepper." (<u>Id.</u> at 36.) Plaintiffs argue that the Court should deny Defendants' motion for summary judgment because the proceedings regarding the tickets were decided in Lepper's favor, and there are questions of fact as to whether there was probable cause and whether there was actual malice. (<u>Id.</u> at 36-37.) On the probable cause question, Plaintiffs specifically point to a quote in a <u>Newsday</u> article after the Appellate Term made its decision in which Glass stated that "village officials knew there was an issue in the way the summons was written, and they could not correct it after the fact." (<u>Id.</u> at 36.) As to malice, Plaintiffs point to another <u>Newsday</u> article that states that Glass was paid $50,000 for his work in relation to the Lepper tree house. (<u>Id.</u>) Plaintiffs also state vaguely that unspecified conversations between Defendants regarding the tree house are sufficient to show that actual malice is a question for trial. (<u>Id.</u> at 37.)

Defendants argue that Plaintiffs' reliance on the decision of Appellate Court finding that the tickets were facially deficient is misplaced because this decision was not on the merits. As to probable cause, Defendants argue there was probable cause—there is a standing provision of the Village zoning code that required Lepper to obtain a permit and he failed to do so. (Def. Br. at

24.)

"In order to prevail on a Section 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, [ ] and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). New York "law . . . places a heavy burden on malicious prosecution plaintiffs." Smith-Hunter v. Harvey, 95 N.Y.2d 191 (N.Y. 2000). To survive summary judgment on a malicious prosecution claim, a plaintiff must demonstrate: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)).

The Court finds that Plaintiffs' malicious prosecution claim fails because they have not shown that the charges were terminated in Lepper's favor as required by New York law.  The Second Circuit has held that where a "prosecution [] was terminated when the state court dismissed the charges without prejudice based on facial insufficiency[,] [s]uch a dismissal does not constitute a favorable termination." Russell v. The J. News, 672 F. App'x 76, 78 (2d Cir. 2016); see also Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) (holding that, in New York, dismissal for facial insufficiency is "not a decision on the merits, an essential element of a cause of action for malicious prosecution"); MacFawn v. Kresler, 88 N.Y.2d 859, 860 (1996) (holding that a dismissal of the information without prejudice for facial insufficiency may not serve as the basis for a malicious prosecution claim).

Additionally, Plaintiffs' argument that there was no probable cause, or a factual question as to probable cause fails.  Plaintiffs focus on the fact that Defendant Glass was quoted in Newsday as saying that Village officials knew there was an issue with the facial sufficiency of the tickets.

However, Defendants have sufficiently shown that there was probable cause to issue the tickets. Based on the undisputed facts, Lepper was required to obtain a permit under the Code because either (1) the tree house was a building or (2) a playground or gym with a lot size greater than 90 feet. Just from looking at the tree house, it is clear that there was probable cause to believe it was a building, and/or an outdoor gym/playground over 90 square feet. Lepper built the tree house without a permit. Accordingly, there was probable cause to issue the tickets. The fact that the tickets were ultimately dismissed because they failed to include sufficient factual allegations does change the fact that Defendants possessed probable to pursue this prosecution. Plaintiffs also point to no evidence showing actual malice beyond unspecific conversations between the individual Defendants about the tree house.

Accordingly, the Court grants summary judgment on this claim.

### 7. Abuse of Process

In the Amended Consolidated Complaint, Plaintiffs also allege that Defendants "issued legal process to silence the Plaintiffs" and engaged in abuse of the legal process to compel Lepper remove the tree house. (Am. Consol. Compl. at ¶¶ 119, 184, 262-64.) Defendants argue that summary judgment should be granted on this claim because the facts show that Defendants' actions were a legitimate enforcement of the Village code. (Def Br. at 3; Reply at 10.) Plaintiffs do not address their abuse of process claim in their summary judgment briefing. Accordingly, Plaintiffs have waived and abandoned this claim. Even if Plaintiffs have not abandoned the abuse of process claim, it would still fail.

In order to establish liability for malicious abuse of process under Section 1983, a plaintiff must establish the claim's elements under state law. See Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, "'a malicious abuse-of-process claim lies against a defendant who

(1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with the intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" Savino, 331 F.3d at 76 (quoting Cook, 41 F.3d at 80). "The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y. 1995). "There must be an abuse of process, that is, a use of process that has as its direct object the achievement of an improper and ulterior purpose or objective." Pinter v. City of New York, 976 F. Supp. 2d 539, 568 (S.D.N.Y. 2013) (internal quotation marks omitted).

Plaintiffs have not shown that Defendants intended to do harm or acted in order to obtain a collateral objective outside the legitimate ends of the legal process. Nowhere in their briefing do they even attempt to put forward factual support to meet these prongs of the analysis. Accordingly, the Court grants summary judgment on this claim.

### 8. Eighth Amendment – Excessive Fines

Plaintiffs argue that the tickets issued to Lepper violate the Eighth Amendment. Plaintiffs also argue that the Fellman's October 18, 2018 letter telling Lepper that he "must remove the tree house in its entirety or summonses may be issued on a daily basis" violates the Eighth Amendment (Pl. Ex. 19), as do statements made during a conference before Judge Bianco by Defendant Glass that the Town could continue to issue fines. (Pl. Opp. 43-46; Pl. 56.1 Counterstatement at ¶ 91.) Plaintiffs argue that this amounts to threats of daily fines of $1,000. (Pl. Opp. 43-46.) Defendants argue that Plaintiffs' bare assertion that the assessed fines and possible of future fines are excessive is insufficient to prove an Eighth Amendment claim.

As an initial matter, the Court notes that there seems to be some confusion as to the dollar amount of the tickets assessed and how many tickets were actually issued. Defendants state that

tickets were issued in July, August, and October. (Glass Aff. at ¶¶ 13-14; Fellman Aff. ¶ 6.) Plaintiffs state that tickets were issued on only two occasions. (Pl. Opp. Brief at 43.) Defendants state the fines assessed did not exceed more than $500 total and were returned after the decision from the Appellate Court. (Def. Br. a 21-22; Fellman Aff. ¶ 13.) Lepper states in his affidavit that Fellman told him at their August 2018 meeting that he owed $250 for the first accusatory instrument, $500 for the second accusatory instrument, and $1,000 for the third accusatory instrument. (Lepper Aff. at ¶¶ 24-25.) Plaintiffs do not state the amount of the fines actually assessed by Justice Rafter in their summary judgment briefing. The photos of the July tickets also do not indicate how much the fines for each ticket were. (Pl. Ex. 26.)

Regardless of whether the fines were for $500 total or for $250, $500, and $1,000, the Court finds the tickets and possibility of future tickets was not excessive in violation of the Eighth Amendment.

First, the Court considers the "threatened" fines that have not yet been assessed or paid. The claims as to these potential fines are not yet ripe for the Court's review. "Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." Infinity Outdoor, Inc. v. City of New York, 165 F. Supp. 2d 403, 431 (E.D.N.Y. 2001) (quoting Cheffer v. Reno, 55 F.3d 1517, 1523 (11th Cir. 1995)). Where "no fine has been imposed, and no enforcement proceedings have been commenced," an Eighth Amendment claim is not ripe for review. Id. See also Farina v. Metro. Transportation Auth., 409 F. Supp. 3d 173, 195-96 (S.D.N.Y. 2019) (finding two plaintiffs' claims were not ripe for review because although the fines had been assessed and payment demanded, plaintiffs had not yet paid them and were in the process of disputing them, and the complaint alleged that other plaintiffs had been successful in disputing them). Accordingly, the Court finds the Eighth Amendment claims

based on the possible future fines are not ripe for review.

Next, the Court considers the fines that have been assessed.  The Second Circuit has adopted a two-step inquiry to decide "whether a financial penalty is excessive under the Eighth Amendment."  United States v. Viloski, 814 F.3d 104, 108-09 (2d Cir. 2016) (citing United States v. Bajakajian, 524 U.S. 321, 118 (1998)).  "First, a court must consider whether the payment or forfeiture at issue constitutes a fine, meaning that it is punitive in nature and not purely remedial."  Farina, 409 F. Supp. 3d at 194 (internal quotations omitted).  "If the fine is remedial, and intended only to compensate the government for lost revenue, it fall[s] outside the scope of the Excessive Fines Clause."  Farina., 409 F. Supp. 3d at 198 (internal quotation marks omitted).  Second, a court determines whether the fine is unconstitutionally excessive meaning whether "it is grossly disproportional to the gravity of a defendant's offense."  Viloski, 814 F.3d at 110.

With regard to the first step, Defendants argue that the fines against Lepper were intended to correct dangerous conditions on property.  (Def. Br. at 21.)  Plaintiffs argue that the fines were in effect a punishment.  (Pl. Opp. at 45.)  Neither side put forward evidence in support of their position.  The Court agrees with Plaintiffs on this first step.  This fine does not appear to be remedial but rather seems to seek to enforce compliance with the zoning code and punish non-compliance.  See Farina, 409 F. Supp. 3d at 198 ("Civil fines that seek to deter rule-breaking or enforce compliance are punitive in character.")

As to the second step, the Second Circuit has held that courts should be guided by four non-exhaustive factors set forth in the Supreme Court's Bajakajian decision, which look to "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused

by the defendant's conduct." <u>Viloski</u>, 814 F.3d at 108, 110.  The excessiveness analysis "involves solely a proportionality determination." <u>Id.</u> at 111 (internal quotations omitted). "The burden rests on the [challenger of the fine] to show the unconstitutionality of the forfeiture." <u>United States v. Castello</u>, 611 F.3d 116, 120 (2d Cir. 2010); <u>see also</u> <u>Greenport Gardens, LLC v. Vill. of Greenport</u>, No. 19-CV-2330, 2021 WL 4480551, at *13 (E.D.N.Y. Sept. 30, 2021)

Here, as to the first factor, Lepper was assessed either $500 or $1,750 total for his four violations of building a tree house without a permit.  As to the second factor, Plaintiffs do not argue that Lepper falls outside the class of persons for whom the zoning ordinance and ticketing regulation were designed.  Lepper certainly seems to fit into the class of persons for whom the statute was principally designed—he is a resident and homeowner in the Village.  As to the third factor, neither party has put forth evidence as to the maximum fine that could be imposed.  Plaintiff argues that the Town has threatened to fine him $1,000 per violation.  This is clearly insufficient to show gross disproportionality.  <u>See</u> <u>Greenport Gardens, LLC</u>, 2021 WL 4480551, at *14 (where plaintiffs did not allege any facts with respect to the maximum fine that could have been imposed or how much they were charged under each ticket only that they were charged $5,000 total that it was "plainly [] insufficient to show gross disproportionality" and dismissing an Eighth Amendment claim).  The Village Zoning Code itself, of which the Court takes judicial notice, states that:

> For any and every violation of the provisions of this chapter, the owner  . . . shall, upon conviction thereof, be guilty of a violation pursuant to the Penal Law of the State of New York, punishable by a fine not exceeding $250 or by imprisonment for a term not exceeding 15 days, or by both such fine and imprisonment. The continuation of an offense against the provisions of this chapter shall constitute, for each day the offense is continued, a separate and distinct offense hereunder.

Village Zoning Code, 365-57[22].   Accordingly, if Plaintiff's fine for four violations was $500 it

---

[22] https://ecode360.com/6595435.

would be below the statutory maximum.  See United States v. Varrone, 554 F.3d 327, 332 (2d Cir.

2009) (if the value of forfeited property is within the range of fines prescribed by Congress, a

strong presumption arises that the forfeiture is constitutional) (quoting United States v. 817 N.E.

29th Drive, Wilton Manors, Fla., 175 F.3d 1304, 1309 (11th Cir.1999)).  Even if the fines were for

$1,750, the Court would find they were not grossly disproportional.  As to the fourth factor,

Defendants argue that the tree house posed a danger and the fines are intended to correct dangerous

conditions on the Property, which seems to be a legitimate basis for a fine.  See Greenport Gardens,

2021 WL 4480551, at *15 ("with respect to the nature of the harms caused by Plaintiffs' conduct,

they appear to vary from sanitary to fire-safety infractions, which seem to be legitimate bases for

fines.")  Moreover, even absent potential safety concerns, the Village and its residents are harmed

when a resident disregards the Village Code and zoning requirements.  Ultimately, Plaintiffs do

not provide any support for finding that the $500 or $1,750 already assessed in fines is grossly

disproportional to Plaintiffs' violations of the zoning code.  Rather, their briefing focuses on the

threat of future fines.

The Court finds that this is insufficient to support an Eighth Amendment claim and that

Defendants' motion for summary judgment on the claim is granted.

**9. Brady Claim**

Plaintiffs also raise for the first time in their opposition briefing that Lepper's rights were

violated because Defendant Glass committed a Brady violation by failing to provide him with

certain information about the Baldauf tree house during the prosecution of the tickets.  (Pl. Opp.

26-28.)

To prevail on a Brady claim brought pursuant to Section 1983, "a plaintiff must show the

materiality of the nondisclosed evidence, 'a showing that does not depend on factual innocence,

but rather what would have been proven absent the violation ... [with] reference to the likely effect that the suppression of [the] particular evidence had on the outcome of the trial.'" Bellamy v. City of New York, 914 F.3d 727, 751 (2d Cir. 2019) (quoting Poventud v. City of New York, 750 F.3d 121, 134 (2d Cir. 2014) (en banc)).  "[T]o show prejudice the claimant must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Id. (internal quotation marks omitted).  "For example, a § 1983 plaintiff proceeding on a Brady theory can succeed on his claim if, had the withheld information been disclosed prior to trial, he would have been acquitted based on reasonable doubt or convicted on a lesser charge." Id. (internal citations omitted).  Plaintiffs do not even attempt to show, nor could they, that had Lepper received some unspecified information about the Baldauf tree house, the outcome of the proceeding would have been different.  As explained earlier, the circumstances of the Baldauf tree house were similar to Lepper's tree house.  And, regardless, no information about the Baldauf tree house would have been relevant to Lepper's guilt or innocence[23].  To the extent that Lepper raises a Brady claim about other potential categories of alleged Brady material, Lepper's claims fail as his allegations are conclusory and meritless.

Moreover, the only defendant a Brady claim would be relevant to is Glass, who as discussed infra, is protected by absolute immunity on this claim.

Accordingly, the Court grants summary judgment on this claim.

**10. Double Jeopardy**

Plaintiffs also argue that "[c]ontinuing to issue tickets every day for the same conduct violates the double jeopardy clause of the Fifth Amendment."  (Pl. Opp. at 45.)  Defendants argue

---

[23]  At best, evidence about how the Village dealt with other treehouses may have been relevant to a potential selective enforcement defense.  Defendants, however, do not point to any authority indicating that the prosecutor's Brady obligations extend to evidence about other potential prosecutions that a defendant might use in support of a selective enforcement defense.

that Plaintiffs put forward no explanation or factual support for this claim.

Tickets were issued to Plaintiff on three successive days in July and then again in August and October for building a tree house with no permit.  Plaintiff was prosecuted for four tickets and a trial was held at which he was found guilty of four charges of violating Babylon Village Code § 365-26.  His convictions were reversed.  (Pl. Ex. 20, Appellate Court Decision.)  The October tickets have not been adjudicated.

The Double Jeopardy Clause protects an individual's right not to be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2.  "It prohibits both the second prosecution of a defendant for the same offense after an acquittal or a conviction and the imposition of multiple punishments for the same offense."  Dubin v. Cty. of Nassau, 277 F. Supp. 3d 366, 398 (E.D.N.Y. 2017); see North Carolina v. Pearce, 395 U.S. 711, 717, (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794 (1989).

Plaintiffs have put forward no evidence that Lepper was prosecuted again for same offense after an acquittal.  Lepper's convictions were reversed based on the facial insufficiency of the tickets, and, regardless, there is no claim that Lepper has been prosecuted again for these convictions.  Plaintiffs also do not put forward evidence that the four charges he was convicted of were "multiple punishments for the same offense."  The Village Zoning Code Section 365-57, of which the Court takes judicial notice, states that:  "[t]he continuation of an offense against the provisions of this chapter shall constitute, for each day the offense is continued, a separate and distinct offense hereunder."  Therefore, each of Plaintiffs' four violations that he was convicted of were new and separate violations of the zoning code each day that the tree house remained standing.

Accordingly, summary judgment on this claim is granted.

### 11. Conspiracy Claim Pursuant to 1983, 1985, and 1986

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted).  "Moreover, a valid claim of conspiracy under Section 1983 to violate a complainant's constitutional rights must contain allegations demonstrating an actual deprivation of constitutional rights."  Singer v. City of New York, 417 F. Supp. 3d 297, 327–28 (S.D.N.Y. 2019) (internal quotations and alterations omitted.)  "A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right; accordingly, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights."  Id.

To prove a civil rights conspiracy claim under Section 1985, a plaintiff must show:  "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Zhang Jingrong v. Chinese Anti-Cult World All., 287 F. Supp. 3d 290, 297 (E.D.N.Y. 2018) (quoting Britt v. Garcia, 457 F. 3d 264, 270 n.4 (2d Cir. 2006)). "A § 1985(3) violation must be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action."  Beni v. New York, No. 18-CV-0615, 2019 WL 7598702, at *5 (E.D.N.Y. Aug. 19, 2019), report and recommendation adopted, No. 18-CV-0615, 2019 WL 4894243 (E.D.N.Y. Sept. 30, 2019) (citing Emmons v. City University of New York, 715 F. Supp. 2d 394, 416 (E.D.N.Y. Jun. 2, 2010)).  "As with Section 1983 conspiracy claims, Section 1985 claims

require a showing of an underlying constitutional violation." Edwards v. Horn, No. 10-CV-6194, 2012 WL 473481, at *19 (S.D.N.Y. Feb. 14, 2012).

"Section 1986 provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in § 1985 are about to be committed and having power to prevent or aid, neglects to do so." Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999) (internal quotations omitted). Where a plaintiff's fails to prove a Section 1985 claim, his derivative § 1986 claim fails. K.W. ex rel. Brown v. City of New York, 275 F.R.D. 393, 400 (E.D.N.Y. 2011).

As explained above, Plaintiffs have not sufficiently proven any underlying constitutional violation. Accordingly, Plaintiffs' conspiracy claims must fail.

### 12. Absolute and Qualified Immunity

Defendants argue that the Village Trustees (Silvestri, Davida, and Adams), Mayor Scordino, Deputy Mayor Muldowney, Building Inspector Fellman, and Village Attorney Glass, are protected by absolute immunity from the claims brought pursuant to Sections 1983. Defendants argue that all parties are protected by qualified immunity.

The Court notes that the individual defendants are sued in both their official and personal capacities. When sued in their personal capacity, "[l]ocal legislators, like their counterparts on the state and regional levels, are entitled to absolute immunity for their legislative activities." Almonte v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007). "However, local governments, municipalities, or officials sued in their official capacity are not entitled to legislative immunity." Dean, 527 F. Supp. 3d at 413. See Almonte, 478 F.3d at 106 ("Immunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances

where they are sued in their official capacities.'"). Accordingly, the Court considers Defendants' immunity defenses with respect to their claims against Defendants in their individual capacities.

   *a. Absolute Immunity*

   First, Defendants argue that Glass is entitled to absolute immunity because the "facts demonstrate that the claims against the Village prosecutor . . . relate to [his] role in a judicial function and are entitled to claim absolute immunity." (Def. Br. at 28.)   Plaintiffs argue that "[c]riminal prosecutors enjoy absolute immunity but not village attorneys who proliferate public coffers to enrich themselves over a child's treehouse." (Pl. Opp. at 28-29.)  Despite Plaintiffs' argument, "[i]t is well established that a prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution . . . is immune from a civil suit for damages under § 1983." Shmueli v. City of New York, 424 F.3d 231, 236 (2d Cir. 2005) (quoting Imbler v. Pachtman, 424 U.S. 409, 410 (1976)).  "[P]rosecutors are absolutely immune . . . for conduct in 'initiating a prosecution and in presenting the [municipality's] case,' . . . insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" Burns v. Reed, 500 U.S. 478, 486 (1991) (quoting Imbler, 424 U.S. at 430-31). "Such immunity extends to individuals serving as 'Village Attorney.'" Sausa v. Vill. of W. Hampton Dunes, No. 18-CV-3802, 2019 WL 7598667, at *5 (E.D.N.Y. June 10, 2019), report and recommendation adopted, No. 18-CV-3802, 2019 WL 4874898 (E.D.N.Y. Sept. 30, 2019).

   However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." Warney v. Monroe Cty., 587 F.3d 113, 121 (2d Cir. 2009) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)). "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to

qualified immunity . . ." <u>Pinaud v. County of Suffolk</u>, 52 F.3d 1139, 1147 (2d Cir. 2015) (quoting <u>Day v. Morgenthau</u>, 909 F.2d 75, 77 (2d Cir. 1990)) (additional citations omitted).  The claims against Glass relate to the Village's prosecution of Lepper for the unpermitted tree house, and therefore, absolute immunity is warranted.  Specifically, Glass is certainly protected by absolute immunity for Plaintiffs' Brady, Eighth Amendment, and Double Jeopardy claims.  To the extent any of the claims relate to Glass's administrative or investigative duties, the claims fail on the merits as discussed <u>supra</u>.

Second, Plaintiffs argue that Fellman is entitled to absolute immunity because the claims relate to his "role in a judicial function" as code enforcement officer/Building Inspector.  (Def. Br. at 28.)  Courts have held that a building inspector's decisions may be quasi-judicial in nature and subject to absolute immunity.  <u>See</u> <u>Dean</u>, 527 F. Supp. 3d at 412 (a defendant's "actions based on his capacity as commissioner of the Department of Buildings are also quasi-judicial in nature and subject to absolute immunity because his determinations on [p]laintiffs' applications 'necessarily involved . . . a consideration of the facts before him — an act which a building inspector must perform as part of his responsibilities.'") (internal quotations omitted).  Plaintiffs do not cite any contrary authority or raise any specific arguments regarding Fellman's claim of absolute immunity.  To the extent Plaintiffs allege violations based on Fellman's determinations regarding Lepper's permit application, the Court finds Fellman is subject to absolute immunity.  To the extent the claims against Fellman fall outside this scope, the claims fail on the merits as discussed <u>supra</u>.

Third, Defendants argue that Scordino is entitled to absolute immunity in his role as mayor and Muldowney is entitled to absolute immunity in his role as deputy mayor because they are executive members of the Village.  "To determine if absolute immunity applies to a particular defendant's conduct, the test is a functional one—whether the actions taken were legislative,

judicial, or prosecutorial in nature—and does not rely on whether the defendant's title falls within a designated category." Tower Properties LLC v. Vill. of Highland Falls, No. 14-CV-4502, 2017 WL 519267, at *6 (S.D.N.Y. Feb. 7, 2017).  Defendants state that the mayor and deputy mayor are subject to absolute immunity because they are part of the executive branch of the Village. However, Defendants do not explain how any of the mayor or deputy mayor's actions were legislative or judicial in nature.  Accordingly, the Court does not find that absolute immunity applies.

Fourth, Defendants argue that the Village Trustees are entitled to absolute immunity from civil liability for their legislative activities.  "[A]bsolute legislative immunity for Section 1983 actions extends to local legislators." Cent. UTA of Monsey v. Vill. of Airmont, New York, No. 18-CV-11103, 2020 WL 377706, at *21 (S.D.N.Y. Jan. 23, 2020) (internal citations omitted). "Legislative immunity applies to actions that are both '(1) substantively legislative, i.e., acts that involve policy making,' and '(2) procedurally legislative, i.e., passed by means of established legislative procedures.'" Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y., 111 F. Supp. 3d 459, 491 (S.D.N.Y. 2015) (quoting State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 89 (2d Cir. 2007)).  The allegations against the Village Trustees relate to them receiving updates about the tree house and having discussions about the prosecution of Lepper.  Plaintiffs fail to provide particularized evidence about how these Defendants were involved in the constitutional violations.  To the extent, Plaintiffs' allegations are based on policy making, absolute immunity would apply.  However, it is not clear that any of the claims are based on Trustees' policymaking function.

   b. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (internal quotation marks omitted).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted).  Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743 (internal quotation marks omitted).

Plaintiffs argue that Defendants are not protected by qualified immunity.  Specifically, Plaintiffs argue that Defendants were aware that they were violating clearly established law when they "withheld evidence, knowingly filed insufficient instruments and profiteered from false and malicious prosecution in retaliation for Plaintiffs speaking out against the heroin problem in the Village of Babylon."  (Pl. Opp. at 28-32.)  As explained above, Plaintiffs have not shown any underlying constitutional violations.  The Court also notes that, even if Plaintiffs could establish an underlying violation on his due process, malicious prosecution, Takings, Brady, Eighth Amendment, and Double Jeopardy claims, all the individual defendants would, at the very least, be entitled to qualified immunity on those claims.  For example, with respect to Plaintiffs' due process claim, Plaintiffs have failed to show that Defendants violated any clearly established due process rights of Lepper.  Similarly, with respect to the malicious prosecution, there was, at the very least, arguable probable cause to prosecute Lepper's tickets.[24]

### 13. Monell Claim Against the Village

It is well-established that a municipality, such as the Village, may be liable under Section

---

[24] Plaintiff's First Amendment retaliation claim and equal protection claim all fail, factually, on the merits.  Accordingly, it is unnecessary to further address the question of qualified immunity for those claims.

1983 only if the plaintiff proves that "action pursuant to official . . . policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978); see also Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004). To establish the existence of a municipal policy or custom, the plaintiff must establish: (1) the existence of a formal policy officially endorsed by the municipality, (2) actions taken or decisions made by an official with final decision making authority, (3) a practice so persistent and widespread that it constitutes a custom, or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to a "deliberate indifference" to the rights of those who come in contact with the municipal employees. Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002). "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). (internal citations omitted). "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." Id. (internal citations omitted).

Plaintiffs argue that they have sufficiently shown underlying constitutional violations. (Pl. Opp. at 25-26.) Plaintiffs contend that "[t]he official policy, dictated by the decedent–Defendant Mayor was to silence John Lepper" and argue that the Scordino's letter about the tree house and Fellman's testimony that he met with the Scordino prior to issuing any tickets is sufficient to show the existence of this policy. (Pl. Opp. at 26; Fellman Dep. at 199.) Defendants argue that Plaintiffs' Monell claim fails because Plaintiffs have not shown any underlying constitutional violation and have not identified any municipal policy that impairs constitutional rights. (Def. Br.

at 25.)

Plaintiffs' <u>Monell</u> claims fail because, as explained <u>supra</u>, Plaintiffs have not established any underlying constitutional violations[25].   Accordingly, the Court finds that Defendants are entitled to summary judgment on the <u>Monell</u> claim.

**D. <u>State Law Claims</u>**

Plaintiffs raise state law claims for malicious prosecution, abuse of process, negligence, negligent and/or intentional infliction of emotional distress, defamation, and prima facie tort.  (Am. Consol. Compl. ¶¶ 236-278.)  Having determined that Plaintiffs' federal claims in this action do not survive Defendants' motion for summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted.  <u>See</u> § 1367(c)(3).  Accordingly, the Court dismisses Plaintiffs' state law claims without prejudice.

**E. <u>Attorney's Fees/Sanctions</u>**

Defendants also request attorney's fees and sanctions because they argue that Plaintiffs brought this action with the intent to harass and embarrass defendants.  Defendants request a hearing to determine the amount of attorneys' fees owed.  (Def. Br. at 37-38.)  Plaintiffs also request attorneys' fees.  (Pl. Opp. at 6.)  The Court finds that the parties have not submitted sufficient briefing for the Court to issue a decision on this issue.  If the parties still wish to bring motions for attorney's fees and sanctions, they must submit a proposed briefing schedule to the Court by April 7, 2022.

---

[25]   There is no evidence that Scordino violated Plaintiffs' constitutional rights.  The Court is required to address this question because Plaintiff sued Scordino in his official capacity and seeks to impose <u>Monell</u> liability as a result of Scordino's actions. The claims against Scordino in his individual capacity are identical to the claims brought against him in his official capacity.  Although motion practice was stayed concerning the claims against Scordino in his individual capacity due to a dispute between the parties regarding substitution of his estate, the same analysis would apply to the claims against Scordino in his individual and official capacities.  Therefore, the Court finds that the claims in his individual capacity are dismissed as well.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.  The parties' cross motions for judgment on the pleadings and Defendants' motion for a preliminary injunction are denied as moot.[26]  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:  March 29, 2022
      Central Islip, New York

                                 /s/ (JMA)
                                 JOAN M. AZRACK
                                 UNITED STATES DISTRICT JUDGE

---

[26]  Rather than decide whether Plaintiffs' pleadings alleged any plausible claims, the Court focused on Defendants' summary judgment motion which addressed the viability of Plaintiffs' claims in light of the fully developed factual record.

In light of the dismissal of Plaintiffs' claims, Defendants' motion for a preliminary injunction is moot.  Moreover, even if Defendants' motion for a preliminary injunction was somehow not moot, that motion would be denied. Defendants have not filed any substantive counterclaims in this case for which they could receive any preliminary injunctive relief.